UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROBERT J. VILA and B.V.T.V., INC.,

      Plaintiffs,

v.

SEARS, ROEBUCK AND COMPANY,
SEARS HOLDINGS CORPORATION and
KMART HOLDING CORPORATION,

      Defendants.

Civil Action No. 05-11717-REK

### DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT

Pursuant to FED. R. CIV. P. 56(**b**), Defendants Sears, Roebuck and Co. ("**Sears**"), Sears Holdings Corporation ("**SHC**") and Kmart Holding Corporation ("**Kmart**") (collectively "**Defendants**"), hereby oppose Plaintiff's Motion for Partial Summary Judgment and also hereby cross-move for summary judgment on all counts in plaintiffs' First Amended Complaint ("**FAC**"). In opposition to Plaintiff's motion and in support of this cross-motion, Defendants submit contemporaneously herewith their Response to Plaintiff Robert J. Vila's Statement of Material Facts In Support Of Plaintiff's Motion For Partial Summary Judgment, Memorandum of Law In Opposition To Plaintiffs' Motion For Partial Summary Judgment And In Support Of Defendants' Cross-Motion For Summary Judgment, the Declaration of Annapoorni R. Sankaran (hereinafter the "Sankaran Declaration") (Volumes I-IV), and state: in this Case plaintiffs Robert J. Vila ("**Vila**") and B.V.T.V., Inc. ("**BVTV**") (collectively "**Plaintiffs**") have brought claims against Sears, SHC and Kmart relating to two agreements between Sears and the Plaintiffs: a spokesperson agreement between Sears and Vila, and a syndication agreement between BVTV

and Sears.  Under the Spokesperson Agreement, Vila formerly acted as a spokesperson for Sears products.  However, Sears validly terminated that agreement in August 2005.  Since then, the undisputed facts have revealed that Vila was in material breach of its terms well before Sears' termination and, accordingly, defendants are entitled to judgment as a matter of law on all of Vila's claims related to that spokesperson agreement.  Secondly, the undisputed facts show that the parties never agreed to an extension of the syndication agreement by which Sears would fund BVTV for the production of a 2005-2006 season (or any subsequent season) of the television show *Bob Vila's Home Again*.  Because there was no agreement, Defendants are entitled to judgment as a matter of law on all claims related to the syndication agreement.

## LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS NOT IN DISPUTE[1]

1.      Vila is an individual residing in Chilmark, Massachusetts.  Deposition of Vila ("**Vila Depo.**") Vol. 1, p. 5.  Vila is the president of his television production company and co-plaintiff BVTV, a Massachusetts company.  Vila Depo Vol. 1 p. 7-8; print out from Secretary of State, attached as Exhibit H to Sankaran Declaration.

2.      Defendant Sears is a New York corporation with a principal place of business in Hoffman Estates, Illinois, and is one of the most famous and long established retailers in the United States.  First Amended Complaint ("**FAC**") ¶3; Answer to Amended Complaint and Counterclaim ("**Answer**") ¶3, Counterclaim ¶2.  Defendant SHC is a Delaware corporation with a principal place of business in Hoffman Estates, Illinois.  FAC ¶4; Answer ¶4.  Defendant Kmart is a Delaware corporation with a principal place of business in Troy, Michigan.  FAC ¶5; Answer ¶5.  On or about

---

[1] Deposition transcripts and other documents referenced in this memorandum are attached to Volumes I-IV of the Sankaran Declaration, submitted contemporaneously herewith.  Copies of excerpts of deposition transcripts, documents not marked as exhibits in the depositions in this case and unreported cases are attached to Volume I of the Sankaran Declaration; copies of selected exhibits from the depositions in this case are attached as exhibits to Volumes II and III of the Sankaran Declaration; and DVDs are attached as exhibits to Volume IV of the Sankaran Declaration.

November 16, 2004, Kmart and Sears announced their merger. November 18, 2004 Kmart 8-K, attached as Exhibit I to <u>Sankaran Declaration</u>. As of the date of the consummation of the merger on March 24, 2005, Sears and Kmart entered into a Reciprocal Services Agreement whereby Sears and Kmart performed work for each other, including corporate, administrative, financial and legal services. <u>See</u> Reciprocal Services Agreement, attached as Exhibit J to <u>Sankaran Declaration</u>. SHC is the holding company for both Sears and Kmart. Kmart March 24, 2005 Press Release, attached as Exhibit K to <u>Sankaran Declaration</u>.

3.      The relationship between Sears and Vila began or about September 29, 1989 when Vila and Ogilvy & Mather ("**Ogilvy**"), as agent for Sears, entered into the Bob Vila Spokesperson Agreement (the "**Spokesperson Agreement**") pursuant to which Vila was to act as a spokesperson for Sears and its products. Deposition Exhibit 13 (The Spokesperson Agreement and all of its amendments were marked as Exhibit 13 to the depositions taken by the parties in this case). Between 1989 and 2000, the Spokesperson Agreement was amended ten times. <u>Id.</u>

4.      Also on or about September 29, 1989, BVTV and Ogilvy, as agent for Sears, entered into the Bob Vila Syndicated Television Programs Agreement (the "**Syndication Agreement**") pursuant to which Sears made payments to BVTV to fund the production of a home improvement television show originally titled *Home Again with Bob Vila* and later titled *Bob Vila's Home Again*. Deposition Exhibit 4 (The Syndication Agreement and all of its amendments were marked as Exhibit 4 to the depositions taken by the parties in this case). Between 1989 and 1998, the parties amended the Syndication Agreement ten times, the last of which expired upon the conclusion of the 2004-2005 season of *Bob Vila's Home Again*. <u>Id.</u>

5.      Pursuant to the Spokesperson Agreement, Vila was to be available for professional services in connection with the advertising of Sears' products including but not limited to

performing in television and radio commercials, posing for photographs, and making personal appearances (such as at store openings).  Spokesperson Agreement, Article II.

6.    Payments were to be made in advance by Sears to Vila under the Spokesperson Agreement on January 1 and July 1 of each year the agreement was in effect.   Spokesperson Agreement, Article III(2).

7.    The Spokesperson Agreement also provides that:

> During the term of this Agreement and for a period of six (6) months thereafter, you [(Vila)] will not render any services or make any public statements for or on behalf of, nor will you permit your name, likeness, photograph, voice or biography to be used in, advertising publicizing or promoting any product or service other than the Product.
> . . .
> Further, although Vila shall have the right to appear in any non-sponsored media without Sears prior approval, Vila shall submit a written proposal to Sears to appear in any sponsored media.

Spokesperson Agreement, Amendment IX, Part 6.

8.    The Spokesperson Agreement contains a "Morals" clause which states:

> If you [(Vila)] have committed or shall commit any act, or have or do become involved in any situation or occurrence bringing you into public disrepute, contempt, scandal or ridicule, or shocking, insulting, or offending the people of this nation or any racial or religious group thereof, or reflecting unfavorably upon our reputation or our Products, then we shall have the right to immediately terminate this agreement.  Our decision on all matters arising under this paragraph shall be conclusive and shall be based on our judgment as to whether or not your act or involvement has harmed or may be harmful in a significant respect; provided that our decision to terminate hereunder must be exercised if at all, no later than 60 days after the facts giving rise to such right under this paragraph are brought to our attention.  Should a termination take place, ours and your remedies shall be those set forth in Article VII. 6. above.

Spokesperson Agreement, Article VII (7) (emphasis added) (the "**Morals/Misconduct Clause**").

9.    With respect to breach and termination, the Spokesperson Agreement provides:

> If you [(Vila)] or we at anytime commit a material breach of any provision of this agreement or at any time fail or refuse to fulfill your material obligations hereunder, then we may terminate this agreement forthwith.  Further, in such event, we shall

also be entitled to all available legal and equitable remedies which we may have.  In the event that this contract is terminated pursuant to this paragraph, you shall nevertheless be entitled to all payment accrued, including the pro rata portion including the date of such termination.

Spokesperson Agreement, Article VI, Part 6 (emphasis added).

10.    The Spokesperson Agreement also provides "[i]f the <u>Bob Vila Home Again television show is cancelled for any reason, Sears has the right to terminate this Agreement</u> effective the 31st day of December following the notice of cancellation."    Spokesperson Agreement, Amendment IX, Part 7; Amendment X, Part 4 (the "**Home Again Cancellation Clause**") (emphasis added).

11.    In their depositions, neither Vila nor Ronald Feiner, Esq., counsel for Vila and one of his FED. R. CIV. P. 30(b)(6) designees, testified that this provision was ambiguous.

12.    The Spokesperson Agreement is an integrated agreement, Spokesperson Agreement Article VII(15) (the Spokesperson Agreement "constitutes the entire understanding between you and us in respect to the subject matter hereof"), and is governed by the law of Illinois. Spokesperson Agreement, Article VII (16).

13.    Pursuant to the Syndication Agreement, Sears is the owner of all trademarks associated with the *Bob Vila's Home Again* f/k/a *Home Again with Bob Vila* television program.

14.    Specifically, the Syndication Agreement provides:

(a) . . . Producer [(BVTV)] agrees that it will not use the name "Sears" and <u>any of Sears trademarks, trade names or service marks without the express written permission from Sears</u>.  Producer expressly recognizes and acknowledges that the use of Sears marks shall not confer upon Producer any proprietary rights to any such Sears marks.  <u>Upon expiration or upon termination of Producer's right to use Sears marks for any cause, Producer shall immediately cease all use of all such Sears marks and will not use any such Sears marks thereafter.  Producer agrees not to question, contest or challenge the ownership by Sears of any such right, title or interest in any such mark</u>, except the right to use the same pursuant to the terms and conditions of this agreement, and will not seek to register the same.

5

(b) . . . <u>Producer acknowledges that Sears may register any and all of the trademarks, service marks or trade names for the Program(s) under this Agreement in its own name</u>, and that Producer's use thereof shall inure to the benefit of Sears for such purposes, as well as for other purposes. <u>Producer shall cooperate in any such registration by Sears or application therefore</u>.

Syndication Agreement Section 18(a) & (b) (emphasis added).

15.     Each of the ten amendments to the Syndication Agreement incorporated and applied the identical Section 18 "Sears Trademark, Trade Names, Services Marks" from the original September 29, 1989 Syndication Agreement. <u>See</u> Deposition Exhibit 4.

16.     Pursuant to the terms of the Syndication Agreement, Sears owns all right, title and interest in the "HOME AGAIN" trademark. <u>Id.</u>

17.     The Syndication Agreement is governed by the law of New York. Syndication Agreement ¶ 22.

18.     Starting on or about February 4, 2004, Mr. Feiner began discussions about a possible extension to the Syndication Agreement beyond the 2004-2005 television season with Andrew Ginger ("**Ginger**"), then Vice President of Brand Management at Sears, Drew Farkas, Esq., in-house counsel at Sears and Mark Rode ("**Rode**"), then Brand Manager at Sears. Deposition Exhibits 67, 190. Those negotiations between BVTV and Sears continued throughout 2004. <u>See</u> Deposition Exhibits 5, 7, 16, 68, 70, 72, 73, 131, 132, 133, 134, 135, 137, 183; Deposition of Ronald Feiner ("**Feiner Depo.**") Vol. 1, p. 244 Vol. 2, p. 276.

19.     During this time, on or about November 18, 2004, Sears announced its merger with Kmart which was to become final during the following year on or about March 24, 2005. November 18, 2004 Kmart 8-K dated.

20.     In response to the announcement, Mr. Feiner requested that Sears representatives explain any consequences of the merger to Vila, including its effects on the negotiations about a

possible extension of the Syndication Agreement. See Deposition Exhibit 7. In response, Rode explained to Mr. Feiner: "As for the Kmart issue we have been instructed not to talk about the merger. Partly because it won't be done until the spring and partly because I don't think they have a clue yet what they're going to do." Id.

21.    In fact, in early January 2005, Rode communicated to Sarah Monzon ("**Monzon**"), the line producer at BVTV and one of BVTV's FED. R. CIV. P. 30(b)(6) designees, that the contract approval process at Sears had been changed in light of the merger. See Deposition Exhibit 20; Deposition of Monzon ("**Monzon Depo.**"), p. 5.

22.    On or about January 14, 2005, Rode, who did not have authority to sign any amendment to the Syndication Agreement, transmitted a redlined draft extension to Mr. Feiner. See Deposition Exhibits 21, 179; Feiner Depo. Vol. 2, p. 292-94. In his e-mail transmitting the redlined draft, Rode in no way indicated that the redline had been approved by Sears. Deposition Exhibit 21 ("Attached is the contract with the revisions you requested (I hope)").

23.    This redlined draft of Amendment No. 11 of the Syndication Agreement has a proposed term of two years: September 1, 2005 through August 31, 2007. Deposition Exhibit 21. By its terms, the redlined draft of the extension to the Syndication Agreement would require BVTV to deliver 26 episodes for each of the two "Years" specified and require Sears to make payments which span a period of over two years. Id.

24.    On or about January 18, 2005, Mr. Feiner asked Rode to send execution copies of Amendment No. 11 to the Syndication Agreement. However Sears never sent the copies, Sears never signed any draft of Amendment No. 11, Sears never told Mr. Feiner that it would send execution copies, and Vila never signed any draft of Amendment No. 11. In fact, there was no meeting of the minds on January 18, 2005. Vila Depo. Vol. 1, pp. 235-36, 248-49; Feiner Depo.

Vol. 1, pp. 50-51; Feiner Depo. Vol. 2, pp. 303-05; Monzon Depo. pp. 52-54.

    25.    Vila testified:

Q.    Okay.  Let's start then by looking at some documents.  First of all, did anyone ever present to you a signed extension of the syndication agreement for your signature at any point in 2005?

A.    No.

Vila Depo. Vol. 1, pp. 235-36.

    26.    Vila further testified that there was no agreement between the parties as to an extension of the Syndication Agreement in January 2005:

Q.    Were there negotiations going on concerning an extension of the syndication agreement <u>as of January 22, 2005</u>?

A.    <u>Yes.</u>

Q.    <u>And there were some issues, some open issues that existed as of January 22, 2005 concerning that syndication agreement; is that right?</u>

A.    <u>Apparently.</u>

Q.    Well, you were aware, you had been told by your representatives that there were issues concerning the syndication agreement and any amendment to the syndication agreement, correct?

A.    I don't recall what they were.

. . .

Q.    Yes, I'm sorry, January 22, 2005.  <u>As of January 22, 2005 were you told by your representatives that there were negotiations that were going on concerning a potential extension of the syndication agreement?</u>

    MR. O'BRIEN:  The syndication agreement you are referring to when you use that phrase is what?

    MR. GREENBERG:  The syndication agreement which is the subject of the lawsuit.

    MR. O'BRIEN:  13, I believe, is the --

    MR. GREENBERG:  Exhibit 13 with the amendments.

    MS. SANKARAN:  4.

    MR. GREENBERG:  I'm sorry, Exhibit 4.

A.    <u>Yes.</u>

Vila Depo. Vol. 1, pp. 248-49 (emphasis added).

    27.    Mr. Feiner's testimony also supports the fact that there was no agreement regarding an extension in January 2005:

Q.    Did you contact Mr. Farkas or Mr. Ginger to try to get this syndication

agreement executed?

A.     Yes.

Q.     Did you ask him to sign it and get it back to you?

A.     No.  I asked him why have we not gotten a signed copy yet?

Q.     You asked him that in January?

A.     I am sure I asked him this January 14th.

Q.     How soon after?

A.     Well, I think if you look at Exhibit 22, I am asking for it on January 18th, "The new Vila syndication agreement is fine.  Can you have Drew arrange for execution copies?"

Q.     You sent that to Mr. Rode?

A.     Yes.

Q.     As you said, you never got it back signed?

A.     No.

Q.     And no one ever promised you it was going to be signed, right?

       MR. O'BRIEN:  Objection to the form.

Q.     Did anyone at Sears ever tell you the agreement was going to be signed?

A.     Every time for the past 15 years that a contract needed to be signed and a final agreement was agreed to, it was followed by a signature.

Q.     Did anyone in January 2005 tell you --

A.     I had no reason to believe otherwise.

Q.     -- tell you that the extension to the syndication agreement that was drafted was going to be signed by Sears?

       MR. O'BRIEN:  In so many words?

Q.     In so many words?

A.     No.

Feiner Depo. Vol. 2, pp. 303-05 (emphasis added).

        28.     Mr. Feiner also testified:

Q.     Did Mr. Vila or B.V.T.V. ever sign a document which set forth the two-year extension?

A.     No.

Q.     Did anyone from Sears ever sign a document which set forth this two-year extension?

A.     No.

. . .

Q.     Did you ever get execution copies?

A.     Never received execution copies.

Feiner Depo. Vol. 1, pp. 50-51.

        29.     Monzon, the producer at BVTV, testified that there was no meeting of the minds

regarding an extension of the Syndication Agreement in January 2005:

| | |
|---|---|
| Q. | Did Mr. Vila ever tell you in January of 2005 that Sears had agreed to extend the syndication agreement? |
| A. | I don't think so. |
| Q. | Okay. Did anyone ever tell you in January of 2005 that Sears had agreed to extend the syndication agreement? |
| A. | I don't think so. |
| Q. | Did anyone ever tell you in January of 2005 that negotiations concerning the possible extension of the syndication agreement were ongoing? |
| A. | I think that would be a fair assessment of what I understood. |
| . . . | |
| Q. | <u>Is it accurate that based upon what Mr. Vila told you during January of 2005 that throughout that month you understood that negotiations about a possible extension of the syndication agreement were on going?</u><br>MR. O'BRIEN: Objection to the form. You can answer. |
| A. | <u>Yes, I believe that's accurate.</u> |

Monzon Depo. pp. 52-54 (emphasis added).

30.     The fact that the parties continued to negotiate the terms of the amendment to the Syndication Agreement from January 2004 through June 15, 2005 further supports BVTV's testimony that there was no meeting of the minds as to an extension to the Syndication Agreement in January 2005. <u>See</u> Deposition Exhibits 22, 24, 27, 28, 29, 30, 95, 172, 186, 179, 173.

31.     On February 1, 2005, Mr. Feiner e-mailed Rode indicating his understanding that BVTV could not receive payment under the Syndication Agreement until there was a signed contract in place between the parties. Mr. Feiner wrote, "<u>Because of the contract not being signed</u>, Bob has not received the $750,000 due the first of the year." Deposition Exhibit 179 (emphasis added).

32.     Rode replied by explaining that he did not have authority to bind Sears to the contract and that in light of the merger between Sears and Kmart, issues were still unresolved. Rode replied "I think you me and Andy [(Ginger)] (or just you and Andy) will need to talk on this. While I can negotiate contract I feel comfortable with[,] <u>I don't have access to the individuals here who would ultimately issue a go/no go decision.</u> Six months ago this would be a no brainer. With the

merger[,] Andy is going to need to weigh-in." Id. (emphasis added).

33.    Vila acknowledged that there was no agreed extension to the Syndication Agreement in his e-mail to Monzon.  Deposition Exhibit 173.  On February 3, 2006 Vila wrote "I'm in a difficult position.  The extension with Sears remains incomplete due to the K-Mart merger and internecine struggles.  I am involved in other negotiations but can't commit to anything just yet." Id. (emphasis added).

34.    Monzon, the producer at BVTV, testified:

> Q.    As of February 2005 is it correct that there was uncertainty in your mind as to whether or not there would be funding for the new show?
> A.    Yes, there was uncertainty.

Monzon Depo. p. 58.

35.    Rode e-mailed Melissa Marchand ("**Marchand**") the Chief Operating Officer of BV Webties LLC, the company that runs the Bobvila.com web site and one of BVTV's FED. R. CIV. P. 30(b)(6) designees,  indicating that there were issues on the Sears side relating to the extension of the Syndication Agreement.  See Deposition of Marchand ("**Marchand Depo.**"), p. 20.  He wrote on March 11, 2005 "On another note we heard back from Bill Crowley and there (as there always seems to be these days) are issues."  Deposition Exhibit 27.

36.    Marchand  further testified about this e-mail:

> Q.    So as of that date [(March 11, 2005)], was it your understanding that the parties still hadn't come to an agreement with respect to an extension of the syndication agreement?
> MR. O'BRIEN:  Object to the form.  You may answer.
> A.    Yes.

Marchand Depo. p. 53.

37.    In her notes regarding March 2005, Monzon wrote "We continue to wait for word from Sears."  Deposition Exhibit 220.

38.    On April 28, 2005, Rode transmitted a proposal regarding an extension of the Syndication Agreement and a renegotiation of the Spokesperson Agreement to Mr. Feiner.  <u>See</u> Deposition Exhibit 66.

39.    Shortly thereafter, Mr. Feiner rejected that offer.  <u>See</u> Deposition Exhibit 42.

40.    During this time, Sears' new management team composed initially of Luis Padilla ("**Padilla**"), the President of Merchandising and Marketing and Chief Merchant at Sears, and later William Crowley ("**Crowley**"), the Chief Financial Officer of SHC, were reviewing the relationship between Sears and BVTV and Vila and assessing the financial benefits of the same.  <u>See</u> Deposition Exhibits 80, 32, 34, 36, 38, 44, 47, 48, 110, 112, 142, 149, 150, 151.  Specifically, Sears was considering whether an extension of the Syndication Agreement was in the best business interest of Sears.  <u>Id.</u>; Deposition of Crowley ("**Crowley Depo**."), pp. 69-70, 73-74.

41.    Knowing and acknowledging that it had no agreement with Sears as to a possible amendment to the Syndication Agreement, began negotiations directly with King World to see whether King World would fund the production of a home improvement television show starring Vila.  Feiner Depo. Vol. 1, pp. 86-87, 93.

42.    On March 24, 2005, Vila confirmed with Monzon and Marchand that he had alternate funding for the production of a home improvement television show, <u>see</u> Deposition Exhibits 193, 220, and on May 16, 2005 entered into a production agreement with King World, whereby King World would fund the production of a home improvement television show starring Vila (the "**KW Agreement**").  Deposition Exhibits 158, 159, 217, 218, 219.

43.    Even though BVTV had entered into the KW Agreement and had received funds from King World for the production of the television show, BVTV continued to invoice Sears for the production costs of the *Home Again* show.  <u>See</u> Deposition Exhibits 52, 58, 158; Feiner

Depo. Vol. 2., pp. 361-62.

44.     In response to these invoices, and without knowledge of the KW Agreement, on June 15, 2006, Robert Rathke, Esq., in-house counsel for SHC, sent Mr. Feiner a letter notifying him that Sears had never agreed to an extension of the Syndication Agreement, specifically stating that Sears "<u>does</u> <u>not</u> <u>desire</u> <u>to</u> <u>pay</u> <u>to</u> <u>produce</u> <u>the</u> <u>'Home</u> <u>Again'</u> <u>show</u> and B.V.T.V. is proceeding with the production of the 'Home Again' show <u>at</u> <u>its</u> <u>own</u> <u>risk</u> . . . ." Deposition Exhibit 180 (emphasis added); <u>see also</u> Vila Depo. Vol. 1. pp. 88-90; Feiner Depo. Vol. 2, pp. 349, 359-60.  The letter also invited Mr. Feiner to discuss an "amicable" resolution regarding Sears' desire to terminate the spokesperson relationship between Sears and Vila.  Deposition Exhibit 180.

45.     Mr. Feiner replied to Sears' June 15, 2005 letter by letter dated June 28, 2005 in which he stated that BVTV's position is that the parties agreed to an extension of the Syndication Agreement and that Sears did not have a right to terminate the Spokesperson Agreement pursuant to the Home Again Cancellation Clause, as Sears did not have a right to cancel the show *Home Again*. June 28, 2005 Letter from Mr. Feiner to Mr. Rathke.  He also invited Sears to engage in negotiations to resolve the situation.  <u>Id.</u>

46.     Approximately twenty days later, on or about July 18, 2005, Vila and BVTV filed this action in the Dukes County Superior Court.  <u>See</u> Deposition Exhibit 215; Docket.  In their original complaint, BVTV and Vila made public statements concerning Sears engaging in "bad faith" and "unfair and deceptive conduct."  Complaint ¶¶ 1, 45, 62 and WHEREFORE clause (E) and (J).

47.     Sears responded to Mr. Feiner's June 28, 2005 letter by letter dated July 22, 2005 in which Sears explained that it did not agree with Mr. Feiner's positions regarding the Syndication

Agreement and the Spokesperson Agreement, and reminded Mr. Feiner that:

> Sears did not renew the Home Again program and has not authorized anyone to continue to produce or air the program using the Home Again name or any of Sears' trademarks. As between B.V.T.V. and Sears, the Syndicated Television Program Agreement clearly grants Sears all rights to the trademarks of the program.

Deposition Exhibit 162 (emphasis added). In this same letter, Sears also made a proposal to Vila to resolve the dispute. Id.

48.     Sears removed this case to this Court on or about August 17, 2005.

49.     By letter dated August 19, 2005, without having made the July 1, 2005 payment, terminated the Spokesperson Agreement, based on, *inter alia*, (1) Vila's use of Sears' *Home Again* trademark without permission or authority, (2) Vila's public statements about Sears, i.e., that Sears had engaged in deceptive and unfair trade practices which Sears concluded in its sole discretion reflected unfavorably upon Sears' reputation, and (3) the cancellation of the Home Again television show. See Case Docket; Deposition Exhibit 62.

50.     The new *Bob Vila* show began airing nationally the week of September 5, 2005. Feiner Depo Vol. 1, p. 100.

51.     Vila made the decision to change the show's name from *Bob Vila's Home Again* to *Bob Vila* on or about August 23, 2005, shortly after Defendants filed their counterclaim for trademark infringement regarding the Home Again name. Case Docket; Deposition Exhibit 195; Marchand Depo. p. 85.

52.     In their moving papers, Vila and BVTV argue that the *Bob Vila* show is the same television show as *Bob Vila's Home Again* with simply a different name. Plaintiff Robert J. Vila's Statement of Material Facts In Support of Plaintiffs' Motion for Partial Summary Judgment, p. 3.

53.     Vila's own testimony and documents, however, belie this claim and show that *Bob Vila* is a new show and that new episodes of *Bob Vila's Home Again* are not airing. Vila Depo. Vol.

1., p. 61; Vila Depo Vol. 2. pp. 359-60; Deposition Exhibits 155, 156, 157, 176, 194, 212, 213, 214.

54.     Vila testified as follows about his new television show:

Q.     So what is your <u>new</u> show?
A.     "Bob Vila."
Q.     And when did that new show start?
A.     The fall of '05.
Q.     And the producer of that show is what company?
A.     B.V.T.V. Inc.

Vila Depo. Vol. 1., p. 61 (emphasis added).  He further testified:

Q.     What are the different shows you have done in the last 15 years that they have
       sold or that they have been involved in, what are the different shows?
A.     You want me to tell you the content of the different shows?
Q.     I just want to know the names of the Vila different shows.
A.     "Bob Vila's Home Again."
Q.     Okay.  What other shows?
A.     "Bob Vila."
Q.     What else?
A.     "Bob Vila's Guide to Historic Homes," "Restore America."
Q.     Wait just a second.  What else?
A.     I think that's it.
Q.     So you have had over the last 15 years <u>four</u> <u>different</u> shows that have been
       televised; is that right?
A.     <u>Yes</u>.

Vila Depo Vol. 2. pp. 359-60 (emphasis added).

55.     In Vila's printed biography which is distributed to various media for the promotion

of the *Bob Vila* show, Vila states "Bob Vila has appeared on television for over 25 years — first on

'This Old House' and, for 15 years, on 'Bob Vila's Home Again' <u>and now with his new show</u>, 'Bob

Vila.'"  Deposition Exhibit 157 (emphasis added).

56.     Vila's web site bobvila.com references his show *Bob Vila* as beginning in 2005 and

as "Season 1."  <u>See</u> Deposition Exhibits 155, 156, and 213.

57.     Furthermore, several media outlets have printed stories regarding Vila's new show:

• "Home fixer-upper <u>Bob</u> <u>Vila's</u> <u>new</u> <u>series</u> shows how to build a house that can stand up
  to a hurricane's fury."  St. Petersburg Times, September 10, 2005, Deposition Exhibit

194 (emphasis added);

- "If anything, <u>Vila's new show</u> is a good primer on what to look for when you buy your next house." Miami Herald, September 11, 2005, Deposition Exhibit 194 (emphasis added);

- "As part of his <u>new show</u>, Bob Vila and his crew constructed a storm ready home in Florida to replace a home that was destroyed by Hurricane Charlie in 2004." TvSquad.com October 25, 2005**,** Exhibit 176 (emphasis in the original);

- "<u>A new TV series</u> about building homes able to withstand storms has left its star, handyman Bob Vila, with one big regret: 'I wish I'd been a year earlier.'" San Diego Union Tribune, September 11, 2005, Exhibit 194 (emphasis added).

Neither BVTV nor Vila ever requested that any of these publications print retractions when the show was referenced as a "new" show. Marchand Depo. p. 77.

58.    Despite the fact that the Spokesperson Agreement specifically required Vila to seek permission from Sears in writing to appear in "sponsored media," <u>see</u> Spokesperson Agreement Amendment IX, Part 6, Deposition Exhibit 159, Vila never sought Sears' permission to appear in the *Bob Vila* show which was sponsored by numerous companies.

59.    The credits to the episodes specifically designate the show as sponsored media:

- Episode 9 was "Sponsored in part by: DuPont Corian, Whirlpool, Cardell Cabinets," *Bob Vila* Episodes 1-14 DVDs, attached as Exhibit P to <u>Sankaran Declaration,</u>
- Episode 10 was "Sponsored in part by: Toto, USA, D&B/Hurricane Master Garage Doors Melbourne, FL," <u>id.</u>,
- Episode 11 was "Sponsored in part by: Sun State Landscaping, Trent Culleny Landscaping Contractor Inc., Gardens Alive!, PestAgon, Lawn Logic, American Farms, Butler Tree Farms, John Deere Landscapes, Triple "O" Nursery, Toro, " <u>id.</u>,
- Episode 12 was "Sponsored in part by: Blue Haven Pools, Baby Barrier, Armor Screen, Hawyard, Jandy," <u>id.</u>,
- Episode 13 was "Sponsored in part by: Bellawood, Moen, Smith & Noble, Seagull Lighting," <u>id.</u>, and
- Episode 14 was "Sponsored in part by: Bacon's Furniture Gallery, Frontgate, Whirlpool, OXO, Chantal, Chicago Metallic, Joyce Chen, Ironwood Gourmet, Lodge Manufacturing," <u>Id.</u>

60.    Also, despite the fact that Vila agreed not to permit his name, likeness, photograph, voice or biography to be used in advertising, publicizing or promoting any product or service other

than Sears' products, Vila did just that during the term of the Spokesperson Agreement and during the six months after Sears terminated.  Exhibit P to Sankaran Declaration.

61.    On the *Bob Vila* show, Vila's name, likeness, photograph, and voice were used to advertise, publicize and/or promote the following products:

- Cardell Cabinets
- Dupont Corian kitchen countertops
- Whirlpool dishwasher
- Toto, USA,  electric toilet
- D&D Garage Doors, Hurricane Master garage door
- Lawn Logic watering/irrigation system for yards
- Gardens Alive Pyola pest control, Escar-go! slug and snail bait
- PestAgon termite prevention device
- Commercial Residential Construction swimming pool cage
- Blue Haven Pools swimming pool
- Baby Barrier Pool Fence Company child protection fence around pool
- Armor Screen
- Moen sink fixtures and plumbing
- Electric Controls, Inc., surge protector
- Sea Gull Lighting
- Smith and Noble bamboo window shades
- Mercedes Homes
- Chantal Cookware
- Lodge Manufacturing cast iron skillet
- OXO goodgrips cooking utensils
- Front Gate patio furniture
- Chevy Truck
- FLASH
- Solid Wall Systems
- Precision Forms
- D. Peck Roofing
- Simpson Strong Tile
- Hanson Roof Tile
- PGT Industries
- Great Southern Windows
- Kohler Global Power Group
- SquareD/Scheinder Electric
- Georgia Pacific
- Tranquility Plumbing
- Electric Controls, Inc.
- Blue Haven Pools & Spa
- Royal Bathe Manufacturing
- Prestige Gunite
- Color Wheel Paints & Coatings
- RBP Trim
- Porceelanosa
- West Coast Drywall
- Creative Touch Interiors
- Joyce Chen wok
- Ironwood Gourmet wooden salad bowl and serving dishes
- Whirlpool refrigerator and double oven.

See Exhibit P to Sankaran Declaration.

62.    Filming and production for the Punta Gorda project began the end of May 2005 or beginning of June 2005 during the time the Spokesperson Agreement was in effect.  Monzon Depo. pp. 133-34.

63.    Vila was well aware of his obligations under the Competitive Protection provisions

of the Spokesperson Agreement, as his counsel Mr. Feiner informed him and King World of the same:

> Also I wish to remind you that Bob is still under contract for his personal services for Sears, Roebuck and Company, and, as such, <u>Bob cannot render any services for, or permit his name, likeness, photograph, etc., to be used in advertising, publicizing or promoting any product or service other than Sears</u>. This . . . could have an impact if someone wanted on-air credit.

Deposition Exhibit 159 (emphasis added).

64.    Vila never sought written permission from Sears to appear in these episodes pursuant to Competitive Protection provisions of the Spokesperson Agreement.  Feiner Depo. p. 98-100.

65.    From the beginning of March 2005 through March 28, 2006, Vila used Sears' Home Again mark without permission or other authority.  <u>See</u> Deposition Exhibits 158, 159, 160, 163, 164, 165, 166, 167, 169, 187, 200, 201, 202, 203,  205, 206, 207, 208, 209, 211, 212, 213, 214, 221, 225,  227, 228, 229, 230, 231, 232, 233, 234, 235, 236, 238; Monzon Depo. pp. 133-134; Marchand Depo. pp. 175-76; Exhibits P and Q to <u>Sankaran Declaration.</u>

66.    Since as early as March 7, 2005, despite the fact that BVTV and Vila were fully aware that Sears had not agreed to fund the production of another season of *Bob Vila's Home Again* and that Sears had all rights and interest in the Home Again mark, Monzon, Marchand and other Vila representatives, on repeated occasions, used the Home Again mark in attempts to solicit product donation for *Bob Vila's Home Again* (which Vila and King World separately, and without Sears' involvement, agreed to produce for the 2005-2006 season), and for advertising on the bobvila.com web site, including:

- March 7, 2005 solicitation to Wood Promotion Network for product donation to "Home Again," Deposition Exhibit 200,
- June 21, 2005 solicitation for Moen product donation to "Home Again," Deposition Exhibits 234, 233,
- June 21, 2005 solicitation to WarmZone

- April 5, 2005 solicitation to Plain & Fancy for product donation to "Home Again," Deposition Exhibit 221,
- May 11, 2005 solicitation to Whirlpool for product donation to "Home Again," Deposition Exhibit 225,
- May 25, 2005 and June 3, 2005 solicitations to DCS appliances for product donation to "Home Again," Deposition Exhibit 201, 228, 227,
- June 10, 2005 solicitation to Western Red Cedar Lumber Association for product donation to "Home Again," Deposition Exhibit 202,
- June 10, 2005 solicitation to Wayne Dalton for product donation to "Home Again," Deposition Exhibits 160, 203,
- June 13, 2005 product donation from Georgia Pacific referring to program as "Home Again," Deposition Exhibit 229,
- June 16, 2005 inquiry to tile donator for "Home Again," Deposition Exhibit 230,
- June 17, 2005 solicitation to Sun Systems for product donation to "Home Again," Deposition Exhibit 231,
- June 17, 2005 Product donation from Georgia Pacific referring to program as "Home Again," Deposition Exhibit 232,
- June 21, 2005 solicitation to Jen-Weld for product donation to "Home Again," Deposition Exhibit 205,
- for product donation to "Home Again," Deposition Exhibit 206,
- June 21, 2005 follow-up to Hanson regarding product donation to "Home Again," Deposition Exhibit 235,
- June 22, 2005 solicitation to e-Counters for product donation to "Home Again," Deposition Exhibit 207,
- June 22, 2005 solicitation to DuPont Corian for product donation to "Home Again," Deposition Exhibit 236,
- July 1, 2005 solicitation for foam insulation product donation to "Home Again," Deposition Exhibit 208,
- July 15, 2005 solicitation to Whirlpool for product donation to "Home Again," Deposition Exhibit 209,
- July 21, 2005 solicitation to Landscape Anchors for donation to "Home Again," Deposition Exhibit 238,
- July 28, 2005 solicitation to Benjamin Moore for product donation to "Home Again," Deposition Exhibit 164,
- August 2, 2005 solicitation to Gardens Alive for product donation to "Home Again," Deposition Exhibit 165, 211,
- August 2, 2005 solicitation to DuPont Corian for product donation to "Home Again," Deposition Exhibit 166
- August 3, 2005 solicitation to ATAS for product donation to "Home Again," Deposition Exhibit 167, and
- August 4, 2005 solicitation to Benjamin Moore for product donation to "Home Again," Deposition Exhibit 187.

67.    The May 16, 2005 KW Agreement refers to the television show being produced as "Bob Vila's Home Again." Deposition Exhibits 158, 159.

68.    In producing *Bob Vila's Home Again*, BVTV continued to violate Sears' trademark by entering into license agreements with stock footage companies referring to the program title as "Bob Vila's Home Again." Deposition Exhibit 168.

69.    The releases used by BVTV to secure authority from people appearing on *Bob Vila* represented to the people executing them that the program was "Bob Vila's Home Again." See Deposition Exhibit 169.

70.    These trademark violations occurred both before and after the July 1, 2005 payment was allegedly due under the Spokesperson Agreement on the following dates:

- June 5, 2005,
- June 6, 2005 (4 releases),
- June 7, 2005 (3 releases),
- June 15, 2005,
- June 25, 2005,
- July 12, 2005 (3 releases),
- July 13, 2005 (5 releases),
- July 19, 2005 (3 releases),
- July 25, 2005,
- July 26, 2005,
- August 2, 2005 (3 releases),
- August 3, 2005 (3 releases),
- August 9, 2005 (4 releases),
- August 16, 2005 (7 releases),
- August 17, 2006 (5 releases),
- August 23, 2005 (2 releases),
- August 31, 2005 (4 releases),
- September 13, 2005 (7 releases),
- September 14, 2006 (5 releases),
- September 15, 2005 (4 releases),
- September 20, 2005,
- September 26, 2005, and
- numerous undated releases.

71.    In promoting his show, when interviewed on Fox News which aired on or about September 11, 2005, Vila referred to his new show as "Bob Vila's Home Again." DVD of Fox News September 11, 2005 episode, attached Exhibit Q, to Sankaran Declaration.

72.    At the end of episode 10 of the *Bob Vila* show, which aired on November 14, 2005, in a teaser for the following week's episode, Vila states "come home again next week . . . ." Episode 10 of *Bob Vila*, attached Exhibit P, to Sankaran Declaration.

73.    As late as the beginning of 2006, Vila advertised for sale caps, t-shirts and mugs bearing the Home Again mark on bobvila.com. Deposition Exhibit 163; Marchand Depo. pp. 92-93.

74.    In the frequently asked questions section of his web site, Vila, from 2003 up to at least March 27, 2006, referred to his current television show as "Bob Vila's Home Again." "**How do I get my new home improvement invention on your show and/or web site?** Bob Vila is happy to consider your product for use on 'Bob Vila's Home Again' if you mail us a sample, press

kit and product literature."  Marchand Depo. pp. 175-76; Deposition Exhibit 214 (emphasis in the original).  "**Why is Bob Vila no longer hosting 'This Old House'?**  Bob Vila currently hosts and produces 'Bob Vila's Home Again' which give him more freedom to choose projects and products."  Deposition Exhibit 212 (emphasis in the original).

WHEREFORE, Sears, Roebuck and Co., Sears Holdings Corporation and Kmart Holding Corporation respectfully request that this Court deny the Plaintiff's Motion for Partial Summary Judgment and enter Judgment in their favor on all counts in Plaintiffs' Amended Complaint.

### REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(D), defendants Sears, Roebuck and Co., Sears Holdings Corporation and Kmart Holding Corporation respectfully request an oral argument on Plaintiff's Motion for Partial Summary Judgment and on Defendants' Cross Motion for Summary Judgment ("**Defendant's Cross Motion For Summary Judgment**").

### LOCAL RULE 7.1(A)(2) CERTIFICATE

I, Annapoorni Sankaran, hereby certify that on April 6, 2005 I communicated with counsel for plaintiffs by electronic mail and attempted in good faith to resolve the issues regarding Defendant's Cross-Motion For Summary Judgment.

RESPECTFULLY SUBMITTED:
SEARS HOLDINGS CORPORATION and
KMART HOLDING CORPORATION,
Defendants, and SEARS, ROEBUCK AND CO.,
Defendant/Counterclaimant,
By their attorneys:

/s/ Annapoorni R. Sankaran
Gary R. Greenberg, BBO #209420
Annapoorni R. Sankaran, BBO #631065
Sebastian R. Colley, BBO #663842
GREENBERG TRAURIG, LLP
One International Place, 20th Floor
Boston, MA 02110
(617) 310-6000
(617) 310-6001 (fax)

<u>CERTIFICATE OF SERVICE</u>

     I Annapoorni R. Sankaran, hereby certify that, pursuant to Local Rule 5.4(c), on April 11, 2006 I served a copy of the foregoing electronically upon:

James F. O'Brien, Esq.
410 Park Avenue, Suite 1530
New York, NY 10022

                               /s/ Annapoorni R. Sankaran
                               Annapoorni R. Sankaran