UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROBERT J. VILA and B.V.T.V., INC.,

      Plaintiffs,

v.                                                                    Civil Action No. 05-11717-REK

SEARS, ROEBUCK AND COMPANY,
SEARS HOLDINGS CORPORATION and
KMART HOLDING CORPORATION,

      Defendants.

**<u>DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN SUPPORT OF
DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

**<u>INTRODUCTION</u>**

Defendants Sears, Roebuck and Co. ("**Sears**"), Sears Holdings Corporation ("**SHC**") and

Kmart Holding Corporation ("**Kmart**") (collectively "**Defendants**"), hereby submit this

memorandum of law in opposition to Plaintiff's Motion for Partial Summary Judgment and in

support of their Cross-Motion for Summary Judgment on All Counts in Plaintiffs' First

Amended Complaint ("**FAC**").  In this Case plaintiff Robert J. Vila ("**Vila**") and his company

B.V.T.V., Inc. ("**BVTV**") (collectively "**Plaintiffs**"), have brought claims against Sears, SHC

and Kmart relating to two agreements between Sears and the Plaintiffs: a spokesperson

agreement between Sears and Vila and a syndication agreement between BVTV and Sears.

Under the spokesperson agreement, Vila formerly acted as a spokesperson for Sears products.

However, Sears validly terminated that agreement in August 2005.  As the undisputed facts

reveal, Vila was in material breach of the Spokesperson Agreement's terms well before Sears'

termination and, accordingly, Defendants are entitled to judgment as a matter of law on all of Vila's claims related to that spokesperson agreement. Secondly, the undisputed facts demonstrate that the parties never agreed to an extension of the syndication agreement by which Sears would fund BVTV for the production of a 2005-2006 season (or any subsequent season) of the television show *Bob Vila's Home Again*. Because there was no agreement, Defendants are entitled to judgment as a matter of law on all claims related to the syndication agreement.[1]

## FACTUAL BACKGROUND[2]

Vila is an individual residing in Chilmark, Massachusetts. Deposition of Vila ("**Vila Depo.**") Vol. 1, p. 5. Vila is the president of his television production company and co-plaintiff BVTV, a Massachusetts company. Vila Depo Vol. 1 p. 7-8; print out from Secretary of State, attached as Exhibit H to Sankaran Declaration.

Defendant Sears is a New York corporation with a principal place of business in Hoffman Estates, Illinois, and is one of the most famous and long established retailers in the United States. First Amended Complaint ("**FAC**") ¶3; Answer to Amended Complaint and Counterclaim ("**Answer**") ¶3, Counterclaim ¶2. Defendant SHC is a Delaware corporation with a principal place of business in Hoffman Estates, Illinois. FAC ¶4; Answer ¶4. Defendant Kmart is a Delaware corporation with a principal place of business in Troy, Michigan. FAC ¶5; Answer ¶5. On or about

---

[1] In the FAC, Vila has alleged claims for breach of contract, repudiation of contract, breach of the implied covenant of good faith and fair dealing, estoppel, and violation of MASS. GEN. L. ch. 93A against Sears, and tortious interference with contract against Kmart and SHC. FAC ¶¶ 45-69. Additionally, in the FAC, BVTV has alleged claims for breach of contract, repudiation of contract, breach of the covenant of good faith and fair dealing, and violation of MASS. GEN. L. ch. 93A against Sears, and tortious interference with contract against Kmart and SHC. FAC ¶¶ 70-86. Sears also has asserted counterclaims for trademark and trade name infringement under 15 U.S.C. §1125(a), breach of contract, conversion, common law trademark infringement/palming off, violation of MASS. GEN. L. ch. 93A, and quantum meruit against Vila and BVTV. Answer.

[2] Deposition transcripts and other documents referenced in this memorandum are attached to the Declaration of Annapoorni R. Sankaran (hereinafter "Sankaran Declaration"), submitted contemporaneously herewith. Copies of excerpts of deposition transcripts, documents not marked as exhibits in the depositions in this case and unreported cases are attached to Volume I of the Sankaran Declaration; copies of selected exhibits from the depositions in this case are attached as exhibits to Volumes II and III of the Sankaran Declaration; and DVDs are attached as exhibits to Volume IV of the Sankaran Declaration.

November 16, 2004, Kmart and Sears announced their merger.  November 18, 2004 Kmart 8-K, attached as Exhibit I to <u>Sankaran Declaration</u>.  As of the date of the consummation of the merger on March 24, 2005, Sears and Kmart entered into a Reciprocal Services Agreement whereby Sears and Kmart performed work for each other, including corporate, administrative, financial and legal services.  <u>See</u> Reciprocal Services Agreement, attached as Exhibit J to <u>Sankaran Declaration</u>.  SHC is the holding company for both Sears and Kmart.  Kmart March 24, 2005 Press Release, attached as Exhibit K to <u>Sankaran Declaration</u>.

The relationship between Sears and Vila began or about September 29, 1989 when Vila and Ogilvy & Mather ("**Ogilvy**"), as agent for Sears, entered into the Bob Vila Spokesperson Agreement (the "**Spokesperson Agreement**") pursuant to which Vila was to act as a spokesperson for Sears and its products.  Deposition Exhibit 13 (The Spokesperson Agreement and all of its amendments were marked as Exhibit 13 to the depositions taken by the parties in this case).  Between 1989 and 2000, the Spokesperson Agreement was amended ten times.  <u>Id.</u>  Also on or about September 29, 1989, BVTV and Ogilvy, as agent for Sears, entered into the Bob Vila Syndicated Television Programs Agreement (the "**Syndication Agreement**") pursuant to which Sears made payments to BVTV to fund the production of a home improvement television show originally titled *Home Again with Bob Vila* and later titled *Bob Vila's Home Again*.  Deposition Exhibit 4 (The Syndication Agreement and all of its amendments were marked as Exhibit 4 to the deposition taken by the parties in this case).   Between 1989 and 1998, the parties amended the Syndication Agreement ten times, the last of which expired upon the conclusion of the 2004-2005 season of *Bob Vila's Home Again*.  <u>Id.</u>

TERMS OF THE SPOKESPERSON AGREEMENT AT ISSUE

Pursuant to the Spokesperson Agreement, Vila was to be available for professional services

in connection with the advertising of Sears' products including but not limited to performing in television and radio commercials, posing for photographs, and making personal appearances (such as at store openings). Spokesperson Agreement, Article II. Payments were to be made in advance by Sears to Vila under the Spokesperson Agreement on January 1 and July 1 of each year the agreement was in effect. Spokesperson Agreement, Article III(2). The Spokesperson Agreement also provides that:

> During the term of this Agreement and for a period of six (6) months thereafter, you [(Vila)] will not render any services or make any public statements for or on behalf of, nor will you permit your name, likeness, photograph, voice or biography to be used in, advertising publicizing or promoting any product or service other than the Product.
> . . .
> Further, although Vila shall have the right to appear in any non-sponsored media without Sears prior approval, Vila shall submit a written proposal to Sears to appear in any sponsored media.

Spokesperson Agreement, Amendment IX, Part 6. The Spokesperson Agreement contains a "Morals" clause which states:

> If you [(Vila)] have committed or shall commit any act, or have or do become involved in any situation or occurrence bringing you into public disrepute, contempt, scandal or ridicule, or shocking, insulting, or offending the people of this nation or any racial or religious group thereof, or reflecting unfavorably upon our reputation or our Products, then we shall have the right to immediately terminate this agreement. Our decision on all matters arising under this paragraph shall be conclusive and shall be based on our judgment as to whether or not your act or involvement has harmed or may be harmful in a significant respect; provided that our decision to terminate hereunder must be exercised if at all, no later than 60 days after the facts giving rise to such right under this paragraph are brought to our attention. Should a termination take place, ours and your remedies shall be those set forth in Article VII. 6. above.

Spokesperson Agreement, Article VII (7) (emphasis added) (the "**Morals/Misconduct Clause**").

With respect to breach and termination, the Spokesperson Agreement provides:

> If you [(Vila)] or we at anytime commit a material breach of any provision of this agreement or at any time fail or refuse to fulfill your material obligations hereunder, then we may terminate this agreement forthwith. Further, in such event, we shall

also be entitled to all available legal and equitable remedies which we may have.  In the event that this contract is terminated pursuant to this paragraph, you shall nevertheless be entitled to all payment accrued, including the pro rata portion including the date of such termination.

Spokesperson Agreement, Article VI, Part 6 (emphasis added).  It also provides "[i]f the <u>Bob</u> <u>Vila</u> <u>Home</u> <u>Again</u> <u>television</u> <u>show</u> <u>is</u> <u>cancelled</u> <u>for</u> <u>any</u> <u>reason,</u> <u>Sears</u> <u>has</u> <u>the</u> <u>right</u> <u>to</u> <u>terminate</u> <u>this</u> <u>Agreement</u> effective the 31st day of December following the notice of cancellation."  Spokesperson Agreement, Amendment IX, Part 7; Amendment X, Part 4 (the "**Home Again Cancellation Clause**") (emphasis added).  In their depositions, neither Vila nor Ronald Feiner, Esq., counsel for Vila and one of his FED. R. CIV. P. 30(b)(6) designees, testified that this provision was ambiguous.

The Spokesperson Agreement is an integrated agreement, Spokesperson Agreement Article VII(15) (the Spokesperson Agreement "constitutes the entire understanding between you and us in respect to the subject matter hereof"), and is governed by the law of Illinois.  Spokesperson Agreement, Article VII (16).

### TERMS OF THE SYNDICATION AGREEMENT AT ISSUE

Pursuant to the Syndication Agreement, Sears is the owner of all trademarks associated with the *Bob Vila's Home Again* f/k/a *Home Again with Bob Vila* television program.  Specifically, the Syndication Agreement provides:

(a) . . . Producer [(BVTV)] agrees that it will not use the name "Sears" and <u>any of</u> <u>Sears</u> <u>trademarks,</u> <u>trade</u> <u>names</u> <u>or</u> <u>service</u> <u>marks</u> <u>without</u> <u>the</u> <u>express</u> <u>written</u> <u>permission</u> <u>from Sears</u>.  Producer expressly recognizes and acknowledges that the use of Sears marks shall not confer upon Producer any proprietary rights to any such Sears marks.  <u>Upon</u> <u>expiration</u> <u>or</u> <u>upon</u> <u>termination</u> <u>of</u> <u>Producer's</u> <u>right</u> <u>to</u> <u>use</u> <u>Sears</u> <u>marks</u> <u>for</u> <u>any</u> <u>cause,</u> <u>Producer</u> <u>shall</u> <u>immediately</u> <u>cease</u> <u>all</u> <u>use</u> <u>of</u> <u>all</u> <u>such</u> <u>Sears</u> <u>marks</u> <u>and</u> <u>will</u> <u>not</u> <u>use</u> <u>any</u> <u>such</u> <u>Sears</u> <u>marks</u> <u>thereafter.</u>  <u>Producer</u> <u>agrees</u> <u>not</u> <u>to</u> <u>question,</u> <u>contest</u> <u>or</u> <u>challenge</u> <u>the</u> <u>ownership</u> <u>by</u> <u>Sears</u> <u>of</u> <u>any</u> <u>such</u> <u>right,</u> <u>title</u> <u>or</u> <u>interest</u> <u>in</u> <u>any</u> <u>such</u> <u>mark</u>, except the right to use the same pursuant to the terms and conditions of this agreement, and will not seek to register the same.

(b) . . . <u>Producer</u> <u>acknowledges</u> <u>that</u> <u>Sears</u> <u>may</u> <u>register</u> <u>any</u> <u>and</u> <u>all</u> <u>of</u> <u>the</u> <u>trademarks,</u> <u>service</u> <u>marks</u> <u>or</u> <u>trade</u> <u>names</u> <u>for</u> <u>the</u> <u>Program(s)</u> <u>under</u> <u>this</u>

<u>Agreement</u> <u>in</u> <u>its</u> <u>own</u> <u>name</u>, and that Producer's use thereof shall inure to the benefit of Sears for such purposes. <u>Producer shall cooperate</u> <u>in</u> <u>any</u> <u>such</u> <u>registration</u> <u>by</u> <u>Sears</u> <u>or</u> <u>application</u> <u>therefore</u>.

Syndication Agreement Section 18(a) & (b) (emphasis added). Each of the ten amendments to the Syndication Agreement incorporated and applied the identical Section 18 "Sears Trademark, Trade Names, Services Marks" from the original September 29, 1989 Syndication Agreement. <u>See</u> Deposition Exhibit 4. Accordingly, it is indisputable that pursuant to the terms of the Syndication Agreement, Sears owns all right, title and interest in the "HOME AGAIN" trademark. <u>Id.</u>

The Syndication Agreement is governed by the law of New York. Syndication Agreement ¶ 22.

### NEGOTIATION OF AN ELEVENTH AMENDMENT TO THE SYNDICATION AGREEMENT

As previously described, Amendment No. 10 to the Syndication Agreement expired with the conclusion of the 2004-2005 television season of *Bob Vila's Home Again*. Starting on or about February 4, 2004, Mr. Feiner began discussions about a possible extension to the Syndication Agreement beyond the 2004-2005 television season with Andrew Ginger ("**Ginger**"), then Vice President of Brand Management at Sears, Drew Farkas, Esq., in-house counsel at Sears and Mark Rode ("**Rode**"), then Brand Manager at Sears. Deposition Exhibits 67, 190. Those negotiations between BVTV and Sears continued throughout 2004. <u>See</u> Deposition Exhibits 5, 7, 16, 68, 70, 72, 73, 131, 132, 133, 134, 135, 137, 183; Deposition of Ronald Feiner ("**Feiner Depo.**") Vol. 1, p. 244 Vol. 2, p. 276.

During this time, on or about November 18, 2004, Sears announced its merger with Kmart which was to become final during the following year on or about March 24, 2005. November 18, 2004 Kmart 8-K dated. In response to the announcement, Mr. Feiner requested that Sears

representatives explain any consequences of the merger to Vila, including its effects on the negotiations about a possible extension of the Syndication Agreement. <u>See</u> Deposition Exhibit 7. In response, Rode explained to Mr. Feiner: "As for the Kmart issue we have been instructed not to talk about the merger. Partly because it won't be done until the spring and partly because I don't think they have a clue yet what they're going to do." <u>Id.</u> In fact, in early January 2005, Rode communicated to Sarah Monzon ("**Monzon**"), the line producer at BVTV and one of BVTV's FED. R. CIV. P. 30(b)(6) designees, that the contract approval process at Sears had been changed in light of the merger. <u>See</u> Deposition Exhibit 20; Deposition of Monzon ("**Monzon Depo.**"), p. 5.

On or about January 14, 2005, Rode, who did not have authority to sign any amendment to the Syndication Agreement, transmitted a redlined draft extension to Mr. Feiner. <u>See</u> Deposition Exhibits 21, 179; Feiner Depo. Vol. 2, p. 292-94. In his e-mail transmitting the redlined draft, Rode in no way indicated that the redline had been approved by Sears. Deposition Exhibit 21 ("Attached is the contract with the revisions you requested (I hope)"). This redlined draft of Amendment No. 11 of the Syndication Agreement has a proposed term of two years: September 1, 2005 through August 31, 2007. Deposition Exhibit 21. By its terms, the redlined draft of the extension to the Syndication Agreement would require BVTV to deliver 26 episodes for each of the two "Years" specified and require Sears to make payments which span a period of over two years. <u>Id.</u> On or about January 18, 2005, Mr. Feiner asked Rode to send execution copies of Amendment No. 11 to the Syndication Agreement. However Sears never sent the copies, Sears never signed any draft of Amendment No. 11, Sears never told Mr. Feiner that it would send execution copies, and Vila never signed any draft of Amendment No. 11. In fact, the undisputed evidence in this case reveals that there was no meeting of the minds on January 18, 2005, as Plaintiffs claim. Vila testified:

> Q.    Okay.  Let's start then by looking at some documents.  First of all, did anyone ever present to you a signed extension of the syndication agreement for your signature at any point in 2005?
>
> A.    No.

Vila Depo. Vol. 1, pp. 235-36.  He further testified that there was no agreement between the parties

as to an extension of the Syndication Agreement in January 2005:

> Q.    Were there negotiations going on concerning an extension of the syndication agreement <u>as of</u> <u>January</u> <u>22,</u> <u>2005</u>?
>
> A.    <u>Yes.</u>
>
> Q.    <u>And</u> <u>there</u> <u>were</u> <u>some</u> <u>issues,</u> <u>some</u> <u>open</u> <u>issues</u> <u>that</u> <u>existed</u> <u>as</u> <u>of</u> <u>January</u> <u>22,</u> <u>2005</u> <u>concerning</u> <u>that</u> <u>syndication</u> <u>agreement;</u> <u>is</u> <u>that</u> <u>right</u>?
>
> A.    <u>Apparently.</u>
>
> Q.    Well, you were aware, you had been told by your representatives that there were issues concerning the syndication agreement and any amendment to the syndication agreement, correct?
>
> A.    I don't recall what they were.
>
>       . . .
>
> Q.    Yes, I'm sorry, January 22, 2005.  <u>As</u> <u>of</u> <u>January</u> <u>22,</u> <u>2005</u> <u>were</u> <u>you</u> <u>told</u> <u>by</u> <u>your</u> <u>representatives</u> <u>that</u> <u>there</u> <u>were</u> <u>negotiations</u> <u>that</u> <u>were</u> <u>going</u> <u>on</u> <u>concerning</u> <u>a</u> <u>potential</u> <u>extension</u> <u>of</u> <u>the</u> <u>syndication</u> <u>agreement</u>?
>
>       MR. O'BRIEN:  The syndication agreement you are referring to when you use that phrase is what?
>
>       MR. GREENBERG:  The syndication agreement which is the subject of the lawsuit.
>
>       MR. O'BRIEN:  13, I believe, is the --
>
>       MR. GREENBERG:  Exhibit 13 with the amendments.
>
>       MS. SANKARAN:  4.
>
>       MR. GREENBERG:  I'm sorry, Exhibit 4.
>
> A.    <u>Yes.</u>

Vila Depo. Vol. 1, pp. 248-49 (emphasis added).  Mr. Feiner's testimony also supports the fact that

there was no agreement regarding an extension in January 2005:

> Q.    Did you contact Mr. Farkas or Mr. Ginger to try to get this syndication agreement executed?
>
> A.    Yes.
>
> Q.    Did you ask him to sign it and get it back to you?
>
> A.    No.  I asked him why have we not gotten a signed copy yet?
>
> Q.    You asked him that in January?
>
> A.    I am sure I asked him this January 14th.
>
> Q.    How soon after?
>
> A.    Well, I think if you look at Exhibit 22, I am asking for it on January 18th,

"The new Vila syndication agreement is fine.  Can you have Drew arrange for execution copies?"

Q.   You sent that to Mr. Rode?
A.   Yes.
Q.   <u>As you said, you never got it back signed</u>?
A.   <u>No.</u>
Q.   And no one ever promised you it was going to be signed, right?
     MR. O'BRIEN:  Objection to the form.
Q.   Did anyone at Sears ever tell you the agreement was going to be signed?
A.   Every time for the past 15 years that a contract needed to be signed and a final agreement was agreed to, it was followed by a signature.
Q.   <u>Did anyone in January 2005 tell you</u> --
A.   I had no reason to believe otherwise.
Q.   -- <u>tell you that the extension to the syndication agreement that was drafted was going to be signed by Sears</u>?
     MR. O'BRIEN:  In so many words?
Q.   <u>In so many words?</u>
A.   <u>No.</u>

Feiner Depo. Vol. 2, pp. 303-05 (emphasis added). He also testified:

Q.   Did Mr. Vila or B.V.T.V. ever sign a document which set forth the two-year extension?
A.   No.
Q.   Did anyone from Sears ever sign a document which set forth this two-year extension?
A.   No.
. . .
Q.   Did you ever get execution copies?
A.   Never received execution copies.

Feiner Depo. Vol. 1, pp. 50-51.  Further, Monzon, the producer at BVTV, testified that there was no

meeting of the minds regarding an extension of the Syndication Agreement in January 2005:

Q.   Did Mr. Vila ever tell you in January of 2005 that Sears had agreed to extend the syndication agreement?
A.   I don't think so.
Q.   Okay.  Did anyone ever tell you in January of 2005 that Sears had agreed to extend the syndication agreement?
A.   I don't think so.
Q.   Did anyone ever tell you in January of 2005 that negotiations concerning the possible extension of the syndication agreement were ongoing?
A.   I think that would be a fair assessment of what I understood.
. . .
Q.   <u>Is it accurate that based upon what Mr. Vila told you during January of</u>

> <u>2005</u> <u>that</u> <u>throughout</u> <u>that</u> <u>month</u> <u>you</u> <u>understood</u> <u>that</u> <u>negotiations</u> <u>about</u> <u>a</u>
> <u>possible</u> <u>extension</u> <u>of</u> <u>the</u> <u>syndication</u> <u>agreement</u> <u>were</u> <u>on</u> <u>going?</u>
> MR. O'BRIEN: Objection to the form. You can answer.
> A.       <u>Yes,</u> <u>I</u> <u>believe</u> <u>that's</u> <u>accurate.</u>

Monzon Depo. pp. 52-54 (emphasis added). The fact that the parties continued to negotiate the

terms of the amendment to the Syndication Agreement from January 2004 through June 15, 2005

further supports BVTV's testimony evidencing that there was no meeting of the minds as to an

extension to the Syndication Agreement in January 2005. <u>See</u> Deposition Exhibits 22, 24, 27, 28,

29, 30, 95, 172, 186, 179, 173. Further:

- On February 1, 2005, Mr. Feiner e-mailed Rode indicating his understanding that BVTV could not receive payment under the Syndication Agreement until there was a signed contract in place between the parties. Mr. Feiner wrote, "<u>Because</u> <u>of</u> <u>the</u> <u>contract</u> <u>not</u> <u>being</u> <u>signed</u>, Bob has not received the $750,000 due the first of the year." Deposition Exhibit 179 (emphasis added).

- Rode replied by explaining that he did not have authority to bind Sears to the contract and that in light of the merger between Sears and Kmart, issues were still unresolved. Rode replied "I think you me and Andy [(Ginger)] (or just you and Andy) will need to talk on this. While I can negotiate contract I feel comfortable with[,] <u>I</u> <u>don't</u> <u>have</u> <u>access</u> <u>to</u> <u>the</u> <u>individuals</u> <u>here</u> <u>who</u> <u>would</u> <u>ultimately</u> <u>issue</u> <u>a</u> <u>go/no</u> <u>go</u> <u>decision</u>. Six months ago this would be a no brainer. With the merger[,] Andy is going to need to weigh-in." <u>Id.</u> (emphasis added).

- Indeed, Vila himself acknowledged that there was no agreed extension to the Syndication Agreement in his e-mail to Monzon. Deposition Exhibit 173. On February 3, 2006 Vila wrote "I'm in a difficult position. <u>The</u> <u>extension</u> <u>with</u> <u>Sears</u> <u>remains</u> <u>incomplete</u> <u>due</u> <u>to</u> <u>the</u> <u>K-Mart</u> <u>merger</u> <u>and</u> <u>internecine</u> <u>struggles</u>. I am involved in other negotiations but can't commit to anything just yet." <u>Id.</u> (emphasis added).

- Monzon, the producer at BVTV, testified:

  > Q.       As of February 2005 is it correct that there was uncertainty in your mind
  >           as to whether or not there would be funding for the new show?
  > A.       Yes, there was uncertainty.

  Monzon Depo. p. 58.

- Later, Rode e-mailed Melissa Marchand ("**Marchand**") the Chief Operating Officer of BV Webties LLC, the company that runs the Bobvila.com web site and one of BVTV's FED. R. CIV. P. 30(b)(6) designees, indicating that there were issues on the Sears side relating to the extension of the Syndication Agreement. <u>See</u> Deposition of Marchand

("**Marchand Depo.**"), p. 20.  He wrote on March 11, 2005 "On another note we heard back from Bill Crowley and there (as there always seems to be these days) are issues." Deposition Exhibit 27.

- Marchand  further testified about this e-mail:

  Q.    So as of that date [(March 11, 2005)], was it your understanding that the parties still hadn't come to an agreement with respect to an extension of the syndication agreement?
          MR. O'BRIEN:  Object to the form.  You may answer.
  A.    Yes.

  Marchand Depo. p. 53.

- In her notes regarding March 2005, Monzon wrote "We continue to wait for word from Sears."  Deposition Exhibit 220.

- On April 28, 2005, Rode transmitted a proposal regarding an extension of the Syndication Agreement and a renegotiation of the Spokesperson Agreement to Mr. Feiner.  See Deposition Exhibit 66.

- Shortly thereafter, Mr. Feiner rejected that offer.  See Deposition Exhibit 42.

In fact during this time, Sears' new management team composed initially of Luis Padilla ("**Padilla**"), the President of Merchandising and Marketing and Chief Merchant at Sears, and later William Crowley ("**Crowley**"), the Chief Financial Officer of SHC, were reviewing the relationship between Sears and BVTV and Vila and assessing the financial benefits of the same.  See Deposition Exhibits 80, 32, 34, 36, 38, 44, 47, 48, 110, 112, 142, 149, 150, 151.  Specifically, Sears was considering whether an extension of the Syndication Agreement was in the best business interest of Sears.  Id.; Deposition of Crowley ("**Crowley Depo.**"), pp. 69-70, 73-74.

In fact, BVTV, knowing and acknowledging that it had no agreement with Sears as to a possible amendment to the Syndication Agreement, began negotiations directly with King World to see whether King World would fund the production of a home improvement television show starring Vila.  Feiner Depo. Vol. 1, pp. 86-87, 93.  On March 24, 2005, Vila confirmed with Monzon and Marchand that he had alternate funding for the production of a home improvement

11

television show, see Deposition Exhibits 193, 220, and on May 16, 2005 entered into a production agreement with King World, whereby King World would fund the production of a home improvement television show starring Vila (the "**KW Agreement**").  Deposition Exhibits 158, 159, 217, 218, 219.  Indeed, even though BVTV had entered into the KW Agreement and had received funds from King World for the production of the television show, BVTV continued to invoice Sears for the production costs of the *Home Again* show.  See Deposition Exhibits 52, 58, 158; Feiner Depo. Vol. 2., pp. 361-62.  In response to these invoices, and without knowledge of the KW Agreement, on June 15, 2006, Robert Rathke, Esq., in-house counsel for SHC, sent Mr. Feiner a letter notifying him that Sears had never agreed to an extension of the Syndication Agreement, specifically stating that Sears "does not desire to pay to produce the 'Home Again' show and B.V.T.V. is proceeding with the production of the 'Home Again' show at its own risk . . . ."  Deposition Exhibit 180 (emphasis added); see also Vila Depo. Vol. 1. pp. 88-90; Feiner Depo. Vol. 2, pp. 349, 359-60.  The letter also invited Mr. Feiner to discuss an "amicable" resolution regarding Sears' desire to terminate the spokesperson relationship between Sears and Vila.  Deposition Exhibit 180.

### CONCLUSION OF NEGOTIATIONS BETWEEN THE PARTIES

Mr. Feiner replied to Sears' June 15, 2005 letter by letter dated June 28, 2005 in which he stated that BVTV's position is that the parties agreed to an extension of the Syndication Agreement and that Sears did not have a right to terminate the Spokesperson Agreement pursuant to the Home Again Cancellation Clause, as Sears did not have a right to cancel the show *Home Again*.  June 28, 2005 Letter from Mr. Feiner to Mr. Rathke.  He also invited Sears to engage in negotiations to resolve the situation.  Id.

Approximately twenty days later, on or about July 18, 2005, Vila and BVTV filed this

action in the Dukes County Superior Court.  <u>See</u> Deposition Exhibit 215; Docket.  In their original complaint, BVTV and Vila made public statements concerning Sears engaging in "bad faith" and "unfair and deceptive conduct."  Complaint ¶¶ 1, 45, 62 and WHEREFORE clause (E) and (J).

Sears responded to Mr. Feiner's June 28, 2005 letter by letter dated July 22, 2005 in which Sears explained that it did not agree with Mr. Feiner's positions regarding the Syndication Agreement and the Spokesperson Agreement, and reminded Mr. Feiner that:

> <u>Sears</u> <u>did</u> <u>not</u> <u>renew</u> <u>the</u> <u>Home</u> <u>Again</u> <u>program</u> <u>and</u> <u>has</u> <u>not</u> <u>authorized</u> <u>anyone</u> <u>to</u> <u>continue</u> <u>to</u> <u>produce</u> <u>or</u> <u>air</u> <u>the</u> <u>program</u> <u>using</u> <u>the</u> <u>Home</u> <u>Again</u> <u>name</u> <u>or</u> <u>any</u> <u>of</u> <u>Sears'</u> <u>trademarks</u>.  As between B.V.T.V. and Sears, the Syndicated Television Program Agreement clearly grants Sears all rights to the trademarks of the program.

Deposition Exhibit 162 (emphasis added).  In this same letter, Sears also made a proposal to Vila to resolve the dispute.  <u>Id.</u>  Sears removed this case to this Court on or about August 17, 2005, and by letter dated August 19, 2005, without having made the July 1, 2005 payment, terminated the Spokesperson Agreement, based on, *inter alia*, (1) Vila's use of Sears' *Home Again* trademark without permission or authority, (2) Vila's public statements about Sears, i.e., that Sears had engaged in deceptive and unfair trade practices which Sears concluded in its sole discretion reflected unfavorably upon Sears' reputation, and (3) the cancellation of the Home Again television show.  <u>See</u> Case Docket; Deposition Exhibit 62.

### VILA'S NEW TELEVISION SERIES

The new *Bob Vila* show began airing nationally the week of September 5, 2005.  Feiner Depo Vol. 1, p. 100.  Vila made the decision to change the show's name from *Bob Vila's Home Again* to *Bob Vila* on or about August 23, 2005, shortly after Defendants filed their counterclaim for trademark infringement regarding the Home Again name.  Case Docket; Deposition Exhibit 195; Marchand Depo. p. 85.  In their moving papers, Vila and BVTV argue that the *Bob Vila* show is the same television show as *Bob Vila's Home Again* with simply a different name.  Plaintiff Robert J.

Vila's Statement of Material Facts In Support of Plaintiffs' Motion for Partial Summary Judgment, p. 3. Vila's own testimony and documents, however, belie this claim and show that *Bob Vila* is a new show and that new episodes of *Bob Vila's Home Again* are not airing.

Vila testified as follows about his new television show:

| | |
|---|---|
| Q. | So what is your <u>new</u> show? |
| A. | "Bob Vila." |
| Q. | And when did that new show start? |
| A. | The fall of '05. |
| Q. | And the producer of that show is what company? |
| A. | B.V.T.V. Inc. |

Vila Depo. Vol. 1., p. 61 (emphasis added). He further testified:

| | |
|---|---|
| Q. | What are the different shows you have done in the last 15 years that they have sold or that they have been involved in, what are the different shows? |
| A. | You want me to tell you the content of the different shows? |
| Q. | I just want to know the names of the Vila different shows. |
| A. | "Bob Vila's Home Again." |
| Q. | Okay. What other shows? |
| A. | "Bob Vila." |
| Q. | What else? |
| A. | "Bob Vila's Guide to Historic Homes," "Restore America." |
| Q. | Wait just a second. What else? |
| A. | I think that's it. |
| Q. | So you have had over the last 15 years <u>four</u> <u>different</u> shows that have been televised; is that right? |
| A. | <u>Yes</u>. |

Vila Depo Vol. 2. pp. 359-60 (emphasis added). In Vila's printed biography which is distributed to various media for the promotion of the *Bob Vila* show, Vila states "Bob Vila has appeared on television for over 25 years — first on 'This Old House' and, for 15 years, on 'Bob Vila's Home Again' <u>and</u> <u>now</u> <u>with</u> <u>his</u> <u>new</u> <u>show</u>, 'Bob Vila.'" Deposition Exhibit 157 (emphasis added). Similarly, Vila's web site bobvila.com, consistent with Vila's testimony, references his show *Bob Vila* as beginning in 2005 and as "Season 1." <u>See</u> Deposition Exhibits 155, 156, and 213.

Furthermore, several media outlets have printed stories regarding Vila's new show:

- "Home fixer-upper <u>Bob</u> <u>Vila's</u> <u>new</u> <u>series</u> shows how to build a house that can stand up to a hurricane's fury."  St. Petersburg Times, September 10, 2005, Deposition Exhibit 194 (emphasis added);

- "If anything, <u>Vila's</u> <u>new</u> <u>show</u> is a good primer on what to look for when you buy your next house." Miami Herald, September 11, 2005, Deposition Exhibit 194 (emphasis added);

- "As part of his <u>new</u> <u>show</u>, Bob Vila and his crew constructed a storm ready home in Florida to replace a home that was destroyed by Hurricane Charlie in 2004." TvSquad.com October 25, 2005, Exhibit 176 (emphasis in the original);

- "<u>A</u> <u>new</u> <u>TV</u> <u>series</u> about building homes able to withstand storms has left its star, handyman Bob Vila, with one big regret: 'I wish I'd been a year earlier.'" San Diego Union Tribune, September 11, 2005, Exhibit 194 (emphasis added).

Neither BVTV nor Vila ever requested that any of these publications print retractions when the show was referenced as a "new" show.  Marchand Depo. p. 77.  Under these circumstances, there is no question that *Bob Vila* is a new television show.

Further, despite the fact that the Spokesperson Agreement specifically required Vila to seek permission from Sears in writing to appear in "sponsored media," <u>see</u> Spokesperson Agreement Amendment  IX, Part 6, Deposition Exhibit 159, Vila never sought Sears' permission to appear in the *Bob Vila* show which was sponsored by numerous companies.  The credits to the episodes specifically designate the show as sponsored media:

- Episode 9 was "Sponsored in part by: DuPont Corian, Whirlpool, Cardell Cabinets," *Bob Vila* Episodes 1-14 DVDs, attached as Exhibit P to <u>Sankaran Declaration,</u>
- Episode 10 was "Sponsored in part by: Toto, USA, D&B/Hurricane Master Garage Doors Melbourne, FL," <u>id.,</u>
- Episode 11 was "Sponsored in part by: Sun State Landscaping, Trent Culleny Landscaping Contractor Inc., Gardens Alive!, PestAgon, Lawn Logic, American Farms, Butler Tree Farms, John Deere Landscapes, Triple "O" Nursery, Toro," <u>id.,</u>
- Episode 12 was "Sponsored in part by: Blue Haven Pools, Baby Barrier, Armor Screen, Hawyard, Jandy," <u>id.,</u>
- Episode 13 was "Sponsored in part by: Bellawood, Moen, Smith & Noble, Seagull Lighting," <u>id.,</u> and
- Episode 14 was "Sponsored in part by: Bacon's Furniture Gallery, Frontgate, Whirlpool, OXO, Chantal, Chicago Metallic, Joyce Chen, Ironwood Gourmet, Lodge Manufacturing," <u>Id.</u>.

Also, despite the fact that Vila agreed not to permit his name, likeness, photograph, voice or biography to be used in advertising, publicizing or promoting any product or service other than Sears' products, Vila did just that during the term of the Spokesperson Agreement and during the six months after Sears terminated.  On the *Bob Vila* show, Vila's name, likeness, photograph, and voice were used to advertise, publicize and/or promote the following products:

- Cardell Cabinets
- Dupont Corian kitchen countertops
- Whirlpool dishwasher
- Toto, USA,  electric toilet
- D&D Garage Doors, Hurricane Master garage door
- Lawn Logic watering/irrigation system for yards
- Gardens Alive Pyola pest control, Escar-go! slug and snail bait
- PestAgon termite prevention device
- Commercial Residential Construction swimming pool cage
- Blue Haven Pools swimming pool
- Baby Barrier Pool Fence Company child protection fence around pool
- Armor Screen
- Moen sink fixtures and plumbing
- Electric Controls, Inc., surge protector
- Sea Gull Lighting
- Smith and Noble bamboo window shades
- Mercedes Homes
- Chantal Cookware
- Lodge Manufacturing cast iron skillet
- OXO goodgrips cooking utensils
- Front Gate patio furniture

- Chevy Truck
- FLASH
- Solid Wall Systems
- Precision Forms
- D. Peck Roofing
- Simpson Strong Tile
- Hanson Roof Tile
- PGT Industries
- Great Southern Windows
- Kohler Global Power Group
- SquareD/Scheinder Electric
- Georgia Pacific
- Tranquility Plumbing
- Electric Controls, Inc.
- Blue Haven Pools & Spa
- Royal Bathe Manufacturing
- Prestige Gunite
- Color Wheel Paints & Coatings
- RBP Trim
- Porceelanosa
- West Coast Drywall
- Creative Touch Interiors
- Joyce Chen wok
- Ironwood Gourmet wooden salad bowl and serving dishes
- Whirlpool refrigerator and double oven.

See Exhibit P to Sankaran Declaration.  Filming and production for the Punta Gorda project began the end of May 2005 or beginning of June 2005 during the time the Spokesperson Agreement was in effect.  Monzon Depo. pp. 133-34.  Vila was well aware of his obligations under the Competitive

Protection provisions of the Spokesperson Agreement, as his counsel Mr. Feiner informed him and King World of the same:

> Also I wish to remind you that Bob is still under contract for his personal services for Sears, Roebuck and Company, and, as such, Bob cannot render any services for, or permit his name, likeness, photograph, etc., to be used in advertising, publicizing or promoting any product or service other than Sears. This . . . could have an impact if someone wanted on-air credit.

Deposition Exhibit 159 (emphasis added). Yet Vila never sought written permission from Sears to appear in these episodes pursuant to Competitive Protection provisions of the Spokesperson Agreement. Feiner Depo. p. 98-100.

### VIOLATION OF SEARS' TRADEMARK RIGHTS IN THE HOME AGAIN MARK

From the beginning of March 2005 through March 28, 2006, Vila used Sears' Home Again mark without permission or other authority. First, since as early as March 7, 2005, despite the fact that BVTV and Vila were fully aware that Sears had not agreed to fund the production of another season of *Bob Vila's Home Again* and that Sears had all rights and interest in the Home Again mark, Monzon, Marchand and other Vila representatives, on repeated occasions, used the Home Again mark in attempts to solicit product donation for *Bob Vila's Home Again* (which Vila and King World separately, and without Sears' involvement, agreed to produce for the 2005-2006 season), and for advertising on the bobvila.com web site, including:

- March 7, 2005 solicitation to Wood Promotion Network for product donation to "Home Again," Deposition Exhibit 200,
- April 5, 2005 solicitation to Plain & Fancy for product donation to "Home Again," Deposition Exhibit 221,
- May 11, 2005 solicitation to Whirlpool for product donation to "Home Again," Deposition Exhibit 225,
- May 25, 2005 and June 3, 2005 solicitations to DCS appliances for

- June 21, 2005 solicitation for Moen product donation to "Home Again," Deposition Exhibits 234, 233,
- June 21, 2005 solicitation to WarmZone for product donation to "Home Again," Deposition Exhibit 206,
- June 21, 2005 follow-up to Hanson regarding product donation to "Home Again," Deposition Exhibit 235,
- June 22, 2005 solicitation to e-Counters for product donation to "Home Again," Deposition Exhibit 207,

product donation to "Home Again," Deposition Exhibit 201, 228, 227,

- June 10, 2005 solicitation to Western Red Cedar Lumber Association for product donation to "Home Again," Deposition Exhibit 202,
- June 10, 2005 solicitation to Wayne Dalton for product donation to "Home Again," Deposition Exhibits 160, 203,
- June 13, 2005 product donation from Georgia Pacific referring to program as "Home Again," Deposition Exhibit 229,
- June 16, 2005 inquiry to tile donator for "Home Again," Deposition Exhibit 230,
- June 17, 2005 solicitation to Sun Systems for product donation to "Home Again," Deposition Exhibit 231,
- June 17, 2005 Product donation from Georgia Pacific referring to program as "Home Again," Deposition Exhibit 232,
- June 21, 2005 solicitation to Jen-Weld for product donation to "Home Again," Deposition Exhibit 205,

- June 22, 2005 solicitation to DuPont Corian for product donation to "Home Again," Deposition Exhibit 236,
- July 1, 2005 solicitation for foam insulation product donation to "Home Again," Deposition Exhibit 208,
- July 15, 2005 solicitation to Whirlpool for product donation to "Home Again," Deposition Exhibit 209,
- July 21, 2005 solicitation to Landscape Anchors for donation to "Home Again," Deposition Exhibit 238,
- July 28, 2005 solicitation to Benjamin Moore for product donation to "Home Again," Deposition Exhibit 164,
- August 2, 2005 solicitation to Gardens Alive for product donation to "Home Again," Deposition Exhibit 165, 211,
- August 2, 2005 solicitation to DuPont Corian for product donation to "Home Again," Deposition Exhibit 166
- August 3, 2005 solicitation to ATAS for product donation to "Home Again," Deposition Exhibit 167, and
- August 4, 2005 solicitation to Benjamin Moore for product donation to "Home Again," Deposition Exhibit 187.

Further trademark violations appear in the May 16, 2005 KW Agreement which refers to the television show being produced as "Bob Vila's Home Again." Deposition Exhibits 158, 159. All of these trademark violations occurred prior to the time the July 1, 2005 payment was allegedly due under the Spokesperson Agreement.

Additionally, in producing *Bob Vila's Home Again*, BVTV continued to violate Sears' trademark by entering into license agreements with stock footage companies referring to the program title as "Bob Vila's Home Again." Deposition Exhibit 168.

The releases used by BVTV to secure authority from people appearing on *Bob Vila* represented to the people executing them that the program was "Bob Vila's Home Again." See

Deposition Exhibit 169.  These trademark violations occurred both before and after the July 1, 2005

payment was allegedly due under the Spokesperson Agreement on the following dates:

- June 5, 2005,
- June 6, 2005 (4 releases),
- June 7, 2005 (3 releases),
- June 15, 2005,
- June 25, 2005,
- July 12, 2005 (3 releases),
- July 13, 2005 (5 releases),
- July 19, 2005 (3 releases),
- July 25, 2005,
- July 26, 2005,
- August 2, 2005 (3 releases),
- August 3, 2005 (3 releases),
- August 9, 2005 (4 releases),
- August 16, 2005 (7 releases),
- August 17, 2006 (5 releases),
- August 23, 2005 (2 releases),
- August 31, 2005 (4 releases),
- September 13, 2005 (7 releases),
- September 14, 2006 (5 releases),
- September 15, 2005 (4 releases),
- September 20, 2005,
- September 26, 2005, and
- numerous undated releases.

In promoting his show, when interviewed on Fox News which aired on or about September

11, 2005, Vila referred to his new show as "Bob Vila's Home Again."  DVD of Fox News

September 11, 2005 episode, attached Exhibit Q, to Sankaran Declaration.  Additionally, at the end

of episode 10 of the *Bob Vila* show, which aired on November 14, 2005, in a quick tease for the

following week's episode, Vila states "come home again next week . . . ."  Episode 10 of *Bob

Vila*, attached Exhibit P, to Sankaran Declaration.

Vila further continued to violate Sears' trademark on his web site bobvila.com.  As late as

the beginning of 2006, Vila advertised for sale caps, t-shirts and mugs bearing the Home Again

mark on bobvila.com. Deposition Exhibit 163; Marchand Depo. pp. 92-93. Additionally, in the

frequently asked questions section of his web site, Vila, from 2003 up to at least March 27, 2006,

referred to his current television show as "Bob Vila's Home Again."  "**How do I get my new home

improvement invention on your show and/or web site?** Bob Vila is happy to consider your

product for use on 'Bob Vila's Home Again' if you mail us a sample, press kit and product

literature."  Marchand Depo. pp. 175-76; Deposition Exhibit 214 (emphasis in the original).  "**Why

is Bob Vila no longer hosting 'This Old House'?** Bob Vila currently hosts and produces 'Bob

Vila's Home Again' which gives him more freedom to choose projects and products."  Deposition Exhibit 212 (emphasis in the original).

Based on these undisputed facts, it is clear that Sears validly terminated the Spokesperson Agreement (a) under the Morals/Misconduct Clause because Vila (i) repeatedly violated Sears trademark and (ii) made public statements reflecting unfavorably on Sears' reputation; and (b) under the Home Again Cancellation Clause because the show has terminated.  Furthermore, as Vila himself was in material breach of the terms of the Spokesperson Agreement prior to July 1, 2005 because of his unauthorized use of the Home Again mark, because of his appearance in sponsored media without permission, and the use of his name, likeness and voice in advertising, promoting and publicizing products other than Sears' products, he is not entitled to any portion of the July 1, 2005 payment.  Moreover, the undisputed facts show that there was no meeting of the minds between January 14-18, 2005 regarding any two-year extension of the Syndication Agreement, thus rendering any draft unenforceable.

## ARGUMENT

### I.  THIS COURT SHOULD DENY PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND ALLOW DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AS THERE ARE NO DISPUTED ISSUES OF MATERIAL FACT AND DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW.

#### A.    STANDARD FOR SUMMARY JUDGMENT.

"Summary judgment is appropriate when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  De-Jesus-Adorno v. Browning Ferris Indus. of P. R., Inc., 160 F.3d 839, 841 (1st Cir. 1998).  In addition, "summary judgment is appropriate against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial." <u>Terry v. Bayer Corp.</u>, 145 F.3d 28, 34 (1st Cir. 1998).  Rule 56 of the Federal Rules of Civil Procedure authorizes a court to grant summary judgment.  Specifically, Rule 56(c) provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Further, Rule 56(e) provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

"The role of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  <u>Camar Corp. v. Preston Trucking Co., Inc.</u>, 18 F. Supp. 2d 112, 114 (D. Mass. 1998), citing <u>Mesnick v. Gen. Elec. Co.</u>, 950 F.2d 816, 822 (1st Cir. 1991), <u>cert. denied</u>, 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992)).  "The burden is upon the moving party to show, based upon the pleadings, discovery on file and affidavits that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." <u>Id.</u>  This burden may be discharged by pointing out the absence of evidence to support the nonmoving party's case. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 325, 106 U.S. 2548, 2554, 91 L.E.2d 265 (1986).  "When the moving party has carried its burden . . .  its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L.E.2d 538 (1986).  The adverse party may not rest upon "mere allegations or denials," FED. R. CIV. P. 56(e), but "must set forth specific facts showing that there is a genuine

issue for trial." Id.

To defeat a properly supported motion for summary judgment, a factual issue must be both "genuine" and "material." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2509-10, 91 L.E.2d 202 (1986). A factual issue is not "genuine" unless "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. A factual issue is not "material" unless it "might affect the outcome of the suit under the governing law." Id. In deciding whether there is a genuine issue of material fact, the court must draw all reasonable inferences in favor of the nonmoving party. Id. at 255. However, the First Circuit has noted that "[a] genuine issue of material fact does not spring into being simply because a litigant claims that one exists. Neither wishful thinking nor 'mere promise[s] to produce admissible evidence at trial'. . . nor conclusory responses unsupported by evidence . . . will serve to defeat a properly focused Rule 56 motion." Martinez v. New England Med. Ctr. Hosps., Inc., 307 F. Supp. 2d 257, 264 (D. Mass. 2004), citing Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). Drawing all inferences in favor of Sears, Kmart and SHC with respect to Plaintiff's motion for partial summary judgment and in favor of Vila and BVTV with regard to Defendants' cross-motion for summary judgment, there is no genuine issue of material fact on Plaintiff's claims and the Court should grant summary judgment in Defendants' favor on all claims.

## B.    CHOICE OF LAW.

In this case, the Spokesperson Agreement has a choice of law clause specifying the application of Illinois law and the Syndication Agreement has a choice of law clause designating New York law. Spokesperson Agreement Article VII(16); Syndication Agreement ¶ 22. To the extent, Plaintiffs allege tort claims, this Court need not decide what law applies to plaintiffs' claims as the law is the same in the relevant jurisdictions. Okmyansky v. Herbalife Int'l of Am.,

Inc., 415 F.3d 154, 158 (1st Cir. 2005); Royal Bus. Group, Inc. v. Realist, Inc., 933 F.2d 1056, 1064 (1st Cir. 1991); Fashion House, Inc. v. K Mart Corp., 892 F.2d 1076, 1092 (1st Cir. 1989); American Employers' Insurance Company v. Swiss Reinsurance America Corporation, 275 F. Supp. 2d 29, 37 (D. Mass. 2003); Commercial Union Ins. Co. v. Swiss Reinsurance Am. Corp., 2003 WL 1786863, at *7 n. 6 (D. Mass. March 31, 2003).

C.     **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT SHOULD BE DENIED AND DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT ON COUNTS I, II, III, AND VI IN THE FAC RELATING TO THE SPOKESPERSON AGREEMENT SHOULD BE ALLOWED AS THERE ARE NO DISPUTED ISSUES OF MATERIAL FACT AND DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW.**

1.     Defendants Are Entitled To Judgment As A Matter Of Law On Plaintiffs' Claim For Breach Of The Spokesperson Agreement.

The essence of Vila's breach of the Spokesperson Agreement is two-fold. First, Vila claims that Sears was not entitled to terminate the Spokesperson Agreement under the Morals/Misconduct Clause because of Vila's violation of Sears' Home Again trademark and Vila's public statements reflecting unfavorably on Sears, and under the Home Again Cancellation Clause because *Bob Vila's Home Again* has been cancelled. Plaintiff Robert J. Vila's Memorandum of Reasons In Support Of His Motion For Partial Summary Judgment ("**Plaintiffs' Summary Judgment Memo**"), pp. 9-12. Second, Vila argues, even if Sears was entitled to terminate the Spokesperson Agreement, Sears did not do so until after the July 1, 2005 payment became due and, accordingly, Vila is due $948,750. Plaintiffs' Summary Judgment Memo pp. 5-7.[3] Because Vila was not in compliance with the material terms of the Spokesperson Agreement at the time the July 2005 payment became due—as a

---

[3] Vila claims that Sears continued to use Vila's image on the craftsman.com web site and therefore owes Vila for that use. Plaintiffs' Summary Judgment Memo, p. 5. However, Sears had the right to use those images post-termination pursuant to the Spokesperson Agreement. Spokesperson Agreement Article II ("We [(Sears)] shall have full and complete right . . . to telecast, broadcast, use, reproduce, and/or exhibit the Advertising during the term hereof and for a period of sixty (60) days thereafter (for make-good purposes only) . . . ."). Even if Sears did not have the right to use the images of Vila post-termination on its Craftsman® web site, Vila's claim is not under the terminated Spokesperson Agreement, but rather one for unjust enrichment—a claim which is absent from the FAC.

result of his trademark violations and his violation of the competitive protection provisions of the Spokesperson Agreement—he cannot recover.  Accordingly, Defendants are entitled to judgment as a matter of law.

> **(a)**    **Sears Was Entitled To Terminate The Spokesperson Agreement Under The Morals/Misconduct Clause Because Of Vila's Violation Of Sears Trademark Rights.**

The essence of the Morals/Misconduct Clause is Sears' ability to protect its reputation.  An essential feature of protecting its reputation is enforcing Sears' rights under the trademarks it owns.  In its agreement with Vila, Sears bargained for the ability to protect its reputation via the Morals/Misconduct Clause, which permitted it to terminate the Spokesperson Agreement if, in its sole discretion, it determined that Vila became involved in an activity that reflected unfavorably upon its reputation.  The Morals/Misconduct clause specifically provides:

> If you have committed or shall commit any act, or have or do become involved in any situation or occurrence bringing you into public disrepute, contempt, scandal or ridicule, or shocking, insulting, or offending the people of this nation or any racial or religious group thereof, or reflecting unfavorably upon our reputation or our Products, then we shall have the right to immediately terminate this agreement.  Our decision on all matters arising under this paragraph shall be conclusive and shall be based on our judgment as to whether or not your act or involvement has harmed or may be harmful in a significant respect; provided that our decision to terminate hereunder must be exercised if at all, no later than 60 days after the facts giving rise to such right under this paragraph are brought to our attention.  Should a termination take place, ours and your remedies shall be those set forth in Article VII. 6. above.

Spokesperson Agreement, Article VII (7) (emphasis added). The terms of the Morals/Misconduct Clause encompass the misappropriation of a trademark.  "Section 43(a) of the Lanham Act now expressly prohibits, *inter alia*, the use of any symbol or device which is likely to deceive consumers as to the association, sponsorship, or approval of goods, or services by another."  Waits v. Frito-Lay, Inc., 978 F.2d 1093, 1106-08 (9th Cir. 1992).  This is because owners of trademarks invest time, effort and money in a mark to associate it with its owner's reputation.

When a mark is misappropriated, the owner loses control of the quality of the products and services that are sold with that mark which could damage the owner's reputation. <u>See, e.g.</u>, <u>Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc.</u>, 754 F.2d 91 (2d Cir. 1985); <u>Wesley-Jessen Div. of Schering Corp. v. Bausch & Lomb, Inc.</u>, 698 F.2d 862 (7th Cir. 1983); <u>Paco Rabanne Parfums, S.A. v. Norco Enterps.</u>, 680 F.2d 891, 894 (2d Cir. 1982); <u>Hills Bros. Coffee, Inc. v. Hills Supermarkets, Inc.</u>, 428 F.2d 379, 381 (2d Cir. 1970); <u>Kusan, Inc. v. Alpha Distributors, Inc.</u>, 693 F.Supp. 1372, 1374 (D.Conn. 1988); <u>accord El Greco Leather Prods. Co. v. Shoe World, Inc.</u>, 806 F.2d 392 (2d Cir. 1986), <u>cert. denied</u>, 484 U.S. 817, 108 S.Ct. 71, 98 L.Ed.2d 34 (1986); <u>Polymer Technology Corp. v. Mimran</u>, 975 F.2d 58, 62 (2d Cir. 1992), <u>amended</u> <u>reported at</u> 1992 U.S. App. LEXIS 32204 (2d Cir. 1992), <u>aff'd</u>, 37 F.3d 74 (2d Cir. 1994) ("actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain"); <u>Warner-Lambert Co. v. Schick U.S.A., Inc.</u>, 935 F. Supp. 130, 141 (D. Conn. 1996). Therefore, a violation of a trademark clearly falls within the reputational harm that the Morals/Misconduct Clause was intended to cover.

The Syndication Agreement makes it clear that Sears is the owner of the Home Again trademark. It unequivocally and unambiguously states that:

(a) . . . Producer [(BVTV)] agrees that it will not use the name "Sears" and any of Sears trademarks, trade names or service marks without the express written permission from Sears. Producer expressly recognizes and acknowledges that the use of Sears marks shall not confer upon Producer any proprietary rights to any such Sears marks. <u>Upon</u> <u>expiration</u> <u>or</u> <u>upon</u> <u>termination</u> <u>of</u> <u>Producer's</u> <u>right</u> <u>to</u> <u>use</u> <u>Sears</u> <u>marks</u> <u>for</u> <u>any</u> <u>cause,</u> <u>Producer</u> <u>shall</u> <u>immediately</u> <u>cease</u> <u>all</u> <u>use</u> <u>of</u> <u>all</u> <u>such</u> <u>Sears</u> <u>marks</u> <u>and</u> <u>will</u> <u>not</u> <u>use</u> <u>any</u> <u>such</u> <u>Sears</u> <u>marks</u> <u>thereafter.</u> <u>Producer</u> <u>agrees</u> <u>not</u> <u>to</u> <u>question,</u> <u>contest</u> <u>or</u> <u>challenge</u> <u>the</u> <u>ownership</u> <u>by</u> <u>Sears</u> <u>of</u> <u>any</u> <u>such</u> <u>right,</u> <u>title</u> <u>or</u> <u>interest</u> <u>in</u> <u>any</u> <u>such</u> <u>mark,</u> except the right to use the same pursuant to the terms and conditions of this agreement, <u>and</u> <u>will</u> <u>not</u> <u>seek</u> <u>to</u> <u>register</u> <u>the</u> <u>same.</u>

(b) . . . <u>Producer</u> <u>acknowledges</u> <u>that</u> <u>Sears</u> <u>may</u> <u>register</u> <u>any</u> <u>and</u> <u>all</u> <u>of</u> <u>the</u> <u>trademarks,</u> <u>service</u> <u>marks</u> <u>or</u> <u>trade</u> <u>names</u> <u>for</u> <u>the</u> <u>Program(s)</u> <u>under</u> <u>this</u> <u>Agreement</u> <u>in</u> <u>its</u> <u>own</u> <u>name,</u> <u>and</u> <u>that</u> <u>Producer's</u> <u>use</u> <u>thereof</u> <u>shall</u> <u>inure</u> <u>to</u> <u>the</u>

benefit of Sears for such purposes, as well as for other purposes.  Producer shall
cooperate in any such registration by Sears or application therefore.

Syndication Agreement Section 18(a) & (b) (emphasis added).   Under the Syndication

Agreement: (1) Sears has the right to register any and all marks at any time associated with the

Home Again television show, (2) BVTV is required to comply with any of Sears' efforts to

register the marks, (3) BVTV is not permitted to challenge the ownership of any of Sears' marks,

and (4) upon expiration of the Syndication Agreement BVTV is not permitted to use any of

Sears' marks.   There can be no clearer expression that the "Home Again" mark is owned by

Sears.[4]

Sears determined that Vila's unauthorized use of Sears' Home Again mark reflected

unfavorably on it and/or its products and properly terminated the Spokesperson Agreement.  After

Sears learned that Vila began using the Home Again mark in association with a purported

sixteenth season of a home improvement television show starring Vila, Sears informed Vila that,

in its sole discretion, it determined this act to constitute "substantial misconduct" and terminated

the Spokesperson Agreement pursuant to the Home Again Cancellation Clause.[5]  See Deposition

Exhibit 62.  As Sears' exercise of discretion is absolute in this circumstance, see, e.g., Bank One,

Springfield v. Rossetti, 309 Ill.App. 1048, 1059-60, 723 N.E.2d 755, 764 (1999), its termination

was proper.

---

[4] It is true that Sears has not registered this mark with the United States Patent and Trademark office.  However, even where unregistered, the Home Again mark is entitled to protection pursuant to 15 U.S.C. § 1125(a).
[5] In fact, Sears informed Vila and BVTV that they had no right to use the Home Again mark in association with the production of any 2005-2006 (or subsequent) home improvement television show by letter dated July 22, 2005.  See Exhibit 162.  However, Vila continued to use the mark without permission.

**(b)    Sears Was Entitled To Terminate The Spokesperson Agreement Under The Morals/Misconduct Clause Because Of Vila's Public Statements Reflecting Unfavorably On Sears Reputation.**

As described above, the Morals/Misconduct Clause of the Spokesperson Agreement allowed Sears to terminate where Vila engaged in actions which reflected unfavorably upon Sears' reputation or Sears' products.  The language is broad and encompasses statements made in the course of litigation.  The Morals/Misconduct clause specifically provides:

> If you have committed or shall commit any act, or have or do become involved in any situation or occurrence bringing you into public disrepute, contempt, scandal or ridicule, or shocking, insulting, or offending the people of this nation or any racial or religious group thereof, or reflecting unfavorably upon our reputation or our Products, then we shall have the right to immediately terminate this agreement.  Our decision on all matters arising under this paragraph shall be conclusive and shall be based on our judgment as to whether or not your act or involvement has harmed or may be harmful in a significant respect; provided that our decision to terminate hereunder must be exercised if at all, no later than 60 days after the facts giving rise to such right under this paragraph are brought to our attention.  Should a termination take place, ours and your remedies shall be those set forth in Article VII. 6. above.

Spokesperson Agreement, Article VII (7) (emphasis added).  In accordance with this language, Sears can invoke its rights under the Morals/Misconduct Clause when Vila becomes involved in "any act" or "any situation or occurrence" which Sears determines to reflect unfavorably on it. Id. (emphasis added).  There is no exclusion from these very broad terms for acts, situations, or occurrences in connection with bringing a lawsuit nor are acts, situations, or occurrences in judicial setting implicitly exempted.  As previously discussed, Sears and Vila, represented by counsel, bargained for the terms in the Morals/Misconduct Clause.  When a spokesperson for the products of a particular company accuses that company of engaging in bad faith and deceptive trade practices, that company can obviously conclude that the spokesperson is reflecting unfavorably upon it, and, accordingly, that the spokesperson is no longer of value.  See, e.g., Nader v. ABC Television, 330 F. Supp. 2d 345 (S.D.N.Y. 2004) (granting summary judgment in ABC's favor on

27

plaintiff's claim for breach of contract under a morals clause where plaintiff was arrested and was also the subject of media attention), aff'd 150 Fed. Appx. 54 (2d Cir. 2005) (unpublished, not precedential authority) Korb v. Raytheon Corp., 410 Mass. 581, 584, 574 N.E.2d 370, 372 (1991) (employee was permissibly fired where employee made public statements against employer's financial interests and employer concluded the employee "lost his effectiveness as its spokesperson").  Furthermore, although statements contained in pleadings may insulate their maker from claims for defamation, see Scheib v. Grant, 22 F.3d 149, 156 (7th Cir. 1994), the law in Illinois and several other jurisdictions is that such statements do not relieve a party from its contractual obligations.  See Cummings v. Beaton & Association, Inc., 249 Ill. App. 3d 287, 306, 618 N.E.2d 292, 311 (1992).  In Cummings, the Appellate Court of Illinois ruled that a party's conduct in judicial proceedings in breach of a settlement agreement was not protected by judicial privilege.  249 Ill. App. 3d at 306, 618 N.E.2d at 311-12.  The contract in question required all parties to make recommendations to a bankruptcy court to approve the agreement.  249 Ill. App. 3d at 295, 618 N.E.2d at 293.  Instead, one of the parties wrote a letter and made statements to a bankruptcy court judge recommending an alternative agreement.  249 Ill. App. 3d at 299, 618 N.E.2d at 298-99.  After deciding that this conduct was a breach of the agreement, the appellate court rejected the party's assertion that a cause of action for breach was insulated because the breach took place within a document filed with a court.  249 Ill. App. 3d at 306; 618 N.E.2d at 311-12.  "Lane's self-styled role as officer of the court does not require us to agree that his actions in breach of contract were protected by judicial privilege . . . .  If we adopted this position, the implication would be that any party could breach a contract with impunity simply by repudiating it in open court.  We find the argument irrational and unsupported by sound authority."  Id.  See also Patton v. Cox, 276 F.3d 493, 500 (9th Cir. 2002) (defendant, by

voluntarily entering into an agreement to refrain from disclosing findings of psychological examination, thereby choosing to limit his ability to share particular information, "was not at liberty to breach his obligation [by voluntarily disclosing findings in a quasi-judicial hearing] even if he felt it was in the public's best interest to do so"); Tulloch v. JPMorgan Chase & Co., 2006 WL 197009 (S.D. Tex. Jan. 24, 2006) (where plaintiff attached a confidential contract to the Complaint in violation of the confidentiality provisions contained therein, , the court refused to extend litigation privilege to conduct in judicial proceedings in breach of contractual terms and noted that "plaintiff's contractual confidentiality obligations predated the lawsuit, and it cannot be public policy to allow parties to a contract to unilaterally nullify such pre-existing contractual obligations merely by filing suit");[6] Wentland v. Wass, 126 Cal. App. 4th 1484, 25 Cal. Rptr. 3d 109 (2005) (because application of the litigation privilege would frustrate the purpose of a pre-litigation agreement by plaintiff not to make any "accusation or comment that alleged wrongdoing by" the defendant with respect to a real estate investment, court reversed the dismissal of a cause of action for breach of contract based upon statements made in pleadings which constituted allegations of wrongdoing in violation of that agreement).

Pursuant to the Morals/Misconduct clause, Vila knew that if he became involved in any activities which reflected unfavorably on Sears and/or its products, Sears had the absolute right to terminate the Spokesperson Agreement. Vila specifically bargained for this deal and collected over $13 million in exchange. Knowing this, and represented by counsel, Vila filed the FAC which contained statements concerning Sears engaging in "bad faith" and "unfair and deceptive trade practices." Complaint ¶¶ 1, 45, 62, and WHEREFORE clauses (E) and (J); FAC ¶¶ unnumbered introductory paragraph, 68, 85, WHEREFORE clauses (E) and (J). Nothing in the Spokesperson

---

[6] Indeed, in the instant case, it was not necessary as matter of law for Vila to allege a violation of Mass. Gen. L. ch. 93A in that the choice of law clause contained in the Spokesperson Agreement precluded the application of Mass. Gen. L. ch. 93A to his contract based claims. See infra Part I(C)(4), .

Agreement prevents Vila from filing such a claim.  However, the fact that these public statements are in the form of a Complaint does not shield Vila from the consequences of the Morals/Misconduct Clause.  See Cummings, 249 Ill. App. 3d at 306, 618 N.E.2d at 311; see also Patton, 276 F.3d at 500; Tulloch, 2006 WL 197009; Wentland, 126 Cal. App. 4th at 1484.  The Spokesperson Agreement provided that Sears had the sole and conclusive right to determine that after Vila made these statements it would be impossible for him to represent the company as its spokesperson and accordingly he no longer had value.  See, e.g., Nader, 150 Fed. Appx. 54; Korb, 410 Mass. at 584, 574 N.E.2d at 372; Deposition Exhibit 62.  Indeed, Vila's public statements regarding Sears became the subject of additional media attention in the *Chicago Tribune*.  See Deposition Exhibits 170, 171.   Under these circumstances there can be no question that Sears validly exercised its right to terminate the Spokesperson Agreement under the Morals/Misconduct for Vila's public statements.  Accordingly, Sears properly terminated the Spokesperson Agreement.

> **(c)** **Sears Was Entitled To Terminate The Spokesperson Agreement Under The Home Again Cancellation Clause Because The Television Program *Bob Vila's Home Again* Has Been Cancelled.**

It is undisputed that the show titled *Bob Vila's Home Again* is cancelled.  The Home Again Cancellation Clause specifically allows Sears to terminate the Spokesperson Agreement under the following circumstances: "[i]f the Bob Vila Home Again television show is cancelled for any reason, Sears has the right to terminate this Agreement effective the 31st day of December following the notice of cancellation."  Spokesperson Agreement, Amendment IX, Part 7; Amendment X, ¶ 4 (emphasis added).  Unambiguous contracts preclude the admission of parol evidence to modify their terms. Air Safety, Inc. v. Teacher Realty Corp., 185 Ill.2d 457, 462-63, 706 N.E.2d 882, 884 (1999).  Additionally, unambiguous contracts are to be interpreted based on their plain meaning. "A court must construe the meaning of a contract by examining the language and may not interpret

the contract in a way contrary to the plain and obvious meaning of its terms." <u>Dean Mgmt., Inc. v.</u> <u>TBS Construct., Inc.</u>, 339 Ill. App. 3d 263, 269, 790 N.E.2d 934, 939 (2003).    Black's Law Dictionary defines "cancel" as "To <u>terminate</u> a promise, obligation, or right." <u>Black's Law</u> <u>Dictionary</u> 197 (7th ed. 1990) (emphasis added).  A "cancellation clause" is further defined as, *inter alia,* "[a] contractual provision allowing one or both parties to annul their obligations under certain conditions." <u>Id</u>.  "Cancellation" is defined as "[a]n annulment or <u>termination</u> of a promise or an obligation." <u>Id.</u> (emphasis added).  Simply, since the show that is designated in the Home Again Cancellation Clause has ceased airing, has terminated and therefore was "cancelled for any reason," Sears had the unilateral right to terminate the Spokesperson Agreement.

It is undisputed that *Bob Vila* is a new show and that new episodes of the *Home Again* show are no longer airing.  Vila's testimony, biography and web site designate the show *Bob Vila* as "new." <u>See</u> Vila Depo. Vol. 1, p. 61; Vila Depo Vol. 2. pp. 359-60; Deposition Exhibit 155, 156, 157, 213.  Furthermore, several media outlets have printed stories regarding Vila's <u>new</u> show, separate and apart from Home Again.  See Deposition Exhibits 176, 194.  The contract language in the Spokesperson Agreement is specific in designating the cancellation of a particular show which triggers Sears' power to terminate.  The specific show designated is the cancellation of the "<u>Bob</u> <u>Vila</u> <u>Home</u> <u>Again</u> television show."  Spokesperson Agreement, Amendment IX, Part 7; Amendment X, Paragraph 4 (emphasis added).  Based on Vila's testimony, it is clear that (1) new episodes of the Home Again show are not airing; (2) the show *Bob Vila* is a "new" and "different" show from Home Again; and (3) as a matter of law, new episodes of the *Home Again* show are not airing and therefore Home Again has terminated.  <u>Black's Law Dictionary</u> 197 (7th ed. 1990) (defining "cancel" as "To <u>terminate</u> a promise, obligation, or right;" and "Cancellation" as "[a]n annulment or <u>termination</u> of a promise or an obligation") (emphasis added). Furthermore, there is

no testimony that the Home Again Cancellation Clause is ambiguous, and in fact, it is not.[7] Parol evidence modifying these terms is therefore precluded. Air Safety, 185 Ill.2d at 462-63, 706 N.E.2d at 884. Accordingly, the plain meaning of the Spokesperson Agreement permitted Sears to lawfully terminate. See Deposition Exhibit 62.

> **(d)    Because Vila Was Not In Compliance With Material Terms Of The Spokesperson Agreement As Of July 1, 2005, His Claim Must Fail.[8]**

It is axiomatic that a party cannot recover for breach of contract without showing complete and strict performance of all of the contract's terms. Under contract law, the party seeking to enforce the contract has the burden of proving that he has substantially complied with all material terms of the contract. Israel v. Nat'l Canada Corp., 276 Ill. App. 3d 454, 461, 658 N.E.2d 1184, 1191 (1996), citing Goldstein v. Lustig, 154 Ill. App. 3d 595, 507 N.E.2d 164 (1987).

> Under contract law, a party in breach may not enforce the contract. . . . A party seeking to enforce a contract has the burden of proving he has substantially complied with all material terms of the agreement. . . . A party who materially breaches a contract cannot take advantage of the terms of the contract that benefit him, nor can he recover damages from the other party to the contract.

James v. Mobile Medics, 341 Ill. App. 3d 451, 455, 792 N.E.2d 461, 464 (2003) (citations omitted). Therefore, because Vila cannot demonstrate that he was in compliance with the terms of the Spokesperson Agreement when the July payment allegedly became due, his claim must fail.

The undisputed facts show that Vila and BVTV were in violation of Sears' trademark

---

[7] Should this Court determine that the Home Again Cancellation Clause is ambiguous, this Court cannot grant summary judgment in Plaintiffs' favor as there are disputed issues of fact as to what parol evidence may show.

[8] Should this Court conclude that Sears' termination of the Spokesperson Agreement was ineffective, summary judgment in Plaintiffs' favor is not warranted as Vila's own breaches of the Spokesperson Agreement predating the date the July 1, 2005 payment became due and continuing thereafter made him ineligible to claim breach. Furthermore, there is a question of fact as to whether Vila was even damaged as he was in material breach of the Spokesperson Agreement.

Home Again from March 2005 to March 27, 2006. As set forth above, since as early as March 7, 2005, Monzon, Marchand and other Vila representatives, on repeated occasions, used Sears' Home Again mark in attempts to solicit product donation for the Home Again show and for advertising on the bobvila.com website. See Deposition Exhibits 160, 164, 165, 166, 167, 187, 200, 201, 202, 203, 205, 206, 207, 208, 209, 211, 221, 225,  227, 228, 229, 230, 231, 232, 233, 234, 235, 236, 238. Further trademark violations appear in the May 16, 2005 KW Agreement which refers to the television show being produced for the 2005-2006 season as "Bob Vila's Home Again." Deposition Exhibit 158, 159. These violations occurred both before and after the July 1, 2005 payment was allegedly due under the Spokesperson Agreement. Similarly, the releases used by BVTV to secure authority from individuals appearing on the *Bob Vila* television show represented to those individuals executing them that the program was "Bob Vila's Home Again;" at least ten of these releases were dated before July 1, 2005. See Deposition Exhibit 169. Additionally, on episode 10 of the *Bob Vila* show, which began filming in late May or early June 2005 and aired on November 14, 2005, in a teaser for the following week's episode, Vila states "come home again next week . . . ." Exhibit P to Sankaran Declaration (emphasis added); Monzon Depo. pp. 133-134. Vila further violated Sears' trademark continuously prior to July 1, 2005 on his web site bobvila.com, by calling his currently airing show "Home Again" and by selling products bearing the Home Again mark. Deposition Exhibits 163, 212, 213, 214; Marchand Depo. pp. 175-76.

In addition to breaching the Spokesperson Agreement by impermissibly using Sears' trademark, Vila also breached the Competitive Protection section. The first aspect of that section requires that Vila not to permit his name, likeness, photograph, voice or biography to be used in advertising, publicizing or promoting any product or service other than Sears' products for the term of the Spokesperson Agreement and during the six months thereafter. Spokesperson Agreement

Amendment IX, ¶6. Additionally, Vila, Mr. Feiner and King World were fully aware of the application of these provisions to Vila's new show. See Deposition Exhibit 159. Mr. Feiner wrote a letter to King World copying Vila and stating

> Also I wish to remind you that Bob is still under contract for his personal services for Sears, Roebuck and Company, and, as such, <u>Bob</u> <u>cannot</u> <u>render</u> <u>any</u> <u>services</u> <u>for,</u> <u>or</u> <u>permit</u> <u>his</u> <u>name,</u> <u>likeness,</u> <u>photograph,</u> <u>etc.,</u> <u>to</u> <u>be</u> <u>used</u> <u>in</u> <u>advertising,</u> <u>publicizing</u> <u>or</u> <u>promoting</u> <u>any</u> <u>product</u> <u>or</u> <u>service</u> <u>other</u> <u>than</u> <u>Sears.</u> This . . . could have an impact if someone wanted on-air credit.

Deposition Exhibit 159 (emphasis added). Yet on the *Bob Vila* show, Vila's allowed his name, likeness, photograph, and voice to be used to advertise, publicize and/or promote numerous products without Sears' prior permission. See <u>supra</u> pp. 15-17, for list of products. The second aspect of the Competitive Protection clause provides, "although Vila shall have the right to appear in any non-sponsored media without Sears prior approval, Vila shall submit a written proposal to Sears to appear in any <u>sponsored</u> media." Spokesperson Agreement, Amendment IX, ¶ 6 (emphasis added). According to its own terms, the *Bob Vila* show is "sponsored" media as the credits to the episodes of the *Bob Vila* show concerning the Punta Gorda project state that at least six of the episodes were "sponsored." Episodes 9-14, attached as Exhibit P to <u>Sankaran Declaration</u>. Again, knowing of his obligations, Vila never sought written permission from Sears to appear in these episodes, in violation of the terms of the Spokesperson Agreement. Feiner Depo. pp. 98-100; Deposition Exhibit 159. Filming of these episodes began in the end of May or beginning of June 2005, before the July 1, 2005 payment allegedly became due. Monzon Depo. pp. 133-34. Under these circumstances, it is undisputed that even though Sears validly terminated the Spokesperson Agreement after July 1, 2005, Vila was in violation of material terms of the Spokesperson agreement prior to the time that the July 1, 2005 payment allegedly became due. Therefore, as a matter of law, Vila cannot demonstrate substantial compliance, and, accordingly, is not entitled to

recover. See Israel, 276 Ill. App. 3d at 461, 658 N.E.2d at 1191 (1996); James, 341 Ill. App. 3d at 455, 792 N.E.2d at 464. Therefore, he cannot recover for any alleged breach of the Spokesperson Agreement.

> **2.  Defendants Are Entitled To Judgment As A Matter Of Law On Plaintiffs' Claim For Anticipatory Repudiation.**

A repudiation consists of:

> (a) a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach . . . , or (b) a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach.

Restatement (Second) of Contracts §250; see also Busse v. Paul Revere Life Ins. Co., 341 Ill. App. 3d 589, 594, 793 N.E.2d 779, 783 (2003). An essential element to a claim for anticipatory repudiation is a breach of the underlying agreement. That is, where a party validly exercises a right to terminate under the terms of a contract, no claim for anticipatory repudiation lies. See, e.g., AT&T Commc'ns, Inc. v. Perry, 296 F.3d 1307, 1314 (Fed. Cir. 2002).

In this case, as demonstrated in Part supra I(C)(1), Sears validly terminated the Spokesperson Agreement. Where, as here, there was valid termination under the terms of the contract, a claim for anticipatory repudiation is precluded, as a matter of law. Therefore, Defendants are entitled to summary judgment on Vila's claim for anticipatory repudiation.

> **3.  Defendants Are Entitled To Judgment As A Matter Of Law On Plaintiffs' Claim For Breach Of The Implied Covenant Of Good Faith And Fair Dealing.**

It is true, as Vila asserts, that the implied duty of good faith and fair dealing attaches to every contract in Illinois. However, Vila's cursory examination of the legal principles involved entirely ignores the principle that the covenant of good faith and fair dealing cannot override express terms of a contract. Suburban Ins. Serv., Inc. v. Virginia Sur. Co., Inc., 322 Ill. App. 3d

688, 693, 752 N.E.2d 15, 19 (2001) ("[P]arties to a contract are entitled to enforce its terms to the letter, and an implied covenant of good faith and fair dealing cannot overrule or modify the express terms of a contract. The covenant of good faith and fair dealing does not allow a party to read an obligation into a contract that does not exist."), citing No. Trust Co. v. VIII South Michigan Assocs., 276 Ill App. 3d 355, 368, 657 N.E.2d 1095 (1995); Bank One, Springfield v. Roscetti, 309 Ill. App. 3d 1048, 1060, 723 N.E.2d 755, 764 (1999). "Parties are entitled to enforce the terms of their negotiated contracts to the letter without being mulcted for lack of good faith." Mid-West Energy Consultants, Inc. v. Covenant Home, 352 Ill. App. 3d 160, 166, 815 N.E.2d 911, 916 (2004), citing Resolution Trust Corp. v. Holtzman, 248 Ill. 3d 105, 113, 618 N.E.2d 418, 424 (1993). Because Sears validly terminated the Spokesperson Agreement according to its terms, there can be no breach of the implied covenant of good faith and fair dealing.

As described above, see supra Part I(C)(1), Sears validly terminated the Spokesperson Agreement pursuant to the Morals/Misconduct Clause and the Home Again Cancellation Clause. See supra Part I(C)(1). Sears validly exercised its rights under the Spokesperson Agreement because the undisputed facts show that Vila used Sears' trademark without authorization, Vila made public statements which reflected unfavorably upon Sears, and because the Home Again show was canceled. Obligations of good faith cannot as a matter of law limit Sears' exercise of its express rights of termination under the Spokesperson Agreement. Suburban Ins., 322 Ill. App. 3d at 693, 752 N.E.2d at 19; Bank One, 309 Ill. App. 3d at 1060, 723 N.E.2d at 764 (1999); Mid-West Energy, 352 Ill. App. 3d at 164, 815 N.E.2d at 916. Therefore, because the Spokesperson Agreement was validly terminated, Defendants are entitled to judgment as a matter of law on Plaintiffs' claim for breach of the covenant of good faith and fair dealing of the Spokesperson

Agreement.

**4.      Defendants Are Entitled To Judgment As A Matter Of Law On Plaintiffs' Claim For Violation of MASS. GEN. L. ch. 93A.**

Vila's MASS. GEN. L. ch. 93A claims fails for three reasons: (1) it is precluded by the choice of law clause in the Spokesperson Agreement; (2) a mere breach of contract is not enough to sustain a MASS. GEN. L. ch. 93A; and (3) where all underlying common law claims fail, the MASS. GEN. L. ch. 93A claim fails too.

The law is well settled that where a contract has a choice of law provision specifying the application of law other than Massachusetts, and the underlying claims to the MASS. GEN. L. ch. 93A claim sound in contract, then the choice of law provision governs and precludes the application of MASS. GEN. L. ch. 93A. Northeast Data Sys., Inc. v. McDonnell Douglas Computer Sys. Co., 986 F.2d 607 (1993); Value Partners S.A. v. Bain & Co., Inc., 245 F. Supp. 2d 269, 274 (2003); Worldwide Commodities v. J. Amicone Company, Inc., 36 Mass. App. Ct. 304, 307-09, 630 N.E.2d 615, 617-18 (1994). It is undisputed that the Spokesperson Agreement has a choice of law provision designating the application of Illinois law. Spokesperson Agreement Article VII(16). It is also undisputed that all of the other claims against the defendants relating to the Spokesperson Agreement sound in contract: breach of contract, repudiation of contract, and breach of the implied covenant of good faith and fair dealing, and equitable estoppel (pertaining to terms of the contract)[9] — all of Plaintiffs' claims relate to the terms of the Spokesperson Agreement. Indeed, there is not one tort claim that has been asserted against Sears. FAC ¶¶45-61. As the underlying claims sound in contract, the Illinois choice of law provision precludes the application of MASS. GEN. L. ch. 93A and this claim must fail as a

---

[9] Vila has asserted a claim for tortious interference with contractual relations against SHC and Kmart. Vila has not moved for summary judgment on this claim, but it is the subject of Defendants' cross-motion for summary judgment. See infra part I(D)(2).

matter of law.  <u>Northeast Data</u>, 986 F.2d 607; <u>Value Partners</u>, 245 F.Supp.2d at 274; <u>Worldwide Commodities</u>, 36 Mass. App. Ct. at 307-09, 630 N.E.2d at 617-18.

The next blow to Plaintiffs' Spokesperson Agreement MASS. GEN. L. ch. 93A claim is the fact that there was no breach of the Spokesperson Agreement.  It is unquestionable that the mere breach of contract is never sufficient to merit a violation of MASS. GEN. LAWS ch. 93A.  <u>Trent Partners and Assoc., Inc. v. Digital Equip. Corp.</u>, 120 F. Supp. 2d 84, 106 (D. Mass. 1999).  Merely reciting the magic words of "93A" should not be, and is not, sufficient to warrant the award of double or treble damages for routine behavior in the course of negotiating a contract.  Chapter 93A protects against unfair trade practices, and liability is only appropriate if conduct by a defendant is "within . . . the penumbra of some common-law, statutory, or other established concept of unfairness; . . . is immoral, unethical or unscrupulous; [and] . . . causes substantial injury to [other businessmen]."  <u>Grand Pac. Fin. Corp. v. Brauer</u>, 57 Mass. App. Ct. 407, 418-19, 783 N.E.2d 849, 861 (2003), quoting <u>PMP Assocs., Inc. v. Globe Newspaper Co.</u>, 366 Mass. 593, 596, 321 N.E.2d 915 (1975).  Sears validly exercised its rights under the Spokesperson Agreement to terminate.  There are no other allegations giving rise to anything other than a breach of contract and that is simply not enough to sustain a violation of MASS. GEN. L. ch. 93A.  <u>Trent Partners</u>, 120 F. Supp. 2d at 106.

Finally, the sockdolager to the claim is the legal principle that where a litigant raises a claim under MASS. GEN. L. ch. 93A based on other common law claims, "[w]hen the underlying common law claim fails, the chapter 93A must also fail."  <u>Flynn v. Estate of McGrath</u>, 2001 WL 1772032, *3 (Mass. Super. Ct. Nov. 2, 2001).  <u>See also</u> <u>Macoviak v. Chase Home Mortgage Corp.</u>, 40 Mass. App. Ct. 755, 760-61, 667 N.E.2d 900, 904 (1996).  Because Sears validly exercised its rights under the Spokesperson Agreement and all of Plaintiff's claims regarding the

Spokesperson Agreement have failed as a matter of law (breach of contract, breach of the covenant of good faith and fair dealing, repudiation of contract, see supra Part I(C)(1)-(3), equitable estoppel, and tortious interference, see infra Part I(D), there is no violation of MASS. GEN. L. ch. 93A. Without anything separate constituting a MASS. GEN. L. ch. 93A violation, the claim too falls away. Flynn, 2001 WL 1772032, at *3.

> **D.    DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT ON COUNTS IV AND VI IN THE FAC RELATING TO THE SPOKESPERSON AGREEMENT SHOULD BE ALLOWED AS THERE ARE NO DISPUTED ISSUES OF MATERIAL FACT AND DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW.**

> **1.    Defendants Are Entitled To Judgment As A Matter Of Law On Plaintiffs' Claim For Equitable Estoppel.**

Because Sears validly terminated the Spokesperson Agreement under both the Morals/Misconduct Clause and the Home Again Cancellation Clause, and because the terms of Home Again Cancellation Clause are unambiguous, Defendants are entitled to summary judgment on Plaintiffs' claim for equitable estoppel. To prove a claim for equitable estoppel, a plaintiff must show (1) that a party says or does something intended to induce conduct on the part of another; (2) that the other person reasonably relies on the representation, and therefore acts or refrains from acting; and (3) that the other person incurs a detriment as a result. Boelkes v. Harlem Consol. Sch. Dist., 299 Ill. Dec. 753, 760, 842 N.E.2d 790, 797 (2006), citing Geddes v. Mill Creek Country Club, Inc., 196 Ill. 2d 302, 313-14, 751 N.E.2d 1150, 1157 (2001). It is well settled that parol evidence is barred from modifying unambiguous contract terms. Air Safety, 185 Ill.2d at 462-63, 706 N.E.2d at 884. Furthermore, where a contract is unambiguous and is integrated, a plaintiff cannot use a claim of equitable estoppel to bring in parol evidence to modify the terms thereof.

The agreement pleaded, if it was ever made, should have been integrated in the

written agreement. The parol evidence rule provides that there can be no claim as to any oral part of a contract which is contradictory of the part that has been reduced to writing.

As for the suggestion that there is an estoppel because of some fraudulent purpose to acquire and cancel bonds, we may say that there was no relation of trust and confidence existing among the makers of this agreement. The parol evidence rule cannot be evaded or set aside by the device of claiming an estoppel. To ground an estoppel a representation must concern existing facts and not a mere promise omitted from a written contract.

Cont'l Bank & Trust Co. of New York v. W.A.R. Realty Corp., 40 N.Y.S.2d 854, 858, 265 A.D. 729, 733 (1943) (internal citations omitted) (emphasis added). As the Spokesperson Agreement is an integrated agreement, Vila's claim for equitable estoppel is barred.

In Vila's claim for equitable estoppel, he argues that Sears should be estopped from terminating the Spokesperson Agreement under the Home Again Cancellation Clause because he claims it was never contemplated that Sears could cancel the show *Bob Vila's Home A*gain. First, whether Sears is equitably estopped from interpreting the Home Again Cancellation Clause in any particular way is irrelevant as Sears properly terminated the Spokesperson Agreement under an entirely separate and distinct clause — the Morals/Misconduct clause. See supra Part I(C)(1)(a)-(b). Regardless, the gravamen of Vila's equitable estoppel claim is the contract language itself which says: "[i]f the Bob Vila Home Again television show is cancelled for any reason, Sears has the right to terminate this Agreement effective the 31st day of December following the notice of cancellation." Spokesperson Agreement, Amendment IX, Part 8; Amendment X, Paragraph 4. These terms are clear and unambiguous. See Spokesperson Agreement Article VII(15) (Vila acknowledges that the Spokesperson Agreement "constitutes the entire understanding between you and us in respect to the subject matter hereof"). This paragraph does not specify who may cancel the television show *Bob Vila's Home Again*. It simply permits Sears to terminate the Spokesperson Agreement if *Bob Vila's Home Again* is cancelled for any reason. Nothing can be less ambiguous.

Under these circumstances, a claim for equitable estoppel should be precluded as there is no reason to look to parol evidence as to the interpretation of this unambiguous term. <u>Air Safety</u>, 185 Ill.2d at 462-63, 706 N.E.2d at 884; <u>Cont'l Bank & Trust</u>, 40 N.Y.S.2d at 858, 265 A.D. at 733 (1943). Therefore, Defendants are entitled to judgment as a matter of law on Plaintiff's claim for equitable estoppel.

<b>2.    Defendants Are Entitled To Judgment As A Matter Of Law On Plaintiffs' Claim For Tortious Interference Relating To The Spokesperson Agreement.</b>

To state a cause of action for tortious interference with a contract in Illinois, a plaintiff must allege:

> (1) the existence of a valid and enforceable contract between the plaintiff and a third party; (2) defendant's awareness of the contract; (3) defendant's intentional and unjustified inducement of the breach; (4) defendant's wrongful conduct caused a substantial breach of the contract caused a substantial breach of the contract by the third party; and (5) damages.

<u>Purmal v. Robert N. Wadington & Assocs.</u>, 354 Ill. App. 3d 715, 727, 820 N.E.2d 86 (2004).

<u>See also</u> <u>Harrison v. Netcentric Corp.</u>, 433 Mass. 465, 476, 755 N.E.2d 622, 632 (2001) (In Massachusetts, a claim for intentional interference with contractual relations requires a plaintiff to prove "(1) he had a contract with a third party; (2) the defendant knowingly interfered with that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions."). Where a parent company has a financial interest in the contracts of its subsidiary, it cannot, as a matter of law, be liable for tortious interference of contractual relations.

> One who, having a financial interest in the business of a third person intentionally causes that person not to enter into a prospective contractual relation with another does not interfere improperly with the other's relation if he (a) does not employ wrongful means and (b) acts to protect his interest from being prejudiced by the relation.

41

Williams v. B&K Med. Sys., 49 Mass. App. Ct. 563, 574-75, 732 N.E.2d 300, 308-309 (2000). The Massachusetts Appeals Court noted, "out-of-state cases addressing the privilege of a parent company to interfere in contracts involving a subsidiary company stress the necessity of proving that the interfering party had a direct financial interest in the contract at issue" and added that it might be necessary to prove a "legitimate corporate purpose." Id. at 575-76, 309-10. Because SHC was the corporate parent and holding company of Sears, it had a privilege to participate in negotiation of the Spokesperson Agreement.

Plaintiffs' claim for tortious interference with the Spokesperson Agreement by SHC and Kmart fails because (1) there was no breach and (2) SHC cannot as a matter of law interfere with the Spokesperson Agreement. First, Vila cannot satisfy an essential element of his claim for tortious interference as he cannot demonstrate that the Spokesperson Agreement was breached. As set forth above, see supra part I(C)(1), Sears validly terminated the Spokesperson Agreement under the Morals/Misconduct Clause and the Home Again Cancellation Clause. As there was no breach, an essential element is missing, and as a result, Defendants are entitled to judgment as a matter of law.

Assuming arguendo that there was a breach, which is expressly denied, based on the undisputed facts, SHC and Kmart are still entitled to judgment as a matter of law on the claim for tortious interference. The lynchpin of Vila's interference with contractual relations claim is Kmart's and SHC's alleged participation in the alleged breach of the Spokesperson Agreement which purportedly occurred when Sears did not pay the July 1, 2005 payment. As of the date of the consummation of the merger, Sears and Kmart operated under a Reciprocal Services and Supply Agreement by which Sears and Kmart provided, inter alia, corporate, administrative, legal and financial services to each other. Exhibit J to Sankaran Declaration. Furthermore SHC

is the holding company of Sears and clearly has a financial interest and a legitimate business purpose in the affairs of Sears. See March 24, 2005 Kmart Press Release. Under these circumstances, the actions of SHC are privileged and, as a matter of law, SHC is not liable for tortious interference. Defendants are entitled to judgment as a matter of law. Williams, 49 Mass. App. Ct. at 574-75, 732 N.E.2d at 308-309.

**E. DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT ON COUNTS VII-XI OF THE FAC RELATING TO SYNDICATION AGREEMENT SHOULD BE ALLOWED AS THERE ARE NO DISPUTED ISSUES OF MATERIAL FACT AND DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW.**

The simple fact is that there never was an agreement as to an Amendment No. 11 to the Syndication Agreement which Plaintiffs' own documents and testimony prove. These facts defeat all of BVTV's claims regarding the Syndication Agreement, rendering them without merit.

**1. Defendants Are Entitled To Judgment As A Matter Of Law On Plaintiffs' Claim For Breach Of The Syndication Agreement.**

**(a) No Contract Between The Parties Was Formed On January 18, 2005 As There Was No Mutual Assent.**

As a matter of law, Defendants are entitled to summary judgment on Plaintiffs' claim for breach the Syndication Agreement. "The common law elements of a cause of action for breach of contract are (1) formation of a contract between plaintiff and defendant, (2) performance by plaintiff, (3) defendant's failure to perform, (4) resulting damage." Ledain v. Town of Ontario, 746 N.Y.S.2d 760, 763, 192 Misc.2d 247, 250 (2002). Furthermore, it is well settled that contract formation requires mutual assent between the parties. Express Indus. & Terminal Corp. v. New York State Dep't of Transp., 93 N.Y.2d 584, 589, 715 N.E.2d 1050, 1053 (1999), citing Martin Delicatessen v. Schumacher, 52 N.Y.2d 105, 109, 417 N.E.2d 541 (1981) ("To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure

that the parties are truly in agreement with respect to all material terms."). Furthermore, the mere transmittal of a redlined draft, clearly denoted as such on the face of the document does not constitute an offer, and assent to the same does not result in a binding contract. "Businessmen would be undesirably inhibited in their dealings if expressions of intent and the exchange of drafts were taken as legally binding agreements." Tull v. Mister Donut Dev. Corp., 7 Mass. App. Ct. 626, 631, 389 N.E.2d 447, 451 (1979). Moreover, negotiations leading up to a potential agreement may not bind a party when it is clear that authorization and execution of the contract is required. Scheck v. Francis, 26 N.Y.2d 466, 469-70, 260 N.E.2d 493, 494 (1970) ("It is well settled that, if the parties to an agreement do not intend it to be binding upon them until it is reduced to writing and signed by both of them, they are not bound and may not be held liable until it has been written out and signed."); see also Brause v. Goldman, 199 N.Y.S.2d 606, 611, 10 A.D.2d 328, 332 (N.Y. App. Div. 1960) ("When the wording and sense of letters exchanged between the parties reveal no present intent to form a binding contract, but rather to continue negotiations with the possible ultimate meeting of minds deferred until some future time, either party may withdraw with impunity prior to that time.").

Since there was never a meeting of the minds between BVTV and Sears with respect to an extension of the Syndication Agreement, Plaintiff's claim for breach fails. Plaintiffs' testimony and the documents unequivocally demonstrate that there was no mutual assent with respect to the January 14, 2005 redlined draft of Amendment No. 11 to the Syndication Agreement. The undisputed facts show that the redlined draft versions of Amendment No. 11 contained the provision: "Acceptance of and agreement to this Amendment No. 11 is confirmed by signing your name in the place indicated below" indicating that a signature was required in order to make the document binding. Moreover, Mr. Feiner expressly requested execution

44

versions of Amendment No. 11. Deposition Exhibits 22, 23. The facts are that:

- Vila never signed Amendment No. 11, Feiner Depo. Vol. 1, pp. 50-51; Vila Depo. Vol. 1, pp. 235-36;

- Sears never signed Amendment No. 11, Feiner Depo. Vol. 2, pp. 303-05;

- Sears never sent Mr. Feiner execution copies of Amendment No. 11, Vila Depo. Vol. 1, pp. 235-26, 248-49; Feiner Depo. Vol. 1, p. 50-51, Feiner Depo. Vol. 2, 303-305;

- Sears never told Mr. Feiner that it would transmit execution copies of Amendment No. 11; Feiner Depo. Vol. 2, pp. 303-05;

- BVTV clearly understood that the agreement to Amendment No. 11 to the Syndication Agreement would not be complete until the parties had both signed the agreement. Feiner Depo. Vol. 2, pp. 275-76;

- Vila and BVTV acknowledge that it was their understanding that as of January 22, 2005, no agreement had been reached between the parties and there were outstanding issues. Vila Depo. Vol. 1, pp. 248-49; Monzon Depo. pp. 52-54.

See supra pp. 7-10. As made clear by the testimony of the Plaintiffs and the conduct of the parties, no offer was made by Sears to BVTV by way of the transmission of a redlined draft, and no contract was formed. See Scheck, 26 N.Y.2d at 469-70, 260 N.E.2d at 494; Brause, 199 N.Y.S.2d at 611, 10 A.D.2d at 332. The parties' subsequent conduct supports the fact that no agreement was reached in January 2005 as there was no meeting of the minds. See Exhibits 22, 24, 27, 28, 29, 30, 95, 172, 186, 179, 173.

- In fact, on February 1, 2005, Mr. Feiner e-mailed Rode indicating his understanding that BVTV could not receive payment under the Syndication Agreement until there was a signed contract in place between the parties. Mr. Feiner wrote, "Because of the contract not being signed, Bob has not received the $750,000 due the first of the year." Deposition Exhibit 179 (emphasis added).

- Rode replied by explaining that he did not have authority to bind Sears to the contract and that in light of the merger between Sears and Kmart, issues were still unresolved. Rode replied, "I think you me and Andy [(Ginger)] (or just you and Andy) will need to talk on this. While I can negotiate a contract I feel comfortable with[,] I don't have access to the individuals here would ultimately issues a go/no go decision. Six months ago this would be a no brainer. With the merger[,] Andy is going to need to weigh-in." Id. (emphasis added).

45

- Indeed, Vila himself acknowledged that there was no agreed-to extension to the Syndication Agreement in his e-mail to Monzon.  Deposition Exhibit 173.  On February 3, 2006 Vila wrote, "I'm in a difficult position.  The extension with Sears remains incomplete due to the K-Mart merger and internecine struggles.  I am involved in other negotiations but can't commit to anything just yet."  Id. (emphasis added).

- Monzon, the producer at BVTV, testified:

  > Q.    As of February 2005 is it correct that there was uncertainty in your mind as to whether or not there would be funding for the new show?
  > A.    Yes, there was uncertainty.

  Monzon Depo. p. 58.

- Later, Rode e-mailed Melissa Marchand ("**Marchand**") the Chief Operating Officer of BV Webties, the company that runs the Bobvila.com web site indicating that there were issues on the Sears side relating to the extension of the Syndication Agreement.  See Marchand Depo. p. 20.  He wrote on March 11, 2005 "On another note we heard back from Bill Crowley and there (as there always seems to be these days) are issues." Deposition Exhibit 27.

- Marchand  further testified about this e-mail:

  > Q.    So as of that date [(March 11, 2005)], was it your understanding that the parties still hadn't come to an agreement with respect to an extension of the syndication agreement?
  > MR. O'BRIEN:  Object to the form.  You may answer.
  > A.    Yes.

  Marchand Depo. p. 53.

- In her notes regarding March 2005, Monzon writes, "We continue to wait for word from Sears."  Deposition Exhibit 220.

- On April 28, 2005, Rode transmitted a proposal regarding an extension of the Syndication Agreement and a renegotiation of the Spokesperson Agreement to Mr. Feiner.  See Deposition Exhibit 66.

- Shortly thereafter, Mr. Feiner rejected that offer.  See Deposition Exhibit 42.

In fact during this time, Sears' new management team composed initially of Padilla, the President of Merchandising and Marketing and Chief Merchant at Sears, and later Crowley, the Chief Financial Officer of SHC, were reviewing the relationship between Sears and BVTV and Vila and assessing the financial benefits of the same.  See Deposition Exhibits 80, 32, 34, 36, 38, 44, 47,

48, 110, 112, 142, 149, 150, 151.  Specifically, Sears was considering whether an extension of the Syndication Agreement was in the best business interest of Sears.  Id.; Crowley Depo. pp. 69-70, 73-74.  Accordingly, Sears was in the process of reviewing the contract to assess its contractual rights.  Id.

In fact, BVTV, knowing and acknowledging that it had no agreement with Sears as to Amendment No. 11 to the Syndication Agreement, began negotiations directly with King World to see whether King World would fund the production of a home improvement television show staring Vila.  Feiner Depo. Vol. 1, pp. 86-87, 93.  On March 24, 2005, Vila confirmed with Monzon and Marchand that he had alternate funding for the production of a home improvement television show, see Deposition Exhibits 193, 220, and on May 16, 2005 entered into the KW Agreement whereby King World – not Sears – would fund the production of a home improvement television show starring Vila.  Deposition Exhibits 158, 159, 217, 218, 219.  These actions are completely inconsistent with BVTV's position that it had an agreement with Sears.

Indeed, even though BVTV had entered into the KW Agreement, BVTV continued to invoice Sears for the production costs of the Home Again show.  See Deposition Exhibits 12, 52, 58, 125, 158; Feiner Depo. Vol. 2, pp. 361-62.  In response to these invoices, and without knowledge of the KW Agreement, on June 15, 2006, SHC sent Mr. Feiner a letter notifying him that Sears had never agreed to an extension of the Syndication Agreement; and stating that Sears "does not desire to pay to produce the 'Home Again' show and B.V.T.V. is proceeding with the production of the 'Home Again' show at its own risk . . . ."  Deposition Exhibit 180.  This was the end of the negotiations of Amendment No. 11 and clearly, there was no mutual assent to any terms of an extension to the Syndication Agreement.  Accordingly, the January 14, 2005 redlined draft of Amendment No. 11 to the Syndication Agreement is not a contract and is therefore

unenforceable.  See Express Indus., 93 N.Y.2d at 589, 715 N.E.2d at 1053; Scheck, 26 N.Y.2d at

469-70, 260 N.E.2d at 494; Brause, 199 N.Y.S.2d at 611, 10 A.D.2d at 332.  Defendants are

entitled to judgment as a matter of law on BVTV's claim for breach of the Syndication

Agreement.[10]

> **(b)     Assuming Arguendo That The Parties Entered Into Amendment No. 11 To The Syndication Agreement, It Fails To Satisfy The Statute Of Frauds And Is, Therefore, Unenforceable.**

The alleged January 18, 2005 Amendment No. 11 to the Syndication Agreement is

unenforceable because it fails to satisfy the statute of frauds.  In New York, the statute of frauds

requires a contract for services not capable of being performed within one year to be in writing in

order to be enforceable.  Sheey v. Clifford Chance Rogers & Wells LLP, 3 N.Y.3d 554, 559-60,

822 N.E.2d 763 (2004) ("The statute of frauds, as incorporated into section 5-701(a)(1) of the

General Obligations Law, provides that an agreement is void if it is not in writing and

'subscribed by the party to be charged therewith' when the agreement '[b]y its terms is not to be

performed within one year from the making thereof.'").  The law is the same in Illinois and

Massachusetts. See Lawyer's Title Ins. Corp. v. Dearborn Title Corp., 939 F. Supp. 611, 617

(N.D. Ill. 1996) (citing 740 ILL. COMP. STAT. 80/1 as providing that "[u]nder the Statute of

Frauds, a plaintiff may not sue to enforce an unwritten contract if it is not to be performed within

one year") (vacated in part on other grounds); MASS. GEN. LAWS. Ch. 259, §1.  As Amendment

No. 11 to the Syndication Agreement was never finalized or signed by any of the parties charged,

the Statute of Frauds precludes its enforceability.

Amendment No. 11 to the Syndication Agreement contemplated services to be performed

---

[10] In its claim with respect to the Syndication Agreement, BVTV claims that it is owed certain incentive bonuses for the 2003-2004 and 2004-2005 television seasons.  However, there is no deposition testimony or documents produced which demonstrate that BVTV is entitled to those bonuses.

over the course of at least two years.  Any claim for its breach, therefore, fails as a matter of law.  The redlined draft document which BVTV claims constitutes Amendment No. 11 of the Syndication agreement has a term of two years.  Deposition Exhibit 21.  It states, "The parties hereto, your production company B.V.T.V., Inc., ('Producer') and Sears, Roebuck and Co. ('Sears') are desirous of setting forth the terms for going forward for <u>the</u> <u>next</u> <u>two</u> <u>broadcast</u> <u>years, i.e. September 1, 2005 through August 31, 2006 and September 1, 2006 through August 31, 2007</u>."  <u>Id.</u> (emphasis added).  By its terms, the redlined draft document BVTV claims is Amendment No. 11 would require BVTV to deliver 26 episodes for each of the two "Years" specified and require Sears to make payments which span a period of over two years.  <u>Id.</u>  On its face, this alleged contract requires at least two full years for its terms to be met.  Since the redlined draft of Amendment No. 11 was never signed, let alone agreed to by Sears, <u>see</u> part I(E)(1)(a), <u>supra</u>, it fails to satisfy the statute of frauds.  <u>See</u> N.Y. GEN. OBLIG. LAW §5-701(a)(1); ILL. COMP. STAT. 80/1; MASS. GEN. LAWS. ch. 259, §1.  Under these circumstances, BVTV's claim for breach of contract must fail, and Defendants are entitled to summary judgment.

### 2.    <u>Defendants Are Entitled To Judgment As A Matter Of Law On Plaintiffs' Claim For Repudiation Of The Syndication Agreement.</u>

The unavoidable fact that there was no mutual assent and the statute of frauds bars the enforceability of any alleged Amendment No. 11 to the Syndication Agreement also means that Defendants are entitled to a judgment as a matter of law on Plaintiffs' claim of repudiation of contract.  According to the Restatement (Second) of Contracts § 250, repudiation is defined as "(a) a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach . . ., or (b) a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach."  <u>See also</u> <u>Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.</u>, 92 N.Y.2d

458, 462-63, 705 N.E.2d 656 (1998).  Both of these definitions presuppose the existence of an enforceable contract, something that the Plaintiffs cannot prove, as set forth in Part I(E)(1), supra.  Because Sears never agreed to Amendment No. 11 to the Syndication Agreement, and because the statute of frauds bars the enforcement of the January 14, 2005 redlined draft, Defendants were not capable of repudiating the purported amendment, and summary judgment for Defendants on the claim of repudiation is appropriate.

> **3.    Defendants Are Entitled To Summary Judgment As A Matter Of Law On Plaintiffs' Claim For Breach Of The Implied Covenant Of Good Faith And Fair Dealing Relating To The Syndication Agreement.**

Similarly, Plaintiffs cannot prove that Sears breached the implied covenant of good faith and fair dealing with respect to the alleged Amendment No. 11 to the Syndication Agreement. Where there is no contract, there can be no breach of the implied covenant of good faith and fair dealing.  Lakeville Pace Mech., Inc. v. Elmar Realty Corp., 714 N.Y.S.2d 338, 342, 276 A.D.2d 673, 676 (N.Y. App. Div. 2000).  As made clear above, there never was any mutual assent with respect to Amendment No. 11 and the January 14, 2005 redlined draft fails to satisfy the statute of frauds.  As there is no contract, the covenant of good faith and fair dealing never attached and, accordingly, could not have been breached.  Lakeville Pace, 714 N.Y.S.2d at 342, 276 A.D.2d at 676.  Therefore, Defendants are entitled to judgment as a matter of law on the claim.

> **4.    Defendants Are Entitled To Summary Judgment On Plaintiffs' Claim For Tortious Interference With The Syndication Agreement.**

In bringing a claim of tortious interference with contractual relations, Plaintiffs are required to demonstrate that they had a contract with defendant Sears, that SHC and/or Kmart knowingly induced Sears to break that contract, and Plaintiffs were harmed by the conduct of SHC and/or Kmart.  Edsall v. Assumption College, 367 F. Supp. 2d 72, 82 (D. Mass. 2005); Mass. Cash Register, 901 F. Supp. at 421.  The same elements are required under New York and

Illinois law.  See, e.g., Carvel Corp. v. Noonan, 3 N.Y.3d 182, 189-90, 818 N.E.2d 1100 (2004);

Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 424, 668 N.E.2d 1370 (1996);

Strosberg v. Brauvin Realty Serv., Inc., 295 Ill. App. 3d 17, 32, 691 N.E.2d 834, 845 (Ill. App.

Ct. 1998).  As stated above, since there is no extension to the Syndication Agreement, there is no

contract with which SHC and/or Kmart could have interfered.   As the undisputed facts

demonstrate that Plaintiffs cannot satisfy a necessary element of their claim for tortious

interference with the Syndication Agreement, Defendants are entitled to judgment as a matter of

law.

**5.    This Court Should Grant Defendants Summary Judgment On Plaintiffs' Claim For Violation of MASS. GEN. LAWS ch. 93A Relating To The Syndication Agreement**

As set forth in Part I(C)(4), supra, the MASS. GEN. L. ch. 93A claim related to the

Syndication Agreement fails for the same three reasons the MASS. GEN. L. ch. 93A claims for the

Syndication Agreement: (1) it is precluded by the choice of law clause in the Spokesperson

Agreement; (2) a mere breach of contract is not enough to sustain a MASS. GEN. L. ch. 93A; and

(3) where all underlying common law claims fail, the MASS. GEN. L. ch. 93A claim fails too.

Again, the law is well settled that where a contract has a choice of law provision

specifying the application of law other than Massachusetts, and the underlying claims to the

MASS. GEN. L. ch. 93A claim sound in contract, then the choice of law provision governs and

precludes the application of MASS. GEN. L. ch. 93A.  Northeast Data, 986 F.2d 607; Value

Partners, 245 F.Supp.2d at 274; Worldwide Commodities, 36 Mass. App. Ct. at 307-09, 630

N.E.2d at 617-18.  It is undisputed that the document the BVTV claims constitutes Amendment

No. 11 to the Syndication Agreement has a choice of law provision designating the application of

New York law.  Syndication Agreement ¶ 22.   It is also undisputed that all of the other claims

against the defendants relating to the Syndication Agreement sound in contract: breach of contract, repudiation of contract, and breach of the implied covenant of good faith and fair dealing[11]—all of Plaintiffs' claims relate to the alleged breach of the alleged Syndication Agreement.  There is not one tort-based claim that has been asserted against Defendant Sears relating to the Syndication Agreement.  FAC ¶¶70-78.  As the underlying claims sound in contract, the New York choice of law provision precludes the application of MASS. GEN. L. ch. 93A and this claim must fail as a matter of law.  See Northeast Data, 986 F.2d 607; Value Partners, 245 F.Supp.2d at 274; Worldwide Commodities, 36 Mass. App. Ct. at 307-09, 630 N.E.2d at 617-18.

Next, Plaintiffs' MASS. GEN. L. ch. 93A claim fails because the mere breach of contract is never sufficient to merit a violation of MASS. GEN. LAWS ch. 93A.  Trent Partners, 120 F. Supp. 106.  No contract was formed between the parties with regards to Amendment No. 11, as there is no signed writing evidencing Sears' assent to the terms of the alleged contract.  No conduct on the part of Sears, SHC and Kmart with regards to the negotiation of, and ultimate decision not to agree upon, Amendment No. 11 of the Syndication Agreement even begins to hint at evidence meriting a finding for the Plaintiffs relating to chapter 93A.  How a simple business decision not enter into a contract can be characterized as "unfair" or "deceptive" is wholly unclear—it is a question left conspicuously unanswered by Plaintiffs' pleadings, and has not been answered by any of the witness' testimony or any of the documents.  Moreover, as a matter of a law the simple allegation that Defendants breached Amendment No. 11 to the Syndication Agreement is insufficient to warrant a finding of a violation of c. 93A.  See Trent Partners, 120 F. Supp. 2d at 106.

Finally, where a litigant raises a claim under MASS. GEN. L. c. 93A based on other

---

[11] Again, there is a tortious interference claim asserted against SHC and Kmart.

common law claims, "[w]hen the underlying common law claim fails, the chapter 93A must also fail." Flynn, 2001 WL 1772032, at *3. See also Macoviak v. Chase Home Mortgage Corp., 40 Mass. App. Ct. 755, 760-61, 667 N.E.2d 900, 904 (1996). Because there never was an amendment to the Syndication Agreement, all of the underlying claims to the MASS. GEN. LAWS ch. 93A count (the breach of contract, repudiation of contract, breach of the implied covenant of good faith and fair dealing and tortious interference with contract discussed above) are groundless and have failed as a matter of law. This leaves no basis for the Defendants to face liability on the 93A claim." Flynn, 2001 WL 1772032, at *3. Therefore, Defendants are entitled to summary judgment on Plaintiffs' claim.

WHEREFORE, Sears, Roebuck and Co., Sears Holdings Corporation and Kmart Holding Corporation respectfully request that this Court deny the Plaintiff's Motion for Partial Summary Judgment and enter Judgment in their favor on all counts in Plaintiffs' Amended Complaint.

RESPECTFULLY SUBMITTED:
SEARS HOLDINGS CORPORATION and
KMART HOLDING CORPORATION,
Defendants, and SEARS, ROEBUCK AND CO.,
Defendant/Counterclaimant,
By their attorneys:

/s/ Annapoorni R. Sankaran
Gary R. Greenberg, BBO #209420
Annapoorni R. Sankaran, BBO #631065
Sebastian R. Colley, BBO #663842
GREENBERG TRAURIG, LLP
One International Place, 20th Floor
Boston, MA 02110
(617) 310-6000
(617) 310-6001 (fax)

CERTIFICATE OF SERVICE

I Annapoorni R. Sankaran, hereby certify that, pursuant to Local Rule 5.4(c), on April 11, 2006 I served a copy of the foregoing electronically upon: James F. O'Brien, Esq., 410 Park Avenue, Suite 1530, New York, NY 10022.

/s/ Annapoorni R. Sankaran
Annapoorni R. Sankaran