UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROBERT J. VILA and B.V.T.V., INC.,

      Plaintiffs,

v.

SEARS, ROEBUCK AND COMPANY,
SEARS HOLDINGS CORPORATION and
KMART HOLDING CORPORATION,

      Defendants.

Civil Action No. 05-11717-REK

## **DECLARATION OF ANNAPOORNI R. SANKARAN (VOLUME I)**

I, Annapoorni R. Sankaran declare and say:

1.     I am a shareholder at Greenberg Traurig, LLP, a member of the bar of this Court and, along with Gary R. Greenberg, Esq., am counsel for defendants Sears, Roebuck and Company, Sears Holdings Corporation and Kmart Holding Corporation (collectively "Defendants").

2.     A true and accurate copy of Plaintiffs' First Amended Complaint is attached hereto in Volume 1 as Exhibit A.

3.     A true and accurate copy of Defendants' Answer and First Amended Counterclaim to Plaintiffs' First Amended Complaint is attached hereto in Volume 1 as Exhibit B.

4.     True and accurate copies of excerpts from the deposition of Robert J. Vila are attached hereto in Volume I as Exhibit C.

5.     True and accurate copies of excerpts from the deposition of Ronald E.

Feiner, Esq., are attached hereto in Volume I as Exhibit D.

6.    True and accurate copies of excerpts from the deposition of Sarah Beasley Monzon are attached hereto in Volume I as Exhibit E.

7.    True and accurate copies of excerpts from the deposition Melissa W. Marchand are attached hereto in Volume I as Exhibit F.

8.    True and accurate copies of excepts from the deposition of  William C. Crowley are attached herein in Volume I as Exhibit G.

9.    A true and accurate copy of a print-out from the web-site of the Secretary of the Commonwealth of Massachusetts relating to B.V.T.V., Inc., is attached hereto in Volume 1 as Exhibit H.

10.    A true and accurate copy of Kmart's 8K filing dated November 18, 2004, is attached hereto in Volume 1 as Exhibit I.

11.    A true and accurate copy of the Reciprocal Services and Supply Agreement between Kmart Corporation and Sears Roebuck and Co. dated March 24, 2005 is attached hereto in Volume I as Exhibit J.

12.    A true and accurate copy of the Kmart March 24, 2005 Press Release is attached hereto in Volume I as Exhibit K.

13.    A true and accurate copy of a letter from Ronald E. Feiner, Esq., to Robert Rathke, Esq., dated June 29, 2005 is attached hereto in Volume 1 as Exhibit L.

14.    A true and accurate copy of Commercial Union Insurance Company v. Swiss Reinsurance America Corporation, 2003 WL 1787863 (D. Mass. March 31, 2003) is attached hereto in Volume I as Exhibit M.

15.    A true and accurate copy of Flynn v. Estate of David J. McGrath, 2001 WL

1772032 (Mass. Super. November 2, 2001) is attached hereto in Volume I as Exhibit N.

16.    A true and accurate copy of <u>Tulloch v. JPMorgan Chase & Co.</u>, 2006 WL

197009 (S. D. Tex. January 24, 2006) is attached hereto in Volume I as Exhibit O.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 11TH DAY OF APRIL,

2006.

/s/ Annapoorni R. Sankaran
ANNAPOORNI R. SANKARAN

<u>CERTIFICATE OF SERVICE</u>

I Annapoorni R. Sankaran, hereby certify that, pursuant to Local Rule 5.4(c), on April 11, 2006 I served a copy of the foregoing electronically upon:

James F. O'Brien, Esq.
410 Park Avenue, Suite 1530
New York, NY 10022

/s/ Annapoorni R. Sankaran
Annapoorni R. Sankaran

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.
05-11717 REK

---

|  |  |
|---|---|
| ROBERT J. VILA and B.V.T.V., INC. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| SEARS, ROEBUCK AND CO., | ) |
| SEARS HOLDINGS CORPORATION | ) |
| and KMART HOLDING COPORATION | ) |
| Defendants. | ) |
| | ) |

---

## PLAINTIFFS' FIRST AMENDED COMPLAINT

Plaintiffs Robert J. Vila and B.V.T.V., Inc. file this First Amended Complaint seeking to recover damages and other relief from defendants Sears, Roebuck and Co., Sears Holdings Corporation and Kmart Holding Corporation in connection with the repudiation of and breaches by Sears, Roebuck and Co. of a contract with Robert J. Vila to act as spokesperson for certain products of Sears, Roebuck and Co. and of a contract with B.V.T.V., Inc. for the production of the nationally syndicated television series known as *Bob Vila's Home Again.* In particular, Robert J. Vila seeks the recovery of amounts due and to become due pursuant to his Spokesperson Agreement with Sears, Roebuck and Co., damages from Sears Holdings Corporation and Kmart Holding Corporation due to their tortious interference with the Spokesperson Agreement and an award of damages

from Sears, Roebuck and Co., Sears Holdings Corporation and Kmart Holding Corporation due to their bad faith and unfair and deceptive conduct, trebled on account of defendants' willful violations of M.G.L. c. 93A, §§2 and 11, together with interest, costs and attorneys' fees. B.V.T.V., Inc. seeks the recovery of amounts due and to become due pursuant to its Syndication Agreement with Sears, Roebuck and Co., damages from Sears Holdings Corporation and Kmart Holding Corporation due to their tortious interference with the Syndication Agreement and an award of damages from Sears, Roebuck and Co., Sears Holdings Corporation and Kmart Holding Corporation due to their bad faith and unfair and deceptive conduct, trebled on account of defendants' willful violation of M.G.L. c. 93A, §§2 and 11, together with interest, costs and attorneys' fees.

## THE PARTIES

1.  Plaintiff Robert J. Vila ("Vila") is a citizen of the Commonwealth of Massachusetts with a residence in Chilmark, Massachusetts. Continuously since 1989, Vila has been the national spokesperson for certain products marketed and sold by defendant Sears, Roebuck and Co.

2.  Plaintiff B.V.T.V., Inc. ("BVTV") is a corporation organized and existing under the laws of the Commonwealth of Massachusetts with a principal place of business at 115 Kingston Street, Boston, Massachusetts. Continuously since 1989, BVTV has been the producer of the nationally syndicated television series initially known as *Home Again With Bob Vila* and more recently known as *Bob Vila's Home Again* which series has been financed by Sears, Roebuck and Co.

2

3.  Defendant Sears, Roebuck and Co. ("Sears") is a corporation organized and existing under the laws of the State of New York with a principal place of business at 3333 Beverly Road., Hoffman Estates, Illinois. At all times material hereto, Sears has been one of the nation's largest retailers of merchandise, including so-called home improvement products.

4.  Defendant Sears Holdings Corporation ("SHLD") is a corporation organized in 2004 and existing under the laws of the State of Delaware with a principal place of business at 3333 Beverly Road., Hoffman Estates, Illinois

5.  Defendant Kmart Holding Corporation ("Kmart") is a corporation organized and existing under the laws of the State of Delaware with a principal place of business at 3100 West Big Beaver Road, Troy, Michigan.

## JURISDICTION AND VENUE

6.  This Court has personal jurisdiction with respect to defendants Sears, SHLD and Kmart pursuant to M.G.L. c. 223A, §3 because Sears transacts business within the Commonwealth of Massachusetts and SHLD and Kmart have caused tortious injury in the Commonwealth of Massachusetts.

7.  This Court has jurisdiction with respect to the subject matter of this action pursuant to 28 U.S.C. § 1332.

8.  Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## FACTS

9. On or about September 29, 1985, Sears entered into an agreement with Vila, whereby, for guaranteed compensation, Vila was to render professional services as a spokesperson, participant and performer in connection with the advertising of Sears' products by way of, among other things, television and radio commercials, videos, still photographs and personal appearances (the "Spokesperson Agreement"). The Spokesperson Agreement includes, at Paragraph VII, sub-paragraph 2, a "Pay or Play" provision that Sears will not be required to request Vila's services at any time or to utilize Vila's services or the product of Vila's services and that Sears' only obligation shall be to make the payments required pursuant to the Spokesperson Agreement.

10. The Spokesperson Agreement has been extended and amended by the parties ten (10) times and currently is due to expire on December 31, 2009. The "Pay or Play" provision remained in effect through all ten amendments. Since 1989, Vila has performed and continues to be ready, willing and able to perform his obligations to Sears pursuant to the Spokesperson Agreement, as amended.

11. The Spokesperson Agreement, Amendment IX, paragraph 7 provides, "If the Bob Vila Home Again television show is canceled for any reason, Sears has the right to terminate this Agreement effective the 31st day of December following the notice of cancellation."

12. At the time of the negotiations of Amendment IX to the Spokesperson Agreement in 1998, to induce Vila to enter into Amendment IX, Sears

4

represented that the language of paragraph 7 was there in the event that the television series was canceled by the syndicator of the television series, an independent third party. Sears intended that Vila rely upon that representation and Vila reasonably did rely upon that representation in entering into Amendment IX to the Spokesperson Agreement, as amended.

13. The Spokesperson Agreement, Amendment X, paragraph 4, dated December 1, 2000, provides, "Paragraph 7 of Amendment IX shall remain in effect during the current term and any extension of that certain Bob Vila Syndicated Television Program Agreement dated September 29, 1989, as amended, between Ogilvy & Mather, as agent for Sears, and B.V.T.V., Inc."

14. On or about September 29, 1989, Sears entered into an agreement with BVTV, whereby BVTV was to produce and deliver to Sears a series of home improvement television programs to be financed by Sears (the "Syndication Agreement"). The television programs produced by BVTV and financed by Sears are distributed for airing by a syndicator, an independent third party.

15. The Syndication Agreement has been extended and amended by the parties eleven (11) times. Negotiations for the most recent amendment to the Syndication Agreement (Amendment 11) took place from February 2004 to January 18, 2005. During the period of these negotiations, BVTV, relying upon the fifteen year course of conduct of the parties in amicably and non-adversarially successfully negotiating the ten (10) prior amendments to the Syndication Agreement, began performance of BVTV's obligations under Amendment 11.

5

16. Amendment 11 to the Syndication Agreement provides for the production by BVTV and financing by Sears of the television series for the 2005-2006 and 2006-2007 viewing seasons. At no time during the period of negotiations of Amendment 11 did Sears give any indication to BVTV that it would not enter into Amendment 11 with BVTV.

17. On or about November 17, 2004, when negotiations for Amendment 11 of the Syndication Agreement were nearing conclusion, Sears announced a transaction whereby, subject to, among other things, shareholder approval by the shareholders of Kmart and Sears, respectively, Kmart would acquire Sears and combine the two companies into a major new retail company.

18. In anticipation of that transaction, on November 23, 2004, Kmart formed SHLD in the State of Delaware.

19. Pursuant to the course of conduct established by Sears and BVTV over the fifteen years of their relationship, in December 2004, BVTV began preproduction activities for the 2005–2006 viewing season of the television series and submitted invoices to Sears for the initial payment of $750,000 that would be due under Amendment 11 on January 1, 2005 as it had done religiously over the prior years.

20. On January 18, 2005, Sears and BVTV concluded their negotiations and entered into Amendment 11 to the Syndication Agreement, as amended. Since 1989, BVTV has performed and continues to perform its obligations to Sears pursuant to the Syndication Agreement, as amended.

21. Pursuant to the Syndication Agreement, as amended, for the 2003-2004 viewing season, Sears is obligated, among other things, to pay BVTV certain incentive

6

bonus payments of up to a maximum of $1,250,000. Sears has not fully accounted to BVTV for or paid to BVTV the entirety of the incentive bonus payments due for the 2003-2004 viewing season. Upon information and belief, the balance of the incentive bonus payment due to BVTV for the 2003-2004 viewing season is approximately $450,000.

22. Pursuant to the Syndication Agreement, as most recently amended and in effect, for the 2005-2006 viewing season, Sears is obligated to pay to BVTV the guaranteed sums of $750,000 by January 1, 2005, $494,500 by March 1, 2005, $275,000 by August 1, 2005, plus, by August 1, 2005, a $200,000 advance against incentive bonus payments, with the balance of said incentive bonus payments to be estimated and paid by October 1, 2005. Similarly, for the 2006-2007 viewing season, Sears is obligated, among other things, to pay BVTV the guaranteed sums of $750,000 by January 1, 2006, $494,500 by March 1, 2006 , $275,000 by August 1, 2006, plus, by August 1, 2006, a $200,000 advance against incentive bonus payments, with the balance of said incentive bonus payments to be estimated and paid by October 1, 2006.

23. In February 2005, although the transaction with Kmart Holding had not been consummated or approved by shareholders of Sears and Kmart, and although Sears and BVTV had just recently entered into Amendment 11 to the Syndication Agreement, Kmart and SHLD caused Sears to advise BVTV that management of Kmart and SHLD wanted to change the Syndication Agreement, as amended and then in effect.

24. Although Sears and BVTV had just recently entered into Amendment 11 to the Syndication Agreement, because of the long and mutually successful relationship BVTV enjoyed with Sears, BVTV engaged in discussions with Sears for a possible further amendment to the Syndication Agreement, as amended and then in effect.

25. In the course of those discussions, Kmart and SHLD caused Sears to advise Vila that management of Kmart and SHLD also wanted to change the Spokesperson Agreement, as amended and then in effect. The most recent amendment to the Spokesperson Agreement (Amendment X) had been entered into in December 2000 and extended the term of the Spokesperson Agreement through December 31, 2009.

26. Because of the long and mutually successful relationship Vila enjoyed with Sears, Vila engaged in discussions with Sears for a possible further amendment to the Spokesperson Agreement, as amended and then in effect.

27. When those discussions did not progress as SHLD and Kmart desired, SHLD and Kmart caused Sears to claim that Sears had not agreed with BVTV for the production of the television series *Bob Vila's Home Again* for the 2005-2006 viewing season or any other future viewing season.

28. SHLD and Kmart caused Sears to breach its Syndication Agreement, as amended, with BVTV and to refuse to pay BVTV (i) the balance of the incentive bonus payments for the 2003-2004 viewing season, believed to be $450,000 (ii) the payments due BVTV pursuant to the Syndication Agreement, as amended, by January 1, 2005, March 1, 2005 and August 1, 2005 in the total amount of

8

$1,719,500 and (iii) by October 1, 2005, an amount to be determined, as incentive bonus payments for the 2004-2005 viewing season.

29.  SHLD also caused Sears totally to repudiate the Syndication Agreement, as amended, and stated that Sears will not make any payments due BVTV or to become due to BVTV in the future under the Syndication Agreement, as amended. For the 2006-2007 viewing season, Sears is obligated, among other things, to pay BVTV the guaranteed sums of $750,000 by January 1, 2006, $494,500 by March 1, 2006 , $275,000 by August 1, 2006, plus, by August 1, 2006, a $200,000 advance against incentive bonus payments, with the balance of said incentive bonus payments to be estimated and paid by October 1, 2006.

30.  Further, SHLD and Kmart also caused Sears to take the position that Sears' repudiation of the Syndication Agreement, as amended, constituted a "cancellation" of the television series, entitling Sears to terminate the Spokesperson Agreement with Vila.

31.  Pursuant to the Spokesperson Agreement, as amended, Sears is obligated to pay to Vila each year through December 31, 2009, one half of the guaranteed compensation for that year on January 1 and the other half on July 1.

32.  The guaranteed compensation owed to Vila for the year 2005 is $1,897,500. The guaranteed compensation to be paid to Vila for the years 2006-2009 is $9,686,926.

33.  Sears made the payment due Vila on January 1, 2005 in the amount of $948,750, which was 50% of the monies contractually due for that year.

9

34.  SHLD and Kmart, without color of justification or any explanation, caused Sears to refuse to pay to Vila the balance of the guaranteed compensation due  July 1, 2005 in the amount of $948,750. Sears had neither received a notification of cancellation of the television series by the syndicator, nor had it sent Vila a notice of termination of the Spokesperson Agreement. In fact, the television series has not been canceled and is currently airing nationwide.

35.  On July 18, 2005, plaintiffs filed this action in the Dukes County Superior Court, Edgartown, Massachusetts.

36.  Defendants requested that plaintiffs grant defendants an extension of time to August 22, 2005 for defendants to file a responsive pleading to plaintiffs' Complaint. Plaintiffs granted the requested extension of time.

37.  During the period from August 1, 2005 through and including August 17, 2005, plaintiffs and defendants engaged in discussions regarding  the facts of the case and attempts to resolve their issues. On several occasions during those discussions, plaintiffs were informed in response to their direct questions that defendants were not contesting plaintiffs' rights to be paid the $948,750 due Vila on July 1, 2005 (Complaint, Count I) or the balance of the incentive bonus payments overdue BVTV for the 2003-2004 viewing season (Complaint, Count VI). Also in response to direct questions, defendants did not state any factual or legal basis for not making those payments.

38.  Efforts to reach a resolution were unsuccessful and on August 17, 2005, defendants removed this action to this Court.

10

39. On August 17, 2005, counsel for plaintiffs conferred, pursuant to Local Rule 7.1, with counsel for defendants concerning plaintiffs' intent to move for partial summary judgment with respect to Counts I and VI of plaintiffs' Complaint, since there was no genuine material issue of fact in dispute as to those Counts of the Complaint.

40. On August 19, 2005, by fax letter of that date addressed to Vila, defendant SHLD stated, among other things, and for the very first time and without any prior notice, that defendant Sears "has learned that you have engaged in substantial misconduct under the [Spokesperson] agreement including your violation of Sears' trademark in the Home Again name"; that Sears was, therefore, under no obligation to make the July 1, 2005 payment under the Spokesperson Agreement; and that Sears was terminating the Spokesperson Agreement effective August 19, 2005. In that letter, SHLD, further stated that, since Vila had alleged in the Complaint that Sears "knowingly and intentionally deceived" Vila, Vila was "involved in [a] situation" that "reflects unfavorably upon [Sears'] reputation" and that Sears was terminating the Spokesperson Agreement on that ground as well. SHLD further stated that Sears "hereby cancels the Bob Vila Home Again television show".

41. On August 22, 2005, defendants filed their Answer to the Complaint and defendant Sears filed a counterclaim alleging trademark infringement and overpayment of the incentive bonus for the 2003-2004 viewing season.

42. On August 23, 2005, counsel for defendants faxed a letter to counsel for plaintiffs claiming that Sears had a trademark in the words HOME AGAIN, that

that trademark is the exclusive property of Sears, that defendants were infringing on the alleged trademark and demanding that defendants cease and desist from the alleged infringement.

43. On August 24, 2005, by letter of the same date, counsel for plaintiffs advised counsel for defendants that the words HOME AGAIN were not a trademark, that the alleged trademark was not the exclusive property of Sears, that Sears' position had no merit, but that it was a non-issue for plaintiffs. Defendants were advised that BVTV had intended to use the phrase "Home Again" in its production of the television series for the 2005-2006 season, anticipating that defendant Sears and plaintiff BVTV would settle their issues regarding Sears' obligation to finance that production. Defendants were further advised that, since such a resolution now appeared unlikely, "BVTV's production, advertising and airing of its home improvement television series for the 2005-2006 [viewing] season and thereafter will not bear the phrase 'Home Again'".

44. On August 25, 2005, at the inception of a meeting among counsel and representatives of both plaintiffs and defendants, defendants were advised by plaintiffs that, although defendants' position regarding the alleged trademark had no merit, plaintiffs would not use the phrase "Home Again" in the name of the television series for the 2005-2006 viewing season or thereafter. Defendants were further advised that BVTV was taking immediate action to remove the phrase "Home Again" from the title of the television series and from any advertising or promotions for the series for the 2005-2006 viewing season. Plaintiffs requested that, if defendants became aware of any continuing use of the phrase "Home

Again" in advertising or promotions, defendants notify plaintiffs or their counsel of the same and plaintiffs would attempt to have such phrase removed from such advertising or promotion.

## COUNT I
### (Breach of Contract)

45. Vila repeats the allegations contained in paragraphs 1 through 44, as though fully set forth herein.

46. By its failure and refusal to pay Vila the guaranteed compensation in the amount of $948,750 due Vila on July 1, 2005, Sears has breached its obligations to Vila pursuant to the Spokesperson Agreement.

47. As a direct and proximate result of Sears' breach of the Spokesperson Agreement, Vila has been damaged in an amount to be determined at trial, but, in no event less than $948,750, plus interest, costs and his attorneys' fees.

## COUNT II
### (Repudiation of Contract)

48. Vila repeats the allegations contained in paragraphs 1 through 47, as though fully set forth herein.

49. Sears has repudiated its future obligations to Vila pursuant to the Spokesperson Agreement.

50. As a direct and proximate result of Sears' repudiation of the Spokesperson Agreement, as amended to run through December 31, 2009, Vila has been

13

damaged in an amount to be determined at trial, but, in no event less than $948,750 and will be damaged in a further amount to be determined at trial, but, in no event less than $9,686,926, plus interest, costs and his attorneys' fees.


## COUNT III
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

51. Vila repeats the allegations contained in paragraphs 1 through 50, as though fully set forth herein.

52. By its actions and conduct, Sears has breached the implied covenant of good faith and fair dealing inherent in the Spokesperson Agreement, as amended.

53. As a direct and proximate result of Sears' breach of the implied covenant of good faith and fair dealing inherent in the Spokesperson Agreement, as amended, Vila has been damaged in an amount to be determined at trial, but, in no event less than $948,750, and will be damaged in a further amount to be determined at trial, but, in no event less than $9,686,926, plus interest, costs and his attorneys' fees.


## COUNT IV
### (Equitable Estoppel)

54. Vila repeats the allegations contained in paragraphs 1 through 53, as though fully set forth herein.

55. In the negotiation of Amendment IX to the Spokesperson Agreement, Sears represented that paragraph 7 of the proposed Amendment IX was there in the

14

event that the television series was canceled by the syndicator of the television series, an independent third party.

56. Sears intended that Vila rely upon that representation and Vila reasonably did rely upon that representation in entering into Amendment IX to the Spokesperson Agreement, as amended.

57. SHLD have now caused Sears to take the position and Sears has taken the position that Sears, itself, rather than the syndicator, is entitled to cancel the television series and, thereby, is entitled to terminate the Spokesperson Agreement.

58. By letter dated August 19, 2005, SHLD asserted that Sears cancelled the television series, effective that date.

59. In fact, the television series has not been canceled and is currently airing nationwide.

60. As the result of the foregoing, Vila has been damaged in an amount to be determined at trial, but, in no event less than $948,750, and will be damaged in a further amount to be determined at trial, but, in no event less than $9,686,926, plus interest, costs and his attorneys' fees.

61. Defendants' conduct is inequitable and defendants should be estopped from asserting that Sears, itself, has the right to cancel the television series in order to escape Sears' substantial obligations to Vila through December 31, 2009 under the Spokesperson Agreement, as amended.

## COUNT V
### (Tortious Intereference)

62. Vila repeats the allegations contained in paragraphs 1 through 61, as though fully set forth herein.

63. SHLD and Kmart knew of the Spokesperson Agreement, as amended, between Sears and Vila.

64. SHLD and Kmart, without any right or privilege to do so, intentionally and tortiously interfered with the Spokesperson Agreement with improper purpose or by improper means, causing Sears to breach its obligations to Vila under the Spokesperson Agreement, as amended, to breach the implied covenant of good faith and fair dealing in the Spokesperson Agreement and to repudiate its future obligations to Vila under the Spokesperson Agreement.

65. As a direct and proximate result of SHLD's and Kmart's tortious interference with the Spokesperson Agreement between Sears and Vila, Vila has been damaged in an amount to be determined at trial, but, in no event less than $948,750 and will be damaged in a further amount to be determined at trial, but, in no event less than $9,686,926, plus interest, costs and his attorneys' fees.

## COUNT VI
### (Violation of M.G.L. 93A)

66. Vila repeats the allegations contained in paragraphs 1 through 65, as though fully set forth herein.

16

67. Vila, Sears, SHLD and Kmart are engaged in trade or commerce in the Commonwealth of Massachusetts, within the meaning of M.G.L. c. 93A.

68. By their actions and conduct, Sears, SHLD and Kmart have knowingly and intentionally engaged in unfair and deceptive acts or practices in violation of M.G.L. c. 93A, §§2 and 11.

69. As a direct and proximate result of Sears', SHLD's and Kmart's violations of M.G.L. c. 93A, Vila has been damaged in an amount to be determined at trial, but, in no event less than $948,750, trebled, but in no event, less than doubled, plus interest, costs and his attorneys' fees. Further, Vila will be damaged in a further amount to be determined at trial, but, in no event less than $9,686,926, trebled, but in no event, less than doubled, plus interest, costs and his attorneys' fees.

COUNT VII
(Breach of Contract)

70. BVTV repeats the allegations contained in paragraphs 1 through 69, as though fully set forth herein.

71. By its failure and refusal to pay BVTV the full incentive bonus due for the 2003-2004 and the 2004-2005 viewing seasons and the guaranteed compensation past due BVTV for the 2005-2006 viewing season, Sears has breached its obligations to BVTV pursuant to the Syndication Agreement, as amended.

72. As a direct and proximate result of Sears' breach of the Syndication Agreement, BVTV has been damaged in an amount to be determined at trial, but, in no event less than $2,169,500, plus interest, costs and its attorneys' fees.

## COUNT VIII
### (Repudiation of Contract)

73. BVTV repeats the allegations contained in paragraphs 1 through 72, as though fully set forth herein.

74. Sears has repudiated its future obligations to BVTV pursuant to the Syndication Agreement.

75. As a direct and proximate result of Sears' repudiation of the Syndication Agreement, BVTV has been damaged in an amount to be determined at trial, but, in no event less than $2,169,500, plus interest, costs and its attorneys' fees, and will be damaged in a further amount to be determined at trial, but, in no event less than $1,719,500, plus interest, costs and its attorneys' fees.

## COUNT IX
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

76. BVTV repeats the allegations contained in paragraphs 1 through 75, as though fully set forth herein.

77. By its actions and conduct, Sears has breached the implied covenant of good faith and fair dealing inherent in the Syndication Agreement, as amended.

78. As a direct and proximate result of Sears' breach of the implied covenant of good faith and fair dealing inherent in the Syndication Agreement, as amended, BVTV has been damaged in an amount to be determined at trial, but, in no event less than $2,169,500, plus interest, costs and its attorneys' fees. and will be damaged

18

in a further amount to be determined at trial, but, in no event less than $1,719,500, plus interest, costs and its attorneys' fees.

COUNT X
(Tortious Interference With Contract)

79. BVTV repeats the allegations contained in paragraphs 1 through 78, as though fully set forth herein.

80. SHLD and Kmart knew of the Syndication Agreement, as amended, between Sears and BVTV.

81. SHLD and Kmart, without any right or privilege to do so, intentionally and tortiously interfered with that contract, with improper motive or by improper means, causing Sears to breach its obligations to BVTV under the Syndication Agreement, as amended, to breach the implied covenant of good faith and fair dealing inherent in the Syndication Agreement and to repudiate its future obligations to BVTV under the Syndication Agreement.

82. As a direct and proximate result of SHLD's and Kmart's tortious interference with the Syndication Agreement between Sears and BVTV, BVTV has been damaged in an amount to be determined at trial, but, in no event less than $2,169,500, plus interest, costs and its attorneys' fees and will be damaged in a further amount to be determined at trial, but, in no event less than $1,719,500, plus interest, costs and its attorneys' fees.

<u>COUNT XI</u>
(Violation of M.G.L. c. 93A)

83. BVTV repeats the allegations contained in paragraphs 1 through 82, as though fully set forth herein.

84. BVTV, Sears, SHLD and Kmart are engaged in trade or commerce in the Commonwealth of Massachusetts, within the meaning of M.G.L. c. 93A.

85. By their actions and conduct, Sears, SHLD and Kmart have knowingly and intentionally engaged in unfair and deceptive acts or practices in violation of M.G.L. c. 93A, §§2 and 11.

86. As a direct and proximate result of Sears', SHLD's and Kmart's violations of M.G.L. c. 93A, BVTV has been damaged in an amount to be determined at trial, but, in no event less than $2,169,500, trebled, but in no event, less than doubled, plus interest, costs and its attorneys' fees. Further, BVTV will be damaged in a further amount to be determined at trial, but, in no event less than $1,719,500, trebled, but in no event, less than doubled, plus interest, costs and its attorneys' fees.

<u>PRAYERS FOR RELIEF</u>

WHEREFORE, Robert J. Vila and B.V.T.V, Inc. respectfully request that this Court enter judgment, as follows:

A. Awarding Robert J. Vila damages against Sears, Roebuck and Co. in an amount to be determined at trial, but in no event less than $948,750, as a result of Sears,

20

Roebuck and Co.'s breach of the Spokesperson Agreement, together with interest, costs and his attorneys' fees;

B. Awarding Robert J. Vila damages against Sears, Roebuck and Co. in an amount to be determined at trial, but in no event less than $9,686,926, as a result of Sears, Roebuck and Co.'s repudiation of the Spokesperson Agreement, together with interest, costs and his attorneys' fees;

C. Awarding Robert J. Vila damages against Sears, Roebuck and Co. in an amount to be determined at trial, but in no event less than $10,635,676, as a result of Sears, Roebuck and Co.'s breach of the implied covenant of good faith and fair dealing inherent in the Spokesperson Agreement, together with interest, costs and his attorneys' fees;

D. Awarding Robert J. Vila damages against Sears Holdings Corporation and Kmart Holding Corporation in an amount to be determined at trial, but in no event less than $10,635,676, as a result of Sears Holdings Corporation's and Kmart Holding Corporation's tortious interference with the Spokesperson Agreement, together with interest, costs and his attorneys' fees;

E. Awarding Robert J. Vila damages against Sears, Roebuck and Co., Sears Holdings Corporation and Kmart Holding Corporation in an amount to be determined at trial, but in no event less than $10,635,676, trebled, but, in no event less than doubled, as a result of Sears, Roebuck and Co.'s, Sears Holding Corporation's and Kmart Holding Corporation's unfair and deceptive conduct in violation of M.G.L. c. 93A, together with interest, costs and his attorneys' fees;

21

F. Awarding B.V.T.V., Inc. damages against Sears, Roebuck and Co. in an amount to be determined at trial, but in no event less than $2,169,500, as a result of Sears, Roebuck and Co.'s breach of the Syndication Agreement, together with interest, costs and its attorneys' fees;

G. Awarding B.V.T.V., Inc. damages against Sears, Roebuck and Co. in an amount to be determined at trial, but in no event less than $1,719,500, as a result of Sears, Roebuck and Co.'s repudiation of the Syndication Agreement, together with interest, costs and its attorneys' fees;

H. Awarding B.V.T.V., Inc. damages against Sears, Roebuck and Co. in an amount to be determined at trial, but in no event less than $3,889,000, as a result of Sears, Roebuck and Co.'s breach of the implied covenant of good faith and fair dealing inherent in the Syndication Agreement, together with interest, costs and its attorneys' fees;

I. Awarding B.V.T.V., Inc. damages against Sears Holdings Corporation and Kmart Holding Corporation, in an amount to be determined at trial, but in no event less than $3,889,000, as a result of Sears Holdings Corporation's and Kmart Holding Corporation's tortious interference with the Syndication Agreement, together with interest, costs and its attorneys' fees;

J. Awarding B.V.T.V., Inc. damages against Sears, Roebuck and Co., Sears Holdings Corporation and Kmart Holding Corporation, in an amount to be determined at trial, but in no event less than $3,889,000, trebled, but, in no event, less than doubled, as a result of Sears, Roebuck and Co.'s, Sears Holdings

22

Corporation's and Kmart Holding Corporation's unfair and deceptive conduct in violation of M.G.L. c. 93A, together with interest, costs and its attorneys' fees;

K. Awarding Robert J. Vila and B.V.T.V., Inc. such other and further relief as this Court deems just and proper.

## JURY DEMAND

Robert J. Vila and B.V.T.V., Inc. hereby demand a jury as to all claims and issues so triable.

ROBERT J. VILA and B.V.T.V., INC.

By their attorney,

James F. O'Brien (BBO # 375765)
410 Park Avenue, Suite 1530
New York, New York 10022
212 813 9300
212 813 1907 (fax)

Dated: October 20, 2005

## CERTIFICATE OF SERVICE

I, James F. O'Brien, counsel for Plaintiffs, hereby certify that, on October 20, 2005, I served a true copy of the foregoing Motion for Partial Summary Judgment upon Anna Sankaran Esq., Greenberg, Traurig LLP, One International Place, Boston, MA 02110, counsel for defendants, by overnight mail, postage prepaid.

James F. O'Brien

23

# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROBERT J. VILA and B.V.T.V., INC.,

      Plaintiffs,

v.

SEARS, ROEBUCK AND CO., SEARS
HOLDINGS CORPORATION and
KMART HOLDING CORPORATION,

      Defendants.

Civil Action No. 05-11717-REK

## DEFENDANTS' ANSWER AND FIRST AMENDED COUNTERCLAIM TO PLAINTIFFS' FIRST AMENDED COMPLAINT

Defendants Sears, Roebuck and Co. ("Sears Co."), Sears Holdings Corporation (Sears Holdings") and Kmart Holding Corporation ("Kmart Holdings") (collectively "Defendants"), neither admit nor deny the allegations contained in the unnumbered introductory paragraph of Plaintiffs' First Amended Complaint as they are introductory in nature and the First Amended Complaint, the Bob Vila Spokesperson Agreement and amendments (the "Spokesperson Agreement"), and the Bob Vila Syndicated Television Program Agreement and amendments (the "Syndication Agreement") speak for themselves.

## THE PARTIES

1.      Defendants neither admit nor deny the allegations contained in the first sentence of paragraph 1 of the First Amended Complaint as they are without sufficient information or knowledge as to their truth. With respect to the second sentence of paragraph 1 of the First Amended Complaint, Defendants admit that Vila was the spokesperson for certain products marketed and sold by Sears continuously from September 29, 1989 and deny the remaining

allegations in the second sentence of paragraph 1 of the First Amended Complaint. Defendants further state that the Spokesperson Agreement speaks for itself.

2.    Defendants neither admit nor deny the allegations contained in the first sentence of paragraph 2 of the First Amended Complaint as they are without sufficient information or knowledge as to their truth. With respect to second sentence, Defendants admit that Since September 29, 1989 through the end of 2004, BVTV has been the producer of a nationally syndicated television home improvement series staring Bob Vila financed by Sears; Defendants further admit that that series was originally known as "Home Again With Bob Vila" and before the 1991-1992 season, changed its name to "Bob Vila's Home Again;" Defendants deny the remaining allegations contained in the second sentence of paragraph 2 of the First Amended Complaint.

3.    Admitted.

4.    Admitted.

5.    Admitted.

## JURISDICTION AND VENUE

6.    Neither admitted nor denied as the information contained in paragraph 6 of the First Amended Complaint contains conclusions of law, and not allegations of fact and, accordingly, require no response.

7.    Neither admitted nor denied as the information contained in paragraph 7 of the First Amended Complaint contains conclusions of law, and not allegations of fact and, accordingly, require no response. Defendants further state that this Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1441 and 1446.

8.    Neither admitted nor denied as the information contained in paragraph 8 of the

2

First Amended Complaint contains conclusions of law, and not allegations of fact and, accordingly, require no response.

## FACTS

9.    Neither admitted nor denied as the Spokesperson Agreement speaks for itself.

10.    Defendants neither admit nor deny the allegations contained in the first and second sentences of paragraph 10 of the First Amended Complaint as the amendments to the Spokesperson Agreement speak for themselves. Defendants further state that on or about August 18, 2005, Sears terminated the Spokesperson Agreement. Defendants deny the allegations contained in the third sentence of paragraph 10.

11.    Neither admitted nor denied as the Spokesperson Agreement speaks for itself.

12.    Defendants deny that Vila was induced to enter into any of the amendments to the Spokesperson Agreement and neither admit nor deny the remaining allegations contained in the first sentence of paragraph 12 of the First Amended Complaint as they are without sufficient knowledge and/or information as to their truth. Defendants deny the allegations contained in the second sentence of paragraph 12 of First Amended Complaint.

13.    Neither admitted nor denied as the Spokesperson Agreement speaks for itself.

14.    Defendants neither admit nor deny the allegations contained in the first sentence of paragraph 14 of the First Amended Complaint as the Syndication Agreement speaks for itself. With respect to the second sentence of paragraph 14, Defendants admit that between September 29, 1989 and August 18, 2005, the television program "Home Again with Bob Vila," which later changed its name to "Bob Vila's Home Again," was distributed for airing by a syndicator. Defendants neither admit nor deny the remaining allegations of paragraph 14 as the Syndication Agreement speaks for itself.

15.     Defendants neither admit nor deny the allegations contained in the first sentence of paragraph 15 as the amendments to the Syndication Agreement speak for themselves. With respect to the second sentence of paragraph 15 of the First Amended Complaint, Defendants admit that Sears and BVTV engaged in negotiations with respect to the Syndication Agreement between late 2004 and January 2005 and deny the remaining allegations contained in the second sentence of paragraph 15 of the First Amended Complaint. Defendants deny that BVTV began performance of BVTV's obligations under any purported eleventh amendment of the Syndication Agreement. Defendants neither admit nor deny the remaining allegations of the third sentence of paragraph 15 as they are without sufficient information or knowledge as to their truth.

16.     Denied.

17.     Defendants neither admit nor deny that on or about November 17, 2004 negotiations for Amendment 11 of the Syndication Agreement were nearing conclusion as they are without sufficient information or knowledge as to the truth. Defendants admit the remaining allegations of paragraph 17 of the First Amended Complaint.

18.     Admitted.

19.     Defendants expressly deny that they was a course of conduct between Sears and plaintiff B.V.T.V., Inc. ("BVTV"), and neither admit nor deny the remaining allegations contained in paragraph 19 of the Complaint as they are without sufficient knowledge and/or information as to their truth.

20.     Denied.

21.     Defendants neither admit nor deny the allegations contained in the first sentence of paragraph 21 of the First Amended Complaint as the amendments to the Syndication

4

Agreement speaks for themselves. Defendants deny the allegations contained in the second and third sentences of paragraph 21 of the First Amended Complaint.

22.    Denied.

23.    Defendants admit that in February 2005, the transaction between the Defendants had not yet been consummated or approved by shareholders of Sears and Kmart and deny the remaining allegations contained in paragraph 23 of the First Amended Complaint.

24.    Defendants deny that Sears and BVTV entered into Amendment 11 to the Syndication Agreement and that it was ever in effect; Defendants admit that Sears and BVTV engaged in additional discussions regarding another amendment to the Syndication Agreement; Defendants deny the remaining allegations contained in paragraph 24 of the First Amended Complaint.

25.    Defendants admit that Sears advised Vila that it wanted to negotiate changes to the Spokesperson Agreement and deny the remaining allegations contained in the first sentence of paragraph 25 of the First Amended Complaint. Defendants neither admit nor deny the allegations contained in the second sentence of paragraph 25 of the First Amended Complaint as the amendments to the Spokesperson Agreement speak for themselves.

26.    Defendants admit that Vila entered into discussions with Sears regarding amending the Spokesperson Agreement. Defendants neither admit nor deny the remaining allegations contained in paragraph 26 of the First Amended Complaint as they are without sufficient knowledge and or information as to their truth.

27.    Defendants admit that Sears had not agreed with BVTV for the production of the television series Home Again With Bob Vila for the 2005-2006 season or any other future season. Defendants deny the remaining allegations contained in paragraph 27 of the First

Amended Complaint.

    28.    Denied.

    29.    Denied.

    30.    Denied.    Defendants further state that on or about August 18, 2005, Sears cancelled the Spokesperson Agreement.

    31.    Neither admitted nor denied as the Spokesperson Agreement speaks for itself.

    32.    Neither admitted nor denied as the Spokesperson Agreement speaks for itself.

    33.    Defendants admit that Sears made the payment due Villa on January 1, 2005 in the amount of $948,750. Defendants deny the remaining allegations of paragraph 33 of the First Amended Complaint.

    34.    Defendants deny the allegations of the first sentence of paragraph 34 of the First Amended Complaint. Defendants admit that Sears did not receive a notice of cancellation by the syndicator and denies the remaining allegations contained in paragraph 34 of the First Amended Complaint. With respect to the third sentence of paragraph 34 of the First Amended Complaint, Defendants admit that on or about August 18, 2005, Sears cancelled the Spokesperson Agreement and neither admit nor deny the remaining allegations contained in paragraph 34 of the First Amended Complaint as they are without sufficient knowledge and/or information as to their truth.

    35.    Neither admitted nor denied as the docket in the Dukes County Superior Court speaks for itself.

    36.    Admitted.

    37.    Defendants admit engaging in discussion regarding the facts of the case. Defendants deny the remaining allegations of paragraph 37 of the First Amended Complaint.

38.    Admitted.

39.    Defendants admit that counsel for plaintiffs conferred with counsel for defendants concerning plaintiffs' intent to move for partial summary judgment with respect to certain counts of plaintiffs' complaint. Defendants deny the remaining allegations of paragraph 39 of the First Amended Complaint.

40.    Defendants neither admit nor deny the allegations contained in paragraph 40 of the First Amended Complaint as the August 19, 2005 fax letter speaks for itself.

41.    Neither admitted nor denied as this Court's docket and Defendants' counterclaim speak for themselves.

42.    Defendants neither admit nor deny the allegations contained in paragraph 42 of the First Amended Complaint as the August 23, 2005 letter speaks for itself.

43.    Defendants deny that "HOME AGAIN" is not a trademark and that "HOME AGAIN" is not the exclusive property of Sears. Defendants neither admit nor deny the remaining allegations contained in paragraph 43 of the First Amended Complaint as the August 24, 2005 letter speaks for itself.

44.    Defendants admit that on August 25, 2005 plaintiffs told defendants that plaintiffs would not use the phrase "Home Again" in the name of the television series for the 2005-2006 viewing season or thereafter. Defendants deny the remaining allegations of the first sentence of paragraph 44 of the First Amended Complaint. Defendants admit the allegations of the second and third paragraphs of paragraph 44 of the First Amended Complaint.

## COUNT I
### (Breach of Contract)

45.    Defendants restate and incorporate by reference their answers to paragraphs 1-44 of the First Amended Complaint.

7

46.    Defendants refer the Court to the Spokesperson Agreement for its express terms and conditions.  Further answering, Defendants admit that the spokesperson Agreement provided for a payment of $948,750 on July 1, 2005.  Sears also states that the Spokesperson Agreement further provides that in the event of cancellation or termination of the Spokesperson Agreement, Vila would be only entitled to payments pro rata through the date of cancellation.  Since the agreement was canceled on or about August 18, 2005, Vila is not entitled to the full payment, but rather only a pro rata amount which must be reduced by the damages Defendants have suffered as a result of Vila's misconduct.  Based on the Vila's breaches and trademark infringement, defendants state that the damage caused by Vila exceed any pro rata portion of monies to which Vila would otherwise be due under the Spokesperson Agreement.  Accordingly, defendants deny the allegations in paragraph 46 of the First Amended Complaint.

47.    Denied.

## COUNT II
### (Repudiation of Contract)

48.    Defendants restate and incorporate by reference their answers to paragraphs 1-47 of the First Amended Complaint.

49.    Denied.    Defendants further state that Sears terminated the Spokesperson Agreement on August 18, 2005.

50.    Denied.

## COUNT III
### (Breach of the Covenant of Good Faith And Fair Dealing)

51.    Defendants restate and incorporate by reference their answers to paragraphs 1-50 of the First Amended Complaint.

52.    Denied.

8

53.    Denied.

## COUNT IV
(Equitable Estoppel)

54.    Defendants restate and incorporate by reference their answers to paragraph 1-53 of the First Amended Complaint.

55.    Neither admitted nor denied as the Defendants are without sufficient knowledge and/or information as to the truth of the allegations contained in paragraph 55 of the First Amended Complaint.

56.    Denied.

57.    Defendants admit that pursuant to the Spokesperson Agreement and amendments thereto, Sears is entitled to cancel the Spokesperson Agreement and denies the remaining allegations contained in paragraph 57 of the First Amended Complaint.

58.    Neither admitted nor denied as the August 19, 2005 letter speaks for itself.

59.    Defendants state that the Spokesperson Agreement is canceled  and neither admitted nor deny the remaining allegations contained in paragraph 59 of the First Amended Complaint as they are without sufficient knowledge and/or information as to their truth.

60.    Denied.

61.    Denied.

## COUNT V
(Tortious Interference With Contract)

62.    Defendants restate and incorporate by reference their answers to paragraphs 1-61 of First Amended Complaint.

63.    Admitted.

64.    Denied.

9

65. Denied.

## COUNT VI
### (Violation of MASS. GEN. L. ch. 93A)

66. Defendants restate and incorporate by reference their answers to paragraphs 1-65 of the First Amended Complaint.

67. Neither admitted nor denied as the information contained in paragraph 67 of the First Amended Complaint contains conclusions of law, not allegations of fact, and accordingly requires no response.

68. Denied.

69. Denied.

## COUNT VII
### (Breach of Contract)

70. Defendants restate and incorporate by reference their answers to paragraphs 1-69 of the First Amended Complaint.

71. Denied.

72. Denied.

## COUNT VIII
### (Repudiation of Contract)

73. Defendants restate and incorporate by reference their answers to paragraphs 1-72 of the First Amended Complaint.

74. Denied.

75. Denied.

## COUNT IX
### (Breach of the Implied Covenant of Good Faith And Fair Dealing)

76. Defendants restate and incorporate by reference their answers to paragraphs 1-75

of the First Amended Complaint.

77.     Denied.

78.     Denied.

## COUNT X
### (Tortious Interference With Contract)

79.     Defendants restate and incorporate by reference their answers to paragraphs 1-78 of First Amended Complaint.

80.     Admitted.

81.     Denied.

82.     Denied.

## COUNT XI
### (Violation of MASS. GEN. L. ch. 93A)

83.     Defendants restate and incorporate by reference their answers to paragraphs 1-82 of the First Amended Complaint.

84.     Neither admitted nor denied as the information contained in paragraph 84 of the First Amended Complaint contain conclusions of law, not allegations of fact, and accordingly require no response.

85.     Denied.

86.     Denied.

## AFFIRMATIVE DEFENSES

## AFFIRMATIVE DEFENSE ONE

Plaintiffs' First Amended Complaint fails to state a claim upon which relief can be granted.

## AFFIRMATIVE DEFENSE TWO

Plaintiffs' First Amended Complaint should be dismissed as the so-called Amendment 11 to the Syndication Agreement fails to comply with the statute of frauds. 740 ILL. COMP. STAT. 80/1;  MASS. GEN L. ch. 259, §1; N.Y. GEN. OBLIG. LAWS §5-701.

## AFFIRMATIVE DEFENSE THREE

Plaintiffs' claims are barred because Defendants' actions were privileged.  <u>Williams v. B & K Med. Syst., Inc.</u>, 49 Mass. App. Ct. 563 (2000); Restatement (Second) of Torts § 769.

## AFFIRMATIVE DEFENSE FOUR

Plaintiffs' claims are barred because Massachusetts does not recognize a claim for anticipatory repudiation.  <u>Daniels v. Newton</u>, 114 Mass. 530 (1874).

## AFFIRMATIVE DEFENSE FIVE

To the extend plaintiffs' were injured, which is expressly denied, Defendants are, at a minimum, entitled to a setoff against any damages allegedly incurred by plaintiff for Plaintiffs' own breach of contract.

## AFFIRMATIVE DEFENSE SIX

Plaintiffs' claims are barred by the doctrine of unclean hands.

## AFFIRMATIVE DEFENSE SEVEN

Plaintiffs' claims are barred as plaintiffs' reliance was not reasonable.

## AFFIRMATIVE DEFENSE EIGHT

Plaintiffs' claims are barred by their own breach of contract.

## FIRST AMENDED COUNTERCLAIM OF SEARS, ROEBUCK AND CO.

1.      Counterclaimant Sears, Roebuck and Co. ("Sears") seeks relief against

12

plaintiffs/counterclaim defendants Robert J. Vila ("Vila") and B.V.T.V., Inc. ("BVTV") (collectively "Counterclaim Defendants"), for breach of contract, trademark infringement and unfair competition in violation of § 43(a) of the Lanham Act, conversion, common law trademark infringement, violation of MASS. GEN. L. ch. 93A, and unjust enrichment. Counterclaim Defendants breached their contract with Sears and have infringed Sears' HOME AGAIN trademark by producing, promoting and making plans to air new episodes of a home improvement show incorporating Sears' HOME AGAIN trademark. In addition, Counterclaim Defendants collected bonus payments far in excess of what they were due, unjustly enriching themselves to the detriment of Sears.

## PARTIES

2.      Sears is a New York corporation with a principal place of business in Hoffman Estates, Illinois.  Sears is one of the most famous and long established retailers in the United States and has become an American institution.

3.      Defendant Vila is an individual who upon information and belief is a resident of Chilmark, Dukes County, Commonwealth of Massachusetts.

4.      Defendant BVTV is, upon information and belief a Massachusetts Corporation with a principal place of business in Boston, Suffolk County, Commonwealth of Massachusetts.

## JURISDICTION AND VENUE

5.      This court has subject matter jurisdiction over this action pursuant to 15 U.S.C. §1121(a) and 28 U.S.C. §§ 1331, 1332, and 1367.

6.      Venue of this matter is appropriate in this jurisdiction pursuant to 28 U.S.C. §1391.

13

**FACTUAL ALLEGATIONS**

7.     On or about September 29, 1989, BVTV and Ogilvy & Mather ("Ogilvy"), as

agent for Sears, entered into the Bob Vila Syndicated Television Programs Agreement (the

"Syndication Agreement").  Pursuant to the Syndication Agreement, Sears agreed to finance a

series of home improvement television programs produced by BVTV staring Vila.

8.     Pursuant to the Syndication Agreement,

(a) . . . Producer [(BVTV)] agrees that it will not use the name "Sears" and any of
Sears trademarks, trade names or service marks without the express written
permission from Sears.  Producer expressly recognizes and acknowledges that the
use of Sears marks shall not confer upon Producer any proprietary rights to any
such Sears marks.  Upon expiration or upon termination of Producer's right to use
Sears marks for any cause, Producer shall immediately cease all use of all such
Sears marks and will not use any such Sears Marks thereafter.  Producer agrees
not to question, contest or challenge the ownership by Sears of any such right,
title or interest in any such mark, except the right to use the same pursuant to the
terms and conditions of this agreement, and will not seek to register the same.

(b)  . . .  Producer acknowledges that Sears may register any and all of the
trademarks, service marks or trade names for the Program(s) under this
Agreement in its own name, and that Producer's use thereof shall inure to the
benefit of Sears for such purposes, as well as for other purposes.  Producer shall
cooperate in any such registration by Sears or application therefore.

Syndication Agreement Section 18(a) & (b).

9.     For each year between 1989 and 2004, BVTV has been producing the home

improvement television series starring Vila, which was originally entitled "Home Again with

Bob Vila" and is now titled "Bob Vila's Home Again" ("HOME AGAIN") pursuant to the terms

of the Syndication Agreement.  The Syndication Agreement was amended 10 times.  The first

through ninth Amendments to the Syndication Agreement each covered one year seasons of the

production of HOME AGAIN; the Tenth Amendment  covered the period from 1999 through

2004 for the production of HOME AGAIN.  Each of the ten amendments to the Syndication

Agreement incorporated and applied the identical Section 18 "Sears Trademark, Trade Names,

14

Services Marks" from the original September 29, 1989 Syndication Agreement. Accordingly, Sears owns all right, title and interest in the "HOME AGAIN" trademark.

10.     The most recent iteration of the Syndication Agreement (the tenth amendment) also provided for certain incentive bonuses to be paid by Sears to BVTV for the 2003-2004 season pursuant to paragraph 3 of Amendment 10 to the Syndication Agreement.

11.     The home improvement television series bearing the HOME AGAIN mark has been broadcast since 1990. The HOME AGAIN series is currently syndicated on approximately 180 stations nationwide, covering over 92% of the United States. In addition to its association with the home improvement television show, the HOME AGAIN trademark also is used on videos and DVDs containing copies of past episodes. Sears has spent millions of dollars over the past fifteen years promoting its HOME AGAIN trademark.

12.     The last Amendment to the Syndication Agreement expired in 2004 and covered the 2004-2005 series of HOME AGAIN. Although Sears entered into negotiations with Counterclaim Defendants regarding a subsequent extension for another season, no agreement was ever reached and the parties never executed any amendment covering an subsequent season beyond the 2004-2005 season.

13.     Counterclaim Defendants began production of a 2005-2006 season of a new television series bearing and/or using Sears' HOME AGAIN trademark in or around June 2005, and which, upon information and belief began airing on September 12, 2005. Counterclaim Defendants were not given permission to use Sears' HOME AGAIN trademark and such use is improper and unlawful.

14.     Sears inadvertently overpaid the incentive bonus due for the 2003-2004 season pursuant to the Syndication Agreement as amended, to BVTV and Vila by approximately

15

$75,000.

## COUNT I.
## Trademark and Trade Name Infringement Under 15 U.S.C. §1125(a)

15.    Counterclaim Defendants' improper and unauthorized use of Sears' HOME

AGAIN trademark constitutes trademark infringement and unfair competition under Section

43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

16.    Counterclaim Defendants' unauthorized use of Sears' HOME AGAIN trademark

in commerce, in connection with the marketing, advertising, offering for sale and/or sale of their

home improvement television series, is willful and intended to cause, and is likely to cause,

confusion, mistake and/or deception as to the origin, source or sponsorship of their television

show and in flagrant disregard to Sears' lawful rights.  Accordingly, this is an exceptional case

within the meaning of 15 U.S.C. § 1117(a).

17.    Counterclaim Defendants' conduct has and will continue to injure Sears by

diminishing and destroying the good will Sears has squired in its HOME AGAIN trademark.

Sears has no adequate remedy at law, and, if Counterclaim Defendants are not enjoined, Sears

will continue to suffer irreparable harm and injury to its goodwill and reputation.

## COUNT II
## Breach of Contract

18.    Counterclaimant restates and realleges the allegations contained in paragraphs 1 –

17 of the Counterclaim as if fully stated herein.

19.    Counterclaim Defendants have breached Section 18 of the Syndication

Agreements by producing and advertising a 2005-2006 home improvement series bearing the

Sears' HOME AGAIN mark without the permission of Sears.

20.    These breaches of contract by Vila and BVTV have directly and proximately

16

caused Sears damages.

21.    Sears has no plain and adequate remedy at law.

### COUNT III
### Conversion

22.    Sears restates and realleges the allegations contained in paragraphs 1 – 21 of the Counterclaim as if fully stated herein.

23.    Sears is, and during all times alleged herein was, the sole owner of the trademark HOME AGAIN.

24.    Sears had possession, or the right to immediate possession, of Sears' trademark HOME AGAIN at the time of Counterclaim Defendants' unlawful conduct.

25.    Counterclaim Defendants interfered with Sears' right to possession or right to immediate possession by intentionally and willfully misappropriating and exercising dominion over Sears' HOME AGAIN trademark.

26.    As a direct and proximate consequence of Counterclaim Defendants' unlawful and unjustified dominion over Sears' property, Sears has suffered damages.

### COUNT IV
### Common Law Trademark Infringement/Palming Off

27.    Counterclaimant restates and realleges the allegations contained in paragraphs 1 – 26 of the Counterclaim as if fully stated herein.

28.    Counterclaim Defendants have adopted and used a trademark identical to that owned by Sears.

29.    Counterclaim Defendants' unauthorized and unlawful conduct in producing and airing a home improvement television series bearing Sears' HOME AGAIN trademark will likely cause consumer confusion as to the source of the program. Counterclaim Defendants'

conduct has and will continue to injure Sears by diminishing and destroying the good will Sears

has squired in its HOME AGAIN trademark.  Sears has no adequate remedy at law, and, if

Counterclaim Defendants are not enjoined, Sears will continue to suffer irreparable harm and

injury to its goodwill and reputation.

**COUNT V**
**Violation of MASS. GEN. L. ch. 93A**

30.     Sears restates and realleges the allegations contained in paragraphs 1 – 29 of the

Counterclaim as if fully stated herein.

31.     Counterclaim Defendants are engaged in trade or commerce within the meaning

of MASS. GEN. L. ch. 93A.  Counterclaim Defendants' actions occurred primarily and

substantially in Massachusetts.

32.     The conduct of Counterclaim Defendants described above constitutes one or more

unfair, deceptive, and/or anti-competitive acts or practices in violation of MASS. GEN. L. ch. 93A,

§§2, 11.

33.     Sears has and continues to suffer irreparable harm to its goodwill and image as a

direct and proximate consequence of Counterclaim Defendants' several violations of MASS. GEN.

L. ch. 93A as described above.

34.     Counterclaim Defendants' conduct constitutes a willful and/or knowing violation

of MASS. GEN. L. ch. 93A, resulting in substantial and irreparable harm to Sears unless and until

their conduct is enjoined.  Accordingly, Sears is entitled to recover up to three but not less than

two times the amount of its actual damages, together with interest, costs, and attorneys fees.

35.     Sears has no plain and adequate remedy at law.

### COUNT VI
**Restitution/Unjust Enrichment/*Quantum Meruit* (trademark/trade name)**

36.     Counterclaimant restates and realleges the allegations contained in paragraphs 1 –
35 of the Counterclaim as if fully stated herein.

37.     Counterclaim Defendants are using and profiting from Sears' HOME AGAIN
trademark but have not paid Sears for such use.

38.     As a direct and proximate result of Counterclaim Defendants' failure to
compensate Sears for the use of its HOME AGAIN mark, Counterclaim Defendants have been
unjustly enriched to the detriment of Sears.

39.     Sears has no adequate remedy at law and is entitled to the disgorged benefits by
which the Counterclaim Defendants were unjustly enriched.

### COUNT VII
**Restitution/Unjust Enrichment/*Quantum Meruit* (contract)**

40.     Sears restates and realllege the allegations contained in paragraphs 1 – 39 of the
Counterclaim as if fully stated herein.

41.     Counterclaim Defendants were overpaid for the 2003-2004 bonus payment
pursuant to the Syndication Agreement in an amount no less than $75,000 (the "Unearned Bonus
Payment"), which Counterclaim Defendants did not earn.

42.     As a direct and proximate result of Counterclaim Defendants failure to repay
Sears the Unearned Bonus, Counterclaim Defendants have been unjustly enriched to the
detriment of Sears.

### PRAYER FOR RELIEF

WHEREFORE, Counterclaimant Sears, Roebuck and Co., prays for the following relief:

1.      With respect to Counts I-VI: an order that:

(a)    the trademark HOME AGAIN is owned by Sears, and that Sears has the exclusive right to use such trademark in the United States;

(b)    Counterclaim Defendants have unfairly competed with Sears by unlawfully, and without authorization using Sears' HOME AGAIN trademark in connection with another television series that is likely to cause confusion as to the source, sponsorship or association of Sears;

(c)    Counterclaim Defendants and their officers, agents, servants, employees, attorneys, and all other persons in active concert and/or participation with them who receive notice, be temporarily, preliminarily and permanently enjoined and restrained from:

(i)    using any trademark or name or design identical, or confusingly similar, to Sears' HOME AGAIN trademark;

(ii)    otherwise infringing Sears' HOME AGAIN trademark;

(iii)    otherwise unfairly competing with Sears relating to the television series HOME AGAIN; and,

(iv)    Causing or creating a likelihood of confusion or misunderstanding as to source, association with, affiliation with, sponsorship of, approval of, or certification of or by Sears, or engaging in any other conduct which tends to pass off Counterclaim Defendants' television home improvement show as that of Sears or which tends to create a likelihood of confusion, misunderstanding, or false representation in association therewith.

(d)    Counterclaim Defendants be directed to file in Court, and to serve on Sears, within thirty (30) days after entry of the above injunction, a report in writing,

20

under oath, setting forth in detail the manner and form in which it has complied with the injunctive relief ordered by this Court.

(e)     Counterclaim Defendants be directed to deliver up to this Court for destruction, pursuant to 15 U.S.C. § 1118, all prints, advertisements, promotional materials, electronic media or other articles in its possession bearing or exhibiting Sears' HOME AGAIN trademark, or any reproduction, counterfeit, copy or colorable imitation thereof, and all plates, molds, matrices, screens, or other means of making the same.

(f)     an accounting be held and judgment rendered for damages sustained by Sears on account of Counterclaim Defendants' trademark infringement and unfair competition, under both federal and state law, that the case be found to be exceptional and that reasonable attorneys fees be assessed against Counterclaim Defendants and awarded to Sears pursuant to 15 U.S.C. §1117(a).

(g)     this Court award reasonable attorney fees, taxable costs and such other and further relief to Sears as deemed just.

21

2.    With respect to Counts II-VII, an order awarding Sears damages, interest, costs, attorney's fees and all such further relief as this Court deems appropriate.


**SEARS, ROEBUCK AND CO., SEARS HOLDINGS CORPORATION AND KMART HOLDING CORPORATION HEREBY DEMAND A TRIAL BY JURY ON ALL COUNTS SO TRIABLE IN BOTH THE FIRST AMENDED COMPLAINT AND COUNTERCLAIM.**


**RESPECTFULLY SUBMITTED:**
SEARS HOLDINGS CORPORATION and
KMART HOLDING CORPORATION,
Defendants, and SEARS, ROEBUCK AND CO.,
Defendant/Counterclaimant,
By their attorneys:


/s/ Annapoorni R. Sankaran
Gary R. Greenberg, BBO #209420
A. John Pappalardo, BBO # 338760
Annapoorni R. Sankaran, BBO #631065
GREENBERG TRAURIG, LLP
One International Place, 20th Floor
Boston, MA 02110
(617) 310-6000
(617) 310-6001 (fax)


<u>CERTIFICATE OF SERVICE</u>

I Annapoorni R. Sankaran, hereby certify that on October 31, 2005, I served a copy of the foregoing by first class mail, postage-prepaid upon:

James F. O'Brien, Esq.
410 Park Avenue, Suite 1530
New York, NY 10022

/s/ Annapoorni R. Sankaran
Annapoorni R. Sankaran

22

# EXHIBIT C

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-----------------------------x
ROBERT J. VILA and B.V.T.V.,
INC.,

      Plaintiffs,

    vs.          No. 05-11717-REK

SEARS, ROEBUCK AND CO., SEARS
HOLDINGS CORPORATION and
KMART HOLDINGS CORPORATION,

      Defendants.
-----------------------------x


DEPOSITION OF ROBERT J. VILA

New York, New York

Wednesday, March 15, 2006

Reported by:
Yaffa Kaplan
JOB NO. 182381

**ORIGINAL**

580c18f3-699a-44e6-8c7f-89c2b638c610

1

2

3                          March 15, 2006

4                          9:36 a.m.

5

6           Deposition of ROBERT J. VILA, held at

7      the offices of Greenberg Traurig LLP, 200 Park

8      Avenue, New York, New York, pursuant to

9      Notice, before Yaffa Kaplan, a Notary Public

10     of the State of New York.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

580c18f3-699a-44e6-8c7f-89c2b638c610

Page 5

                              Vila

R O B E R T   J.   V I L A,  called as a witness,

        having been duly sworn by a Notary Public, was

        Examined and testified as follows:

EXAMINATION BY

MR. GREENBERG:

1       Q.     Please state your full name for the
2   record.
3       A.     Robert J. Vila.
4       Q.     What is your address?
5       A.     183 State Road, Chilmark, Massachusetts
6   02535.
7       Q.     Mr. Vila, what is your current
8   occupation?
9       A.     I am a television host.  I am a
10  spokesperson for Sears Craftsman Tools.
11      Q.     You say you are a television host?
12      A.     I am a television host.  I host a
13  program on home improvement.
14      Q.     What's the name of that program?
15      A.     "Bob Vila."
16      Q.     When did that program start to air?
17      A.     We have been producing television shows
18  on this subject for approximately 17 years.  Prior
19  to that, I hosted for over a decade the original

580c18f3-699a-44e6-8c7f-89c2b638c610

1                           Vila

2          Q.     Does she work for anyone?

3          A.     She has been employed by my company for

4    approximately 16 years.

5          Q.     When you say your company, let me back

6    up.  Are you an officer or director of any

7    companies?

8          A.     Yes.

9          Q.     Can you list for me the companies in

10   which you are either an officer or director?

11         A.     B.V.T.V. Inc., having offices at 115

12   Kingston Street in Boston, Massachusetts.

13         Q.     What is B.V.T.V. Inc.?

14         A.     B.V.T.V., Bob Vila Television, is the

15   production company that produces the "Bob Vila"

16   show.

17         Q.     What is your position with B.V.T.V.

18   Inc.?

19         A.     I own the company.

20         Q.     Is it wholly owned by you?

21         A.     No.

22         Q.     Who are the other shareholders, other

23   than yourself?

24         A.     A trust.

25         Q.     How many shares do you own?

580c18f3-699a-44e6-8c7f-89c2b638c610

1                              Vila

2        A.       70 percent.

3        Q.       And the remaining 30 percent, who owns

4   those?

5        A.       My three children.

6        Q.       And that's in a trust?

7        A.       Yes.

8        Q.       What's the name of that trust?

9        A.       I think there are three individual

10   trusts, that each kid has.

11        Q.       And are you an officer or director of

12   B.V.T.V. Inc.?

13        A.       Right.

14        Q.       What are you?  Are you both an officer

15   and director?

16        A.       President.

17        Q.       Who are the other directors?

18        A.       There is no board.

19        Q.       There is no board?

20        A.       There are no other directors.

21        Q.       Does B.V.T.V. Inc. have any employees?

22        A.       Yes.

23        Q.       Who are the employees of B.V.T.V. Inc.?

24        A.       Sarah Monzon.

25        Q.       Who else?

580c18f3-699a-44e6-8c7f-89c2b638c610

1                        Vila

2     Precise Forms Inc., Endless Pools, Bellawood, Crown

3     Point?

4                 MR. O'BRIEN:  You mean him personally?

5                 MR. GREENBERG:  Yes, him personally.

6         A.    Me personally, of course not.

7         Q.    Did you ever seek Sears's consent to

8     list any company on your website?

9                 MR. O'BRIEN:  Again, him personally?

10        A.    I don't know.

11        Q.    You personally?

12        A.    No.

13        Q.    To your knowledge, has anyone on your

14    behalf or on behalf of any of your companies ever

15    sought Sears's consent to list a company on your

16    website?

17                MR. O'BRIEN:  Objection to the form.

18                You may answer.

19        A.    I assume so.

20        Q.    And why do you assume so?

21        A.     I have a relationship with Sears that

22    goes back to 1989 and we have always been very

23    careful with this separate business, not to promote

24    any products or services that would compete with

25    this.  I am the spokesman for this brand,

580c18f3-699a-44e6-8c7f-89c2b638c610

1                          Vila

2    Craftsman.

3        Q.    I just want to be sure that I understand

4    correctly.  It was your understanding that you

5    would not, without Sears's permission, advertise on

6    your website products that were competitive with

7    products sold by Sears?

8              MR. O'BRIEN:  Objection to the form.

9              You may answer.

10        A.    On the website, not -- you are asking

11    about the website, not the television shows?

12        Q.    My question had to do with the website.

13        A.    Repeat the question.

14        Q.    Is it -- was it your understanding, sir,

15    that you would not advertise on your website

16    products that were competitive with products sold

17    by Sears unless you had obtained Sears's consent in

18    advance?

19        A.    I don't believe so.

20        Q.    You don't believe that that was --

21        A.    The answer is no.

22        Q.    You don't have any obligation to do

23    that?

24              MR. O'BRIEN:  Objection to the form.

25              You can answer.

580c18f3-699a-44e6-8c7f-89c2b638c610

1                              Vila

2              Yes, this is accurate.  The only thing I

3  have to update is that Susannah is going to be a

4  college senior.

5          Q.      On page 2 of Exhibit 1157, at the end is

6  a reference -- it says, "Bob Vila has appeared on

7  television for over 25 years, first on 'This Old

8  House' and for 15 years on 'Bob Vila's Home Again,'

9  and now with his new show, 'Bob Vila.'"  Do you see

10 that?

11         A.      Yes.

12         Q.      So what is your new show?

13         A.      "Bob Vila."

14         Q.      And when did that new show start?

15         A.      The fall of '05.

16         Q.      And the producer of that show is what

17 company?

18         A.      B.V.T.V. Inc.

19         Q.      Does B.V.T.V. have a relationship with

20 anyone with respect to that show, a contractual

21 relationship?

22                 MR. O'BRIEN:  You can answer.

23         A.      Yes.

24         Q.      With whom?

25         A.      King World.

580c18f3-699a-44e6-8c7f-89c2b638c610

Page 88

1                           Vila

2          the meaning of the terms of the contract.

3                    To the extent that your knowledge is

4          obtained from legal advice given to you by

5          your counsel, I instruct you not to answer.

6          To the extent that it does not require the

7          disclosure of legal advice you received from

8          your counsel, you may answer.

9          Q.    I will rephrase.  I will withdraw the

10     question.

11                   In the spring of 2005, the spokesperson

12     agreements is still in effect, correct?

13         A.    I believe so.

14         Q.    And Sears had not terminated the

15     spokesperson agreement as of the spring of 2005,

16     had it?

17         A.    I believe that's correct.

18         Q.    And if I understand from your prior

19     testimony, in May of 2005 you signed up on an

20     agreement with King World to do a new television

21     show, correct, May 16, 2005; is that right?

22                   MR. O'BRIEN:  You are referring to

23         Exhibit 158.

24                   MR. GREENBERG:  Yes.

25         A.    It's dated May 16, 2005.

580c18f3-699a-44e6-8c7f-89c2b638c610

Page 89

Vila

Q.    And you did not, you and no one on your
behalf disclosed the existence of the agreement to
Sears at that time, correct?

A.    I don't know.

Q.    Well, you are not aware of any
disclosure, correct?

A.    I am not aware of any disclosure.

Q.    When you signed that agreement in May
2005, it was contemplated that you would be
performing on a television show, right?

A.    Yes.

Q.    And it was contemplated that advertising
would be sold for that show, correct?

A.    Yes.

Q.    And it was contemplated that there would
be product placements that occurred on the show?

A.    Yes.

Q.    So that you knew in May of 2005, when
you signed the agreement with King World, that it
would be products -- that product placement on the
show, that you would be, using your word, tacitly
promoting?

MR. O'BRIEN:  Objection to the form of
the question.

580c18f3-699a-44e6-8c7f-89c2b638c610

Vila

1
2          You can answer.
3     A.    I didn't know what would be on the show
4  at that point in time.
5     Q.    Well, you knew that the plan was to sell
6  advertising and to get companies to put their
7  products on your show?
8     A.    Right.
9     Q.    But you didn't instruct anyone to tell
10 Sears about this plan, correct, in May of 2005?
11    A.    I personally did not.
12    Q.    Well, you didn't tell anyone to instruct
13 Sears either -- strike that.
14          You didn't tell Sears, but did you tell
15 anyone maybe you ought to tell Sears we are
16 entering into this agreement with King World?
17          MR. O'BRIEN:  Objection to the form.
18          You can answer.
19    A.    No.
20    Q.    Also you were a spokesman for products
21 and services as of the spring of 2005; isn't that
22 right?
23    A.    Yes.
24    Q.    For Bellawood Flooring, you were
25 promoting that product?

Page 235

1                          Vila

2              MR. O'BRIEN:  Objection.  There is no

3         such claim made.

4         Q.    Well, do you claim that there was an

5    oral agreement, that there was an agreement to

6    extend the syndication agreement beyond the

7    2004-2005 season?

8         A.    Yes.

9         Q.    Was that -- how long was that extension

10   to -- how many years was that to run?

11        A.    Two more years.

12        Q.    And have you ever seen a written

13   document signed by Sears which sets forth the terms

14   of that extension?

15        A.    No.

16        Q.    Have you ever signed a written document

17   which sets forth the terms of that extension?

18        A.    I don't recall.

19        Q.    When do you claim that -- strike that.

20             Were you notified sometime in the early

21   part of 2004 -- I'm sorry, 2005, that Sears was not

22   prepared to commit at that point in time to signing

23   an extension of the syndication agreement?

24        A.    I don't recall that.

25        Q.    Okay.  Let's start then by looking at

580c18f3-699a-44e6-8c7f-89c2b638c610

1                          Vila

2    some documents.  First of all, did anyone ever

3    present to you a signed extension of the

4    syndication agreement for your signature at any

5    point in 2005?

6         A.    No.

7         Q.    When did you first learn that Sears was

8    either going to be acquired or was going to merge

9    with another company?

10        A.    I don't recall.

11        Q.    Was it sometime in the latter part of

12   2004?

13        A.    I think so.

14        Q.    What did you learn as it related to

15   Sears either being acquired or merging?

16        A.    My earliest recollection has to do with

17   a lot of colleagues at Sears who were afraid they

18   were about to be axed.

19        Q.    Well, did you read a press release in

20   which Sears announced that there was going to be a

21   merger, subject to shareholder approval?

22        A.    I did at some point.

23        Q.    When you -- what was your reaction when

24   you learned of a -- that the merger agreement had

25   been executed involving Sears?

580c18f3-699a-44e6-8c7f-89c2b638c610

1                        Vila

2        agreement which is the subject of the lawsuit.

3              MR. O'BRIEN:  13, I believe, is the --

4              MR. GREENBERG:  Exhibit 13 with the

5        amendments.

6              MS. SANKARAN:  4.

7              MR. GREENBERG:  I'm sorry, Exhibit 4.

8    A.        Yes.

9    Q.        Would you turn to Exhibit 24 in your

10   book, sir.  It's an e-mail bearing a date of

11   February 2, 2005.  Do you see that from?

12             MR. O'BRIEN:  What number?

13             MR. GREENBERG:  I'm sorry, Exhibit, I'm

14        sorry, 24.

15             MR. O'BRIEN:  24.

16             MR. GREENBERG:  Yes.

17             MR. O'BRIEN:  It's a Sears document,

18        1315.

19             MR. GREENBERG:  Yes, Sears 1315.

20   Q.        An e-mail from Mr. Rode to Mr. Feiner;

21   is that right?  Do you have that in front of you,

22   dated February 1, 2005?

23   A.        Yes.

24   Q.        And Mr. Feiner at this point in time was

25   your representative?

Page 249

1                         Vila

2        A.    Yes.

3        Q.    And Mr. Rode wrote to Mr. Feiner, "I

4   think you, me and Andy, or just you and Andy, will

5   need to talk.  While I can negotiate contracts I

6   feel comfortable with, I don't have access to the

7   individuals here who would ultimately issue a go-no

8   go decision.  Six months ago this would be a no

9   brainer.  With the merger, Andy is going to need to

10  weigh in.  I will nag him right now to make sure he

11  shares any insights he has."  Do you see that?

12       A.    I see that.

13       Q.    Were you told by your representatives as

14  of February 1, 2005 that there were certain

15  individuals at Sears above Mr. Rode and Mr. Ginger

16  that would have to make the ultimate decision on

17  whether the syndication agreement was going to be

18  extended?

19            MR. O'BRIEN:  Objection.  The document

20       that you just read doesn't state that.

21            MR. GREENBERG:  I just asked him a

22       simple question.

23            MR. O'BRIEN:  Well, I want to make sure

24       he understands, independent of what the

25       subject says, because the exhibit says

580c18f3-699a-44e6-8c7f-89c2b638c610

Page 262

1                              Vila

2        A.     Yes.

3        Q.     What was the status -- what did you

4   understand was the status of the negotiations

5   concerning the possible extension of the

6   syndication agreement as of March 11, 2005?

7               MR. O'BRIEN:  Objection to the form.

8               You may answer.

9        A.     I don't recall.

10       Q.     You said before that -- strike that.

11              What money did you spend in 2004 in

12   anticipation of the syndication agreement being

13   renewed?

14       A.     I don't know a figure.

15       Q.     Can you identify any expenditures that

16   you or your companies made in 2004 in anticipation

17   of the syndication agreement being extended?

18       A.     No.

19       Q.     How about in January 2005?  Can you

20   identify any monies that your you or your company

21   expended in anticipation that the syndication

22   agreement was going to be extended?

23              MR. O'BRIEN:  Objection to the form.

24              You can answer.

25       A.     The only thing that comes to mind would

580c18f3-699a-44e6-8c7f-89c2b638c610

1                              Vila

2   be payroll.

3        Q.    Payroll for who?

4        A.    Producers, associate producers and the

5   like who were doing preproduction work.

6        Q.    Did you hire any new people or were

7   these people that were on the payroll from the

8   prior season?

9        A.    They're staff.

10       Q.    Existing staff?

11       A.    Right.

12       Q.    Did you hire any new people?

13       A.    No.

14       Q.    I want to be clear with this.  You said

15   before that -- and you can strike that.

16            Can you identify any expenses that you

17   incurred prior to early February 2005 or any

18   contracts you signed based upon your claim that

19   Sears promised to extend the syndication agreement?

20            MR. O'BRIEN:  By "you," you mean

21   Mr. Vila personally?

22            MR. GREENBERG:  You or your companies.

23            MR. O'BRIEN:  Well --

24            MR. GREENBERG:  You or any company in

25   which you or B.V.T.V. Inc. --

1              Vila

2           MR. O'BRIEN:  But your question is

3      whether he knows --

4           MR. GREENBERG:  Well, he is --

5           MR. O'BRIEN:  -- is that right?

6      Q.    I want to know whether or not you --

7  whether or not prior to February 2005 B.V.T.V. Inc.

8  or you incurred any expense based upon your claim

9  that Sears promised to extend the syndication

10 agreement?

11     A.    Just ongoing staff salary.

12     Q.    And those staff are still at the

13 company, at B.V.T.V.?

14     A.    Yes.

15     Q.    And they are being used to produce the

16 "Bob Vila" show?

17     A.    Yes.

18     Q.    I'm sorry, are you the -- B.V.T.V. Inc.,

19 you are the president?

20     A.    Yes.

21     Q.    Are you the chief executive officer?

22     A.    Don't call myself that.

23     Q.    Well, who is responsible for the

24 day-to-day supervision of the employees of B.V.T.V.

25 Inc.?

580c18f3-699a-44e6-8c7f-89c2b638c610

Page 297

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

------------------------------x
ROBERT J. VILA and B.V.T.V.,
INC.,

        Plaintiffs,

     vs.          No. 05-11717-REK

SEARS, ROEBUCK AND CO., SEARS
HOLDINGS CORPORATION and
KMART HOLDINGS CORPORATION,

        Defendants.
------------------------------x


CONTINUED DEPOSITION OF ROBERT J. VILA

New York, New York

Thursday, March 16, 2006


Reported by:
Yaffa Kaplan
JOB NO. 182382A

**ORIGINAL**

874be2bd-50d5-405d-9427-d1fa9e8ac824

Page 298

1

2

3                        March 16, 2006

4                        9:03 a.m.

5

6          Continued Deposition of ROBERT J. VILA,

7    held at the offices of Greenberg Traurig LLP,

8    200 Park Avenue, New York, New York, pursuant

9    to Notice, before Yaffa Kaplan, a Notary

10   Public of the State of New York.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

874be2bd-50d5-405d-9427-d1fa9e8ac824

Page 359

1                              Vila
2              You may answer.
3      A.      Their expertise is in television
4  syndication.
5      Q.      What have they done for you to entitle
6  them, or what services have they performed in
7  connection with the syndication and the
8  spokesperson agreement?
9      A.      They sell the show.
10     Q.      They sell the show to who?
11     A.      They sell the show -- well, that's not
12  right.  They interact with King World.
13     Q.      What's not right?
14     A.      They don't sell the show.
15     Q.      When you say "the show," what show are
16  you talking about?
17     A.      All the shows that I have done in the
18  last 15 years.
19     Q.      What are the different shows you have
20  done in the last 15 years that they have sold or
21  that they have been involved in, what are the
22  different shows?
23     A.      You want me to tell you the content of
24  the different shows?
25     Q.      I just want to know the names of the

874be2bd-50d5-405d-9427-d1fa9e8ac824

1                          Vila

2    different shows.

3         A.    "Bob Vila's Home Again."

4         Q.    Okay.   What other shows?

5         A.    "Bob Vila."

6         Q.    What else?

7         A.    "Bob Vila's Guide to Historic Homes,"

8    "Restore America."

9         Q.    Wait just a second.   What else?

10        A.    I think that's it.

11        Q.    So you have had over the last 15 years

12   four different shows that have been televised; is

13   that right?

14        A.    Yes.

15        Q.    And Sears was the sponsor for "Bob Vila

16   Home Again"; is that right?

17        A.    That's right.

18        Q.    Is there a sponsor for the "Bob Vila"

19   show?

20        A.    No.

21        Q.    Now "Bob Vila's Guide to Historic

22   Homes"?

23        A.    Yes.

24        Q.    When did that air?

25        A.    I don't recall.

874be2bd-50d5-405d-9427-d1fa9e8ac824

1

Volume III
Pages 1 through 111
Exhibits per index

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No. 05-11717-REK

- - - - - - - - - - - - - - - x

ROBERT J. VILA and B.V.T.V, INC.,
             Plaintiffs,

V.

SEARS, ROEBUCK and CO., SEARS
HOLDINGS CORPORATION and KMART
HOLDING CORPORATION,
             Defendants.

- - - - - - - - - - - - - - - x

CONTINUED DEPOSITION OF ROBERT J. VILA
Tuesday, March 28, 2006, 12:57 a.m.
GREENBERG TRAURIG, LLP
One International Place
Boston, Massachusetts 02110

----------Reporter: MaryJo O'Connor, CSR, RPR-------
BOSTON REPORTING ASSOCIATES
REGISTERED PROFESSIONAL REPORTERS
67 Bright Road
Belmont, Massachusetts 02478
(617) 877-6640

```
 1  APPEARANCES:

 2  JAMES F. O'BRIEN, ESQ.
    410 Park Avenue, Suite 1530
 3  New York, New York 10022
    (212) 813-9300
 4  Counsel for the Plaintiffs.

 5
    GREENBERG TRAURIG, LLP
 6  (By: Gary R. Greenberg, Esq., Annapoorni R.
    Sankaran, Esq., Sebastian Colley, Esq., and Wendy
 7  Champagne, Paralegal)
    One International Place
 8  Boston, Massachusetts 02110
    (617) 310-6000
 9  Counsel for the Defendants.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

99

1   Q. And Bellawood has a showroom on the

2 BobVila.com website?

3   A. I believe so.

4   Q. And Bellawood pays a monthly fee; is that

5 right?

6   A. I don't know if it's monthly.

7   Q. They pay a fee?

8   A. They pay a fee.

9   Q. Is that disclosed anywhere in any of

10 your -- is that disclosed that Bellawood pays

11 BobVila.com a website?

12    MR. O'BRIEN:  Disclosed to whom?

13    MR. GREENBERG:  To the public.

14   A. I don't know.

15   Q. When did you start this arrangement with

16 Bellawood where they would be paying a fee for its

17 listing on the website?

18   A. I don't know when it started.

19   Q. Is it more than two years old?

20    MR. O'BRIEN:  Asked and answered.

21   A. I'm not sure.

22   Q. Did Sears ever receive any portion of that

23 fee?

24   A. Not to my knowledge.

1       Q.   Now, the BobVila.com website, that was paid

2   for by Sears; is that right?

3               MR. O'BRIEN:   Objection.

4       A.   No.

5       Q.   Did Sears fund the construction of that

6   website?

7               MR. O'BRIEN:   Objection.

8       A.   Sears threw away a lot of money.  The

9   question is did they fund the development of the

10  site.  The answer is no.  The site was developed in

11  the last five years.

12      Q.   By whom?

13      A.   By all the people that run it.

14      Q.   You say by all the people that run it, who

15  is it?

16      A.   By Jack Hill, Mel Marchand and David Masher

17  and a number of other people who have created the

18  site and made it what it is today.

19      Q.   Did Sears spend any money in the

20  development of the Bob Vila website?

21      A.   Yes.

22      Q.   How much?

23      A.   I think nearly $10 million dollars.

24      Q.   And how much has BobVila.com spent in

# EXHIBIT D

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

------------------------------x
ROBERT J. VILA and B.V.T.V.,
INC.,

        Plaintiffs,

     vs.         No. 05-11717-REK

SEARS, ROEBUCK AND CO., SEARS
HOLDINGS CORPORATION and
KMART HOLDINGS CORPORATION,

        Defendants.
------------------------------x

DEPOSITION OF RONALD E. FEINER

New York, New York

Thursday, March 16, 2006

Reported by:
Yaffa Kaplan
JOB NO. 182382B



1

2

3                            March 16, 2006

4                            1:03 p.m.

5

6              Deposition of RONALD E. FEINER, held at

7       the offices of Greenberg Traurig LLP, 200 Park

8       Avenue, New York, New York, pursuant to

9       Notice, before Yaffa Kaplan, a Notary Public

10      of the State of New York.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

a21eeae1-e1db-4d93-a0e7-56c3f3841788

1                           Feiner
2        A.      Amendment Number 10, for a six-year
3  extension.
4        Q.      How long was the term of this alleged
5  extension to last?
6        A.      Two years.
7        Q.      Did Mr. Vila or B.V.T.V. ever sign a
8  document which set forth the two-year extension?
9        A.      No.
10        Q.      Did anyone from Sears ever sign a
11  document which set forth this two-year extension?
12        A.      No.
13        Q.      Were you ever given a document by Sears
14  and told by Sears to get Mr. Vila to sign this
15  document evidencing a two-year extension?
16        A.      I was given a document that I was led to
17  believe was the final document.
18        Q.      My question was did Sears ever tell you
19  to get Mr. Vila to sign a document?
20        A.      No.   They said they would send execution
21  copies.
22        Q.      Did you ever get execution copies?
23        A.      Never received execution copies.
24        Q.      So you never got anything from Sears --
25  strike that.

a21eeae1-e1db-4d93-a0e7-56c3f3841788

1          Feiner

2          Sears never asked you to get Mr. Vila to

3    sign a piece of paper, right?

4          MR. O'BRIEN:  Objection to the form of

5          the question.  Asked him to sign a piece of

6          paper, I mean in what context are you talking

7          about?

8          Q.    Fair enough.  Fair enough.  Isn't it --

9    strike that.

10         Who negotiated this alleged extension on

11   behalf of B.V.T.V., this extension of the

12   syndication agreement?

13         A.    Myself, Jonathan Russo.

14         Q.    Did Mr. Russo have any independent

15   discussions with Sears in which you weren't

16   present?

17         A.    Yes.

18         Q.    Did you have discussions with Sears when

19   Mr. Russo wasn't present?

20         A.    Yes.

21         Q.    When did you first become aware that

22   Sears was going to be merging with Kmart?

23         A.    I believe when there was a press

24   announcement in late 2004.

25         Q.    Was that sometime in November in 2004?

1                         Feiner

2    contract?

3         A.    Well, I think we just looked at an

4    exhibit before this one that said that.

5         Q.    And did you understand that what Sears

6    was telling you was they were having difficulty

7    getting the necessary approvals for the signature

8    on the contract?

9         A.    I don't think they were having trouble

10   as much getting the necessary approvals as I

11   understood getting to find the right party to sign

12   it.

13        Q.    Did they tell you that they had

14   requested that the contract be signed?

15        A.    Yes.

16        Q.    And they told you they were unable to

17   get it signed; is that right?

18        A.    They said because of the confusion and

19   whether or not they were to be dealing with Kmart

20   people or Sears people at this time, whether it was

21   Janine or Padilla, they felt they had lost their

22   way on the process.

23        Q.    Now what dollars, if any, did B.V.T.V.

24   spend in December or January in reliance upon an

25   extension of the syndication agreement?

1          Feiner

2          MR. O'BRIEN:  Only those two months,

3     December of 2004?  I want to be sure.

4     Q.     December 2004, January 2005?

5     A.     I have no idea.

6     Q.     Do you know if they spent a nickel?

7     A.     I believe they did.

8     Q.     Did you discuss this subject with

9     Mr. Vila?

10    A.     No, I haven't.

11    Q.     If I told you that Mr. Vila testified

12    that they didn't hire anybody?

13          MR. O'BRIEN:  I am going to --

14    Q.     They hired no new employees during that

15    period of time, would that surprise you?

16          MR. O'BRIEN:  Objection.  You are making

17    a representation as to what another witness

18    said.  There will be a transcript as to what

19    he says.  I think it's an improper question.

20          With that, you may answer.

21    A.     No.

22          MR. GREENBERG:  Well, he has answered

23    it.

24    Q.     What monies, if any, did B.V.T.V. spend

25    in February in reliance upon the belief that Sears

a21eeae1-e1db-4d93-a0e7-56c3f3841788

1                           Feiner

2    was going to extend the syndication agreement?

3         A.    I have no idea, but B.V.T.V. didn't hire

4    people.  They had people on payroll given that they

5    assumed they were going year to year.

6         Q.    How many people were on B.V.T.V.'s --

7    how many employees did they have?

8              MR. O'BRIEN:  When?

9         Q.    In January 2005?

10        A.    Half a dozen.

11        Q.    And how many did they have in September

12   2004?

13        A.    Half a dozen.

14        Q.    And in January -- in August of 2005?

15        A.    Probably the same.

16             MR. O'BRIEN:  Let's take a break if it's

17        okay with you.  Ten minutes?

18             MR. GREENBERG:  Sure.

19             (Recess taken.)

20   BY MR. GREENBERG:

21        Q.    Mr. Feiner, with respect to the

22   allegation that there was an agreement to extend

23   the syndication agreement beyond August 2005, who

24   did you have dealings with on behalf of Sears on

25   that subject?

                         Feiner

1

2  World there were no issues.

3        Q.    Well, Sears told you there were issues,

4  right?

5              MR. O'BRIEN:   Objection.

6        A.    They didn't tell me there were issues.

7        Q.    Well, this e-mail that you got said

8  there were issues, right?

9        A.    Says there have been some issues.

10 Doesn't say there are issues.

11       Q.    What, if anything, did you do to

12 investigate what the status of the negotiations was

13 between Sears and King World when you got this

14 e-mail?

15       A.    We spoke to King World and King World

16 said we can't get anyone on the phone.

17       Q.    So how soon after you got this e-mail

18 did you speak with King World?

19       A.    Probably the next day or next business

20 day.

21       Q.    So when you learned that King World

22 couldn't get anyone on the phone from Sears, were

23 you concerned?

24       A.    Absolutely.

25       Q.    Why were you concerned?

1                    Feiner

2      A.    Because I think we needed a syndicator

3  and I didn't know whether at this point we should

4  be negotiating with King World ourselves and sue

5  Sears for the loss of the difference.

6      Q.    So you were contemplating litigation,

7  you just said you were contemplating litigation as

8  early as late January 2005?

9      A.    No, I would probably say February.

10     Q.    You were contemplating suing Sears as

11 early as February 2005?

12     A.    I was contemplating what to do if Sears

13 ultimately didn't pay on the syndication agreement,

14 and whether or not I should sign separately with

15 King World, who was very anxious to do a contract

16 because they do very well on this agreement.

17          I was concerned as to where to proceed,

18 but since Bob had an exclusive with Sears on a

19 spokesperson agreement, I was in a bind to find

20 another sponsor.

21     Q.    Another sponsor for what?

22     A.    For the show.

23     Q.    For what show?

24     A.    "Home Again with Bob Vila."

25     Q.    I thought you had a sponsor for that

Page 93

Feiner

1
2      15-year show, was King World always the syndicator?

3          A.    Yes -- well, in various incantations.

4          Q.    And the contractual arrangement, did

5      B.V.T.V. or Mr. Vila ever have a direct contract

6      with King World?

7          A.    No, we had contact, but no contract.

8          Q.    And the contract was between Sears and

9      King World?

10         A.    I never saw it.

11         Q.    Was it your understanding that the

12     contract was between Sears and King World?

13         A.    I don't know if it was Ogilvy or Sears.

14         Q.    But Ogilvy was representing Sears; is

15     that right?

16         A.    Yes.

17         Q.    So at some point in the first quarter of

18     2005, B.V.T.V. made a decision to negotiate with

19     King World a direct contract?

20         A.    Yes.

21         Q.    Whose idea was it to have a -- to

22     negotiate a direct contract with King World?

23         A.    Might have been Mark Rode's.

24         Q.    Did you have meetings with King World?

25         A.    I don't recall.  I don't think I did.

1                           Feiner

2       A.    No.    I had numerous conversations with

3   Andy Ginger about it and with King World about it.

4       Q.    There is a written agreement which you

5   negotiated back in 1989, a syndication agreement,

6   which you would agree with me indicates in

7   substance that unless Sears agrees that there won't

8   be any competitive products of Sears advertised on

9   the program for as long as Mr. Vila is the

10  spokesperson?

11          MR. O'BRIEN:   Objection.   The document

12      speaks for itself.

13          But you can answer.

14      A.    I don't recall.   Sears paid us a lot of

15  money and as a result of paying us a lot of money,

16  you can be sure that I made sure at every turn if

17  there was any question of doing anything to piss

18  off or annoy Sears, it would be checked first with

19  Sears.

20      Q.    Has Sears -- since the "Bob Vila" show

21  started production, has B.V.T.V. or anyone on its

22  behalf sought Sears's permission for permitting

23  advertising or sponsors of product that are

24  competitive with Sears?

25          MR. O'BRIEN:   Since the show, the new

1                          Feiner

2          show, started?

3                    MR. GREENBERG:   Yes.

4          A.    I don't know that B.V.T.V. has sought

5     sponsors.  That's the job of the syndicator.   I

6     don't believe that we have sought sponsors.   Bob

7     was a spokesperson for Sears.   In addition to that,

8     Sears was a sponsor for the show.   Bob was not a

9     spokesperson for Chevy Trucks, but Chevy Trucks was

10    a sponsor for the show.   We had no other

11    spokesperson arrangement that Sears hadn't

12    approved.

13         Q.    Sir, isn't it correct that Sears had the

14    right to approve or disapprove of what advertisers

15    were going to advertise on the show?

16         A.    No, that wasn't my understanding.

17         Q.    Isn't it true that if any advertiser on

18    the show sold product that was competitive with

19    Sears, it required Sears's approval?

20         A.    That was between King World and Sears.

21         Q.    But is that your understanding as to

22    what was required?

23         A.    If it was in direct competition with

24    Sears, it required it.

25         Q.    And you?

a21eeae1-e1db-4d93-a0e7-56c3f3841788

1                              Feiner

2        A.      None of the new shows have aired -- oh,

3    I mean since September.

4        Q.      None of what shows?

5        A.      I'm sorry -- strike that.

6        Q.      None of what new shows are you referring

7    to?

8        A.      The "Bob Vila" shows.

9        Q.      The new program, when did the new

10   program start airing?

11       A.      September.

12       Q.      September of what year?

13       A.      19 -- 2005.

14       Q.      And but why if Mr. Vila claims he is

15   still a spokesperson for Sears, why hasn't anyone

16   sought Sears's consent when Mr. Vila's new show

17   advertises product which is competitive with Sears?

18       A.      I think you should ask King World that

19   question.  I think because also Sears chose not to

20   sponsor the show.

21       Q.      When you say Sears chose not to sponsor

22   the show, what are you referring to?

23       A.      I am still waiting for a million and a

24   half dollars for the last year.

25       Q.      Isn't it true that B.V.T.V. agreed that

a21eeae1-e1db-4d93-a0e7-56c3f3841788

1

2          UNITED STATES DISTRICT COURT

3            DISTRICT OF MASSACHUSETTS

4    ------------------------------x
     ROBERT J. VILA and B.V.T.V.,
5    INC.,

6              Plaintiffs,

7         vs.                    No. 05-11717-REK

8    SEARS, ROEBUCK AND CO., SEARS
     HOLDINGS CORPORATION and
9    KMART HOLDINGS CORPORATION,

10             Defendants.
     ------------------------------x

11

12

13

14    CONTINUED DEPOSITION OF RONALD E. FEINER

15            New York, New York

16          Monday, March 20, 2006

17

18

19

20

21

22

23   Reported by:
     Yaffa Kaplan
24   JOB NO. 182383                    **ORIGINAL**

25

1

2

3                    March 20, 2006

4                    9:58 a.m.

5

6            Continued Deposition of RONALD E.

7    FEINER, held at the offices of Greenberg

8    Traurig LLP, 200 Park Avenue, New York, New

9    York, pursuant to Notice, before Yaffa Kaplan,

10   a Notary Public of the State of New York.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          Feiner

2    Farkas to me.

3         Q.    Relating to what?

4         A.    An attached revised draft red-line to

5    show changes.  Most of them relate to adding the

6    bonus and trying to accommodate the desire to sign

7    it in advance of the syndication deal.

8         Q.    So as of July 2004, you were exchanging

9    draft documents; is that right?

10        A.    We were exchanging comments and drafts.

11        Q.    Was Amendment Number 11, was this

12   document ever signed?

13              MR. O'BRIEN:  I'm sorry?

14        A.    Was Amendment Number 11?

15        Q.    The document that's part of Exhibit 132.

16        A.    Signed by who?

17        Q.    By Mr. Vila?

18        A.    No.

19        Q.    Was it ever signed by Sears or a

20   representative of Sears?

21        A.    I don't know.

22        Q.    To your knowledge?

23        A.    Not to my knowledge.

24        Q.    And can you turn to Exhibit 133 and tell

25   me, that's an e-mail -- this is an e-mail on

1                              Feiner

2          Q.     Did you make any determination at that

3     point as to what was the income or losses that were

4     projected by Sears?

5          A.     No, I just realized that we lost -- we

6     would be losing a million dollar guaranteed bonus.

7          Q.     So by November 2003, were you aware that

8     some people at Sears were concerned about the

9     losses that would be attributable to a continuation

10    of the show?

11                MR. O'BRIEN:  Objection to the form.

12         A.     No, no.

13         Q.     Can you go to -- I am going to mark as

14    the next exhibit, Exhibit 186.  I think if you

15    could look at Exhibit 7 in the book.

16         A.     Yes.

17         Q.     Exhibit 7 has two e-mails on it.  The

18    first one, the one on top being dated November 24,

19    2004 and the one on the bottom November 23, 2004.

20         A.     Yes.

21         Q.     Now starting with the one at the bottom.

22                MR. O'BRIEN:  Please read the document

23         before the question is asked.

24         Q.     The November 23, 2004 e-mail, is that

25    from you?

1                         Feiner

2      A.      "Dear Mark.   Thanks, Ron."  Yes.

3      Q.      That's from you to Mr. Rode at Sears?

4      A.      Yes.

5      Q.      As of November 23, 2004, you did not

6    have a redraft of the syndication agreement; is

7    that right?

8              MR. O'BRIEN:  Objection to the form.

9      A.      I wrote, "To date I have not received

10   the redraft that Drew -- from Drew."

11     Q.      And you wrote, "This is becoming of

12   concern to Bob and myself."

13     A.      Yes.

14     Q.      And why was it a concern, becoming a

15   concern to Bob and yourself?

16     A.      Because I knew money came with the

17   signature.

18     Q.      When you say money came with the

19   signature, signature of what?

20     A.      Of the syndication agreement.

21     Q.      How did you know that money came with a

22   signature?

23     A.      Because we got money every time the

24   contracts were signed.

25     Q.      Did someone ever, at Sears, ever tell

1                                Feiner

2          Q.    Can you look at Exhibit 17.

3          A.    Yes.

4          Q.    Do I understand that as an e-mail that

5    you sent to Mr. Rode?

6          A.    Yes.

7          Q.    And you raise some -- a couple of

8    concerns on the draft extension agreement?

9          A.    Yes, I did.

10         Q.    Now, what was Mr. Rode's position you

11   said?

12         A.    I assumed he was in charge of Craftsman

13   brands or -- I don't know.  He was the low man on

14   the totem pole.

15         Q.    The low man on the totem pole?

16         A.    Between him, Henry and Andy and Janine.

17         Q.    When did he start at Sears?

18         A.    You just showed me that welcome memo.

19         Q.    He had only been there a few months?

20         A.    It just says, "Hi, I am just arrived at

21   Sears."  Sometime in August I believe.

22         Q.    Why were you communicating with the low

23   man on the totem pole?

24         A.    I was told that he was going to be our

25   point man, that Andy was extremely busy and Henry

1                          Feiner

2    had been removed from the account.

3          Q.    Who told you that?

4          A.    Mark.

5          Q.    Mr. Rode told you that himself?

6          A.    Mark, Andy, I spoke to them all.  I

7    don't know.

8          Q.    Who told you that Mr. Rode was going to

9    be the point person?

10         A.    Someone at Sears.

11         Q.    Who?

12         A.    Mark Rode, Andy Ginger, Henry Ferris.

13         Q.    Did they all?

14         A.    I said I don't know.  It had to be one

15   of those three.

16         Q.    When did they tell you that?

17         A.    I don't recall.

18         Q.    Other than knowing Mr. Rode was the low

19   man on the totem pole -- I'm sorry, who told you

20   that he was the low man on the totem pole; is that

21   Mr. Rode's comment?

22         A.    No.  Mr. Rode told me that he reported

23   to Henry Ferris when he got there, and Mr. Ferris

24   reported to Andy Ginger, and Andy Ginger reported

25   to Janine, and Janine reported to Alan Lacy.

1                          Feiner

2       Q.     When you say low man on the totem pole,

3  is that something you concluded?

4       A.     Something I concluded from the chain of

5  command that I understood.

6       Q.     Can you look at Exhibit 20?

7       A.     Okay.

8       Q.     Do you see there is an e-mail dated

9  January 10, 2005 from Mr. Rode to Mr. Vila?

10            MR. O'BRIEN:   You mean the one to Sarah,

11        with a copy to Vila?

12            MR. GREENBERG:   Yes.

13       A.     There is something from Melissa Marchand

14  to Mel Marchand.   I don't understand what that is.

15       Q.     There is an e-mail from Mark Rode to --

16  who is, first of all, who is Sarah?

17       A.     Sarah is Bob's line producer.

18       Q.     What are her responsibilities?

19       A.     To make sure everything is ready when

20  they film the shows.

21       Q.     Have you seen this e-mail before?

22       A.     No.

23       Q.     You never saw this before?

24       A.     I have no recollection of seeing it.

25       Q.     Just so I am clear, you on January 10,

```
 1                        Feiner

 2            MR. O'BRIEN:  King World, you mean --

 3            MR. GREENBERG:  King World.

 4            MR. O'BRIEN:  You stated Kmart.

 5      Q.    I'm sorry, King World.  I'm sorry.

 6      A.    There is a difference.

 7      Q.    I'm sorry, what did you say?

 8      A.    It's a difference.  King World, he was

 9   talking about the syndicator.

10      Q.    Did he provide you with names of people

11   at King World?

12      A.    No recollection that he did.

13      Q.    Did you have any communication with

14   Mr. Farkas or Mr. Ginger during the period

15   January 1st to the end of January?

16      A.    I am sure I did.

17      Q.    Do you recall the substance of any

18   communication?

19      A.    No, I don't.

20      Q.    Did you contact Mr. Farkas or Mr. Ginger

21   to try to get this syndication agreement executed?

22      A.    Yes.

23      Q.    Did you ask him to sign it and get it

24   back to you?

25      A.    No.  I asked him why have we not gotten
```

1                         Feiner

2    a signed copy yet?

3         Q.    You asked him that in January?

4         A.    I am sure I asked him this January 14th.

5         Q.    How soon after?

6         A.    Well, I think if you look at Exhibit 22,

7    I am asking for it on January 18th, "The new Vila

8    syndication agreement is fine.  Can you have Drew

9    arrange for execution copies?"

10        Q.    You sent that to Mr. Rode?

11        A.    Yes.

12        Q.    As you said, you never got it back

13   signed?

14        A.    No.

15        Q.    And no one ever promised you it was

16   going to be signed, right?

17              MR. O'BRIEN:  Objection to the form.

18        Q.    Did anyone at Sears ever tell you the

19   agreement was going to be signed?

20        A.    Every time for the past 15 years that a

21   contract needed to be signed and a final agreement

22   was agreed to, it was followed by a signature.

23        Q.    Did anyone in January 2005 tell you --

24        A.    I had no reason to believe otherwise.

25        Q.    -- tell you that the extension to the

Page 305

```
 1                        Feiner

 2     syndication agreement that was drafted was going to

 3     be signed by Sears?

 4                 MR. O'BRIEN:  In so many words?

 5          Q.    In so many words?

 6          A.    No.

 7          Q.    On January -- Exhibit 23 --

 8          A.    Okay.

 9          Q.    -- on -- is that an e-mail from you to

10     Mr. Farkas dated January 21, 2005?

11          A.    Yes.

12          Q.    Why did you write to Mr. Farkas?

13          A.    He had drafted it.

14          Q.    Hadn't received a signed agreement yet;

15     is that right?

16          A.    I hadn't received execution copies.

17     They usually came from the legal department.

18          Q.    And you and Mr. Vila were anxious?

19          A.    Yes, we needed the money.

20          Q.    You needed the money to do what?

21          A.    To go into production.

22          Q.    Well, so production hadn't started yet;

23     is that right?

24          A.    Pre -- no preproduction had started.

25          Q.    What's preproduction?
```

```
 1                      Feiner
 2    when you testified, the first day, that you did not
 3    send a copy of this agreement to Sears?
 4         A.    No, I didn't.
 5         Q.    The signed agreement?
 6         A.    No, I did not.
 7         Q.    You didn't send a letter to Sears
 8    either?
 9         A.    No, it's not indicated.
10         Q.    Did you tell anyone at Sears that this
11    agreement between B.V.T.V. and King World had been
12    signed?
13         A.    No, I don't think I was talking to
14    anyone except Rathke.
15         Q.    Well, did you or anyone on behalf of
16    Mr. Vila send Sears a letter to advise them that
17    this agreement had been signed?
18              MR. O'BRIEN:  Objection to the form.  In
19         terms of his knowledge, right?  In terms of
20         whether he did, fine, but in terms of anyone
21         else --
22         Q.    To your knowledge, sir, to your
23    knowledge, did anyone on behalf of B.V.T.V. advise
24    Sears in writing?
25         A.    King World might have.  I don't know.
```

1                        Feiner

2        Q.    And Mr. Vila signed an agreement --

3    strike that.

4              B.V.T.V. signed an agreement in May of

5    2005 allowing or authorizing King World to

6    distribute for the 2005-006 season the "Bob Vila's

7    Home Again" show; is that right?

8        A.    Yes.

9        Q.    And did you ever try to, or did anyone

10   on behalf of B.V.T.V., to your knowledge, ever try

11   to register the trademark "Home Again"?

12       A.    No.  Never had any value.

13       Q.    Did you ever try to register the

14   trademark "Home Again"?

15       A.    I don't know.  He had trademark lawyers.

16   Whether they registered "Bob Vila," I know in lots

17   of classes, but clearly Bob Vila was the only one

18   who could register "Bob Vila."

19       Q.    Why was it -- why didn't you tell Sears

20   that B.V.T.V. had signed an agreement with King

21   World?

22       A.    Why didn't I tell them?

23       Q.    Yes.

24       A.    I wouldn't have known who to talk to.  I

25   was told not to talk to anyone but Rathke.

1                      Feiner

2      Q.    Why didn't you write a letter to Rathke?

3      A.    I couldn't communicate.

4      Q.    Why didn't you write a letter?

5      A.    Why didn't I?  I chose not to.

6      Q.    Why did you choose not to let Mr. Rathke

7  or anyone at Sears know that a direct agreement had

8  been signed between King World and B.V.T.V.?

9      A.    I think Sears knew.

10     Q.    Why didn't you tell them?

11     A.    I think Sears knew.

12     Q.    Is that why?

13     A.    Yes, it's a very small world.  They

14  could have spoken at King World.  They could have

15  learned anywhere.  It's no secret when someone is

16  continuing a show.

17     Q.    Isn't it true that you were concerned

18  that if Sears learned of that agreement, that it

19  might jeopardize the payments under the

20  spokesperson agreement?

21     A.    Not at all.

22           MR. O'BRIEN:  Objection.

23           You can answer.

24     A.    Not at all.

25     Q.    Isn't it a concern that you had that if

1                          Feiner

2     you showed Sears a copy of that agreement, that

3     there was no chance that Sears was going to extend

4     the syndication agreement?

5          A.    Quite the opposite.

6          Q.    You thought, actually thought signing

7     this agreement increased the likelihood of an

8     syndication agreement being signed?

9          A.    I thought signing this agreement had no

10    bearing whatsoever on the spokesperson agreement.

11         Q.    Did you think signing this agreement had

12    any bearing on whether or not a syndication

13    agreement amendment would be executed between Sears

14    and B.V.T.V.?

15         A.    I was hoping it would expedite it.

16         Q.    How would signing the agreement with

17    King World expedite Sears signing a syndication

18    agreement extension?

19         A.    Because we were trying to settle all

20    outstanding disputes between Sears and Vila and I

21    wanted to keep the option open.

22         Q.    Keep what option open?

23         A.    That Sears could still support "Bob

24    Vila's Home Again."

25         Q.    What was the amount of money that

```
 1                      Feiner
 2   Mr. Vila received from King World when this
 3   agreement was signed?
 4        A.    I think it was two-thirds.
 5        Q.    Was that something you negotiated?
 6        A.    No.  In the agreement it calls for
 7   payments on certain dates, but I think the second
 8   date had already been reached.
 9        Q.    And I think you said you have no idea
10   how that money was spent?
11        A.    It was spent on producing shows, I
12   assume.
13        Q.    Do you have any idea how it was spent?
14   Do you have any direct knowledge how it was spent?
15        A.    I assume it was spent on producing
16   shows.
17        Q.    When you say producing shows --
18        A.    Paying cameramen, paying hotel rooms.
19        Q.    What else?
20        A.    Whatever else they do in a production.
21   I am not a producer.
22        Q.    How many cameramen does B.V.T.V. employ?
23        A.    I have no idea.  I don't know how many
24   sound people.
25        Q.    Were you involved in the decision to
```

# EXHIBIT E

1

Volume I
Pages 1 through 174
Exhibits per index


UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


Civil Action No. 05-11717-REK

- - - - - - - - - - - - - - - x

ROBERT J. VILA and B.V.T.V, INC.,
            Plaintiffs,

V.

SEARS, ROEBUCK and CO., SEARS
HOLDINGS CORPORATION and KMART
HOLDING CORPORATION,
            Defendants.

- - - - - - - - - - - - - - - x


DEPOSITION OF SARAH BEASLEY MONZON
Tuesday, March 29, 2006, 10:00 a.m.
GREENBERG TRAURIG, LLP
One International Place
Boston, Massachusetts 02110




----------Reporter: MaryJo O'Connor, CSR, RPR-------
BOSTON REPORTING ASSOCIATES
REGISTERED PROFESSIONAL REPORTERS
67 Bright Road
Belmont, Massachusetts 02478
(617) 877-6640

2

```
 1   APPEARANCES:

 2   JAMES F. O'BRIEN, ESQ.
     410 Park Avenue, Suite 1530
 3   New York, New York 10022
     (212) 813-9300
 4   Counsel for the Plaintiffs.

 5
     GREENBERG TRAURIG, LLP
 6   (By: Gary R. Greenberg, Esq., Sebastian Colley,
     Esq., and Wendy Champagne, Paralegal)
 7   One International Place
     Boston, Massachusetts 02110
 8   (617) 310-6000
     Counsel for the Defendants.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

5

P R O C E E D I N G S

SARAH BEASLEY MONZON,

having been satisfactorily identified by a

Massachusetts drivers license and duly sworn by the

Notary Public, was examined and testified as

follows:

DIRECT EXAMINATION

BY MR. GREENBERG:

    Q.   Just state your name and address please?

    A.   Sarah Beasley Monzon, 214 Lynn Fells

Parkway, Melrose, Massachusetts.

        MR. O'BRIEN:  Usual stipulations?

        MR. GREENBERG:  Oh, yes, I'm sorry.

    Q.   And, Ms. Monzon, where do you work?

    A.   I work at B.V.T.V.

    Q.   And what's your position?

    A.   I'm a producer.

    Q.   For how long have you worked for B.V.T.V.?

    A.   For approximately 16 years.

    Q.   And has your duties and responsibilities

changed during that 16 years?

    A.   Yes.

    Q.   What are your current duties and

responsibilities?

1   to February of 2005, other than that one call you

2   made in January, you hadn't started any

3   preproduction work with respect to that show that

4   was going to air in the fall of 2005; is that right?

5        A.    No, that's not right.  We had also had

6   discussions internally about what sorts of projects

7   we wanted to do.

8        Q.    Other than internal discussions?

9        A.    Other than internal discussions, no, I

10  don't believe so.

11       Q.    When you say internal discussions, how many

12  discussions did you have internally prior to

13  February of 2005?

14       A.    I don't know how to count that.

15       Q.    With whom did you have internal

16  discussions?

17       A.    I would have had them with Bob and with

18  Melissa Marchand.

19       Q.    And what do you recall about the subjects

20  of those internal discussions?

21       A.    I recall that Bob expressed the desire to

22  do a storm-ready project.  He wanted to go to

23  Florida.  He wanted to do a story that followed up

24  on the terrible hurricane season of 2004.

39

1     Q.   Anything else that you can recall?

2     A.   No.

3     Q.   Was it your task to try to find a project

4 that would fit within those parameters?

5     A.   Yes.

6     Q.   And when -- did you start working on that

7 in February?

8          MR. O'BRIEN:  Of 2005.

9          MR. GREENBERG:  2005.

10    A.   No, I had been investigating similar

11 projects starting in December.  You know, I had been

12 looking online for articles about work that was

13 being done and trying to figure out who I should be

14 talking to.

15    Q.   Did you spend any money?

16    A.   Not that I recall.

17    Q.   And what was your understanding, as of the

18 1st of February 2005, what was your understanding as

19 to the status of any contractual agreement between

20 Sears and B.V.T.V. with respect to Sears's

21 willingness to sponsor the show for the upcoming

22 season?

23         MR. O'BRIEN:  Objection to the form.  You

24 can answer.

52

1       Q.   Did you tell Mr. Rode that you had been

2  instructed not to communicate with Sears?

3       A.   I don't remember if I responded to him.  I

4  believe that Bob responded to it and copied Mr. Rode

5  on it with those instructions.

6       Q.   Did Mr. Vila tell you why you shouldn't

7  have -- he didn't want you to have direct

8  communication with Sears?

9            MR. O'BRIEN:  Objection.  Misstates the

10  testimony.  The testimony was that she was not to

11  have contact with Mr. Rode without Mr. Vila.

12       Q.   Did Mr. Vila tell you why he was giving you

13  those instructions?

14       A.   I don't know if he mentioned specifically

15  to me why, but I understood that it was because

16  there were pending negotiations with Sears.

17       Q.   Did Mr. Vila ever tell you in January of

18  2005 that Sears had agreed to extend the syndication

19  agreement?

20       A.   I don't think so.

21       Q.   Okay.  Did anyone ever tell you in January

22  of 2005 that Sears had agreed to extend the

23  syndication agreement?

24       A.   I don't think so.

1      Q.    Did anyone ever tell you in January of 2005

2  that negotiations concerning the possible extension

3  of the syndication agreement were ongoing?

4      A.    I think that would be a fair assessment of

5  what I understood.

6      Q.    And your understanding was based upon what?

7      A.    On what I had been told.

8      Q.    By whom?

9      A.    I don't recall exactly, but certainly by

10  Bob and by Mel and I don't know who else.

11      Q.    Mel is whom?

12      A.    Melissa Marchand.

13      Q.    And she works for whom?

14      A.    BobVila.com.

15      Q.    And when you say Bob, that would be Bob

16  Vila?

17      A.    Yes.

18      Q.    Is it an accurate statement that throughout

19  the month of January 2005 based upon what Mr. Vila

20  was telling you, you understood that negotiations

21  about a possible extension of the syndication

22  agreement were ongoing?

23      MR. O'BRIEN:    Objection to the form.    You

24  can answer.

1      A.    Say it again?

2      Q.    Is it accurate that based upon what Mr.

3  Vila told you during January of 2005 that throughout

4  that month you understood that negotiations about a

5  possible extension of the syndication agreement were

6  ongoing?

7           MR. O'BRIEN:  Objection to the form.  You

8  can answer.

9      A.   Yes, I believe that's accurate.

10          MR. O'BRIEN:  Do you want to take a break?

11          MR. GREENBERG:  Sure.

12          MR. O'BRIEN:  I was asking her actually.

13          THE WITNESS:  That would be good.

14               (Brief recess.)

15     Q.   Ms. Monzon, you were given today a

16  three-page document entitled "'Bob Vila's Home

17  Again' Season 16."  Just can you identify what this

18  is?

19     A.   This is a chronology of preproduction that

20  I was asked to compose in April of 2005.

21     Q.   So you prepared the document in April of

22  2005?

23     A.   Yes.

24     Q.   And just before I mark it, who asked you to

1       Q.   Did you understand that as of February 3,

2   2005, Mr. Vila was looking into sources of funding

3   other than Sears for the new show?

4            MR. O'BRIEN:   You mean other than from this

5   e-mail?

6            MR. GREENBERG:   Yes.

7       Q.   From any source, whether it's this e-mail

8   or any other source -- strike that.   I'll start

9   over.

10           As of February 3, 2005, was it your

11  understanding that Mr. Vila was investigating other

12  sources other than Sears to fund the new show?

13      A.   I don't know, but I don't think so.

14      Q.   When he said, "I'm involved in other

15  negotiations," what did you understand that to mean?

16      A.   I understood it to mean he was in other

17  negotiations and didn't want to tell me about them.

18      Q.   And is it correct that during the month of

19  February 2005, essentially you were in a holding

20  pattern in terms of preproduction work for the new

21  show?

22      A.   Yes.

23      Q.   As of February 2005 is it correct that

24  there was uncertainty in your mind as to whether or

1    Q.    Just so I'm clear, as of the middle of

2  July, you were continuing to solicit product

3  donations for the middle of July 2005 you were

4  continuing to solicit product donations for the

5  2005/2006 season identifying the show as "Bob Vila's

6  Home Again"?

7    A.    That's correct.

8        MR. GREENBERG:  Can I mark as the next

9  exhibit, 2 pages.

10            (Document marked for

11  identification as Monzon Exhibit 238.)

12    Q.    Can you identify what is Exhibit 238?

13    A.    This is an e-mail from me to Michael Dudek

14  at Better Bilt Products dated July 21, 2005

15  containing e-mails to and from Angela Polo regarding

16  product donation to the Punta Gorda project, the

17  2005/2006 viewing season.

18    Q.    As of July 21, 2005, were you soliciting

19  product donations for a show named "Bob Vila's Home

20  Again" in which you intended to air -- which

21  B.V.T.V. intended to air for the fall 2005 season?

22    A.    Yes.

23    Q.    What was the status of the production as of

24  July of 2005?

1      A.    As of July 2005, we were in production I

2    would estimate halfway through the Rowley project

3    and perhaps slightly more than that through the

4    Punta Gorda project.

5      Q.    When did production start -- when we say

6    production, do you mean the actual renovation and

7    the -- when you say production, what do you mean by

8    production?

9      A.    By production I mean producing the number

10   of shows to fill the episodes that we need to fill.

11     Q.    Shooting the shows, had that already

12   started?

13     A.    Shooting the shows and production.

14     Q.    When did you first start shooting the shows

15   for the 2005/2006 season?

16     A.    I believe we started the very end of May or

17   the beginning of June.  I believe we started in

18   Rowley first.

19     Q.    So by the end of June, how many of the

20   shows had been shot approximately?

21     A.    By the end of June, I would say perhaps

22   three to five in each location.  I'm not positive,

23   though.

24     Q.    Just I want to be sure I'm clear, so by

# EXHIBIT F

VOLUME: I

PAGES: 1-179

EXHIBITS: 188-214


UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - x

ROBERT J. VILA and B.V.T.V., INC.,

                Plaintiffs,

   v.                           Civil Action

SEARS, ROEBUCK and CO., SEARS        No. 05-11717-REK

HOLDINGS CORPORATION and KMART

HOLDING CORPORATION,

                Defendants.

- - - - - - - - - - - - - - - - - x


DEPOSITION of MELISSA W. MARCHAND

March 27, 2006

10:08 a.m.

Greenberg Traurig, LLP

One International Place

Boston, Massachusetts


Reporter: Michael D. O'Connor, RPR

2

```
 1  APPEARANCES:

 2

 3      JAMES F. O'BRIEN, ESQ

 4      410 Park Avenue, Suite 1530

 5      New York, New York 10022

 6      (212)813-9300

 7      For the Plaintiffs.

 8

 9      GREENBERG TRAURIG, LLP

10      By Annapoorni R. Sankaran, Esq. and

11      Sebastian Colley, Esq.

12      One International Place

13      Boston, Massachusetts 02110

14      (617)310-6000

15      For Sears Holdings Corporation and K-Mart

16      Holding Corporation, and Sears, Roebuck and

17      Company.

18

19

20

21

22

23

24
```

```
 1  Notice of Taking Deposition of the Rule 30(b)(6)

 2  designee of BVWebTies, and ask you if you've seen

 3  that document before?

 4      A.    Yes, I have.

 5      Q.    Either you or Mr. O'Brien, can you tell me

 6  if this witness is being designated as the person

 7  with the most knowledge of BVWebTies, LLC for any of

 8  the topics listed on Page 4 of the Notice of Taking

 9  Deposition?

10          MR. O'BRIEN:  Yes.  No. 1, and perhaps on

11  2, but I think that's preferably Ms. Monzon, three,

12  four and five.

13          MS. SANKARAN:  Could you mark that as the

14  next exhibit.

15      A.    Just to make Sarah happy, it's Monzon.

16          (Document marked as Exhibit 189

17          for identification)

18      Q.    What's the current title of your position

19  at WebTies?

20      A.    Chief operating officer.

21      Q.    How long have you been the chief operating

22  officer?

23      A.    About three months.

24      Q.    Before that what was your position?
```

1      A.    No.

2      Q.    At BVWebTies, other than counsel, did

3  anyone keep you apprised of the status of

4  negotiations of the syndication agreement extension?

5      A.    No.

6      Q.    Now, Mr. Rode refers to issues.  What did

7  you understand that to mean?

8      A.    That there was something that the two

9  parties did not agree on.

10     Q.    The date of that e-mail is March 11, 2005;

11 is that correct?

12     A.    That's correct.

13     Q.    So as of that date, was it your

14 understanding that the parties still hadn't come to

15 an agreement with respect to an extension of the

16 syndication agreement?

17          MR. O'BRIEN:  Object to the form.  You may

18 answer.

19     A.    Yes.

20     Q.    I'm going to show you a new document that

21 has been Bates stamped P 565, and ask you if you've

22 ever seen these e-mails before?  Take your time to

23 review it.

24     A.    All right, I've read it.

85

```
 1        Q.    It talks about "Today's turn of events,
 2   specifically the removal of the 'Home Again' show
 3   title."  Do you see that?
 4        A.    Yes.
 5        Q.    Do you know what happened on August 23,
 6   2005 with respect to changing the name?
 7        A.    Yes.
 8        Q.    What happened on that day?
 9        A.    Bob announced that the name of the show --
10   he wanted to change the name of the show, after
11   having conversation with his legal counsel.
12        Q.    How did he announce that he wanted to
13   change the name of the show?
14        A.    He didn't call a meeting.  He just talked
15   to Jim and talked to Larry and talked to me.  It was
16   just conversation.
17        Q.    Were they --
18        A.    We were at a shoot.
19        Q.    Were they separate individual conversations
20   with various people or were you in a group?
21        A.    I'm not absolutely sure.  We were not all
22   in a group and there was not a group an announcement
23   made.
24        Q.    Do you know whether an e-mail went out to
```

```
 1        A.    Yes, I did.

 2        Q.    How long did that process take?

 3        A.    If I'm not mistaken, there was a weekend

 4   coming up, and I would say by the beginning of the

 5   week we had gone through all of the relevant pages

 6   and made changes.

 7        Q.    Is it your understanding that that process

 8   is complete with respect to the website?

 9        A.    As of today?

10        Q.    As of today.

11        A.    Yes.

12        Q.    When do you believe that process was

13   completed?

14        A.    As it referenced the television show for

15   2005/2006, it was completed within a few days.

16        Q.    In any other aspect, did it take longer?

17        A.    It's my -- well, how can I put this.  We

18   sell product on the website, hats -- let me go back.

19   We sold product on the website that had the name

20   "Home Again" on the product; T-shirts, hats, mugs.

21   We continued to sell that product.  Primarily it was

22   an oversight, because it did not specifically

23   reference the season in question.  Since Bob had

24   been the star of Home Again, it still referenced
```

1    something that was related to Bob.

2         So those products remained on the web site

3    it will it was pointed out by legal counsel that we

4    should no longer sell those products, because they

5    referenced the prior television show.

6         Q.   Do you know when that happened?

7         A.   It would have to have been early 2006.

8         Q.   Before you talked about the process around

9    August 24, 2005 of making changes to the website,

10   which took three days to a week or so.  Who was

11   responsible for carrying that out at WebTies?

12        A.   Trey Simmons, Gordon Jones, David Masher.

13        Q.   Were you satisfied that they had completed

14   that project?

15        A.   Yes, I was.

16        Q.   Did they report to you at the time?

17        A.   Yes.

18        Q.   Did you give them instructions as to what

19   to remove or what to change?

20        A.   Yes, I did.

21        Q.   And what did you explain to them needed to

22   be changed?

23        A.   That references to the 2005/2006 television

24   season, programming, was changed to "Bob Vila" from

1        A.    Probably nine people.

2        Q.    Is one of the tasks that is involved

3   reviewing frequently asked questions that have been

4   posted to the site?

5        A.    I think reviewing content in general might

6   be a part of someone's job.

7        Q.    Does someone have the job of going back

8   over frequently asked questions to make sure that

9   outdated questions and answered aren't there?

10       A.    I would have thought so until today.

11       Q.    Okay.  Who do you think would have had that

12  responsibility?

13       A.    Greg Vazzana.

14       Q.    Take a look at Exhibit 214.  I believe your

15  testimony was that you don't recall ever seeing this

16  one?

17       A.    That's correct.

18       Q.    And this is another frequently asked

19  question?

20       A.    That's correct.

21       Q.    As you sit here, it states, "Previous 4 of

22  14."  Do you see that?

23       A.    Yes.

24       Q.    What does "4 of 14" mean?

1      A.    There must be 14 previously asked questions

2  in this particular category of Bob on TV FAQs.

3      Q.    Do you know when this was posted?

4      A.    Again, it would probably have been posted

5  in the time frame of end of 2000 or 2001.   It was

6  posted in 2001.

7      Q.    How do you know that?

8      A.    Because all of the final changes to the

9  website took place in 2001.

10     Q.    Okay.

11          MR. O'BRIEN:   I have no further questions.

12          MS. SANKARAN:   I have just two quick

13  questions for you.

14                  REDIRECT EXAMINATION

15     BY MS. SANKARAN:

16     Q.    I believe you testified earlier that you

17  reviewed Mr. Vila's transcript in preparation for

18  your deposition today; is that right?

19     A.    That's correct.

20     Q.    Did you also review the exhibits that were

21  marked in his deposition?

22     A.    No.

23     Q.    If I quickly direct your attention to

24  Exhibit 163, which should be in that bound volume.

1    A.    Okay.

2    Q.    It starts out with a couple pages on the

3    hats and caps and whatnot, and then it has a few

4    pages on distressing new beams for a century-old

5    look, and then it has one of those frequently asked

6    questions that we marked as an exhibit.  Do you see

7    that?

8    A.    Yes.

9    Q.    Then after that, it has another one of the

10   frequently asked questions that we marked as an

11   exhibit.  Do you see that?

12   A.    Yes.

13   Q.    Were you shown those prior to today's

14   deposition?

15   A.    No, I was not.

16   Q.    Have you ever had any property that you

17   owned be the subject of any episode of "Home Again"

18   or "Bob Vila"?

19   A.    No, I have not.

20        MS. SANKARAN:  That's all.

21        MR. O'BRIEN:  Okay.  We are done.

22        (Whereupon the deposition

23         concluded at 4:41 p.m.)

24

# EXHIBIT G

Page 1

1

2    UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF MASSACHUSETTS          COPY

3    ------------------------------------x

4    ROBERT J. VILA and B.V.T.V., INC.,        :

5                 Plaintiffs,                   :

6           - against -                         :    Civil Action
                                                     No. 05-11717-REK
7    SEARS, ROEBUCK AND CO., SEARS HOLDINGS :
     CORPORATION and KMART HOLDING
8    CORPORATION,                               :

9                 Defendants.                   :

10   ------------------------------------x

11                          200 Park Avenue
                            New York, New York
12

13                          March 1, 2006
                            11:00 a.m.
14

15

16        ORAL DEPOSITION of WILLIAM C. CROWLEY, a

17   nonparty witness herein, taken by the Plaintiffs,

18   pursuant to Notice, held at the above-captioned

19   time and place, before Hanna Roth, Shorthand

20   Reporter and Notary Public of the State of New

21   York.

22

23

24

25

Page 2

```
 1

 2          A P P E A R A N C E S:

 3              JAMES F. O'BRIEN, ESQ.
                    Attorney for Plaintiffs
 4                      410 Park Avenue
                        Suite 1530
 5                      New York, New York 10022
                        (212) 813-9300
 6


 7

 8              GREENBERG TRAURIG, LLP
                    Attorneys for Defendants
 9                      One International Place
                        Boston, Massachusetts 02110
10                      (617) 310-6058
           By:          GARY GREENBERG, ESQ.
11                      ANNAPOORNI R. SANKARAN, ESQ.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 69

1                    William Crowley

2          proposed.

3          Q.    The proposed renegotiated deal, was

4    there a proposed renegotiated deal at that time?

5          A.    There was a proposal for a deal with

6    Bob Vila.

7          Q.    Whose proposal was it?

8          A.    I'm not sure which this is referring

9    to.

10         Q.    Do you recall participating in

11   constructing a proposed renegotiated deal with

12   Bob Vila?

13         A.    Yes.

14         Q.    What was your input into that?

15         A.    I don't recall.

16         Q.    "Now, Eddie, the structure, if I can

17   use that word, make sure you look at the proposed

18   renegotiated deal."  Did you do so?

19         A.    I assume I did so.

20         Q.    Let's look at the next e-mail, top of

21   the page.  This is from you dated Friday, April

22   1, 2005, to L. Padilla.  Is that Luis Padilla?

23         A.    Yes.

24         Q.    Your statement to him is:  "What is

25   the best way to reduce our exposure to Vila?"

Page 70

William Crowley

What did you mean by that?

A.    There was this proposed deal, which I know we had put together.  The group, Rode and guys, had been putting together a deal which would involve a trade-off of the library and the spokesperson agreement, a bunch of things.  The goal was to reduce the exposure of future payments to Vila, given that there is very little value to continuing having him as a spokesperson for the company.  So he wanted it, likely we thought, and we were trying to put together a deal that would reduce the amount of money we would have to continue to pay to him over time.

Q.    Those payments you're referring to over time were under the spokesperson agreement?

A.    I think that's right.

Q.    Do you recall if Mr. Padilla responded to your e-mail that we just read?

A.    Just to clarify, I'm not sure whether this deal was the one we proposed to them.  They proposed a deal where they would reduce future exposure for liability and some payments.  I'm not sure whether it was their proposal or our proposal to them.

Page 73

William Crowley

A.     It may have.  I've seen a lot of

exhibits.  I don't know whether I saw this or

not.

Q.     On Exhibit 112, Mr. Padilla's e-mail

to you is dated Saturday, April 2, 2005, and he

refers to reviewing with you on Monday, that

would be April 4th.  This memo is to Luis Padilla

from Andy Ginger, with a carbon copy to Janine

Bousquette, dated April 4, 2005, Re: The Vila

Negotiation.

Now, you don't recall one way or the

other if you've seen this document before,

correct?

A.     Correct.

Q.     At or about April 4, 2005, was there a

new contract approval process announced?

A.     There was a new contract approval

process.  I don't recall when it was announced.

It was announced by that date.  It may have been

announced before that.  I don't remember.

Q.     Now, see the paragraph that says

"Background," sir?

A.     Yes.

Q.     The second line of that, near the end

Page 74

William Crowley

of line, it says:  "Sears wants to restructure to

a business arrangement that provides reduced

expense."  At or about April 4, 2005, was that

your understanding of what Sears wanted to do?

A.    My understanding was we wanted to

reduce the amount we were paying, yes.

Essentially, the view from the marketing people

that was reflected to me was there was very

little value in the Vila relationship anymore,

given his declining popularity.  It really wasn't

providing value to Sears.

Q.    Would you turn back to Exhibit 110 for

a second.  That's -- I'm sorry, it's 149.  This

is a redacted document.  This indicates it has

attachments.  Do you see at the top?

A.    Yes.

Q.    That apparently were communicated up

the line.  Do you recall receiving the

attachments?

A.    I don't recall receiving them.  Looks

like I forwarded them, but I may have received

them or not.  I don't know what the attachments

are specifically.

Q.    My next question was going to be, did

# EXHIBIT H



# The Commonwealth of Massachusetts
## William Francis Galvin

Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512
Telephone: (617) 727-9640

*B. V. T. V., INC.* **Summary Screen**

Help with this form

| Request a Certificate |
| --- |

**The exact name of the Domestic Profit Corporation:** B. V. T. V., INC.

**Entity Type:** Domestic Profit Corporation

**Identification Number:** 043062874

**Old Federal Employer Identification Number (Old FEIN):** 000313181

**Date of Organization in Massachusetts:** 09/14/1989

**Current Fiscal Month / Day:** 12 / 31      **Previous Fiscal Month / Day:** 00 / 00

**The location of its principal office in Massachusetts:**
No. and Street: 115 KINGSTON STREET
City or Town: BOSTON      State: MA   Zip: 02111   Country: USA

**If the business entity is organized wholly to do business outside Massachusetts, the location of that office:**
No. and Street:
City or Town:      State:      Zip:      Country:

**The name and address of the Registered Agent:**
Name: ROBERT J. VILA
No. and Street: 115 KINGSTON STREET
City or Town: BOSTON      State: MA   Zip: 02111   Country: USA

**The officers and all of the directors of the corporation:**

| Title | Individual Name<br>First, Middle, Last, Suffix | Address (no PO Box)<br>Address, City or Town, State, Zip Code | Expiration of Term |
| --- | --- | --- | --- |
| PRESIDENT | ROBERT J. VILA | 183 STATE ROAD, BOX 297<br>CHILMARK, MA 02535 USA | Until successor is elected |
| TREASURER | ROBERT J. VILA | 183 STATE ROAD, BOX 297<br>CHILMARK, MA 02535 USA | Until successor is elected |
| SECRETARY | ROBERT J. VILA | 183 STATE ROAD, BOX 297<br>CHILMARK, MA 02535 USA | Until successor is elected |

# EXHIBIT I

Downloaded By: GREEN009

Company: KMART HOLDING CORP
Form Type: 8-K        SEC File #: 000-50278
Document Type: EX-2.1
Description: AGREEMENT AND PLAN OF MERGER
File Date: 11/18/04
State of Incorporation:   DE
Fiscal Year End:  01/28
CIK:  0001229206
SIC:  5331
IRS Identifying Number:  320073116


Business Address

Mailing Address
3100 WEST BIG BEAVER ROAD
TROY, MI 48084

LIVEDGAR Information Provided By:
GSI ONLINE
A division of Global Securities Information, Inc.

Washington, DC              New York, NY                Chicago, IL
Los Angeles, CA             Miami, FL                   Dallas, TX

For Additional Information About LIVEDGAR, Call
1-800-669-1154
or Visit Us on the World Wide Web at
http://www.gsionline.com

EXHIBIT 2.1
EXECUTION COPY

AGREEMENT AND PLAN OF MERGER

DATED AS OF NOVEMBER 16, 2004

BY AND BETWEEN

KMART HOLDING CORPORATION

AND

SEARS, ROEBUCK AND CO.

TABLE OF CONTENTS

                                                                                          PAGE
                                                                                          ----

ARTICLE I THE MERGER.................................................................................1
       1.1.    Organization of Holdco.............................................................1
       1.2.    Directors and Officers of Holdco..................................................2
       1.3.    Organization of Merger Subs.......................................................2
       1.4.    Actions of Directors and Officers.................................................2
       1.5.    Actions of Sears and Kmart........................................................2
       1.6.    The Mergers.......................................................................3
       1.7.    Effective Time of the Mergers.....................................................3
       1.8.    Closing...........................................................................3
       1.9.    Certificates of Incorporation and By-laws of the Surviving Corporations...........3
       1.10.   Officers and Directors of the Surviving Corporations..............................4

ARTICLE II EFFECTS OF THE MERGERS...................................................................4
       2.1.    Conversion of Sears Securities....................................................4
               (a)      Conversion of Sears Common Stock.........................................4
               (b)      Sears and Kmart-Owned Shares.............................................5
               (c)      Conversion of Sears Merger Sub Stock.....................................5
               (d)      Adjustments..............................................................5
       2.2.    Sears Election Procedures.........................................................5
       2.3.    Sears Proration...................................................................7
       2.4.    Sears Dissenting Shares...........................................................8
       2.5.    Conversion of Kmart Securities....................................................8
               (a)      Conversion of Kmart Common Stock.........................................8
               (b)      Kmart and Sears-Owned Shares.............................................9
               (c)      Conversion of Kmart Merger Sub Stock.....................................9
               (d)      Cancellation of Holdco Common Stock......................................9
               (e)      Exchange of Certificates.................................................9
       2.6.    Exchange of Certificates..........................................................9
               (a)      Deposit of Merger Consideration..........................................9
               (b)      Exchange Procedures......................................................9
               (c)      Distributions With Respect to Unexchanged Shares........................11
               (d)      No Fractional Shares....................................................11
               (e)      Termination of Exchange Fund............................................12
               (f)      No Liability............................................................12
               (g)      Withholding.............................................................12
       2.7.    Sears Options, Etc...............................................................12
       2.8.    Kmart Options, Etc...............................................................14

ARTICLE III REPRESENTATIONS AND WARRANTIES.........................................................15
       3.1.    Representations and Warranties of Sears..........................................15
               (a)      Organization, Standing and Power........................................15
               (b)      Capital Structure.......................................................16

i

|       | (c) | Authority.................................................................18 |
|       | (d) | SEC Documents; Undisclosed Liabilities....................................19 |
|       | (e) | Information Supplied......................................................19 |
|       | (f) | Compliance with Applicable Laws and Reporting Requirements................20 |
|       | (g) | Legal Proceedings........................................................20 |
|       | (h) | Taxes....................................................................21 |
|       | (i) | Certain Agreements.......................................................21 |
|       | (j) | Benefit Plans............................................................22 |
|       | (k) | Subsidiaries.............................................................22 |
|       | (l) | Absence of Certain Changes or Events.....................................23 |
|       | (m) | Board Approval...........................................................23 |
|       | (n) | Vote Required............................................................23 |
|       | (o) | Properties...............................................................23 |
|       | (p) | Intellectual Property....................................................24 |
|       | (q) | Environmental Matters....................................................24 |
|       | (r) | Labor and Employment Matters.............................................25 |
|       | (s) | Brokers or Finders.......................................................25 |
|       | (t) | Opinion of Sears Financial Advisor.......................................25 |
| 3.2.  |     | Representations and Warranties of Kmart...................................25 |
|       | (a) | Organization, Standing and Power.........................................25 |
|       | (b) | Capital Structure........................................................26 |
|       | (c) | Authority................................................................27 |
|       | (d) | SEC Documents; Undisclosed Liabilities....................................28 |
|       | (e) | Information Supplied.....................................................28 |
|       | (f) | Compliance with Applicable Laws and Reporting Requirements................29 |
|       | (g) | Legal Proceedings........................................................29 |
|       | (h) | Taxes....................................................................30 |
|       | (i) | Certain Agreements.......................................................30 |
|       | (j) | Benefit Plans............................................................30 |
|       | (k) | Subsidiaries.............................................................31 |
|       | (l) | Absence of Certain Changes or Events.....................................31 |
|       | (m) | Board Approval...........................................................31 |
|       | (n) | Vote Required............................................................32 |
|       | (o) | Properties...............................................................32 |
|       | (p) | Intellectual Property....................................................32 |
|       | (q) | Environmental Matters....................................................33 |
|       | (r) | Labor and Employment Matters.............................................33 |
|       | (s) | Brokers or Finders.......................................................33 |
|       | (t) | Opinion of Kmart Financial Advisor.......................................33 |
| ARTICLE IV COVENANTS RELATING TO CONDUCT OF BUSINESS........................................34 | | |
| 4.1.  |     | Covenants of Sears.......................................................34 |
|       | (a) | Ordinary Course..........................................................34 |
|       | (b) | Dividends; Changes in Stock..............................................34 |

ii

    (c)   Issuance of Securities..................................................34
    (d)   Governing Documents, Etc..............................................35
    (e)   No Acquisitions.......................................................35
    (f)   No Dispositions.......................................................35
    (g)   Indebtedness..........................................................35
    (h)   Other Actions.........................................................36
    (i)   Accounting Methods; Tax Matters.......................................36
    (j)   Tax-Free Qualification................................................36
    (k)   Compensation and Benefit Plans........................................36
    (l)   No Liquidation........................................................37
    (m)   Litigation............................................................37
    (n)   No Restrictions on Business...........................................37
    (o)   Other Agreements......................................................37
4.2.   Covenants of Emart.........................................................37
    (a)   Ordinary Course.......................................................37
    (b)   Dividends; Changes in Stock...........................................38
    (c)   Issuance of Securities................................................38
    (d)   Governing Documents...................................................38
    (e)   No Acquisitions.......................................................38
    (f)   No Dispositions.......................................................39
    (g)   Indebtedness..........................................................39
    (h)   Other Actions.........................................................39
    (i)   Accounting Methods; Tax Matters.......................................39
    (j)   Tax-Free Qualification................................................39
    (k)   Compensation and Benefit Plans........................................40
    (l)   No Liquidation........................................................40
    (m)   Litigation............................................................40
    (n)   No Restrictions on Business...........................................40
    (o)   Other Agreements......................................................41
4.3.   Transition.................................................................41
4.4.   Advice of Changes; Government Filings......................................41
4.5.   Control of Other Party's Business..........................................41

ARTICLE V ADDITIONAL AGREEMENTS.....................................................42
5.1.   Preparation of Proxy Statement; Stockholders Meetings......................42
5.2.   Access to Information; Confidentiality.....................................43
5.3.   Reasonable Best Efforts....................................................44
5.4.   Acquisition Proposals......................................................46
5.5.   Affiliates.................................................................49
5.6.   Stock Exchange Listing.....................................................49
5.7.   Employee Benefit Plans.....................................................49
5.8.   Section 16 Matters.........................................................50
5.9.   Fees and Expenses..........................................................51
5.10.  Governance.................................................................51
5.11.  Indemnification; Directors' and Officers' Insurance........................51
5.12.  Public Announcements.......................................................53

iii

```
    5.13.    Additional Agreements.................................................53

ARTICLE VI CONDITIONS PRECEDENT..............................................53
    6.1.     Conditions to Each Party's Obligation To Effect the Merger..........53
             (a)     Stockholder Approval.......................................53
             (b)     Exchange Listing...........................................54
             (c)     Requisite Regulatory Approvals.............................54
             (d)     Form S-4...................................................54
             (e)     No Injunctions or Restraints; Illegality...................54
             (f)     Effective Times............................................54
    6.2.     Conditions to Obligations of Kmart.................................54
             (a)     Representations and Warranties.............................54
             (b)     Performance of Obligations of Sears........................55
             (c)     Tax Opinion................................................55
    6.3.     Conditions to Obligations of Sears.................................55
             (a)     Representations and Warranties.............................55
             (b)     Performance of Obligations of Kmart........................56
             (c)     Tax Opinion................................................56

ARTICLE VII TERMINATION AND AMENDMENT........................................56
    7.1.     Termination........................................................56
    7.2.     Effect of Termination..............................................57
    7.3.     Amendment..........................................................59
    7.4.     Extension; Waiver..................................................59

ARTICLE VIII GENERAL PROVISIONS..............................................60
    8.1.     Non-survival of Representations, Warranties and Agreements.........60
    8.2.     Notices............................................................60
    8.3.     Interpretation.....................................................61
    8.4.     Counterparts.......................................................61
    8.5.     Entire Agreement; No Third Party Beneficiaries.....................61
    8.6.     Governing Law......................................................62
    8.7.     Severability.......................................................62
    8.8.     Assignment.........................................................62
    8.9.     Submission to Jurisdiction.........................................62
    8.10.    Enforcement........................................................62
    8.11.    WAIVER OF JURY TRIAL...............................................63
```

iv

EXHIBITS

Exhibit A            Support Agreement
Exhibit 1.1(a)       Holdco Certificate of Incorporation
Exhibit 1.1(b)       Holdco By-laws
Exhibit 1.2          Holdco Directors and Officers Pre-Closing Exhibit 1.10(a)      Sears
Directors and Officers Post-Closing Exhibit 1.10(b)       Kmart Directors and Officers Post-
Closing Exhibit 5.5          Form of Affiliate Agreement
Exhibit 5.10(a)      Holdco Directors Post-Closing
Exhibit 5.10(b)      Holdco Officers Post-Closing

v

INDEX OF DEFINED TERMS

|                                          | SECTION    |
|------------------------------------------|------------|
| Acquisition Proposal                     | 5.4(a)     |
| Acquisitions                             | 4.1(e)     |
| Agreement                                | Preamble   |
| Applicable Antitrust Laws                | 3.1(c)     |
| Benefit Plans                            | 3.1(j)     |
| Book-Entry Shares                        | 2.5(d)     |
| Canadian Antitrust Laws                  | 3.1(c)     |
| Cancelled Shares                         | 2.1(b)     |
| Cash Cap Number                          | 2.3(a)     |
| Cash Consideration                       | 2.1(a)     |
| Cash Electing Sears Share                | 2.1(a)     |
| Cash Election                            | 2.1(a)     |
| Cash Election Number                     | 2.3(b)     |
| Cash Percentage                          | 2.3(a)     |
| Certificates                             | 2.5(e)     |
| Certificates of Merger                   | 1.7(b)     |
| Change in Kmart Recommendation           | 5.1(c)     |
| Change in Recommendation                 | 5.4(b)     |
| Change in Sears Recommendation           | 5.1(b)     |
| Closing                                  | 1.8        |
| Closing Date                             | 1.8        |
| Code                                     | Preamble   |
| Confidentiality Agreements               | 5.2(b)     |
| Converted Shares                         | 2.1(b)     |
| DGCL                                     | 1.6(c)     |
| Dissenting Shares                        | 2.4(a)     |
| Effective Time                           | 1.7(c)     |
| Electing Sears Share                     | 2.1(a)     |
| Election Date                            | 2.2(d)     |
| Environmental Claim                      | 3.1(q)     |
| Environmental Laws                       | 3.1(q)     |
| Environmental Permits                    | 3.1(q)     |
| ERISA                                    | 3.1(j)     |
| ESL                                      | Recitals   |
| Exchange Act                             | 2.2(d)     |
| Exchange Agent                           | 2.2(a)     |
| Exchange Fund                            | 2.6(a)     |
| Exchange Ratio                           | 2.1(a)     |
| Excluded Shares                          | 2.1(b)     |
| Form of Election                         | 2.2(c)     |
| Form S-4                                 | 5.1(a)     |
| Former Kmart Holders                     | 2.6(b)     |
| Former Kmart Shares                      | 2.6(b)     |
| Governmental Entity                      | 3.1(c)     |

|                                         | SECTION     |
|-----------------------------------------|-------------|
| Holdco................................................... | 1.1         |
| Holdco Common Stock...................................... | 1.1         |
| HSR Act.................................................. | 3.1(c)      |
| Indemnified Parties...................................... | 5.11(b)     |
| Infringe................................................. | 3.1(p)      |
| Injunction............................................... | 6.1(e)      |
| Insiders................................................. | 5.8         |
| Joint Proxy Statement/Prospectus......................... | 5.1(a)      |
| Kmart.................................................... | Preamble    |
| Kmart Benefit Plans...................................... | 3.2(j)      |
| Kmart Board Approval..................................... | 3.2(m)      |
| Kmart Book-Entry Shares.................................. | 2.5(e)      |
| Kmart Certificates....................................... | 2.5(e)      |
| Kmart Certificate of Merger.............................. | 1.7(b)      |
| Kmart Common Stock....................................... | 2.5(a)      |
| Kmart Consideration...................................... | 2.5(a)      |
| Kmart Contracts.......................................... | 3.2(i)      |
| Kmart Disclosure Schedule................................ | 3.2         |
| Kmart Indemnified Parties................................ | 5.11(b)     |
| Kmart Intellectual Property.............................. | 3.2(p)      |
| Kmart Merger............................................. | 1.6(b)      |
| Kmart Merger Sub......................................... | 1.3(b)      |
| Kmart Permits............................................ | 3.2(f)      |
| Kmart Permitted Liens.................................... | 3.2(o)      |
| Kmart Preferred Stock.................................... | 3.2(b)      |
| Kmart Recommendation..................................... | 5.1(c)      |
| Kmart SEC Documents...................................... | 3.2(d)      |
| Kmart Stock Option....................................... | 2.8(a)      |
| Kmart Stock Plans........................................ | 3.2(b)      |
| Kmart Stockholders Meeting............................... | 5.1(c)      |
| Kmart Termination Fee.................................... | 7.2(b)      |
| Kmart's Current Premium.................................. | 5.11(d)     |
| Lehman Brothers.......................................... | 3.2(s)      |
| material................................................. | 3.1(a)      |
| material adverse effect.................................. | 3.1(a)      |
| Mergers.................................................. | 1.6(b)      |
| Merger Consideration..................................... | 2.5(a)      |
| Merger Subs.............................................. | 1.3(b)      |
| Morgan Stanley........................................... | 3.1(t)      |
| Nasdaq................................................... | 2.6(d)      |
| New Plans................................................ | 5.7(b)      |
| Non-Electing Sears Holders............................... | 2.6(b)      |
| Non-Electing Sears Share................................. | 2.1(a)      |
| NYBCL.................................................... | 1.6(c)      |
| NYSE..................................................... | 3.2(c)      |

|                                           | SECTION      |
| ----------------------------------------- | ------------ |
| Other Kmart Stock-Based Awards            | 2.8(a)       |
| Other Sears Stock-Based Awards            | 2.7(a)       |
| Public Proposal                           | 7.2(b)       |
| Required Kmart Vote                       | 3.2(n)       |
| Required Sears Vote                       | 3.1(n)       |
| Required Stockholder Votes                | 3.2(n)       |
| Required Stockholders Meetings            | 5.1(c)       |
| Requisite Regulatory Approvals            | 6.1(c)       |
| Restricted Kmart Share                    | 2.8(a)       |
| Restricted Sears Share                    | 2.7(a)       |
| Sears                                     | Preamble     |
| Sears Benefit Plans                       | 3.1(j)       |
| Sears Board Approval                      | 3.1(m)       |
| Sears Book-Entry Shares                   | 2.2(a)       |
| Sears Certificates                        | 2.2(a)       |
| Sears Certificate of Merger               | 1.7(a)       |
| Sears Common Stock                        | 2.1(a)       |
| Sears Consideration                       | 2.1(a)       |
| Sears Contracts                           | 3.1(i)       |
| Sears Disclosure Schedule                 | 3.1          |
| Sears Indemnified Parties                 | 5.11(a)      |
| Sears Intellectual Property               | 3.1(p)       |
| Sears Merger                              | 1.6(a)       |
| Sears Merger Sub                          | 1.3(a)       |
| Sears Option Cash-Out Amount              | 2.7(a)       |
| Sears Permits                             | 3.1(f)       |
| Sears Permitted Liens                     | 3.1(o)       |
| Sears Preferred Stock                     | 3.1(b)       |
| Sears Recommendation                      | 5.1(b)       |
| Sears SEC Documents                       | 3.1(d)       |
| Sears SAR                                 | 2.7(a)       |
| Sears Stock Option                        | 2.7(a)       |
| Sears Stock Plans                         | 3.1(b)       |
| Sears Stock Valuation                     | 2.7(a)       |
| Sears Stockholders Meeting                | 5.1(b)       |
| Sears Termination Fee                     | 7.2(c)       |
| Sears's Current Premium                   | 5.11(c)      |
| Section 16 Information                    | 5.8          |
| SEC                                       | 3.1(a)       |
| Securities Act                            | 3.1(b)       |
| Shortfall Number                          | 2.3(c)       |
| Significant Subsidiary                    | 3.1(a)       |
| Stock Consideration                       | 2.1(a)       |
| Stock Electing Sears Share                | 2.1(a)       |
| Stock Election                            | 2.1(a)       |

```
                                                      SECTION
                                                      -------

Stock Percentage...............................................   2.7(a)
Subsidiary.....................................................   3.1(a)
Superior Proposal..............................................   5.4(f)
Support Agreement..............................................   Recitals
tax, taxable, taxes............................................   3.1(h)
Violation......................................................   3.1(c)
Voting Debt....................................................   3.1(b)
```

ix

AGREEMENT AND PLAN OF MERGER dated as of November 16, 2004 (this "Agreement") is by and between Kmart Holding Corporation, a Delaware corporation ("Kmart"), and Sears, Roebuck and Co., a New York corporation ("Sears").

WHEREAS, the Boards of Directors of Kmart and Sears have approved, and deem it advisable and in the best interests of their respective stockholders to consummate, their respective Mergers (as defined in Section 1.6(b)) in which the issued and outstanding shares of capital stock of each of Kmart and Sears will be converted into the right to receive shares of capital stock of Holdco (as defined in Section 1.1);

WHEREAS, the Boards of Directors of Kmart and Sears have each determined that their respective Mergers and the other transactions contemplated hereby are consistent with, and in furtherance of, their respective business strategies and goals;

WHEREAS, Kmart and Sears desire to make certain representations, warranties and agreements in connection with the Mergers and also to prescribe various conditions to the Mergers;

WHEREAS, for Federal income tax purposes, (i) it is intended that the exchange of Sears Common Stock and Kmart Common Stock for Holdco Common Stock pursuant to the Mergers, taken together, shall qualify as a transaction described in Section 351 of the Internal Revenue Code of 1986, as amended (the "Code"); (ii) it is intended that the Kmart Merger shall qualify as a reorganization within the meaning of Section 368(a) of the Code; and (iii) the parties intend, by executing this Agreement, to adopt a plan of reorganization within the meaning of Treasury Regulation Section 1.368-2(g); and

WHEREAS, as a condition and inducement to each of Kmart's and Sears's willingness to enter into this Agreement, Kmart, Sears and certain affiliates of ESL Investments, Inc. (collectively, "ESL") are entering into a Support Agreement, dated as of the date hereof in the form of Exhibit A hereto (the "Support Agreement"), pursuant to which, among other things, ESL has agreed to vote all shares of Kmart Common Stock and Sears Common Stock beneficially owned by ESL in favor of adoption of this Agreement, to make a Stock Election (as defined herein) with respect to all shares of Sears Common Stock beneficially owned by ESL and not to sell or otherwise transfer any shares of Kmart Common Stock or Sears Common Stock prior to the termination of such Support Agreement in accordance with its terms;

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth herein, the parties agree as follows:

ARTICLE I
THE MERGER

1.1. Organization of Holdco. As promptly as practicable following the execution of this Agreement, Kmart shall organize a new corporation ("Holdco") under the laws of the State of Delaware for the sole purpose of effectuating the Mergers and the other transactions contemplated hereby. The Certificate of Incorporation and By-laws of Holdco shall initially be as agreed upon by Kmart and Sears. The authorized capital stock of Holdco shall initially

consist of 100 shares of common stock, par value $0.01 per share (the "Holdco Common Stock"), of which only one share shall be issued to Kmart. Kmart shall take, and shall cause Holdco to take, all requisite action to cause the Certificate of Incorporation of Holdco to be in the form of Exhibit 1.1(a) hereto and the By-laws of Holdco to be in the form of Exhibit 1.1(b) hereto immediately following the Effective Time.

1.2. Directors and Officers of Holdco. Prior to the Effective Time, the directors and officers of Holdco shall consist of the directors and officers as set forth on Exhibit 1.2. Kmart shall take all requisite action to cause the directors and officers of Holdco as of the Effective Time to be as provided in Section 5.10.

1.3. Organization of Merger Subs. As promptly as practicable following the execution of this Agreement, Kmart shall cause Holdco to organize for the sole purpose of effectuating the Mergers:

(a) a corporation organized under the laws of the State of New York ("Sears Merger Sub"); the Certificate of Incorporation and By-laws of Sears Merger Sub shall be in such forms as shall be determined by Holdco, Kmart and Sears as soon as practicable following the execution of this Agreement; and the authorized capital stock of Sears Merger Sub shall initially consist of 100 shares of common stock, par value $0.01 per share, all of which shares shall be issued to Holdco at a price of $1.00 per share; and

(b) a corporation organized under the laws of the State of Delaware ("Kmart Merger Sub" and, together with Sears Merger Sub, the "Merger Subs"); the Certificate of Incorporation and By-laws of Kmart Merger Sub shall be in such forms as shall be determined by Holdco, Kmart and Sears as soon as practicable following the execution of this Agreement; and the authorized capital stock of Kmart Merger Sub shall initially consist of 100 shares of common stock, par value $0.01 per share, all of which shares shall be issued to Holdco at a price of $1.00 per share.

1.4. Actions of Directors and Officers. As promptly as practicable following the execution of this Agreement, Kmart shall take all requisite action to designate the directors and officers of Holdco (subject to Sears's consent) and each of the Merger Subs and to take such steps as may be necessary or appropriate to complete the organization of Holdco as contemplated by Sections 1.1 and 1.2 and the Merger Subs as contemplated by Section 1.3. Kmart (and, if applicable, Sears) shall cause the directors of Holdco to ratify and approve this Agreement and to cause the directors of the Merger Subs to ratify and approve this Agreement.

1.5. Actions of Sears and Kmart. As promptly as practicable following the execution of this Agreement, Kmart, as the holder of all the outstanding shares of Holdco Common Stock, shall cause Holdco to enter into and become a party to this Agreement and adopt this Agreement and shall cause Holdco, as the sole stockholder of each of the Merger Subs, to cause the Merger Subs to enter into and become a party to this Agreement and adopt this Agreement. Kmart shall cause Holdco, and Holdco shall cause the Merger Subs, to perform their respective obligations under this Agreement. As promptly as practicable after the date hereof the parties shall cause this Agreement to be amended to add Holdco and the Merger Subs as parties, and each Merger Sub shall become a constituent corporation in its respective Merger.

2

1.6. The Mergers. At the Effective Time (as defined in Section 1.7(c)):

(a) Sears Merger Sub shall be merged with and into Sears (the "Sears Merger"). Sears will be the surviving corporation in the Sears Merger, and the separate existence of Sears Merger Sub shall cease. As a result of the Sears Merger, Sears shall become a wholly-owned Subsidiary of Holdco.

(b) Kmart Merger Sub shall be merged with and into Kmart (the "Kmart Merger" and, together with the Sears Merger, the "Mergers"). Kmart will be the surviving corporation in the Kmart Merger, and the separate existence of Kmart Merger Sub shall cease. As a result of the Kmart Merger, Kmart shall become a wholly-owned Subsidiary of Holdco.

(c) The Sears Merger will have the effects set forth in the New York Business Corporation Law (the "NYBCL"), and the Kmart Merger will have the effects set forth in the Delaware General Corporation Law (the "DGCL").

1.7. Effective Time of the Mergers. Subject to the provisions of this Agreement, on the Closing Date (as defined in Section 1.8), the parties shall (and shall cause their Subsidiaries to) cause the following to occur:

(a) Sears Merger Sub and Sears shall execute and deliver for filing a certificate of merger (the "Sears Certificate of Merger") to the Department of State for the State of New York, in such form and manner provided in the NYBCL. The applicable parties thereto shall make all other filings or recordings required under Section 904(b) and any other provision of the NYBCL to effect the Sears Merger.

(b) Kmart Merger Sub and Kmart shall execute and deliver for filing a certificate of merger (the "Kmart Certificate of Merger" and, together with the Sears Certificate of Merger, the "Certificates of Merger") to the Secretary of State for the State of Delaware, in such form and manner provided in the DGCL. The applicable parties thereto shall make all other filings or recordings required under the DGCL to effect the Kmart Merger.

(c) The Mergers shall become effective upon the filing of the Certificates of Merger with the Department of State for the State of New York and the Secretary of State for the State of Delaware or, in each case, at such time thereafter as is provided in such Certificates of Merger as agreed between the parties; provided that the Mergers shall become effective at the same time (such time as the Mergers become effective, the "Effective Time").

1.8. Closing. The closing of the Merger (the "Closing") will take place at 10:00 a.m. on the date (the "Closing Date") that is the second business day after the satisfaction or waiver (subject to applicable law) of the conditions set forth in Article VI (excluding conditions that, by their terms, are to be satisfied on the Closing Date, but subject to the satisfaction or wavier or such conditions), unless another time or date is agreed to in writing. The Closing shall be held at the offices of Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017, unless another place is agreed to in writing.

1.9. Certificates of Incorporation and By-laws of the Surviving Corporations. (a) At the Effective Time, the Restated Certificate of Incorporation and By-laws of Sears shall be

3

amended so as to read in their entirety as the Certificate of Incorporation and By-laws of Sears Merger Sub as in effect immediately prior to the Effective Time, except for the agent and except that the surviving corporation in the Sears Merger shall retain Sears's name.

(b) At the Effective Time, the Amended and Restated Certificate of Incorporation and By-laws of Kmart shall be amended so as to read in their entirety as the Certificate of Incorporation and By-laws of Kmart Merger Sub as in effect immediately prior to the Effective Time, except for the incorporator and except that the surviving corporation in the Kmart Merger shall retain Kmart's name.

1.10. Officers and Directors of the Surviving Corporations. (a) At the Effective Time, the persons indicated in Exhibit 1.10(a) shall be the directors and officers (with the offices indicated therein) of Sears, as the surviving corporation in the Sears Merger.

(b) At the Effective Time, the persons indicated in Exhibit 1.10(b) shall be the directors and officers (with the offices indicated therein) of Kmart, as the surviving corporation in the Kmart Merger.

ARTICLE II
EFFECTS OF THE MERGERS

2.1. Conversion of Sears Securities. At the Effective Time, by virtue of the Sears Merger and without any action on the part of Holdco, Sears Merger Sub, Sears or the holders of any of the following securities:

(a) Conversion of Sears Common Stock. Each common share, par value $0.75 per share, of Sears ("Sears Common Stock") issued and outstanding immediately prior to the Effective Time (other than any Excluded Shares (as defined in Section 2.1(b)) and any Dissenting Shares (as defined in Section 2.4(a)) shall, subject to Sections 2.3 and 2.6(d), be converted into the right to receive the following consideration (the "Sears Consideration"):

(i) Each share of Sears Common Stock with respect to which an election to receive cash (a "Cash Election") has been effectively made and not revoked or lost pursuant to Section 2.2 (each, a "Cash Electing Sears Share") shall be converted into the right to receive $50.00 in cash without interest (the "Cash Consideration").

(ii) Each share of Sears Common Stock with respect to which an election to receive stock consideration (a "Stock Election") is properly made and not revoked or lost pursuant to Section 2.2 (each, a "Stock Electing Sears Share" and, together with each Cash Electing Sears Shares, an "Electing Sears Share") shall be converted into the right to receive 0.5 shares (the "Exchange Ratio"), subject to adjustment in accordance with Section 2.1(d), of validly issued, fully paid and non-assessable shares of Holdco Common Stock (together with any cash in lieu of fractional shares of Holdco Common Stock to be paid pursuant to Section 2.6(d), the "Stock Consideration").

(iii) Each share of Sears Common Stock other than shares of Sears Common Stock with respect to which a Cash Election or a Stock Election is properly made and not revoked or lost pursuant to Section 2.2 (each, a "Non-Electing Sears Share") shall be

4

converted into the right to receive the Cash Consideration or the Stock Consideration or a combination of both, subject to Section 2.3.

(b) Sears and Kmart-Owned Shares. Each share of Sears Common Stock owned by Sears or Sears Merger Sub ("Cancelled Shares"), in each case immediately prior to the Effective Time, shall be canceled without any conversion thereof, and no consideration shall be paid with respect thereto. Each share of Sears Common Stock owned by Kmart or any direct or indirect wholly-owned Subsidiary of Sears or Kmart (the "Converted Shares" and, together with the Cancelled Shares, the "Excluded Shares"), in each case immediately prior to the Effective Time, shall be converted into the right to receive the Stock Consideration. The Stock Consideration paid pursuant to this Section 2.1(b) shall not be subject to proration under Section 2.3.

(c) Conversion of Sears Merger Sub Stock. Each share of common stock of Sears Merger Sub issued and outstanding immediately prior to the Effective Time shall be converted into one fully paid and, subject to the NYBCL, non-assessable common share of Sears, as the surviving corporation in the Sears Merger.

(d) Adjustments. If, after the date hereof and prior to the Effective Time, either (i) Kmart pays a dividend in, splits, combines into a smaller number of shares, or issues by reclassification any shares of Kmart Common Stock or (ii) Sears pays a dividend in, splits, combines into a smaller number of shares, or issues by reclassification any shares of Sears Common Stock, then the Merger Consideration and Exchange Ratio and any other similarly dependent items, as the case may be, shall be appropriately adjusted to provide to the holders of Sears Common Stock the same economic effect as contemplated by this Agreement prior to such action, and as so adjusted shall, from and after the date of such event, be the Merger Consideration, Exchange Ratio or other dependent item, as applicable, subject to further adjustment in accordance with this sentence.

2.2. Sears Election Procedures. (a) Not less than three business days prior to the mailing of the Joint Proxy Statement/Prospectus, Kmart and Sears shall jointly designate a bank or trust company to act as exchange agent hereunder (the "Exchange Agent") for the purpose of exchanging certificates that immediately prior to the Effective Time represented shares of Sears Common Stock (the "Sears Certificates") and shares of Sears Common Stock represented by book-entry ("Sears Book-Entry Shares").

(b) Each person who, on or prior to the Election Date (as defined below), is a record holder of shares of Sears Common Stock other than Dissenting Shares shall be entitled to specify the number of such holder's shares of Sears Common Stock (and, if such shares to which the election relates are represented by Sears Certificates, such particular shares) with respect to which such holder makes a Cash Election or Stock Election.

(c) Holdco shall prepare and file as an exhibit to the Form S-4 a form of election (the "Form of Election") in form and substance reasonably acceptable to Sears. The Form of Election shall specify that delivery shall be effected, and risk of loss and title to any Sears Certificates shall pass only upon proper delivery of the Form of Election and any Sears Certificates. Sears shall mail the Form of Election with the Joint Proxy Statement/Prospectus (as

5

defined in Section 5.1(a)) to all persons who are record holders of shares of Sears Common Stock as of the record date for the Sears Stockholders Meeting (as defined in Section 5.1(b)). The Form of Election shall be used by each record holder of shares of Sears Common Stock (or, in the case of nominee record holders, the beneficial owner through proper instructions and documentation) who wishes to make a Cash Election or a Stock Election or a combination of both for any and all shares of Sears Common Stock held by such holder. Sears shall use its reasonable best efforts to make the Form of Election available to all persons who become holders of shares of Sears Common Stock during the period between the record date for the Sears Stockholders Meeting and the Election Date.

(d) Any holder's election shall have been properly made only if the Exchange Agent shall have received at its designated office, by 5:00 p.m., New York City time, on (1) the date of the Sears Stockholders Meeting or (2) if the Closing Date is more than four business days following the Sears Stockholders Meeting, two business days preceding the Closing Date (the "Election Date"), a Form of Election properly completed and signed and accompanied by (i) Certificates representing the shares of Sears Common Stock to which such Form of Election relates, duly endorsed in blank or otherwise in form acceptable for transfer on the books of Sears (or by an appropriate guarantee of delivery of such Sears Certificates as set forth in such Form of Election from a firm that is an "eligible guarantor institution" (as defined in Rule 17Ad-15 under the Securities Exchange Act of 1934, as amended (the "Exchange Act")); provided that such Sears Certificates are in fact delivered to the Exchange Agent by the time set forth in such guarantee of delivery) or (ii) in the case of Sears Book-Entry Shares, any additional documents required by the procedures set forth in the Form of Election. After a Cash Election or a Stock Election is validly made with respect to any shares of Sears Common Stock, no further registration of transfers of such shares shall be made on the stock transfer books of Sears, unless and until such Cash Election or Stock Election is properly revoked.

(e) Kmart and Sears shall publicly announce the anticipated Election Date at least five business days prior to the anticipated Closing Date. If the Closing Date is delayed to a subsequent date, the Election Date shall be similarly delayed to a subsequent date, and Kmart and Sears shall promptly announce any such delay and, when determined, the rescheduled Election Date.

(f) Any Cash Election or Stock Election may be revoked with respect to all or a portion of the shares of Sears Common Stock subject thereto by the holder who submitted the applicable Form of Election by written notice received by the Exchange Agent prior to 5:00 p.m., New York City time, on the Election Date. In addition, all Cash Elections and Stock Elections shall automatically be revoked if this Agreement is terminated in accordance with Article VII. If a Cash Election or Stock Election is revoked with respect to shares of Sears Common Stock represented by Sears Certificates, Sears Certificates representing such shares shall be promptly returned to the holder that submitted the same to the Exchange Agent.

(g) The determination of the Exchange Agent (or the joint determination of Kmart and Sears, in the event that the Exchange Agent declines to make any such determination) shall be conclusive and binding as to whether or not Cash Elections and Stock Elections shall have been properly made or revoked pursuant to this Section 2.2 and as to when Cash Elections, Stock Elections and revocations were received by the Exchange Agent. The Exchange Agent (or

6

Kmart and Sears jointly, in the event that the Exchange Agent declines to make the following computation) shall also make all computations as to the proration contemplated by Section 2.3, and absent manifest error this computation shall be conclusive and binding. The Exchange Agent may, with the written agreement of Kmart, after Kmart's reasonable consultation with Sears, make any rules as are consistent with this Section 2.2 for the implementation of the Cash Elections and Stock Elections provided for in this Agreement as shall be necessary or desirable to effect these Cash Elections and Stock Elections.

2.3. Sears Proration. Notwithstanding anything in this Agreement to the contrary (but subject to Sections 2.1(b) and 2.4):

(a) The Cash Percentage (as defined below) of the shares of Sears Common Stock (other than the Excluded Shares) issued and outstanding immediately prior to the Effective Time (such number, the "Cash Cap Number") shall be converted into the right to receive the Cash Consideration, and all other shares of Sears Common Stock (other than the Excluded Shares) issued and outstanding immediately prior to the Effective Time shall be converted into the right to receive the Stock Consideration. The "Cash Percentage" shall be equal to 45%, subject to adjustment as provided in Section 2.1(d).

(b) If the aggregate number of Cash Electing shares of Sears Common Stock (such number, the "Cash Election Number") exceeds the Cash Cap Number, then (i) all Cash Electing Sears Shares and Non-Electing Sears Shares shall be converted into the right to receive the Stock Consideration and (ii) the number of Cash Electing Sears Shares of each stockholder of Sears that shall be converted into the right to receive the Cash Consideration shall be equal to the product obtained by multiplying (A) the number of Cash Electing Sears Shares of such stockholder by (B) a fraction, the numerator of which is the Cash Cap Number and the denominator of which is the Cash Election Number, with the remaining number of such holder's Cash Electing Sears Shares being converted into the right to receive the Stock Consideration.

(c) If the Cash Election Number is less than the Cash Cap Number (such difference between the Cash Election Number and Cash Cap Number, the "Shortfall Number"), then (x) all Cash Electing Sears Shares shall be converted into the right to receive the Cash Consideration and (y) the Stock Electing Sears Shares and Non-Electing Sears Shares shall be treated in the following manner:

(i) if the Shortfall Number is less than or equal to the aggregate number of Non-Electing Sears Shares, then (x) all Stock Electing Sears Shares shall be converted into the right to receive the Stock Consideration and (y) the Non-Electing Sears Shares of each stockholder of Sears shall be converted into the right to receive the Cash Consideration in respect of that number of Non-Electing Sears Shares equal to the product obtained by multiplying (1) the number of Non-Electing Sears Shares of such stockholder by (2) a fraction, the numerator of which is the Shortfall Number and the denominator of which is the aggregate number of Non-Electing Sears Shares, with the remaining number of such holder's Non-Electing Sears Shares being converted into the right to receive the Stock Consideration; or

7

(ii) if the Shortfall Number exceeds the aggregate number of Non-Electing Sears Shares, then (x) all Non-Electing Sears Shares shall be converted into the right to receive the Cash Consideration and (y) the number of Stock Electing Sears Shares of each stockholder of Sears that shall be converted into the right to receive the Cash Consideration shall be equal to the product obtained by multiplying (1) the number of Stock Electing Sears Shares of such stockholder by (2) a fraction, the numerator of which is the amount by which the Shortfall Number exceeds the aggregate number of Non-Electing Sears Shares, and the denominator of which is the aggregate number of Stock Electing Sears Shares, with the remaining number of such holder's Stock Electing Sears Shares being converted into the right to receive the Stock Consideration.

(d) For purposes of the calculations in this Section 2.3, shares of Sears Common Stock that constitute Dissenting Shares immediately prior to the Effective Time shall be deemed to be Non-Electing Shares.

2.4. Sears Dissenting Shares. (a) Shares of Sears Common Stock that are issued and outstanding immediately prior to the Effective Time and that are held by holders of shares of Sears Common Stock who have properly demanded and perfected their rights to be paid the fair value of such shares in accordance with Sections 623 and 910 of the NYBCL (the "Dissenting Shares") shall not be converted into the right to receive the Merger Consideration, and the holders thereof shall be entitled to only such rights as are granted by the NYBCL. If any such stockholder of Sears shall fail to perfect or effectively shall withdraw or lose such stockholder's right to be paid fair value under Sections 623 and 910 of the NYBCL, such stockholder's shares of Sears Common Stock shall thereupon be deemed to have been converted, at the Effective Time, into the right to receive the Merger Consideration payable or issuable in respect of Non-Electing Sears Shares as set forth in Section 2.3 of this Agreement, without any interest thereon.

(b) Sears shall give Kmart (or, after the Closing, Holdco) (i) notice of any notice received by Sears of intent to demand the fair value of any shares of Sears Common Stock, withdrawals of such notices and any other notices served pursuant to Sections 623 and 910 of the NYBCL and received by Sears and (ii) the opportunity to direct, jointly with Sears, all negotiations and proceedings with respect to the exercise of such dissenters' rights under Sections 623 and 910 of the NYBCL. Sears shall not, except with the prior written consent of Kmart (or, after the Closing, Holdco) or as otherwise required by applicable law, make any payment with respect to any such exercise of dissenters' rights or offer to settle or settle any such rights.

2.5. Conversion of Kmart Securities. At the Effective Time, by virtue of the Kmart Merger and without any action on the part of Holdco, Kmart Merger Sub, Kmart or the holders of any of the following securities:

(a) Conversion of Kmart Common Stock. Each share of common stock, par value $0.01 per share, of Kmart ("Kmart Common Stock") issued and outstanding immediately prior to the Effective Time (other than any shares cancelled pursuant to Section 2.5(b)) shall be converted into the right to receive one validly issued, fully paid and non-assessable share of Holdco Common Stock (the "Kmart Consideration" and, together with the Sears Consideration, the "Merger Consideration").

8

(b) Kmart and Sears-Owned Shares. Each share of Kmart Common Stock owned by Kmart or Kmart Merger Sub, in each case immediately prior to the Effective Time, shall be cancelled without any conversion thereof, and no consideration shall be paid with respect thereto. Each share of Kmart Common Stock owned by Sears or any direct or indirect wholly-owned Subsidiary of Sears or Kmart, in each case immediately prior to the Effective Time, shall be converted into the right to receive the Kmart Consideration.

(c) Conversion of Kmart Merger Sub Stock. Each share of common stock of Kmart Merger Sub issued and outstanding immediately prior to the Effective Time shall be converted into one fully paid and non-assessable share of common stock of Kmart, as the surviving corporation in the Kmart Merger.

(d) Cancellation of Holdco Common Stock. Each share of Holdco Common Stock held by Kmart immediately prior to the Effective Time shall be cancelled, and no consideration shall be paid with respect thereto.

(e) Exchange of Certificates. Certificates that immediately prior to the Effective Time represented shares of Kmart Common Stock (the "Kmart Certificates" and, together with the Sears Certificates, the "Certificates") and shares of Kmart Common Stock represented by book-entry ("Kmart Book-Entry Shares" and, together with the Sears Book-Entry Shares, the "Book-Entry Shares") shall be exchanged in accordance with Section 2.6.

2.6.  Exchange of Certificates.

(a) Deposit of Merger Consideration. (i) As of and from time to time after the Effective Time, Holdco shall deposit with the Exchange Agent, for the benefit of the stockholders of Sears and Kmart, (A) certificates or, at Holdco's option, evidence of shares in book entry form, representing shares of Holdco Common Stock in denominations as the Exchange Agent may reasonably specify and (B) cash, in each case as are issuable or payable, respectively, pursuant to this Article II in respect of shares of Sears Common Stock for which Sears Certificates or Sears Book-Entry Shares have been properly delivered to the Exchange Agent or the cash to be paid in lieu of fractional shares. Such certificates (or evidence of book-entry form, as the case may be) for shares of Holdco Common Stock and such cash so deposited, together with any dividends or distributions with respect thereto, are hereinafter referred to as the "Exchange Fund".

(ii) The Exchange Agent shall invest any cash deposited with the Exchange Agent by Holdco as directed by Holdco, provided that no such investment or losses thereon shall affect the Cash Consideration payable to holders of shares of Sears Common Stock entitled to receive such consideration or cash in lieu of fractional interests, and Holdco and Kmart shall promptly provide additional funds to the Exchange Agent for the benefit of holders of shares of Sears Common Stock entitled to receive such consideration in the amount of any such losses. Any interest or income produced by such investments shall not be deemed part of the Exchange Fund and shall be payable to Holdco or Kmart, as Holdco directs.

(b) Exchange Procedures. (i) As soon as reasonably practicable after the Effective Time, Holdco shall cause to be mailed to (x) each record holder, as of the Effective

9

Time, of Non-Electing Sears Shares (such holders, "Non-Electing Sears Holders") and (y) each record holder, as of the Effective Time, of shares of Kmart Common Stock (such holders, "Former Kmart Holders" and such shares, "Former Kmart Shares")): (i) a letter of transmittal (which shall specify that delivery shall be effected, and risk of loss and title to the Certificates held by such holder representing such Non-Electing Sears Shares or Former Kmart Shares, as the case may be, shall pass, only upon proper delivery of the Certificates to the Exchange Agent or, in the case of Book-Entry Shares, upon adherence to the procedures set forth in the letter of transmittal) and (ii) instructions for use in effecting the surrender of the Certificates or, in the case of Book-Entry Shares, the surrender of such shares, for payment of the Merger Consideration therefor. Such letter of transmittal shall be in such form and have such other provisions as Holdco may specify.

(ii) (x) Each former stockholder of Sears who properly made and did not revoke a Cash Election or Stock Election shall be entitled to receive in exchange for such stockholder's Electing Sears Shares the following as specified in clauses (A) and (B), and (y) upon surrender by a Non-Electing Sears Holder to the Exchange Agent of a Certificate or Book-Entry Shares, as applicable, together with a letter of transmittal, duly completed and validly executed in accordance with the instructions thereto, and such other documents as may be required pursuant to such instructions, each Non-Electing Sears Holder shall be entitled to receive in exchange therefor: (A) the number of whole shares of Holdco Common Stock, if any, into which such holder's shares of Sears Common Stock represented by such holder's properly surrendered Certificates or Book-Entry Shares, as applicable, were converted in accordance with this Article II (after taking into account all shares of Sears Common Stock to which an election or non-election of the same type were made), and such Certificates or Book-Entry Shares so surrendered shall be forthwith cancelled, and (B) a check in an amount of U.S. dollars (after giving effect to any required withholdings pursuant to Section 2.6(g)) equal to (I) the amount of cash (including the Cash Consideration and cash in lieu of fractional interests in shares of Holdco Common Stock to be paid pursuant to Section 2.6(d)), if any, into which such holder's shares of Sears Common Stock represented by such holder's properly surrendered Certificates or Book-Entry Shares, as applicable, were converted in accordance with this Article II, plus (II) any cash dividends or other distributions that such holder has the right to receive pursuant to Section 2.6(c).

(iii) Upon surrender by a Former Kmart Holder to the Exchange Agent of a Certificate or Book-Entry Shares, as applicable, together with a letter of transmittal, duly completed and validly executed in accordance with the instructions thereto, and such other documents as may be required pursuant to such instructions, each Former Kmart Holder shall be entitled to receive in exchange therefor: (A) the number of whole shares of Holdco Common Stock into which such holder's shares of Kmart Common Stock represented by such holder's properly surrendered Certificates or Book-Entry Shares, as applicable, were converted in accordance with this Article II, and such Certificates or Book-Entry Shares so surrendered shall be forthwith cancelled, and (B) a check in an amount of U.S. dollars (after giving effect to any required withholdings pursuant to Section 2.6(g)) equal to any cash dividends or other distributions that such holder has the right to receive pursuant to Section 2.6(c).

(iv) If payment or issuance of the Merger Consideration is to be made to a person other than the person in whose name the surrendered Certificate is registered, it shall be a

10

condition of payment or issuance that the Certificate so surrendered shall be properly endorsed or shall be otherwise in proper form for transfer and that the person requesting such payment or issuance shall have paid to the Exchange Agent any transfer and other taxes required by reason of the payment or issuance of the Merger Consideration to a person other than the registered holder of the Certificate surrendered or shall have established to the satisfaction of the Exchange Agent that such tax either has been paid or is not applicable. In the event that any Certificate shall have been lost, stolen or destroyed, upon the holder's compliance with the replacement requirements established by the Exchange Agent, including, if necessary, the posting by the holder of a bond in customary amount as indemnity against any claim that may be made against it with respect to the Certificate, the Exchange Agent shall deliver in exchange for the lost, stolen or destroyed Certificate the applicable Merger Consideration payable in respect of the shares of Sears Common Stock or Kmart Common Stock, as the case may be, represented by the Certificate pursuant to this Article II.

(v) No interest shall be paid or accrued for the benefit of holders of the Certificates or Book-Entry Shares on the Merger Consideration payable in respect of the Certificates or Book-Entry Shares. Until surrendered as contemplated hereby, each Certificate or Book-Entry Share shall, after the Effective Time, represent for all purposes only the right to receive upon such surrender the applicable Merger Consideration as contemplated by this Article II, the issuance or payment of which (including any cash in lieu of fractional shares) shall be deemed to be the satisfaction in full of all rights pertaining to shares of Sears Common Stock converted in the Sears Merger and shares of Kmart Common Stock converted in the Kmart Merger.

(vi) At the Effective Time, the stock transfer books of Sears and Kmart shall be closed, and thereafter there shall be no further registration of transfers of shares of Sears Common Stock or Kmart Common Stock, respectively, that were outstanding prior to the Effective Time. After the Effective Time, Certificates or Book-Entry Shares presented to Sears or Kmart for transfer shall be canceled and exchanged for the consideration provided for, and in accordance with the procedures set forth, in this Article II.

(c) Distributions With Respect to Unexchanged Shares. No dividends or other distributions with respect to shares of Holdco Common Stock issuable with respect to the shares of Sears Common Stock or Kmart Common Stock shall be paid to the holder of any unsurrendered Certificates or Book-Entry Shares until those Certificates or Book-Entry Shares are surrendered as provided in this Article II. Upon surrender, there shall be issued and/or paid to the holder of the shares of Holdco Common Stock issued in exchange therefor, without interest, (A) at the time of surrender, the dividends or other distributions payable with respect to those shares of Holdco Common Stock with a record date on or after the date of the Effective Time and a payment date on or prior to the date of this surrender and not previously paid and (B) at the appropriate payment date, the dividends or other distributions payable with respect to those shares of Holdco Common Stock with a record date on or after the date of the Effective Time but with a payment date subsequent to surrender.

(d) No Fractional Shares. No certificates or scrip representing fractional shares of Holdco Common Stock shall be issued upon the surrender for exchange of Certificates or Book-Entry Shares evidencing Sears Common Stock, and such fractional share interests will

11

not entitle the owner thereof to vote or to any rights of a stockholder of Holdco. In lieu thereof, upon surrender of the applicable Certificates or Book-Entry Shares, Holdco shall pay each holder of Sears Common Stock an amount in cash equal to the product obtained by multiplying (a) the fractional share interest to which such holder (after taking into account all shares of Sears Common Stock held at the Effective Time and for which an election or non-election of the same type was made by such holder) would otherwise be entitled, by (b) the closing price on the NASDAQ National Market ("Nasdaq") for a share of Kmart Common Stock on the last trading day immediately preceding the Effective Time.

(e) Termination of Exchange Fund. Any portion of the Exchange Fund that remains undistributed to the stockholders of Sears and Kmart on the first anniversary of the Effective Time shall be delivered to Holdco, upon demand by Holdco, and any stockholders of Sears or Kmart who have not theretofore complied with this Article II shall thereafter look only to Holdco for payment of their claim for any part of the Merger Consideration, any cash in lieu of fractional shares of Holdco Common Stock and any dividends or distributions with respect to Holdco Common Stock.

(f) No Liability. None of Kmart, Sears or Holdco shall be liable to any holder of shares of Sears Common Stock or Kmart Common Stock for cash or shares of Holdco Common Stock (or dividends or distributions with respect thereto) from the Exchange Fund delivered to a public official pursuant to any applicable abandoned property, escheat or similar law.

(g) Withholding. Holdco and the Exchange Agent shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement to any holder of shares of Sears Common Stock, Dissenting Shares or shares of Kmart Common Stock such amounts as it is required to deduct and withhold with respect to the making of such payment under the Code and the rules and regulations promulgated thereunder, or any provision of state, local or foreign tax law. To the extent that amounts are so withheld by Holdco or the Exchange Agent, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the holder of the shares of Sears Common Stock, Dissenting Shares or shares of Kmart Common Stock in respect of which such deduction and withholding was made by Holdco or the Exchange Agent.

2.7. Sears Options, Etc. (a) The Board of Directors of Sears or the appropriate committee thereof shall take all action necessary so that:

(i) Each option or other right to acquire Sears Common Stock under any Sears Stock Plan (as defined in Section 3.1(b)) (a "Sears Stock Option") and any stock appreciation right granted under any Sears Stock Plan (a "Sears SAR"), which, in each case, is outstanding immediately prior to the Effective Time (whether vested or unvested) shall, as of the Effective Time, cease to represent an option or other right to acquire, or to be a stock appreciation right with respect to, as the case may be, shares of Sears Common Stock and shall instead represent the right to receive, as soon as practicable after the Effective Time, an amount of cash equal to the product of (i) the excess, if any, of (A) the Sears Option Cash-Out Amount of a share of Sears Common Stock over (B) the exercise price per share of such stock option or stock appreciation right multiplied by (ii) the

12

number of shares of Sears Common Stock subject to such stock option or stock appreciation right, less any required withholding taxes. For the purposes of this Section 2.7, the "Sears Option Cash-Out Amount" of a share of Sears Common Stock means the sum of (x) the Cash Percentage multiplied by the Cash Consideration, plus (y) the product of (1) the Stock Percentage (as defined below) multiplied by (2) the product of the Exchange Ratio multiplied by the closing price on Nasdaq for a share of Kmart Common Stock on the last trading day immediately preceding the Effective Time. The "Stock Percentage" means 100% minus the Cash Percentage.

(ii) Each issued and outstanding share of Sears Common Stock subject to vesting or other lapse restrictions pursuant to the Sears Stock Plans immediately prior to the Effective Time (a "Restricted Sears Share") shall, as of the Effective Time, vest and become free of such restrictions to the extent required by the terms thereof and shall be converted into the right to receive the Stock Consideration in accordance with Section 2.1(a)(ii) and the other provisions of this Article II; provided that any fractional shares resulting from such conversion shall be rounded to the nearest whole share; and provided, further, that all Holdco Common Stock issuable upon conversion of such Restricted Sears Shares shall be subject to the same terms (including the vesting terms taking into account any required acceleration thereof by virtue of the transactions contemplated hereby) as were applicable to such Restricted Sears Shares in respect of which they are issued; and

(iii) All stock-based awards, other than Sears Stock Options, Sears SARs and Restricted Sears Shares ("Other Sears Stock-Based Awards"), granted under any Sears Stock Plan and outstanding immediately prior to the Effective Time shall, as of the Effective Time, vest and become free of restrictions to the extent required by the terms thereof and shall be converted automatically at the Effective Time into a right or award with respect to a number of shares of Holdco Common Stock equal to the product of the number of shares of Sears Common Stock subject to such Other Sears Stock-Based Award multiplied by the Exchange Ratio; provided that all such converted stock-based rights or awards shall be subject to the same terms (including the vesting terms taking into account any required acceleration thereof by virtue of the transactions contemplated hereby) as were applicable to such Other Sears Stock-Based Awards in respect of which they are issued.

(b) As soon as practicable after the Effective Time, Holdco shall deliver to the holders of Restricted Sears Shares and Other Sears Stock-Based Awards appropriate notices setting forth such holders' rights pursuant to the Sears Stock Plans, and the agreements evidencing the grants of such Restricted Sears Shares and Other Sears Stock-Based Awards, as the case may be, shall continue in effect on the same terms and conditions (subject to the adjustments required by this Section 2.7 after giving effect to the Sears Merger and the assumption by Holdco as set forth above).

(c) Holdco shall take all corporate action necessary to reserve for issuance a sufficient number of shares of Holdco Common Stock for delivery with respect to Restricted Sears Shares and Other Sears Stock-Based Awards assumed by it in accordance with this Section 2.7. As of the Effective Time, Holdco shall file a registration statement on Form S-8 (or any successor or other appropriate form) with respect to the shares of Holdco Common Stock subject

13

to such Sears equity awards and shall maintain the effectiveness of such registration statement or registration statements (and maintain the current status of the prospectus or prospectuses contained therein) for so long as such Sears equity awards remain outstanding. With respect to those individuals who subsequent to the Sears Merger will be subject to the reporting requirements under Section 16(a) of the Exchange Act, where applicable, Holdco shall administer the Sears Stock Plans assumed pursuant to this Section 2.7 in a manner that complies with Rule 16b-3 promulgated under the Exchange Act to the extent the applicable Sears Stock Plan complied with such rule prior to the Sears Merger.

2.8. Kmart Options, Etc. (a) The Board of Directors of Kmart or the appropriate committee thereof shall take all action necessary so that:

(i) Each option or other right to acquire Kmart Common Stock granted under any Kmart Stock Plan (as defined in Section 3.2(b)) (a "Kmart Stock Option") that is outstanding immediately prior to the Effective Time shall, as of the Effective Time, cease to represent an option or other right to acquire shares of Kmart Common Stock and shall be converted, at the Effective Time, into an option to acquire, on the same terms and conditions as were applicable under the Kmart Stock Option (but taking into account any changes thereto provided for in the applicable Kmart Stock Plan, in any award agreement or in such option), that number of shares of Holdco Common Stock equal to the number of shares of Kmart Common Stock subject to such Kmart Stock Option immediately prior to the Effective Time, at a price per share equal to the per share exercise price specified in such Kmart Stock Option immediately prior to the Effective Time;

(ii) Each issued and outstanding share of Kmart Common Stock subject to vesting or other lapse restrictions pursuant to the Kmart Stock Plans immediately prior to the Effective Time (a "Restricted Kmart Share") shall, as of the Effective Time, vest and become free of such restrictions to the extent required by the terms thereof and shall be converted into the right to receive the Kmart Consideration in accordance with Section 2.5(a) and the other provisions of this Article II; provided that all Holdco Common Stock issuable upon conversion of such Restricted Kmart Shares shall be subject to the same terms (including the vesting terms) as were applicable to such Restricted Kmart Shares in respect of which they are issued; and

(iii) All stock-based awards, other than Kmart Stock Options and Restricted Kmart Shares ("Other Kmart Stock-Based Awards"), granted under any Kmart Stock Plan and outstanding immediately prior to the Effective Time shall, as of the Effective Time, vest and become free of restrictions to the extent required by the terms thereof and shall be converted automatically at the Effective Time into a right or award with respect to the same number of shares of Holdco Common Stock as they represented with respect to shares of Kmart Common Stock immediately prior to the Effective Time; provided that all such converted stock-based rights or awards shall be subject to the same terms (including the vesting terms) as were applicable to such Other Kmart Stock-Based Awards in respect of which they are issued.

(b) As soon as practicable after the Effective Time, Holdco shall deliver to the holders of Kmart Stock Options, Restricted Kmart Shares and Other Kmart Stock-Based Awards

14

appropriate notices setting forth such holders' rights pursuant to the Kmart Stock Plans, and the agreements evidencing the grants of such Kmart Stock Options, Restricted Kmart Shares and Other Kmart Stock-Based Awards, as the case may be, shall continue in effect on the same terms and conditions (subject to the adjustments required by this Section 2.8 after giving effect to the Kmart Merger and the assumption by Holdco as set forth above).

(c) Holdco shall take all corporate action necessary to reserve for issuance a sufficient number of shares of Holdco Common Stock for delivery with respect to Kmart Stock Options, Restricted Kmart Shares and Other Kmart Stock-Based Awards assumed by it in accordance with this Section 2.8. As of the Effective Time, if requested by Kmart prior to the Effective Time, Holdco shall file a registration statement on Form S-8 (or any successor or other appropriate form) with respect to the shares of Holdco Common Stock subject to such Kmart equity awards and shall maintain the effectiveness of such registration statement or registration statements (and maintain the current status of the prospectus or prospectuses contained therein) for so long as such Kmart equity awards remain outstanding. With respect to those individuals who subsequent to the Kmart Merger will be subject to the reporting requirements under Section 16(a) of the Exchange Act, where applicable, Holdco shall administer the Kmart Stock Plans assumed pursuant to this Section 2.8 in a manner that complies with Rule 16b-3 promulgated under the Exchange Act to the extent the applicable Kmart Stock Plan complied with such rule prior to the Kmart Merger.

ARTICLE III
REPRESENTATIONS AND WARRANTIES

3.1. Representations and Warranties of Sears. Except (x) with respect to any subsection of this Section 3.1, as set forth in the correspondingly identified subsection of the disclosure schedule delivered by Sears to Kmart concurrently herewith (the "Sears Disclosure Schedule") (it being understood by the parties that any information disclosed in one subsection of the Sears Disclosure Schedule shall be deemed to be disclosed for purposes of each other subsection of the Sears Disclosure Schedule to which the relevance of such information is reasonably apparent) or (y) as disclosed in the Sears SEC Documents (as defined below) filed with the SEC prior to the date hereof, Sears represents and warrants to Kmart as follows:

(a) Organization, Standing and Power. Each of Sears and its Significant Subsidiaries (as defined below) is a corporation or other entity duly organized, validly existing and, if applicable, in good standing under the laws of its jurisdiction of incorporation, has all requisite power and authority to own, lease and operate its properties and to carry on its business as now being conducted, and is duly qualified and, if applicable, in good standing to do business in each jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification necessary, in each case, other than as would not, either individually or in the aggregate, reasonably be expected to have a material adverse effect on Sears. The Restated Certificate of Incorporation and By-laws of Sears, copies of which have been made available to Kmart, are true, complete and correct copies of such documents as in effect on the date hereof. As used in this Agreement:

(i) the word "Subsidiary" when used with respect to any party means any corporation or other organization, whether incorporated or unincorporated, (A) of which such

15

party or any other Subsidiary of such party is a general partner (excluding partnerships, the general partnership interests of which held by such party or any Subsidiary of such party do not have a majority of the voting interests in such partnership), or (B) at least a majority of the stock or other equity interests of which that have by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation or other organization is directly or indirectly owned or controlled by such party or by any one or more of its Subsidiaries, or by such party and one or more of its Subsidiaries;

(ii) a "Significant Subsidiary" means any Subsidiary of Sears or Kmart, as the case may be, that constitutes a Significant Subsidiary of such party within the meaning of Rule 1-02 of Regulation S-X of the Securities and Exchange Commission (the "SEC");

(iii) any reference to any event, change or effect being "material" with respect to any entity means an event, change or effect that is material in relation to the financial condition businesses or results of operations of such entity and its Subsidiaries taken as a whole; and

(iv) the term "material adverse effect" means, with respect to any entity, a material adverse effect on the financial condition, businesses or results of operations of such entity and its Subsidiaries taken as a whole; provided that, for purposes of this clause (iii) above and this clause (iv) the following shall not be deemed "material" or to have a "material adverse effect": any change or event caused by or resulting from (A) changes, after the date hereof, in prevailing economic or market conditions in the United States or elsewhere (except to the extent those changes have a materially disproportionate effect on such entity and its Subsidiaries relative to other similarly situated participants in the industries in which they operate), (B) changes or events, after the date hereof, affecting the industries in which they operate generally (except to the extent those changes or events have a materially disproportionate effect on such entity and its Subsidiaries relative to other similarly situated participants in the industries in which they operate), (C) changes, after the date hereof, in generally accepted accounting principles or requirements applicable to such entity and its Subsidiaries, (D) changes, after the date hereof, in laws, rules or regulations of general applicability or interpretations thereof by any Governmental Entity (as defined in Section 3.1(c)(iii)), (E) the execution, delivery and performance of this Agreement or the Support Agreement or the consummation of any transaction contemplated hereby or thereby or the announcement thereof, or (F) any outbreak of major hostilities in which the United States is involved or any act of terrorism within the United States or directed against its facilities or citizens wherever located.

(b) Capital Structure. (i) The authorized capital stock of Sears consists of 1,000,000,000 shares of Sears Common Stock and 50,000,000 preferred shares, par value $1.00 per share (the "Sears Preferred Stock"), of which 3,250,000 shares of Sears Preferred Stock are designated 8.88% Preferred Shares and 7,187,500 shares of Sears Preferred Stock are designated Series A Mandatorily Exchangeable Preferred Shares. As of the close of business on October 30, 2004 (A) 430,615,224 shares of Sears Common Stock were issued (including shares held in treasury), 33,062,583 shares of Sears Common Stock were reserved for issuance upon the exercise or payment of outstanding stock options, stock units or other awards or pursuant to any plans of Sears under which any award, grant or other form of compensation issuable in the form of, or based in whole or in part on the value of, Sears Common Stock, has been conferred on any

16

individual or entity (such stock options, units and other awards and plans, collectively, the "Sears Stock Plans"), and 223,800,540 shares of Sears Common Stock were held by Sears in its treasury or by its Subsidiaries; and (B) no shares of Sears Preferred Stock were outstanding or reserved for issuance. All outstanding shares of Sears Common Stock have been duly authorized and validly issued and are fully paid and, except as set forth in the NYBCL, non-assessable and are not subject to preemptive rights.

(ii) No bonds, debentures, notes or other indebtedness generally having the right to vote on any matters on which stockholders may vote ("Voting Debt") of Sears are issued or outstanding.

(iii) Except for (A) this Agreement, (B) Sears Stock Options, Sears SARs and Other Sears Stock-Based Awards that represented, as of October 30, 2004, the right to acquire up to an aggregate of 31,998,113 shares of Sears Common Stock, and (C) agreements entered into and securities and other instruments issued after the date hereof as permitted by Section 4.1, there are no options, warrants, calls, rights, commitments or agreements of any character to which Sears or any Subsidiary of Sears is a party or by which it or any such Subsidiary is bound obligating Sears or any Subsidiary of Sears to issue, deliver or sell, or cause to be issued, delivered or sold, additional shares of capital stock or any Voting Debt or stock appreciation rights of Sears or of any Subsidiary of Sears or obligating Sears or any Subsidiary of Sears to grant, extend or enter into any such option, warrant, call, right, commitment or agreement. There are no outstanding contractual obligations of Sears or any of its Subsidiaries (A) to repurchase, redeem or otherwise acquire any shares of capital stock of Sears or any of its Subsidiaries, or (B) pursuant to which Sears or any of its Subsidiaries is or could be required to register shares of Sears Common Stock or other securities under the Securities Act of 1933, as amended (the "Securities Act"), except any such contractual obligations entered into after the date hereof as permitted by Section 4.1.

(iv) Since October 30, 2004, except as permitted by Section 4.1, Sears has not (A) issued or permitted to be issued any shares of capital stock, stock appreciation rights or securities exercisable or exchangeable for or convertible into shares of capital stock of Sears or any of its Subsidiaries, other than pursuant to and as required by the terms of the Sears Stock Plans and any employee stock options and other awards issued under the Sears Stock Plans prior to the date hereof (or issued after the date hereof in compliance with Sections 4.1(c) and 4.1(k))); (B) repurchased, redeemed or otherwise acquired, directly or indirectly through one or more Sears Subsidiaries, any shares of capital stock of Sears or any of its Subsidiaries; or (C) declared, set aside, made or paid to the stockholders of Sears dividends or other distributions on the outstanding shares of capital stock of Sears, other than regular quarterly cash dividends on the Sears Common Stock at an amount per share not in excess of the regular quarterly cash dividend most recently declared by Sears prior to the date hereof.

(v) The Sears employee stock purchase plan (A) will continue until the Closing Date, and no further purchase periods will commence thereafter, and (B) will be terminated by Sears immediately prior to and effective as of the Closing Date. The optional cash purchase (but not the dividend reinvestment) feature of any Sears dividend reinvestment and stock purchase plan will be terminated within 30 days of a written request by Kmart unless all

17

such optional cash purchases are satisfied through open market purchases of Sears Common Stock and not through new issuances of Sears Common Stock by Sears.

(c) Authority. (i) Sears has all requisite corporate power and authority to enter into this Agreement and, subject in the case of the consummation of the Sears Merger to the adoption of this Agreement by the Required Sears Vote, to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate action on the part of Sears, subject in the case of the consummation of the Sears Merger to the adoption of this Agreement by the Required Sears Vote. This Agreement has been duly executed and delivered by Sears and constitutes a valid and binding obligation of Sears, enforceable against Sears in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equitable principles.

(ii) The execution and delivery of this Agreement does not, and the consummation of the transactions contemplated hereby will not, (A) conflict with, or result in any violation of, or constitute a default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or the loss of a material benefit under, or the creation of a lien, pledge, security interest, charge or other encumbrance on any assets (any such conflict, violation, default, right of termination, cancellation or acceleration, loss or creation, a "Violation") pursuant to, any provision of the Restated Certificate of Incorporation or By-laws of Sears or equivalent governing documents of any Significant Subsidiary of Sears, or (B) subject to obtaining or making the consents, approvals, orders, authorizations, registrations, declarations and filings referred to in paragraph (iii) below, result in any Violation of any loan or credit agreement, note, mortgage, indenture, lease, Sears Benefit Plan (as defined in Section 3.1(j)) or other agreement, obligation, instrument, permit, concession, franchise, license, judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Sears or any Subsidiary of Sears or their respective properties or assets, which Violation, individually or in the aggregate, would reasonably be expected to (x) have a material adverse effect on Sears or (y) prevent, materially delay or materially impede Sears's ability to perform its obligations hereunder or to consummate the transactions contemplated hereby.

(iii) No consent, approval, order or authorization of, or registration, declaration or filing with, any court, administrative agency or commission or other governmental authority or instrumentality, domestic or foreign, or self-regulatory organization (a "Governmental Entity") is required by or with respect to Sears or any Subsidiary of Sears in connection with the execution and delivery of this Agreement by Sears or the consummation by Sears of the transactions contemplated hereby, the failure to make or obtain that, individually or in the aggregate, would reasonably be expected to (x) have a material adverse effect on Sears or (y) prevent, materially delay or materially impede Sears's ability to perform its obligations hereunder or to consummate the transactions contemplated hereby, except for (A) the filing with the SEC of (1) the Joint Proxy Statement/Prospectus and (2) such reports under Sections 13(a), 13(d), 13(g) and 16(a) of the Exchange Act, as may be required in connection with this Agreement and the transactions contemplated hereby and the obtaining from the SEC of such orders as may be required in connection therewith, (B) the filing of the Sears Certificate of

18

Merger with the applicable Governmental Entities required by the NYBCL, (C) notices or filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), and (D) such authorizations required pursuant the Competition Act (Canada) and the Investment Canada Act of 1985 (Canada) (collectively, the "Canadian Antitrust Laws" and, together with the HSR Act, the "Applicable Antitrust Laws").

(d) SEC Documents; Undisclosed Liabilities. (i) Sears has filed all required reports, schedules, registration statements and other documents with the SEC since December 29, 2002 (the "Sears SEC Documents"). As of their respective dates of filing with the SEC (or, if amended or superseded by a filing prior to the date hereof, as of the date of such filing), the Sears SEC Documents complied in all material respects with the requirements of the Securities Act or the Exchange Act, as the case may be, and the rules and regulations of the SEC thereunder applicable to such Sears SEC Documents, and none of the Sears SEC Documents when filed contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. The financial statements of Sears included in the Sears SEC Documents complied as to form, as of their respective dates of filing with the SEC, in all material respects with all applicable accounting requirements and with the published rules and regulations of the SEC with respect thereto (except, in the case of unaudited statements, as permitted by Form 10-Q of the SEC), have been prepared in accordance with generally accepted accounting principles applied on a consistent basis during the periods involved (except as may be disclosed therein) and fairly present in all material respects the consolidated financial position of Sears and its consolidated Subsidiaries and the consolidated results of operations, changes in stockholders' equity and cash flows of such companies as of the dates and for the periods shown. As of the date hereof, there are no outstanding written comments from the SEC with respect to any of the Sears SEC Documents.

(ii) Except for (A) those liabilities that are appropriately reflected or reserved for in the consolidated financial statements of Sears included in its Quarterly Report on Form 10-Q for the fiscal quarter ended October 2, 2004, as filed with the SEC prior to the date hereof, (B) liabilities incurred since October 2, 2004 in the ordinary course of business consistent with past practice, (C) liabilities that would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Sears, (D) liabilities incurred pursuant to the transactions contemplated by, or permitted by, this Agreement, and (E) liabilities or obligations discharged or paid in full prior to the date hereof in the ordinary course of business consistent with past practice, Sears and its Subsidiaries do not have, any liabilities or obligations of any nature whatsoever (whether accrued, absolute, contingent or otherwise) that are required to be reflected in Sears's financial statements in accordance with generally accepted accounting principles.

(e) Information Supplied. None of the information supplied or to be supplied by Sears for inclusion or incorporation by reference in (i) the Form S-4 will, at the time the Form S-4 is filed with the SEC and at the time it becomes effective under the Securities Act, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, and (ii) the Joint Proxy Statement/Prospectus will, at the date of mailing to stockholders and at the times of the meetings of stockholders to be held in connection with the Mergers, contain any untrue statement of a

19

material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. The Proxy Statement relating to the Sears Stockholders Meeting will comply as to form in all material respects with the requirements of the Exchange Act and the rules and regulations of the SEC thereunder. No representation or warranty is made by Sears with respect to statements made or incorporated by reference therein based on information supplied by Kmart for inclusion or incorporation by reference in the Joint Proxy Statement/Prospectus.

(f) Compliance with Applicable Laws and Reporting Requirements. (i) Sears and its Subsidiaries hold all permits, licenses, variances, exemptions, orders and approvals of all Governmental Entities that are material to the operation of the businesses of Sears and its Subsidiaries, taken as a whole (the "Sears Permits"), and Sears and its Subsidiaries are and have been in compliance with the terms of the Sears Permits and all applicable laws and regulations, except where the failure so to hold or comply, individually or in the aggregate, would not reasonably be expected to have a material adverse effect on Sears. The businesses of Sears and its Subsidiaries are not being and have not been conducted in violation of any law, ordinance or regulation of any Governmental Entity (including the Sarbanes-Oxley Act of 2002), except for violations that, individually or in the aggregate, do not have, and would not reasonably be expected to have, a material adverse effect on Sears. To the knowledge of Sears, no investigation by any Governmental Entity with respect to Sears or any of its Subsidiaries is pending or threatened, other than, in each case, those the outcome of which, individually or in the aggregate, would not reasonably be expected to have a material adverse effect on Sears.

(ii) Sears and its Subsidiaries have designed and maintain a system of internal controls over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act) sufficient to provide reasonable assurances regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Sears (A) has designed and maintains disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) to ensure that material information required to be disclosed by Sears in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and is accumulated and communicated to Sears's management as appropriate to allow timely decisions regarding required disclosure, and (B) has disclosed, based on its most recent evaluation of such disclosure controls and procedures prior to the date hereof, to Sears's auditors and the audit committee of Sears's Board of Directors (1) any significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting that are reasonably likely to adversely affect in any material respect Sears's ability to record, process, summarize and report financial information and (2) any fraud, whether or not material, that involves management or other employees who have a significant role in Sears's internal controls over financial reporting. Sears has made available to Kmart a summary of any such disclosure made by management to Sears's auditors and audit committee since January 1, 2002.

(g) Legal Proceedings. There is no claim, suit, action, investigation or other demand or proceeding (whether judicial, arbitral, administrative or other) pending or, to the knowledge of Sears, threatened, against or affecting Sears or any Subsidiary of Sears that would reasonably be expected to have, individually or in the aggregate, a material adverse effect on

20

Sears, nor is there any judgment, decree, injunction, rule or order of any Governmental Entity or arbitrator outstanding against Sears or any Subsidiary of Sears having or that would reasonably be expected to have, individually or in the aggregate, a material adverse effect on Sears or on Holdco after the Effective Time. No claim, suit, action, investigation, demand or proceeding alleging that Sears or any of its Subsidiaries is liable for asbestos-related matters, individually or in the aggregate, has, and none of them would reasonably be likely to have, a material adverse effect on Sears.

(h) Taxes. Sears and each of its Subsidiaries have filed all material tax returns required to be filed by any of them and have paid (or Sears has paid on their behalf) all taxes shown as due on such returns, and the most recent financial statements contained in the Sears SEC Documents reflect an adequate reserve, in accordance with generally accepted accounting principles, for all taxes payable by Sears and its Subsidiaries accrued through the date of such financial statements. No material deficiencies or other claims for any taxes have been proposed, asserted or assessed against Sears or any of its Subsidiaries that are not adequately reserved for. For the purpose of this Agreement, the term "tax" (including, with correlative meaning, the terms "taxes" and "taxable") shall mean (i) all Federal, state, local and foreign income, profits, franchise, gross receipts, payroll, sales, employment, use, property, withholding, excise, occupancy and other taxes, duties or assessments of any nature whatsoever, together with all interest, penalties and additions imposed with respect to such amounts, (ii) liability for the payment of any amounts of the type described in clause (i) as a result of being or having been a member of an affiliated, consolidated, combined or unitary group, and (iii) liability for the payment of any amounts as a result of being party to any tax sharing agreement or as a result of any express or implied obligation to indemnify any other person with respect to the payment of any amounts of the type described in clause (i) or (ii). Neither Sears nor any of its Subsidiaries has taken any action or knows of any fact, agreement, plan or other circumstance that would reasonably be expected to prevent the exchange of Sears Common Stock and Kmart Common Stock for Holdco Common Stock pursuant to the Mergers, taken together, from qualifying as a transaction described in Section 351 of the Code.

(i) Certain Agreements. Except for this Agreement, neither Sears nor any of its Subsidiaries is a party to or bound by any contract, arrangement, commitment or understanding (i) with respect to the employment of any directors or executive officers, or with any consultants that are natural persons, involving the payment of $2.0 million or more per annum, (ii) that is a "material contract" (as such term is defined in Item 601(b)(10) of Regulation S-K of the SEC), (iii) that limits the ability of Sears or any of its Subsidiaries to compete in any line of business, in any geographic area or with any person, or that requires referrals of business and, in each case, which limitation or requirement would reasonably be expected to be material to Sears and its Subsidiaries taken as a whole, (iv) in the case of a Sears Benefit Plan, any of the benefits of which will be increased, or the vesting of the benefits of which will be accelerated, by the occurrence of any of the transactions contemplated by this Agreement, or the value of any of the benefits of which will be calculated on the basis of any of the transactions contemplated by this Agreement, or (v) that would prevent, materially delay or materially impede the consummation of any of the transactions contemplated by this Agreement. All contracts, arrangements, commitments or understandings of the type described in this Section 3.1(i) (collectively referred to herein as the "Sears Contracts") are valid and in full force and effect, except to the extent they have previously expired in accordance with their terms or if the failure

21

to be in full force and effect, individually or in the aggregate, would not reasonably be expected to have a material adverse effect on Sears. Neither Sears nor any of its Subsidiaries has, and to the knowledge of Sears, none of the other parties thereto have, violated any provision of, or committed or failed to perform any act, and no event or condition exists, which with or without notice, lapse of time or both would constitute a default under the provisions of, any Sears Contract, except in each case for those violations and defaults that, individually or in the aggregate, would not reasonably be expected to result in a material adverse effect on Sears.

(j) Benefit Plans. (i) With respect to each employee benefit plan (including any "employee benefit plan", as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), including multiemployer plans within the meaning of ERISA Section 3(37)) and all stock purchase, stock option, severance, employment, change-in-control, fringe benefit, collective bargaining, bonus, incentive, deferred compensation and other material employee benefit plans, agreements, programs, policies or other arrangements, whether or not subject to ERISA, whether formal or informal, oral or written, legally binding or not (all the foregoing being herein called "Benefit Plans"), under which any employee or former employee of Sears or any of its Subsidiaries has any present or future right to benefits, maintained or contributed to by Sears or any of its Subsidiaries or under which Sears or any of its Subsidiaries has any present or future liability (the "Sears Benefit Plans"), Sears has made available to Kmart a true and correct copy of (A) the most recent annual report (Form 5500) filed with the IRS, if any, (B) such Sears Benefit Plan, (C) each trust agreement relating to such Sears Benefit Plan, if any, (D) the most recent summary plan description for each Sears Benefit Plan for which a summary plan description is required by ERISA, (E) the most recent actuarial report or valuation relating to a Sears Benefit Plan subject to Title IV of ERISA, and (F) the most recent determination letter issued by the IRS with respect to any Sears Benefit Plan qualified under Section 401(a) of the Code, if any.

(ii) With respect to the Sears Benefit Plans, individually and in the aggregate, no event has occurred and, to the knowledge of Sears, there exists no condition or set of circumstances, in connection with which Sears or any of its Subsidiaries could be subject to any liability that would reasonably be expected to have a material adverse effect on Sears under ERISA, the Code or any other applicable law.

(iii) True and complete copies of the Sears Stock Plans as in effect on the date hereof have been provided or made available to Kmart.

(iv) No Sears Benefit Plan or Sears Stock Plan exists that could result in the payment to any present or former employee of Sears or any Subsidiary of Sears of any money or other property or accelerate or provide any other rights or benefits to any present or former employee of Sears or any Subsidiary of Sears, in each case, as a result of the transactions contemplated by this Agreement, whether or not such payment would constitute a parachute payment within the meaning of Code Section 280G.

(k) Subsidiaries. Exhibit 21 to Sears's Annual Report on Form 10-K for the fiscal year ended January 3, 2004 filed with the SEC prior to the date hereof includes all the Subsidiaries of Sears that are Significant Subsidiaries. All of the shares of capital stock of each of the Subsidiaries held by Sears or by another Subsidiary of Sears are fully paid and

nonassessable and are owned by Sears or a Subsidiary of Sears free and clear of any claim, lien or encumbrance.

(1) Absence of Certain Changes or Events. Except as disclosed in the Sears SEC Documents filed prior to the date hereof (or, in the case of actions taken after the date hereof, except as permitted by Section 4.1), since October 2, 2004, (i) Sears and its Subsidiaries have conducted their respective businesses in the ordinary course consistent with their past practices and (ii) there has not been any change, circumstance or event (including any event involving a prospective change) that has had, or would reasonably be expected to have, a material adverse effect on Sears.

(m) Board Approval. The Board of Directors of Sears, by resolutions duly adopted by unanimous vote of those voting at a meeting duly called and held (the "Sears Board Approval"), has (i) adopted this Agreement, and (ii) recommended that the stockholders of Sears adopt this Agreement and directed that such matter be submitted for consideration by Sears stockholders at the Sears Stockholders Meeting (as defined in Section 5.1(b)). The Sears Board Approval constitutes approval of this Agreement and the Sears Merger for purposes of Section 912 of the NYBCL such that no other action or approval of the Board of Directors or any person is needed to exempt this Agreement, the Support Agreement, the Sears Merger or the other transactions contemplated hereby from the restrictions of Section 912 of the NYBCL and of any other transaction effected by Kmart or any of its affiliates for purposes of Section 912 of the NYBCL. To the knowledge of Sears, except for Section 912 of the NYBCL (which has been rendered inapplicable), no "moratorium," "control share," "fair price" or other anti-takeover law or regulation is applicable to this Agreement, the Sears Merger, or the other transactions contemplated hereby.

(n) Vote Required. The affirmative vote of the holders of two-thirds of the outstanding shares of Sears Common Stock to adopt this Agreement (the "Required Sears Vote") is the only vote of the holders of any class or series of Sears capital stock necessary to adopt this Agreement.

(o) Properties. Except as would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on Sears, Sears or one of its Subsidiaries (i) has good and marketable title to all the properties and assets reflected in the latest audited balance sheet included in the Sears SEC Documents as being owned by Sears or one of its Subsidiaries or acquired after the date thereof that are material to Sears's business on a consolidated basis (except properties sold or otherwise disposed of since the date thereof in the ordinary course of business), free and clear of all claims, liens, charges, security interests or encumbrances of any nature whatsoever, except (A) statutory liens securing payments not yet due, (B) such imperfections or irregularities of title, claims, liens, charges, security interests, easements, covenants and other restrictions or encumbrances as do not materially affect the use of the properties or assets subject thereto or affected thereby or otherwise materially impair business operations at such properties and (C) mortgages, or deeds of trust, security interests or other encumbrances on title related to indebtedness reflected on the consolidated financial statements of Sears (such liens, imperfections and irregularities in clauses (A),(B) and (C), "Sears Permitted Liens"), and (ii) is the lessee of all leasehold estates reflected in the latest audited financial statements included in the Sears SEC Documents or acquired after the date

23

thereof that are material to its business on a consolidated basis (except for leases that have expired by their terms since the date thereof or been assigned, terminated or otherwise disposed of in the ordinary course of business consistent with past practice) and is in possession of the properties purported to be leased thereunder, and each such lease is valid without default thereunder by the lessee or, to Sears's knowledge, the lessor.

(p) Intellectual Property. Except as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Sears, (i) Sears or its Subsidiaries own free and clear of all claims, liens, charges, security interests or encumbrances of any nature whatsoever other than Sears Permitted Liens or have a valid license to use all material patents, inventions, copyrights, software, trademarks, service marks, domain names, trade names and other intellectual property (including any registrations or applications for registration of any of the foregoing) (collectively, the "Sears Intellectual Property") necessary to carry on their business as currently conducted, (ii) the Sears Intellectual Property does not infringe, imitate, misappropriate, dilute, violate or otherwise derogate or make unauthorized use of ("Infringe") the intellectual property rights of third parties and is not being Infringed by any third parties, (iii) to the knowledge of Sears, no facts or circumstances exist that would affect the validity, substance or existence of, or Sears's rights in, the Sears Intellectual Property, (iv) Sears and its Subsidiaries have taken reasonable actions to protect and maintain the Sears Intellectual Property, including Sears Intellectual Property that is confidential in nature, and (v) there are no claims, suits or other actions, and to the knowledge of Sears, no claim, suit or other action is threatened, that seek to limit or challenge the validity, enforceability, ownership, or right to use, sell or license the Sears Intellectual Property, nor does Sears know of any valid basis therefor.

(q) Environmental Matters. Except as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Sears, (i) Sears and its Subsidiaries hold, and are currently, and have been for the last five years, in continuous compliance with all applicable permits, licenses, registrations and other governmental authorizations required under all foreign, federal, state and local statutes, rules, regulations, ordinances, orders, decrees and common law relating in any manner to contamination, pollution or protection of human health, natural resources or the environment ("Environmental Laws") for Sears to conduct its operations ("Environmental Permits"), and are currently, and have been for the last five years, otherwise in continuous compliance with all applicable Environmental Laws and, to the knowledge of Sears, there is no condition that would reasonably be expected to violate applicable Environmental Laws or applicable Environmental Permits in the future, (ii) to Sears's knowledge, Sears and its Subsidiaries have not received any written notice, claim, demand, action, suit, complaint, proceeding or other communication by any person alleging any violation of, or any actual or potential liability under, any Environmental Laws (an "Environmental Claim"), and Sears has no knowledge of any pending or threatened Environmental Claim, (iii) no hazardous, dangerous or toxic substance, including petroleum (including crude oil or any fraction thereof), asbestos and asbestos-containing materials, polychlorinated biphenyls, radon, fungus, mold, urea-formaldehyde insulation and any other material that is regulated pursuant to any Environmental Laws or that would reasonably be expected to result in liability under any Environmental Laws have been generated, transported, treated, stored, installed, disposed of, arranged to be disposed of, released or threatened to be released at, on, from or under any of the properties or facilities currently or formerly owned, leased or otherwise used by Sears or its Subsidiaries, in violation of, or in a manner or to a

location that would reasonably be expected to give rise to liability to Sears or its Subsidiaries under or relating to, any Environmental Laws, and (iv) Sears and its Subsidiaries have not assumed, contractually or by operation of law, any liabilities or obligations under or relating to any Environmental Laws.

(r) Labor and Employment Matters. Except as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Sears, (i) there is no labor strike, dispute, slowdown, stoppage or lockout actually pending or, to the knowledge of Sears, threatened against Sears or any of its Subsidiaries, (ii) no union organizing campaign with respect to the employees of Sears or its Subsidiaries is underway or, to Sears's knowledge, threatened, (iii) there is no unfair labor practice charge or complaint against Sears or its Subsidiaries pending or, to the knowledge of Sears, threatened before the National Labor Relations Board or any similar state or foreign agency, (iv) there is no grievance pending relating to any collective bargaining agreement or other grievance procedure, and (v) no charges with respect to or relating to Sears or its Subsidiaries are pending before the Equal Employment Opportunity Commission or any other Governmental Entity responsible for the prevention of unlawful employment practices.

(s) Brokers or Finders. No agent, broker, investment banker, financial advisor or other firm or person except Morgan Stanley & Co. Incorporated ("Morgan Stanley") is or will be entitled to any broker's or finder's fee or any other similar commission or fee in connection with any of the transactions contemplated by this Agreement. Sears has disclosed to Kmart all material terms of the engagement of Morgan Stanley.

(t) Opinion of Sears Financial Advisor. Sears has received the opinion of Morgan Stanley, dated the date hereof, to the effect that the Sears Consideration is fair, from a financial point of view, to Sears and the holders of Sears Common Stock.

3.2. Representations and Warranties of Kmart. Except (x) with respect to any subsection of this Section 3.2, as set forth in the correspondingly identified subsection of the disclosure schedule delivered by Kmart to Sears concurrently herewith (the "Kmart Disclosure Schedule") (it being understood by the parties that any information disclosed in one subsection of the Sears Disclosure Schedule shall be deemed to be disclosed for purposes of each other subsection of the Sears Disclosure Schedule to which the relevance of such information is reasonably apparent), or (y) as disclosed in the Kmart SEC Documents (as defined below) filed with the SEC prior to the date hereof, Kmart represents and warrants to Sears as follows:

(a) Organization, Standing and Power. Each of Kmart and the Significant Subsidiaries of Kmart is a corporation or other entity duly organized, validly existing and, if applicable, in good standing under the laws of its jurisdiction of incorporation, has all requisite power and authority to own, lease and operate its properties and to carry on its business as now being conducted, and is duly qualified and, if applicable, in good standing to do business in each jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification necessary, in each case, other than as would not, either individually or in the aggregate, reasonably be expected to have a material adverse effect on Kmart. The Amended and Restated Certificate of Incorporation and By-laws of Kmart, copies of which have been made available to Sears, are true, complete and correct copies of such documents as in effect on

25

the date hereof. Each of Holdco and the Merger Subs shall be, as of the Closing, a corporation duly organized, validly existing and in good standing in its jurisdiction of incorporation.

(b) Capital Structure. (i) The authorized capital stock of Kmart consists of 500,000,000 shares of Kmart Common Stock, and 20,000,000 shares of preferred stock, par value $0.01 per share ("Kmart Preferred Stock"). As of the close of business on November 16, 2004, (A) 89,677,509 shares of Kmart Common Stock were issued (including shares held in treasury), 1,318,321 shares of Kmart Common Stock were reserved for issuance upon the exercise or payment of outstanding stock options, stock units or other awards or pursuant to any plans of Kmart under which any award, grant or other form of compensation issuable in the form of, or based in whole or in part on the value of, Kmart Common Stock has been conferred on any individual or entity (such stock options, units and other awards and plans, collectively, the "Kmart Stock Plans"), and 499,506 shares of Kmart Common Stock were held by Kmart in its treasury or by its Subsidiaries; and (B) no shares of Kmart Preferred Stock were outstanding or reserved for issuance. All outstanding shares of Kmart Common Stock have been duly authorized and validly issued and are fully paid and non-assessable and are not subject to preemptive rights. The shares of Holdco Common Stock to be issued pursuant to or as specifically contemplated by this Agreement (including as contemplated by Sections 2.7 and 2.8 hereof) will have been duly authorized as of the Effective Time and, if and when issued in accordance with the terms hereof, will be validly issued, fully paid and non-assessable and will not be subject to preemptive rights.

(ii) No Voting Debt of Kmart is issued or outstanding.

(iii) Except for (A) this Agreement, (B) Kmart Stock Options and Other Kmart Stock-Based Awards that represented, as of November 16, 2004, the right to acquire up to an aggregate of 1,318,321 shares of Kmart Common Stock, and (C) agreements entered into and securities and other instruments issued after the date hereof as permitted by Section 4.2, there are no options, warrants, calls, rights, commitments or agreements of any character to which Kmart or any Subsidiary of Kmart is a party or by which it or any such Subsidiary is bound obligating Kmart or any Subsidiary of Kmart to issue, deliver or sell, or cause to be issued, delivered or sold, additional shares of capital stock or any Voting Debt or stock appreciation rights of Kmart or of any Subsidiary of Kmart or obligating Kmart or any Subsidiary of Kmart to grant, extend or enter into any such option, warrant, call, right, commitment or agreement. There are no outstanding contractual obligations of Kmart or any of its Subsidiaries (A) to repurchase, redeem or otherwise acquire any shares of capital stock of Kmart or any of its Subsidiaries or (B) pursuant to which Kmart or any of its Subsidiaries is or could be required to register shares of Kmart Common Stock or other securities under the Securities Act, except any such contractual obligations entered into after the date hereof as permitted by Section 4.2.

(iv) Since November 16, 2004, except as permitted by Section 4.2, Kmart has not (A) issued or permitted to be issued any shares of capital stock, stock appreciation rights or securities exercisable or exchangeable for or convertible into shares of capital stock, of Kmart or any of its Subsidiaries, other than pursuant to and as required by the terms of the Kmart Stock Plans and any employee stock options and other awards issued under the Kmart Stock Plans prior to the date hereof (or issued after the date hereof in compliance with Sections 4.2(c) and 4.2(k)); (B) repurchased, redeemed or otherwise acquired, directly or indirectly through one or

26

more Kmart Subsidiaries, any shares of capital stock of Kmart or any of its Subsidiaries; or (C) declared, set aside, made or paid to the stockholders of Kmart dividends or other distributions on the outstanding shares of capital stock of Kmart.

(c) Authority. (i) Kmart has all requisite corporate power and authority to enter into this Agreement and, except for the adoption of this Agreement by the Required Kmart Vote, to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate action on the part of Kmart, except for the adoption of this Agreement by the Required Kmart Vote. This Agreement has been duly executed and delivered by Kmart and constitutes a valid and binding obligation of Kmart, enforceable against Kmart in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equitable principles.

(ii) The execution and delivery of this Agreement does not, and the consummation of the transactions contemplated hereby will not, (A) result in any Violation pursuant to any provision of the Amended and Restated Certificate of Incorporation or By-laws of Kmart or equivalent governing documents of any Significant Subsidiary of Kmart, or (B) subject to obtaining or making the consents, approvals, orders, authorizations, registrations, declarations and filings referred to in paragraph (iii) below, result in any Violation of any loan or credit agreement, note, mortgage, indenture, lease, Kmart Benefit Plan (as defined in Section 3.2(j)) or other agreement, obligation, instrument, permit, concession, franchise, license, judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Kmart or any Subsidiary of Kmart or their respective properties or assets which Violation, individually or in the aggregate, would reasonably be expected to (x) have a material adverse effect on Kmart or (y) prevent, materially delay or materially impede Kmart's ability to perform its obligations hereunder or to consummate the transactions contemplated hereby.

(iii) No consent, approval, order or authorization of, or registration, declaration or filing with, any Governmental Entity is required by or with respect to Kmart or any Subsidiary of Kmart in connection with the execution and delivery of this Agreement by Kmart or the consummation by Kmart of the transactions contemplated hereby, the failure to make or obtain that, individually or in the aggregate, would reasonably be expected to (x) have a material adverse effect on Kmart or (y) prevent, materially delay or materially impede Kmart's ability to perform its obligations hereunder or to consummate the transactions contemplated hereby, except for (A) the filing with the SEC of the Joint Proxy Statement/Prospectus, the Form S-4 and such reports under Sections 12, 13(a), 13(d), 13(g) and 16(a) of the Exchange Act as may be required in connection with this Agreement and the transactions contemplated hereby and the obtaining from the SEC of such orders as may be required in connection therewith, (B) such filings and approvals as are required to be made or obtained under the securities or blue sky laws of various states in connection with the transactions contemplated by this Agreement, (C) the filing of the Kmart Certificate of Merger with the Secretary of State of the State of Delaware, (D) the listing of the Holdco Common Stock on Nasdaq or New York Stock Exchange, Inc. (the "NYSE") (as to be agreed by the parties), and (E) notices, filings and other authorizations under the Applicable Antitrust Laws.

27

(d) SEC Documents; Undisclosed Liabilities. (i) Kmart has filed all required reports, schedules, registration statements and other documents with the SEC since May 6, 2003 (the "Kmart SEC Documents"). As of their respective dates of filing with the SEC (or, if amended or superseded by a filing prior to the date hereof, as of the date of such filing), the Kmart SEC Documents complied in all material respects with the requirements of the Securities Act or the Exchange Act, as the case may be, and the rules and regulations of the SEC thereunder applicable to such Kmart SEC Documents, and none of the Kmart SEC Documents when filed contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. The financial statements of Kmart included in the Kmart SEC Documents complied as to form, as of their respective dates of filing with the SEC, in all material respects with all applicable accounting requirements and with the published rules and regulations of the SEC with respect thereto (except, in the case of unaudited statements, as permitted by Form 10-Q of the SEC), have been prepared in accordance with generally accepted accounting principles applied on a consistent basis during the periods involved (except as may be disclosed therein) and fairly present in all material respects the consolidated financial position of Kmart and its consolidated Subsidiaries and the consolidated results of operations, changes in stockholders' equity and cash flows of such companies as of the dates and for the periods shown. As of the date hereof, there are no outstanding written comments from the SEC with respect to any of the Kmart SEC Documents.

(ii) Except for (A) those liabilities that are appropriately reflected or reserved for in the consolidated financial statements of Kmart included in its Quarterly Report on Form 10-Q for the fiscal quarter ended July 28, 2004, as filed with the SEC prior to the date hereof, (B) liabilities incurred since July 28, 2004 in the ordinary course of business consistent with past practice, (C) liabilities that would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Kmart, (D) liabilities incurred pursuant to the transactions contemplated by, or permitted by, this Agreement, and (E) liabilities or obligations discharged or paid in full prior to the date hereof in the ordinary course of business consistent with past practice, Kmart and its Subsidiaries do not have, any liabilities or obligations of any nature whatsoever (whether accrued, absolute, contingent or otherwise) that are required to be reflected in Kmart's financial statements in accordance with generally accepted accounting principles.

(e) Information Supplied. None of the information supplied or to be supplied by Kmart for inclusion or incorporation by reference in (i) the Form S-4 will, at the time the Form S-4 is filed with the SEC and at the time it becomes effective under the Securities Act, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading and (ii) the Joint Proxy Statement/Prospectus will, at the date of mailing to stockholders and at the times of the meetings of stockholders to be held in connection with the Mergers, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. The Joint Proxy Statement/Prospectus (other than the Proxy Statement relating to the Sears Stockholders Meeting) will comply as to form in all material respects with the requirements of the Exchange Act and the rules and regulations of the SEC thereunder, and the Form S-4 will comply as to form in all material respects with the requirements of the Securities

28

Act and the rules and regulations of the SEC thereunder. No representation or warranty is made by Kmart with respect to statements made or incorporated by reference therein based on information supplied by Sears for inclusion or incorporation by reference in the Joint Proxy Statement/Prospectus or Form S-4.

(f) Compliance with Applicable Laws and Reporting Requirements. (i) Kmart and its Subsidiaries hold all permits, licenses, variances, exemptions, orders and approvals of all Governmental Entities that are material to the operation of the businesses of Kmart and its Subsidiaries, taken as a whole (the "Kmart Permits"), and Kmart and its Subsidiaries are and have been in compliance with the terms of the Kmart Permits and all applicable laws and regulations, except where the failure so to hold or comply, individually or in the aggregate, would not reasonably be expected to have a material adverse effect on Kmart. The businesses of Kmart and its Subsidiaries are not being and have not been conducted in violation of any law, ordinance or regulation of any Governmental Entity (including the Sarbanes-Oxley Act of 2002), except for violations that, individually or in the aggregate, do not have, and would not reasonably be expected to have, a material adverse effect on Kmart. To the knowledge of Kmart, no investigation by any Governmental Entity with respect to Kmart or any of its Subsidiaries is pending or threatened, other than, in each case, those the outcome of which, individually or in the aggregate, would not reasonably be expected to have a material adverse effect on Kmart.

(ii) Kmart and its Subsidiaries have designed and maintain a system of internal controls over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act) sufficient to provide reasonable assurances regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Kmart (A) has designed and maintains disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) to ensure that material information required to be disclosed by Kmart in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and is accumulated and communicated to Kmart's management as appropriate to allow timely decisions regarding required disclosure, and (B) has disclosed, based on its most recent evaluation of such disclosure controls and procedures prior to the date hereof, to Kmart's auditors and the audit committee of Kmart's Board of Directors (1) any significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting that are reasonably likely to adversely affect in any material respect Kmart's ability to record, process, summarize and report financial information and (2) any fraud, whether or not material, that involves management or other employees who have a significant role in Kmart's internal controls over financial reporting. Kmart has made available to Sears a summary of any such disclosure made by management to Kmart's auditors and audit committee since January 1, 2002.

(g) Legal Proceedings. There is no claim, suit, action, investigation or other demand or proceeding (whether judicial, arbitral, administrative or other) pending or, to the knowledge of Kmart, threatened, against or affecting Kmart or any Subsidiary of Kmart that would reasonably be expected to have, individually or in the aggregate, a material adverse effect on Kmart, nor is there any judgment, decree, injunction, rule or order of any Governmental Entity or arbitrator outstanding against Kmart or any Subsidiary of Kmart having, or that would reasonably be expected to have, individually or in the aggregate, a material adverse effect on

29

Kmart or on Holdco after the Effective Time. No claim, suit, action, investigation, demand or proceeding alleging that Kmart or any of its Subsidiaries is liable for asbestos-related matters, individually or in the aggregate, has, and none of them would reasonably be likely to have, a material adverse effect on Kmart.

(h) Taxes. Kmart and each of its Subsidiaries have filed all material tax returns required to be filed by any of them and have paid (or Kmart has paid on their behalf) all taxes shown as due on such returns, and the most recent financial statements contained in the Kmart SEC Documents reflect an adequate reserve, in accordance with generally accepted accounting principles, for all taxes payable by Kmart and its Subsidiaries accrued through the date of such financial statements. No material deficiencies or other claims for any taxes have been proposed, asserted or assessed against Kmart or any of its Subsidiaries that are not adequately reserved for. Neither Kmart nor any of its Subsidiaries has taken any action or knows of any fact, agreement, plan or other circumstance that would reasonably be expected to prevent the exchange of Sears Common Stock and Kmart Common Stock for Holdco Common Stock pursuant to the Mergers, taken together, from qualifying as a transaction described in Section 351 of the Code or the Kmart Merger from qualifying as a reorganization within the meaning of Section 368(a) of the Code.

(i) Certain Agreements. Except for this Agreement, neither Kmart nor any of its Subsidiaries is a party to or bound by any contract, arrangement, commitment or understanding (i) with respect to the employment of any directors or executive officers, or with any consultants that are natural persons, involving the payment of $2.0 million or more per annum, (ii) that is a "material contract" (as such term is defined in Item 601(b)(10) of Regulation S-K of the SEC), (iii) that limits the ability of Kmart or any of its Subsidiaries to compete in any line of business, in any geographic area or with any person, or that requires referrals of business and, in each case, which limitation or requirement would reasonably be expected to be material to Kmart and its Subsidiaries taken as a whole, (iv) in the case of a Kmart Benefit Plan, any of the benefits of which will be increased, or the vesting of the benefits of which will be accelerated, by the occurrence of any of the transactions contemplated by this Agreement, or the value of any of the benefits of which will be calculated on the basis of any of the transactions contemplated by this Agreement, or (v) that would prevent, materially delay or materially impede the consummation of any of the transactions contemplated by this Agreement. All contracts, arrangements, commitments or understandings of the type described in this Section 3.2(i) (collectively referred to herein as "Kmart Contracts") are valid and in full force and effect, except to the extent they have previously expired in accordance with their terms or if the failure to be in full force and effect, individually or in the aggregate, would not reasonably be expected to have a material adverse effect on Kmart. Neither Kmart nor any of its Subsidiaries has, and to the knowledge of Kmart, none of the other parties thereto have, violated any provision of, or committed or failed to perform any act, and no event or condition exists, which with or without notice, lapse of time or both would constitute a default under the provisions of, any Kmart Contract, except in each case for those violations and defaults that, individually or in the aggregate, would not reasonably be expected to result in a material adverse effect on Kmart.

(j) Benefit Plans. (i) With respect to each Benefit Plan, under which any employee or former employee of Kmart or any of its Subsidiaries has any present or future right to benefits, maintained or contributed to by Kmart or any of its Subsidiaries or under which

30

Kmart or any of its Subsidiaries has any present or future liability (the "Kmart Benefit Plans"), Kmart has made available to Sears a true and correct copy of (A) the most recent annual report (Form 5500) filed with the IRS, if any, (B) such Kmart Benefit Plan, (C) each trust agreement relating to such Kmart Benefit Plan, if any, (D) the most recent summary plan description for each Kmart Benefit Plan for which a summary plan description is required by ERISA, (E) the most recent actuarial report or valuation relating to a Kmart Benefit Plan subject to Title IV of ERISA, and (F) the most recent determination letter issued by the IRS with respect to any Kmart Benefit Plan qualified under Section 401(a) of the Code, if any.

(ii) With respect to the Kmart Benefit Plans, individually and in the aggregate, no event has occurred and, to the knowledge of Kmart, there exists no condition or set of circumstances in connection with which Kmart or any of its Subsidiaries could be subject to any liability that would reasonably be expected to have a material adverse effect on Kmart under ERISA, the Code or any other applicable law.

(iii) True and complete copies of the Kmart Stock Plans as in effect on the date hereof have been provided or made available to Sears.

(iv) No Kmart Benefit Plan or Kmart Stock Plan exists that could result in the payment to any present or former employee of Kmart or any Subsidiary of Kmart of any money or other property or accelerate or provide any other rights or benefits to any present or former employee of Kmart or any Subsidiary of Kmart, in each case, as a result of the transactions contemplated by this Agreement, whether or not such payment would constitute a parachute payment within the meaning of Code Section 280G.

(k) Subsidiaries. Exhibit 21 to Kmart's Annual Report on Form 10-K for the fiscal year ended January 28, 2004 filed with the SEC prior to the date hereof includes all the Subsidiaries of Kmart that are Significant Subsidiaries. All of the shares of capital stock of each of the Subsidiaries held by Kmart or by another Subsidiary of Kmart are fully paid and nonassessable and are owned by Kmart or a Subsidiary of Kmart free and clear of any claim, lien or encumbrance.

(1) Absence of Certain Changes or Events. Except as disclosed in the Kmart SEC Documents filed prior to the date hereof (or, in the case of actions taken after the date hereof, except as permitted by Section 4.2), since July 28, 2004, (i) Kmart and its Subsidiaries have conducted their respective businesses in the ordinary course consistent with their past practices and (ii) there has not been any change, circumstance or event (including any event involving a prospective change) that has had, or would reasonably be expected to have, a material adverse effect on Kmart.

(m) Board Approval. The Board of Directors of Kmart, by resolutions duly adopted by unanimous vote of those voting at a meeting duly called and held (the "Kmart Board Approval"), has (i) approved this Agreement and declared it to be advisable, and (ii) recommended that the stockholders of Kmart adopt this Agreement and directed that such matter be submitted for consideration by Kmart stockholders at the Kmart Stockholders Meeting (as defined in Section 5.1(c)). To the knowledge of Kmart, no "moratorium," "control share," "fair

31

price" or other anti-takeover law or regulation is applicable to this Agreement, the Kmart Merger or the other transactions contemplated hereby.

(n) Vote Required. The affirmative vote of the holders of a majority of the outstanding shares of Kmart Common Stock to adopt this Agreement (the "Required Kmart Vote" and, together with the Required Sears Vote, the "Required Stockholder Votes") is the only vote of the holders of any class or series of Kmart capital stock necessary to adopt this Agreement and to approve the transactions contemplated hereby (including the Kmart Merger).

(o) Properties. Except as would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on Kmart, Kmart or one of its Subsidiaries (i) has good and marketable title to all the properties and assets reflected in the latest audited balance sheet included in the Kmart SEC Documents as being owned by Kmart or one of its Subsidiaries or acquired after the date thereof that are material to Kmart's business on a consolidated basis (except properties sold or otherwise disposed of since the date thereof in the ordinary course of business), free and clear of all claims, liens, charges, security interests or encumbrances of any nature whatsoever, except (A) statutory liens securing payments not yet due, (B) such imperfections or irregularities of title, claims, liens, charges, security interests, easements, covenants and other restrictions or encumbrances as do not materially affect the use of the properties or assets subject thereto or affected thereby or otherwise materially impair business operations at such properties and (C) mortgages, or deeds of trust, security interests or other encumbrances on title related to indebtedness reflected on the consolidated financial statements of Kmart (such liens, imperfections and irregularities in clauses (A),(B) and (C), "Kmart Permitted Liens"), and (ii) is the lessee of all leasehold estates reflected in the latest audited financial statements included in the Kmart SEC Documents or acquired after the date thereof that are material to its business on a consolidated basis (except for leases that have expired by their terms since the date thereof or been assigned, terminated or otherwise disposed of in the ordinary course of business consistent with past practice) and is in possession of the properties purported to be leased thereunder, and each such lease is valid without default thereunder by the lessee or, to Kmart's knowledge, the lessor.

(p) Intellectual Property. Except as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Kmart, (i) Kmart or its Subsidiaries own free and clear of all claims, liens, charges, security interests or encumbrances of any nature whatsoever other than Kmart Permitted Liens or have a valid license to use all material patents, inventions, copyrights, software, trademarks, service marks, domain names, trade names and other intellectual property (including any registrations or applications for registration of any of the foregoing) (collectively, the "Kmart Intellectual Property") necessary to carry on their business as currently conducted, (ii) the Kmart Intellectual Property does not Infringe the intellectual property rights of third parties and is not being Infringed by any third parties, (iii) to the knowledge of Kmart, no facts or circumstances exist that would affect the validity, substance or existence of, or Kmart's rights in, the Kmart Intellectual Property, (iv) Kmart and its Subsidiaries have taken reasonable actions to protect and maintain the Kmart Intellectual Property, including Kmart Intellectual Property that is confidential in nature, and (v) there are no claims, suits or other actions, and to the knowledge of Kmart, no claim, suit or other action is threatened, that seek to limit or challenge the validity, enforceability, ownership, or

32

right to use, sell or license the Kmart Intellectual Property, nor does Kmart know of any valid basis therefor.

(q) Environmental Matters. Except as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Kmart, (i) Kmart and its Subsidiaries hold, and are currently, and have been for the last five years, in continuous compliance with all applicable Environmental Permits, and are currently, and have been for the last five years, otherwise in continuous compliance with all applicable Environmental Laws and, to the knowledge of Kmart, there is no condition that would reasonably be expected to violate applicable Environmental Laws or applicable Environmental Permits in the future, (ii) to Kmart's knowledge, Kmart and its Subsidiaries have not received any Environmental Claim, and Kmart has no knowledge of any pending or threatened Environmental Claim, (iii) no hazardous, dangerous or toxic substance, including petroleum (including crude oil or any fraction thereof), asbestos and asbestos-containing materials, polychlorinated biphenyls, radon, fungus, mold, urea-formaldehyde insulation and any other material that is regulated pursuant to any Environmental Laws or that would reasonably be expected to result in liability under any Environmental Laws have been generated, transported, treated, stored, installed, disposed of, arranged to be disposed of, released or threatened to be released at, on, from or under any of the properties or facilities currently or formerly owned, leased or otherwise used by Kmart or its Subsidiaries, in violation of, or in a manner or to a location that would reasonably be expected to give rise to liability to Kmart or its Subsidiaries under or relating to, any Environmental Laws, and (iv) Kmart and its Subsidiaries have not assumed, contractually or by operation of law, any liabilities or obligations under or relating to any Environmental Laws.

(r) Labor and Employment Matters. Except as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Kmart, (i) there is no labor strike, dispute, slowdown, stoppage or lockout actually pending or, to the knowledge of Kmart, threatened against Kmart or any of its Subsidiaries, (ii) no union organizing campaign with respect to the employees of Kmart or its Subsidiaries is underway or, to Kmart's knowledge, threatened, (iii) there is no unfair labor practice charge or complaint against Kmart or its Subsidiaries pending or, to the knowledge of Kmart, threatened before the National Labor Relations Board or any similar state or foreign agency, (iv) there is no grievance pending relating to any collective bargaining agreement or other grievance procedure, and (v) no charges with respect to or relating to Kmart or its Subsidiaries are pending before the Equal Employment Opportunity Commission or any other Governmental Entity responsible for the prevention of unlawful employment practices.

(s) Brokers or Finders. No agent, broker, investment banker, financial advisor or other firm or person except Lehman Brothers Inc. ("Lehman Brothers") is or will be entitled to any broker's or finder's fee or any other similar commission or fee in connection with any of the transactions contemplated by this Agreement. Kmart has disclosed to Sears all material terms of the engagement of Lehman Brothers.

(t) Opinion of Kmart Financial Advisor. Kmart has received the opinion of Lehman Brothers, dated the date hereof, to the effect that the Merger Consideration is fair, from a financial point of view, to Kmart.

33

ARTICLE IV
COVENANTS RELATING TO CONDUCT OF BUSINESS

4.1. Covenants of Sears. During the period from the date hereof and continuing until the Effective Time, Sears agrees as to itself and its Subsidiaries that, except as expressly contemplated or permitted by this Agreement or to the extent that Kmart shall otherwise consent in writing, which consent shall not be unreasonably withheld or delayed:

(a) Ordinary Course. Sears and its Subsidiaries shall carry on their respective businesses in the usual, regular and ordinary course consistent with past practice and use all reasonable efforts to preserve intact their present business organizations, maintain their rights, franchises, licenses and other authorizations issued by Governmental Entities and preserve their relationships with employees, customers, suppliers and others having business dealings with them to the end that their goodwill and ongoing businesses shall not be impaired in any material respect at the Effective Time. Sears shall not, nor shall it permit any of its Subsidiaries to, (i) enter into any new material line of business, (ii) change its or its Subsidiaries' operating policies in any respect that is material to Sears, except as required by law or by policies imposed by a Governmental Entity, (iii) incur or commit to any capital expenditures or any obligations or liabilities in connection therewith other than capital expenditures and obligations or liabilities incurred or committed to in the ordinary course of business consistent with past practice and in any event not in excess of the amount set forth in Section 4.1(a) of the Sears Disclosure Schedule, in the aggregate, or (iv) enter into any agreement that would constitute a Sears Contract had such agreement been in effect on the date hereof or terminate or make any material change to any Sears Contract, except in the ordinary course of business consistent with past practice.

(b) Dividends; Changes in Stock. Sears shall not, nor shall it permit any of its Subsidiaries to, or propose to, (i) declare or pay any dividends on or make other distributions in respect of any of its capital stock, except (A) the declaration and payment of regular quarterly cash dividends on the Sears Common Stock at an amount per share not in excess of the regular quarterly cash dividend most recently declared prior to the date hereof with usual record and payment dates for such dividends in accordance with Sears's past dividend practice, and (B) for dividends by a wholly-owned Subsidiary of Sears, (ii) split, combine or reclassify any of its capital stock or issue or authorize or propose the issuance or authorization of any other securities in respect of, in lieu of or in substitution for, shares of its capital stock (except for any split, combination or reclassification of capital stock of a wholly-owned Subsidiary of Sears or any issuance or authorization or proposal to issue or authorize any securities of a wholly-owned Subsidiary of Sears to Sears or another wholly-owned Subsidiary of Sears) or (iii) repurchase, redeem or otherwise acquire, or permit any Subsidiary to redeem, purchase or otherwise acquire, any shares of its capital stock or any securities convertible into or exercisable for any shares of its capital stock, except for any wholly-owned Subsidiary of Sears.

(c) Issuance of Securities. Sears shall not, nor shall it permit any of its Subsidiaries to, issue, deliver or sell, or authorize or propose the issuance, delivery or sale of, any shares of its capital stock of any class, any Voting Debt, any stock appreciation rights, or any securities convertible into or exercisable or exchangeable for, or any rights, warrants or options to acquire, any such shares or Voting Debt, or enter into any agreement with respect to any of the

34

foregoing, other than (i) the issuance of Sears Common Stock required to be issued upon the exercise or settlement of Sears Stock Options, Sears Stock Appreciation Rights or other equity rights or obligations under the Sears Stock Plans or Sears Benefit Plans outstanding on the date hereof in accordance with the terms of the applicable Sears Stock Plan or Sears Benefit Plan in effect on the date hereof, or (ii) issuances by a wholly-owned Subsidiary of its capital stock to its parent or to another wholly-owned Subsidiary of Sears.

(d) Governing Documents, Etc. Sears shall not amend or propose to amend its Restated Certificate of Incorporation or By-laws or, except as permitted pursuant to Section 4.1(e) or (f), enter into, or permit any Subsidiary to enter into, a plan of consolidation, merger or reorganization with any person other than a wholly-owned Subsidiary of Sears.

(e) No Acquisitions. Other than acquisitions (whether by means of merger, share exchange, consolidation, tender offer, asset purchase or otherwise) and other business combinations (collectively, "Acquisitions") that (i) would not reasonably be expected to materially delay, impede or affect the consummation of the transactions contemplated by this Agreement in the manner contemplated hereby, (ii) are Acquisitions of inventory in the ordinary course of business consistent with past practice, and (iii) for which the fair market value of the total consideration paid by Sears and its Subsidiaries in such Acquisitions does not exceed in the aggregate the amount set forth in Section 4.1(e) of the Sears Disclosure Schedule, Sears shall not, and shall not permit any of its Subsidiaries to, acquire or agree to acquire, by merging or consolidating with, by purchasing a substantial equity interest in or a substantial portion of the assets of, by forming a partnership or joint venture with, or by any other manner, any business or any corporation, partnership, association or other business organization or division thereof or otherwise acquire or agree to acquire any assets that are material to Sears; provided, however, that the foregoing shall not prohibit (A) internal reorganizations or consolidations involving existing Subsidiaries that would not present a material risk of any material delay in the receipt of any Requisite Regulatory Approval or (B) the creation of new Subsidiaries organized to conduct or continue activities otherwise permitted by this Agreement.

(f) No Dispositions. Other than (i) internal reorganizations or consolidations involving existing Subsidiaries that would not reasonably be expected to materially delay, impede or affect the consummation of the transactions contemplated by this Agreement in the manner contemplated hereby, (ii) dispositions referred to in Sears SEC Documents filed prior to the date hereof or as disclosed in the Sears Disclosure Schedule, (iii) are dispositions of inventory in the ordinary course of business consistent with past practice, and (iv) other dispositions of assets (including Subsidiaries) if the book value thereof does not exceed in the aggregate the amount set forth in Section 4.1(f) of the Sears Disclosure Schedule, Sears shall not, and shall not permit any of its Subsidiaries to, sell, lease, assign, encumber or otherwise dispose of, or agree to sell, lease, assign, encumber or otherwise dispose of, any of its assets (including capital stock of its Subsidiaries and indebtedness of others held by Sears and its Subsidiaries) that are material, individually or in the aggregate, to Sears.

(g) Indebtedness. Sears shall not, and shall not permit any of its Subsidiaries to, incur, create or assume any long-term indebtedness for borrowed money (or modify any of the material terms of any such outstanding long-term indebtedness), guarantee any such long-term indebtedness or issue or sell any long-term debt securities or warrants or rights to

35

acquire any long-term debt securities of Sears or any of its Subsidiaries or guarantee any long-term debt securities of others, other than (i) in replacement of existing or maturing debt, (ii) indebtedness of any Subsidiary of Sears to Sears or to another Subsidiary of Sears, or (iii) indebtedness that does not exceed in the aggregate the amount set forth in Section 4.1(g) of the Sears Disclosure Schedule.

(h) Other Actions. Sears shall not, and shall not permit any of its Subsidiaries to, intentionally take any action that would, or would reasonably be expected (unless such action is required by applicable law) to adversely affect the ability of the parties to obtain any of the Requisite Regulatory Approvals without taking any action of the type referred to in Section 5.3(b)(i).

(i) Accounting Methods; Tax Matters. Except as disclosed in any Sears SEC Document filed prior to the date hereof, Sears shall not change its methods of accounting in effect at January 3, 2004, except as required by changes in generally accepted accounting principles as concurred in by Sears's independent auditors. Sears shall not (i) change its annual tax accounting period and (ii) make any tax election that, individually or in the aggregate, would reasonably be expected to have a material adverse effect on Sears or Holdco after the Effective Time.

(j) Tax-Free Qualification. Sears shall not, and shall not permit any of its Subsidiaries to, intentionally take or cause to be taken any action, whether before or after the Effective Time, that would reasonably be expected to prevent or impede the exchange of Sears Common Stock and Kmart Common Stock for Holdco Common Stock pursuant to the Mergers, taken together, from qualifying as a transaction described in Section 351 of the Code.

(k) Compensation and Benefit Plans. Sears shall not and shall not permit its Subsidiaries to, except as set forth in Section 4.1(k) of the Sears Disclosure Schedule: (i) other than in the ordinary course of business consistent with past practice with respect to employees (but not directors of Sears or officers of Sears or any Significant Subsidiary thereof), enter into, adopt, amend (except for such amendments as may be required by law) or terminate any Sears Benefit Plan, or any other employee benefit plan or any agreement, arrangement, plan or policy between Sears or a Subsidiary of Sears and one or more of its directors, officers or employees, (ii) except as required by any plan or arrangement as in effect as of the date hereof and except for, with respect to employees (but not directors of Sears or officers of Sears or any Significant Subsidiary thereof), normal payments, awards and increases in the ordinary course of business consistent with past practice, increase in any manner the compensation or fringe benefits of any director, officer or employee or pay any benefit not required by any contract, plan or arrangement as in effect as of the date hereof or enter into any contract, agreement, commitment or arrangement to do any of the foregoing, (iii) enter into or renew any contract, agreement, commitment or arrangement (other than a renewal occurring in accordance with the terms thereof) providing for the payment to any director, officer or employee of such party of compensation or benefits contingent, or the terms of which are materially altered, upon the occurrence of any of the transactions contemplated by this Agreement, or (iv) provide, with respect to the grant of any stock option, restricted stock, restricted stock unit or other equity-related award on or after the date hereof to the extent permitted by Section 4.1(c), that the vesting of any such stock option, restricted stock, restricted stock unit or other equity-related

36

award or any Sears Benefit Plan shall accelerate or otherwise be affected by the occurrence of any of the transactions contemplated by this Agreement.

(1) No Liquidation. Sears shall not, and shall not permit any of its Significant Subsidiaries to, adopt a plan of complete or partial liquidation or resolutions providing for or authorizing such a liquidation or a dissolution, restructuring, recapitalization or reorganization.

(m) Litigation. Sears shall not, and shall not permit any of its Subsidiaries to, settle or compromise any material litigation other than settlements or compromises of litigation where the amount paid (less the amount reserved for such matters by Sears and any insurance coverage applicable thereto) in settlement or compromise, in each case, does not exceed an amount set forth in Section 4.1(m) of the Sears Disclosure Schedule.

(n) No Restrictions on Business. Sears shall not, and shall not permit any of its Subsidiaries to, enter into or otherwise become party to any contract, arrangement, commitment or understanding that will restrict or limit, in any material respect, the ability of Holdco, Sears or Kmart or any of their respective Subsidiaries from conducting, from and after the Closing, any of their businesses in any geographical area, other than any contract, arrangement, commitment or understanding terminable in full (including the restrictions and limitations on conduct of business) on notice of not more than 45 days by Holdco or a Subsidiary thereof without the incurrence of any liability (including an incurrence of an obligation to make any payment of any amount in respect of such termination).

(o) Other Agreements. Sears shall not, and shall not permit any of its Subsidiaries to, agree to, or make any commitment to, take, or authorize, any of the actions prohibited by this Section 4.1.

4.2. Covenants of Kmart. During the period from the date hereof and continuing until the Effective Time, Kmart agrees to itself and its Subsidiaries that, except as expressly contemplated or permitted by this Agreement or to the extent that Sears shall otherwise consent in writing, which consent shall not be unreasonably withheld or delayed:

(a) Ordinary Course. Kmart and its Subsidiaries shall carry on their respective businesses in the usual, regular and ordinary course consistent with past practice and use all reasonable efforts to preserve intact their present business organizations, maintain their rights, franchises, licenses and other authorizations issued by Governmental Entities and preserve their relationships with employees, customers, suppliers and others having business dealings with them to the end that their goodwill and ongoing businesses shall not be impaired in any material respect at the Effective Time. Kmart shall not, nor shall it permit any of its Subsidiaries to, (i) enter into any new material line of business, (ii) change its or its Subsidiaries' operating policies in any respect that is material to Kmart, except as required by law or by policies imposed by a Governmental Entity, (iii) incur or commit to any capital expenditures or any obligations or liabilities in connection therewith other than capital expenditures and obligations or liabilities incurred or committed to in the ordinary course of business consistent with past practice and in any event not in excess of the amount set forth in Section 4.2(a) of the Kmart Disclosure Schedule, in the aggregate, or (iv) enter into any agreement that would constitute a Kmart Contract had such agreement been in effect on the date hereof or terminate or

37

make any material change to any Kmart Contract, except in the ordinary course of business consistent with past practice.

(b) Dividends; Changes in Stock. Kmart shall not, nor shall it permit any of its Subsidiaries to, or propose to, (i) declare or pay any dividends on or make other distributions in respect of any of its capital stock, except for dividends by a wholly-owned Subsidiary of Kmart, (ii) split, combine or reclassify any of its capital stock or issue or authorize or propose the issuance or authorization of any other securities in respect of, in lieu of or in substitution for, shares of its capital stock (except for any split, combination or reclassification of capital stock of a wholly-owned Subsidiary of Kmart or any issuance or authorization or proposal to issue or authorize any securities of a wholly-owned Subsidiary of Kmart to Kmart or another wholly-owned Subsidiary of Kmart) or (iii) repurchase, redeem or otherwise acquire, or permit any Subsidiary to redeem, purchase or otherwise acquire, any shares of its capital stock or any securities convertible into or exercisable for any shares of its capital stock, except for any wholly-owned Subsidiary of Kmart.

(c) Issuance of Securities. Kmart shall not, nor shall it permit any of its Subsidiaries to, issue, deliver or sell, or authorize or propose the issuance, delivery or sale of, any shares of its capital stock of any class, any Voting Debt, any stock appreciation rights or any securities convertible into or exercisable or exchangeable for, or any rights, warrants or options to acquire, any such shares or Voting Debt, or enter into any agreement with respect to any of the foregoing, other than (i) the issuance of Kmart Common Stock required to be issued upon the exercise or settlement of Kmart Stock Options or other equity rights or obligations under the Kmart Stock Plans or Kmart Benefit Plans outstanding on the date hereof in accordance with the terms of the applicable Kmart Stock Plan or Kmart Benefit Plan in effect on the date hereof, or (ii) issuances by a wholly-owned Subsidiary of its capital stock to its parent or to another wholly-owned Subsidiary of Kmart.

(d) Governing Documents. Kmart shall not amend or propose to amend its Amended and Restated Certificate of Incorporation or By-laws or, except as permitted pursuant to Section 4.2(e) or 4.2(f), enter into, or permit any Subsidiary to enter into, a plan of consolidation, merger or reorganization with any person other than a wholly-owned Subsidiary of Kmart.

(e) No Acquisitions. Other than Acquisitions that (i) would not reasonably be expected to materially delay, impede or affect the consummation of the transactions contemplated by this Agreement in the manner contemplated hereby, (ii) are Acquisitions of inventory in the ordinary course of business consistent with past practice, and (iii) for which the fair market value of the total consideration paid by Kmart and its Subsidiaries in such Acquisitions does not exceed in the aggregate the amount set forth in Section 4.2(e) of the Kmart Disclosure Schedule, Kmart shall not, and shall not permit any of its Subsidiaries to, acquire or agree to acquire, by merging or consolidating with, by purchasing a substantial equity interest in or a substantial portion of the assets of, by forming a partnership or joint venture with, or by any other manner, any business or any corporation, partnership, association or other business organization or division thereof or otherwise acquire or agree to acquire any assets that are material to Kmart; provided, however, that the foregoing shall not prohibit (A) internal reorganizations or consolidations involving existing Subsidiaries that would not present a

38

material risk of any material delay in the receipt of any Requisite Regulatory Approval or (B) the creation of new Subsidiaries organized to conduct or continue activities otherwise permitted by this Agreement.

(f) No Dispositions. Other than (i) internal reorganizations or consolidations involving existing Subsidiaries that would not reasonably be expected to materially delay, impede or affect the consummation of the transactions contemplated by this Agreement in the manner contemplated hereby, (ii) dispositions referred to in Kmart SEC Documents filed prior to the date hereof or as disclosed in the Kmart Disclosure Schedule, (iii) are dispositions of inventory in the ordinary course of business consistent with past practice, and (iv) other dispositions of assets (including Subsidiaries) if the book value thereof does not exceed in the aggregate the amount set forth in Section 4.2(f) of the Kmart Disclosure Schedule, Kmart shall not, and shall not permit any of its Subsidiaries to, sell, lease, assign, encumber or otherwise dispose of, or agree to sell, lease, assign, encumber or otherwise dispose of, any of its assets (including capital stock of its Subsidiaries and indebtedness of others held by Kmart and its Subsidiaries) that are material, individually or in the aggregate, to Kmart.

(g) Indebtedness. Kmart shall not, and shall not permit any of its Subsidiaries to, incur, create or assume any long-term indebtedness for borrowed money (or modify any of the material terms of any such outstanding long-term indebtedness), guarantee any such long-term indebtedness or issue or sell any long-term debt securities or warrants or rights to acquire any long-term debt securities of Kmart or any of its Subsidiaries or guarantee any long-term debt securities of others, other than (i) in replacement of existing or maturing debt, (ii) indebtedness of any Subsidiary of Kmart to Kmart or to another Subsidiary of Kmart, or (iii) indebtedness that does not exceed in the aggregate the amount set forth in Section 4.2(g) of the Kmart Disclosure Schedule.

(h) Other Actions. Kmart shall not, and shall not permit any of its Subsidiaries to, intentionally take any action that would, or would reasonably be expected (unless such action is required by applicable law) to adversely affect the ability of the parties to obtain any of the Requisite Regulatory Approvals without taking any action of the type referred to in Section 5.3(b)(i).

(i) Accounting Methods; Tax Matters. Except as disclosed in any Kmart SEC Document filed prior to the date hereof, Kmart shall not change its methods of accounting in effect at January 28, 2004, except as required by changes in generally accepted accounting principles as concurred in by Kmart's independent auditors. Kmart shall not (i) change its annual tax accounting period and (ii) make any tax election that, individually or in the aggregate, would reasonably be expected to have a material adverse effect on Kmart or Holdco after the Effective Time.

(j) Tax-Free Qualification. Kmart shall not, and shall not permit any of its Subsidiaries to, intentionally take or cause to be taken any action, whether before or after the Effective Time, that would reasonably be expected to prevent or impede the exchange of Sears Common Stock and Kmart Common Stock for Holdco Common Stock pursuant to the Mergers, taken together, from qualifying as a transaction described in Section 351 of the Code or the

39

Kmart Merger from qualifying as a reorganization within the meaning of Section 368(a) of the Code.

(k) Compensation and Benefit Plans. Kmart shall not and shall not permit its Subsidiaries to, except as set forth in Section 4.2(k) of the Kmart Disclosure Schedule: (i) other than in the ordinary course of business consistent with past practice with respect to employees (but not directors of Kmart or officers of Kmart or any Significant Subsidiary thereof), enter into, adopt, amend (except for such amendments as may be required by law) or terminate any Kmart Benefit Plan, or any other employee benefit plan or any agreement, arrangement, plan or policy between Kmart or a Subsidiary of Kmart and one or more of its directors, officers or employees, (ii) except as required by any plan or arrangement as in effect as of the date hereof and except for, with respect to employees (but not directors of Kmart or officers of Kmart or any Significant Subsidiary thereof), normal payments, awards and increases in the ordinary course of business consistent with past practice, increase in any manner the compensation or fringe benefits of any director, officer or employee or pay any benefit not required by any contract, plan or arrangement as in effect as of the date hereof or enter into any contract, agreement, commitment or arrangement to do any of the foregoing, (iii) enter into or renew any contract, agreement, commitment or arrangement (other than a renewal occurring in accordance with the terms thereof) providing for the payment to any director, officer or employee of such party of compensation or benefits contingent, or the terms of which are materially altered, upon the occurrence of any of the transactions contemplated by this Agreement, or (iv) provide, with respect to the grant of any stock option, restricted stock, restricted stock unit or other equity-related award on or after the date hereof to the extent permitted by Section 4.2(c), that the vesting of any such stock option, restricted stock, restricted stock unit or other equity-related award or any Kmart Benefit Plan shall accelerate or otherwise be affected by the occurrence of any of the transactions contemplated by this Agreement.

(l) No Liquidation. Kmart shall not, and shall not permit any of its Significant Subsidiaries to, adopt a plan of complete or partial liquidation or resolutions providing for or authorizing such a liquidation or a dissolution, restructuring, recapitalization or reorganization.

(m) Litigation. Kmart shall not, and shall not permit any of its Subsidiaries to, settle or compromise any material litigation other than settlements or compromises of litigation where the amount paid (less the amount reserved for such matters by Kmart and any insurance coverage applicable thereto) in settlement or compromise, in each case, does not exceed an amount set forth in Section 4.2(m) of the Kmart Disclosure Schedule.

(n) No Restrictions on Business. Kmart shall not, and shall not permit any of its Subsidiaries to, enter into or otherwise become party to any contract, arrangement, commitment or understanding that will restrict or limit, in any material respect, the ability of Holdco, Kmart or Sears or any of their respective Subsidiaries from conducting, from and after the Closing, any of their businesses in any geographical area, other than any contract, arrangement, commitment or understanding terminable in full (including the restrictions and limitations on conduct of business) on notice of not more than 45 days by Holdco or a Subsidiary thereof without the incurrence of any liability (including an incurrence of an obligation to make any payment of any amount in respect of such termination).

40

(o) Other Agreements. Kmart shall not, and shall not permit any of its Subsidiaries to, agree to, or make any commitment to, take, or authorize, any of the actions prohibited by this Section 4.2.

4.3. Transition. In order to facilitate the integration of the operations of Sears and Kmart and their respective Subsidiaries and to permit the coordination of their related operations on a timely basis, and in an effort to accelerate to the earliest time possible following the Effective Time the realization of synergies, operating efficiencies and other benefits expected to be realized by the parties as a result of the Mergers, each of Sears and Kmart shall, and shall cause its Subsidiaries to, consult with the other on strategic and operational matters (including the development, enhancement and performance of each party's internal controls over financial reporting) to the extent such consultation is not in violation of applicable laws, including laws regarding the exchange of information and other laws regarding competition.

4.4. Advice of Changes; Government Filings. Each party shall confer on a regular and frequent basis with the other, report on operational matters and promptly advise the other orally and in writing of any change or event having, or that would reasonably be expected to have, a material adverse effect on such party or that would cause or constitute a material breach of any of the representations, warranties or covenants of such party contained herein; provided, however, that any noncompliance with the foregoing shall not constitute the failure to be satisfied of a condition set forth in Article VI or give rise to any right of termination under Article VII unless the underlying breach shall independently constitute such a failure or give rise to such a right. Sears and Kmart shall file all reports required to be filed by each of them (or their Subsidiaries) with the SEC between the date hereof and the Effective Time and shall deliver to the other party copies of all such reports promptly after the same are filed. Each of Sears and Kmart shall have the right to review in advance, and to the extent practicable each will consult with the other, in each case subject to applicable laws relating to the exchange of information, with respect to any filing made with, or written materials submitted to, any third party or any Governmental Entity in connection with the transactions contemplated by this Agreement. In exercising the foregoing right, each of the parties agrees to act reasonably and as promptly as practicable. Each party agrees that it will consult with the other party with respect to the obtaining of all permits, consents, approvals and authorizations of all third parties and Governmental Entities necessary or advisable to consummate the transactions contemplated by this Agreement, and each party will keep the other party apprised of the status of matters relating to completion of the transactions contemplated hereby.

4.5. Control of Other Party's Business. Nothing contained in this Agreement (including Section 4.3) shall give Kmart, directly or indirectly, the right to control or direct the operations of Sears or shall give Sears, directly or indirectly, the right to control or direct the operations of Kmart prior to the Effective Time. Prior to the Effective Time, each of Sears and Kmart shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its and its Subsidiaries' respective operations.

41

ARTICLE V
ADDITIONAL AGREEMENTS

5.1. Preparation of Proxy Statement; Stockholders Meetings. (a) (i) As promptly as reasonably practicable following the date hereof, Kmart and Sears shall cooperate in preparing and shall cause to be filed with the SEC mutually acceptable proxy materials that shall constitute the proxy statement/prospectus relating to the matters to be submitted to the Sears stockholders at the Sears Stockholders Meeting (as defined in Section 5.1(b)) and to the Kmart stockholders at the Kmart Stockholders Meeting (as defined in Section 5.1(c)) (such joint proxy statement/prospectus, and any amendments or supplements thereto, the "Joint Proxy Statement/Prospectus"), and Holdco shall prepare, together with Kmart and Sears, and file with the SEC a registration statement on Form S-4 (of which the Joint Proxy Statement/Prospectus shall be a part) with respect to the issuance of Holdco Common Stock in the Mergers (such Form S-4, and any amendments or supplements thereto, the "Form S-4").

(ii) Each of Holdco, Kmart and Sears shall use reasonable best efforts to have the Joint Proxy Statement/Prospectus cleared by the SEC and the Form S-4 declared effective by the SEC, to keep the Form S-4 effective as long as is necessary to consummate the Mergers and the other transactions contemplated hereby, and to mail the Joint Proxy Statement/Prospectus to their respective stockholders as promptly as practicable after the Form S-4 is declared effective. Kmart and Sears shall, as promptly as practicable after receipt thereof, provide the other party with copies of any written comments and advise the other party of any oral comments with respect to the Joint Proxy Statement/Prospectus or Form S-4 received from the SEC. Each party shall cooperate and provide the other party with a reasonable opportunity to review and comment on any amendment or supplement to the Joint Proxy Statement/ Prospectus and the Form S-4 prior to filing such with the SEC, and each party will provide the other party with a copy of all such filings made with the SEC. Holdco shall use its reasonable best efforts to take any action required to be taken under any applicable state securities laws in connection with the Mergers and each party shall furnish all information concerning it and the holders of its capital stock as may be reasonably requested in connection with any such action.

(iii) Each party will advise the other party, promptly after it receives notice thereof, of the time when the Form S-4 has become effective, the issuance of any stop order, the suspension of the qualification of the Holdco Common Stock issuable in connection with the Mergers for offering or sale in any jurisdiction, or any request by the SEC for amendment of the Joint Proxy Statement/Prospectus or the Form S-4. If at any time prior to the Effective Time any information relating to either of the parties, or their respective affiliates, officers or directors, should be discovered by either party that should be set forth in an amendment or supplement to any of the Form S-4 or the Joint Proxy Statement/Prospectus so that such documents would not include any misstatement of a material fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, the party that discovers such information shall promptly notify the other party and, to the extent required by law, rules or regulations, an appropriate amendment or supplement describing such information shall be promptly filed with the SEC and disseminated to the stockholders of Sears and Kmart.

42

(b) Sears shall duly take all lawful action to call, give notice of, convene and hold a meeting of its stockholders as promptly as practicable following the date upon which the Form S-4 becomes effective (the "Sears Stockholders Meeting") for the purpose of obtaining the Required Sears Vote with respect to the transactions contemplated by this Agreement and, unless it is permitted to make a Change in Sears Recommendation (as defined below) pursuant to Section 5.4(b), shall use reasonable best efforts to solicit the approval of its stockholders of the matters comprising the Required Sears Vote; and the Board of Directors of Sears shall recommend approval of the matters comprising the Required Sears Vote by the stockholders of Sears to the effect as set forth in Section 3.1(m) (the "Sears Recommendation") and shall not (x) withdraw or modify (or propose to withdraw or modify) in any manner adverse to Kmart such recommendation or (y) take any other action or make any other statement in connection with the Sears Stockholders Meeting inconsistent with such recommendation (collectively, a "Change in Sears Recommendation"), except as and to the extent expressly permitted by Section 5.4(b). Notwithstanding any Change in Sears Recommendation, this Agreement shall be submitted to the stockholders of Sears at the Sears Stockholders Meeting for the purpose of approving the matters comprising the Required Sears Vote, and nothing contained herein shall be deemed to relieve Sears of such obligation.

(c) Kmart shall duly take all lawful action to call, give notice of, convene and hold a meeting of its stockholders as promptly as practicable following the date upon which the Form S-4 becomes effective (the "Kmart Stockholders Meeting" and, together with the Sears Stockholders Meeting, the "Required Stockholders Meetings") for the purpose of obtaining the Required Kmart Vote with respect to the transactions contemplated by this Agreement and, unless it is permitted to make a Change in Kmart Recommendation (as defined below) pursuant to Section 5.4(b), shall use reasonable best efforts to solicit the approval of its stockholders of the matters comprising the Required Kmart Vote; and the Board of Directors of Kmart shall recommend approval of the matters comprising the Required Kmart Vote by the stockholders of Kmart to the effect as set forth in Section 3.2(m) (the "Kmart Recommendation") and shall not (x) withdraw or modify (or propose to withdraw or modify) in any manner adverse to Sears such recommendation or (y) take any other action or make any other statement in connection with the Kmart Stockholders Meeting inconsistent with such recommendation (a "Change in Kmart Recommendation"), except as and to the extent expressly permitted by Section 5.4(b). Notwithstanding any Change in Kmart Recommendation, this Agreement shall be submitted to the stockholders of Kmart at the Kmart Stockholders Meeting for the purpose of approving the matters comprising the Required Kmart Vote, and nothing contained herein shall be deemed to relieve Kmart of such obligation.

(d) Sears and Kmart shall each use their reasonable best efforts to cause the Sears Stockholders Meeting and the Kmart Stockholders Meeting to be held on the same date.

5.2. Access to Information; Confidentiality. (a) Upon reasonable notice, Sears and Kmart shall each (and shall cause each of their respective Subsidiaries to) afford to the employees, counsel, advisors and other representatives of the other, reasonable access, during normal business hours during the period prior to the Effective Time, to all its properties, books, contracts, records and officers and, during such period, each of Sears and Kmart shall (and shall cause each of their respective Subsidiaries to) make available to the other all information concerning its business, properties and personnel as such other party may reasonably request.

43

Any such investigation shall be conducted in such a manner as not to interfere unreasonably with the business or operations of Sears or Kmart, as the case may be. Neither party nor any of its Subsidiaries shall be required to provide access to or to disclose information where such access or disclosure would violate or prejudice the rights of its customers, jeopardize the attorney-client privilege of the institution in possession or control of such information or contravene any law, rule, regulation, order, judgment, decree or binding agreement entered into prior to the date hereof. To the extent practicable, the parties will make appropriate substitute disclosure arrangements under circumstances in which the restrictions of the preceding sentence apply.

(b) The parties will hold any such information that is nonpublic in confidence to the extent required by, and in accordance with, the provisions of the letters dated March 16, 2004 (as amended June 29, 2004), and November 10, 2004, between Sears and Kmart (collectively, the "Confidentiality Agreements"), which Confidentiality Agreements will remain in full force and effect.

(c) No such investigation by either Kmart or Sears shall affect the representations and warranties of the other.

5.3. Reasonable Best Efforts. (a) Subject to the terms and conditions of this Agreement, each party will use its reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable under this Agreement and applicable laws, rules and regulations to consummate the Mergers and the other transactions contemplated by this Agreement as soon as practicable after the date hereof, including preparing and filing as promptly as practicable all documentation to effect all necessary applications, notices, filings and other documents and to obtain as promptly as practicable all Requisite Regulatory Approvals (as defined herein) and all other consents, waivers, orders, approvals, permits, rulings, authorizations and clearances necessary or advisable to be obtained from any third party or any Governmental Entity in order to consummate the Mergers or any of the other transactions contemplated by this Agreement. Each party shall use its reasonable best efforts to refrain from taking any action that would reasonably be expected to adversely affect or delay the ability of the parties to obtain all Requisite Regulatory Approvals. In furtherance and not in limitation of the foregoing, each party agrees (i) to make, as promptly as practicable, (A) an appropriate filing of a Notification and Report Form pursuant to the HSR Act with respect to the transactions contemplated hereby (which filing shall be made in any event within 15 business days of the date hereof), and (B) appropriate filings with the applicable Governmental Entities under the Canadian Antitrust Laws within the time periods specified thereunder to effect a Closing as soon as practicable, and (ii) in each case, to supply as promptly as practicable any additional information and documentary material that may be requested pursuant to such Applicable Antitrust Laws or by such authorities and to use reasonable best efforts to cause the expiration or termination of the applicable waiting periods under the HSR Act and the receipt of all such consents, waivers, orders, approvals, permits, rulings, authorizations and clearances under such other Applicable Antitrust Laws or from such authorities as soon as practicable.

(b) Notwithstanding the foregoing or any other provision in this Agreement to the contrary, nothing in this Section 5.3 shall require, or be deemed to require, (i) Kmart or Sears (or any of their respective Subsidiaries) to take any action, agree to take any action or consent to the taking of any action (including with respect to selling, holding separate or otherwise

44

disposing of any business or assets or conducting its (or its Subsidiaries') business in any specified manner) if doing so would, individually or in the aggregate, reasonably be expected to result in a material adverse effect on Holdco after the Effective Time, or (ii) Kmart or Sears (or any of their respective Subsidiaries) to take any such action that is not conditional on the consummation of the Mergers. Neither party shall take or agree to take any action identified in clause (i) or (ii) of the preceding sentence without the prior written consent of the other party (which shall not be unreasonably withheld or delayed).

(c) Each of Kmart and Sears shall, in connection with the efforts referenced in Section 5.3(a), use its reasonable best efforts to (i) cooperate in all respects with each other in connection with any filing or submission and in connection with any investigation or other inquiry, including any proceeding initiated by a private party, (ii) promptly inform the other party of the status of any of the matters contemplated hereby, including providing the other party with a copy of any written communication (or summary of oral communications) received by such party from, or given by such party to, the Antitrust Division of the Department of Justice, the Federal Trade Commission or any other Governmental Entity and of any written communication (or summary of oral communications) received or given in connection with any proceeding by a private party, in each case regarding any of the transactions contemplated hereby, and (iii) consult with each other in advance to the extent practicable of any meeting or conference with any such Governmental Entity or, in connection with any proceeding by a private party, with any such other person, and to the extent permitted by any such Governmental Entity or other person, give the other party the opportunity to attend and participate in such meetings and conferences.

(d) In furtherance and not in limitation of the covenants of the parties contained in this Section 5.3, (i) if (A) any objections are asserted with respect to the transactions contemplated hereby under any law, rule, regulation, order or decree (including the Applicable Antitrust Laws), (B) any administrative or judicial action or proceeding is instituted (or threatened to be instituted) by any Governmental Entity or private party challenging the Mergers or the other transactions contemplated hereby as violative of any law, rule, regulation, order or decree (including the Applicable Antitrust Laws) or that would otherwise prevent, materially delay or materially impede the consummation of the Mergers or the other transactions contemplated hereby, or (C) any law, rule, regulation, order or decree is enacted, entered, promulgated or enforced by a Governmental Entity that would make the Mergers or the other transactions contemplated hereby illegal or would otherwise prevent, materially delay or materially impede the consummation of the Mergers or the other transactions contemplated hereby, then (ii) each of Sears and Kmart shall use its reasonable best efforts to resolve any such objections, actions or proceedings so as to permit the consummation of the transactions contemplated by this Agreement, including, subject to Section 5.3(b), selling, holding separate or otherwise disposing of or conducting its or its Subsidiaries' business or asset in a specified manner, or agreeing to sell, hold separate or otherwise dispose of or conduct its or its Subsidiaries' business or assets in a specified manner, which would resolve such objections, actions or proceedings.

(e) In furtherance and not in limitation of the covenants of the parties contained in this Section 5.3, but subject to first complying with the obligations of Section 5.3(d), if any of the events specified in Section 5.3(d)(i)(B) or (C) occurs, then each of Kmart

45

and Sears shall cooperate in all respects with each other and use its reasonable best efforts, subject to Section 5.3(b), to contest and resist any such administrative or judicial action or proceeding and to have vacated, lifted, reversed or overturned any judgment, injunction or other decree or order, whether temporary, preliminary or permanent, that is in effect and that prevents, materially delays or materially impedes the consummation of the Mergers or the other transactions contemplated by this Agreement and to have such law, rule, regulation, order or decree repealed, rescinded or made inapplicable so as to permit consummation of the transactions contemplated by this Agreement, and each of Kmart and Sears shall use its reasonable best efforts to defend, at its own cost and expense, any such administrative or judicial actions or proceedings.

(f) Notwithstanding the foregoing or any other provision of this Agreement, nothing in this Section 5.3 shall limit a party's right to terminate this Agreement pursuant to Section 7.1(b) or 7.1(c) so long as such party has up to then complied with its obligations under this Section 5.3.

(g) Holdco shall agree to execute and deliver, at or prior to the Effective Time, supplemental indentures and other instruments required for the due assumption, as determined by the parties, of Sears's and Kmart's outstanding debt, guarantees and other securities to the extent required by the terms of such debt, guarantees and securities and the instruments and agreements relating thereto, and Sears shall assist Holdco in accomplishing the same.

(h) Each of Sears and Kmart and their respective Boards of Directors shall, if any "moratorium," "control share," "fair price" or other anti-takeover law or regulation becomes applicable to this Agreement, the Mergers, or any other transactions contemplated hereby, use all reasonable best efforts to ensure that the Mergers and the other transactions contemplated by this Agreement may be consummated as promptly as practicable on the terms contemplated hereby and otherwise to minimize the effect of such law or regulation on this Agreement, the Mergers and the other transactions contemplated hereby.

5.4. Acquisition Proposals. (a) Each of Kmart and Sears agrees that neither it nor any of its Subsidiaries nor any of the officers and directors of it or its Subsidiaries shall, and that it shall use its reasonable best efforts to cause its and its Subsidiaries' employees, agents and representatives (including any investment banker, attorney or accountant retained by it or any of its Subsidiaries) not to, directly or indirectly, (i) initiate, solicit, encourage or knowingly facilitate any inquiries or the making of any proposal or offer with respect to, or a transaction to effect, a merger, reorganization, share exchange, consolidation, business combination, recapitalization, liquidation, dissolution or similar transaction involving it or any of its Significant Subsidiaries (other than any such transaction permitted by Section 4.1(e) or (f) in the case of Sears, and Section 4.2(e) or (f) in the case of Kmart) or any purchase or sale of 20% or more of the consolidated assets (including stock of its Subsidiaries) of it and its Subsidiaries, taken as a whole, or any purchase or sale of, or tender or exchange offer for, its voting securities that, if consummated, would result in any person (or the stockholders of such person) beneficially owning securities representing 20% or more of its total voting power (or of the surviving parent entity in such transaction) or any of its Significant Subsidiaries (any such proposal, offer or transaction (other than a proposal or offer made by the other party to this

46

Agreement or an affiliate thereof) being hereinafter referred to as an "Acquisition Proposal"), (ii) have any discussions with or provide any confidential information or data to any person relating to an Acquisition Proposal, or engage in any negotiations concerning an Acquisition Proposal, or knowingly facilitate any effort or attempt to make or implement an Acquisition Proposal, or (iii) approve or recommend, or propose to approve or recommend, or execute or enter into, any letter of intent, agreement in principle, merger agreement, asset purchase or share exchange agreement, option agreement or other similar agreement related to any Acquisition Proposal or propose or agree to do any of the foregoing.

(b) Notwithstanding anything in this Agreement to the contrary, either party or its Board of Directors shall be permitted to (A) to the extent applicable and subject to Section 5.4(g) and being otherwise in compliance with this Section 5.4(b), comply with Rule 14d-9 and Rule 14e-2 promulgated under the Exchange Act with regard to an Acquisition Proposal or make any other disclosure required by law or its fiduciary duties (other than with respect to matters covered by clauses (B) or (C)), (B) effect a Change in Sears Recommendation or a Change in Kmart Recommendation (as applicable, a "Change in Recommendation"), or (C) engage in any discussions or negotiations with, or provide any confidential information or data to, any person in response to an unsolicited bona fide written Acquisition Proposal by any such person first made after the date hereof, if and only to the extent that,

(i) in any such case referred to in clause (B) or (C) above, (I) such party's Required Stockholders Meeting shall not have occurred, (II) such party has complied in all material respects with this Section 5.4, and (III) its Board of Directors, after consultation with its outside legal counsel, determines in good faith that failure to take such action would be inconsistent with its fiduciary duties under applicable law,

(ii) in the case of clause (B) above, (I) it has received an unsolicited bona fide written Acquisition Proposal from a third party and its Board of Directors, after consultation with its outside legal counsel and financial advisors, concludes in good faith that such Acquisition Proposal constitutes a Superior Proposal (as defined below) (after giving effect to all of the proposed revisions to this Agreement which may be offered by the other party to this Agreement pursuant to clause (III) below), (II) it has notified the other party to this Agreement, at least four business days in advance, of its intention to effect a Change in Recommendation, specifying the material terms and conditions of such Superior Proposal and the identity of the party making such Superior Proposal, and furnishing to the other party to this Agreement a copy of any relevant proposed transaction agreements with the party making such Superior Proposal and any other material documents received by it or its representatives, and (III) prior to effecting such a Change in Recommendation, it has, and has caused its financial and legal advisors to, negotiate with the other party to this Agreement in good faith to make such adjustments in the terms and conditions of this Agreement such that such Acquisition Proposal would no longer constitute a Superior Proposal, and

(iii) in the case of clause (C) above, its Board of Directors, after consultation with outside legal counsel and financial advisors, concludes in good faith that there is a reasonable likelihood that such Acquisition Proposal constitutes or is reasonably likely to result in a Superior Proposal, and prior to providing any information or data to any person

47

in connection with an Acquisition Proposal by any such person, its Board of Directors receives from such person an executed confidentiality agreement having provisions that are no less favorable to the party providing such information than those contained in the Confidentiality Agreements.

(c) Each of Kmart and Sears shall notify the other party to this Agreement as promptly as practicable of any such inquiries, proposals or offers received by, any such information requested from, or any such discussions or negotiations sought to be initiated or continued with, it or any of its representatives, indicating, in connection with such notice, the identity of such person and the material terms and conditions of any inquiries, proposals or offers (including a copy thereof if in writing and any related available material documentation or correspondence), and in any event each of Kmart and Sears shall provide written notice to the other party of such inquiries, proposals, offers, requests for information and initiation of such discussions or negotiations within 24 hours of such event. Each of Kmart and Sears agrees that it will promptly keep the other party informed of the status and material terms of any such inquiries, proposals or offers (including whether withdrawn or rejected), the status and nature of all information requested and delivered, and the status and material terms of any such discussions or negotiations, and in any event each of Kmart and Sears shall provide the other party with written notice of any material development thereto within 24 hours thereof. Each of Kmart and Sears also agrees to provide the other party hereto with any information that it provides to the third party making the request therefor at substantially the same time it provides such information to such third party, unless the other party hereto has already been provided with such information.

(d) Sears agrees that (i) it will and will cause its Subsidiaries, and its and their officers, directors, agents, representatives and advisors to, cease immediately and terminate any and all existing activities, discussions or negotiations with any third parties conducted heretofore with respect to any Acquisition Proposal, and (ii) it will not release any third party from, or waive any provisions of, any confidentiality or standstill agreement to which it or any of its Subsidiaries is a party with respect to any Acquisition Proposal. Sears agrees that it will use reasonable best efforts to promptly inform its and its Subsidiaries' respective directors, officers, key employees, agents and representatives of the obligations undertaken in this Section 5.4. Sears shall, if it has not already done so, promptly request, to the extent it has a contractual right to do so, that each person, if any, that has heretofore executed a confidentiality agreement within the six months prior to the date hereof in connection with its consideration of any Acquisition Proposal to return or destroy all confidential information or data heretofore furnished to any person by or on behalf of it or any of its Subsidiaries.

(e) Nothing in this Section 5.4 shall (x) permit either party to terminate this Agreement or (y) affect any other obligation of the parties under this Agreement. Neither party shall submit to the vote of its stockholders any Acquisition Proposal other than the Mergers prior to the termination of this Agreement.

(f) For purposes of this Agreement, "Superior Proposal" means a bona fide written Acquisition Proposal that the Board of Directors of Kmart or Sears, as the case may be, concludes in good faith, after consultation with its financial advisors and legal advisors, taking into account all legal, financial, regulatory, timing and other aspects of the proposal and the

48

person making the proposal (including any break-up fees, expense reimbursement provisions and conditions to consummation): (i) is more favorable to the stockholders of Kmart or Sears, as the case may be, from a financial point of view, than the transactions contemplated by this Agreement (after giving effect to any adjustments to the terms and provisions of this Agreement committed to in writing by Kmart or Sears, as the case may be, in response to such Acquisition Proposal), (ii) is fully financed or reasonably capable of being fully financed, reasonably likely to receive all required governmental approvals on a timely basis and otherwise reasonably capable of being completed on the terms proposed, and (iii) with respect to Sears only, satisfies such other considerations contemplated in clauses (1) and (2) of Section 717(b) of the NYBCL; provided that, for purposes of this definition of "Superior Proposal," the term Acquisition Proposal shall have the meaning assigned to such term in Section 5.4(a), except that the reference to "20% or more" in the definition of "Acquisition Proposal" shall be deemed to be a reference to "a majority" and "Acquisition Proposal" shall only be deemed to refer to a transaction involving Kmart or Sears, as the case may be.

(g) Any disclosure (other than a "stop, look and listen" or similar communication of the type contemplated by Rule 14d-9(f) under the Exchange Act) made pursuant to Section 5.4(b)(A) shall be deemed to be a Change in Recommendation, unless the Board of Directors of the party making such disclosure expressly (i) reaffirms its recommendation to its stockholders in favor of the applicable Merger and (ii) rejects such other Acquisition Proposal.

5.5. Affiliates. Each of Sears and Kmart shall use all reasonable efforts to cause each person who is an "affiliate" (for purposes of Rule 145 under the Securities Act) to deliver to Holdco, as soon as reasonably practicable and in any event prior to the Sears Stockholders Meeting or the Kmart Stockholders Meeting, as applicable, a written agreement substantially in the form attached as Exhibit 5.5.

5.6. Stock Exchange Listing. Holdco and Kmart shall use all reasonable efforts to cause (i) the shares of Holdco Common Stock to be issued in the Mergers and (ii) the shares of Holdco Common Stock to be reserved for issuance upon the exercise of any Other Sears Stock-Based Awards, Kmart Stock Options and Other Kmart Stock-Based Awards, to be approved for listing on either Nasdaq or NYSE (as to be agreed by the parties), subject to official notice of issuance, prior to the Closing Date.

5.7. Employee Benefit Plans. (a) Kmart and Sears agree that, except as otherwise provided herein (including as set forth in Section 5.7(a) of the Sears Disclosure Schedule or Section 5.7(a) of the Kmart Disclosure Schedule, as applicable) and unless otherwise mutually determined, the Kmart Benefit Plans and Sears Benefit Plans in effect at the date hereof shall remain in effect after the Effective Time with respect to employees covered by such plans at the Effective Time, until such time as Holdco shall otherwise determine, subject to applicable laws and the terms of such plans. Prior to and following the Effective Time, the parties shall cooperate in good faith to formulate Benefit Plans for Holdco and its Subsidiaries, with respect both to employees who were covered by the Kmart Benefit Plans and Sears Benefit Plans at the Effective Time and employees who were not covered by such plans at the Effective Time, that provide benefits for services on a basis that does not discriminate between employees who were

49

covered by the Kmart Benefit Plans and employees who were covered by the Sears Benefit Plans.

(b) With respect to any Benefit Plans in which any Holdco employees who are employees of Kmart or Sears (or their Subsidiaries) prior to the Effective Time first become eligible to participate on or after the Effective Time, and in which such Holdco employees did not participate prior to the Effective Time (the "New Plans"), Holdco shall: (i) waive all pre-existing conditions, exclusions and waiting periods with respect to participation and coverage requirements applicable to the Holdco employees and their eligible dependents under any New Plans in which such employees may be eligible to participate after the Effective Time, except to the extent such pre-existing conditions, exclusions or waiting periods would apply under the analogous Kmart Benefit Plan or Sears Benefit Plan, as the case may be; (ii) provide each Holdco employee and their eligible dependents with credit for any co-payments and deductibles paid prior to the Effective Time under a Kmart Benefit Plan or Sears Benefit Plan (to the same extent that such credit was given under the analogous Benefit Plan prior to the Effective Time) in satisfying any applicable deductible or out-of-pocket requirements under any New Plans in which such employees may be eligible to participate after the Effective Time; and (iii) recognize all service of the Holdco employees with Kmart or Sears, and their respective affiliates, for all purposes (including, purposes of eligibility to participate, vesting credit, entitlement to benefits, and, except with respect to defined benefit pension plans, benefit accrual) in any New Plan in which such employees may be eligible to participate after the Effective Time, to the extent such service is taken into account under the applicable New Plan and only to the extent such service was credited under the analogous Benefit Plan prior to the Effective Time; provided that the foregoing shall not apply to the extent it would result in duplication of benefits.

(c) With respect to Benefit Plans maintained or contributed to outside the United States for the benefit of non-United States citizens or residents, the principles set forth in the preceding paragraph of this Section 5.7 shall apply to the extent the application of such principles does not violate applicable foreign law.

5.8. Section 16 Matters. Assuming that Sears and Kmart deliver to Holdco the Section 16 Information (as defined below) reasonably in advance of the Effective Time, the Board of Directors of Holdco, or a committee of Non-Employee Directors thereof (as such term is defined for purposes of Rule 16b-3(d) under the Exchange Act), shall reasonably promptly thereafter and in any event prior to the Effective Time adopt a resolution providing that the receipt by the Insiders (as defined below) of Sears and Kmart of Holdco Common Stock in exchange for shares of Sears Common Stock (including Restricted Sears Shares) or shares of Kmart Common Stock, as the case may be, or to receive shares of Holdco Common Stock upon conversion of Other Sears Stock-Based Awards or Other Kmart Stock-Based Awards, as the case may be, in each case pursuant to the transactions contemplated hereby and to the extent such securities are listed in the Section 16 Information provided by Sears and Kmart to Holdco prior to the Effective Time, are intended to be exempt from liability pursuant to Section 16(b) under the Exchange Act such that any such receipt shall be so exempt. "Section 16 Information" shall mean information accurate in all material respects regarding the Insiders of a person, the number of shares of the capital stock held by each such Insider, and the number and description of options, stock appreciation rights, restricted shares and other stock-based awards held by each such Insider. "Insiders", with respect to a person, shall mean those officers and directors of such

person who are subject to the reporting requirements of Section 16(a) of the Exchange Act and who are listed in the Section 16 Information.

5.9. Fees and Expenses. Whether or not the Mergers are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such expense, except as otherwise provided in Section 7.2 hereof and except that (a) if the Mergers are consummated, the surviving corporations in the Mergers shall pay, or cause to be paid, any and all property or transfer taxes imposed on either party in connection with the Mergers, and (b) expenses incurred in connection with filing, printing and mailing the Joint Proxy Statement/Prospectus and the Form S-4 shall be shared equally by Kmart and Sears.

5.10. Governance. (a) On or prior to the Effective Time, Holdco's Board of Directors shall cause the number of directors that will comprise the full Board of Directors of Holdco at the Effective Time to be 10. The members of the initial Board of Directors of Holdco at the Effective Time shall be as set forth on Exhibit 5.10(a). No other directors or employees of Kmart or Sears shall be designated to serve on the Board of Directors of Holdco at the Effective Time.

(b) On or prior to the Effective Time, the Holdco Board of Directors shall take such actions as are necessary to cause the persons indicated in Exhibit 5.10(b) to be elected or appointed to the offices of Holdco specified in such Exhibit as of the Effective Time.

(c) The headquarters of Holdco will be located in Hoffman Estates, Illinois.

(d) The name of Holdco shall be Sears Holdings Corporation.

5.11. Indemnification; Directors' and Officers' Insurance. (a) From and after the Effective Time, Holdco shall, to the fullest extent permitted by applicable law, indemnify, defend and hold harmless, and provide advancement of expenses to, each person who is now, or has been at any time prior to the date hereof or who becomes prior to the Effective Time, an officer, director or employee of Sears or any of its Subsidiaries (the "Sears Indemnified Parties") against all losses, claims, damages, costs, expenses, liabilities or judgments or amounts that are paid in settlement of or in connection with any claim, action, suit, proceeding or investigation based in whole or in part on or arising in whole or in part out of the fact that such person is or was a director, officer or employee of Sears or any Subsidiary of Sears, and pertaining to any matter existing or occurring, or any acts or omissions occurring, at or prior to the Effective Time, whether asserted or claimed prior to, or at or after, the Effective Time (including matters, acts or omissions occurring in connection with the approval of this Agreement and the consummation of the transactions contemplated hereby) to the same extent such persons are indemnified or have the right to advancement of expenses as of the date hereof by Sears pursuant to Sears's Restated Certificate of Incorporation, By-laws and indemnification agreements, if any, in existence on the date hereof with any directors, officers and employees of Sears and its Subsidiaries.

(b) From and after the Effective Time, Holdco shall, to the fullest extent permitted by applicable law, indemnify, defend and hold harmless, and provide advancement of expenses to, each person who is now, or has been at any time prior to the date hereof or who

51

becomes prior to the Effective Time, an officer, director or employee of Kmart or any of its Subsidiaries (the "Kmart Indemnified Parties" and, together with the Sears Indemnified Parties, the "Indemnified Parties") against all losses, claims, damages, costs, expenses, liabilities or judgments or amounts that are paid in settlement of or in connection with any claim, action, suit, proceeding or investigation based in whole or in part on or arising in whole or in part out of the fact that such person is or was a director, officer or employee of Kmart or any Subsidiary of Kmart, and pertaining to any matter existing or occurring, or any acts or omissions occurring, at or prior to the Effective Time, whether asserted or claimed prior to, or at or after, the Effective Time (including matters, acts or omissions occurring in connection with the approval of this Agreement and the consummation of the transactions contemplated hereby) to the same extent such persons are indemnified or have the right to advancement of expenses as of the date hereof by Kmart pursuant to Kmart's Amended and Restated Certificate of Incorporation, By-laws and indemnification agreements, if any, in existence on the date hereof with any directors, officers and employees of Kmart and its Subsidiaries.

(c) For a period of six years after the Effective Time, Holdco shall cause to be maintained in effect the current policies of directors' and officers' liability insurance maintained by Sears (provided that Holdco may substitute therefor policies with a substantially comparable insurer of at least the same coverage and amounts containing terms and conditions that are no less advantageous to the insured) with respect to claims arising from facts or events that occurred at or before the Effective Time; provided, however, that Holdco shall not be obligated to make annual premium payments for such insurance to the extent such premiums exceed 250% of the premiums paid as of the date hereof by Sears for such insurance ("Sears's Current Premium"), and if such premiums for such insurance would at any time exceed 250% of Sears's Current Premium, then Holdco shall cause to be maintained policies of insurance that, in Holdco's good faith determination, provide the maximum coverage available at an annual premium equal to 250% of Sears's Current Premium.

(d) For a period of six years after the Effective Time, Holdco shall cause to be maintained in effect the current policies of directors' and officers' liability insurance maintained by Kmart (provided that Holdco may substitute therefor policies with a substantially comparable insurer of at least the same coverage and amounts containing terms and conditions that are no less advantageous to the insured) with respect to claims arising from facts or events that occurred at or before the Effective Time; provided, however, that Holdco shall not be obligated to make annual premium payments for such insurance to the extent such premiums exceed 250% of the premiums paid as of the date hereof by Kmart for such insurance ("Kmart's Current Premium"), and if such premiums for such insurance would at any time exceed 250% of Kmart's Current Premium, then Holdco shall cause to be maintained policies of insurance that, in Holdco's good faith determination, provide the maximum coverage available at an annual premium equal to 250% of Kmart's Current Premium.

(e) Holdco shall pay (as incurred) all expenses, including reasonable fees and expenses of counsel, that an Indemnified Person may incur in enforcing the indemnity and other obligations provided for in this Section 5.11.

(f) If Holdco or any of its successors or assigns (i) consolidates with or merges into any other person and shall not be the continuing or surviving corporation or entity of

52

such consolidation or merger, or (ii) transfers or conveys all or substantially all of its properties and assets to any person, then, and in each such case, to the extent necessary, proper provision shall be made so that the successors and assigns of Holdco, as the case may be, shall assume the obligations set forth in this Section 5.11.

(g) The provisions of this Section 5.11 (i) are intended to be for the benefit of, and shall be enforceable by, each Indemnified Party, his or her heirs and representatives and (ii) are in addition to, and not in substitution for, any other rights to indemnification or contribution that any such person may have by contract or otherwise.

5.12. Public Announcements. Kmart and Sears shall use reasonable best efforts (i) to develop a joint communications plan, (ii) to ensure that all press releases and other public statements with respect to the transactions contemplated hereby shall be consistent with such joint communications plan, and (iii) except in respect of any announcement required by applicable law or by obligations pursuant to any listing agreement with or rules of any securities exchange in which it is impracticable to consult with each other as contemplated by this clause (iii), to consult with each other before issuing any press release or, to the extent practical, otherwise making any public statement with respect to this Agreement or the transactions contemplated hereby. In addition to the foregoing, except to the extent disclosed in or consistent with the Joint Proxy Statement/Prospectus in accordance with the provisions of Section 5.1 or as otherwise permitted under Section 4.4, no party shall issue any press release or otherwise make any public statement or disclosure concerning the other party or the other party's business, financial condition or results of operations without the consent of such other party, which consent shall not be unreasonably withheld or delayed. Each party shall provide the other party with its stockholder lists and allow and facilitate the other party's contact with its stockholders and prospective investors and following a Change in Sears Recommendation or Change in Kmart Recommendation, as the case may be, such contacts may be made without regard to the above limitations of this Section 5.12.

5.13. Additional Agreements. In case at any time after the Effective Time any further action is necessary or desirable to carry out the purposes of this Agreement or to vest Holdco or the surviving corporation of the Mergers with full title to all properties, assets, rights, approvals, immunities and franchises of either of the constituent corporations of the Kmart Merger and the Sears Merger, the proper officers and directors of each party to this Agreement shall take all such necessary action.

ARTICLE VI
CONDITIONS PRECEDENT

6.1. Conditions to Each Party's Obligation To Effect the Merger. The respective obligation of each party to effect the applicable Merger shall be subject to the satisfaction prior to the Closing Date of the following conditions:

(a) Stockholder Approval. Sears shall have obtained the Required Sears Vote, and Kmart shall have obtained the Required Kmart Vote.

(b) Exchange Listing. The shares of (i) Holdco Common Stock to be issued in the Merger and (ii) Holdco Common Stock to be reserved for issuance upon exercise of any Other Sears Stock-Based Awards, Kmart Stock Options and Other Kmart Stock-Based Awards shall have been authorized for listing on Nasdaq or NYSE (as to be agreed by the parties), upon official notice of issuance.

(c) Requisite Regulatory Approvals. All authorizations, consents, orders or approvals of, or declarations or filings with, and all expirations of waiting periods required from, any Governmental Entity under the Applicable Antitrust Laws shall have been filed, have occurred or been obtained (all such permits, approvals, filings and consents and the lapse of all such waiting periods being referred to as the "Requisite Regulatory Approvals"), and all such Requisite Regulatory Approvals shall be in full force and effect.

(d) Form S-4. The Form S-4 shall have become effective under the Securities Act and shall not be the subject of any stop order or proceedings seeking a stop order.

(e) No Injunctions or Restraints; Illegality. No temporary restraining order, preliminary or permanent injunction or other order issued by any court of competent jurisdiction or other legal restraint or prohibition (an "Injunction") preventing the consummation of the Mergers shall be in effect. There shall not be any action taken, or any law, rule, regulation or order enacted, entered, enforced or deemed applicable to the Mergers, by any Governmental Entity of competent jurisdiction that makes the consummation of either Merger illegal.

(f) Effective Times. The Sears Merger and Kmart Merger shall be consummated at identical Effective Times.

6.2. Conditions to Obligations of Kmart. The obligation of Kmart to effect the Kmart Merger is subject to the satisfaction of the following conditions unless waived by Kmart:

(a) Representations and Warranties.

(i) The representations and warranties of Sears set forth in Section 3.1(b)(i) and (iii) shall be true and correct (except for deviations of not more than 1% of the number of Sears's fully diluted outstanding shares of Sears Common Stock disclosed in Section 3.1(b)(i) and (iii)), as of the date hereof and as of the Closing Date as if made at and as of such time (except for representations and warranties made only as of a specified date, which shall be true and correct to the extent required in this clause (i) only as of the specified date);

(ii) the representations and warranties of Sears set forth in Sections 3.1(b) (other than clauses (i) and (iii) of Section 3.1(b)), 3.1(c)(i), and 3.1(s) shall be true and correct in all material respects as of the date hereof and as of the Closing Date as if made at and as of such time (except for representations and warranties made only as of a specified date, which shall be true and correct in all material respects only as of the specified date); and

(iii) (A) the other representations and warranties of Sears contained in this Agreement that are qualified as to material adverse effect shall be true and correct and

54

(B) such other representations and warranties of Sears contained in this Agreement that are not so qualified (disregarding all qualifications and exceptions contained therein regarding materiality or knowledge) shall be true and correct, in each case as of the date hereof and as of the Closing Date as if made at and as of that time (except for representations and warranties made only as of a specified date, which shall be true and correct as of the specified date), except to the extent where the failures of any such representations and warranties referred to in clause (B) to be so true and correct, in the aggregate, have not had, and would not reasonably be expected to have, a material adverse effect on Holdco after the Effective Time.

Kmart shall have received a certificate signed on behalf of Sears by the Chief Executive Officer and Chief Financial Officer of Sears to such effect.

(b) Performance of Obligations of Sears. Sears shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing Date, and Kmart shall have received a certificate signed on behalf of Sears by the Chief Executive Officer and Chief Financial Officer of Sears to such effect.

(c) Tax Opinion. Kmart shall have received the opinion of Simpson Thacher & Bartlett LLP, counsel to Kmart, dated the Closing Date, to the effect that the exchange of Sears Common Stock and Kmart Common Stock for Holdco Common Stock pursuant to the Mergers, taken together, will be treated for Federal income tax purposes as a transaction described in Section 351 of the Code. In rendering such opinion, counsel to Kmart shall be entitled to rely upon customary representations and assumptions provided by Holdco, Kmart, Sears and others that counsel to Kmart reasonably deems relevant.

6.3. Conditions to Obligations of Sears. The obligation of Sears to effect the Sears Merger is subject to the satisfaction of the following conditions unless waived by Sears:

(a) Representations and Warranties.

(i) The representations and warranties of Kmart set forth in Section 3.2(b)(i) and (iii) shall be true and correct (except for deviations of not more than 1% of the number of Kmart's fully diluted outstanding shares of Kmart Common Stock disclosed in Section 3.2(b)(i) and (iii)), as of the date hereof and as of the Closing Date as if made at and as of such time (except for representations and warranties made only as of a specified date, which shall be true and correct to the extent required in this clause (i) only as of the specified date);

(ii) the representations and warranties of Kmart set forth in Sections 3.2(b) (other than clauses (i) and (iii) of Section 3.2(b)), 3.2(c)(i), and 3.2(s) shall be true and correct in all material respects as of the date hereof and as of the Closing Date as if made at and as of such time (except for representations and warranties made only as of a specified date, which shall be true and correct in all material respects only as of the specified date); and

(iii) (A) the other representations and warranties of Kmart contained in this Agreement that are qualified as to material adverse effect shall be true and correct and

55

(B) such other representations and warranties of Kmart contained in this Agreement that are not so qualified (disregarding all qualifications and exceptions contained therein regarding materiality or knowledge) shall be true and correct, in each case as of the date hereof and as of the Closing Date as if made at and as of that time (except for representations and warranties made only as of a specified date, which shall be true and correct as of the specified date), except to the extent where the failures of any such representations and warranties referred to in clause (B) to be so true and correct, in the aggregate, have not had, and would not reasonably be expected to have, a material adverse effect on Holdco after the Effective Time.

Sears shall have received a certificate signed on behalf of Kmart by the Chairman and Chief Executive Officer and by the Chief Financial Officer of Kmart to such effect.

(b) Performance of Obligations of Kmart. Kmart shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing Date, and Sears shall have received a certificate signed on behalf of Kmart by the Chairman and Chief Executive Officer and the Chief Financial Officer of Kmart to such effect.

(c) Tax Opinion. Sears shall have received the opinion of Wachtell, Lipton, Rosen & Katz, counsel to Sears, dated the Closing Date, to the effect that the exchange of Sears Common Stock and Kmart Common Stock for Holdco Common Stock pursuant to the Mergers, taken together, will be treated for Federal income tax purposes as a transaction described in Section 351 of the Code. In rendering such opinion, counsel to Sears shall be entitled to rely upon customary representations and assumptions provided by Holdco, Kmart, Sears and others that counsel to Sears reasonably deems relevant.

ARTICLE VII
TERMINATION AND AMENDMENT

7.1. Termination. This Agreement may be terminated at any time prior to the Effective Time, by action taken or authorized by the Board of Directors of the terminating party or parties, whether before or after any Required Stockholder Vote has been obtained:

(a) by mutual consent of Kmart and Sears in a written instrument;

(b) by either Kmart or Sears, upon written notice to the other party, if a Governmental Entity of competent jurisdiction that must grant a Requisite Regulatory Approval has denied approval of either Merger and such denial has become final and non-appealable; or any Governmental Entity of competent jurisdiction shall have issued an order, decree or ruling or taken any other action permanently restraining, enjoining or otherwise prohibiting either Merger, and such order, decree, ruling or other action has become final and non-appealable; provided, however, that the right to terminate this Agreement under this Section 7.1(b) shall not be available to any party whose failure to comply with Section 5.3 or any other provision of this Agreement has been the cause of, or resulted in, such action;

(c) by either Kmart or Sears, upon written notice to the other party, if both Mergers shall not have been consummated on or before June 1, 2005 (or August 1, 2005 if on June 1, 2005 any Requisite Regulatory Approval shall not have been obtained but each other

56

condition set forth in Article VI (other than such conditions that by their nature are to be satisfied on the Closing Date) shall have been satisfied); provided, however, that the right to terminate this Agreement under this Section 7.1(c) shall not be available to any party whose failure to comply with any provision of this Agreement has been the cause of, or resulted in, the failure of the Effective Time to occur on or before such date;

(d) by Kmart, upon written notice to Sears, if Sears shall have: (i) failed to make the Sears Recommendation or effected a Change in Sears Recommendation (or resolved to take any such action) that is adverse to Kmart in any material respect, whether or not permitted by the terms hereof, (ii) materially breached its obligations under this Agreement by reason of a failure to call the Sears Stockholders Meeting in accordance with Section 5.1(b) or a failure to prepare and mail to its stockholders the Joint Proxy Statement/Prospectus in accordance with Section 5.1(a), or (iii) materially breached its obligations under Section 5.4;

(e) by Sears, upon written notice to Kmart, if Kmart shall have: (i) failed to make the Kmart Board Recommendation or effected a Change in Kmart Recommendation (or resolved to take any such action) that is adverse to Sears in any material respect, whether or not permitted by the terms hereof, (ii) materially breached its obligations under this Agreement by reason of a failure to call the Kmart Stockholders Meeting in accordance with Section 5.1(c) or a failure to prepare and mail to its stockholders the Joint Proxy Statement/Prospectus in accordance with Section 5.1(a), or (iii) materially breached its obligations under Section 5.4;

(f) by either Kmart or Sears, upon written notice to the other party, if there shall have been a breach by the other party of any of the covenants or agreements or any of the representations or warranties set forth in this Agreement on the part of such other party, which breach, either individually or in the aggregate, would result in, if occurring or continuing on the Closing Date, the failure of the condition set forth in Section 6.2(a) or (b) or Section 6.3(a) or (b), as the case may be, and which breach has not been cured within 30 days following written notice thereof to the breaching party or, by its nature, cannot be cured within such time period; or

(g) by either Kmart or Sears, if the Required Kmart Vote or Required Sears Vote shall not have been obtained upon a vote taken thereon at the duly convened Kmart Stockholders Meeting or Sears Stockholders Meeting, as the case may be.

7.2. Effect of Termination. (a) In the event of termination of this Agreement by either Sears or Kmart as provided in Section 7.1, this Agreement shall forthwith become void, and there shall be no liability or obligation on the part of Kmart or Sears or their respective officers or directors, except with respect to Section 5.2(b) (Access to Information; Confidentiality), Section 5.9 (Fees and Expenses), this Section 7.2 (Effect of Termination), and Article VIII (General Provisions), which shall survive such termination and except that no party shall be relieved or released from any liabilities or damages arising out of its willful and material breach of this Agreement.

(b) Kmart shall pay Sears, by wire transfer of immediately available funds to such accounts as Sears may designate, the sum of $380 million (the "Kmart Termination Fee") if this Agreement is terminated as follows:

(i) if Sears shall terminate this Agreement pursuant to Section 7.1(e), then Kmart shall pay the Kmart Termination Fee on the business day following such termination;

(ii) if (A) either party shall terminate this Agreement pursuant to Section 7.1(g) because the Required Kmart Vote shall not have been received and (B) at any time after the date hereof and at or before the date of the Kmart Stockholders Meeting an Acquisition Proposal shall have been publicly announced (a "Public Proposal") with respect to Kmart, then Kmart shall pay $70 million of the Kmart Termination Fee on the business day following such termination; and if (C) within twelve months of the date of such termination of this Agreement, Kmart or any of its Subsidiaries enters into any definitive agreement with respect to, or consummates, any Acquisition Proposal, then Kmart shall pay the remaining $310 million of the Kmart Termination Fee on the date of such execution or consummation; and

(iii) if (A) either party shall terminate this Agreement pursuant to Section 7.1(c) or Sears shall terminate this Agreement pursuant to Section 7.1(f), (B) at any time after the date hereof and before such termination there shall have been a Public Proposal with respect to Kmart, (C) following the occurrence of such Public Proposal, Kmart shall have breached intentionally or recklessly (and not cured after notice thereof) any of its representations, warranties, covenants or agreements set forth in this Agreement, which breach shall have resulted in the failure of the Effective Time to occur prior to the termination of this Agreement, then Kmart shall pay $70 million of the Kmart Termination Fee on the business day following such termination; and if (D) within twelve months of the date of such termination of this Agreement, Kmart or any of its Subsidiaries enters into any definitive agreement with respect to, or consummates, any Acquisition Proposal, then Kmart shall pay the remaining $310 million of the Kmart Termination Fee upon the date of such execution or consummation.

If Kmart fails to pay all amounts due to Sears on the dates specified, then Kmart shall pay all costs and expenses (including legal fees and expenses) incurred by Sears in connection with any action or proceeding (including the filing of any lawsuit) taken by it to collect such unpaid amounts, together with interest on such unpaid amounts at the prime lending rate prevailing at such time, as published in the Wall Street Journal, from the date such amounts were required to be paid until the date actually received by Sears.

(c) Sears shall pay Kmart, by wire transfer of immediately available funds to such accounts as Kmart may designate, the sum of $400 million (the "Sears Termination Fee") if this Agreement is terminated as follows:

(i) if Kmart shall terminate this Agreement pursuant to Section 7.1(d), then Sears shall pay the Sears Termination Fee on the business day following such termination;

(ii) if (A) either party shall terminate this Agreement pursuant to Section 7.1(g) because the Required Sears Vote shall not have been received and (B) at any time after the date hereof and at or before the date of the Sears Stockholders Meeting, there

58

shall have been a Public Proposal with respect to Sears, then Sears shall pay $70 million of the Sears Termination Fee on the business day following such termination; and if (C) within twelve months of the date of such termination of this Agreement, Sears or any of its Subsidiaries enters into any definitive agreement with respect to, or consummates, any Acquisition Proposal, then Sears shall pay the remaining $330 million of the Sears Termination Fee on the date of such execution or consummation; and

(iii) if (A) either party shall terminate this Agreement pursuant to Section 7.1(c) or Kmart shall terminate this Agreement pursuant to Section 7.1(f), (B) at any time after the date hereof and before such termination there shall have been a Public Proposal with respect to Sears, (C) following the occurrence of such Public Proposal, Sears shall have breached intentionally or recklessly (and not cured after notice thereof) any of its representations, warranties, covenants or agreements set forth in this Agreement, which breach shall have resulted in the failure of the Effective Time to occur prior to the termination of this Agreement, then Sears shall pay $70 million of the Sears Termination Fee on the business day following such termination; and if (D) within twelve months of the date of such termination of this Agreement, Sears or any of its Subsidiaries enters into any definitive agreement with respect to, or consummates, any Acquisition Proposal, then Sears shall pay the remaining $330 million of the Sears Termination Fee upon the date of such execution or consummation.

If Sears fails to pay all amounts due to Kmart on the dates specified, then Sears shall pay all costs and expenses (including legal fees and expenses) incurred by Kmart in connection with any action or proceeding (including the filing of any lawsuit) taken by it to collect such unpaid amounts, together with interest on such unpaid amounts at the prime lending rate prevailing at such time, as published in the Wall Street Journal, from the date such amounts were required to be paid until the date actually received by Kmart.

(d) If the Required Sears Vote is not obtained at the Sears Stockholders Meeting, in addition to any fees that otherwise may be payable under this Section 7.2, Sears shall reimburse Kmart for all costs and expenses incurred by Kmart in connection with this Agreement and the transactions contemplated hereby up to $10 million.

7.3. Amendment. This Agreement may be amended by the parties, by action taken or authorized by their respective Boards of Directors, at any time before or after approval of the matters presented in connection with this Agreement by the stockholders of Sears or of Kmart, but, after any such approval, no amendment shall be made which by law requires further approval by such stockholders without such further approval. This Agreement may not be amended except by an instrument in writing signed on behalf of each of the parties.

7.4. Extension; Waiver. At any time prior to the Effective Time, the parties, by action taken or authorized by their respective Board of Directors, may, to the extent permitted by applicable law, (a) extend the time for the performance of any of the obligations or other acts of the other party, (b) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto, and (c) waive compliance with any of the agreements or conditions contained herein. Any agreement on the part of a party to any such extension or waiver shall be valid only if set forth in a written instrument signed on behalf of

such party. The failure of a party to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of those rights. No single or partial exercise of any right, remedy, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. Any waiver shall be effective only in the specific instance and for the specific purpose for which given and shall not constitute a waiver to any subsequent or other exercise of any right, remedy, power or privilege hereunder.

ARTICLE VIII
GENERAL PROVISIONS

8.1. Non-survival of Representations, Warranties and Agreements. None of the representations, warranties, covenants and agreements in this Agreement or in any instrument delivered pursuant to this Agreement, including any rights arising out of any breach of such representations, warranties, covenants, and agreements, shall survive the Effective Time, except for those covenants and agreements that by their terms apply or are to be performed in whole or in part after the Effective Time.

8.2. Notices. All notices and other communications hereunder shall be in writing and shall be deemed duly given (a) on the date of delivery if delivered personally, or by facsimile, upon confirmation of receipt, (b) on the first business day following the date of dispatch if delivered by a recognized next-day courier service, or (c) on the fifth business day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid. All notices hereunder shall be delivered as set forth below, or pursuant to such other instructions as may be designated in writing by the party to receive such notice.

(a) if to Kmart, to

Kmart Holding Corporation
3100 West Big Beaver Road
Troy, Michigan 48084
Attention:  General Counsel
Facsimile No.:  (248) 614-0951

with a copy to

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017
Attention:  John Finley, Esq.
            Mario A. Ponce, Esq.
Facsimile No.:  (212) 455-2502

and

60

(b) if to Sears, to

Sears, Roebuck and Co.
3333 Beverly Road
Hoffman Estates, Illinois 60179
Attention:  General Counsel
Facsimile No.:  (847) 286-2471

with a copy to

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York 10019
Attention:  Andrew R. Brownstein, Esq.
            Joshua R. Cammaker, Esq.
Facsimile No.:  (212) 403-2000

8.3. Interpretation. When a reference is made in this Agreement to Sections, Exhibits or Schedules, such reference shall be to a Section of or Exhibit or Schedule to this Agreement unless otherwise indicated. The table of contents and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation". The phrase "made available" in this Agreement shall mean that the information referred to has been made available by the party to whom such information is to be made available. The phrases "herein," "hereof," "hereunder" and words of similar import shall be deemed to refer to this Agreement as a whole, including the Exhibits and Schedules hereto, and not to any particular provision of this Agreement. The word "or" shall be inclusive and not exclusive. Any pronoun shall include the corresponding masculine, feminine and neuter forms. The phrases "known" or "knowledge" mean, with respect to either party to this Agreement, the actual knowledge of those of such party's executive officers who have been involved in the negotiation of this Agreement. The term "affiliate" has the meaning given to it in Rule 12b-2 of the Exchange Act, and the term "person" has the meaning given to it in Sections 3(a)(9) and 13(d)(3) of the Exchange Act.

8.4. Counterparts. This Agreement may be executed in counterparts, each of which shall be considered one and the same agreement and this Agreement shall become effective when a counterpart signed by each party shall be delivered to the other party, it being understood that both parties need not sign the same counterpart.

8.5. Entire Agreement; No Third Party Beneficiaries. This Agreement (including the documents and the instruments referred to herein) (a) constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof, other than the Confidentiality Agreements, which shall survive the execution and delivery of this Agreement in accordance with their terms and (b) except as provided in Sections 5.10 and 5.11 (which are intended for the benefit of only the persons specifically named therein), is not intended to confer upon any person other than the parties any rights or remedies hereunder.

61

8.6. Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, except that the NYBCL shall apply to the Sears Merger.

8.7. Severability. Any term or provision of this Agreement that is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability and, unless the effect of such invalidity or unenforceability would prevent the parties from realizing the major portion of the economic benefits of the Mergers that they currently anticipate obtaining therefrom, shall not render invalid or unenforceable the remaining terms and provisions of this Agreement or affect the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction. If any provision of this Agreement is so broad as to be unenforceable, the provision shall be interpreted to be only so broad as is enforceable.

8.8. Assignment. Neither this Agreement nor any of the rights, interests or obligations of the parties hereunder shall be assigned by either party (whether by operation of law or otherwise) without the prior written consent of the other party, and any attempt to make any such assignment without such consent shall be null and void. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and permitted assigns.

8.9. Submission to Jurisdiction. Each party irrevocably submits to the jurisdiction of (a) the Supreme Court of the State of New York, New York County, and (b) the United States District Court for the Southern District of New York, for the purposes of any suit, action or other proceeding arising out of this Agreement or any transaction contemplated hereby. Each party agrees to commence any action, suit or proceeding relating hereto either in the United States District Court for the Southern District of New York or, if such suit, action or other proceeding may not be brought in such court for reasons of subject matter jurisdiction, in the Supreme Court of the State of New York, New York County. Each party irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or any transaction contemplated hereby in (i) the Supreme Court of the State of New York, New York County, or (ii) the United States District Court for the Southern District of New York, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum. Each party further irrevocably consents to the service of process out of any of the aforementioned courts in any such suit, action or other proceeding by the mailing of copies thereof by mail to such party at its address set forth in this Agreement, such service of process to be effective upon acknowledgment of receipt of such registered mail; provided that nothing in this Section 8.9 shall affect the right of any party to serve legal process in any other manner permitted by law. The consent to jurisdiction set forth in this Section 8.9 shall not constitute a general consent to service of process in the State of New York and shall have no effect for any purpose except as provided in this Section 8.9. The parties agree that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

8.10. Enforcement. The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their

specific terms on a timely basis or were otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in any court identified in the Section above, this being in addition to any other remedy to which they are entitled at law or in equity.

8.11. WAIVER OF JURY TRIAL. EACH OF THE PARTIES HEREBY WAIVES TRIAL BY JURY IN ANY JUDICIAL PROCEEDING DIRECTLY INVOLVING ANY MATTERS (WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY.

[Remainder of this page intentionally left blank]

63

IN WITNESS WHEREOF, Kmart and Sears have caused this Agreement to be signed by their respective officers thereunto duly authorized, all as of the date first set forth above.

KMART HOLDING CORPORATION

By:  /s/ William C. Crowley
     ---------------------------------------
     Name:  William C. Crowley
     Title:  Senior Vice President, Finance

SEARS, ROEBUCK AND CO.

By:  /s/ Alan J. Lacy
     ---------------------------------------
     Name:  Alan J. Lacy
     Title:  Chairman, President & CEO

64

# EXHIBIT J

## RECIPROCAL SERVICES AND SUPPLY AGREEMENT

THIS RECIPROCAL SERVICES AND SUPPLY AGREEMENT (the "Agreement") is made and entered into effective as of March 24, 2005 (the "Effective Date"), by and between KMART CORPORATION, a Michigan corporation, ("Kmart") and SEARS, ROEBUCK AND CO., a New York corporation ("Sears").

### RECITALS

**WHEREAS,** Sears Holdings Corporation, a Delaware corporation, directly or indirectly owns all of the issued and outstanding capital stock of each of Sears and Kmart;

**WHEREAS,** each of Sears and Kmart, directly or through subsidiaries, is a retailer that sells merchandise supplied by numerous vendors;

**WHEREAS,** Sears and Kmart have valuable relationships with their respective vendors;

**WHEREAS,** each of Sears and Kmart desires to take advantage of the vendor relationships of the other by obtaining, at prices determined on an arm's length basis, goods, including merchandise, supplied by the other;

**WHEREAS,** each of Sears and Kmart has expertise in merchandising and marketing, as well as expertise in providing, for itself and others, various services supporting management and service operations; and

**WHEREAS,** each of Sears and Kmart desires to take advantage of the expertise of the other by obtaining, for a fee determined on an arm's length basis, services provided by the other.

### AGREEMENTS

**NOW, THEREFORE,** in consideration of the above Recitals, which are incorporated herein by this reference, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereby agree as follows:

### SECTION I
### SUPPLY OF GOODS

1.1.    <u>Sale of Goods</u>. During the term of this Agreement, each party (a "Seller") agrees to sell to the other party (a "Purchaser"), and Purchaser agrees to buy, in accordance with the terms and conditions of this Agreement, designated goods ("Goods"). A Purchaser shall issue instructions to the Seller setting forth the specific Goods to be purchased and other applicable information. In the event of any inconsistencies or conflicts between this Agreement and any such instructions, the terms of this Agreement shall be controlling.

    1.2.   <u>Assignment</u>. Upon the request of a Purchaser, the Seller shall assign to the Purchaser the Seller's rights and remedies, including defense and indemnity rights, under any third party contract to which Seller is a party to the extent necessary to allow the Purchaser to directly assert such rights and remedies against the Seller's vendors of Goods and/or related services. The assignor further agrees to execute and deliver to the assignee or its affiliates any and all further documents deemed by the assignee to be necessary in documenting and effectuating the foregoing assignment.

    1.3.   <u>Attorney-in-Fact</u>. Each party hereby appoints the other, irrevocably during the term of this Agreement, as its attorney-in-fact for the purpose of executing any and all documents and instruments required to be executed in connection with the performance by such other party of its duties pursuant to this Agreement.

## SECTION II
## SERVICES

    2.1   <u>Sears Services</u>. Sears shall provide to Kmart certain services (the "Sears Services") as set forth on the attached <u>Exhibit A</u>. Sears shall perform the Sears Services in a professional manner consistent with good business practices.

    2.2   <u>Kmart Services</u>. Kmart shall provide to Sears certain services (the "Kmart Services") as set forth on the attached <u>Exhibit B</u>. Kmart shall perform the Kmart Services in a professional manner consistent with good business practices.

    2.3   <u>System Access</u>. Each party shall give the other party appropriate access to such party's computers and other electronic systems (collectively, "Systems"). Each party shall be responsible for ensuring that their Recipients (as defined in Section 5.5.3 below) only use such systems in connection with the Kmart Services and the Sears Services, as the case may be. Each party shall, upon request of the other party, advise such party in writing of the name of each such Recipient who has been given such access. Each party will cooperate with the other party in the investigation of any apparent unauthorized access or use by the other party or their Recipients of the other party's Systems.

    2.4   <u>General</u>. Each party shall provide such input and assistance to the other party as may reasonably be requested in connection with the performance of the Kmart Services and the Sears Services, as the case may be. Each party in its discretion may (i) select the personnel who will perform the services contemplated by this Agreement on its behalf; (ii) select and engage the services of other professionals and consultants in connection with its provision of services hereunder; and/or (iii) cause one or more of its subsidiaries to perform such services on its behalf.

## SECTION III
## PAYMENTS

3.1   <u>Pricing for Goods</u>. Pricing for Goods shall be determined in accordance with the factors set forth on <u>Exhibit C</u>, or as otherwise mutually agreed by the parties.

3.2   <u>Payments for Services</u>.

3.2.1   Sears shall charge and Kmart shall pay to Sears for the Sears Services an annual fee calculated in accordance with the attached <u>Exhibit D</u>, or as otherwise mutually agreed by the parties.

3.2.2   Kmart shall charge and Sears shall pay to Kmart for the Kmart Services an annual fee calculated in accordance with the attached <u>Exhibit E</u>, or as otherwise mutually agreed by the parties.

3.2.3   Each of Sears and Kmart may adjust the annual fee set forth on <u>Exhibit D</u> or <u>Exhibit E</u>, respectively, on a going-forward basis upon the completion of each 12-month period during the term of this Agreement (or at such other times as the parties mutually agree) to account for any changes in its respective duties and responsibilities under this Agreement. Any such adjustment to the fees to be charged hereunder shall be set forth in a revised <u>Exhibit D</u> or <u>Exhibit E</u>, as the case may be, which shall supersede the then current <u>Exhibit D</u> or <u>Exhibit E</u> and become a part of this Agreement without further action by the parties.

3.2.4   Upon at least 15 days' prior written request, which shall not be made more than once during any year, either party may audit the books and records of the other party in order to verify the calculation of fees charged pursuant to this Agreement. Prompt adjustment shall be made by the proper party to compensate the other party for any errors or omissions disclosed by such an audit. Any such audits shall be conducted during regular business hours in such a manner as not to interfere with normal business activities. The party requesting the audit shall pay the cost of such audit unless the amounts paid to such requesting party hereunder are found to be less than 95% of the actual amounts due with respect to the time period in question, in which case the audited party shall pay the cost of such audit.

## SECTION IV
## TERM AND TERMINATION

4.1   This Agreement shall commence as of the Effective Date and shall expire on December 31, 2006. Thereafter, the term shall renew automatically for an unlimited number of successive additional terms of one year each; provided, however, that either party may terminate this Agreement at any time without cause, without penalty, and without liability for any costs or damages resulting from such termination, upon not less

3

than 90 days' prior written notice to the other. Termination or expiration of this Agreement shall not, however, relieve either party of obligations or liabilities incurred by it prior to such termination or expiration.

## SECTION V
## CONFIDENTIALITY

    5.1   <u>Protection of Proprietary Information</u>. Except as permitted or contemplated by this Agreement, neither party shall disclose or permit any of their respective Recipients to disclose any of the other party's Proprietary Information. Neither party shall use or permit any of their respective Recipients to use any of the other party's Proprietary Information for any purpose other than the purposes of this Agreement. Each of the parties shall (i) notify the other party immediately of any unauthorized possession, use, or knowledge of such other party's Proprietary Information, (ii) promptly furnish full details of such possession, use, or knowledge to the other party, and (iii) cooperate with the other party in any litigation against third parties as may be deemed necessary by such other Party to protect its proprietary rights in the Proprietary Information. Each of the parties shall return, and shall cause their Recipients to return, all copies, transcriptions, or other reproductions of, and any notes relating to, the other party's Proprietary Information to such other party upon the earliest of (a) the request of the other party, (b) the accomplishment of the purpose for which the Proprietary Information was provided, and (c) the expiration or termination of this Agreement.

    5.2   <u>Protection of Confidential Personal Information</u>. A Recipient shall not duplicate or incorporate Confidential Personal Information received from the other party into its own records or databases. A Recipient shall restrict disclosure of the disclosing party's Confidential Personal Information to its employees who have a need to know such information to perform under this Agreement. A Recipient shall not disclose the Confidential Personal Information of the other party to any third party, including an affiliate, permitted contractor, or other representative of the Recipient, without the prior written consent of the disclosing party and, in the case of disclosure to a third party that is not affiliated with the Recipient, the written agreement of the third party Recipient to be bound by the terms of this Section V. Each party shall establish and maintain written policies and procedures designed to ensure the confidentiality of the Confidential Personal Information. Copies of such policies and procedures shall be provided to either party upon request.

    5.3   <u>Permitted Disclosures</u>. Notwithstanding anything herein to the contrary, the obligations of Section 5.1 above shall not apply with respect to any Proprietary Information that (i) was in the public domain at the time of disclosure or subsequently entered the public domain other than through a breach of this Section V, (ii) was in the possession of the Recipient free of any obligation of confidentiality at the time of disclosure to the Recipient, (iii) was rightfully disclosed to the Recipient by a third party free of any obligation of confidentiality subsequent to the time of disclosure to the Recipient hereunder, or (iv) was independently developed by the Recipient.

4

5.4    Survival. Sears and Kmart agree that their respective obligations with respect to any portion of the other party's Proprietary Information under this Agreement shall survive the expiration or termination of this Agreement until such time as the portion of the Proprietary Information in question falls within one of the exceptions set forth in Section 5.3 above.

5.5    Definitions. For purposes of this Agreement:

5.5.1    "Confidential Personal Information" means all information about a party's individual customers, including but not limited to names, addresses, telephone numbers, account numbers, customer lists, and demographic, financial and transaction information, whether in writing, verbal, recorded, or in some other physical form, which has been supplied by one party to the other either prior to or after the Effective Date;

5.5.2    "Proprietary Information" means all confidential or proprietary information or data of a party to this Agreement, whether scientific, technical, engineering, financial, operational, marketing, or of a business or economic nature, including Confidential Personal Information, whether in writing, verbal, recorded, or in some other physical form, which has been supplied by one party to the other either prior to or after the Effective Date; and

5.5.3    "Recipients" means the parties to this Agreement and their respective affiliates, directors, officers, partners, managers, employees, consultants, agents or representatives, and any or all of them, to the extent such persons receive Proprietary Information.

## SECTION VI
## DEFENSE AND INDEMNIFICATION

6.1    Defense and Indemnification by Sears. Sears agrees to indemnify, defend and hold harmless Kmart and its affiliates, officers, directors, shareholders, employees, agents, representatives, successors and assigns, from and against any and all claims, losses, liabilities, damages, penalties, costs or out-of-pocket expenses (including reasonable attorneys fees) asserted against or incurred by Kmart arising out of or resulting from (i) any breach of this Agreement by Sears; (ii) any gross negligence or willful misconduct in connection with the performance of the Sears Services; (iii) the infringement or other violation of any intellectual property right in any way relating to or affecting Goods sold to Kmart by Sears ("Sears-Supplied Goods"), or any unfair competition involving Sears-Supplied Goods; (iv) death of or injury to any person, damage to any property, or any other damage or loss, by whomsoever suffered, resulting or claimed to result in whole or in part from any latent or patent defect in Sears-Supplied Goods; (v) any violation by Sears (or its affiliates, subsidiaries, subcontractors, suppliers, or representatives) in the manufacture, possession, use or sale of Sears-Supplied Goods of any federal, state or local law; (vi) the packaging, tagging, labeling, packing, shipping, delivery and/or invoicing of Sears-Supplied Goods; (vii) failure to warn or to provide adequate warnings and/or

instructions in the use, assembly, service or installation of Sears-Supplied Goods; (viii) the display, assembly or installation of Sears-Supplied Goods; or (ix) the loss, unauthorized disclosure or unauthorized use of Kmart's Confidential Personal Information; provided, however, Sears is not liable hereunder to the proportional extend any injury or damage is proximately caused by the negligence and/or willful misconduct of Kmart.

6.2    Defense and Indemnification by Kmart. Kmart agrees to indemnify, defend and hold harmless Sears and its affiliates, officers, directors, shareholders, employees, agents, representatives, successors and assigns, from and against any and all claims, losses, liabilities, damages, penalties, costs or out-of-pocket expenses (including reasonable attorneys fees) asserted against or incurred by Sears arising out of or resulting from (i) any breach of this Agreement by Kmart; (ii) any gross negligence or willful misconduct in connection with the performance of the Kmart Services; (iii) the infringement or other violation of any intellectual property right in any way relating to or affecting Goods sold to Sears by Kmart ("Kmart-Supplied Goods"), or any unfair competition involving Kmart-Supplied Goods; (iv) death of or injury to any person, damage to any property, or any other damage or loss, by whomsoever suffered, resulting or claimed to result in whole or in part from any latent or patent defect in Kmart-Supplied Goods; (v) any violation by Kmart (or its affiliates, subsidiaries, subcontractors, suppliers, or representatives) in the manufacture, possession, use or sale of Kmart-Supplied Goods of any federal, state or local law; (vi) the packaging, tagging, labeling, packing, shipping, delivery and/or invoicing of Kmart-Supplied Goods; (vii) failure to warn or to provide adequate warnings and/or instructions in the use, assembly, service or installation of Kmart-Supplied Goods; (viii) the display, assembly or installation of Kmart-Supplied Goods; or (ix) the loss, unauthorized disclosure or unauthorized use of Sears' Confidential Personal Information; provided, however, Kmart is not liable hereunder to the proportional extend any injury or damage is proximately caused by the negligence and/or willful misconduct of Sears.

6.3    Survival. The defense and indemnification obligations contained in this Section VI shall survive the expiration or termination of this Agreement.

### SECTION VII
### LIMITATION OF LIABILITY

7.1    NEITHER PARTY SHALL UNDER ANY CIRCUMSTANCE BE LIABLE TO THE OTHER PARTY FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY OR PUNITIVE DAMAGES ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE SERVICES TO BE PROVIDED HEREUNDER, EVEN IF SUCH PARTY IS APPRISED OF THE LIKELIHOOD OF SUCH DAMAGES OCCURRING.

## SECTION VIII
## INDEPENDENT CONTRACTOR

8.1     Sears and Kmart each shall have exclusive control over their respective employees and agents.  Each of Sears and Kmart shall exercise its independent judgment in the performance of the Sears Services and the Kmart Services, respectively.

8.2     Each of Sears and Kmart shall have control over and be solely responsible for all labor and employee relation policies, salaries and policies relating to wages, hours, working conditions or other conditions of its employees or agents hereunder, and shall be solely responsible for making all necessary deductions and withholdings from its employees' and agents' salaries and other compensation, and for the payment of all applicable contributions, taxes and assessments.

8.3   . The relationship of the parties for purposes of this Agreement will be that of independent contractors and nothing contained in this Agreement shall be construed as creating a partnership, agency or joint venture between the parties with respect to the Sears Services or the Kmart Services.  Except as expressly provided herein, (i) neither party shall become bound by any representation, act or omission of the other, and (ii) neither party shall make any commitment to any third party necessitating action hereunder by the other, its employees or agents without the prior written consent of such other party.


## SECTION IX
## MISCELLANEOUS PROVISIONS

9.1     Further Assurances.  From and after the Effective Date, each of Sears and Kmart shall take such actions, provide such additional information, and execute and deliver to the other such other and further documents and instruments, as are expressly required hereunder or as shall be necessary or reasonably requested in order to effect the intent of this Agreement and consummate the transactions contemplated hereby.

9.2     Notices.  All notices or other communications that are required or may be given pursuant to the terms of this Agreement shall be given in writing and shall be deemed given on the earliest of (i) actual receipt, irrespective of the method of delivery (including delivery by facsimile transmission), (ii) on the delivery day following dispatch if sent by express mail (or similar next day air courier service), or (iii) on the sixth day after mailing by registered or certified United States mail, return receipt requested, first-class postage prepaid and addressed as follows:

if to Sears:

Sears, Roebuck and Co.
3333 Beverly Road
Hoffman Estates, Illinois 60179
Attn:  President, Sears Merchandising and Marketing
Fax:    (847) 286-0266

7

if to Kmart:

> Kmart Corporation
> 3100 West Big Beaver Road
> Troy, Michigan 48084
> Attn:   SVP, Kmart Chief of Staff
> Fax:    (248) 637-4857

or to such other addresses or facsimile number as either party may hereafter specify for such purpose by notice to the other party.

    9.3    <u>Construction</u>. For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires: (i) the terms defined herein include the plural as well as the singular and vice-versa; (ii) any reference to an "Exhibit", a "Section", a "subsection" or a "paragraph" refers to an Exhibit, a Section, a subsection or a paragraph, as the case may be, of this Agreement; (iii) the Exhibits hereto form part of this Agreement; (iv) all references to this Agreement and the words "herein", "hereof", "hereto" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Exhibit, Section, subsection, paragraph or other subdivision; and (v) the words "including," "included" and "includes" means inclusion without limitation.

    9.4    <u>Limitations on Authority</u>. Notwithstanding any other provision of this Agreement to the contrary, neither party shall be authorized to manage the affairs of the other. The management, policies, and operations of each party, including but not limited to all decisions relating to corporate matters, shall be the responsibility of the directors and officers of such party, acting pursuant to and in accordance with such party's corporate charter and bylaws.

    9.5    <u>Compliance with Law</u>. Each party shall fully comply with applicable laws and regulations in performing its duties hereunder, as the case may be. Fees ands expenses arising out of any acts required by law or regulation in connection with the services to be provided and Goods to be sold by either party under this Agreement shall, without duplication of amounts payable in accordance with this Agreement, be included in the costs of such services and Goods, as the case may be.

    9.6    <u>Authorization</u>. Each party represents to the other party that, assuming due authorization, execution and delivery by the other party, (i) this Agreement is the valid, legal, and binding agreement of the party, (ii) this Agreement does not contravene any other agreement to which Sears or Kmart, respectively, is a party or of its certificate or articles of incorporation (as applicable) or bylaws, and (iii) it has the resources and experience to perform its obligations under this Agreement.

    9.7    <u>Severability</u>. The parties acknowledge and agree that, should any provision of this Agreement be determined to violate or contravene any law, such provision shall be severed or modified to the extent necessary to comply with such applicable law, and such

modified provision and the remainder of the provisions hereof shall continue in full force and effect.

9.8    Successors and Assigns.  This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective legal representatives, successors and assigns; provided, however, that neither party may assign all or any portion of their rights and obligations under this Agreement without the express written consent of the other.

9.9    Modification.  This Agreement may only be amended or modified by the express written agreement of both parties.

9.10    Governing Law.  This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of Illinois, without regard to the conflicts of law provisions thereof.

9.11    Headings and Captions.  The headings or captions in this Agreement are inserted for convenience and identification only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provisions hereof.

9.12    Entire Agreement.  This Agreement contains the entire understanding and agreement between the parties with respect to the subject matter hereof and supersedes all previous communications, proposals, representations, and agreements, whether oral or written.

9.13    Effect of Waiver.  No waiver whether express or implied, of any breach of any term, condition, or obligation of this Agreement shall be construed as a waiver of any subsequent breach of that term, condition, or obligation, or of any other term, condition, or obligation of this Agreement of the same or different nature.

9.14    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.  Facsimile signatures shall have the same force and effect as original signatures.

*[Signature Page Follows]*

9

IN WITNESS WHEREOF, the parties have executed this Reciprocal Services and Supply Agreement effective as of the Effective Date.

KMART CORPORATION,
a Michigan corporation

By: _____

Name:_____

Title: _____


SEARS, ROEBUCK AND CO.,
a New York corporation

By: _*(signature)*_____

Name: _Michael R. Odell_____

Title: _EVP Sears Stores_____

10

IN WITNESS WHEREOF, the parties have executed this Reciprocal Services and Supply Agreement effective as of the Effective Date.

KMART CORPORATION,
a Michigan corporation

By: _____

Name: _Dere Roges_____

Title: _EVP/GM  Kmart Stores_

SEARS, ROEBUCK AND CO.,
a New York corporation

By: _____

Name: _Michael R. Odell_____

Title: _EVP Sears Stores_____

10

**EXHIBIT A**

<u>Sears Services</u>

- ➤ Merchandise assortment planning services
- ➤ Store replenishment services
- ➤ Distribution and transportation services
- ➤ Procurement services
- ➤ Various information technology services
- ➤ General corporate and administrative services, including financial and legal services as the parties mutually agree
- ➤ Negotiation and administrative services relating to credit and financial products
- ➤ Such other services as the parties mutually agree

Date of Exhibit: March 24, 2005

**EXHIBIT B**

<u>Kmart Services</u>

> Merchandise assortment planning services
> Store replenishment services
> Distribution and transportation services
> Procurement services
> Various information technology services
> General corporate and administrative services, including financial and legal services as the parties mutually agree
> Such other services as the parties mutually agree

Date of Exhibit: March 24, 2005

**EXHIBIT C**

<u>Factors for Calculation of Prices for Goods</u>

- Seller's invoice price of Goods, less vendor allowances, plus

- Seller's freight cost, including: (a) all duties and taxes (including excise and withholding taxes) payable in any country where production or delivery takes place; (b) any commissions to selling agents; and (c) other incidental charges; plus

- such additional amounts to be mutually determined by the parties from time to time.

Date of Exhibit: March 24, 2005

**EXHIBIT D**

<u>Formula for Calculation of Payments for Sears Services</u>

Kmart shall pay to Sears fees in amounts mutually agreed upon by the parties from time to time.

Date of Exhibit: March 24, 2005

**EXHIBIT E**

<u>Formula for Calculation of Payments for Kmart Services</u>

Sears shall pay to Kmart fees in amounts mutually agreed upon by the parties from time to time.


Date of Exhibit: March 24, 2005

# EXHIBIT K



**kmart.**

Free Shipping See Details

🛒 Shopping Cart    0 Items

☀ PHARMACY | HOMEPAGE | TRACK YOUR ORDER
❀ MARTHA'S FLOWERS | MY ACCOUNT | STORE FINDER
🗓 WEEKLY CIRCULAR | CUSTOMER SERVICE | SIGN IN

| JEWELRY | APPAREL | FOR THE HOME | ELECTRONICS | HEALTH & BEAUTY | SPORTS | TOYS | BABY & KIDS | CLEARANCE | SEARS |

Search [enter keyword(s)] GO    Only at Kmart ▸ Martha Stewart Everyday | Thalia Sodi | Joe Boxer | Route 66 | Jaclyn Smith | More ▸

Homepage ▸ Company Information

# Kmart Corporation News

### About Kmart Press Releases

March 24, 2005

**Contacts:**

**For Kmart Holding Corporation**
Media Relations
(248) 463-1021

**For Sears, Roebuck and Co.**
Chris Brathwaite
(847) 286-4681

**Brunswick Group**
(212) 333-3810

**For Immediate Release**

### KMART AND SEARS COMPLETE MERGER TO FORM
### SEARS HOLDINGS CORPORATION

*New Stock " Ticker Symbol: SHLD " To Begin Trading on NASDAQ March 28*

**Troy, MI, and Hoffman Estates, IL, March 24, 2005** -- Kmart Holding Corporation (NASDAQ: KMRT) and Sears, Roebuck and Co. (NYSE: S) announced today that they have completed the transaction announced on November 17, 2004 combining Sears and Kmart into a major new retail company named Sears Holdings Corporation. Sears Holdings is the nation's third largest retailer, with approximately $55 billion in annual revenues and a national footprint of nearly 3,500 retail stores in the United States, including 2,350 full-line and off-mall stores, and 1,100 specialty retail stores.

Starting March 28, 2005, Sears Holdings stock will be listed for trading on the Nasdaq National Market under the ticker symbol "SHLD."

Kmart and Sears shareholders each approved the combination at their special shareholder meetings held earlier today.

Edward S. Lampert, chairman of Sears Holdings, said, "This new enterprise will seek to leverage the combined strengths of Sears and Kmart to create greater long-term value than either could have generated on a stand-alone basis. Sears Holdings plans to offer customers a new, more compelling shopping experience with a differentiated and expanded product range. We believe Sears Holdings has the potential to be a great company with a truly great retail business."

Alan J. Lacy, vice chairman and chief executive officer of Sears Holdings said, "This combination accelerates Sears' off-mall strategy and gives customers a complete, convenient shopping solution. Shoppers will have greater access to the leading proprietary brands of both Kmart and Sears, along with financial services products and the industry's leading service organization. With a national store base of nearly 3,500 stores, we expect to be able to leverage our scale and strategically grow the business."

Aylwin B. Lewis, president of Sears Holdings and chief executive officer of Kmart and Sears Retail, said, "With the close of the merger, we will focus on successfully executing the integration plan for Sears Holdings and building the foundation for a strong future. As we go forward, we will continue to count on the dedication and hard work of Sears and Kmart associates. The hallmarks of our new enterprise will continue to be performance and dedication to quality products and customer service, and we aim to instill these traits throughout our corporate culture."

Under the terms of the transaction, Kmart shareholders received one share of new Sears Holdings common stock for each Kmart share. Sears, Roebuck shareholders had the right to elect either $50.00 in cash or 0.5 of a share of Sears Holdings for each Sears, Roebuck share. Shareholder elections will be prorated to ensure that in the aggregate 55 percent of Sears, Roebuck shares are converted into Sears Holdings shares and 45 percent of Sears, Roebuck shares are converted into cash. Sears Holdings expects to announce preliminary proration calculations prior to the opening of the market on Monday, March 28, 2005.

Sears Holdings, headquartered in Hoffman Estates, Ill., is the holding company for the Sears, Roebuck and Kmart businesses, which will continue to operate separately under their respective brand names. Kmart will continue to have a presence in Michigan.

Sears Holdings is drawing on an accomplished group of leaders from both companies: Mr. Lampert serves as chairman of Sears Holdings; Mr. Lacy, vice chairman and chief executive officer of Sears Holdings; Mr. Lewis, president of Sears Holdings and chief executive officer of Kmart and Sears Retail; and William C. Crowley, executive vice president and chief financial officer of Sears Holdings.

Messrs. Lampert, Lacy, Lewis and Crowley are joined on a 10-member Sears Holdings board of directors by Ann N. Reese, Founder and Executive Director of the Center for Adoption Policy Studies and former Chief Financial Officer of ITT Corp.; Steven T. Mnuchin, Chairman and Co-Chief Executive Officer of Dune Capital Management LP; Julian C. Day, former President and Chief Executive Officer of Kmart; Michael A. Miles, former Chairman of the Board and Chief Executive Officer of Philip Morris Companies Inc.; Donald J. Carty, former Chairman of the Board and Chief Executive Officer of AMR Corporation and American Airlines, Inc.; and Thomas J. Tisch, Managing Partner of Four Partners, a private investment firm.

**About Sears Holdings Corporation**
Sears Holdings Corporation is the nation's third largest broadline retailer, with approximately $55 billion in annual revenues, and with approximately 3,800 full-line and specialty retail stores in the United States and Canada. Sears Holdings is the leading home appliance retailer as well as a leader in tools, lawn and garden, home electronics and automotive repair and maintenance. Key proprietary brands include Kenmore, Craftsman and DieHard, and a broad apparel offering, including such well-known labels as Lands' End, Jaclyn Smith and Joe Boxer, as well as the Apostrophe and Covington brands. It also has Martha Stewart Everyday products, which are offered exclusively in the U.S. by Kmart and in Canada by Sears Canada. For more information, visit Sears Holdings' website at www.searshc.com.

# # #

This document contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements include, but are not limited to, statements about the benefits of the business combination transaction involving Sears Holdings Corporation, Kmart Holding Corporation and Sears, Roebuck and Co., including future financial and operating results, the combined company's plans, objectives, expectations and intentions and other statements that are not historical facts. Such statements are based upon the current beliefs and expectations of Kmart's and Sears, Roebuck's management and are subject to significant risks and uncertainties. Actual results may differ from those set forth in the forward-looking statements.

The following factors, among others, could cause actual results to differ from those set forth in the forward-looking statements: the failure of Kmart and Sears, Roebuck stockholders to approve the transaction; the risk that the businesses will not be integrated successfully; failure to quickly realize synergies and cost-savings from the transaction as a result of technical, logistical, competitive and other factors; disruption from the transaction making it more difficult to maintain relationships with clients, employees or suppliers; competitive conditions in retail and related services industries; changes in consumer confidence, tastes, preferences and spending; the availability and level of consumer debt; anticipated cash flow and the ability of Sears Holdings to maintain sufficient operating cash flow and liquidity; the successful execution of, and customer response to, strategic initiatives, including the full-line store strategy and the conversion and integration of the Kmart stores and other new store

locations; the pace of growth in store locations, which may be higher or lower than anticipated; the possibility that new business and strategic options for one or more business segments will be identified, potentially including selective acquisitions, dispositions, restructurings, joint ventures and partnerships; trade restrictions, tariffs, and other factors potentially affecting the ability to find qualified vendors and access products in an efficient manner; the ability to successfully implement initiatives to improve inventory management capabilities; anticipated cash flow; changes in interest rates; the outcome of pending legal proceedings and bankruptcy claims; social and political conditions such as war, political unrest and terrorism or natural disasters; the possibility of negative investment returns in any pension plans; volatility in financial markets; changes in debt ratings, credit spreads and cost of funds; the possibility of interruptions in systematically accessing the public debt markets; the impact of seasonal buying patterns, which are difficult to forecast with certainty; and general economic conditions and normal business uncertainty. These forward-looking statements speak only as of the time first made, and no undertaking has been made to update or revise them as more information becomes available. Additional factors that could cause Kmart's and Sears, Roebuck's results to differ materially from those described in the forward-looking statements can be found in the 2004 Annual Reports on Forms 10-K of Kmart and Sears, Roebuck filed with the SEC and available at the SEC's Internet site (http://www.sec.gov).

### # # #

---



**Customer Service**
- Shipping Information
- Return Policy
- Contact Us
- more ›

**Kmart Stores**
- Store Locator
- Weekly Ad
- Gift Card
- Pharmacy

**My Account**
- Address Book
- Order History
- Wish List
- more ›

**Kmart deals**
Sign up for email savings!

enter email address 

Kmart Company Info | Sears Holdings Corporation Info | Careers | Product Recalls
Terms of Use | Privacy & Secure Shopping | Kmart Rewards Card | Vendor Resources | NetZero Internet | Site Map
© 2004 Kmart.com LLC

# EXHIBIT L

KAUFMANN, FEINER, YAMIN, GILDIN & ROBBINS LLP

ATTORNEYS AT LAW
777 THIRD AVENUE
NEW YORK, NEW YORK 10017

TELEPHONE (212) 755-3100
FACSIMILE (212) 755-3174
www.kaufmanafeiner.com

Writer's Direct Dial:
(212) 705-0820
Writer's E-Mail Address  rfeiner@kfygr.com

June 28, 2005

**VIA FEDERAL EXPRESS**
Robert Rathke, Esq.
Sears Holdings Corporation
3100 West Big Beaver Road
Troy, MI 48084

<u>RE: B.V.T.V. - "Home Again" Television Program</u>

Dear Mr. Rathke:

I am in receipt of your letter dated June 15, 2005 received on the 20th day of June. As you are well aware, our position is that Season 16 of the Syndication Agreement was contractually agreed to by the parties. The negotiations were concluded and all material terms had been resolved to the satisfaction of both parties. I understand that your position is contrary, although there is no evidence to support your stance.

Your reference to your reliance on Paragraph 7 of the Spokesperson Agreement as enabling Sears to terminate the Spokesperson Agreement is misplaced. The "Bob Vila's Home Again" series has <u>not</u> been canceled, and therefore, Sears has no right to terminate the Spokesperson Agreement.

The right to cancel in the television business exists with the distributor of the show, not Sears, the sponsor. The show is still in distribution. To the extent that there is any ambiguity, everyone involved in the negotiation of Paragraph 7 of the Spokesperson Agreement will confirm that Paragraph 7 was added to cover the unlikely possibility that the distributor could not clear the show and, if that were to occur, to provide Sears with a right to terminate the Spokesperson Agreement. It was <u>never</u> intended that Sears would have the unilateral opportunity to cancel the series so that it could then terminate the Spokesperson Agreement. As you can see from the dates of the contracts, the Spokesperson Agreement is a separate, independent agreement running at least five years beyond the term of the Production Agreement. But for the event of a cancellation of the series by the distributor, the Spokesperson Agreement exists beyond and independent of the Syndication Agreement. Sears' position that it can cancel the series in order to give itself the right to terminate the Spokesperson Agreement is not only in violation of the terms of the Spokesperson Agreement, but is also a breach of the implied covenant of good faith and fair dealing inherent in every contract.

P 0000282

KAUFMANN, FEINER, YAMIN, GILDIN & ROBBINS LLP

Robert Rathke, Esq.
June 28, 2005
- Page 2 -

Further, there is presently owed and unpaid to B.V.T.V. past incentives earned from the 2004-2005 television series estimated to be between $350,000 and $500,000. In a conference call on March 23, 2005 with Andy Ginger, Drew Farkas, Mark Rode, Wendy Pifner, Esq. of Holland & Hart and the undersigned, there was a request made by Sears, in settlement discussions, asking us to waive the incentive bonus for 2004-2005 which was estimated to be in the aforementioned range. (The final calculations as of that date had not been completed. They were scheduled to be completed by early spring.) Please let me know what this amount is and when we can expect payment.

It is clear that we disagree on many issues but, we likewise believe that neither of us would gain by protracted litigation. I reiterate that Bob would be open to good faith negotiations for the amicable resolution of the Syndication Agreement, the past incentives due and a reasonable proposal for a buy-out on the remaining years of his Spokesperson Contract.

I look forward to hearing from you.

Very truly yours,

Ronald E. Feiner

REF/klc/30
vila/sears

cc:    Mr. Bob Vila
       James F. O'Brien, Esq.

P 0000283

# EXHIBIT M



Not Reported in F.Supp.2d                                                                                                    Page 1
Not Reported in F.Supp.2d, 2003 WL 1786863 (D.Mass.)
**(Cite as: 2003 WL 1786863 (D.Mass.))**

▶

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Massachusetts.
COMMERCIAL UNION INSURANCE COMPANY
and American Employers' Insurance Company
Plaintiffs,
v.
SWISS REINSURANCE AMERICA
CORPORATION, Defendant.
**No. Civ.A. 00-12267-DPW.**

March 31, 2003.

*MEMORANDUM AND ORDER*

WOODLOCK, J.

*1 Plaintiffs Commercial Union Insurance and American Employers' Insurance Company bring this suit for payment of certain claims on a series of facultative reinsurance certificates providing excess liability coverage. The certificates were issued by defendant Swiss Reinsurance or its predecessor in interest. The plaintiffs seek money damages for breach of contract and a declaratory judgment as to the extent and nature of Swiss Reinsurance's ongoing obligations to Commercial Union under the reinsurance policies. Swiss Reinsurance has filed a counterclaim requesting a declaration that it is not obligated to make further payments to CGU under the certificates. Before me are cross motions for summary judgment.

I. BACKGROUND
A. The Parties
Plaintiffs Commercial Union Insurance Company ("CGU") and American Employers Insurance Company ("AEIC"), (collectively "Plaintiffs") are Massachusetts corporations, with principal places of business in Boston. CGU is the successor in interest of Employers-Commercial Union Insurance Company ("ECGU").

The Defendant, Swiss Reinsurance ("Swiss Re"), is a New York Corporation with its principal place of business in Armonk, New York. Swiss Re is licensed by the Massachusetts Division of Insurance to transact business in the Commonwealth of Massachusetts. Swiss Re is the successor in interest to North American Reinsurance Corporation ("NA Re").

B. The Policies
Between October 20, 1962 and June 30, 1974, AEIC and ECGU, CGU's predecessor in interest, provided excess liability coverage to W.R. Grace and Co. ("Grace") (not a party to this action) in the form of four multiyear umbrella policies ("CGU policies"): Policy No. A15-2127-51 (effective 10/20/62--10/20/65), Policy No. A16-8220-001 (effective 10/20/65-10/20/68), Policy No. A16-8220-003 (effective 10/20/68-6/30/71), Policy No. EY-8220-005 (effective 6/30/71-6/30/74). These policies were directly excess of seven primary policies issued by the Maryland Casualty Co. ("Maryland") (not a party) between 1962 and 1973 ("Maryland policies"). Specifically, during the period October 20, 1962 through June 30, 1967, the CGU policies were excess of five primary policies issued by Maryland to Grace for one year periods. During the period June 30, 1967 to June 30, 1973, the CGU policies were excess of two primary policies each issued by Maryland to Grace for a three year period.

1. *The Underlying Policies*

The Maryland Policies    [FN1] contained an endorsement titled "Three Year Policy" which stated that

> FN1. From June 1973-June 1976, Continental Casualty Co. replaced Maryland as Grace's primary insurer. Therefore, between June 30, 1973 and June 30, 1974, there was no Maryland policy underlying the CGU Umbrella policies at issue in this case. The CGU policy was excess of only the first year of the Continental Casualty policy.

A policy period of three years is comprised of three consecutive annual periods. Computation and adjustment of earned premium shall be made at the end of each annual period. Aggregate limits of liability as stated in this policy shall apply separately to each annual period.
These policies had $1 million per occurrence and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1786863 (D.Mass.)
**(Cite as: 2003 WL 1786863 (D.Mass.))**

aggregate limits. Maryland also issued two three-year policies to Grace (June 1967-June 1973) which were, in all material respects, similar to the one-year policies.

### 2. *The Excess Policies*

**\*2** The CGU policies were directly in excess of the Maryland primary policies and had stated limits of $5 million each occurrence and in the aggregate, excess of primary limits or "self-insured retention." Neither the declarations page nor other provisions of the CGU policies expressly state whether these per occurrence and aggregate limits apply on an annualized basis.

Two of the Policies also contain the following Endorsement:
It is agreed that the Terms and Conditions of this policy will not be construed any more restrictive than the Terms and Conditions of Underlying Insurance set forth in Item 3 of the Declarations.
Policies EY-8220-005 and A16-8220-003 state:
It is agreed that such coverage as is afforded by this policy shall apply to occurrences covered by the terms and conditions of [the underlying policy] or by the terms and conditions of this policy except that the definition of Property Damage as contained in this policy shall apply.

### 3. *The Reinsurance Certificates*

Between 1965 and 1971 NA Re, the predecessor in interest of Swiss Re, issued three facultative certificates of reinsurance to CGU ("Certificates"). Each of the Certificates referenced a particular CGU Umbrella Policy: Certificate No. 101085 referenced Policy No. A16-8220-001; Certificate No. 103970 referenced Policy No. A16-8220-003; Certificate No. 008091-6 referenced Policy No. EY-8220-005. The Certificates were drafted using NA Re's Certificate forms. *Id.*

The Certificates provide coverage on a "quota share basis" under which Swiss Re agreed to accept a fixed percentage of CGU's covered losses up to the reinsurance limits. [FN2] These limits were specified in Item 4 "Reinsurance Accepted" of the Certificates and varied across the policies. The policies and their limits were:

> FN2. "Quota share reinsurance" is a form of "pro-rata reinsurance in which the reinsurer participates in a fixed percentage of loss." Graydon S. Staring, *Law of Reinsurance* §

2.8 (2002). By contrast, "excess of loss" reinsurance provides coverage that is not pro-rata "that commences to pay when a loss exceeds a stated or defined amount." *Id.*

*No. 101085:* "50% quota share of first $1,000,000 each occurrence"
*No. 103970:* $250,000 each occurrence part of the first $500,000.
*No. 0080916:* "187,500 part of first $500,000, nil of next $4,500,000."

The Certificates also contained "follow form" provisions expressed in either of the following language: "The liability of the Reinsurer specified in Item 4 of the Certificate shall follow that of the Company ..." (Certificate No. 103970, Conditions, ¶ A) or, "the liability of the Reinsurer shall follow the terms and conditions of the Company's policy furnished to the Reinsurer at the effective date of this Reinsurance Certificate, unless otherwise specifically provided herein by Endorsement made part of this Certificate" (Certificate Nos. 101085, 80916, "Application of Liability," ¶ A). The Certificates contained no other endorsements expressly defining or limiting the correspondence between the Certificates and the underlying policies. *Id.*

The Certificates also contained a "Loss Payable" provision providing that: "All claims involving this reinsurance, when settled by the Company, shall be binding of the Reinsurers, which shall be bound to pay its proportion of such settlements promptly following receipt of proof of loss." Certificate Nos. 101085, 103970, "Conditions," Loss Payable" ¶ E; Certificate No. 80916, "Loss Payable" ¶ F.

### C. Factual Background
#### 1. *The Coverage Litigation*

**\*3** On November 25, 1987, Grace initially filed suit against its insurers in the Massachusetts Superior Court seeking a declaration of insurance coverage for property damage arising from environmental contamination at various Grace sites across the country. Grace later amended its complaint by specifying twenty-four sites. Following Grace's amended complaint, in June 1988, Maryland filed a declaratory judgment action against Grace in the United States District Court for the Southern District of New York, which was assigned to Judge Martin, seeking clarification of its obligations under the primary policies to indemnify Grace against liability arising from pollution at nine polluted sites. *Maryland Casualty Co. v. W.R. Grace & Co.,* No. 88

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1786863 (D.Mass.)
**(Cite as: 2003 WL 1786863 (D.Mass.))**

Civ. 4337(JSM). Thereafter, the initial Massachusetts case was dismissed; Grace filed a third party complaint against CGU in the Southern District of New York action and hundreds of sites were added to the suit, transforming it into a comprehensive declaratory judgment action concerning the rights and obligations arising out of the multiple insurance policies. *Id.* at 4.

*2. The Insurer's Early Evaluation of Potential Liability*

During the pendency of the New York litigation, CGU engaged in frequent evaluations and conversations of its potential liability to Grace. These conversations involved CGU staff, including James J. McKay; as well as coverage counsel James Christie, and Bradley Mortensen, named partners of Christie, Parabue, Mortensen and Young, P.C., ("CPMY"); Rex Brien and Steven Urgo, attorneys at CPMY, Ann Mizner, an attorney at Kilgore, Martin & Frumer, and later, in-house counsel to CGU. Throughout these discussions, CGU staff and attorneys analyzed the state of New York law on per occurrence limits, whether the $5,000,000 policy limits would be annualized or would apply per policy, and whether these limits would be applied per site or per claim.

Of particular relevance to this case were the discussions among CGU and its attorneys over the question whether New York courts would interpret the CGU umbrella policies as providing annualized limits. In April 1995, CPMY attorney Brien drafted three memoranda for CPMY analyzing New York law on per occurrence limits for multiple year policies, "issues of critical importance to determining Commercial Union's potential exposure." Brien concluded that "New York courts would likely read the Commercial Union policies limit of liability provision as providing only one per occurrence limit for any single occurrence during the three-year policy period." In other words, according to Brien, it was unlikely that New York courts would construe the policies so as to mandate annualized limits. The distinction was of critical importance to CGU because annualized limits in a multi-year policy would mean that a separate claim could be filed for each year in which an occurrence took place, thus potentially trebling CGU's liability on a three year policy.

*4 In reaching this conclusion however, Brien expressed "concern" over the impact of an opinion from the District of New Jersey construing the "follow form" provision. *Hatco Corporation v. W.R.*

*Grace & Co.,* 801 F.Supp. 1334 (D.N.J 1992). Brien wrote that:

> Arguably, if the underlying primary policies [the Maryland policies] have annualized limits, the court could find that the per occurrence limit of liability language in the Commercial Union policies was amended to provide annualized limits, consistent with the primary policies.

Brien nevertheless concluded first, that Commercial Union could defeat this argument by contending that Grace should be estopped from arguing for annualized limits based on its litigation posture in the *Hatco* litigation, and second, that CGU could argue that *Hatco* reflected a fundamental distinction between "coverage" provisions, which would be subject to follow form rules, and limitation of liability provisions which might not. In any event, Brien concluded that CGU could expect Grace to argue for annualized limits.

On April 9, 1996, CPMY attorney Mortenson wrote a letter memorandum to Joseph Dalton, Vice President for Reinsurance at CGU, analyzing among other things, the number of occurrence limits available to W.R. Grace. Mortenson stated his conclusion that "Grace is entitled to three annual occurrence limits" under CGU's 1962-65 and 1965-68 Umbrella policies but that Grace would not be so entitled under the 1968-71 and 1971-74 policies. Mortenson based his opinion, chiefly, on language in the 1962-65, 1965-68 CGU policies stating that the excess coverage would not be construed "any more restrictive" than the coverage in the Maryland primary policies. Because the CGU policies during this period were in excess of three separate primary policies, Mortenson concluded that the "no more restrictive" provision would operate to require annualized limits for these policies.

On the other hand, Mortenson contended that the later CGU policies contained different versions of the "no more restrictive" provision that could substantially change a court's interpretation of CGU's follow form liability. Mortenson stated:

> Whereas the previous "no more restrictive than" endorsements made the entire policy no more restrictive than the "underlying insurance," this endorsement states that the "Coverage" afforded by the policy shall apply to "occurrence" covered by the terms and conditions of the Maryland policy. We believe that this language mandates that the specific grant of coverage for occurrences ... set forth in the Maryland policy must be recognized by the Commercial Union policy even if the terms and conditions of the Commercial Union Policy would

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1786863 (D.Mass.)
(Cite as: 2003 WL 1786863 (D.Mass.))

otherwise exclude coverage. However, this language only addresses *whether there is coverage* for an occurrence under the terms and conditions, not *how much coverage* is available under the terms and conditions.

Based on this analysis, Mortenson concluded that CGU policy Nos. A16-8220- 003 and EY-8220-005 would not be susceptible to an annualized limits argument.

**\*5** On May 3, 1996, approximately one year after the Brien memos and less than a month after the Mortenson memo, CPMY attorney Urgo wrote to Dalton and Ellen Martin, an attorney at Kilgore Martin, enclosing a copy of a recent decision by Judge Martin in a separate but related case involving Grace and Maryland Casualty ("Grace Asbestos"). *Maryland Casualty Co. v. W.R. Grace & Co.,* 88 Civ. 2613(JSM), 1996 WL 169326 (S.D.N.Y., April 10, 1996). Based on Judge Martin's decision in *Grace Asbestos,* Urgo reiterated the opinion that New York courts would probably not apply annualized limits to excess liability policies on the basis of a "follow form" argument where the excess policy is silent as to annualization.

One year later, in April 1997, CPMY attorney Christie wrote to Mizner, McKay, and Robert McCarthy of CGU expressing confidence that CGU has "the better argument" on the issue of annualization on the basis of Judge Martin's *Grace Asbestos* ruling. Moreover, Christie declared "We obviously do not believe it necessary to either settle or negotiate on the basis that these occurrence limits are annualized ..."

### 4. The Grace--CGU Settlement Discussions

Sometime in 1997, representatives of Grace and CGU began expressing interest in beginning meaningful settlement discussions. Just prior to this point, McKay was assigned responsibility as CGU's lead negotiator. Together with CPMY's Christie, McKay had earlier handled CGU's litigation strategy in the declaratory judgment proceedings. At this point however McKay apparently became more involved as settlement discussions intensified in 1997. Around this time, McKay decided to consult with CPMY's Mortenson to get from him what he anticipated would be an "objective open-minded evaluation of what the strengths and weaknesses of the case [were] notwithstanding Mr. Christie's overly optimistic and aggressive pursuit of those defenses available in litigation." Apparently, McKay and in-house counsel Mizner had become concerned that

Christie's analyses of CGU's likelihood of success in the New York litigation were, as Mizner phrased it, "on a gut level out of whack" and, as McKay phrased it, "crazy in a sense, because they were just entirely overly optimistic."

McKay testified that because of his declining confidence in Christie's analysis, he "felt it would have been irresponsible for me to rely on [Christie's] positions." According to McKay, Mortenson's opinion was more reliable because it was based on "the wealth of information provided to [CGU] by Grace" once settlement discussions had begun. Mortenson himself testified that people at CGU sometimes thought that Christie "doesn't see the forest for the trees." Mizner also suggested that she believed Christie had become "enamored of the case" and that Mortenson was brought in to provide a "neutral perspective' of their settlement negotiations.

On October 10, 1997 Mortenson and McKay met with representatives of Grace to discuss settlement of the New York action. At that meeting, the Grace representatives, including Jeff Posner, presented Mortenson and McKay with a list of 41 Grace sites for which the company claimed coverage under the policies. In addition, Grace demanded between $50-100 million to settle the case.

**\*6** McKay testified that he concluded, on the basis of the list of 41 sites and the fact that Grace was demanding more than $20 million in coverage, that Grace was contending that the CGU policies must be construed as offering an annualized occurrence and aggregate limit. In other words, because the CGU policies as written had an aggregate limit of $20 million, the only way Grace could have calculated a dollar amount in excess of that figure would have been by annualizing the coverage. McKay stated that he confirmed this conclusion by asking the Grace representatives how they had calculated their settlement figure, to which they "advised they had calculated on a pro rata annualized basis."

During the course of settlement negotiations, CGU and Grace agreed to focus their discussions on nine polluted sites ("Focus Sites") [FN3] so as to structure a proposed settlement. The nine Focus Sites were selected on the basis of their size and the potential exposure they presented to CGU. As part of the decision to focus the negotiation on the nine sites, Grace agreed to give CGU the information it would need to make an independent analysis of the damage and prospective remediation costs. According to testimony of Ann Mizner, McKay and Mortenson

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1786863 (D.Mass.)
(Cite as: 2003 WL 1786863 (D.Mass.))

Page 5

were very pleased with the first meeting with the Grace representatives particularly because they "believed it would capture or contain the liability, and it would give us a real opportunity to settle the case."

> FN3. The nine focus sites were Ft. Pierce, Florida; Nashua, New Hampshire; Memphis, Tennessee; Odessa, Texas; Walpole, Massachusetts; Acton, Massachusetts; Woburn, Massachusetts; Charleston, South Carolina and Wayne, New Jersey.

As part of the preparations for the settlement discussions with Grace, Mortenson advised CGU of his recommended coverage discounts for the Focus Sites. Mortenson testified that he prepared the coverage discounts for each site according to where he thought CGU's legal defenses were not strong.

In July 1998, CGU and Grace agreed in principle to a settlement of the New York litigation in which CGU would pay Grace $70 million over seven years for a full release of liability under all policies issued to Grace and, as well, any extra-contractual obligations CGU might have incurred during their dealings. The parties subsequently agreed to base their settlement on the present value of the payment. In October 1998, the parties entered into a settlement agreement in which CGU agreed to make a cash payment of $57.6 million.

Between October 1998 and August 19, 1999, Mortenson, McKay and Mizner engaged in the process of drafting and revising the memorandum memorializing the Grace settlement. This memorandum recounted the history of the litigation and negotiations, the theories of CGU's defenses and settlement strategies, as well as calculations of the coverage discounts that were to be applied to each of the Focus Sites in arriving at the final settlement figure. During the months between achieving the settlement and the final memorandum of that achievement, numerous editorial and substantive changes were made to the document, the bulk of them apparently by Mortenson, Mizner, and McKay.

5. *The Demand on Swiss Re*

*7 On August 20, 1999 CGU billed Swiss Re for $18,312,053 as its share of the Grace New York settlement. Included with the reinsurance tender were proofs of loss, a copy of the Settlement Agreement/ Release, and the Settlement Memorandum and Legal Analysis. In his letter accompanying the bill, McKay explained that the settlement was based on the claims

regarding the nine Focus Sites, and that, the settlement was allocated among these nine sites in addition to providing CGU with a full release from claims relating to any of the non-Focus sites. Furthermore, McKay explained that CGU had calculated the value of the claims on an annualized basis with each policy providing for a one occurrence limit per year and treating each site as a separate occurrence. The liability attributable to each site was then assigned on a pro rata basis to each year of the Policies. McKay noted that

> ... some insurers may disagree with [CGU's] treatment of the occurrence issue, [but] we strongly believe that what is contained in the enclosed billing is an accurate reflection of [CGU's] underlying settlement rationale given the facts and circumstances involved with this claim, and in particular, the manuscript policy language which afforded very broad coverage to the insured.

Swiss Re apparently paid $7,794,963 on September 6 and 8, 2000, but refused to reimburse CGU for the remainder of the settlement. [FN4] It argues that CGU's billing was inappropriate because it was based on a full annualization of the claims in contravention of the single, per occurrence limits, expressed in the Facultative Certificates.

> FN4. Swiss Re Answer, Affirmative Defenses and Counterclaim, ¶ 26, Dock. No. 5; CGU Answer to Defs. Counterclaim, ¶ 26, Dock. No. 12. I note, however, that in its Rule 56.1 Statement, Swiss Re states that it had paid CGU $5,326,208 "in satisfaction of its obligations under the Certificates." Swiss Re, R. 56.1 Statement, ¶ 65, Dock. No. 34.

On November 2, 2000, CGU filed this suit against Swiss Re for damages and declaratory relief. On December 8, 2000, Swiss Re filed an answer and counter-claim for declaratory judgment, requesting a declaration that it has no obligation to pay the full amount tendered to it by CGU, or to make other payments to CGU for existing or future billings or legal expenses. [FN5]

> FN5. Swiss Re requests a declaration that CGU's submission of an annualized reinsurance tender was improper and that "CGU's remaining claim is accordingly reduced to $2,306,873." Swiss Re Motion for Partial Summary Judgment, Dock. No. 32.

Not Reported in F.Supp.2d                                                                 Page 6
Not Reported in F.Supp.2d, 2003 WL 1786863 (D.Mass.)
**(Cite as: 2003 WL 1786863 (D.Mass.))**

## II. DISCUSSION
### A. Reinsurance Overview

Reinsurance is a mechanism by which an insurer spreads its risk by acquiring indemnification for loss on policies it has issued. There are two basic types of reinsurance policies: "facultative" and "treaty." Treaty reinsurance deals with specified classes of risks covered by an insurer. In other words, "treaty reinsurance involves the pooling of all policies covering a particular type of risk--such as all property damage, all liability insurance--among a group of insurers, each of whom agrees to cover a certain portion of all claims of that type." *Commercial Union Ins. Co. v. Seven Provinces Ins. Co. Ltd.,* 9 F.Supp.2d 49, 51, n. 1 (D.Mass.1998). Facultative reinsurance, the type at issue here, involves the offer of all or a portion of the risk of a particular insured to one or more potential reinsurers, who may then accept or reject the risk in whole or part. *See Seven Provinces,* 9 F.Supp.2d at 51, n. 1; *United Fire & Casualty Co. v. Awkwright Mutual Ins. Co.,* 53 F.Supp.2d 632, 639 (S.D.N.Y.1999); *Unigard Security Insurance Co. v. North River Ins. Co.,* 4 F.3d 1049, 1053-54 (2d Cir.1993).

**\*8** In interpreting reinsurance contracts, the ceding company, (here CGU) has the burden of proving coverage under the Certificates. *See e.g., Commercial Union v. Seven Provinces,* 217 F.3d 33, 38 (1st Cir.2000); *Travelers Casualty and Surety Co., v. Underwriters at Lloyd's,* 724 N.Y.S.2d 1, 1 (N.Y.App.Div.2000). In this case it is undisputed that the Grace claims were covered by the policies at issue. The question here concerns the limits to that coverage.

In countering CGU's motion for summary judgment, Swiss Re argues first that its multi-year Facultative Certificates do not obligate it to indemnify CGU on an annualized basis for claims against the underlying Maryland and CGU policies, notwithstanding the fact that these underlying policies may have granted annual or annualized coverage. Specifically, Swiss Re contends that standard "follow form" language in the Certificates does not trump the limitation of liability expressly stated in the Certificates. Second, Swiss Re argues that even if the annualization is appropriate, it should not be obligated to pay a portion of the settlement between Grace and CGU because the decision to allocate the settlement across nine sites, and the coverage discounts applied to those sites, were unreasonable. I consider each argument in turn.

### B. Annualization

The question at the heart of this case--whether Swiss Re's refusal to pay CGU's claims on the Facultative Certificates issued by NA Re on an annualized basis was justified--implicates several legal issues, chiefly the construction of insurance policies and the evaluation of the degree of concurrence between primary and reinsurance policies. I consider these issues in turn. [FN6]

> FN6. As the forum state for this diversity action, Massachusetts choice of law rules apply. *See A. Johnson & Co. v. Aetna Cas. & Sur. Co.,* 741 F.Supp. 298, 299 (D.Mass.1990). Application of these rules suggests that either New York or Massachusetts' substantive law could govern this dispute. The First Circuit has held that where the choice of law decision will make no difference because the substantive law of the potentially applicable jurisdiction is the same, it is "unnecessary" to make a formal choice of law. *See Royal Business Group, Inc. v. Realist,* Inc., 933 F.2d 1056, 1064 (1st Cir.1991); *Fashion House, Inc. v. Kmart Corp.,* 892 F.2d 1076, 1092 (1st Cir.1989). The parties to this diversity action do not present a dispute as to the choice of law to be applied here and there appears to be no difference on the relevant issues between the law of New York and that of Massachusetts. Consequently, I find it unnecessary to make a formal choice of law decision.

### 1. Construction of Insurance Policies

Construing the language of an insurance contract is a question of law for the reviewing court. *Affiliated FM Insurance Co. v. Constitution Reinsurance Co.,* 416 Mass. 839, 843 (1994); *Commercial Union Ins. Co., v. Walbrook Ins. Co., Ltd.,* 7 F.3d 1047, 1050 (1st Cir.1993). Insurance contract terms are given their ordinary meaning, based on an examination of the entire policy, including its endorsements. *See Continental Cas. Co., v. Canadian Universal Ins. Co.,* 924 F.2d 370, 374-75 (1st Cir.1991) (applying Mass. law); *Falmouth Nat'l Bank v. Ticor Title Ins. Co.,* 920 F.2d 1058, 1061 (1st Cir.1990) (applying Mass. law). An insurance contract must be interpreted as a whole to give effect to its general purpose, and with a view to effectuating the intent of the parties. *See Cullen Enter. v. Mass. Insurer's Insolvency Fund,* 399 Mass. 886, 900 n. 27 (1987); *Walbrook,* 7 F.3d at 1050. Where the words of an insurance contract are free from ambiguity the court will construe and enforce the language according to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1786863 (D.Mass.)
(Cite as: 2003 WL 1786863 (D.Mass.))

its usual and ordinary meaning. *Hakim v. Mass. Insurer's Insolvency Fund*, 424 Mass. 275, 281 (1997). Furthermore, a court must read the policy as written and is not free to revise it or change the order of words. *See Hakim*, 424 Mass. at 281. "Custom and usage may aid in policy interpretation not as tending to contradict or vary a contract but on the theory that such usage forms part of the contract." *Seven Provinces*, 9 F.Supp.2d at 66, *quoting Boston Edison Co. v. F.E.R.C.*, 856 F.2d 361, 365 (1st Cir.1988) (applying Massachusetts law).

*9 Finally, under Massachusetts law, rules of construction which protect the "reasonable expectations" of a primary insured do not apply in the reinsurance context where, it is presumed, both parties are sophisticated business enterprises familiar with the practices and forms of the reinsurance industry and are well-equipped to understand the scope of the coverage provided by the Certificates. *See Boston Ins. Co. v. Fawcett*, 357 Mass. 535, 543 (1970); *Waltham Precision Instruments, Inc. v. Federal Ins. Co.*, 1988 WL 22499 (D.Mass.1988)(applying Massachusetts law); *Ruthardt v. Underwriters at Lloyd's London*, Mass.Super. Ct., Civ. Act. No. 91-7877C. at 11-12.

The proper starting point for an analysis of the meaning of the policies is with the text of the policies. As noted above, the Swiss Re policies contain "follow form" provisions which state: "The liability of the Reinsurer specified in Item 4 of the Certificate shall follow that of the Company and, except as otherwise provided specifically herein, shall be subject in all respects to the terms and conditions of [CGU's] policy" or "the liability of the Reinsurer shall follow the terms and conditions of the Company's policy ... unless otherwise specifically provided herein by Endorsement made part of this Certificate. "Item 4" of Certificate No. 103970, as referenced by the first follow form provision, states the "Reinsurance Accepted" under the policy and provides: "$250,000 each occurrence part of the first $500,000." In respect to the terms of the second provision, the Certificates contained no other endorsements "specifically" defining or limiting the concurrence of the Certificates to the underlying policies.

At the outset, I must determine whether the Certificates are ambiguous. At first glance, the follow form provisions contained in the Application of Liability may seem ambiguous in providing that Swiss Re's liability shall follow the "terms and conditions" of the ceding insurer; as the instant controversy makes clear, the phrase "terms and conditions" is perhaps subject to two reasonable, but conflicting, interpretations.

Read in the broadest possible way, "terms and conditions" could encompass the entire underlying policy, including its coverage definitions, exclusions, endorsements, and limits of liability. That is essentially the reading advanced by CGU.

For its part, Swiss Re contends that "terms and conditions" should be read narrowly to refer to those provisions establishing the type of coverage in the underlying policy, but does not extend to the limits of liability set forth in the reinsurance Certificates. According to Swiss Re, following the "terms and conditions" of the underlying policy obligates Swiss Re to indemnify CGU for losses from occurrences as defined in the underlying policies but does not operate to cause Swiss Re to exceed its bargained for limits of liability as those limits are expressed in the Certificates.

*10 While it may be true that "terms and conditions" taken out of context is arguably vague, construing this provision in light of the Certificates as a whole, as I must, and in light of recent decisions discussing the effect of follow form provisions, I find that the Certificates set forth unambiguous limits to Swiss Re's liability to CGU. I find the question of annualization to be one of limits. And I conclude the clear language of the Certificates does not permit the imposition of annualized limits on Swiss Re in excess of the stated per occurrence and aggregate limits.

I find that any arguable ambiguity of the follow form provision in the Certificates is clarified by the operation of the express liability limits of the Certificates, as set forth in Items 2 and 4 of the policies. The "Application of Liability" provisions, stated in Certificates 101085 and 80916 covering CGU policies for 1965-68 and 1971-74 respectively, make clear that the follow form provision is subject to specific provisions of the Certificates.

CGU contends that, given the "by endorsement made part of this Certificate" language of Certificates No. 101085 and No. 80916, the fact that the Certificates contain no such endorsements expressly limiting Swiss Re's obligation to follow form with CGU demonstrates that the limits of liability are controlled by the follow form provisions. According to CGU, the absence of any limiting endorsements means that Swiss Re must follow form of the terms and conditions of the underlying policies, such that Swiss

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1786863 (D.Mass.)
**(Cite as: 2003 WL 1786863 (D.Mass.))**

Re must annualize its coverage as CGU has done.

Based on an evaluation of the Certificates as a whole, I find that this argument mistakes the import both of the phrase "by endorsement made part of this certificate" as well as the limitations of liability set forth on the face page of the Certificates. The fact that no endorsement exists altering or amending the terms of the policy does not mean that the Certificate provided no limits whatsoever to Swiss Re's liability to CGU. The crucial terms of a reinsurance contract, namely the policy period, per occurrence and aggregate limits, as well as the premium to be charged, are not generally expressed in the form of endorsements but rather on the face page of the reinsurance certificates themselves. The Certificates in dispute here clearly identify that the coverage provided by the reinsurance covers three year policy periods: 1962-65, 1968-71, and 1971-74. Similarly, the Certificates identify the per occurrence and aggregate limits of coverage afforded by the reinsurance. These crucial terms exist prior to any endorsement and form the framework to which any future endorsements would attach. In other words, the mere fact that endorsements were not added to the policy is irrelevant to the existence, and preeminence, of the stated policy term and limits of liability. Thus, while not an "endorsement made part of this certificate" per se, the limitations of liability set forth in the declarations page nonetheless constitute specific terms that govern the amount of indemnification available under the policy. In this respect, the primary import of the phrase "endorsement made part of the Certificate" is to require that any adjustments or alterations to the reinsurance coverage within this framework be expressed and incorporated in the policy. In the case of the per occurrence and aggregate limitations of liability, there is no doubt that such a term is part of, if not essential to, the policy and reflects the coverage and premium which NA Re and CGU actually bargained for.

**\*11** The limitations of liability and policy period expressed on the face page of the Certificates are unambiguous. The reinsurance certificates cover three year terms. "Item 4" in the certificates, defining the "Reinsurance Accepted" under the policies, specifies the level of indemnification offered. For example, Certificate 101085 states that the reinsurer accepts "50% Quota Share part of first $1,000,000 each occurrence" of CGU's umbrella liability. Item 4 of Certificate 103970 provides "$250,000 each occurrence part of the first $500,000." Finally, Item 4 of Certificate 80916 provides $187,500 part of first $500,000. Each of these Certificates provides clear and unambiguous limits on the indemnification afforded by the reinsurance during the three year policy term. There is nothing in the Certificates to suggest that the coverage was understood to apply on an annual basis, rather than on the three year policy term defined by the Certificates. As a consequence, I find that the language of the Certificates read as a whole is not ambiguous as to the annualization issue.

### 2. Effect of Follow Form Provisions

Having concluded that the Certificates are not ambiguous, I must next consider the separate question of the potential conflict between the follow form and limitation of liability provisions. CGU argues that, in the absence of express endorsements limiting Swiss Re's obligation to follow form with the CGU and Maryland policies, the follow form provision of the policy must prevail over the stated limits of liability. Swiss Re counters that the limits of liability, reflecting as they do the particular agreement of the parties, must trump the standard, pre-printed follow form language contained in the "Conditions" section of the Certificates.

Where there is a conflict between written or typewritten terms and standard or form language in an insurance contract, the written or typewritten language prevails. *See e.g., N.Y. Marine & Gen. Ins. Co. v. Tradeline,* 266 F.3d 112, 124 (2d Cir.2001); *Bluewaters, Inc. v. Boag,* 320 F.2d 833, 835 n. 4 (1st Cir.1963)* ("that typewritten additions normally prevail if there is a conflict with printed provisions is well established"); *Plymouth Rubber Co., Inc. v. Ins. Co. of North Am.,* 18 Mass.App.Ct. 364, 366 (1984). Indeed, the force of the limitations of liability as a specific, bargained for term, decisively outweighs the boilerplate follow form provisions which CGU claims are controlling here. *See id.* As one leading treatise has stated the rule: "If the printed and written clauses are repugnant to each other and cannot be reconciled, the written part, having been especially chosen for the occasion to express the agreement of the parties, will be given effect." *See 2 Couch on Insurance §* 22:3 (3d ed.1997). In light of this well established rule, I conclude that the limitations of liability, being provisions drafted specifically to govern the relationship between CGU and NA Re regarding the cession of some portion of CGU's liability, may not be overwritten by the operation of standard follow form language in the certificates. *See id.*

**\*12** Courts analyzing similar policy language have

concluded that stated limits of liability control standard follow form provisions. *See e.g., CSX Transportation v. Commercial Union Ins. Co.,* 82 F.3d 478, 483 (D.C.Cir.1996); *Society of the Roman Catholic Church of the Diocese of Lafayette and Lake Charles Inc., v. Interstate Fire & Cas. Co.,* ("Society I"), 26 F.3d 1359, 1366 (5th Cir.1994) (fact that three year occurrence policy provides less coverage than three one-year policies did not justify providing more insurance coverage than the insured bargained for); *Unigard,* 4 F.3d at 1071; *Bellefonte v. Reins. Co. v. Aetna Cas. and Sur. Co.,* 903 F.2d 910, 913 (2d. Cir.1990); *Calvert Fire Ins. Co. v. Yosemite Ins. Co.,* 573 F.Supp. 27, 29 (E.D.N.C.1983) (reinsurer's liability followed the fortunes of ceding insurer only within limits specified in reinsurance certificates); *Diamond Shamrock Chemicals Co. v. Aetna Cas. and Sur. Co.,* 258 N.J.Super. 167, 224-25 (1992) (limit of liability in excess policies does not follow form but was fixed per occurrence, notwithstanding fact that primary policies contained annualized limits).

The decision of the Second Circuit in *Unigard,* following its *Bellefonte* holding, is particularly relevant. The court in *Unigard* faced a similar argument to that advanced by CGU, namely that the follow form provision in certain multiyear reinsurance certificates required the reinsurer to pay sums in excess of the certificate's stated limits. *See id.* at 1070. The *Unigard* Court noted first that the Certificate in controversy provided policy limits. *See id.* at 1071. Next, reiterating the logic of *Bellefonte,* the court stated that the limitation on liability capped the reinsurer's liability under the certificate and that "all other contractual language must be construed in light of that cap." *See id., quoting Bellefonte,* 903 F.2d at 914. The court then concluded that the fact that the ceding insurer had been compelled to pay certain disputed expenses by binding arbitration could not alter the bargained for terms of the agreement as expressed in the limitations of liability. *See id.*

Where, as here, the stated limits of liability are clear and unambiguous, judicial interpolation of the word "annual" into the express language of the certificates would be inappropriate. *See e.g., Grace Asbestos,* 1996 WL 169326, at *5; *CSX,* 82 F.3d at 483; *Society I,* 26 F.3d at 1366. There is no language in the Certificates remotely suggesting that "each occurrence" should be read as "each occurrence each year." *See CSX,* 82 F.3d at 483. Imposing such a term would fundamentally re-write the coverage afforded by the policy by making Swiss Re liable for up to

three times its express and bargained-for liability under the Certificate. *See Society,* 26 F.3d at 1366.

The conclusion that follow form provisions may not, in cases of alleged ambiguity, be used to supplant express liability caps is supported by case law from numerous jurisdictions which has held that "follow form" provisions are intended primarily to forestall, if not prevent, litigation between ceding insurers and reinsurers over the whether a claim is "of a type" covered by the primary insurance. *See e.g., Christiana Gen. Ins. Corp., v. Great Am. Ins. Co.,* 979 F.2d 268, 280 (2d. Cir.1992) (reinsurer liable for risks encompassed by underlying policy, not for payments clearly beyond the scope of underlying policy or in excess of its agreed to exposure); *United Fire,* 53 F.Supp.2d at 641-42 (follow form provision in reinsurance certificate does not require inclusion of earthquake protection insurance as "term and condition" of business interruption insurance); *Hatco Corp. v. W.R. Grace & Co.,* 801 F.Supp. 1334, 1355, 1357 (D.N.J.1992) (pollution exclusion in reinsurance policy gives way to coverage afforded by underlying policy due to following form provision, unless expressly excluded by reinsurance); *State Automobile Mut. Ins. Co. v. American Re-Insurance Co.,* 748 F.Supp. 556, 561 (S.D.Oh.1990) (follow the fortunes clause in reinsurance agreement means that "reinsurer is only liable for the loss *of the kind* reinsured") (emphasis added); 13A J. Appelman and J. Appelman, Insurance Law and Practice, § 7698 at 556 (1976) ("despite a 'follow the fortunes clause', the reinsurer is only liable for a loss *of the kind* reinsured") (emphasis added).

**\*13** As the court in *Aetna Casualty. and Surety v. Home Insurance Co .,* stated: "the purpose of following form is to achieve concurrence between the reinsured contract and the policy of reinsurance, thereby assuring the ceding company, that by purchasing reinsurance, it has *covered the same risks* by reinsurance that it has undertaken on behalf of the original insured under its own policy." 882 F.Supp. 1328, 1345 (S.D.N.Y.1995) (emphasis supplied). The goal of follow form provisions is to assure the ceding insurer that the purchased reinsurance will cover the same "occurrences" as provided by its underlying policies. *See id.* The case law establishes that follow form provisions like those at issue here prevent a reinsurer from contesting the decision of an underlying insurer to cover a claim, not from denying to indemnify the ceding insurer for sums in excess of its limits of liability. *See Christiana,* 979 F.2d at 280; *State Automobile,* 748 F.Supp. at 561; *United Fire,* 53 F.Supp.2d at 641-42; *Hatco,* 801 F.Supp. at 1355,

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1786863 (D.Mass.)
**(Cite as: 2003 WL 1786863 (D.Mass.))**

Page 10

1357.

Of course, the question here is more narrowly whether Swiss Re is obligated to follow form with CGU's payment of claims validly within its coverage calculated on an annualized basis. CGU argues that even if the limitations of liability set forth in Item 4 of the facing page of the Certificates do limit Swiss Re's per occurrence liability, Item 4 does not specify the application of that liability. Thus, CGU contends, according to the Application of Liability provision of the Certificates, Swiss Re must "follow form" and provide annualized limits. .

In support of its argument that the follow form provisions in this case, in combination with the no more restrictive clauses of its policies, required CGU to annualize Grace's claims against it, and therefore CGU's tender to Swiss Re, CGU cites *Hatco Corporation v. W.R. Grace and Company,* 801 F.Supp. at 1335- 37.

*Hatco* involved an earlier chapter in the litigation of the many insurance claims arising out of Grace's pollution of hundreds of sites across the country. *Id.* at 1333. One of the central issues in *Hatco* was whether "gradual pollution" was an "occurrence" as that term was defined within the primary and excess insurance Grace had purchased. *Id.* at 1343. For present purposes, CGU cites to *Hatco* for the proposition that "follow form" provisions in the excess umbrella policies issued to Grace must be read so as to allow coverage for the gradual pollution claims where the excess policies did not expressly exclude coverage. *Id.* at 1348, 1353-1355.

Significantly, the policies at issue in *Hatco* contained the same follow form provision that may be found in two of the three disputed policies here. *Id.* at 1355. Specifically, the policy stated:

> it is agreed that such coverage as is afforded by this policy shall apply to occurrences covered by the terms and conditions of Maryland Casualty Company ... or by the terms and conditions of this policy except that the definitions of Property Damage as contained in this policy shall apply.

*14 *Id.* at 1355. Based on this provision in the excess policy, Grace argued in *Hatco* that the excess policy effectively incorporated the gradual pollution coverage provided by the underlying policy in spite of its exclusion from the reinsurance policies. *Id.* In particular, Grace asserted that the phrase "such coverage as is afforded" referred only to "the dollar amount thresholds to trigger excess coverage and the *maximum policy limits"* but did not otherwise exclude

types of coverage afforded by the underlying policy. *Id.* (emphasis supplied). The Insurers countered that coverage under the excess policies for occurrences covered by the Maryland primary policies was afforded only to the extent that such coverage was consistent with the terms of the excess policies. *Id.*

Finding for Grace, the court in *Hatco* held that the following form provision in dispute was ambiguous in that it was susceptible to either of the interpretations offered by the parties. *Id.* The *Hatco* court determined that the lack of clarity in the follow form provision must be construed against the drafter, in that case, the excess insurers. *Id.* The effect of this determination was to "delete the pollution exclusion in the excess policies to the extent it was inconsistent with the coverage provided by the primary policy." 801 F.Supp. at 1355. Thus in analyzing "no more restrictive" provisions in the underlying policies that are identical to those disputed here, the *Hatco* held that unless the excess policies expressly exclude coverage for a particular occurrence, the "no more restrictive" provision operates to mandate concurrence of coverage between the primary and excess policies. *Id.* at 1357-58.

*Hatco* turns on the difference between "coverage" provisions and limitations of liability. *See id.* at 1353-56. It stands for the proposition that, absent express exclusions for types of occurrences, follow form provisions will require concurrence of coverage between excess and primary policies. *See id.* The court stated that the provisions at issue "merely set lower policy coverage limits for property damage resulting from gradual pollution than is provided under the general damage limits for property damage ." *Id.* The effect of this distinction for the parties here is significant because it casts the result of *Hatco* not simply as a broad authorization of follow form provisions but locates the analysis in a narrower field of inquiry covering the difference between coverage and limitation of liability provisions. *See id.* In other words, *Hatco* is consistent with those cases holding that follow form provisions will assure concurrence of coverage unless the type of risk is expressly excluded. *See CSX,* 82 F.3d at 483; *Unigard,* 4 F.3d at 1070-71; *Bellefonte,* 903 F.2d at 913; *Calvert,* 573 F.Supp. at 29. *Hatco* does not purport to erode the distinction between coverage issues and liability limits.

*15 CGU also cites to a pair of decisions in this circuit, *Seven Provinces,* 9 F.Supp.2d at 66-67 (D.Mass.1998) and *Commercial Union Ins. Co. v. Seven Provinces,* 217 F.3d 33 (1st Cir.2000), in

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1786863 (D.Mass.)
(Cite as: 2003 WL 1786863 (D.Mass.))

support of its follow form argument. In *Seven Provinces,* the District Court held, among other things, that the follow the settlements doctrine, a variant of the follow form principle, required that the reinsurer pay its portion of the insured's settlement of protracted environmental litigation. 9 F.Supp.2d at 66-67. Moreover, the court held that the follow the settlements rule covered the reinsured's coverage determinations and its allocation of the litigation settlement across policies. *Id.*

These holdings do affirm that the follow the fortunes doctrine creates a powerful presumption that settlements made by a reinsured will be sustained, barring evidence of bad-faith, collusion or fraud. *Id.* Nevertheless, I find that while instructive for defining the burdens of the parties in these kinds of disputes and the viability of settlement allocations, the *Seven Provinces* holdings do not clarify the threshold question in this case, namely whether the follow form provisions in the Certificates may be read to require the reinsurer to pay for claims that exceed the stated limitation of coverage.

I find the reasoning of the Second Circuit in *Bellefonte,* and *Unigard* and the Southern District in *United Fire* most persuasive on the threshold issue. Together these cases stand for the rule that, notwithstanding the importance of enabling concurrence between primary and excess policies, follow form provisions should not be read to erase the limitations of liability set out in a reinsurance certificate. *See Unigard,* 4 F.3d at 1070-71; *Bellefonte,* 903 F.2d at 913 (follow the fortunes provisions meant to "coexist with" not supplant liability caps in certificates); *United Fire,* 53 F.Supp.2d. at 641-42; *see also, Grace Asbestos,* 1996 WL 169326 at *3-4. As Judge Martin, the presiding judge in the underlying policy dispute from which the instant case springs, observed in *Grace Asbestos,* "while the [reinsurance] policies follow form to the underlying insurance in some respects, this does not include limits of liability ..." *Grace Asbestos,* 1996 WL 169326 at *3.

In this respect, the limitation of liability set out in Item 4 of the Certificates must be recognized as an express statement of the terms and conditions of the policy sufficient to resolve an apparent ambiguity regarding the coverage. *See Grace Asbestos,* 1996 WL 169326 at *3; *Unigard,* 4 F.3d at 1071, *Bellefonte,* 903 F.2d at 913. Therefore, I conclude that the follow form provisions and no more restrictive endorsements may not be read through the unexpressed vehicle of annualization to increase

Swiss Re's aggregate liability beyond that stated in the limitations of liability of each Certificate. *See id.*

**\*16** Recent case law on the issue of annualization also supports a conclusion that annualized limits should not be read into multi-year reinsurance policies, absent an express statement that the policy coverage is to be calculated on an annual basis. *See e.g., Society I,* 26 F.3d at 1365- 66; *Diamond Shamrock,* 258 N.J.Super. at 223-25; *Hercules, Inc., v. Aetna Cas. & Sur. Co.,* 1998 WL 962089 *5-6 (Del.Super.Ct. Sept. 30, 1998); *General Refractories Co. v. Allstate Ins. Co.,* 1994 WL 246274 *1, *3 (E.D.Pa. June 8 1994); *see also,* Paris, "Reinsurance Issues", 6 Massachusetts Liability Insurance Manual § 6.5- § 6.7, Massachusetts Continuing Legal Education (2000); Chanes, "Once is Never Enough," Mealey's Litigation Report: Insurance, Vol. 14, Issue 27 (May 16, 2000) at 1-8. Much of the recent litigation has arisen in the area of mass tort and environmental pollution litigation and concerns how an underlying insurer determines the number of occurrences under its policy. *See* Paris at § 6.7.2; Chanes, at 2.

*Society I* concerned the interplay of two three year primary policies and two multi-year excess policies in providing coverage for the policyholder in the wake of liability claims stemming from years of child abuse by the policyholder's employees. 26 F.3d at 1362. The trial judge had determined that coverage under the primary policies was triggered at the time each child was molested during a policy period; all subsequent incidents involving the same child were considered "repeated exposure to the same conditions" and were therefore part of the same occurrence. *See id. at 1366.* The *Society I* court then rejected the excess insurer's argument that the primary policies must be annualized, holding that, absent an express annualization clause, multi-year insurance policies would not be annualized. *See id.; see also, Society of Roman Catholic Church of Diocese of Lafayette, Inc. v. Interstate Fire & Cas. Co.,* 126 F.3d 727, 742 (5th Cir.1997) ("Society II").

Although *Society I* concerned the annualization of primary policy limits, other courts have applied the same reasoning to cases involving the annualization of limits in excess policies. *See e.g., Diamond Shamrock,* 258 N.J.Super. at 223-25 (absence of annual definition in multiyear excess policies precludes annualization of excess policy limits); *General Refractories,* 1994 WL 246274 at *3; *but see Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.,* 978 F.Supp. 589, 607-08 (D.N.J.1997) *rev'd*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1786863 (D.Mass.)
(Cite as: 2003 WL 1786863 (D.Mass.))

Page 12

*on other grounds by Chemical Leaman Tank Lines v. Aetna Cas. & Sur. Co.,* 177 F.3d 210 (3d. Cir.1999).

To summarize, I conclude that Swiss Re was not obligated to annualize the limits of liability as stated in the Facultative Certificates at issue here. These limits stand as the ceiling of Swiss Re's liability to CGU during the three year policy period. The "follow form" provisions of the Certificates, while assuring concurrence of coverage, may not be used to increase the reinsurer's unambiguous, bargained-for limits of liability as stated in the Certificates. Summary judgment for Swiss Re is therefore appropriate and a declaratory judgment will enter in favor of Swiss Re.

C. Allocation of Settlement

**\*17** Because I have determined that Swiss Re was not required to indemnify CGU in excess of the limits of liability stated in the reinsurance certificates, I conclude that Swiss Re is only obligated to "follow the fortunes" of CGU's settlement with Grace up to the per occurrence limit specified in the Certificates. *See Unigard,* 4 F.3d at 581 (under follow the fortunes doctrine, reinsurer is required to indemnify for payments reasonably within the terms of reinsurance policy); *Christiana,* 979 F.2d at 280; *Ruthardt,* slip. op. at 17-18 (follow the fortunes doctrine not relevant where reinsurer denied payment based on express terms of reinsurance policies). "The follow the fortunes doctrine is not intended to supplant other provisions of the reinsurance treaties." *Ruthardt,* at 17-18.

Swiss Re's challenge to the Grace settlement and site allocation formula employed by CGU was, as argued in its summary judgment briefs, concerned with the propriety of the annualization decision. Because Swiss Re has posed no independent challenge in its briefing to the legitimacy of the overall Grace settlement, I need not consider further CGU's follow the fortunes argument.

III. CONCLUSION

For the reasons stated above, CGU's motion for summary judgment is DENIED; and Swiss Re's motion for partial summary judgment is GRANTED.

I am prepared to direct the clerk to enter a declaration in favor of Swiss Re, to the effect that CGU's submission of its Reinsurance Tender on an annualized basis was improper as a matter of law and that Swiss Re has no obligation to make payments on that basis. Nevertheless, no doubt because the practical impact as to particular claims for payments

was not the focus of the parties' summary judgment briefing and because my own calculations of what I understand to be the relevant arithmetic seems inconsistent, I am hesitant to craft a declaration without additional assistance from the parties in identifying what further action is necessary to bring this case to final judgment. Accordingly, the parties are directed to confer and submit on or before April 15, 2003, jointly if they can, separately if they must, a proposal for reducing this case to final judgment on the basis of this Memorandum, including a proposed form of declaratory judgment identifying what additional financial obligations of Swiss Re, if any, remain to be resolved in accordance with this Memorandum.

Not Reported in F.Supp.2d, 2003 WL 1786863 (D.Mass.)

**Motions, Pleadings and Filings (Back to top)**

• 2003 WL 24196197 (Expert Report and Affidavit) Affidavit of James J. Powers (Oct. 02, 2003)

• 2002 WL 32919723 (Trial Motion, Memorandum and Affidavit) Defendant Swiss Reinsurance America Corporation's Memorandum of Law in Support of Its Motion for Partial Summary Judgment (Apr. 15, 2002)

• 2002 WL 32924235 (Partial Expert Testimony) (Partial Testimony) (Apr. 03, 2002)

• 2002 WL 32925304 (Partial Expert Testimony) Continued Deposition of John Hilton (Mar. 22, 2002)

• 2002 WL 32924234 (Partial Expert Testimony) (Partial Testimony) (Feb. 20, 2002)

• 2002 WL 32925305 (Partial Expert Testimony) (Partial Testimony) (Feb. 20, 2002)

• 2002 WL 32925307 (Partial Expert Testimony) Deposition of Thomas M. Tobin (Feb. 13, 2002)

• 2002 WL 32924237 (Expert Report and Affidavit) Expert Report of Thomas M. Tobin (Jan. 15, 2002)

• 2002 WL 32924236 (Partial Expert Testimony) (Partial Testimony) (Jan. 11, 2002)

• 2002 WL 32925306 (Partial Expert Testimony) (Partial Testimony) (Jan. 11, 2002)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                      Page 13
Not Reported in F.Supp.2d, 2003 WL 1786863 (D.Mass.)
**(Cite as: 2003 WL 1786863 (D.Mass.))**

• 2001 WL 34831905 (Trial Pleading) Plaintiffs' Answer to Defendant's Counterclaim (Jan. 17, 2001)

• 2000 WL 34558107 (Trial Pleading) Answer, Affirmative Defenses, and Counterclaim of Defendant Swiss Reinsurance America Corporation (Dec. 08, 2000)

• 2000 WL 34558106 (Trial Pleading) Complaint (Nov. 21, 2000)

• 1:00cv12267 (Docket) (Nov. 02, 2000)

• 2000 WL 34562105 (Partial Expert Testimony) (Partial Testimony) (Jan. 01, 2000)

**END OF DOCUMENT**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT N



Not Reported in N.E.2d                                                                                                    Page 1
Not Reported in N.E.2d, 2001 WL 1772032 (Mass.Super.)
**(Cite as: 2001 WL 1772032 (Mass.Super.))**

Only the Westlaw citation is currently available.

Superior Court of Massachusetts.
Bernard J. FLYNN et al. [FN1]

FN1. Jeffrey M. Flynn.

v.

The ESTATE OF David J. McGRATH et al. [FN2]

FN2. Joann McGrath and David Beard, executors; David J. McGrath, III; Joann McGrath, individually; REP Company of Wisconsin, Inc.; and, ADECCO Corporation.

No. 002016.

Nov. 2, 2001.

MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

S. JANE HAGGERTY, Justice.

*1 Bernard Flynn and Jeffrey Flynn (collectively, "the plaintiffs") have brought four claims against the defendants. Currently, Count I (breach of contract) is pending against defendants REP Company of Wisconsin, Inc. ("REP") and ADECCO Corporation ("ADECCO"). Counts II (deceit) and III (intentional infliction of emotional distress) are pending against Scott McGrath, David McGrath, III and REP. Count IV (violation of c. 93A) is pending against Scott McGrath, David McGrath, III and ADECCO. Pursuant to Mass.R.Civ.P. 56, the defendants have moved for summary judgment on all counts.

Background

Since 1981, Bernard Flynn and TAD Resources International, Inc. ("TAD") have operated a joint venture, Axtra. Bernard Flynn and TAD each owned 50% of Axtra. David McGrath, Jr. supplied the financial backing for the joint venture, while Bernard Flynn acted as the general manager. Jeffrey Flynn started working for Axtra and reporting to his father, Bernard, in 1985. When David J. McGrath, Jr. died in 1995, his sons Scott McGrath and David McGrath, III, continued to run the joint venture with Bernard.

In the late summer of 1997, TAD's shareholders decided to sell TAD and its affiliate companies. Scott McGrath told Bernard Flynn of the decision and offered to purchase Bernard's interest in Axtra. Negotiations for the sale followed. The negotiations included discussions about Jeffrey Flynn's future employment. The final agreement ("the agreement"), dated October 15, 1997, contained the following provisions. Bernard Flynn agreed to sell his shares of Axtra to REP, one of TAD's affiliates, for $285,000. The defendants agreed that Axtra would "enter into an employment arrangement with Jeffery Flynn on terms customarily used by Axtra in its arrangements with its similarly situated employees." At that time, Axtra only had three employees, including Jeffrey Flynn. Subsequently, TAD sold all its interests to ADECCO.

Jeffrey Flynn had worked for Axtra as a sales manager since 1992. He never had an employment contract. After the agreement and Bernard Flynn's sale of his shares, Axtra continued to operate as it had before, and Jeffrey Flynn continued in his position as a sales manager, receiving the same salary and benefits. In December 1997, Jeffrey Flynn met with two ADECCO managers, and he told them he wanted to be an area manager. They said they would have to get back to him. After a week or so had passed without any communication from the managers, Jeffrey Flynn resigned, stating as a reason the fact that he did not have an employment contract. Defendants never told him he should stop coming to work. Jeffrey Flynn understood that he would still be paid if he continued to work.

Bernard and Jeffrey Flynn have filed a lawsuit claiming breach of contract, deceit, intentional infliction of emotional distress, and unfair and deceptive trade practices. Defendants now move for summary judgment pursuant to Mass.R.Civ.P. 56. For the following reasons, defendants' motion for summary judgment is *ALLOWED*.

Discussion

*2 The court grants summary judgment, pursuant to Mass.R.Civ.P. 56, where there are no genuine issues of material fact, and if viewing the entire record in the light most favorable to the nonmoving party, the moving party demonstrates it is entitled to judgment as a matter of law. *Kourouvacilis v. General Motors*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                      Page 2
Not Reported in N.E.2d, 2001 WL 1772032 (Mass.Super.)
(Cite as: 2001 WL 1772032 (Mass.Super.))

*Corp.*, 410 Mass. 706, 711 (1991). Summary judgment is appropriate where all material facts have been established and the moving party is entitled to judgment as a matter of law, such as in cases involving construction of a contract. *Augat, Inc. v. Liberty Mutual Ins.*, 410 Mass. 117, 120 (1991). This court considers the pleadings, deposition transcripts, affidavits, and letters and contracts submitted as exhibits in arriving at its conclusion on this motion. Mass.R.Civ.P. 56(c).

**I. Breach of Contract Against All Defendants (Count I)**

To succeed in a breach of contract claim, plaintiffs must prove four elements. They must prove there was an agreement supported by valid consideration; that they were ready, willing and able to perform; that defendant's breach prevented plaintiffs' performance; and, that plaintiffs suffered damages. *Singarella v. City of Boston*, 342 Mass. 385, 387 (1961).

Plaintiffs claim the agreement included two terms as the consideration for the sale of Bernard Flynn's 5000 interest in Axtra. First, REP would pay $285,000. Second, Axtra would "enter into an employment arrangement with Jeffrey Flynn on terms customarily used by Axtra in its arrangement with its similarly situated employees." Jeffrey Flynn was an intended beneficiary of the contract which permits him to bring this suit. See *Rae v. Air-Speed, Inc.*, 386 Mass. 187, 194 95 (1982). Plaintiffs assert that the failure to provide Jeffrey Flynn with an employment contract was a breach of the agreement. The agreement, however, did not call for an employment contract. It merely called for an employment arrangement which Axtra provided to Jeffrey Flynn.

Furthermore, even if the agreement had called for an employment contract, defendants did not breach the agreement. Jeffrey Flynn never had a contract prior to the sale of the Axtra shares. He remained in the same job at the same level of pay after the sale, and no one ever requested that he resign. Moreover, his resignation was voluntary. Therefore, the defendants did not breach the agreement and are entitled to judgment as a matter of law.

**II. Deceit Against Defendants Scott J. McGrath, David J. McGrath, III and REP (Count II)**

To prevail in a deceit claim, plaintiffs must show that the defendants "made a false representation of material fact with knowledge of its falsity for the purpose of inducing the plaintiff[s] to act thereon,

and that the plaintiff[s] relied upon the representations as true and acted upon it to [their] damage." *Slaney v. Westwood Auto, Inc.*, 366 Mass. 688, 703 (1975).

Plaintiffs claim that the three letters from Scott McGrath and REP to Bernard Flynn stating that Axtra would enter into an employment arrangement with Jeffrey Flynn are evidence that the defendants knowingly made a false representation to plaintiffs that Jeffrey Flynn would have an employment contract. Plaintiffs also assert Bernard Flynn relied upon this representation in agreeing to sell his shares, and that has caused the plaintiffs' damages. There is simply no evidence that the defendants intentionally made any false representations to Bernard Flynn concerning the employment of Jeffrey Flynn. Furthermore, plaintiffs have not suffered any harm. Jeffrey Flynn was continuously employed by Axtra until he voluntarily resigned in December 1997. There is no evidence that he would not have continued in his employment at ADECCO if he had not resigned. Therefore, the defendants are entitled to judgment as a matter of law on the deceit claim.

**III. Intentional Infliction of Emotional Distress Against Defendants Scott J. McGrath and David J. McGrath, III and REP (Count III)**

*3 Intentional infliction of emotional distress requires proof of four elements. First, plaintiffs must prove that defendants intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from the conduct. Second, plaintiffs must show that defendants' conduct was "extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community." *Tetrault v. Mahoney, Hawkes & Goldings*, 425 Mass. 456, 466 (1997). Third, plaintiffs must show the defendants' actions caused the plaintiffs' distress. Finally, plaintiffs must show the distress suffered was "severe and of such a nature that no reasonable person could be expected to endure it." *Id.*

Plaintiffs rely on the same alleged facts in support of their deceit claim to support the intentional infliction of emotional distress claim. Since this Court has found that there is no evidence to support the deceit claim, the claim for emotional distress that relies on the deceit claim necessarily fails. Therefore, summary judgment shall issue in favor of the defendants on Count III.

**IV. G.L.c. 93A Violation Against All Defendants**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 2001 WL 1772032 (Mass.Super.)
(Cite as: 2001 WL 1772032 (Mass.Super.))

(Count IV)

Lastly, the plaintiffs claim the defendants' actions were unfair or deceptive. An action may be considered deceptive if it could reasonably be found that the person acted differently than he ordinarily would have due to the practice. See *Mongeau v. Boutelle*, 10 Mass.App.Ct. 246, 248 (1980). Again, plaintiffs' chapter 93A claims rely on the underlying common law claims, breach of contract, intentional infliction of emotional distress, and deceit. When the underlying common law claim fails, the chapter 93A claim must also fail. See *Macoviak v. Chase Home Mortgage Corp.*, 40 Mass.App.Ct. 755, 760 (1996). Furthermore, there is insufficient evidence to show that the defendants' alleged actions caused any harm to the plaintiffs. Jeffrey Flynn voluntarily resigned and, therefore, any harm he suffered was a result of his own conduct and not a result of the defendants' actions. Accordingly, there is no evidence to support the plaintiffs' chapter 93A claim. Defendants are entitled to judgment as a mater of law as to this count.

### Order

It is hereby *ORDERED* that defendants' motion for summary judgment is *ALLOWED*. Judgment shall enter for the defendants.

Not Reported in N.E.2d, 2001 WL 1772032 (Mass.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT O

Westlaw.

Slip Copy                                                                    Page 1
Slip Copy, 2006 WL 197009 (S.D.Tex.)
**(Cite as: 2006 WL 197009 (S.D.Tex.))**

Only the Westlaw citation is currently available.

United States District Court,
S.D. Texas, Houston Division.
Gary TULLOCH, Plaintiff,
v.
JPMORGAN CHASE & CO., Defendant.
**No. Civ.A. H-05-3583.**

Jan. 24, 2006.

Robert J. Filteau, Filteau Sullivan & O'Rourke,
Houston, TX, for Plaintiff.

Bradley J. Johnson, JP Morgan Chase & Co, Asst.
Gen. Counsel, Dallas, TX, for Defendant.

*MEMORANDUM OPINION AND ORDER*

LAKE, J.

*1 Plaintiff, Gary Tulloch, brings this action against
defendant, JPMorgan Chase & Company (JPMC), for
breach of contract and fraudulent inducement.
Pending before the court is Plaintiff's Motion to
Dismiss Defendant JPMorgan Chase and Co.'s
Counterclaim (Docket Entry No. 6). For the reasons
set forth below, plaintiff's motion will be denied.

*I. Background and Factual Allegations*
Plaintiff filed this action on September 7, 2005, in
the County Court at Law No. 2, Harris County,
Texas, Cause No. 846759, against JPMorgan Chase
& Company. [FN1] Plaintiff alleges that

> FN1. See Plaintiff's Original Petition, Tab 1
> attached to Notice of Removal, Docket
> Entry No. 1.

[o]n January 6, 2005, Plaintiff and Defendant
executed a release agreement, *a copy of which is
attached hereto as Exhibit A,* which provided for
the payment of a special payment to Mr. Tulloch in
the amount of FORTY-TWO THOUSAND AND
TWO HUNDRED FIFTY DOLLARS and no cents
($42,250.00). The special payment was to be made
on or by April 4, 2005.
On April 7, 2005, Mr. Tulloch was paid THREE-
THOUSAND TWO HUNDRED FIFTY
DOLLARS and no cents ($3,250.00) of the special
payment. This partial payment was untimely.

However, Defendant has refused to pay THIRTY-
NINE THOUSAND DOLLARS and no cents
($39,000.00) remaining on the special payment
despite demand to do so. [FN2]

> FN2. *Id.* at ¶¶ 5-6.

Defendant received notice of this action on
September 20, 2005. [FN3] On October 4, 2005,
defendant filed an Original Answer and
Counterclaim. [FN4] Defendant alleges in its
counterclaim that

> FN3. See Notice of Removal, Docket Entry
> No. 1, p. 1 (citing Original Petition Citation,
> Tab 2 attached thereto).

> FN4. See Original Answer and
> Counterclaim of JPMorgan Chase & Co.,
> Tab 3 attached to Notice of Removal,
> Docket Entry No. 1.

4. The Release Agreement had an express and
explicit confidentiality clause that DID NOT
provide for the parties abrogating or violating their
confidentiality obligations in the event of litigation
over the Release Agreement. To the contrary, the
confidentiality clause was narrowly drawn to
provide for specific parties and circumstances
under which the confidentiality obligations would
be suspended, none of which apply here.
5. Attaching the Release Agreement to the Original
Petition of plaintiff-counterdefendant Tulloch was
not necessary to the initiation of litigation on his
claims. Nor was any effort or attempt made by
plaintiff-counterdefendant Tulloch to maintain the
confidentiality of the Release Agreement, by
having the pleading filed under seal, or the like.
6. The public disclosure of the Release Agreement
by attaching it to a public pleading was a willful
and deliberate breach of the Release Agreement by
plaintiff-counterdefendant Tulloch.
7. Such breach of the Release Agreement was done
willfully, and in bad faith, in a crass and unsubtle
effort to extort additional sums of cash from JPMC
above and beyond the $42,250 already paid to the
plaintiff-counterdefendant Tulloch by JPMC in
satisfaction of its obligations under the Release
Agreement.
8. All conditions precedent under the Release
Agreement have been performed or have already

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

occurred.

9. Defendant-counterclaimant JPMC seeks return of all sums paid to plaintiff-counterdefendant under the Release Agreement, plus its attorneys fees, plus any additional sums for interest or the like to which it may be entitled under the law. [FN5]

> FN5. *Id.* at third and fourth unnumbered pages.

*2 On October 19, 2005, defendant removed plaintiff's action to this court on the basis of diversity of citizenship. [FN6] Asserting that Texas law affords him an "absolute privilege to attach the Release Agreement to his Petition," [FN7] plaintiff seeks dismissal of defendant's counterclaim for failure to state a claim for which relief may be granted.

> FN6. Notice of Removal, Docket Entry No. 1.

> FN7. Plaintiff's Memorandum of Law in Support of His Motion to Dismiss Defendant's Counterclaim, Docket Entry No. 5, p. 2, ¶ 3.

## II. *Standards of Review*
### A. Federal Rule of Civil Procedure 12(b)(6)

A Rule 12(b)(6) motion tests the formal sufficiency of the pleadings and is "appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim." *Ramming v. United States,* 281 F.3d 158, 161 (5th Cir.2001), *cert. denied sub nom. Cloud v. United States,* 536 U.S. 960, 122 S.Ct. 2665, 153 L.Ed.2d 839 (2002). The court must accept the factual allegations of the complaint as true, view them in a light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor. *Id.* "[A] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 998, 152 L.Ed.2d 1 (2002) (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984)).

> When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.

*Id.* at 997 (quoting *Scheuer v. Rhodes,* 416 U.S. 232,

94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974)). *See also Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) ("[A] complaint should not be dismissed ... unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.").

### B. Application of State Law

Where, as here, a federal court exercises jurisdiction over state law causes of action based on diversity of citizenship under 28 U.S.C. § 1332, the court must apply state substantive law. *See Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 823, 82 L.Ed. 1188 (1938). *See also Shanks v. AlliedSignal, Inc.,* 169 F.3d 988, 993 (5th Cir.1999). Determination of state substantive law is to be made in reliance on final decisions of the state's highest court. *Shanks,* 169 F.3d at 993. "When there is no ruling by the state's highest court, it is the duty of the federal court to determine as best it can, what the highest court of the state would decide." *Id.* The Texas Supreme Court has yet to rule on the specific issue presented by this appeal, i.e., whether Texas law of absolute privilege extends beyond tort claims for libel and slander to claims for breach of contract. Accordingly, the court is required to make an *Erie* guess as to what the Texas Supreme Court would most likely decide. *See Herrmann Holdings Ltd. v. Lucent Technologies Inc.,* 302 F.3d 552, 558 (5th Cir.2002) ("[I]n deciding this case, we are required to make an *Erie* guess as to what the Texas Supreme Court would most likely decide."). In making an *Erie* guess the court defers to intermediate state appellate court decisions "unless convinced by other persuasive data that the highest court of the state would decide otherwise." *Id.* (quoting *First National Bank of Durant v. Trans Terra Corp.,* 142 F.3d 802, 809 (5th Cir.1998)).

## III. *Analysis*

*3 Citing *James v. Brown,* 637 S.W.2d 914 (Tex.1982), and *Reagan v. Guardian Life Insurance Co.,* 140 Tex. 105, 166 S.W.2d 909 (1941), plaintiff argues that defendant's counterclaim should be dismissed for failure to state a claim for which relief may be granted because plaintiff "had the absolute privilege to attach the Release Agreement to his Petition." [FN8] Citing *Laub v. Pesikoff,* 979 S.W.2d 686, 691-692 (Tex.App.--Houston [1st Dist.] 1998, pet. denied), and *Bird v. W.C.W.,* 868 S.W.2d 767 (Tex.1994), plaintiff argues that "[w]hen the claim asserts that an injury resulted from a communication [made during the course of a judicial proceeding], the privilege bars the claim." [FN9] Defendant responds that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 197009 (S.D.Tex.)
**(Cite as: 2006 WL 197009 (S.D.Tex.))**

Page 3

FN8. Plaintiff's Memorandum of Law in Support of His Motion to Dismiss Defendant's Counterclaim, Docket Entry No. 5, p. 2.

FN9. *Id.* at pp. 2-3, 10 S.W. 721.

under Texas law legal pleadings and communications made in the course of litigation will not support an action sounding in tort for defamation ... however ... nothing in Texas law affords a contracting party a privilege to conduct himself during litigation in such a way as to breach pre-existing contractual obligations. [FN10]

FN10. Response of JPMorgan Chase to Plaintiff's Motion to Dismiss Defendant's Counterclaim, Docket Entry No. 8, first page.

Citing *Shanks v. AlliedSignal, Inc.,* 169 F.3d 988, 995 (5th Cir.1999), plaintiff replies that "[a]lthough Defendant casts his counterclaim as a contract-based action, it is virtually indistinguishable from a defamation claim. Therefore, the absolute privilege must be applied to dismiss the counterclaim [because s]uch communications are absolutely immune from civil liability." [FN11] Because the court is not persuaded either that defendant's counterclaim is "indistinguishable from a defamation claim," or that the Texas Supreme Court would extend the privilege to the breach of contract counterclaim asserted in this action, the court concludes that plaintiff's motion to dismiss should be denied.

FN11. Plaintiff's Reply to JPMorgan Chase and Co.'s Response to Plaintiff's Motion to Dismiss Defendant's Counterclaim, Docket Entry No. 9, p. 2.

A. Texas Law of Absolute Privilege

The absolute privilege of parties and witnesses to participate in judicial proceedings without having to answer civil actions in damages for libel and/or slander is well established in Texas law. *See Belo & Co. v. Wren,* 63 Tex. 686 (1884), *Runge v. Franklin,* 72 Tex. 585, 10 S.W. 721 (1889). The Texas Supreme Court has described this absolute privilege as meaning that "[a]ny communication, oral or written, uttered or published in the due course of a judicial proceeding is absolutely privileged and cannot constitute the basis of a civil action in damages for slander or libel." *Reagan,* 166 S.W.2d at

912. Although the Texas Supreme Court has stated that "[t]his privilege extends to any statement made by the judge, jurors, counsel, parties or witnesses, and attaches to all aspects of the proceedings, including statements made in open court, pre-trial hearings, depositions, affidavits and any of the pleadings or other papers in the case," *James,* 637 S.W.2d at 917-18, it has never held that this privilege bars all civil causes of action arising from communications made during the course of a judicial proceeding. *See Shanks,* 169 F.3d at 995 & n. 8 (recognizing that "[i]t is unclear whether, under Texas law, absolute immunity bars all causes of action from communications during a ... judicial proceeding."). Accordingly the court must make an *Erie* guess as to whether the Texas Supreme Court would decide that Texas law of absolute privilege bars the breach of contract counterclaim asserted in this action.

*4 In *Runge,* 72 Tex. at 590, 10 S.W. 721, the Texas Supreme Court described the absolute privilege's bar of civil actions in damages for libel and the policy behind it:

... we believe the better and prevailing rule to be that for any defamatory matter contained in a pleading in a court of civil jurisdiction no action for libel can be maintained. The power possessed by the courts to strike out scandalous matter from proceedings before them, and to punish as for contempt, is considered a sufficient guaranty against the abuse of the privilege.... We believe it is and ought to be the law that proceedings in civil courts are absolutely privileged. Citizens ought to have the unqualified right to appeal to the civil courts for redress, without the fear of being called to answer in damages for libel.

In *James,* 637 S.W.2d at 914, the Texas Supreme Court declined to extend the absolute privilege beyond civil suits in damages for libel and slander. *James* involved an action for damages brought against three psychiatrists. 637 S.W.2d at 916. On the application of her children, Mrs. James was involuntarily hospitalized. She was examined by three psychiatrists, all of whom filed reports with the court stating that she was mentally ill and likely to injure herself or others if not immediately restrained. After obtaining a writ of habeas corpus pursuant to which the proceedings against her were dismissed, Mrs. James filed suit against the three psychiatrists alleging libel, negligent misdiagnosis-medical malpractice, malicious prosecution, and false imprisonment. Upholding summary judgment for the psychiatrists, the court of appeals held that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 4
Slip Copy, 2006 WL 197009 (S.D.Tex.)
**(Cite as: 2006 WL 197009 (S.D.Tex.))**

"publication of the doctors' opinions ... [in the] mental health and guardianship proceedings was privileged and that no damages could be recovered for the consequences of publication, even though the doctors' assessments might have been arrived at negligently." *Id.* Although the Texas Supreme Court upheld the appeal court's decision on the libel claim, it expressly declined to extend the psychiatrists' absolute privilege to "other remedies at law." *Id* . at 918. The court explained that

> While the doctors' communications to the court of their diagnoses of Mrs. James' mental condition, regardless of how negligently made, cannot serve as the basis for a defamation action, the diagnoses themselves may be actionable on other grounds.... The unavailability of a defamation action does not preclude a plaintiff from pursuing other remedies at law. *See Runge v. Franklin,* 72 Tex. 585, 10 S.W. 721 (1889) and *Tsesmelis v. Sinton State Bank,* 53 S.W.2d 461 (Tex. Comm'n App.1932, judgmt. adopted). Mrs. James is not prevented from recovering from the doctors for negligent misdiagnosis-medical malpractice merely because their diagnoses were later communicated to a court in the due course of judicial proceedings.

*Id.* at 917-918.

In *Bird,* 868 S.W.2d at 767, the Texas Supreme Court held that the absolute privilege extends beyond civil suits in damages for libel and slander when the claims at issue are virtually indistinguishable from claims for defamation and the damages sought flow from defamatory communications made in the course of a judicial proceeding. *See Laub,* 979 S.W.2d at 691-692 (describing *Bird* ). Bird was a psychologist who examined a child for signs of sexual abuse, and after concluding that the child had been abused by his natural father, signed an affidavit stating these conclusions. In an attempt to modify a custody order, the child's mother filed the affidavit in family court. Following dismissal of all matters, criminal and civil, predicated upon Bird's conclusion that the child had been abused, the child's natural father sued Bird for "damages for past and future mental anguish, including 1)[i]njury to his reputation; 2)[p]ublic contempt; 3)[r]idicule; 4)[l]oss of relationships; and 5)[l]oss of self-esteem." *Bird,* 868 S.W.2d at 768-769. Affirming a grant of summary judgment to Bird, the Texas Supreme Court held "that a statement in an affidavit filed as a part of a court proceeding is privileged." *Id.* The court explained that "while couched in terms of negligent misdiagnosis, the essence of the father's claim is that it was Bird's communication of her diagnosis that caused him emotional harm and related financial damages." *Id.* at

771 (citing *Doe v. Blake,* 809 F.Supp. 1020, 1028 (D.Conn.1992) ( "extending the privilege beyond defamation actions to avoid the 'circumvention [of the policy behind the privilege] by affording an almost equally unrestricted action under a different label' ")).

*\*5 Read together, the *James* and *Bird* decisions show that the Texas Supreme Court has decided that Texas law of absolute privilege bars claims for defamation (i.e., libel and slander) and claims based on different legal theories when the essence of the claim at issue is damages that flow from defamatory communications made in the course of a judicial proceeding, but strongly suggest that the Texas Supreme Court would not extend the absolute privilege to claims that are not based on defamatory statements and do not seek "defamation damages." *See Bird,* 868 S.W.2d at 771-772. *See also Laub,* 979 S.W.2d at 691-692 (citing *Bird* as standing for the principle that "the judicial communication privilege cannot be circumvented by disguising a claim [for defamation] under a different label," and applying Texas law of absolute privilege to bar a variety of claims after concluding that the essence of each claim was that the plaintiff suffered injury flowing from the communication of allegedly false statements during a judicial proceeding).

B.  Application of Texas Law to Defendant's Counterclaim

1.  *Is Defendant's Counterclaim Based on a Defamatory Statement?*

Defendant's counterclaim asserts a claim for breach of contract arising from plaintiff's attachment of the Release Agreement to the Original Petition that he filed in state court. Defendant alleges that plaintiff's attachment of the Release Agreement to his Original Petition breached the Release Agreement's confidentiality clause. Although plaintiff argues that defendant's counterclaim should be dismissed because it is "virtually indistinguishable from a defamation claim," [FN12] plaintiff has not explained why defendant's counterclaim is virtually indistinguishable from a defamation claim, and the court is not persuaded that it is.

> FN12. Plaintiff's Reply to JPMorgan Chase and Co.'s Response to Plaintiff's Motion to Dismiss Defendant's Counterclaim, Docket Entry No. 9, p. 2.

To maintain a cause of action for defamation under

Slip Copy                                                                                          Page 5
Slip Copy, 2006 WL 197009 (S.D.Tex.)
**(Cite as: 2006 WL 197009 (S.D.Tex.))**

Texas law counter-plaintiff must plead and prove that the counter-defendant (1) published a statement (2) that was defamatory concerning the counter-plaintiff (3) while acting with actual malice regarding the truth of the statement. *WFAA-TV, Inc. v. McLemore,* 978 S.W.2d 568, 571 (Tex.1998), *cert. denied,* 526 U.S. 1051, 119 S.Ct. 1358, 143 L.Ed.2d 519 (1999). Whether a publication is capable of being defamatory is initially a question of law to be determined by the court. *Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 114 (Tex.2000). To make this determination the court should consider whether the words used are reasonably capable of defamatory meaning. *See Musser v. Smith Protective Servs., Inc.,* 723 S.W.2d 653, 654-655 (Tex.1987). The determination is based on how a person of ordinary intelligence would perceive the entire statement. *Id. See also Bentley v. Bunton,* 94 S.W.3d 561, 579 (Tex.2002). A "defamatory statement" is a statement

    that tends to injure the reputation of a person referred to in it. . The statement is likely to lower that person in the estimation of reasonable people and in particular to cause that person to be regarded with feelings of hatred, contempt, ridicule, fear, or dislike.

**\*6** *Black's Law Dictionary* 428 (7th ed.1999).

In order for defendant's breach of contract counterclaim to be "virtually indistinguishable" from a defamation claim, the disclosure on which it is based, i.e., the Release Agreement, must be comprised of words that are reasonably capable of defamatory meaning. *See Musser,* 723 S.W.2d at 654-55. Plaintiff has not explained why the contents of the Release Agreement are reasonably capable of defamatory meaning, i.e., why disclosure of the Release Agreement would tend to injure his reputation, or cause him to be regarded with feelings of hatred, contempt, ridicule, fear, or dislike. Nor has he explained how or why disclosure of the Release Agreement could create a dispute regarding its truth or falsity that is capable of injuring the defendant's reputation. Moreover, the damages that defendant seeks are not the type of damages commonly sought in defamation actions, i.e., damages for loss of reputation and mental anguish. *See Bently,* 94 S.W.3d at 604. Instead, the damages that defendant seeks are "return of all sums [of money] paid to plaintiff-counterdefendant under the Release Agreement, plus its attorneys fees. .," [FN13] damages that are typically sought in breach of contract actions. *See IT Corp. v. Motco Site Trust Fund,* 903 F.Supp. 1106, 1131-1132 (S.D.Tex.1994) (under Texas law a plaintiff seeking damages for breach of contract may elect to sue either for the benefit of the bargain or for

restitution). Accordingly, the court is not persuaded that defendant's breach of contract counterclaim is virtually indistinguishable from a defamation claim.

    FN13. Original Answer and Counterclaim of JPMorgan Chase & Co., Tab 3 attached to Docket Entry No. 1, fourth unnumbered page.

2. *Should the Privilege be Extended to Avoid the Circumvention of the Policy Behind It?*

In *Runge* the Texas Supreme Court based its recognition of the absolute privilege on its belief that "[c]itizens ought to have the unqualified right to appeal to the civil courts for redress, without fear of being called to answer in damages for libel." 72 Tex. at 590, 10 S.W. 721. In *Bird,* 868 S.W.2d at 771, the Texas Supreme Court made clear that the absolute privilege should be extended beyond defamation claims to claims based on different legal theories that are advanced for the purpose of circumventing the policy behind the privilege, i.e., when the essence of the claim at issue is that the plaintiff suffered injury flowing from the communication of false or defamatory statements during a judicial proceeding. *See Laub,* 979 S.W.2d at 691 (citing *Bird,* 868 S.W.2d at 771). The court explained that "[t]he privilege afforded against defamation actions is founded on the 'theory that the good it accomplishes in protecting the rights of the general public outweighs any wrong or injury which may result to a particular individual.' " *Bird,* 868 S.W.2d at 771 (quoting *Reagan,* 166 S.W.2d at 913). *See also Attava v. Shoukfeh,* 962 S.W.2d 237, 239 (Tex.App.--Amarillo 1998, pet. denied) (describing the policy underlying the absolute privilege as "intended to protect the integrity of the process itself and to insure that the decision-making body gets the information it needs"); and *Leigh v. Parker,* 740 S.W.2d 101, 103 (Tex.App.-- Austin 1987, writ denied) (an action is " 'privileged' if it furthers a policy interest of such importance that one is entitled to protection even at the expense of damage to another").

**\*7** Defendant argues that plaintiff's contractual confidentiality obligations predated the lawsuit, and it cannot be public policy to allow parties to a contract to unilaterally nullify such preexisting contractual obligations merely by filing suit. Few courts have addressed this issue because few lawyers would counsel their clients to be so risky. The few courts that have, have held that the contracting party has, in essence, contractually waived any litigation-communication privilege that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 6
Slip Copy, 2006 WL 197009 (S.D.Tex.)
**(Cite as: 2006 WL 197009 (S.D.Tex.))**

might arguably apply. *See Wentland v. Wass,* 126
Cal.App.4th 1484, 25 Cal.Rptr.3d 109
(Cal.App.2005). Here, [plaintiff] contractually
obligated himself to silence on the terms of his
separation agreement from JPMC. His Motion to
Dismiss amounts to no more than a naked assertion
that he has the right to unilaterally and arbitrarily
ignore that obligation merely by filing a lawsuit
that alleges JPMC breached some other part of the
same contract.

That assertion, in turn, highlights the audacity of
[plaintiff's] Motion to Dismiss: there was no reason
for him to attach a copy of the entire agreement,
unredacted, to his lawsuit. On their face his actions
amount to a willful and deliberate breach of the
confidentiality clause. [Plaintiff] did not even try to
adhere to his confidentiality obligations--
functionally speaking he simply tore up the
confidentiality clause and scattered it to the four
winds, asserting the right to do this simply because
he had asserted that JPMC had breached some
other portion of the contract. [FN14]

> **FN14.** Surresponse of JPMorgan Chase to
> Plaintiff's Motion to Dismiss Defendant's
> Counterclaim, Docket Entry No. 11, second
> and third pages.

Plaintiff does not argue, and the court does not find,
that plaintiff's decision to attach an unredacted copy
of the Release Agreement to his publicly filed
Original Petition furthers the public policy that the
Texas Supreme Court has said the absolute privilege
is intended to promote, i.e., that "[c]itizens ought to
have the unqualified right to appeal to the civil courts
for redress, without fear of being called to answer in
damages for libel ." *Runge,* 72 Tex. at 590, 10 S.W.
721. Nor has plaintiff argued that the good
accomplished by disclosure of the Release
Agreement outweighs any wrong or injury that its
disclosure could cause the defendant to suffer.
Moreover, for the reasons explained above, the court
is not persuaded that the defendant's counterclaim is
essentially a defamation claim that the defendant has
recast as a breach of contract claim to circumvent the
policy behind the absolute privilege. Instead,
defendant's counterclaim alleges that plaintiff's public
disclosure of the unredacted Release Agreement
deprived the defendant of the benefit of the bargain
memorialized therein, and defendant seeks the
contract damages that flow from the alleged breach.
Accordingly, the court concludes that there is no
reason to believe that the Texas Supreme Court
would extend the absolute privilege to bar the breach
of contract counterclaim that the defendant has

asserted against the plaintiff in this action.

#### IV. Conclusions and Order

For the reasons explained above, the court concludes
that the counterclaim for breach of contract that
defendant has alleged against the plaintiff is not
barred by Texas law of absolute privilege.
Accordingly, Plaintiff's Motion to Dismiss Defendant
JPMorgan Chase and Co.'s Counterclaim (Docket
Entry No. 6) is DENIED.

**\*8** The January 27, 2006, Scheduling Conference
will be held at 2:00 p.m., instead of 3:00 p.m., in
Court Room 9-B, 9th Floor, United States
Courthouse, 515 Rusk Avenue, Houston, Texas.

Slip Copy, 2006 WL 197009 (S.D.Tex.)

**END OF DOCUMENT**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.