UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROBERT J. VILA and B.V.T.V., INC.,

      Plaintiffs,

v.

SEARS, ROEBUCK AND COMPANY,
SEARS HOLDINGS CORPORATION and
KMART HOLDING CORPORATION,

      Defendants.

Civil Action No. 05-11717-REK

## DECLARATION OF ANNAPOORNI R. SANKARAN

I, Annapoorni R. Sankaran declare and say:

1.     I am a shareholder at Greenberg Traurig, LLP, a member of the bar of this Court and, along with Gary R. Greenberg, Esq., am counsel for defendants Sears, Roebuck and Company, Sears Holdings Corporation and Kmart Holding Corporation (collectively "Defendants").

2.     True and accurate copies of exhibits marked at the depositions in this case are attached hereto in Volume II as Exhibits 4 through 150 (only deposition exhibits referenced in Defendants' Memorandum Of Law In Opposition to Plaintiffs' Motion For Partial Summary Judgment And In Support of Defendants' Cross-Motion for Summary Judgment are contained in Volume II).

SIGNED UNDER THE PENALTIES OF PERJURY THIS 11TH DAY OF APRIL, 2006.

/s/ Annapoorni R. Sankaran
ANNAPOORNI R. SANKARAN

<u>CERTIFICATE OF SERVICE</u>

I Annapoorni R. Sankaran, hereby certify that, pursuant to Local Rule 5.4(c), on April 11, 2006 I served a copy of the foregoing electronically upon:

James F. O'Brien, Esq.
410 Park Avenue, Suite 1530
New York, NY 10022

<u>/s/ Annapoorni R. Sankaran</u>
Annapoorni R. Sankaran

EXHIBIT 4



# Ogilvy&Mather
### *Advertising*
676 St Clair Chicago, Illinois 60611
Telephone 1 312 988-2500 • Telex 255162 • Cable Ogilvy Chicago

September 29, 1989

B.V.T.V., Inc.
79 Sand Point
Box 2052
Oyster Harbor
Cape Cod, MA  02655

Attn:  <u>Mr. Bob Vila</u>

Re:  <u>Bob Vila Syndicated Television Programs</u>

Dear Mr. Vila:

This will set forth the terms of the agreement between your production company, B.V.T.V., Inc. ("Producer") and us Ogilvy & Mather ("Ogilvy") as agent for our client, Sears, Roebuck & Co. ("Sears"), with regard to a syndicated television series to be financed by Sears, produced by Producer and starring Bob Vila.

1.  <u>PROGRAM</u>

Producer agrees to produce and deliver to Ogilvy on or before December 15, 1989 a one half-hour pilot (the "Pilot") plus a minimum five minute promotional leader to be used by Sears and its designated syndicator for the selling of the syndicated programs (the "Series"). The Pilot and each program of the Series will be designed to be inserted into a half-hour programming slot in syndication. The Pilot and the Series will consist of Bob Vila hosting a program dealing with building, home repair and home improvement. The Pilot and the Series will be produced on tape and in color. The sound will be fully synchronized with the photographic action and the Pilot and the Series will be of first class technical and production qualities and conform to broadcast quality standards in the television industry and in keeping with the standards of like "home improvement" television programs.



EXHIBIT
#4 10
1-24-06

2.    CLEARING THE PILOT; FIRST 13 PROGRAMS

Sears shall be responsible for obtaining the services of a television syndicator who will be responsible for clearing the Series for weekly airing.  Upon an 80% clearance of the U.S. marketplace or a firm 80% projection on the part of Ogilvy, both based on the 1990 Nielson Television Index (NTI) household estimate, Sears will release to Producer the sums set forth in Paragraph 7(ii) below for an order of thirteen (13) one-half hour programs (including the already delivered Pilot).  It is presently intended that an 80% clearance will occur in January 1990.

3.    SECOND 13 PROGRAMS

Provided the series clears 80% of the market place the first program will air at any time after April 1, 1990 and weekly thereafter.  On the first air date of the Series, Sears will release the funds set forth in Paragraph 7(iii) below for an order of thirteen (13) additional one-half hour programs.

4.    THIRD 13 PROGRAMS

If after the first twelve (12) weeks of airing the programs achieve a 3.1 NTI household rating, Sears will pay at the time set forth in Paragraph 7(iv) below the sum set forth therein for an order of thirteen (13) additional one-half hour programs consisting of thirteen (13) pre-existing programs containing eleven (11) minutes of new material placed within any thirteen (13) of the existing twenty-six (26) programs.  If the programs do not achieve a 3.1 NTI household rating after twelve (12) weeks of airing, Sears will have the option to cease funding the Series.

5.    COMMENCEMENT OF SERIES.

Sears shall have the right in its sole discretion after consultation with its syndicator when to begin airing the Series.  It is presently anticipated that there will be an attempt to begin the Series in the Spring of 1990 (after April 1, 1990).  If Sears finds that it can obtain a better placement by beginning the Series in September 1990, Sears at its sole option shall have the right to begin the Series at that point but in no event shall the Series begin airing later than October 15, 1990.  In the event that the Series is not broadcast by October 15, 1990, Producer owns the Pilot and Sears owns the 12 Programs and each is free to proceed in whatever manner they choose without further obligations to each other except for Library Usage Fees to Producer as set forth in this Agreement.

-2-

P 0000002

6. <u>PILOT AND SERIES TALENT</u>

Producer agrees to obtain and forward to Sears agreements with persons appearing in the Series and/or bearing any claims thereto which will permit Sears and those acting on its behalf to sell, resell and use in all media (including commercials) the Pilot and the Series upon the payment to those individuals (and Vila) any applicable union residuals at scale. (No other payments shall be made to Vila personally pursuant to this Agreement except those applicable under standard union agreements.)

7. <u>COMPENSATION</u>:

(i) Producer agrees to pay all costs related to the production of the Pilot.

(ii) Sears agrees to pay and Producer agrees to accept the sum of Two Million Two Hundred Thousand Dollars ($2,200,000) when 80% of the U.S. marketplace has been cleared or it appears certain to Ogilvy that 80% of the marketplace will be cleared. This Two Million Two Hundred Thousand Dollar ($2,200,000) payment is consideration for thirteen (13) one-half hour programs (including the already delivered Pilot).

(iii) Sears agrees to pay and Producer agrees to accept the additional sum of Two Million Dollars ($2,000,000) on the date of the first airing of the first program in the Series. This Two Million Dollar ($2,000,000) payment is consideration for the second thirteen (13) additional one-half hour programs.

(iv) Sears agrees to pay and Producer agrees to accept the additional sum of Two Million Dollars ($2,000,000) on or before January 1, 1991, as payment for the third thirteen (13) one-half hour programs which contain the eleven (11) minutes in each episode of fresh material.

(v) At the end of one year from the date of the first airing of the Series and provided the Series has a national average rating of 4.3 (based on NTI household ratings) or above for the year, Sears agrees to pay and Producer agrees to accept the sum of $500,000 as a ratings bonus payable within thirty (30) days after information is made available to Ogilvy that is necessary to make this determination but in no event more than sixty (60) days after the first anniversary of the airing of the Series.

-3-

P 0000003

8.  SECOND YEAR AND THIRD YEAR RENEWALS

If Sears has ordered all thirty-nine (39) programs in the first year and wishes to renew the Series for a second one year period (Year II) by ordering additional programs in the same quantity as described in Paragraphs 2, 3 and 4 of this agreement, Sears agrees to notify Producer on or before six months after the first airing of the Series.  The price for additional programs in Year II shall be set using the following formula:

| COMPENSATION | | | AVG. NTI HH RTG |
| BASE | BONUS | TOTAL | FOR 2ND YEAR |
| --- | --- | --- | --- |
| $6,200,000 | $0 | $6,200,000 | 3.1 |
| $6,200,000 | $100,000 | $6,300,000 | 3.3 |
| $6,200,000 | $200,000 | $6,400,000 | 3.5 |
| $6,200,000 | $300,000 | $6,500,000 | 3.7 |
| $6,200,000 | $400,000 | $6,600,000 | 3.9 |
| $6,200,000 | $500,000 | $6,700,000 | 4.3 |

If Sears has ordered all thirty-nine (39) programs in Year II and wishes to renew the Series for a third one year period (Year III) by ordering additional programs in the same quantity as described in Paragraphs 2, 3 and 4 of this agreement, Sears agrees to notify Producer on or before six months after the first airing of the Series in Year II.

Year II payments will be made on the same schedule as used in Year I, using $6,200,000 as the base payment.  The performance bonus based on second year ratings performance, or that portion above $6,200,000 but not more than $6,700,000 will also be paid on the same schedule as in Year I.

In Year III, no changes will be made in the schedule of payments or performance bonus calculation, however, the above referenced Base and Bonus compensation amounts will be increased by 5%.

9.  PRODUCERS AGREEMENT

In consideration of all of the foregoing, Producer agrees to produce the Pilot and Series in a professional manner using a professional staff and in keeping with the standards of like "home improvement" shows.  Sears through Ogilvy shall have approval over the storyboards of each program.  After a storyboard is submitted, Ogilvy shall have five (5) working days to approve the storyboard or suggest reasonable changes.  Failure of Ogilvy to respond within the five (5) day period shall be deemed to be approval of the storyboard.  Producer agrees to produce each program of the Series and Pilot so that said program reflects its storyboard content.  In all other respects, Producer shall be solely responsible for all

-4-

P 0000004

aspects of the Pilot and the Series, including but not limited to project development and/or renovation costs, talent, travel and accommodations, talent and production crew salaries, equipment rentals or purchases, etc. Producer agrees to use Sears Home Improvement products and services (services subject to Producer's approval) wherever applicable as desired by Sears and possible (based upon availability and delivery) on the Series and Pilot. Sears will cause to be appointed a liason at Sears wherein Producer will be able to purchase from Sears at Sear's cost any products or services sold by Sears.

### 10.  LIBRARY USAGE FEES

In the event that Sears elects not to renew the Series for additional year(s) but instead elects to air existing programs of the Series for additional years, Sears shall pay to Producer a library usage fee each year based upon forty-two and one-half percent (42 1/2%) of the media value of each program.  (This library usage fee payment criteria shall continue to be in effect for any years in which no new programs are ordered but old ones are re-aired.)   Said payment to Producer shall be made by Sears within thirty (30) days at the end of each six month period (after the first airing) accompanied by appropriate statements setting forth the computations for each airing.  Producer shall have standard industry audit rights with regard to said statements.

### 11.  TURNAROUND

In the event that Sears elects not to proceed with the Series because they are unable to clear 80% of the market (1990 NTI household estimate), Sears agrees to therewith turn over to Producer the Pilot to be used by Producer free and clear without compensation to Sears to develop on its own or with others a syndicated television series.  During any period of time that Vila is a spokesperson for Sears, Producer agrees that said "new series not financed by Sears" will not have an "on-air national sponsor" who would be either a national chain retailer or manufacturer of a product competitive with Sears Home Improvement.

### 12.  OWNERSHIP OF SERIES

Except as specifically referred to in Paragraph 10 and 11 of this agreement, all programs delivered to Ogilvy shall become and remain the sole and absolute property of Sears which shall retain complete control thereof, including but not limited to, unlimited domestic and foreign broadcast, rebroadcast, sale or resale, Advertising (as defined in Spokesperson Agreement), etc. All commercial time relating to the Series shall be the sole property of Sears and the amount of the commercial time allocation will be at Sears sole discretion.

P 0000005

### 13. SEARS CREDIT

Sears shall be accorded a prominant presentation credit and entitlement rights (if requested by December 1, 1989) at the head of the program, on all programs it finances Presentation credit language (and entitlement language if chosen by Sears) shall be delivered to Producer on or before December 1, 1989. Presentation credit language shall be in the manner as "This Program brought to you by Craftsman Home and Yard Centers at Sears, the place more people trust". Additionally Ogilvy shall be accorded a rolling program credit at the conclusion of the Program, on all programs Sears finances and the Pilot, in a manner such as "Produced in association with Ogilvy and Mather".

### 14. INDEMNITIES

Producer agrees that it will protect, defend, hold harmless and indemnify Sears, its successors, assigns, directors, officers and employees, and their respective heirs and representatives from and against any and all claims, demands, actions, liabilities, damages, losses, fines, penalties, costs and expenses (including attorneys' fees) of any kind whatsoever (including without limitation of the foregoing, those relating to actual or alleged death of or injury to person and damage to property), actually or allegedly, directly or indirectly, arising or resulting from or connected with (a) Producer's performance or failure of performance of this Agreement; (b) Producer carrying out its functions hereunder including, but not limited to, all allegations that the Pilot or Series materials, and/or communications prepared by or distributed by or through Producer constitute (1) libel, slander, and/or defamation; (2) patent infringement, trademark infringement or dilution, or infringement of any statutory copyright, common law right, title or slogan; (3) piracy, plagiarism, the misappropriation of another's ideas; and/or (4) invasion of rights of privacy or rights of publicity; (c) all purchases, contracts, debts and/or obligations made by Producer; (d) the omission or commission of any act, lawful or unlawful, by Producer or any of Producer's agents or employees, whether or not such act is within the scope of employment of such agents or employees. Notwithstanding anything contained in the foregoing, Producer shall not be liable for damage to third parties which is caused by the active and primary negligence of Sears, its agents or employees.

Sears similarly agrees that it will protect, defend hold harmless and indemnify Producer its successors, assigns, directors, officers and employees and the respective heirs and representatives from and against any and all claims, demands, actions, liabilities, damages, losses, fines, penalties, cost and expenses (including attorneys fees) of any kind whatsoever (including without limitation of the foregoing those relating to actual or alleged death of or injury to person and damage to property) actually or allegedly, directly or indirectly arising or resulting from or

-6-

P 0000006

connected with (a) Sears performance or failure of performance of
this agreement (b) the omission or commission of any act lawful of
unlawful by any Sears agents or employees, whether or not such act
is within the scope of employment of such agents or employees (c)
the failure of Sears to comply with any applicable law, ordinance,
rule or regulation and/or inquiries or investigations of any
governmental agency (d) product liability actions that may be
brought against Producer, Bob Vila, Ogilvy or Sears, as a result of
the use of products supplied by Sears.

### 15.   FORCE MAJEURE

If for any reason such as strikes, boycotts, war, Acts of
God, labor troubles, riots, delays of commercial carriers or
restraints of public authority, Producer shall be unable to deliver
any of the programs produced hereunder during any period contained
herein or option period, if any, hereof, then Producer shall have
the right to extend the delivery period for an equivalent period of
time without being in breach of the agreement.  However this period
shall not exceed three (3) months.

### 16.   FULL POWER

Both parties represent amd warrant that they have the full
right and authority to enter into this agreement.

### 17.   NOTICES

Service of all notices under this agreement shall be
sufficient if given personally, mailed return receipt requested or
telefaxed to the respective parties at the addresses set forth at
top of this agreement.

### 18.   SEARS TRADEMARKS, TRADE NAMES, SERVICE MARKS

(a)  Except as set forth in this agreement Producer agrees
that it will not use the name "Sears" and any of Sears trademarks,
trade names or service marks without the express written permission
from Sears.  Producer expressly recognizes and acknowledges that
the use of Sears marks shall not confer upon Producer any
proprietary rights to any such Sears marks.  Upon expiration or
upon termination of Producer's right to use Sears marks for any
cause, Producer shall immediately cease all use of all such Sears
marks and will not use any such Sears marks thereafter.  Producer
agrees not to question, contest or challenge the ownership by Sears
of any such right, title or interest in any such mark, except the
right to use the same pursuant to the terms and conditions of this
agreement, and will not seek to register the same.  Producer agrees
that upon expiration or termination of right to use Sears marks
pursuant to this agreement for any cause or without cause, Producer
will execute all necessary or appropriate documents to confirm
Sears said ownership or to transfer any rights it may have acquired
from Sears.

-7-

(b)  Except as set forth in this agreement Producer acknowledges that Sears may register any and all of the trademarks, service marks or trade names for the Program(s) under this Agreement in its own name, and that Producer's use thereof shall inure to the benefit of Sears for such purpose, as well as for other purposes.  Producer shall cooperate in any such registration by Sears or application therefor.

(c)  Producer recognizes that each of Sears marks possesses a special, unique and extraordinary character which makes it difficult to assess the monetary damage which Sears would sustain in the event of unauthorized use.  Producer expressly recognizes and agrees that irreparable injury would be caused to Sears by such unauthorized use and agrees that preliminary or permanent injunctive relief would be appropriate in the event of breach of this Paragraph by Producer provided that such remedy shall not be exclusive of other legal remedies otherwise available.

19.    COPYRIGHT NOTICES

Producer agrees to the use of a Sears copyright notice on the Pilot and Series prepared for distribution under this Agreement. (In the event Producer receives the Pilot back in Turnaround, it shall have the right to substitute its own copyright notice on the Pilot).

20.    PURCHASES

Producer will not make any purchases or incur any obligation or expense of any kind in the name of Sears.

21.    INSURANCE

(a)  Producer, at its expense, hereby agrees and covenants that it shall obtain and maintain during the Term of this Agreement the following policies of insurance from companies satisfactory to Sears, containing provisions satisfactory to Sears, and adequate to fully protect Sears as well as Producer from and against any and all claims, demands, actions, liabilities, damages, losses, costs and expenses arising out of the subjects covered by such policies of insurance:

(1) Worker's Compensation Insurance containing a waiver of subrogation in favor of Sears executed by the insurance company and covering all costs, benefits and liability under State Workers' Compensation and similar laws which may accrue in favor of any person employed by Contractor, and Employer's Liability Insurance with limits of not less than $100,000;

(2)  Comprehensive General Liability Insurance including, but not limited to, coverage for personal injury with limits of not less than $500,000 combined

-8-

P 0000008

single limits for bodily injury and property damage per occurrence;

(3) Contractual Liability Insurance specifically endorsed to cover the indemnity provisions of this Agreement with limits of not less than $500,000 combined single limits for bodily injury and property damage per occurrence;

(4) Motor Vehicle Liability Insurance with a Non-Ownership Liability Endorsement in Producer's name covering all vehicles used in connection with Producer's operations under this Agreements with limits of not less than $500,000 combined single limits for bodily injury and property damage per occurrence; and

(5) Umbrella Excess Liability Insurance including, but not limited to, product liability, blanket contractual liability, personal injury, errors and omissions and advertising liability with limits of not less than $1,000,000 combined single limits for bodily injury and property damage per occurrence.

(b) Each insurance policy obtained by Producer shall name Sears as an additional insured and shall contain a severability of interest/cross liability endorsement. Each policy obtained by Producer shall expressly provide that it shall not be subject to change or cancellation without at least thirty (30) days prior written notice to Sears. Producer shall furnish Sears with copies of the policies required to be maintained by Producer or certificates thereof concurrently with the execution and delivery of this agreement. If Producer obtains additional insurance, then Producer shall have Sears named as an additional insured on each of said insurance policies without any charge to Sears. In order to avoid conflicts between insurance companies, Producer shall use its best efforts to have all policies of insurance obtained by Producer issued by one insurance company.

(c) Any approval by Sears of any insurance policies or additional insurance obtained by Sears shall not relieve Contractor of any responsibility hereunder including, but not limited to, claims in excess of limits described above.

22. **GENERAL**

This agreement shall be governed by and construed under the laws of the State of New York. This agreement contains the entire understanding of the parties with respect to the subject matter and may not be modified except in writing signed by the parties hereto. The headings at the beginning of each paragraph of this agreement are for convenience only and

-9-

shall not in any way affect the interpretation of any paragraph of this agreement or the agreement itself.  This agreement may be exectued in counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same agreement.  The rights and remedies of the parties as set forth herein are cumulative and in addition to any other right or remedy available to them.  Waiver of any rights hereunder by either party shall not be construed as limiting the future exercise of such rights.

Please confirm your acceptance of and agreement to the foregoing by affixing your signature in the place indicated below.

Very truly yours,

SEARS, ROEBUCK AND CO.

BY: _____

Bill Patterson
Vice President,
Home Improvements Group

OGILVY AND MATHER

BY: _____ (10-3-89)

Ole Riise
Vice President
Account Supervisor

ACCEPTED:

B.V.T.V., Inc.

BY: _____

BOB VILA

Bob Vila agrees not to engage in any other professional activities that would render him unavailable to provide any of the services contracted for herein.  Bob Vila represents and warrants that throughout the full term he

-10-

P 0000010

will remain a member in good standing of any labor union or
guild with which Oglivy or Sears shall have any agreement
requiring such union or guild membership.

BOB VILA, individually in
so far as the
agreement relates
to him


/0001f
09/28/1315


-11-

P 0000011

BOB VILA CONTRACTUAL COMMITMENTS

1.   Rickel Home Centers -- As of August 24th, 1989, Rickel
     Home Centers has ceased all radio and television
     commercials using Bob Vila.  In all other respects the
     contract was terminated except that Rickel's Sunday
     home supplements have been printed through November
     and possibly December.  This will be the extend of
     Bob's remaining commitment to Rickel.

2.   Newell Window Furnishings and Amerok Corporation
     (Both divisions of Newell Company) -- Bob's contract
     expires on September 10, 1989.

3.   Boyle-Midway Household Products (Zud, Plastic Wood,
     Noxon, Old English Scratch Cover, Easy-Off Mildew
     Cleaner, 3 in 1 Oil and Easy-Off Oven Cleaner) --
     Bob's contract expires on February 21, 1990.

4.   Sports Illustrated -- Bob is doing an advertorial for
     Sports Illustrated for Fall 1989 issue.

5.   American Electric Power -- Bob has been doing a series
     of one-year contracts with them since May 5, 1986.
     His present contract runs out on May 4, 1990.  They
     also license the generic commercial to other public
     utility companies.

6.   Time/Life Home Repair Books Television Commercial --
     Television and print contract runs through December
     31, 1990.  Relationship can continue at Vila's option.

EXHIBIT A

P 0000012

Exhibit 1

P 0000013

OGILVY AND MATHER
676 North St. Clair
Chicago, IL  60611

June 8, 1990

B.V.T.V. Inc.
79 Sand Point
Box 2052
Oyster Harbor
Cape Cod, MA  02655

Re:  <u>Amendment to Syndication Agreement</u>

Dear Mr. Vila:

An agreement has heretofore been entered into dated
September 29, 1989, between your production company, B.V.T.V.
Inc. ("Producer") and us, Ogilvy & Mather ("Ogilvy"), as agent
for our client, Sears, Roebuck and Co. ("Sears") with regard to
a syndicated television series to be financed by Sears and
produced by Producer and starring Bob Vila (the "Agreement").
We are all desirous at this time of extending the term of the
Agreement as well as amending other terms and conditions
contained therein.  The following therefore, constitutes an
Amendment to the Agreement.

1.  The parties acknowledge that the Pilot has been
duly delivered by Producer to Ogilvy and the Series has cleared
80% of the marketplace.

P 0000014

2.   The references to "NTI household ratings" and "AVG. NTI HH RTG" in the Agreement shall be deemed to mean "NTI household ratings" in the markets cleared for the weekly airing of the Series.

3.   Paragraph "8.   <u>SECOND YEAR AND THIRD YEAR RENEWALS</u> shall be deemed amended to read "8.   <u>SECOND YEAR THROUGH ELEVENTH YEAR RENEWALS</u>".

The last three paragraphs in Paragraph 8 shall be deemed deleted and the following shall be substituted therein:

> "If Sears has ordered all thirty-nine (39) programs in Year II and wishes to renew the Series for successive one year periods (Years III through XI) by ordering additional programs in the same quantity as described in Paragraphs 2, 3 and 4 of the Agreement Sears has the option to extend the Agreement for each successive year by notifying Producer on or before December 1 after the first airing of the Series in each successive year.
>
> Year II payments will be made on the following schedule, using $6,200,000 as the base payment: $2,200,000 within 60 days after notification to Producer of Sears' desire to order additional programs in same quantity as described in Paragraphs 2, 3 and 4 of the Agreement; $2,000,000 on the first airing of the Series ordered, and $2,000,000 on the next January 5.  The performance bonus based on second year ratings performance, or that portion above $6,200,000 but not more than $6,700,000 will likewise be paid on the same schedule as in Year I.
>
> In Years III through XI, no changes will be made in the schedule of payments in the preceding paragraph or performance bonus calculation,

- 2 -

P 0000015

however, the above referenced Base and Bonus
compensation amounts will be cumulatively
increased by 5% each year commencing with Year
III and continuing through Year XI."

4.   The body of Paragraph "10.   LIBRARY USAGE FEES"

shall be deemed deleted and the following shall be substituted

therein:


"10.   LIBRARY USAGE FEES


In the event that Sears elects not to renew

the Series for additional year(s) but instead

elects to air existing programs of the Series for
additional years, Sears shall pay to Producer a
library usage fee each year based upon forty-two
and one-half percent (42 1/2%) of the media value
of each program with a minimum guarantee of
$1,000,000.   (This library usage fee payment
criteria shall continue to be in effect for any
years in which no new programs are ordered but
old ones are re-aired.)   Said payment to Producer
shall be made by Sears within thirty (30) days at
the end of each six month period (after the first
airing) accompanied by appropriate statements
setting forth the computations for each airing.
Producer shall have standard industry audit
rights with regard to said statements.   In the
event that Sears elects not to renew the Series
for additional year(s) and elects not to air
existing programs (or is unable to clear the
Series), Sears may at its option, pay to Producer
the guarantee of $1,000,000 for that year and if
it so elects, for each successive year to
continue to exploit the existing programs in
which event all terms and conditions of this
Agreement shall remain in full force and effect."


5.   The body of Paragraph "11.   TURNAROUND" shall be

deemed deleted and the following shall be substituted therein:


- 3 -

**"11.  TURNAROUND**

In the event that Sears elects not to proceed with the Series and elects not to pay to Producer the minimum guarantee of $1,000,000, Sears agrees to therewith turn over to Producer (thereby eliminating any financial or other obligation by Sears to B.V.T.V. or its representatives) all programs in the Series (including the Pilot) to be used by Producer free and clear without compensation to Sears to sell as a syndicated television series and/or to exploit in any manner it chooses.  Additionally, Sears agrees to assign to Producer all contracts entered into for the exploitation of the Series and cause to be paid to Producer all revenues due and owing Sears, pursuant to said contracts, from the time of such election forward.  In the event Sears has received any unrecouped advances against the Series, said advances will be equitably pro-rated between Sears and Producer. During any period of time that Vila is a spokesperson for Sears, Producer agrees that any new or old programs for the Series will not have an "on-air national sponsor" who would be either a national chain retailer or manufacturer of a product competitive with Sears Home Improvement."

6.   All references in this Agreement which refer to delivery of a program or programs in the Series shall be deemed to include the delivery of an approximately 25 second promo piece, promoting each upcoming program and one 25 second season launch promo piece per year.

Except for the foregoing, all of the terms and conditions of the Agreement are hereby ratified and affirmed.

— 4 —

P 0000017

Please confirm your acceptance of and agreement to the foregoing by affixing your signature in the place indicated below.

Very truly yours,

Sears, Roebuck and Co.

By: _____

Bill Patterson
Vice President,
Home Improvements Group

Accepted:

B.V.T.V., Inc.

Ogilvy & Mather

By: _____

Ole Riise
Vice President,
Account Supervisor

By: _____
    Bob Vila

/76FF:90:05:30

- 5 -

P 0000018

Please confirm your acceptance of and agreement to the foregoing by affixing your signature in the place indicated below.

Very truly yours,

Sears, Roebuck and Co.

By: _____

Bill Patterson
Vice President,
Home Improvements Group

Accepted:

B.V.T.V., Inc.

By: _____
Bob Vila

/76FF:90:05:30

Ogilvy & Mather

By: _____

Ole Riise
Vice President,
Account Supervisor

– 5 –

P 0000019

## EXHIBIT A

### I.  AMERICAN ELECTRIC POWER

The following list of AEP markets (excluding Columbus, Ohio) are all minor markets with very modest populations.

**\*Indiana Michigan Power**
South Bend, IN
Fort Wayne, IN
Muncie, IN (cable)
Marion, IN (cable)

**\*Wheeling Power**
Wheeling, WV

**Kentucky Power**
Hazard, KY
Ashland, KY (cable)

**\*Ohio Power**
Lima, OH
Canton, OH
Zanesville, OH
Steubenville, OH
Newark, OH (cable)

**Appalachian Power**
Huntington, WV
Charleston, WV
Roanoak, VA
Abingdon, VA
Beckley, WV
Bluefield, WV

### II.  AMERICAN ELECTRIC POWER LICENSES

The contracts with the licensing companies (non AEP companies) say that "each license shall be for a term of one year, beginning on the date the license is granted, with a one-year option. Therefore, all licenses granted in relation to this agreement shall expire no later than three years from the date of this agreement." According to AEP, the date of the agreement was February 1988, hence, it expires February 1991.

Facts on the licensing companies are below. They signed up for all media except West Penn Power, who has no television.

| Company | Customers | End of License |
|---------|-----------|----------------|
| 1. Kentucky Utilities | 337,760 | July 6, 1990 |
| 2. West Penn Power | 540,267 | Feb. 20, 1991 |
| 3. Central Hudson | 201,960 | Oct. 1, 1990 |
| 4. Metropolitan Edison | 342,680 | Aug. 11, 1990 |
| 5. Central Illinois Public Service | 262,972 | Jan. 30, 1991 |
| 6. Potomac Electric | 114,380 | Oct. 2, 1990 |
| 7. Monongahela Power | 283,870 | Dec. 22, 1990 |
| 8. Orange & Rockland | 209,500 | Oct. 5, 1990 |

\*  Indiana Michigan Power, Ohio Power, and Wheeling Power plan
     to have reduced usage of the Vila spots in 1990.
58FF

Exhibit 2

AMENDMENT #2

Ogilvy & Mather
676 North St. Clair
Chicago, IL 60611

February 8, 1991

B.V.T.V., Inc.
P.O. Box 749
Marstons Mills, MA 02648

Attn: Mr. Bob Vila

Re: Amendment No. 2 to Syndication Agreement

Dear Mr. Vila:

An agreement has heretofore been entered into dated September 29, 1989 between your production company, B.V.T.V. Inc. ("Producer") and us, Ogilvy and Mather ("Ogilvy") as agent for our client, Sears Roebuck and Co. ("Sears") as amended June 8, 1990 with regard to a syndicated television series to be financed by Sears and produced by Producer and starring Bob Vila. (The agreement and the amendment are herein defined as the "Agreement".) We are all desirous at this time of amending certain terms of the Agreement for Year II. The following therefore constitutes our understanding thereof:

1.  For Year II, Producer agrees to produce and deliver to Ogilvy, 26 one-half hour programs which programs are scheduled to commence airing weekly in September, 1991.  The 26 programs (the "Series") shall be delivered in two 13 week cycles and shall conform with the standards set forth in the Agreement.  Sears will have prior approval, not to be unreasonably withheld, of the location of the two main sites to be used for the Series.   In addition to the 26 programs, there shall also be delivered to Ogilvy 26 vignettes of 30 seconds each and 26 ten second "tune-ins".  Each of said vignettes and "tune-ins" shall coincide with each respective program.

2.  For Year II of the Series and for Year II only, Sears agrees to pay and Producer agrees to accept the sum of $3,900,000.  Said $3,900,000 shall be paid in 12 monthly installments of $325,000 each.  Said $325,000 shall be due on or before the first of each month commencing January 1, 1991 and continuing through December 1, 1991, except the January and February payments shall be due on or before February 1, 1991. The bonus figures based upon average NTI household ratings for Year II shall remain applicable.

3.  The parties hereto agree that prior to December 15, 1991 they and/or their representatives will meet to discuss modifications, if any, in the financial aspects of the

-2-

P 0000023

Agreement for Year III.  It is understood, however, that in no event would Producer be entitled to receive any additional moneys other than that which is provided for in the Agreement.

In all other respects, the Agreement, except as modified herein, shall remain in full force and effect.

Very truly yours,

OGILVY & MATHER

BY: _____
    Chuck Otto  (DAVID WURFEL)
    Account Supervisor

SEARS, ROEBUCK AND CO.

By: _____
    Bill Patterson
    Vice-President
    Home Improvement Group

B.V.T.V., INC.

BY: _____
    Bob Vila

139FF
91:02:27

-3-

P 0000024

Exhibit 3

P 0000025

**AMENDMENT #3**


Ogilvy & Mather
676 North St. Clair
Chicago, IL 60611


February 8, 1991

B.V.T.V., Inc.
P.O. Box 749
Marstons Mills, MA 02648

Attn:  Mr. Bob Vila

Re:  <u>Amendment No. 3 to Syndication Agreement</u>

Dear Mr. Vila:

An agreement has heretofore been entered into dated September 29, 1989 between your production company, B.V.T.V. Inc. ("Producer") and us, Ogilvy and Mather ("Ogilvy") as agent for our client, Sears Roebuck and Co. ("Sears") as amended June 8, 1990 and February 8, 1991 with regard to a syndicated television series to be financed by Sears and produced by Producer and starring Bob Vila ("Vila").  (The Agreement and Amendments 1 and 2 are herein defined as the "Agreement".)  We are all desirous at this time of amending certain terms and conditions contained in the Agreement relating to certain ancillary rights in the Series.  The following therefore constitutes our understanding thereto:

1.   Commencing January 1, 1991, Producer shall have
the right to sell as video cassettes in the home video market
all of the programs produced for the Series.  Sears shall have
the right of approval, not to be unreasonably withheld, of the
methods of distribution employed by the Producer.  Any and all
net profits received by Producer (as defined in Exhibit A) from
the distribution of the Series in the home video market are to
be divided 60% to Producer and 40% to Sears.  Sears has the
right to purchase any of the home video products from Producer
at Producer's or Producer's distributor's cost.  Producer,
Sears and Ogilvy agree that Sears shall have the option to have
placed on each tape sleeve the Sears/Craftsman logo as well as
an option to insert a 30 second commercial at the beginning of
each tape.

2.   Commencing January 1, 1991, Producer shall have
the right to use the name and/or logo of the Series in all
areas of merchandising including but not limited to the use of
the name and/or logo on tee-shirts, hats, mugs, etc.  Any and
all net profits received by Producer (as defined in Exhibit A)
from such hard goods merchandising programs shall be divided
50% to Producer and 50% to Sears.

-1-

3.  Vila would continue to have the right to write or cause to be written either hard or soft cover books either as companions to the programs in the Series or as "stand-alones" using the name "Home Again With Bob Vila."  Advances, royalties and/or net profits (as defined in Exhibit A) paid to Vila or Producer from the sales of these books are to be divided 60% to Vila and 40% to Sears.  Notwithstanding the foregoing, Vila shall have the right to continue to author or co-author any books which do not use the name "Home Again" and which do not conflict with or contain the same material as the books produced with the name "Home Again", for which Vila shall be entitled to retain 100% of any advances, royalties and/or profits paid for the same.

4.  Sears' receipt of a percentage of the net profits for sales of the video cassette and merchandise described herein shall continue for so long as the Agreement is in full force and effect and for so long as Sears has ownership of the television Series.

5.  In all of the foregoing wherein Sears is entitled to financial participation, Sears shall retain the right at its own expense and through its authorized employees or its independent public accountants to examine records of expenditures on behalf of its participation in the videotape sales, book sales and hard goods merchandising program.  Sears

-2-

P 0000028

shall notify Producer sufficiently in advance to insure that
such records are made available to Sears authorized
representatives.

        In all other respects, the Agreement, except as
modified herein, shall remain in full force and effect.


                            Very truly yours,

                            OGILVY & MATHER

                            BY: _____
                                CHUCK OTTO
                                Account Supervisor


                            SEARS, ROEBUCK AND CO.

                            By: _____
                                Bill Patterson
                                Vice-President
                                Home Improvement Group


B.V.T.V., INC.

BY: _____
        Bob Vila

139FF
91:02:27


                            -3-


P 0000029

## DEFINITION OF NET PROFITS

Net profits shall be defined as all monies actually received by Producer or any of its affiliates from the exploitation of any of the products (i.e., books, video cassettes merchandising, etc.) referred to in this agreement. The only sums which Producer may deduct from any proceeds it actually receives are any costs incurred directly by Producer or paid to third parties in order to ready the products for exploitation.  Any fees paid to Vila or any one affiliated with B.V.T.V. for any services rendered in creating the products shall be reasonable and commensurate with industry standards. All payments made hereunder shall be made no less frequently than twice a year and shall be accompanied by statements setting forth the basis of such payment.

/142FF

P 0000030

Exhibit 4

AMENDMENT #4

Ogilvy & Mather
676 North St. Clair
Chicago, IL 60611

January ✓2 , 1992

B.V.T.V., Inc.
P.O. Box 749
Marstons Mills, MA 02648

Attn: Mr. Bob Vila

     Re:  <u>Amendment No. 4 to Syndication Agreement</u>

Dear Mr. Vila:

An agreement has heretofore been entered into dated
September 29, 1989 between your production company, B.V.T.V.
Inc. ("Producer"), Ogilvy and Mather ("Ogilvy") as advertising
agency for our client, Sears Roebuck and Co. and Sears, Roebuck
and Co. ("Sears") as amended June 8, 1990 ("Amendment No. 1")
and February 8, 1991 ("Amendment No. 2 and No. 3") with regard
to a syndicated television series financed by Sears and
produced by Producer and starring Bob Vila. (The agreement and
the amendments are herein defined as the "Agreement".) We are
all desirous at this time of amending certain terms of the
Agreement for Year III. The following therefore constitutes
our understanding thereof:

1.   For Year III, Producer agrees to produce and deliver to Ogilvy, 26 one-half hour programs which programs are scheduled to commence airing weekly in September, 1992.  The 26 programs (the "Series III") shall be delivered in two 13 week cycles and shall conform with the standards set forth in the Agreement.  Sears will have prior approval, not to be unreasonably withheld, of the location of the two main sites to be used for the Series.  In addition to the 26 programs, there shall also be delivered to Ogilvy 26 vignettes of 30 seconds each and 26 ten second "tune-ins".  Each of said vignettes and "tune-ins" shall coincide with each respective program.

2.   For Year III of Series III and for Year III only, Sears agrees to pay and Producer agrees to accept the sum of $2,430,000 ($30,000 of said funds are to be applied to Producer's $60,000 obligation to Dera & Associates (Public Relations).  Said $2,430,000 shall be paid in three installments of $810,000 each.  Each  $810,000 payment shall be due on or before January 1, 1992 (or within 20 days of execution hereof, which ever is later), April 1, 1992 and August 1, 1992.

3.   The bonus figures based upon average NTI household ratings for Year III shall be as follows and shall be paid to Producer if said ratings are achieved:

-2-

P 0000033

| Avg. NTI HH RTG For 3rd YEAR | Bonus |
|---|---|
| 2.2 | $ 50,000 |
| 2.3 | 150,000 |
| 2.5 | 200,000 |
| 2.6 | 250,000 |
| 2.7 | 300,000 |
| 2.8 | 350,000 |
| 2.9 | 400,000 |

The bonus shall be paid on a pro rata quarterly basis so that, by way of example, if after the first quarter of Year III, the average rating for the show for that quarter is 2.9, Producer would receive a $100,000 bonus (25% of $400,000). If at the end of the second quarter, the average rating for the show for that quarter is 2.5, Producer would receive a $50,000 bonus (25% of $200,000).

4.   The body of Paragraph "10 – Library Usage Fees" in the Agreement shall be deemed deleted and the following shall be substituted therein:

"10.   LIBRARY USAGE FEES.

In the event that Sears elects not to renew the Series for additional year(s), but instead elects to air existing programs of the Series for additional year(s) and Bob Vila is still under contract as a spokesperson for Sears, Sears shall pay to Producer a library usage fee each year based upon 42 1/2% of the revenues received from the distribution of the Series less license fees or the advertising barter time value,

o 50053 on 9-30-04

-3-

which ever is greater, of each program with a minimum yearly
guarantee of $1,000,000.  The minimum yearly guaranteed monies
of $1,000,000 shall include any monies paid to Bob Vila as a
spokesperson for Sears for that given year  (the "Minimum
Guarantee").  This library usage fee payment criteria shall
continue to be in effect for any year(s) in which no new
programs are ordered, but old ones are re-aired.  Said payment
to Producer shall be made by Sears within thirty days at the
end of each six month period, (after the first airing)
accompanied by appropriate statements setting forth the
computations for such payments.  Producer shall have standard
industry audit rights with regard to said statements.

In the event that Sears elects not to renew the Series
for additional year(s) and elects not to air existing programs
or is unable to license the Series or Producer's 42 1/2%
(combined with monies received by Bob Vila as a spokesperson
for Sears) does not total $1,000,000 for that year and Bob Vila
is still under contract as a spokesperson for Sears and if
Sears so elects, for each successive year Sears shall have the
option to pay the difference so that Producer has received a
total of $1,000,000 for that year, or said programs shall go
into Turnaround."

5.  The body of Paragraph "11 - <u>TURNAROUND</u>" in the
Agreement shall be deemed deleted and the following shall be
substituted therein:

-4-

P 0000035

"11.   TURNAROUND.

In the event that Sears elects not to proceed with the new episodes of Series and elects not to pay the Producer the Minimum Guarantee, Sears agrees by March 1 of said year to therewith turn over to Producer (thereby eliminating any financial or other obligation by Sears to Producer or its representative) all programs in the Series to be used by Producer free and clear to sell or license as a syndicated television series, except Sears shall be entitled to receive 42 1/2% of the revenues, if any, received from the distribution of the Series less distribution fees.  Said payment to Sears shall be made by Producer within thirty days after the end of each six month period (after the first airing) accompanied by appropriate statements setting forth the computations for such payments.  Sears shall have standard industry audit rights. Additionally, Sears agrees to assign to Producer all contracts entered into for the exploitation of the Series and cause to be paid to Producer all revenues due and owing Sears, pursuant to said contracts, from the time of such election forward.  In the event Sears has received any unrecouped advances against the Series, said advances will be equitably pro-rated between Sears and Producer.  During any period of time that Vila is a spokesperson for Sears, Producer agrees that any new or old programs for the Series will not have an "on-air national sponsor" who would be either a national chain retailer or

-5-

P 0000036

manufacturer of a product competitive with Sears Home Improvement.

In the event that Sears elects not to renew the Series for additional year(s) and Bob Vila is no longer under contract as a spokesperson for Sears and Sears has not exploited the Series during any one year period, the Series shall revert to Producer and all programs in the Series may be used by Producer free and clear, to sell or license, as syndicated television series, except Sears shall be entitled to receive 42-1/2% of the revenues, if any, received from the distribution of the Series, less distribution fees."

6. The parties hereto agree that prior to December 1, 1992, they and/or their representatives will meet to discuss modifications, if any, in the financial aspects of the Agreement for Year IV.

In all other respects, the Agreement, except as modified herein, shall remain in full force and effect.

Very truly yours,

OGILVY & MATHER

By: _____
David Wurfel
~~Account Supervisor~~
ON ACCOUNT MEDIA DIRECTOR
6/16/92

-6-

SEARS, ROEBUCK AND CO.

By: _____
    **Bill Patterson**
    **Vice-President**
    **Home Improvement Group**

**B.V.T.V., INC.**

By: _____
    **Bob Vila**

2009F
024280.27

-7-

P 0000038

Exhibit 5

P 0000039

<u>AMENDMENT #5</u>

OGILVY & MATHER
676 North St. Clair
Chicago, IL 60611

February 10, 1993

B.V.T.V., Inc.
P.O. Box 749
Marstons Mills, MA 02648

Attn:  Mr. Bob Vila

Re:  <u>Amendment No. 5 to Syndication Agreement</u>

Dear Mr. Vila:

An agreement has heretofore been entered into dated September 29, 1989 between your production company, B.V.T.V. Inc. ("Producer"), Ogilvy and Mather ("Ogilvy") as advertising agency for our client, Sears Roebuck and Co. and Sears, Roebuck and Co. ("Sears") as amended June 8, 1990 ("Amendment No. 1") February 8, 1991 ("Amendment No. 2 and No. 3") and January 12, 1992 ("Amendment No. 4") with regard to a syndicated television series financed by Sears and produced by Producer and starring Bob Vila. (The agreement and the amendments are herein defined as the "Agreement".)  We are all desirous at this time of amending certain terms of the Agreement for Year IV.  The following therefore constitutes our understanding thereof:

1.  For Year IV, Producer agrees to produce and deliver to Ogilvy, 26 one-half hour programs which programs are scheduled to commence airing weekly in September, 1993.  The 26 programs

("Series IV") shall be delivered in two 13 week cycles and shall conform with the standards set forth in the Agreement. Sears will have prior approval, not to be unreasonably withheld, of the location of two main sites to be used for the Series. In addition to the 26 programs, there shall also be delivered to Ogilvy 26 vignettes of 30 seconds each and 26 ten second "tune-ins". Each of said vignettes and "tune-ins" shall coincide with each respective program.

2.  For Year IV of Series IV and for Year IV only, Sears agrees to pay and Producer agrees to accept:

(i) the guaranteed sum of $1,500,000. Said $1,500,000 shall be paid as follows: (a) $750,000 shall be due on or before January 1, 1993 (or within 15 days of execution hereof, which ever is later), $375,000 on or before April 1, 1993 and $375,000 on or before August 1, 1993; plus

(ii) The following sums based upon the sale of 208 units by Group W:

(a)  In the event that Group W sells 50% of said units, B.V.T.V. shall receive an additional $200,000;

(b)  In the event Group W sells 75% of said units, B.V.T.V. shall receive an additional $300,000 (for a total of $500,000); and

(c)  In the event Group W sells 90% or more of said units, B.V.T.V. shall receive an additional of $100,000 (for a total of $600,000).

— 2 —

3.   The parties hereto agree that prior to October 15 1993, they and/or their representatives will meet to discuss modifications, if any, in the financial aspects of the Agreement for Year V.  If no agreement is reached for Year V by said date, there will be no Year V option.

In all other respects, the Agreement, except as modified herein, shall remain in full force and effect.

Very truly yours,

OGILVY & MATHER

By: _Kay D Durkin_
   Kay Durkin
   Vice-President
   Director of National Broadcast

SEARS, ROEBUCK AND CO.

By: _Marv Stern_
   Marv Stern
   Vice-President
   Home Improvement Group

B.V.T.V., INC.

By: _Bob Vila_
   Bob Vila

2074F
024280.27

— 3 —

P 0000042

Exhibit 6

P 0000043

**AMENDMENT # 6**

**OGILVY & MATHER**
**676 North St. Clair**
**Chicago, IL 60611**

November 15, 1993

B.V.T.V., Inc.
P.O. Box 749
Marstons Mills, MA 02648
Attn: Mr. Bob Vila

    RE: Amendment No. 6 to Syndication Agreement (Year V)

Dear Mr. Vila:

    An agreement has heretofore been entered into dated September 29, 1989 between your production company, B.V.T.V. Inc. ("Producer"), Ogilvy & Mather ("Ogilvy") as advertising agency for our client, Sears Roebuck and Co. ("Sears") as amended June 8, 1990 ("Amendment No. 1") February 8, 1991 ("Amendment No. 2 and No. 3") January 12, 1992 ("Amendment No. 4") and February 10, 1993 ("Amendment No. 5") with regard to a syndicated television series financed by Sears and produced by Producer and starring Bob Vila. (The agreement and amendments are herein defined as the "Agreement".) We are all desirous at this time of amending certain terms of the Agreement for Year V. The following therefore constitutes our understanding thereof:

    1. For Year V, Producer agrees to produce and deliver to Ogilvy, 26 one-half hour programs which programs are scheduled to commence airing weekly in September, 1994. The 26 programs ("Series V") shall be delivered in two 13 week cycles and shall

P 0000044

conform with the standards set forth in the Agreement.  Sears will have prior approval, not to be unreasonably withheld, of the locations of the Series.  In addition to the 26 programs, there shall also be delivered to Ogilvy 26 vignettes of 30 seconds each and 26 ten second "tune-ins".  Each of said vignettes and "tune-ins" shall coincide with each respective program.

2.   For Year V of Series V and for Year V only, Sears agrees to pay and Producer agrees to accept:

(i)  the guaranteed sum of $1,700,000.  Said $1,700,000 shall be paid as follows:  (a) $750,000 shall be due on or before January 1, 1994, (b) $375,000 on or before March 1, 1994, (c) $375,000 on or before August 1, 1994 and (d) $200,000 as a guarantee for (ii) below but in no event payable later than December 31, 1994; plus

(ii) The following sums based upon the sale of ~~208~~ 312 KD units by Group W:

(a)  In the event that Group W sells 50% of said units, B.V.T.V. shall receive an additional $200,000 (see (i) above);

(b)  In the event Group W sells 55% of said units, B.V.T.V. shall receive an additional $125,000;

(c)  In the event Group W sells 60% of said units, B.V.T.V. shall receive an additional $125,000;

(d)  In the event Group W sells 65% of said units, B.V.T.V. shall receive an additional $125,000;

2

P 0000045

(e)  In the event Group W sells 70% of said units, B.V.T.V. shall receive an additional $125,000;

(f)  In the event Group W sells 75% of said units, B.V.T.V. shall receive an additional $125,000;

(g)  In the event Group W sells 80% of said units, B.V.T.V. shall receive an additional $125,000; and

(h)  In the event Group W sells 90% of said units, B.V.T.V. shall receive an additional $125,000.

3.   The parties hereto agree that prior to October 15, 1994, they and/or their representatives will meet to discuss modifications, if any, in the financial aspects of the Agreement for Year VI. If no agreement is reached for Year VI by said date, there will be no Year VI option.

4.   Sears agrees to advance to Producer $100,000 as an advance against Group W selling 50% of the units referred to in Paragraph 2.(i)(a) of Amendment No. 5 dated February 10, 1993. Additional bonus figures based upon the sale of all or part of the 312 K0 ~~208~~ units by Group W shall be paid as and when paid to Group W.

5.   The status of Group W's sell-offs shall be provided by Ogilvy to Producer on a quarterly basis.

In all other respects, the Agreement, except as modified herein, shall remain in full force and effect.

3

P 0000046

Very truly yours,

SEARS ROEBUCK & CO.

By: _____
Jerry Post
Vice-President
Home Improvement Group

OGILVY & MATHER

B.V.T.V., INC.

By: _____
Bob Vila

4

P 0000047



Exhibit 7

P 0000048

**AMENDMENT # 7**

**OGILVY & MATHER**
676 North St. Clair
Chicago, IL 60611

December 5, 1994

B.V.T.V., Inc.
P.O. Box 749
Marstons Mills, MA 02648
Attn: Mr. Bob Vila

RE: Amendment No. 7 to Syndication Agreement (Year VI)

Dear Mr. Vila:

An agreement has heretofore been entered into dated September 29, 1989 between your production company, B.V.T.V. Inc. ("Producer"), Ogilvy & Mather ("Ogilvy") as advertising agency for our client, Sears Roebuck and Co. ("Sears") as amended June 8, 1990 ("Amendment No. 1"), February 8, 1991 ("Amendment No. 2 and No. 3"), January 12, 1992 ("Amendment No. 4"), February 10, 1993 ("Amendment No. 5") and November 15, 1994 ("Amendment No. 6") with regard to a syndicated television series financed by Sears and produced by Producer and starring Bob Vila. (The agreement and amendments are herein defined as the "Agreement".) We are all desirous at this time of amending certain terms of the Agreement for Year VI. The following therefore constitutes our understanding thereof:

1.    For Year VI, Producer agrees to produce and deliver to Ogilvy, 26 one-half hour programs which programs are scheduled to commence airing weekly in September, 1995.    The 26 programs ("Series VI") shall be delivered in two 13 week cycles and shall conform with the standards set forth in the Agreement.  Sears will have prior approval, not to be unreasonably withheld, of the locations of the Series.  In addition to the 26 programs, there shall also be delivered to Ogilvy 26 vignettes of 30 seconds each and 26 ten second "tune-ins".  Each of said vignettes and "tune-ins" shall coincide with each respective program.

2.    For Year VI of Series VI and for Year VI only, Sears agrees to pay and Producer agrees to accept:

(i)        the guaranteed sum of $1,519,500.    Said $1,519,500 shall be paid as follows:  (a) $750,000 shall be due on or before January 1, 1995, (b) $394,500 on or before March 1, 1995, (c) $375,000 on or before August 1, 1995; plus

(ii)        $325,000 as a guarantee for (iii)(a) and (b) below but in no event payable later than December 31, 1995; plus

(iii)      The following sums based upon the sale of 312 units by Group W:

(a)  In the event that Group W sells 50% of said units, B.V.T.V. shall receive an additional $200,000 (see (ii) above);

(b)  In the event Group W sells 55% of said units, B.V.T.V. shall receive an additional $125,000 (see (ii) above);

2

       (c)   In the event Group W sells 60% of said units, B.V.T.V. shall receive an additional $125,000;

       (d)   In the event Group W sells 65% of said units, B.V.T.V. shall receive an additional $125,000;

       (e)   In the event Group W sells 70% of said units, B.V.T.V. shall receive an additional $125,000;

       (f)   In the event Group W sells 75% of said units, B.V.T.V. shall receive an additional $125,000;

       (g)   In the event Group W sells 80% of said units, B.V.T.V. shall receive an additional $125,000; and

       (h)   In the event Group W sells 90% of said units, B.V.T.V. shall receive an additional $125,000.

3.   The above guaranteed sum shall be inclusive of the cost of the Closed Captioning the 26 programs by the National Captioning Institute, Inc.

4.   The parties hereto agree that prior to October 15, 1995, they and/or their representatives will meet to discuss modifications, if any, in the financial aspects of the Agreement for Year VII.  If no agreement is reached for Year VII by said date, there will be no Year VII option.

3

5.    The status of Group W's sell-offs shall be provided by Ogilvy to Producer on a quarterly basis.

In all other respects, the Agreement, except as modified herein, shall remain in full force and effect.

Very truly yours,

OGILVY & MATHER

By: _~~signature~~_ HENRY J FOSSLE
ACCOUNT SUPERVISOR

SEARS, ROEBUCK AND CO.

By: _~~signature~~_
SEARS MARKETING MANAGER

B.V.T.V., INC.

By: _~~signature~~_
Bob Vila

VILA\SYN.AMD.#7

4

P 0000052

Exhibit 8

P 0000053

<u>**AMENDMENT # 8**</u>

**OGILVY & MATHER**
**676 North St. Clair**
**Chicago, IL 60611**

December 19, 1995

B.V.T.V., Inc.
P.O. Box 749
Marstons Mills, MA 02648
Attn: Mr. Bob Vila

    RE:  <u>Amendment No. 8 to Syndication Agreement (Year VII)</u>

Dear Mr. Vila:

    An agreement has heretofore been entered into dated September 29, 1989 between your production company, B.V.T.V. Inc. ("Producer"), Ogilvy & Mather ("Ogilvy") as advertising agency for our client, Sears Roebuck and Co. ("Sears") as amended June 8, 1990 ("Amendment No. 1"), February 8, 1991 ("Amendment No. 2 and No. 3"), January 12, 1992 ("Amendment No. 4"), February 10, 1993 ("Amendment No. 5"), November 15, 1993 ("Amendment No. 6") and December 5, 1994 ("Amendment No. 7") with regard to a syndicated television series financed by Sears and produced by Producer and starring Bob Vila.  (The agreement and amendments are herein defined as the "Agreement".)  We are all desirous at this time of amending certain terms of the Agreement for Year VII.  The following therefore constitutes our understanding thereof:

    1.    For Year VII, Producer agrees to produce and deliver to Ogilvy, 26 one-half hour programs which programs are scheduled to

commence airing weekly in September, 1996. The 26 programs ("Series VII") shall be delivered in two 13 week cycles and shall conform with the standards set forth in the Agreement. Sears will have prior approval, not to be unreasonably withheld, of the locations of the Series. In addition to the 26 programs, there shall also be delivered to Ogilvy 26 vignettes of 30 seconds each and 26 ten second "tune-ins". Each of said vignettes and "tune-ins" shall coincide with each respective program.

    2.   For Year VII of Series VII and for Year VII only, Sears agrees to pay and Producer agrees to accept:

    (i)      the guaranteed sum of $1,519,500. Said $1,519,500 shall be paid as follows: (a) $750,000 shall be due on or before January 1, 1996, (b) $394,500 on or before April 1, 1996, (c) $375,000 on or before August 1, 1996; plus

    (ii)      $325,000 as a guarantee for a portion of (iii)(a) below, payable on December 1, 1996;

    (iii)    The following sums based upon the Revenue (as defined in Exhibit A) generated and received by Group W from the sale of 312 units by them.

    (a)  In the event the Revenue received by Group W for said units is $1,400,000, B.V.T.V. shall receive an additional $625,000, ($325,000 of this amount shall be paid as a guarantee on December 1, 1996) see (ii) above;

2

P 0000055

      (b)   In the event the revenue received by Group W is $1,600,000, B.V.T.V. shall receive an additional $100,000;

      (c)   In the event the revenue received by Group W is $1,800,000, B.V.T.V. shall receive an additional $75,000;

      (d)   In the event the revenue received by Group W is $2,000,000, B.V.T.V. shall receive an additional $100,000;

      (e)   In the event the revenue received by Group W is $2,200,000, B.V.T.V. shall receive an additional $100,000;

      (f)   In the event the revenue received by Group W is $2,400,000, B.V.T.V. shall receive an additional $80,000;

      (g)   In the event the revenue received by Group W is $2,600,000, B.V.T.V. shall receive an additional $95,000; and

      (h)   In the event the revenue received by Group W is $2,800,000, B.V.T.V. shall receive an additional $25,000.

      (iv)    Said total bonus shall be capped at a maximum of $1,200,000.

      (v)    A bonus payment schedule will be established on the basis of the contract with Group W, but shall in any event be paid December 1, 1996 (see 2(ii)(a) above), July 15, 1997 and December 1, 1997.

      3.   Producer shall be responsible for the cost of Closed Captioning the 26 programs by the National Captioning Institute, Inc.

3

P 0000056

4.    The parties agree that prior to October 15, 1996, they and/or their representatives will meet to discuss renewal of the agreement for Year VIII and any modifications, including modifications of the financial aspects of the Agreement for Year VIII.

5.    The status of Group W's sell-offs shall be provided by Ogilvy to Producer on a quarterly basis.

6.    This agreement may be signed in counterparts.

In all other respects, the Agreement, except as modified herein, shall remain in full force and effect.

Very truly yours,

OGILVY & MATHER

By: _____

SEARS, ROEBUCK AND CO.

By: _____
ANDY GINGER

B.V.T.V., INC.

By _____
BOB VILA

ref/vila/syndic.#8

4

P 0000057

## EXHIBIT A

Revenue:   For purposes of this Agreement, the term "Revenue" shall be deemed to mean the aggregate of the sums paid to and actually received by Group W from all sources of the Program for Year VII less the following amounts; (a) taxes (however denominated and irrespective of any tax credits or deductions taken by Group W) paid to any governmental authority in connection with the exploitation of the Program or of any rights relating thereto (except that any corporate income or franchise taxes of Group W shall not be deducted from Revenue) and all sums actually paid as costs of acquiring permits and any similar authority to secure the distribution of the Program or any of said rights; (b) all adjustments, credits, allowances, rebates and refunds actually made by Group W to third parties and if the same has been taken into account as Revenue then an equivalent amount shall be eliminated from subsequent Revenue; (c) unless and until earned, otherwise available to Group W or usable by Group W, all sums received in the nature of security deposits or periodic payments; and (d) all costs and expenses incurred by or on behalf of Group W in order to obtain any damages, settlements or other recoveries in connection with any interference with or infringements of any of Group W's or Sears' rights in the Program.  Group W agrees that such recoveries will be included in Revenue.

5

P 0000058

Exhibit 9

P 0000059

**AMENDMENT # 9**

**OGILVY & MATHER**
**676 North St. Clair**
**Chicago, IL 60611**

December 18, 1996

B.V.T.V., Inc.
P.O. Box 749
Marstons Mills, MA 02648
Attn: Mr. Bob Vila

Re: **Amendment No. 9 to Syndication Agreement**
    **(Year VIII and Year IX)**

Dear Mr. Vila:

An agreement has heretofore been entered into dated September 29, 1989 between your production company, B.V.T.V. Inc. ("Producer"), Ogilvy & Mather ("Ogilvy") as advertising agency for our client, Sears Roebuck and Co. ("Sears") as amended June 8, 1990 ("Amendment No. 1"), February 8, 1991 ("Amendment No. 2 and No. 3"), January 12, 1992 ("Amendment No. 4"), February 10, 1993 ("Amendment No. 5"), November 15, 1993 ("Amendment No. 6"), December 5, 1994 ("Amendment No. 7") and December 19, 1995 with regard to a syndicated television series financed by Sears and produced by Producer and starring Bob Vila.  (The agreement and amendments are herein defined as the "Agreement".)  We are all

desirous at this time of amending certain terms of the Agreement for Year VIII and Year IX. The following therefore constitutes our understanding thereof:

1.    For Year VIII and Year IX respectively, Producer agrees to produce and deliver to Ogilvy, 26 one-half hour programs which programs are scheduled to commence airing weekly in September, 1997 and September, 1998 respectively. The 26 programs ("Series VIII and IX") shall be delivered in two 13 week cycles and shall conform with the standards set forth in the Agreement. Sears will have prior approval, not to be unreasonably withheld, of the locations of the Series. In addition to the 26 programs each year, there shall also be delivered to Ogilvy each year 26 vignettes of 30 seconds each and 26 ten second "tune-ins". Each of said vignettes and "tune-ins" shall coincide with each respective program.

2.    For Year VIII of Series VIII and for Year VIII only, Sears agrees to pay and Producer agrees to accept:

(i)        the guaranteed sum of $1,519,500. Said $1,519,500 shall be paid as follows: (a) $750,000 shall be due on or before January 1, 1997, (b) $394,500 on or before April 1, 1997, (c) $375,000 on or before August 1, 1997; plus

(ii)       $325,000 as a guarantee for a portion of (iii)(a) below, payable on December 1, 1997;

2

P 0000061

(iii)    The following sums based upon the Revenue (as defined in Exhibit A) generated and received by EyeMark from the sale of 312 units by them.

(a)  In the event the Revenue received by Group W for said units is $1,400,000, B.V.T.V. shall receive an additional $625,000, ($325,000 of this amount shall be paid as the guarantee on December 1, 1997) see (ii) above;

(b)  In the event the revenue received by Group W is $1,600,000, B.V.T.V. shall receive an additional $100,000;

(c)  In the event the revenue received by Group W is $1,800,000, B.V.T.V. shall receive an additional $75,000;

(d)  In the event the revenue received by Group W is $2,000,000, B.V.T.V. shall receive an additional $100,000;

(e)  In the event the revenue received by Group W is $2,200,000, B.V.T.V. shall receive an additional $100,000;

(f)  In the event the revenue received by Group W is $2,400,000, B.V.T.V. shall receive an additional $80,000;

(g)  In the event the revenue received by Group W is $2,600,000, B.V.T.V. shall receive an additional $95,000; and

(h)  In the event the revenue received by Group W is $2,800,000, B.V.T.V. shall receive an additional $25,000.

(iv)    Said total bonus shall be capped at a maximum of $1,200,000.

(v)    A bonus payment schedule will be established on the basis of the contract with EyeMark, but shall in any event be

3

paid December 1, 1997 (see 2(ii)(a) above), July 15, 1997 and December 1, 1998.

3.    For Year IX of Series IX and for Year IX only, Sears agrees to pay and Producer agrees to accept:

(i)        the guaranteed sum of $1,519,500.    Said $1,519,500 shall be paid as follows:   (a) $750,000 shall be due on or before January 1, 1998, (b) $394,500 on or before April 1, 1998, (c) $375,000 on or before August 1, 1998; plus

(ii)        $325,000 as a guarantee for a portion of (iii)(a) below, payable on December 1, 1998;

(iii)        The following sums based upon the Revenue (as defined in Exhibit A) generated and received by EyeMark from the sale of 312 units by them.

(a)   In the event the Revenue received by Group W for said units is $1,400,000, B.V.T.V. shall receive an additional $625,000, ($325,000 of this amount shall be paid as a guarantee on December 1, 1998) see (ii) above;

(b)   In the event the revenue received by Group W is $1,600,000, B.V.T.V. shall receive an additional $100,000;

(c)   In the event the revenue received by Group W is $1,800,000, B.V.T.V. shall receive an additional $75,000;

(d)   In the event the revenue received by Group W is $2,000,000, B.V.T.V. shall receive an additional $100,000;

(e)   In the event the revenue received by Group W is $2,200,000, B.V.T.V. shall receive an additional $100,000;

4

(f)   In the event the revenue received by Group W is $2,400,000, B.V.T.V. shall receive an additional $80,000;

(g)   In the event the revenue received by Group W is $2,600,000, B.V.T.V. shall receive an additional $95,000; and

(h)   In the event the revenue received by Group W is $2,800,000, B.V.T.V. shall receive an additional $25,000.

(i)   In the event the revenue received by Group W is $3,000,000, B.V.T.V. shall receive an additional $50,000.

(iv)   Said total bonus shall be capped at a maximum of $1,250,000.

(v)   A bonus payment schedule will be established on the basis of the contract with EyeMark, but shall in any event be paid December 1, 1998 (see 2(ii)(a) above), July 15, 1999 and December 1, 1999.


4.   Producer shall be responsible for the cost of Closed Captioning the 26 programs each year by the National Captioning Institute, Inc.


5.   The parties agree that prior to October 15, 1998, they and/or their representatives will meet to discuss renewal of the agreement for Year X and any modifications, including modifications of the financial aspects of the Agreement for Year X.


6.   The status of EyeMark's sell-offs shall be provided by Ogilvy to Producer on a quarterly basis.

P 0000064

7.    This agreement may be signed in counterparts.

In all other respects, the Agreement, except as modified herein, shall remain in full force and effect.

Very truly yours,

OGILVY & MATHER

By: _____

SEARS, ROEBUCK AND CO.

By: _____
        ANDY GINGER

B.V.T.V., INC.

By: _____
        BOB VILA

ref/vila/syndic.#9

6

P 0000065

## EXHIBIT A

**Revenue:**   For purposes of this Agreement, the term "Revenue" shall be deemed to mean the aggregate of the sums paid to and actually received by Group W from all sources of the Program for Year VII less the following amounts; (a) taxes (however denominated and irrespective of any tax credits or deductions taken by Group W) paid to any governmental authority in connection with the exploitation of the Program or of any rights relating thereto (except that any corporate income or franchise taxes of Group W shall not be deducted from Revenue) and all sums actually paid as costs of acquiring permits and any similar authority to secure the distribution of the Program or any of said rights; (b) all adjustments, credits, allowances, rebates and refunds actually made by Group W to third parties and if the same has been taken into account as Revenue then an equivalent amount shall be eliminated from subsequent Revenue; (c) unless and until earned, otherwise available to Group W or usable by Group W, all sums received in the nature of security deposits or periodic payments; and (d) all costs and expenses incurred by or on behalf of Group W in order to obtain any damages, settlements or other recoveries in connection with any interference with or infringements of any of Group W's or Sears' rights in the Program.  Group W agrees that such recoveries will be included in Revenue.

7

Exhibit 10

[date]    1\5\98

B.V.T.V., Inc.
Attn: Mr. Bob Vila
P.O. Box 749
Marstons Mills, MA 02648

Re:    Amendment No. 10 to Bob Vila Syndicated Television Program Agreement
(Year 10 - Year 15)("Amendment No. 10")

Dear Mr. Vila:

The parties hereto, your production company, B.V.T.V., Inc. ("Producer") and us, Ogilvy
& Mather ("Ogilvy") as agent for our client, Sears, Roebuck and Co. ("Sears"), are desirous of
setting forth the terms for going forward for the next six years ("Year 10-Year 15") with regard
to Bob Vila Home Again ("Home Again"), the syndicated television series financed by Sears,
produced by B.V.T.V., Inc. ("Producer") and starring you, Bob Vila ("Vila")(the "Series"),
subject to the prior arrangements between Sears and Eyemark Entertainment ("Eyemark").

An agreement regarding Home Again, dated September 28, 1989, has heretofore been
entered into between Producer and Ogilvy, as advertising agency for Sears, (the "1989
Agreement") and was subsequently amended on June 8, 1990 ("Amendment No. 1"), February 8,
1991 ("Amendment No. 2 and No. 3"), January 12, 1992 ("Amendment No. 4"), February 10,
1993 ("Amendment No. 5"), November 15, 1993 ("Amendment No. 6"), December 5, 1994
("Amendment No. 7"), December 19, 1995 ("Amendment No. 8") and December 19, 1995
("Amendment No. 8") (The 1989 Agreement and amendments are herein defined as the "10 Year
Agreement.")

1.    THE 10 YEAR AGREEMENT.  The following paragraphs of the 10 Year
Agreement shall be deemed to apply to this Amendment No. 10: 3. SEARS CREDIT, 14.
INDEMNITIES, 15. FORCE MAJEURE, 16. FULL POWER, 17. NOTICES, 18 SEARS
TRADEMARK, TRADE NAMES, SERVICE MARKS, 19. COPYRIGHT NOTICES, 20.
PURCHASES, 21. INSURANCE, and 22. GENERAL.

2.    PRODUCER'S OBLIGATIONS.  For Year 10-Year 15, Producer agrees to
produce and deliver to Sears 26 one half-hour programs which programs are scheduled to
commence airing in September, 1999 (the "26 Programs").  The 26 Programs, Series 10 through
Series 15,  shall be delivered in two 13-week cycles and shall conform with standards consistent
with all prior programs submitted to Ogilvy.  Sears will have prior approval over the locations of

CHIDOCS/1023/527247.v6 12/14/1998 9:54 AM

the Series. Such approval shall not be unreasonably withheld. In addition to the 26 Programs per year, there shall also be delivered to Sears 26 vignettes of 30-seconds each and 26 "10-second tune-ins." Each of said vignettes and tune-ins shall coincide with each respective program. Producer agrees to produce the Series in a professional manner using a professional staff and in keeping with the standards of previously produced Home Again shows. Producer shall be solely responsible for all aspects of the Series, including but not limited to, project development and/or renovation costs, talent, travel and accommodations, talent and production crew salaries, equipment rentals or purchases, etc. If requested by Sears, Producer agrees to use Sears Home Improvement products and services in the production of the Series wherever applicable, if available and deliverable. Sears shall appoint a Sears liaison from whom Producer may purchase any products or services sold by Sears at Sears cost.

3.    CONSIDERATION. For Year 10-Year 15 (Series 10 through Series 15), Sears agrees to pay and Producer agrees to accept each year the guaranteed sum of $1,519,000 with incentive bonuses up to a maximum of an additional $1,250,000 based upon the following benchmarks:

(a)    The following sums based upon the Revenue (as defined in Exhibit A) generated and received by the first-run syndicator from the sale of 312 units by them.

In the event the Revenue received by the first-run syndicator for said units is:

(i)    $1,400,000, B.V.T.V. shall receive an additional $625,000;

(ii)    $1,600,000, B.V.T.V. shall receive an additional $100,000;

(iii)    $1,800,000, B.V.T.V. shall receive an additional $75,000;

(iv)    $2,000,000, B.V.T.V. shall receive an additional $100,000;

(v)    $2,200,000, B.V.T.V. shall receive an additional $100,000;

(vi)    $2,400,000, B.V.T.V. shall receive an additional $80,000;

(vii)    $2,600,000, B.V.T.V. shall receive an additional $95,000;

(viii)    $2,800,000, B.V.T.V. shall receive an additional $25,000; and

(ix)    $3,000,000, B.V.T.V. shall receive an additional $50,000;

(b)    Said total bonuses shall be capped at a maximum of $1,250,000 per season.

(c)    Said $1,519,000 plus the $1,250,000, if earned, shall be paid as follows.

2

P 0000069

(i)      $750,000 shall be due on or before each January 1 commencing January 1, 1999 (production fee);

(ii)     $494,500 on or before each March 1 commencing March 1, 1999 (production fee);

(iii)    $475,000 on or before each August 1 commencing August 1, 1999 (of which $275,000 shall be a production fee and $200,000 as the first payment of the incentive bonus);

(iv)    $500,000 on or before each October 1 commencing October 1, 1999 (if incentive bonus is earned); and

(v)     $550,000 on or before each December 1 commencing December 1, 1999 (if incentive bonus is earned).

Producer shall be responsible for the execution and cost each year of the National Captioning Institute, Inc.'s close-captioning of the 26 Programs.

4.      THE LIBRARY.   All shows previously created and subsequently created after the first year of syndication (the "Library"), which shall be delivered to Ogilvy, shall be deemed to be owned by Sears and Producer equally both during the term of this Agreement and upon termination of the Series. The parties agree to submit to each other for prior written approval any and all programs, concepts and ideas relating to the marketing of the Library. Such approval shall not be unreasonably withheld by either party. It shall be the responsibility of Producer and Ogilvy, in connection with Vila's agent, as designated by Vila, to enter into contracts to control and maximize income from the Library from cable sales, second run syndication with the prior written approval of Producer, Ogilvy and Sears. Notwithstanding the above sentence, all such contracts shall be signed by Sears. All gross income from first run syndication and from all subsequent sales and uses of the Library, less the expenses paid to Producer from Year 10-Year 15 and expenses paid to syndicator, less any bonus received by Vila from Year 10-Year 15 shows, shall be divided equally between Sears and Producer. First-run syndication shall be handled by a syndication company such as Eyemark upon which Producer and Ogilvy shall mutually agree. All other uses of the Library shall be mutually agreed upon between Producer and Sears and the income from such uses shall be divided equally between Producer and Sears.

Any disputes relating to this paragraph 4 shall be arbitrated pursuant to the arbitration provision, attached hereto and incorporated herein as Exhibit 1.

P 0000070

Except for the foregoing, all of the terms and conditions of the 1989 Agreement and all amendments relating thereto which are not inconsistent with the foregoing are hereby ratified and affirmed.

Acceptance of and agreement to this Amendment No. 10 is confirmed by signing your name in the place indicated below.

Very truly yours,

OGILVY AND MATHER, as
agent for SEARS, ROEBUCK AND
CO.

By: _Kay Durkin_
Kay Durkin

ACCEPTED:

B.V.T.V., INC.

By _Bob Vila_
Bob Vila

P 0000071

## ARBITRATION PROVISION FOR PARAGRAPH 4 OF AMENDMENT NO. 10 TO BOB VILA SYNDICATED TELEVISION PROGRAM AGREEMENT (THE "AGREEMENT")

Any and all claims, disputes or controversies (whether in contract, tort, or otherwise, including statutory, common law, intentional tort, property and equitable claims) relating to the uses of the Library pursuant to **Paragraph 4 - The Library** shall be resolved by final and binding arbitration before a single arbitrator (the "Arbitrator") in Cook County, Illinois. This arbitration provision does not prevent either party from seeking interim injunctive relief from a court in order to preserve the status quo or to protect assets until such time as the arbitration has been commenced and the arbitrator has an opportunity to consider the matter of interim relief. Neither party shall institute any proceeding in any court or administrative agency or any arbitration to resolve a dispute between the parties before that party has sought to resolve the dispute through direct negotiation with the other party. If the dispute is not resolved within three (3) business days after receipt of a written demand for direct negotiation, the parties may then attempt to resolve the dispute through arbitration as provided in this arbitration provision.

All arbitrations shall be administered by the American Arbitration Association in according with its then existing Commercial Arbitration Rules by one of the five following qualified media arbitrators, who shall be selected in the following order as each Arbitrator's availability permits:

1)
2)
3)
4)
5)

The prevailing party (as determined by the Arbitrator) shall in addition be awarded by the Arbitrator such party's own attorneys' fees and expenses in connection with such proceeding. The non-prevailing party (as determined by the Arbitrator) shall pay the Arbitrator's fees and expenses. The Arbitrator shall apply relevant law and provide written, reasoned findings of fact and conclusions of law. This arbitration provision is made pursuant to a transaction involving interstate commerce and shall be governed by the Federal Arbitration Act, 9 U.S.C. Section 1, *et seq.* Judgment on the award rendered by the Arbitrator may be entered in any court having jurisdiction. If any portion of this arbitration provision is deemed invalid or unenforceable, it shall not invalidate the remaining portions of this arbitration provision. The substantive law of the State of Illinois without reference to any principles concerning conflicts of law, shall govern the validity of this Agreement, the construction of its terms and the interpretation of the rights, duties and remedies of the parties hereunder; provided, however, that this Arbitration provision and the parties' rights under this provision shall be governed by and construed in accordance with the Federal Arbitration Act.

# EXHIBIT 5

∂4282⁊

**kcondon**

| | |
|---|---|
| **From:** | "Jonathan Russo" <Jrusso@ArtistsAgency com> |
| **To:** | "kcondon" <kcondon@kaufmannfeiner.com> |
| **Sent:** | Tuesday, November 23, 2004 12 22 PM |
| **Subject:** | RE  Vila Syndication Agreement |

THANKS FOR EVERYTHING  JR

-----Original Message-----
**From:** kcondon [mailto:kcondon@kaufmannfeiner.com]
**Sent:** Tuesday, November 23, 2004 12:03 PM
**To:** MRODE@sears.com
**Cc:** Bob Vila; Jonathan Russo
**Subject:** Vila Syndication Agreement

Dear Mark

A few weeks ago you were kind enough to arrange a conference call so that we could finish off Bob Vila's Syndication Agreement extension  To date, I have not received the redraft from Drew  This is becoming of concern to Bob and myself  Can you please check its status and get back to me?

Also, I would appreciate it if we could arrange a conference call with you, me, Bob and Andy to discuss the recent K-Mart situation and its impact, if any, on Bob

Thanks, Ron



11/23/04

# EXHIBIT 7

kcondon

**From:**     <MRODE@sears.com>
**To:**       "kcondon" <kcondon@kaufmannfeiner.com>
**Cc:**       <jrusso@ArtistsAgency.com>, "Bob Vila" <rjvila@bobvila.com>
**Sent:**     Wednesday, November 24, 2004 12:03 PM
**Subject:**  Re  Vila Syndication Agreement

Ron,

I know Drew was working on it, but I was out all last week and now Drew is out this week. I left a message and should hear something Monday.

As for the K-Mart issue we have been instructed to not talk about the merger. Partly because it won't be done until spring and partly because I don't think they have a clue yet what they're going to do. The only thing they have said with any consistency is some K-Marts will be Sears. That's not a bad thing for the brand (or Bob). I'll let you know when the gag order is lifted and we can schedule a meeting.

Mark P Rode
Craftsman Brand Manager
(847) 286-3447


"kcondon" <kcondon@kaufmannfeiner.com>

11/23/2004 11:03 AM
Please respond to "kcondon"

**To**     <MRODE@sears.com>
**cc**     "Bob Vila" <rjvila@bobvila.com>, <jrusso@ArtistsAgency.com>
**Subject**  Vila Syndication Agreement


Dear Mark

A few weeks ago you were kind enough to arrange a conference call so that we could finish off Bob Vila's Syndication Agreement extension. To date, I have not received the redraft from Drew. This is becoming of concern to Bob and myself. Can you please check its status and get back to me?

Also, I would appreciate it if we could arrange a conference call with you, me, Bob and Andy to discuss the recent K-Mart situation and its impact, if any, on Bob

Thanks, Ron



EXHIBIT
# 71A
1-24-06

11/29/04

P 0000232

EXHIBIT 12

**Sent:** Wed, 08 Dec 2004 21:51:52 GMT
**From:** Fred Ciba
**To:** Richard Anderson
**CC:** Mark Rode
**BCC:**
**Subject:** ...............Bob Vila, 2005...............

Richard I have two Bob Vila invoices here, both due 1/1/05.....

1. Personal Spokesperson Contract - Year 2005, Payment #1   Rate $1,897,500, Amount $948,750

2. Syndication Agreement - Season 16, Payment #1 ($750,000 less 4.75%), Amount $714,375 (The "less 4.75%" goes to Michael Ferrone, $36,625)

Per Mark Rode, and per the contract I have here, it's OK to pay the Personal, might I have a JA number?
Per Mark Rode, I shall hold onto the Syndication invoice.

Advise on JA#. Thanks, Fred. _



EXHIBIT
#2 /s
1-24-06

SEARS-2141

# EXHIBIT 13

# Ogilvy&Mather
### Advertising

676 St Clair Chicago, Illinois 60611
Telephone 1 312 988-2500 · Telex 255162 · Cable Ogilvy Chicago

~~B. V. Col.~~ BOB VILA
Colton, Hartnick, Yamin & Sheresky
79 Madison Avenue
New York, NY 10016                    September 29, 1989

Dear Bob Vila:

### Re:  Bob Vila Spokesperson Agreement

This will set forth the terms of the agreement between you and
us as agency for our client, Sears, Roebuck and Co., and Sears,
Roebuck and Co., whereby you agree to render personal services
in advertising Sears Home Improvement (Group 700-7) products
and services (hereinafter referred to as "product(s)") upon the
terms and conditions set forth below.

I.   TERM

 A.  The term of this agreement shall commence on October
     15, 1989 and continue through December 31, 1990
     ("first-term").

 B.  We shall have the option, if we so elect, to extend
     the term of this agreement for one additional year to
     commence on the first day after termination of the
     then preceding term by giving you notice no later
     than November 1, 1990.

II.  NATURE OF SERVICES AND USE

 We hereby engage the talent to render the following
 professional services to us as spokesperson, performer
 and participant in connection with the advertising of the
 Client's Products as follows:

 A.  Perform in as many  television commercials as we may
     designate;

 B.  Perform in as many recording sessions/radio
     commercials as we may designate;

 C.  Perform in as many videos or taped announcements for
     industrial use in-store as we may designate;

 D.  Pose for such number of still photographs as we may
     designate;

 E.  Make as many personal appearances as we may designate;

 F.  However, the total days worked shall not exceed 40
     days as defined under "Notice/Availability."


EXHIBIT
#13
1-24-06

P 0000086

— 2 —

G.  You hereby grant to us and our Client the right to
use and re-use your name, approved likeness, (not be
be unreasonably withheld) photograph, voice,
signature, biography, testimonial and/or endorsement
in all materials produced hereunder, including but
not limited to the following forms of marketing
activities:  (a) <u>advertising</u> -- television and radio
commercials, magazine and newspaper ads (ROP or
circulars), direct mail, catalogs; (b) <u>industrial use</u>
-- POP videos and announcements; (c) <u>promotional</u>
<u>materials</u> -- signs, brochures, posters, displays; (d)
<u>special merchandising</u> -- premiums, give-aways,
products; (e) <u>new line items</u> -- "how-to" audio/video
casssettes, Craftsman/Vila products, etc. (points "a"
through "e" termed "Advertising").

H.  You warrant and represent that you are familiar with
the Client and Client's Products, recommend them, and
will continue to recommend them throughout the Term
(, and the Option Period(s) if any,) hereof.  Should
it prove necessary, you shall cooperate with us in
executing any affidavits, testimonial statements, or
releases confirming such familiarity and
recommendation which may be required for network
clearance or legal reasons.  Such cooperation shall
include, without limitation, using the product(s)
which are the subject of such testimonial.

## Extent of Ownership and Use

All Advertising produced hereunder, all elements
thereof, shall be and remain the absolute property of
our client forever.  We shall have full and complete
right to copyright said Advertising; and to telecast,
broadcast, use, reproduce, and/or exhibit the Advertising
during the term hereof and for a period of sixty (60)
days thereafter (for make-good purposes only) except for
catalogs or in-store signage issued prior to termination
of this agreement which may be used up until one year
after date of issue.  Sears may telecast broadcast, use,
reproduce, and/or exhibit the Advertising anywhere in the
United States, its possessions and territories, Mexico
and Canada ("Territory(s)") subject only to the
provisions of this agreement and to the restrictions of
any union or guild having jurisdiction hereof.

## Notice/Availability

We shall give you two (2) weeks prior notice of the
date(s) and place(s) wherein you will render your
services hereunder which services you shall then render,
subject only to your prior bona fide contractual
commitments which will not include the taping of the
syndicated TV series.  However, we shall do our best to
give more than 2 weeks notice where possible and will
accommodate the taping of the syndicated TV series
whenever possible.

- 3 -

It is understood that during the initial term, we will
have your services for a total of 40 working days (8 hour
days). Should you be required to perform your services
in excess of eight hours on any given day, you will be
compensated at the standard applicable union fees as
outlined in paragraph III. point one.

Working days shall be defined strictly as scale for those
periods when actually performing the requested service,
not travel to and from the worksite, weather days, rest,
etc.

Manner of Rendering Service

You agree to render your services hereunder in a
competent pain-stacking and artistic manner and to the
best of your ability. You will attend and participate in
all rehearsals, conferences and other such meetings that
we may deem necessary or advisable from time to time.
All of your services will be subject to our approval,
direction and control at all times and you will promptly
comply with whatever reasonable instructions, suggestions
and recommendations which may be given from time to time
in connection with the rendition of your services, on
behalf of the Product.

Television commercials or industrial videos to be
produced during the Initial Term (and any Option
Period(s)) shall be shot at such time(s) and place(s) as
we shall designate. The television commercial(s) may be
taped or filmed as we may determine. Should weather
conditions or any occurrence beyond our reasonable
control make it impractical or impossible to shoot, we
shall have the right to postpone such shoot(s) without
any additional compensation to you until such time(s) as
we may determine. We shall have the right to use the
footage shot to produce number of commercials or such
number of television commercials as we designate.

These commercials shall be of such length and may be used
in such a manner as we may determine (during the Initial
Term and the Option Period(s)) anywhere within the
Territory(s). We shall have the right to edit the
commercials for legal reasons, marketing reasons and time
requirements.

— 4 —

Recording session shall take place at such time(s) and place(s) as we shall designate. Should any occurrence beyond our reasonable control make it impossible or impractical to record, we shall have the right to postpone such session(s) without additional compensation to you until such time(s) as we may determine. During all recording sessions (whether within the Initial Term or any Option Period(s),) we may require the talent to record radio commercials and/or voiceover tracks to be used in connection with the television commercials, video or taped announcements, produced pursuant to this agreement. We shall have the right to use the recordings made to produce (such number of radio commercials as we determine). These commercials or taped announcements shall be of such length and may be used in such manner as we may determine (during the Initial Term and the Option Period(s) anywhere within the Territory(s). We shall have the right to edit the commercials for legal reasons, marketing reasons, and time requirements.

Still photographs to be shot (during the Initial Term and Options Period(s), if applicable,) shall be shot at such time(s) and place(s) as we shall designate. The photographs taken hereunder may be used, together with such copy as we choose, to produce such number of print advertisements (and promotional materials for store usage — collateral materials, point of purchase, etc.) as we may determine. The print advertisements may be run by us in newspapers and/or magazines anywhere within the Territory(s). The promotional materials may be used by us in the same territory as the newspaper and magazine advertisements. We shall have the right to use the print materials produced during the Initial Term in the Option Period(s).

You shall make personal appearances at such time(s) and place(s) as we may designate. Personal appearance days may be consecutive or non-consecutive as we may determine, and talent may be required to make such appearances anywhere within the Territory(s).

III.    COMPENSATION

We agree to pay you, and you agree to accept, in consideration of all services rendered by you and the use of the results thereof, all rights granted by you to us, and all covenants and representations made by you, the following compensation:

Initial Term and First Option Period

1.  With respect to all services provided by you pursuant to this agreement, we shall pay you the applicable fees provided for in the respective contracts with the several unions having jurisdiction over the use and re-use of the commercials at scale. Overtime will be compensated at scale and a half (9-10 hours) and double scale (11 hours and beyond).

- 5 -

2.  We agree, however, that your guaranteed compensation with respect to all services provided by you pursuant to this agreement shall be the sum of $456,682 ("Guarantee") plus the pension and welfare payment sum of $43,318, based on the standard 11.5% of the amount allocated to broadcast and industrial use ("P & W Guarantee"). The Guarantee shall be paid to you in 3 payments. The first $200,000 payment shall be payable within 15 days upon execution of this agreement. The remaining Guarantee sum of $256,682 will be payable as follows: $128,341 by January 1, 1990 and $128,341 by July 1, 1990. The Guarantee shall also include payment for all other services to be performed by you hereunder, the use of materials produced from such services, and all rights granted and covenants, representations and warranties made by you herein. The Guarantee shall be allocated as follows: a) $250,000 to your service in and the use of television materials; b) $100,000 to your service in and the use of radio materials, c) $26,682 to your services in video or taped announcements for industrial use; and d) $80,000 to your services in posing for still photographs and the use thereof, personal appearances, and all rights granted and covenants, representations and warranties made by you herein. The aforementioned Guarantee shall be credited against all payments that become due under the preceding paragraph.

Should we exercise our option to renew, with respect to your services in the commercials, their use and re-use, we shall likewise pay you the applicable fees provided for in the respective contracts with the several unions having jurisdiction over the use and re-use of the commercials at scale. We will allocate the compensation as we deem it appropriate in our sole discretion.

Any sums that may become due under the appropriate union contract(s) by reason of or on account of additional rehearsal, holding fees and any other additional services covered by said union agreements in connection with the commercials shall be credited against the Guarantee.

We agree to reimburse you for the actual amount of your and one other person's necessary and reasonable travel expenses incurred in connection with the performance of your services hereunder. This shall specifically include: first class a) airfare; b) ground transportation; c) lodging and $100 per diem. You agree to provide us with documentation of such expenses upon request.

– 6 –

All payments to be made to you will be made subject
to such deductions as may be required by law, and you
shall be fully responsible for the payment for all
taxes required by federal, state and local laws. All
payments will be sent to the following address: B.V.
TV., ~~Colton, Hartwick, Tamin & Sheresky, 79 Madison~~
~~Avenue, New York, NY 10016.~~ P.O. BOX 749
MARSTONS MILLS, MA. 02648
You will be responsible for all payments to be made
to any agent, broker, or other third party with
respect to the services rendered by you and the
rights granted by you hereunder.

IV.     COMPETITIVE PROTECTION

During the terms of this agreement and for a period of 60
days thereafter, you will not render any services or make
any public statements for on behalf of, nor will you
permit your name, likeness, photograph, voice, biography
to be used in advertising, publicizing or promoting any
product or service other than the Product. Under mutual
agreement, the one allowable exception is your current
job as a spokesperson for Time/Life home improvement
books.

You hereby commit to a termination schedule of any and
all existing services rendered companies other than the
Product and Time/Life per exhibit A.

IV.     WARRANTY

1.   Testimonial Capacity

You warrant and represent that the statements made by
you in connection with the commercial and the Product
represents your actual belief and personal experience
and you will provide an affidavit to such effect. You
also warrant that you will comply with all relevant
Federal Trade Commission guidelines on endorsements
and testimonials as directed by Ogilvy & Mather.

2.   Contractual Capacity

You and we further warrant and represent that you
have full right to enter into this agreement and that
you are free to perform all of your obligations
hereunder without violating the legal or equitable
rights of anyone.

- 7 -

**VII.   MISCELLANEOUS PROVISIONS**

**1.   Services Unique**

It is understood and agreed that the services to be performed by you and the rights and privileges granted to us hereunder are of special, unique, unusual, extraordinary and intellectual character, giving them a peculiar value.

**2.   Pay or Play**

We shall not be required to request your services at any time or to utilize your services or the product of your services, it being understood that, subject to articles VII. 6., 7., 9., and 10. hereof, our only obligation shall be to make the payments required pursuant to the provisions of Article III. hereof.

**3.   Union Membership**

You warrant, represent and agree that you are a member of the American Federation of Television and Radio Artists and of Screen Actors Guild, and will remain a member in good standing for the duration of this agreement.

**4.   Indemnities**

You will at all times indemnify and hold harmless us and our client and our and their respective licensees and assigns from and against any and all claims, damages, liabilities, costs and expenses, including counsel fees, arising out of any material breach by you of any representation, warranty, or agreement made by you herein.

We shall similarly indemnify you and hold you harmless with respect to any claims, damages, liabilities, costs and expenses, including counsel fees, with respect to all material in the Advertising supplied by us, as well as any product liability actions that may be brought against you, us and/or our client.

**5.   Ownership of Materials**

You acknowledge that you have no right, title or interest, and agree that you will not claim any, in or to any of the materials produced hereunder.

- 8 -

6. **Breach**

If you or we at any time commit a material breach of any provision of this agreement or at any time fail or refuse to fulfill your material obligations hereunder, then we may terminate this agreement forthwith. Further, in such event, we shall also be entitled to all available legal and equitable remedies which we may have.

In the event that this contract is terminated pursuant to this paragraph, you shall nevertheless be entitled to all payment accrued, including the pro rata portion of the compensation under this contract up to and including the date of such termination.

7. **Morals**

If you have committed or shall commit any act, or have or do become involved in any situation or occurrence bringing you into public disrepute, contempt, scandal or ridicule, or shocking, insulting, or offending the people of this nation or any racial or religious group thereof, or reflecting unfavorably upon our reputation or our Products, then we shall have the right to immediately terminate this agreement. Our decision on all matters arising under this paragraph shall be conclusive and shall be based on our judgment as to whether or not your act or involvement has harmed or may be harmful in a significant respect; provided that our decision to terminate hereunder must be exercised, if at all, not later than sixty 60 days after the facts giving rise to such right under this paragraph are brought to our attention. Should a termination take place, ours and your remedies shall be those set forth in Article VII. 6. above.

8. **Force Majeure**

If for any reason, such as strikes, boycotts, war, Acts of God, labor troubles, riots, delays of commercial carriers, or restraints or public authority, we shall be unable to use and or re-use any of the materials produced hereunder during any period of the Initial Term (or Option Period, if any,) hereof, (as applicable,) then we shall have the right to extend the Initial Term (or Option Period, if any,) hereof for an equivalent period without any additional compensation to you. However, this period shall not exceed 3 months. If the period exceeds 3 months, both parties shall be released from the contract.

P 0000093

— 9 —

9.  Death

In the event of your death during the Initial Term (or Option Period, if any) hereof, we shall have the right to elect either:  (i) to have this agreement continue in full force and effect with respect to all terms and conditions except those pertaining to your performance of services; or (ii) to terminate all usage permitted hereunder immediately following death.  In the event we elect to terminate usage of the materials produced hereunder, the applicable Guarantee set forth in Article III. above shall be equitably prorated to the date of death, and, if necessary, your agent agree to promptly refund any overpayment.

10.  Illness

If during the Initial Term or any Option Period hereof, you should fail to fulfill your obligations hereunder due to illness, injury, accident, or significant change in physical appearance or voice, then we shall have the right to terminate this agreement if you are prevented from rendering services for four (4) or more consecutive weeks.  In such event, we shall have no obligation to make any payments to you if you have not performed any services.  However, if you have already performed some services, we shall have the right to either:  (i) use the materials already produced hereunder upon making any payments required under Article II. hereof, or (ii) choose not to continue using the materials produced hereunder, in which case the applicable Guarantee shall be equitably prorated to the date we cease using the materials and, if necessary, you agree to promptly refund any overpayment.

11.  Full Power

You and we represent that you have the full right and authority to enter into this agreement.

12.  Notices

Service of all notices under this agreement shall be sufficient if given personally, mailed return receipt requested, or telegraphed to the General Counsel of Ogilvy & Mather, New York, NY or to you at the address set forth above.  Any notice given personally or mailed shall be deemed to have been given on the date reflected on the receipt evidencing delivery, and any notice telegraphed shall be deemed to have been given on the day it is deposited with the telegraph company for transmission.

P 0000094

- 10 -

13. Fan Mail

Any and all mail addressed to the talent and received by us from the public in connection with the results of the services hereunder shall be and shall remain our property. However, such mail shall be made available upon your request for review and copying.

14. Waiver

The failure by either of us to exercise rights granted to us herein upon the occurrence of any of the contingencies set forth in this agreement shall not constitute a waiver of such rights upon the reoccurrence of such contingency.

15. Entire Understanding

This agreement constitutes the entire understanding between you and us in respect to the subject matter hereof, and supersedes all prior agreements. No waiver, modification or addition to this agreement shall be valid unless in writing and signed by the parties hereto.

16. Law Governing

This agreement shall be construed in accordance with the law of the State of Illinois.

17. Interviews, Advertising and Publicity

You will not authorize or release advertising matter or publicity, or give interviews which make reference to your engagement hereunder without our prior written approval, provided, that the talent may make limited casual references to your performance of services hereunder.

18. Confidentiality

You shall hold in strict confidence all information obtained from Sears with respect to Sears operations, plans, and programs, and not divulge or reveal such information to any other persons.

P 0000095

– 11 –

## 18. Applicable Union Agreements

This agreement is subject to all of the terms and conditions of the respective contracts of the union(s) having jurisdiction over services covered by this agreement, as such contracts may be superseded, amended, or supplemented.

Please confirm your acceptance of and agreement to the foregoing by affixing your signature in the place indicated below.

Talent

By _____
Bob Vila
Soc. Sec. # 261 900 699

Sears, Roebuck and Co.

By _____
Bill Patterson
Vice President,
Home Improvements Group

Ogilvy & Mather/Chicago

By _____ (10-3-89)
Ole Riise
Vice President,
Account Supervisor

Exhibit 1

P 0000097

**OGILVY AND MATHER**
**676 North St. Clair**
**Chicago, IL 60611**

June 8, 1990

Mr. Bob J. Vila
c/o Ronald E. Feiner, Esq.
79 Madison Avenue
New York, New York  10016

Re:  Amendment to Bob Vila's Spokesperson Agreement

Dear Bob:

An agreement has heretofore been entered into dated September 29th, 1989 between you and us as agency for our client, Sears Roebuck and Co. whereby you agreed to render personal services as a spokesperson for Sears Home Improvement (Group 700-7) Products and Services (the "Agreement"). We are all desirous at this time of extending the term of the Agreement as well as other certain terms and conditions contained therein. The following therefore constitutes the Amendment to the Agreement.

Paragraph "I.  Term" shall be deemed amended by adding thereto a new sub-paragraph C which shall read as follows:

"C.  We shall have the option, if we so elect, to extend the term of this agreement for three (3) successive three year extensions (Extension I 1992, 1993, 1994, Extension II 1995, 1996, 1997 and Extension III 1998, 1999, 2000.)  On or before

P 0000098

TO                 15084281954 P.04

September 1, before the expiration of the option term or each subsequent extension, we shall have the option of giving you notice to extend for the next extension period."

The paragraph on the top of page 3 which refers to "40 working days" unless desired by Sears, shall be deemed not to include personal appearances made by you on behalf of the television show entitled "Home Again with Bob Vila" or any other "non-advertising activities" including NATPE, media interviews, and industry events. Notwithstanding the foregoing, it is understood that you shall have absolute approval over all such personal appearances which are not counted toward your forty (40) day commitment.

Also in the same paragraph on top of page 3, it is now hereby agreed that you shall not be required on any of these "40 working days" to work more than ten hour days. Additionally, we agree to use our best efforts to give you a minimum of 60 days advance notice as to when your services will be required pursuant to this Agreement.

Paragraph III. <u>Compensation.</u> The subheading title "Initial Term and First Option Period" shall be deemed amended to read "Initial Term, First Option Period and Extensions I, II and III ".

- 2 -

P 0000099

The guarantee referred to in subparagraph 2 shall be increased on a 10% cumulative increase each year of the contract (on the base of $500,000) with said 10% increase to begin on January 1, 1992 (e.g., $550,000 for contract year 1992, $605,000 for 1993, $665,500 for 1994, etc.) Each guarantee commencing with January 1, 1990 shall be payable on a yearly basis in two equal installments due and payable on January 5 and July 1 of each year.

Paragraph IV shall be amended to add the following:

"American Electric Power shall have the right to use you as a spokesperson through December of 1990 (with expenditures not to exceed Two Million ($2,000,000) Dollars for 1990) and the companies listed on the attached schedule shall be permitted to continue to use the generic heat pump advertisements through the periods indicated on the attached schedule. It is understood that you have no further obligations under these agreements which will in any way affect your performance under this Agreement and that all uses mentioned herein will be of material which has been shot prior to your contract with us."

It is understood by the parties hereto that the Agreement and this Amendment are to be construed and exist separate and apart from the "Bob Vila Syndicated Television Programs" Agreement and Amendment.

Except for the foregoing, all of the terms and conditions of the Agreement are hereby ratified and affirmed.

- 3 -

P 0000100

Please confirm your acceptance of and agreement to the foregoing amendment by affixing your signature in the place indicated below.

Talent:

_____
Bob Vila
SS#: 261-900-699

Sears, Roebuck and Co.

By: _____
   Bill Patterson
   Vice President,
   Home Improvements Group

Ogilvy & Mather/Chicago

By: _____
   Ole Riise
   Vice President,
   Account Supervisor

/76FF:90:05:30

- 4 -

P 0000101

Exhibit 2

P.0000102

OGILVY & MATHER

676 North St. Clair

Chicago, IL 60611

December 3, 1990

Mr. Bob J. Vila
c/o Ronald E. Feiner, Esq.
79 Madison Avenue
New York, New York 10016

RE:    Amendment II to Bob Vila's Spokesperson Agreement

Dear Bob:

An agreement has heretofore been entered into dated
September 29, 1989 between you and Ogilvy & Mather, as
advertising agency for Sears, Roebuck and Co., whereby you agreed
to render personal services as a spokesperson for Sears Home
Improvement (Group 700-7) Products and Services (the
"Agreement"). Said Agreement was subsequently amended on June 8,
1990. We are all desirous at this time of extending the term of
the Agreement as well as modifying other certain terms and
conditions contained therein. The following therefore
constitutes Amendment II to the Agreement.

Mr. Bob J. Vila
December 3, 1990
Page Two


Paragraph "I.  TERM"  Subparagraph A shall be deleted in its entirety and the following language substituted:

A.  The term of this Agreement shall commence on
    January 1, 1991, and continue through December 31, 1991.


Subparagraph B shall be amended by changing the date for notice of renewal of the Agreement from November 1, 1990 to November 1, 1991.


Paragraph "III.  COMPENSATION" shall be amended by changing the dates for payment of guaranteed compensation from January 1, 1990, and July 1, 1990 to January 1, 1991 and July 1, 1991, respectively.  The guaranteed compensation for 1991 shall be Five Hundred Thousand ($500,000.00) Dollars in accordance with the terms of paragraph III of the Agreement.


Paragraph "IV.  COMPETITIVE PROTECTION" shall be amended by adding the following language:


You represent that you currently have no contractual obligation to film any more commercials for Time/Life.  In the event you are called upon to enter into such an

Mr. Bob J. Vila

December 3, 1990

Page Three

agreement or are asked to appear in any Time/Life advertisement, you agree to give Sears, during the term of this Agreement and for sixty (60) days thereafter, the right to approve or disapprove of your participation in any future Time/Life advertising.

Please confirm your acceptance of and agreement to the foregoing amendment by affixing your signature in the place indicated below.

**Talent:**

Bob Vila
SS#:  261-900-699

**Sears, Roebuck and Co.**

By: Bill Patterson
Vice President,
Home Improvements Group

**Ogilvy & Mather/Chicago**

By: David Wurfel
Vice President,
Account Media Director

P 0000105

Exhibit 3

P 0000106

AMENDMENT #3

OGILVY AND MATHER
676 North St Clair
Chicago, IL 60611

December 3, 1991

Mr. Bob Vila
c/o Ronald E. Feiner, Esq.
79 Madison Avenue
New York, N.Y. 10016

RE:  Amendment III to Bob Vila Spokesperson Agreement

Dear Bob:

An Agreement has heretofore been entered into dated September 29, 1989, between you and Ogilvy & Mather, as advertising agency for Sears, Roebuck and Co., whereby you agreed to render personal services as a spokesperson for Sears Home Improvement Group (Department 700-7).  Said Agreement was subsequently amended on June 8, 1990 (Amendment I) and December 3, 1990 (Amendment II).  We are all desirous at this time of extending the term of the Agreement, as well as modifying other terms and conditions contained therein.  The following constitutes Amendment III to the Agreement.

Paragraph I.  TERM

Subparagraph A. shall be amended by changing the dates for the term of this Agreement from January 1, 1991 through December 31, 1991, to January 1, 1992 through December 31, 1992, respectively.

Subparagraph B. shall be amended by changing the date for notice of renewal of the Agreement from November 1, 1991 to August 1, 1992.

Subparagraph C., as added by Amendment I dated June 8, 1990, shall be deleted in its entirety and the following language substituted:

"C.  We shall have the option, if we so elect, to extend the term of this Agreement for eight (8) successive one-year extensions through the year 2000 by August 1 of each year.

Paragraph III.  COMPENSATION

Paragraph III shall be amended by changing the dates

for payment of guaranteed compensation from January 1, 1991 and July 1, 1991, to January 2, 1992 and July 1, 1992, respectively. The guaranteed compensation for 1992 shall be Five Hundred Fifty Thousand Dollars ($550,000.00) in accordance with the terms of Paragraph III of the Agreement.

It is understood by the parties that the Agreement and its Amendments are to be construed and exist separate and apart from the "Bob Vila Syndicated Television Programs" Agreement and Amendment.

Except for the foregoing, all of the terms and conditions of the Agreement are hereby ratified and affirmed.

Please confirm your acceptance of and agreement to this Amendment by signing your name in the place indicated below.

TALENT:

_____
Bob Vila
SS# 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


SEARS, ROEBUCK AND CO.

By: _____
Bill Patterson
Vice President,
Home Improvement Group


OGILVY & MATHER/CHICAGO

By: _____
Charles Otto
Management Supervisor
Vice President


2007F

-2-

P 0000108

Exhibit 4

P 0000109

AMENDMENT #4

**OGILVY & MATHER**
676 North St. Clair
Chicago, Illinois  60611

July 13, 1992

Mr. Bob Vila
c/o Ronald E. Feiner, Esq.
79 Madison Avenue
New York, New York  10016

RE:  Amendment IV to Bob Vila Spokesperson Agreement

Dear Bob:

An Agreement has heretofore been entered into dated September 29, 1989, between you and Ogilvy & Mather, as advertising agency for Sears, Roebuck and Co., whereby you agreed to render personal services as a spokesperson for Sears Home Improvement Group (Department 700-7).  Said Agreement was subsequently amended on June 8, 1990 (Amendment I), December 3, 1990 (Amendment II), and December 3, 1991 (Amendment III).  We are all desirous at this time of extending the term of the Agreement, as well as modifying other terms and conditions contained therein.  The following constitutes Amendment IV to the Agreement.

Paragraph I.  TERM

Subparagraph A. shall be amended by changing the dates for the term of this Agreement from January 1, 1992 through December 31, 1992, to January 1, 1993 through December 31, 1993, respectively.

Paragraph III.  COMPENSATION

Paragraph III shall be amended by changing the dates for payment of guaranteed compensation from January 1, 1992 and July 1, 1992, to January 2, 1993, and July 1, 1993, respectively.  The guaranteed compensation for 1993 shall be Six Hundred Five Thousand Dollars ($605,000.00) in accordance with the terms of Paragraph III of the Agreement.

It is understood by the parties that the Agreement and its Amendments are to be construed and exist separate and apart from the "Bob Vila Syndicated Television Programs" Agreement and Amendment.

Except for the foregoing, all of the terms and conditions of the Agreement are hereby ratified and affirmed.

Please confirm your acceptance of and agreement to this Amendment by signing your name in the place indicated below.

TALENT:

SEARS, ROEBUCK AND CO.

_____

Bob Vila
SS# 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

By: _____

Marv Stern
Vice President
Home Improvement Group

OGILVY & MATHER/CHICAGO

By: _____

Charles Otto
Management Supervisor
Vice President

2007F

Exhibit 5

<u>**AMENDMENT # 5**</u>

**OGILVY & MATHER**
**676 North St. Clair**
**Chicago, Illinois 60611**

November 15, 1993

Mr. Bob Vila
c/o Ronald E. Feiner, Esq.
Kaufmann, Feiner, Yamin,
    Gildin & Robbins
777 Third Avenue
New York, New York 10017

RE:   <u>Amendment V to Bob Vila Spokesperson Agreement (Year V)</u>

Dear Bob:

An Agreement has heretofore been entered into dated September 29, 1989, between you and Ogilvy & Mather, as advertising agency for Sears, Roebuck and Co., whereby you agreed to render personal services as a spokesperson for Sears Home Improvement Group (Department 700-7). Said Agreement was subsequently amended on June 8, 1990 (Amendment I), December 3, 1990 (Amendment II), December 3, 1991 (Amendment III) and July 13, 1992 (Amendment IV). We are all desirous at this time of extending the term of the Agreement, as well as modifying other terms and conditions contained therein. The following therefore constitutes Amendment V to the Agreement.

**Paragraph I.   TERM**

Subparagraph A. shall be amended by changing the dates for the term of this Agreement from January 1, 1993 through December 31, 1993 to January 1, 1994 through December 31, 1994, respectively.

**Paragraph III.   COMPENSATION**

Paragraph III shall be amended by changing the dates for payment of guaranteed compensation from January 1, 1993 and July 1, 1993 to January 1, 1994 and July 1, 1994, respectively. The guaranteed compensation for 1994 shall be Six Hundred Sixty Five Thousand Five Hundred Dollars ($665,500.00) in accordance with the terms of Paragraph III of the Agreement.

Page Two

Except for the foregoing, all of the terms and conditions of the Agreement are hereby ratified and affirmed.

Please confirm your acceptance of and agreement to this Amendment by signing your name in the place indicated below.

TALENT:

_____
Bob Vila
SS# 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

SEARS, ROEBUCK AND CO.

BY: _____
Jerry Post
Vice President
Home Improvement Group

OGILVY & MATHER/CHICAGO

By: _____
Charles Otto
Management Supervisor
Vice President

P 0000114

Exhibit 6

P 0000115

<u>**AMENDMENT # 6**</u>

**OGILVY & MATHER**
**676 North St. Clair**
**Chicago, Illinois 60611**

October 21, 1994

Mr. Bob Vila
c/o Ronald E. Feiner, Esq.
Kaufmann, Feiner, Yamin,
   Gildin & Robbins
777 Third Avenue
New York, New York 10017

RE:   <u>Amendment VI to Bob Vila Spokesperson Agreement (Year VI)</u>

Dear Bob:

An Agreement has heretofore been entered into dated September 29, 1989, between you and Ogilvy & Mather, as advertising agency for Sears, Roebuck and Co., whereby you agreed to render personal services as a spokesperson for Sears Home Improvement Group (Department 700-7).   Said Agreement was subsequently amended on June 8, 1990 (Amendment I), December 3, 1990 (Amendment II), December 3, 1991 (Amendment III), July 13, 1992 (Amendment IV) and November 15, 1993 (Amendment V).   We are all desirous at this time of extending the term of the Agreement, as well as modifying other terms and conditions contained therein.   The following therefore constitutes Amendment VI to the Agreement.

Paragraph I.   TERM

Subparagraph A. shall be amended by changing the dates for the term of this Agreement from January 1, 1994 through December 31, 1994 to January 1, 1995 through December 31, 1995, respectively.

Paragraph III.   COMPENSATION

Paragraph III shall be amended by changing the dates for payment of guaranteed compensation from January 1, 1994 and July 1, 1994 to January 1, 1995 and July 1, 1995, respectively.   The guaranteed compensation for 1995 shall be Seven Hundred Thirty Two Thousand and Fifty Dollars ($732,050.00) in accordance with the terms of Paragraph III of the Agreement.

Page Two


Except for the foregoing, all of the terms and conditions of the Agreement are hereby ratified and affirmed.

Please confirm your acceptance of and agreement to this Amendment by signing your name in the place indicated below.

TALENT:

Bob Vila
/SS# 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

SEARS, ROEBUCK AND CO.

By: _____
    Jerry Post
    Vice President
    Home Improvement Group


OGILVY & MATHER/CHICAGO

By: _____
    Charles Otto
    Management Supervisor
    Vice President

Exhibit 7

P 0000118

**AMENDMENT # 7**

**OGILVY & MATHER**
**676 North St. Clair**
**Chicago, Illinois 60611**

November 17, 1995

Mr. Bob Vila
c/o Ronald E. Feiner, Esq.
Kaufmann, Feiner, Yamin,
   Gildin & Robbins
777 Third Avenue
New York, New York 10017

RE: <u>Amendment VII to Bob Vila Spokesperson Agreement (Year VII)</u>

Dear Bob:

An Agreement has heretofore been entered into dated September 29, 1989, between you and Ogilvy & Mather, as advertising agency for Sears, Roebuck and Co., whereby you agreed to render personal services as a spokesperson for Sears Home Improvement Group (Department 700-7). Said Agreement was subsequently amended on June 8, 1990 (Amendment I), December 3, 1990 (Amendment II), December 3, 1991 (Amendment III), July 13, 1992 (Amendment IV), November 15, 1993, (Amendment V) and October 21, 1995 (Amendment VI). We are all desirous at this time of extending the term of the Agreement, as well as modifying other terms and conditions contained therein. The following therefore constitutes Amendment VII to the Agreement.

**Paragraph I.  TERM**

Subparagraph A. shall be amended by changing the dates for the term of this Agreement from January 1, 1995 through December 31, 1995 to January 1, 1996 through December 31, 1996, respectively.

**Paragraph III.  COMPENSATION**

Paragraph III shall be amended by changing the dates for payment of guaranteed compensation from January 1, 1995 and July 1, 1995 to January 1, 1996 and July 1, 1996, respectively. The guaranteed compensation for 1996 shall be Eight Hundred and Five Thousand Two Hundred and Fifty-Five Dollars ($805,255.00) in accordance with the terms of Paragraph III of the Agreement.

Page Two

Except for the foregoing, all of the terms and conditions of the Agreement are hereby ratified and affirmed.

Please confirm your acceptance of and agreement to this Amendment by signing your name in the place indicated below.

TALENT:

_____
Bob Vila
SS# 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

SEARS, ROEBUCK AND CO.

By: _____
Jerry Post
Vice President
Home Improvement Group


OGILVY & MATHER/CHICAGO

By: _____
Bill Reishtein
Management Supervisor
Vice President

P 0000120

Exhibit 8

<u>**AMENDMENT # 8**</u>

**OGILVY & MATHER**
**676 North St. Clair**
**Chicago, Illinois 60611**

December 18, 1996

Mr. Bob Vila
c/o Ronald E. Feiner, Esq.
Kaufmann, Feiner, Yamin,
    Gildin & Robbins
777 Third Avenue
New York, New York 10017

RE:  <u>**Amendment VIII to Bob Vila Spokesperson Agreement**</u>
     <u>**(Year VIII and Years IX)**</u>

Dear Bob:

An Agreement has heretofore been entered into dated September 29, 1989, between you and Ogilvy & Mather, as advertising agency for Sears, Roebuck and Co., whereby you agreed to render personal services as a spokesperson for Sears Home Improvement Group (Department 700-7).  Said Agreement was subsequently amended on June 8, 1990 (Amendment I), December 3, 1990 (Amendment II), December 3, 1991 (Amendment III), July 13, 1992 (Amendment IV), November 15, 1993, (Amendment V), October 21, 1994 (Amendment VI) and November 17, 1995 (Year VII).  We are all desirous at this time of extending the term of the Agreement, as well as modifying other terms and conditions contained therein.  The following therefore constitutes Amendment VII to the Agreement.

Paragraph I.  TERM

Subparagraph A. shall be amended by changing the dates for the term of this Agreement from January 1, 1996 through December 31, 1996 to January 1, 1997 through December 31, 1998, respectively.

**Paragraph III.  COMPENSATION**

Paragraph III shall be amended by changing the dates for payment of guaranteed compensation from January 1, 1996 and July 1, 1996 to January 1, 1997 and July 1, 1997 for Year VIII and January 1, 1998 and July 1, 1998 for Year IX respectively.  The guaranteed compensation for 1997 shall be Eight Hundred and Eighty-Five Thousand Seven Hundred and Eighty-Five Dollars ($885,785.00) and for 1998 shall be Nine Hundred and Seventy-Four Thousand Three Hundred and Fifty-Eight Dollars ($974,358.00) in accordance with the terms of Paragraph III of the Agreement.

Except for the foregoing, all of the terms and conditions of the Agreement are hereby ratified and affirmed.

Please confirm your acceptance of and agreement to this Amendment by signing your name in the place indicated below.

TALENT:                              SEARS, ROEBUCK AND CO.

_____        By: _____
Bob Vila                             Andy Ginger
SS# 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


                                 OGILVY & MATHER/CHICAGO

                                 By: _____
                                     Bill Reishtein
                                     Management Supervisor
                                     Vice President

Exhibit 9

[date]    1|5|99

Mr. Bob Vila
c/o Ronald E. Feiner, Esq.
Kaufmann, Feiner, Yamin, Gildin & Robbins
777 Third Avenue
New York, New York 10017

       Re:    **Amendment IX to Bob Vila Spokesperson Agreement**
               **(Years 10 through and including 15)**

Dear Bob:

       An Agreement dated September 29, 1989 has heretofore been entered into between you and Ogilvy & Mather, as advertising agency for Sears, Roebuck and Co. ("Sears")(the "Agreement"), whereby you agreed to render personal services as a spokesperson for Sears Home Improvement Group (Department 700-7). The Agreement was subsequently amended on June 8, 1990 (Amendment I), December 3, 1990 (Amendment II), December 3, 1991 (Amendment III), July 13, 1992 (Amendment IV), November 15, 1993 (Amendment V), October 21, 1994 (Amendment VI), November 17, 1995 (Amendment VII), and December 18, 1996 (Amendment VIII). We are all desirous at this time of extending the term of the Agreement, as well as modifying other terms and conditions contained therein. The following therefore constitutes Amendment IX to the Agreement.

1.    **TERM**

       Paragraph I(A) of the Agreement shall be amended to extend the Term to December 31, 2004.

2.    **COMPENSATION**

       Paragraph III of the Agreement shall be amended such that the guaranteed compensation for the respective years shall be as follows:

1999 - $1,072,000.00 (original contract)
2000 - $1,180,000.00
2001 - $1,300,000.00
2002 - $1,430,000.00
2003 - $1,575,000.00
2004 - $1,725,000.00

Each year, one half of the guaranteed sum for that year shall be paid on January 1 and the other half on July 1.

3.    **OPTION TO RENEW**

Sears shall have to option to renew the Agreement for the Year 2005 at a guaranteed sum of $1,897,500.00.

4.    **COMMISSION**

Vila shall receive a commission on Sears products sold by direct marketing on television commercials in which Vila appears and/or are directly connected to a product endorsement on the Internet. Said commission shall be limited to those sales made by phone and/or mail and/or on the Internet or any other electronic means which may be developed during the Term of this Agreement. Such sales shall not include store sales. Said commission shall be one (1%) percent of gross on each item sold. Said commissions shall be made quarterly to Vila and shall be capped each year at $100,000

5.    **AVAILABILITY**

The first sentence of the second paragraph of the Section of the Agreement entitled Notice/Availability shall be deleted in its entirety and replaced with the following:

"It is understood that during the Term of this Agreement, Sears will have your services for a total of thirty -five (35) working days (eight hour days)."

6.    **COMPETITIVE PROTECTION**

The first sentence of Paragraph IV of the Agreement shall be deleted in its entirety and replaced with the following:

"During the Term of this Agreement and for a period of six (6) months thereafter, you will not render any services or make any public statements for or on behalf of, nor will you permit your name, likeness, photograph, voice or biography to be used in, advertising publicizing or promoting any product or service other than the Product. Vila may submit a written proposal to

2

P 0000126

Sears to promote additional products and services. Sears shall have thirty (30) days to approve or reject Vila's proposal(s). Sears approval shall not be unreasonably withheld. If approved, such additional products and services shall be "approved products and services". Current approved products and services include:

1) Home 1-2-3 Mortgage Company
2) Department of Housing and Urban Development ("HUD")
3) Presley Homes
4) IMT Technology/Surge Plunge 2000
5) Allergy Free

Products and services currently being reviewed for approval include:

1) Bob Vila branded clothing.

Further, although Vila shall have the right to appear in any non-sponsored media without Sears prior approval, Vila shall submit a written proposal to Sears to appear in any sponsored media. Sears shall have thirty (30) days to approve or reject Vila's proposal(s) to appear in sponsored media. Sears approval shall not be unreasonably withheld.

7. **CANCELLATION OF TELEVISION SHOW**

If the Bob Vila Home Again television show is canceled for any reason, Sears has the right to terminate this Agreement effective the 31st day of December following the notice of cancellation.

8. **CONTINGENCY**

This Agreement is contingent upon the execution of Amendment No. 10 to the Bob Vila Syndicated Television Program Agreement dated September 28, 1989 ("BVTV Agreement").

Except for the foregoing, all of the terms and conditions of the Agreement and all amendments relating thereto which are not inconsistent with the foregoing are hereby ratified and affirmed.

Acceptance of and agreement to this Amendment is confirmed by signing your name in the place indicated below.

**BOB VILA**                                    **SEARS, ROEBUCK AND CO.**

Date: Dec 21 / 98                               Date: Jan 4, 1999
By: _____                             By: _____

3

Exhibit 10

P 0000128

December 1, 2000

Mr. Bob Vila
c/o Ronald E. Feiner, Esq.
Kaufmann, Feiner, Yamin, Gildin & Robbins
777 Third Avenue
New York, NY 10017

Re:    Amendment X to Bob Vila Spokesperson Agreement
       (Years 10 through and including 20)

Dear Bob:

An Agreement dated September 29, 1989 has heretofore been entered into between you and Ogilvy & Mather, as advertising agency for Sears, Roebuck and Co. ("Sears") (the"Agreement"), whereby you agreed to render personal services as a spokesperson for Sears Home Improvement Groups. The Agreement was subsequently amended on June 8, 1990, (Amendment 1), December 3, 1990 (Amendment II), December 3, 1991 (Amendment III), July 13, 1992 (Amendment IV), November 15, 1993 (Amendment V), October 21, 1994 (Amendment VI), November 17, 1995 (Amendment VII), December 18, 1996 (Amendment VIII), and January 5, 1999 (Amendment IX). We are all desirous at this time of extending the term of the Agreement, as well as modifying other terms and conditions contained therein. The following therefore constitutes Amendment X to the Agreement.

1.    **TERM**

Paragraph I(A) of the Agreement shall be amended to extend the Term through December 31, 2009.

2.    **COMPENSATION**

Paragraph III of the Agreement shall be amended such that the guaranteed compensation for the respective years shall be as follows:

| | |
|---|---|
| 1999 - $1,072,000.00 (original contract) | 2005 - $1,897,500.00 |
| 2000 - $1,180,000.00 | 2006 - $2,087,250.00 |
| 2001 - $1,300,000.00 | 2007 - $2,295,975.00 |
| 2002 - $1,430,000.00 | 2008 - $2,525,572.00 |
| 2003 - $1,575,000.00 | 2009 - $2,778,129.00 |
| 2004 - $1,725,000.00 | |

DEC.21.2000    1:06PM    SEARS STRATEGIC MKTG                    NO.756    P.4/4

Vila Spokesperson Agreement
Amendment X
Page Two


Each year, one half of the guaranteed sum for that year shall be paid on January 1 and the other half on July 1.

3.    Paragraph 4 of Amendment IX is deleted in its entirety subject to final accounting through December 31, 2000.

4.    Paragraph 7 of Amendment IX shall remain in effect during the current term and any extension of that certain Bob Vila Syndicated Television Program Agreement dated September 29, 1989, as amended, between Ogilvy & Mather, as agent for Sears, and B.V.T.V., Inc.

5.    This preamble to the Agreement is amended to delete the words "(Group 700-7)."

Except for the foregoing, all of the terms and conditions of the Agreement and all amendments relating thereto which are not inconsistent with the foregoing are hereby ratified and affirmed

Acceptance of and agreement to this Amendment is confirmed by signing your name in the place indicated below.


BOB VILA                        SEARS, ROEBUCK AND CO.

Date: _____          Date: _10/18/00_____

By: _____            By: _me g. gl____

# EXHIBIT 16

2428-27

**kcondon**

| | |
|---|---|
| **From:** | <MRODE@sears.com> |
| **To:** | "kcondon" <kcondon@kaufmannfeiner com> |
| **Sent:** | Wednesday, December 22, 2004 6 31 PM |
| **Attach:** | DMLIB-#9197-v5-HomeAgain_Amend_11 DOC |
| **Subject:** | Re Bob Vila |

Not what you asked for, but I believe you may be pleased anyway  Attached is a draft of the agreement with your requested edits  I am happy to talk through this when you have a minute to review.  The library is nowhere until we can lock in the syndication agreement (which I have been assured is in the hands of King World).  Hope all is well

Mark P. Rode
Craftsman Brand Manager
(847) 286-3447

"kcondon" <kcondon@kaufmannfeiner.com>

12/13/2004 02 08 PM
Please respond to "kcondon"

| | |
|---|---|
| To | <MRODE@sears com> |
| cc | <JRusso@ArtistsAgency com> |
| Subject | Bob Vila |

Dear Mark:

Thank you for responding so promptly on the December bonus figure. I would appreciate it, however, if we could spend a few minutes before the holidays talking about the status of: 1) Bob's extension agreement; and, 2) what's going on with the library. I will work with you to accommodate your schedule on this as I am sure Jonathan will as well.

I look forward to hearing from you

Regards, Ron



EXHIBIT
#16 10
1-24-06

12/23/04

DRAFT

_____ , 2004

B.V.T.V., Inc
Attn: Mr. Bob Vila
115 Kingston St
3<sup>rd</sup> Floor
Boston, MA 02111

Re:    Amendment No. 11 to Bob Vila Syndicated Television Program Agreement
       (Year 16 - Year 17) ("Amendment No. 11").

Dear Mr Vila:

The parties hereto, your production company, B V.T.V., Inc. ("Producer") and Sears, Roebuck and Co ("Sears") are desirous of setting forth the terms for going forward for the next two years ("Year 16 - Year 17") with regard to Bob Vila's Home Again ("Home Again"), the syndicated television series financed by Sears, produced by Producer and starring you, Bob Vila ("Vila").

An agreement regarding the Series dated September 28, 1989, has heretofore been entered into between Producer and Ogilvy & Mather, as agent for Sears (the 1989 Agreement") and was subsequently amended on June 8, 1990 ("Amendment No 1"), February 8, 1991 ("Amendment No. 2 and No. 3"), January 12, 1992 ("Amendment No.4"), February 10, 1993 ("Amendment No.5"), November 15, 1993 ("Amendment No.6"), December 5, 1994 ("Amendment No.7") December 19, 1995 ("Amendment No 8"), December 18, 1996 ("Amendment No 9") and January 5, 1999 ("Amendment No 10) (The 1989 Agreement and amendments are herein defined as "the Agreement."); and the parties desire to amend and extend the Agreement on the terms set forth below.

1.    PRODUCER'S OBLIGATIONS. For each of Year 16 and Year 17, Producer agrees to produce and deliver to Sears a minimum of 26 one half-hour programs which programs are scheduled to commence airing in September, 2005 (the "New Programs"). The New Programs, Series 16 through Series 17, shall be delivered in two 13-week cycles for each year and shall conform with standards consistent with all prior programs submitted pursuant to the Agreement. Sears will have prior approval over the locations of the New Programs. Such approval shall not be unreasonably withheld. In addition to the New Programs, there shall also be delivered to Sears for each of Years 16 and Year 17, a minimum of 26 vignettes of 30-seconds each and a minimum of 26 "10-second tune-ins." Each of said vignettes and tune-ins shall coincide with each respective program. Producer agrees to produce the New Programs, and related vignettes and tune-ins, in a professional manner using a professional staff and in keeping with the standards of previously produced Home Again shows. Producer shall be solely responsible for all aspects of the New Programs, vignettes and tune-ins, including but not limited to, project development and/or renovation costs, talent, travel and accommodations, talent and production crew salaries, equipment rentals or purchases, etc.    If requested by Sears, Producer agrees to use Sears Home Improvement products and services in the production of the New Programs wherever applicable, based on availability and delivery.   Sears shall appoint a Sears liaison from whom Producer may purchase any products or services sold by Sears at Sears cost.    Each New Program will contain a prominent presentation credit naming Sears in a manner acceptable to it, including, without limitation, placement at the head of each New Program.

DRAFT

2.   CONSIDERATION.

(a)   For each of Year 16 and Year 17 (Series 16 through Series 17). Sears agrees to pay and Producer agrees to accept each Year the guaranteed sum of $1,519,500.

(b)   Said $1,519,500 shall be paid each Year as follows:

(i)   $750,000 shall be due on or before each January 1 commencing January 1, 2005.

(ii)   $494,500 on or before each March 1 commencing March 1, 2005; and

(iii)   $275,000 on or before each August 1 commencing August 1, 2005.

(c)   In addition, any revenue sharing due Producer pursuant to Paragraph 4 of Amendment 10, as amended below, from the first-run syndication of the New Programs ("Revenue Sharing") shall be paid by Sears as follows

(i)   On or before August 1 of each Year, commencing August 1, 2005, Sears shall pay Producer a $200,000 advance;

(ii)   On or before October 1 of each Year, commencing October 1, 2005, Sears shall estimate the full amount due Producer for the applicable Year from Revenue Sharing and pay Producer such estimated amount to the extent it is in excess of the above $200,000 advance, and

(iii)   As soon as practicable after Sears' receipt from the syndicator of final statement(s) with respect to each Year, Sears shall calculate the final amount due Producer from Revenue Sharing for the Year. If the final amount is greater than the amounts previously paid for the Year under (i) and (ii) above, Sears shall pay the difference. If the final amount is less than the previously paid amounts, Sears may take a credit for the difference against any future amounts payable by Sears to Producer or any of Producer's affiliates, whether pursuant to this or any other agreement. If the final amount is equal to the previously paid amounts, no further amount will be due and owing. Sears shall provide Producer a written statement showing the amount being paid, the credit due or that no amount is due, as applicable, together with a copy of the statement(s) from the syndicator upon which such calculation was based.

Producer shall be responsible for the execution and cost each year of the National Captioning Institute, Inc.'s close-captioning of all New Programs.

3.   FURTHER AMENDMENTS   Effective with the production of the New Programs, the Agreement shall be further amended as follows:

(a)   The term "Series" as used in the Agreement shall be deemed to include the New Programs together with their related vignettes and tune-in for all purposes as provided therein.

(b)   Paragraph 4 of Amendment 10, THE LIBRARY, is amended as follows: (i) the words "use good faith efforts" shall be inserted before the words "to enter into contracts" in the fourth sentence thereof; (ii) "Ogilvy" shall be substituted with "Mindshare (or other Sears media agency)"; (iii) the sixth sentence thereof is deleted and replaced with the following: "All gross income from first run syndication and from all subsequent sales and uses of the Library, less any fees or other costs paid to Producer for the Series and less fees or other costs paid to a syndicator or other third party relating to the syndication or other sale or use of the Series, shall be divided equally between Sears and Producer;" and (iv) the end of the eighth sentence thereof shall be amended to add the following: "as described above."

P 0000244

**DRAFT**

(c)      Paragraphs 21(a)(2) and 21(a)(3) of the Agreement are amended to delete "$500,000," each time it appears therein, and replace it with "$1,000,000;" Paragraph 21(a)(5) is amended to delete "$1,000,000" and replace it with "$4,000,000," and a new clause (a)(6) is added as follows: "Professional Liability or Errors & Omissions Insurance with limits of not less that $5,000,000 per claim".

The parties acknowledge that the Distribution and Media Sales Agreement dated September 1, 1999 (as amended, the "Distribution Agreement") between Sears and CBS Broadcasting Inc. for the television distribution of the Series (through Series 15), including the Library, expires August 31, 2005 for broadcast distribution and September 30, 2006 for cable distribution.  This Amendment No. 11 and the parties' obligations in connection herewith are therefore expressly conditioned upon the completion of a mutually acceptable written extension of the Distribution Agreement or replacement thereof with respect to the New Programs.

All of the terms and conditions of the Agreement which are not inconsistent with the foregoing are hereby ratified and affirmed

Acceptance of and agreement to this Amendment No. 11 is confirmed by signing your name in the place indicated below

Very truly yours,

**SEARS, ROEBUCK AND CO.**

By: _____
Its: _____

Agreed and Accepted
B.V.T V . Inc.

_____
Bob Vila

P 0000245

# EXHIBIT 20

**From:** Melissa Marchand <mel.marchand@bobvila.com>
**Subject:** Fwd: Year End
**Date:** January 10, 2005 3:52:34 PM EST
**To:** mel.marchand@bobvila.com

Mel Marchand

BobVila.com
115 Kingston St., 3rd floor
Boston, MA 02111
617–848–8458 (Boston)
508–737–5328 (mobile)

Begin forwarded message:

**From:** MRODE@sears.com
**Date:** January 10, 2005 3:23:05 PM EST
**To:** sarah@bobvila.com
**Cc:** rjvila@bobvila.com
**Subject:** Year End

Sarah,

As part of the approval process here at Sears and in light of the merger, which will complicate everything, I have a request.

Starting with the objectives of the show and going back a season or so, can you give me examples of successes and also of things that didn't succeed. I don't need a laundry list of either. I just need enough to show that there is a plan and how it is being actualized. Also, if there are changes that were made (or will be made) as a result of lessons learned, I would love to be armed with those as well.

My goal would be to have a very clear understanding of what the vision is and how that was or wasn't realized. I want to be an advocate but I need to show we have a vision and that we have been introspective and critical of the work.

If you would like to discuss I am more than happy to talk it over. Thanks again.

Mark P. Rode
Craftsman Brand Manager
(847) 286–3447



P 0000524

# EXHIBIT 21

## Kin Condon

| | |
|---|---|
| **From:** | <MRODE@sears com> |
| **To:** | <rfeiner@kaufmannfeiner com> |
| **Sent:** | Friday, January 14, 2005 1:27 PM |
| **Attach:** | prod devel-rev1.doc |
| **Subject:** | Revision to product agreement |

Ron,

Attached is the contract with the revisions you requested (I hope)   I am also collecting Names of people at King World in case you or Jonathan have any good contacts

Mark P  Rode
Craftsman Brand Manager
(847) 286-3447

7/14/2005



P 0000131

**DRAFT**

~~, 2004~~January 11, 2005

B.V.T.V., Inc.
Attn: Mr. Bob Vila
115 Kingston St.
3<sup>rd</sup> Floor
Boston, MA 02111

Re.    Amendment No. 11 to Bob Vila Syndicated Television Program Agreement
       (Year 16 -Year 17) ("Amendment No. 11").

Dear Mr. Vila:

The parties hereto, your production company, B.V.T.V., Inc. ("Producer") and Sears, Roebuck and Co. ("Sears") are desirous of setting forth the terms for going forward for the next two ~~years~~broadcast years, i e , September 1, 2005 through August 31, 2006 and September 1, 2006 through August 31, 2007 ("Year 16 - Year 17") with regard to Bob Vila's Home Again ("Home Again"), the syndicated television series financed by Sears, produced by Producer and starring you, Bob Vila ("Vila").

An agreement regarding the Series dated September 28, 1989, has heretofore been entered into between Producer and Ogilvy & Mather, as agent for Sears (the 1989 Agreement") and was subsequently amended on June 8, 1990 ("Amendment No.1"), February 8, 1991 ("Amendment No. 2 and No. 3"), January 12, 1992 ("Amendment No 4"), February 10, 1993 ("Amendment No.5"), November 15, 1993 ("Amendment No.6"), December 5, 1994 ("Amendment No.7"), December 19, 1995 ("Amendment No. 8"), December 18, 1996 ("Amendment No. 9") and January 5, 1999 ("Amendment No. 10) (The 1989 Agreement and amendments are herein defined as "the Agreement."); and the parties desire to amend and extend the Agreement on the terms set forth below.

1.    PRODUCER'S OBLIGATIONS. For each of Year 16 and Year 17. Producer agrees to produce and deliver to Sears a minimum of 26 one half-hour programs which programs are scheduled to commence airing in September, 2005 (the "New Programs"). The New Programs, Series 16 through Series 17, shall be delivered in two 13-week cycles for each year and shall conform with standards consistent with all prior programs submitted pursuant to the Agreement. Sears will have prior approval over the locations of the New Programs. Such approval shall not be unreasonably withheld. In addition to the New Programs, there shall also be delivered to Sears for each of Years 16 and Year 17, a minimum of 26 vignettes of 30-seconds each and a minimum of 26 "10-second tune-ins." Each of said vignettes and tune-ins shall coincide with each respective program. Producer agrees to produce the New Programs, and related vignettes and tune-ins, in a professional manner using a professional staff and in keeping with the standards of previously produced Home Again shows. Producer shall be solely responsible for all aspects of the New Programs, vignettes and tune-ins, including but not limited to, project development and/or renovation costs, talent, travel and accommodations, talent and production crew salaries, equipment rentals or purchases, etc.   If requested by Sears. Producer agrees to use Sears Home Improvement products and services in the production of the New Programs wherever applicable, based on availability and delivery   Sears shall appoint a Sears liaison from whom Producer may purchase any products or services sold by Sears at Sears 'cost   Each New Program will contain a prominent presentation credit naming Sears in a manner acceptable to it, including, without limitation, placement at the head of each New Program.

P 0000132

DRAFT

2.   **CONSIDERATION**

   (a)   For each of Year 16 and Year 17 (Series 16 through Series 17), Sears agrees to pay and Producer agrees to accept each Year the guaranteed sum of $1,519,500.

   (b)   Said $1,519,500 shall be paid each Year as follows

      (i)   $750,000 shall be due on or before each January 1 commencing January 1, 2005;

      (ii)   $494,500 on or before each March 1 commencing March 1, 2005, and

      (iii)   $275,000 on or before each August 1 commencing August 1, 2005

   (c)   In addition, any revenue sharing due Producer pursuant to Paragraph 4 of Amendment 10, as amended below, ~~from~~in respect of Years 16 and Year 17 (including amounts for the first-run syndication of the New Programs and in respect of any amounts received over such periods relating to the Library) ("Revenue Sharing") shall be paid by Sears as follows:

      (i)   On or before August 1 of each Year, commencing August 1, 2005, Sears shall pay Producer a $200,000 advance.

      (ii)   On or before October 1 of each Year, commencing October 1, 2005, Sears shall estimate the full amount due Producer for the applicable Year from Revenue Sharing and pay Producer such estimated amount to the extent it is in excess of the above $200,000 advance, and

      (iii)   As soon as practicable after Sears' receipt from the syndicator of ~~final~~year-end reconciliation statement(s) with respect to each Year (generally received by _____ following the end of the Year) (the "Year-End Statement"), Sears shall calculate the ~~final~~full amount due Producer from Revenue Sharing for the Year  If the ~~final~~such amount is greater than the amounts previously paid for the Year under (i) and (ii) above, Sears shall pay the difference.  If ~~the final~~such amount is less than the previously paid amounts, Sears may take a credit for the difference against any future amounts payable by Sears to Producer or any of Producer's affiliates, whether pursuant to this or any other agreement.  If ~~the final~~such amount is equal to the previously paid amounts, no further amount will be due and owing.  Sears shall provide Producer a written statement (the "Sears Final Statement") showing the amount being paid, the credit due or that no amount is due, as applicable, together with a copy of the statement(s) from the syndicator upon which such calculation was based.

      The parties acknowledge that Sears may receive after the Sears Final Statement further adjustments in revenue from the syndicator relating to a Year.  As soon as practical after Sears' receipt of such an adjustment, Sears will make any adjustments to the Sears Final Statement, and pay any further amounts due or take such further credits in accordance with the methodology described above, as may be required because of such adjustment

Producer shall be responsible for the execution and cost each year of the National Captioning Institute, Inc 's close-captioning of all New Programs.

3.   **FURTHER AMENDMENTS**   Effective with the production of the New Programs, the Agreement shall be further amended as follows:

DRAFT

(a)     The term "Series" as used in the Agreement shall be deemed to include the New Programs together with their related vignettes and tune-in for all purposes as provided therein.

(b)     Paragraph 4 of Amendment 10, THE LIBRARY, is amended as follows: (i) the words "use good faith efforts" shall be inserted before the words "to enter into contracts" in the fourth sentence thereof; (ii) "Ogilvy" shall be substituted with "Mindshare (or other Sears media agency)"; (iii) the sixth sentence thereof is deleted and replaced with the following: "All gross income from first run syndication and from all subsequent sales and uses of the Library, less any fees or other costs paid to Producer for the Series and less fees or other costs paid to a syndicator or other third party relating to the syndication or other sale or use of the Series, shall be divided equally between Sears and Producer;" and (iv) the end of the eighth sentence thereof shall be amended to add the following: "as described above."

(c)     Paragraphs 21(a)(2) and 21(a)(3) of the Agreement are amended to delete "$500,000," each time it appears therein, and replace it with "$1,000,000;" Paragraph 21(a)(5) is amended to delete "$1,000,000" and replace it with "$4,000,000," and a new clause (a)(6) is added as follows: "Professional Liability or Errors & Omissions Insurance with limits of not less that $5,000,000 per claim"

The parties acknowledge that the Distribution and Media Sales Agreement dated September 1, 1999 (as amended, the "Distribution Agreement") between Sears and CBS Broadcasting Inc. for the television distribution of the Series (through Series 15), including the Library, expires August 31, 2005 for broadcast distribution and September 30, 2006 for cable distribution. This Amendment No. 11 and the parties' obligations in connection herewith are therefore expressly conditioned upon the completion of a mutually acceptable written extension of the Distribution Agreement or replacement thereof with respect to the New Programs

All of the terms and conditions of the Agreement which are not inconsistent with the foregoing are hereby ratified and affirmed.

Acceptance of and agreement to this Amendment No. 11 is confirmed by signing your name in the place indicated below.

Very truly yours,

SEARS, ROEBUCK AND CO.

By: _____
Its: _____

Agreed and Accepted
B.V.T V., Inc.

_____
Bob Vila

# EXHIBIT 22

2428-27

## kcondon

**From:** "Jonathan Russo" <Jrusso@ArtistsAgency com>
**To:** "kcondon" <kcondon@kaufmannfeiner com>
**Sent:** Tuesday, January 18, 2005 10 49 AM
**Subject:** RE. Vila Agreement

GREAT  WELL DONE, I WILL TELL BIRKHAHN  JR

    -----Original Message-----
    **From:** kcondon [mailto:kcondon@kaufmannfeiner.com]
    **Sent:** Tuesday, January 18, 2005 10:25 AM
    **To:** MRODE@sears.com
    **Cc:** Bob Vila; Jonathan Russo
    **Subject:** Vila Agreement

    Dear Mark

    The new Vila Syndication Agreement is fine   Can you have Drew arrange for execution copies?  Also,
    please call Jonathan Birkhahn, Senior Vice President of King World Productions, at 212-541-0266
    regarding the syndication agreement

    Thanks, Ron Feiner



1/18/05

P 0000135

# EXHIBIT 23

**From:** Redacted
**Sent:**
**To:**
**CC:**
**BCC:**
**Subject:** Re: Vila Extension Agreement

_____

Redacted




"kcondon" <kcondon@kaufmannfeiner.com>
01/21/2005 12:24 PM
Please respond to "kcondon"

To: <dfarka2@sears.com>
cc: "Bob Vila" <rjvila@bobvila.com>, <jrusso@ArtistsAgency.com>,
<MRODE@sears.com>
Subject: Vila Extension Agreement


Dear Drew:
When can I expect to receive execution copies of the Vila extension agreement
whose redline we found to be acceptable? As you can imagine, we are quite
anxious to cause this to be signed and to allow Mark to finish the King World
deal.
Ron

_____



# EXHIBIT 24

Page 1 of 1



From: ████████████████
Sent: ████████████████
To: ████████
Subject:████    *Redacted*

Mark Rode

02/01/2005 02:31 PM

To:    "rfeiner" <Rfeiner@kaufmannfeiner.com>
cc:
Subject:    Re: Link

I think you me and Andy (or just you and Andy) will need to talk on this. While I can negotiate contracts I feel comfortable with I don't have access to the individuals here who would ultimately issue a go/no go decision. Six months ago this would be a no brainer. With the merger Andy is going to need to weigh-in. I will go nag him right now to make sure he shares any insights he has.

Mark P. Rode
Craftsman Brand Manager
(847) 286-3447

"rfeiner" <Rfeiner@kaufmannfeiner.com>

02/01/2005 12:52 PM

To:    <MRODE@sears.com>
cc:
Subject:

Because of the contract not being signed, Bob has not received the $750,000 due the first of the year. Another reason for him to complain.

9/2005



EXHIBIT
#24
1-24-06

SEARS 1315

# EXHIBIT 27

>> >
>> >
>> > Melissa Marchand <mel.marchand@bobvila.com>
>> >
>> > 03/11/2005 04:26 PM
>> >
>> >
>> > To: MRODE@sears.com
>> > cc:
>> > Subject: Re: Ty.com
>> >
>> >
>> >
>> > Will do!
>> > Mel
>> >
>> > BobVila.com
>> > 115 Kingston St., 3rd floor
>> > Boston, MA 02111
>> > 617-848-8458 (Boston)
>> > 508-737-5328 (mobile)
>> > On Mar 11, 2005, at 5:20 PM, MRODE@sears.com wrote:
>> >
>> > > >
>> > > Sure lie to me. Everyone else does.
>> > > >
>> > > >
>> > > On another note we heard back from Bill Crowley and there >> (as there
>> > > always seems to be these days) are issues. We think we can >> address
>> > > some of the issues and are going to regroup with Jeanine on >> Monday
>> > > and
>> > > hopefully schedule a meetings with Ron on Tuesday. If you >> would be
>> > > kind enough to percolate that through your group I would >> appreciate
>> > > it.
>> > > >
>> > > Mark P. Rode
>> > > Craftsman Brand Manager
>> > > (847) 286-3447
>> > > >
>> > >
>> > >
>> > >
>> > >
>> > >
>> > > Melissa Marchand <mel.marchand@bobvila.com>
>> > >
>> > > 03/11/2005 03:44 PM
>> > >
>> > >
>> > > To: MRODE@sears.com
>> > > cc:
>> > > Subject: Re: Ty.com
>> > >
>> > >
>> > >
>> > > I got back just as David left. And it's snowing AGAIN!
>> > > Mel
>> > >
>> > > BobVila.com
>> > > 115 Kingston St., 3rd floor
>> > > Boston, MA 02111
>> > > 617-848-8458 (Boston)
>> > > 508-737-5328 (mobile)
>> > > On Mar 11, 2005, at 2:59 PM, MRODE@sears.com wrote:
>> > >
>> > > > >
>> > > > No it doesn't and weren't you supposed to be unavailable >> right
>> > > now?
>> > > > >
>> > > > Mark P. Rode
>> > > > Craftsman Brand Manager
>> > > > (847) 286-3447
>> > > > >
>> > > > >
>> > > > >
>> > > > >
>> > > > >



> Boston, MA 02111
> 617-848-8458 (Boston)
> 508-737-5328 (mobile)
>
Begin forwarded message:

> From: Melissa Marchand <mel.marchand@bobvila.com>
> Date: March 11, 2005 5:58:40 PM EST
> To: MRODE@sears.com
> Subject: Re: Ty.com
>
> Avoid the legumes. Stick with the leafy greens.
> (I'm delighted that Bob was gracious. You deserve it. I think he > understands that you're doing all that you can.)
> Mel
>
> BobVila.com
> 115 Kingston St., 3rd floor
> Boston, MA 02111
> 617-848-8458 (Boston)
> 508-737-5328 (mobile)
> On Mar 11, 2005, at 5:39 PM, MRODE@sears.com wrote:
>
>>
>> I am in bean counter hell. Bob was extraordinarily gracious.
>>
>> Mark P. Rode
>> Craftsman Brand Manager
>> (847) 286-3447
>>
>>
>>
>>
>>
>>
>> Melissa Marchand <mel.marchand@bobvila.com>
>
>>
>>
>> 03/11/2005 04:40 PM
)>
>>
>>
>
>>
>> To: MRODE@sears.com
>
>>
>> cc:
>
>>
>> Subject: Re: Ty.com
>
>>
>>
>>
>>
>> feel free to cal me with with any of the color commentary
>> 508-362-2296
>> Mel
>>
>> BobVila.com
>> 115 Kingston St., 3rd floor
>> Boston, MA 02111
>> 617-848-8458 (Boston)
>> 508-737-5328 (mobile)
>> On Mar 11, 2005, at 5:27 PM, MRODE@sears.com wrote:
>>
>> >
>> > Talking to Bob right now.
>> >
>> > Mark P. Rode
>> > Craftsman Brand Manager
>> > (847) 286-3447
>> >
>> >
>> >
>> >

EXHIBIT 28

**Sent:** Fri, 18 Mar 2005 17:11:51 GMT
**From:** Drew Farkas
**To:** Jon Birkhahn
**CC:** Andy Ginger; Mark Rode
**BCC:** Mary Tortorice
**Subject:** RE: Bob Vila

Jon, a meeting was held with our new CFO, Bill Crowley. There were some questions and comments coming out of that meeting which the business has been following up on. Unfortunately, the impending merger (which is expected to close as of the 24th) is taking up most of our executives' time and is contributing to the delay. Nevertheless, I'm still hoping to get a response next week.

**"Birkhahn, Jon"**
**<jbirkhahn@kingworld.**
**com>**

03/18/2005 10:21 AM

To: <dfarka2@sears.com>
cc: <Jrusso@ArtistsAgency.com>
Subject: RE: Bob Vila

"dfarka2

'Jonatha

Drew - I'd appreciate hearing back from you on this.
Jon

-------------------------------------

From: Birkhahn, Jon

Sent: Monday, March 14, 2005 2:57 PM

To: 'dfarka2@sears.com'

Cc: 'Jonathan Russo'

Subject: Bob Vila

Drew - are there any developments to report on your end?

Jonathan Birkhahn

Senior Vice President Business Affairs

**King World Productions, Inc./CBS Enterprises**

1700 Broadway

New York, New York 10019


EXHIBIT
#28 ID
1-24-06

SEARS-1796

# EXHIBIT 29

**Sent:** Fri, 18 Mar 2005 20:39:58 GMT
**From:** kcondon
**To:** dfarka2@sears.com
**CC:** MRODE@sears.com; Bob Vila; jrusso@ArtistsAgency.com
**BCC:**
**Subject:** Bob Vila Shows

Dear Drew: I understand that King World has been trying to reach you. I think that if we don't get a decision regarding Sears' renewal of the shows very soon, we, on behalf of Bob, should negotiate the deal with King World with your blessing - as time is really creating a crunch situation regarding producing the shows in the manner and quality we are all used to. Please let me know your thoughts. Regards, Ron Feiner_



EXHIBIT
#9.5
1-24-06

SEARS-1801

# EXHIBIT 30

2428-27

## kcondon

| | |
|---|---|
| **From:** | "kcondon" <kcondon@kaufmannfeiner.com> |
| **To:** | "Bob Vila" <rjvila@bobvila.com> |
| **Sent:** | Wednesday, March 23, 2005 1 41 PM |
| **Subject:** | Sears Conference Call |

(The following was dictated but not read)

Bob

I had a conversation this day with Andy Ginger, Drew Farkas, Mark Rode and Wendy Pifner, Esq of Holland and Hart

The first 20 minutes of the conversation dealt with their giving me an overview of the chaotic situation presently existing at Sears They said things are unfolding quite quickly By Friday, senior management is expected to be announced as the shareholder vote takes place tomorrow There will probably be some sharing of power at the top which will involve Bill Crowley, Lambert's right-hand man, Alan Lacy, the guy running K-Mart today, and Luis Padilla (who was responsible previously for marketing at Target). Jeannine, Andy's boss, will report directly to Padilla (if she still has her job). In effect, everyone at Sears as well as K-Mart will be applying for a new job at Sears Holding K-Mart and Sears will disappear into the background Padilla runs marketing and merchandising He is working with a budget that calls for a very substantial reduction in marketing.

The restructure that they are proposing is strictly from a cost structure, they are not looking for long-term relationships but more like one-offs that Target has been working with The kind of deal that you and Martha have is not Padilla's favorite by any means

Their proposal is as follows

1 They will reduce or eliminate their ownership in the Library for the various considerations herein (they are estimating the Library to have a market value of $12 million based upon prior cable deals, giving Sears a $6 million equity).

2 They will renew "Home Again" for one year with the bonuses refigured on an actual cost basis for them.

3 In exchange, Sears wants to reduce the Spokesperson agreement as follows

2006 – $700,000

2007 – $1,000,000

2008 – $1,600,000

2009 – Eliminated

4. They are willing to reduce personal days by five per year, for a total of 20 days (suggesting if we want more, it's possible)

5. They want to eliminate what remains in the incentive bonus for 2004/05 which probably is somewhere in the range of $350,000-450,000

6 We also discussed eliminating the exclusivity on non-competing endorsements

They had not presented this proposal yet to senior management, although it fits within the budget requirements they have They are extremely interested in knowing as soon as possible what our reaction is to the foregoing. I

3/23/2005



EXHIBIT
#30 ID
1-24-06

P 0000259

suggested we would talk again mid-day on Friday.

Ron

3/23/2005

P 0000260

# EXHIBIT 32

**Sent:** Wed, 06 Apr 2005 16:20:42 GMT
**From:** Luis Padilla
**To:** WCC
**CC:** gmanto@sears.com
**BCC:**
**Subject:** RE: Vila

Redacted

"WCC"
<WCC@eslinvest.com>

04/06/2005 10:52 AM

To:
cc:
Subject:  RE: Vila

<lpadill

Redacted

William C. Crowley
wcc@eslinvest.com
W: 203-861-4603
M: 917-536-8033

**From:** lpadilla@sears.com [mailto:lpadilla@sears.com]
**Sent:** Wednesday, April 06, 2005 10:08 AM
**To:** WCC
**Subject:** RE: Vila

We are negotiating a trade off on dollars and days nothing to report yet. I will have
finance run an npv you probably won't like it but I will run it by you. Should have it
done today. Luis.

"WCC" <WCC@eslinvest.com>

04/06/2005 09:15 AM

To:     <lpadilla@s
cc:
Subject:    RE: Vi

Is there a trade off of dollars and days?
In other words, what is greatest reduction  that we could get on the economics?  We may
not decide to do that, but I would like to understand if we could get out of the future
payments by giving up more upfront, even accelerating some of the payments (he may



SEARS-1948

want it extended, we just want the lowest npv to us).

William C. Crowley
*wcc@esllnwest.com*
W: 203-861-4603
M: 917-536-8033

**From:** lpadilla@sears.com [mailto:lpadilla@sears.com]
**Sent:** Monday, April 04, 2005 9:41 AM
**To:** Eddie; WCC
**Subject:** Vila

Further review of Vila contract and renegotiation. I can review with you tonight. Luis.

----- Forwarded by Luis Padilla/Full-Line/SEARS on 04/04/2005 09:40 AM -----

Andy Ginger

04/04/2005 09:13 AM

To:      Luis Padilla/Full-Line/SEARS@SEARS

cc:
Subject:    Vila

Per Claudette's request, I'm e-mailing the content of the memo I sent to your office.

Per your request, attached shows where we are.  Need input to move forward.  Also, need to know if we should prepare for approval through the new contract approval process announced this morning.

**Background:**  Current show deal is not bringing Sears a break-even bottom line. Overall investment rising.  Spokesperson contract runs through 2009.  Sears wants to re-structure to a business arrangement that provides reduced expense. Sears wants to exchange ownership in the TV show library for reduction in future obligations.

Timing urgent.  CBS/Kingworld has sold-out 2005-06 season to advertisers and has prepared to clear in syndication for this fall.

Achieved Sears original financial targets going into negotiation:

SEARS-1949

- Breakeven potential for 2005 on Home Again

- Breakeven on a final, one-year extension for the TV show

- Significant reductions in spokesperson expense for 2006-2009

- Total agreed reduction in expense of $5.3 to $5.5 MM

- Exceeds Sears est. valuation of 50% ownership in the library by $500 K

**Recommended next steps:**

- Agree on financials
- Negotiate to retain current exclusivity process (1)
- Negotiate to retain 20 days per year (2)
- Prioritize these as stated above, using days to hold exclusivity

**Recap of Vila Negotiation**

|  | Current Contractual Obligation | Current Negotiated Stat |
|---|---|---|
| **2004-5 Home Again Incentive** |  |  |
| Minimum | 425,000 | 0 |
| Maximum | 625,000 | 0 |
| **Spokesperson Fee** |  |  |
| 2006 | 2,087,250 | 1,043,625 |
| 2007 | 2,295,975 | 1,147,988 |
| 2008 | 2,525,572 | 1,262,786 |
| 2009 | 2,778,129 | 1,389,065 |
| Total | 9,686,926 | 4,843,464 |
| **Spokesperson Days** |  |  |
| 2006 | 35 | 17.5 |
| 2007 | 35 | 17.5 |
| 2008 | 35 | 17.5 |
| 2009 | 35 | 17.5 |
| Total | 140 | 70 |
| **Library Ownership** | 50/50 | 100% BVTV |
| **Show Production Extension** |  | 1 Year Extension |

| Exclusivity Approval Process | Sears 100% review and appoval not to be unreasonbly witheld | Vila proposes to relax for banking. automotive |

# EXHIBIT 34

**Sent:** Redacted
**From:**
**To:**
**CC:**
**BCC:**
**Subject:** Vila Contract

Redacted

**Mark Rode**
04/15/2005 11:41 AM

To:
cc:
Subject:  Vila Contract

wcc@es

Bill,

I just wanted to follow up on the short analysis that was sent your way on the Bob Vila situation.  Bob has requested a response today on the production portion of the agreement for the 2005-2006 season.  I recognize there are a number of moving parts to this and want to make sure you have full disclosure of the facts (as well as a contact name for questions).
Janine had requested that we bundle the show and the spokesperson/library agreement to maximize leverage.  However, this has caused Bob to get behind on the show's production.  Additionally, Bob's representatives have agreed to take a reduction on monies he is contractually owed from the 2004-2005 season in order to move the 2005-2006 season forward.  Which makes the leverage point somewhat moot.

While bundling them makes it neater, if we would like to take more time to evaluate the library v spokesperson agreement portion of the deal, I recommend we move forward on the production agreement.  I have already convinced them to take $.25 on the dollar and may be able to cut a little deeper.

Please let me know how you would like me to proceed.  Thanks

Mark P. Rode
Craftsman Brand Manager
(847) 286-3447



EXHIBIT
#34 10
1-24-06

SEARS-1848

# EXHIBIT 36

**Mark**

**From:**          WCC
**ınt:**           Saturday, April 16, 2005 1:45 PM
**J:**             'MRODE@sears.com'
**Cc:**            'lpadil4@sears.com'
**Subject:**       Re Vila Contract

Can you send me the excel sheet with the comparison of extending vs. Not extending the
production for another year.

What do we think the economics are to him?

Please also send me the contract.

I would like to figure out the cheapest way to get out of this agreement.

William C. Crowley
ESL Investments
wcc@eslinvest.com
203-861-4603

-----Original Message-----
From: MRODE@sears.com <MRODE@sears.com>
To: WCC <WCC@eslinvest.com>
Sent: Fri Apr 15 12:41:57 2005
Subject: Vila Contract

Bill,

I just wanted to follow up on the short analysis that was sent your way on the Bob Vila
ituation.  Bob has requested a response today on the production portion of the agreement
r the 2005-2006 season.  I recognize there are a number of moving parts to this and want
o make sure you have full disclosure of the facts (as well as a contact name for
questions).
Janine had requested that we bundle the show and the spokesperson/library agreement to
maximize leverage.  However, this has caused Bob to get behind on the show's production.
Additionally, Bob's representatives have agreed to take a reduction on monies he is
contractually owed from the 2004-2005 season in order to move the 2005-2006 season
forward.  Which makes the leverage point somewhat moot.

While bundling them makes it neater, if we would like to take more time to evaluate the
library v spokesperson agreement portion of the deal, I recommend we move forward on the
production agreement.  I have already convinced them to take $.25 on the dollar and may be
able to cut a little deeper.

Please let me know how you would like me to proceed.   Thanks

Mark P. Rode
Craftsman Brand Manager
(847) 286-3447



EXHIBIT
#36 1D
1-24-06

**SEARS-1725**

# EXHIBIT 38

Craftsman Brand Manager
(847) 286-3447

"WCC" <WCC@eslinvest.com>

04/18/2005 03:39 PM

To:      <MRODE@sears.com>
cc:
Subject:   Re: Bob Vila

What is Npv of payments to him?
------------------------------
William C. Crowley
ESL Investments
wcc@eslinvest.com
203-861-4603

-----Original Message-----
From: MRODE@sears.com <MRODE@sears.com>
To: WCC <WCC@eslinvest.com>
Sent: Mon Apr 18 16:30:59 2005
Subject: RE: Bob Vila

I don't have the spreadsheet with me but I think Bob has offered to forego a little more
than $8M to get the library. The NPV was between $6M-$7M. I recommend we take
that deal as I don't think we will find better. I believe I can negotiate somewhat more
favorable terms and pump up the NPV. The other option is to hit the street with the
property, but we couldn't realize any gains until September '06 when TLC is done with it
and we also would have commissions to consider.

Would you like me to move forward exchanging the library for future payments to Bob?

Mark P. Rode
Craftsman Brand Manager
(847) 286-3447

To:      **Redacted**
cc:      <



# EXHIBIT 42

**Sent:** Redacted
**From:**
**To:**

**CC:**
**BCC:**
**Subject:** Vila Proposal

Redacted

"kcondon"
<kcondon@kaufmannafei
ner.com>

04/28/2005 04:57 PM
Please respond to
"kcondon"

To:
cc:
<rjvila@bobvila.com>, <jfobl@aol.com>
Subject:  Vila Proposal

<MROI
"Bob Vi

Dear Mark:

I am embarrassed and outraged at having the assignment of presenting Sears's "counter-proposal" to Bob Vila who has been a loyal spokesperson and partner of Sears for 15 years now.

Initially, our conversations with Andy Ginger were to try and help Sears out in a difficult situation so that the financial cash flow at Sears fit within its budgetary constraints. We never intended to, nor will we, negotiate from a position of weakness.

Please be reminded that Bob has a spokesperson agreement with Sears that takes him through the year 2009 which calls for payments to him by Sears totaling approximately $9,700,000. Why in the world would be ever accept, in lieu of that, payments totaling $4,400,000? Also, what is his incentive to waive future payments due for the 2004-2005 television season?

The consideration for the reductions in our initial proposal, were that we would receive 100% ownership of the library and do with it as we pleased. The idea of splitting profits



SEARS-1905

with Sears is <u>exactly</u> the deal we presently have. Where's the benefit to us?

Please note that, as everyone who worked with us at Sears over the years knows, we have a contract for the production of television shows for an additional two years commencing September 2005. Every term was agreed to in the contract, and the contract has mirrored all ten of the prior amendments to Bob's syndicated television contract.

Therefore, we must totally reject out-of-hand your proposal of this day. There is no basis in law and in fact for it, there is absolutely no incentive for Bob in it, and there is no legal justification to agree to it. If Sears is interested in replacing an "aging spokesperson" for a "younger spokesperson", why don't they take the high road and give him ownership of the shows and buy him out of his contract at 90¢ on the dollar?

Please note that we are proceeding under the existing contracts.

Very truly yours, Ron

SEARS-1906

# EXHIBIT 44

**Sent:** Redacted
**From:**
**To:**
**CC:**
**BCC:**
**Subject:** RE: Bill memo on Bob

Redacted

"WCC"
<WCC@eslinvest.com>

04/29/2005 07:27 AM

To:
cc:
Subject:  RE: Bill memo on Bob

<MROI

Regarding response:

What is our obligation to fund this year's production?
What is our control over the name?

Call him and tell him that we added the 50% over the cost because we did not want to



SEARS-1909

look stupid. We believe that the value of the library may be higher. Is there some other way to give us comfort on that?

If it is just the 50% part, get a counter.

You can tell him that you are in a difficult position. New owners. Looking at everything. You are trying to get something done. Sears values Bob and the long relationship, but the library and control of the name has a lot of value.


William C. Crowley
*wcc@eslinvest.com*
W: 203-861-4603
M: 917-536-8033

**From:** MRODE@sears.com [mailto:MRODE@sears.com]
**Sent:** Thursday, April 28, 2005 3:53 PM
**To:** WCC
**Subject:** RE: Bill memo on Bob


Done, I will transmit to Bob

Mark P. Rode
Craftsman Brand Manager
(847) 286-3447




"WCC" <WCC@eslinvest.com>

| | |
|---|---|
| To: | <MRODE@sears.com> |
| cc: | |
| Subject: | RE: Bill memo on Bob |

04/28/2005 12:46 PM




Two issues:

1.    I want the right to use the library in our store, web site.
2.    50% on excess over the reduction in payments.

William C. Crowley
*wcc@eslinvest.com*
W: 203-861-4603
M: 917-536-8033

SEARS-1910

# EXHIBIT 28

**Sent:** Fri, 18 Mar 2005 17:11:51 GMT
**From:** Drew Farkas
**To:** Jon Birkhahn
**CC:** Andy Ginger; Mark Rode
**BCC:** Mary Tortorice
**Subject:** RE: Bob Vila

Jon, a meeting was held with our new CFO, Bill Crowley. There were some questions and comments coming out of that meeting which the business has been following up on. Unfortunately, the impending merger (which is expected to close as of the 24th) is taking up most of our executives' time and is contributing to the delay. Nevertheless, I'm still hoping to get a response next week.

| **"Birkhahn, Jon"** <jbirkhahn@kingworld. com> 03/18/2005 10:21 AM | **To:** <dfarka2@sears.com> **cc:** <Jrusso@ArtistsAgency.com> **Subject:** RE: Bob Vila | "dfarka2 'Jonatha |
|---|---|---|

Drew - I'd appreciate hearing back from you on this.
Jon

---

**From:** Birkhahn, Jon

**Sent:** Monday, March 14, 2005 2:57 PM

**To:** 'dfarka2@sears.com'

**Cc:** 'Jonathan Russo'

**Subject:** Bob Vila

Drew - are there any developments to report on your end?

Jonathan Birkhahn

Senior Vice President Business Affairs

**King World Productions, Inc./CBS Enterprises**

1700 Broadway

New York, New York 10019



SEARS-1796

# EXHIBIT 29

**Sent:** Fri, 18 Mar 2005 20:39:58 GMT
**From:** kcondon
**To:** dfarka2@sears.com
**CC:** MRODE@sears.com; Bob Vila; jrusso@ArtistsAgency.com
**BCC:**
**Subject:** Bob Vila Shows

Dear Drew: I understand that King World has been trying to reach you. I think that if we don't get a decision regarding Sears' renewal of the shows very soon, we, on behalf of Bob, should negotiate the deal with King World with your blessing - as time is really creating a crunch situation regarding producing the shows in the manner and quality we are all used to.Please let me know your thoughts.Regards, Ron Feiner_



SEARS-1801

# EXHIBIT 30

**kcondon**

| | |
|---|---|
| **From:** | "kcondon" <kcondon@kaufmannfeiner.com> |
| **To:** | "Bob Vila" <rjvila@bobvila.com> |
| **Sent:** | Wednesday, March 23, 2005 1 41 PM |
| **Subject:** | Sears Conference Call |

(The following was dictated but not read)

Bob

I had a conversation this day with Andy Ginger, Drew Farkas, Mark Rode and Wendy Pifner, Esq of Holland and Hart

The first 20 minutes of the conversation dealt with their giving me an overview of the chaotic situation presently existing at Sears They said things are unfolding quite quickly By Friday, senior management is expected to be announced as the shareholder vote takes place tomorrow There will probably be some sharing of power at the top which will involve Bill Crowley, Lambert's right-hand man, Alan Lacy, the guy running K-Mart today, and Luis Padilla (who was responsible previously for marketing at Target). Jeannine, Andy's boss, will report directly to Padilla (if she still has her job). In effect, everyone at Sears as well as K-Mart will be applying for a new job at Sears Holding K-Mart and Sears will disappear into the background Padilla runs marketing and merchandising He is working with a budget that calls for a very substantial reduction in marketing.

The restructure that they are proposing is strictly from a cost structure, they are not looking for long-term relationships but more like one-offs that Target has been working with The kind of deal that you and Martha have is not Padilla's favorite by any means

Their proposal is as follows

1 They will reduce or eliminate their ownership in the Library for the various considerations herein (they are estimating the Library to have a market value of $12 million based upon prior cable deals, giving Sears a $6 million equity).

2 They will renew "Home Again" for one year with the bonuses refigured on an actual cost basis for them.

3 In exchange, Sears wants to reduce the Spokesperson agreement as follows

2006 – $700,000

2007 – $1,000,000

2008 – $1,600,000

2009 – Eliminated

4. They are willing to reduce personal days by five per year, for a total of 20 days (suggesting if we want more, it's possible)

5. They want to eliminate what remains in the incentive bonus for 2004/05 which probably is somewhere in the range of $350,000-450,000

6 We also discussed eliminating the exclusivity on non-competing endorsements

They had not presented this proposal yet to senior management, although it fits within the budget requirements they have They are extremely interested in knowing as soon as possible what our reaction is to the foregoing. I

3/23/2005


EXHIBIT
#30 ID
1-24-06

suggested we would talk again mid-day on Fnday.

Ron

# EXHIBIT 32

**Sent:** Wed, 06 Apr 2005 16:20:42 GMT
**From:** Luis Padilla
**To:** WCC
**CC:** gmanto@sears.com
**BCC:**
**Subject:** RE: Vila

**Redacted**

"WCC"
&lt;WCC@eslinvest.com&gt;

04/06/2005 10:52 AM

To:
cc:
Subject: RE: Vila

&lt;lpadill

**Redacted**

William C. Crowley
wcc@eslinvest.com
W: 203-861-4603
M: 917-536-8033

**From:** lpadilla@sears.com [mailto:lpadilla@sears.com]
**Sent:** Wednesday, April 06, 2005 10:08 AM
**To:** WCC
**Subject:** RE: Vila

We are negotiating a trade off on dollars and days nothing to report yet. I will have
finance run an npv you probably won't like it but I will run it by you. Should have it
done today. Luis.

"WCC" &lt;WCC@eslinvest.com&gt;

04/06/2005 09:15 AM

To:    &lt;lpadilla@s
cc:
Subject:    RE: Vi

Is there a trade off of dollars and days?
In other words, what is greatest reduction that we could get on the economics? We may
not decide to do that, but I would like to understand if we could get out of the future
payments by giving up more upfront, even accelerating some of the payments (he may



want it extended, we just want the lowest npv to us).

William C. Crowley
wcc@esllnwest.com
W: 203-861-4603
M: 917-536-8033


**From:** lpadilla@sears.com [mailto:lpadilla@sears.com]
**Sent:** Monday, April 04, 2005 9:41 AM
**To:** Eddie; WCC
**Subject:** Vila


Further review of Vila contract and renegotiation. I can review with you tonight. Luis.
----- Forwarded by Luis Padilla/Full-Line/SEARS on 04/04/2005 09:40 AM -----


Andy Ginger                                          **To:**    Luis Padilla/Full-Line/SEARS@SEARS

04/04/2005 09:13 AM                                  **cc:**
                                                     **Subject:**    Vila


Per Claudette's request, I'm e-mailing the content of the memo I sent to your office.

Per your request, attached shows where we are. Need input to move forward. Also,
need to know if we should prepare for approval through the new contract approval
process announced this morning.

**Background:** Current show deal is not bringing Sears a break-even bottom line.
Overall investment rising. Spokesperson contract runs through 2009. Sears wants to re-
structure to a business arrangement that provides reduced expense. Sears wants to
exchange ownership in the TV show library for reduction in future obligations.

Timing urgent. CBS/Kingworld has sold-out 2005-06 season to advertisers and has
prepared to clear in syndication for this fall.


Achieved Sears original financial targets going into negotiation:

SEARS-1949

- Breakeven potential for 2005 on Home Again

- Breakeven on a final, one-year extension for the TV show

- Significant reductions in spokesperson expense for 2006-2009

- Total agreed reduction in expense of $5.3 to $5.5 MM

- Exceeds Sears est. valuation of 50% ownership in the library by $500 K

**Recommended next steps:**

- Agree on financials
- Negotiate to retain current exclusivity process (1)
- Negotiate to retain 20 days per year (2)
- Prioritize these as stated above, using days to hold exclusivity

**Recap of Vila Negotiation**

|  | Current Contractual Obligation | Current Negotiated Stat |
|---|---|---|
| **2004-5 Home Again Incentive** | | |
| Minimum | 425,000 | 0 |
| Maximum | 625,000 | 0 |
| | | |
| **Spokesperson Fee** | | |
| 2006 | 2,087,250 | 1,043,625 |
| 2007 | 2,295,975 | 1,147,988 |
| 2008 | 2,525,572 | 1,262,786 |
| 2009 | 2,778,129 | 1,389,065 |
| Total | 9,686,926 | 4,843,464 |
| | | |
| **Spokesperson Days** | | |
| 2006 | 35 | 17.5 |
| 2007 | 35 | 17.5 |
| 2008 | 35 | 17.5 |
| 2009 | 35 | 17.5 |
| Total | 140 | 70 |
| | | |
| **Library Ownership** | 50/50 | 100% BVTV |
| | | |
| **Show Production Extension** | | 1 Year Extension |

**Exclusivity Approval Process**

Sears 100% review and appoval not to be
unreasonbly witheld

Vila proposes to relax for
banking. automotive

# EXHIBIT 34

**Sent:** **Redacted**
**From:**
**To:**
**CC:**
**BCC:**
**Subject:** Vila Contract

**Redacted**

**Mark Rode**

04/15/2005 11:41 AM

To:
cc:
Subject:  Vila Contract

wcc@es

Bill,

I just wanted to follow up on the short analysis that was sent your way on the Bob Vila situation.  Bob has requested a response today on the production portion of the agreement for the 2005-2006 season.  I recognize there are a number of moving parts to this and want to make sure you have full disclosure of the facts (as well as a contact name for questions).

Janine had requested that we bundle the show and the spokesperson/library agreement to maximize leverage.  However, this has caused Bob to get behind on the show's production.  Additionally, Bob's representatives have agreed to take a reduction on monies he is contractually owed from the 2004-2005 season in order to move the 2005-2006 season forward.  Which makes the leverage point somewhat moot.

While bundling them makes it neater, if we would like to take more time to evaluate the library v spokesperson agreement portion of the deal, I recommend we move forward on the production agreement.  I have already convinced them to take $.25 on the dollar and may be able to cut a little deeper.

Please let me know how you would like me to proceed.  Thanks

Mark P. Rode
Craftsman Brand Manager
(847) 286-3447



SEARS-1848

# EXHIBIT 36

**Mark**

| | |
|---|---|
| **From:** | WCC |
| **nt:** | Saturday, April 16, 2005 1:45 PM |
| **:** | 'MRODE@sears.com' |
| **Cc:** | 'lpadil4@sears.com' |
| **Subject:** | Re Vila Contract |

Can you send me the excel sheet with the comparison of extending vs. Not extending the production for another year.

What do we think the economics are to him?

Please also send me the contract.

I would like to figure out the cheapest way to get out of this agreement.

William C. Crowley
ESL Investments
wcc@eslinvest.com
203-861-4603

-----Original Message-----
From: MRODE@sears.com <MRODE@sears.com>
To: WCC <WCC@eslinvest.com>
Sent: Fri Apr 15 12:41:57 2005
Subject: Vila Contract

Bill,

I just wanted to follow up on the short analysis that was sent your way on the Bob Vila tuation. Bob has requested a response today on the production portion of the agreement r the 2005-2006 season. I recognize there are a number of moving parts to this and want o make sure you have full disclosure of the facts (as well as a contact name for questions).
Janine had requested that we bundle the show and the spokesperson/library agreement to maximize leverage. However, this has caused Bob to get behind on the show's production. Additionally, Bob's representatives have agreed to take a reduction on monies he is contractually owed from the 2004-2005 season in order to move the 2005-2006 season forward. Which makes the leverage point somewhat moot.

While bundling them makes it neater, if we would like to take more time to evaluate the library v spokesperson agreement portion of the deal, I recommend we move forward on the production agreement. I have already convinced them to take $.25 on the dollar and may be able to cut a little deeper.

Please let me know how you would like me to proceed. Thanks

Mark P. Rode
Craftsman Brand Manager
(847) 286-3447



EXHIBIT
#36 1D
1-24-06

**SEARS-1725**

# EXHIBIT 38

Craftsman Brand Manager
(847) 286-3447

"WCC" <WCC@eslinvest.com>

04/18/2005 03:39 PM

To:      <MRODE@sears.com>
cc:
Subject:    Re: Bob Vila

What is Npv of payments to him?
----------------------------
William C. Crowley
ESL Investments
wcc@eslinvest.com
203-861-4603

-----Original Message-----
From: MRODE@sears.com <MRODE@sears.com>
To: WCC <WCC@eslinvest.com>
Sent: Mon Apr 18 16:30:59 2005
Subject: RE: Bob Vila

I don't have the spreadsheet with me but I think Bob has offered to forego a little more
than $8M to get the library. The NPV was between $6M-$7M. I recommend we take
that deal as I don't think we will find better. I believe I can negotiate somewhat more
favorable terms and pump up the NPV. The other option is to hit the street with the
property, but we couldn't realize any gains until September '06 when TLC is done with it
and we also would have commissions to consider.

Would you like me to move forward exchanging the library for future payments to Bob?

Mark P. Rode
Craftsman Brand Manager
(847) 286-3447

To:      **Redacted**
cc:      <



SEARS-1855

# EXHIBIT 42

**Sent:** Redacted
**From:**
**To:**

**CC:**
**BCC:**
**Subject:** Vila Proposal
　　　　　　　Redacted

"kcondon"
<kcondon@kaufmanafei
ner.com>

04/28/2005 04:57 PM
Please respond to
"kcondon"

To:
cc:
<rjvila@bobvila.com>, <jfobl@aol.com>
Subject:   Vila Proposal

<MROI
"Bob Vi

Dear Mark:

I am embarrassed and outraged at having the assignment of presenting Sears's "counter-proposal" to Bob Vila who has been a loyal spokesperson and partner of Sears for 15 years now.

Initially, our conversations with Andy Ginger were to try and help Sears out in a difficult situation so that the financial cash flow at Sears fit within its budgetary constraints. We never intended to, nor will we, negotiate from a position of weakness.

Please be reminded that Bob has a spokesperson agreement with Sears that takes him through the year 2009 which calls for payments to him by Sears totaling approximately $9,700,000. Why in the world would he ever accept, in lieu of that, payments totaling $4,400,000? Also, what is his incentive to waive future payments due for the 2004-2005 television season?

The consideration for the reductions in our initial proposal, were that we would receive 100% ownership of the library and do with it as we pleased. The idea of splitting profits



with Sears is <u>exactly</u> the deal we presently have. Where's the benefit to us?

Please note that, as everyone who worked with us at Sears over the years knows, we have a contract for the production of television shows for an additional two years commencing September 2005. Every term was agreed to in the contract, and the contract has mirrored all ten of the prior amendments to Bob's syndicated television contract.

Therefore, we must totally reject out-of-hand your proposal of this day. There is no basis in law and in fact for it, there is absolutely no incentive for Bob in it, and there is no legal justification to agree to it. If Sears is interested in replacing an "aging spokesperson" for a "younger spokesperson", why don't they take the high road and give him ownership of the shows and buy him out of his contract at 90¢ on the dollar?

Please note that we are proceeding under the existing contracts.

Very truly yours, Ron

# EXHIBIT 44

**Sent:** Redacted
**From:**
**To:**
**CC:**
**BCC:**
**Subject:** RE: Bill memo on Bob

       Redacted

 

"WCC"
<WCC@eslinvest.com>

04/29/2005 07:27 AM

    **To:**
    **cc:**
    **Subject:**  RE: Bill memo on Bob

                                                                            <MROI

Regarding response:

What is our obligation to fund this year's production?
What is our control over the name?

Call him and tell him that we added the 50% over the cost because we did not want to



SEARS-1909

look stupid. We believe that the value of the library may be higher. Is there some other way to give us comfort on that?

If it is just the 50% part, get a counter.

You can tell him that you are in a difficult position. New owners. Looking at everything. You are trying to get something done. Sears values Bob and the long relationship, but the library and control of the name has a lot of value.

William C. Crowley
*wcc@eslinvest.com*
W: 203-861-4603
M: 917-536-8033

**From:** MRODE@sears.com [mailto:MRODE@sears.com]
**Sent:** Thursday, April 28, 2005 3:53 PM
**To:** WCC
**Subject:** RE: Bill memo on Bob

Done, I will transmit to Bob

Mark P. Rode
Craftsman Brand Manager
(847) 286-3447

"WCC" <WCC@eslinvest.com>

04/28/2005 12:46 PM

| | |
|---|---|
| To: | <MRODE@sears.com> |
| cc: | |
| Subject: | RE: Bill memo on Bob |

Two issues:

1.    I want the right to use the library in our store, web site.
2.    50% on excess over the reduction in payments.

William C. Crowley
*wcc@eslinvest.com*
W: 203-861-4603
M: 917-536-8033

# EXHIBIT 47

**Sent:** Thu, 05 May 2005 15:16:28 GMT
**From:** Mark Rode
**To:** WCC
**CC:**
**BCC:** Drew Farkas
**Subject:** RE: Where are we with Vila?
I will get him what he needs and make sure he has the correct contact.

And, I want to be very clear because I feel like a jerk. I hope it didn't sound like the legal team was holding anything up or was lacking in any way. That is absolutely not the case.

Mark P. Rode
Craftsman Brand Manager
(847) 286-3447


"WCC"
<WCC@eslinvest.com>               To:                                    <MROI
05/05/2005 09:33 AM               cc:
                                  Subject:  RE: Where are we with Vila?


I want Rob involved.


William C. Crowley
*wcc@eslinvest.com*
W (203) 861-4603
M (917) 536-8033

**From:** MRODE@sears.com [mailto:MRODE@sears.com]
**Sent:** Thursday, May 05, 2005 10:21 AM
**To:** WCC
**Subject:** RE: Where are we with Vila?


Wanted to answer your question on Rob and I didn't know who he was last night. I don't think we need additional council. Drew, and the legal team, have been great, dedicating all the time we have needed. They have a very good understanding of where we are on the issues and have been a huge asset in keeping me on the straight and narrow. Additionally, trying to get someone else up to speed likely will just slow down the process.

We, as a group, just need to understand exactly what we want to accomplish. We are at the point where we need to fish or cut bait. I would very much like to avoid this becoming a public matter. It would be bad for everyone if this somehow became public knowledge. I would also like to leave our spokesperson with the feeling that we didn't crush him in negotiation. I want the best deal for Sears Holdings, but I also respect what Bob has done



EXHIBIT
#47 D
1-24-06

SEARS-1931

for us in the past and what I anticipate he can bring in the future.

That said, I think the deal he offered is better for us than for him. Am I pleased with how much we are paying him? No, but someone negotiated that sucker a while back and short of permanently cutting ties I don't see a good way out. We can get try to get more, but I believe we are on the precipice of causing this to go public.

Let me know if you have time today when we can talk.

Mark P. Rode
Craftsman Brand Manager
(847) 286-3447

| | |
|---|---|
| **Mark Rode** | To:      "WCC" <WCC@eslinvest.com> |
| 05/04/2005 09:23 PM | cc: |
| | Subject:     RE: Where are we with Vila?Link |

If you have time tomorrow we can sit with Drew (legal). Let me know what might work.

Mark P. Rode
Craftsman Brand Manager
(847) 286-3447

| | |
|---|---|
| "WCC" <WCC@eslinvest.com> | To:      <MRODE@sears.com> |
| 05/04/2005 07:38 PM | cc: |
| | Subject:     RE: Where are we with Vila? |

Keep me involved. Maybe I should call someone. Or should we involve Rob Rathke?

I want to know asap what our options and leverage points are in the production contract and spokesman contract. Is the later exclusive?

William C. Crowley
wcc@eslinvest.com
W: 203-861-4603
M: 917-536-8033


**From:** MRODE@sears.com [mailto:MRODE@sears.com]
**Sent:** Wednesday, May 04, 2005 10:40 AM
**To:** WCC
**Subject:** Re: Where are we with Vila?


Legal is reviewing.

Would you like to be involved in strategy or just be briefed on where we end up?  As BV is being extraordinarily confrontational, without litigating, I don't see us getting them to move much off their offer.

Mark P. Rode
Craftsman Brand Manager
(847) 286-3447

# EXHIBIT 48

Sent: Thu, 05 May 2005 15:36:40 GMT
From: WCC
To: MRODE@sears.com
CC:
BCC:
Subject: RE: Where are we with Vila?

No problem. Rob is really talented at negotiating these agreements. He
has proven himself time and time again. He does it better than I can and
as well as all but one or two NYC lawyers that I have worked with.This is
important, so I want him in the game. That being said, legal must respond
with alacrity. I asked what our rights and obligations are under the
production agreement. I still do not have a definitive answer. How can we
negotiate without knowing that cold? William C. Crowley wcc@eslinvest.com W (203)
861-4603M (917) 536-8033

From:MRODE@sears.com [mailto:MRODE@sears.com] Sent: Thursday, May 05, 2005
11:16 AMTo: WCCSubject: RE: Where are we with Vila? I will get him what he
needs and make sure he has the correct contact. And, I want to be very clear
because I feel like a jerk. I hope it didn't sound like the legal team was
holding anything up or was lacking in any way. That is absolutely not the
case.Mark P. RodeCraftsman Brand Manager(847) 286-3447


                    "WCC" <WCC@eslinvest.com>

                    05/05/2005 09:33 AM


I want Rob involved.    William C. Crowley wcc@eslinvest.com W (203) 861-4603
M (917) 536-8033

From:MRODE@sears.com [mailto:MRODE@sears.com] Sent: Thursday, May 05, 2005
10:21 AMTo: WCCSubject: RE: Where are we with Vila? Wanted to answer your
question on Rob and I didn't know who he was last night. I don't think we
need additional council. Drew, and the legal team, have been great,
dedicating all the time we have needed. They have a very good understanding
of where we are on the issues and have been a huge asset in keeping me on
the straight and narrow. Additionally, trying to get someone else up to speed
likely will just slow down the process. We, as a group, just need to
understand exactly what we want to accomplish. We are at the point where
we need to fish or cut bait. I would very much like to avoid this becoming
a public matter. It would be bad for everyone if this somehow became public
knowledge. I would also like to leave our spokesperson with the feeling that
we didn't crush him in negotiation. I want the best deal for Sears Holdings,
but I also respect what Bob has done for us in the past and what I anticipate
he can bring in the future. That said, I think the deal he offered is better
for us than for him. Am I pleased with how much we are paying him? No, but
someone negotiated that sucker a while back and short of permanently cutting
ties I don't see a good way out. We can get try to get more, but I believe
we are on the precipice of causing this to go public. Let me know if you
have time today when we can talk. Mark P. RodeCraftsman Brand
Manager(847) 286-3447



SEARS-2155

Mark Rode

05/04/2005 09:23 PM

To:
cc:
Sut

If you have time tomorrow we can sit with Drev (legal).  Let me know what
night work.Mark P. RodeCraftsman Brand Manager(847) 286-3447

"WCC" <WCC@eslinvest.com>

05/04/2005 07:38 PM

Keep me involved.  Maybe I should call someone.  Or should we involve Rob
Rathke?  I want to know asap what our options and leverage points are in
the production contract and spokesman contract.  Is the later
exclusive?    William C. Crowley _wcc@eslinvest.com_ W: 203-861-4603
M:  917-536-8033

From:MRODE@sears.com [mailto:MRODE@sears.com]Sent: Wednesday, May 04, 2005
10:40 AMTo: WCCSubject: Re: Where are we with Vila?  Legal is reviewing.Would
you like to be involved in strategy or just be briefed on where we end up?  As
BV is being extraordinarily confrontational, without litigating, I don't see
us getting them to move much off their offer.Mark P. RodeCraftsman Brand
Manager(847) 286-3447 _

SEARS-2156

# EXHIBIT 49

**Sent:** Fri, 06 May 2005 04:11:55 GMT
**From:** Mark Rode
**To:** lpadilla@searshc.com@SEARS
**CC:**
**BCC:**
**Subject:** Bob Vila Agreement

There is a clause in one of the amendments which says if the show is "cancelled" we can terminate the spokesperson agreement. The clause was written to cover us if Bob was no longer marketable and we couldn't sell the show. Since we own the name and pay for syndication, Rob Rathke believes that if we "cancel" the show that would allow us to get out of the remainder of the spokesperson agreement.

I believe Bob has value, but I doubt I can carry they day with blood in the water. See you at 8.

Mark P. Rode
Craftsman Brand Manager
(847) 286-3447

----- Forwarded by Mark Rode/Marketing/SEARS on 05/05/2005 11:05 PM -----

To:                                                          Red:

cc:
Subject:  Bob Vila Agreement

**Redacted**



# EXHIBIT 52

**Fred Ciba**

05/18/2005 08:34 AM

To:     Mark Rode/Marketing/SEARS@SEARS
cc:     Richard Anderson/Marketing/SEARS@SEARS
Subject:    ...........Bob Vila, past due...........

Mark, I have two invoices from Bob Vila, just received, marked **Past Due...**

Invoice #514              Bob Vila             Syndication Agreement,
season 16, payment 1      $714,375.00

Invoice #fer12072004      Michael Ferrone      Syndication Agreement,
season 16, payment 1      $36,625.00

...they, of course, are the Past Due copies of the invoices we originally received
for payment, due 1/1/05. Those invoices I continue to hold per your direction.
Advice on these? Thanks, Fred.

**This message and its contents (to include attachments) are the
property of Sears Holdings Corporation, Kmart Holding
Corporation, Sears Roebuck & Company and/or their affiliates
and may contain confidential and proprietary information.
You are hereby notified that any disclosure, copying, or
distribution of this message, or the taking of any action based
on information contained herein is strictly prohibited.
Unauthorized use of information contained herein may subject
you to civil and criminal prosecution and penalties. If you are
not the intended recipient, you should delete this message
immediately.**



SEARS-1939

# EXHIBIT 58



# Invoice

| DATE | INVOICE # |
|------|-----------|
| 7/8/2005 | 536 |

| VENDOR # |
|----------|
| 780754065 |

**BILL TO**

Mr. Fred Ciba, Executive Producer
SEARS, ROEBUCK & CO.
Department 727ACS; Location D2-131B
3333 Beverly Road
Hoffman Estates, IL  60179

| DESCRIPTION | AMOUNT |
|-------------|--------|
| SYNDICATION AGREEMENT - Season 16, Payment #3 ($475,000 less 4.75%) | 452,437.50 |
| PAYMENT DUE AUGUST 1, 2005 | |
| PLEASE MAKE CHECK PAYABLE TO: | |
| vTV, INC. | |
| 115 KINGSTON STREET | |
| BOSTON MA  02111 | |
| **Total** | **$452,437.50** |

EXHIBIT
#5810
1-24-06

**SEARS 0491**

The most trusted name in home improvement.

115 Kingston St · 3rd Floor   Boston, MA 02111   www.bobvila.com · PHONE 617.848.8452 · FAX 617.848.8401

# MICHAEL C. FERRONE
**PO BOX 2484**
**119 ALPINE AVENUE**
**OAK BLUFFS MA  02557**

| DATE | INVOICE # |
|---|---|
| 7/8/2005 | FER07082005-02 |

**BILL TO:**

Mr. Fred Ciba
SEARS ROEBUCK & CO.
Department 727ACS; Location D2, 131B
3333 Beverly Road
Hoffman Estates IL  60179

| DESCRIPTION | AMOUNT |
|---|---|
| BVTV SYNDICATION AGREEMENT - Season 16, Payment #3<br>4.75% of $475,000<br><br>PAYMENT DUE:  AUGUST 1, 2005<br><br><br><br>Please note change of address. | $        22,562.50 |
| **TOTAL** | $        22,562.50 |

**SEARS 0492**

# EXHIBIT 62

# SEARS HOLDINGS CORPORATION

Michael W. Kler
Vice President - Deputy General Counsel,
Litigation and Government Affairs
Law Department

Sears Holdings Corporation
3333 Beverly Road, B6-312A
Hoffman Estates, Illinois 60179
Telephone: (847) 286-6272
Fax: (847) 286-0288
mkler@sears.com

August 19, 2005

<u>CERTIFIED MAIL, RETURN RECEIPT REQUESTED &amp;</u>
<u>BY FACSIMILE</u>

Mr. Robert Vila
c/o Ronald E. Feiner, Esq
Kaufman, Feiner, Yamin, Gildin &amp; Robbins
777 Third Avenue
New York, NY 10017

Dear Mr. Vila:

Please be advised that, as a result of your conduct, Sears, Roebuck and Co. ("Sears") hereby notifies you of its election to terminate and cancel the Bob Vila Spokesperson Agreement ("Spokesperson Agreement") effective on the date of your receipt of this notice. Sears has learned that you have engaged in substantial misconduct under the agreement, including your violation of Sears' trademark in the Home Again name. As a result of this material breach of the Spokesperson Agreement, Sears was under no obligation to pay for your services beginning on July 1, 2005. In addition, under Article VII(6) of the Spokesperson Agreement, which permits Sears to terminate the agreement in response to any material breach thereunder, Sears hereby terminates the Spokesperson Agreement.

Article VII.7 of the Spokesperson Agreement grants to Sears an independent right to terminate the Spokesperson Agreement if you are "involved in any situation" that "reflect[s] unfavorably upon [Sears'] reputation." The provision states also that Sears' "decision on all matters arising under this paragraph shall be conclusive and shall be based on our judgment as to whether or not your act or involvement has harmed or may be harmful in a significant respect." Sears has determined that your false accusation that Sears knowingly and intentionally deceived you -- which you have insisted on airing notwithstanding Sears' good faith attempt to avoid litigation and adverse publicity -- will "reflect unfavorably upon [Sears'] reputation." Accordingly, by this letter, Sears terminates the Spokesperson Agreement on the independent basis that you have made false accusations that may significantly harm Sears' reputation.

EXHIBIT
#62 D
1-24-06

In addition to Sears' right to terminate the Spokesperson Agreement pursuant to Article VII(6) and (7), Sears also retains and reserves any and all other grounds for termination arising out of your conduct.

Finally, pursuant to Paragraph 7 of Amendment IX to the Spokesperson Agreement, incorporated by Paragraph 4 of Amendment X to the Spokesperson Agreement, if "the Bob Vila Home Again television show is canceled for any reason," Sears has the right to terminate the Spokesperson Agreement effective on December 31 after the notice of cancellation. Paragraph 7 of Amendment IX to the Spokesperson Agreement (emphasis added). As set forth above, Sears has exercised its right to terminate the Spokesperson Agreement immediately pursuant to Article VII(6) and (7). However, should Sears' cancellation pursuant to Articles VII(6) and (7) be deemed ineffective for any reason, Sears hereby exercises its rights under Paragraph 7 of Amendment IX to the Spokesperson Agreement, incorporated by Paragraph 4 of Amendment X to the Spokesperson Agreement, and hereby cancels the Bob Vila Home Again television (confirming prior advice to you). Pursuant to that cancellation, under no circumstances, would the Spokesperson Agreement be effective beyond December 31, 2005.

Sincerely yours,

Michael W. Kier

Michael W. Kier

# EXHIBIT 66

**kcondon**

From:        <MRODE@sears com>
To:          <kcondon@kaufmannfeiner com>
Sent:        Thursday, April 28, 2005 4 07 PM
Attach:      bob pro.ppt
Subject:     Proposal

Take a look and we can talk.


Mark P. Rode
Craftsman Brand Manager
(847) 286-3447


EXHIBIT
#66 iD
1-24-06

4/28/2005

# Vila Licensing proposal

Proposing

- A reduction of $1.365m for each year of the spokesperson agreement from 2006-2009 NO (which splits the difference in the 2 proposals) ?

- Elimination of any future payments due for incentives earned from the 2004-2005 television season

- We would request 20 days per year for Sears with additional days available to us at NO $25,000 (Which splits the 2 proposals).

- We would like, in perpetuity, use of the library for on-line and in-store (for NO promotional purposes, not selling the library as a product)

- A 50/50 revenue share on any future realized value of the library greater than the NO amount agreed to in this contract

Bob would get

- We would relinquish the rights to the Home Again Library and the Home Again name YES

- We will release him from total exclusivity and allow him to pursue non-competitive YES categories (banking, mortgage, automotive)

- Continue the production agreement for the 2005-2006 season for $1.5m

  – Any income, after expenses would be shared equally, any losses would be deducted from NO future spokesperson payments

  – The agreement would be contingent on King World waiving their rights to any past due NO monies they believed are owed to them

P 0000268

EXHIBIT 67

**kcondon**

---

| | |
|---|---|
| **From:** | "Melissa Marchand" |
| **To:** | "kcondon" <kcondon@kaufmannfeiner.com> |
| **Sent:** | Saturday, February 14, 2004 12:19 AM |
| **Attach:** | unnamed.txt |
| **Subject:** | Re: Conversation with Andy Ginger |

Hi, Ron:

Steve's number is 212-541-0235. I'll pass this along to Andy but I thought you might like it for files as well. I look forward to hearing the outcome of the call.

Have a happy Valentine's Day!
Mel

On Feb 13, 2004, at 5:40 PM, kcondon wrote:

ArialDear Bob, Jack and Mel:

ArialI spoke with Andy Ginger for some time today. He reiterated to me the difficulties he is having with his new boss, but claims to be managing.

ArialWith regard to Canada, he told me that the five days have been approved by Sear U.S. and will be counted towards the 35. He still is waiting for a proposal from Sears Canada to use you for an additional 10 days above your contract and will keep me posted on this.

ArialWith regard to the renewal of the contract, he said the lawyers are close to finishing it and we should have it the beginning of next week. He agreed with me that time is of the essence in this matter.

ArialLastly, we discussed Sear's role in not taking advertising on "Home Again". Andy's reaction was more money is generated for the show if Sears does not take two spots as King World has more inventory to sell and Bob receives more money. I told him that was not the way I believe King World saw it and Hirsch, especially, was quite annoyed with Kay and Sears for having pulled out on advertising. Andy assured me that if we give him Hirsch's direct line, he will call him and discuss. It should be an interesting conversation. I would appreciate it, Mel, if you could leave Andy a message, either through Alice or on his voice mail as to how to reach Hirsch directly and tell him to call us after he has spoken with him.

ArialIf any of you have any questions, please feel free to call.

ArialRon



**EXHIBIT**
# 67 ID
1-30-06 RMC

2/17/04

EXHIBIT 68

**kcondon**

| | |
|---|---|
| **From:** | <aginger@sears com> |
| **To:** | "kcondon" <kcondon@kaufmannfeiner com> |
| **Cc:** | <hferris@sears com>; |
| **Sent:** | Wednesday, February 25, 2004 6 29 PM |
| **Subject:** | Re: Home Again |

Ron, we have a draft from Drew. Henry has consolidated comments and is going to see Drew for a revision in the next day or so. I should not take much time to complete.

| | | |
|---|---|---|
| "kcondon" <kcondon@kaufmann feiner.com> | To: | <dfarka2@sears.com> |
| | cc: | <aginger@sears.com>, "Bob Vila" <rjvila@bobvila.com>, "Jack Hill" <jhill@capecod.net>, "Jonathan Russo" <Jrusso@ArtistsAgency.com> |
| 02/24/2004 03:44 PM | Subject: | Home Again |

Dear Drew:

Please let me know where we are on Bob Vila's "Home Again" extension with Sears. Since we are coming down to the last year under the present contract, it becomes essential for Bob to begin planning for future seasons. If you've not made progress on the same, I will be glad to take a shot at the drafting.

Please let me hear from you. Thanks.

Regards, Ron

EXHIBIT
#68  ID
1-30-06  RMC

2/26/04

EXHIBIT 70

APR 07 '05  04:18PM 2129566187                              PAGE 2 of 1

**rfeiner@kfygr.com**

| | |
|---|---|
| **From:** | <dfarka2@sears.com> |
| **To:** | <rfeiner@kfygr.com> |
| **Sent:** | Monday, March 29, 2004 1:48 PM |
| **Attach:** | DMLIB-#9197-v3-HomeAgain_Amend_11.DOC |
| **Subject:** | Home Again Amendment No. 11 |

Here it is again. Please confirm once you receive. Thanks.

----- Forwarded by Drew Farkas/Legal/SEARS on 03/29/2004 11:49 AM -----

> Drew Farkas
>
> 03/23/2004 06:17 PM
>
> To:  rfeiner@kfygr.com
> cc:  F. Henry Ferris/Marketing/SEARS@Sears, kay.durkin@mindshareworld.com, Andy Ginger/Marketing/SEARS@Sears
> Subject: Home Again Amendment No. 11

(See attached file: DMLIB-#9197-v3-HomeAgain_Amend_11.DOC)

Ron, as discussed, please find attached my draft of Amendment No. 11 for your review. Once you've had a chance to look it over, please feel free to call me any questions or comments. Please note that this draft is still subject to final approval by Henry and Andy, so I do need to reserve for their further comment.

Also, on a related matter, we need to discuss whether further payments are to be made to Mr. Ferrone per the arrangements created under the past agreement. I believe Sears is amendable to making such further payments but we might need to put in place some additional paper confirming that agreement. I'd be happy to do that but please confirm that the arrangement are still to be per the original letter sent to Andy by BVTV.

Hope all is well.



EXHIBIT
#70 ID
1-30-06 RMC

4/12/2004

P 0000193

APR 07 '05  04:18PM 2129566187                                                P.3-9

**DRAFT**

_____, 2004

B.V.T.V., Inc.
Attn: Mr. Bob Vila
115 Kingston St.
3rd Floor
Boston, MA 02111

Re:    Amendment No. 11 to Bob Vila Syndicated Television Program Agreement
        (Year 16 -Year 17) ("Amendment No. 11").

Dear Mr. Vila:

        The parties hereto, your production company, B.V.T.V., Inc. ("Producer") and Sears, Roebuck and Co. ("Sears") are desirous of setting forth the terms for going forward for the next two years ("Year 16 - Year 17") with regard to Bob Vila's Home Again ("Home Again"), the syndicated television series financed by Sears, produced by Producer and starring you, Bob Vila ("Vila").

        An agreement regarding the Series dated September 28, 1989, has heretofore been entered into between Producer and Ogilvy & Mather, as agent for Sears (the 1989 Agreement") and was subsequently amended on June 8, 1990 ("Amendment No.1"), February 8, 1991 ("Amendment No. 2 and No. 3"), January 12, 1992 ("Amendment No.4"), February 10, 1993 ("Amendment No.5"), November 15, 1993 ("Amendment No.6"), December 5, 1994 ("Amendment No.7"), December 19, 1995 ("Amendment No. 8"), December 18, 1996 ("Amendment No. 9") and January 5, 1999 ("Amendment No. 10) (The 1989 Agreement and amendments are herein defined as "the Agreement."); and the parties desire to amend and extend the Agreement on the terms set forth below.

1.    PRODUCER'S OBLIGATIONS  For each of Year 16 and Year 17, Producer agrees to produce and deliver to Sears a minimum of 26 one half-hour programs which programs are scheduled to commence airing in September, 2005 (the "New Programs"). The New Programs, Series 16 through Series 17, shall be delivered in two 13-week cycles for each year and shall conform with standards consistent with all prior programs submitted pursuant to the Agreement. Sears will have prior approval over the locations of the New Programs. Such approval shall not be unreasonably withheld. In addition to the New Programs, there shall also be delivered to Sears for each of Years 16 and Year 17, a minimum of 26 vignettes of 30-seconds each and a minimum of 26 "10-second tune-ins." Each of said vignettes and tune-ins shall coincide with each respective program  Producer agrees to produce the New Programs, and related vignettes and tune-ins, in a professional manner using a professional staff and in keeping with the standards of previously produced Home Again shows  Producer shall be solely responsible for all aspects of the New Programs, vignettes and tune-ins, including but not limited to, project development and/or renovation costs, talent, travel and accommodations, talent and production crew salaries, equipment rentals or purchases, etc.  If requested by Sears, Producer agrees to use, and provide on-air visability and/or mention for, Sears Home Improvement products and services in the production of the New Programs wherever applicable, if available and deliverable.  Sears shall appoint a Sears liaison from whom Producer may purchase any products or services sold by Sears at Sears cost.  Each New Program will contain a prominent presentation credit naming Sears in a manner acceptable to it, including, without limitation, placement at the head of each New Program.

DRAFT

2.    CONSIDERATION.    For each of Year 16 and Year 17 (Series 16 through Series 17), Sears agrees to pay and Producer agrees to accept each year the guaranteed sum of $1,519,500 to be paid as follows:

    (a)    $750,000 shall be due on or before each January 1 commencing January 1, 2005;

    (b)    $494,500 on or before each March 1 commencing March 1, 2005; and

    (c)    $275,000 on or before each August 1 commencing August 1, 2005.

Producer shall be responsible for the execution and cost each year of the National Captioning Institute, Inc.'s close-captioning of all New Programs.

3.    FURTHER AMENDMENTS.    Effective with the production of the New Programs, the Agreement shall be further amended as follows:

    (a)    The term "Series" as used in the Agreement shall be deemed to include the New Programs together with their related vignettes and tune-in for all purposes as provided therein.

    (b)    Paragraph 4 of Amendment 10, THE LIBRARY, is amended as follows: (i) the words "use good faith efforts" shall be inserted before the words "to enter into contracts" in the fourth sentence thereof; (ii) "Ogilvy" shall be substituted with "Mindshare (or other Sears media agency)"; and (iii) the sixth sentence thereof is deleted and replaced with the following: "All gross income from first run syndication and from all subsequent sales and uses of the Library, less any fees or other costs paid to Producer for the Series and fees or other costs paid to a syndicator, shall be divided equally between Sears and Producer."

    (c)    Paragraphs 21(a)(2) and 21(a)(3) of the Agreement are amended to delete "$500,000," each time it appears therein,  and replace it with "$1,000,000;" Paragraph 21(a)(5) is amended to delete "$1,000,000" and replace it with "$4,000,000;" and a new clause (a)(6) is added as follows: "Professional Liability or Errors & Omissions Insurance with limits of not less that $5,000,000 per claim".

This Amendment No. 11 and the parties' obligations in connection herewith are expressly conditioned upon the completion of a mutually acceptable syndication agreement with respect to the New Programs.

All of the terms and conditions of the Agreement which are not inconsistent with the foregoing are hereby ratified and affirmed.

Acceptance of and agreement to this Amendment No. 11 is confirmed by signing your name in the place indicated below.

Very truly yours,

SEARS, ROEBUCK AND CO.

By: _____
Its: _____

Agreed and Accepted
B.V T.V., Inc.

_____
   Bob Vila

917-392-
      4347

# EXHIBIT 72

Page 1 of 1

*a4a8a7*

**kcondon**

**From:** "kcondon" <kcondon@kaufmannfeiner com>
**To:** <dfarka2@sears com>
**Cc:** "Bob Vila" <rjvila@bobvila.com>, <aginger@sears.com>; "Henry Ferris" <hferris@sears.com>; <jrusso@ArtistsAgency.com>
**Sent:** Tuesday, April 13, 2004 11:41 AM
**Subject:** Bob Vila Syndication Agreement Amendment

Dear Drew

I have had the opportunity to review the draft of Amendment No. 11 to Bob Vila's syndicated television program agreement for years 16 and 17 with my client, and we have the following thoughts and reactions:

In my mind, the substantive change in the deal from Amendment 10 to Amendment 11 was the elimination of the bonus as a guaranteed figure. I don't believe Andy and I ever discussed the elimination of the bonus. What I was hoping to do, was at the end of the year, determine whether or not a bonus would have been due, how much, and have it paid to Bob to the extent that it was earned. I believe this past year we received over $700,000 on the bonus, and I assumed that if we continued along that same path, the same would be available for us in year 16. I don't believe this in any way makes the deal any worse for Sears. Could you please discuss the forgoing with Andy as I think the intent was not to eliminate the bonus, per se, but merely its guarantee

On other issues, please note the following

1 Are the vignettes still necessary and are they being used?

2. There is a new provision that asks Bob to use and provide on-air visability or mention for Sears Home Improvement products and services in production of the new programs. Please advise us as to the thought behind this provision It is not that we object, it just that we don't understand where it came from

3 When do you anticipate the mutually acceptable syndication agreement with respect to the new programs to be completed with King World, as the deal is conditioned on this.

I look forward to hearing from you. Please note that I have taken the liberty of sending a copy of this letter to Andy and Henry as well as my client.

Regards.

Cordially, Ron Feiner



EXHIBIT

# 72    ID
1-30-06    RMC

4/13/04

# EXHIBIT 73

Page 1 of 1

2428-27

**kcondon**

| | |
|---|---|
| **From:** | <rfeiner@kfygr.com> |
| **To:** | "kcondon" <kcondon@kaufmannfeiner.com> |
| **Sent:** | Monday, May 03, 2004 4:31 PM |
| **Subject:** | Fw. B.V T V. Extension |

—— Original Message ——
From: rfeiner@kfygr.com
To: dfarka2@sears.com
Cc: Rjvila@Worldnet Alt.Net ; Jonathan Russo
Sent: Monday, May 03, 2004 4:29 PM
Subject: Fw B.V.T.V. Extension

Soooooooooooo? Also is anyone in touch with King World. apparently they know nothing of the renewal.
—— Original Message ——
From: kcondon
To: dfarka2@sears.com
Cc: aginger@sears.com ; Henry Ferns , Bob Vila , jrusso@ArtistsAgency.com
Sent: Wednesday, April 28, 2004 10:53 AM
Subject: B.V T V Extension

Dear Drew

Can we please put the Vila "Home Again" extension to bed? Please let me hear from you as planning for the extension must begin yesterday.

Ron

**EXHIBIT**

# 73   ID
1-30-06   MC

5/3/04

P 0000203

# EXHIBIT 74

## SNAP-ON, INC.

**Vice President & Chief Marketing Officer**                                        **Nov. 2005-Present**

## SEARS

**Vice President  Brand Management - Strategic Marketing & Advertising**       **1999-2005**
Member of leadership team driving Sears retail marketing strategy.  Led product and outlet brand
strategy, positioning, strategic marketing and advertising for Kenmore, Craftsman and DieHard,
national brands sold across 20+ Sears and non-Sears, retail, direct and commercial selling
formats. Led Sears sales promotion, partnership, event, and sports marketing programs.
President of Sears Brands LLC and Sears Intellectual Property Rights Management Co.  Member
of Citibank/Sears interface board.

*Mark Cohen – EVP Marketing 1/1/99 to 9/99, President Softlines & CMO 9/99-1/22/01 (CEO report direct)*
*David Selby – SVP Marketing 1/26/01-10/02 (CEO report direct)*
*Janine Bousquette – EVP and Chief Customer and Marketing Officer 11/1/02-4/11/05 (CEO report direct)*

**Craftsman Brand Director - Strategic Marketing & Advertising**                 **1996-1999**

*Dan Laughlin – VP Strategic Marketing and Advertising 1996-1998  (reported to John Costello, CMO)*
*Mark Cohen – EVP Marketing named 1/1/99 (reported to Arthur Martinez, CEO)*

**National Retail Marketing Manager – Home Improvement**                   **1993-1996**

*Jerry Post – VP/GMM – Home Improvement 1993-1995*

**National Marketing Manager – Major Catalog Media**                        **1989-1993**

**Catalog Marketing Manager – Automotive**                                  **1988-1989**

**Assistant Retail Marketing Manager – Auto & Recreation**                  **1987-1988**

**Assistant Buyer – Bicycles & Accessories**                                **1986-1987**

**Sales Promotion Manager – Sporting Goods**                                **1985-1986**

**Merchandise Assistant – Sporting Goods**                                  **1984-1985**

**Assistant Creative Director**                                             **1983**

**Retail Advertising Copywriter**                                           **1979-1983**

-------------------------------------------------------------------

*Joe Laughlin – VP Corporate Finance and Development  - July 1999*
*Dennis Honan – VP/GMM Online – Nov. 1999*
*Lacy – Pres. Svc/Credit/Online – Nov.  1999.... CEO – Oct. 2000*
*Cohen – CEO Sears Canada - Jan. 2001*
*Luis Padilla – Pres. Mdsg. & Mktg. – Aug. 2004*
*Bobvila joint venture announced March 2000*
*Bobvila CEO named – Andy Wetmore – July 2000*
*Merger intent announced 11/17/2004*
*Shareholders approve merger 3/24/2005*
*WARN period began 4/4/05*
*Leave began 6/4/05*
*Seperation 10/4/05*

EXHIBIT
#74  ID
1-30-06 RMC

# EXHIBIT 80

**Sears, Roebuck & Co**

# Memo

**To:**   Janine Bousquette

**From:** Andy Ginger

**Date:** 03/14/05

**Re:**   Vila Contract Amendment

---

Our original recommendation was to negotiate in 2 steps.   First, negotiate the show...the urgent step...buying time to establish the current value of the library in the market.  Then, negotiate re-structuring the overall relationship, using the library value.

The attached outlines the approach we would use to negotiate **in one step.**  It presumes our historical knowledge of the library value is sufficient to leverage.  In our discussion last week, you favored a one-step approach.  We developed this with in-depth participation from Drew.

If successful, this would achieve many desired outcomes:  2005 almost break-even, 2006 break-even, reduce future spokesperson obligation by over $5 MM.  We do not know how they will react.  The attached reflects an aggressive posture from our end.  *The notes in italics are for our reference only.*

Please let me know if you have any input.  We would like to put this in front of Vila's attorney on Tuesday, March 15.   If the structured negotiation process requires approvals from others before we proceed, please let me know right away.



EXHIBIT
#80  D
1-20-06

-04 then to 50998 on 1-26-05

SEARS-2480

# EXHIBIT 95

**Sent:** Mon, 21 Mar 2005 17:44:13 GMT
**From:** Drew Farkas
**To:** kcondon
**CC:** Mark Rode; Andy Ginger
**BCC:** Mary Tortorice
**Subject:** Re: Bob Vila Shows

Ron, my apologies for the continued delay.  Unfortunately, the pending merger (slated to close as of the end of this week) is taking up most of the executives' time and is contributing to the delay.

In any event, Andy Ginger is out today and tomorrow.  He returns this Wednesday so I will have the opportunity to discuss this with him then.

Thanks.

| | |
|---|---|
| "kcondon" <kcondon@kaufmannfelner.com> 03/18/2005 02:39 PM Please respond to "kcondon" | To: cc: "Bob Vila" <rjvila@bobvila.com>, <jrusso@ArtistsAgency.com> Subject: Bob Vila Shows |

<dfarka: <MRODE

Dear Drew: I understand that King World has been trying to reach you. I think that if we don't get a decision regarding Sears' renewal of the shows very soon, we, on behalf of Bob, should negotiate the deal with King World with your blessing -- as time is really creating a crunch situation regarding producing the shows in the manner and quality we are all used to.

Please let me know your thoughts.

Regards, Ron Feiner

EXHIBIT
#95  JD
1-31-06  BMC

SEARS-1807

EXHIBIT 110

**Mark**

| | |
|---|---|
| From: | lpadilla@sears.com |
| Sent: | Saturday, April 02, 2005 11:09 AM |
| To: | WCC |
| Subject: | Re: Bob Vila and ████████ Contract Details |

Send him back to Cuba? Kidding, we are in process of renegotiating our commitment to minimize our exposure of fees and lenght of time. I will review with you on monday.

------------------------------
Sent from my BlackBerry Wireless Handheld

------ Original Message -----
From: "WCC" [WCC@eslinvest.com]
Sent: 04/02/2005 09:04 AM
To: <lpadilla@sears.com>
Subject: FW: Bob Vila and ████████ Contract Details

What is the best way to reduce our exposure to Vila?

William C. Crowley
wcc@eslinvest.com
W: 203-861-4603
M: 917-536-8033

-----Original Message-----
From: Eddie
Sent: Wednesday, March 30, 2005 11:47 AM
To: WCC
Subject: FW: Bob Vila and ████████ Contract Details

Make sure you look at the proposed renegotiated deal with Bob Vila to see if it makes sense.

-----Original Message-----
From: ████████
Sent: ████████
To: ████
Cc: ████████
Subject: ████████

*Redacted*

**EXHIBIT**

#110 ID
1-31-06 RMC

# EXHIBIT 112

**Sears, Roebuck & Co.**

# Memo

**To:**    Luis Padilla

**From:** Andy Ginger

**CC:**    Janine Bousquette

**Date:** 04/04/05

**Re:**    Vila Negotiation

---

Per your request, attached shows where we are. Need input to move forward. Also, need to know if we should prepare for approval through the new contract approval process announced this morning.

**Background:** Current show deal is not bringing Sears a break-even bottom line. Overall investment rising. Spokesperson contract runs through 2009. Sears wants to re-structure to a business arrangement that provides reduced expense. Sears wants to exchange ownership in the TV show library for reduction in future obligations.

Timing urgent. CBS/Kingworld has sold–out 2005-06 season to advertisers and has prepared to clear in syndication for this fall.

**Achieved Sears original financial targets going into negotiation:**

- Breakeven potential for 2005 on Home Again
- Breakeven on a final, one-year extension for the TV show
- Significant reductions in spokesperson expense for 2006-2009
- Total agreed reduction in expense of $5.3 to $5.5 MM
  - Exceeds Sears est. valuation of 50% ownership in the library by $500 K

**Recommended next steps:**

- Agree on financials
- Negotiate to retain current exclusivity process (1)
- Negotiate to retain 20 days per year (2)
- Prioritize these as stated above, using days to hold exclusivity



EXHIBIT
#112 JD
1-31-06 RMC

• Page 1

SEARS-2431

**Recap of Vila Negotiation**

|  | Current Contractual Obligation | Current Negotiated Status | Reduction |
|---|---|---|---|

**2004-5 Home Again Incentive**

|  | | | |
|---|---|---|---|
| Minimum | 425,000 | 0 | 425,000 |
| Maximum | 625,000 | 0 | 625,000 |

**Spokesperson Fee**

|  | | | |
|---|---|---|---|
| 2006 | 2,087,250 | 1,043,625 | 1,043,625 |
| 2007 | 2,295,975 | 1,147,988 | 1,147,987 |
| 2008 | 2,525,572 | 1,262,786 | 1,262,786 |
| 2009 | 2,778,129 | 1,389,065 | 1,389,064 |
| Total | 9,686,926 | 4,843,464 | 4,843,462 |

**Spokesperson Days**

|  | | | |
|---|---|---|---|
| 2006 | 35 | 17.5 | 17.5 |
| 2007 | 35 | 17.5 | 17.5 |
| 2008 | 35 | 17.5 | 17.5 |
| 2009 | 35 | 17.5 | 17.5 |
| Total | 140 | 70 | 70 |

| Library Ownership | 50/50 | 100% BVTV | As Proposed By Sears |
|---|---|---|---|

| Show Production Extension | | 1 Year Extension | As Proposed By Sears |
|---|---|---|---|

| Exclusivity Approval Process | Sears 100% review and appoval not to be unreasonbly witheld | Vila proposes to relax for mortgage, finance, banking. automotive | Sears does not wish to relax process |
|---|---|---|---|

**SEARS-2432**

egotiation

| Current Contractual Obligation | Sears Proposal | Reduction | Current Negotiated Status | Reduction | Difference |
|---|---|---|---|---|---|

ain Incentive

| | | | | | |
|---|---|---|---|---|---|
| 425,000 | 0 | 425,000 | 0 | 425,000 | 0 |
| 625,000 | 0 | 625,000 | 0 | 625,000 | 0 |

Fee

| | | | | | |
|---|---|---|---|---|---|
| 2,087,250 | 1,387,250 | 700,000 | 1,043,625 | 1,043,625 | -343,625 |
| 2,295,975 | 1,295,975 | 1,000,000 | 1,147,988 | 1,147,987 | -147,988 |
| 2,525,572 | 925,572 | 1,600,000 | 1,262,786 | 1,262,786 | 337,214 |
| 2,778,129 | 0 | 2,778,129 | 1,389,065 | 1,389,064 | 1,389,065 |
| 9,686,926 | 3,608,797 | 6,078,129 | 4,843,464 | 4,843,462 | 1,234,666 |

Days

| | | | | | |
|---|---|---|---|---|---|
| 35 | 30 | 5 | 17.5 | 17.5 | -13 |
| 35 | 30 | 5 | 17.5 | 17.5 | -13 |
| 35 | 30 | 5 | 17.5 | 17.5 | -13 |
| 35 | 0 | 35 | 17.5 | 17.5 | 18 |
| 140 | 90 | 50 | 70 | 70 | -21 |

| | | | | | |
|---|---|---|---|---|---|
| 50/50 | 100% BVTV | | 100% BVTV | As Proposed By Sears | None |

| | | | | | |
|---|---|---|---|---|---|
| | | | 1 Year Extension | As Proposed By Sears | |

| | | | | | |
|---|---|---|---|---|---|
| Sears 100% review and appoval not to be unreasonbly witheld | No Change | | Vila proposes to relax for mortgage, finance, banking. automotive | Sears does not wish to relax process | |

SEARS-2433

**If Assets are sold outright**

| | # of Episodes | Average value of each episode ($) | Total $ Value (MM) |
|---|---|---|---|
| Season's 1-5 | 140 | 15,000 | 2,100,000 |
| Season's 6-8 | 78 | 20,000 | 1,560,000 |
| Season's 10-12 | 78 | 25,000 | 1,950,000 |
| Season's 13-14 | 52 | 35,000 | 1,820,000 |
| Season's 15-16 | 52 | 45,000 | 2,340,000 |
| Total Value | | | 9,770,000 |

**If Assets are rented than sold**

| | # of Episodes | Average value of each episode ($) | Total $ Value (MM) |
|---|---|---|---|
| Season's 1-5 | 140 | 5,000 | 700,000 |
| Season's 6-8 | 78 | 12,500 | 975,000 |
| Season's 10-12 | 78 | 20,000 | 1,560,000 |
| Season's 13-14 | 52 | 30,000 | 1,560,000 |
| Season's 15-16 | 52 | 35,000 | 1,820,000 |
| Total Rental Value | | | 6,615,000 |
| Residual Value | | | 2,500,000 |
| Total Value | | | 9,115,000 |

SEARS-2434

| Expenses | Paid By | Paid To | 2002 Original Est | 2002 Final 12/02 | 2003 Revised 05/15 | 2003 Final 12/06 | 2004 Original Est | 2004 Estimate Rev 12/00/04 | 2005 | 2005 | 2006 | 2007 | 2007 | 2008 | 2008 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| First Run Production | Sears | BVTV | $1,519,000 | $1,519,000 | $1,519,000 | $1,519,000 | $1,519,000 | $1,519,500 | | | | | | | |
| Eyemark Guarantee | Netted | Eyemark | $675,000 | $582,002 | $675,000 | $675,000 | $400,000 | $474,885 | $0 | $0 | $0 | $0 | | | |
| Eyemark Commission | Netted | Eyemark | $135,000 | $143,520 | $128,360 | $128,360 | $400,000 | $474,885 | $0 | $0 | $0 | $0 | | | |
| Eyemark Revenue | Netted | Eyemark | $285,000 | $276,500 | $240,000 | $192,032 | $102,000 | $123,455 | $0 | $0 | $0 | $0 | | | |
| Nielsen Ratings | Netted | Nielsen | $73,000 | $73,000 | $75,000 | $75,000 | $195,000 | $195,000 | $0 | $0 | $0 | $0 | | | |
| Satellite Fees | Netted | Various | $82,000 | $82,802 | $76,000 | $40,400 | $40,000 | $237,432 | $0 | $0 | $0 | $0 | | | |
| Incentive | Sears | BVTV | $1,080,000 | $990,000 | $600,000 | $40,400 | $40,000 | $40,000 | $0 | $0 | $0 | $0 | | | |
| Eyemark Cable Commission | Netted | Eyemark | $479,375 | $479,375 | $600,000 | $625,000 | $525,000 | $723,000 | $0 | $0 | $0 | $0 | | | |
| Refilling Expense | | | | | $333,125 | $333,125 | $349,375 | $349,375 | $178,750 | $200,000 | $375,000 | $200,000 | | | |
| Store Brochures | | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | | | |
| Mailer Exposures | | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | | | |
| Preprint Ads for Show | | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | | | |
| Total Expenses | | | $4,288,375 | $4,005,699 | $3,846,178 | $3,248,605 | $3,271,379 | $3,509,527 | $178,750 | $200,000 | $375,000 | $200,000 | | | |
| | | | | | | | | | | | | | | | |
| Revenue | | | | | | | | | | | | | | | |
| First Run Ad Revenue Units 1&2 | Eyemark | Sears | $975,000 | $652,002 | $550,000 | $392,432 | $385,000 | $474,885 | | | | | | | |
| First Run Ad Revenue Units 3-6 | Eyemark | Sears | $1,000,000 | $1,104,002 | $985,000 | $784,883 | $785,000 | $349,751 | $0 | $0 | $0 | $0 | | | |
| First Run Ad Revenue Unit 7 | Eyemark | Sears | $350,000 | $375,000 | $240,000 | $199,216 | $200,000 | $237,432 | $0 | $0 | $0 | $0 | | | |
| TLC Cable Revenue | Eyemark | Sears | $1,917,500 | $1,917,500 | $1,332,500 | $1,332,500 | $1,397,500 | $1,397,500 | $715,000 | $800,000 | $1,500,000 | $800,000 | | | |
| Total Revenue | | | $4,242,500 | $3,849,504 | $3,087,500 | $2,706,011 | $2,767,500 | $3,059,526 | $715,000 | $800,000 | $1,500,000 | $800,000 | | | |
| | | | | | | | | | | | | | | | |
| Net Revenue | | | -$45,875 | -$156,195 | -$788,675 | -$542,594 | -$503,875 | -$450,099 | $536,250 | $600,000 | $1,125,000 | $600,000 | | | |
| | | | | | | | | | | | | | | | |
| Who Gets What: | | | | | | | | | | | | | | | |
| BVTV Expense | | | $2,599,000 | $2,419,000 | $2,319,000 | $2,144,000 | $2,144,000 | $2,244,500 | $0 | $0 | $0 | $0 | | | |
| BVTV Split of Net Revenue | | | -$22,938 | -$78,098 | -$394,338 | -$271,297 | -$251,938 | -$225,050 | $268,125 | $300,000 | $582,500 | $300,000 | | | |
| Sears Split of Net Revenue | | | -$22,938 | -$78,098 | -$394,338 | -$271,297 | -$251,938 | -$225,050 | $268,125 | $300,000 | $582,500 | $300,000 | | | |

SEARS-2435

# Proposal To Vila Currently In Play

**Positioning:**

Sears situation is evolving rapidly. Current investment in the show is not bringing Sears a break-even bottom line. Overall investment keeps rising. Trend line is not acceptable and needs to change. We want to re-structure our relationship to a business arrangement that makes basic fiscal sense. *(Proposal uses show equity to pre-pay/reduce Sears expense by $6.5 MM.,)*

**Proposal:**

- Sears wants to exchange ownership in the library for reduction in future obligations.

- Sears believes the library is worth $12 MM or more in the market...Sears equity is $6.0 MM

- Sears will extend Home Again 1 year (06-07), but only on a break-even basis. *(Cable contracts have been in the range of $10 M over 5 years. We have 390 episodes. This values them at $30 K each...an aggressive average. They cannot collect revenue on this until 2007.)*

**What Sears Wants In Exchange:**

- Reductions of spokesperson fee as follows: 2006 - $700 K, 2007 = $1.0 K, 2008 = $1.6 MM *(This reduces them to: $1.4, $1.3, $0.9)*

- End the spokesperson agreement at the end of 2008. *(Eliminates 2009 obligation of $2.8 MM.,)*

- Eliminate any future incentive due in 2005 on Home Again revenue *(Estimated at $425 K, '05 goes to within $175 K of break-even.,)*

**In addition** to releasing it's library rights, Sears offers, and is negotiable on, the following:

- Reduce by 5 personal service days per year, 2005-2008, for a total of 20 days *(They will negotiate for relaxed exclusivity in non-competitive categories. These have no value without this.)*

**SEARS-2436**

EXHIBIT 125

# BOBVILA

# Invoice

| DATE | INVOICE # |
|---|---|
| 7/8/2005 | 535 |

| VENDOR # |
|---|
| 780754065 |

**BILL TO**

Mr. Fred Ciba, Executive Producer
SEARS, ROEBUCK & CO.
Department 727ACS; Location D2-131B
3333 Beverly Road
Hoffman Estates, IL  60179

*PAST DUE*

| DESCRIPTION | AMOUNT |
|---|---|
| SYNDICATION AGREEMENT - Season 16, Payment #2 ($494,500 less 4.75%) | 471,011.25 |
| | |
| PAYMENT DUE MARCH 1, 2005 | |
| | |
| PLEASE MAKE CHECK PAYABLE TO: | |
| | |
| BVTV, INC. | |
| 115 KINGSTON STREET | |
| BOSTON MA  02111 | |

| **Total** | **$471,011.25** |
|---|---|

EXHIBIT
#65 19
21-06

**SEARS 0489**

The most trusted name in home improvement

115 Kingston St   3rd Floor   Boston, MA 02111   www.bobvila.com   PHONE: 617.848.8452   FAX: 617.848.840

# MICHAEL C. FERRONE
**PO BOX 2484**
**119 ALPINE AVENUE**
**OAK BLUFFS MA  02557**

| DATE | INVOICE # |
|------|-----------|
| 7/8/2005 | FER07082005-01 |

**BILL TO:**

Mr. Fred Ciba
SEARS ROEBUCK & CO.
Department 727ACS; Location D2, 131B
3333 Beverly Road
Hoffman Estates IL  60179

PAST DUE

| DESCRIPTION | AMOUNT |
|-------------|--------|
| BVTV SYNDICATION AGREEMENT - Season 16, Payment #2<br>4.75% of $494,500<br><br>PAYMENT DUE:  MARCH 1, 2005<br><br><br>Please note change of address. | $    23,488.75 |
| **_TOTAL_** | $    23,488.75 |

**SEARS 0490**

# BOBVILA

# Invoice

| DATE | INVOICE # |
|------|-----------|
| 7/8/2005 | 536 |

| VENDOR # |
|----------|
| 780754065 |

BILL TO

Mr. Fred Ciba, Executive Producer
SEARS, ROEBUCK & CO.
Department 727ACS; Location D2-131B
3333 Beverly Road
Hoffman Estates, IL  60179

| DESCRIPTION | AMOUNT |
|-------------|--------|
| SYNDICATION AGREEMENT - Season 16, Payment #3 ($475,000 less 4.75%) | 452,437.50 |
| PAYMENT DUE AUGUST 1, 2005 | |
| \EASE MAKE CHECK PAYABLE TO: | |
| BVTV, INC. | |
| 115 KINGSTON STREET | |
| BOSTON MA  02111 | |
| **Total** | **$452,437.50** |

**SEARS 0491**

The most trusted name in home improvement.

115 Kingston St   3rd Floor   Boston, MA 02111   www.bobvila.com   PHONE 617.848.8452   FAX 617.848.8401

**MICHAEL C. FERRONE**
PO BOX 2484
119 ALPINE AVENUE
OAK BLUFFS MA  02557

| DATE | INVOICE # |
|------|-----------|
| 7/8/2005 | FER07082005-02 |

**BILL TO:**

Mr. Fred Ciba
SEARS ROEBUCK & CO.
Department 727ACS; Location D2, 131B
3333 Beverly Road
Hoffman Estates IL  60179

| DESCRIPTION | AMOUNT |
|-------------|--------|
| BVTV SYNDICATION AGREEMENT - Season 16, Payment #3<br>4.75% of $475,000 | $      22,562.50 |
| PAYMENT DUE:  AUGUST 1, 2005 | |
| Please note change of address. | |
| **TOTAL** | $      22,562.50 |

SEARS 0492

EXHIBIT 131

**kcondon**

| | |
|---|---|
| **From:** | \<dfarka2@sears.com\> |
| **To:** | \<rfeiner@kfygr.com\> |
| **Cc:** | \<aginger@sears.com\>, \<hferns@sears.com\> |
| **Sent:** | Thursday, June 24, 2004 7:44 PM |
| **Subject:** | Bob Vila's Home Again - Update |

Ron.

I've sent a revised draft of the amendment to Andy and Henry for their signoff. My understanding is that they are out tomorrow but I hope to have a conversation with them early next week and have a draft back to you.

We are hoping to get shortly an expected timetable from Peter Tortorice (MindShare) for completing a new syndication agreement. Henry and I did speak to him after our meeting last week and he indicated that he thought KingWorld might overstating the need to complete things by July 1, however. I will let you know when we hear from Peter.

I will keep you posted. Hope all is well.



2-2-06
EXHIBIT NO. 131
D. BRIDGES

6/25/04

EXHIBIT 132

Page 1 of 1

*2428-27*

**kcondon**

| | |
|---|---|
| **From:** | <rfeiner@kfygr.com> |
| **To:** | "kcondon" <kcondon@kaufmannfeiner.com> |
| **Sent:** | Thursday, July 08, 2004 3:39 PM |
| **Attach:** | DMLIB-#9197-v4A- |
| **Subject:** | Fw: Bob Vila's Home Again |

----- Original Message -----
From: <dfarka2@sears.com>
To: <rfeiner@kfygr.com>
Cc: <hferris@sears.com>; <aginger@sears.com>
Sent: Thursday, July 08, 2004 3:21 PM
Subject: Bob Vila's Home Again

> (See attached file: DMLIB-#9197-v4A-HomeAgain_Amend_11.DOC)
>
> Ron, see attached revised draft, redlined to show the changes.  Most of
> them relate to adding the bonus and trying to accommodate the desire to
> sign it in advance of a syndication deal.  Regarding the product placement
> language, I've just gone back to what was in amendment No. 10.  Sorry for
> the delay.
>
> If you have any questions, don't hesitate to call.
>

2-2-06
EXHIBIT NO. 13a
D. BRIDGES

7/8/04

**DRAFT**

_____, 2004

B.V.T.V., Inc.
Attn: Mr. Bob Vila
115 Kingston St.
3rd Floor
Boston, MA 02111

Re:    **Amendment No. 11 to Bob Vila Syndicated Television Program Agreement
       (Year 16 - Year 17) ("Amendment No. 11").**

Dear Mr. Vila

        The parties hereto, your production company, B.V.T.V., Inc. ("Producer") and Sears, Roebuck and Co. ("Sears") are desirous of setting forth the terms for going forward for the next two years ("Year 16 - Year 17") with regard to Bob Vila's Home Again ("Home Again"), the syndicated television series financed by Sears, produced by Producer and starring you, Bob Vila ("Vila").

        An agreement regarding the Series dated September 28, 1989, has heretofore been entered into between Producer and Ogilvy & Mather, as agent for Sears (the 1989 Agreement") and was subsequently amended on June 8, 1990 ("Amendment No.1"), February 8, 1991 ("Amendment No. 2 and No. 3"), January 12, 1992 ("Amendment No.4"), February 10, 1993 ("Amendment No.5"), November 15, 1993 ("Amendment No.6"), December 5, 1994 ("Amendment No.7"), December 19, 1995 ("Amendment No. 8"), December 18, 1996 ("Amendment No. 9") and January 5, 1999 ("Amendment No. 10) (The 1989 Agreement and amendments are herein defined as "the Agreement."); and the parties desire to amend and extend the Agreement on the terms set forth below.

1.    **PRODUCER'S OBLIGATIONS** For each of Year 16 and Year 17, Producer agrees to produce and deliver to Sears a minimum of 26 one half-hour programs which programs are scheduled to commence airing in September, 2005 (the "New Programs"). The New Programs, Series 16 through Series 17, shall be delivered in two 13-week cycles for each year and shall conform with standards consistent with all prior programs submitted pursuant to the Agreement. Sears will have prior approval over the locations of the New Programs. Such approval shall not be unreasonably withheld. In addition to the New Programs, there shall also be delivered to Sears for each of Years 16 and Year 17, a minimum of 26 vignettes of 30-seconds each and a minimum of 26 "10-second tune-ins." Each of said vignettes and tune-ins shall coincide with each respective program. Producer agrees to produce the New Programs, and related vignettes and tune-ins, in a professional manner using a professional staff and in keeping with the standards of previously produced Home Again shows. Producer shall be solely responsible for all aspects of the New Programs, vignettes and tune-ins, including but not limited to, project development and/or renovation costs, talent, travel and accommodations, talent and production crew salaries, equipment rentals or purchases, etc. If requested by Sears, Producer agrees to use, and provide on air visability and/or mention for use Sears Home Improvement products and services in the production of the New Programs wherever applicable, if available and deliverable based on availability and delivery. Sears shall appoint a Sears liaison from whom Producer may purchase any products or services sold by Sears at Sears cost. Each New Program will contain a prominent presentation credit naming Sears in a manner acceptable to it, including, without limitation, placement at the head of each New Program.

DRAFT

2.     CONSIDERATION.   For each of Year 16 and Year 17 (Series 16 through Series 17), Sears agrees to pay and Producer agrees to accept each ~~year~~Year the guaranteed sum of $1,519,500 ~~to be paid as follows: with incentive bonuses up to a maximum of an additional $1,250,000 based upon the following benchmarks~~

      (a)     The following sums based upon the Revenue (as defined in Exhibit A) paid to and actually received by the syndicator with respect to the first-run syndication of New Programs for each Year.

      If such Revenue for such Year is:

          (i)     $1,400,000, Producer shall receive an additional $625,000;

          (ii)     $1,600,000, Producer shall receive an additional, $100,000;

          (iii)     $1,800,000, Producer shall receive an additional $75,000;

          (iv)     $2,000,000, Producer shall receive an additional $100,000,

          (v)     $2,200,000, Producer shall receive an additional $100,000

          (vi)     $2,400,000, Producer shall receive an additional $80,000;

          (vii)     $2,600,000, Producer shall receive an additional $95,000,

          (viii)     $2,800,000, Producer shall receive an additional $25,000, and

          (ix)     $3,000,000, Producer shall receive an additional $50,000.

      (b)     Said total bonuses shall be capped at a maximum of $1,250,000 per each Year.

      (c)     Said $1,519,500 plus any earned bonuses shall be paid each Year as follows.

          (i)     $750,000 shall be due on or before each January 1 commencing January 1, 2005;

          (ii)     $494,500 on or before each March 1 commencing March 1, 2005; and

      ~~(c)~~$275,000, together with any earned bonus for the Year, on or before each August 1 commencing August 1, ~~2005~~

      ~~(c)(iii)   2005.~~

Producer shall be responsible for the execution and cost each year of the National Captioning Institute, Inc.'s close-captioning of all New Programs.

3     FURTHER AMENDMENTS.   Effective with the production of the New Programs, the Agreement shall be further amended as follows:

      (a)     The term "Series" as used in the Agreement shall be deemed to include the New Programs together with their related vignettes and tune-in for all purposes as provided therein.

      (b)     Paragraph 4 of Amendment 10, THE LIBRARY, is amended as follows: (i) the words "use good faith efforts" shall be inserted before the words "to enter into contracts" in the fourth sentence thereof; (ii) "Ogilvy" shall be substituted with "Mindshare (or other Sears media agency)"~~and~~ (iii) the sixth sentence thereof is deleted and replaced with the following "All gross income from first run syndication and from all subsequent sales and uses of the Library, less any fees (including any bonus) or other costs paid to Producer for the Series and less fees or other costs paid to a syndicator or other third party relating to the syndication or other sale or use of the Series, shall be divided equally between Sears and ~~Producer."~~Producer; and (iv) the end of the eighth sentence thereof shall be amended to add the following: "as described above."

      (c)     Paragraphs 21(a)(2) and 21(a)(3) of the Agreement are amended to delete "$500,000," each time it appears therein, and replace it with "$1,000,000;" Paragraph 21(a)(5) is amended to delete

DRAFT

"$1,000,000" and replace it with "$4,000,000;" and a new clause (a)(6) is added as follows "Professional Liability or Errors & Omissions Insurance with limits of not less that $5,000,000 per claim".

The parties acknowledge that the Distribution and Media Sales Agreement dated September 1, 1999 (as amended, the "Distribution Agreement") between Sears and CBS Broadcasting Inc. for the television distribution of the Series (through Series 15), including the Library, expires August 31, 2005 for broadcast distribution and September 30, 2006 ——— This for cable distribution. This Amendment No. 11 and the parties' obligations in connection herewith are therefore expressly conditioned upon the completion of a mutually acceptable ~~syndication agreement~~written extension of the Distribution Agreement or replacement thereof with respect to the New ~~Programs.~~ Programs as well as the Library.

All of the terms and conditions of the Agreement which are not inconsistent with the foregoing are hereby ratified and affirmed.

Acceptance of and agreement to this Amendment No. 11 is confirmed by signing your name in the place indicated below.

Very truly yours,

**SEARS, ROEBUCK AND CO.**

By: _____
Its: _____

Agreed and Accepted
B.V.T.V., Inc

_____
Bob Vila

**DRAFT**

## EXHIBIT A

"Revenue" shall be deemed to mean the aggregate of all sums paid to and actually received by the syndicator with respect to the first-run syndication of New Programs less the following amounts: (a) taxes (however denominated and irrespective of any tax credits or deductions taken by the syndicator) paid to any governmental authority in connection with the exploitation of the New Programs or of any rights relating thereto (except that any corporate income or franchise taxes of the syndicator shall not be deducted from Revenue) and all sums actually paid as costs of acquiring permits and any similar authority to secure the distribution of the New Program or any of said rights   (b) all adjustments, credits, allowances, rebates and refunds actually made by the syndicator to third parties and if the same has been taken into account as Revenue then an equivalent amount shall be eliminated from subsequent Revenue; (c) unless and until earned, otherwise available to the syndicator or usable by the syndicator, all sums received in the nature of security deposits or advances; and  (d) all costs and expenses incurred by or on behalf of the syndicator in order to obtain any damages, settlements or other recoveries in connection with any interference with or infringements of any of the syndicator's or Sears' rights in the New Programs.  It is understood that such recoveries will be included in Revenue.

EXHIBIT 133

*Vila*

**kcondon**

*Sus*
*2428-27*

| | |
|---|---|
| **From:** | "Jonathan Russo" <Jrusso@ArtistsAgency.com> |
| **To:** | "kcondon" <kcondon@kaufmannfeiner.com> |
| **Sent:** | Monday, July 19, 2004 5:37 PM |
| **Subject:** | RE: Vila Agreement |

THANKS, OF COURSE IT SHOULD INCLUDE ALL REVENUES  I E-MAILED BIRKHAHN TO SEE IF HE
HEARD FROM SEARS/MINDSHARE  JR ALSO ON THE 10TH I WILL BE ON L.I, CANNOT MAKE DINNER,
WILL SEE BOB THE WEEK AFTER ON THE VINEYARD  JR

-----Original Message-----
**From:** kcondon [mailto:kcondon@kaufmannfeiner.com]
**Sent:** Monday, July 19, 2004 5:16 PM
**To:** dfarka2@sears.com
**Cc:** Bob Vila; aginger@sears.com; Henry Ferris; Jonathan Russo
**Subject:** Vila Agreement

Dear Drew

The only concern I have about the redrafted agreement for Years 16 and 17
(Amendment #11 to the Bob Vila Syndicated Television Program Agreement) is
contained in Paragraph 2.A. The bonuses referred to therein should be in respect to **all**
monies received by the Syndicator, not just with respect to first-run syndication of the
New Programs. This should include cable television revenues. The original language we
had worked with was "Revenue generated and received by the first-run syndicator from
the sale of the New Programs". I assume this was your intention, but it was not clear in
the redraft. If we could clarify this, we would be ready to sign execution copies. If this is
not your understanding, please let me know at once.

I also would appreciate it if we could formalize our receiving the same information Sears
receives from the Syndicator showing the payment or receipt of the Revenue. Either we
should get bi-monthly statements, or statements within 30 days after you receive the
same. Whatever is your preference.

Please let me hear from you

Ron:



2-2-06
EXHIBIT NO. 133
D. BRIDGES

7/20/04

# EXHIBIT 134

*242827*                Page 1 of 1

Vila

Sears

**kcondon**

**From:**      "Jonathan Russo" <Jrusso@ArtistsAgency com>
**To:**        "kcondon" <kcondon@kaufmannfeiner.com>
**Sent:**      Wednesday, July 21, 2004 12 17 PM
**Subject:**   RE: Bob Vila Deal
YEP. JR

-----Original Message-----
**From:** kcondon [mailto:kcondon@kaufmannfeiner.com]
**Sent:** Wednesday, July 21, 2004 12:18 PM
**To:** dfarka2@sears.com
**Cc:** agingen@sears.com; Henry Ferris; Bob Vila; Jonathan Russo
**Subject:** Bob Vila Deal

Dear Drew:

Please check on this as soon as possible as this is the essence of the deal. My
understanding was that since we could not count on cable, the bonus would not be
guaranteed, but in the event cable revenues did come in, Bob would be eligible for the
bonus. Where else would cable revenues go?

Please let me know as soon as possible as this would dramatically alter the deal.

Ron



2·2-06
EXHIBIT NO. 134
D. BRIDGES

7/21/04

P 0000218

# EXHIBIT 135

$\partial \eta \partial 8 \cdot \partial 7$

## kcondon

| | |
|---|---|
| **From:** | <dfarka2@sears.com> |
| **To:** | "kcondon" <kcondon@kaufmannfeiner.com> |
| **Cc:** | <hferris@sears.com>; <aginger@sears.com> |
| **Sent:** | Friday, July 23, 2004 5:31 PM |
| **Subject:** | Re: Bob Vila Deal |

Henry has been out this week but will be back next week. I will get some
time with he and Andy to discuss. Note that, in either case, BVTV would
still share in cable revenues 50/50 per the Library paragraph (para. 4 of
Amend 10).

Thanks.

```
"kcondon"
<kcondon@kaufmann      To:    <dfarka2@sears.com>
feiner.com>            cc:    <aginger@sears.com>, "Henry Ferris"
                       <hferris@sears.com>, "Bob Vila" <rjvila@bobvila.com>,
07/21/2004 11:17       <jrusso@ArtistsAgency.com>
AM                     Subject: Bob Vila Deal
Please respond to
"kcondon"
```

Dear Drew:

Please check on this as soon as possible as this is the essence of the
deal. My understanding was that since we could not count on cable, the
bonus would not be guaranteed, but in the event cable revenues did come in,
Bob would be eligible for the bonus. Where else would cable revenues go?

Please let me know as soon as possible as this would dramatically alter the
deal.

Ron

2-2-06

EXHIBIT NO. 135

D. BRIDGES

7/26/04

EXHIBIT 137

Page 1 of 1

2428-27

**kcondon**

| | |
|---|---|
| **From:** | <MRODE@sears.com> |
| **To:** | "kcondon" <kcondon@kaufmannfeiner.com> |
| **Sent:** | Monday, November 01, 2004 10:06 AM |
| **Subject:** | Re  Vila Syndication Agreement |

Ron,

Now that I'm back in the office, let me see what I can set up.

P.S  The quarterly check for the tractors and mowers should have arrived at BV.com

Mark P  Rode
Craftsman Brand Manager
(847) 286-3447

---

"kcondon" <kcondon@kaufmannfeiner.com>

10/29/2004 10 36 AM
Please respond to "kcondon"

To      <dlarka2@sears com>, <aginger@sears corn>, <mrode@sears com>
cc      "Bob Vila" <rjvila@bobvila com>
Subject     Vila Syndication Agreement

Dear Drew, Andy and Mark:

Can we please have a conference call as soon as possible to resolve clarifications needed to B.V T.V.'s extension for Years 16 and 17 to the Syndication Agreement. I believe if we are all on the phone for 15 minutes, the Agreement will be ready to be signed.

Please let me hear from you with regard to possible times early next week to do this. Thank you all in advance

Regards, Ron Feiner

DREW FARKAS
847-286-9759

2-2-06
EXHIBIT NO. 137
D. BRIDGES

11/1/04

# EXHIBIT 142

To:
cc:
Subject:

If we do not continue paying for the production, can he step in and still produce, or do
we control that decision? Not without an agreement from us.
If he produces more shows, do they go into the library/ Yes, and would be half owned by us
if we pay for production.
What are the plans for syndicating the library?  We would like to sell but it is
encumbered until '06 What do we think the value of the library is?  $4M-$8M  How did we
come to that value? Past sales, rental, current environment.
What do we think the impact of another year of programming will be on the library/ It is
the best asset and it keeps our spokesperson on TV
Can we trade a portion of our ownership of the library to eliminate our continuing spokes
person obligation?  Some, but not all.

Again, I would like to review the contract.  Do we have any rights under the contract that
might help us in this negotiation? We do not appear to have much leverage.

William C. Crowley
wcc@eslinvest.com <mailto:wcc@eslinvest.com>
W:  203-861-4603
M:  917-536-8033

Redacted

From:
Sent:
To:
Cc:
Subject:

To:
cc:

Subject:

2-2-06

EXHIBIT NO. 14

D. BRIDGES

SEARS-1758

# EXHIBIT 149

**From:** WCC
**Sent:** Friday, April 01, 2005 8:16 PM
**To:** lpadilla@sears.com
**Subject:** FW: Bob Vila and ▮▮▮▮▮▮▮ Contract Details

**Attachments:** DMLIB-#52061-v1-Eddie_Summaries.DOC; vilaflowchart.ppt; HomeAgain.ppt

  
vilaflowchart.ppt    HomeAgain.ppt (21
(23 KB)    KB)

What is the best way to reduce our exposure to Vila?

William C. Crowley
wcc@eslinvest.com
W: 203-861-4603
M: 917-536-8033

Redacted

-----Original Message-----
**From:** Eddie
**Sent:** Wednesday, March 30, 2005 11:47 AM
**To:** WCC
**Subject:** FW: Bob Vila and ▮▮▮▮▮▮▮ Contract Details

Make sure you look at the proposed renegotiated deal with Bob Vila to see if it makes sense.

-----Original Message-----
**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**To:** ▮▮▮▮
**Cc:** ▮▮▮▮▮▮▮▮
**Subject:** Bob Vila and ▮▮▮▮▮▮▮ Contract Details

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

SEARS-1763

# EXHIBIT 150

**Mark**

From:
Sent:
To:
Cc:
Subject:





-----Original Message-----
From: Eddie
Sent: Monday, April 18, 2005 5:07 PM
To: WCC
Subject: Re: Bob Vila

We better understand the value of the library.  What does it consist of?
--------------------------------
Sent from my BlackBerry Wireless Handheld (www.BlackBerry.net)

-----Original Message-----
From: WCC <WCC@eslinvest.com>
To: Eddie <Eddie@eslinvest.com>
Sent: Mon Apr 18 18:05:44 2005
Subject: FW: Bob Vila

I will get Scott's views.

I would like to see if we can get a good value on the library and thereby forego the
obligated cash payments.

I need to review contracts and details, which I got today.


William C. Crowley

wcc@eslinvest.com <mailto:wcc@eslinvest.com>

W: 203-861-4603

M:  917-536-8033


From: MRODE@sears.com [mailto:MRODE@sears.com]
Sent: Monday, April 18, 2005 3:31 PM
To: WCC
Subject: RE: Bob Vila


I don't have the spreadsheet with me but I think Bob has offered to forego a little more
than $8M to get the library.  The NPV was between $6M-$7M.  I recommend we take that deal
as I don't think we will find better.  I believe I can negotiate somewhat more favorable
rms and pump up the NPV.  The other option is to hit the street with the property, but
couldn't realize any gains until September '06 when TLC is done with it and we also

**SEARS-1751**

would have commissions to consider.

Would you like me to move forward exchanging the library for future payments to Bob?

Mark P. Rode
Craftsman Brand Manager
(847) 286-3447



Redacted

To:
cc:
Subject:

From:
Sent:
To:
Cc:
Subject:

SEARS-1752