UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.
05-11717-REK

_____
                                          )
ROBERT J. VILA and B.V.T.V., INC.         )
                                          )
                    Plaintiffs,           )
                                          )
                                          )
v.                                        )
                                          )
                                          )
SEARS, ROEBUCK AND CO.,                   )
SEARS HOLDINGS CORPORATION                )
 and KMART HOLDING COPORATION             )
                    Defendants.           )
_____)


## PLAINTIFFS' OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

Plaintiffs' Robert J. Vila ("Vila") and B.V.T.V., Inc., ("BVTV"), by their attorney and pursuant to F.R.C.P. 56(b), hereby submit their Opposition to Defendants' Cross Motion for Summary Judgment (**"Def. CM"**) on all Counts of Plaintiffs' First Amended Complaint.

## INTRODUCTION

Since September 1989, Robert J. Vila has been under contract with Defendant Sears, Roebuck and Co.'s, ("Sears"), to act as the national spokesperson for Sears' Craftsman brand products and services (the "Spokesperson Agreement") **(Dep. Ex. 13)**. As and when requested by Sears, Mr. Vila made personal appearances, radio, television and print commercials and videos promoting the Sears' Craftsman brand products and services, including on Sears' Craftsman website. The Spokesperson Agreement, by its terms, is to expire in December 2009 and by, its terms, Mr. Vila was to receive

$10,635,676 in compensation from July 1, 2005 through July 1, 2009. **(Dep. Ex. 13, Amendment X)**.

Also since September 1989, Plaintiff BVTV has been under contract with Defendant Sears to produce a nationally syndicated home improvement television series hosted by Mr. Vila **(the "Series")**. The Series was initially unnamed and then known as *Home Again with Bob Vila,* later as *Bob Vila's Home Again* and is presently known as *Bob Vila* . Until the current 2005-2006 viewing season, Sears paid BVTV agreed upon sums and bonuses for the production of the Series (the "Syndication Agreement"). **(Dep. Ex 4)**. Sears, in turn, contracted over the years with independent third party distributors to arrange for distribution of the Series through syndication in television markets throughout the country and to sell commercial advertising time on the Series. **(Dep. Ex. 71**) The syndicator of the Series is and has been for a number of years King World Productions ("King World").

Beginning in early 2004, BVTV and Sears were negotiating the terms of a proposed Amendment 11 to the Syndication Agreement which would extend Sears' funding of the production of the Series for the 2005-2006 and 2006-2007 viewing seasons. Viewing seasons run approximately from September-August. Negotiations of the details of Amendment 11 continued intermittently through 2004. Full agreement on all terms and conditions of Amendment 11 was reached on January 18, 2005.

On or about November 17, 2004, Sears had announced a transaction whereby, subject to regulatory and shareholder approval and satisfaction of or waiver of certain conditions, Defendant Kmart Holding Corporation ("Kmart") would acquire Sears. In connection with that acquisition, Defendant Sears Holdings Corporation ("SHLD") was to be the parent of both Sears and Kmart. The transaction was not approved by shareholders and consummated until March 24, 2005.

Beginning well before the consummation of the acquisition of Sears by Kmart, Kmart caused Sears not to holographically sign Amendment 11 to the Syndication Agreement, to breach and repudiate Sears' contractual obligations to BVTV under the Syndication Agreement and to condition Sears' performance under Amendment 11 of the Syndication Agreement upon an agreement by Mr. Vila to substantially reduce Sears' obligations to him under the Spokesperson Agreement. When no such concession was granted to Sears by Mr. Vila, Sears refused to pay Mr. Vila $948,750 due him by July 1, 2005 under the Spokesperson Agreement. Sears provided no explanation or justification to Mr. Vila regarding its failure to pay him. It simply did not make the payment. This action was commenced on July 18, 2005 in Dukes Superior Court.

On August 4, 2005, counsel for all Defendants requested of and were granted by Plaintiffs' counsel an extension of time to respond to Plaintiffs' Complaint to and including August 22, 2005. There then ensued two weeks of discussions between the parties in an effort to resolve the issues which were the subject of the original Complaint. Those discussions were unsuccessful and, on August 17, 2005, the Defendants removed the action to the United States District Court for the District of Massachusetts.

On August 18, 2005, pursuant to the Local Rules of the United States District Court for the District of Massachusetts, counsel for Plaintiffs advised counsel for Defendants, that, since Defendants had not articulated any reason for Sears' refusal to make the July 1, 2005 payment to Mr. Vila or the bonus due BVTV for the 2004-2005 viewing season, and, to the contrary, had stated that Defendants were not contesting that those sums were due Mr. Vila, Plaintiffs intended to file a Motion for Partial Summary Judgment as to those counts in their Complaint.

In order to defeat summary judgment, on August 19, 2005, Defendant SHLD sent a fax letter to Vila, purporting, among other things, to "cancel" the Series, to terminate the Spokesperson Agreement and repudiating all future obligations to Vila under the Spokesperson Agreement. Defendant's letter

further alleged that Mr. Vila was in material breach of his obligations under the Spokesperson Agreement. **(Dep. Ex. 62)** On August 22, 2005, Defendants filed their Answer and Defendant Sears filed a multi-count counterclaim against Plaintiffs.

On October 20, 2005, Plaintiffs filed their First Amended Complaint and Defendants subsequently filed their Answer and Defendant Sears reiterated its multi-count Counterclaim against Plaintiffs.

On February 8, 2006, Mr. Vila learned that, notwithstanding its purported termination of the Spokesperson Agreement, Defendant Sears continued to exploit Vila's trademarks, service marks, name and image on Sears' Craftsman website. On that same date Vila made demand upon Sears for compensation pursuant to the Spokesperson Agreement in the amounts due for July 1, 2005 and January 1, 2006, plus statutory interest. Defendants did not respond, but continued to exploit Mr. Vila's trademarks, service marks, name, image and likeness on its Craftsman website until approximately March 1, 2006.

On February 22, 2006, in accordance with F.R.C.P. Rule 56(a), Mr. Vila filed and served his Motion for Partial Summary Judgment. On April 11, 2006 Defendants filed their Opposition to Mr. Vila's Motion For Partial Summary Judgment and their Cross-Motion for Summary Judgment as to all Counts of Plaintiffs' First Amended Complaint.

Although initially noticed for April 19, 2006 it was not until July 5, 2006 that Plaintiffs were able to take the deposition of Mary Tortorice, the person designated by Sears under F.R.C.P. 30(b)(6), as the person most knowledgeable concerning Sears' counterclaim that Mr. Vila breached the Spokesperson Agreement by infringing on Sears' alleged trademark in the words "Home Again". That deposition establishes, among other things, that Sears has no trademark interest in the words "Home Again" and that Sears has improperly exploited Mr. Vila's trademarks, service marks, name likeness and image to promote the sale of Sears' products, without compensation to Mr. Vila.

## LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS OF RECORD AS TO WHICH THERE EXIST GENUINE ISSUES TO BE TRIED

### A. Response to Defendants' Statement of Material Facts Not in Dispute (Presented in the order in which they appear in Defendants' Cross-Motion)

For the convenience of the Court, citations to deposition transcripts are as follows:

**Vila** is Robert J. Vila, a plaintiff.

**Feiner** is Ronald Feiner, counsel and business advisor to Mr. Vila and BVTV.

**Ginger** is Andy Ginger, former Vice President of Brand Management for defendant Sears, former President of Sears Brands LLC and former President of Sears Intellectual Property Management Company.

**Crowley** is William C. Crowley, Senior Vice President of Finance for defendant Kmart and Executive Vice President and Chief Financial Officer of defendant Sears Holdings Corporation.

**Rode** is Mark Rode, former Craftsman Brand Manager for defendant Sears.

**Farkas** is Drew Farkas, Esq., Senior Counsel for defendant Sears.

**Padilla** is Luis Padilla, former President of Merchandising, Marketing and Product Development for defendant Sears.

**Rathke** is Robert Rathke, in-house counsel for defendants Kmart and SHLD.

**Tortorice** is Mary Tortorice, Esq., Assistant General Counsel for Marketing, Intellectual property and Sourcing for defendant SHLD.

**Marchand** is Melissa Marchand, Chief Operating Officer for BV Webties, LLC.

**Monzon** is Sarah Monzon, line producer for plaintiff BVTV.

1.  **Plaintiffs deny that Mr. Vila was a spokesperson for "Sears and its products". (Def. CM p. 3, ¶¶ 3, 5).** On or about September 29, 1989, Mr. Vila entered into a contract in Massachusetts **(Vila Dep. p. 219)** with Defendant Sears, Roebuck and Co., ("Sears"), to act as the national spokesperson for Defendant Sears Home Improvement (Group 700-7) products and services, (the "Products")  and to make personal appearances, radio, television and print commercials and videos promoting the

Products (the "Spokesperson Agreement") **(Dep. Ex. 13; p. 1; Ginger Dep. pp. 28-31).**  The only Products for which Mr. Vila is the spokesperson (Sears Home Improvement (Group 700-7 products and services) are the Sears brand "Craftsman" products. **(Vila Dep. pp. 30-31, 38, 86, 312, 313, 367-369; Marchand Dep. pp.28-29; Ginger Dep. pp. 28-31, 38**).

**2.    Plaintiffs deny that the Syndication Agreement was amended by the parties only "ten times".** (**Def. CM, p. 3, ¶ 4).** On or about September 29,1989, BVTV entered into a contract with Defendant Sears  (the "Syndication Agreement") **(Dep. Ex. 4)** to produce the nationally syndicated home improvement television series, known initially as *Home Again with Bob Vila,* later as *Bob Vila's Home Again* **(Def. Counterclaim, p.14, ¶ 9)** and presently known  as *Bob Vila* (the "Series") **(Vila Dep. p. 189).** The Series is produced by BVTV and stars and is hosted by Bob Vila. **(Dep. Ex. 4, p. 1**). The Syndication Agreement has been extended and amended by Sears and Vila eleven times. **(Dep. Ex. 4, Amendment X; Dep. Ex. 21; Dep. Ex. 22) .**

**3.    Plaintiffs deny that payments were to be made by Sears to Mr. Vila under the Spokesperson Agreement "in advance". (Def. CM, p. 4, ¶ 6).** The annual compensation payable to Mr. Vila under the Spokesperson Agreement was guaranteed compensation and payable in installments by January 1 and July 1 of each year, **(Dep. Ex. 13. p. 5 and Amendment X, ¶ 2)** even if Mr. Vila was not requested to perform any services. The Spokesperson Agreement includes, at Paragraph VII, sub-paragraph 2,  a "Pay or Play" provision that Sears will not be required to request Vila's services at any time or to utilize Vila's services or the product of Vila's services and that Sears' only obligation shall be to make the payments required pursuant to the Spokesperson Agreement. **(Dep. Ex. 13, p. 7, ¶ VII, 2).**

4.   **Plaintiffs deny that, "pursuant to the Syndication Agreement, Sears is the owner of all trademarks associated with" the Series. (Def. CM p. 5, ¶ 13).** Nothing in the Syndication Agreement conveys ownership to Sears of all trademarks associated with the Series. **(Dep. Ex. 4).** The Series' name(s) always included the name "Bob Vila". Mr. Vila never relinquished control of his own name. In fact, the trademarks and service marks BOB VILA and BOB VILA'S are registered with the United States Patent and Trademark Office. **(Ex. K)**. Pursuant to the Syndication Agreement, as amended, Sears paid BVTV negotiated sums and bonuses in return for the sponsorship of the Series produced by BVTV. **(Dep. Ex. 4, pp. P 3, 6, 15, 23, 33, 34, 41, 45, 46, 50, 51, 55, 56, 61-64, 69, 70; Dep. Ex. 21, p. P 133; Feiner Dep. pp. 307-308, 315).** Sears, in turn, contracted with independent third party distributors to arrange for distribution of the Series through the syndication process in television markets throughout the country and to sell commercial advertising time on the Series**. (Dep. Ex. 71, Ginger Dep. p. 75**). Sears sponsored and ultimately owned the Series in conjunction with BVTV **(Ginger Dep. pp. 28, 64; Dep. Ex. 4, Amend. 10, ¶ 4; Dep. Ex. 71, p. SEARS 1144 ¶¶ K. and L.).**

5.   **Plaintiffs deny that the words "Home Again" are  a "trademark". (Def. CM, p. 6, ¶ 16).** Sears states as a conclusion that the words "Home Again" are a trademark, without offering any facts in support of that conclusion. The name of the Series was never "Home Again". **(Tortorice Dep. p. 101).** It was *Home Again With Bob Vila, Bob Vila's Home Again*  **(Def. CM p. 3, ¶ 4.)** and is now *Bob Vila.* **(Vila Dep. p. 189**). The Syndication Agreement itself uses the words "Home Again" only as a short hand definition in that document for "Bob Vila's Home Again". **(Dep. Ex. 4, Amendment 10, p. P68; Dep. Ex. 21, p. P132).** Defendant's Rule 30(b)(6) witness, Mary Tortorice, Esq., Associate General Counsel of Marketing, Intellectual Property and Sourcing, testified at her deposition taken on July 5, 2006, that there was no information related to the alleged "Home Again" trademark in the files

of the Law Department of Sears **(Tortorice Dep., pp. 7, 8, 23)**; that "Home Again" is not a registered trademark of Sears **(Tortorice Dep. pp. 12-13, 25)**; that Sears does not have any record in any form wherein it lists the words "Home Again" as a trademark owned by Sear**s (Tortorice Dep., pp. 14, 34-35, 37)**; that Sears' trademarks are owned by a subsidiary, Sears Brands LLC **(Tortorice Dep., p. 55)**; there are no records of Sears Brands LLC that state it owns the alleged trademark "Home Again" **(Tortorice Dep., p. 55)**; that the words "Home Again" standing alone has not been used in commerce by Sears **(Tortorice Dep., pp. 59, 78, 81, 104, 105)**; that the alleged trademark "Home Again" is not identified with any product sold by Sears **(Tortorice Dep., pp. 60-61, 63, 64, 81, 104, 105)**; that Sears is not using the alleged trademark "Home Again" **(Tortorice Dep., pp. 64, 81)**; that Sears has no evidence of any consumer identification of the alleged trademark "Home Again" with Sears **(Tortorice Dep., p. 64)**; that Sears has not received any comments from consumers that they were confused by the use of the words "Home Again" **(Tortorice Dep., p.66)**; that Sears has no evidence of confusion among donors of products or services with regard to whether Sears is sponsoring *Bob Vila* **(Tortorice Dep., p. 77)**; that Sears is not claiming that it owns the name *Bob Vila's Home Again* **(Tortorice Dep. p. 59)**; that Sears is not in the business of producing television shows **(Tortorice Dep. pp. 61, 73);**that Sears has sustained no actual injury **(Tortorice Dep., p. 77)**; that Sears continued to exploit the name and likeness of Bob Vila on Sears' Craftsman website after August 19, 2005 **(Tortorice Dep. p. 84);** Sears is not claiming that it owns the words "Bob Vila's" **(Tortorice Dep. p. 102**)

**6.    Plaintiffs deny that, pursuant to the Syndication Agreement, "Sears owns all right, title and interest" in the alleged trademark "Home Again" . (Def. CM, p. 6, ¶ 16).** Nothing in the Syndication Agreement conveys ownership to Sears of the words "Home Again" or of the name of the Series. (**Dep. Ex. 4).** At the time of the execution of the Syndication Agreement, the Series had not

even been named. **(Feiner Dep. p. 378).** The Series is owned equally by Sears and BVTV. **(Ginger Dep. pp. 28, 64; Dep. Ex. 4, Amend. 10, ¶ 4; Dep. Ex. 71, p. SEARS 1144 ¶¶ K. and L.).**

7.    **Plaintiffs deny that the merger of Sears and Kmart "was to become final on March 24, 2005". (Def. CM p. 6, ¶ 19).** On November 17, 2005, Sears issued a press release announcing a proposed acquisition of Sears by Kmart. The proposed acquisition was subject to receipt of shareholder and regulatory approval and the waiver or satisfaction of other conditions. **(Sankaran Decl., Ex. I).**

8.  **Plaintiffs deny that Mr. Feiner requested that Sears' representatives explain "the consequences of the proposed merger on the negotiations for the extension of the Syndication Agreement" between Sears and BVTV. (Def. CM, pp. 6-7, ¶ 20).** On November 23, 2004, Mr. Feiner sent an email to Mr. Rode, Sears' Craftsman Brand Manager, requesting that Mr. Rode arrange a conference call among Mr. Feiner, Mr. Vila, Mr. Ginger, Sears' Vice president for Brand Management, and Mr. Rode to discuss "the recent K-Mart situation and its impact, if any on Bob [Vila]". **(Feiner Dep. pp. 52-53; Dep. Ex. 7).** Mr. Feiner did not contemplate any, nor did he question Sears about any, effect of the proposed merger on BVTV's negotiations of the extension of the Syndication Agreement. **(Dep. Ex. 7)** Mr. Feiner wanted to determine whether, under the Spokesperson Agreement, Sears would be "using Bob [Vila] more, less or in what capacity? Would they use him for infomercials? Would they use him for commercials? Would they want him to speak more? Would they want store appearances?" **(Feiner Dep. p. 278).** On November 24, 2004, Mr. Rode replied by email to Mr. Feiner, stating that "..we have been instructed not to talk about the merger…..The only thing they have said with any consistency is some K-marts will be Sears. That's not a bad thing for the brand [Craftsman] (or Bob [Vila])." **(Dep. Ex. 7).**

9.   Plaintiffs deny that "Rode in no way indicated that the redline had been approved by Sears." **(Def. CM p. 7, ¶ 22).** On January 14, 2005, Mr. Rode sent an email to Mr. Feiner which stated, "Attached is the contract with the revisions you requested (I hope)…..Mark P. Rode, Craftsman Brand Manager." (emphasis added). Attached to the email was a three page document dated January 11, 2005 and redlined to show the revisions requested by Mr. Feiner. **(Dep. Ex. 21).** The document attached to Mr. Rode's January 14, 2005 email to Mr. Feiner **(Dep. Ex. 21)** was the product of negotiations that had been conducted intermittently for almost a year and discussions among Mr. Rode and Mr. Ginger and Mr. Farkas, Sears' Senior Counsel, regarding Mr. Feiner's comments. **(Rode Dep., p. 77).** Neither the email or the document contained any suggestion that it was "for discussion purposes only" or "subject to further review or comment" by anyone at Sears, or any qualifier whatsoever. **(Dep. Ex. 21).** Ms. Bousquette, Mr. Ginger's superior, had approved a two year contract. **(Ginger Dep. p. 136; Dep. Ex. 75).** Mr. Farkas, Senior Counsel at Sears, prepared the document after communication with his client, Sears. **(Farkas Dep., pp. 55-56).**

10.    Plaintiffs deny that there was no meeting of the minds on January 18, 2005. **(Def. CM p. 7, ¶ 24.)** On January 18, 2005, Mr. Feiner sent an email to Mr. Rode accepting the offer contained in Deposition Exhibit 21, stating, "The new Vila Syndication Agreement is fine. Can you have Drew [Farkas] arrange for execution copies……" **(Feiner Dep. p. 65; Dep. Ex. 22).** At that point, there was a full meeting of the minds and Amendment 11 to the Syndication Agreement was fully negotiated and ready to sign. **(Ginger Dep. pp. 137, 172, 377- 378; Dep. Ex. 75, ¶ 1; Dep. Ex. 78; Feiner Dep. pp. 301, 304, 382).** After Mr. Rode received Mr. Feiner's email of January 18, 2005,**(Dep. Ex. 22)** he did not communicate to Mr. Feiner any objection to its contents. **(Rode Dep., p. 78).**

11.    Plaintiffs deny that Mr. Vila testified that there was no agreement between the parties as to an extension of the Syndication Agreement in January 2005. **(Def. CM p.8, ¶ 26).** At his

deposition, Mr. Vila was presented with a document **(Dep. Ex. 172)** dated January 22, 2005 which was an email from Mr. Rode of Sears to Mr. Vila's agent, Jonathan Russo, referring to "negotiations going forward". Defendants' counsel then asked Mr. Vila "The subject [of the email] now is the syndication agreement, right?" Mr. Vila responded, "I think so." **(Vila Dep. pp. 243-244).** With a series of leading questions, Defendants' counsel then asked Mr. Vila to admit that there "…were negotiations going by your agent and Mr. Rode about an extension of the syndication agreement …and some open issues that existed as of January 22, 2005 concerning the syndication agreement." Mr. Vila responded, "Apparently." **(Vila Dep. pp. 244-245).** A full reading of Deposition Exhibit 172, including the email chain that preceded the email to which Defendants' counsel directed Mr. Vila's attention, makes it clear that the subject of that email was not the extension to the Syndication Agreement between Sears and BVTV, but rather the subject was the extension of the syndication agreement between Sears and King World, the distributor of the Series.

12.    **Plaintiffs deny that Mr. Feiner's testimony "supports the fact that there was no agreement regarding the extension in January 2005". (Def. CM pp. 8-9, ¶ 27).** On January 21, 2005, Mr. Feiner sent an email to Mr. Farkas and asked, "When can I expect to receive execution copies of the Vila extension agreement whose redline we found to be acceptable?" **(Dep. Ex. 23; Feiner Dep. p. 76).** Mr. Feiner testified that "…I think we needed a syndicator and I didn't know whether at this point we should be negotiating with King World ourselves and sue Sears for the loss of the difference." **(Feiner Dep., pp. 86, 87, 93).**

13.    **Defendants deny that "the parties continued to negotiate the terms of the amendment to the Syndication Agreement from January 2004 through June 15, 2005." (Def. CM, p. 10, ¶ 30).** All negotiations between the parties after January 18, 2005, were focused on Sears' attempts to renegotiate the Spokesperson Agreement. Mr. Ginger testified that Sears was holding back on

execution of the document [Amendment 11 to the Syndication Agreement] (**Ginger Dep. pp. 136-137**) **"**as directed". (**Dep. Ex. 75; Ginger Dep. p. 136**). Mr. Ginger told Mr. Feiner, "There is craziness going on here. I am not sure I can tell you when [the extension would be signed]". (**Feiner Dep. p. 80**). Mr. Ginger testified that, at a meeting on March 14, 2005, "There was a desire expressed at this point to try to restructure the relationship with Bob [Vila]  beyond the scope of the syndication agreement and to also try to restructure the spokesperson agreement and the overall relationship with Bob [Vila]." (**Ginger Dep. p. 195; Padilla Dep. pp. 30-31**). On March 23, 2005, in a conference call with Mr. Feiner, Mr. Ginger made a proposal to Mr. Feiner that called for, among other things, a reduction in the amounts to become due Mr. Vila under the Spokesperson Agreement and a waiver by BVTV of a bonus which Mr. Ginger said was  due under the Syndication Agreement. (**Feiner Dep. p. 124-125; Ginger Dep. pp. 330, 331, 337; Dep. Ex. 30; Rode Dep. pp. 121-126, 129-131, 133; Farkas Dep. pp. 88-90**). Mr. Feiner was told that Sears was now making it a condition of signing the syndication extension that they renegotiate the spokesperson deal. (**Feiner Dep. p. 125**). He was also told that the proposal made in the conference call had not been presented to Sears' senior management. (**Dep. Ex. 30**). Mr. Feiner testified that "Andy [Ginger] said 'its different times now. If you want to get the syndication deal signed, you are going to have to agree on some reduction [in the Spokesperson Agreement]." (**Feiner Dep. p. 126**). Mr. Ginger's notes reflect that Mr. Feiner said "[Sears] Can't just walk away from contracts." (**Dep. Ex. 100; Ginger Dep. pp. 324, 326**). On April 29, 2005, as Sears attempted to compel such a restructuring of the whole relationship, Mr. Feiner advised Sears that "Bob Vila and BVTV have valid and binding contracts with Sears and have been acting in accordance with those agreements. Given our long and mutually successful relationship with Sears, we entered into discussions, in good faith, <u>regarding amending both contracts </u>on terms that would be mutually satisfactory to all." (emphasis added). (**Dep. Ex. 46**).

12

**14.      Plaintiffs deny that Mr. Rode stated to Mr. Feiner on February 1, 2005 that "in light of the merger between Sears and Kmart, issues were still unresolved." (Def. CM p. 10, ¶ 32).** Mr. Rode made no such statement in his email of February 1, 2005 to Mr. Feiner. **(Dep. Ex. 179).** Mr. Feiner had been told by Sears that, in light of the merger, they were having difficulty finding someone to sign the contract. **(Feiner Dep. pp. 61-62).** Mr. Feiner testified that he was told that Sears was not sure who was going to sign the contract and that "It was confusing because before the shareholders voted on the merger, Kmart had people working at Sears and they didn't know whether they were in an official capacity or not an official capacity. I assumed they couldn't sign by Sears, but they were making decisions and they kept mentioning this guy Crowley [Senior Vice President of Finance for Kmart] would have a say in it. And I couldn't figure it out since it was prior to the merger what the confusion was." **(Feiner Dep. p. 300).**

**15.      Plaintiffs deny that Mr. Vila acknowledged that "there was no agreed extension to the Syndication Agreement". (Def. CM p. 11, ¶ 33).** Mr. Feiner had been told by Sears that they were having difficulty finding someone to sign the contract and he conveyed that to Mr. Vila. **(Feiner Dep. pp. 61-62).** On February 3, 2005, Mr. Vila in turn advised his line producer that "The extension with Sears remains incomplete due to the Kmart merger." **(Dep. Ex. 173).** Mr. Feiner also testified that he never expected there would be a decision on whether to sign it, but he knew there were maybe a problem on who would sign it. **(Feiner Dep. pp. 323, 383).**

**16.      Plaintiffs deny that Mr. Padilla "was considering whether an extension of the Syndication Agreement was in the best business interest of Sears." (Def. CM p. 12, ¶ 40).** Prior to the consummation of the merger of Kmart and Sears, William Crowley, an officer of Kmart, was "hanging around" Sears' offices. **(Padilla Dep., p. 34).** Mr. Crowley was not a part of the management team at Sears and did not fit into the organizational structure at that point in time. **(Ginger Dep., p. 123).** Mr.

Luis Padilla, Sears President of Merchandising, Marketing and Product Development, testified that he had been told that "… all contracts had to be cleared by Bill [Crowley] and Eddie [Lampert] [officers of Kmart]. That was clear." **(Padilla Dep., pp. 40-42).** Mr. Padilla testified he was not reviewing specific contract terms or anything like that because it was not his responsibility. Mr. Padilla testified that "all contracts had to be approved by Bill Crowley [of Kmart]". **(Padilla Dep., p. 49).** In late February or early March 2005, Mr. Ginger then sought guidance from Mr. Crowley, a senior officer of Kmart, because, "It was clear that Mr. Crowley was going to play a role in making decisions about the transition between the two companies…" **(Ginger Dep. p. 115; Dep. Ex. 77.)** Mr. Ginger believed the matter was urgent and needed to be resolved quickly because "…., there was a contract that had been pending for some time, it was ready to be signed and hadn't moved." **(Ginger Dep., p. 172).** On March 4, 2005, Mr. Ginger sent an email to Mr. Crowley stating "Need to know what kind of questions you have or information you need…. Sorry to be a pest but we need to resolve asap." **(Dep. Ex. 77).** Although the merger had yet to be submitted to shareholders for approval, and Mr. Crowley had no position with or authority to act for Sears, Mr. Crowley responded by email of the same date to Mr. Ginger instructing Mr. Ginger "Summarize deals in email for me please." **(Dep. Ex. 77; Crowley Dep. p. 55).** By email dated March 7, 2005, Mr. Ginger responded to Mr. Crowley's instruction and stated "We have reviewed these [contracts] in detail with Luis Padilla and Janine Bousquette………Vila [redacted] are ready for signature….We would like to move forward as soon as possible…" (emphasis added)**(Dep. Ex. 78; Ginger Dep., pp. 174-176; Crowley Dep. pp. 55-56).** Mr. Crowley testified that, since he "first met with them, they [Ginger and Rode] wanted to get  this [Amendment 11 to the Syndication Agreement] signed. He also said "I don't recall if they asked for my approval" and "I didn't sign the agreement….I wasn't an officer of Sears Roebuck." **(Crowley Dep. pp., 75-76).** Mr. Ginger met with Mr. Crowley **(Ginger Dep. p. 181)** and informed Mr. Crowley

"of the nature of the relationship…the structure… the financials…what the pending situation looks like…" Mr. Ginger also testified that "I know that there were meetings between he [Crowley] and folks inside the legal department." **(Ginger Dep. p. 182).** Mr. Crowley testified that, prior to the consummation of the merger, he "did discuss with them [Sears' personnel] my views on, you know, work they had done [regarding Vila], analysis, shared my thoughts." **(Crowley Dep. pp., 63-64).** He further testified "I can't recall specifically advice that I gave or insights….I believe I gave some."**(Crowley Dep. p. 65).** On Monday, March 14, 2005, **(Dep. Ex. 27; Dep. Ex. 80),** a meeting was held among Mr. Ginger, Mr. Padilla, Ms. Bousquette, Mr. Farkas, Mr. Rode and others **(Ginger Dep. p. 193).** Mr. Ginger testified that "… we were responding back to whatever inquiries came out of the meeting that Bill [Crowley] had had with the legal department." **(Ginger Dep. p. 192).** Mr. Ginger testified that, at that meeting "There was a desire expressed at this point to try to restructure the relationship with Bob [Vila]  beyond the scope of the syndication agreement and to also try to restructure the spokesperson agreement and the overall relationship with Bob [Vila]." **(Ginger Dep. p. 195;).** Mr. Ginger had never heard any mention of restructuring the Spokesperson Agreement before it was announced at this meeting. **(Ginger Dep. pp. 196, 200, 203).** There was "expressed the desire to attempt to find a different approach to the relationship with Bob [Vila] that would yield a lower cost." **(Ginger Dep. p. 197).** Mr. Ginger testified that "What we were going to propose was a profound change to the relationship [with Vila]". **(Ginger Dep. p. 201).** Subsequent to this meeting, Mr. Ginger informed Mr. Feiner that "…the new powers…wanted to make it a condition of the …syndication deal that we renegotiate the spokesperson deal." **(Feiner Dep. p. 123).** Mr. Crowley admitted that he participated in constructing a proposed renegotiated deal with Bob Vila. **(Crowley Dep. pp. 69-70).**

**17.    Plaintiffs deny that they knew and acknowledged that BVTV "had no agreement with Sears as to a possible amendment to the Syndication Agreement and began negotiations directly**

**with King World". (Def. CM p. 12, ¶ 41).** Mr. Feiner testified that "…I think we needed a syndicator [distributor for the Series] and I didn't know whether at this point we should be negotiating with King World ourselves <u>and sue Sears for the loss of the difference</u>." (emphasis added). **(Feiner Dep., pp. 86, 87, 93).** On March 21, 2005, Mr. Feiner sent an email to Mr. Rode stating, "I think that if we don't get a decision regarding Sears' renewal of the shows very soon, we, on behalf of Bob, should negotiate the deal with King World [the distributor of the Series] with your blessing- as time is really creating a crunch situation regarding producing the shows in the manner and quality we are all used to." **(Feiner Dep. pp. 332-333; Dep. Ex. 29 and 95).** Mr. Feiner testified that he spoke to Mr. Rode about BVTV dealing directly with King World on numerous occasions while Mr. Feiner was waiting for a signed contract. **(Feiner Dep. pp. 329-330).** Mr Feiner said , "We had discussions with King World who said they could support the show and they could make a payment to us, which is not as much as Sears, but that we felt it was absolutely essential to remain in syndication for many reasons."**(Feiner Dep. p. 92)** "....[i]f Bob's show didn't go on, it would be such a setback to his franchise, that once someone is removed from television, the tradition is it's very difficult for them to go back." **(Feiner Dep. pp. 324-325).**

18.     **Plaintiffs deny that BVTV continued to invoice Sears "for the production costs" of the Series. (Def. CM, p.12, ¶ 43).** BVTV continued to invoice Sears for the periodic payments contractually due under the Syndication Agreement. **(Dep. Ex. 52, 58).**

19.     **Plaintiffs deny that *Bob Vila* is a "new show". (Def. CM, p.14, ¶¶ 50, 51, 52, 53, 55, 56, 57, 58).** In Deposition Exhibit 21 which includes the contract prepared by Sears for the 2005-2006 and 2006-2007 viewing seasons **(Farkas Dep. pp. 5, 13, 21-22, 27, 31, 46, 51-52,55-56; Feiner Dep. pp. 233-234),** Sears, itself defines the "programs which are scheduled to commence airing in September 2005" as (the "<u>New Programs</u>") (emphasis added). **(Dep. Ex. 21, p. P132, ¶ 1).** There are no

differences between *Bob Vila's Home Again* and *Bob Vila.* **(Vila Dep. III pp. 49-51)** Plaintiffs themselves demanded that the name of the Series be changed to delete the words "Home Again" from its title. On August 23, 2005, counsel for Defendants sent a letter to counsel for Plaintiffs **(Dep. Ex. 242)** claiming, among other things, that Sears owned a trademark in the words "Home Again", that BVTV and Mr. Vila were violating that trademark and demanding that BVTV and Mr. Vila "cease and desist from any further production of any home improvement television series bearing the name HOME AGAIN and will prevent any such episodes from being advertised, marketed and aired." By letter dated August 24, 2005, **(Dep. Ex. 243)** counsel for Plaintiffs advised counsel for Defendants that Defendants' contentions were without merit, but that "it only deflects attention from the real issues between the parties." Plaintiffs' counsel further stated "You are hereby advised that BVTV's production, advertising and airing of its home improvement television series for the 2005-2006 season and thereafter will not bear the phrase "Home Again". Further, although knowing that Sears' claims were meritless, BVTV took immediate action to edit the words "Home Again" from the programs already produced for the 2005-2006 viewing season and from all advertisements and promotions for the Series. **(Dep. Ex. 195, 196; Marchand Dep. pp. 82-92; Monzon Dep. pp. 142-150;).**

20.    **Plaintiffs deny that *Bob Vila* is "sponsored media" and that Sears' permission is required for Mr. Vila to appear on *Bob Vila.***(Def. CM, p. 16, ¶ 58).** *Bob Vila* is not sponsored media. "Sponsorship" in the television industry involves the ownership of 1/3 or more of all the commercial advertising time in the Series with the sponsor getting a "billboard" credit and exclusivity within its product category. **(Ex. N [Perin Report, p.3]; Ex. M [Sissors and Baron, <u>Advertising Media Planning</u> (6th ed.) pp. 347, 429]; Ex. L [Blumenthal and Goodenough, <u>This Business of Television</u> (2nd ed.) pp. 419-420])** For fifteen years, Sears owned and controlled all the national advertising time in the Series. **(Dep. Ex. 4, ¶ 12).** Sears received an acknowledgement of its sponsorship of the Series

by a "billboard" (credit) appearing at the beginning of each episode in the Series. **(Vila Dep. pp. 42,** **305-306, 352; Feiner Dep. p. 207; Monzon Dep. pp. 11, 121 ; Ex. N [Perin Report, p. 3]; Ex. M** **[Sissors and Baron, <u>Advertising Media Planning</u> (6th ed.) pp. 347-348]**).  The current season of the Series, now titled *Bob Vila*, does not have a sponsor **(Vila Dep. p. 360).**

21.      **Plaintiffs deny that the credits to the [*Bob Vila*] show specifically designate the show as** **"sponsored media". (Def. CM, p. 16, ¶ 59).** There is a difference between a sponsor, such as Sears, and anyone else who buys advertising time on the show. **(Vila Dep. pp. 42, 112).** Companies that donated products or services to the projects which are the subject of the episodes and having a value that could be attached to them are given a rolling credit at the end of the show reciting "sponsored in part by…." (**Monzon Dep. p. 14**), but they are not sponsors as that term is understood in the television industry. The Federal Communications requires an acknowledgement of those companies who donated products or services  to a broadcast using the words "..sponsored, paid for, or furnished, either in whole or in part." 47 C.F.R § 73.1212(a)(1). **(Ex. Q).**

22.    **Plaintiffs deny that, during the term of the Spokesperson Agreement that began in 1989** **and during the six months following the alleged termination of the Spokesperson Agreement by** **Sears on August 19, 2005, Mr. Vila permitted his name, likeness, photograph, voice or biography** **to be used in advertising, publicizing or promoting any product or service other than Sears** **Craftsman Tools without the actual knowledge and consent of Sears. (Def. CM, pp. 16-17, ¶¶ 60** **and 61).** The prohibitions of the "Competitive Protection" provision of the Spokesperson Agreement were to prevent Mr. Vila acting as a spokesperson for a company, service or product competitive with Sears Craftsman Brand products or services for which Mr. Vila was the spokesperson since 1989. . **(Dep. Ex. 13, p. 6, ¶ IV; Vila Dep. pp. 30-31, 38, 86, 312, 313, 367; Feiner Dep. pp. 350-352 ;** **Marchand Dep. pp.28-29; Ginger Dep. pp 28-31, 38**). The Competitive Protection portion of the

Spokesperson Agreement was amended from time to time to permit Mr. Vila to act as a spokesperson for other companies, products or services not competitive with Craftsman brand products or services**. (Dep. Ex. 13, Amendment I, p. P 100, Amendment II, p. P 104, Amendment IX, pp. P 126-127; Feiner Dep. pp. 13, 14, 99).** Sears, in the fifteen years it sponsored the Series, never once objected to anything Mr. Vila did on the show and Sears saw everything before it aired. **(Feiner Dep. p. 355)**. The entities  listed in paragraph 61 of Defendants' Cross Motion  are all either donated products or services to the projects which were the subject of the Series or paid for commercial advertising time on the Series. None are competitive with Craftsman brand services or products.

23.    **Plaintiffs deny that, from the beginning of March 2005 through March 28, 2006, Mr. Vila used Sears' alleged Home Again mark without permission or other authority. (Def. CM p. 18, ¶ 65, 66, 67, 68)**. Sears states as a conclusion the words "Home Again" are a trademark, without offering any facts in support of that conclusion. As stated above in paragraph 5, "Home Again" is not a trademark. The name of the Series was never "Home Again". It was  *Home Again With Bob Vila* then *Bob Vila's Home Again* (Def. CM p. 3, ¶ 4)and is now *Bob Vila* **(Vila Dep. p. 189)**. Nothing in the Syndication Agreement conveys ownership to Sears of the words "Home Again" or of the name of the Series. **(Dep. Ex. 4)**. At the time of the execution of the Syndication Agreement, the Series had not even been named. **(Feiner Dep. pp. 378-379)**. The Series is owned equally by Sears and BVTV. **(Ginger Dep. p. 28; Dep. Ex. 4, Amend. 10, ¶ 4; Dep. Ex. 71, p. SEARS 1144 ¶¶ K. and L.)**. For the September 2004-August 2005 viewing season, the name of the Series was *Bob Vila's Home Again* and the Series was sponsored by Sears pursuant to Amendment 10 of the Syndication Agreement. The Series for the September 2005-August 2006 viewing season was also to be named *Bob Vila's Home Again.* With the full knowledge of Sears, pre-production, production, product solicitation, promotion and advertising for the 2005-2006 viewing season were conducted using that title for the Series until

August 23, 2005 when Sears counsel demanded that BVTV cease and desist from its use (**Dep. Ex. 242**). Sears never even suggested that the words "Home Again" were a trademark and that Sears' permission was required for its use until July 22, 2005. (**Dep. Ex. 162**). Contrary to Defendants' representation that Plaintiffs used the alleged "Home Again" mark "in attempts to solicit product donations for the Series" (**Def. CM, p. 18, ¶ 66**), only one of the numerous exhibits cited uses the words "Home Again" standing alone. All other of the exhibits cited by Defendants use the words "Bob Vila's Home Again"

Subsequent to Mr. Rathke's letter of July 22, 2005, the parties were engaged in efforts to settle their disputes. Those efforts terminated on August 17, 2005. By letter dated Friday, August 19, 2005, (**Dep. Ex. 62**), Sears claimed, among other things and for the first time that Mr. Vila and BVTV were infringing upon Sears' alleged trademark in the words "Home Again".

24.    **Plaintiffs deny that the appearance release forms from people appearing on *Bob Vila* were trademark violations. (Def. CM, p. 20, ¶¶ 69-70).** As demonstrated in paragraph 5, above, "Home Again" is not a trademark. Further, Deposition Exhibit 169 consists of approximately 90 preprinted Appearance Release Forms. Of those, 59 had been signed before the name of the Series was changed from *Bob Vila's Home Again* to *Bob Vila* at the insistence of Sears' counsel. After August 23, 2005 an additional 22 of the preprinted forms were used through oversight. (**Monzon Dep. pp. 163-165, 169**). The remainder of the Appearance Release Forms had the words "Home Again" stricken. Not one Appearance Release Form stated "Home Again" standing alone.

25.    **Plaintiffs deny that after August 23, 2005, Mr. Vila referred to the Series as "Bob Vila's Home Again" in an interview on Fox News (Def. CM, p. 20 ¶ 71).** The interview referred to was conducted prior to August 23, 2005, the date when Defendants' counsel demanded that BVTV cease and desist from the use of the words "Home Again" in connection with the 2005-2006 episodes of the

Series. After August 23, 2005, BVTV attempted to have Fox News edit the interview to delete the reference to "Bob Vila's Home Again". Despite BVTV's best efforts Fox would not/ could not edit the interview as requested by BVTV. **(Vila Response to Request for Admissions, pp. 17-18, ¶ 62)**

## ARGUMENT

It is axiomatic that a party is entitled to summary judgment under F.R.C.P. Rule 56 when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Barbour v. Dynamics Research Corp., 63 F.3d 32, 36 (1st Cir. 1995)(quoting Fed.R.C..P. 56(c)), cert denied, 516 U.S.1113 (1996).  In order to prevail on their Cross-Motion for Summary Judgment, Defendants must show that there is an absence of evidence to support Plaintiffs' position. Rogers v. Fair, 902 F.2d 140, 143 (1st Cir. 1990); see also Celotex Corp. v. Catrett, 477 U. S. 317, 325 (1986).  If Defendants do so, the burden shifts to Plaintiffs, which must come forward with specific facts showing there is a genuine dispute of a material fact that must be resolved at trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  A fact is material if it affects the outcome of the litigation under the governing law. Anderson, 477 U. S. at 248.  A dispute is genuine if a fair minded jury could return a verdict on the evidence presented. Id., at 252. See also Rogers, 902 F.2d at 143 (where evidence is merely colorable or is not significantly probative, summary judgment is warranted).

## DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

Defendants, in their effort to justify Sears' refusal to pay Mr. Vila the amounts due and to become due under the Spokesperson Agreement, claim that Mr. Vila was in material breach of the Spokesperson Agreement before July 1, 2005 and that the television Series was cancelled by Sears, permitting Sears to terminate the Spokesperson Agreement. Defendants assertions are without basis in fact or law.

### 1.    Breach of the Spokesperson Agreement

Defendant Sears  never asserted to Vila or any of his representatives that Vila was not entitled to the July 1, 2005 payment of $948,750 until August 19, 2005, a month after this action was instituted. **(Dep. Ex. 22).** Indeed, Sears own internal corporate communications are to the contrary. On June 20, 2005, Sears approved the payment of Vila's invoice for that amount. **(Dep. Ex. 56 and 57)**. Despite that approval, Sears did not make the payment **(Vila Dep. p. 168)**.

Mr. Rode, who directed that the payment be made, testified that he did not know why the invoice was not paid. **(Rode Dep. pp. 214-215).** Mr. Padilla testified that he did not even know that the invoice had not been paid. **(Padilla Dep. p. 118).**

After initiation of this action, there ensued several weeks of attempts to resolve the issues between the parties. During that period, Sears never asserted that Mr. Vila was not entitled to the July 1, 2005 payment or that he was in any way in breach of his obligations under the Spokesperson Agreement.

Settlement negotiations concluded unsuccessfully on August 17, 2005 and Defendants removed this action to this Court.   **(First Amend. Comp. ¶ 38)**. On that same date, August 17, 2005, Vila's counsel, pursuant to Local Rule 7.1, notified Defendants' counsel that Vila would be moving for partial summary judgment as to Count I of the Complaint (Breach of the Spokesperson Agreement) and conferred with Defendants' counsel in an attempt to resolve the proposed motion. **(First Amend. Comp. ¶ 39).** In order to defeat Plaintiffs' proposed Motion for Partial Summary Judgment, on August 19, 2005, by fax letter of that date addressed to Vila, **(Dep. Ex. 62)** defendant SHLD stated, among other things, and for the very first time, that  defendant Sears "has learned that you have engaged in substantial misconduct under the [Spokesperson] agreement including your violation of Sears' trademark in the Home Again name"; that Sears was, therefore, under no obligation to make the July 1, 2005 payment under the Spokesperson Agreement; and that Sears was terminating the

Spokesperson Agreement effective August 19, 2005. In that letter, SHLD, further stated that, since Vila had alleged in the Complaint that Sears "knowingly and intentionally deceived" Vila, Vila was "involved in [a] situation" that "reflects unfavorably upon [Sears'] reputation" and that Sears was terminating the Spokesperson Agreement on that ground as well. SHLD further stated that Sears "hereby cancels the Bob Vila Home Again television show". **(First Amend. Comp. ¶ 40; Dep. Ex. 62**)

### (**a**).    Sears Has No Trademark Rights in the Words "Home Again"

Sears claims that it was entitled to terminate the Spokesperson Agreement because of Mr. Vila's alleged violation of Sears' Trademark rights **(Def. CM p. 24).** Sears claims that the words "Home Again", standing alone, is a trademark owned exclusively by Sears and that Mr. Vila had been infringing on the alleged trademark prior to July 1, 2005. **(Dep. Ex. 62).** Sears must establish that the term "Home Again" has either acquired secondary meaning or is inherently distinctive. The term "Home Again" never acquired any secondary meaning (i.e., reputation or good will in the public perception). As set forth in detail in paragraph 5, above, the words "Home Again" is not a trademark. The deposition testimony of Sears designated Rule 30(b)(6) witness establishes, beyond question, that "Home Again" is not a trademark . **(See paragraph 5, above)**. Since the words "Home Again" has acquired no secondary meaning, it cannot be a common law trademark. See, <u>National Color Laboratories. Inc. v. Philip's Foto Co.</u> 273 F. Supp. 1002 (S.D.N.Y. 1967); 2 J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u> § 16:34, at 16-56-13 (4th ed. 2006) **(Ex. O)**.

 Sears argues that Paragraphs 18(a) and 18 (b) of the Syndication Agreement **(Dep. Ex. 4)** establish that the alleged mark "Home Again" is owned by Sears. At the execution of the Syndication Agreement, it was assumed Sears would be using its descriptive names such as "Craftsman Hour" as the title for the Series. It was understood that Mr. Vila could not have the name "Sears" or any its

existing trade names. **(Feiner Dep. pp. 378-379).** Paragraph 18 (a) of the Syndication Agreement reflects that understanding expressly with respect to the name "Sears" and any of "Sears' trademarks, trade names or service marks". It has nothing to do with the name of the Series. It does not mention, refer to, or vest Sears with any ownership in any trademark interests that might exist in the Series' name(s). This is reinforced in Paragraph 18(a) by providing that, "upon expiration or upon termination of Producer's [BVTV's] right to use Sears marks for any cause, Producer [BVTV] shall immediately cease all use of all such Sears marks and will not use any such Sears marks thereafter," (emphasis added). Likewise, Paragraph 18(b) merely provides that Sears may register "trademarks, service marks or trade names for the Program(s) [Series] under this Agreement in its own name." (emphasis added). It does not convey ownership of the name of the Series to Sears. "Home Again" is not and has never been a "trademark, service mark or trade name" for the Series. Sears never attempted to register the words "Home Again" as a trademark or otherwise. **(Def. CM, p.26, n. 4).** Indeed, it was not until July 22, 2005, after this litigation was initiated, that Sears ever even suggested that "Home Again" was a trademark owned by Sears. **(Dep. Ex. 162).** The name of the Series was never "Home Again". It was always *Home Again With Bob Vila, Bob Vila's Home Again* and is now *Bob Vila*.

Further, it is undisputed that from early February 2004 to January 18, 2005, Sears and BVTV were negotiating the terms of Amendment 11 to the Syndication Agreement for the production by BVTV and the funding by Sears of the home improvement program hosted by Mr. Vila and titled *Bob Vila's Home Again*. Sears contends that those negotiations continued until June 15, 2005 when Mr. Rathke sent a letter to Mr. Feiner, stating that "Sears does not desire to continue to pay to produce the "Home Again" show and B.V.T.V.  is proceeding with the production of the "Home Again" show at its own risk.." **(Dep. Ex. 180; Def. CM p. 12).** Sears not only knew that BVTV was engaging in pre-production and production of the Series with that title, Sears was working with BVTV in that effort.

**(Rode Dep. pp. 55-57; Marchand Dep. pp. 171-173).** Sears also knew and expected that BVTV was going to produce the Series, with or without Sears' involvement. **(Ginger Dep., pp. 408-409; Feiner Dep. pp. 332-333, 329-330; Dep. Ex. 29 and 95).**

In his letter to Mr. Feiner of June 15, 2005 **(Dep. Ex. 180),** Mr. Rathke makes no mention of any purported right of Sears in the words "Home Again". It was not until July 22, 2005, after this litigation was initiated, that Sears even suggested to BVTV that "Home Again" was a trademark owned by Sears. **(Dep. Ex. 162).**

The words "Home Again" are not a trademark. The words "Home Again" are not owned exclusively by Sears. The Series was never titled "Home Again". There was no violation of any of Sears' trademark rights and Sears had no basis for terminating the Spokesperson Agreement on the ground that Mr. Vila was engaged in trademark infringement.

**(b).   Sears Was Not Entitled to Terminate the Spokesperson Agreement Because of Vila's Public Statements Allegedly Reflecting Unfavorably Upon Sears' Reputation**

Sears, in its efforts to avoid liability for its breach of the Spokesperson Agreement, looks to Article VII (7) of the Spokesperson Agreement, the so-called "morals" clause and claims, that, because, in the Complaint, Mr. Vila plead that Defendants' conduct constituted unfair and deceptive acts and practices in violation of M.G.L. c. 93A., Mr. Vila breached the Spokesperson Agreement. **(Def. CM. pp. 4-5, ¶¶ 8 and 9; pp. 13-14, ¶¶ 46 and 49).** Defendants argue that Sears' "decision on all matters arising under this paragraph shall be conclusive and shall be based on our judgment as to whether or not your act or involvement has harmed or may be harmful <u>in a significant respect</u>;"(emphasis added).  **(Dep. Ex. 62).**

Article VII, paragraph 6 of the Spokesperson Agreement provides, in relevant part as follows:

> If you or <u>we</u> at any time commit a material breach of any provision of
> this agreement …..we may terminate this agreement forthwith. Further,

> in such event, we shall also be entitled to all available legal and equitable
> remedies which we may have. (emphasis added).

**(Dep. Ex. 13, p. 8, ¶ 6;)**

Sears committed a material breach of the Spokesperson Agreement by not paying Mr. Vila the $947,850 due him by July 1, 2005. Mr. Vila was thus contractually entitled to invoke all available legal and equitable remedies which he may have. Indeed, defendants concede that nothing in the Spokesperson Agreement prevents Mr. Vila from filing his claims. **(Def. Memo. pp. 29-30).**

Defendants have produced no evidence to support their contention that the pleadings in this action have "harmed or may be harmful" [to Sears' reputation or products] in any respect, much less "in a significant respect". That is because no such evidence exists. Sears has sustained no actual injury **(Tortorice Dep., p. 77).** In fact, Sears continued to exploit the name and likeness of Bob Vila on Sears' Craftsman website to promote the sales of its products after August 19, 2005 and until early 2006. **(Tortorice Dep. p. 84).**

After the commencement of the action, two new articles concerning this litigation appeared in the *Chicago Tribune*. ( **Def. Memo., p. 30; Dep. Ex. 170 and 171).** Both articles described the lawsuit as a "breach of contract" suit and neither article referred to "unfair and deceptive trade practices" or "bad faith".

Sears, however, claims that

> Our decision on such matters arising under this paragraph
> shall be conclusive and shall be based on our judgment as
> to whether or not your act…has harmed or may be harmful
> in a significant respect; **(Def. CM, p. 4, ¶ 8, p. 14, ¶ 49).**

Sears argues that its exercise of its discretion is absolute  and  that

> There is no exception from these very broad terms for acts, situations,
> or occurrences in connection with bringing a lawsuit, nor are acts,
> situations, or occurrences in judicial setting implicitly exempted. **(Def. Memo., p.27)**

The provisions of Article VII, ¶ 6 of the Spokesperson Agreement, recited above, expressly negate that argument, as Sears was in material breach. Further, the cases cited by Defendants in support of their argument are inapposite. In <u>Nader v. ABC Television</u>, 330 F. Supp. 2d 345, (S.D.N.Y. 2004), an actor in a soap opera was arrested for the sale of cocaine and resisting arrest. He was terminated under a morals clause in his contract. He sued, claiming, among other things, breach of the implied covenant of good faith and fair dealing. The court found his claims without merit and stated, as to the issue of good faith and fair dealing that, "Nader has not proffered any evidence whatsoever of bad faith on the part of ABC". <u>Nader,</u> at 349. The record in this case is replete with evidence of Sears bad faith. **(Dep. Ex. 30, 32, 36, 45, 46, 47, 49, 57, 62, 110, 112, 121, 142, 149, 162; Also see paragraph 5, above).**

<u>Korb v. Raytheon</u>, 410 Mass. 581 (1991) did not involve a "morals" clause, but rather concerned the termination of an employee at will. Korb's bad faith claim was never reached by the court because there was no contractual benefit to which he was entitled. The case was  decided on the basis that he was an employee at will. <u>Korb</u>, at 584. <u>Cummings v. Beaton</u>, 249 Ill. App. 3d  287 did not involve a "morals" clause, but rather a breach of a settlement agreement. The parties to a lawsuit had agreed to a settlement of a dispute. One of the parties was in bankruptcy and all parties agreed to recommend approval of the settlement to the bankruptcy court. One of the non bankrupt parties reneged on that agreement. In a subsequent suit, the offending party defendant claimed, among other defenses, judicial privilege. The court rejected that argument, stating, "This is not a defamation action, however, and the logic of McDonald's position escapes us." <u>Cummings,</u> at 311. <u>Cummings</u> has no relevance. <u>Patton v. Cox</u> 276 F3d 493 (9th Cir. 2002) , involving breach of a contract to keep certain information confidential, followed by a voluntary disclosure of information in a <u>quasi judicial</u> proceeding, also is irrelevant to this case. <u>Tulloch v. JPMorgan Chase & Co.</u> 2006 WL 197009 (S.D. Texas, Jan. 24 2006) involved the attachment to a complaint of a release agreement between the parties which agreement

specified it was confidential and set forth specific instances in which the agreement could be disclosed. The court found the attachment of the agreement to the plaintiff's complaint was not necessary for plaintiff to maintain his cause of action and was a breach of contract. <u>Tulloch</u> is inapposite. In each of the cases cited by defendants, the issue involved a pre-existing agreement not to disclose the substance of a confidential contract. None of them dealt with pleading causes of action.

The allegations in the Complaint and First Amended Complaint relating to breaches of the implied covenant of good faith and fair dealing and unfair and deceptive  practices in violation of M.G.L. c. 93A are reflective of defendants' conduct and accurate pleading of available causes of action arising therefrom.  Indeed, the First Circuit,  in <u>Okmyansky v. Herbalife International of America, Inc.</u>, 415 F. 3d 154 (1st Cir. 2005), stated

> Ceding discretion in a contract is not tantamount to
> subjecting oneself to legalized tyranny. Every contract
> contains an implied covenant of good faith and fair
> dealing. (citation omitted). Consequently, not even
> reservation of absolute discretion can clear the way
> for totally arbitrary and unprincipled exercise of a
> contracting party's power. <u>Here, however, the plaintiff
> has not claimed a breach of the covenant of good faith
> and fair dealing, nor has he brought suit for unfair or
> deceptive trade practices.</u> See, generally, Mass. Gen. Laws
> ch. 93A, §§ 2, 11. (emphasis added) <u>Okmyansky,</u> at 162, fn. 3.

**(c).        The Television Series has not Been Cancelled**

Defendants assert that "It is undisputed that the show titled *Bob Vila's Home Again* is cancelled."  and that Sears is entitled to terminate the Spokesperson Agreement "if the <u>Bob Vila Home Again</u> television show is cancelled for any reason….. effective the 31st day of December following the notice of cancellation." **(Def. Memo.,  p. 30; Dep. Ex. 13, Amend. 9, ¶ 7; Amend. 10, ¶ 4).** The television Series which is the subject of the Syndication Agreement **(Dep. Ex. 4, 21 and 22)** and of the above referenced Amendments to the Spokesperson Agreement is not cancelled. It is currently airing in

syndication nationwide. **(Ex. N [Perin Report, p. 6]).** Since 1990 to the present day, the Series has been continuously airing nationwide in syndication. The Series was unnamed at the execution of the Syndication Agreement **(Dep. Ex. 4; Feiner Dep. p. 379)**. It was then named *Home Again With Bob Vila.* Its title was subsequently changed to *Bob Vila's Home Again.* It was never known as <u>Bob Vila Home Again.</u>**(Def. CM., p.3, ¶ 4; Vila Dep., pp.  49-51, 189; Dep. Ex. 71)**  In August 2005, its title was changed again to *Bob Vila*,  in response to Sears demand that the words "Home Again" be deleted from its title. **(Dep. Ex. 242 and 244).** The purpose of the Amendment to the Spokesperson Agreement regarding "Cancellation of the Television Show" was to give Sears the option of terminating the Spokesperson Agreement (which ran through December 2009)  in the event that the Series could not be sold in syndication. **(Feiner Dep., 193-194;Dep. Ex. 49)** Sears had a contract with a third party syndicator to distribute the Series to television markets across the United States  and to sell advertising on the Series. **(Dep. Ex. 71).** If the syndicator could not sell the Series to a requisite number of television stations across the country, then the syndicator could cancel the show. Sears acknowledges that by March 2005, King World had already sold out the Series. **(Dep Ex. 112; Ex. N [Perin Report, pp. 4-5]).**

Sears own internal email **(Dep. Ex. 49)** demonstrates that  Sears not only knew the true meaning and purpose of the so-called "cancellation clause", but planned to distort that meaning in order to escape its obligations to Mr. Vila under the Spokesperson Agreement.

The Series was never cancelled. Its title was changed three times, the last to appease Sears' baseless demand made three weeks before the Series was to begin airing for the 2005-2006 viewing season. *Bob Vila* is the same show as *Bob Vila's Home Again* which was the same show as *Home Again With Bob Vila.* Under all of the titles, BVTV has produced and continues to produce a home improvement

television Series, starring and hosted by Bob Vila which has been syndicated nationally for sixteen years.

**(d).**       **Vila Was In Compliance with All Material Terms of the Spokesperson Agreement As of July 1, 2005 and Remains in Compliance and Sears is Not Entitled to Terminate the Spokesperson Agreement**

Defendants devote three pages of their Memorandum to the proposition that "Because Mr. Vila was not in compliance with material terms of the Spokesperson Agreement as of July 1, 2005, his claim must fail". **(Def. Memo. pp. 32-35).** As the record already established in this case demonstrates and as cited throughout this Opposition, Mr. Vila was in compliance with all material terms of the Spokesperson Agreement and is entitled to judgment for Sears' material breach of non-payment of the amounts due him thereunder.

As the record set forth herein shows:

A. The words "Home Again" are not a trademark. **(Pl. Opp. ¶ 5);**

B.  Sears is not the owner of all trademarks associated with the Series and has no ownership interest in the words "Home Again". **(Pl. Opp. ¶¶ 4, 5, 6 and 23).**

C. Plaintiffs deleted any reference to the words "Home Again" in connection with the production, promotion and advertising of the 2005-2006 episodes of the Series, as demanded by Sears on August 23, 2005. **(Pl. Opp., ¶ 19).**

D.  Mr. Vila did not violate the "Competitive Protection" provision or the "Morals Clause" of the Spokesperson  Agreement. **(Pl. Opp. ¶¶ 20, 21, 22 and 23).**

Mr. Vila was in compliance with all material terms of the Spokesperson Agreement and he is entitled to judgment against Sears for its material breach thereof.

**2.**       **<u>Repudiation of Contract</u>**

The Spokesperson Agreement provides that

> This agreement shall be construed in accordance with the
> law of the State of Illinois.

**(Dep. Ex. 13, p. 10, ¶ 16)**.

The State of Illinois recognizes the cause of action for anticipatory breach or repudiation of a contract.

> The doctrine of anticipatory repudiation requires a clear
> manifestation of an intent not to perform the contract on
> the date of performance. The failure of the breaching
> party must be a total one which defeats or renders
> unattainable the object of the contract.(citation omitted)
> That intention must be a definite and unequivocal
> manifestation that he will not render the promised
> performance when the time fixed for it in the contract
> arrives.

In re Marriage of Olsen, 124 Ill. 2d, 19, 24, 528 N.E. 2d 684 (1988). See also, Busse v. The Paul

Revere Life Insurance Co., 341 Ill. App. 3d 589, 594, 793 N.E. 2d 779 (2003);

Sears has the obligation under the Spokesperson Agreement to pay Vila as and when provided in that

contract ( **Dep. Ex. 13, p.7 Article VII, paragraph 2.**) By fax letter to Vila dated August 19, 2005,

.(**Dep. Ex. 62**) Defendant Sears definitely and unequivocally renounced its duty – its only obligation

under the Spokesperson Agreement – to make the payments provided as and when they were to come

due**.** As demonstrated in the record of this case cited in detail above, Sears purported justifications for

its refusal to pay Mr. Vila set forth in that letter are groundless and were interposed for the purpose of

defeating Plaintiff's proposed Motion for Partial Summary Judgment of which Defendants were

advised on August 17, 2005. (**First Amend. Comp. ¶ 39; Pl. Opp. ¶¶ 4, 5, 6, 19, 20, 21, 22, 23 and**

**24**).

Even more telling is that, notwithstanding its purported termination of the Spokesperson Agreement,

Sears continued to exploit the benefits to it of the Spokesperson Agreement by utilizing the name and

likenesses of Vila on Sears' Craftsman website from and after August 19, 2005 to on or about March

1, 2006. ( **Tortorice Dep. p. 84; Pl. Motion for Partial Summary Judgment, Vila Aff., Ex. C**).

Vila is entitled to judgment on Count II of the First Amended Complaint, as a matter of law.

### 3.    Breach of the Implied Covenant of Good Faith and Fair Dealing

For months prior to Sears' refusal to pay Vila the sum of $948,750, due by July 1, 2005 under the Spokesperson Agreement, Defendants had been engaged in efforts to have Vila and BVTV renegotiate both the Spokesperson Agreement with Vila and the Syndication Agreement with BVTV. **(First Amend. Comp. ¶¶ 24-27; Pl. Opp. ¶¶ 13 and 16).** Sears had stated in an internal memorandum dated February 7, 2005 that the extension  of the Syndication Agreement with BVTV was "negotiated and ready to sign". **(Pl. Opp. ¶¶ 10 and 16; Dep. Ex. 75)**. In an exchange of emails **(Dep. Ex. 110)**, Defendants stated as follows: On March 30, 2005, the Chairman of SHLD (Eddie Lampert) wrote to the Chief   Financial Officer (William C. Crowley),

> Make sure you look at the proposed <u>renegotiated deal</u> with Bob Vila
> to see if it makes sense (emphasis added).

On April 2, 2005 Mr. Crowley wrote to Mr. Luis Padilla the then President  of   Merchandising, Marketing and Product Development for Sears,

> What is the best way to<u> reduce our exposure to Vila</u>? (emphasis added).

On April 2, 2005, Mr. Padilla replied to Mr. Crowley

> Send him back to Cuba? Kidding, we are <u>in the process of renegotiating</u>
> <u>our commitment to minimize our exposure of fees and length (sic) of time.</u>
> I will review with you Monday (sic). (emphasis added).

In another internal memorandum of April 4, 2005, **(Dep. Ex. 112)**, Sears stated as follows:

> Spokesperson Agreement runs through 2009. Sears wants
> to re-structure to a business arrangement that provides reduced
> expense. Sears wants to exchange ownership in the TV show
>  library [re-runs] for reduction in future obligations.
>
> Timing is urgent. CBS/Kingworld has sold-out 2005-06 season
>  to advertisers and has prepared to clear in syndication for this fall.

On April 6, 2005, Mr. Crowley emailed Mr. Padilla (**Dep. Ex. 32**) and said

> ….what is the greatest reduction that we could get
> on the economics….<u>I would like to understand if we
> could get out of the future payments…</u> (emphasis added)

On April 15, 2005, William Crowley emailed Mark Rode, the Sears Craftsman Brand Manager (**Dep.**

**Ex. 36**) and stated,

> I would like to figure out the cheapest way to get out of this
> agreement.

In still another email, the date of which and the addressee to whom sent were redacted,

(**Dep. Ex. 142**), William Crowley states,

> Can we trade a portion of our ownership of the library to eliminate
> our continuing spokesperson obligation?.....Again, I would like to
> review the contract. Do we have any rights under the contract that
> might help us in this negotiation? We do not appear to have much
> leverage.

On April 18, 2005 (**Dep. Ex. 150**), Mr. Crowley reported to Mr. Lampert, the Chairman of SHLD, that

> I would like to see if we can get good value on the library
> and thereby forego the <u>obligated cash payments.</u> (emphasis added)

On May 5, 2005, Mr. Rode emailed Mr. Crowley (**Dep. Ex. 47**)

> ….Am I pleased how much we are paying him? No,
> but <u>someone negotiated that sucker a while back and
> short of permanently cutting ties, I don't see a way out</u>. (emphasis added)

Mr. Crowley responded, "I want Rob involved". (**Dep. Ex. 47**)

On May 6, 2005, Mr. Rode emailed Mr. Padilla  (**Dep. Ex. 49**) and stated that

> There is a clause in one of the amendments which says if
> the show is "cancelled" we can terminate the spokesperson
> agreement. The clause was written to cover us if Bob was no
> longer marketable and we couldn't sell the show. Since we own
> the name and pay for syndication, <u>Rob</u> Rathke (emphasis added)
> believes that if we "cancel" the show that would allow us to get

> out of the remainder of the spokesperson agreement.
> (quotation marks in original).

Under Illinois law, every contract contains the implied covenant of good faith and fair dealing.

> Illinois courts have recognized that a party who does not properly
> exercise contractual discretion breaches the implied covenant of
> good faith and fair dealing that is in every contract. (citations omitted).
> Where a contract specifically vests one of the parties with broad
> discretion in performing a term of the contract, the covenant of
> good faith and fair dealing requires that the discretion be exercised
> "reasonably and with proper motive, not arbitrarily, capriciously
> or in a manner inconsistent with the reasonable expectations of
> the parties." Resolution Trust Corp. v. Holzman, 248 Ill. App. 3d 105,
> 112, 618 N.E. 2d 418, 424 (1993)

Mid-West Energy Consultants, Inc. v. Covenant House, 352 Ill. App. 3d 160, 165, 815 N.E. 2d 15, 19

(2001). The issue of Sears' contractual discretion is central to its purported termination of the

Spokesperson Agreement. Sears exercise of its discretion is not "absolute", as it claims. **(Def. Memo.**

**p. 26).** While it is clear that courts will not add terms to a contract in order to achieve a result that is

more favorable to a party, courts will look within the terms of the contract to test for good faith and

fair dealing. In Dayan v. McDonald's Corporation, 125 Ill. App. 3d 972, 466 N.E. 2d 958 (1978), in

discussing employment cases where the good faith doctrine had been applied, the court stated

> Where a party acts with improper motive, be it a desire to extricate
> himself from a contractual obligation by refusing to bring about a condition
> precedent or a desire to deprive an employee of reasonably anticipated
> benefits through termination, that party is exercising contractual
> discretion in a manner inconsistent with the reasonable expectations
> of the parties and therefore is acting in bad faith. Dayan, at 991.

In Schwinder v. Austin Bank of Chicago, 348 Ill. App. 3d 461, 809 N.E. 2d 180 (2004), the court

stated

> …contractual language that, on its face, gives one or the other
> of the parties an unbridled right to cancel or terminate the contract
> must, if possible, be construed so as to sustain the validity of the
> contract in question. Schwinder, at 475.

Sears own documents, cited above, make it abundantly clear that Sears was determined to extricate itself from the contractual obligation to pay Mr. Vila the more than $10,000,00 to become due him through 2009. Its discretion to terminate the Spokesperson Agreement is neither absolute nor unfettered. It abused that discretion by (i) concocting  alleged breaches of the Spokesperson Agreement by Mr. Vila, (ii) claiming that, because Mr. Vila properly articulated causes of action for the breach of the implied covenant of good faith and fair dealing and violation of M.G.L. c. 93A, Sears had determined that he had been involved in an act that has harmed or is likely to harm Sears' reputation or products, "in a significant respect" and (iii)  claiming that it could "cancel" the television Series and that, although the Series is still airing, it is "cancelled". Sears has breached the implied covenant of good faith and fair dealing and Mr. Vila is entitled to  judgment on Count III of the First Amended Complaint, as a matter of law.

### 4.      Violation of M.G.L. c. 93A

Defendants assert that (i) the Illinois choice of law provision in the Spokesperson Agreement precludes the application of M. G. L. c. 93A to their conduct, (ii) a mere breach of contract is not enough to sustain a chapter 93A claim and (iii) where all underlying common law claims fail, the chapter 93A claim fails too. **(Def. Memo., p. 37).** Defendants cite to Northeast Data Systems, Inc. v. McDonnell Douglas Computer Sys. Co. 986 F.2d 607 (1st Cir. 1993) in support of their argument that the Illinois choice of law provision precludes the application of Chapter 93A. In Northeast Data, the subject contract contained the following provision:

> This agreement and the rights and obligations of the parties hereto
> shall be governed by and construed in accordance with the laws
> of California. (emphasis added). Northeast Data, at 609.

The magistrate, below, had dismissed plaintiff's Chapter 93A claims concluding that, "…since California has no 93A-type of law, he must dismiss Northeast's 93A claims. <u>Northeast</u>, at 610.

In the instant case, the Spokesperson Agreement's choice of law provision is much narrower:

> <u>This agreement shall be construed</u> in accordance with the law
> of the State of Illinois. (emphasis added). **(Dep. Ex. 13, p.10, ¶ 16).**

Additionally, Illinois does in fact have a "93A-type of law" identified as "Consumer Fraud and Deceptive Business Practices Act" which provides, in part, as follows:

> Unfair methods of competition and unfair or deceptive acts or
> practices, including, but not limited to the use or employment
> of any deception, fraud, false pretense, false promise, misrepresentation
> or the concealment, suppression or omission of any material fact,
> with the intent that others rely upon the concealment, suppression
> or omission of such material fact, or the use or employment of
> any practice described in Section 2 of the "Uniform Deceptive Trade
> Practices Act, approved August 5, 1965, in the conduct of any trade,
> or commerce are hereby declared unlawful whether any person has
> in fact been misled, deceived or damaged thereby. In construing
> this section, consideration shall be given to the interpretations of the
> Federal Trade Commission and the federal courts relating to Section
> 5(a) of the Federal Trade Commission Act. 815 ILCS 505/

In <u>Speakman v. Allamerica Financial Life Ins. & Annuity Co.</u>, Civil Action No. 04-40077-FDS (D. Mass. April 21, 2005), this court stated as follows:

> "[A] simple breach of contract is never enough, by itself,
> to constitute a violation of Chapter 93A. (citations omitted).
> However, courts have held that claims of violation of the
> implied covenant of good faith and fair dealing are not simple
> breach of contract claims for purposes of Chapter 93A. (citations
> omitted). Inherent in such claims is "an element of either bad faith
> and improper motive or a breach of fair dealing…..that clearly
> falls within 'established common law … concept(s) of unfairness' ".
> <u>Speakman</u>, at 28.

See, also, <u>Anthony's Pier Four, Inc. v. HBC Associates</u>, 411 Mass. 451, 476 (1991).

 The conduct of Sears in its dealings with Mr. Vila meets, if not exceeds that level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce.

Levings v. Forbes & Wallace, 8 Mass. App. Ct. 498 , 504 (1979). When their attempted renegotiation of the Spokesperson Agreement did not go to their liking, Defendants, caused Sears not to pay the $948,750 due Vila by July 1, 2005. Sears made no claim that Vila was not entitled to that payment. Rather Sears intended to use the non-payment as a wedge to extort economic concessions from Vila. Pepsi-Cola Metropolitan Bottling Co. v. Checkers, Inc., 754 F.2d 10, 17-19 (1st Cir. 1985). In Anthony's Pier Four, at 476, the court stated

> The judge's extensive findings as to Anthony's violation
> of the covenant of good faith and fair dealing…established
> both as a matter of fact and law that Anthony's actions were
> unfair or deceptive.

This was a knowing use of a pretext to coerce Vila to accept less than the Spokesperson Agreement required.

That Sears continued to exploit the name and likenesses of Vila on its Craftsman website, without paying compensation to Vila  is undisputed. **(Tortorice Dep., p. 84).** Plaintiffs first became aware of this exploitation on February 8, 2006 and it was admitted by Sears at Ms. Tortorice's deposition on July 5, 2006. This exploitation is the subject of Plaintiff's Motion for Partial Summary Judgment. It is also the subject of Plaintiffs' Motion to Further Amend Complaint, pending before this court. Even should Plaintiff Vila's breach of contract claim fail in its entirety, Sears is  still liable to Mr. Vila for their exploitation of his trade marks, service marks, tradename, name, image and likeness after August 19, 2005 to on or about March 1, 2006. Such claim would sound in tort and Chapter 93A would be applicable thereto, notwithstanding the Illinois choice of law provision.

Further, Plaintiffs have asserted claims against Defendants SHLD and Kmart for tortious interference with both the Spokesperson Agreement and the Syndication  Agreement. As to those claims, Chapter 93A is clearly applicable.

**5.**                                    **Equitable Estoppel**

Paragraph 7 of Amendment IX to the Spokesperson Agreement provides

> If the Bob Vila Home Again television show is canceled for any reason,
> Sears has the right to terminate this Agreement effective the 31st day of
> December following the notice of cancellation.

Sears argues that Mr. Vila is not entitled to introduce parol evidence in support of claim of equitable estoppel, claiming that the language of the so-called "Cancellation Clause" is unambiguous. **(Def. Memo., p. 39).** In Air Safety, Inc. v. Teachers Realty Corporation, 185 Ill. 2d 457, 706 N.E. 2d 882 (1999), cited by Sears the court stated

> If, however, the trial court finds that the language of
> the contract is susceptible to more than one meaning,
> then an ambiguity is present. (citation omitted) Air Safety, at, 463.

As federal jurisdiction is premised on diversity jurisdiction, the court applies the substantive law of the forum state. Davis v. G.N. Mortg. Corp., 396 F.3d 869, 876 (7th Cir. 2005). Under Massachusetts law, "The meaning of a contract cannot be understood merely by 'isolating words and interpreting them as though they stood alone'.(citations omitted). Contracts must, in other words be read as a whole." McAdams v. Massachusetts Mutual Life Ins. Co., 391 F. 3d 287, 298-299 (1st Cir. 2001).

> Contract interpretation under Massachusetts law
> depends heavily on context and recognizes that
> words can have different meanings in different
> contexts. (citations omitted). Thus, agreements
> should be construed 'with reference to the situation
> of the parties when they made it and to the objects
> sought to be accomplished'. McAdams, at 299.

In the negotiation of Amendment IX to the Spokesperson Agreement, Sears represented to Mr. Feiner that paragraph 7 of the proposed Amendment IX was there in the event that the television Series was canceled by the syndicator of the television Series [King World], an independent third party. **(First Amend. Comp., Count IV, ¶ 55).** Mr. Feiner testified  that:

> Andy Ginger said to me "We have a concern that if the ratings
> fall out (sic) of 'Bob Vila's Home Again' or for some reason the
> public turns against him and the syndicator cancels the syndication
> agreement that they have with Sears, that Sears would have a right
> at the end of that year to terminate the spokesperson agreement….
> The syndicator is the only one who can cancel it because he can't
> sell it. **Feiner Dep. pp. 193-194)**

> I never heard of a sponsor being able to cancel the show. If
> a sponsor doesn't want to sponsor the show, the show gets another
> sponsor. The show isn't canceled. The sponsor has an option to
> support the show or not support the show, not to cancel it or not cancel it.
> (**Feiner Dep., p 206).**

Mr. Feiner's testimony about the so-called "Cancellation Clause" is confirmed by Sears' own

internal email of May 6, 2005 from Mr. Rode to Mr. Padilla (**Dep. Ex. 49)** which states

> There is a clause in one of the amendments which says if
> the show is "cancelled" we can terminate the spokesperson
> agreement. <u>The clause was written to cover us if Bob was no
> longer marketable and we couldn't sell the show.</u> Since we own
> the name and pay for syndication, <u>Rob</u> Rathke believes that
> if we "cancel" the show that would allow us to get out of the
> remainder of the spokesperson agreement. (emphasis added)
> (quotation marks in original).
> I believe Bob has value, but I doubt I can carry the day with
> blood in the water.

The exclusive right to distribute and market the Series belongs not to Sears, but to the independent

third party, King World, pursuant to the contract between Sears and King World. (**Dep. Ex. 71).** Sears

knew that the show was marketable and, in fact, had been sold out by King World since at least March

2005. (**Dep. Ex. 112).**

Mr. Feiner's testimony and Sears' own knowledge of the purpose of the so-called "Cancellation

Clause" is further confirmed by the Report of Richard Perin. (**Ex. N, pp. 2-6).** Sears' argument,

concocted by Kmart's in house counsel, Mr. Rathke, (**Dep. Ex. 49),** that Sears, itself, can "cancel" the

Series and thus "get out of" its obligations under the Spokesperson Agreement is commercially and

logically absurd. Amendment X to the Spokesperson Agreement provides, at paragraph 3,

> Paragraph 7 of Amendment IX [the so-called Cancellation Clause]
> shall remain in effect <u>during the current term and any extension
> of that certain Bob Vila Syndicated</u> Television Agreement dated
> September 29, 1989, as amended.......(emphasis added).

As Sears would have it, Sears did not enter into the January 18, 2005 Amendment 11 to the

Syndication Agreement. Following that claim to its logical conclusion, there was no extension of

the Syndication Agreement in effect when Sears purported to "cancel" the Series on August 19,

2005. This is so because Sears also claims that, prior to August 19, 2005, it had made all

payments, including incentive bonuses due BVTV, pursuant to Amendment 10 to the Syndication

Agreement. It is undisputed that BVTV had fully performed its obligations, pursuant to the same

Amendment X, because, by August 19, 2005, all 26 episodes had not only been produced by BVTV,

but they were in their second airing for the 2004-2005 viewing season, with only four more episodes

to be re-run. The airing of the Series was not a term of the Syndication Agreement between Sears and

BVTV, but was the subject of the distribution agreement between Sears and King World. According to

Sears claims and arguments, Amendment X was fully performed prior to August 19, 2005 and Sears

had not entered into Amendment XI. Thus, on August 19, 2005, when Sears purported to "cancel" the

Series, there was no extension of the Syndication Agreement then in effect.

The language of the so-called "Cancellation Clause" does not say <u>by whom</u> the Series may be

cancelled. Indeed, the word "cancelled" implicitly contemplates cancellation by a third party. The

Syndication Agreement and the amendments thereto never mention the words "cancel" or

"cancellation" or "cancelled", much less give Sears a right "to cancel" the Series. The only language

used is "renewal". **Dep. Ex. 4, Amend. 1, ¶ 3; Amend. 4, ¶ 4; Amend. 8, ¶ 5; Amend. 9, ¶ 5).** A

review of the context of the Syndication Agreement demonstrates that the plain meaning of "renewal"

is renewal of Sears' sponsorship of the Series. Further, the Series is owned jointly by Sears and BVTV. **(Dep. Ex. 4, Amendment X, ¶4)**. Sears could not have a right to "cancel" the Series. Finally, the Series has not been cancelled. It is currently broadcast nation wide in syndication. **(Ex. N, p. 6)**. Sears should be equitably estopped from claiming that Sears 'cancelled" the Series.

### 6.  Tortious Interference

Plaintiffs have alleged that Sears breached the Spokesperson Agreement **(First Amend. Comp., Counts  I and II)** and the Syndication Agreement **(First Amend. Comp., Counts VII and VIII)** and that  Defendants SHLD and Kmart tortiously interfered with both contracts **(First Amend. Comp., Counts V and X).**   Defendants argue that Mr. Vila's claim for tortious  interference with the Spokesperson Agreement by SHLD and Kmart "fails because (1) there was no breach and (2) SHC [SHLD] cannot as a matter of law interfere with the Spokesperson Agreement." **(Def. Memo., p.42).**

As to the first point, Plaintiffs have demonstrated in great detail above that Defendant Sears breached the Spokesperson Agreement in material respects by refusing to pay Mr. Vila the sum of $948,750 on July 1, 2005, by repudiating Sears future obligations to Mr. Vila under the Spokesperson Agreement **(Dep. Ex. 62)** and by continuing to exploit Mr. Vila's name, likeness and image on Sears' Craftsman website from August 19, 2005, the date of the unlawful termination of the Spokesperson Agreement to on or about March 1, 2006. **(Plaintiff's Motion for Partial Summary Judgment, Vila Aff., Ex. C; Dep. Ex. 154).** Sears breached the Syndication Agreement with BVTV **(Dep. Ex. 4; Dep. Ex. 21 and Dep. Ex. 22),** by its refusal to make payments due thereunder. **(First Amend. Comp.,Counts VII and VIII; Dep. Ex. 10, 58, 180).**

SHLD did not become the parent company of Sears until March 24, 2004. **(Def. Opp., ¶ 2).** The tortious interference with the Syndication Agreement by SHLD and Kmart occurred prior to that date. Likewise their tortious  interference with the Spokesperson Agreement was put into action well before

the consummation of the merger. Clearly Kmart and SHLD had no privilege to interfere with Sears' contracts with BVTV and Mr. Vila prior to March 24, 2005, but interfere they did in the person of Mr. Crowley, Kmart's Senior Vice President for Finance and SHLD's Executive Vice President and Chief Financial Officer. **(See ¶¶ 14, 15 and 16, above; Dep. Ex. 75).**    Even after the merger was consummated, SHLD and Kmart were not privileged to interfere with the Syndication Agreement and the Spokesperson Agreement. Courts "recognize a privilege in intentional interference with contract cases where the defendant was acting to protect an interest which the law deems to be of equal or greater value than the plaintiff's contractual rights." HPI Healthcare Servs., Inc. v. Mt. Vernon Hosp., Inc., 131 Ill. 2d 145, 156, 545 N.E. 2d 672, 677 (1989). The burden of proof is upon Defendants Kmart and SHLD to establish the existence of the claimed privilege. Williams v. B&K Medical Systems, Inc., 49 Mass. App. Ct. 563, 573, 732 N.E. 2d 300 (2000), citing to Owen v. Williams, 322 Mass. 356, 360 (1948). Defendants assert that because of SHLD's status as the "corporate parent and holding company of Sears" (which did not occur until March 24, 2005), "it had a privilege to participate in the [re]negotiation of the Spokesperson Agreement". **(Def. Memo. p. 42).** Defendants further assert that SHLD "clearly has a financial interest and a legitimate business purpose in the affairs of Sears." **(Def. Memo., p. 43).** Whether SHLD's interest in the Syndication Agreement and the Spokesperson Agreement is sufficient  to support Defendants' claim of privilege is to be determined on the evidence presented. Williams, at 575. There already exists ample evidence in the record of this case from which a trier of fact can draw proper inferences and conclude that Kmart and SHLD's interference with the Spokesperson Agreement and the Syndication Agreement was both intentional and without justification. Williams, at 577. **(See ¶¶ 13, 14, 15 and 16, above: Dep. Ex. 49, 75).**

### 7.        Breach of the Syndication Agreement

Defendants assert that there was no contract formed as to Amendment 11 to the Syndication Agreement **(Dep. Ex. 4; Dep. Ex. 21 and Dep. Ex. 22)** as there was no mutual assent. **(Def. Memo., p. 43).** The record thus far demonstrates that there was, indeed, mutual assent to all terms and conditions of Amendment 11 to the Syndication Agreement. The negotiation of Amendment 11 took place intermittently for almost a year with most of the communications conducted by email. The negotiations culminated in the January 14, 2005 email transmission by Mark Rode, the Sears Craftsman Brand Manager, to Mr. Feiner, BVTV's business advisor and counsel, of "the contract with the revisions you requested (I hope)." **(Dep. Ex. 21).** The contract attached to the email was the product of the almost year long intermittent negotiations and discussions among Mr. Rode, his superior, Mr. Ginger, and Sears' Senior Counsel, Drew Farkas, Esq. regarding the terms and conditions of the contract and Mr. Feiner's comments thereto. **(Rode Dep., p. 77).** Mr. Ginger's superior, Ms. Bousquette, had already approved a two year extension of the Syndication Agreement. **(Ginger Dep., p. 136; Dep. Ex. 75).** On January 18, 2005, Mr. Feiner, on behalf of BVTV, accepted the offer set forth in Deposition Exhibit 21, by email addressed to Mr. Rode dated January 18, 2005, stating, "The new Vila Syndication Agreement is fine. Can you have Drew [Farkas] arrange for execution copies…" **(Dep. Ex. 22).** Mr. Rode testified that he never objected to the contents of Mr. Feiner's January 18, 2005 email.**(Rode Dep., p.78).** This is a classic case of "offer **(Dep. Ex. 21)** and acceptance **(Dep. Ex. 22)".** That there was, in fact, a full meeting of the minds as to Amendment 11 to the Syndication Agreement is further confirmed by Sears' own internal communications, subsequent to January 18, 2005, which repeatedly echo that the "contract is fully negotiated and ready to sign". **(Dep. Ex. 75, ¶1; Dep. Ex. 78; Ginger Dep. pp. 137, 172, 174-176, 377-378; Crowley Dep. pp. 55-56, 75-76).** Communications between BVTV and Sears subsequent to January 18, 2005 and prior to

March 23, 2005 never addressed a single business or legal issue with regard to the Syndication Agreement. Neither was there any suggestion that Amendment 11 would not be signed. Rather, the issue was who would sign it. **(Dep. Ex. 23; Feiner Dep. pp. 61, 62, 76, 80, 86-87, 93, 300, 323, 383).** On March 23, 2005, Mr. Feiner was told that Sears was now making it a condition of signing the Syndication Agreement that the Spokesperson Agreement be renegotiated. **(Feiner Dep. p. 125).** Amendment 11 to the Syndication Agreement was fully negotiated; the January 14, 2005 offer of Sears **(Dep. Ex. 21)** was timely accepted by BVTV **(Dep. Ex. 22)** and on that day a binding contract was formed.

### 8. <u>Statute of Frauds</u>

Defendants assert that the January 18, 2005 Amendment 11 to the Syndication Agreement is unenforceable because it fails to satisfy the New York statute of frauds. Defendants argue that Amendment 11 requires two full years for its terms to be met and has not been signed and that Defendants are entitled to summary judgment thereon. **(Def. Memo. pp. 48-49).**

The January 18, 2005 Amendment to the Syndication Agreement consisting of Sears email transmittal of January 14, 2005 **(Dep. Ex. 21)** and BVTV's January 18, 2005 email acceptance **(Dep. Ex. 22)** satisfy the "writing" requirement of the New York statute of frauds.

New York's General Obligations Law § 5-701(b)(4) provides, in relevant part as follows:

> [t]he tangible written text produced by telex, telefacsimile, computer retrieval or other process by which electronic signals are transmitted by telephone or otherwise shall constitute a writing and any symbol executed or adopted by a party with the present intention to authenticate a writing shall constitute a signing.

Also see, <u>Rosenfeld v. Zerneck</u>, 776 N.Y.S. 2d 458 (2004) and <u>Bazak International Corp. v. Tarrant Apparel Group,</u> 378 F. Supp. 2d 377 (S.D.N.Y. 2005). Federal law is in accord.

> Notwithstanding any statute, regulation, or other rule of law
> (other than this subchapter and subchapter II of this chapter),
> with respect to any transaction in or affecting interstate or
> foreign commerce –
>
> (1) a signature, contract, or other record relating to such
> transaction may not be denied legal effect, validity, or enforceability
> solely because it is in electronic form; and
>
> (2) a contract relating to such transaction may not be denied legal
> effect, validity, or enforceability because an electronic signature or
> electronic record was used in its formation. 15 U.S.C. §§ 7001 (a) (1) and (2)

As described above, the email transmittal by Mark Rode, Sears Craftsman Brand Manager, bore the typewritten signature of " Mark P. Rode, Craftsman Brand Manager". **(Dep. Ex. 21).** Mr. Rode testified that he had discussed the content of the contract enclosed with his email with his superior, Mr. Ginger, and Sears' Senior Counsel, Drew Farkas, Esq. before transmitting it to Mr. Feiner. **(Rode Dep., p.77).** In fact, the contract was prepared by Mr. Farkas after communicating with his client. **(Farkas Dep. pp. 55-56).**

In addition, to the foregoing, Amendment 11 to the Syndication Agreement satisfies the requirement of New York's Uniform Commercial Code in two respects. First, it is a "writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker." N.Y.U.C.C. Law, § 2-201 (1). The U.C.C. Law of New York provides that " 'written' or 'writing' includes printing, typewriting or any other intentional reduction to tangible form.  N.Y.U.C.C. Law § 1-201 (46)" <u>Bazak,</u> at 11. Whether viewed as a contract for the sale of goods or intangibles, Amendment 11 to the Syndication Agreement clearly satisfies the "writing" requirement of the New York statute of frauds and Federal law.

Further, Amendment 11 falls within the so-called "merchant's exception to the New York U.C.C. Law § 2-201(2) which provides that

> Between merchants if within a reasonable time a writing in confirmation

> of the contract and sufficient against the sender is received and the party
> receiving it has reason to know its contents, it satisfies the requirements
> of subsection (1) against such party unless written notice of objection to
> its contents is given within ten days after it is received.

Sears and BVTV had been operating under the Syndication Agreement for fifteen years prior to Amendment 11. Under the Syndication Agreement and its Amendments, BVTV produced and delivered to Sears 26 episodes per viewing season of the home improvement television program hosted by Mr. Vila. Mr. Rode's email of January 14, 2005 states, in the "re:" line "Revision to product agreement". Mr. Rode testified that he received Mr. Feiner's email of January 18, 2005 **(Dep. Ex. 22)** and, after receiving it did not send Mr. Feiner any letter objecting to the contents of Mr. Feiner's email. **(Dep. Ex. 22; Rode Dep. p. 78).** It was not until June 15, 2005 that such a written objection was articulated by Sears. **(Dep. Ex. 180).** Under any analysis of governing New York law and the undisputed facts set forth above, a binding contract for Amendment 11 to the Syndication Agreement was formed on January 18, 2005 and in form and substance satisfying the New York statute of frauds.

### 9.    Repudiation of the Syndication Agreement

Defendants argue that they "were not capable of repudiating the purported amendment

[Amendment 11] because Sears never agreed to Amendment 11 to the Syndication Agreement.

As demonstrated above, Sears did agree to Amendment 11. By letter dated June 15, 2005, Sears repudiated its obligations under Amendment 11 **(Dep. Ex. 180),** stating "..Sears has no obligation to make any payments….".

### 10.    Implied Covenant of Good Faith and Fair Dealing

Defendants again argue that there was no contract [Amendment 11 to the Syndication Agreement] so there could be no breach of the implied covenant of good faith and fair dealing. **(Def. Memo., p. 50).**

As demonstrated above, Sears did agree to Amendment XI to the Syndication Agreement. The implied covenant of good faith and fair dealing has long been recognized under New York law.

> Under New York law, a covenant of good faith and fair
> dealing is implied in all contracts. (citations omitted).
> This covenant embraces a pledge that neither party shall
> do anything which will have the effect of destroying or injuring
> the rights of the other party to receive the fruits of the contract.

State St. Bank v. Inversiones Errazuriz, 374 F.3d 158, 179 (2d Cir. 2004).

Although Sears denies that it agreed to Amendment 11 of the Syndication Agreement, it was, nonetheless, bound by the Syndication Agreement as amended through Amendment 10. Amendments 7, 8, and 9 to the Syndication Agreement provided that the parties would meet by October 15 of the year prior to the expiration of the respective extensions to discuss any changes to the financial terms for the extensions for the upcoming viewing seasons. The established practice of the parties over the fiteen years of their relationship was to meet well in advance of the October 15 date. Customarily, the agreed upon amendments were executed on or about January 1 of each contract year. Negotiations of Amendment 11 for the 2005-2006 and 2006-2007 viewing seasons began in early 2004. **(Feiner Dep. p. 233; Ginger Dep., pp. 64-67; Dep. Ex. 69).** By the summer of 2004, it was understood among BVTV, Sears and King World, the distributor of the Series, that the Series would be extended for two years. **(Feiner Dep. pp. 241-242; Dep. Ex. 69).** Negotiations of the details extended throughout 2004. Full agreement on all terms was reached and the contract for Amendment XI was formed by January 18, 2005. Notwithstanding that, Sears held off holographically signing it in order to attempt to compel Mr. Vila to renegotiate the terms of the Spokesperson Agreement. Sears had stated in an internal memorandum dated February 7, 2005 that the extension  of the Syndication Agreement with BVTV was "negotiated and ready to sign". **(Dep. Ex. 75).** This mantra was repeated continually after January 18, 2005. **(Pl. Opp. ¶¶ 10 and 16;** Nonetheless, Sears wanted to try to restructure the relationship with

Bob [Vila] beyond the scope of the syndication agreement and to also try to restructure the spokesperson agreement and the overall relationship with Bob [Vila] **(Ginger Dep. p. 195; Padilla Dep. pp. 30-31).** Mr. Feiner was told that Sears was making it a condition of signing the syndication extension (with BVTV) that Mr. Vila renegotiate his spokesperson deal. **(Feiner Dep., p. 125)**. There is ample evidence in the record for the trier of fact to conclude that Sears breached the implied covenant of good faith and fair dealing in the Spokesperson Agreement

### 11.    Tortious Interference With the Syndication Agreement

Defendants claim that there was no contract for Kmart and/or SHLD to interfere with. **(Def. Memo. p. 50).** The record is replete with evidence of the tortious interference by Kmart and SHLD with the Syndication Agreement which was fully negotiated and ready to sign. It was not signed because Mr. Crowley of Kmart interfered with the process**.** Prior to the merger, "all contracts had to be cleared by Mr. Crowley, an officer of Kmart. **(Padilla Dep., pp. 40-42, 49**). Mr. Crowley testified that "I don't recall if they asked for my approval" and "I didn't sign the agreement…I wasn't an officer of Sears, Roebuck." **(Crowley Dep. pp. 75-76).** Mr. Crowley testified that, prior to the consummation of the merger, he "did discuss with them [Sears' personnel] my views on, you know, work they had done [regarding Vila], analysis, shared my thoughts." **(Crowley Dep. pp., 63-64).** He further testified "I can't recall specifically advice that I gave or insights….I believe I gave some. **(Crowley Dep. p. 65).** He also admitted that he participated in constructing a proposed renegotiated deal with Bob Vila. **(Crowley Dep. pp. 69-70).**

SHLD did not become the parent company of Sears until March 24, 2004. **(Def. Opp., ¶ 2).** The tortious interference with the Syndication Agreement by SHLD and Kmart had already occurred prior to that date.

### 12.                    M.G.L. c. 93A

Defendants argue that the application of M.G.L. c. 93A to their conduct with regard to Amendment XI to the Syndication is precluded by the choice of law provision in the Syndication Agreement. **(Def. Memo., pp. 51-53).** The choice of law provision **(Dep. Ex. 4, ¶ 22)** provides as follows:

> This agreement shall be governed by and construed under the laws
> of the State of New York.

This choice of law provision is much narrower than that in <u>Northeast Data,</u> which stated as follows

> This agreement <u>and the rights and obligations of the parties hereto</u>
> <u>shall be governed by</u> and construed in accordance with the laws
> of California. (emphasis added). <u>Northeast Data,</u> at 609.

The Spokesperson Agreement' choice of law provision does not preclude the application of M.G.L. c. 93A in connection with acts and omissions of Sears in holding hostage its performance of its obligations under the Syndication Agreement in order to coerce Mr. Vila into making substantial concessions under the Spokesperson Agreement. Further, the tortious interference by Kmart and SHLD was with respect to both the Syndication Agreement and the Spokesperson Agreement. Defendants are not entitled to summary judgment as a matter of law.

### CONCLUSION

Plaintiffs Robert J. Vila and B.V.T.V., Inc. respectfully requests that this Court deny Defendants' Cross-Motion for Summary Judgment and, rather, on the truly undisputed facts set forth herein, enter Summary Judgment for Plaintiffs on Plaintiff's Motion for Partial Summary Judgment and on such other Counts of Plaintiffs' First Amended Complaint as this Court deems appropriate.

ROBERT J. VILA  and B.V.T.V., INC.
 By their attorney,

/s/ James F. O'Brien_____
James F. O'Brien (BBO # 375765)
410 Park Avenue, Suite 1530
New York, New York 10022
212 813 9300
Dated: July 21, 2006               jfob1@aol.com

## CERTIFICATE OF SERVICE

I, James F. O'Brien, counsel for plaintiffs,  hereby certify that on July 21, 2006 I served a true copy of the foregoing Opposition upon Anna Sankaran, Esq., Greenberg, Traurig LLP, One International Place, Boston, MA 02110 counsel for defendants by overnight mail, postage prepaid and electronically.

/s/ James F. O'Brien
James F. O'Brien