UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.
05-11717-WGY

_____

ROBERT J. VILA and B.V.T.V., INC.    )
                                     )
            Plaintiffs,              )
                                     )
                                     )
v.                                   )
                                     )
                                     )
SEARS, ROEBUCK AND CO.,              )
SEARS HOLDINGS CORPORATION           )
 and KMART HOLDING COPORATION        )
            Defendants.              )
_____)


## DECLARATION OF JAMES F. O'BRIEN


James F. O'Brien, declares and says as follows:

1.  I am an attorney and a member of the bar of the Supreme Judicial Court of the Commonwealth of Massachusetts, the bar of the State of New York, the United States District Court  for the District of Massachusetts and the United States District Court for the Southern District of New York.

2.  I am counsel for the Plaintiffs Robert J. Vila and B.V.T.V., Inc. in this action.

3.  Attached hereto as **Exhibit A** are true and accurate excerpts from the deposition of Robert J. Vila.

 4.  Attached hereto as **Exhibit B** are true and accurate excerpts from the deposition of Andy Ginger.

5. Attached hereto as **Exhibit C** are true and accurate excerpts from the deposition of Mark P. Rode.

6. Attached hereto as **Exhibit D** are true and accurate excerpts from the deposition of William C. Crowley.

7. Attached hereto as **Exhibit E** are true and accurate excerpts from the deposition of Ronald E. Feiner.

8. Attached hereto as **Exhibit F** are true and accurate excerpts from the deposition of Luis Padilla.

9. Attached hereto as **Exhibit G** are true and accurate excerpts from the deposition of Drew Farkas.

10. Attached hereto as **Exhibit H** are true and accurate excerpts from the deposition of Mary Tortorice.

11. Attached hereto as **Exhibit I** are true and accurate excerpts from the deposition of Melissa W. Marchand.

12. Attached hereto as **Exhibit J** are true and accurate excerpts from the deposition of Sarah Beasley Monzon.

13. Attached hereto as **Exhibit K** are true and accurate excerpts from the Trademark Electronic Search System reflecting the registrations of trademarks and service marks for BOB VILA and BOB VILA'S.

14. Attached hereto as **Exhibit L** are true and accurate excerpts from Sissors and Baron, Advertising Media Planning, Sixth Edition.

15. Attached hereto as **Exhibit M** are true and accurate excerpts from Blumenthal and Goodenough, This Business of Television.

16. Attached hereto as **Exhibit N** is a true and accurate copy of Report of Plaintiffs' Expert Witness Richard Perin.

17. Attached hereto as **Exhibit O** are true and accurate excerpts from 2 J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition.</u>, Fourth Edition.

18. Attached hereto as **Exhibit P** is a true and accurate copy of  815 ILCS 505/1, /2, /2z and /10a  excerpted from the Illinois Consumer Fraud and Deceptive Business Practices Act.

19. Attached hereto as **Exhibit Q** is a true and accurate copy of 47 C.F.R. § 73.1212.

20. Attached hereto as **Exhibit R** are true and accurate copies of N.Y.U.C.C. §§ 1-201, 1-206 and 2-201 and N.Y. Gen. Oblig. Law § 5-701.

21. Attached hereto as **Exhibit S** is a true and accurate copy of Plaintiff Robert J. Vila's Response to the First Request for Admissions of Defendants.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 21ST DAY OF JULY 2006


<u>/s/ James F. O'Brien</u>
James F. O'Brien


CERTIFICATE OF SERVICE

I, James F. O'Brien, counsel for plaintiffs,  hereby certify that on July 21, 2006 I served a true copy of the foregoing Declaratio upon Anna Sankaran, Esq., Greenberg, Traurig LLP, One International Place, Boston, MA 02110 counsel for defendants by overnight mail, postage prepaid and electronically.


<u>/s/ James F. O'Brien</u>
James F. O'Brien

**EXHIBIT A (1)**

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

------------------------------x

ROBERT J. VILA and B.V.T.V.,

INC.,

                    Plaintiffs,

            vs.                    No. 05-11717-REK

SEARS, ROEBUCK AND CO., SEARS

HOLDINGS CORPORATION and

KMART HOLDINGS CORPORATION,

                    Defendants.

------------------------------x


DEPOSITION OF ROBERT J. VILA

New York, New York

Wednesday, March 15, 2006


Reported by:

Yaffa Kaplan

JOB NO. 182381

Page 2

1

2

3                              March 15, 2006

4                              9:36 a.m.

5

6           Deposition of ROBERT J. VILA, held at

7      the offices of Greenberg Traurig LLP, 200 Park

8      Avenue, New York, New York, pursuant to

9      Notice, before Yaffa Kaplan, a Notary Public

10     of the State of New York.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1

2    A P P E A R A N C E S:

3

4        JAMES F. O'BRIEN, ESQ.

5        Attorneys for Plaintiffs

6            410 Park Avenue - Suite 1530

7            New York, NY 10022

8

9        GREENBERG TRAURIG LLP

10       Attorneys for Defendants

11           One International Place

12           Boston, MA 02110

13   BY:    GARY R. GREENBERG, ESQ.

14          ANNAPOURNI R. SANKARAN, ESQ.

15          WENDY C. CHAMPAGNE, ESQ.

16                  -and-

17          SEBASTIAN R. COLLEY, ESQ.

18

19

20

21

22

23

24

25

Page 30

```
1                          Vila

2   Precise Forms Inc., Endless Pools, Bellawood, Crown

3   Point?

4              MR. O'BRIEN:  You mean him personally?

5              MR. GREENBERG:  Yes, him personally.

6        A.   Me personally, of course not.

7        Q.   Did you ever seek Sears's consent to

8   list any company on your website?

9              MR. O'BRIEN:  Again, him personally?

10       A.   I don't know.

11       Q.   You personally?

12       A.   No.

13       Q.   To your knowledge, has anyone on your

14  behalf or on behalf of any of your companies ever

15  sought Sears's consent to list a company on your

16  website?

17             MR. O'BRIEN:  Objection to the form.

18             You may answer.

19       A.   I assume so.

20       Q.   And why do you assume so?

21       A.   I have a relationship with Sears that

22  goes back to 1989 and we have always been very

23  careful with this separate business, not to promote

24  any products or services that would compete with

25  this.  I am the spokesman for this brand,
```

1                          Vila

2    Craftsman.

3         Q.    I just want to be sure that I understand

4    correctly.  It was your understanding that you

5    would not, without Sears's permission, advertise on

6    your website products that were competitive with

7    products sold by Sears?

8                    MR. O'BRIEN:  Objection to the form.

9                    You may answer.

10        A.    On the website, not -- you are asking

11   about the website, not the television shows?

12        Q.    My question had to do with the website.

13        A.    Repeat the question.

14        Q.    Is it -- was it your understanding, sir,

15   that you would not advertise on your website

16   products that were competitive with products sold

17   by Sears unless you had obtained Sears's consent in

18   advance?

19        A.    I don't believe so.

20        Q.    You don't believe that that was --

21        A.    The answer is no.

22        Q.    You don't have any obligation to do

23   that?

24                    MR. O'BRIEN:  Objection to the form.

25                    You can answer.

Page 38

1                              **Vila**

2        Q.      Did they pay money?

3        **A.      They pay money.**

4        Q.      And you said that the appliances that

5    Whirlpool sells, do those appliances appear on your

6    show?

7        **A.      Sometimes.**

8        Q.      What appliances that Whirlpool sells do

9    you recall appearing on your show?

10       **A.      Kitchen appliances.**

11       Q.      When you say kitchen appliances --

12       **A.      Dishwasher, refrigerator, maybe a stove,**

13   **I don't recall.**

14       Q.      Are those products, dishwasher, stove,

15   refrigerator, are those products that one can buy

16   in a Sears store?

17       **A.      Yes, in Brand Central.**

18       Q.      I'm sorry?

19       **A.      It used to be Brand Central, when Sears**

20   **stopped being an exclusive Kenmore dealer and**

21   **started carrying all sorts of other brands, maybe a**

22   **decade ago, but I don't represent Kenmore or Brand**

23   **Central.   I only represent Craftsman Tools.**

24       Q.      Pella Windows, what is Pella Windows --

25   do they pay to be a sponsor on the "Bob Vila" show?

Page 42

1                              Vila

2          a legal conclusion.

3                    You can answer.

4          **A.      I don't know.**

5          Q.      The contract with Whirlpool, is it

6    correct that Whirlpool agreed to buy advertising on

7    the "Bob Vila" show in the spring of 2005?

8          **A.      I don't know.**

9          Q.      Now, is there a difference in your mind

10   with the company being a sponsor versus being a

11   purchaser of advertising for you at the "Bob Vila"

12   show?

13         **A.      Sure.**

14         Q.      And what is the distinction?

15         **A.      In years past, a sponsor such as Sears**

16   **would present the show.  Therefore, when you turned**

17   **on the telly and it was the right time it says**

18   **"Sears Presents Bob Vila" blah-blah-blah, and**

19   **that's a sponsorship, as opposed to anybody else**

20   **buying advertising time for 15 seconds, 30 seconds,**

21   **60 seconds.  They are adjacent to the show, but**

22   **they are not the sponsors.  Do you understand?**

23         Q.      And --

24                  MR. O'BRIEN:  He asks the question.

25         Q.      -- does the "Bob Vila" show have any

Page 49

1                           Vila

2        A.    No, I personally did not.  My attorney

3   does that.

4        Q.    Let's just break this down just so the

5   record is clear for the various proceedings in this

6   case.

7              Prior to entering into the spokesperson

8   agreement with Bellawood Flooring, you never sought

9   Sears's permission to enter into such an agreement,

10  you personally; is that right?

11       A.    That's not true.

12       Q.    Okay.  Did you personally seek Sears's

13  permission before you entered into a spokesperson

14  agreement with Bellawood Flooring?

15       A.    Yes.

16       Q.    Did you send Sears something in writing?

17       A.    I personally did not send Sears anything

18  in writing.

19       Q.    Did you pick up the phone and call?

20       A.    I typically would just talk with Andy

21  Ginger.

22       Q.    Do you have a recollection of talking to

23  Mr. Ginger on this subject?

24       A.    On Bellawood Flooring?

25       Q.    Yes.

Page 50

1                          Vila

2       **A.    No.**

3       Q.    Do you have a recollection of talking to

4    anyone at Sears on the subject of their consenting

5    to your entering into a spokesperson agreement with

6    Bellawood Flooring?

7       **A.    No.  That's something that Ron Feiner**

8    **would deal with.**

9       Q.    To your knowledge, did Mr. Feiner seek

10   Sears's consent prior to you entering into an

11   agreement with Bellawood Flooring?

12      **A.    Sure.**

13      Q.    Who did he speak with?

14      **A.    I assume he spoke with Andy Ginger.**

15      Q.    What did Mr. Feiner tell you on the

16   subject of his seeking approval from Sears for the

17   Bellawood Flooring spokesman agreement?

18               MR. O'BRIEN:  Before you answer the

19         question, I want to interject that Mr. Feiner

20         is an attorney and in terms of the response of

21         the witness, you are not to disclose

22         conversations with Mr. Feiner, in connection

23         with the question that's asked, that relate to

24         legal advice or opinions he gave you or legal

25         questions you asked.

Page 51

1                          Vila

2              But in terms of the facts reported to

3       you, you may answer the question.

4       A.     I don't remember three years ago.

5       Q.     What, if anything, do you recall

6  Mr. Feiner telling you on the subject of his

7  seeking Sears's consent before you signed a

8  spokesperson agreement with Bellawood Flooring?

9       A.     That it was approved.

10      Q.     He told you that?

11      A.     I recollect because we wouldn't have

12  entered into a relationship of any endorsement

13  without Sears's approval.

14      Q.     Why is that?

15      A.     Because we had an understanding.

16      Q.     What was the understanding that Sears

17  had?

18      A.     Aside from the exclusivity?

19      Q.     What do you mean by the "exclusivity"?

20      A.     I was the exclusive spokesman for

21  Craftsman Tools, so, therefore, I didn't go out and

22  do any additional spokesman work or commercials for

23  any additional brand of tools.

24      Q.     Bellawood Flooring was not a tool?

25      A.     You got it.

Page 52

1                        **Vila**

2        Q.     So why did you understand you needed

3    Sears's consent?

4              MR. O'BRIEN:   Objection to the form of

5        the question.

6        Q.     Did you understand you needed Sears's

7    consent before you could become a spokesperson for

8    Bellawood Flooring?

9        **A.     We had a pretty good relationship that**

10   **involved a certain amount of trust and cooperation**

11   **with a number of people, who were recently all**

12   **fired, including Mr. Ginger, but as a matter of**

13   **courtesy my agents and my attorneys always included**

14   **Mr. Ginger in any consideration of additional**

15   **business, whether it was Bellawood Flooring or any**

16   **other company.**

17       Q.     Did Mr. Feiner tell you that he sought

18   and obtained Sears's consent prior to your entering

19   into the spokesperson agreement with Bellawood

20   floors?

21       **A.     I don't remember.**

22       Q.      Did Mr. Feiner tell you -- did anyone

23   ever tell you that they had sought and obtained

24   Sears's consent before you entered into an

25   agreement with Bellawood floors?

Page 86

1                            Vila

2   it's initial cap "Product" to mean?

3       **A.    I don't know what you mean, where it's**

4   **initialed.   I don't see anything initialed here.**

5           **MR. O'BRIEN:  No initial cap.**

6       Q.    Capitalized P.

7       **A.    Over there.**

8           **MR. O'BRIEN:  That's what he is**

9   **referring to.**

10      **A.    "Other than the Product" and "the**

11  **Product" being Sears Craftsman Tools.**

12      Q.    So do I understand that when you signed

13  this agreement back in 1989, you understood that

14  you would not, except for Craftsman Tools or

15  anything that Sears consented to, you would not

16  allow your name, your likeness, your photograph,

17  your voice, to be used in advertising, publishing,

18  or promoting any product or service?

19          MR. O'BRIEN:  For the record, the word

20      is "publicizing."  You said "publishing"

21      twice.  It's "publicizing," just so we have a

22      clean record.

23      **A.    My understanding is that I was exclusive**

24  **to Craftsman Tools.**

25      Q.    What do you mean by "exclusive to

Page 112

1                              Vila

2        A.    Yes.

3        Q.    Did Pella agree to become a sponsor for

4   the "Bob Vila" show prior to the middle of August

5   2005?

6        A.    I don't know.

7        Q.    Who would know?

8        A.    Michael Auerbach, Mel Marchand, Sarah

9   Monzon, all these people that are in production and

10  preproduction.

11       Q.    What is, when someone becomes a sponsor

12  for the show, as distinguished from simply buying

13  advertising, what's the distinction in your mind?

14       A.    I tried to explain earlier the

15  difference between national advertising and local

16  advertising and sponsorship.  Sponsorship refers to

17  Sears, "Sears presents," quote-unquote.

18       Q.    Well, you just said Pella was a sponsor?

19       A.    They are a national advertiser.

20       Q.    Okay.

21       A.    So is Chevy Trucks, so is Whirlpool.

22  But Sears was a presenter because they co-produced

23  the show and because they bought or used a certain

24  amount of the advertising time.

25       Q.    Did you appear in any of the

Page 168

1                          **Vila**

2         Q.    When did Sears -- when was Sears in

3    breach of the spokesperson agreement?

4         **A.    When they didn't pay me.**

5         Q.    When was that?

6         **A.    July 1st.**

7         Q.    If I understand it, if you were in

8    breach of the agreement prior to July 1st, you

9    wouldn't be entitled to cover anything, correct?

10              MR. O'BRIEN:  Do you mean a material

11         breach?

12              MR. GREENBERG:  Yes, yes.

13         Q.    If you were?

14              MR. O'BRIEN:  You are not trying to

15         refashion what the document says?

16              MR. GREENBERG:  No.

17         Q.    Would you agree that if you were in

18    material breach of the spokesperson agreement prior

19    to July 1, 2005, you would be entitled to nothing?

20              MR. O'BRIEN:  Objection, calls for a

21         legal conclusion.

22              You may answer.

23         **A.    I don't know.**

24         Q.    You don't know?  Okay.

25              Throughout the period prior to July 1,

1                                    Vila

2          Q.     What's the name, what's the name on the

3    show?

4          A.     **The current season of my show is called**

5    **"Bob Vila."  Prior seasons were known as "Bob**

6    **Vila's Home Again," dating back to 1990.**

7          Q.     So someone on your behalf had

8    discussions with Do It Yourself Network about the

9    library of the old shows and those old shows

10   included the "Bob Vila's Home Again"?

11         A.     **At some point in time.**

12         Q.     And was Do It Yourself Network to

13   acquire the library, were the discussions to

14   acquire the library?

15         A.     **I don't know.**

16         Q.     Did you inform anyone at Sears that such

17   discussions were taking place?

18         A.     **No.**

19         Q.     Did you ask anyone on your behalf to

20   notify anyone at Sears that such discussions were

21   taking place?

22         A.     **I think I -- yes, I have a recollection.**

23         Q.     Who did you ask to notify Sears?

24         A.     **I recall asking Jonathan Russo to talk**

25   **with Andy Ginger.**

Page 219

1                           Vila

2      Q.      All right.  Well, let me show you.  Can

3  you turn to Exhibit 13, the spokesperson agreement,

4  it's Exhibit 13.

5      A.      Yes.

6      Q.      Page numbered 10.

7              MS. SANKARAN:  P95.

8      Q.      Section 16 says "Law Governing" --

9              MR. O'BRIEN:  Let him turn to page 10.

10     Q.      See where it says "Law Governing"?

11     A.      Yes.

12     Q.      It says, "This agreement shall be

13  governed in accordance with the laws of the State

14  of Illinois."

15             MR. O'BRIEN:  Objection, does not so

16     state.

17     Q.      I'm sorry.  "This agreement shall be

18  construed in accordance with the laws of the State

19  of Illinois."

20     A.      I see that.

21     Q.      When this agreement was signed by you,

22  where were you?

23     A.      Massachusetts.

24     Q.      And where was Sears?

25     A.      Illinois.

Page 243

1                              Vila

2      @BobVila.com?

3           A.    Yes.

4           Q.    That's your personal e-mail address?

5           A.    Yes.

6           Q.    Do you own a laptop, sir?

7           A.    Yes.

8           Q.    Do you have one in your home, in your

9      office?

10          A.    Most of the time.

11          Q.    Okay.

12                MR. GREENBERG:  Can we mark a three-page

13          document as the next exhibit.

14                (Exhibit 172, e-mail string, marked for

15          identification, as of this date.)

16          Q.    Mr. Vila, Exhibit 172, the first e-mail

17     at the top of the first page is from -- it's dated

18     January 22, 2005; do you see that?

19          A.    Yes.

20          Q.    And it's from Mark Rode at Sears?

21          A.    Yes.

22          Q.    It's to Jonathan Russo; that's your

23     agent?

24          A.    Yes.

25          Q.    And you are copied on that?

1                          Vila

2      A.     Yes.

3      Q.     And also your lawyer, Mr. Feiner, is

4   copied?

5      A.     Yes.

6      Q.     And he writes, "I spoke with Jonathan

7   Wednesday and will handle negotiations going

8   forward."  The subject now is the syndication

9   agreement; isn't that right?

10     A.     I think so.

11     Q.     So they are in negotiations at this

12  point in time; is that right?

13     A.     I think so.

14     Q.     This is January 22, 2005.  There are

15  negotiations by your agent and Mr. Rode about an

16  extension of the syndication agreement; is that

17  right?

18            MR. O'BRIEN:  Objection, objection

19      because --

20            MR. GREENBERG:  He can answer the

21      question.

22            MR. O'BRIEN:  I can -- will you allow me

23      to make a statement?

24            MR. GREENBERG:  As long as you don't

25      coach him any more.

1                        Vila

2           MR. O'BRIEN:  I object to that statement

3    about coaching the witness.

4           You have made a statement that this is

5    regarding the syndication agreement.

6           MR. GREENBERG:  I am asking him and he

7    said it did, there were negotiations going on.

8           MR. O'BRIEN:  And the people -- well,

9    read the question back.

10         Q.    Were there negotiations going on

11  concerning an extension of the syndication

12  agreement as of January 22, 2005?

13        **A.    Yes.**

14         Q.    And there were some issues, some open

15  issues that existed as of January 22, 2005

16  concerning that syndication agreement; is that

17  right?

18        **A.    Apparently.**

19         Q.    Well, you were aware, you had been told

20  by your representatives that there were issues

21  concerning the syndication agreement and any

22  amendment to the syndication agreement, correct?

23        **A.    I don't recall what they were.**

24         Q.    My point, sir, is, is it correct that

25  you were aware as of January 22, 2005 that there

**EXHIBIT A (2)**

Page 297

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

------------------------------x

ROBERT J. VILA and B.V.T.V.,

INC.,

           Plaintiffs,

        vs.             No. 05-11717-REK

SEARS, ROEBUCK AND CO., SEARS

HOLDINGS CORPORATION and

KMART HOLDINGS CORPORATION,

          Defendants.

------------------------------x

CONTINUED DEPOSITION OF ROBERT J. VILA

New York, New York

Thursday, March 16, 2006

Reported by:

Yaffa Kaplan

JOB NO. 182382A

Page 298

1

2

3                              March 16, 2006

4                              9:03 a.m.

5

6          Continued Deposition of ROBERT J. VILA,

7     held at the offices of Greenberg Traurig LLP,

8     200 Park Avenue, New York, New York, pursuant

9     to Notice, before Yaffa Kaplan, a Notary

10    Public of the State of New York.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           Vila

2    "Bob Vila Home Again" show, did B.V.T.V. Inc.

3    solicit product donations from various companies

4    for use on the Sears-sponsored "Bob Vila Home

5    Again" show?

6              MR. O'BRIEN:  Do you mean for the entire

7         period from 1989 on?

8              MR. GREENBERG:  Yes, from 1989 through

9         2004.

10        A.    Yes.

11        Q.    And when you said yesterday that Sears

12   sponsored the show, is that a term that you

13   intended to be different from the words just

14   advertised on the show?

15        A.    Yes.

16        Q.    What's the differentiation between

17   sponsoring the show and just advertising on the

18   show?

19        A.    In my mind, it means that Sears presents

20   the show and is the major advertiser on the show.

21        Q.    Was the show, when the show was

22   introduced, for example, on the television, would

23   it say "Sears Presents Bob Vila Home Again"?

24        A.    Yes.

25        Q.    In B.V.T.V.'s role during the period,

1                          Vila

2      approximately 15 years that Sears sponsored the

3      show, what was B.V.T.V.'s role vis-a-vis the "Bob

4      Vila Home Again" show?

5          **A.    B.V.T.V. produced the show.**

6          Q.    When you say produced "the show," what

7      are the areas generically of the work that B.V.T.V.

8      would do as part of its responsibilities to produce

9      the show?

10          **A.    Everything to coordinate the actual**

11      **physical construction or remodeling of the subject**

12      **property, which was the subject matter of the show,**

13      **for anywhere from 13 to 26 half-hour programs.**

14          Q.    Did B.V.T.V.'s responsibilities include

15      soliciting product donations for use in the show

16      from companies?

17          **A.    Soliciting, I am not sure what that**

18      **means.**

19          Q.    Well, did B.V.T.V. have a role in

20      communicating with companies to seek to obtain

21      product donations for use on the show?

22          **A.    B.V.T.V. and the line producer, Sarah**

23      **Monzon, interacted with many different companies.**

24      **Usually companies would approach us hoping to have**

25      **their product seen on the show.**

Page 307

1                              Vila

2        Q.    What's your understanding as to why

3   companies approached B.V.T.V. to seek to have their

4   products shown on the show?

5        A.    Exposure.

6        Q.    Again I am only talking about the period

7   that Sears sponsored the show, you understand?

8        A.    **What period is that?**

9        Q.    1989 until -- when did Sears stop

10  sponsoring?

11       A.    **15 years.**

12       Q.    So during that 15-year period, did you

13  believe that Sears was closely associated with the

14  show?

15       A.    **Sears, in order to maintain journalistic**

16  **integrity in the show, always tried to stay out of**

17  **the production of the show so as not to have it**

18  **appear that the show was merely a show for Sears**

19  **Craftsman products.**

20       Q.    Was the Sears name, in your mind,

21  associated with the "Bob Vila Home Again" show?

22       A.    **Yes.**

23       Q.    And can you just explain why you believe

24  the Sears name was associated with the "Bob Vila

25  Home Again" show?

Page 308

1                              Vila

2              MR. O'BRIEN:  Objection.

3              You can answer.

4         A.    **When the show comes on it says "Sears**

5    **Presents."**

6         Q.    Anything else?

7         A.    **No.**

8         Q.    In literature or press kits concerning

9    the "Bob Vila Home Again" show, was the name

10   "Sears" contained in any of those literature or

11   press kits?

12        A.    **I don't know for sure.**

13        Q.    Do you have a belief either way?

14        A.    **Yes.**

15        Q.    What is your belief?

16        A.    **I assume it was.**

17        Q.    Why do you assume the Sears name was

18   included in those kinds of press kits?

19        A.    **Because "Sears Presents Bob Vila's Home**

20   **Again."**

21        Q.    So let me be sure I understand

22   correctly.  During the 15-year period that the "Bob

23   Vila Home Again" show was aired, the show would

24   start "Sears Presents Bob Vila Home Again"; is that

25   right?

Page 312

1                              Vila

2    press kits that B.V.T. disseminated would identify

3    that Sears was sponsoring the "Bob Vila Home Again"

4    show?

5                  MR. O'BRIEN:   Objection.

6         A.    I don't recall.

7         Q.    In B.V.T.'s communicating with companies

8    about potential product donation, did B.V.T.

9    disclose to these companies that this was a show

10   sponsored by Sears?

11        A.    It's B.V.T.V., Bob Vila Television, four

12   letters.

13              What's your question.

14        Q.    Did B.V.T.V. in its communication with

15   potential companies to donate product for use in

16   the show, did they tell those companies that the

17   "Bob Vila Home Again" show was sponsored by Sears?

18        A.    I don't know.

19        Q.    You did promotions over the 15-year

20   period for Craftsman Tools and Sears; is that

21   right?

22        A.    Craftsman Tools.

23        Q.    When you did promotions, what type of

24   promotions did you do?

25        A.    Television commercials, personal

Page 313

1                                  **Vila**

2    **appearances at Sears stores grand openings,**

3    **personal appearances on military bases, et cetera.**

4          Q.    When you did personal appearances, were

5    there any signs or other indications that you were

6    also involved in the "Bob Vila Home Again" show?

7          **A.    Yes.**

8          Q.    Just -- could you just explain, was the

9    show, the "Bob Vila Home Again" show, promoted or

10   advertised during some of these promotional tours

11   you did for Craftsman Tools?

12         **A.    Yes.**

13         Q.    How was the show promoted?

14         **A.    For example, at an appearance at a Sears**

15   **store, the Craftsman Tool department would have a**

16   **TV set playing a loop of a "Bob Vila Home Again"**

17   **show.**

18         Q.    Any other examples?

19         **A.    There usually would be a poster at store**

20   **entrances with a promotional picture of me that,**

21   **you know, said "Bob Vila, Host of Home Again, in**

22   **our Tool Department" or something like that.**

23         Q.    Would the sign also say, you know,

24   "Sears Presents Bob" --

25         **A.    I don't recall that.**

Page 314

1                              Vila

2        Q.    But the show, the "Bob Vila Home Again"

3   show, was promoted as -- was advertised during your

4   promotional tours for Craftsman; is that right?

5        A.    No.

6        Q.    Well, you said when you made -- when you

7   make your promotional tour for Craftsman Tools

8   there would be signs that made reference to the

9   "Bob Vila Home Again" show, right?

10       A.    Yes.

11       Q.    What other -- was one of your goals when

12  you did these promotional tours for Craftsman Tools

13  to let people know that you were meeting, that you

14  also had this television show, "Bob Vila Home

15  Again"?

16            MR. O'BRIEN:  Objection.  The form of

17       your question.

18       Q.    Was that one of your goals?

19            MR. O'BRIEN:  Objection to the form of

20       the question.

21       A.    I am confused by the question.  The goal

22  was to sell tools.

23       Q.    Then why when you had a -- when you did

24  a promotional tour would you have signage or other

25  indication for the public to see the "Bob Vila Home

1                              Vila

2        **A.      Sorry.**

3        Q.      -- do you comment on your own reactions

4    as to whether it's easy to use, difficult to use,

5    whether it seems to do the job?

6        **A.      I might.**

7        Q.      Well, I mean if one were to view your

8    "Home Again" shows over the years, the 15-year

9    period, would one see numerous instances of your

10   making favorable comments about products that you

11   would demonstrate?

12             MR. O'BRIEN:  Objection to the form.

13             You can answer.

14       **A.      Not necessarily.**

15       Q.      The new show that is airing now, you

16   testified that that show was -- you said it was

17   presold; is that right?

18       **A.      I was told that.**

19       Q.      You were told that by whom?

20       **A.      Mr. Russo.**

21       Q.      And Mr. Russo is your agent; is that

22   right?

23       **A.      Yes, that's right.**

24       Q.      And when did he tell you the show was

25   presold?

Page 352

1                              Vila

2       **A.     I don't recall.**

3       Q.    Was it prior to the middle of May 2005?

4       **A.     I don't recall.**

5       Q.    And who did the preselling?

6       **A.    King World.**

7       Q.    And when King World was -- when you say

8  presold, that's selling advertising time on the

9  show; is that right?

10      **A.     I think so.**

11      Q.    And did -- was it King World's job every

12 year to do the preselling of the advertising?

13      **A.     I believe so.**

14      Q.    Was it your understanding -- I think you

15 said before for 15 years that the show was known it

16 was sponsored by Sears, it was "Sears Presents Bob

17 Vila Home Again," correct?

18           MR. O'BRIEN:  Objection to the form.

19 It's a multiple question.

20      Q.    Was the sole -- did King World use the

21 fact that Sears was sponsoring the show in any

22 fashion in its efforts to sell advertising time on

23 the show?

24      **A.    King World was in business with Sears.**

25      Q.    My question is, did King World use the

Page 353

                              Vila

1
2   fact that Sears was sponsoring the show to assist

3   it in trying to convince advertisers to advertise

4   on the show?

5        **A.    I don't know.**

6        Q.    Do you have any belief either way?

7             MR. O'BRIEN:  Objection.

8        **A.    No.**

9        Q.    When your -- when the employees of

10  B.V.T.V. were seeking to -- I'm sorry, were

11  communicating -- strike that.

12            In your lawsuit, sir, in the lawsuit by

13  B.V.T.V., do you claim that there are payments due

14  under the syndication agreement?

15       **A.    Yes.**

16       Q.    And do you claim that there are any

17  payments due -- actually, what are the payments

18  that you claim are due under the syndication

19  agreement?

20       **A.    We had a contract for two more seasons**

21  **agreed to and the specific numbers I don't have off**

22  **the top of my head, but they would be for the two**

23  **years that had been agreed to.**

24       Q.    Any other generically types of payments

25  that you claim are due under the syndication

Page 354

                                    Vila

1

2    agreement?

3         A.    **There are bonuses that were due and were**

4    **never paid.**

5         Q.    For what years were bonuses due and

6    never paid?

7         A.    **'04-'05.**

8         Q.    And what is the bonus that you claim was

9    due for 2004-2005?

10        A.    **I believe that's 450,000.**

11        Q.    And how is that -- how did you calculate

12   that?

13        A.    **I don't know how it's calculated.  King**

14   **World calculates it, shares it with Sears.**

15        Q.    Well, you are the plaintiff and your

16   company is the plaintiff.  Is it your claim that

17   you are owed $450,000 as bonus payments under the

18   syndication agreement?

19        A.    **Yes.**

20        Q.    What's the factual basis on which you

21   make the claim that you are owed $450,000 for bonus

22   payments?

23        A.    **It's always been in the syndication**

24   **contract.**

25        Q.    How was the $450,000 calculated?

Page 360

                                    Vila

1

2    different shows.

3          A.      "Bob Vila's Home Again."

4          Q.      Okay.   What other shows?

5          A.      "Bob Vila."

6          Q.      What else?

7          A.      "Bob Vila's Guide to Historic Homes,"

8    "Restore America."

9          Q.      Wait just a second.   What else?

10         A.      I think that's it.

11         Q.      So you have had over the last 15 years

12   four different shows that have been televised; is

13   that right?

14         A.      Yes.

15         Q.      And Sears was the sponsor for "Bob Vila

16   Home Again"; is that right?

17         A.      That's right.

18         Q.      Is there a sponsor for the "Bob Vila"

19   show?

20         A.      No.

21         Q.      Now "Bob Vila's Guide to Historic

22   Homes"?

23         A.      Yes.

24         Q.      When did that air?

25         A.      I don't recall.

1                        Vila

2   "Home Again" show?

3        A.    Sure.

4        Q.    And in what context were those

5   references made?

6        A.    **In the context of introducing me to the**

7   **viewers.**

8        Q.    And when you went on those television

9   shows, did you on occasion speak or identify, speak

10  about Sears or identify Sears as being a sponsor

11  for the "Home Again" show?

12            MR. O'BRIEN:  Objection to the form.

13            You can answer.

14       A.    **Yes.**

15       Q.    I mean was one of your goals when you

16  appeared on these television shows to promote Sears

17  and the "Home Again" show?

18            MR. O'BRIEN:  Objection to the form.

19       A.    **As a spokesman for Craftsman Tools, yes.**

20       Q.    So over the years, the 15 years that

21  Sears sponsored the show, approximately how many

22  times did you appear as a guest on a television

23  show?

24       A.    **Incalculable.**

25       Q.    Hundreds?

Page 368

1                          Vila

2              MR. O'BRIEN:   Objection.

3       A.      Possibly.

4       Q.      Over a hundred?

5       A.      Don't know.

6       Q.      You said several dozens, sir?

7       A.      Easily.

8       Q.      Those, we are talking about national

9   television shows?

10      A.      Not always.

11      Q.      "Today Show," "CBS," "Jay Leno," "Home

12  Improvement," those are all national shows, right?

13      A.      Those are.

14      Q.      And do I understand that when you

15  appeared on those shows, one of your objectives was

16  to publicize the Sears name and the "Home Again"

17  show?

18      A.      Not on those shows.

19      Q.      On what shows, television shows that you

20  appeared as a guest, was one of your objectives to

21  appear to promote the Sears name and the "Home

22  Again" show?

23      A.      In every appearance, that was arranged

24  by Sears via Satellite Media Tours.  That was done

25  twice annually.  Obviously, the objective there was

Page 369

```
 1                        Vila

 2  to talk about Sears Tools.

 3        Q.    And the "Home Again" show?

 4        A.    Not necessarily the "Home Again" show.

 5  Craftsman.

 6        Q.    I am trying to focus on your television

 7  appearances.

 8        A.    That's what I am talking about.

 9              MR. O'BRIEN:  Let him ask his questions.

10        Q.    On the television appearances on these

11  TV shows where you were a guest --

12              MR. O'BRIEN:  Other than satellite TV

13        shows.

14              MR. GREENBERG:  Other than the satellite

15        TV shows.

16        Q.    Other than satellite TV shows.

17        A.    Okay.

18        Q.    On those TV shows where you were a

19  guest, was one of your objectives to promote the

20  Sears name as well as the "Home Again" show?

21              MR. O'BRIEN:  Objection to the form.

22              You can answer.

23        A.    Yes.

24        Q.    And why was that one of your objectives?

25        A.    Because it's good practice.
```

1

```
                                    Volume III
                                    Pages 1 through 111
                                    Exhibits per index


              UNITED STATES DISTRICT COURT

              DISTRICT OF MASSACHUSETTS


                            Civil Action No. 05-11717-REK

- - - - - - - - - - - - - - - - x

ROBERT J. VILA and B.V.T.V, INC.,
            Plaintiffs,


V.


SEARS, ROEBUCK and CO., SEARS
HOLDINGS CORPORATION and KMART
HOLDING CORPORATION,
                Defendants.


- - - - - - - - - - - - - - - - x




           CONTINUED DEPOSITION OF ROBERT J. VILA
            Tuesday, March 28, 2006, 12:57 a.m.
                GREENBERG TRAURIG, LLP
                One International Place
              Boston, Massachusetts 02110
```

```
- - - - - - - - - -Reporter: MaryJo O'Connor, CSR, RPR- - - - - - -
              BOSTON REPORTING ASSOCIATES
           REGISTERED PROFESSIONAL REPORTERS
                    67 Bright Road
              Belmont, Massachusetts 02478
                    (617) 877-6640
```

2

1  APPEARANCES:

2  JAMES F. O'BRIEN, ESQ.
   410 Park Avenue, Suite 1530
3  New York, New York 10022
   (212) 813-9300
4  Counsel for the Plaintiffs.

5
   GREENBERG TRAURIG, LLP
6  (By: Gary R. Greenberg, Esq., Annapoorni R.
   Sankaran, Esq., Sebastian Colley, Esq., and Wendy
7  Champagne, Paralegal)
   One International Place
8  Boston, Massachusetts 02110
   (617) 310-6000
9  Counsel for the Defendants.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

49

```
 1        A.    During what period?

 2        Q.    During the period from August of 2005

 3   starting then until last week.

 4        A.    I don't remember when I looked at it.

 5        Q.    In what context did you look at it?

 6        A.    Well, I had looked at it one time in the

 7   context of my, you know, number of days that I was

 8   supposed to perform because we were negotiating to

 9   shorten the number of days and the amount of money

10   paid, but I don't remember exactly when that was.

11        Q.    Is that the last time you can recall

12   looking at it, prior to the depositions?

13        A.    No.  I looked at it probably the week

14   before the depositions.

15        Q.    During the period of time that you were

16   doing the new "Bob Vila" show, did you consult with

17   the spokesperson agreement?  Did you review it?

18        A.    I don't recall.

19        Q.    Did you seek any advice during the period

20   that you were doing the new "Bob Vila" show from

21   anyone as to whether the spokesperson agreement had

22   any impact on what you could do with the new show?

23        A.    I don't recall.

24        Q.    Could you just, if you could, how would you
```

50

1  contrast the new "Bob Vila" show to the "Bob Vila's

2  Home Again" show?

3        MR. O'BRIEN:  Objection to the form.  You

4  mean compare them?

5        MR. GREENBERG:  Yes, compare them.

6     A.    It's a very similar show in content.

7     Q.    When you say they're different, what are

8  the differences?

9     A.    There really are no differences.

10    Q.    Was the subject different?

11    A.    No.  Well --

12        MR. O'BRIEN:  What do you mean by subject?

13    Q.    Is the subject of the shows different?

14    A.    Yes.

15    Q.    And how is it different.

16    A.    It's different every year.

17        MR. O'BRIEN:  I would suggest that counsel

18  define the word subject as I suggested.  What do you

19  mean by the subject of the show?  I think Mr. Vila

20  is referring to projects.

21    Q.    How many projects did you do on the new

22  "Bob Vila" show?  The one that started airing in the

23  fall of 2005.

24    A.    Two.

51

1    Q.    And what were the two?

2    A.    The storm-ready house in Punta Gorda,

3  Florida, demonstrating the latest technologies for

4  building a house that can withstand a hurricane

5  impact, and the renovation of a Queen Anne Victorian

6  in Rowley, Mass..

7    Q.    And the storm-ready house, how many shows

8  was that renovation project shown on?

9    A.    Thirteen.

10    Q.    And that property was owned by who?

11    A.    A local couple.

12    Q.    Anyone that you knew before?

13    A.    No.

14    Q.    Okay.  And the Rowley, Massachusetts

15  property was owned by who?

16    A.    By Mr. and Mrs. David Masher.

17    Q.    Is that someone you had any dealings with

18  in the past?

19    A.    Mr. Masher worked for BobVila.com.

20    Q.    In what capacity?

21    A.    I don't know his title.

22         MR. O'BRIEN:  Let me take ten minutes.

23         MR. GREENBERG:  Sure.

24              (Brief recess.)

**EXHIBIT B (1)**

ROBERT J. VILA and )
B.V.T.V., INC., )
 )
 Plaintiffs, )
 )
 vs. )
 ) Civil Action No.
SEARS, ROEBUCK AND CO., )
SEARS HOLDINGS CORPORATION ) 05-11717-REK
and KMART HOLDING )
CORPORATION, )
 )
 Defendants. )

**ORIGINAL**

The deposition of ANDY GINGER, called by the Plaintiffs for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, taken before ROBIN M. CHIMNIAK, a Notary Public within and for the County of DuPage, State of Illinois, and a Certified Shorthand Reporter of said State, taken at 77 West Wacker Drive, Suite 3000, Chicago, Illinois, on the 30th day of January, 2006, at the hour of 11:05 a.m.

# COURT REPORTING

DOWNTOWN
77 W. WASHINGTON, STE. 1917
CHICAGO, IL 60602
312/895-4974

SUBURBS
1407 E. ELM STREET
WHEATON, IL 60187
630/690-6911

BridgesReporting@aol.com
FAX 312/528-9025

```
 1          PRESENT:

 2              MR. JAMES P. O'BRIEN
                    410 Park Avenue
 3                  Suite 1530
                    New York, New York 10022
 4
                        and
 5
                KAUFMANN, FEINER, YAMIN, GILDIN &
 6                ROBBINS, LLP
                BY:  MR. RONALD E. FEINER
 7                  777 Third Avenue
                    New York, New York 10017
 8
                        Appeared on behalf of the
 9                      Plaintiffs;

10              GREENBERG TRAURIG,  LLP
                BY:  MS. ANNAPOORNI R. SANKARAN
11                  One International Place
                    Boston, Massachusetts 02110
12
                        and
13
                SEARS, ROEBUCK AND CO.
14              BY:  MR. FRANK CALABRESE
                    333 Beverly Road
15                  Hoffman Estates, Illinois 60179

16                      Appeared on behalf of
                        Defendants.
17

18

19

20

21

22

23

24
```

1       Q.   Now, you're aware that Sears, Roebuck

2    and Co. had a relationship with Robert J. Vila?

3       A.   Yes.

4       Q.   I think --

5       MR. O'BRIEN:   Off the record.

6                           (Discussion off the

7                           record.)

8    BY MR. O'BRIEN:

9       Q.   You're also aware that Sears, Roebuck

10   and Co. had a relationship with an entity called

11   B.V.T.V., Inc.?

12      A.   Yes.

13      Q.   Now, as to B.V.T.V., Inc., could you

14   describe that relationship?

15      A.   Sears had a contract with B.V.T.V. to

16   produce "Bob Vila's Home Again" television show

17   that Sears sponsored and ultimately owned in

18   conjunction with B.V.T.V.

19      Q.   When did you first become aware of that

20   contract?

21      A.   I was aware of the relationship prior

22   to 1993, but in 1993, when I came back to the

23   retail operation as the national retail marketing

24   manager of home improvement, I became the

```
 1    executive responsible for that relationship and
 2    therefore became involved in the contract.
 3         Q.   For how long during your time at Sears
 4    were you the executive responsible for the
 5    relationship between Sears, Roebuck and Co. and
 6    B.V.T.V., Inc.?
 7         A.   In these different and various
 8    capacities with different people reporting to me,
 9    from 1993 through the day that I left.
10         Q.   April 4, 2005.
11         A.   Correct.
12         Q.   Well, I stated that as a fact.
13         A.   Yes.
14         Q.   That's the date?
15         A.   It's a fact, yes.
16         Q.   I'm sorry.  With respect to the
17    relationship between Robert J. Vila and Sears
18    Roebuck and Co., can you describe that for us?
19         A.   Sears had a contract with Bob to
20    provide services as a spokesperson for the home
21    improvement categories that I previously
22    described as part of that national retail
23    marketing manager job.
24         Q.   When did you first become aware of that
```

```
 1   relationship?
 2        A.   In 1993.
 3        Q.   When did you first become aware of the
 4   contract between Mr. Vila and Sears?
 5        A.   About June of 1993, when I took that
 6   assignment.  When I moved from the catalog back
 7   to the retail operation.
 8        Q.   Okay.  So is it fair to say that you
 9   became responsible for the relationships both
10   with B.V.T.V. and Mr. Vila at the same time?
11        A.   Yes.
12        Q.   Who gave you that responsibility?
13        A.   Jerry Post.
14        Q.   Who is Jerry Post?
15        A.   He was the vice president and general
16   merchandise manager for the home improvement
17   category from 1993 to 1995.
18        Q.   Is Mr. Post still with Sears, Roebuck
19   and Co.?
20        A.   No.
21        Q.   Did he retire?
22        A.   He did retire, yes.
23        Q.   When Mr. Post gave you those
24   responsibilities, what did he tell you, if
```

1    anything?

2        A.    To manage the relationship in the

3    course of marketing the business and building the

4    brand, the Craftsman brand.

5        Q.    I'm sorry?

6        A.    The Craftsman brand.

7        Q.    Who did manage the relationship prior

8    to you?

9        A.    The marketing person in that assignment

10   was Bob Rodgers, R-o-d-g-e-r-s.

11       Q.    Did Mr. Rodgers leave Sears, Roebuck at

12   the same time you assumed responsibility for

13   management of the relationship?

14       A.    No.  No.  He has left since though.

15       Q.    I'm sorry?

16       A.    He is no longer with the company, but

17   he was with the company for a period of time

18   after he --

19       Q.    Okay.

20       A.    (Continuing) -- handed the

21   responsibility to me.

22       Q.    When the responsibility was handed over

23   to you, did Mr. Rodgers talk to you about the

24   history of the relationship to that point in

1      regarding the syndication agreement between

2      Sears, Roebuck and Co. and B.V.T.V., Inc.?

3          A.    Yes.

4          Q.    Now, I believe your testimony has been

5      that in general the syndication agreement

6      provides that B.V.T.V., Inc., will produce

7      television programs for Sears to be paid for or

8      sponsored by Sears, Roebuck and Co.?

9          A.    Yes, that's correct.

10         Q.    Is it your understanding that that's

11     been the nature, essential nature of that

12     contract since its inception?

13         A.    Yes.

14         Q.    Now, do you recall when you first began

15     the discussions for Amendment 11 to the

16     syndication agreement?

17         A.    I don't recall precisely when we would

18     have began those discussions, but it would have

19     been in early 2004.

20         Q.    Okay.  I'll show you another document.

21     MS. SANKARAN:  Thank you.

22     MR. O'BRIEN:  We'll mark this as 68.

23

24

```
 1                    (Whereupon Deposition Exhibit

 2                    No. 68 was marked as

 3                    requested.)

 4                    (Witness examines

 5                    document.)

 6         THE WITNESS:  Yes.

 7    BY MR. O'BRIEN:

 8         Q.    Okay.  You've finished reading it?

 9         A.    I've finished.

10         Q.    This appears to be a so-called e-mail

11    chain, does it not?

12         A.    Yes.

13         Q.    At the bottom of Exhibit 68, beginning

14    with the words, "Dear Drew"?

15         A.    Yes.

16         Q.    That appears to be an e-mail to Drew

17    Farkas with a copy -- from Ron Feiner with a copy

18    to you.  Do you see that?

19         A.    Yes.

20         Q.    Do you recall receiving that?

21         A.    Yes.

22         Q.    Now, at the end of that e-mail from Mr.

23    Feiner, he graciously offers to take a shot at

24    the drafting of the new amendment; correct?
```

1         A.    Yes.

2         MS. SANKARAN:  Objection.

3              Go ahead.

4    BY MR. O'BRIEN:

5         Q.    Then we'll look at the top of this

6    document, Exhibit 68.  Is that an e-mail from you

7    to Mr. Feiner?

8         A.    Yes, it is.

9         Q.    Okay.  And do you recall sending that

10   e-mail to Mr. Feiner?

11        A.    I don't recall it specifically, but I

12   probably sent it.

13        Q.    The date of it is Wednesday, February

14   25th, 2004?

15        A.    Yes.

16        Q.    And it says:

17              "Ron, we have a draft from Drew."

18              Does that refresh your recollection as

19   to when the negotiations --

20        A.    Yes.

21        Q.    (Continuing) -- occurred?

22        A.    Yes.

23        Q.    And what is your memory now that it is

24   refreshed?

1      A.   It confirms that we began the

2  discussion about this amendment in early 2004.

3      Q.   And prior to February 25, 2004?

4      A.   Well, at or around February 25th of

5  2004, yes.

6      Q.   Well, you state in your e-mail that "we

7  have a draft from Drew."

8      A.   Yes.

9      Q.   Now, as I understood it -- and Drew was

10  Drew Farkas?

11      A.   That's correct.

12      Q.   He's a lawyer with -- in Sears, Roebuck

13  and Co.?

14      A.   That's correct.

15      Q.   As I understood your testimony as to

16  general practice, Mr. Farkas wouldn't prepare a

17  draft until there had been some discussion of

18  business terms; is that correct?

19      A.   In general that's true, yes.

20      Q.   Do you recall that's what you had

21  discussed as of February 25th with Mr. Feiner?

22      A.   We discussed the intent or the

23  possibility of extending the agreement.

24      Q.   Okay.  Now, the agreement had been

1    extended many times before, had it not?

2        A.    Yes.

3        Q.    Okay.  Now, do you recall anything more

4    specific about the proposed extension of the

5    syndication agreement?

6        A.    There was a discussion about the term

7    of this agreement, this particular extension, and

8    about how long we would make the extension.

9        Q.    Okay.  And do you recall what term

10   Sears wanted?

11       A.    Sears ultimately wanted a shorter term,

12   and Ron wanted initially a longer term.  So Ron

13   would have preferred to extend the termination

14   date of the spokesperson agreement, and Sears was

15   interested in a shorter term.

16       Q.    So do you recall what the termination

17   date of the spokesperson agreement was?

18       A.    I don't recall precisely, but 2009,

19   with some protections on the tail.

20       Q.    Mr. Feiner wanted to extend B.V.T.V.'s

21   syndication agreement to be coterminous with the

22   spokesperson agreement?

23       A.    Yes, roughly coterminous.

24       Q.    And Sears did not want that?

1          A.    It would have been on the longer end of

2     that spectrum.

3          Q.    Now, as I understand the nature of the

4     syndication agreement, B.V.T.V., Inc., would

5     produce the television series, actually do the

6     filming and so forth -- excuse me for my lack of

7     expertise -- Sears would pay money to B.V.T.V.,

8     Inc., in consideration of its production of the

9     series?

10         A.    Yes.

11         Q.    I know there were other terms.  I'm

12    just trying to get at the general nature.

13              Then I understand that Sears would

14    enter into contractual relationships with a third

15    party to distribute the television series; is

16    that correct?

17         A.    That's correct.

18         Q.    Who was that third party as of February

19    2004?

20         A.    It would have been King World, which is

21    a division of CBS.

22         Q.    For ease of reference, we'll just refer

23    to them as King World; is that okay?

24         A.    Yes.

```
 1          Q.    Now, in February 2004, were you also --
 2    strike that.
 3                Were you the person at Sears, Roebuck
 4    and Co. who would negotiate the agreements with
 5    King World?
 6          A.    With -- yes, with the assistance of
 7    Sears' attorneys and the advertising agency.
 8          Q.    Ogilvy & Mather?
 9          A.    At this point in time the division of
10    WPP Partners that would have been involved was
11    MindShare.  MindShare was a piece of the
12    advertising agency that was spun out of Ogilvy &
13    Mather and reconstituted as a part of WPP
14    Partners.  So they were a partner agency to
15    Ogilvy.
16          Q.    They were essentially the same people;
17    right?
18          A.    Essentially the same people.
19          Q.    Now, in February 2004 were you
20    negotiating the agreement with King World for the
21    2005-2006 viewing season and beyond?
22          A.    I don't remember precisely when we
23    began the discussions with King World, but yes,
24    in general, over the course of time, we
```

1/30/06    VILA v SEARS    Ginger, Vol 1    115

```
 1          A.    It would have been, you know,

 2    electronically communicated on the Web site, just

 3    as the press release was externally communicated

 4    outside.

 5          Q.    Did someone suggest to you that you

 6    meet Mr. Crowley?

 7          A.    It was clear that Mr. Crowley was going

 8    to play a role in making decisions about the

 9    transition between the two companies because he

10    had been identified as applying that role, and I

11    was trying to obtain a resolution on a number of

12    pending contract negotiations that I was involved

13    in, including the contract negotiation we're

14    talking about here.

15          Q.    That is with respect to the syndication

16    agreement with B.V.T.V.?

17          A.    Yes.

18          Q.    What other contract negotiations were

19    you inspired to contact Mr. Crowley for?

20          A.    NASCAR.

21          Q.    Any others?

22          A.    No.

23          Q.    Now, prior to your meeting with

24    Mr. Crowley, had you been instructed to cease any
```

```
 1    that Ms. Bousquette was in communication with

 2    Mr. Crowley?

 3         A.    I don't believe so, no.

 4         Q.    Did you ask her to go to Mr. Crowley to

 5    get that guidance?  I mean, she was your

 6    superior.

 7         A.    Yes, I was asking her to help us find

 8    resolution in whatever way she saw fit.

 9         Q.    Were those your words?

10         A.    Yeah, or the equivalent.

11              Mr. Crowley was not a part of the

12    management team in the company at that point.  He

13    was announced as a person who was going to be

14    responsible for helping integrate the two

15    companies, but he didn't fit into the

16    organizational structure at that point in time.

17              So the request would have been to try

18    to work with the management team to see if we

19    could find a way to resolve things.

20         Q.    That would be your request to --

21         A.    Janine.

22         Q.    (Continuing) -- Ms. Bousquette?

23         A.    Yes.  She reported to Luis Padilla, et

24    cetera.
```

1          Q.    When was "earlier"?

2          A.    During 2004 we had discussed it

3    multiple times.

4          Q.    And she approved of a two-year

5    contract?

6          A.    Yes.  She was willing to move forward

7    with a shorter extension.

8          Q.    And she was aware, as you testified

9    earlier, of the financials that were involved?

10          A.    Yes.  Anytime we would have discussed

11    it, we would have discussed the financials along

12    with the terms.

13          Q.    Now, it says in your next paragraph:

14               "As with other long-term deals, since

15    the merger announcement, as directed, we have

16    been holding back the contract completion on

17    this."

18          A.    Yes.

19          Q.    You were holding back on signing the

20    contract; is that correct?

21          A.    We were holding back on completing

22    contracts and signing contracts in any case.

23          Q.    Well, with respect to the B.V.T.V.

24    syndication agreement extension, what you were

1    holding back on was executing the document?

2        A.    That's correct.  Yes, we had not

3    executed it.

4        Q.    Okay.  Now, you then go on to say:

5        "We cannot hold back on taking action

6    any longer."

7        Why did you state that?

8        A.    For the reasons cited immediately after

9    that in the memo, which is that B.V.T.V. and CBS

10   King World were past their time frame, and they

11   were in a position where they had to begin or had

12   already begun selling advertising and making

13   arrangements to create the television show.

14       Q.    Now, as the memo goes on, you state in

15   paragraph numbered 1 -- these are options you

16   referred to.

17       A.    That's right.

18       Q.    "Complete the extensions with BVTV and

19   CBS."

20       Then:

21       "They are negotiated and ready to

22   sign."

23       Now, was that a true statement?

24       A.    Yes.

1        Q.    When you refer to CBS, that's the same

2    as King World?

3        A.    Yes.

4        Q.    So as of February 7th, they were ready

5    for signature; correct?

6        A.    Yes.

7        Q.    Now, the other option you presented in

8    Paragraph No. 2 was to release B.V.T.V. to make

9    alternative arrangements.  What did you mean by

10   that?

11       A.    That if we were not able to complete

12   the negotiation, sign the contract to extend the

13   relationship for the television show, that we

14   would make an arrangement with B.V.T.V. to allow

15   them to make other arrangements to execute the

16   television show.

17       Q.    Now, you've said:

18            "Complete the negotiations and sign."

19            You've testified in your statement in

20   this document that the B.V.T.V. document was

21   negotiated.

22       A.    Yes.

23       Q.    So what you really mean was if we're

24   not going to sign it; is that correct?

```
 1        A.    Yes.

 2        Q.    I just want to be precise.

 3        A.    Yes.

 4        Q.    Now, you then state:

 5              "We have indicated to BVTV that the

 6    first option is unlikely in the current

 7    situation."

 8              Now, Option No. 1 is essentially to

 9    sign the contract.

10        A.    That's correct.

11        Q.    First of all, who indicated that to

12    B.V.T.V.?

13        A.    I think that we had -- since the

14    announcement of the merger, we had indicated to

15    B.V.T.V. that we were not in a position to sign

16    at that point in time.

17        Q.    Now, I respect your answer, but in

18    terms of "we," I mean, somebody indicated.  Was

19    it you?

20        A.    I'm not sure whether it would have been

21    myself or Mark Rode, but probably both of us at

22    different times.

23        Q.    Mark Rode would not have indicated that

24    to them unless you approved; is that correct?
```

```
 1        Mr. Crowley?

 2            A.   I'm guessing yes.

 3            Q.   I'm sorry?

 4            A.   I'm guessing that is the case, yes.

 5            Q.   Now, you go on again and say:

 6                 "The Home Again deal is also over the

 7    timeline."

 8                 There you're referring to the

 9    syndication agreement?

10            A.   Yes.

11            Q.   What did you mean when you said "over

12    the timeline"?

13            A.   Urgent; needed to be resolved quickly.

14            Q.   Why did it need to be resolved quickly?

15            A.   Because we were getting late in the

16    process of making arrangements with King World

17    that, you know, there was a contract that had

18    been pending for some time, it was ready to be

19    signed, and it hadn't moved.

20            Q.   Now, Mr. Crowley responds to you

21    saying:

22                 "Summarize deals in email for me

23    please."

24                 Did you do so?
```

 1    before you.  We'll marked that as 78.

 2         A.    Yes.

 3                   (Witness examines

 4                    document.)

 5         THE WITNESS:  So this is an e-mail from me

 6    to Bill Crowley, and, in fact, I did respond with

 7    the contract summaries in e-mail.

 8    BY MR. O'BRIEN:

 9         Q.    Okay.  Now, this e-mail is dated March

10    7, 2005.

11         A.    Yeah.

12         Q.    You state:

13              "Per your request, attached are the 3

14    contract amendment summaries for" -- and then

15    there are things redacted.  But one of them is

16    "Bob Vila's Home Again"?  Correct?

17         A.    Yes, that's correct.

18         Q.    You state:

19              "We have reviewed these in detail with

20    Luis Padilla and Janine Bousquette."

21              Had you, in fact, reviewed these

22    contract summaries in detail with Luis Padilla by

23    March 7, 2005?

24         A.    If I wrote here, yes, I believe that's

1    the case then.   We would have reviewed it with

2    Luis by this point, yes.

3          Q.    Does it refresh your recollection as to

4    whether by March 7, 2005, you had met with

5    Mr. Padilla?

6          A.    Yeah, we had met with Mr. Padilla in

7    some way.   I don't recall the details of that.

8    But clearly if I was saying to Bill we had met by

9    that point, we had met with Padilla and talked

10   about them, yes.

11         Q.    Now, you state further in your e-mail:

12         "Vila and" blank "are ready for

13   signature.   We stand ready to" -- something is

14   missing there.

15         Was that missing from the original, or

16   was it redacted?   Do you know?

17         A.    I don't know.

18         Q.    Well, it says, "We stand ready to" --

19   and it's blank -- "you would like to see."

20         Does that refresh your memory at all?

21         A.    No.   I don't know what was in there.   I

22   mean, I'm presuming the other part of the

23   sentence was there.   I don't know what it says.

24   Maybe it refers to one of the other two contract

1    amendments.

2        Q.    You say:

3            "Let me know.  We would like to move

4    forward as soon as possible."

5            And then:

6            "I can send hard copies to Denise

7    Hoffman if that is helpful."

8            Who is Denise?

9        A.    Denise is the administrative assistant

10    in the Sears headquarters in Hoffman Estates who

11    was supporting Bill whenever he was in the

12    building.

13        Q.    Was she a Sears employee?

14        A.    Yes.

15        Q.    Now, did Mr. Crowley respond to this

16    e-mail?

17        A.    I don't remember.

18        Q.    Did Mr. Crowley have -- as I

19    understand, Mr. Crowley had an office at Sears,

20    Roebuck and Co. on the sixth floor.

21        A.    I believe during the period of time

22    we're talking about here, that was prior to the

23    execution of the merger, that he used a temporary

24    office there.

1    e-mail before?

2         A.    No.

3         Q.    Now, the date of this is March 11,

4    2005.

5         A.    Right.

6         Q.    And as I understand it, to this point

7    in time you haven't met with Mr. Crowley?

8         A.    No, by this time I would have.  And I'm

9    trying to put the pieces together on the time

10   line here.

11        Q.    Okay.  There are two conversations that

12   occurred here with Crowley I'm aware of on this

13   subject.  Without trying to time them to the

14   specific documents that you provided here, which

15   is difficult, but --

16        MS. SANKARAN:  And before you answer, I'm

17   just going to instruct you to -- not to answer or

18   reveal any attorney-client communications in the

19   course of your answer.

20        THE WITNESS:  I understand.

21        MR. O'BRIEN:  Attorney-client communications

22   in which legal advice was sought.  Is that what

23   you mean to say?  Is that your objection?

24        MS. SANKARAN:  Yes.  It is not an objection.

1    It was an instruction.

2        MR. O'BRIEN:  That's your instruction.

3    Okay.

4        THE WITNESS:  Yes.  And in one of those

5    conversations was a conversation I had with Bill

6    to inform him of the nature of the relationship,

7    which was to basically say here are the structure

8    of it, the financials; here is what the pending

9    situation looks like, and there were the

10   communications on e-mail that we've previously

11   reviewed here.  And then I know that there were

12   meetings between he and folks inside the legal

13   department, and I don't know the nature of those

14   conversations.

15   BY MR. O'BRIEN:

16       Q.    Okay.  Let's go to the first meeting

17   that you do know about.

18            Now, I understood that was a one-on-one

19   meeting between you and Crowley; is that correct?

20       A.    That's correct.  Yes.

21       Q.    All right.  And how long did that

22   meeting last?

23       A.    Probably half an hour.

24       Q.    What did you say to him concerning the

**EXHIBIT B (2)**

1    I had with Bill, I would have communicated to her

2    that we had given them the information, and they

3    had asked a few questions.

4         Q.   Did anything come -- when you were

5    with -- as this e-mail suggests, regrouping with

6    Janine, what was that about?

7         A.   I believe at this point we were

8    responding back to whatever inquiries came out of

9    the meeting that Bill had had with the legal

10   department.

11        Q.   What were those inquiries?

12        A.   I don't remember precisely.

13        Q.   Okay.

14        A.   And in general they would have been,

15   you know, subjects discussed between the

16   attorneys and Bill.

17        Q.   If you could speak up a little.  I know

18   the hour is getting late.

19        A.   Generally they would have been subjects

20   that Bill would have discussed with the attorney.

21                    (Whereupon Deposition Exhibit

22                     No. 80 was marked as

23                     requested.)

24                    (Witness examines

```
 1                    document.)

 2         THE WITNESS:  Yes, I read it.

 3    BY MR. O'BRIEN:

 4         Q.    Exhibit 80 is a memo, memorandum from

 5    you to Ms. Bousquette; correct?

 6         A.    Correct.

 7         Q.    Dated March 14, 2005?

 8         A.    Yes.

 9         Q.    And the re line is the Vila contract

10    amendment.  Is that referring to the B.V.T.V.

11    syndication agreement?

12         A.    Yes.

13         Q.    All right.  Now, you've read the

14    content of this memorandum that you authored.

15    Does that refresh your recollection as to your

16    meeting with Janine?

17         A.    Yes.

18         Q.    Okay.  So let's talk about your meeting

19    with Janine before we talk about the content of

20    this memorandum.  Who attended?

21         A.    I believe at this meeting we had

22    myself; Luis Padilla; Janine Bousquette; Henry

23    Ferris; Drew Farkas; Toure Clayborn, T-o-u-r-e,

24    like it sounds; possibly Mark Rode, but I'm not
```

1    subjects of the meeting were the NASCAR contract

2    and the syndication agreement?

3        A.    Primarily, yes.  And I guess when I say

4    the Ty Pennington contract was not in discussion

5    here, the ongoing arrangement with Ty was a

6    multiyear arrangement, which was not up for

7    discussion at this point in time.

8            There were ongoing discussions with Ty

9    about things that were ancillary to that that

10   were going on during this period of time.  So,

11   you know, whether or not we had some small

12   conversation about those things or not, I don't

13   remember.  There could have been some, but it

14   wasn't about the main arrangement with Ty.

15       Q.    So what was discussed about the

16   B.V.T.V. syndication agreement at that meeting?

17       A.    There was a desire expressed at this

18   point to try to restructure the relationship with

19   Bob beyond the scope of the syndication agreement

20   and to also try to restructure the spokesperson

21   agreement and the overall relationship with Bob.

22       Q.    Now, the spokesperson agreement was not

23   up for -- was not due to expire till 2009;

24   correct?

```
 1         A.    Correct.

 2         Q.    Who raised the subject of restructuring

 3    the spokesperson agreement?

 4         A.    Luis Padilla and Janine Bousquette.

 5         Q.    Well, they didn't both speak at the

 6    same time, so --

 7         A.    No, and I don't remember who spoke

 8    first.  But essentially the content of the

 9    meeting, they both expressed that desire.

10         Q.    Did you have the impression that they

11    had discussed this before that meeting?

12         A.    Yes.

13         Q.    Now, had you heard of this concept

14    before this meeting?  That is, of restructuring

15    the spokesperson agreement?

16         A.    No.

17         Q.    Did you get the impression that either

18    or both of Luis Padilla and Janine Bousquette had

19    discussed it with Mr. Crowley prior to this

20    meeting?

21         A.    They did not communicate whether they

22    had discussed with him or not.

23         Q.    Did you get the impression that they

24    had?
```

```
 1        A.    I don't know.

 2        Q.    Now, was this memorandum that's marked

 3   as Exhibit 80 something you prepared after the

 4   meeting with Padilla and Bousquette?

 5        A.    Yes.

 6        Q.    So at the meeting when the subject was

 7   raised about restructuring the spokesperson

 8   agreement, what was said and by whom?

 9        A.    I'm sorry.  Read the question back, if

10   you could.

11                        (Record read.)

12        THE WITNESS:  Both Janine and Luis expressed

13   the desire to deal with reduced marketing budgets

14   that were going to go in place after the merger

15   and the need to reduce expense and expressed the

16   desire to attempt to find a different approach to

17   the relationship with Bob that would yield a

18   lower cost.

19   BY MR. O'BRIEN:

20        Q.    That's what they said?

21        A.    Yes.

22        Q.    Did you say anything?

23        A.    I asked a lot of questions about what

24   their interests were.
```

1          Q.    And who communicated that to you?

2          A.    Janine and Luis.

3          Q.    When did she communicate that to you?

4          A.    I don't remember precisely, but, you

5    know, by the point that we -- by the time that I

6    had written this memo and by the time we had this

7    meeting, it was communicated to us we would be

8    looking at smaller budgets.  We didn't know

9    precisely how that was going to manifest itself.

10         Q.    Now, prior to this meeting you had not

11   heard anything about the desire to restructure

12   the spokesperson agreement?

13         A.    Right.  That's correct.

14         Q.    Did you express an opinion at that

15   meeting as to whether that would be possible?

16         A.    I never gave anybody an indication that

17   I believed that there was a certainty we could do

18   this.

19         Q.    Well, understanding you couldn't

20   represent to somebody it was a certainty, could

21   you indicate to people that you thought it was

22   doable?

23         A.    At the point where I wrote this, I

24   said, "We do not know how they will react."  So I

1    indicated to people verbally and in writing that

2    I did not know what the outcome would be.

3        Q.    Now, you had been dealing with Mr.

4    Feiner, and for that matter with Mr. Vila

5    himself, since 1993?

6        A.    Yes.

7        Q.    And you had negotiated many amendments

8    to both the spokesperson agreement and the

9    syndication agreement with B.V.T.V.; had you not?

10       A.    Yes.

11       Q.    Did you have a sense, your own sense,

12   as to how they would react?

13       A.    I had a sense that they would listen.

14   I didn't know how they would respond back, and I

15   believe it was a profound change to the

16   arrangement.

17       Q.    What was a profound change?

18       A.    What we were going to propose was a

19   profound change to the relationship.

20       Q.    Why did you have the sense that they

21   would listen, that is Ron Feiner and Mr. Vila?

22       A.    Because we had a good relationship

23   historically, and I believe that, you know, that

24   would at least get them to listen to us in

```
 1      presenting our point of view and our proposal.
 2           MS. SANKARAN:  Off the record for a second.
 3                          (Short recess.)
 4      BY MR. O'BRIEN:
 5           Q.   Now, prior to this date, the date of
 6      this memorandum, is it your testimony that no one
 7      had discussed with Mr. Feiner or anyone
 8      representing Mr. Vila or B.V.T.V., Inc., the
 9      desire of Sears to restructure the spokesperson
10      agreement with Mr. Vila?
11           A.   Yes.
12           Q.   Okay.  Now, this memorandum states:
13           "Our original recommendation was to
14      negotiate in 2 steps."
15           Now, what was to be negotiated in two
16      steps?
17           A.   I believe that the verbal conversations
18      that went on around this had to do with how we
19      would approach proposing a restructuring of the
20      spokesperson arrangement.
21           Q.   Okay.  Well --
22           A.   And so it refers to the option of
23      either trying to negotiate one part of it and
24      come back for the other, versus what was attached
```

1    here, which was a proposal to negotiate it in one

2    step.

3         Q.   Well, the first time the concept of

4    renegotiating the spokesperson agreement along

5    with the syndication agreement, the first time

6    that came up was at a meeting with Janine,

7    Padilla, possibly Rode, Farkas?

8         A.   Right, the meeting we referred to.

9         Q.   Okay.  So when was it that you made

10   this original recommendation to negotiate in two

11   steps?

12        A.   Either in that meeting or in some

13   discussion that happened prior to that.

14        Q.   Okay.

15        A.   I'm not sure precisely the timing of

16   that, but, you know, somewhere in this space.

17        Q.   Does this refresh your recollection as

18   to when that meeting occurred?

19        A.   Not certain.

20        Q.   Now, had you put your recommendation

21   that it be negotiated in two steps into writing?

22        A.   I don't remember.

23        Q.   To whom did you make that

24   recommendation?

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

ROBERT J. VILA and                 )        ORIGINAL
B.V.T.V., INC.,                    )
                                   )
        Plaintiffs,                )
                                   )
    vs.                            )
                                   )  Civil Action No.
SEARS, ROEBUCK AND CO.,            )
SEARS HOLDINGS CORPORATION         )  05-11717-REK
and KMART HOLDING                  )
CORPORATION,                       )
                                   )
        Defendants.                ).


The continued deposition of ANDY

GINGER, called by the Plaintiffs for examination,

taken pursuant to the Federal Rules of Civil

Procedure of the United States District Courts

pertaining to the taking of depositions, taken

before ROBIN M. CHIMNIAK, a Notary Public within

and for the County of DuPage, State of Illinois,

and a Certified Shorthand Reporter of said State,

taken at 77 West Wacker Drive, Suite 3000,

Chicago, Illinois, on the 31st day of January,

2006, at the hour of 10:15 a.m.


# COURT REPORTING

*DOWNTOWN*
77 W. WASHINGTON, STE. 1917
CHICAGO, IL 60602
312/895-4974

*SUBURBS*
1407 E. ELM STREET
WHEATON, IL 60187
630/690-6911

BridgesReporting@aol.com
*FAX* 312/528-9025

1              MR. O'BRIEN:  Okay.  I'm going to show you

2       another document, Sears 2475, and ask that that

3       be marked.

4                          (Whereupon Deposition Exhibit

5                           No. 100 was marked as

6                           requested.)

7       BY MR. O'BRIEN:

8              Q.    Are these your notes?

9              A.    Yes.

10             Q.    Do you know when they were made or when

11      you made them?

12             A.    These were notes made when Ron Feiner

13      responded on the telephone to the proposal that

14      we had made in March to restructure the

15      arrangement with Bob Vila on the spokesperson

16      agreement and the syndication agreement.

17             Q.    So these notes were after that

18      conference call?

19             A.    That's correct.  These notes were in

20      response to Ron.

21             MR. O'BRIEN:  Okay.  I show you another

22      document, Sears 2476, and ask you if you can

23      identify that.

24

1    that.

2                    (Whereupon Deposition Exhibit

3                    No. 102 was marked as

4                    requested.)

5         THE WITNESS:  These are notes that are

6    related to Exhibit 100 that are also from that

7    same call in which Ron responded to the proposal

8    we had made.

9    BY MR. O'BRIEN:

10        Q.   With respect to Exhibit 102, there is a

11   line that says:

12              Could get a valuation from 2 to 4

13   million dollars.

14        A.   Yes.

15        Q.   What does that refer to?

16        A.   That's me writing down what Ron said to

17   me.

18        Q.   Do all these notes reflect what Mr.

19   Feiner said to you?

20        A.   Well, they either -- they either

21   reflect directly what he said to me or what I

22   wrote down when he was talking to me, yes.

23        Q.   Okay.

24        A.   That is true of both pages here.

1    about the terms of the proposal between these two

2    documents.  So in 81 we don't see the specific

3    dollars by year that we do in 94.

4         Q.   As I understand, Exhibit 94 is a

5    document that reflects the input of

6    Ms. Bousquette after the meeting that the team

7    had with Mr. Padilla and Ms. Bousquette?

8         A.   Yes.

9         Q.   And I believe you also testified that

10   Exhibit 94 and Exhibit 82 are identical?

11        A.   Yes.

12        MR. O'BRIEN:  Tired?

13        MS. SANKARAN:  No.  We're just repeating

14   ourselves over and over again and wasting time.

15   BY MR. O'BRIEN:

16        Q.   When did this conference call with Mr.

17   Feiner occur?

18        A.   I'm not sure, but I think you have an

19   exhibit here where Ron wrote down the date.

20        Q.   Okay.

21        A.   So if we look at that exhibit, we could

22   probably determine that pretty quickly.

23        Q.   Well, I'm going to show you the exhibit

24   anyway.  It's Exhibit 30.  If you looked at the

1    exhibits, you read it this morning.

2         A.    Is that in this pile?

3         MS. SANKARAN:  Yes.

4    BY MR. O'BRIEN:

5         Q.    Now, this was introduced in the

6    deposition of Mr. Rode, as with all of these

7    exhibits for identification.

8              This is a memo from Mr. Feiner to

9    Mr. Vila.  It's dated --

10        MS. SANKARAN:  Objection.  It's an e-mail.

11        MR. O'BRIEN:  I'm sorry?

12        MS. SANKARAN:  It's an e-mail, not a memo.

13        MR. O'BRIEN:  I'm sorry.

14   BY MR. O'BRIEN:

15        Q.    It's an e-mail from Mr. Feiner to

16   Mr. Vila.  And it's dated March 23, 2005, and the

17   subject is "Sears Conference Call."  Do you want

18   to take a minute to read it?  Because what I'm

19   going to ask you is I'm going to ask you

20   questions about what Mr. Feiner says in this

21   document occurred during that conference call.

22        A.    Yes.  I've read it.

23        Q.    Okay.  Now, it states in the conference

24   call was Andy Ginger, Drew Farkas, Mark Rode, and

1    presentation?

2        A.    Yes.  We put the Sears Holdings logo

3    and identity onto many documents.

4        Q.    Now, in the numbered parts of this

5    e-mail --

6        A.    Yes.

7        Q.    (Continuing) -- looking at the numbered

8    paragraph 5, it says -- Mr. Feiner says:

9            "They want to eliminate what remains in

10   the incentive bonus for 2004/05 which probably is

11   somewhere in the range of $350,000-450,000."

12           Does Mr. Feiner report accurately what

13   you said concerning that subject?

14       MS. SANKARAN:  Objection.

15       THE WITNESS:  I don't remember precisely the

16   number that I used at this point in time, but the

17   Exhibit 82 would indicate to me that we were

18   estimating $425,000.

19   BY MR. O'BRIEN:

20       Q.    Now, he says -- "he," Mr. Feiner, says

21   at the bottom of the first page:

22           "They had not presented this proposal

23   yet to senior management . . . ."

24           Was that true?  Well, first of all, was

1          Q.    Okay.   Now, in Exhibits 88 and 89,

2    could you take a look at those, please?

3          A.    Yes, I have them.

4          Q.    These documents were prepared

5    apparently in February 2005.   According to my

6    notes, that's your testimony.

7          A.    Yes.

8          Q.    And both -- Exhibit 88 says:

9          "Both contract amendments are ready for

10   signature."

11         A.    It says that, yes.

12         Q.    That was referring to the B.V.T.V.,

13   Inc., agreement with Sears and the King World

14   agreement with Sears?

15         A.    Yes, that's correct.

16         Q.    I want to show you Exhibit 21 or ask

17   you to look at Exhibit 21 and 22 while you are at

18   it.

19         MS. SANKARAN:   21 and 22?

20         MR. O'BRIEN:   21 and 22.

21         THE WITNESS:   I have them.

22   BY MR. O'BRIEN:

23         Q.    If you take a look at Exhibit 21 --

24   this was introduced through Mr. Rode.

1          A.    Yes.

2          Q.    (Continuing) -- and the attachment to

3    it?

4          A.    Yes.

5          Q.    That's part of it.

6                Is that the contract amendment with

7    B.V.T.V., Inc., that was ready for signature that

8    you've been referring to?

9          A.    Yes, I believe so.

10         Q.    If you could look at Exhibit 22, again,

11   this was introduced to -- through Mr. Rode.  Do

12   you recall seeing this e-mail before today --

13   there were actually two e-mails, but I'm

14   addressing the one that's first in time.

15         A.    I saw this in the course of looking at

16   exhibits yesterday, yes.

17         Q.    Yeah.  All right.  Did you see this

18   e-mail before yesterday?

19         A.    I don't remember seeing it before

20   yesterday.

21         Q.    Okay.  Now, you don't remember one way

22   or the other?

23         A.    Correct.

24         Q.    I want to draw your attention now to

1     Exhibit 71.   I believe this is a document you

2     identified yesterday as the contract in existence

3     in April 2004 with King World.

4          A.    That's correct.

5          Q.    And you pointed out that part of

6     Exhibit 71 is an amendment dated as of August 2,

7     2000?

8          A.    Correct.

9          MR. O'BRIEN:   Okay.   I'll show you another

10    document.   This is a three-page document,

11    pages -- Sears pages 1217 through 1219.

12                         (Whereupon Deposition Exhibit

13                          No. 114 was marked as

14                          requested.)

15    BY MR. O'BRIEN:

16         Q.    Can you identify this document?

17         A.    It's a proposed second amendment to the

18    contract between the distribution media sales

19    agreement between Sears and King World.

20         Q.    Now, there are some markings on this,

21    appears in pen or pencil.   Do you know whose

22    markings those are?

23         A.    No, I'm not certain.

24         Q.    And you've seen this document before

1    BY MR. O'BRIEN:

2        Q.    Amendment 11 to the syndication

3    agreement was to be a two-year contract?

4        A.    Correct.

5        Q.    Now, you said that there were -- going

6    back to the contract approval process changes

7    that occurred after the announcement of the

8    Kmart/Sears transaction, you had a conversation,

9    I believe you said with precision, was February

10   2nd, 2005, with Mr. Vila?

11       A.    I said on or about February 2nd.

12       Q.    Oh, okay.  Why were you so specific?

13       A.    It was at a television shoot, and I

14   believe that's the date the shoot occurred.

15       Q.    Where was it?

16       A.    Pardon me?

17       Q.    Where was the shoot?

18       A.    In Chicago.

19       Q.    Now, you stated in cross-examination

20   that you told Mr. Vila that if he wanted to

21   continue to produce the television show, he

22   should adhere to the principles of the

23   spokesperson agreement.

24              What were you referring to

1     specifically?

2          A.    If he was going to make an arrangement

3     to produce the television show with -- without

4     Sears' participation, that it was still required

5     by the spokesperson agreement that he not create

6     a competitive endorsement or that he do other

7     things that would violate the competitive

8     principles that are in the spokesperson

9     agreement.

10         Q.    Was it your understanding that

11    Mr. Vila -- strike that.  I'm a little confused.

12         The spokesperson agreement was between

13    Mr. Vila and Sears?

14         A.    Correct.

15         Q.    The syndication agreement was between

16    B.V.T.V. and Sears?

17         A.    Correct.

18         Q.    What were these competitive principles

19    you were talking about?

20         A.    The spokesperson agreement requires

21    that Bob not endorse competitive products; that

22    he not, you know, be associated with competitive

23    products in ways that would be damaging to Sears.

24         Q.    I see.  So you were referring to Bob

# EXHIBIT  C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

ROBERT J. VILA and B.V.T.V., INC.)
                             )
        Plaintiffs;       )
                             )
      -vs-           )  No. 05-11717-REK
                             )
SEARS, ROEBUCK AND CO.,     )
SEARS HOLDINGS CORPORATION   )
and KMART HOLDING CORPORATION, )   **ORIGINAL**
                             )
        Defendants.       )

The deposition of MARK P. RODE, taken in

the above-entitled cause, before Christine Golden, a

Notary Public and Certified Shorthand Reporter in and

for the County of DuPage, State of Illinois, taken at

77 West Wacker Drive, 30th Floor, Chicago, Illinois on

the 24th day of January, 2006, commencing at 10:00

o'clock a.m.

Reported by:  Christine Golden, CSR
License No.:  84-2126

COURT REPORTING

*DOWNTOWN*
77 W. WASHINGTON, STE. 1917
CHICAGO, IL 60602
312/895-4974

*SUBURBS*
1407 E. ELM STREET
WHEATON, IL 60187
630/690-6911

BridgesReporting@aol.com
*FAX* 312/528-9025

1    APPEARANCES:

2

3          MR. JAMES F. O'BRIEN, ESQ.,
           (410 Park Avenue, Suite 1530,
           New York, New York  10022)
4          212-813-9300
                on behalf of the Plaintiffs;

5

6          GREENBERG TRAURIG, LLP
           (One International Place, Boston,
7          Massachusetts  02110)
           617-310-6058
8          by:  MS. ANNAPOORNI R. SANKARAN,
                on behalf of the Defendants.

9
                      and
10
           MR. FRANK CALABRESE,
11         Associate General Counsel, Law Department
           (3333 Beverly Road, Hoffman Estates
12         Illinois  60179)
           847-286-0517
13              on behalf of the Defendants.

14

15

16

17

18

19

20

21

22

23

24

1      A.    It would have been -- this would it have been

2   2003-2004 season which would have ended in August or

3   someplace like that.

4      Q.    After August of 2004 there were still bonus

5   payments being made to B.V.T.V. on account of the

6   2003-2004 viewing season?

7      A.    Correct.  I think the final tally from King World

8   didn't come to Richard until, I think, 2005.

9      Q.    Okay.

10      A.    'Cause they had to make goods and stuff like that.

11      Q.    Now, do you recall in the, let's say, last calendar

12   quarter of 2004 that you were working with B.V.T.V., Inc.

13   in connection with the next viewing season that is for the

14   year 2005-2006?

15      A.    Yes.  2004-2005 I think was contracted for so it

16   would have been the 2005-2006.

17      Q.    Right.  As I understand the bonus payments we just

18   talked about were for the 2003-2004 season?

19      A.    Right.

20      Q.    In December of 2004 you were essentially in the

21   middle of the 2004-2005 year?

22      A.    Correct.

23      Q.    My question is were you in the fall, the last

24   calendar quarter let's say of 2004, working actively with

1    B.V.T.V., Inc. for the production of the TV show for the

2    2005-2006 season?

3       A.   2005-2006 and 2006-2007.  We were doing it two

4    years.

5       Q.   Okay.  You were certainly negotiating for a

6    two-year extension at that time?

7       A.   Yes.

8       Q.   I'm asking specifically in terms of projects

9    for the 2005-2006 season.  Were you working on those as

10   well?

11      A.   In terms of what projects Bob would be doing?

12      Q.   Yes.

13      A.   Yes.  Yes.  Correct.

14      Q.   One was a Florida project?

15      A.   Yes, a hurricane.

16      Q.   Could you explain for the record what that

17   project was?

18      A.   It ended up entailing a couple whose home had been

19   destroyed during one of the hurricanes and Bob wanted to do

20   a construction down there that would make the house not

21   hurricane proof but less susceptible to the damage caused

22   by hurricanes, wind, essentially.

23      Q.   And both you and B.V.T.V. were working on

24   developing that project in the last quarter of 2004,

1    correct?

2       A.    Correct.

3       Q.    That was before anything was signed?

4       A.    Correct.

5       Q.    For that season?

6       A.    Correct.

7       Q.    I want to show you actually two documents at the

8    same time and ask you if you have seen those documents

9    before.  These two documents are Sears 184 and 185.

10      A.    I don't know that I've seen the Michael Ferrone

11   statement.  I don't know what -- I don't know what it is.

12   I just know I've seen it.

13      Q.    What is document 184?

14      A.    Invoice from B.V.T.V.Com for the first part,

15   first payment of Season 16, what would have been Season

16   16.

17      Q.    What's the date of that invoice?

18      A.    December 2nd.

19      Q.    Do you recall seeing this invoice?

20      A.    I believe I've seen this invoice, yes.

21      MR. O'BRIEN:  Could we mark that as 10?  For

22   identification purposes for the record I'd like to

23   number document 1785 as Exhibit 11.

24

1              (Whereupon, said document was marked

2              as Exhibit No. 20 for identification.)

3    BY MR. O'BRIEN:

4        Q.    The next document before you is actually a group

5    of documents, P 131 through 134.  And on the first page it

6    indicates that is an e-mail from M. Rode to R. Feiner dated

7    sent January 14, 2005.  Do you recall sending that?

8        A.    Yes.

9        Q.    Okay.  Now, up to this point in time at a minimum

10   you had sent a December 22, 2004 draft to Mr. Feiner,

11   Mr. Feiner had given you comments on the December 22, 2004

12   draft, you had taken those comments and discussed them with

13   Mr. Ginger and/or Mr. Farkas, right?  Is this the document

14   that's attached here the result of all the foregoing?

15       A.    I believe it is, yes.

16       Q.    Okay.

17         MR. O'BRIEN:  Mark that, please, as 21.

18              (Whereupon, said document was marked

19              as Exhibit No. 21 for identification.)

20   BY MR. O'BRIEN:

21       Q.    With respect to Exhibit 21 -- Strike that.

22           Let's go to this document, sir.  This is a

23   document that's labeled P 135.

24           Have you reviewed it?

1    A.    Yes.

2    Q.    Now, this document contains two e-mails, the second

3    one on the page which the first in time by about 14 minutes

4    is from K Condon and that is Ron Feiner, to you, Subject:

5    Vila Agreement.  Okay.  Do you recall receiving this?

6    A.    Yes.

7    Q.    Okay.  Now, after you received this document did

8    you send Mr. Feiner any letter objecting to the content of

9    this exhibit?

10    A.    I don't believe so.

11    Q.    When you received -- excuse me.  Before we move on

12    let's mark this as 22.

13                    (Whereupon, said document was marked

14                    as Exhibit No. 22 for identification.)

15    BY MR. O'BRIEN:

16    Q.    I want you to look at Exhibits 10 and 11.

17    A.    Okay.

18    Q.    These were previously identified as invoices,

19    certainly Exhibit 10 was, invoices to Sears from B.V.T.V.,

20    Inc., for the first payment for Season 16.  Now, these

21    were addressed specifically to Mr. Fred Ciba.  Did I

22    understand correctly that you received a copy of this?

23    A.    Yeah.  Fred would have given me a copy.

24    Q.    Now, did you ever send any notice written, whether

1    e-mail or letter, to B.V.T.V., Inc. objecting to this

2    invoice?

3        A.    Fred was corresponding with them so it would not

4    have been my job, it would have been his responsibility to

5    send it.

6        Q.    I take it you didn't?

7        A.    I did not, correct.

8        Q.    Do you know whether Mr. Ciba did?

9        A.    I do not.

10       Q.    Did you direct him to?

11       A.    I don't believe I did, no.

12       Q.    Did Mr. Ciba report to you?

13       A.    No.

14       Q.    Was he your peer?

15       A.    Yes.

16       Q.    Did you have any discussion with Mr. Ciba about

17   objecting to these invoices?

18       A.    I told him not to pay them but to send something

19   back?  No, I don't think I did.

20       Q.    Okay.  Now, at about this time, this time now being

21   January 18, 2005, what was happening with the negotiations

22   with King World?

23       A.    I don't believe we had gotten anywhere.

24       Q.    By the way -- I'm sorry, you hadn't gotten --

1      Q.     First of all, why did that conference call occur?

2      A.     To brief Ron as to what the disposition was or the

3   ongoing negotiations for the Syndication Agreement.

4      Q.     By that being the agreement between Sears and

5   B.V.T.V.?

6      A.     Correct.

7      Q.     Now, first of all, whose idea was it to have this

8   conference call?

9      A.     I think Ron requested it.

10     Q.     Who is Wendy Pifner?

11     A.     I do not know.

12     Q.     Were you all in the same room when this conference

13  call took place with Mr. Feiner?

14     A.     Drew, Andy and I were in the same room.

15     Q.     Before the conference call took place did you

16  discuss what was going to be said by the people on the

17  Sears' side of the call?

18     A.     Yes.  I'm certain we did.

19     Q.     Okay.  What was said and by whom?

20       MS. SANKARAN:  Hold on.  I don't want you to reveal

21  any attorney-client communications so to the extent you

22  had communications internally at Sears with Sears'

23  counsel seeking legal advice don't divulge that but you

24  can talk about anything else.

1    THE WITNESS: I think on the call Andy -- I believe

2  Andy had spoke the entire time to Ron.

3  BY MR. O'BRIEN:

4    Q.  You've got to speak up a little.

5    A.  I'm sorry.  I believe on the call Andy spoke to

6  Ron.

7    Q.  Okay.  But I'm asking you about what was

8  discussed among the Sears people before they talked to

9  Mr. Feiner?

10    MS. SANKARAN:  Same instructions.

11  BY MR. O'BRIEN:

12    Q.  As to what was going to be said?

13    A.  I think that was with the lawyers and discussion

14  of what would be said is in that regard.  I don't think

15  that's --

16    Q.  Who was the lawyer on the call?

17    A.  Drew was on the call and there was another lawyer

18  as well.  I don't know who she was.

19    Q.  Could that have been Wendy Pifner?

20    A.  It could have been.

21    Q.  You don't know?

22    A.  No.

23    Q.  Do you know the firm all Holland and Hart?

24    A.  I do not.

1    Q.    In the course of those discussions with the other

2    lawyer who was not present was legal advice sought?

3    A.    Yeah, I believe so.

4    Q.    By whom?

5    A.    Andy would have asked for legal opinion.

6    Q.    Do you have a recollection that Andy asked for a

7    legal opinion?

8    A.    I have recollection that Andy asked Drew what,

9    you know -- yes.

10    Q.    You understand what I mean by legal opinion as

11    opposed to fact?

12    A.    Yeah.  Yeah.  Drew didn't -- yeah.

13    Q.    Aside from the legal opinion sought and presumably

14    given what else was discussed?

15    MS. SANKARAN: Hold on.  Before you answer the

16    question I'm going to instruct you not to answer to the

17    extent items were discussed with Drew in order for him

18    to be able to give a legal conclusion.  Those would be

19    covered for the purposes of attorney-client privilege.

20    So I know this is tough for you, but you have to separate

21    it out so that the privilege is maintained.  I would

22    instruct you not to answer that information.  If there

23    are other facts you can talk about those.

24    THE WITNESS: Okay.  We would have talked about who

1   was going to speak and the points to cover.  I think that

2   would have been most of it.

3   BY MR. O'BRIEN:

4      Q.   Now, before the call was made and before this

5   group of you; Andy, Drew and the other lawyer who was on

6   the phone, before that group got together were you told

7   what was to be done in the course of this call?

8      A.   Was I told what was to be done?  No.

9      Q.   Was Andy --

10      A.   Well, hold on.  I believe Andy had conversations

11   with others.

12      Q.   With whom?

13      A.   My recollection is Jeannine.

14      Q.   Jeannine.  Okay.  Do you recall how long the

15   conversation lasted?

16     MS. SANKARAN:  Which conversation are you talking

17   about?

18   BY MR. O'BRIEN:

19      Q.   Fair enough.  Do you recall how long the

20   conversation with Mr. Feiner lasted?

21      A.   I'd say it was reasonably brief.  Somewhere

22   between fifteen minutes and a half hour.  It wasn't a

23   very long conversation.

24      Q.   Do you recall someone on the Sears' side

1    providing Mr. Feiner with an overview of the chaotic

2    situation existing at Sears?

3        A.    I believe Andy did all the talking and I believe

4    he would have communicated it was difficult to get things

5    done, yes.

6        Q.    Do you recall Andy saying or anyone else saying

7    that things were unfolding quite quickly at Sears?

8        A.    I don't remember that statement, no.

9        Q.    Do you recall someone saying that by Friday

10   senior management's expected to be announced?

11       A.    I don't remember that being said but that

12   wouldn't surprise me.

13       Q.    Okay.

14       A.    I don't remember the date of the call, either,

15   though.  I'm sorry.

16       Q.    Let me help you.

17       A.    Okay.

18       Q.    This is a document P 259, 260 and these are an

19   e-mail from K Condon to Mr. Vila reporting on facts, not

20   on any legal communication, regarding the Sears conference

21   call of March 23, 2005.  Take a minute and review that.

22       A.    Okay.

23            MR. O'BRIEN:  Let's have that marked, please, as 30.

24

1              (Whereupon, said document was marked

2              as Exhibit No. 30 for identification.)

3       MS. SANKARAN: I'm not objecting but it hasn't been

4    authenticated.

5       MR. O'BRIEN:  It's for identification purposes

6    because I'm going to be questioning the witness on the

7    content.

8    BY MR. O'BRIEN:

9       Q.   My first question to you, sir, is does it refresh

10   your recollection as to what that conference call would

11   have been discussing?

12      A.   I know Andy provided a brief.  I don't remember him

13   saying these things but they don't seem inconsistent with

14   what was going on.

15      Q.   When you say Andy provided a brief what do you

16   mean?

17      A.   He briefed them, told them what was going on at

18   Sears.  Not a legal brief.

19      Q.   Having read the documents and understanding this

20   is Mr. Feiner's notes, okay, it is true that he had the

21   conversation with Andy, Drew, you, and he identifies a

22   Wendy Pifner of Holland and Hart?  You agree with that?

23      A.   I know there was somebody else on the line.  If it

24   was Wendy Pifner I don't know.

1    Q.   He says in the first 20 minutes there was a

2    discussion, the conversation dealt with an overview of

3    the chaotic situation existing at Sears.  Do you agree

4    with that?

5    A.   Yes.

6    Q.   I don't mean verbatim.  I am asking as to

7    concepts.

8    A.   All of the concepts here make perfect sense.  I

9    just don't remember him saying them.

10    Q.   It says, "There probably will be some sharing of

11    power at the top which will involve Bill Crowley, Lampert's

12    right-hand man, Alan Lacy, the guy running K-Mart today,

13    and Luis," is it Lewis or Luis?

14    A.   Luis.

15    Q.   "Luis Padilla."  Bill Crowley had already been

16    involved in the business affairs of Sears before this

17    conversation took place on March 23, correct?

18    A.   Yes.

19    Q.   Who is Lampert?

20    A.   Eddie Lampert is the owner of ESL Investments

21    which bought majority share of K-Mart and subsequent --

22    Q.   Now, it states here that Jeannine, Andy's boss,

23    will report directly to Padilla, if she still has her

24    job.  Was that statement made, that her job was at risk?

1    Q.   You said it involved yourself, Andy, maybe Henry,

2 maybe Drew?

3    A.   Probably Drew.

4    Q.   What about Bill Crowley?

5    A.   No.

6    Q.   What about Padilla?

7    A.   No.

8    Q.   What about Jeannine?

9    A.   No.  She wouldn't have been in the room but I

10 believe at this point in time Andy had briefed her.

11    Q.   Okay.  Well, let me revise my question.

12    A.   Okay.

13    Q.   Okay.  Whether or not it was in your presence

14 at a meeting where you participated in constructing this

15 proposal, do you know if Crowley had input into the

16 proposal?

17    A.   I don't know.

18    Q.   One way or the other?

19    A.   I don't know.

20    Q.   That's what I'm getting at.  You don't know one

21 way or the other.

22        Paragraph No. 3 says in exchange for what's in

23 paragraph No. 1 and No. 2, it says Sears wants to reduce

24 the Spokesperson Agreement as follows:  It has numbers.

1    Do you recall —— like for 2006 it says $700,000.  Do you

2    recall if that was the reduction or that was the amount

3    that Sears was willing to pay?

4        A.   I believe that was the reduction.

5        Q.   So they wanted a $700,000 reduction for the year

6    2006 and a $1,000,000 reduction for 2007, $1,600,000

7    reduction for 2008 and a total reduction of 2009?

8        A.   Yes.

9        Q.   Look at paragraph 5, please.  It says "they,"

10   I believe they is referring to Sears, "want to eliminate

11   what remains in the incentive bonus for 2004/2005 which

12   probably is somewhere in the range of $350,000—450,000."

13           Do you recall that statement being made?

14       A.   Yes.

15       Q.   As to the numbers 250 —— strike that —— 350,000

16   to $450,000, where did that number come from?

17      MS. SANKARAN:  Objection.  He didn't write the

18   e-mail.

19   BY MR. O'BRIEN:

20       Q.   Was it said?  Were these numbers correct?  Does

21   he accurately report here what you remember being said

22   at the conference call?

23       A.   I believe so.

24       Q.   Okay.  So where did the numbers came from, the

1    Sears' side of the conversation?

2        A.   I don't know that to be the case.  He may have

3    decided what those bonus structures would be.

4        Q.   You have no memory one way or the other?

5        A.   I think the numbers are close.  I don't know if

6    he conjectured that based on what he knew or if he was --

7    or if it was told to him.

8        Q.   At the time of this conference call in March 2005

9    did Sears owe B.V.T.V. bonus for the year 2003-2004?

10       MS. SANKARAN: To the extent you know you can answer.

11       THE WITNESS: I don't think so.

12   BY MR. O'BRIEN:

13       Q.   Okay.  Do you recall the last bonus payment it

14   made under your authority was $25,000?

15       A.   Right.

16       Q.   In the end of December?

17       A.   For the 2003-2004?

18       Q.   Correct.

19       A.   This is the 2004-2005.

20       Q.   Stay with me.

21       A.   Sorry.

22       Q.   After that $25,000 payment was made for the

23   2003-2004 year did Sears receive further numbers from

24   King World that would indicate a payment was due to

1    B.V.T.V.?

2        A.    I do not remember we received a further payment

3    that indicated he should get more money for 2003-2004.

4        Q.    Do you remember one way or another?

5        A.    I do not remember seeing anything that would

6    indicate that.

7        Q.    Do you remember discussing it?

8        A.    No.

9        Q.    Now, this in this Exhibit 30, it refers to

10   2004-2005.  That's the season from September 24,

11   September 2004 to August 2005, correct?

12       A.    Correct.

13       Q.    Now, was there a bonus owed in March, 2005?  Was

14   there a bonus owed to Mr. Vila, to B.V.T.V., Inc. for

15   that 2004-2005 season?

16       A.    I think this is an assumption on what was -- what

17   would be due him, not that he was, in fact -- that it was

18   actualized at this point.

19       Q.    That it was --

20       A.    That it was earned at this point.

21       Q.    Do you recall under the B.V.T.V. Syndication

22   Agreement that certain bonus payments are required to be

23   made by Sears in anticipation of bonuses being earned?

24       A.    I didn't remember that but I may have known at

1    the time.

2        Q.   Do you know it now?

3        A.   No, I don't.  I'm sorry.

4        Q.   I don't want --

5        A.   I'm sorry.  This says to eliminate what remains

6    in the incentive bonus payment.  I'm kind of assuming

7    there was a 2004-2005 payment already made, but I don't

8    remember that.

9        Q.   Now, it says -- Mr. Feiner says at the bottom

10   of the first page, "They," I assume that means you,

11   Mr. Farkas, Mr. Ginger?

12       A.   Yeah.

13       Q.   "Had not presented this proposal yet to senior

14   management."  Who is senior management?  First of all,

15   do you remember this being said by Mr. Ginger or anyone

16   on your side of the call?

17       A.   Yeah.  I seem to remember him saying.

18       Q.   Who was the senior management that was referred

19   to?

20       A.   It would have been, I would assume, Luis, Bill

21   Crowley, people who would have had to have signed a

22   contract of that size at this point.

23       Q.   It says, "It fits within budget requirements."

24            Take a short break?

1                    (Whereupon, a short break was taken.)

2    BY MR. O'BRIEN:

3        Q.    What is ESL Investments?

4        A.    It's Eddie Lampert's investment company, whatever

5    his middle initial is, Eddie something Lampert.

6        Q.    Was Bill Crowley an officer of ESL Investments?

7        A.    I believe he.

8        Q.    Was he also an officer of K-Mart Corporation?

9        A.    Yes, he was.

10       Q.    I want to show you this document, it consists of

11   a number of pages, Sears document 1940 through 1944 and

12   I'll ask if you would take a look at it and tell me if

13   you have ever seen this document before?

14       A.    It's a little difficult to read.

15       MS. SANKARAN:  For the record I know that when we did

16   the production that this came out in a really weird way.

17   There should be another one that sets it out in a chart.

18   There are duplicates of this e-mail.  I'm not sure if you

19   have them with you.

20       MR. O'BRIEN: I'm not sure, either.  Why don't I do

21   this, if this is acceptable?  I just intend to refer to

22   the first page of this document.

23       MS. SANKARAN: Okay.

24

1      Q.    When was "earlier"?

2      A.    During 2004 we had discussed it

3    multiple times.

4      Q.    And she approved of a two-year

5    contract?

6      A.    Yes.  She was willing to move forward

7    with a shorter extension.

8      Q.    And she was aware, as you testified

9    earlier, of the financials that were involved?

10     A.    Yes.  Anytime we would have discussed

11   it, we would have discussed the financials along

12   with the terms.

13     Q.    Now, it says in your next paragraph:

14           "As with other long-term deals, since

15   the merger announcement, as directed, we have

16   been holding back the contract completion on

17   this."

18     A.    Yes.

19     Q.    You were holding back on signing the

20   contract; is that correct?

21     A.    We were holding back on completing

22   contracts and signing contracts in any case.

23     Q.    Well, with respect to the B.V.T.V.

24   syndication agreement extension, what you were

1    Are you familiar with this document?

2        A.   Yes.

3        MR. O'BRIEN: Let's mark this as 49.

4                    (Whereupon, said document was marked

5                    as Exhibit No. 49 for identification.)

6    BY MR. O'BRIEN:

7        Q.   Now, prior to writing this e-mail on May 6, 2005

8    you reviewed the Spokesperson Agreement between Robert J.

9    Vila and Sears?

10       A.   I had looked at it and knew kind of what it said

11   but not in a substantive manner to go over it.

12       Q.   And I think you already testified, I'll ask again,

13   prior to May 6, 2005 had you reviewed the B.V.T.V.

14   Syndication Agreement with Sears in the same manner?

15       A.   In the same manner.  I knew that it was there

16   and kind of what it said but not in detail.

17       Q.   When did you become aware, as you say, in this

18   e-mail as follows, "There is a clause in one of the

19   amendments which says if the show is 'cancelled' we can

20   terminate the Spokesperson Agreement"?

21       A.   I'm sorry, an attorney --

22       MS. SANKARAN: No.  I think the question was when

23   did you become aware?  I want you to answer that.

24       THE WITNESS:  It would have been something around

1   prior to -- somewhat shortly prior to this date, around

2   this.

3   BY MR. O'BRIEN:

4       Q.   It's fair to say on or around May 6, 2005?

5       A.   Probably before.

6       Q.   Not much before May 6th?

7       A.   No, sir.

8       Q.   Not more than May 5th?

9       A.   Correct.

10      Q.   Okay.  Now, the next sentence you state, "The

11  clause was written to cover us if Bob was no longer

12  marketable and we couldn't sell the show."

13          How did you arrive at that conclusion?

14      MS. SANKARAN: Again, I'm going to instruct you not

15  to answer to the extent that it would reveal privileged

16  attorney-client communications.  If you learned this

17  information from someone outside of counsel as to the

18  purpose of the clause then you can talk about it.

19      THE WITNESS: It was an attorney-client.

20  BY MR. O'BRIEN:

21      Q.   Just so I understand, the language in the second

22  sentence is something an attorney told you?

23      A.   This is -- was part of an attorney conversation.

24      Q.   Well, all I want is a yes or no.  And I don't

1   want to pursue this for no good purpose.

2      A.   Right.

3      Q.   I'm simply asking this.  Let me put it this way.

4   Let me restate the question.  The language in the second

5   sentence, and I quote again, "The clause was written to

6   cover us if Bob was no longer marketable and we couldn't

7   sell the show," did somebody tell you that?

8      A.   Yes.

9      Q.   Was that person an attorney?

10     A.   Yes.

11     Q.   When did that person tell you the things that are

12  in this second sentence?

13     A.   Again, some time before this was written but after

14  May 5th or after --

15     Q.   Okay.  Did anyone other than an attorney say to

16  you that the clause was written to cover us if Bob was

17  no longer marketable and we couldn't sell the show?

18     A.   No.

19     Q.   Did you make any inquiry of anyone else?

20     A.   No.

21     Q.   Now, the third sentence of this e-mail -- by the

22  way, I haven't stated this, this is an e-mail from you to

23  Luis Padilla, correct?

24     A.   Correct.

1    Q.    The third sentence you say, "Since we own the

2    name." First of all, what name are you referring to?

3    A.    Bob Vila's Home Again.

4    Q.    And you state, "we own the name, 'Bob Vila's Home

5    Again.'" How do you reach that conclusion?

6    A.    A lawyer.

7    MS. SANKARAN: Again, hold on. I'm going to instruct

8    you not to answer to the extent it would reveal an

9    attorney-client communication.

10    THE WITNESS: Then I can't.

11    BY MR. O'BRIEN:

12    Q.    A lawyer told you that?

13    A.    Yes.

14    Q.    Well, "Since we own the name," and then continuing

15    on to the next phrase, "and pay for syndication, Rob Rathke

16    believes that if we 'cancel' the show that would allow us

17    to get out of the remainder of the Spokesperson Agreement."

18    Is what you wrote in that last sentence in your

19    e-mail to Mr. Padilla true?

20    MS. SANKARAN: Objection. Calls for a legal

21    conclusion. You can talk about your understanding.

22    MR. O'BRIEN: No. No. I'm asking, so we're clear,

23    counsel, I'm asking this witness if what he wrote in

24    this e-mail is true.

1        THE WITNESS: Yes

2    BY MR. O'BRIEN:

3        Q.    Thank you.  Who's Stacey Bashara, B-a-s-h-a-r-a?

4        A.    I'm sorry, I'm not --

5        Q.    Did she have something to do with Ty Pennington?

6        A.    I don't remember.

7        Q.    Okay.  This is a Sears document 2395 through 2398.

8        A.    I can answer that question now, I believe.

9        Q.    This document has refreshed your recollection?

10       A.    Yeah.

11           MR. O'BRIEN: Let's mark it and then you can answer

12   the question.  That will be 50.

13                      (Whereupon, said document was marked

14                      as Exhibit No. 50 for identification.)

15   BY MR. O'BRIEN:

16       Q.    Now, Exhibit 50 refreshes your recollection as to

17   who Stacey Bashara is?

18       A.    Yes.  Stacey worked for one of our advertising

19   agencies Aeicoff.

20       Q.    I'm sorry?

21       A.    I'm sorry.  Stacey worked for one of our

22   advertising agencies, Aeicoff and Company which handled

23   direct marketing to television of which Bob did a number

24   of those commercials.

1    A.   Yes.

2    Q.   Let me give you this and ask you if you can

3    identify it?

4    A.   Looks like the previous invoice less union dues

5    and Fred submitted it.

6         MR. O'BRIEN: Now, can we have that marked, please?

7                   (Whereupon, said document was marked

8                   as Exhibit No. 57 for identification.)

9    BY MR. O'BRIEN:

10   Q.   Referring you to Exhibit 57 there is a stamp on

11   the face of that invoice, is there not?

12   A.   There is.

13   Q.   What is that stamp?

14   A.   It's an approval stamp.

15   Q.   Is that the procedure for processing invoices at

16   Sears?

17   A.   It is.

18   Q.   And it has been during the time you were there?

19   A.   Correct.

20   Q.   Now --

21   A.   It's changed since then but I think I believe this

22   to be the approval process at that time.

23   Q.   Now, that authorizes the payment of the July 1st,

24   the invoice due July 1, 2005 for the Spokesperson

```
 1   Agreement, correct?

 2      A.   Correct.

 3      Q.   You approved it?

 4      A.   Fred approved this.

 5      Q.   Well, Fred asked for your approval before he

 6   approved it, did he not?

 7      A.   Yeah.  He sent me the e-mail.

 8      Q.   In other words, Fred couldn't approve it unless you

 9   approved it?

10      A.   Fred would not have submitted it without my

11   approval prior.

12      Q.   It's fair to say you approved that.  Was that

13   payment made?

14      A.   I don't believe so.

15      Q.   Why?

16      A.   I don't know.

17      Q.   Nobody ever told you why this money wasn't paid?

18      A.   No.

19      Q.   You had no discussions with anyone as to the

20   nonpayment of the July invoice?

21      MS. SANKARAN:  I'm going to instruct you not to answer

22   to the extent it would reveal attorney-client

23   communication.

24      THE WITNESS: I had no discussion with anybody I don't
```

1   believe at all about why it was not paid.  I don't remember

2   any discussion around that.

3   BY MR. O'BRIEN:

4       Q.   Did you know, in fact, that this invoice Exhibit 57

5   was not paid?

6       A.   Yes.

7       Q.   How did you know that?

8       A.   Fred told me it wasn't paid.

9       Q.   Did Fred tell you why it wasn't paid?

10      A.   I don't believe Fred knew.

11      Q.   Who told Fred not to pay it?

12          MS. SANKARAN: Objection.

13          THE WITNESS: I don't know.  I don't remember.  I

14  don't know if -- I don't know.  I don't even know if

15  he ever told me who told him not to pay it.

16  BY MR. O'BRIEN:

17      Q.   Did you ask him?

18      A.   I don't remember.

19      Q.   Did Mr. Feiner ask you why it was not paid?

20      A.   I don't think so.

21      Q.   At this point in time, the end of June, latter

22  part of June, 2005 were you told not to communicate any

23  further with Mr. Feiner?

24      A.   Yes.

1    A.    I do not believe I have, no.

2    Q.    You've never seen it before?

3    A.    No.

4    Q.    All right.  If you would go through it with me?

5        MS. SANKARAN:  Why don't you just give him a minute

6    to read it.

7        MR. O'BRIEN:  Sure.

8        THE WITNESS: Okay.

9    BY MR. O'BRIEN:

10    Q.    Now, in the first paragraph of this letter I

11    believe it's the second sentence it states, "Sears has

12    learned that you have engaged in substantial misconduct

13    under the Agreement."  The agreement referred to is the

14    Spokesperson Agreement.  "Including your violation of

15    Sears' trademark in the Home Again name."

16            Now, when did your leave the employ of Sears

17    Roebuck and Company?

18    A.    January or December 31st.

19    Q.    2005?

20    A.    Correct.

21    Q.    So during the entire period that you were at

22    Sears were you aware of any violation by Mr. Vila of

23    any Sears' trademark?

24    A.    I don't think so.  The answer is no.

1       Q.    In the next sentence of this letter states, "As

2    a result of this material breach of the Spokesperson

3    Agreement, Sears was under no obligation to pay for your

4    services beginning on July 1, 2005."

5            Before reading this letter this afternoon had

6    you ever heard any statement like that being made?

7       A.    No.

8       MS. SANKARAN:  Objection.

9       THE WITNESS: No.

10   BY MR. O'BRIEN:

11      Q.    Did anyone discuss with you a desire on the

12   part of Sears to terminate the Spokesperson Agreement?

13      MS. SANKARAN:  Just answer either yes or no or I

14   don't know or I don't remember.

15      THE WITNESS: Yes

16   BY MR. O'BRIEN:

17      Q.    Who?

18      MS. SANKARAN:  Just answer the name and we'll see if

19   there's a privilege.

20      THE WITNESS:  Bill Crowley.

21   BY MR. O'BRIEN:

22      Q.    When?

23      A.    It was in the documents we've looked at.  I can't

24   give you the exact date.

# EXHIBIT  D

Page 1

1

2      UNITED STATES DISTRICT COURT
       FOR THE DISTRICT OF MASSACHUSETTS

3      ---------------------------------------x

4      ROBERT J. VILA and B.V.T.V., INC.,        :

5                      Plaintiffs,               :

6             - against -                        :   Civil Action
                                                     No. 05-11717-REK
7      SEARS, ROEBUCK AND CO., SEARS HOLDINGS :
       CORPORATION and KMART HOLDING
8      CORPORATION,                              :

9                      Defendants.               :

10     ---------------------------------------x

11                        200 Park Avenue
                          New York, New York
12

13                        March 1, 2006
                          11:00 a.m.

14

15

16          ORAL DEPOSITION of WILLIAM C. CROWLEY, a

17     nonparty witness herein, taken by the Plaintiffs,

18     pursuant to Notice, held at the above-captioned

19     time and place, before Hanna Roth, Shorthand

20     Reporter and Notary Public of the State of New

21     York.

22

23

24

25

Page 2

1

2        A P P E A R A N C E S:

3            JAMES F. O'BRIEN, ESQ.
                    Attorney for Plaintiffs
4                        410 Park Avenue
                        Suite 1530
5                        New York, New York 10022
                        (212) 813-9300

6


7            GREENBERG TRAURIG, LLP
                    Attorneys for Defendants
8                        One International Place
                        Boston, Massachusetts 02110
9                        (617) 310-6058
10      By:          GARY GREENBERG, ESQ.
                    ANNAPOORNI R. SANKARAN, ESQ.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 55

William Crowley

1
2       MR. GREENBERG:  Objection.
3       A.    I didn't say that.
4       Q.    You told him to summarize the deals in
5    the e-mail?
6       A.    Yes.
7       Q.    Did he do so?
8       A.    I don't know.
9       Q.    You don't know?
10      A.    I don't know if I did.
11      Q.    Would you look at Exhibit 78.
12      A.    I see it.
13      Q.    Now, Exhibit 78 is an e-mail from Andy
14   Ginger to you, is it not?
15      A.    Yes.
16      Q.    He is sending it to you at an e-mail
17   address that is wcc@eslinvest.com correct?
18      A.    Yes.
19      Q.    That's where your primary office was
20   at ESL Investments?
21      A.    March 7th, I would spend time at ESL
22   and time in Troy.
23      Q.    Do you recall seeing this document
24   before today?
25      A.    I don't recall seeing it.

Page 56

William Crowley

1

2       Q.    He says to you: "Per your request,

3   attached are three contract amendment summaries

4   for," and then there are redactions, "Bob Vila's

5   Home Again," then another redaction, "we have

6   reviewed these in detail with Luis Padilla and

7   Janine Bousquette," then more redactions.  He

8   says, "Vila," and another redaction, "are ready

9   for signature.  We stand ready to," redaction

10  that appears, "you would like to see, let me

11  know, we would like to move forward as soon as

12  possible."  Did you reply to that?

13      A.    I don't recall.

14      Q.    This is March 7th.  Why was he asking

15  you --

16            MR. GREENBERG:  Objection.

17      Q.    Why was Mr. Ginger asking you that we

18  would like to move forward as soon as possible?

19      A.    I don't know.

20      Q.    Just being a nice guy?

21            MR. GREENBERG:  Objection.

22      A.    Ask Mr. Ginger.

23      Q.    In fact, you were running the shop at

24  that time, weren't you, sir?

25            MR. GREENBERG:  Objection.

Page 63

William Crowley

1
2   there would be cost reductions.
3                (Recess taken.)
4        Q.    Prior to March 24, 2005, what was the
5   purpose of your communications with Sears
6   personnel regarding Vila?
7        A.    I was trying to learn information to
8   find out what was going on.
9        Q.    Did you get that information you were
10  seeking?
11       A.    I got some of it over time.
12       Q.    When you got that information, what
13  did you do with it?
14       A.    I reviewed it, analyzed it, tried to
15  understand it.
16       Q.    Did you give any comments back to the
17  Sears people on the information you received?
18       A.    I found or would ask for more
19  information to try to understand better what the
20  current situation was.
21       Q.    But other than asking for more
22  information, did you offer any insights regarding
23  the information conveyed to you?
24       A.    I did discuss with them my views on,
25  you know, work they had done, analysis, shared my

Page 64

William Crowley

1

2  thoughts.

3          Q.    Which thoughts did you share with them

4  concerning Vila?

5                  MR. GREENBERG:  We are talking --

6                  MR. O'BRIEN:  Prior to March 24th.

7                  MR. GREENBERG:  Again, you're not

8          talking about anything relating to

9          discussions with counsel, because if you

10         are, we are not going into that.

11                 MR. O'BRIEN:  He got that instruction

12         got so many times, I'm sure he is in tune

13         with that.

14         Q.    I am not asking for legal advice you

15  got, I'm asking about your insights that you may

16  have shared with them regarding Vila.

17                 MR. GREENBERG:  Again, to the extent

18         you provided information to counsel or any

19         meeting where counsel attended and you

20         intended that to be seeking legal advice, we

21         are asserting the privilege.  In the

22         question, I believe, Mr. O'Brien is not

23         asking you for any communication where you

24         said anything in the context of seeking

25         legal advice.

Page 65

William Crowley

1

2        A.    I can't recall specifically advice

3    that I gave or insights.

4        Q.    But you did give some?

5        A.    I believe I gave some.

6        Q.    Prior to March 24, 2005, did

7    Mr. Ginger inform you that the spokesperson

8    agreement with Bob Vila extended through December

9    31, 2009?

10        A.    I don't recall.

11        Q.    Do you recall whether anyone at Sears

12    informed you that the spokesperson agreement with

13    Mr. Vila extended through December 31, 2009?

14        A.    I don't recall whether he told me that

15    specifically.  I don't recall whether anyone said

16    that to me specifically.

17        Q.    Do you recall, prior to March 24,

18    2005, being informed that the syndication

19    agreement extension with B.V.T.V. Inc. was

20    negotiated and ready to sign?

21        A.    I don't recall.

22        Q.    With whom at Sears did you have the

23    most interface, if you will, during that period

24    of November to March 24, 2005?

25        A.    The CFO, Allen Lacy.

Page 66

William Crowley

1

2      Q.    Who was the CFO?

3      A.    Glen Richter, Bill Phelan, a number of

4  finance people.

5      Q.    Now, as to the information or the

6  learning you gathered during the period November

7  to March 24, 2005, did you pass that information

8  on to Mr. Lampert?

9      A.    What information?

10     Q.    The information you said you learned

11 during the period of time.

12     A.    Any information?  Some I did, yes.

13     Q.    Did you pass any information to Mr.

14 Lampert concerning Vila?

15     A.    Yes, I did.

16     Q.    What information was that?

17     A.    I recall on a couple occasions telling

18 him that we were describing what was going on at

19 the time.

20     Q.    Did he respond to that information?

21     A.    I don't recall.

22     Q.    Would you take another look at

23 Exhibit 77.  You've seen it once before.  This is

24 the two e-mails, one of which is from you to

25 Mr. Ginger.  Do you recall this?

Page 69

William Crowley

1
2      proposed.

3          Q.    The proposed renegotiated deal, was

4      there a proposed renegotiated deal at that time?

5          A.    There was a proposal for a deal with

6      Bob Vila.

7          Q.    Whose proposal was it?

8          A.    I'm not sure which this is referring

9      to.

10         Q.    Do you recall participating in

11     constructing a proposed renegotiated deal with

12     Bob Vila?

13         A.    Yes.

14         Q.    What was your input into that?

15         A.    I don't recall.

16         Q.    "Now, Eddie, the structure, if I can

17     use that word, make sure you look at the proposed

18     renegotiated deal."  Did you do so?

19         A.    I assume I did so.

20         Q.    Let's look at the next e-mail, top of

21     the page.  This is from you dated Friday, April

22     1, 2005, to L. Padilla.  Is that Luis Padilla?

23         A.    Yes.

24         Q.    Your statement to him is:  "What is

25     the best way to reduce our exposure to Vila?"

Page 70

William Crowley

1  What did you mean by that?

3      A.    There was this proposed deal, which I
4  know we had put together.  The group, Rode and
5  guys, had been putting together a deal which
6  would involve a trade-off of the library and the
7  spokesperson agreement, a bunch of things.  The
8  goal was to reduce the exposure of future
9  payments to Vila, given that there is very little
10  value to continuing having him as a spokesperson
11  for the company.  So he wanted it, likely we
12  thought, and we were trying to put together a
13  deal that would reduce the amount of money we
14  would have to continue to pay to him over time.

15      Q.    Those payments you're referring to
16  over time were under the spokesperson agreement?

17      A.    I think that's right.

18      Q.    Do you recall if Mr. Padilla responded
19  to your e-mail that we just read?

20      A.    Just to clarify, I'm not sure whether
21  this deal was the one we proposed to them.  They
22  proposed a deal where they would reduce future
23  exposure for liability and some payments.  I'm
24  not sure whether it was their proposal or our
25  proposal to them.

Page 71

William Crowley

1

2          MR. GREENBERG:  When you say they,

3     just so the record is clear --

4          THE WITNESS:  The Vila Group, broadly

5     defined.

6          Q.    Did you have direct communications

7     with what you just referred to as the Vila Group?

8          A.    I don't think so.  I don't recall.

9          Q.    I think I asked you whether

10    Mr. Padilla responded to your e-mail of April 1st,

11    asking what was the best way to reduce your

12    exposure to Vila.

13         A.    I don't recall responding to this.

14         Q.    Turn to Exhibit 110, please.

15         A.    Yes.

16         Q.    Exhibit 110 is another e-mail chain

17    and it contains three of the e-mails we just

18    spoke about.  Then at the top it has another

19    e-mail that's from Padilla to you, dated April

20    2nd, Re: Bob Vila, and redacted. "Contract

21    details."  Do you recall receiving this?

22         A.    Yes, I do.

23         Q.    Mr. Padilla says:  "Send him back to

24    Cuba?  Kidding.  We are in the process of

25    negotiating our commitment to minimize our

Page 72

William Crowley

1

2     exposure of fees and," I think he means "length

3     of time," misspelled. "I will review with you on

4     Monday."

5                Now, you were already aware, prior to

6     April 2, 2005, that "we are in the process of

7     negotiating our commitment to him."  Isn't that

8     correct?

9         A.    I was aware of discussions with him,

10    yes.

11        Q.    Did you respond to this e-mail from

12    Mr. Padilla?

13        A.    I don't recall.

14        Q.    Do you recall meeting with him on

15    Monday, as it refers to in the e-mail?

16        A.    I don't know if I did.

17        Q.    Would you turn to Exhibit 112.  Take a

18    moment because this is a multiple-page exhibit,

19    sir.

20        A.    Okay.

21        Q.    First of all, I am going to ask if

22    you've ever seen this document before today.

23        A.    I don't recall ever seeing it.

24        Q.    Does that include the attachment to

25    it?

Page 75

William Crowley

1

2    you read the attachments?  You don't know if you

3    even got them?

4        A.    I don't know.  I mean, a got a lot of

5    stuff.  This was not the top priority in terms of

6    what we were dealing with.

7        Q.    Please go back to 112.  If you look at

8    the third paragraph, "Timing urgent," was that

9    communicated to you at or around April 4, 2005?

10       A.    I was aware that there were people,

11   Andy Ginger and Rode, who wanted to get this

12   approved.  That was going on since I first met

13   with them.

14       Q.    Get it approved by whom?

15       A.    Somebody.  They wanted to get it

16   signed.

17       Q.    Well, were they asking for your

18   approval?

19       A.    I couldn't sign the document.

20       Q.    I didn't ask that.  Were you asked if

21   you approved it?

22       A.    I don't recall if they asked for my

23   approval.

24       Q.    Do you know whose approval they were

25   seeking?

Page 76

William Crowley

1

2    A.    I don't know.  I mean, I wasn't an

3    officer of Sears Roebuck, I didn't sign the

4    agreement.

5    MR. GREENBERG:  We are talking about

6    the period prior to March 24th?

7    MR. O'BRIEN:  Right.

8    Q.    So they were seeking somebody's

9    approval but you don't know whose?

10    A.    They wanted to get it signed.

11    Q.    What was preventing them from getting

12    it signed?

13    A.    I don't recall.

14    Q.    Now, the same paragraph, next sentence

15    says:  "CBS Kingworld has sold out 2005-'06

16    season to advertisers and has prepared to clear

17    in syndication for this fall."

18    At or about this time, were you

19    advised of that?

20    A.    I don't remember being told that.

21    Q.    Now, as to the attachments to this

22    Exhibit 112, for lack of a better word,

23    spreadsheets that appear to be there, did you

24    instruct someone to prepare those?

25    A.    I don't recall.

Page 131

William Crowley

1
2  spokesperson fee in or around June 2005?

3       A.    I don't recall speaking with -- it may

4  have been Mark Rode or someone else.  I do recall

5  that I had discussions with counsel, Rob Rathke.

6  Based on that, my understanding of those

7  conversations is that we weren't obligated to pay

8  the fee.

9       Q.    When did those conversations take

10 place?

11      A.    I think it was June.

12      Q.    Look at the next e-mail, June 20th.

13 This is from Judy Davis to Fred Ciba.  Who is

14 Judy Davis?

15      A.    I don't know.

16      Q.    The Re line, again, is "Bob Vila

17 Spokesperson (2005)."  Ms. Davis says:  "Fred, I

18 don't believe there is a correlation between the

19 spokesperson fee and the legal issue at hand.

20 With that in mind, I believe we should go ahead

21 and process the invoice," et cetera.

22            Look above that, Mr. Ciba, on June

23 20th, says in response to Judy Davis, same

24 subject:  "Thanks, Judy.  Looks like we can pay

25 this on time.  Fred."

**EXHIBIT E (1)**

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-----------------------------x

ROBERT J. VILA and B.V.T.V.,

INC.,

            Plaintiffs,

        vs.                      No. 05-11717-REK

SEARS, ROEBUCK AND CO., SEARS

HOLDINGS CORPORATION and

KMART HOLDINGS CORPORATION,

            Defendants.

-----------------------------x

DEPOSITION OF RONALD E. FEINER

New York, New York

Thursday, March 16, 2006

Reported by:

Yaffa Kaplan

JOB NO. 182382B

1

2

3                           March 16, 2006

4                           1:03 p.m.

5

6              Deposition of RONALD E. FEINER, held at

7        the offices of Greenberg Traurig LLP, 200 Park

8        Avenue, New York, New York, pursuant to

9        Notice, before Yaffa Kaplan, a Notary Public

10       of the State of New York.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2    A P P E A R A N C E S:

3

4        JAMES F. O'BRIEN, ESQ.

5    Attorney for Plaintiffs

6            410 Park Avenue - Suite 1530

7            New York, NY 10022

8

9    GREENBERG TRAURIG LLP

10   Attorneys for Defendants

11           One International Place

12           Boston, MA 02110

13   BY:    GARY R. GREENBERG, ESQ.,

14          WENDY C. CHAMPAGNE, ESQ.

15              -and-

16          ANNAPOURNI R. SANKARAN, ESQ.

17

18

19

20

21

22

23

24

25

1                              Feiner

2        Q.    Which other companies?

3        A.    Whatever deals he entered into to be a

4    spokesperson or a personal appearance or a

5    television personality.

6        Q.    Can you recall tell me the ones that you

7    recall?

8        A.    Presley Homes, Home 123.

9        Q.    What others?

10       A.    Bellawood, Lumber Liquidators.

11       Q.    What others?

12       A.    "CBS Morning Show."

13       Q.    What other?

14       A.    "NBC Today Show."

15       Q.    Any others?

16       A.    Yes, but I can't think of any.

17   Plumber's Secret.

18       Q.    What companies has Mr. Vila been a

19   spokesperson for other than Sears?

20       A.    The ones that I have just listed, except

21   for the CBS and NBC.

22       Q.    So Mr. Vila was a spokesperson for

23   Presley Homes?

24       A.    Yes.

25       Q.    During what years?

Page 14

                                    Feiner

1

2          A.      I can't remember the years.

3          Q.      Is he still?

4          A.      No.

5          Q.      And Home123?

6          A.      Is he -- yes, he still is for Home123.

7          Q.      Bellawood?

8          A.      Still is for Bellawood.

9          Q.      Is the Home123 a year-to-year contract

10   or is it a multi --

11         A.      Year-to-year contract.

12         Q.      When -- what's the anniversary date on

13   it?

14         A.      August.

15         Q.      So it expired last --

16         A.      August.

17         Q.      When in August of '05 was it?

18         A.      I don't recall.

19         Q.      And Bellawood, is that a year-to-year?

20         A.      It had been -- oh, never mind.

21   Bellawood is a -- I think it's a two-year.  It's a

22   one-year with a second-year option.

23         Q.      Is that still in existence?

24         A.      Yes.

25         Q.      When does that expire?

Page 49

1                              Feiner

2        A.    No, not February.

3        Q.    I'm sorry, when in 2005?

4        A.    Well, it had to go to the end I would

5    assume, August 2005.

6        Q.    Now, so there was in force a syndication

7    agreement until August 2005; is that right?

8              MR. O'BRIEN:  Objection.

9              You may answer.

10       A.    No.  There is still a syndication

11   agreement in effect.

12       Q.    Now you -- B.V.T.V. claims that there

13   was and is it B.V.T.V.'s claim that there was an

14   agreement to extend the syndication agreement

15   beyond August 2005?

16       A.    Yes.

17       Q.    And does B.V.T.V. claim that Sears

18   agreed to such an extension?

19       A.    Yes.

20       Q.    And what were the terms of that

21   extension that B.V.T.V. claims Sears agreed to?

22       A.    I believe, but not having it in front of

23   me, that it was the same terms that were contained

24   in the extension.

25       Q.    What extension are you referring to?

1                           Feiner

2        A.    Amendment Number 10, for a six-year

3    extension.

4        Q.    How long was the term of this alleged

5    extension to last?

6        A.    Two years.

7        Q.    Did Mr. Vila or B.V.T.V. ever sign a

8    document which set forth the two-year extension?

9        A.    No.

10       Q.    Did anyone from Sears ever sign a

11   document which set forth this two-year extension?

12       A.    No.

13       Q.    Were you ever given a document by Sears

14   and told by Sears to get Mr. Vila to sign this

15   document evidencing a two-year extension?

16       A.    I was given a document that I was led to

17   believe was the final document.

18       Q.    My question was did Sears ever tell you

19   to get Mr. Vila to sign a document?

20       A.    No.  They said they would send execution

21   copies.

22       Q.    Did you ever get execution copies?

23       A.    Never received execution copies.

24       Q.    So you never got anything from Sears --

25   strike that.

Page 51

1                           Feiner

2              Sears never asked you to get Mr. Vila to

3      sign a piece of paper, right?

4              MR. O'BRIEN:  Objection to the form of

5          the question.  Asked him to sign a piece of

6          paper, I mean in what context are you talking

7          about?

8          Q.   Fair enough.  Fair enough.  Isn't it --

9      strike that.

10             Who negotiated this alleged extension on

11     behalf of B.V.T.V., this extension of the

12     syndication agreement?

13         A.   **Myself, Jonathan Russo.**

14         Q.   Did Mr. Russo have any independent

15     discussions with Sears in which you weren't

16     present?

17         A.   **Yes.**

18         Q.   Did you have discussions with Sears when

19     Mr. Russo wasn't present?

20         A.   **Yes.**

21         Q.   When did you first become aware that

22     Sears was going to be merging with Kmart?

23         A.   **I believe when there was a press**

24     **announcement in late 2004.**

25         Q.   Was that sometime in November in 2004?

Page 52

1                        Feiner

2      A.     Sounds correct, yes.

3      Q.     What did you learn as a result of that

4   press announcement?

5      A.     I learned that nobody at Sears could

6   talk about it because they didn't know much about

7   it and it was confidential.

8      Q.     Did you try to get some information from

9   people at Sears about it?

10     A.     Yes.

11     Q.     Who did you seek out information from?

12     A.     Mark Rode.

13     Q.     What did you ask Mr. Rode?

14     A.     How is this going to impact Bob's deal.

15     Q.     Were you concerned that it might impact

16  Bob's deal?

17     A.     No.

18     Q.     Just asked him how it was going to

19  impact?

20     A.     Would he still have a job, would Andy

21  still have a job, would Ogilvy still be -- I mean I

22  was asking him what they expected changes to be.    I

23  knew I had a contract.

24     Q.     Well, you didn't have an agreement on

25  the extension the syndication?

1                          Feiner

2        **A.    No, I had a contract with Bob with Sears**

3   **until 2009.**

4        Q.    When you learned of the merger, the

5   announcement of the merger, you asked Sears how

6   this was going to effect Mr. Vila's relationship?

7        **A.    And they said they anticipated --**

8        Q.    We will get to that.

9        **A.    Yes.**

10       Q.    You asked him that?

11       **A.    Yes.**

12       Q.    And what was the response you got?

13       **A.    They don't think so.**

14       Q.    Did you want to know how it might, when

15   you say how it might affect Bob's relationship,

16   what was the relationship you were referring to?

17       **A.    His being a spokesperson and how many**

18   **times they wanted to use him and what programs they**

19   **would use him for because that varied from year to**

20   **year.  Excuse me.**

21       Q.    Did they tell you in words or in

22   substance that they weren't certain because they

23   didn't know what was going to happen after the

24   merger, assuming it occurred?

25       **A.    Not till after February, not till after**

1                              Feiner

2       the Kmart merger and internecine struggles.  I am

3       involved in other negotiations but can't commit to

4       anything just yet.  Meanwhile I am off to Super

5       Bowl tomorrow and then off to Madrid next Tuesday."

6            Q.    Did you tell Mr. Vila that the extension

7       concerning the syndication agreement remains

8       incomplete due to the Kmart merger and intercompany

9       issues?

10                 MR. O'BRIEN:  Objection.

11            To the extent that the answer to that

12            question would disclose attorney -- privileged

13            attorney-client communications, meaning where

14            legal advice was sought or was given, I ask

15            you to respect the privilege.

16            To the extent that you can answer that

17            question without disclosing a privileged

18            attorney-client communication, answer it as

19            best you can.

20            A.    I don't believe I would have ever used

21       the word "incomplete."  I was told by Sears that

22       they were having difficulty finding someone to sign

23       the contract and I conveyed that to Bob.

24            Q.    When were you told by Sears that they

25       were having difficulty having someone sign the

1                          Feiner

2    contract?

3         A.    Well, I think we just looked at an

4    exhibit before this one that said that.

5         Q.    And did you understand that what Sears

6    was telling you was they were having difficulty

7    getting the necessary approvals for the signature

8    on the contract?

9         A.    I don't think they were having trouble

10   as much getting the necessary approvals as I

11   understood getting to find the right party to sign

12   it.

13        Q.    Did they tell you that they had

14   requested that the contract be signed?

15        A.    Yes.

16        Q.    And they told you they were unable to

17   get it signed; is that right?

18        A.    They said because of the confusion and

19   whether or not they were to be dealing with Kmart

20   people or Sears people at this time, whether it was

21   Janine or Padilla, they felt they had lost their

22   way on the process.

23        Q.    Now what dollars, if any, did B.V.T.V.

24   spend in December or January in reliance upon an

25   extension of the syndication agreement?

1                          Feiner

2        A.    Mark Rode and Andy Ginger on rare

3    occasions.

4        Q.    And you were representing B.V.T.V. Inc.;

5    is that right?

6        A.    Yes.

7        Q.    And what is the date that you claim that

8    there was -- strike that.

9              What is the date that you claim that

10   agreement was reached?

11       A.    There was a communication sometime in

12   January that I sent to Mark Rode telling him the

13   changes that he had made in the red-line agreement

14   were acceptable and ready to go.

15       Q.    In early January and late December, were

16   you discussing the -- were you negotiating this

17   proposed extension of the syndication agreement?

18       A.    I believe so.

19       Q.    With Mr. Rode; is that right?

20       A.    I think Andy was involved as well.

21       Q.    But Mr. Rode was also involved?

22       A.    Yes.

23       Q.    And did Mr. Rode communicate to you that

24   in either late December, early January, that the

25   Kmart-Sears merger was contemplating the

1                              Feiner

2    negotiations to extend the syndication agreement?

3         A.    I think I was advised and I think it was

4    from Andy, not from Rode, that they were having

5    troubles getting answers, not responses, but I

6    don't think it was ever in jeopardy.

7         Q.    Did anyone tell you in late December,

8    early January that the merger was contemplating

9    negotiations going on with the extension of the

10   syndication agreement?

11        A.    I was told that there were complications

12   because everything was in flux and in confusion and

13   nobody knew where to get to get the answers.

14        Q.    Were you told in words or in substance,

15   sir, by the Sears representatives that the pending

16   merger was complicating a whole variety of things,

17   including getting approvals to extend the

18   syndication agreement?

19             MR. O'BRIEN:  Objection.  What is the

20        time frame?

21        Q.    Prior late December 2004, early January

22   2005?

23        A.    I don't recall, but I don't think had I

24   been told that I would have gotten final drafts, if

25   there was a problem.

1                          Feiner

2    that you sent to Mr. Farkas at Sears?

3         A.    Yes.

4         Q.    Is this -- does Exhibit 23 contain an

5    e-mail that you sent?

6         A.    In a what?

7         Q.    An e-mail that you sent?

8         A.    Yes, it does.

9         Q.    When did you send it?

10        A.    The date on the e-mail is 1/21/2005.

11        Q.    Now it appears to be sent from K.

12   Condon?

13        A.    That's my secretary.

14        Q.    And you asked Mr. Farkas when you

15   could -- when you expected to receive the execution

16   copies of the extension agreement?

17        A.    Yes, we needed money.

18        Q.    Who needed money?

19        A.    Bob needed money.

20        Q.    He didn't have any money?

21        A.    He needed money to produce the show.

22        Q.    So he hadn't started to produce the

23   show, is that it?

24        A.    He had spent money, as I understand it.

25        Q.    How much money did he spend?

1                          Feiner

2          **A.    You asked me that.  I don't know.**

3          Q.    How do you know he spent money?

4          **A.    Because I was told it was getting**

5    **costly.**

6          Q.    Who told you that?

7          **A.    Who told me that?  Sarah and Bob.**

8          Q.    Who told -- what did they tell you on

9    the subject that it was getting costly?

10         **A.    They have to make decisions.**

11         Q.    What, Mr. Feiner, specifically did she

12   tell you?

13         **A.    She said they had to make decisions,**

14   **they had to contract with the homeowners and the**

15   **like.**

16         Q.    They haven't entered into any contracts

17   yet?

18         **A.    I don't know.**

19         Q.    She told you they had to make decisions?

20         **A.    Yes.**

21         Q.    Did she tell you what kind of decisions

22   they had to make?

23         **A.    Financial decisions.**

24         Q.    What did Mr. Vila say?

25         **A.    I want to know if this is a go with**

1                              Feiner

2    Sears.  Am I paying for it?  Is King World paying

3    for it?  Who is paying for the show?  I can't keep

4    spending my own money.

5          Q.    Did he tell you what he was spending?

6          A.    Did he tell me, no.  I didn't ask.

7          Q.    What did you tell B.V.T.V. when they

8    asked you whether or not, whether they should --

9    did they ask you whether they should start making

10   commitments?

11                MR. O'BRIEN:  Objection.  To the extent

12         you are inquiring into attorney-client

13         communication or legal advice was sought or

14         given or legal opinions were expressed, I

15         instruct him not to answer the question.

16                To the extent, with that limitation in

17         mind, it's not under the attorney-client

18         privilege, you may answer if you can.

19         A.    I can't answer.

20         Q.    On Exhibit 23, that is your e-mail to

21   Mr. Farkas, and you asked when can you expect to

22   receive the execution copies of the Vila extension

23   agreement.  Did you ever get it?

24         A.    Did I ever get it?

25         Q.    Did you ever receive it?

Page 80

Feiner

1

2      Q.    Did you start calling asking where is

3   it?

4      A.    You bet.

5      Q.    Who did you call?

6      A.    Mark Rode.

7      Q.    Anyone else?

8      A.    Maybe Andy.

9      Q.    And what did you say?

10      A.    When are we getting the execution

11   copies.

12      Q.    And what did they say to you?

13      A.    There is craziness going on here.  I am

14   not sure I can tell you when.

15      Q.    Did they ask you what they were

16   referring to when they said there was craziness

17   going on here?

18      A.    Yes.  They said they don't know who was

19   making the decisions.  They have to have a meeting.

20   They couldn't get in to see this one, they couldn't

21   get in to see that one.  They had other problems on

22   their hands.  They said it was an absolute mess.

23      Q.    Did you convey that information to

24   B.V.T.V.?

25      A.    Yes.

Page 86

1                              **Feiner**

2   **World there were no issues.**

3          Q.     Well, Sears told you there were issues,

4   right?

5                 MR. O'BRIEN:   Objection.

6          A.     **They didn't tell me there were issues.**

7          Q.     Well, this e-mail that you got said

8   there were issues, right?

9          A.     **Says there have been some issues.**

10  **Doesn't say there are issues.**

11         Q.     What, if anything, did you do to

12  investigate what the status of the negotiations was

13  between Sears and King World when you got this

14  e-mail?

15         A.     **We spoke to King World and King World**

16  **said we can't get anyone on the phone.**

17         Q.     So how soon after you got this e-mail

18  did you speak with King World?

19         A.     **Probably the next day or next business**

20  **day.**

21         Q.     So when you learned that King World

22  couldn't get anyone on the phone from Sears, were

23  you concerned?

24         A.     **Absolutely.**

25         Q.     Why were you concerned?

1                          Feiner

2      A.    Because I think we needed a syndicator

3   and I didn't know whether at this point we should

4   be negotiating with King World ourselves and sue

5   Sears for the loss of the difference.

6      Q.    So you were contemplating litigation,

7   you just said you were contemplating litigation as

8   early as late January 2005?

9      A.    No, I would probably say February.

10     Q.    You were contemplating suing Sears as

11  early as February 2005?

12     A.    I was contemplating what to do if Sears

13  ultimately didn't pay on the syndication agreement,

14  and whether or not I should sign separately with

15  King World, who was very anxious to do a contract

16  because they do very well on this agreement.

17           I was concerned as to where to proceed,

18  but since Bob had an exclusive with Sears on a

19  spokesperson agreement, I was in a bind to find

20  another sponsor.

21     Q.    Another sponsor for what?

22     A.    For the show.

23     Q.    For what show?

24     A.    "Home Again with Bob Vila."

25     Q.    I thought you had a sponsor for that

1                         Feiner

2  B.V.T.V. make some decision about moving forward

3  with the "Bob Vila Home Again" television show

4  without Sears's financial support?

5         A.    We had discussions with King World, who

6  said that they could support the show and they

7  could make a payment to us, which is not as much as

8  Sears, but that we felt it was absolutely essential

9  to remain in syndication for many reasons.

10        Q.    Now, when did you -- whose idea was it

11  to deal directly with, for B.V.T.V., to deal

12  directly with King World?

13        A.    Well, we had a relationship with them

14  over the years.

15        Q.    Well, with respect to the "Bob Vila Home

16  Again" show or the "Home" --

17        A.    Probably would have been -- no, I can

18  answer the first question.  It would probably have

19  been Jonathan Russo.

20        Q.    Was there any contract that existed

21  between B.V.T.V. and King World prior to May of

22  2005?

23        A.    Not that I know of.

24        Q.    Now with respect to the show "Bob Vila

25  Home Again" or "Home Again with Bob Vila," that

Page 93

                              Feiner

1

2    15-year show, was King World always the syndicator?

3         A.    Yes -- well, in various incantations.

4         Q.    And the contractual arrangement, did

5    B.V.T.V. or Mr. Vila ever have a direct contract

6    with King World?

7         A.    No, we had contact, but no contract.

8         Q.    And the contract was between Sears and

9    King World?

10        A.    I never saw it.

11        Q.    Was it your understanding that the

12   contract was between Sears and King World?

13        A.    I don't know if it was Ogilvy or Sears.

14        Q.    But Ogilvy was representing Sears; is

15   that right?

16        A.    Yes.

17        Q.    So at some point in the first quarter of

18   2005, B.V.T.V. made a decision to negotiate with

19   King World a direct contract?

20        A.    Yes.

21        Q.    Whose idea was it to have a -- to

22   negotiate a direct contract with King World?

23        A.    Might have been Mark Rode's.

24        Q.    Did you have meetings with King World?

25        A.    I don't recall.  I don't think I did.

1                              Feiner

2        A.    No.   I had numerous conversations with

3    Andy Ginger about it and with King World about it.

4        Q.      There is a written agreement which you

5    negotiated back in 1989, a syndication agreement,

6    which you would agree with me indicates in

7    substance that unless Sears agrees that there won't

8    be any competitive products of Sears advertised on

9    the program for as long as Mr. Vila is the

10   spokesperson?

11            MR. O'BRIEN:  Objection.  The document

12       speaks for itself.

13            But you can answer.

14       A.    I don't recall.  Sears paid us a lot of

15   money and as a result of paying us a lot of money,

16   you can be sure that I made sure at every turn if

17   there was any question of doing anything to piss

18   off or annoy Sears, it would be checked first with

19   Sears.

20       Q.    Has Sears -- since the "Bob Vila" show

21   started production, has B.V.T.V. or anyone on its

22   behalf sought Sears's permission for permitting

23   advertising or sponsors of product that are

24   competitive with Sears?

25            MR. O'BRIEN:  Since the show, the new

Page 99

                             Feiner

1

2        show, started?

3             MR. GREENBERG:  Yes.

4        A.    I don't know that B.V.T.V. has sought

5   sponsors.  That's the job of the syndicator.  I

6   don't believe that we have sought sponsors.  Bob

7   was a spokesperson for Sears.  In addition to that,

8   Sears was a sponsor for the show.  Bob was not a

9   spokesperson for Chevy Trucks, but Chevy Trucks was

10  a sponsor for the show.  We had no other

11  spokesperson arrangement that Sears hadn't

12  approved.

13        Q.    Sir, isn't it correct that Sears had the

14  right to approve or disapprove of what advertisers

15  were going to advertise on the show?

16        A.    No, that wasn't my understanding.

17        Q.    Isn't it true that if any advertiser on

18  the show sold product that was competitive with

19  Sears, it required Sears's approval?

20        A.    That was between King World and Sears.

21        Q.    But is that your understanding as to

22  what was required?

23        A.    If it was in direct competition with

24  Sears, it required it.

25        Q.    And you?

Page 123

1                           Feiner

2    proposal?

3          A.    I think I had calls with Andy prior to

4    it, who said that he is having trouble justifying

5    the relationship with Bob to the new powers, and

6    that they wanted to make it a condition of the

7    spokesperson -- of the syndication deal, that we

8    renegotiate the spokesperson deal.

9          Q.    Did Mr. Ginger explain why he was having

10   difficulty justifying the existence, the

11   continuation of the relationship?

12         A.    No.

13         Q.    Did you have any understanding of that

14   subject?

15         A.    I assumed they didn't want to spend as

16   much money as they were spending.

17         Q.    Had you had discussions with anyone from

18   Sears that Sears didn't believe they were getting

19   the return on their investment in Mr. Vila?

20         A.    No, I wouldn't know how to judge that.

21         Q.    What was said to you on the conference

22   call on the subject of the proposal?

23         A.    I think I spelled it out in the memo.

24         Q.    Well if you can just for the record,

25   what was proposed by Sears?

Page 124

Feiner

1

2        MR. O'BRIEN:  You want him to read from

3    the memo?

4        MR. GREENBERG:  I want --

5        A.    They would reduce or eliminate -- Sears

6    would reduce or eliminate its ownership in the

7    library for various other considerations.

8            They would renew "Home Again" for one

9    year, with bonuses refigured on the actual cost

10   basis for them.

11           And what Sears wanted from Bob was to

12   take reductions in a spokesperson agreement for the

13   next three years, and eliminate the last year.

14   They were willing to reduce his personal appearance

15   dates and they wanted to eliminate a bonus that we

16   had been told was due.

17           But even presenting -- they had not

18   presented it to senior management yet, so it was

19   hard for me to take seriously.

20       Q.    So is that you didn't take the proposal

21   seriously?

22       A.    I had a contract.

23       Q.    My question is did you take the proposal

24   seriously?

25       A.    I took it seriously that they were

1                              Feiner

2    serious about the proposal.

3          Q.    Did they tell you they weren't

4    authorized to commit to the proposal because they

5    hadn't taken it yet to the senior management?

6          A.    They had not presented this proposal yet

7    to senior management, although it fits within the

8    budget requirements they have.

9          Q.    Did you understand that this proposal

10   required the approval of senior management before

11   Sears would be bound by it?

12                MR. O'BRIEN:  Objection to the form.

13                You can answer.

14         A.    There was already a contract in

15   existence.  I was satisfied with the status quo.

16         Q.    As of March 23, 2005, is it correct that

17   you had been told by representatives of Sears that

18   they were not going to sign an extension to the

19   syndication agreement, the two-year extension?

20         A.    I was told that they were now making it

21   a condition of signing this syndication deal that

22   they renegotiate the spokesperson deal, which I was

23   quite shocked at.

24         Q.    When you say you were quite shocked at

25   it, what did you say to Sears during the

1                          Feiner

2    conversation?

3         A.    We have a deal.

4         Q.    I don't see that anywhere in this memo.

5         A.    It's not in the memo.

6         Q.    You said to them we have a deal?

7         A.    Yes.

8         Q.    What did they say to you?

9         A.    Andy said it's different times now.   If

10   you want to get the syndication deal signed, you

11   are going to have to agree to some reduction.

12        Q.    What did you say?

13        A.    I said what kind of reduction?   I have

14   always been very cooperative with Andy Ginger.   If

15   he asked me to entertain something, I would

16   entertain it.

17             He once asked me if Bob would be a

18   spokesperson for Kenmore without any extra money,

19   and I said yes.   He wanted Bob to be included in

20   his days to go to Canada, which he wasn't required

21   to do.   I said yes.   That's the way the

22   relationship worked.   If he asked me something, I

23   would consider it.

24        Q.    You would consider it; would you check

25   with Bob before committing to it?

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

------------------------------x

ROBERT J. VILA and B.V.T.V.,

INC.,

        Plaintiffs,

        vs.             No. 05-11717-REK

SEARS, ROEBUCK AND CO., SEARS

HOLDINGS CORPORATION and

KMART HOLDINGS CORPORATION,

        Defendants.

------------------------------x


CONTINUED DEPOSITION OF RONALD E. FEINER

New York, New York

Monday, March 20, 2006


Reported by:

Yaffa Kaplan

JOB NO. 182383

Page 173

1

2

3                                   March 20, 2006

4                                   9:58 a.m.

5

6               Continued Deposition of RONALD E.

7     FEINER, held at the offices of Greenberg

8     Traurig LLP, 200 Park Avenue, New York, New

9     York, pursuant to Notice, before Yaffa Kaplan,

10    a Notary Public of the State of New York.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2        A P P E A R A N C E S:

 3

 4            JAMES F. O'BRIEN, ESQ.

 5            Attorney for Plaintiffs

 6                410 Park Avenue - Suite 1530

 7                New York, NY 10022

 8

 9            GREENBERG TRAURIG LLP

10            Attorneys for Defendants

11                One International Place

12                Boston, MA 02110

13        BY:   GARY R. GREENBERG, ESQ.,

14            WENDY C. CHAMPAGNE, ESQ.

15                -and-

16            ANNA POURNI R. SANKARAN, ESQ.

17

18

19

20

21

22

23

24

25
```

1                          Feiner

2    understand that I spoke to Sears very, very

3    frequently during this period of time.  We were

4    developing lots of programs and projects together.

5            Q.    Besides involving Bob Vila?

6            A.    All involving Bob Vila.  So I don't

7    remember who was present or whether it was on the

8    phone or whether it was a meeting.

9            Q.    Do you have any notes of any discussions

10   concerning your negotiation with Sears of Amendment

11   Number 9?

12           A.    I don't recall.

13           Q.    Do you recall whether or not Mr. Vila's

14   agent had any discussion with Sears concerning

15   section 7, the cancellation of the television show?

16           A.    I don't recall.

17           Q.    What do you recall saying to Sears's

18   representatives on the subject and what did they

19   say to you on the subject of section 7,

20   cancellation of the television show?

21           A.    Andy Ginger said to me, "We have a

22   concern that if the ratings fallout of 'Bob Vila's

23   Home Again' or for some reason the public turns on

24   him and the syndicator cancels the syndication

25   agreement that they have with Sears, that Sears

1                                    Feiner

2    would have a right at the end of that year to

3    terminate the spokesperson agreement."

4         Q.    When you say at the end, of what year,

5    at the end of the season?

6         A.    The 31st of the December following the

7    notice of cancellation.

8         Q.    When it says here, "If the Bob Vila Home

9    Again' television show is canceled for any reason,"

10   what did you understand "for any reason" to mean?

11        A.    It means that if the syndicator cancels

12   it for any reason.  They are the only ones who can

13   cancel it.

14        Q.    When you say cancel it, you are

15   referring to --strike that.

16             How is it that a syndicator can cancel a

17   show?

18        A.    The syndicator is the only one who can

19   cancel it because he can't sell it.  It's not

20   working.

21        Q.    When you say it's not working, what do

22   you mean?

23        A.    The ratings don't justify it.

24        Q.    Well, isn't it true that you can always

25   put a show on television if you are willing to pay

**EXHIBIT E (2)**

1                           Feiner

2    television show is canceled for any reason"; do you

3    see that?

4           A.    Yes.

5           Q.    You said that you believed that that

6    only related to a cancellation by King World?

7           A.    No.   I never heard of a sponsor being

8    able to cancel a show.   If a sponsor doesn't want

9    to sponsor the show, the show gets another sponsor.

10   The show isn't canceled.   The sponsor has an option

11   to support the show or not support the show, not to

12   cancel it or not cancel it.   Not to cancel it or

13   cancel it.

14          Q.    When you say the show can get another

15   sponsor, wasn't it the agreement that Mr. Vila

16   couldn't get a sponsor for the show that sold

17   products that were competitive with Sears?

18               MR. O'BRIEN:   Objection to form.

19          A.    That he couldn't?

20          Q.    That Mr. Vila could not put on a show

21   that was sponsored by a company that sold product

22   that was competitive with what Sears is selling?

23               MR. O'BRIEN:   Objection.   You are asking

24          for a legal conclusion.

25          A.    I don't know at what point in time.

Page 207

Feiner

1

2      Q.    In 1999?

3      A.    In 1999 we were not selling

4  sponsorships.  It was not the -- it wasn't the job.

5  Sears sponsored the show and they, in effect, paid

6  for the production of the show and got their name

7  on the show.  They got rights to do all the product

8  placements they wanted.  They had rights to approve

9  the locations, approve the subject matter, et

10 cetera.

11         King World's job was to sell

12 advertising.  Sears, as I understand it, but I

13 never saw where, restricted King World so that no

14 competitors would advertise on the show.

15     Q.    If Mr. Vila had decided he didn't want

16 to participate in the show anymore, didn't want to

17 do a television show --

18     A.    Yes.

19     Q.    -- would that have satisfied the

20 cancellation requirement here?

21     A.    Did not consider it.  I assumed not

22 because we had an agreement on the spokesperson for

23 2009 and we never expected Bob to do the show that

24 into the future.

25         MR. O'BRIEN:  I think he is asking

1                              **Feiner**

2          **something different.**

3          Q.    You never expected Mr. Vila to do a

4    television show in 2009?

5          **A.    Yes.**

6          Q.    Why not?

7          **A.    Because he would have been about 70.**

8          Q.    So what would have happened -- strike

9    that.

10          What did you understand would happen

11   under the spokesperson agreement if Mr. Vila

12   decided, woke up one morning and said, "I don't

13   want to do this TV show anymore"?

14          **A.    We have a right to be paid under the**

15   **spokesperson agreement until 2009.**

16          Q.    Even if he didn't do a television show?

17          **A.    Yes, that was understood.    That's why**

18   **these are separate agreements.**

19          Q.    I thought you said they are separate

20   agreements because Sears asked that they be

21   separate agreements, but initially you --

22          **A.    No.    In 1989 they were one agreement and**

23   **then they became two agreements.    After that they**

24   **were treated as two agreements.**

25          **In 1989, when the deal was first**

Page 233

Feiner

1

2    MR. O'BRIEN:  I'm sorry?

3    Q.    When did you start negotiating the

4    syndication agreement amendment, which you claim

5    was agreed to in January of 2005?

6    A.    **I believe sometime in January 2004.**

7    Q.    Now, when is it, just going backward,

8    when is it that you claim there was a meeting of

9    the minds concerning the -- strike that.

10    You started negotiating you said in

11    January, a year before, January 2004?

12    A.    **I believe that's when it was first**

13    **discussed.**

14    Q.    Who did you start negotiating with on

15    that topic?

16    A.    **Andy, Kay Durkin.**

17    Q.    What was Durkin's position?

18    A.    **Let's extend for two years.**

19    Q.    No, what position --

20    A.    **Kay Durkin was a media person at Ogilvy**

21    **& Mather, which might have had its name changed at**

22    **that time.**

23    Q.    And were you negotiating with anyone

24    else at that point?

25    A.    **Drew Farkas.**

1                          Feiner

2      Q.      And what was Mr. Farkas's position?

3      A.      **He works for Sears.**

4      Q.      In what position?

5      A.      **I am not sure.**

6      Q.      And the negotiations took place from

7   January 2004 until January 2005; is that right?

8      A.      **Sporadically.**

9      Q.      And when you say sporadically, what do

10  you mean by that?

11     A.      **There would be chunks of time where no**

12  **negotiation would take place.**

13     Q.      And were there periods of time when

14  there were some doubts about whether or not a deal

15  would be made?

16             MR. O'BRIEN:   Objection to the form.

17     A.      **No.**

18     Q.      Did you complain about the way Sears was

19  handling the issue of the renewal of the

20  syndication?

21     A.      **I think I did at the end of 2005.**

22     Q.      End of 2005 or 2004?

23     A.      **2004.   I'm sorry.**

24             MR. GREENBERG:   Can we mark as the next

25  exhibit, 183, it's a series of e-mails

Page 241

                              Feiner

1

2      A.      I think it was the summer of '04.

3      Q.      Who was at that meeting?

4      A.      Jonathan Russo -- no, I am not sure if

5  Jonathan was there.  I was there, Andy was there,

6  and about five people from King World.

7      Q.      What was discussed?

8      A.      The future of the show.

9      Q.      What was said by Sears?

10     A.      Sears said, "We wanted to renew the

11 show."

12     Q.      You said there was some question about

13 whether or not King World --

14     A.      King World was having a monopoly at that

15 point pretty much and was making all its money on

16 strip shows, and they were expressing less interest

17 in shows that were aired once a week.

18             But they reiterated to us that the Bob

19 Vila and the Martha Stewart shows were no-brainers

20 for them and they would love to redo the

21 syndication.

22     Q.      Again, this is the summer of 2004?

23     A.      I believe so.

24     Q.      So the summer of 2004, you claim that

25 King World said they wanted to move forward and

Page 242

1                         Feiner

2      Sears said they wanted to move forward; is that

3      right?

4           A.     Yes.

5           Q.     Did you believe you had a legally

6      enforceable agreement as of June -- as of the

7      summer of 2004 concerning the extension of the

8      syndication show?

9                MR. O'BRIEN:  Objection.  It calls for a

10         legal conclusion.

11               Please let him finish his question.

12          A.     Okay.

13          Q.     Did you believe as of the summer of 2004

14     there was a legally enforceable agreement to

15     continue the "Bob Vila's Home Again" television

16     show?

17               MR. O'BRIEN:  Objection, calls for a

18         legal conclusion.

19               You can answer.

20          A.     We were -- we were in the process of

21     completing negotiations.

22          Q.     So do I understand you were still in

23     negotiations as to the terms of any extension?

24          A.     It was understood that we would extend,

25     that we were talking some details.

1                           Feiner

2    merger announcement.

3         Q.    So there was an announcement before

4    November 23, 2004?

5         A.    I don't recall.

6         Q.    Well, was that what you were referring

7    to?

8         A.    Yes.  I don't know how else I would have

9    known unless I read it.

10        Q.    "And its impact, if any, on Bob."  What

11   did you mean by that?

12        A.    How it would affect Bob, would they be

13   using him more, less, in what capacity?  Would they

14   use him for infomercials?  Would they use him for

15   commercials?  Would they want him to speak more?

16   Would they want store appearances?  Would Ty

17   Pennington take his place?

18        Q.    And you asked for a conference call to

19   discuss that; is that right?

20        A.    Yes.

21        Q.    What was the response you received from

22   Mr. Rode?

23        A.    "As for the Kmart issue, we have been

24   instructed to not talk about the merger partly

25   because it won't be done until spring and partly

Page 300

Feiner

A.    That they weren't sure who was going to sign it.

Q.    And you were told that without signature there would be no money paid, right?

A.    Yes.

Q.    Did anyone at Sears ever tell you that someone was going to sign the agreement?

A.    No.

Q.    Did anyone at Sears ever tell you that they had identified the person or the title that was going to sign the extension to the syndication agreement?

MR. O'BRIEN:  Objection to the form.

You can answer.

A.    It was confusing because before the shareholders voted on the merger, Kmart had people working at Sears and they didn't know whether they were in an official capacity or not an official capacity.

I assumed they couldn't sign by Sears, but they were making decisions and they kept mentioning this guy Crowley would have a say in it. And I couldn't figure it out since it was prior to the merger, what the confusion was.

Page 301

Feiner

2    Q.    Now if you could look at Exhibit 21.

3  What is Exhibit 21?

4    A.    "Attached is a contract with the

5  revisions you requested, I hope.  I am also

6  collecting names of people at King World in case

7  you or Jonathan have any good contacts."

8    Q.    This is an e-mail from who to who?

9    A.    From Mark Rode to me.

10    Q.    What's the date?

11    A.    January 14th.

12    Q.    And is this the e-mail that you claim

13  signifies Sears agreement to extend the syndication

14  agreement?

15    A.    To me this constituted the offer, and

16  the following e-mail my acceptance.

17    Q.    You are saying this is the offer?

18    A.    Yes.

19    Q.    I thought you said that Mr. Rode was low

20  man on the totem pole --

21    A.    He is the representative of Sears.

22    Q.    Well, Mr. Feiner, just let me finish my

23  questions.

24    MR. O'BRIEN:  Objection.  Let Gary ask

25  his question.  Give me a chance to object, and

1                          Feiner

2  a signed copy yet?

3        Q.     You asked him that in January?

4        A.     I am sure I asked him this January 14th.

5        Q.     How soon after?

6        A.     Well, I think if you look at Exhibit 22,

7  I am asking for it on January 18th, "The new Vila

8  syndication agreement is fine.  Can you have Drew

9  arrange for execution copies?"

10        Q.     You sent that to Mr. Rode?

11        A.     Yes.

12        Q.     As you said, you never got it back

13  signed?

14        A.     No.

15        Q.     And no one ever promised you it was

16  going to be signed, right?

17              MR. O'BRIEN:  Objection to the form.

18        Q.     Did anyone at Sears ever tell you the

19  agreement was going to be signed?

20        A.     Every time for the past 15 years that a

21  contract needed to be signed and a final agreement

22  was agreed to, it was followed by a signature.

23        Q.     Did anyone in January 2005 tell you --

24        A.     I had no reason to believe otherwise.

25        Q.     -- tell you that the extension to the

1                          Feiner

2    years.  I don't know.  Sarah used to make many

3    trips.

4         Q.    Are you aware whether anyone actually

5    made any trips?

6         A.    Not aware.

7         Q.    Are you aware of any dollars that were

8    spent on preproduction?

9         A.    I wouldn't have occasion to be aware of

10   it.

11        Q.    Under the Sears syndication agreement,

12   Sears was to pay how much money to B.V.T.V. for the

13   production of the 26 episodes?

14        A.    I think --

15             MR. O'BRIEN:  Objection.  The document

16        speaks for itself.

17             Go ahead, you can answer.

18        A.    I believe 1.5-something million dollars

19   as a guarantee.

20        Q.    Was there any profit in that or was that

21   just to cover their expenses, B.V.T.V.'s expenses?

22             MR. O'BRIEN:  Objection to the form.

23        A.    I have no idea.

24        Q.    How is that amount arrived at?

25        A.    Negotiated.

1                              **Feiner**

2          Q.    Do you know whether or not the

3    approximately $1,500,000 was sufficient to cover

4    B.V.T.V.'s expenses associated with producing the

5    show?

6          **A.    And salaries?**

7          Q.    Whatever, however you want to define

8    expenses.

9          **A.    I have no idea and I have no reason to**

10   **know.**

11         Q.    When you say, "I have no reason to

12   know," the agreement that was entered into with

13   King World between B.V.T.V., that agreement was for

14   King World to pay production costs -- I'm sorry, to

15   pay B.V.T.V. $900,000; is that right?

16         **A.    Yes.**

17         Q.    And that was to cover all of B.V.T.V.'s

18   expenses for the production of 26 shows?

19         **A.    No.   That was money they were giving and**

20   **whether it covered it or didn't cover it really**

21   **didn't matter at that point.**

22         Q.    Well, was there a profit in the $900,000

23   that B.V.T.V. was receiving from King World?

24         **A.    I have no knowledge, but I doubt it**

25   **highly.**

1                          Feiner

2   agreements between B.V.T.V. and Sears, was there

3   any discussion about whether or not B.V.T.V. would

4   be making a profit?  In other words, its costs were

5   less than -- to produce 26 episodes, were less than

6   the approximate $1.5 million that were being paid?

7              MR. O'BRIEN:  Objection to the form.

8              You can answer.

9       A.     The way television works is a production

10  company puts in a bid for how much they can do the

11  show, and the sponsor or the financer pays that

12  amount, and there is very rarely ever an accounting

13  made.  That's the nature of the business.

14      Q.     So do I understand that B.V.T.V. put in

15  a bid to Sears saying we can do 26 shows at the

16  cost of approximately $1.5 million?

17      A.     No.

18      Q.     Then how?

19      A.     We said to Sears we will give you Bob as

20  an exclusive spokesperson and give you at the time

21  39 shows, for a total package of $4.2 million.

22             And Sears said we have a problem with

23  AFTRA or SAG and we need to allocate which money is

24  for the show and which one is for the personal

25  services, so it was arbitrarily broken up by Sears.

Page 316

Feiner

They said let's make 2.4 for the spokes -- for the syndication agreement and one whatever for the -- and that was based on absolutely nothing to do with anything.

    Q.    On the extensions to the syndication agreement, were there ever any discussions about what the cost to produce the show would be?

    A.    Never.

    Q.    Why don't we take -- you want to take your lunch break?

    A.    If you want to keep going.

        (Luncheon recess taken at 1:06 p.m.)

1                           Feiner

2    contract.  I didn't.  I don't know who signs it.  I

3    didn't expect Mark Rode to sign it.

4        Q.    Did you expect that -- had Mr. Rode told

5    you prior to February 1, 2005 that he had authority

6    to make a decision as to whether or not Sears would

7    enter into a contract?

8             MR. O'BRIEN:  In so many words?

9        Q.    Did he tell you that?

10            MR. O'BRIEN:  Objection.

11            You can answer.

12       A.    Every time I have ever dealt with

13   someone at Sears, I assume when they sent me

14   something, they had gotten all of the okays

15   necessary to send it to me.  I believe Drew Farkas

16   and Mark Rode had gotten an okay to send out the

17   red-line final contract.  I never expected there

18   would be a decision on signing it.  I knew there

19   were maybe a problem on who would sign it.

20       Q.    What was your reaction when you got

21   Mr. Rode's February 1, 2005 e-mail saying that

22   "While I can negotiate contracts, I don't have

23   access to the individuals here would -- who have

24   ultimately -- who would ultimately issue a go-no go

25   decision"?

Page 324

1                          Feiner

2        A.    It was frustrating.

3        Q.    Were you angry?

4        A.    Yes, probably.

5        Q.    Why?

6        A.    Because I thought I was getting a signed

7   contract.

8        Q.    What did you determine based upon

9   getting this e-mail?

10       A.    That Sears was in breach of its

11  agreement.

12       Q.    Its agreement to do what?

13       A.    To pay for season 16.

14       Q.    So you determined that on February 1,

15  2005, Sears was in breach?

16       A.    I figured that if Sears did not pay the

17  money, they would be in breach.

18       Q.    And were you concerned about that?

19       A.    Very concerned.

20       Q.    Because it would take money out of your

21  pocket, as well as Mr. Vila's pocket?

22             MR. O'BRIEN:  Objection.

23             You can answer.

24       A.    No, that was not the concern.

25             The concern was if Bob's show didn't go

1                              Feiner

2    on, it would be such a setback to his franchise

3    that once someone is removed from television, the

4    tradition is it's very difficult for them to go

5    back on.  So we were concerned that if he skipped a

6    year, it wouldn't be easy to come back.  And that's

7    why he took less money from King World.

8         Q.    Why did he take less money from King

9    World?  Why did Mr. Vila take less money?

10        A.    No, I said he was willing to take less

11   because he didn't want to lose the franchise of

12   being on the air.

13               MR. O'BRIEN:  Off the record for a

14        second.

15               (Discussion off the record.)

16        Q.    When you got this e-mail, did you

17   contact Mr. Rode?

18        A.    I don't recall.

19        Q.    Did you advise Mr. Vila there was a

20   problem?

21        A.    Yes.

22        Q.    Did you tell Mr. Vila -- was Mr. Vila

23   aware at this time that there were -- that the

24   agreement hadn't been signed?

25        A.    Yes.

Page 329

                              Feiner
1

2   contact with King World?

3       A.    I don't know.

4       Q.    Who on behalf of B.V.T.V. initiated

5   contact with King World?

6       A.    Regarding what?  We spoke to them

7   frequently.

8       Q.    No, regarding a direct syndication

9   agreement?

10      A.    Probably Jonathan Russo.

11      Q.    Did you know about -- that he was going

12  to contact?

13      A.    Yes, it was after I had a conversation

14  with Mark Rode about it.

15      Q.    When did you have this conversation with

16  Mr. Rode?

17      A.    I don't recall.

18      Q.    Was it in January 2005?

19      A.    No.  It was probably March, April.

20      Q.    Why do you believe it was probably

21  March, April?

22      A.    I don't think the King World deal was

23  signed until May 3rd or something like that.  What

24  was the date of the King World?  It was shortly

25  before that.

Page 330

Feiner

2    Q.    That you spoke with Mr. Rode?

3    A.    **On numerous occasions.**

4    Q.    And why did you contact Mr. Rode at this

5    time?

6    A.    **I think Mr. Rode -- we were still**

7    **waiting for a signed contract.**

8    Q.    Did you ask Mr. Rode -- did you ask

9    Sears's permission to -- strike that.

10    Were you aware that as of February,

11    early March, that there was a gentleman named Bill

12    Crowley that had some involvement in what was going

13    on at Sears?

14    A.    **I had heard his name and that he worked**

15    **for Ed Lampert and he was with Kmart, and I**

16    **couldn't figure out what he was doing being**

17    **involved with my contract with Sears, before there**

18    **was a merger.**

19    Q.    Well, you didn't bother to look and see

20    what rights Kmart had in the documents filed

21    with --

22    A.    **I don't think any documents arose until**

23    **the merger, did they?**

24    Q.    Did you look at the documents?

25    A.    **No, I haven't, but the shareholders**

Page 331

1                              Feiner

2     could have voted no.

3          Q.     Who raised with you -- who brought up

4     with you the Bill Crowley name?

5          A.     Probably Andy.

6          Q.     What did he say about Mr. Crowley?

7          A.     There is a new guy here who comes once a

8     week or so to the sixth floor at Sears, and you got

9     to make appointments to go see him, and he can't

10    make any decisions, but he can give advice.    I

11    think that's what I was told.

12         Q.     When did he tell you that?

13         A.     I don't recall.

14         Q.     How early in 2005?

15         A.     Probably March.

16         Q.     And is that all you can recall about

17    being told about what Mr. Crowley's role was?

18         A.     Yes.

19         Q.     Did anyone else mention to you any role

20    that Mr. Crowley had?

21         A.     No, not to my recollection.

22         Q.     Can you look, it's tab 63, Exhibit 29?

23    Do you recognize that?

24         A.     Yes.

25         Q.     What is that?

Page 332

                                Feiner

1

2      A.      It's an e-mail from me to Mark -- to

3   Drew Farkas.

4      Q.      Dated when?

5      A.      March 18th.

6      Q.      Why did you write to Drew Farkas on

7   March 18th?

8      A.      Why?

9      Q.      Yes.

10     A.      Because "I understand that King World

11  has been trying to reach you.  I think if we don't

12  get a decision regarding Sears's renewal of the

13  show very soon, we on behalf of Bob should

14  negotiate the deal with King World, with your

15  blessing, as time is really creating a crunch

16  situation regarding producing the shows in the

17  manner and quality we are all used to.  Please let

18  me know your thoughts.  Regards, Ron Feiner."

19     Q.      At this point in time, was it apparent

20  to you that there was a possibility that Sears

21  would not be interested in renewing the show?

22          MR. O'BRIEN:  Objection to the form.

23          You may answer.

24     A.      There seemed to be to me an

25  understanding that nobody knew what was going on

1                         **Feiner**

2    **and nobody was making decisions, and if we didn't**

3    **act quickly, we would lose the season.**

4        Q.    I thought you said before that as of

5    December or early January, Mr. Vila's company was

6    engaged in preproduction work?

7        **A.    Yes, they were.  They slowed down.**

8        Q.    When did they slow down?

9        **A.    When probably the e-mail you showed me**

10    **before, when Drew said someone else has to sign it**

11    **or something to that effect.**

12        Q.    Which e-mail are you talking about?

13              MR. O'BRIEN:  Is it an exhibit before

14    you.

15        **A.    Yes, it was an exhibit put before me,**

16    **right before lunch.**

17        Q.    Can you turn to Exhibit 20.  Hold onto

18    the one you have.  Just turn to Exhibit 20.  Is

19    that the e-mail you are referring to from Mr. Rode?

20        **A.    No.**

21        Q.    That's not it?

22              Okay, Exhibit 21, dated January 14,

23    2005, is that the e-mail you were referring to?

24        **A.    No.**

25        Q.    If you look at Exhibit 172?

Page 350

Feiner

1

2      Q.    Mr. Vila had a contract with Sears,

3   right, to act as a spokesperson?

4      A.    Yes, he did.

5      Q.    Now, you express in Exhibit 159, in your

6   letter, you want to advise King World of certain

7   restrictions that Mr. Vila had vis-a-vis his

8   spokesperson agreement with Sears; is that right?

9      A.    Yes.

10      Q.    And you say, "I wish to remind you that

11   Bob is still under contract for his personal

12   services for Sears Roebuck and Company and, as

13   such, Bob cannot render any service or permit his

14   name, likeness, photograph, et cetera to be used in

15   advertising, publicizing or promoting any product

16   or service other than Sears."

17      A.    On the show, yes.

18      Q.    What do you mean by that, "On the show,

19   yes"?  What did you mean to advise King World by

20   that sentence?

21      A.    That Bob -- they could not sell time

22   that would tie Bob into a product.

23      Q.    Are you finished with your answer?

24      A.    Yes.

25      Q.    When you say "tie Mr. Vila into a

1                        Feiner

2   product," what do you mean by that?

3        A.    That Bob would not walk into a Home

4   Depot store to buy goods.  He had a relationship

5   with Sears and we did not want to do anything to

6   jeopardize that relationship.  So the same rules

7   applied before that applied now with regard to

8   product placement and promotional use.

9        Q.    When you say product placement, you mean

10  placement of products on the show?

11       A.    Yes, that Bob looks like he is favoring.

12       Q.    When you say product placement, you mean

13  any product on the show; is that right?

14       A.    I don't know the definition.

15       Q.    I'm sorry?

16       A.    No, I don't know what product

17  placement -- the definition of product placement.

18  I think it's when one company asks to have its

19  product placed in a show and either pays or doesn't

20  pay.

21       Q.    Well, you said here that Bob is under a

22  contract with Sears.

23       A.    Yes.

24       Q.    Do you say that you understood that

25  Mr. Vila, under that contract, couldn't allow his

1                          Feiner

2    name, likeness, photograph to be used in

3    advertising, publicizing or promoting any product

4    or service other than Sears?

5         A.    Yes.

6         Q.    Did you envision that before King World

7    sold advertising for the new show, that they would

8    first determine whether or not it was any product

9    that was competitive with Sears?

10        A.    No, this had nothing to do with

11   advertising on the show.  Advertising on the show

12   had nothing to do with an endorsement or else the

13   news would never be able to have advertisers.

14        Q.    Well, did you think this had to do with

15   product that actually appeared on the show?

16        A.    Yes.  And where an advertiser will

17   sometimes say we will buy time, but we want an

18   appearance of Bob at a trade show.

19        Q.    But I mean, any product that appeared on

20   the show, for example, that Mr. Vila was

21   demonstrating, would be a product that would be

22   covered by this; is that right?

23        A.    No.

24        Q.    Well, tell me what.

25        A.    He would have to endorse it.  He would

Page 353

Feiner

1

2    have to say, "I love this product.  You should use

3    it.  I am a spokesperson for it."

4        Q.    So if I made a favorable statement about

5    a product on the show, that that would be covered?

6        A.    I don't think --

7              MR. O'BRIEN:  Objection to the form.

8              You can answer.

9        A.    I think Bob would tell the truth.  He

10   has always told the truth, we were always told by

11   Sears for 15 years not just to use Craftsman

12   product.  We were allowed to use other products, so

13   it didn't look like Bob would be a show for Sears.

14   So whenever would -- be appeared, he would look

15   like to be a spokesman for Sears on a more

16   subliminal way.

17       Q.    When you wrote this, it looks like on

18   the show Mr. Vila was doing something to promote

19   the product unless it was a product or service of

20   Sears that was prohibited by the spokesperson

21   agreement?

22       A.    I don't think Bob ever promoted a

23   product on a show.  That wasn't the purpose of the

24   show.

25       Q.    Well, it says here advertising,

Page 354

1                        Feiner

2    publicizing or promoting any product or service.

3    You have said before you haven't seen his new show,

4    correct?

5         A.    Correct.

6         Q.    So you don't know whether or not in any

7    of these episodes of the new show Mr. Vila has

8    publicized or promoted any product?

9         A.    I don't believe that King World would

10   air it if it was a commercial.

11        Q.    Can you answer the question?

12        A.    I don't believe that King World would

13   air it if it was a commercial.

14        Q.    Over the years when Mr. Vila did the

15   "Home Again" show?

16        A.    Yes.

17        Q.    He publicized product on the show,

18   didn't he?

19        A.    No.

20        Q.    He didn't?

21        A.    How would he publicize?  He used product

22   or he didn't use product.  That was the nature of

23   the show.

24        Q.    Sorry, your testimony is that in the 15

25   years of the "Home Again" series, that Mr. Vila

Page 355

1                          Feiner

2    never publicized or promoted any products?

3         A.    I don't know what that means.  Were

4    there products on the show?  Yes, there were

5    products on the show.

6         Q.    Sir, you negotiated the spokesperson

7    agreement, the syndication agreement, and all the

8    amendments.  I simply want to know, did Mr. Vila in

9    the 15-year period that the "Home Again" show ran,

10   when it was sponsored by Sears, did he ever

11   publicize or promote product on the show?

12        A.    Without the approval of Sears?

13        Q.    No.  Did he ever publicize or promote

14   product on the show?

15        A.    Without the approval of Sears?

16        Q.    No.  Did he ever publicize or promote?

17        A.    I think he probably promoted Sears

18   product.

19        Q.    Did he ever promote or publicize any

20   other product?

21        A.    I don't know.  I don't know what you

22   mean by that.  Sears in the 15 years never once

23   objected to anything Bob did on the show, to my

24   knowledge, and they saw everything before it aired.

25        Q.    Would you agree that Mr. Vila during the

1                          Feiner

2      Q.    Well, look at --

3            MR. O'BRIEN:  If you have an exhibit?

4            MR. GREENBERG:  Can we mark as the next

5      exhibit, Plaintiffs' Exhibit 758.

6            (Exhibit 187, document, Bates number

7      758, marked for identification, as of this

8      date.)

9      Q.    Was one of Sarah Monzon's duties to

10     solicit product for the show, if you know?

11     A.    I don't know.

12     Q.    Sir, is it your testimony that when

13     Mr. Vila signed the syndication agreement and the

14     spokesperson agreement, that you knew that one of

15     the provisions was an acknowledgment between

16     B.V.T.V. and Sears that, as between the two of

17     them, Sears had all rights on -- the ownership

18     rights to the name of the show?

19           MR. O'BRIEN:  Objection to form.  When

20     are you talking about?

21     Q.    In 1989?

22     A.    No.

23     Q.    So if I --

24     A.    The show had not been named and that

25     provision was not in the contract yet, and that was

1                        Feiner

2   assumed, that Sears would be using its descriptive

3   names.  It may be a "Craftsman Hour."  It may be a

4   "Weather Beater Hour."  It was always understood

5   that Sears couldn't have the name "Bob Vila" and

6   Bob Vila couldn't have the name "Sears" or any of

7   its trade names.  I don't think anyone discussed

8   whether or not the title of the show belonged to

9   anyone in particular.

10         Q.    As between Sears and B.V.T.V., when the

11  1989 agreements were entered into, who did you

12  understand had ownership to the name of the show?

13         A.    Whoever owned the show, and that

14  changed.

15         Q.    So?

16         A.    I don't believe you can trademark names

17  of shows.

18              MR. O'BRIEN:  There is no question

19         before you.

20         Q.    When Mr. Vila signed the 1989

21  agreements, did you know that between B.V.T.V. and

22  Sears, B.V.T.V. was acknowledging that Sears owned

23  all rights to the name of the show?

24              MR. O'BRIEN:  Objection.  Calls for a

25         legal conclusion.  The document speaks for

Page 382

Feiner

1

2          MR. GREENBERG:  Yes.

3          MR. O'BRIEN:  You can answer.

4      A.    I don't recall.  I got an agreement with

5    all the changes you requested red-lined.  I got

6    that communication from Mr. Rode or Mr. Farkas in

7    January.  I assumed we had a deal.

8      Q.    Did Mr. Rode tell you that the changes

9    in the red-line agreement were acceptable to Sears?

10         MR. O'BRIEN:  Objection, asked.  I

11    believe he just answered but --

12     Q.    Did he tell you that?

13     A.    I have never gotten a red-lined

14    agreement from Sears in 15 years that wasn't

15    approved and ready to go.

16     Q.    Did Mr. Rode tell you in January 2005

17    that the changes in the red-line agreement were

18    acceptable to Sears?

19     A.    I can't believe he would have sent it

20    out if they weren't.

21     Q.    Did he tell you that?

22     A.    No, there was no need to tell me.  It

23    was a given.

24     Q.    Did he tell you, yes or no?

25     A.    No.

1                        Feiner

2         Q.    Did he tell you that Sears was ready to

3    sign the -- did he tell you in January of 2005 or

4    at any point in time that Sears was ready to sign

5    the extension of the syndication agreement, that is

6    Mr. Rode?

7         A.    I can't imagine him sending me an

8    agreement that wasn't final.

9         Q.    Did Mr. Rode tell you in January or in

10   January 2005 or thereafter that Sears was ready to

11   sign the extension of the syndication agreement?

12        A.    I think he might have.  The question was

13   who was going to sign.

14        Q.    When did he make that statement to you?

15        A.    It's very possible that the confusion at

16   Sears was who was going to sign contracts.

17        Q.    What did Mr. Rode say?

18        A.    There is confusion at Sears as to who is

19   going to sign contracts.

20        Q.    Did he tell you Sears was going to sign

21   this agreement?

22        A.    He told me there was confusion at Sears

23   as to who was going to sign contracts.

24        Q.    That's your best recollection on what he

25   spoke --

# EXHIBIT  F

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

ROBERT J. VILA and            )
B.V.T.V., INC.,               )
                              )                    **ORIGINAL**
        Plaintiffs,           )
                              )
    vs.                       )
                              ) Civil Action No.
SEARS, ROEBUCK AND CO.,       )     05-11717-REK
SEARS HOLDINGS CORPORATION,   )
and KMART HOLDING             )
CORPORATION,                  )
                              )
        Defendants.           )


    The deposition of LUIS PADILLA, called
by the Plaintiffs for examination, taken pursuant
to the Federal Rules of Civil Procedure of the
United States District Courts pertaining to the
taking of depositions, taken before ROBIN M.
CHIMNIAK, a Notary Public within and for the
County of DuPage, State of Illinois, and a
Certified Shorthand Reporter of said State, taken
at 77 West Wacker Drive, Suite 3000, Chicago,
Illinois, on the 13th day of March, 2006, at the
hour of 10:40 a.m.

BRIDGES
**COURT REPORTING**

*DOWNTOWN*
77 W. WASHINGTON, STE. 1917
CHICAGO, IL 60602
312/895-4974

*SUBURBS*
1407 E. ELM STREET
WHEATON, IL 60187
630/690-6911

BridgesReporting@aol.com
*FAX* 312/528-9025

1    PRESENT:

2        MR. JAMES P. O'BRIEN
             410 Park Avenue
3            Suite 1530
             New York, New York 10022

4
             Appeared on behalf of the
5            Plaintiffs;

6    GREENBERG TRAURIG,  LLP
     BY:  MS. ANNAPOORNI R. SANKARAN
7        One International Place
         Boston, Massachusetts 02110

8            and

9
     SEARS, ROEBUCK AND CO.
10   BY:  MR. FRANK CALABRESE
         333 Beverly Road
11       Hoffman Estates,  Illinois 60179

12           Appeared on behalf of
             Defendants.

13

14

15

16

17

18

19

20

21

22

23

24

3/13/06    VILA v SEARS    Padilla

```
 1                          I N D E X
        WITNESS                              PAGE
 2         LUIS PADILLA
             Examination by Mr. O'Brien          4
 3
                        E X H I B I T S
 4                                        PAGE
               NUMBER                  REFERRED TO
 5
                  25                       43
 6                26                       52
                  31                       66, 72, 73
 7                33                       83
                  34                       85
 8                35                       87
                  36                       89
 9                37                       92
                  41                       97
10                42                       98
                  45                       101, 102
11                46                       103
                  49                       106, 122
12                56                       109
                  57                       108
13                62                       112
                  75                       39, 122, 123
14                76                       44
                  77                       45
15                78                       47
                  80                       50
16                96                       53
                 109                       59, 61
17               110                       61
                 121                       110
18               141                       94
                 142                       96, 97
19               149                       57
                 150                       90
20               312                       78

21

22

23

24
```

1    in that.

2        Q.    Can I ask you why you did that?

3        A.    Why?

4        Q.    Yeah.

5        A.    Just a technique that I use to

6    communicate and talk to people.

7        Q.    Did you ever find any contradiction

8    between what your direct reports' direct report

9    would tell you and what your direct report would

10    tell you?

11        A.    I mean, I'm sure occasionally there

12    were some questions, but I don't remember any

13    specifically.

14        Q.    What was your working relationship with

15    Ms. Bousquette?

16        A.    It was great.

17        Q.    Did you tell anyone to renegotiate the

18    spokesman agreement with Bob Vila?

19        A.    With Bob Vila.  I told them to look at

20    the entire deal, as part of it was the

21    spokesperson agreement; to get to the terms that

22    were more -- that I spoke about earlier.  If

23    there was a way to kind of renegotiate the entire

24    deal, which there were three parts to it:  One,

1  the TV show; one, the intellectual property of

2  the old shows; and 3, you know, the spokesperson

3  agreement.

4          So it wasn't a negotiation of the

5  spokesperson agreement, as you said, on its own.

6  It was a negotiation of the entire package with

7  Bob Vila is what I asked for.

8          Q.   That's what I'm trying to get to.  When

9  did you ask for that?

10         A.   Probably -- well, I didn't ask for

11 that.  They came to me and said, "This is what's

12 going on.  What would you like to do?"

13         Q.   When was that, sir?

14         A.   I don't remember the exact timing of

15 that.  It would have had to have been -- it was

16 probably prior to the announcement was the

17 initial discussions of, "What would you like me

18 to do?"  And then it really didn't come up again

19 until probably the second quarter, when it came

20 time to pull the trigger on the TV show, and then

21 it all started.

22         Q.   You say the second quarter.  You mean

23 calendar quarter?

24         A.   Yeah.  Like, February or March or

1     something like that, around in there.

2          Q.   Who asked you what you would like to

3     do?

4          A.   Andy Ginger, I think.  And then I got a

5     couple of updates more along the line of, "We're

6     moving along, still working on it," and then it

7     came to a head later on when it was time to pull

8     the trigger on the TV show.

9          Q.   Who gave you the updates?

10         A.   Andy Ginger.

11         Q.   Do you recall anything he told you in

12    these updates?

13         A.   Just that things were moving along and

14    that he was talking to their attorneys or to Bob

15    and that it was kind of work in process.

16         Q.   Do you recall when he told you that?

17         A.   No.

18         Q.   After the announcement of the proposed

19    merger --

20         A.   Right.

21         Q.   (Continuing) -- did you have

22    communications with any of the people from Kmart?

23         A.   Yes.

24         Q.   Whom?

1  maybe at that meeting, and then maybe once or

2  twice prior to the merger, because he was hanging

3  around and came in my office a couple of times.

4  But not really at all; spoke more to Eddie.

5      Q.   So Crowley was hanging around

6  premerger?

7      A.   I think so.  They were doing some

8  diligence or whatever it was.  I don't remember

9  the exact timing, but he was -- they were around,

10  yeah.

11     Q.   And --

12     A.   Premerger.  Not premerger announcement,

13  but between the announcement --

14     Q.   And consummation.

15     A.   (Continuing) -- and the consummation,

16  that's correct.

17     Q.   Okay.  And you spoke to him a couple of

18  times before the announcement?

19     A.   Yeah, a couple of times.

20     Q.   What was the nature of the discussion?

21     A.   Don't remember.

22     Q.   Did he ask questions?

23     A.   Don't remember.

24     Q.   Did you ask questions?

1          (Witness examines

2     document.)

3     THE WITNESS:  Yes.

4     BY MR. O'BRIEN:

5          Q.    Have you ever seen this memorandum

6     before, Exhibit 75, being a February 7, 2005,

7     memorandum to Janine Bousquette from Andy Ginger?

8          A.    No.

9          Q.    Have you --

10         A.    Prior -- I saw it in the binder in

11    preparation, but not prior to that.

12         Q.    Okay.  Could I draw your attention to

13    the second paragraph?

14         A.    Uh-hum.

15         Q.    Mr. Ginger says to Ms. Bousquette:

16         "Earlier, we met with you and secured

17    approval to negotiate a limited extension of

18    1-2 years vs. the proposed, longer term."

19         A.    Right.

20         Q.    Were you aware of that?

21         A.    No.

22         Q.    Now, in the third paragraph, it says:

23         "As with other long-term deals, since

24    the merger announcement, as directed, we have

3/13/06    VILA v SEARS    Padilla    40

1    been holding back the contract completion on

2    this."

3            Did you give such a direction?

4    A.    No.

5    Q.    Were you aware such a direction had

6    been given?

7    A.    I don't know the timing of it, but

8    certainly all contracts were to be reviewed by

9    Bill and Eddie.  That was clear.

10    Q.    When did that --

11    A.    I don't remember.

12    Q.    Let's stay with that a little bit.

13    A.    Yeah.

14    Q.    Was it a memorandum?

15    A.    Not that I know of.

16    Q.    Did someone tell you that?

17    A.    Yes.

18    Q.    Who?

19    A.    It would have had to have been either

20    Bill or Eddie.

21    Q.    When you say "Bill or Eddie," you're

22    referring to William Crowley or Eddie Lampert?

23    A.    That's correct.

24    Q.    You say that that was clear?

1        A.    Clear.

2        Q.    Now, again, the distinction between --

3    if I can, what -- are you testifying as to what

4    should have happened, or do you have -- or from a

5    specific memory you have?

6        A.    A specific memory of executive

7    committee discussions about contract review.

8        Q.    Who was on the executive committee that

9    you just referred to?

10        A.    To the best of my memory, it would have

11    been myself, Alan Lacy, Glenn Richter -- let's

12    see.  Who else would have been there?  The

13    attorney at the time, Sara LaPorta, which was the

14    chief strategist; the guy who was the head of HR.

15    Those kind of groups.

16        Q.    Were these all Sears people?

17        A.    These were all Sears people, yeah.

18        Q.    Were either of Eddie or Bill there?

19        A.    I'm sure at some point they were --

20    they were in those meetings.  When it actually

21    happened -- not Eddie, but Bill would have been

22    there.

23        Q.    Do you have a specific memory of Bill

24    saying -- that is Bill Crowley --

1      A.    No, not a specific memory.

2      MS. SANKARAN:  Let him finish the question.

3      THE WITNESS:  Go ahead.

4  BY MR. O'BRIEN:

5      Q.    (Continuing) -- that all contracts had

6  to be reviewed by him or Eddie Lampert?

7      A.    No.

8      Q.    But that is the impression you had?

9      A.    It was said.  I don't remember the

10  exact moment that it was said or when it was said

11  or in what context, but it was definitely part of

12  the strategy at Sears, that there be more

13  scrutiny and review at the highest levels for

14  contracts.  That was perfectly clear.

15      Q.    But I'm not perfectly clear.  Was it

16  clear?  Was it said that Eddie Lampert or Bill

17  Crowley had to review all contracts?

18      A.    Eddie Lampert's name would not have

19  been in that sentence.  Bill Crowley's name would

20  have been in a sentence like that, yes.

21      Q.    And that was said by somebody?

22      A.    That was said by somebody.

23      Q.    Who?

24      A.    I don't remember.

BY MR. O'BRIEN:

Q.    Now, the first in time of the e-mails, the second on the page --

A.    I'm not -- let me finish reading it.

Q.    I'm sorry.

(Witness further

examines document.)

THE WITNESS:  Yes.

BY MR. O'BRIEN:

Q.    Okay.  Now, the first of these e-mails is to WCC, which previously has been identified as Bill Crowley.

A.    Right.

Q.    From Andy Ginger.

A.    Right.

Q.    Dated March 4th.

A.    Uh-hum.

Q.    And it is talking about a contract follow-up.

A.    Uh-hum.

Q.    You ever seen this before?

A.    Not this one.

Q.    Did you know that Andy Ginger was communicating directly with Bill Crowley?

3/13/06    VILA v SEARS    Padilla

1    A.    Did I know?  Yes.

2    Q.    Did you direct him to do so?

3    A.    No.

4    Q.    How did you become aware that he was

5    communicating directly with Mr. Crowley?

6    A.    I think during our discussions about

7    the syndication of the TV show around this time,

8    everything had to be run by Bill that had to do

9    with a contract.  So I'm sure I asked him to send

10   whatever he was sending out to include Bill

11   Crowley.

12   Q.    Okay.  Now, are you surprised that you

13   were not copied on this e-mail?

14   A.    No.

15   Q.    We'll turn to the next exhibit; 78,

16   please.

17   A.    Sure.

18   Q.    We see this is another -- an e-mail

19   from Ginger to Crowley dated March 7th --

20   A.    Uh-hum.

21   Q.    (Continuing) -- 2005.

22                     (Witness examines

23                      document.)

24

1    BY MR. O'BRIEN:

2        Q.    Have you ever seen this before?

3        A.    I don't remember.

4        Q.    The e-mail refers to three contract

5    amendment summaries for "Bob Vila's Home Again."

6        A.    Right.

7        Q.    Do you recall ever seeing a contract

8    amendment summary for the Bob Vila "Home Again"

9    show?

10       A.    No, I don't.

11       Q.    Now, continuing on reading this e-mail,

12   Ginger says to Crowley:

13           "We have reviewed these in detail with

14   Luis Padilla and Janine Bousquette."

15           Do you recall reviewing any contract

16   amendment summary in detail?

17       A.    I remember discussing the TV show and

18   the syndication of the TV show and the urgency

19   to -- but that's pretty much all I remember.  He

20   did update me on that.  I don't believe -- I

21   don't remember ever being -- it says that this

22   actually -- with me and Janine in the same room;

23   might have done it separately.

24       Q.    Correct.

1      A.   Yeah.

2      Q.   I'm just wondering if you remember

3  discussing it in detail.

4      A.   I don't -- no, I don't really -- I

5  wasn't -- I probably wasn't discussing any

6  contractual things in detail.  So I think these

7  were all general discussions is what I remember.

8      Q.   Okay, fine.  And you don't remember the

9  contract amendment summary that's referred to?

10     A.   No.  It may have been included in that

11  deck or something.  I'm sure -- there was a lot

12  of decks, but I probably would have not -- at

13  this point, you know, by March, I think at this

14  point I would have certainly not been reviewing

15  any specific contract terms or anything like that

16  because it was basically not my responsibility.

17     Q.   Whose responsibility was it?

18     A.   As I said earlier, all contracts had to

19  be approved by Bill Crowley.  So basically he was

20  the person responsible for the terms of the

21  contracts.

22     Q.   Now bear with me.  I'm still on the

23  same e-mail.

24     A.   Sure.

3/13/06    VILA v SEARS    Padilla

1    ahead?

2        A.    The Father's Day promotion at Wrigley

3    Field?

4        Q.    Yes.

5        A.    I believe it did.

6        Q.    You believe it did?

7        A.    I believe it did, but I don't remember.

8        Q.    Do you know whether or not the second

9    payment of the spokesman agreement that's been

10    referred to in your earlier exhibits payable on

11    or about July 1 was made?

12        A.    I have no clue.  No, I don't.

13        Q.    Now, do you recall -- let me ask you

14    generally.  Do you recall being at meetings

15    attended by you, Janine Bousquette, and the team,

16    if you will, of Drew Farkas, Andy Ginger, Mark

17    Rode?

18        A.    I don't recall any meetings that Janine

19    was at.  So it must have been -- most of those

20    meetings must have been after she was gone.  But

21    that doesn't necessarily mean even before.  I

22    don't remember any meetings with her in it

23    discussing Bob Vila.  There may have been, but I

24    don't remember.

1      Q.    Now, you stated that at some point in

2  time you advised what I call -- and what they

3  call the team?

4      A.    Right.

5      Q.    Ginger, Farkas, Rode; maybe Henry

6  Ferris?

7      A.    I don't think so.  I don't think Henry

8  ever participated in any of these meetings.

9      Q.    Well, the other three; Ginger, Rode,

10  and Farkas.

11      A.    Yeah.

12      Q.    That you advised them of your

13  philosophy that when spokesperson -- strike

14  that -- that when contracts came up for renewal,

15  the whole situation should be reviewed?

16      A.    The whole situation?  No, I never said

17  that.

18      Q.    So, I'm not trying to say -- express it

19  your way.  I don't want to --

20      A.    The term -- had very clear direction

21  about the term of the length of time in these

22  agreements, that I wanted them to be as short as

23  possible.  That's all.

24      Q.    Did you -- and maybe my memory is

# EXHIBIT  G

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

ORIGINAL

ROBERT J. VILA and B.V.T.V., INC.    )
                                     )
            Plaintiff,               )
                                     )
                                     ) No. 05-11717-REK
        vs.                          )
                                     )
SEARS, ROEBUCK AND COMPANY,          )
SEARS HOLDINGS CORPORATION and       )
KMART HOLDING COPORATION,            )
                                     )
            Defendant.               )

        The discovery deposition of Drew Farkas, taken
before Deborah A. Bridges, Certified Shorthand Reporter,
and Notary Public, at 77 West Wacker Drive, 30th Floor,
Chicago, Illinois, commencing at 10:00 a.m. on the 2nd day
of February, A.D., 2006.

BRIDGES COURT REPORTING

DOWNTOWN
77 W. WASHINGTON, STE. 1917
CHICAGO, IL 60602
312/895-4974          BRIDGESREPORTING@AOL.COM

SUBURBS
1407 E. ELM STREET
WHEATON, IL 60187
630/690-6911

1    APPEARANCES:

2            MR. JAMES F. O'BRIEN, ESQ.
3            410 Park Avenue, Suite 1530
             New York, New York 10022
4            212-813-9300

5                    Appeared on behalf of the Plaintiff;

6

7

8            GREENBERG TRAURIG, LLP,
             MS. ANNAPOORNI R. SANKARAN
9            One International Place
             Boston, Massachusetts 02110
10           617-310-6058

11                   Appeared on behalf of the defendants.

12

13

14

15

16

17

18

19

20

21

22

23

24

5

| 1 | Q | 1990? |
|---|---|---|
| 2 | A | (Nodding.) |
| 3 | Q | And are you a member of any bar? |
| 4 | A | I'm a member of both the State of Illinois |

5  Bar and the District of Columbia Bar.

6       Q       And could you tell us your employment

7  history, beginning after you received your law degree?

8       A       My first position was with Kirkland Ellis in

9  Washington, D.C., until, I believe, 1994, then we relocated

10  to Chicago, and I took a position with the law firm of

11  Rosenthal and Schanfield.

12       Q       Could you speak up a bit?  I'm sorry.

13       A       Around 1994 I took a position with the law

14  firm of Rosenthal and Schanfield, and then I believe in 1999

15  I took a position with Sears.

16       Q       Do you specialize in any particular area of

17  law?

18       A       Commercial transactions, general corporate.

19       Q       Now, you stated in 1999 you took a position

20  at Sears.  What was that position?

21       A       Inhouse counsel.

22       Q       Was that your title?

23       A       Senior counsel.

24       Q       And from where were you conducting your

13

1   A    No.  He was not the most senior person in the

2   marketing organization.

3   Q    Who was, at that time?

4   A    I'm not certain I recall.

5   Q    Okay.  Who was the most senior person within

6   the marketing organization of Sears with whom you do recall

7   working?

8   A    I'm sorry.  Can you ask that again?

9   Q    Who is the most senior person in the

10  marketing organization, that you recall having worked with?

11  A    Janine Bousquette

12  Q    Now, my earlier question to you, was -- you

13  may have misunderstood it, but with whom did you negotiate

14  the business terms of Amendment 10 to Exhibit 13?

15  A    I answered as best I can.  I worked with Andy

16  Ginger and exchanged drafts with Ron Feiner.

17  Q    Did you work on Amendment 11 to the

18  syndication agreement as Exhibit 4?

19  MS. SANKARAN:  Sorry.  I will instruct you to answer

20  yes, no, I don't know or I don't recall.

21  THE WITNESS:  Yes, a draft amendment.

22  BY MR. O'BRIEN:

23  Q    Would you look at Exhibit 68?

24  If you would take a minute to review Exhibit

1     the lower half indicates it is from you to Ron Feiner.

2                    Do you recall sending that e-mail?

3          A     Yes.

4          Q     Okay.  And the date of that e-mail is March

5     23, 2004, okay?

6          A     (Nodding.)

7          Q     Now, the next two pages of 70, are they your

8     draft of Amendment Number 11 for Mr. Feiner's review?

9          A     They appear to be.

10         Q     Would you like to take another moment?

11         A     They look to be without, you know, looking at

12    it in my file and looking through the wording, I can't

13    conclusively say.

14         Q     Well, let's also note for the record, there

15    are some handwritten notes and marks on those two pages,

16    Page 194 and 195.  Those are not yours, are they?

17         A     No, they are not.

18         Q     Okay.  So just so we are clear, now, prior to

19    drafting -- prior to preparing your draft of Number 11 for

20    Mr. Feiner's review, what process did you follow with the

21    marketing organization?

22              MS. SANKARAN:  I will instruct you not to answer.

23    BY MR. O'BRIEN:

24         Q     Well, you talked to someone about the

Bridges Court Reporting 312-895-4974

1    business terms, didn't you?

2          MS. SANKARAN:  You can answer yes or no --

3          THE WITNESS:  Yes.

4    BY MR. O'BRIEN:

5          Q      Did you talk to Andy Ginger?

6          MS. SANKARAN:  Answer yes, no, I don't know or I

7    don't recall.

8          THE WITNESS:  I don't recall specifically.

9    BY MR. O'BRIEN:

10          Q      I'm sorry?

11          A      I don't recall specifically.

12          Q      But someone provided you the business terms;

13    is that correct?

14          A      Correct.

15          Q      Okay.  And do you recall when that person

16    provide you the business terms, when that person told you

17    that they had already had discussions with Mr. Feiner on the

18    business terms?

19          MS. SANKARAN:  Instruct you not to answer.

20    BY MR. O'BRIEN:

21          Q      Okay.  After you had discussions with someone

22    from marketing organization, you prepared a draft, Amendment

23    11, and that appears to you to be part of 70; is that

24    correct?

1    THE WITNESS:  I don't recall specifically.

2    BY MR. O'BRIEN:

3    Q    Okay.  Do you recall preparing another draft

4    of the proposed Amendment 11 to the syndication agreement?

5    A    I believe that is the case.

6    Q    Would you look at 73?  Now, 73, exchanged two

7    e-mails both addressed to you.

8    MS. SANKARAN:  Objection, it has three e-mails.

9    BY MR. O'BRIEN:

10    Q    I stand by counsel.  Look at the bottom

11    e-mail.

12    A    Yes.

13    Q    Now, that is addressed to you, with copies to

14    Andy Ginger, Henry Ferris, Bob Vila and J. Russo, and the

15    date is April 28, 2004.  The subject is the B.V.T.V.

16    extension.

17    Do you recall receiving that?

18    A    Yes.

19    Q    Now, Mr. Feiner is asking you if we could

20    please put the Vila Home Again extension to bed.

21    Do you understand him that he was referring

22    to proposed Amendment 11 to the syndication agreement?

23    A    That is my understanding.

24    Q    Okay.  After you received this e-mail, what

1    did you do, if anything?

2         A    I don't have a specific recollection.  I

3    assume I communicated with my client.

4         Q    Okay.  After you communicated with your

5    client, did you do anything?

6         A    I don't have a specific recollection.

7         Q    Okay.  So let's look to the next e-mail on

8    the page, and this is an e-mail from Mr. Feiner to you, and

9    with copies to Mr. Vila and Mr. Russo, subject -- and the

10   date is Monday, May 3rd, 2004, subject B.V.T.V. extension.

11              Do you recall receiving that e-mail?

12        A    Yes.

13        Q    In that e-mail, among other things,

14   Mr. Feiner asked if anyone -- is anyone in touch with King

15   World, all right?

16              Did you know whether anyone was in touch with

17   King World at or about that time, May 2004?

18        A    I don't have a specific recollection as to

19   that specific time.

20        Q    Okay.  Now, you, yourself, had received

21   correspondence from King World with an enclosure dated April

22   2, 2004, Exhibit 71, correct?

23        A    Correct.

24        Q    Okay.  But you were not working on an

1        Q        An agreement with King World?

2        A        Potentially.

3        Q        And MindShare had to work for Sears, did it

4    not?

5        A        Correct.

6        Q        Did you know Mr. Tortorice?

7        A        Not personally.

8        Q        Okay. And you say that "Henry, Andy," that

9    is you, "did speak to him after our meeting last week. They

10    thought King World might overstate the need to complete

11    things by July 1st."

12             Does that refresh your recollection about

13    whether you were working on an extension with King World?

14        A        I don't believe. I don't believe that it was

15    at that time an extension. We were evaluating options.

16        Q        Okay. So we are looking at 132.

17             (WHEREUPON, Exhibit No. 132 was marked

18                  for Identification.)

19        THE WITNESS: Okay.

20    BY MR. O'BRIEN:

21        Q        Okay. Can you identify Exhibit 132?

22        A        It appears to be an e-mail from me to Ron

23    Feiner, transmitting a resized draft of Home Again

24    Amendment 11.

1    Q    Okay. Now, to the best of your memory, are

2  the last three pages of Exhibit 131, a draft made by you and

3  transmitted to Mr. Feiner in 2004?

4    A    They appear to be.

5    Q    Now, before sending that draft to Mr. Feiner,

6  did you discuss it with your client?

7    MS. SANKARAN:  Just answer yes, no, I don't know or

8  I don't recall.

9    THE WITNESS:  Yes.

10  BY MR. O'BRIEN:

11    Q    Is it fair to say that you did not send out

12  any drafts to Mr. Feiner without first discussing them with

13  your client?

14    MS. SANKARAN:  Objection. You can answer.

15    THE WITNESS:  In various -- to various degrees.

16  BY MR. O'BRIEN:

17    Q    Well, you didn't send out drafts without

18  input from your client, did you?

19    A    I had conversations with my client, but not

20  -- it may not be the case in each and every instance that a

21  draft -- that specific draft was reviewed by a client.

22    Q    I'm not talking so much necessarily the piece

23  of paper itself, and the physical piece of paper. I'm

24  talking about the contents set forth in those drafts.

1    A    Correct.

2    Q    Okay.  So correct, you talked to your client?

3    A    Correct.

4    Q    Okay.  In your e-mail, Exhibit 132 you said

5    that the document attached to it is redlined to show

6    changes, and you state most of them relate to adding the

7    bonus and right to accommodate the desire.  To sign in

8    advance of syndication deal.

9            Now, that is a concept you discussed with

10   your client before you put it in the language of this

11   amendment, correct?

12       MS. SANKARAN:  Answer yes, no, I don't know or I

13   don't recall.

14       THE WITNESS:  Yes.

15       MR. O'BRIEN:  I will have another document marked

16   133.

17            (WHEREUPON, Exhibit No. 133 was marked for

18            Identification.)

19       THE WITNESS:  Okay.

20   BY MR. O'BRIEN:

21       Q    Could you identify 133?

22       A    This is an e-mail to me from Ron, relating --

23       Q    I'm sorry.  It is an e-mail from whom?

24       A    Oh, I'm sorry.  An e-mail from Ron to me,

1   BY MR. O'BRIEN:

2       Q       In that conference call, was that issue of

3   the payments resolved?

4       A       I don't recall.

5       Q       After the conference call, did you prepare

6   another draft of Amendment 11 to the syndication agreement?

7       A       I believe at some point, yes.

8       Q       Would you look to Exhibit 5, please?

9       A       Okay.

10      Q       Now, there is a -- Exhibit 5 is an e-mail

11  from Mr. Feiner to Mr. Rode at Sears.  Who is Mr. Rode?

12      A       Mr. Rode is an employee at Sears in the

13  marketing organization.

14      Q       Okay.  And do you know when he joined the

15  marketing organization at Sears?

16      A       No, I don't.

17      Q       I believe you testified that for the most

18  part, the person you were dealing with in the marketing

19  organization, was Henry Ferris?

20      A       Correct.

21      Q       Did that change at some point in time?

22      A       Yes.  Mark Rode became more involved.

23      Q       Okay.  Did that also mean that Mr. Ferris

24  became less involved?

**Bridges Court Reporting 312-895-4974**

51

1    Q    Mr. Rode states Ron, "I know Drew was working
2  on it." This is November 24, 2004.  Prior to that date, had
3  you been working on a new draft of Amendment 11 to the
4  syndication agreement?

5    A    I believe so.  I don't have a specific
6  recollection.

7    Q    He then says that he, Rode, was out all last
8  week and now Drew is out this week.

9         Do you recall being out that week, which
10  included November 24, 2004?

11    A    I don't have a specific recollection, it was
12  around Thanksgiving.

13    Q    Mr. Rode goes on and says that he left a
14  message.  Do you recall receiving a message from Mr. Rode
15  about this matter?

16    MS. SANKARAN:  You can answer yes, no, you don't
17  know or you don't recall.  I don't recall.

18  BY MR. O'BRIEN:

19    Q    Okay.  Would you look at Exhibit 16?

20    MS. SANKARAN:  16 or 60?

21    MR. O'BRIEN:  16.

22    THE WITNESS:  Okay.

23  BY MR. O'BRIEN:

24    Q    Now, Exhibit 16 is an e-mail from Mr. Rode to

**Bridges Court Reporting 312-895-4974**

1    Mr. Feiner, dated December 22, 2004, and attached to it is a

2    3 page document, which Mr. Rode characterizes as a draft of

3    the agreement with your request.

4                    Now, would you look to those three pages

5    there, in Exhibit 16, they are Pages 243, 244, 245.

6                    Did you prepare that document?

7        A       It appears to be so, yes.

8        Q       Now, Mr. Rode transmits this rather than you.

9    Was there any particular reason for that?

10              MS. SANKARAN:  You can answer yes, no, I don't know

11   other I don't recall.

12              THE WITNESS:  No.

13   BY MR. O'BRIEN:

14       Q       Now, the three-page draft attached to Exhibit

15   16, did you prepare that after communication -- receiving

16   information from your client?

17       A       Yes.

18       Q       Now, at this time, this is December of 2004,

19   were negotiations ongoing with King World for a extension of

20   their syndication agreement with Sears?

21       A       I don't have a specific recollection of the

22   time.

23       Q       Okay.  Were you involved with the King World

24   syndication a agreement at -- in the latter part of 2004?

1    I think the exhibits to Mark's deposition.

2         Q    Okay.  Now, Mr. Rode is responding to

3    concerns raised by Mr. Feiner, regarding what they refer to

4    as the December 22, 2004 draft.  He says, "I will have Drew

5    revise."

6         Did you receive an instruction to revise the

7    draft of the syndication agreement?

8         MS. SANKARAN:  You can answer yes no, you don't

9    know.

10        THE WITNESS:  I don't believe so.

11   BY MR. O'BRIEN:

12        Q    Okay.  Would you look at -- and did you do

13   so?

14        A    I believe so.

15        Q    Would you look to Exhibit 21?

16        A    Okay.

17        Q    Now, 21 is an e-mail from Mark Rode to

18   Mr. Feiner, dated January 14, 2005, and attaches a document

19   consisting of 33 pages.

20        And as you note, Mr. Rode says, "attached is

21   the contract with the revisions you requested, I hope."

22        Now, if you look to the attachment, which is

23   Pages 132, 133, 134?

24        A    Yes.

56

1    Q    Is this a document you prepared?

2    A    It appears to be.

3    Q    Okay.  And one of the revisions on the first

4    page of the document is striking of the year 2004, in place

5    of the year January 11, 2005.

6         Now, did you prepare this document after

7    communicating with your client?

8    A    Yes, I believe so.

9    Q    Would you look at 22?

10   A    I'm sorry?

11   Q    22.

12   A    Okay.

13   Q    Now, 22 has two e-mails on it.  Disregard the

14   first one on the top of the page.

15        This is a e-mail dated January 18, 2005, from

16   Mr. Feiner to Mr. Rode.  It states "Dear Mark, the new Vila

17   syndication agreement is fine.  Can you have Drew arrange

18   for execution copies?"

19        Now, did you receive there e-mail or --

20   strike that.  Did you see this e-mail at any time before

21   your review of documents via the deposition?

22   A    Yes, I believe so.

23   Q    Okay.  Did you prepare the execution copies?

24   A    No.

88

1    Q       Who else was at that meeting?

2    A       As I testified, I can't tell which particular

3  meeting is being referred to.

4    Q       But you do recall you were at such a meeting

5  with --

6    A       Well, you know, I've mentioned a number of

7  meetings that were had.

8    Q       Okay. Well, I just want to be sure. You

9  were at a meeting that occurred in March 2005 --

10   A       Um-hum.

11   Q       -- before the merger was consummated, where

12  there was an agreement that the library value was $12

13  million on undiscounted; is that correct?

14   A       Correct.

15   Q       Would you look at Exhibit 97, please?

16   A       Okay.

17   Q       And my question is have you ever seen this

18  document before?

19   A       Not that I recall.

20   Q       Okay. Did you participate in a conference

21  call with Mr. Feiner, March 2005?

22   A       I believe so. I'm not entirely sure of the

23  exact date, but yes.

24   Q       Okay. Would you look at Exhibit 30, please.

1        A        Okay.

2        Q        Now, Exhibit 30 is Mr. Feiner's memorandum of

3    conference call with Sears personnel March 23, 2005.  And it

4    states that he had a conversation that day with Andy Ginger,

5    Mark Rode -- Drew Farkas, Mark Rode and Wendy Pifher of

6    Holland and Hart.

7                 Is this the conference call you participated

8    in?

9        A        It is a conference call I participated in,

10    yes, most likely.

11        Q        And who was Wendy Pifher?

12        A        Wendy pifher, she is an attorney with Holland

13    and Hart.

14        Q        Had you engaged her?

15        A        Yes.

16        Q        Now, in this e-mail -- this memorandum,

17        MS. SANKARAN:  E-mail two.

18        MR. O'BRIEN:  An e-mail he apparently sent to

19    himself and to Mr. Vila, but in this document.

20    BY MR. O'BRIEN:

21        Q        Okay.  This is Mr. Feiner's recollection of

22    what occurred.  Is there anything in Exhibit 30 that you

23    believe is incorrect?

24        A        I don't have a specific recollection on the

1    breakdown of the values.

2            The terms in the proposal would appear to be

3    substantially correct.  I don't agree with the

4    characterization of what was happening regarding personnel

5    at Sears.

6        Q    What are you talking about specifically?

7        A    In the first body, I don't believe at this

8    point in time we knew what the relationships were going to

9    be among senior executives.

10       Q    Is there anything else?

11       A    No.

12       Q    Okay.  Would you look at Exhibit 53?

13            Mr. Farkas, with your counsel's permission,

14   I'm putting before you my copy of what has been marked as

15   Exhibit 53 to these depositions, and it consists of two

16   pages, most of which are redacted.

17            I'd ask you to take a look at it.

18       A    Okay.

19       Q    Now, on the second page of that exhibit,

20   there is paragraph there, one of the few things that is not

21   redacted, okay?  Did you ever see that document before --

22   that language before?

23       A    Yes, I believe so.

24       Q    Okay.  And can you recall when you saw it?

91

| | | |
|---|---|---|
| 1 | A | Not specifically.  I believe probably May. |
| 2 | Q | May of 2005? |
| 3 | A | Correct. |
| 4 | Q | The document, and I'm going from memory, |

5  references you -- it states, I believe Drew Farkas was the

6  attorney that was involved with the negotiations.

7  Do you know who wrote this?

| 8 | A | Yes. |
| 9 | Q | Who? |
| 10 | A | I believe Robert Ratke. |
| 11 | Q | R-a-t-k-e? |
| 12 | A | Correct. |
| 13 | Q | When did you first hear of Mr. Ratke? |
| 14 | A | Prior the merger, as part of this immigration |

15  meeting, that were being held.

16  Q  Who was -- who is -- who is Mr. Ratke at the

17  time you first heard of him?

18  A  An attorney at Kmart.

19  Q  Okay.  And you met with him prior to the

20  merger?

21  A  Yes.

22  Q  Okay.  When you met with him, was this any

23  discussion of Amendment 11 to the syndication agreement?

24  MS. SANKARAN:  I'd instruct you not to answer.

**Bridges Court Reporting 312-895-4974**

1

2    BY MR. O'BRIEN:

3        Q    Was there any discussion of Mr. Vila or

4    B.V.T.V. when you met with Mr. Ratke prior to the merger?

5        MS. SANKARAN:  I'm going to instruct you not to

6    answer.

7    BY MR. O'BRIEN:

8        Q    Did you meet with Mr. -- did you communicate

9    with Mr. Ratke on more than one occasion prior to the

10    merger?

11       A    I believe so.

12       Q    And how many communications did you have with

13    Mr. Ratke prior to the merger?

14       A    I don't recall.

15       Q    Was it more than two?

16       A    I believe so.

17       Q    Were they by e-mail?

18       A    I don't believe so.

19       Q    Were they in person?

20       A    I believe, on occasion.

21       Q    Okay.  Were they by telephone?

22       A    Yes.

23       Q    Would you look at Exhibit 109?

24       MS. SANKARAN:  That is the one we discussed?

93

1          MR. O'BRIEN:  Right.

2          MS. SANKARAN:  And we would object to it being

3    discussed on the record?

4          MR. O'BRIEN:  Well, I need some information in order

5    to make a judgment on your request.

6    BY MR. O'BRIEN:

7          Q     Okay.  So that the witness knows -- well,

8    let's see.  Let's find it first.

9          MR. O'BRIEN:  I have one question on it.

10         MS. SANKARAN:  Okay.  For the witness's background

11   and you can correct me if I'm wrong, there was a document

12   that was marked in Mr. Ginger's deposition, the bottom

13   portions of which we are claiming was an inadvertent

14   production, as it was attorney/client communication on the

15   bottom half.  The top half was introduced in a redacted form

16   elsewhere, including attachments, which were prepared by

17   counsel.

18         MR. O'BRIEN:  Okay.

19   BY MR. O'BRIEN:

20         Q     Mr. Farkas, would you look at the third page

21   of 109, the one that has labeled, each brought of Sears 122

22   labeled at the bottom Sears, 1228.

23         A     Okay.

24         Q     Did you prepare that?

**EXHIBIT H (1)**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT J. VILA and<br>B.V.T.V., INC., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) Civil Action No. |
| SEARS, ROEBUCK AND CO., | ) 05-11717-REK |
| SEARS HOLDINGS CORPORATION, | ) |
| and KMART HOLDING | ) |
| CORPORATION, | ) |
| | ) |
| Defendants. | ) |

**ORIGINAL**

The deposition of MARY TORTORICE,
called by the Plaintiffs for examination, taken
pursuant to the Federal Rules of Civil Procedure
of the United States District Courts pertaining
to the taking of depositions, taken before ROBIN
M. CHIMNIAK, a Notary Public within and for the
County of DuPage, State of Illinois, and a
Certified Shorthand Reporter of said State, taken
at 77 West Wacker Drive, Suite 3000, Chicago,
Illinois, on the 5th day of July, 2006, at the
hour of 11:06 a.m.

## COURT REPORTING

DOWNTOWN
77. W. WASHINGTON, SUITE 1917
CHICAGO, ILLINOIS 60602
312/895-4974

SUBURBS
211 E. ILLINOIS STREET, SUITE L3
WHEATON, ILLINOIS 60187
630/690-6911

WWW.BRIDGESCOURTREPORTING.COM • FAX 312/528-9025

```
 1        PRESENT:

 2            MR. JAMES P. O'BRIEN
                  410 Park Avenue
 3                Suite 1530
                  New York, New York 10022
 4
                     Appeared on behalf of the
 5                   Plaintiffs;

 6        GREENBERG TRAURIG,  LLP
          BY:  MS. ANNAPOORNI R. SANKARAN
 7             One International Place
               Boston, Massachusetts 02110
 8
                     and
 9
          SEARS, ROEBUCK AND CO.
10        BY:  MR. FRANK CALABRESE
               333 Beverly Road
11             Hoffman Estates,  Illinois 60179

12                   Appeared on behalf of
                     Defendants.
13

14

15

16

17

18

19

20

21

22

23

24
```

7/5/06    VILA v SEARS    Tortorice

1        MS. SANKARAN:  And I can provide that.  We

2   are presenting Ms. Tortorice as the person with

3   the most knowledge for Topics 1 through 11, the

4   second half of 13, and 14.

5   BY MR. O'BRIEN:

6        Q.    Now, do you recall, when was the first

7   time that you saw Exhibit 239 and the topics for

8   examination?

9        A.    It would have been the end of June, I

10  believe.

11       Q.    The end of June of 2006?

12       A.    Correct.

13       Q.    Okay.  And could you tell me what

14  you've done to prepare yourself to testify on

15  these topics for which you have been designated

16  by Sears?

17       A.    I was given the summary judgment

18  motions, and I read the summary judgment motions;

19  I requested my paralegal to search in our files

20  on these topics; and that would be it.

21       Q.    What files did you direct your

22  paralegal to search?

23       A.    The files that are in our law

24  department, to see if there was any information

1    related to the "Home Again" trademark.

2    Q.    And was any such information found in

3    your files in the law department?

4    A.    No.

5    Q.    Have you talked to anyone other than

6    your paralegal at Sears, Roebuck and Co. Or Sears

7    Holdings or Sears Holding Management Corp.

8    Concerning the topics for examination today?

9    MS. SANKARAN:    I'm going to instruct you to

10    just answer as to who you spoke with and not what

11    was said.

12    THE WITNESS:    I spoke to my outside counsel,

13    I spoke with another paralegal of mine, and

14    that's it.

15    BY MR. O'BRIEN:

16    Q.    That's it.    You said you spoke to your

17    outside counsel.    Did you mean outside counsel

18    for the defendants in this lawsuit, or your

19    personal counsel?

20    A.    For the defendants in this matter.

21    Q.    Who was that outside counsel?

22    A.    It would have been Anna.

23    Q.    And when, other than this morning, did

24    you speak to Ms. Sankaran?

1          So we are responsible for any trademark

2    clearance, maintaining the portfolio of the

3    intellectual properties, and then the sourcing

4    piece of it is Sears has a number of offices

5    throughout the world that we use to actually go

6    out and find factories to source our product, and

7    we support -- we provide the legal support for

8    those entities.

9          Q.    Are these manufacturing facilities?

10         A.    No, they're not.  They're similar to a

11   buying agent.  They go out and locate the vendors

12   who have the factories that do the sourcing.

13         Q.    Now, you made reference to a portfolio.

14   What was that?

15         A.    Well, we -- the company has an

16   intellectual property portfolio of trademarks,

17   service marks, patents, copyrights.

18         Q.    Okay.  Where is that portfolio

19   maintained?

20         A.    Well, it's virtual because it's

21   intangible assets, so it's -- it's maintained,

22   but I don't know what -- how to answer that.

23         Q.    Well, let me rephrase it.  Does the

24   portfolio -- is it a list?

1        A.    Part of it could become a list.  You

2   could put together a list that would, you know,

3   set forth the intellectual property.

4        Q.    I'm trying to ask.  Does a list

5   exist --

6        A.    Numerous lists exist that make up the

7   portfolio.

8        Q.    Let me finish.  Does a list exist of

9   Sears trademarks?

10        A.    If you went to the USPTO, you could

11   find trademarks that Sears, Roebuck and Co. or

12   Kmart of Michigan would own.  So I can pull a

13   list from that docket.

14        Q.    Well, do I understand that other than

15   what's available in the public domain, Sears

16   doesn't maintain a list of trademarks it owns?

17        A.    I have a number of lists that make up

18   the marks that we have registered.  I do not have

19   a list necessarily of all of our common law

20   trademarks.

21        Q.    Now, with respect to registered marks,

22   okay, are the words "Home Again" on that list of

23   registered marks?

24        A.    "Home Again" is not a registered

1    trademark of Sears.

2        Q.    With respect to so-called common law

3    trademarks -- I don't want to abuse your

4    language, if that's what you said -- do I

5    understand you do not have a list of those?

6        A.    Correct.

7        Q.    All right.  Now, you understand when I

8    use the word "you," I'm referring to Sears,

9    Roebuck and Co. and Sears Holdings?  I'm talking

10    about the corporate you.

11        A.    Yes.

12        Q.    Have you searched for such a list?

13        A.    If they're common law, I necessarily

14    wouldn't have them written down anywhere.

15        Q.    So -- I'm sorry.

16        Well, are they in the portfolio, which

17    as I understand, is a virtual asset, if that's

18    the correct term?

19        A.    Right.  I don't have a folder that's --

20    lists all of the intellectual property.  When I

21    say "portfolio," what I mean is Sears has

22    trademarks, service marks, copyrights, patents

23    that it owns.  They may be registered, they may

24    not be registered.  Regardless, we own them.

1        I do not have one definitive list that

2    I could print out and hand to you that is all of

3    the intellectual property that Sears owns.

4        Q.   Well, is there any record at Sears in

5    any form whatsoever that lists "Home Again" as an

6    owned trademark?

7        A.   I would refer to the contract, where

8    it -- it talks about in the syndication of a show

9    that we owned all of the marks, service marks

10   related to that show.

11       MR. O'BRIEN:  Note my motion to strike the

12   answer.

13            That's for the record, for the court.

14   BY MR. O'BRIEN:

15       Q.   Aside from what you just spoke about, a

16   contract, does Sears have any record in any form,

17   other than what you've just answered, wherein it

18   lists the words "Home Again" as a trademark owned

19   by Sears?

20       A.   No.

21       MR. O'BRIEN:  Would you mark this as the

22   next exhibit, please.

23

24

1    printed on a regular basis, would be disseminated

2    to the marketing attorneys and paralegals, and

3    then to certain marketing clients in the

4    business.

5        Q.    Is that a written policy?

6        A.    No.

7        Q.    Now, for what marketing clients was

8    Exhibit 240 distributed?

9        A.    I do not know.

10       Q.    Who would?

11       A.    It was the paralegals who were working

12   at Sears in February of 2005 would know.

13       Q.    I understand in your preparation for

14   this deposition you asked one paralegal to try to

15   get copies of old advertisements.

16       A.    Correct.

17       Q.    And you asked -- I forget what you

18   asked the other paralegal.

19       A.    I asked the first paralegal to search

20   the Sears law department files to see if there

21   was a file on "Home Again."

22       Q.    And as I understand, there was no file?

23       A.    Correct.

24       Q.    When is the first time that you spoke

1    to anyone at Sears regarding the trademark -- the

2    alleged trademark "Home Again"?

3        A.   I don't know.

4        Q.   Well, did you ever speak to anyone at

5    Sears about the alleged trademark "Home Again"?

6        A.   I would say certainly that I have

7    throughout my career at Sears.  As a marketing

8    attorney, I would have --

9        MS. SANKARAN:  Before you answer, I'm just

10   going to instruct you not to reveal legal advice

11   or attorney-client communications that you

12   rendered to the client.  But to the extent you

13   can answer without doing that, you can answer the

14   question.

15       THE WITNESS:  All right.

16           But as a marketing attorney, there were

17   certainly times when the show and Bob Vila's

18   relationship would have been part of what I was

19   responsible for, and as an intellectual property

20   attorney, having that piece of it, I would have

21   had this conversation in the last few months

22   related to this litigation.

23   BY MR. O'BRIEN:

24       Q.   Other than your discussion in the last

1    couple of months in connection with this

2    litigation, can you name one instance where you

3    spoke to anybody about -- at Sears about the

4    alleged trademark "Home Again"?

5        A.    No.

6        Q.    Okay.  Now, as to the topics of

7    examination, No. 1 is Sears registration of the

8    alleged trademark "Home Again."

9            So you're the person at Sears most

10   knowledgeable about that; correct?

11       A.    Correct.

12       Q.    Did Sears ever register the alleged

13   trademark "Home Again"?

14       A.    Not to my knowledge.

15       Q.    Do you know of anyone else who might

16   have that knowledge?  You're the corporate

17   designee.

18       A.    No.

19       Q.    Do you know if Sears ever attempted to

20   register the trademark "Home Again"?

21       A.    Not to my knowledge.

22       Q.    Now, if I recall your testimony, prior

23   to discussions in connection with this

24   litigation, you can't remember a single

1        A.    I would have it in my e-mails at work.

2        Q.    How large is it?

3        A.    It's -- it's a -- it's over a hundred

4    pages long.

5        Q.    Does it all relate to tools?

6        A.    No, it would be Sears brands.  It would

7    be the trademarks and service marks that are

8    registered or have an application pending for

9    Sears Brands, LLC; Sears, Roebuck and Co.; and it

10    would also contain marks for an entity called

11    KCD, LLC.

12        Q.    What's KCD, LLC?

13        A.    KCD is another intellectual property

14    holding company.

15        Q.    Who owns KCD, LLC?

16        A.    Actually, Sears Brands, LLC, owns KCD,

17    LLC.

18        Q.    Okay.  Now, I understand you reviewed

19    that document.  You said it's about a hundred

20    pages -- in preparation for the deposition today?

21        A.    Yes.  Over a hundred pages.

22        Q.    Okay.  It's over a hundred pages.

23            Anywhere on that list was there a mark

24    or an alleged trademark "Home Again"?

1         MS. SANKARAN:  Objection.

2              You can answer.

3         THE WITNESS:  No.

4    BY MR. O'BRIEN:

5         Q.   Okay.  So therefore, if you were to

6    access your e-mail, download that list, have it

7    printed out, we wouldn't find "Home Again"

8    listed?

9         A.   Correct.

10        Q.   Sears today, Sears or any of its

11   subsidiaries that owns brands or licenses a

12   trademark, do they have a list of common law

13   trademarks that Sears allegedly owns?

14        A.   No.

15        Q.   Back in 2005 did Sears, Roebuck or any

16   of its subsidiaries that you've discussed have a

17   list of common law trademarks that Sears

18   allegedly owns?

19        A.   Looking at Exhibit 240, it looks as

20   though there were some common law marks that were

21   listed in this docketing system.

22        Q.   But you didn't look at this old

23   system --

24        A.   Correct.

1        Q.    (Continuing) -- to determine if "Home

2    Again" was listed?

3        A.    Correct.

4        Q.    Okay.  And can that old system be

5    accessed today?

6        A.    I don't know.

7        Q.    Do you, the 30(b)(6) witness for Sears,

8    Roebuck and Co., know if the words "Home Again"

9    were ever listed as a common law trademark owned

10   by Sears or its subsidiaries?

11       MS. SANKARAN:  Objection; where?

12       THE WITNESS:  What was it?

13       MS. SANKARAN:  You said was it ever listed.

14   I'm just asking anywhere in the world or --

15       MR. O'BRIEN:  Anywhere within what your

16   witness has described as the old system.

17       THE WITNESS:  There would be no reason to

18   list a common law mark.  The system is meant to

19   help us maintain the registration in the USPTO.

20   So common law marks would typically not be listed

21   on this docketing system.

22   BY MR. O'BRIEN:

23       Q.    Okay.  Refer you to Exhibit 240.  You

24   just testified there are common law marks listed

1    here.

2            A.    Yes.    I'm not saying that this is all

3    of our common law marks.    I do see some listed on

4    here.

5            The system, though, it's a docketing

6    system used to help folks manage the registration

7    and the applications of their trademarks and

8    service marks with the USPTO.

9            Q.    Again my question is, do you, the

10    30(b)(6) witness testifying today at this

11    deposition, know whether the alleged trademark

12    "Home Again" was ever listed as a common law

13    trademark owned by Sears in the file from which

14    Exhibit 240 came?

15            A.    No.

16            Q.    Just so the record is clear, do I

17    understand your answer to be no, you don't know,

18    or yes, you know, and it isn't so listed?

19            A.    I do not know.

20            Q.    Exhibit 241.    Now, Exhibit 241 is

21    "DEFENDANTS' ANSWER AND FIRST AMENDED

22    COUNTERCLAIM TO PLAINTIFF'S FIRST AMENDED

23    COMPLAINT."    Have you seen that document before?

24            MS. SANKARAN:    You didn't give me that.    You

1        Q.    Sears Intellectual Property Rights does

2    operational work in connection with

3    the property --

4        A.    Sears Intellectual Property Management

5    Company.

6        Q.    (Continuing) -- property rights

7    management company?

8        A.    Correct.

9        Q.    Okay.  Who owns the alleged trademark

10    "Home Again"?

11        A.    Sears Brands, LLC.

12        Q.    Okay.  Are there any records of Sears

13    Brands, LLC, that so state that?

14        A.    No.

15        Q.    What is your knowledge that Sears

16    Brands, LLC, owns the alleged trademark "Home

17    Again"?  What is that based on?

18        A.    It's based on the fact that the

19    contract that we had, the syndication agreement,

20    provided that any intellectual property of the

21    show would belong to Sears, and Sears Brands,

22    LLC, owns the intellectual property of Sears,

23    Roebuck and Co.

24        Q.    And where did you acquire that

1  the Craftsman Web site that says that?  Strike

2  that.

3         Did you say in reference to the "Home

4  Again" show?

5         A.   The "Bob Vila Home Again" TV show had

6  been referenced on the Craftsman.com Web site.

7         Q.   Are you claiming, as Sears, that Sears

8  owns the name "Bob Vila's Home Again"?

9         A.   No.

10        Q.   My question, have the words "Home

11  Again" -- standing alone, just those words --

12  been used in commerce by Sears?

13        A.   Not to my knowledge.

14        Q.   Does Sears --

15  MS. SANKARAN:  I'm sorry.  I didn't mean to

16  interrupt your question.  I just wanted to take a

17  quick bathroom break, if you don't mind.

18        MR. O'BRIEN:  All right.

19                    (Brief pause.)

20  BY MR. O'BRIEN:

21        Q.   Ms. Tortorice, during the break did you

22  have any discussion with your counsel,

23  Mr. Calabrese, concerning your deposition

24  testimony?

7/5/06      VILA v SEARS      Tortorice

1      A.    Yes.

2          MS. SANKARAN:  And I'll instruct you to

3    answer yes, no, I don't know, or I don't

4    remember.

5          THE WITNESS:  Yes.

6    BY MR. O'BRIEN:

7          Q.    What was that discussion?

8          MS. SANKARAN:  Because you're under oath,

9    I'll let you answer.  But again, be careful not

10    to disclose attorney-client privileged

11    communications.

12          THE WITNESS:  It was just to discuss overall

13    how the deposition was going, and what to expect

14    next.  What to expect next.

15    BY MR. O'BRIEN:

16          Q.    Anyone comment on the substance of any

17    of your answers thus far?  Did either of them I

18    should say?

19          A.    Substance.  Well, we talked about --

20    went through the whole conversation.  We talked

21    about whether questions had been outside of this

22    list of topics, and really that was it.

23          Q.    Okay.  Now, is the alleged trademark

24    "Home Again" associated with any Sears product?

1        A.    Well, it's associated with a TV show,

2   which I would say is certainly sponsored by or

3   was sponsored by Sears.   Any specific product

4   that we sell that we brand "Home Again"?   No.

5            I believe that there were some products

6   that the Bob Vila Web site sold which were

7   branded "Bob Vila Home Again".

8        Q.    Name one.

9        A.    I think that there were some mugs,

10  hats.

11       Q.    Anything else?

12       A.    That's about it.   I don't believe so.

13  I don't know.

14       Q.    Where did you get that information?

15       A.    I got that information in preparation

16  for this deposition.

17       Q.    Is Sears in the business of producing

18  television shows?

19       A.    We do not produce television show

20  shows.   We sponsor television shows.

21       Q.    What television shows has Sears

22  sponsored?

23       A.    Well, we sponsored "Bob Vila Home

24  Again," we have sponsored "Extreme Makeover: Home

**EXHIBIT H (2)**

1    Edition," we sponsored some cooking shows, we've

2    sponsored some various reality TV shows.  At one

3    point in time we sponsored on one of the cable

4    networks their, like, movie of the week.

5        Q.    Now, have any of those -- well, what do

6    you mean by "sponsored"?

7        MS. SANKARAN:  Objection.  I'm going to let

8    her answer, but it's not within the topics of the

9    30(b)(6) list.  But I'll let her answer as to her

10   understanding of the word.

11       MR. O'BRIEN:  She used it, so --

12       MS. SANKARAN:  And that's why I'm allowing

13   her to answer based on her understanding, and not

14   as a 30(b)(6) witness.

15       THE WITNESS:  Sponsoring could mean that we

16   provide money to help actually fund the

17   production of the show, could mean that we

18   provide products that are used on the show, it

19   could mean that we purchase the advertising

20   around the show.

21   BY MR. O'BRIEN:

22       Q.    So do I understand that the alleged

23   trademark "Home Again" identifies the television

24   series starring Bob Vila, home improvement

1    television series starring Bob Vila?

2         MS. SANKARAN:  Objection.

3              You can answer.

4         THE WITNESS:  Yes.

5    BY MR. O'BRIEN:

6         Q.    Does Sears offer for sale any goods

7    using the alleged trademark "Home Again"?

8         A.    No.

9         Q.    Does Sears claim that the alleged

10   trademark "Home Again" has an association with

11   Sears, Roebuck and Co.?

12        A.    Yes.

13        Q.    What is that association?

14        A.    The association is that -- that Sears

15   and Sears' goodwill is attached to the mark "Home

16   Again."

17        Q.    What facts do you have that supports

18   that conclusion?

19        A.    I would base that on fundamental

20   trademark law, where a trademark -- when you own

21   a trademark, the value and the goodwill

22   associated with that would be attached to the

23   owners of that trademark.

24        Q.    Well, are you referring to basic

1    trademark law?

2           A.    Yes.

3           Q.    What makes "Home Again" a trademark?

4           A.    I believe that it shows -- it shows

5    that there is a sponsorship.  I think that people

6    would attach "Home Again" to the Sears name by

7    the way that the TV show was presented, and I

8    think that "Bob Vila's Home Again" people -- I

9    think manufacturers, consumers, watchers of that

10    show -- would attach Sears and Sears' good will

11    to that mark.

12           Q.    Has the show ever been called "Home

13    Again"?

14           A.    No.

15           Q.    What products does Sears sell using the

16    trademark "Home Again"?

17           A.    None.

18           Q.    Does Sears have any evidence of

19    consumer identification of the words "Home Again"

20    with Sears, Roebuck?

21           A.    I have not seen any consumer research.

22           Q.    Do you know if any has been done?

23           A.    I have no knowledge of any being done.

24           Q.    Is Sears using the alleged trademark

1      A.    Correct.

2      Q.    And Craftsman is associated with tools

3  sold by Sears; correct?

4      A.    Correct.

5      Q.    Do you sell any tools under the alleged

6  trademark "Home Again"?

7      A.    No.

8      Q.    Since June 1st, 2005, has Sears

9  received any comments from consumers that they

10  were confused by the use of the words "Home

11  Again"?

12      A.    No.

13      Q.    Since June 2005 has Sears received any

14  comments from consumers regarding the fact that

15  Sears is no longer sponsoring the home

16  improvement program, television program starring

17  Bob Vila?

18      A.    Not to my knowledge.

19      Q.    Does Sears have any products that are

20  similar to any products of B.V.T.V.?

21      MS. SANKARAN:  Objection.

22      THE WITNESS:  I don't know how to answer

23  that.  I'm not sure what products B.V.T.V.

24  offers.

1    are exploiting the "Home Again" mark?

2         A.    The exploitation of the library would

3    also exploit the trademark.

4         Q.    What's the name of the shows that are

5    in the library?

6         A.    "Bob Vila Home Again."

7         Q.    The show isn't known as "Home Again";

8    correct?

9         A.    It is known as -- the mark "Home Again"

10   is part of the title "Bob Vila Home Again."

11        Q.    But it isn't the title, is it?  The

12   title of the show was "Bob Vila's Home Again";

13   correct?

14        A.    Correct.

15        Q.    Sears isn't claiming it has ownership

16   of the words "Bob Vila's Home Again"; correct?

17        A.    We're claiming that we have ownership

18   in "Home Again."

19        Q.    When do you use the words "Home Again"?

20   How do you exploit them?

21        MS. SANKARAN:  Objection, asked and

22   answered.

23             You can answer again if you want.

24        THE WITNESS:  I would argue that --

1      A.    In fact.

2      Q.    In fact.  You're a fact witness.

3      A.    I would argue --

4      Q.    I don't want an argument.  Would you

5  please tell me the facts that you know?  That's

6  what you're here to do.

7      A.    The letters that were sent out to the

8  various manufacturers from B.V.T.V. soliciting

9  sponsorship and product would have harmed Sears

10  because those vendors are either our current

11  vendors or our -- or could be potential vendors,

12  and the fact that the mark "Home Again" was used

13  would lead people to think that Sears was part of

14  that solicitation, when, in fact, they were not.

15      Q.    Do you have any evidence from any such

16  donor of products or services that refer to any

17  confusion?

18      A.    No.

19      Q.    Do you have any knowledge of any actual

20  injury --

21      A.    No.

22      Q.    (Continuing) -- that Sears has

23  sustained?

24      A.    I answered no.

1       Q.    When has Sears used the words "Home

2   Again" separate and apart from the words "Bob

3   Vila's" or "With Bob Vila"?  You recall, by the

4   way, that the name of the show was initially

5   "Home Again with Bob Vila," and then was changed

6   to "Bob Vila's Home Again"?  Does that clarify my

7   question for you?

8       A.    Yes.  I'm not aware of any use by Sears

9   of "Home Again" alone.

10      Q.    You're not claiming that Sears has any

11  right in the words "Bob Vila's Home Again"?

12      MS. SANKARAN:  Objection.

13      MR. O'BRIEN:  Asked and answered?

14      MS. SANKARAN:  I'm just objecting.

15      THE WITNESS:  Sears is claiming that it has

16  ownership in "Home Again."

17  BY MR. O'BRIEN:

18      Q.    That's all?

19      A.    Yes.

20      Q.    By the way, do you know who suggested

21  the original name of the television show be "Home

22  Again with Bob Vila"?

23      A.    No.

24      Q.    Do you know why the name of the

BRIDGES COURT REPORTING
(312)895-4974

1   given the tone of Anna's letter, it appears that,

2   in any settlement of the differences between the

3   parties, the use of the phrase 'Home Again' by

4   BVTV is going to be contested by Sears."

5        Q.   Would you read the next sentence?

6        A.   "Although BVTV denies that Sears'

7   position has any merit, it is a non-issue for

8   BVTV and only deflects attention from the real

9   issues between the parties."

10       Q.   Now, during the 15 years that Sears

11   sponsored the home improvement television program

12   starring Bob Vila, it did so for a commercial

13   reason, did it not?

14       A.   Yes.

15       Q.   That reason was to sell Sears Craftsman

16   tools; was it not?

17       A.   And other products.

18       Q.   How much revenue has Sears realized

19   over the past 15 years as a result of its

20   investment in the television -- home improvement

21   television program starring Bob Vila, investment

22   by way of its sponsorship?

23       A.   I would have no idea.

24       Q.   Would it be in the hundreds of millions

1  of dollars?

2      A.   I do not know.

3      Q.   Does anyone at Sears know?

4      A.   I don't know.

5      Q.   Has Sears ever used the words "Home

6  Again" standing alone -- those words, "Home

7  Again," in promoting any Sears products?

8      MS. SANKARAN:  Objection, asked and

9  answered.

10     THE WITNESS:  No.

11 BY MR. O'BRIEN:

12     Q.   And other than its ownership interest

13 in the library, I understand Sears has not used

14 the alleged trademark "Home Again" since August

15 2005.

16     A.   That would be my understanding.

17     Q.   Has Sears expended any efforts to

18 enforce its rights in the alleged trademark "Home

19 Again" against anyone other than Mr. Vila or

20 B.V.T.V.?

21     A.   I know that Sears did receive a letter

22 in the '90s related to a television home

23 improvement show that used the name "Home."  I

24 don't know how Sears responded to that letter.  I

1   know that Sears received a lawsuit claiming that

2   there was a copyright infringement on a script

3   that was related to a home improvement show, and

4   that Sears defended that lawsuit.

5       Other than that, I have no knowledge.

6       Q.   But I was asking about enforcement of

7   the alleged trademark "Home Again."

8       A.   Well, the first letter that I spoke of,

9   yes.

10      Q.   So Sears claims a trademark on the word

11  "home"?

12      A.   My allegation was that "Home Again"

13  infringed on the owner of "Home."  There is an

14  owner that owns the mark "Home," and the

15  allegation was that "Home Again" infringed on

16  that.

17      Q.   So someone was seeking to enforce a

18  copyright claim against Sears; is that right?

19      A.   A trademark.

20      Q.   I'm sorry.  Someone was seeking to

21  enforce a trademark against Sears?

22      A.   Well, they were stating that "Home

23  Again" infringed on their trademark.

24      Q.   Right.

1        A.    And Sears defended that by arguing that

2    it did not.

3        Q.    Well, I thought you said you didn't

4    know how Sears responded to that.

5        A.    Well, I haven't seen how Sears

6    responded, but "Home Again" is being used, so --

7        Q.    So you don't know?

8        A.    (Continuing) -- "Home" --

9        Q.    So you don't know that Sears defended

10   that or settled that.  You don't know anything

11   about it, other than --

12       A.    I know that we used "Home Again".  I

13   know that "Bob Vila's Home Again" has been used

14   since that letter was received.

15       MR. O'BRIEN:  Do you have that letter?

16       MS. SANKARAN:  You produced it.

17       MR. O'BRIEN:  We produced it?

18       MS. SANKARAN:  Yes, you did.  I can tell you

19   the Bates number.

20       MR. O'BRIEN:  Sure.  Let's go off for a

21   second.

22                          (Discussion off the

23                           record.)

24

BY MR. O'BRIEN:

Q.   Now, you're aware, Ms. Tortorice -- am I pronouncing your name correctly?

A.   Yes.

Q.   (Continuing) -- that Sears continued to exploit the name and likeness of Bob Vila upon Sears' Craftsman Web site after August 19th, 2005?

A.   I am aware of that.

Q.   How did you become aware of that?

A.   It was brought to my attention by Mike Kier, vice president, deputy general counsel at Sears.

Q.   When did he bring it to your attention?

A.   I believe it would have been the beginning of 2006.

Q.   After Mr. Kier brought it to your attention, did you do anything?

A.   I contacted various people in the marketing organization and requested that they remove that from the Web site.

Q.   And did they?

A.   To my knowledge, yes.

Q.   Do you know when?

1        A.    It was "Home Again with Bob Vila."

2        Q.    Where does it say that?

3        A.    I'm reading that from the November

4    21st, 1989, letter.

5        Q.    My question is in September of 1989,

6    when this document, Exhibit 4, was executed --

7        A.    I don't know.

8        Q.    (Continuing) -- it didn't have a name,

9    did it?

10        A.    I don't know.

11        Q.    Okay.  And it was named "Home Again

12    with Bob Vila" before -- at the time it aired.

13    That's the title it went on the air with; right?

14        A.    Yes.

15        Q.    "Home Again with Bob Vila."

16            Then it was changed to "Bob Vila's Home

17    Again"?

18        A.    Yes.

19        Q.    The show's name was never "Home Again,"

20    was it?

21        A.    Standing alone, no.

22        Q.    And Sears isn't claiming it owns the

23    name "Home Again with Bob Vila"; is it?

24        A.    Sears is claiming that it owns "Home

1    Again."

2        Q.    Does that mean yes or no to my

3    question?  Are you claiming that Sears owns the

4    name "Home Again with Bob Vila," which was the

5    title of the show?

6        A.    No.

7        Q.    Is Sears claiming that it owns the name

8    "Bob Vila's" -- that's apostrophe S -- "Home

9    Again," which was also the name of the show?

10       A.    No.  And it could not because it can't

11   own an individual's name.

12       Q.    Correct.

13       A.    But it can own "Home Again," and the

14   contract contemplates that by provision 18.

15       Q.    Right.  Where does it say in the

16   provisions of paragraph 18 Sears owns the name

17   "Home Again"?

18       A.    It does not.  It talks in general terms

19   as to the trademarks and -- trademarks, service

20   marks, and trade names for the programs under

21   this agreement.

22       Q.    18(a) talks about Sears' trademarks,

23   and in September 1989 Sears owned a lot of

24   trademarks, didn't it?

1           A.    Yes.

2           Q.    And some of them -- it was

3    contemplated, was it not, that some of those

4    trademarks might be used in the course of the

5    television show; isn't that correct?

6           A.    Correct.

7           Q.    And paragraph 18(a) gave permission to

8    B.V.T.V., the counterpart to this, to use Sears

9    trademarks; isn't that correct?

10          A.    Yes.

11          Q.    When the series was terminated, or when

12   the contract ended, B.V.T.V. would no longer have

13   the right to use Sears trademarks, would it?

14          A.    Correct.

15          Q.    Now, you state that "Home Again" is a

16   trademark.

17          A.    Yes.

18          Q.    You state that as a conclusion.

19          A.    Yes.

20          Q.    It's not used in commerce standing

21   alone; is it?

22          A.    There may have been hats that were

23   sold --

24          Q.    No.  Do you know?  Yes or no, do you

1      know?  Come on.

2          A.   I did see that there was a Web page

3      that was offering hats that said "Home Alone"

4      (sic) on them.

5          Q.   Who was offering them for sale?

6          A.   B.V.T.V.

7          Q.   Right.  I'm asking if Sears has ever

8      used "Home Again" to promote any product or

9      service?

10         A.   Alone, no, it has not.

11         Q.   Sears has never used "Home Again" --

12     just those words, that's your claim, "Home

13     Again" -- it's never used that in commerce, has

14     it?

15         MS. SANKARAN:  Objection.

16         THE WITNESS:  Well, I would -- I would say

17     yes, that it has used --

18     BY MR. O'BRIEN:

19         Q.   All right.  You're changing testimony

20     you gave earlier.  Now, what's the basis for your

21     change?

22         A.   "Home Again" alone?

23         Q.   Yes.

24         A.   I would say "Home Again," no.  "Bob

1    Vila's Home Again," yes.

2        Q.    That's not the question.  It has never

3    used "Home Again" alone in commerce.

4        A.    No.

5        MR. O'BRIEN:  I have no further -- wait a

6    minute.  Excuse me.

7            I only have one copy of this, but you

8    can look over the shoulder, okay?

9            Can we have this marked as the next

10   exhibit?

11                        (Whereupon Deposition Exhibit

12                        No. 248 was marked as

13                        requested.)

14   BY MR. O'BRIEN:

15       Q.    While you're reviewing it, I represent

16   to you that is just a page I ran off from the

17   United States Patent and Trademark Office's Web

18   site back in April of this year, and I keyed in

19   the words "Home Again," live or dead, and got

20   back the report that is embodied in Exhibit 248.

21           Has Sears investigated as to whether

22   any of the -- I think it's 16 or 17 -- identified

23   trademarks there that use the words "Home Again"

24   have infringed Sears' trademark, alleged

1    trademark of "Home Again"?

2    　　　　A.　　No, we have not.

3    　　　　Q.　　The only person -- strike that.

4    　　　　The only entity against whom Sears has

5    attempted to enforce its claim to a trademark in

6    "Home Again" is B.V.T.V., the plaintiff -- a

7    plaintiff in this case; is that correct?

8    　　　　A.　　The only reservation in agreeing with

9    you is that there is this letter, and I have no

10   knowledge how Sears responded to this letter.

11   　　　　Q.　　That letter is Exhibit 24- --

12   　　　　A.　　-- -7.

13   　　　　Q.　　And it is --

14   　　　　A.　　Bates-stamped --

15   　　　　Q.　　(Continuing) -- a series of letters in

16   1989; is that correct?

17   　　　　A.　　It is one letter in 1989.

18   　　　　Q.　　Okay, a letter in 1989.

19   　　　　And that letter, which you -- portions

20   of which you read into the record, is a claim by

21   someone else that Sears is infringing on that

22   party's trademark; correct?

23   　　　　A.　　Correct.

24   　　　　Q.　　So this is not an enforcement by Sears.

# EXHIBIT  I

1      VOLUME: I

2      PAGES: 1-179

3      EXHIBITS: 188-214

4

5           UNITED STATES DISTRICT COURT

6           DISTRICT OF MASSACHUSETTS

7    - - - - - - - - - - - - - - - - - - x

8    ROBERT J. VILA and B.V.T.V., INC.,

9                    Plaintiffs,

10       v.                        Civil Action

11   SEARS, ROEBUCK and CO., SEARS      No. 05-11717-REK

12   HOLDINGS CORPORATION and KMART

13   HOLDING CORPORATION,

14                    Defendants.

15   - - - - - - - - - - - - - - - - - - x

16

17          DEPOSITION of MELISSA W. MARCHAND

18                March 27, 2006

19                10:08 a.m.

20            Greenberg Traurig, LLP

21           One International Place

22           Boston, Massachusetts

23

24      Reporter: Michael D. O'Connor, RPR

```
 1   APPEARANCES:

 2

 3        JAMES F. O'BRIEN, ESQ

 4        410 Park Avenue, Suite 1530

 5        New York, New York 10022

 6        (212)813-9300

 7        For the Plaintiffs.

 8

 9        GREENBERG TRAURIG, LLP

10        By Annapoorni R. Sankaran, Esq. and

11        Sebastian Colley, Esq.

12        One International Place

13        Boston, Massachusetts 02110

14        (617)310-6000

15        For Sears Holdings Corporation and K-Mart

16        Holding Corporation, and Sears, Roebuck and

17        Company.

18

19

20

21

22

23

24
```

1  Mr. Ferris, in what capacities did you deal with

2  them while you were working at be have WebTies?

3      A.   I communicated with them about various

4  things that we wanted to do with Sears, that we

5  thought might make sense for Sears, and we just kept

6  -- you know, I wanted particularly Andy, and then

7  whoever Andy assigned if we couldn't reach Andy, to

8  know what we were doing, so that we were always in

9  step with Sears in terms of meeting the -- we wanted

10 to have a good working relationship.  We've always

11 had a good working relationship.

12      So in terms of the kind of coverage we were

13 doing, I would talk to Andy about making sure, you

14 know, discussing with him what strategies may be for

15 getting better time slots or talking to Andy about

16 if somebody came to us and wanted to advertise on

17 the website, and I was concerned that their product

18 might be competitive with Craftsman products, I

19 would confirm with Andy or Mark or Henry that the

20 product that, you know, had come to us or we had

21 seen would, in fact, be appropriate for us, or if

22 not, I would reject a request for proposal from that

23 company.

24      Q.   You mentioned just now assessing whether

1    products were competitive with Craftsman.  Why did

2    you do that?

3         A.    Because Bob was the Craftsman spokesperson.

4         Q.    Did you understand that there was some kind

5    of obligation that the website not advertise product

6    that was competitive with Craftsman?

7         A.    Yes, I did.

8         Q.    From where did you get that information?

9         A.    From Andy Ginger.

10        Q.    And what did Andy tell you about that?

11        A.    He told me that we could not advertise any

12   tools, lawn equipment, snowblowers that were not

13   Craftsman products on the website.

14        Q.    Do you remember when he told you this?

15        A.    From day one, when we first launched the

16   website back -- I mean, when we launched it in '96,

17   you know -- I think I was first told by Mr. Feiner

18   that that was the case --

19             MR. O'BRIEN:  I want to advise the witness

20   at this time any discussions you had with Mr. Feiner

21   could be covered by the attorney-client privilege.

22   So if in answering Ms. Sankaran's questions, if a

23   portion of the answer relates to that, you can say

24   the fact of the conversation, and we'll take it from

1  there.

2         Fair enough, Anna?

3         MS. SANKARAN:  That's fine.

4      A.   As I said, I was just given that -- I mean,

5  I can't refer to a specific conversation with

6  anyone.  It was a long time ago.  But my

7  understanding from day one was that when we did this

8  business, we were not to -- because, you know -- we

9  wanted to be very respectful of Bob's relationship,

10  and therefore, we were not using anything -- we

11  could not promote anything that had to do with any

12  competitive products with Craftsman.

13     Q.   Now, a few minutes ago you mentioned how

14  Mr. Vila was the spokesperson for Sears.  Do you

15  remember telling me that?

16     A.   Did I say Sears or Craftsman?

17         MR. O'BRIEN:  You can restate it.

18     Q.   You can clarify your answer.  Did you

19  understand that Bob Vila was a spokesperson for

20  Sears?

21     A.   Yes.  I know that Bob was a spokesperson --

22  well, I guess my understanding was that Bob was

23  employed by Sears as a spokesperson for Craftsman.

24     Q.   Now, you know the reason that we're sitting

1      A.    No, it didn't.

2      Q.    Did you have any discussions with anyone

3  other than counsel as to who owns the name Home

4  Again?

5      A.    No, I did not.

6      Q.    Did you have any discussions with anybody

7  else, other than Mr. Vila, with respect to changing

8  the name of the show?

9      A.    Yes.   I had conversations with a number of

10  people, because once the decision was made, it had

11  to be implemented.

12     Q.    Was Mr. Vila the one who gave you the

13  instruction to change the name?

14     A.    Mr. Vila set the ball in motion.   I spoke

15  with counsel beyond that regarding specifics.

16     Q.    Who was the counsel with whom you spoke?

17     A.    Both with Mr. Feiner and with Mr. O'Brien.

18     Q.    Do you know when those conversations took

19  place?

20     A.    Approximately, I would say, about the

21  fourth week in August of 2005.   It could have been

22  late in the third week, but it was in that time

23  frame.

24     Q.    I'm going to show you a document that has

1    Bates stamps P 293 through 294, and ask you if

2    you've ever seen this before?

3         A.   Now I've forgotten the question.

4         Q.   I just wanted to know if you've ever seen

5    this before.

6         A.   Yes, I have.

7         Q.   I don't know if this is an e-mail or a

8    memo, but it's from an individual named Jim?

9         A.   Yes.

10        Q.   Do you know who Jim is?

11        A.   Jim Kennedy, and he is the B.V.T.V. editor.

12        Q.   When was the first time you saw this

13   document?

14        A.   I believe it was an e-mail, and I believe I

15   saw it the next day.

16        Q.   It's dated August 23, 2005; is that right?

17        A.   Yes.

18        Q.   Was the e-mail forwarded to you or were you

19   in the group to which it was originally directed?

20        A.   I cannot remember.

21        Q.   But your memory is you saw this e-mail

22   around the time of August 23, 2005?

23        A.   Yes.

24             MS. SANKARAN:  Can we mark that as the next

1    exhibit.

2                   (Document marked as Exhibit 195

3                   for identification)

4         Q.    At the beginning of this e-mail, it states,

5    "After along ride home, hours of cellphone

6    conversations, three quick but friendly roadside

7    visits with Mass. State Troopers, I've put together

8    some ideas about today's turn of events.

9    Specifically, the removal of "Home Again" show

10   title.  I throw these ideas out there with caution

11   and respect for I am a new guy."

12                  Did I read that portion correctly?

13        A.    Yes, you did.

14        Q.    He makes reference to cellphone

15   conversations.  Do you remember having any cellphone

16   conversations or phone conversations with Jim on the

17   topic of changing the name on or prior to August 23,

18   2005?

19        A.    No, I did not.

20        Q.    Do you know with whom he had those

21   conversations?

22        A.    I am pretty comfortable to say that he had

23   one with Larry LeCain, who was the cameraman, but

24   I'm not sure who else he spoke with.

1      Q.    It talks about "Today's turn of events,

2  specifically the removal of the 'Home Again' show

3  title." Do you see that?

4      A.    Yes.

5      Q.    Do you know what happened on August 23,

6  2005 with respect to changing the name?

7      A.    Yes.

8      Q.    What happened on that day?

9      A.    Bob announced that the name of the show --

10  he wanted to change the name of the show, after

11  having conversation with his legal counsel.

12      Q.    How did he announce that he wanted to

13  change the name of the show?

14      A.    He didn't call a meeting. He just talked

15  to Jim and talked to Larry and talked to me. It was

16  just conversation.

17      Q.    Were they --

18      A.    We were at a shoot.

19      Q.    Were they separate individual conversations

20  with various people or were you in a group?

21      A.    I'm not absolutely sure. We were not all

22  in a group and there was not a group an announcement

23  made.

24      Q.    Do you know whether an e-mail went out to

1  everyone at B.V.T.V. saying that we are changing the
2  name of the show?
3       A.   I do not believe that that was the case.
4       Q.   Other than changing the name of the show
5  from Mr. Vila about using the name Home Again on
6  either any other products or with reference to
7  anything else?
8       A.   We were focused on removing the name --
9  removing the term "Home Again" from the show, and
10 not just from the name, but because we had cleverly
11 integrated it into as part of the show, all of that
12 needed to be changed, as well as graphics, and so
13 forth.
14      Q.   Were you given any instruction from Mr.
15 Vila on or around August 23, 2005 with respect to
16 removing references to Home Again from the
17 BobVila.com website?
18      A.   On the 23rd, I was not instructed by Mr.
19 Vila to remove references to "Home Again."  We were
20 totally focused that day on the television show.
21      Q.   At any time were you instructed about
22 removing references to "Home Again" from the
23 website?
24      A.   Yes.

1    Q.    Do you remember when that was?

2    A.    It would have been beginning the following

3 day.

4    Q.    So around the 24th or so?

5    A.    Yes.

6    Q.    Who gave that instruction about making

7 changing to the --

8    A.    Legal counsel.

9    Q.    Who from legal counsel gave that

10 instruction; was it Mr. O'Brien, Mr. Feiner or

11 someone else?

12    A.    It would have been Mr. Feiner and/or Mr.

13 O'Brien.

14    Q.    Do you remember who gave it to you, gave

15 you the instruction?

16    A.    I spoke with both gentlemen.

17    Q.    Back to this exhibit that we were looking

18 at, Exhibit 195.  If you look down the page where

19 there's a heading that says "Post Production

20 Options."  Do you see that?

21    A.    Yes, I do.

22    Q.    The third sentence starts, "My opinion

23 would be."  Do you see that?

24    A.    Yes, I do.

1    Q.    It says, "My opinion would be to screw

2    Sears and their lawyers and create new, fresh

3    elements.  I do realize we have 20 days until our

4    first air date.  However, my recommendation for post

5    production options includes the following:"  Did I

6    read that portion correctly?

7    A.    Yes, you did.

8    Q.    Do you know what he was referring to or did

9    you have an understanding when you received this

10   e-mail when he mentioned screwing Sears and their

11   lawyers?

12   A.    Yes, I have an understanding, and did at

13   the time.

14   Q.    Okay.  What was your understanding?

15   * A.    My understanding was that as Bob had

16   referenced, Sears and their attorneys as

17   precipitating our need to delete "Home Again" from

18   the broadcast, Jim's advice was that it would be

19   better to wait -- not to wait, but to move more

20   slowly and recreate new things as opposed to try and

21   quickly delete as best we could.

22   Q.    Maybe I just missed this from your answer,

23   so I apologize, and if you could just clarify a

24   little for me.  What do you understand the reference

1    to Sears and their lawyers to refer to?

2          MR. O'BRIEN:  I think that's asked and

3    answered.

4          MS. SANKARAN:  I may have missed the

5    answer, and I apologize for that.

6       Q.   If you could just clarify that for me

7    again?

8       A.   I liked the way I think I answered it the

9    first time.

10          MR. O'BRIEN:  I would rather read the

11    answer back and not have the same question asked

12    consecutively.

13          MS. SANKARAN:  Why don't we go back to the

14    answer and then I can follow up.

15          MR. O'BRIEN:  Then you can follow up about

16    what it is with the answer that you don't

17    understand.

18          *  (Reporter Read)

19       Q.   When you referenced the lawyers

20    precipitating the need to change the name, how is it

21    that Sears' lawyers had precipitated the need to

22    change the name, if you know?

23       A.    My understanding was that they had

24    communicated with Bob's legal counsel and indicating

1  that in their opinion there was an issue with the

2  use of the name "Home Again."

3          Q.   Were you finished with your answer?

4          A.   I think so.

5          Q.   Now, when the decision was made to change

6  the name on the show, that came first before any

7  reference to the website; is that right?

8          A.   That's correct.

9          Q.   So when the decision was made with

10 reference to changing the name of the show, was that

11 the first time you learned there was an issue with

12 respect to the ownership of the Home Again name?

13         A.   Yes.

14         Q.   Now, prior to that, had you had any

15 discussions with anyone at B.V.T.V. about who owned

16 the Home Again name?

17         A.   No, I did not.

18         Q.   And prior to August 23, 2005, had you ever

19 been told or had any discussions with anyone at

20 WebTies as to who owned the Home Again name?

21         A.   No.

22         Q.   Have you ever seen any documents or

23 agreements that explained who owned the Home Again

24 name?

1          A.     No, I have not.

2          Q.     I believe you said the day after Bob

3   instructed to change the name of the show, you

4   received a directive to make changes to the website;

5   is that correct?

6          A.     That is correct.

7          Q.     Can you tell me, was that directive from

8   counsel?

9          A.     That's correct.

10         Q.     What were you instructed to do?

11         MR. O'BRIEN:   In terms of facts, you may

12   answer the question.   In terms of any legal

13   commentary or opinion that was expressed, I instruct

14   you that that's covered by the attorney-client

15   privilege, and not to answer.   But in terms of

16   directives that were given, you can give that,

17   without any reference to legal advice.

18         A.     My instructions were to change any

19   reference to the 2005/2006 television show

20   descriptive, you know, anything that referred to the

21   project which we were currently producing to change

22   the name of the show to "Bob Vila" in conjunction

23   with the change in the name of the show.

24         Q.     Did you do that?

1    A.    Yes, I did.

2    Q.    How long did that process take?

3    A.    If I'm not mistaken, there was a weekend

4    coming up, and I would say by the beginning of the

5    week we had gone through all of the relevant pages

6    and made changes.

7    Q.    Is it your understanding that that process

8    is complete with respect to the website?

9    A.    As of today?

10    Q.    As of today.

11    A.    Yes.

12    Q.    When do you believe that process was

13    completed?

14    A.    As it referenced the television show for

15    2005/2006, it was completed within a few days.

16    Q.    In any other aspect, did it take longer?

17    A.    It's my -- well, how can I put this.    We

18    sell product on the website, hats -- let me go back.

19    We sold product on the website that had the name

20    "Home Again" on the product; T-shirts, hats, mugs.

21    We continued to sell that product.    Primarily it was

22    an oversight, because it did not specifically

23    reference the season in question.    Since Bob had

24    been the star of Home Again, it still referenced

1    something that was related to Bob.

2         So those products remained on the web site

3    it will it was pointed out by legal counsel that we

4    should no longer sell those products, because they

5    referenced the prior television show.

6         Q.    Do you know when that happened?

7         A.    It would have to have been early 2006.

8         Q.    Before you talked about the process around

9    August 24, 2005 of making changes to the website,

10   which took three days to a week or so.  Who was

11   responsible for carrying that out at WebTies?

12        A.    Trey Simmons, Gordon Jones, David Masher.

13        Q.    Were you satisfied that they had completed

14   that project?

15        A.    Yes, I was.

16        Q.    Did they report to you at the time?

17        A.    Yes.

18        Q.    Did you give them instructions as to what

19   to remove or what to change?

20        A.    Yes, I did.

21        Q.    And what did you explain to them needed to

22   be changed?

23        A.    That references to the 2005/2006 television

24   season, programming, was changed to "Bob Vila" from

1    "Bob Vila's Home Again."

2        Q.    Did you explain to them that there was a

3    dispute with respect to who owned the name "Home

4    Again"?

5        A.    I think my instructions were a little

6    broader than that, and just that due to the current

7    lawsuit, we need to make these changes.

8        Q.    Did you explain why in any way?

9        A.    No.  I didn't go into any great detail.

10        Q.    Was this instruction given orally or in

11    writing?

12        A.    Orally.

13        Q.    Did you e-mail anyone with these

14    instructions?

15        A.    No.  We all work in one big room.

16        Q.    Where is that that you work?

17        A.    115 Kingston Street, third floor.

18        Q.    That's here in Boston, right?

19        A.    Yes.

20        Q.    In the e-mail that we marked as Exhibit

21    195, it lists several ideas or options with respect

22    to removing the name "Home Again" from the

23    television show.  Do you see that?

24        A.    Yes.

1  references to "Home Again" with respect to the

2  2005/2006 season.

3         Were there any other things that you did to

4  remove any references to "Home Again," whether it be

5  in paperwork, with relation to the television show,

6  the website, or anything else?  I believe you also

7  mentioned the product line, the T-shirts, mugs, et

8  cetera.  Other than those things that we've

9  discussed already.

10        A.    Yes.  I spoke with the PR firm, and asked

11  them to change the name of the show in all of their

12  pitches to media.  I asked them if they could have

13  the name changed in any of the pitches that were

14  already out there.

15        There were some interviews pending, and I

16  believe there was one interview that had already

17  taken place, and I asked them if they could try and

18  go back to the media company and see if it could be

19  changed, if there was an opportunity to change it

20  from "Bob Vila's Home Again" to "Bob Vila," since it

21  had not yet aired.

22        I went to the companies we were working

23  with in conjunction with the television show FLASH,

24  the Federal Alliance For Safe Homes, because they

1    had material about this project on their website,

2    and I asked them to be sure to change the name of

3    the show.

4         I went to Mercedes Homes, who were the

5    builders of the house, and they also either had or

6    were planning to have a reference to the project on

7    their website, and I asked them if they could change

8    the name of the show to Bob Vila.

9         PGT Industries, which is a window and door

10   company, also was about to reference the show on

11   their website, so I let them know, and asked if

12   there was going to be a reference, that they were

13   participating in this project, that they change the

14   name of the show.

15        I went to Darin Morgan, who handled

16   affiliate relations for King World, and made sure

17   that the name of the show was changed on the

18   affiliate website, and that the photographs that

19   were on the affiliate website, there was a picture

20   of Bob that was definitely a Sears picture, and that

21   that picture be changed to a more generic picture of

22   Bob.  That's what comes to mind.

23        Q.    You mentioned a Sears picture.  Why did you

24   have that picture changed?

100

1    A.    I was concerned that Sears might not want

2    that picture to be there any more if they wanted the

3    show called "Home Again."

4    Q.    Were the words "Home Again" depicted anyway

5    in that photograph?

6    A.    No.

7    Q.    When you say Sears picture, how do you know

8    it was a Sears picture?

9    A.    It was taken by Sears. I know it was part

10   of the Sears photo shoot.

11   Q.    Now, you mentioned contacting media outlets

12   for either pending interviews or interviews that had

13   already taken place, PR companies, PGT, Mercedes

14   Homes, King World and FLASH to make changes with

15   respect to the name of the show. Did you explain to

16   any of these entities why the show's name was being

17   changed?

18   A.    No, I didn't.

19   Q.    Were you ever asked that by anyone when you

20   told them the name of the show was changing?

21   A.    No, I wasn't. I was asked by the PR firm,

22   and I told them that since we felt the association

23   was really with Bob, that it made sense to go with

24   the eponymous name "Bob Vila" for the show. It was

1   stronger for branding, simpler and it was what

2   everyone referred to the show as anyway.  People

3   would say, I'm going to watch Bob Vila or I saw Bob

4   Vila.

5        Q.   Were you the person who was primarily

6   responsible for making sure the name "Home Again"

7   was not used for the 2005/2006 season, either in the

8   media or on the show or with respect to documents or

9   any other materials?

10       A.   With everything other than the production

11  part of the television show.  Sarah was on vacation

12  when this originally all took place on the 23rd.  So

13  I probably was more involved in working with

14  production people at that point than I ordinarily

15  would have been.  Ordinarily that would have fallen

16  under Sarah's purview.

17       Q.   When you say "production part," what would

18  that include?

19       A.   Jim Kennedy getting those changes made.

20       Q.   Anything else?

21       A.   Not really.

22       Q.   So with respect to all the documents that

23  were used by the show, et cetera, would you be the

24  one that was responsible for making sure "Home

1   Again" references were deleted or instructing

2   whoever was responsible for those documents to do

3   that?

4       A.    Yes.  Although, if Sarah was still talking

5   with people about product donations to the show,

6   making the changes there would really fall within --

7   you know, changing the name in the letter that she

8   might send to someone would be Sarah's

9   responsibility, without my checking up on Sarah.

10          In terms of the appearance -- I forget with

11  a you call it, and it will come to me in a second.

12  When somebody is on the show, after they have been

13  filmed, John gets their signature, because you can't

14  put someone on television without it, and that

15  document would be something that John would need to

16  change, and that would be something that Sarah would

17  need to talk to John about, because John was Sarah's

18  employee.

19      Q.    What's John's last name?

20      A.    Troy.  He is a production assistant.

21      Q.    Do you know whether she instructed Mr. Troy

22  or anyone else to make those changes?

23      A.    I can't speak for Sarah, but I believe so,

24  because we all worked very -- we were all trying to

1  accomplish -- to do the best we could, and follow

2  through on the instructions.

3      Q.    During what period of time were these

4  various changes being made or your actions with

5  respect to calling media outlets, PGT, FLASH, King

6  World, Mercedes Homes, et cetera, do you know what

7  that time frame was?

8      A.    It was all within ten days.  I started

9  calling people immediately.  King World was a little

10  slow, but I was on their case virtually on a daily

11  basis.

12      Q.    By that point, in August, August 24th or

13  so, when all of this started, B.V.T.V. was already

14  in an agreement with King World with respect to the

15  production of the 2005/2006 season of "Bob Vila"; is

16  that right?

17      A.    That's correct.

18      Q.    And did King World, when you spoke with

19  them, have any questions about changing the name as

20  to why?

21      A.    No.

22      Q.    I'm going to show you a document that has

23  Bates stamp P 300 to 303, and ask you if you've seen

24  this before?

1   know, specific permission, that that was acceptable.

2       Q.   Okay.   Were you a person who ever received

3   what you just referred to as explicit permission

4   from Mr. Ginger or his successors for Mr. Vila to be

5   a spokesperson for someone other than Craftsman

6   tools?

7       A.   No.   I personally was not ever.

8       Q.   How is your relationship with Mr. Ginger

9   over the years; how would you characterize it?

10      A.   Very warm and very collegial,

11  collaborative.   I felt like Andy and I were partners

12  in the success of these enterprises that were Bob

13  and Sears were involved in.

14      Q.   What about Mr. Rode?

15      A.   Mr. Rode was wonderful.   He was amazingly

16  quick at getting back to you when you had a

17  question.   He was also forthright, straightforward.

18  If something was good, it was good, and if it

19  wasn't, it wasn't.   He was, you know, I was

20  delighted to work with him.

21      Q.   Did he work with you in terms of trying to

22  develop a project that ultimately became the Punta

23  Gorda project for the 2005/2006 season?

24      A.   Yes, he did.

1    Q.    Do you recall what he did?

2    A.    Yes.  Because Mark and I talked about the

3  projects that we were doing the previous season, the

4  2004/2005, and what seemed to be -- you know, these

5  were some great aspects and, you know, maybe we

6  talked about the floor system a little more -- not

7  the floor, but the under lament system more than the

8  audience was perhaps interested in, Mark was excited

9  about the opportunity to maybe get a little more

10 involved in the planning stages of the project for

11 the coming season to make it a real grabber, just so

12 it would benefit both the television show and Sears.

13   Q.    During what period of time did Mr. Rode

14 engage in that activity that you just described?

15   A.    The fall of 2004 and into the winter of

16 2005.

17   Q.    Can you be more specific when you say the

18 winter of 2005, your best memory?

19   A.    Yes.  It was cold, January, February.  We

20 were trying to find a project in Florida, because we

21 knew after the hurricanes that that was something

22 that would probably grab the audience.  It was

23 certainly relevant.  We also, seeing the success of

24 the show, like "Extreme Makeover Home Edition," we

1  thought if we could do something to help someone.

2  So we were trying to put as many eggs into one

3  basket in the season as we could.

4          So we thought if we could get a great

5  project in a place where you've got hurricane issues

6  that has to do with someone who desperately needs a

7  house, and maybe you can throw a celebrity name in

8  there, that would be another opportunity to get more

9  PR and really build the buzz about the show.

10         So Mark proposed that maybe we could work

11 with the Warrick Dunne Foundation, and Warrick Dunne

12 being a football player, I believe the Atlanta

13 Falcons, who was helping single mothers get homes in

14 Central Florida, and he was having some success.  I

15 don't know whether Mark happened to see it on

16 television, but he said, Let me contact them.

17         So he contacted the Warrick Dunne

18 Foundation and was putting out the idea of maybe

19 they could work with Bob Vila so we could create

20 something that was meaningful to the homeowner,

21 something that was going to have some buzz, some

22 pizzazz, and still be hurricane resistant.

23     Q.    Take a look at Exhibit 212, 213 and 214.

24     A.    Okay.

# EXHIBIT  J

1

Volume I
Pages 1 through 174
Exhibits per index


UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


Civil Action No. 05-11717-REK

- - - - - - - - - - - - - - - - x

ROBERT J. VILA and B.V.T.V,  INC.,
            Plaintiffs,


V.


SEARS, ROEBUCK and CO., SEARS
HOLDINGS CORPORATION and KMART
HOLDING CORPORATION,
            Defendants.

- - - - - - - - - - - - - - - - x


DEPOSITION OF SARAH BEASLEY MONZON
Tuesday, March 29, 2006, 10:00 a.m.
GREENBERG TRAURIG, LLP
One International Place
Boston, Massachusetts 02110


----------Reporter: MaryJo O'Connor, CSR, RPR-------
BOSTON REPORTING ASSOCIATES
REGISTERED PROFESSIONAL REPORTERS
67 Bright Road
Belmont, Massachusetts 02478
(617) 877-6640

2

```
 1   APPEARANCES:

 2   JAMES F. O'BRIEN, ESQ.
     410 Park Avenue, Suite 1530
 3   New York, New York 10022
     (212) 813-9300
 4   Counsel for the Plaintiffs.

 5
     GREENBERG TRAURIG, LLP
 6   (By: Gary R. Greenberg, Esq., Sebastian Colley,
     Esq., and Wendy Champagne, Paralegal)
 7   One International Place
     Boston, Massachusetts 02110
 8   (617) 310-6000
     Counsel for the Defendants.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

1      A.   For the most part the impression that I had

2 was that if it wasn't something that Bob was

3 representing directly for Sears, we had the freedom

4 to solicit donations, but Bob approved every

5 donation that we did.  And if there was ever any

6 question, I was not the final person to make the

7 answer.

8      Q.   Like, for example, like paint, were there

9 certain restrictions in terms of soliciting donated

10 paint?

11      A.   When Bob had his own paint line through

12 Sears, yes, we would try to keep it to that line and

13 we did not solicit donations of paint elsewhere.

14      Q.   During the period of time that you were

15 producer for the "Bob Vila's Home Again" show, was

16 that show sponsored by Sears?

17      A.   Yes.

18      Q.   And what do you understand sponsor to mean?

19      A.   In my understanding it meant that they

20 partially funded the production of the show and had

21 a graphic representation of their company name at

22 the head with verbal credit that they had sponsored

23 the show.

24      Q.   Could you just describe in general

1    A.    Sponsored in part by was dedicated to those

2  who had given material donations with a value that

3  could be attached to them, and Special thanks were

4  to people who had given special permission or

5  something that didn't cost money to them.

6    Q.    So any one that provided product would be

7  identified as a sponsor in part?

8    A.    Correct, in the end credits.

9    Q.    And in your dialogue trying to solicit

10  product donations, would you in the vast majority of

11  occasions indicate that Mr. Vila would be present on

12  the screen when their product was being displayed?

13        MR. O'BRIEN:  Object to the form.  You can

14  answer.

15    A.    Either I indicated it or it was understood

16  in most cases, yes.

17    Q.    Based on your experience, was it important

18  to these suppliers of donated product that Mr. Vila

19  be present on the screen when their product was

20  being displayed?

21    A.    Yes.

22    Q.    And what do you base that on?

23    A.    I --

24        MR. O'BRIEN:  You can answer.

1      A.    I understand that it is a show with the

2  same host under a new title.

3      Q.    Okay.  The name of the show is different;

4  is that right?

5      A.    Correct.

6      Q.    And the sponsorship for the show is

7  different?

8      A.    Yes.

9      Q.    And the projects, the projects that are

10  being depicted on the show, the renovation projects

11  are different than the projects that had been shown

12  under the prior -- under the "Home Again" show; is

13  that right?

14      A.    The projects are different, yes.

15      Q.    And if I understand the -- who is the

16  sponsor of the "Bob Vila" show?

17      A.    The sponsor?

18      Q.    Who are the sponsors of the "Bob Vila"

19  show?

20      A.    Well, sponsor is a word that is interpreted

21  several different ways.  We have national

22  advertising sponsors which included Pella,

23  Whirlpool, Chevy Trucks, and others, who through

24  King World buy a certain amount of advertising time

1    and get to claim a certain degree of sponsorship of

2    the show.

3        Q.    They get to claim.  How do they claim it?

4        A.    Usually there is a billboard at the head of

5    the show that King World will insert that says

6    "Brought to you by Chevy Trucks," or something like

7    that.

8        Q.    So do I understand that Pella Windows,

9    Whirlpool and Chevy Trucks are on one or more shows

10   listed on this billboard as the sponsor?

11       A.    That's my understanding of it.  King World

12   is responsible for inserting those billboards.  We

13   do not do that during the editing process.  It's all

14   part of the body of the show.

15       Q.    Who else are national sponsors?

16       A.    Currently?

17       Q.    No.  At any point during the 2005/2006

18   season.

19       A.    Those are the only ones I'm aware of.

20       Q.    Prior to the 2005/2006 season, were there

21   sponsors, you know, national sponsors other than

22   Sears?

23       A.    To the degree that I just mentioned, to the

24   level of --

1        Q.    Having billboards?

2        A.    Pella and Whirlpool, yes, there were

3    others.    I believe Visa did it one season.    I

4    believe Bellawood has and may still.    I'm not

5    positive about that.    Who else has there been?    I'm

6    sure there are others, but I can't think of them.

7        Q.    Other than the national sponsors for the

8    new show, are there any other levels of sponsorship?

9        A.    Well, there had been previously a level or

10   Sears as cofunder of the show and they had as part

11   of the body of the show, they had a graphics panel

12   that declared that.

13       Q.    Declared what?

14       A.    Brought to you by Sears.

15       Q.    Is there any cofunder of the new show?

16       A.    To my understanding, yes, there is.

17       Q.    And who is that?

18       A.    To my understanding, it's King World.

19       Q.    Is there a graphics panel indicating that?

20       A.    King World has always had a graphics panel

21   at the end of the show as the distributor.    I don't

22   believe they have a graphics panel at the beginning

23   of the new show.

24       Q.    Okay.    Is there any -- in connection with

1  call from my coworkers John Troy and from our editor

2  who was also in the field that they had received

3  instructions from Bob to change the title of the

4  show.  And I received another phone call from Bob

5  shortly that same day confirming that, and I was on

6  vacation when I received it.  So I asked him if

7  there was any reason for me to come back and start

8  working on it, and he said not to worry about it but

9  we would take care of it in the coming weeks.

10      Q.  So up until August 23, 2005 when you were

11  soliciting product donations for the season starting

12  the fall of 2005, is it correct that you represented

13  to the companies you were soliciting that the name

14  of the show was going to be "Bob Vila's Home Again"?

15      A.  That's correct.

16      Q.  And you said on August 23, 2005, you were

17  told by your fellow employees and by Mr. Vila

18  through a voice message that -- I'm sorry you were

19  told by your employees and Mr. Vila that the name of

20  the show had to be changed?

21      MR. O'BRIEN:  Objection to the form.  I

22  think it misstates the testimony.

23      Q.  That you were going to change the name of

24  the show.

143

1       A.    Can you say it again?

2       Q.    Strike that.   What did Mr. Vila tell you on

3   August 23rd?

4            MR. O'BRIEN:   Again, I'll alert you to the

5   instruction I gave you earlier regarding the

6   attorney-client privilege.

7       A.    He told me that the title of the show was

8   going to need to be changed and that we would need

9   to do everything possible to make sure that the show

10  aired with a new name "Bob Vila."

11      Q.    And as of August 23rd, what was the status

12  of the production of the shows?

13      A.    The shows that were airing first had been

14  edited with the old title.

15      Q.    Okay.   Had all the production work been

16  done except for editing the shows, I mean all the

17  footage, for example, had all the footage for the

18  shows had been taken?

19           MR. O'BRIEN:   For the entire season?

20      A.    Not for all the shows, no.

21      Q.    For what percentage of the upcoming shows

22  had the footage been completed?

23      A.    90 percent.

24      Q.    And the product donations for those 90

1    percent of the shows had already been made; is that

2    right, whether it's product or services?

3         A.   Yes, that had either been agreed to or

4    delivered.

5         Q.   Well, once the show is shot, would that

6    signify that the products have been either installed

7    or the services provided?

8         A.   Yes.

9         Q.   So on August 23rd did Mr. Vila tell you

10   what the new name of the show was going to be?

11        A.   Yes, he did.

12        Q.   What did he say?

13        A.   He said it was to be "Bob Vila."

14        Q.   Did he say anything else to you on that

15   subject?

16             MR. O'BRIEN:  Again, the instruction on the

17   attorney-client privilege.  I ask you to be

18   conscious of that.

19        A.   I think that on that day we just arranged

20   to meet when I was back to talk about the mechanics

21   of making the change.

22        Q.   And when were you back?

23        A.   I was back the following Monday, so that

24   would have been August 30th.

1          MR. O'BRIEN:  I think that would actually

2    be the Tuesday, but be that as it may.  August 30th

3    was a Tuesday.

4          THE WITNESS:  Okay.

5     Q.   Was there any discussion at that time or

6    thereafter about notifying the companies that

7    donated product of the intention to change the name

8    of the show?

9     A.   At that time, I don't believe there was a

10   discussion of that.

11    Q.   Now, you said that you spoke with John

12   Troy?

13    A.   On what date?

14    Q.   Did you talk to John Troy about removing

15   the references of the "Home Again" name?

16    A.   Yes, I did.

17    Q.   And when did you talk to him on that

18   subject?

19    A.   Starting on August 23rd when he called me

20   to tell me that it had been decreed, he and I spoke

21   briefly about what the fastest way to get it rolling

22   would be.  I don't recall specifically what words we

23   used.

24    Q.   When you say "Get it rolling," get what

1  rolling?

2      A.  Well, we were going to have to design an

3  entirely new graphics sequence for the head of the

4  show and the tail of the show in two weeks, which is

5  quite a feat in the video world.

6      Q.  What about all the press kits, had the

7  press kits been issued to the various stations

8  identifying the name of the show as "Bob Vila's Home

9  Again"?

10     A.  I don't know.

11     Q.  What discussions, if any, occurred in terms

12 of how would stations be notified that the name of

13 the show was going to change?

14     A.  I believe that King World has all of the

15 contact with the stations and that they were

16 responsible for notifying them.

17     Q.  And what's the basis of that belief?

18     A.  The basis of that belief is that they have

19 always held all contact with local stations and they

20 sell the show to them, feed it to them.

21     Q.  Were there any press releases that you

22 discussed would have to be issued or should be

23 issued to disclosing the changing the name of the

24 show?

 1          MR. O'BRIEN:  Objection to the form.  You

 2  can answer.

 3      A.    Would you rephrase that?

 4      Q.    Did you have discussions with anyone about

 5  issuing press releases by disclosing that the name

 6  of the show was going to change?

 7          MR. O'BRIEN:  Objection to the form of the

 8  question.  You can answer.

 9      A.    I may have had a discussion with Bob's PR

10  agent about doing that.  I don't recall

11  specifically.

12      Q.    Well, were there press releases that had

13  been issued that were in place to be issued that

14  identified the show as "Bob Vila's Home Again"?

15          MR. O'BRIEN:  Objection to the form.  You

16  can answer it.

17      A.    As of what date?

18      Q.    As of August 23, 2005.

19      A.    I am sure that up until August 23rd all

20  press releases regarding the show used the name "Bob

21  Vila's Home Again."

22      Q.    How far in advance -- strike that.

23          Was the show listed like in "TV Guide" and

24  other written publications?

1    A.   Yes, I believe it was.

2    Q.   And how far in advance do those, do you

3    have to get that information in?

4    A.   I don't know.

5    Q.   Do you know whether or not when the show

6    aired whether or not any of the written publications

7    continued to list the show as "Bob Vila's Home

8    Again"?

9    A.   I don't know.

10    Q.   When was King World first notified that the

11    name of the show was going to be changed?

12    A.   I don't know.

13    Q.   Did you have any communication with King

14    World on that subject?

15    A.   No, I did not.

16    Q.   During your absence, to your knowledge that

17    week that you were away -- strike that.

18         You said Mr. Vila told you it could wait

19    until you got back?

20         MR. O'BRIEN:   Objection.   I think that

21    misstates the testimony.

22    Q.   You said you offered to come back from

23    vacation on August 23rd; is that right?

24    A.   That's correct.

1      Q.   And what did Mr. Vila say in response to

2   that?

3      A.   He said he didn't think it was necessary

4   and that John and Jim the editor could handle what

5   needed to be handled up until I came back.

6      Q.   And what did they handle on the subject of

7   changing the name of the show during the week that

8   you were away?

9      A.   They had to recall the masters that had

10   already been sent, they had to get a new graphics

11   package designed and edited into the head of all of

12   the episodes, they had to snip the words "Home

13   Again" out of all of the preshot opens and closes,

14   and do the accompanying sound editing to make it

15   seem seemless.  And then they had to send those

16   masters back out again corrected.

17      Q.   That was done during that week?

18      A.   That was done during the two weeks after

19   August 23rd, because the shows were due in the first

20   week of September.

21      Q.   And what did you do when you returned in

22   terms of assisting in the efforts to change the name

23   of the show?

24      A.   I looked at the graphics package and

1    suggested a last couple of tweaks, but it was

2    basically finished by that point.  I looked at the

3    edits in the rough -- not in the rough cuts, but in

4    the masters to be sure that they were acceptable and

5    checked for others that needed to be made.  I don't

6    recall what else I did.

7         Q.   Did you attempt -- strike that.

8              Did you attempt to delete any -- strike

9    that.

10             Do you watch the show?  Did you watch the

11   2005/2006 show?

12        A.   Yes.

13        Q.   Have you watched all the shows?

14        A.   I have seen every single rough cut, yes.

15        Q.   Have you seen on those shows Mr. Vila at

16   the end of the show say "Come home again next week"?

17        A.   To be aired, no.  Before they were edited,

18   yes.

19        Q.   Have you looked at the edited versions of

20   the shows that were aired on the 2005/2006 season?

21        A.   Yes.

22        Q.   And do you recall whether or not in the

23   edited version of any of the shows that aired in

24   2005/2006 that Mr. Vila at the conclusion of the

1  show stated, quote, "Come home again next week,"

2  close quote?

3      A.   I do not recall that that ever got to air.

4      Q.   Was it your understanding based upon the

5  instructions you got from Mr. Vila that those

6  statements were to be edited out of the show, the

7  statement "Come home again next week"?

8      A.   That was my understanding, yes.

9      Q.   When did you first learn that King World

10 was going to be financing the production costs?

11     A.   Again, I'm not sure of the date that I

12 became aware of that.

13     Q.   How did you learn?

14     A.   How did I learn.  I'm not sure.

15     Q.   Did Mr. Vila ever, or anyone ever make any

16 comments to you about whether or not the arrangement

17 with King World would be better for B.V.T.V. than

18 the prior relationship with Sears?

19     A.   Do you recall if he ever made a statement

20 like that?

21     Q.   Yes.

22     A.   No, I don't recall.

23     Q.   Was Mr. Vila, based on your observations,

24 was he enthused about the arrangement with King

1    A.    John Troy, who is my assistant, carried out

2  the procedure.

3    Q.    On several of these documents identify the

4  program as "Bob Vila's Home Again"; do you see that?

5    A.    Yes.

6    Q.    And some of these documents are dated in

7  September of 2005?

8          MR. O'BRIEN:  Why don't you direct her to a

9  specific --

10   Q.    Yeah, P1007.  Do you have P1007 in front of

11  you?

12          MR. O'BRIEN:  Not yet.

13   A.    Yes.

14   Q.    Bears a date of September 15, 2005; do you

15  see that?

16   A.    Yes, I see that.

17   Q.    And it identifies the program as "Bob

18  Vila's Home Again"?

19   A.    Yes, it does.

20   Q.    Why was B.V.T.V. identifying the show as

21  "Bob Vila's Home Again" as of September 15, 2005?

22   A.    Because it was an oversight.

23   Q.    How about the next document?

24          MR. O'BRIEN:  You mean in terms -- I'm

164

1   sorry.  Does your question mean with respect to this

2   document?

3           MR. GREENBERG:  Yes.

4           MR. O'BRIEN:  Your question seemed

5   open-ended.

6           MR. GREENBERG:  No, yes, with respect to

7   that document.

8           MR. O'BRIEN:  Okay.

9       Q.  P1008 also dated September 15, 2005 again

10  shows the program as "Bob Vila's Home Again"?

11      A.  Yes.

12      Q.  And the subsequent page, the same thing,

13  P1009.  Was Mr. Troy the one responsible for getting

14  these documents executed?

15      A.  Yes.

16      Q.  So if I understand, it was simply a mistake

17  was made and you were using the "Bob Vila's Home

18  Again" name in September of 2005; is that right?

19          MR. O'BRIEN:  With respect to these

20  documents?

21          MR. GREENBERG:  These documents.

22      Q.  Is that right?

23      A.  Yes, these documents.  This was our first

24  shoot after the name change and we had not changed

1  the form yet.

2      Q.  Well, I thought the name was changed on

3  August 23, 2005?

4          MR. O'BRIEN:  With respect -- again, Gary,

5  I object to the form of the question.  You have to

6  be specific.

7      Q.  When was the name changed on the documents

8  that you were using?

9          MR. O'BRIEN:  You mean these appearance

10  release forms?

11          MR. GREENBERG:  Yes, these appearance

12  release forms.

13      A.  I don't know when the name was changed on

14  the forms.  It looks like the first one was dated

15  the 13th on a different shoot.  I don't know.  I

16  can't answer for it.  I did not do this work.

17      Q.  Were there other documents that B.V.T.V.

18  utilized in September that continued to retain the

19  "Bob Vila's Home Again" name?

20      A.  Not to my knowledge.

21      Q.  Mr. Vila, you've known him for how long?

22      A.  I've known him since 1990.

23      Q.  Okay.  To your knowledge has he ever been

24  involved in any lawsuit prior to the one involving

1  on that website and it was a little bit of short

2  notice and I'm sure that things go unnoticed, as

3  we've seen here with this exhibit.

4        MR. O'BRIEN:  You're referring to --

5     A.   I'm referring to the appearance releases.

6     Q.   Who was charged with the assignment of

7  removing any reference to "Home Again" from the

8  BobVila.com website?

9     A.   I don't know who had responsibility for

10  physically removing it.  I do know that Melissa

11  Marchand was overseeing the process.

12     Q.   Have you seen any articles in the newspaper

13  about this lawsuit?

14     A.   Yes.

15     Q.   What articles have you seen?

16     A.   There was something in the "Chicago

17  Tribune" that was forwarded to me by our PR agent.

18  I think there were two articles.

19     Q.   What PR agent?

20     A.   It's Dera Campion -- I forget their current

21  name.  It's Dera Campion & Roslan PR & Associates in

22  New York.

23     Q.   And where are they?

24     A.   In New York.

# EXHIBIT  K

 **United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

# Trademarks > Trademark Electronic Search System(Tess)

*TESS was last updated on Sat Jul 8 04:28:40 EDT 2006*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST |
| NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

Logout  Please logout when you are done to release system resources allocated for you.

Start  List At: _____  OR  Jump  to record: _____  **Record 2 out of 9**

TARR Status  ASSIGN Status  TDR  TTAB Status  ( *Use the "Back" button of the Internet Browser to return to TESS)*

## Typed Drawing

| | |
|---|---|
| **Word Mark** | **BOB VILA** |
| **Goods and Services** | IC 002. US 006 011 016. G & S: Interior and exterior paints and paint primers, sealer coatings in the nature of paint for use in home maintenance, varnishes, lacquers, wood stains, and paint sealers. FIRST USE: 20020607. FIRST USE IN COMMERCE: 20020607 |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Design Search Code** | |
| **Serial Number** | 76429163 |
| **Filing Date** | July 10, 2002 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1B |
| **Published for Opposition** | December 17, 2002 |
| **Registration Number** | 2841150 |
| **Registration Date** | May 11, 2004 |
| **Owner** | (REGISTRANT) B.V.T.V., Inc. CORPORATION DELAWARE 115 Kingston Street Boston MASSACHUSETTS 02111 |
| **Attorney of Record** | Andrew J. Ferren |
| **Prior Registrations** | 2569452;2569454;2570957;AND OTHERS |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Other Data** | The mark identifies a particular living individual whose consent is of record. |



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

# Trademarks > Trademark Electronic Search System(Tess)

*TESS was last updated on Sat Jul 8 04:28:40 EDT 2006*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST |

| NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

Logout  Please logout when you are done to release system resources allocated for you.

Start  List At: ____  OR  Jump  to record: ____  **Record 3 out of 9**

| TARR Status | ASSIGN Status | TDR | TTAB Status | *( Use the "Back" button of the Internet Browser to return to TESS)*

## Typed Drawing

| | |
|---|---|
| **Word Mark** | **BOB VILA'S** |
| **Goods and Services** | IC 041. US 100 101 107. G & S: Entertainment in the nature of on-going television programs featuring home improvement, home renovation, home remodeling, home construction, home maintenance, home repair, home design, home security, landscaping, and home services, namely, contractor and architectural services. FIRST USE: 19900900. FIRST USE IN COMMERCE: 19900900 |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Design Search Code** | |
| **Serial Number** | 76115117 |
| **Filing Date** | August 17, 2000 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | September 17, 2002 |
| **Registration Number** | 2657924 |
| **Registration Date** | December 10, 2002 |
| **Owner** | (REGISTRANT) B.V.T.V., Inc. CORPORATION DELAWARE P.O. BOX 749 20 RASCALLY RABBIT ROAD Marstons Mills MASSACHUSETTS 02648 |
| **Attorney of Record** | Andrew J. Ferren, Esq. |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL |
| **Other Data** | The name "BOB VILA" identifies a living individual whose consent is of record. |



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

# Trademarks > Trademark Electronic Search System(Tess)

*TESS was last updated on Sat Jul 8 04:28:40 EDT 2006*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST |
| NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

Logout   Please logout when you are done to release system resources allocated for you.

Start   List At: [        ]   OR   Jump   to record: [        ]       **Record 4 out of 9**

TARR Status   ASSIGN Status   TDR   TTAB Status   *( Use the "Back" button of the Internet Browser to return to TESS)*

## Typed Drawing

| | |
|---|---|
| **Word Mark** | **BOB VILA** |
| **Goods and Services** | IC 016. US 002 005 022 023 029 037 038 050. G & S: Series of books in the field of home improvement, home renovation, home construction, home repair, home design and landscaping. FIRST USE: 19900000. FIRST USE IN COMMERCE: 19900000 |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Design Search Code** | |
| **Serial Number** | 76110410 |
| **Filing Date** | August 17, 2000 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | February 26, 2002 |
| **Registration Number** | 2570957 |
| **Registration Date** | May 21, 2002 |
| **Owner** | (REGISTRANT) B.V.T.V., Inc. CORPORATION DELAWARE P.O. Box 749 20 Rascally Rabbit Road Marstons Mills MASSACHUSETTS 02648 |
| **Attorney of Record** | Andrew J. Ferren |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Other Data** | The name "BOB VILA" identifies a living individual whose consent is of record. |
| **Live/Dead Indicator** | LIVE |

Trademark Electronic Search System (TESS)



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

# Trademarks > Trademark Electronic Search System(Tess)

TESS was last updated on Sat Jul 8 04:28:40 EDT 2006

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST |
|---|---|---|---|---|---|---|---|---|---|
| NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC | | | | | |

**Logout** Please logout when you are done to release system resources allocated for you.

Start  List At: _____  OR  Jump  to record: _____  **Record 5 out of 9**

| TARR Status | ASSIGN Status | TDR | TTAB Status | *( Use the "Back" button of the Internet Browser to return to TESS)* |
|---|---|---|---|---|

## Typed Drawing

| | |
|---|---|
| **Word Mark** | BOB VILA'S |
| **Goods and Services** | IC 025. US 022 039. G & S: Clothing, namely, t-shirts. FIRST USE: 19970900. FIRST USE IN COMMERCE: 19970900 |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Design Search Code** | |
| **Serial Number** | 76110340 |
| **Filing Date** | August 17, 2000 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | February 19, 2002 |
| **Registration Number** | 2569454 |
| **Registration Date** | May 14, 2002 |
| **Owner** | (REGISTRANT) B.V.T.V., Inc. CORPORATION DELAWARE P.O. Box 749 20 Rascally Rabbit Rd Marstons Mills MASSACHUSETTS 02648 |
| **Attorney of Record** | Andrew J. Ferren |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Other Data** | The name "BOB VILA" identifies a living individual whose consent is of record. |
| **Live/Dead Indicator** | LIVE |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | Top | HELP | PREV LIST | CURR LIST |
|---|---|---|---|---|---|---|---|---|---|
| NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC | | | | | |



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Trademarks > Trademark Electronic Search System(Tess)

*TESS was last updated on Sat Jul 8 04:28:40 EDT 2006*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST |
| NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

Logout  Please logout when you are done to release system resources allocated for you.

Start  List At: _____ OR  Jump  to record: _____    **Record 6 out of 9**

TARR Status | ASSIGN Status | TDR | TTAB Status  *( Use the "Back" button of the Internet Browser to return to TESS)*

### Typed Drawing

| | |
|---|---|
| **Word Mark** | BOB VILA |
| **Goods and Services** | IC 035. US 100 101 102. G & S: Promoting the sale of goods and services of others through the issuance of product endorsements. FIRST USE: 19860300. FIRST USE IN COMMERCE: 19860300 |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Design Search Code** | |
| **Serial Number** | 76110339 |
| **Filing Date** | August 17, 2000 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | February 19, 2002 |
| **Registration Number** | 2569453 |
| **Registration Date** | May 14, 2002 |
| **Owner** | (REGISTRANT) Vila, Robert J. INDIVIDUAL UNITED STATES 8 Highland Street Cambridge MASSACHUSETTS 02138 |
| **Attorney of Record** | Andrew J. Ferren |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL |
| **Other Data** | The name "BOB VILA" identifies a living individual whose consent is of record. |
| **Live/Dead Indicator** | LIVE |



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Trademarks > Trademark Electronic Search System(Tess)

*TESS was last updated on Sat Jul 8 04:28:40 EDT 2006*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST |

| NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

Logout   Please logout when you are done to release system resources allocated for you.

Start   List At:            OR   Jump   to record:        **Record 7 out of 9**

| TARR Status | ASSIGN Status | TDR | TTAB Status |   *( Use the "Back" button of the Internet Browser to return to TESS)*

### Typed Drawing

| | |
|---|---|
| **Word Mark** | **BOB VILA'S** |
| **Goods and Services** | IC 009. US 021 023 026 036 038. G & S: Prerecorded video tapes featuring information in the field of home improvement, home construction and home buying; computer software for use in design management, project management, project tracking and viewing and comparing construction and architectural styles in the field of home improvement, home construction and home buying. FIRST USE: 19960000. FIRST USE IN COMMERCE: 19960000 |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Design Search Code** | |
| **Serial Number** | 76110338 |
| **Filing Date** | August 17, 2000 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | April 16, 2002 |
| **Registration Number** | 2590683 |
| **Registration Date** | July 9, 2002 |
| **Owner** | (REGISTRANT) B.V.T.V., Inc. CORPORATION DELAWARE P.O. Box 749 20 Rascally Rabbit Road Marstons Mills MASSACHUSETTS 02648 |
| **Attorney of Record** | Andrew J. Ferren |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Live/Dead** | |

# EXHIBIT  L

**Sixth Edition**

# Advertising

# Planning

## Jack Z. Sissors AND Roger B. Baron

Foreword by Erwin Ephron, Founder and President, Ephron, Papazian & Ephron, Inc.

as pricing from the previous quarter. Scatter buys offer the advertiser more financial flexibility, with dollar commitment required only one to two months before the air date. Buying scatter does, however, involve inventory and efficiency risks, because the best inventory might already be sold. Also, scatter has historically tended to be less efficient (priced higher) than the up-front market. Finally, networks rarely guarantee scatter buys.

**Opportunistic Buys**   *Opportunistic buys* involve the purchase of inventory on a last-minute basis if the networks have any remaining inventory to sell. Opportunistic buys have a high risk of sellout. On the positive side, these buys can sometimes be very efficient, because the networks are trying to get rid of last-minute inventory just prior to air date.

**Other Types of Network Buys**   Occasionally, advertisers purchase network television programs on a full or partial *sponsorship* basis. A full sponsorship involves purchase of all of the commercial time available in one or more telecasts of a program. Partial sponsorship requires purchase of at least three or four 30-second units of commercial time in one or more telecasts of a program.

In the early days of television, sponsorship was common. Today, although very few hours of network television are fully sponsored, partial sponsorship is common. Sponsorships have several advantages. Audiences identify the sponsor with the program. The advertiser gains additional exposure in the form of opening and closing billboards. Sponsors may use cast members in commercials. Sponsorship also can enable participation in high-quality programming. Sponsorship is especially valuable for advertisers with multiple divisions and product lines where brands with minimal advertising budgets can get high-visibility exposure.

However, sponsorships are generally expensive. Also, the advertiser takes a chance that the program will not do well. An additional drawback is that audience reach is limited with a single program, compared to spreading the buy over a variety of programs.

*Special-event network programming* can be purchased unit by unit or as program sponsorship. Specials such as holiday parades, election night coverage, and award presentations provide a good environment for new-product introductions and for seasonal advertisers because they frequently have mass audience

**Spill-In (or Spill-Out)**  The degree to which programming is viewed in adjacent television markets. Depending on the perspective, this is either spill-in or spill-out. Milwaukee television programming spills out of the Milwaukee DMA and spills into the Madison, Wisconsin, area, and vice versa.

**Spinoff**  A line extension of a magazine on a short-term basis. Also called a *"one-shot" annual edition.*

**Split Run**  The running of two or more versions of an advertisement in every other copy of the same magazine or newspaper. In a variation of split runs, one version of the ad appears in newsstand copies, and another in mail subscription copies. Splits may also occur geographically.

**Split-Run Test**  Research designed to test the effectiveness of various copy elements, prices, or types of offers by placing them in alternative copies of an issue. The researchers evaluate various forms of the advertisements by means of coupon or inquiry returns, or by orders placed for trial offers.

**Sponsor Identification (SI)**  The extent to which a program's sponsor is identified or its product or service remembered. The percentage of listeners or viewers who correctly associate a program with the sponsor of his product is the Sponsor Identification Index (SII).

**Sponsor Relief**  The process whereby an advertiser who has contracted for broadcast time that is no longer needed is granted relief by having another advertiser purchase the unneeded time.

**Sponsorship**  The purchase of more than one announcement in a program (usually a majority of commercials) by one advertiser.

**Spot**  (a) A time period filled entirely by a commercial or public service message and sold separately from the adjacent time periods. Such announcements may be placed between network programs or within local programs. (b) To buy time (programs and/or announcements) on a market-by-market basis from stations through their representatives.

**Spot Announcement**  Commercial placed on individual radio and TV stations.

**Spot Programming**  The process by which an advertiser secures the rights to a television program and places the program on stations in selected markets without regard to network affiliation. The advertiser may own the television program outright, have rights to the program for a specific length of time, or have rights to the program in only a certain part of the country.

**Spot Radio**  The use of stations in selected markets without regard to network affiliation. May involve spot announcements or complete programs.

**Spot Schedule**  A local spot announcement buy or a standard form that agencies submit showing specific times, adjacencies, etc., of a brand's current spot announcements in a market.

**414**

**Makegood**  An announcement or advertisement run as a replacement for one that was scheduled but did not run, or that ran incorrectly. Also, no-charge units given to honor audience delivery guarantees.

**Market**  The geographic area that can receive the program; can range from the entire United States down to a local market.

**Market-by-Market Allocation (MBM)**  A system of media/marketing planning that allocates a brand's total available advertising dollars against current and/or potential business on the basis of each individual TV market. MBM spends all advertising dollars (national and local) available in each market in proportion to current and/or anticipated business in the market. The result of MBM planning is spending more accurately against anticipated sales and thereby generating greater business for a brand.

**Market Development Index**  See *Category Development Index; Market Index.*

**Market Index**  The factor chosen to measure relative sales opportunities in different geographic or territorial units. Any quantitative information that makes estimation of such opportunities possible might be used as a market index. A general market index is a factor that influences the purchase of a specific product or groups of related products. Sometimes called a *market development index* or *category development index.*

**Marketing Mix**  A group of elements used to sell a product or service: product, place (or distribution), price, and promotion.

**Market Outline**  The measurement of the share of market based on total purchases of a particular brand or groups of similar brands with a product category during a specific time period.

**Market Pattern**  The pattern of a product's sales in terms of the relation between the volume and concentration either by total market or by individual market. A thick market pattern is one in which a high portion of all people are prospects for a product. A thin market pattern is one in which a low portion of all people are prospects for a product.

**Market Potential**  The portion of a market that a company can hope to capture for its own product.

**Market Profile**  A demographic description of the people or the households in a product's market. The description may also include economic and retailing information about a territory.

**Market Segmentation**  A strategy of implementing different kinds of marketing programs to various segments of the total consumer market based on demographic or lifestyle characteristics.

**Market Share**  A product's share of an industry's sales volume.

**"Marriage" Split**  Ad placement that occurs when more than one advertiser buys the total circulation of a magazine and each of the advertisers runs its ad in only a portion of that circulation. For example, an advertiser with distribution in the western United States and

# EXHIBIT  M

# THIS
# BUSINESS
# OF

A PRACTICAL GUIDE TO THE
U.S. AND INTERNATIONAL
TELEVISION INDUSTRIES FOR
PRODUCERS, EXECUTIVES,
MARKETERS, PERFORMERS,
WRITERS, AND ENTREPRENEURS

## Howard J. Blumenthal
## and Oliver R. Goodenough



billings total $1 million for a year, the agency retains $150,000 in commissions. The agency's commission or fee structure can be negotiated as part of the client-agency agreement.

Second, the agency may receive a fee for its services, often a monthly retainer that the client will pay over and above, in lieu of, or in combination with, the agency's commissions. The monthly retainer generally reflects the number of hours spent by members of the account and creative teams working on the assignment. For example, an art director earning $1,000 per week might spend half of his or her time on a certain account, or 20 hours per week. This time is billed at approximately three times the labor cost (which covers taxes, benefits, office, overhead, supervisory management, and other related expenses, plus a profit). The client is billed $1,500 for the artist's 20 hours of work per week. Unlike legal charges, these billings are based not on the time logged by any one or two people, but on a reasonable estimate of the hours spent by the team assembled for, or assigned to, a given project.

Third, the agency receives a reimbursement for production costs. When the agency arranges for the production of a commercial or series of commercials, the agency bills the client for the cost of production. In addition, the agency usually (but not always) receives a markup on production costs, typically in the range of 10 percent.

## MEDIA DECISIONS

Television is only one of many media available to the media buyer. Television's combination of sound and moving images, and its ability to reach large numbers of attentive viewers in their own homes in real time makes the medium ideal for certain types of product and image advertising.

Television advertising has its drawbacks as well. The cost of producing a television commercial is almost always higher than the cost of producing advertising materials for radio, print, billboard, or other media. Although the CPM can be lower than with other media, the larger number of viewers can drive the gross cost higher than it would be with other media. This is especially true of network television; local television and cable, however, can be surprisingly affordable.

Network television is a true mass medium, in the sense that it reaches all kinds of demographic groups. Regional networks, syndication, and cable channels can be better choices if the goal is to reach more specific demographic or psychographic groups, as country music lovers or young teens.

Through the late 1960s, television advertisements were 60 seconds long; now, they are mostly 30 seconds and, more and more often, 15 seconds long. As a result, commercials with complicated messages may not be effective. Clutter is a growing problem as well—too many messages barraging the viewer. Unlike print advertisements, which may only interrupt the reader every few minutes, television commercials work in a dynamic environment where messages can speed by too quickly to register an impact on first, second, or even third viewing. Zapping via remote control further aggravates the situation.

## ADVERTISING ON NETWORK TELEVISION

There are several methods by which advertisers buy time on network programs: sponsorship, spot buying, and upfront buying.

### SPONSORSHIP

The most involved form of television advertising is sponsorship of an individual program. Two types of sponsorship are available on network television.

The first is *full-program sponsorship* (a classic example is *Hallmark Hall of Fame*). In this format, a single sponsor buys most or all of the commercial time within a program. Full sponsorship can provide enhanced visibility amidst a cluttered programming and commercial environment. If there is a synergy between the program and the advertiser or its message, a full sponsorship can provide viewers with the image of corporate importance. The advertiser's involvement frequently goes beyond buying commercial time; the production may be promoted by a public-relations and print-advertising campaign. Full sponsorship was more prevalent in the 1950s than it is today; examples from that period include *Armstrong Circle Theater, General Electric Theater, Camel News Caravan, U.S. Steel Hour, The Lux Show with Rosemary Clooney*, and *GE College Bowl*. Full-program sponsorship is uncommon on commercial television, since skyrocketing productions costs have made many advertisers wary of putting all their eggs in one basket. This advertising format is relatively uncommon today; however, Ford's sponsorship of *Schindler's List* is a contemporary example of this practice. Still, a form of exclusive participation is evident on public television. Several large corporations have successfully identified themselves with high-visibility public television programs—Mobil with *Masterpiece Theatre*, for example.

Case 1:05-cv-11717-WGY Document ... Filed 07/2?/2006 Page ... of ...

or a smaller one, the networks began to guarantee a specific numb[er] of viewers (within specific demographic and geographic grou[ps], but on the basis of the entire package, not on the performa[nce of] any particular program.

Makers of automotive products are, by a large margin, the buyers of spot TV. The next two categories are about a third a[s large] (foods, and consumer services such as telephone companies).

## UPFRONT BUYING

This "package guarantee" method of selling advertising ti[me on] network shows evolved into the tradition known as *upfront* [buying.] In upfront buying, the networks offer advertisers "avails" (time [...] at a discount months before the season begins.

### UPFRONT BUYING: NETWORK PRIME-TIME

Immediately after each network's program department annou[nces] the prime-time schedule for the fall season (usually in May) [the] buying season generally begins in May and goes through earl[y...] (the upfront buying season begins as early as March for Satur[day] morning children's programming and for other dayparts).

During the upfront buying season, advertising agencies regi[ster] each client's budget with the network, along with a request [for a] package of shows that reach the client's target audience. The ne[w] sales department responds with a proposal detailing the numbe[r of] spots, the programs, and their air dates. After negotiation, agreem[ent] is reached on the CPM (which may actually be cost per thous[and] *households*, if only one viewer in each household is in the pro[per] demographic category). The network and advertiser also wor[k out] the list of shows, the dates on which the spots will appear, and [the] probable rating. The advertiser commits to the time, but the deg[ree] of commitment can vary. If the client commits to 52 weeks, tho[se are] likely to be more flexible than a deal for a smaller commitment [...] might include the option to cancel up to 25 percent of the ord[er...] first quarter, for example. Rates are likely to be lower if the adver[tiser] buys more time overall, or more time in less desirable shows.

For a client with $10 million to spend in prime-time, [the] advertising agency's media planning department devises a p[lan.] The media planners work closely with the client, in conjun[ction...]

With a *participating sponsorship*, several sponsors share a form of exclusive sponsorship within a program or series. For a premium fee, and a commitment to an ongoing position within the program or series, each participating sponsor is assured exclusivity within its product category. If, for example, Bud Lite helps sponsor the World Series, then no other light-beer brand can advertise (a non-light beer may be allowed, depending upon the arrangement). The participating sponsor may also receive a "billboard," or an on-screen logo with a voice-over advertising slogan, such as "Brought to you by . . . ."; the billboard usually appears at the beginning of a program. Participating sponsorships may be sold either for entire programs or events, or for parts of events, such as the first and second halves of a football game.

Advertising categories worth $1 billion or more to network tele-vision include automotive (mostly automobile manufacturers), proprietary medicines (aspirins, cold and flu remedies, etc.), food and food products, toiletries and toilet goods, restaurants (mostly fast food), and consumer services (mostly telephone, some online).

## SPOT BUYING

Most network advertising is not sold on the basis of a sponsor affiliation with program content. Instead, commercial time is sold on a *spot* or *scatter* basis. In a relatively recent development, advertisers buy time in groups of programs whose *cumulative* viewership offers the desired demographics, psychographics, and geographic skew.

In the 1950s and 1960s, a company that wanted to advertise on network television would select a program that seemed compatible with its advertising message, and buy one 60-second commercial in the program each week. At that time, there were 39 weeks of original shows, with 13 weeks of reruns; now, there are 20 to 22 weeks of original shows. By the mid-1970s, the networks changed their scheduling practices, largely as a result of intramural competition. They began to drift away from programming the same shows in the same time slots week after week. Instead, they started debuting new shows at times other than September (and other than January, which once marked the "second season"), canceling programs in mid-season and moving shows around on the schedules. The old buying practices were no longer viable, so each advertiser had its agency's media department buy television time as a package (of commercials) whose cumulative impact would, hopefully, equal the impact of the old system. The immediate benefit to the networks was the ability to place advertisers in less desirable shows. Given...

# EXHIBIT  N

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.
05-11717-REK

ROBERT J. VILA and B.V.T.V., INC.          )
                                            )
            Plaintiffs,                     )
                                            )
                                            )
v.                                          )
                                            )
                                            )
SEARS, ROEBUCK AND CO.,                     )
SEARS HOLDINGS CORPORATION                  )
and KMART HOLDING COPORATION                )
            Defendants.                     )

## <u>REPORT OF PLAINTIFFS' EXPERT WITNESS RICHARD PERIN</u>

## I. <u>DOCUMENTS RELIED UPON</u>

In preparing this report, I have reviewed the following documents

1. Plaintiffs' First Amended Complaint.

2. Defendants' Answer and First Amended Counterclaim to Plaintiffs' First Amended Complaint.

3. Defendants Motion For Summary Judgment

4. Contract dated September 29, 1989 between B.V.T.V., Inc and Ogilvy & Mather as agent for Sears, Roebuck & Co. (the "Syndication Agreement").

5. Amendments one through ten to the Syndication Agreement.

6. Email dated January 14, 2005 from Mark Rode, Craftsman Brand Manager, to Ronald E. Feiner and the three page attachment thereto.

7. Email dated January 18, 2005 from Ronald E. Feiner to Mark Rode.

8. Contract dated September 29, 1989 between Bob Vila and Ogilvy & Mather as agent for Sears, Roebuck and Co. (the "Spokesperson Agreement").

9. Amendments I through X of the Spokesperson Agreement.

10. Agreement dated April 1, 1994 between Eyemark Entertainment/CBS Enterprises and Sears, Roebuck and Co. (the "Distribution Agreement").

11. Amendment to Distribution Agreement dated September 1, 1999 between CBS Enterprises and Sears, Roebuck and Co.

12. Email dated February 7, 2005 from Andy Ginger of Sears, Roebuck and Co. to Janine Bousquette of Sears.

13. Email dated April 4, 2005 from Andy Ginger of Sears, Roebuck and Co. to Luis Padilla of Sears, Roebuck & Co.

14. Email dated May 6, 2005 from Mark Rode of Sears, Roebuck and Co. to L Padilla of Sears, Roebuck and Co..

15. Letter Agreement dated May 16, 2005 between King World Productions, Inc. and B.V.T.V., Inc. (the "KW Agreement").

16. Letter dated August 19, 2005 from Sears Holdings Corporation to Robert Vila.

17. Amendment to the KW Agreement dated September 25, 2005.

## II. OPINIONS

Based upon my review of those documents and my knowledge, background and experience in the television industry for the past 44 years, the syndicated home improvement television series hosted by and starring Robert J. Vila, initially known as *Home Again With Bob Vila,* subsequently renamed *Bob Vila's Home Again* and currently named *Bob Vila* (the "Television Series")has not been cancelled for the following reasons:

(a) The television pilot and Television Series were and are created and produced by B.V.T.V., Inc.

(b) The production of the Television Series was funded for approximately fifteen years by Sears, Roebuck and Co. for agreed upon prices paid to B.V.T.V., Inc. which prices varied over the years pursuant to the Syndication Agreement and the amendments thereto.

(c) Sears owned and controlled all the national advertising time (commercial units) in the Television Series, pursuant to the Syndication Agreement

(d) Sears was what is known in the television industry as a "sponsor" of the Television series. "Sponsorship" involves the ownership of 1/3 or more of the commercial advertising time in the Television Series. Sears received an acknowledgment of its sponsorship of the Television Series by a "billboard" (credit) appearing at the beginning of each episode in the Television Series.

(e) The Television Series was syndicated, ie. distributed to television stations throughout different television markets in the United States by a third party distributor. Group W Productions was the original distributor of the Television Series. Group W Productions later became Eyemark Entertainment which was later merged, into King World Productions.

(f) In the television syndication business, the distributor presents a television series to local television stations throughout the United States. This entails the individual sales representatives of the distributor traveling to the various television markets and making presentations to a number of competing television stations within those markets. If there are multiple offers to carry the series in a given television market, the distributor would then select the individual television station that was most appropriate for the series.

(g) On April 1, 1994, pursuant to the Distribution Agreement , Sears, Roebuck and Co., although still the "sponsor" of the Television Series with opening billboard credit, turned over the national commercial units of advertising time within the Television Series to the distributor of the Television Series (Eyemark Entertainment) for sale by the distributor to other advertisers.

(h) The Television Series was presented by the distributor to the local television stations as a "barter television show", meaning that a certain amount of commercial units of advertising time within the Television Series was retained by the distributor to sell to national advertisers and the remainder of commercial advertising time was turned over to local television stations to sell to their local, regional, or national spot advertisers.

(i) In the syndication business, the distributor  must "clear" the show (succeed in placing it on local television stations that reach a certain  minimum percentage of U.S. Television Households, (typically 70%)). If the distributor "clears" the show, then it has a "lineup" of local television stations where the advertising in the series retained by the distributor could be sold to national advertisers. In connection with the Syndication Agreement, the Television Series had to be "cleared" in 80% of the U.S. Television Households,.

(j) If, however, the distributor is unable to "clear" the television show, it will be "cancelled" by the distributor, as there is no economic incentive for the distributor. because the advertiser time retained by the distributor cannot be sold at national syndicated barter rates sufficient  to cover the cost of production of the show and distribution fees necessary to market the show.  Similarly, if the clearance or lineup of local television stations is not sufficient to generate advertising revenue to cover all the

costs of the producing the series, then a television show may be cancelled by the producer, as it is not economically viable.

(k) In the syndicated television business, when a currently airing show is "cancelled" it means it will not be renewed for broadcast in the next season. The distributor either gives the local television stations notice that the show will not be produced for the next season or simply does not seek to have the local television shows renew their contracts for the show. Except for shows that are cancelled in mid-season, this typically occurs at or around May of each broadcast year, giving the local television stations lead time to replace the cancelled show with another show for the next broadcast season.

(l) Cancellation of a television show occurs when:

(i) The distributor is unable to clear the show because local television stations are unwilling to air it; or

(ii) The advertisers are unwilling to buy commercial units of advertising time on the show; or

(iii) The distributor determines that it cannot make a reasonable profit; or

(iv) The producer of the show no longer wishes to or is no longer able to produce the show;

(m) If there is a "sponsor" of a television series, that sponsor, subject to existing contractual obligations, can elect not to renew or extend its sponsorship (financial support) of the television series.

(n) Such an election by the sponsor does not effect a "cancellation" of the series. Cancellation of funding only puts the producer of the series at financial risk and forces the producer or production company to find another source of production funding.

(o) Nowhere in the Syndication Agreement or any of its amendments is Sears, Roebuck and Co. given the right to cancel the Television Series.

(p) The Television Series is currently being aired on 228 local television stations and reaches 92% of U. S. Television Households.

(r) The Television Series has not been cancelled as that term is understood in the television industry.

Based upon my review of the documents listed above in Section I and my knowledge, background and experience in the television industry for the past 44 years, it is also my opinion that Sears agreed to provide funding of the Television Series for the 2005-2006 and the 2006-2007 broadcast seasons for the following reasons:

(i) In the television industry, it is established custom and practice that, by or close to February or March, or May, at the latest, commitments must be made as to whether a syndicated television series is going to be produced and distributed for broadcast in the following September-August broadcast year.

(ii) Pursuant to the Syndication Agreement, as amended, Sears, Roebuck and Co, beginning with the 2004-2005 broadcast year is required to meet with B.V.T.V., Inc. prior to the preceding October 15 to determine whether Sears, Roebuck and Co. is going to exercise its option to continue funding production of the Television Series.

(iii) Pursuant to the Distribution Agreement, Sears, Roebuck and Co. is required to give distributor (Eyemark/CBS Enterprises) notice no later than December 15 that Sears, Roebuck and Co. will not fund the production of the Television Series for the upcoming broadcast year.

(iv) These terms are consistent with accepted television industry custom and practice because, beginning in November, distributors begin their efforts to sell or clear the television series to the local television stations in the television markets throughout the nation.

(v) This clearance effort by the distributors is generally culminated at the NATPE (National Association of Television Programming Executives )convention. This convention generally occurs in middle to late January and is a convention of buying and selling television programs. At NATPE, television series are either bought on a cash or barter basis by local television stations for the following September start of the new television broadcast season.

(vi) King World has one of the largest television syndication companies and has a massive selling presence at NATPE and generally concludes the clearance for its programming there.

(vii) If the distributor is successful in selling the television series to enough television stations to effect "clearance" of the television series, the distributor then embarks upon efforts to sell the advertising time it retains within the television series. Since this Television Series is a long established and successful series and already having an estimated barter clearance, King World's efforts were more in the lines of renewals than the launch of a new show.

(viii) The producer of the television series must know as soon as possible whether the television series has "cleared" before incurring the expense of actual production of the television series. Since this Television Series was being renewed (cleared) it was very important for the producer, BVTV, to know that local television stations had in fact renewed the show so the production planning phase could begin.

(ix) The production planning sequence begins with laying out conceptual plans for the new season, incorporating new stories, or new elements, making commitments to production personnel and laying out pre-physical production planning, such as location scouting, and technical needs of equipment for production.

(x) Because of these time constraints, it is established custom and practice in the television industry that commitments are made, often on the basis of a telephone conversation or a handshake, with contract details to be worked out later.

(xi) Distributors, producers, television stations and advertisers rely upon this method of doing business.

(xii) The Syndication Agreement between Sears and BVTV has been in effect for over 15 years. The 10 amendments thereto became fairly standardized and most often reflected adjustments to the economics of guaranteed payments and bonuses. Many of those amendments were relatively short in length, incorporating most, but not all, of the terms and conditions of the initial Syndication Agreement.

(xiii) Both prior to and following October 15, 2004, Sears, Roebuck and Co. and BVTV exchanged emailed drafts and comments regarding Sears' funding of the production of the Television Series for the 2005-2006 and 2006-2007 television seasons. Prior to and October 15, 2004, Sears, Roebuck and Co could have stated that it was not going to fund the Television Series any further. Once that date passed and there was an active negotiation and drafts for the continuing funding of the Television Series, the commitment was confirmed, according to custom and practice in the television industry.

(xiv) By January 18, 2005, even the last of the contract points had been resolved and all details of the parties' arrangements were agreed upon. and both B.V.T.V., Inc. and King World reasonably relied upon that commitment in moving forward with pre-production, promoting, clearing and selling advertising in connection with the Television Series.

Within the Syndication Agreement and the Spokesperson Agreement, terminology is used which has specific meanings understood and relied upon in the television industry. Based upon my review of the documents listed above in Section I and my knowledge,

background and experience in the television industry for the past 44 years, certain of these terms and their meaning in the television industry are as follows:

(a) "Sponsorship" means the ownership of 1/3 or more of the commercial advertising time within a television show. Sometimes, the sponsor uses all the commercial time for itself. Sometimes it sells or causes the commercial time or portions of it to be sold by a third party to other advertisers, usually with restrictions of some sort as to what advertisers may purchase the commercial time. A sponsor does not control other advertisers, but wants product protection from competing companies. This is a matter of negotiation with the distributor.

(b) "Sponsored media" refers to a situation where a sponsor's (as opposed to commercial advertisers) product is identified with the show or the performer. Examples are "The Hallmark Hall of Fame", "Texaco Star Theater" and "The U.S. Steel Hour."

(b) "Syndication" is a method of selling a television program on a market-by-market (station-by-station) basis as opposed to a network of affiliated television stations.

(c) "Network" means two or more television stations (affiliates) that are contractually united to broadcast television programs ("network programs") at the same time and date.

(d) "Makegood" means an advertisement run as a replacement for one that was scheduled, but did not run or that ran incorrectly or where the audience was lower than guaranteed. The additional commercial time is given to an advertiser to "make good" on the guarantee to the advertiser.

(e) "Billboard" means an identifying announcement of sponsorship, at the beginning or end of sponsored television programs.

## III. EXHIBITS

A. Curriculum Vitae.

## IV.  QUALIFICATIONS

A copy of my Curriculum Vitae is attached as Exhibit A.

## V.  PREVIOUS EXPERT TESTIMONY IN THE LAST FOUR YEARS

None.

## VI  COMPENSATION

I am compensated at the rate of $300 per hour study time and $2,500 per day, plus

expenses, for each day I am called to testify.

_____
Richard Perin

### CERTIFICATE OF SERVICE

I, James F. O'Brien, counsel for plaintiffs, hereby certify that on May 30, 2006, I
served a true copy of the foregoing Plaintiff's Statement of Material Facts upon Anna
Sankaran Esq., Greenberg, Traurig LLP, One International Place, Boston, MA 02110
counsel for defendants by electronic mail and by overnight mail, postage prepaid.

_____
James F. O'Brien

# Richard Perin
110 Greene Street
Suite 304
New York, NY 10012

Richard Perin has been in the television production and distribution business for over 44 years. He received a BA in Economics from Michigan State University in 1961. Thereafter his experience has been as follows:

| | |
|---|---|
| 1962-1965 | ABC Television Network New York, NY.  Responsible for placing ABC Television Network programming on ABC Affiliate stations nationally. |
| 1965-1968 | Embassy Pictures Television, New York, NY. Eastern Division Sales Manager, responsible for selling syndicated feature films to television stations in the Eastern part of the U.S. |
| 1968-1971 | Telesynd, a division of Wrather Corp New York, NY. General Sales Manager and Head of Television.  Responsible for syndicating the television series LASSIE and THE LONE RANGER nationally. |
| 1971-1972 | Teledynamics, Inc. Vice President of Sales New York, NY.  Responsible for syndication sales of feature films, animal and travel related series. |
| 1972-1974 | Cinema V TV, Vice President of Sales New York, NY.  Responsible for sales of feature films, to television stations and networks sold the Academy Award Winning feature documentary, THE SORROW AND THE PITY to the ABC Television Network. |
| 1974-1977 | Group W Productions, a division of Westinghouse Broadcasting New York, NY.  Director of Program Development and Eastern Regional Sales Manager.  Responsible for developing television programs and marketing of individual television shows via syndication.  Sold THE MIKE DOUGLAS SHOW, DOCTOR IN THE HOUSE, and various documentaries. |
| 1977-1979 | Perin Enterprises, Inc. New York, NY.  Responsible for the production and distribution of an underwater documentary series THE CORAL JUNGLE. Sold the advertising time within THE CORAL JUNGLE to General Foods and their advertising agency Ogilvy & Mather, New York |

| | |
|---|---|
| 1979-1984 | MG Films/Perin Enterprises a Joint Venture, New York, NY. Responsible for the syndication and distribution to local television stations various television programs including THE WINNING MOMENT, OLYMPIC WINNING MOMENT, WE'RE DANCIN, and assorted one time only specials. |
| 1984-1995 | MG/Perin, Inc. Executive Vice President, Shareholder. Responsible for syndication, distribution and production of various television programs including THE OLYMPIC MOMENT, SUPER BOWL RECORD BOOK, GLOW (Gorgeous Ladies of Wrestling), NIGHT FLIGHT, INSIDE VIDEO:THIS WEEK, produced multiple series for Grey Advertising, OFFBEAT SPORTSBEAT, MY TOWN, LIGHTS, ACTION, HOLLYWOOD and also produced and syndicated ethnic programming HISPANIC AMERICANS; A NEW FRONTIER. |
| 1995-Present | MG/Perin, Inc. President & CEO. Responsible for the administration marketing and syndication of various television programs including MIKE HAMMER:PRIVATE EYE, COAST GUARD, THE EXTRAORDINARY, WOW (Women of Wrestling), WILD AMERICA, CHEATERS. Distributed or produced and distributed, AMERICA'S BLACK FORUM, MI GENTE MY PEOPLE, BLACK INDIANS: AN AMERICAN STORY. |

**PROFESSIONAL ORGANIZATIONS**

NATIONAL ASSOCIATION OF TELEVISION PROGRAMMING EXECUTIVES
Los, Angeles, CA

# EXHIBIT O

*Intellectual Property Library*

# McCarthy on Trademarks and Unfair Competition

J. Thomas McCarthy
**Fourth Edition**

**Volume 2**



**THOMSON**

**WEST**

*For Customer Assistance Call 1-800-328-4880*

© 2006 Thomson/West, Rel. 38, 6/2006

## J.  SECONDARY MEANING MARKS

### § 16:34  Generally

***Secondary Meaning Creates the Trademark Rights.***
For all business symbols which are not inherently distinctive, the law requires that secondary meaning (buyer association of symbol with source) be proven.[1] The only protection the law gives to non-inherently distinctive symbols is to that "penumbra" or "fringe" of meaning which we designate as "secondary meaning."[2] Thus, in determining priority of ownership of a mark which requires secondary meaning, prime emphasis must be focused on when, where, and how secondary meaning was in fact established in the mark. In a dispute over priority of use for a mark requiring secondary meaning, mere priority of use (as for technical trademarks) is insufficient. It is the party who first achieved trademark significance in the mark through secondary meaning who is the senior user of such a mark.[3]

***Who Achieved Secondary Meaning First?*** Since rights by secondary meaning are gained solely by public recognition and association, the test is not simply one of who used the mark first chronologically. The touchstone is how the buying public has come to interpret *plaintiff's* mark. For secondary meaning marks, the issue of priority and ownership is not which party first used the mark, but which party first achieved secondary meaning in the mark. As the California Court of Appeals stated:

> [T]he basic problem appears to be a determination of which title or name, regardless of its adoption in point of time, first made a sufficient impact on a substantial segment of the purchasing public that there thus arose the required associa-

---

[Section 16:34]

[1]*See* categories listed in §§ 15:1-15:4.

[2]*See* §§ 15:5-15:10.

[3]National Color Laboratories, Inc. v. Philip's Foto Co., 273 F. Supp. 1002, 157 U.S.P.Q. 136 (S.D.N.Y. 1967); Schwartz v. Hampton, 30 Misc. 2d 837, 219 N.Y.S.2d 106, 130 U.S.P.Q. 321 (1961), aff'd, 16 A.D.2d 915, 230 N.Y.S.2d 666, 134 U.S.P.Q. 84 (1st Dep't 1962); Tomlin v. Walt Disney Productions, 18 Cal. App. 3d 226, 96 Cal. Rptr. 118, 171 U.S.P.Q. 415 (2d Dist. 1971). *See* Sutton Cosmetics (P. R.), Inc. v. Lander Co., 455 F.2d 285, 172 U.S.P.Q. 449 (2d Cir. 1972) (Hays, J., dissenting).

16-56

tion between the title or name and its single source.[4]

**Senior User Must Have Achieved Secondary Meaning Before Junior User's First Use.** While this would logically require a rule awarding priority to the party who was the first in a race to acquire secondary meaning, the courts have generally adopted an easier-to-apply, but stricter, surrogate test: the senior user must prove the existence of secondary meaning in its mark at the time and place that the junior user first began use of that mark.[5] For example, in one case, the senior user failed to prove acquisition of secondary mean-

---

[4]Family Record Plan, Inc. v. Mitchell, 172 Cal. App. 2d 235, 342 P.2d 10, 122 U.S.P.Q. 414 (2d Dist. 1959).

[5]*Second Circuit:* Polaroid Corp. v. Polarad Electronics Corp., 182 F. Supp. 350, 125 U.S.P.Q. 57 (E.D. N.Y. 1960), aff'd, 287 F.2d 492, 128 U.S.P.Q. 411, 4 Fed. R. Serv. 2d 81 (2d Cir. 1961); Saratoga Vichy Spring Co., Inc. v. Lehman, 625 F.2d 1037, 208 U.S.P.Q. 175 (2d Cir. 1980); PaperCutter, Inc. v. Fay's Drug Co., Inc., 900 F.2d 558, 14 U.S.P.Q.2d 1450 (2d Cir. 1990).

*Third Circuit:* Scott Paper Co. v. Scott's Liquid Gold, Inc., 589 F.2d 1225, 200 U.S.P.Q. 421 (3d Cir. 1978); Commerce Nat. Ins. Services, Inc. v. Commerce Ins. Agency, Inc., 214 F.3d 432, 55 U.S.P.Q.2d 1098 (3d Cir. 2000) ("A plaintiff must establish secondary meaning in a mark at the time and place that the defendant began use of the mark." Plaintiff here did not prove this, court noting that evidence of promotion after the critical date is irrelevant.).

*Fourth Circuit:* Hot Shoppes, Inc. v. Hot Shoppe, Inc., 203 F. Supp. 777, 133 U.S.P.Q. 252 (M.D. N.C. 1962); Perini Corp. v. Perini Const., Inc., 915 F.2d 121, 16 U.S.P.Q.2d 1289 (4th Cir. 1990) (the senior user has the burden to show secondary meaning in the junior user's trade area prior to the time when the junior user entered the market).

*Sixth Circuit:* Upjohn Co. v. William S. Merrell Chemical Co., 269 F. 209 (C.C.A. 6th Cir. 1920); Marion Laboratories, Inc. v. Michigan Pharmacal Corp., 338 F. Supp. 762, 173 U.S.P.Q. 410 (E.D. Mich. 1972), aff'd without op., 473 F.2d 910 (6th Cir. 1973); Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc., 871 F.2d 590, 10 U.S.P.Q.2d 1443 (6th Cir. 1989).

*Seventh Circuit:* Land O'Lakes Creameries, Inc. v. Oconomowoc Canning Co., 221 F. Supp. 576, 139 U.S.P.Q. 11 (E.D. Wis. 1963), aff'd, 330 F.2d 667, 141 U.S.P.Q. 281 (7th Cir. 1964).

*Eighth Circuit:* Co-Rect Products, Inc. v. Marvy! Advertising Photography, Inc., 780 F.2d 1324, 1330, 228 U.S.P.Q. 429, 432 (8th Cir. 1985).

*Ninth Circuit:* Carter-Wallace, Inc. v. Procter & Gamble Co., 434 F.2d 794, 167 U.S.P.Q. 713 (9th Cir. 1970) (no secondary meaning in plaintiff's mark prior to defendant's use date); beef & brew, inc. v. Beef & Brew, Inc.*1, 389 F. Supp. 179, 185 U.S.P.Q. 531 (D. Or. 1974).

ing in the twenty-two day interval between the time of product introduction and the time the junior user started its use of the term. The court stated that: "The senior user has the burden of proving that its mark possessed secondary meaning at the time the junior user commenced its use of the mark."[5]

Several cases have found on the facts that the senior user did not prove the acquisition of secondary meaning in the time interval prior to the arrival of the junior user.[7] The junior user can use its application date as a constructive

---

*Eleventh Circuit*: Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C., 931 F.2d 1519, 19 U.S.P.Q.2d 1056, 1059 (11th Cir. 1991) (no secondary meaning proven prior to junior user's first use).

*Federal Circuit*: Tone Bros., Inc. v. Sysco Corp., 28 F.3d 1192, 31 U.S.P.Q.2d 1321 (Fed. Cir. 1994), cert. denied, 514 U.S. 159, 131 L. Ed. 2d 214, 115 S. Ct. 1356 (1995) ("Secondary meaning must be shown to have existed prior to the date on which the accused infringer commenced using a confusingly similar trade dress.").

Restatement (Third) of Unfair Competition, § 19, comment b, Reporters' Note (1995) ("The party seeking relief ordinarily is required to establish the existence of secondary meaning at the time of commencement of use by the other party.").

[6]G. Heileman Brewing Co. v. Anheuser-Busch, Inc., 676 F. Supp. 1436, 6 U.S.P.Q.2d 1481 (E.D. Wis. 1987), aff'd, 873 F.2d 985, 10 U.S.P.Q.2d 1801 (7th Cir. 1989).

[7]CBS, Inc. v. Logical Games, 719 F.2d 1237, 221 U.S.P.Q. 498 (4th Cir. 1983) (a non-exclusive U.S. importer obtained no secondary meaning in the "Rubik's Cube" trade dress by minimal sales prior to U.S. sales by the exclusive U.S. importer; *see* the criticism of the traditional "surrogate test" of priority of secondary meaning in the decision below at 220 U.S.P.Q. 434 (E.D. Va. 1982)); Calvin Klein Co. v. Farah Mfg. Co., 229 U.S.P.Q. 795 (S.D.N.Y. 1985) (one cannot prevent the use of a secondary meaning mark by another whose use began before the secondary meaning was acquired; plaintiff failed to prove such secondary meaning); Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc., 871 F.2d 590, 10 U.S.P.Q.2d 1443 (6th Cir. 1989) (the senior user must prove that its mark acquired secondary meaning prior to the junior user's first *use* of the similar term; plaintiff failed to prove such secondary meaning at that date); PaperCutter, Inc. v. Fay's Drug Co., 900 F.2d 558, 14 U.S.P.Q.2d 1450 (2d Cir. 1990) (given the short period of time between the parties' first uses, consumers did not have time to associate a descriptive term with the senior user so as to achieve secondary meaning; judgment for junior user); Investacorp, Inc. v. Arabian Investment Banking Corp., 931 F.2d 1519, 19 U.S.P.Q.2d 1056 (11th Cir. 1991), cert. denied, 502 U.S. 1005, 116 L. Ed. 2d 657, 112 S. Ct. 639 (1991) (senior user did not prove acquisition of secondary meaning in the five-year period before the junior user appeared); Bachellerie v. Z. Cavaricci, Inc., 762 F. Supp. 1070, 20 U.S.P.Q.2d 1282 (S.D.N.Y. 1991)

first use date to form the end point for the time frame within which the senior user must prove secondary meaning.[8]

If the senior user cannot prove that its mark possessed secondary meaning at the time defendant commenced its use, there can be no infringement, for if there was no secondary meaning, there was no likelihood of confusion when the junior user arrived on the scene.[9] If defendant's usage is in a product area which is not competitive with plaintiff's usage, plaintiff must show that its secondary meaning carries over so that there will be a likelihood of confusion.[10] The territorial extent of secondary meaning may be limited, and if this is so, it will limit the rights of the user.[11]

The Restatement expresses the secondary meaning priority rule in these terms:

[S]uch designations [as require proof of secondary meaning]

---

(plaintiff failed to prove acquisition of secondary meaning in the four-year "interval between the plaintiff's first use and defendant's first allegedly infringing use"); Black & Decker Corp. v. Dunsford, 944 F. Supp. 220, 42 U.S.P.Q.2d 1531 (S.D.N.Y. 1996) (senior user did not acquire secondary meaning in the five-year time frame before junior user's first use); Commerce Nat. Ins. Services, Inc. v. Commerce Ins. Agency, Inc., 214 F.3d 432, 55 U.S.P.Q.2d 1098 (3d Cir. 2000) (Plaintiff bank did not prove secondary meaning in the insurance market by the date of junior user's entry, court noting that evidence of promotion after the critical date is irrelevant.); Mid-West Management, Inc. v. Capstar Radio Operating Co., 72 U.S.P.Q.2d 1918, 2004 WL 2535404 (W.D. Wis. 2004), later proceedings, 74 U.S.P.Q. 2d 1373, 2005 WL 503817 (W.D. Wisc. 2005) (use only during the four day window between senior and junior first uses was not likely to create secondary meaning: preliminary injunction denied.).

[8]Black & Decker Corp. v. Dunsford, 944 F. Supp. 220, n.12, 42 U.S.P.Q.2d 1531 (S.D.N.Y. 1996). *Author's Comment:* This is appropriate, since the constructive use date was intended by Congress to have the same effect as the earliest actual use at common law.

[9]Ball v. United Artists Corp., 13 A.D.2d 133, 214 N.Y.S.2d 219, 129 U.S.P.Q. 192 (1st Dep't 1961). This connection is discussed in § 15:11.

[10]S. C. Johnson & Son, Inc. v. Johnson, 175 F.2d 176, 81 U.S.P.Q. 509 (2d Cir. 1949), cert. denied, 338 U.S. 860, 94 L. Ed. 527, 70 S. Ct. 103, 83 U.S.P.Q. 543 (1949). *See* §§ 24:5-24:12.

[11]Zimmerman v. Holiday Inns of America, Inc., 438 Pa. 528, 266 A.2d 87, 166 U.S.P.Q. 52 (1970), cert. denied, 400 U.S. 992, 27 L. Ed. 2d 440, 91 S. Ct. 456, 168 U.S.P.Q. 257 (1971); Shoppers Fair of Arkansas, Inc. v. Sanders Co., 328 F.2d 496, 140 U.S.P.Q. 637 (8th Cir. 1964). *See* Jewel Tea Co. v. Kraus, 88 F. Supp. 1003, 84 U.S.P.Q. 218 (D. Ill. 1950), modified on other grounds, 187 F.2d 278, 88 U.S.P.Q. 14, 88 U.S.P.Q. 507 (7th Cir. 1950); §§ 26:25 and 26:41.

are known or used as a mark or trade name in a particular area only when they have acquired secondary meaning in that area. If the prior user's designation has not yet acquired secondary meaning in the relevant area, the prior user does not have priority over a subsequent good faith user who adopts the designation in that area.[12]

In one decision, the Ninth Circuit apparently formulated an exception to the above rule of priority. It held that there was no need for the senior user to prove that its restaurant trade dress had acquired secondary meaning in Phoenix, Arizona before the junior user opened its restaurant there, because plaintiff was a nationwide chain catering to travellers: "[Plaintiff] should be permitted to show that its trade dress has acquired secondary meaning among some substantial portion of consumers nationally."[13]

***The Rule in U.S.P.T.O. Proceedings.*** The above priority rule apparently is not applied in Patent and Trademark Office proceedings. The Trademark Board said in dictum that while, in civil suits, it has been held that the senior user must prove secondary meaning existed prior to the junior user's first use, this rule has never been applied to PTO priority determinations involving the right to register "nor do we see any reason in law or in equity why it should be."[14] The Board later explained that it would follow the rule that a plaintiff in an inter partes proceeding in the PTO with a non-inherently distinctive mark must establish priority of secondary meaning in order to prevail.[15]

---

[12]Restatement (Third) of Unfair Competition § 19, comment b (1995) ("The party seeking relief ordinarily is required to establish the existence of secondary meaning at the time of commencement of use by the other party." *Id.* at Reporters' Note.).

[13]Fuddruckers, Inc. v. Doc's B.R. Others, Inc., 826 F.2d 837, 4 U.S.P.Q.2d 1026 (9th Cir. 1987). *Author's Comment:* The court views secondary meaning on a national scale as a surrogate for proof of secondary meaning on a local scale because plaintiff catered to travellers.

[14]Henry Siegel Co. v. M & R International Mfg. Co., 4 U.S.P.Q.2d 1154 (T.T.A.B. 1987).

[15]Perma Ceram Enterprises, Inc. v. Preco Industries, Ltd., 23 U.S.P.Q.2d 1134 (T.T.A.B. 1992). *See* Larami Corp. v. Talk to Me Programs, Inc., 36 U.S.P.Q.2d 1840, n.9 (T.T.A.B. 1995) (Characterizing *Perma Ceram* as holding that "where neither party's mark in an Opposition proceeding is inherently distinctive, priority lies with the party whose mark is the first to become distinctive through use in commerce." But the

# EXHIBIT  P

Case 1:05-cv-11717-WGY   Document 42-19   Filed 07/21/2006   Page 2 of 9

Illinois Statutes

🗀 **Illinois Statutes**
🗀 **CHAPTER 815 BUSINESS TRANSACTIONS**
🗀 **ACT 505. Consumer Fraud and Deceptive Business Practices Act.**

**815 ILCS 505/1 (from Ch. 121 1/2, par. 261)**

Sec. 1. (a) The term "advertisement" includes the attempt by publication, dissemination, solicitation or circulation to induce directly or indirectly any person to enter into any obligation or acquire any title or interest in any merchandise and includes every work device to disguise any form of business solicitation by using such terms as "renewal", "invoice", "bill", "statement", or "reminder", to create an impression of existing obligation when there is none, or other language to mislead any person in relation to any sought after commercial transaction;

(b) The term "merchandise" includes any objects, wares, goods, commodities, intangibles, real estate situated outside the State of Illinois, or services;

(c) The term "person" includes any natural person or his legal representative, partnership, corporation (domestic and foreign), company, trust, business entity or association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee or cestui que trust thereof;

(d) The term "sale" includes any sale, offer for sale, or attempt to sell any merchandise for cash or on credit.

(e) The term "consumer" means any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household.

(f) The terms "trade" and "commerce" mean the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of this State.

(g) The term "pyramid sales scheme" includes any plan or operation whereby a person in exchange for money or other thing of value acquires the opportunity to receive a benefit or thing of value, which is primarily based upon the inducement of additional persons, by himself or others, regardless of number, to participate in the same plan or operation and is not primarily contingent on the volume or quantity of goods, services, or other property sold or distributed or to be sold or distributed to persons for purposes of resale to consumers. For purposes of this subsection, "money or other thing of value" shall

not include payments made for sales demonstration
equipment and materials furnished on a nonprofit basis
for use in making sales and not for resale.

(Source: P.A. 83-808.)

Copyright © 2006 Loislaw.com, Inc. All Rights Reserved

Illinois Statutes

**Illinois Statutes**
**CHAPTER 815 BUSINESS TRANSACTIONS**
**ACT 505. Consumer Fraud and Deceptive Business Practices Act.**

*815 ILCS 505/2* (from Ch. 121 1/2, par. 262)

Sec. 2.

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

(Source: P.A. 78-904.)

Copyright © 2006 Loislaw.com, Inc. All Rights Reserved

**Illinois Statutes**

🗐 **Illinois Statutes**
🗐 **CHAPTER 815 BUSINESS TRANSACTIONS**
🗐 **ACT 505. Consumer Fraud and Deceptive Business Practices Act.**

815 ILCS 505/2Z (from Ch. 121 1/2, par. 262Z)
[EDITORS' NOTE:  SECTION AS AMENDED BY P.A. 94-13, SEE BELOW VERSIONS FOR SECTIONS AS AMENDED BY P.A. 94-36, 94-280, & 94-292.]

    Sec. 2Z. Violations of other Acts. Any person who knowingly violates the Automotive Repair Act, the Home Repair and Remodeling Act, the Dance Studio Act, the Physical Fitness Services Act, the Hearing Instrument Consumer Protection Act, the Illinois Union Label Act, the Job Referral and Job Listing Services Consumer Protection Act, the Travel Promotion Consumer Protection Act, the Credit Services Organizations Act, the Automatic Telephone Dialers Act, the Pay-Per-Call Services Consumer Protection Act, the Telephone Solicitations Act, the Illinois Funeral or Burial Funds Act, the Cemetery Care Act, the Safe and Hygienic Bed Act, the Pre-Need Cemetery Sales Act, the High Risk Home Loan Act, the Payday Loan Reform Act, subsection (a) or (b) of Section 3-10 of the Cigarette Tax Act, subsection (a) or (b) of Section 3-10 of the Cigarette Use Tax Act, the Electronic Mail Act, paragraph (6) of subsection (k) of Section 6-305 of the Illinois Vehicle Code, or the Automatic Contract Renewal Act commits an unlawful practice within the meaning of this Act.

    (Source: P.A. 93-561, eff. 1-1-04; 93-950, eff. 1-1-05; 94-13, eff. 12-6-05.)

    815 ILCS 505/2Z (from Ch. 121 1/2, par. 262Z)
[EDITORS' NOTE:  SECTION AS AMENDED BY P.A. 94-36, SEE ABOVE VERSION FOR SECTION AS AMENDED BY P.A. 94-13, SEE BELOW VERSIONS FOR SECTIONS AS AMENDED BY P.A. 94-280 & 94-292.]

    Sec. 2Z. Violations of other Acts. Any person who knowingly violates the Automotive Repair Act, the Home Repair and Remodeling Act, the Dance Studio Act, the Physical Fitness Services Act, the Hearing Instrument Consumer Protection Act, the Illinois Union Label Act, the Job Referral and Job Listing Services Consumer Protection Act, the Travel Promotion Consumer Protection Act, the Credit Services Organizations Act, the Automatic Telephone Dialers Act, the Pay-Per-Call Services Consumer Protection Act, the Telephone Solicitations Act, the Illinois Funeral or Burial Funds Act, the Cemetery Care Act, the Safe and Hygienic Bed Act, the Pre-Need Cemetery Sales Act, the High Risk Home Loan Act, subsection (a) or (b) of Section 3-10 of the Cigarette Tax Act, subsection (a) or (b) of Section 3-10 of the Cigarette Use Tax Act, the Electronic Mail Act, paragraph (6) of subsection (k) of Section 6-305 of the Illinois Vehicle Code, the Automatic Contract Renewal Act, or the Personal Information Protection Act commits an unlawful practice within the meaning of this Act.

    (Source: P.A. 93-561, eff. 1-1-04; 93-950, eff. 1-1-05; 94-36, eff. 1-1-06.)

    815 ILCS 505/2Z (from Ch. 121 1/2, par. 262Z)
[EDITORS' NOTE:  SECTION AS AMENDED BY P.A. 94-280, SEE ABOVE VERSIONS FOR SECTIONS AS AMENDED BY P.A. 94-13 & 94-36, SEE BELOW VERSION FOR SECTION AS AMENDED BY P.A. 94-292.]

Sec. 2Z. Violations of other Acts. Any person who knowingly violates the Automotive Repair Act, the Home Repair and Remodeling Act, the Dance Studio Act, the Physical Fitness Services Act, the Hearing Instrument Consumer Protection Act, the Illinois Union Label Act, the Job Referral and Job Listing Services Consumer Protection Act, the Travel Promotion Consumer Protection Act, the Credit Services Organizations Act, the Automatic Telephone Dialers Act, the Pay-Per-Call Services Consumer Protection Act, the Telephone Solicitations Act, the Illinois Funeral or Burial Funds Act, the Cemetery Care Act, the Safe and Hygienic Bed Act, the Pre-Need Cemetery Sales Act, the High Risk Home Loan Act, subsection (a) or (b) of Section 3-10 of the Cigarette Tax Act, subsection (a) or (b) of Section 3-10 of the Cigarette Use Tax Act, the Electronic Mail Act, paragraph (6) of subsection (k) of Section 6-305 of the Illinois Vehicle Code, Article 3 of the Residential Real Property Disclosure Act, or the Automatic Contract Renewal Act commits an unlawful practice within the meaning of this Act.

(Source: P.A. 93-561, eff. 1-1-04; 93-950, eff. 1-1-05; 94-280, eff. 1-1-06.)

815 ILCS 505/2Z (from Ch. 121 1/2, par. 262Z)
[EDITORS' NOTE:  SECTION AS AMENDED BY P.A. 94-292, SEE ABOVE VERSIONS FOR
SECTIONS AS AMENDED BY P.A. 94-13, 94-36, & 94-280.]

Sec. 2Z. Violations of other Acts. Any person who knowingly violates the Automotive Repair Act, the Automotive Collision Repair Act, the Home Repair and Remodeling Act, the Dance Studio Act, the Physical Fitness Services Act, the Hearing Instrument Consumer Protection Act, the Illinois Union Label Act, the Job Referral and Job Listing Services Consumer Protection Act, the Travel Promotion Consumer Protection Act, the Credit Services Organizations Act, the Automatic Telephone Dialers Act, the Pay-Per-Call Services Consumer Protection Act, the Telephone Solicitations Act, the Illinois Funeral or Burial Funds Act, the Cemetery Care Act, the Safe and Hygienic Bed Act, the Pre-Need Cemetery Sales Act, the High Risk Home Loan Act, subsection (a) or (b) of Section 3-10 of the Cigarette Tax Act, subsection (a) or (b) of Section 3-10 of the Cigarette Use Tax Act, the Electronic Mail Act, paragraph (6) of subsection (k) of Section 6-305 of the Illinois Vehicle Code, or the Automatic Contract Renewal Act commits an unlawful practice within the meaning of this Act.

(Source: P.A. 93-561, eff. 1-1-04; 93-950, eff. 1-1-05; 94-292, eff. 1-1-06.)

Copyright © 2006 Loislaw.com, Inc. All Rights Reserved

Case 1:05-cv-11717-WGY    Document 42-19    Filed 07/21/2006    Page 7 of 9

**Illinois Statutes**

📄 **Illinois Statutes**
📄 **CHAPTER 815 BUSINESS TRANSACTIONS**
📄 **ACT 505. Consumer Fraud and Deceptive Business Practices Act.**

*815 ILCS 505/10a* **(from Ch. 121 1/2, par. 270a)**

Sec. 10a. Action for actual damages.

(a) Any person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in its discretion may award actual economic damages or any other relief which the court deems proper; provided, however, that no award of punitive damages may be assessed under this Section against a party defendant who is a new vehicle dealer or used vehicle dealer within the meaning of Chapter 5 of the Illinois Vehicle Code or who is the holder of a retail installment contract within the meaning of Section 2.12 of the Motor Vehicle Retail Installment Sales Act, unless the conduct engaged in was willful or intentional and done with evil motive or reckless indifference to the rights of others. Proof of a public injury, a pattern, or an effect on consumers and the public interest generally shall be required in order to state a cause of action under this Section against a party defendant who is a new vehicle dealer or used vehicle dealer within the meaning of Chapter 5 of the Illinois Vehicle Code or who is the holder of a retail installment contract within the meaning of Section 2.12 of the Motor Vehicle Retail Installment Sales Act. Proof of such public injury may be shown by any one of the following factors:

(1) Violation of a statute that has a public interest impact.

(2) Repeated acts prior to the act involving the plaintiff.

(3) Potential for repetition.

(b) Such action may be commenced in the county in which the person against whom it is brought resides, has his principal place of business, or is doing business, or in the county where the transaction or any substantial portion thereof occurred.

(c) Except as provided in subsections (f), (g), and (h) of this Section, in any action brought by a person under this Section, the Court may grant injunctive relief where appropriate and may award, in addition to the relief provided in this Section, reasonable attorney's fees and costs to the prevailing party.

(d) Upon commencement of any action brought under this Section the plaintiff shall mail a copy of the complaint or other initial pleading to the Attorney General and, upon entry of any judgment or order in the action, shall

mail a copy of such judgment or order to the Attorney
General.

(e) Any action for damages under this Section shall be
forever barred unless commenced within 3 years after the
cause of action accrued; provided that, whenever any
action is brought by the Attorney General or a State's
Attorney for a violation of this Act, the running of the
foregoing statute of limitations, with respect to every
private right of action for damages which is based in
whole or in part on any matter complained of in said
action by the Attorney General or State's Attorney, shall
be suspended during the pendency thereof, and for one
year thereafter.

(f) At any time more than 30 days before the commencement
of trial, a party, who is a new vehicle dealer or used
vehicle dealer within the meaning of Chapter 5 of the
Illinois Vehicle Code or who is the holder of a retail
installment contract within the meaning of Section 2.12
of the Motor Vehicle Retail Installment Sales Act and who
is defending a claim under this Act, may serve upon the
party seeking relief under this Act an offer to allow
judgment to be taken against the defending party to the
effect specified in the offer with costs then accrued. If
within 10 days after service of the offer, the offeree
serves written notice that the offer is accepted, either
party may then file the offer and notice of acceptance
together with proof of service of the notice; the court
shall then enter judgment. An offer not accepted shall be
deemed withdrawn and evidence of the offer is not
admissible except in a proceeding to determine costs.
When a party seeking relief under this Act does not
accept an offer filed with the clerk and served upon the
attorney for that party more than 30 days before the
commencement of trial and when that party fails to obtain
a judgment in an amount more than the total offer of
settlement, that party shall forfeit and the court may
not award any compensation for attorney's fees and costs
incurred after the date of the offer.

(g) At any time more than 30 days before the commencement
of trial, a party who is seeking relief under this Act
from a new vehicle dealer or used vehicle dealer within
the meaning of Chapter 5 of the Illinois Vehicle Code or
from the holder of a retail installment contract within
the meaning of Section 2.12 of the Motor Vehicle Retail
Installment Sales Act may serve the dealer or holder an
offer to allow judgment to be taken against the dealer or
holder to the effect specified in the offer with costs
then accrued. If within 10 days after service of the
offer, the offeree serves written notice that the offer
is accepted, either party may then file the offer and
notice of acceptance together with proof of service of
the notice; the court shall then enter judgment. An offer
not accepted shall be deemed withdrawn and evidence of
the offer is not admissible except in a proceeding to
determine costs. When a dealer or holder does not accept
an offer filed with the clerk and served upon the

attorney for the dealer or holder more than 30 days
before the commencement of trial and if the party seeking
relief against a dealer or holder obtains a judgment in
an amount equal to or in excess of the offer amount, the
party seeking relief shall be paid interest on the offer
amount at the rate as provided in Section 2-1303 of the
Code of Civil Procedure from the date of the offer until
the judgment is paid.

   (h)  At least 30 days prior to the filing of an action
under this Section, a party who is seeking relief shall
serve a written notice of the nature of the alleged
violation and demand for relief upon the prospective
party, who is a new vehicle dealer or used vehicle dealer
within the meaning of Chapter 5 of the Illinois Vehicle
Code or who is the holder of a retail installment
contract within the meaning of Section 2.12 of the Motor
Vehicle Retail Installment Sales Act, against whom such
action will be commenced. Any person receiving such a
demand for relief may, within 30 days of service of the
demand for relief, submit a written offer of settlement,
which offer is to be exclusive of attorney's fees, to the
party serving the notice and demand. The party who is
seeking relief must certify in any cause of action that
the notice and demand was served upon the named
defendants and the substance of their response, if any.
If the offer of settlement is rejected in writing by the
party who is seeking relief, then, in any subsequent
action, the court shall deny any award of attorney's fees
and costs requested by the party seeking relief under
this Act incurred after the rejection of the written
offer of settlement, if the judgment is less than the
amount contained within the offer of settlement. All
written offers of settlement under this subsection shall
be presumed to be offered without prejudice in compromise
of a disputed matter.

(Source: P.A. 91-270, eff. 1-1-00.)

Copyright © 2006 Loislaw.com, Inc. All Rights Reserved

# EXHIBIT  Q

Westlaw.

47 CFR § 73.1212
47 C.F.R. § 73.1212

c

**CODE OF FEDERAL REGULATIONS**
**TITLE 47--TELECOMMUNICATION**
**CHAPTER I--FEDERAL COMMUNICATIONS**
**COMMISSION**
**SUBCHAPTER C--BROADCAST RADIO**
**SERVICES**
**PART 73--RADIO BROADCAST SERVICES**
**SUBPART H--RULES APPLICABLE TO ALL**
**BROADCAST STATIONS**
Current through July 22, 2005; 70 FR 42471

§ 73.1212 Sponsorship identification; list retention; related requirements.

(a) When a broadcast station transmits any matter for which money, service, or other valuable consideration is either directly or indirectly paid or promised to, or charged or accepted by such station, the station, at the time of the broadcast, shall announce:

(1) That such matter is sponsored, paid for, or furnished, either in whole or in part, and

(2) By whom or on whose behalf such consideration was supplied: Provided , however , That "service or other valuable consideration" shall not include any service or property furnished broadcast unless it is so furnished in consideration for an identification or any person, product, service, trademark, or brand name beyond an identification reasonably related to the use of such service or property on the broadcast.

(i) For the purposes of this section, the term "sponsored" shall be deemed to have the same meaning as "paid for."

(ii) In the case of any television political advertisement concerning candidates for public office, the sponsor shall be identified with letters equal to or greater than four percent of the vertical picture height that air for not less than four seconds.

(b) The licensee of each broadcast station shall exercise reasonable diligence to obtain from its employees, and from other persons with whom it deals directly in connection with any matter for broadcast, information to enable such licensee to make the announcement required by this section.

(c) In any case where a report has been made to a broadcast station as required by section 507 of the Communications Act of 1934, as amended, of circumstances which would have required an announcement under this section had the consideration been received by such broadcast station, an appropriate announcement shall be made by such station.

(d) In the case of any political broadcast matter or any broadcast matter involving the discussion of a controversial issue of public importance for which any film, record, transcription, talent, script, or other material or service of any kind is furnished, either directly or indirectly, to a station as an inducement for broadcasting such matter, an announcement shall be made both at the beginning and conclusion of such broadcast on which such material or service is used that such film, record, transcription, talent, script, or other material or service has been furnished to such station in connection with the transmission of such broadcast matter: Provided, however, That in the case of any broadcast of 5 minutes' duration or less, only one such announcement need be made either at the beginning or conclusion of the broadcast.

(e) The announcement required by this section shall, in addition to stating the fact that the broadcast matter was sponsored, paid for or furnished, fully and fairly disclose the true identity of the person or persons, or corporation, committee, association or other unincorporated group, or other entity by whom or on whose behalf such payment is made or promised, or from whom or on whose behalf such services or other valuable consideration is received, or by whom the material or services referred to in paragraph (d) of this section are furnished. Where an agent or other person or entity contracts or otherwise makes arrangements with a station on behalf of another, and such fact is known or by the exercise of reasonable diligence, as specified in paragraph (b) of this section, could be known to the station, the announcement shall disclose the identity of the person or persons or entity on whose behalf such agent is acting instead of the name of such agent. Where the material broadcast is political matter or matter involving the discussion of a controversial issue of public importance and a corporation, committee, association or other unincorporated group, or other entity is paying for or furnishing the broadcast matter, the station shall, in addition to making the announcement required by this section,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

47 CFR § 73.1212                                                                                    Page 2
47 C.F.R. § 73.1212

require that a list of the chief executive officers or members of the executive committee or of the board of directors of the corporation, committee, association or other unincorporated group, or other entity shall be made available for public inspection at the location specified by the licensee under § 73.3526 of this chapter. If the broadcast is originated by a network, the list may, instead, be retained at the headquarters office of the network or at the location where the originating station maintains its public inspection file under § 73.3526 of this chapter. Such lists shall be kept and made available for a period of two years.

(f) In the case of broadcast matter advertising commercial products or services, an announcement stating the sponsor's corporate or trade name, or the name of the sponsor's product, when it is clear that the mention of the name of the product constitutes a sponsorship identification, shall be deemed sufficient for the purpose of this section and only one such announcement need be made at any time during the course of the broadcast.

(g) The announcement otherwise required by section 317 of the Communications Act of 1934, as amended, is waived with respect to the broadcast of "want ad" or classified advertisements sponsored by an individual. The waiver granted in this paragraph shall not extend to a classified advertisement or want ad sponsorship by any form of business enterprise, corporate or otherwise. Whenever sponsorship announcements are omitted pursuant to this paragraph, the licensee shall observe the following conditions:

(1) Maintain a list showing the name, address, and (where available) the telephone number of each advertiser;

(2) Make this list available to members of the public who have a legitimate interest in obtaining the information contained in the list. Such list must be retained for a period of two years after broadcast.

(h) Any announcement required by section 317(b) of the Communications Act of 1934, as amended, is waived with respect to feature motion picture film produced initially and primarily for theatre exhibition.

Note: The waiver heretofore granted by the Commission in its Report and Order adopted November 16, 1960 (FCC 60-1369; 40 F.C.C. 95), continues to apply to programs filmed or recorded on or before June 20, 1963, when § 73.654, the

predecessor television rule, went into effect.

(i) Commission interpretations in connection with the provisions of the sponsorship identification rules are contained in the Commission's Public Notice, entitled "Applicability of Sponsorship Identification Rules," dated May 6, 1963 (40 F.C.C. 141), as modified by Public Notice, dated April 21, 1975 (FCC 75-418). Further interpretations are printed in full in various volumes of the Federal Communications Commission Reports.

[40 FR 18400, Apr. 28, 1975, as amended at 46 FR 13907, Feb. 24, 1981; 49 FR 4211, Feb. 3, 1984; 49 FR 33663, Aug. 24, 1984; 50 FR 32417, Aug. 12, 1985; 57 FR 210, Jan. 3, 1992; 57 FR 8279, March 9, 1992]

<General Materials (GM) - References, Annotations, or Tables>


47 C. F. R. § 73.1212

47 CFR § 73.1212

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT  R

New York Consolidated Laws - § 1-201 U.C.C. General Definitions.    Page 1 of 6

Case 1:05-cv-11717-WGY    Document 42-20    Filed 07/21/2006    Page 5 of 15

**New York Consolidated Laws**

📖 **New York Consolidated Laws**
📖 **CHAPTER 38 OF THE CONSOLIDATED LAWS — UNIFORM COMMERCIAL CODE**
📖 **ARTICLE 1 GENERAL PROVISIONS**
📖 **PART 2 GENERAL DEFINITIONS AND PRINCIPLES OF INTERPRETATION**

§ *1-201 U.C.C.* **General Definitions.**

   Subject to additional definitions contained in the subsequent Articles of this Act which are applicable to specific Articles or Parts thereof, and unless the context otherwise requires, in this Act:

   (1) "Action" in the sense of a judicial proceeding includes recoupment, counterclaim, set-off, suit in equity and any other proceedings in which rights are determined.

   (2) "Aggrieved party" means a party entitled to resort to a remedy.

   (3) "Agreement" means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this Act (Sections 1-205 and 2-208). Whether an agreement has legal consequences is determined by the provisions of this Act, if applicable; otherwise by the law of contracts (Section 1-103). (Compare "Contract".)

   (4) "Bank" means any person engaged in the business of banking.

   (5) "Bearer" means the person in possession of an instrument, document of title, or certificated security payable to bearer or indorsed in blank.

   (6) "Bill of lading" means a document evidencing the receipt of goods for shipment issued by a person engaged in the business of transporting or forwarding goods, and includes an airbill. "Airbill" means a document serving for air transportation as a bill of lading does for marine or rail transportation, and includes an air consignment note or air waybill.

   (7) "Branch" includes a separately incorporated foreign branch of a bank.

   (8) "Burden of establishing" a fact means the burden of persuading the triers of fact that the existence of the fact is more probable than its non-existence.

   (9) "Buyer in ordinary course of business" means a person that buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person, other than a pawnbroker, in the business of selling goods of that kind. A person buys goods in the ordinary course if the sale to the person comports with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices. A person that sells oil, gas, or other minerals at the wellhead or minehead is a person in the business of selling goods of that kind. A buyer in ordinary course of business may buy for cash, by exchange of other property, or on secured or unsecured credit, and may acquire goods or documents of title under a pre-existing contract for sale. Only a buyer that takes possession of the goods or has a right to recover the goods from the seller under article 2 may be a buyer in ordinary course of business. A person that acquires goods in a transfer in bulk or as security for or in

total or partial satisfaction of a money debt is not a buyer in ordinary course of business.

(10) "Conspicuous": A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as: Non-Negotiable Bill of Lading) is conspicuous. Language in the body of a form is "conspicuous" if it is in larger or other contrasting type or color. But in a telegram any stated term is "conspicuous". Whether a term or clause is "conspicuous" or not is for decision by the court.

(11) "Contract" means the total legal obligation which results from the parties' agreement as affected by this Act and any other applicable rules of law. (Compare "Agreement".)

(12) "Creditor" includes a general creditor, a secured creditor, a lien creditor and any representative of creditors, including an assignee for the benefit of creditors, a trustee in bankruptcy, a receiver in equity and an executor or administrator of an insolvent debtor's or assignor's estate.

(13) "Defendant" includes a person in the position of defendant in a cross-action or counterclaim.

(14) "Delivery" with respect to instruments, documents of title, chattel paper or certificated securities means voluntary transfer of possession.

(15) "Document of title" includes bill of lading, dock warrant, dock receipt, warehouse receipt or order for the delivery of goods, and also any other document which in the regular course of business or financing is treated as adequately evidencing that the person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers. To be a document of title a document must purport to be issued by or addressed to a bailee and purport to cover goods in the bailee's possession which are either identified or are fungible portions of an identified mass.

(16) "Fault" means wrongful act, omission or breach.

(17) "Fungible" with respect to goods or securities means goods or securities of which any unit is, by nature or usage of trade, the equivalent of any other like unit. Goods which are not fungible shall be deemed fungible for the purposes of this Act to the extent that under a particular agreement or document unlike units are treated as equivalents.

(18) "Genuine" means free of forgery or counterfeiting.

(19) "Good faith" means honesty in fact in the conduct or transaction concerned.

(20) "Holder" means a person who is in possession of a document of title or an instrument or an investment certificated security drawn, issued or indorsed to him or to his order or to bearer or in blank.

(21) To "honor" is to pay or to accept and pay, or where a credit so engages to purchase or discount a draft complying with the terms of the credit.

(22) "Insolvency proceedings" includes any assignment for the benefit of creditors or other proceedings intended to liquidate or rehabilitate the

estate of the person involved.

(23) A person is "insolvent" who either has ceased to pay his debts in the ordinary course of business or cannot pay his debts as they become due or is insolvent within the meaning of the federal bankruptcy law.

(24) "Money" means a medium of exchange authorized or adopted by a domestic or foreign government as a part of its currency except that it does not include rare or unusual coins used for numismatic purposes. Such rare or unusual coins shall be considered goods; provided, however, that nothing in this subsection shall be deemend to impair or alter the obligation of an insurer to an insured under a contract of insurance heretofore or hereafter issued or delivered in this state covering loss of or damage to property.

(25) A person has "notice" of a fact when

(a) he has actual knowledge of it; or

(b) he has received a notice or notification of it; or

(c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists. A person "knows" or has "knowledge" of a fact when he has actual knowledge of it. "Discover" or "learn" or a word or phrase of similar import refers to knowledge rather than to reason to know. The time and circumstances under which a notice or notification may cease to be effective are not determined by this Act.

(26) A person "notifies" or "gives" a notice or notification to another by taking such steps as may be reasonably required to inform the other in ordinary course whether or not such other actually comes to know of it. A person "receives" a notice or notification when (a) it comes to his attention; or

(b) it is duly delivered at the place of business through which the contract was made or at any other place held out by him as the place for receipt of such communications.

(27) Notice, knowledge or a notice or notification received by an organization is effective for a particular transaction from the time when it is brought to the attention of the individual conducting that transaction, and in any event from the time when it would have been brought to his attention if the organization had exercised due diligence. An organization exercises due diligence if it maintains reasonable routines for communicating significant information to the person conducting the transaction and there is reasonable compliance with the routines. Due diligence does not require an individual acting for the organization to communicate information unless such communication is part of his regular duties or unless he has reason to know of the transaction and that the transaction would be materially affected by the information.

(28) "Organization" includes a corporation, government or governmental subdivision or agency, business trust, estate, trust, partnership or association, two or more persons having a joint or common interest, or any other legal or commercial entity.

(29) "Party", as distinct from "third party", means a person who has engaged in a transaction or made an agreement within this Act.

(30) "Person" includes an individual or an organization (See Section 1-102).

(31) "Presumption" or "presumed" means that the trier of fact must find the existence of the fact presumed unless and until evidence is introduced which would support a finding of its non-existence.

(32) "Purchase" includes taking by sale, discount, negotiation, mortgage, pledge, lien, security interest, issue or re-issue, gift or any other voluntary transaction creating an interest in property.

(33) "Purchaser" means a person who takes by purchase.

(34) "Remedy" means any remedial right to which an aggrieved party is entitled with or without resort to a tribunal.

(35) "Representative" includes an agent, an officer of a corporation or association, and a trustee, executor or administrator of an estate, or any other person empowered to act for another.

(36) "Rights" includes remedies.

(37) "Security interest" means an interest in personal property or fixtures which secures payment or performance of an obligation. The term also includes any interest of a consignor and a buyer of accounts, chattel paper, a payment intangible, or a promissory note in a transaction that is subject to Article 9. The special property interest of a buyer of goods on identification of those goods to a contract for sale under Section 2-401 is not a "security interest", but a buyer may also acquire a "security interest" by complying with Article 9. Except as otherwise provided in Section 2-505, the right of a seller or lessor of goods under Article 2 or 2-A to retain or acquire possession of the goods is not a "security interest", but a seller or lessor may also acquire a "security interest" by complying with Article 9. The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer (Section 2-401) is limited in effect to a reservation of a "security interest".

(a) Whether a transaction creates a lease or security interest is determined by the facts of each case; however, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee, and:

(i) the original term of the lease is equal to or greater than the remaining economic life of the goods,

(ii) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods,

(iii) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement, or

(iv) the lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

(b) A transaction does not create a security interest merely because it

provides that:

(i) the present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into,

(ii) the lessee assumes risk of loss of the goods, or agrees to pay taxes, insurance, filing, recording, or registration fees, or service or maintenance costs with respect to the goods,

(iii) the lessee has an option to renew the lease or to become the owner of the goods,

(iv) the lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed, or

(v) the lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed.

(c) For purposes of this subsection (37):

(i) Additional consideration is not nominal if (A) when the option to renew the lease is granted to the lessee the rent is stated to be the fair market rent for the use of the goods for the term of the renewal determined at the time the option is to be performed, or (B) when the option to become the owner of the goods is granted to the lessee the price is stated to be the fair market value of the goods determined at the time the option is to be performed. Additional consideration is nominal if it is less than the lessee's reasonably predictable cost of performing under the lease agreement if the option is not exercised;

(ii) "Reasonably predictable" and "remaining economic life of the goods" are to be determined with reference to the facts and circumstances at the time the transaction is entered into; and

(iii) "Present value" means the amount as of a date certain of one or more sums payable in the future, discounted to the date certain. The discount is determined by the interest rate specified by the parties if the rate is not manifestly unreasonable at the time the transaction is entered into; otherwise, the discount is determined by a commercially reasonable rate that takes into account the facts and circumstances of each case at the time the transaction was entered into.

(38) "Send" in connection with any writing or notice means to deposit in the mail or deliver for transmission by any other usual means of communication with postage or cost of transmission provided for and properly addressed and in the case of an instrument to an address specified thereon or otherwise agreed, or if there be none to any address reasonable under the circumstances. The receipt of any writing or notice within the time at which it would have arrived if properly sent has the effect of a proper sending.

(39) "Signed" includes any symbol executed or adopted by a party with present intention to authenticate a writing. Without limiting the generality of the preceding sentence, any financing or other statement or

security agreement filed pursuant to Part 5 of Article 9 which contains a copy, however made, of the signature of a secured party or his representative, or of a debtor or his representative, is "signed" by the secured party or the debtor, as the case may be.

(40) "Surety" includes guarantor.

(41) "Telegram" includes a message transmitted by radio, teletype, cable, any mechanical method of transmission, or the like.

(42) "Term" means that portion of an agreement which relates to a particular matter.

(43) "Unauthorized" signature or indorsement means one made without actual, implied or apparent authority and includes a forgery.

(44) "Value". Except as otherwise provided with respect to negotiable instruments and bank collections (Sections 3-303, 4-208 and 4-209) a person gives "value" for rights if he acquires them (a) in return for a binding commitment to extend credit or for the extension of immediately available credit whether or not drawn upon and whether or not a charge-back is provided for in the event of difficulties in collection; or

(b) as security for or in total or partial satisfaction of a pre-existing claim; or

(c) by accepting delivery pursuant to a pre-existing contract for purchase; or

(d) generally, in return for any consideration sufficient to support a simple contract.

(45) "Warehouse receipt" means a receipt issued by a person engaged in the business of storing goods for hire.

(46) "Written" or "writing" includes printing, typewriting or any other intentional reduction to tangible form.

(Amended by Laws 2001, ch. 84, §§ 3-5, 59, eff. July 1, 2001.)

Copyright © 2006 Loislaw.com, Inc. All Rights Reserved

**New York Consolidated Laws**

🔲 **New York Consolidated Laws**
🔲 **CHAPTER 38 OF THE CONSOLIDATED LAWS — UNIFORM COMMERCIAL CODE**
🔲 **ARTICLE 1 GENERAL PROVISIONS**
🔲 **PART 2 GENERAL DEFINITIONS AND PRINCIPLES OF INTERPRETATION**

§ *1-206 U.C.C.* Statute of Frauds for Kinds of Personal Property Not Otherwise Covered.

(1) Except in the cases described in subsection (2) of this section a contract for the sale of personal property is not enforceable by way of action or defense beyond five thousand dollars in amount or value of remedy unless there is some writing which indicates that a contract for sale has been made between the parties at a defined or stated price, reasonably identifies the subject matter, and is signed by the party against whom enforcement is sought or by his authorized agent.

(2) Subsection (1) of this section does not apply to contracts for the sale of goods (Section 2-201) nor of securities (Section 8-113) nor to security agreements (Section 9-203).

(3) Subsection one of this section does not apply to a qualified financial contract as that term is defined in paragraph two of subdivision b of section **5-701** of the general obligations law if either (a) there is, as provided in paragraph three of subdivision b of section 5-701 of such law, sufficient evidence to indicate that a contract has been made or (b) the parties thereto, by means of a prior or subsequent written contract, have agreed to be bound by the terms of such qualified financial contract from the time they reach agreement (by telephone, by exchange of electronic messages, or otherwise) on those terms.

Copyright © 2006 Loislaw.com, Inc. All Rights Reserved

**New York Consolidated Laws**

🗄 **New York Consolidated Laws**
🗄 **CHAPTER 38 OF THE CONSOLIDATED LAWS — UNIFORM COMMERCIAL CODE**
🗄 **ARTICLE 2 SALES**
🗄 **PART 2 FORM, FORMATION AND READJUSTMENT OF CONTRACT**

**§ 2-201 U.C.C. Formal Requirements; Statute of Frauds.**

(1) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

(2) Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within ten days after it is received.

(3) A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable

(a) if the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement; or

(b) if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted; or

(c) with respect to goods for which payment has been made and accepted or which have been received and accepted (Section 2-606).

(4) Subsection one does not apply to a qualified financial contract as that term is defined in paragraph two of subdivision b of section **5-701** of the general obligations law if either (a) there is, as provided in paragraph three of subdivision b of section 5-701 of such law, sufficient evidence to indicate that a contract has been made or (b) the parties thereto, by means of a prior or subsequent written contract, have agreed to be bound by the terms of such qualified financial contract from the time they reach agreement (by telephone, by exchange or electronic messages, or otherwise) on those terms.

Copyright © 2006 Loislaw.com, Inc. All Rights Reserved

New York Consolidated Laws - § 5-701 Gen. Oblig. Agreements required to be in writing.    Page 1 of 3

Case 1:05-cv-11717-WGY    Document 42-20    Filed 07/21/2006    Page 13 of 15

**New York Consolidated Laws**

📖 **New York Consolidated Laws**
📖 **CHAPTER 24-A OF THE CONSOLIDATED LAWS — GENERAL OBLIGATIONS LAW**
📖 **ARTICLE 5 CREATION, DEFINITION AND ENFORCEMENT OF CONTRACTUAL OBLIGATIONS**
📖 **TITLE 7 REQUIREMENTS OF WRITING, EXECUTION OR ACKNOWLEDGMENT FOR EFFECTIVENESS OR ENFORCEABILITY**

**§ *5-701 Gen. Oblig.* Agreements required to be in writing.**

a. Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:

1. By its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime;

2. Is a special promise to answer for the debt, default or miscarriage of another person;

3. Is made in consideration of marriage, except mutual promises to marry;

5. Is a subsequent or new promise to pay a debt discharged in bankruptcy;

6. Notwithstanding section **2-201** of the uniform commercial code, if the goods be sold at public auction, and the auctioneer at the time of the sale, enters in a sale book, a memorandum specifying the nature and price of the property sold, the terms of the sale, the name of the purchaser, and the name of the person on whose account the sale was made, such memorandum is equivalent in effect to a note of the contract or sale, subscribed by the party to be charged therewith;

9. Is a contract to assign or an assignment, with or without consideration to the promisor, of a life or health or accident insurance policy, or a promise, with or without consideration to the promisor, to name a beneficiary of any such policy. This provision shall not apply to a policy of industrial life or health or accident insurance.

10. Is a contract to pay compensation for services rendered in negotiating a loan, or in negotiating the purchase, sale, exchange, renting or leasing of any real estate or interest therein, or of a business opportunity, business, its good will, inventory, fixtures or an interest therein, including a majority of the voting stock interest in a corporation and including the creating of a partnership interest. "Negotiating" includes procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction. This provision shall apply to a contract implied in fact or in law to pay reasonable compensation but shall not apply to a contract to pay compensation to an auctioneer, an attorney at law, or a duly licensed real estate broker or real estate salesman.

b. Notwithstanding paragraph one of subdivision a of this section:

1. An agreement, promise, undertaking or contract, which is valid in other respects and is otherwise enforceable, is not void for lack of a

New York Consolidated Laws - § 5-701 Gen. Oblig. Agreements required to be in writing. Page 2 of 3

Case 1:05-cv-11717-WGY     Document 42-20     Filed 07/21/2006     Page 14 of 15

note, memorandum or other writing and is enforceable by way of action or defense provided that such agreement, promise, undertaking or contract is a qualified financial contract as defined in paragraph two of this subdivision and (a) there is, as provided in paragraph three of this subdivision, sufficient evidence to indicate that a contract has been made, or (b) the parties thereto, by means of a prior or subsequent written contract, have agreed to be bound by the terms of such qualified financial contract from the time they reach agreement (by telephone, by exchange of electronic messages, or otherwise) on those terms.

2. For purposes of this subdivision, a "qualified financial contract" means an agreement as to which each party thereto is other than a natural person and which is:

(a) for the purchase and sale of foreign exchange, foreign currency, bullion, coin or precious metals on a forward, spot, next-day value or other basis;

(b) a contract (other than a contract for the purchase and sale of a commodity for future delivery on, or subject to the rules of, a contract market or board of trade) for the purchase, sale or transfer of any commodity or any similar good, article, service, right, or interest which is presently or in the future becomes the subject of dealing in the forward contract trade, or any product or byproduct thereof, with a maturity date more than two days after the date the contract is entered into;

(c) for the purchase and sale of currency, or interbank deposits denominated in United States dollars;

(d) for a currency option, currency swap or cross-currency rate swap;

(e) for a commodity swap or a commodity option (other than an option contract traded on, or subject to the rules of a contract market or board of trade);

(f) for a rate swap, basis swap, forward rate transaction, or an interest rate option;

(g) for a security-index swap or option or a security (or securities) price swap or option;

(h) an agreement which involves any other similar transaction relating to a price or index (including, without limitation, any transaction or agreement involving any combination of the foregoing, any cap, floor, collar or similar transaction with respect to a rate, commodity price, commodity index, security (or securities) price, security-index or other price index);

(i) for the assignment, sale, trade, participation or exchange of indebtedness or claims relating thereto arising in the course of the claimant's business or profession (including but not limited to commercial and/or bank loans, choses in action arising under or in connection with loan agreements and private notes, and including forward sales), but only to the extent that such indebtedness or obligation was not incurred by a natural person primarily for personal, family or household purposes; or

(j) an option with respect to any of the foregoing.

3. There is sufficient evidence that a contract has been made if:

New York Consolidated Laws - § 5-701 Gen. Oblig. Agreements required to be in writing.    Page 3 of 3

Case 1:05-cv-11717-WGY        Document 42-20        Filed 07/21/2006        Page 15 of 15

(a) There is evidence of electronic communication (including, without limitation, the recording of a telephone call or the tangible written text produced by computer retrieval), admissible in evidence under the laws of this state, sufficient to indicate that in such communication a contract was made between the parties;

(b) A confirmation in writing sufficient to indicate that a contract has been made between the parties and sufficient against the sender is received by the party against whom enforcement is sought no later than the fifth business day after such contract is made (or such other period of time as the parties may agree in writing) and the sender does not receive, on or before the third business day after such receipt (or such other period of time as the parties may agree in writing), written objection to a material term of the confirmation; for purposes of this subparagraph, a confirmation or an objection thereto is received at the time there has been actual receipt by an individual responsible for the transaction or, if earlier, at the time there has been constructive receipt which is the time actual receipt by such an individual would have occurred if the receiving party, as an organization, has exercised reasonable diligence; and a "business day" for the purposes of this subparagraph is a day on which both parties are open and transacting business of the kind involved in that qualified financial contract which is the subject of the confirmation;

(c) The party against whom enforcement is sought admits in its pleading, testimony or otherwise in court that a contract was made; or

(d) There is a note, memorandum or other writing sufficient to indicate that a contract has been made, signed by the party against whom enforcement is sought or by its authorized agent or broker.

For purposes of this paragraph evidence of an electronic communication indicating the making therein of a contract or a confirmation, admission, note, memorandum or writing is not insufficient because it omits or incorrectly states one or more material terms agreed upon, so long as such evidence provides a reasonable basis for concluding that a contract was made.

4. For purposes of this subdivision, the tangible written text produced by telex, telefacsimile, computer retrieval or other process by which electronic signals are transmitted by telephone or otherwise shall constitute a writing and any symbol executed or adopted by a party with the present intention to authenticate a writing shall constitute a signing. The confirmation and notice of objection referred to in subparagraph (b) of paragraph three of this subdivision may be communicated by means of telex, telefacsimile, computer or other similar process by which electronic signals are transmitted by telephone or otherwise, provided that a party claiming to have communicated in such a manner shall, unless the parties have otherwise agreed in writing, have the burden of establishing actual or constructive receipt by the other party as set forth in subparagraph (b) of paragraph three of this subdivision.

(As amended by Laws 2002, ch. 286, § 1, eff. Oct. 5, 2002.)



Copyright © 2006 Loislaw.com, Inc. All Rights Reserved

# EXHIBIT  S

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROBERT J. VILA and B.V.T.V., INC.,

      Plaintiffs,

v.

SEARS, ROEBUCK AND CO., SEARS
HOLDINGS CORPORATION and
KMART HOLDING CORPORATION,

      Defendants.

Civil Action No. 05-11717-REK

## PLAINTIFF ROBERT J. VILA'S RESPONSE TO THE FIRST REQUEST FOR ADMISSIONS OF DEFENDANTS SEARS, ROEBUCK AND CO., SEARS HOLDINGS CORP. AND KMART HOLDING CORP.

### Request for Admissions

1.     You never received any version of Amendment No. 11 to the Syndication Agreement signed by a representative of Sears.

### Response

Admitted that Robert J. Vila never received any version of Amendment No. 11 to the Syndication Agreement holographically signed by a representative of Sears. Except as so qualified, otherwise denied.

2.     You never transmitted a signed version of Amendment No. 11 to the Syndication Agreement to Sears.

<u>Response</u>

Admitted that Robert J. Vila never transmitted a holographically signed version of Amendment No. 11 to the Syndication Agreement to Sears. Except as so qualified, otherwise denied.

3.    You never caused a signed version of Amendment No. 11 to the Syndication Agreement to be transmitted to Sears.

<u>Response</u>

Admitted that Robert J. Vila never caused a holographically signed version of Amendment No. 11 to the Syndication Agreement to be transmitted to Sears. Except as so qualified, otherwise denied.

4.    You never signed any version of Amendment No. 11 to the Syndication Agreement.

<u>Response</u>

Admitted that Robert J. Vila never holographically signed any version of Amendment No. 11 to the Syndication Agreement. Except as so qualified, otherwise denied.

5.    Sears never informed you or your representative that it would transmit a signed version of Amendment No. 11 to the Syndication Agreement to you or your representative.

<u>Response</u>

Admitted that Sears never informed Robert J. Vila that Sears would transmit a holographically signed version of Amendment No. 11 to the Syndication Agreement.

2

6.    No parties have signed any version of Amendment No. 11 to the Syndication Agreement.

Response

Admitted that neither BVTV or Sears holographically signed any version of Amendment No. 11 to the Syndication Agreement. Except as so qualified, otherwise denied.

7.    There is no signed and executed version of Amendment No. 11 to the Syndication Agreement.

Response

Denied.

8.    The draft of Amendment No. 11 to the Syndication Agreement transmitted by Mark Rode to Ronald E. Feiner, Esq. on January 14, 2005 was a redlined draft.

Response

Admitted that the document transmitted by Mark Rode to Ronald E. Feiner, Esq., on January 14, 2005 was redlined and had the word "Draft". Denied that the document was a redlined draft, because Mr. Rode's transmittal of the document stated "Attached is the contract with the revisions you requested (I hope)."

9.    After January 14, 2005, you never received a clean, non-redlined draft of Amendment No. 11 to the Syndication Agreement.

<u>Response</u>

Admitted that Robert J. Vila did not receive a clean, non-redlined draft of Amendment No. 11 to the Syndication Agreement after January 14, 2005.

10.    There is no contract between Sears and BVTV as to Amendment No. 11 to the Syndication Agreement.

<u>Response</u>

Denied.

11.    As of January 22, 2005, BVTV and Sears were still in negotiations regarding Amendment No. 11 to the Syndication Agreement.

<u>Response</u>

Denied.

12.    As of February 3, 2005, you knew that Amendment No. 11 to the Syndication Agreement was incomplete.

<u>Response</u>

Admitted that, as of February 3, 2005, Robert J. Vila knew that Amendment No. 11 to the Syndication Agreement was incomplete in that it lacked holographic signatures. Except as so qualified, otherwise denied.

13.    You were aware that from between November 16, 2004 to March 24, 2005 Sears and Kmart Holding were in the process of merging and forming Sears Holdings.

<u>Response</u>

Robert J. Vila cannot truthfully admit or deny that from between November 16, 2004 to March 24, 2005 Sears and Kmart Holding were in the process of merging and forming Sears Holdings, because Sears Holdings was formed and doing business at least as early as January 6, 2005. Further, Sears announced on or about November 16, 2004 that it had agreed to be acquired by Kmart Holding and that that transaction was subject to the satisfaction of certain conditions, including, but not limited to, shareholder approval.

14.     Paragraph 7 of Amendment IX to the Spokesperson Agreement is not ambiguous.

<u>Response</u>

Robert J. Vila objects to this request as it calls for a conclusion of law.

15.     Paragraph 4 of Amendment X to the Spokesperson Agreement is not ambiguous.

<u>Response</u>

Robert J. Vila objects to this request as it calls for a conclusion of law.

16.     The new television program *Bob Vila* debuted in September 2005.

<u>Response</u>

Admitted that the television program titled *Bob Vila* began airing in September 2005. Except as so qualified, otherwise denied.

17.     The television program *Bob Vila* is a new show.

Response

Denied.

18.     New episodes of the television program *Bob Vila's Home Again* are no longer airing.

Response

Admitted that, since September 2005, new episodes of the show titled *Bob Vila's Home Again* have not aired.

19.     The television program *Bob Vila* is a different show from *Bob Vila's Home Again*.

Response

Denied.

20.     The television program *Bob Vila's Home Again* has been cancelled.

Response

Denied.

21.     You approved the inclusion of counts VI and XI in the First Amended Complaint, which state that Sears "knowingly and intentionally engaged in unfair and deceptive acts or practices in violation of M.G.L. c. 93A, §§2 and 11."

Response

Admitted.

6

22.    You did not seek the express, written permission of Sears to use the trademark "Home Again" as part of the pre-production, production and promotion of the 2005-2006 season of the television show currently known as *Bob Vila*.

Response

Denied that "Home Again" is a trademark and that Sears' permission for the use of the words "Home Again" is required. Admitted that, in accordance with the terms of the Syndication Agreement and the course of dealing between BVTV and Sears over fifteen years, BVTV, until August 23, 2005, used the words "Bob Vila's Home Again" as part of the pre-production, production and promotion of the 2005-2006 season of the television show which was renamed *Bob Vila* on August 23, 2005. As so qualified, admitted that BVTV did not seek further express written permission of Sears to use the words "Home Again" as part of the pre-production, production and promotion of the 2005-2006 season of the television show.

23.    You did not seek the express, written permission of Sears to use the trademark "Home Again" in soliciting product donation for the 2005-2006 season of the television show currently known as *Bob Vila*.

Response

Denied that "Home Again" is a trademark and that Sears' permission for the use of the words "Home Again" is required. Admitted that, in accordance with the terms of the Syndication Agreement and the course of dealing between BVTV and Sears over fifteen years, BVTV, until August 23, 2005, used the words "Bob Vila's Home Again" as part of the soliciting of product donation for the 2005-2006 season of the television show which was renamed *Bob Vila* on August 23, 2005. As so qualified, admitted that BVTV did not seek further express written

7

permission of Sears to use the words "Home Again" as part of the soliciting of product donation for 2005-2006 season of the television show.

24.    You did not seek the express, written permission of Sears to use the trademark "Home Again" in soliciting advertisements for the 2005-2006 season of the television show currently known as *Bob Vila*.

<u>Response</u>

Denied that "Home Again" is a trademark and that Sears' permission for the use of the words "Home Again" is required. Denied that Robert J. Vila solicited advertisements for the 2005-2006 season of the television show currently known as *Bob Vila*.

25.    You entered into an agreement with King World on May 16, 2005 granting King World the distribution rights to a television program entitled "Bob Vila's Home Again."

<u>Response</u>

Admitted BVTV entered into such agreement.

26.    You did not inform Sears of the May 16, 2005 agreement with King World.

<u>Response</u>

Denied that Sears was not informed of the negotiation of the agreement with King World. As so qualified, admitted that Robert J. Vila did not inform Sears of the May 16, 2005 agreement with King World.

8

27.    You entered into the May 16, 2005 agreement with King World without receiving express written permission from Sears to use the trademark "Home Again."

<u>Response</u>

Denied that "Home Again" is a trademark and that Sears' permission for the use of the words "Home Again" is required. Denied that Robert J. Vila entered into the May 16, 2005 agreement with King World. Except as so qualified, otherwise admitted.

28.    As recently as February 9, 2006, the website www.BobVila.com stated that "Bob Vila currently hosts and produces *Bob Vila's Home Again* which gives him more freedom to choose projects," without seeking the express written permission of Sears to use the trademark "Home Again."

<u>Response</u>

Denied that "Home Again" is a trademark and that  Sears' permission for the use of the words "Home Again" is required. As so qualified, admitted.

29.    As recently as February 8, 2006, the website www.BobVila.com stated that "Bob Vila is happy to consider your product for use on *Bob Vila's Home Again* if you mail us a sample, press kit and product literature," without seeking the express written permission of Sears to use the trademark "Home Again."

<u>Response</u>

Denied that "Home Again" is a trademark and that Sears' permission for the use of the words "Home Again" is required. As so qualified, admitted.

30.    As recently as February 9, 2006, the webstore at www.BobVila.com offered for sale, without seeking the express written permission of Sears, T-shirts and hats bearing the trademark "Home Again".

Response

Denied that "Home Again" is a trademark and that Sears' permission for the use of the words "Home Again" is required. Admitted that offered for sale were T-shirts and mugs stating "Bob Vila's Home Again" and caps stating "Home Again".

31.    In May 2005 through August 2005 you authorized third parties to promote the 2005-2006 season of the television show as "Bob Vila's Home Again" without the express written permission of Sears to use the trademark "Home Again."

Response

Denied that "Home Again" is a trademark and that Sears' permission for the use of the words "Home Again" is required. Admitted that, in accordance with the terms of the Syndication Agreement and the course of dealing between BVTV and Sears over fifteen years, BVTV, until August 23, 2005, used the words "Bob Vila's Home Again" to promote the 2005-2006 season of the television show which was named "Bob Vila's Home Again" and was renamed *Bob Vila* on August 23, 2005. As so qualified, admitted that Robert J. Vila did not seek further express written permission of Sears to use the words "Home Again" as part of the promotion of the 2005-2006 season of the television show.

32.    BVTV did not have express written permission from Sears to send the e-mails contained in Deposition Exhibits 160, 164, 165, 166, 167, 187, 200, 201, 202, 203, 205, 206, 207, 208, 209, 211, 221, 225, 227, 228, 229, 230, 231, 232, 233, 234, 235, 236 and 238.

Response

Denied that Sears' permission was required. As so qualified, admitted.


33.    BVWebTies LLC did not have express written permission from Sears to send the e-mails contained in Deposition Exhibits 160, 164, 165, 166, 167, 187, 200, 201, 202, 203, 205, 206, 207, 208, 209, 211, 221, 225, 227, 228, 229, 230, 231, 232, 233, 234, 235, 236 and 238.

Response

Denied that Sears' permission was required. Denied that BV Webties sent the emails contained in Deposition Exhibits 160, 164, 165, 166, 167, 187, 200, 201, 202, 203, 205, 206, 207, 208, 209, 211, 221, 225, 227, 228, 229, 230, 231, 232, 233, 234, 235, 236 and 238.


34.    You did not have express written permission from Sears to use the "Home Again" trademark on the appearance release forms contained in Deposition Exhibit 169.

Response

Denied that "Home Again" is a trademark and that Sears' permission for the use of the words "Home Again" is required. Denied that all appearance release forms contained in Deposition Exhibit 169 used the words "Home Again". Admitted that, in accordance with the terms of the Syndication Agreement and the course of dealing between BVTV and Sears over fifteen years, BVTV, until August 23, 2005, used the words "Bob Vila's Home Again" on the appearance release forms for the 2005-2006 season for the television show which was named

11

"Bob Vila's Home Again" and was renamed *Bob Vila* on August 23, 2005. Admitted that, after August 23, 2005, some of the appearance release forms contained in Deposition Exhibit 169 did use the words "Bob Vila's Home Again". As so qualified, admitted that Robert J. Vila did not seek further express written permission of Sears to use the words "Home Again".

35.    Episode 1 of *Bob Vila* featured Big Johnson Concrete Pumping.

<u>Response</u>

Admitted.

36.    Episode 2 of *Bob Vila* featured Precise Forms concrete forms.

<u>Response</u>

Admitted.

37.    Episode 3 of *Bob Vila* featured Simpson Strong Tie, Hanson Roof Tile and DiPeck Roofing.

<u>Response</u>

Admitted.

38.    Episode 4 of *Bob Vila* featured PCT Windows.

<u>Response</u>

Denied. Admitted that Episode 4 of *Bob Vila* featured PGT Windows.

39.    Episode 5 of *Bob Vila* featured Electric Controls, Inc. and Georgia Pacific dry wall.

Response

Admitted.


40.    Episode 6 of *Bob Vila* featured a Blue Haven Pools swimming pool and a Royal Baths Manufacturing bathtub.

Response

Admitted.


41.    Episode 7 of *Bob Vila* featured Color Wheel Paints and Coating.

Response

Admitted.


42.    Episode 8 of *Bob Vila* featured Moored Painting, Bellawood hard wood floors, Alcoa sofits and a Whirlpool heat pump.

Response

Denied as to Bellawood hard wood floors. As so qualified, admitted.


43.    Episode 9 of *Bob Vila* featured DuPont Corian, cabinets by Cardell Cabinets and a Whirlpool dishwasher.

Response

Admitted.

13

44.    Episode 9 of *Bob Vila* was sponsored by DuPont Corian, Whirlpool and Cardell Cabinets.

<u>Response</u>

Denied.


45.    Episode 9 of *Bob Vila* was sponsored media.

<u>Response</u>

Denied.


46.    Episode 10 of *Bob Vila* featured a Toto, USA toilet, and garage door by D&B Garage Doors.

<u>Response</u>

Admitted.


47.    Episode 10 of *Bob Vila* was sponsored by Toto, USA and D&B/Hurricane Master Garage Doors.

<u>Response</u>

Denied.


48.    Episode 10 of *Bob Vila* was sponsored media.

<u>Response</u>

Denied.


14

49.     Episode 11 of *Bob Vila* featured the Gardens Alive products Pyola and Escar-go!

<u>Response</u>

Admitted.


50.     Episode 11 of *Bob Vila* was sponsored by Sun State Landscaping, Trent Culleny

Landscaping Contractor, Inc., Gardens Alive!, PestAgon, Lawn Logic, American Farms, Butler

Tree Farms, John Deere Lanscapes, Triple "O" Nuresery, and Toro.

<u>Response</u>

Denied.


51.     Episode 11 of *Bob Vila* was sponsored media.

<u>Response</u>

Denied.


52.     Episode 12 of *Bob Vila* featured a Commercial Residential Construction pool

cage, a Blue Haven Pools swimming pool, and a Baby Barrier Pool Fence Company safety fence.

<u>Response</u>

Admitted.


53.     Episode 12 of *Bob Vila* was sponsored by Blue Haven Pools, Baby Barrier,

Armor Screen, Hawyard, Jandy.

<u>Response</u>

Denied.


15

54.     Episode 12 of *Bob Vila* was sponsored media.

Response

Denied.


55.     Episode 13 of *Bob Vila* featured a hardwood floor by Lumber

Liquidators/Bellawood, lighting by Sea Gull Lighting and bamboo shades by Smith and Noble.

Response

Admitted.


56.     Episode 13 of *Bob Vila* was sponsored by Bellawood, Moen, Smith & Noble and

Seagull Lighting.

Response

Denied.


57.     Episode 13 of *Bob Vila* was sponsored media.

Response

Denied.


58.     Episode 14 of *Bob Vila* featured pots and pans by Chantal Cookware, a cast iron

skillet by Lodge Manufacturing OXO Goodgrips cooking utensils, a wok by Joyce Chen

Cookware, wooden serving plates and a salad bowl by Ironwood Gourmet, a Whirlpool

refrigerator, a Whirlpool double oven, and Front Gate patio furniture.

<u>Response</u>

Admitted.


59.    Episode 14 was sponsored by Bacon's Furniture Gallery, Front Gate, Whirlpool,

OXO, Chantal, Chicago Metallic, Joyce Chen, Ironwood Gourmet and Lodge Manufacturing.

<u>Response</u>

Denied.


60.    Episode 14 of *Bob Vila* was sponsored media.

<u>Response</u>

Denied.


61.    You never sought the permission of Sears to appear in episodes 1-14 of *Bob Vila.*

<u>Reply</u>

Admitted.


62.    In an interview which aired on 9/11/2005 on the Fox News television program "Fox

Magazine," you identified the title of the 2005-2006 television program produced by BVTV as

"Bob Vila's Home Again."

<u>Reply</u>

The subject interview was filmed by Fox before August 23, 2005. After August 23, 2005,

BVTV attempted to have Fox edit the interview to delete the reference to "Bob Vila's Home

Again". Despite BVTV's best efforts, Fox would not/could not edit the interview as requested by BVTV. As so qualified, admitted.

63.    You never sought the permission of Sears to use the trademark "Home Again" for his September 11, 2005 interview with "Fox Magazine."

<u>Reply</u>

Denied that "Home Again" is a trademark and that Sears' permission for the use of the words "Home Again" is required. Denied that Robert J. Vila gave an interview to "Fox Magazine" on September 11, 2005.

64.    The trademark rights as to "Home Again" are set forth in Section 18(a) and (b) of the Syndication Agreement, as amended.

<u>Reply</u>

Denied.

65.    You were not permitted to register the trademark "Home Again."

<u>Reply</u>

Denied that "Home Again" is a trademark.

66.    Sears has the right to register the trademark "Home Again" at any time.

<u>Reply</u>

Denied.

67.     You are not permitted to challenge the Sears' ownership of the trademark "Home Again."

Reply

Denied that "Home Again" is a trademark.

68.     Sears owns the trademark "Home Again."

Reply

Denied that "Home Again" is a trademark and that the words "Home Again" are owned or controlled by Sears.

69.     You no longer have the right to use the trademark "Home Again."

Reply

Denied that "Home Again" is a trademark and that Sears' permission is required to use the words "Home Again".

70.     Attached as Exhibit 1 is a true and accurate copy of a letter from Ronald E. Feiner, Esq. to Robert Rathke, Esq., dated June 28, 2005.

Reply

Admitted.

ROBERT J. VILA

By his attorney:

JAMES F. O'BRIEN, ESQ. (BBO #375765)
410 PARK AVENUE, SUITE 1530
NEW YORK, NEW YORK 10022
212 813 9300
212 813 1907 (FAX)

19

<u>CERTIFICATE OF SERVICE</u>

I James F. O'Brien, hereby certify that on May 2006 I served a copy of the foregoing by electronic and first class mail, postage-prepaid upon:

Anna Sankaran, Esq,
Greenberg Traurig, LLP
One International Place
Boston, MA 02110

James F. O'Brien

20