UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.
05-11717-WGY

_____
                                        )
ROBERT J. VILA and B.V.T.V., INC.       )
                                        )
            Plaintiffs,                 )
                                        )
                                        )
v.                                      )
                                        )
                                        )
SEARS, ROEBUCK AND CO.,                 )
SEARS HOLDINGS CORPORATION              )
 and KMART HOLDING COPORATION           )
            Defendants.                 )
_____)


## DECLARATION OF JAMES F. O'BRIEN


James F. O'Brien, declares and says as follows:

1.  I am an attorney and a member of the bar of the Supreme Judicial Court of the Commonwealth of Massachusetts, the bar of the State of New York, the United States District Court  for the District of Massachusetts and the United States District Court for the Southern District of New York.

2.  I am counsel for the Plaintiffs Robert J. Vila and B.V.T.V., Inc. in this action.

3.   Attached hereto are true and accurate copies of certain exhibits marked at the depositions in this case and cited in Plaintiffs' Opposition as **(Dep. Ex.-).**

SIGNED UNDER THE PENALTIES OF PERJURY THIS 21ST DAY OF JULY 2006

/s/ James F. O'Brien
James F. O'Brien

CERTIFICATE OF SERVICE

I, James F. O'Brien, counsel for plaintiffs, hereby certify that on July 21, 2006 I served a true copy of the foregoing Declaration upon Anna Sankaran, Esq., Greenberg, Traurig LLP, One International Place, Boston, MA 02110 counsel for defendants by overnight mail, postage prepaid and electronically.

/s/ James F. O'Brien
James F. O'Brien

**DEPOSITION EXHIBIT 4 (1)**



# Ogilvy & Mather
*Advertising*

676 St Clair Chicago, Illinois 60611
Telephone 1 312 988 2400 • Telex 255162 • Cable Ogilvy Chicago

September 29, 1989

B.V.T.V., Inc.
79 Sand Point
Box 2052
Oyster Harbor
Cape Cod, MA 02655

Attn:  <u>Mr. Bob Vila</u>

            Re:  <u>Bob Vila Syndicated Television Programs</u>

Dear Mr. Vila:

            This will set forth the terms of the agreement between your production company, B.V.T.V., Inc. ("Producer") and us Ogilvy & Mather ("Ogilvy") as agent for our client, Sears, Roebuck & Co. ("Sears"), with regard to a syndicated television series to be financed by Sears, produced by Producer and starring Bob Vila.

            1.  <u>PROGRAM</u>

            Producer agrees to produce and deliver to Ogilvy on or before December 15, 1989 a one half-hour pilot (the "Pilot") plus a minimum five minute promotional leader to be used by Sears and its designated syndicator for the selling of the syndicated programs (the "Series").  The Pilot and each program of the Series will be designed to be inserted into a half-hour programming slot in syndication.  The Pilot and the Series will consist of Bob Vila hosting a program dealing with building, home repair and home improvement.  The Pilot and the Series will be produced on tape and in color.  The sound will be fully synchronized with the photographic action and the Pilot and the Series will be of first class technical and production qualities and conform to broadcast quality standards in the television industry and in keeping with the standards of like "home improvement" television programs.



EXHIBIT
#41D
1-24-06
Blumberg No. 5208

2.  <u>CLEARING THE PILOT; FIRST 13 PROGRAMS</u>

Sears shall be responsible for obtaining the services of a television syndicator who will be responsible for clearing the Series for weekly airing. Upon an 80% clearance of the U.S. marketplace or a firm 80% projection on the part of Ogilvy, both based on the 1990 Nielson Television Index (NTI) household estimate, Sears will release to Producer the sums set forth in Paragraph 7(ii) below for an order of thirteen (13) one-half hour programs (including the already delivered Pilot). It is presently intended that an 80% clearance will occur in January 1990.

3.  <u>SECOND 13 PROGRAMS</u>

Provided the series clears 80% of the market place the first program will air at any time after April 1, 1990 and weekly thereafter. On the first air date of the Series, Sears will release the funds set forth in Paragraph 7(iii) below for an order of thirteen (13) additional one-half hour programs.

4.  <u>THIRD 13 PROGRAMS</u>

If after the first twelve (12) weeks of airing the programs achieve a 3.1 NTI household rating, Sears will pay at the time set forth in Paragraph 7(iv) below the sum set forth therein for an order of thirteen (13) additional one-half hour programs consisting of thirteen (13) pre-existing programs containing eleven (11) minutes of new material placed within any thirteen (13) of the existing twenty-six (26) programs. If the programs do not achieve a 3.1 NTI household rating after twelve (12) weeks of airing, Sears will have the option to cease funding the Series.

5.  <u>COMMENCEMENT OF SERIES.</u>

Sears shall have the right in its sole discretion after consultation with its syndicator when to begin airing the Series. It is presently anticipated that there will be an attempt to begin the Series in the Spring of 1990 (after April 1, 1990). If Sears finds that it can obtain a better placement by beginning the Series in September 1990, Sears at its sole option shall have the right to begin the Series at that point but in no event shall the Series begin airing later than October 15, 1990. In the event that the Series is not broadcast by October 15, 1990, Producer owns the Pilot and Sears owns the 12 Programs and each is free to proceed in whatever manner they choose without further obligations to each other except for Library Usage Fees to Producer as set forth in this Agreement.

-2-

6.  <u>PILOT AND SERIES TALENT</u>

Producer agrees to obtain and forward to Sears agreements with persons appearing in the Series and/or bearing any claims thereto which will permit Sears and those acting on its behalf to sell, resell and use in all media (including commercials) the Pilot and the Series upon the payment to those individuals (and Vila) any applicable union residuals at scale.  (No other payments shall be made to Vila personally pursuant to this Agreement except those applicable under standard union agreements.)

7.  <u>COMPENSATION</u>:

(i)  Producer agrees to pay all costs related to the production of the Pilot.

(ii)  Sears agrees to pay and Producer agrees to accept the sum of Two Million Two Hundred Thousand Dollars ($2,200,000) when 80% of the U.S. marketplace has been cleared or it appears certain to Ogilvy that 80% of the marketplace will be cleared.  This Two Million Two Hundred Thousand Dollar ($2,200,000) payment is consideration for thirteen (13) one-half hour programs (including the already delivered Pilot).

(iii)  Sears agrees to pay and Producer agrees to accept the additional sum of Two Million Dollars ($2,000,000) on the date of the first airing of the first program in the Series.  This Two Million Dollar ($2,000,000) payment is consideration for the second thirteen (13) additional one-half hour programs.

(iv)  Sears agrees to pay and Producer agrees to accept the additional sum of Two Million Dollars ($2,000,000) on or before January 1, 1991, as payment for the third thirteen (13) one-half hour programs which contain the eleven (11) minutes in each episode of fresh material.

(v)  At the end of one year from the date of the first airing of the Series and provided the Series has a national average rating of 4.3 (based on NTI household ratings) or above for the year, Sears agrees to pay and Producer agrees to accept the sum of $500,000 as a ratings bonus payable within thirty (30) days after information is made available to Ogilvy that is necessary to make this determination but in no event more than sixty (60) days after the first anniversary of the airing of the Series.

-3-

8.  SECOND YEAR AND THIRD YEAR RENEWALS

If Sears has ordered all thirty-nine (39) programs in the first year and wishes to renew the Series for a second one year period (Year II) by ordering additional programs in the same quantity as described in Paragraphs 2, 3 and 4 of this agreement, Sears agrees to notify Producer on or before six months after the first airing of the Series.  The price for additional programs in Year II shall be set using the following formula:

| COMPENSATION | | | AVG. NTI HH RTG |
| BASE | BONUS | TOTAL | FOR 2ND YEAR |
| --- | --- | --- | --- |
| $6,200,000 | $0 | $6,200,000 | 3.1 |
| $6,200,000 | $100,000 | $6,300,000 | 3.3 |
| $6,200,000 | $200,000 | $6,400,000 | 3.5 |
| $6,200,000 | $300,000 | $6,500,000 | 3.7 |
| $6,200,000 | $400,000 | $6,600,000 | 3.9 |
| $6,200,000 | $500,000 | $6,700,000 | 4.3 |

If Sears has ordered all thirty-nine (39) programs in Year II and wishes to renew the Series for a third one year period (Year III) by ordering additional programs in the same quantity as described in Paragraphs 2, 3 and 4 of this agreement, Sears agrees to notify Producer on or before six months after the first airing of the Series in Year II.

Year II payments will be made on the same schedule as used in Year I, using $6,200,000 as the base payment.  The performance bonus based on second year ratings performance, or that portion above $6,200,000 but not more than $6,700,000 will also be paid on the same schedule as in Year I.

In Year III, no changes will be made in the schedule of payments or performance bonus calculation, however, the above referenced Base and Bonus compensation amounts will be increased by 5%.

9.  PRODUCERS AGREEMENT

In consideration of all of the foregoing, Producer agrees to produce the Pilot and Series in a professional manner using a professional staff and in keeping with the standards of like "home improvement" shows.  Sears through Ogilvy shall have approval over the storyboards of each program.  After a storyboard is submitted, Ogilvy shall have five (5) working days to approve the storyboard or suggest reasonable changes.  Failure of Ogilvy to respond within the five (5) day period shall be deemed to be approval of the storyboard.  Producer agrees to produce each program of the Series and Pilot so that said program reflects its storyboard content.  In all other respects, Producer shall be solely responsible for all

-4-

P 0000004

aspects of the Pilot and the Series, including but not limited to project development and/or renovation costs, talent, travel and accommodations, talent and production crew salaries, equipment rentals or purchases, etc. Producer agrees to use Sears Home Improvement products and services (services subject to Producer's approval) wherever applicable as desired by Sears and possible (based upon availability and delivery) on the Series and Pilot. Sears will cause to be appointed a liason at Sears wherein Producer will be able to purchase from Sears at Sear's cost any products or services sold by Sears.

### 10.  LIBRARY USAGE FEES

In the event that Sears elects not to renew the Series for additional year(s) but instead elects to air existing programs of the Series for additional years, Sears shall pay to Producer a library usage fee each year based upon forty-two and one-half percent (42 1/2%) of the media value of each program.  (This library usage fee payment criteria shall continue to be in effect for any years in which no new programs are ordered but old ones are re-aired.)   Said payment to Producer shall be made by Sears within thirty (30) days at the end of each six month period (after the first airing) accompanied by appropriate statements setting forth the computations for each airing.  Producer shall have standard industry audit rights with regard to said statements.

### 11.  TURNAROUND

In the event that Sears elects not to proceed with the Series because they are unable to clear 80% of the market (1990 NTI household estimate), Sears agrees to therewith turn over to Producer the Pilot to be used by Producer free and clear without compensation to Sears to develop on its own or with others a syndicated television series.  During any period of time that Vila is a spokesperson for Sears, Producer agrees that said "new series not financed by Sears" will not have an "on-air national sponsor" who would be either a national chain retailer or manufacturer of a product competitive with Sears Home Improvement.

### 12.  OWNERSHIP OF SERIES

Except as specifically referred to in Paragraph 10 and 11 of this agreement, all programs delivered to Ogilvy shall become and remain the sole and absolute property of Sears which shall retain complete control thereof, including but not limited to, unlimited domestic and foreign broadcast, rebroadcast, sale or resale, Advertising (as defined in Spokesperson Agreement), etc. All commercial time relating to the Series shall be the sole property of Sears and the amount of the commercial time allocation will be at Sears sole discretion.

-5-

## 13. SEARS CREDIT

Sears shall be accorded a prominant presentation credit and entitlement rights (if requested by December 1, 1989) at the head of the program, on all programs it finances Presentation credit language (and entitlement language if chosen by Sears) shall be delivered to Producer on or before December 1, 1989. Presentation credit language shall be in the manner as "This Program brought to you by Craftsman Home and Yard Centers at Sears, the place more people trust". Additionally Ogilvy shall be accorded a rolling program credit at the conclusion of the Program, on all programs Sears finances and the Pilot, in a manner such as "Produced in association with Ogilvy and Mather".

## 14. INDEMNITIES

Producer agrees that it will protect, defend, hold harmless and indemnify Sears, its successors, assigns, directors, officers and employees, and their respective heirs and representatives from and against any and all claims, demands, actions, liabilities, damages, losses, fines, penalties, costs and expenses (including attorneys' fees) of any kind whatsoever (including without limitation of the foregoing, those relating to actual or alleged death of or injury to person and damage to property), actually or allegedly, directly or indirectly, arising or resulting from or connected with (a) Producer's performance or failure of performance of this Agreement; (b) Producer carrying out its functions hereunder including, but not limited to, all allegations that the Pilot or Series materials, and/or communications prepared by or distributed by or through Producer constitute (1) libel, slander, and/or defamation; (2) patent infringement, trademark infringement or dilution, or infringement of any statutory copyright, common law right, title or slogan; (3) piracy, plagiarism, the misappropriation of another's ideas; and/or (4) invasion of rights of privacy or rights of publicity; (c) all purchases, contracts, debts and/or obligations made by Producer; (d) the omission or commission of any act, lawful or unlawful, by Producer or any of Producer's agents or employees, whether or not such act is within the scope of employment of such agents or employees. Notwithstanding anything contained in the foregoing, Producer shall not be liable for damage to third parties which is caused by the active and primary negligence of Sears, its agents or employees.

Sears similarly agrees that it will protect, defend hold harmless and indemnify Producer its successors, assigns, directors, officers and employees and the respective heirs and representatives from and against any and all claims, demands, actions, liabilities, damages, losses, fines, penalties, cost and expenses (including attorneys fees) of any kind whatsoever (including without limitation of the foregoing those relating to actual or alleged death of or injury to person and damage to property) actually or allegedly, directly or indirectly arising or resulting from or

-6-

P 0000006

connected with (a) Sears performance or failure of performance of this agreement (b) the omission or commission of any act lawful of unlawful by any Sears agents or employees, whether or not such act is within the scope of employment of such agents or employees (c) the failure of Sears to comply with any applicable law, ordinance, rule or regulation and/or inquiries or investigations of any governmental agency (d) product liability actions that may be brought against Producer, Bob Vila, Ogilvy or Sears, as a result of the use of products supplied by Sears.

### 15. FORCE MAJEURE

If for any reason such as strikes, boycotts, war, Acts of God, labor troubles, riots, delays of commercial carriers or restraints of public authority, Producer shall be unable to deliver any of the programs produced hereunder during any period contained herein or option period, if any, hereof, then Producer shall have the right to extend the delivery period for an equivalent period of time without being in breach of the agreement. However this period shall not exceed three (3) months.

### 16. FULL POWER

Both parties represent amd warrant that they have the full right and authority to enter into this agreement.

### 17. NOTICES

Service of all notices under this agreement shall be sufficient if given personally, mailed return receipt requested or telefaxed to the respective parties at the addresses set forth at top of this agreement.

### 18. SEARS TRADEMARKS, TRADE NAMES, SERVICE MARKS

(a) Except as set forth in this agreement Producer agrees that it will not use the name "Sears" and any of Sears trademarks, trade names or service marks without the express written permission from Sears. Producer expressly recognizes and acknowledges that the use of Sears marks shall not confer upon Producer any proprietary rights to any such Sears marks. Upon expiration or upon termination of Producer's right to use Sears marks for any cause, Producer shall immediately cease all use of all such Sears marks and will not use any such Sears marks thereafter. Producer agrees not to question, contest or challenge the ownership by Sears of any such right, title or interest in any such mark, except the right to use the same pursuant to the terms and conditions of this agreement, and will not seek to register the same. Producer agrees that upon expiration or termination of right to use Sears marks pursuant to this agreement for any cause or without cause, Producer will execute all necessary or appropriate documents to confirm Sears said ownership or to transfer any rights it may have acquired from Sears.

-7-

(b)  Except as set forth in this agreement Producer acknowledges that Sears may register any and all of the trademarks, service marks or trade names for the Program(s) under this Agreement in its own name, and that Producer's use thereof shall inure to the benefit of Sears for such purpose, as well as for other purposes.  Producer shall cooperate in any such registration by Sears or application therefor.

(c)  Producer recognizes that each of Sears marks possesses a special, unique and extraordinary character which makes it difficult to assess the monetary damage which Sears would sustain in the event of unauthorized use.  Producer expressly recognizes and agrees that irreparable injury would be caused to Sears by such unauthorized use and agrees that preliminary or permanent injunctive relief would be appropriate in the event of breach of this Paragraph by Producer provided that such remedy shall not be exclusive of other legal remedies otherwise available.

19.  <u>COPYRIGHT NOTICES</u>

Producer agrees to the use of a Sears copyright notice on the Pilot and Series prepared for distribution under this Agreement. (In the event Producer receives the Pilot back in Turnaround, it shall have the right to substitute its own copyright notice on the Pilot).

20.  <u>PURCHASES</u>

Producer will not make any purchases or incur any obligation or expense of any kind in the name of Sears.

21.  <u>INSURANCE</u>

(a)  Producer, at its expense, hereby agrees and covenants that it shall obtain and maintain during the Term of this Agreement the following policies of insurance from companies satisfactory to Sears, containing provisions satisfactory to Sears, and adequate to fully protect Sears as well as Producer from and against any and all claims, demands, actions, liabilities, damages, losses, costs and expenses arising out of the subjects covered by such policies of insurance:

(1) Worker's Compensation Insurance containing a waiver of subrogation in favor of Sears executed by the insurance company and covering all costs, benefits and liability under State Workers' Compensation and similar laws which may accrue in favor of any person employed by Contractor, and Employer's Liability Insurance with limits of not less than $100,000;

(2)  Comprehensive General Liability Insurance including, but not limited to, coverage for personal injury with limits of not less than $500,000 combined

—8—

P 0000008

single limits for bodily injury and property damage per occurrence;

(3)  Contractual Liability Insurance specifically endorsed to cover the indemnity provisions of this Agreement with limits of not less than $500,000 combined single limits for bodily injury and property damage per occurrence;

(4)  Motor Vehicle Liability Insurance with a Non-Ownership Liability Endorsement in Producer's name covering all vehicles used in connection with Producer's operations under this Agreements with limits of not less than $500,000 combined single limits for bodily injury and property damage per occurrence; and

(5)  Umbrella Excess Liability Insurance including, but not limited to, product liability, blanket contractual liability, personal injury, errors and omissions and advertising liability with limits of not less than $1,000,000 combined single limits for bodily injury and property damage per occurrence.

(b)  Each insurance policy obtained by Producer shall name Sears as an additional insured and shall contain a severability of interest/cross liability endorsement. Each policy obtained by Producer shall expressly provide that it shall not be subject to change or cancellation without at least thirty (30) days prior written notice to Sears. Producer shall furnish Sears with copies of the policies required to be maintained by Producer or certificates thereof concurrently with the execution and delivery of this agreement. If Producer obtains additional insurance, then Producer shall have Sears named as an additional insured on each of said insurance policies without any charge to Sears. In order to avoid conflicts between insurance companies, Producer shall use its best efforts to have all policies of insurance obtained by Producer issued by one insurance company.

(c)  Any approval by Sears of any insurance policies or additional insurance obtained by Sears shall not relieve Contractor of any responsibility hereunder including, but not limited to, claims in excess of limits described above.

22.  <u>GENERAL</u>

This agreement shall be governed by and construed under the laws of the State of New York. This agreement contains the entire understanding of the parties with respect to the subject matter and may not be modified except in writing signed by the parties hereto. The headings at the beginning of each paragraph of this agreement are for convenience only and

-9-

P 0000009

shall not in any way affect the interpretation of any paragraph of this agreement or the agreement itself. This agreement may be exectued in counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same agreement. The rights and remedies of the parties as set forth herein are cumulative and in addition to any other right or remedy available to them. Waiver of any rights hereunder by either party shall not be construed as limiting the future exercise of such rights.

Please confirm your acceptance of and agreement to the foregoing by affixing your signature in the place indicated below.

Very truly yours,

SEARS, ROEBUCK AND CO.

BY: _____

Bill Patterson
Vice President,
Home Improvements Group

OGILVY AND MATHER

BY: _____ (10-3-89)

Ole Riise
Vice President
Account Supervisor

ACCEPTED:

B.V.T.V., Inc.

BY: _____

BOB VILA

Bob Vila agrees not to engage in any other professional activities that would render him unavailable to provide any of the services contracted for herein. Bob Vila represents and warrants that throughout the full term he

-10-

P 0000010

will remain a member in good standing of any labor union or guild with which Oglivy or Sears shall have any agreement requiring such union or guild membership.

_____
BOB VILA, individually in so far as the agreement relates to him

/0001f
09/28/1315

-11-

## BOB VILA CONTRACTUAL COMMITMENTS

1.  Rickel Home Centers -- As of August 24th, 1989, Rickel
    Home Centers has ceased all radio and television
    commercials using Bob Vila. In all other respects the
    contract was terminated except that Rickel's Sunday
    home supplements have been printed through November
    and possibly December. This will be the extend of
    Bob's remaining commitment to Rickel.

2.  Newell Window Furnishings and Amerok Corporation
    (Both divisions of Newell Company) -- Bob's contract
    expires on September 10, 1989.

3.  Boyle-Midway Household Products (Zud, Plastic Wood,
    Noxon, Old English Scratch Cover, Easy-Off Mildew
    Cleaner, 3 in 1 Oil and Easy-Off Oven Cleaner) --
    Bob's contract expires on February 21, 1990.

4.  Sports Illustrated -- Bob is doing an advertorial for
    Sports Illustrated for Fall 1989 issue.

5.  American Electric Power -- Bob has been doing a series
    of one-year contracts with them since May 5, 1986.
    His present contract runs out on May 4, 1990. They
    also license the generic commercial to other public
    utility companies.

6.  Time/Life Home Repair Books Television Commercial --
    Television and print contract runs through December
    31, 1990. Relationship can continue at Vila's option.

EXHIBIT A

P 0000012

Exhibit 1

P 0000013

OGILVY AND MATHER
676 North St. Clair
Chicago, IL  60611


June 8, 1990


B.V.T.V. Inc.
79 Sand Point
Box 2052
Oyster Harbor
Cape Cod, MA  02655

      Re:  <u>Amendment to Syndication Agreement</u>

Dear Mr. Vila:

      An agreement has heretofore been entered into dated September 29, 1989, between your production company, B.V.T.V. Inc. ("Producer") and us, Ogilvy & Mather ("Ogilvy"), as agent for our client, Sears, Roebuck and Co. ("Sears") with regard to a syndicated television series to be financed by Sears and produced by Producer and starring Bob Vila (the "Agreement"). We are all desirous at this time of extending the term of the Agreement as well as amending other terms and conditions contained therein.  The following therefore, constitutes an Amendment to the Agreement.


      1.  The parties acknowledge that the Pilot has been duly delivered by Producer to Ogilvy and the Series has cleared 80% of the marketplace.

2.    The references to "NTI household ratings" and "AVG. NTI HH RTG" in the Agreement shall be deemed to mean "NTI household ratings" in the markets cleared for the weekly airing of the Series.

3.    Paragraph "8.    <u>SECOND YEAR AND THIRD YEAR RENEWALS</u> shall be deemed amended to read "8.    <u>SECOND YEAR THROUGH ELEVENTH YEAR RENEWALS</u>".

The last three paragraphs in Paragraph 8 shall be deemed deleted and the following shall be substituted therein:

> "If Sears has ordered all thirty-nine (39) programs in Year II and wishes to renew the Series for successive one year periods (Years III through XI) by ordering additional programs in the same quantity as described in Paragraphs 2, 3 and 4 of the Agreement Sears has the option to extend the Agreement for each successive year by notifying Producer on or before December 1 after the first airing of the Series in each successive year.
>
> Year II payments will be made on the following schedule, using $6,200,000 as the base payment: $2,200,000 within 60 days after notification to Producer of Sears' desire to order additional programs in same quantity as described in Paragraphs 2, 3 and 4 of the Agreement; $2,000,000 on the first airing of the Series ordered, and $2,000,000 on the next January 5.  The performance bonus based on second year ratings performance, or that portion above $6,200,000 but not more than $6,700,000 will likewise be paid on the same schedule as in Year I.
>
> In Years III through XI, no changes will be made in the schedule of payments in the preceding paragraph or performance bonus calculation,

— 2 —

P 0000015

however, the above referenced Base and Bonus
compensation amounts will be cumulatively
increased by 5% each year commencing with Year
III and continuing through Year XI."

    4.  The body of Paragraph "10.  <u>LIBRARY USAGE FEES</u>"

shall be deemed deleted and the following shall be substituted

therein:

    "10.  <u>LIBRARY USAGE FEES</u>

    In the event that Sears elects not to renew

the Series for additional year(s) but instead

elects to air existing programs of the Series for
additional years, Sears shall pay to Producer a
library usage fee each year based upon forty-two
and one-half percent (42 1/2%) of the media value
of each program with a minimum guarantee of
$1,000,000.  (This library usage fee payment
criteria shall continue to be in effect for any
years in which no new programs are ordered but
old ones are re-aired.)  Said payment to Producer
shall be made by Sears within thirty (30) days at
the end of each six month period (after the first
airing) accompanied by appropriate statements
setting forth the computations for each airing.
Producer shall have standard industry audit
rights with regard to said statements.  In the
event that Sears elects not to renew the Series
for additional year(s) <u>and</u> elects not to air
existing programs (or is unable to clear the
Series), Sears may at its option, pay to Producer
the guarantee of $1,000,000 for that year and if
it so elects, for each successive year to
continue to exploit the existing programs in
which event all terms and conditions of this
Agreement shall remain in full force and effect."

    5.  The body of Paragraph "11.  <u>TURNAROUND</u>" shall be

deemed deleted and the following shall be substituted therein:

- 3 -

"11.  TURNAROUND

In the event that Sears elects not to
proceed with the Series and elects <u>not</u> to pay to
Producer the minimum guarantee of $1,000,000,
Sears agrees to therewith turn over to Producer
(thereby eliminating any financial or other
obligation by Sears to B.V.T.V. or its
representatives) all programs in the Series
(including the Pilot) to be used by Producer free
and clear without compensation to Sears to sell
as a syndicated television series and/or to
exploit in any manner it chooses.  Additionally,
Sears agrees to assign to Producer all contracts
entered into for the exploitation of the Series
and cause to be paid to Producer all revenues due
and owing Sears, pursuant to said contracts, from
the time of such election forward.  In the event
Sears has received any unrecouped advances
against the Series, said advances will be
equitably pro-rated between Sears and Producer.
During any period of time that Vila is a
spokesperson for Sears, Producer agrees that any
new or old programs for the Series will not have
an "on-air national sponsor" who would be either
a national chain retailer or manufacturer of a
product competitive with Sears Home Improvement."

6.  All references in this Agreement which refer to

delivery of a program or programs in the Series shall be deemed

to include the delivery of an approximately 25 second promo

piece, promoting each upcoming program and one 25 second season

launch promo piece per year.


Except for the foregoing, all of the terms and

conditions of the Agreement are hereby ratified and affirmed.


- 4 -

Please confirm your acceptance of and agreement to the foregoing by affixing your signature in the place indicated below.

Very truly yours,

Sears, Roebuck and Co.

By: _____
    Bill Patterson
    Vice President,
    Home Improvements Group

Accepted:

B.V.T.V., Inc.

Ogilvy & Mather

By: _____

    Ole Riise
    Vice President,
    Account Supervisor

By: _____
    Bob Vila

/76FF:90:05:30

– 5 –

Please confirm your acceptance of and agreement to the foregoing by affixing your signature in the place indicated below.

Very truly yours,

Sears, Roebuck and Co.

By: _____

Bill Patterson
Vice President,
Home Improvements Group

Accepted:

B.V.T.V., Inc.

By: _____
Bob Vila

/76FF:90:05:30

Ogilvy & Mather

By: _____

Ole Riise
Vice President,
Account Supervisor

- 5 -

## EXHIBIT A

### I.   AMERICAN ELECTRIC POWER

The following list of AEP markets (excluding Columbus, Ohio) are
all minor markets with very modest populations.

*Indiana Michigan Power           *Wheeling Power
South Bend, IN                        Wheeling, WV
Fort Wayne, IN
Muncie, IN (cable)                 Kentucky Power
Marion, IN (cable)                    Hazard, KY
                                      Ashland, KY (cable)


*Ohio Power                        Appalachian Power
Lima, OH                              Huntington, WV
Canton, OH                            Charleston, WV
Zanesville, OH                        Roanoak, VA
Steubenville, OH                      Abingdon, VA
Newark, OH (cable)                    Beckley, WV
                                      Bluefield, WV


### II.   AMERICAN ELECTRIC POWER LICENSES

     The contracts with the licensing companies (non AEP companies) say that
"each license shall be for a term of one year, beginning on the date the license is
granted, with a one-year option.  Therefore, all licenses granted in relation to this
agreement shall expire no later than three years from the date of this agreement."
According to AEP, the date of the agreement was February 1988, hence, it expires
February 1991.

Facts on the licensing companies are below.  They signed up for all media except West
Penn Power, who has no television.

| Company | Customers | End of License |
|---------|-----------|----------------|
| 1.   Kentucky Utilities | 337,760 | July 6, 1990 |
| 2.   West Penn Power | 540,267 | Feb. 20, 1991 |
| 3.   Central Hudson | 201,960 | Oct. 1, 1990 |
| 4.   Metropolitan Edison | 342,680 | Aug. 11, 1990 |
| 5.   Central Illinois Public Service | 262,972 | Jan. 30, 1991 |
| 6.   Potomac Electric | 114,380 | Oct. 2, 1990 |
| 7.   Monongahela Power | 283,870 | Dec. 22, 1990 |
| 8.   Orange & Rockland | 209,500 | Oct. 5, 1990 |


*   Indiana Michigan Power, Ohio Power, and Wheeling Power plan
    to have reduced usage of the Vila spots in 1990.
58FF

Exhibit 2

P 0000021

AMENDMENT #2

Ogilvy & Mather
676 North St. Clair
Chicago, IL  60611

February 8, 1991

B.V.T.V., Inc.
P.O. Box 749
Marstons Mills, MA  02648

Attn:  Mr. Bob Vila

Re:  Amendment No. 2 to Syndication Agreement

Dear Mr. Vila:

An agreement has heretofore been entered into dated September 29, 1989 between your production company, B.V.T.V. Inc. ("Producer") and us, Ogilvy and Mather ("Ogilvy") as agent for our client, Sears Roebuck and Co. ("Sears") as amended June 8, 1990 with regard to a syndicated television series to be financed by Sears and produced by Producer and starring Bob Vila.  (The agreement and the amendment are herein defined as the "Agreement".)  We are all desirous at this time of amending certain terms of the Agreement for Year II.  The following therefore constitutes our understanding thereof:

1.  For Year II, Producer agrees to produce and deliver to Ogilvy, 26 one-half hour programs which programs are scheduled to commence airing weekly in September, 1991.  The 26 programs (the "Series") shall be delivered in two 13 week cycles and shall conform with the standards set forth in the Agreement.  Sears will have prior approval, not to be unreasonably withheld, of the location of the two main sites to be used for the Series.  In addition to the 26 programs, there shall also be delivered to Ogilvy 26 vignettes of 30 seconds each and 26 ten second "tune-ins".  Each of said vignettes and "tune-ins" shall coincide with each respective program.

2.  For Year II of the Series and for Year II only, Sears agrees to pay and Producer agrees to accept the sum of $3,900,000.  Said $3,900,000 shall be paid in 12 monthly installments of $325,000 each.  Said $325,000 shall be due on or before the first of each month commencing January 1, 1991 and continuing through December 1, 1991, except the January and February payments shall be due on or before February 1, 1991. The bonus figures based upon average NTI household ratings for Year II shall remain applicable.

3.  The parties hereto agree that prior to December 15, 1991 they and/or their representatives will meet to discuss modifications, if any, in the financial aspects of the

-2-

P 0000023

Agreement for Year III.  It is understood, however, that in no event would Producer be entitled to receive any additional moneys other than that which is provided for in the Agreement.

In all other respects, the Agreement, except as modified herein, shall remain in full force and effect.

Very truly yours,

OGILVY & MATHER

BY: _____
Chuck Otto
Account Supervisor

SEARS, ROEBUCK AND CO.

By: _____
Bill Patterson
Vice-President
Home Improvement Group

B.V.T.V., INC.

BY: _____
Bob Vila

139FF
91:02:27

—3—

Exhibit 3

P 0000025

AMENDMENT #3

Ogilvy & Mather
676 North St. Clair
Chicago, IL  60611

February 8, 1991

B.V.T.V., Inc.
P.O. Box 749
Marstons Mills, MA  02648

Attn:  Mr. Bob Vila

Re:  <u>Amendment No. 3 to Syndication Agreement</u>

Dear Mr. Vila:

An agreement has heretofore been entered into dated
September 29, 1989 between your production company, B.V.T.V.
Inc. ("Producer") and us, Ogilvy and Mather ("Ogilvy") as agent
for our client, Sears Roebuck and Co. ("Sears") as amended June
8, 1990 and February 8, 1991 with regard to a syndicated
television series to be financed by Sears and produced by
Producer and starring Bob Vila ("Vila").  (The Agreement and
Amendments 1 and 2 are herein defined as the "Agreement".)  We
are all desirous at this time of amending certain terms and
conditions contained in the Agreement relating to certain
ancillary rights in the Series.  The following therefore
constitutes our understanding thereto:

P 0000026

1.  Commencing January 1, 1991, Producer shall have the right to sell as video cassettes in the home video market all of the programs produced for the Series.  Sears shall have the right of approval, not to be unreasonably withheld, of the methods of distribution employed by the Producer.  Any and all net profits received by Producer (as defined in Exhibit A) from the distribution of the Series in the home video market are to be divided 60% to Producer and 40% to Sears.  Sears has the right to purchase any of the home video products from Producer at Producer's or Producer's distributor's cost.  Producer, Sears and Ogilvy agree that Sears shall have the option to have placed on each tape sleeve the Sears/Craftsman logo as well as an option to insert a 30 second commercial at the beginning of each tape.

2.  Commencing January 1, 1991, Producer shall have the right to use the name and/or logo of the Series in all areas of merchandising including but not limited to the use of the name and/or logo on tee-shirts, hats, mugs, etc.  Any and all net profits received by Producer (as defined in Exhibit A) from such hard goods merchandising programs shall be divided 50% to Producer and 50% to Sears.

-1-

P 0000027

3.  Vila would continue to have the right to write or cause to be written either hard or soft cover books either as companions to the programs in the Series or as "stand-alones" using the name "Home Again With Bob Vila."  Advances, royalties and/or net profits (as defined in Exhibit A) paid to Vila or Producer from the sales of these books are to be divided 60% to Vila and 40% to Sears.  Notwithstanding the foregoing, Vila shall have the right to continue to author or co-author any books which do not use the name "Home Again" and which do not conflict with or contain the same material as the books produced with the name "Home Again", for which Vila shall be entitled to retain 100% of any advances, royalties and/or profits paid for the same.

4.  Sears' receipt of a percentage of the net profits for sales of the video cassette and merchandise described herein shall continue for so long as the Agreement is in full force and effect and for so long as Sears has ownership of the television Series.

5.  In all of the foregoing wherein Sears is entitled to financial participation, Sears shall retain the right at its own expense and through its authorized employees or its independent public accountants to examine records of expenditures on behalf of its participation in the videotape sales, book sales and hard goods merchandising program.  Sears

-2-

P 0000028

shall notify Producer sufficiently in advance to insure that such records are made available to Sears authorized representatives.

In all other respects, the Agreement, except as modified herein, shall remain in full force and effect.

Very truly yours,

OGILVY & MATHER

BY: _____
    CHUCK OTTO
    Account Supervisor

SEARS, ROEBUCK AND CO.

By: _____
    Bill Patterson
    Vice-President
    Home Improvement Group

B.V.T.V., INC.

BY: _____
    Bob Vila

139FF
91:02:27

-3-

P 0000029

## DEFINITION OF NET PROFITS

Net profits shall be defined as all monies actually received by Producer or any of its affiliates from the exploitation of any of the products (i.e., books, video cassettes merchandising, etc.) referred to in this agreement. The only sums which Producer may deduct from any proceeds it actually receives are any costs incurred directly by Producer or paid to third parties in order to ready the products for exploitation. Any fees paid to Vila or any one affiliated with B.V.T.V. for any services rendered in creating the products shall be reasonable and commensurate with industry standards. All payments made hereunder shall be made no less frequently than twice a year and shall be accompanied by statements setting forth the basis of such payment.

/142FF

P 0000030

**DEPOSITION EXHIBIT 4 (2)**

Exhibit 4

P 0000031

AMENDMENT #4


Ogilvy & Mather
676 North St. Clair
Chicago, IL 60611


January *12* , 1992


B.V.T.V., Inc.
P.O. Box 749
Marstons Mills, MA 02648

Attn:  Mr. Bob Vila

      Re:  <u>Amendment No. 4 to Syndication Agreement</u>

Dear Mr. Vila:

      An agreement has heretofore been entered into dated September 29, 1989 between your production company, B.V.T.V. Inc. ("Producer"), Ogilvy and Mather ("Ogilvy") as advertising agency for our client, Sears Roebuck and Co. and Sears, Roebuck and Co. ("Sears")  as amended June 8, 1990 ("Amendment No. 1") and February 8, 1991 ("Amendment No. 2 and No. 3") with regard to a syndicated television series financed by Sears and produced by Producer and starring Bob Vila.  (The agreement and the amendments are herein defined as the "Agreement".)  We are all desirous at this time of amending certain terms of the Agreement for Year III.  The following therefore constitutes our understanding thereof:

1. For Year III, Producer agrees to produce and deliver to Ogilvy, 26 one-half hour programs which programs are scheduled to commence airing weekly in September, 1992. The 26 programs (the "Series III") shall be delivered in two 13 week cycles and shall conform with the standards set forth in the Agreement. Sears will have prior approval, not to be unreasonably withheld, of the location of the two main sites to be used for the Series. In addition to the 26 programs, there shall also be delivered to Ogilvy 26 vignettes of 30 seconds each and 26 ten second "tune-ins". Each of said vignettes and "tune-ins" shall coincide with each respective program.

2. For Year III of Series III and for Year III only, Sears agrees to pay and Producer agrees to accept the sum of $2,430,000 ($30,000 of said funds are to be applied to Producer's $60,000 obligation to Dera & Associates (Public Relations). Said $2,430,000 shall be paid in three installments of $810,000 each. Each $810,000 payment shall be due on or before January 1, 1992 (or within 20 days of execution hereof, which ever is later), April 1, 1992 and August 1, 1992.

3. The bonus figures based upon average NTI household ratings for Year III shall be as follows and shall be paid to Producer if said ratings are achieved:

-2-

P 0000033

| Avg. NTI HH RTG For 3rd YEAR | Bonus |
|---|---|
| 2.2 | $ 50,000 |
| 2.3 | 150,000 |
| 2.5 | 200,000 |
| 2.6 | 250,000 |
| 2.7 | 300,000 |
| 2.8 | 350,000 |
| 2.9 | 400,000 |

The bonus shall be paid on a pro rata quarterly basis so that, by way of example, if after the first quarter of Year III, the average rating for the show for that quarter is 2.9, Producer would receive a $100,000 bonus (25% of $400,000). If at the end of the second quarter, the average rating for the show for that quarter is 2.5, Producer would receive a $50,000 bonus (25% of $200,000).

   4.  The body of Paragraph "10 - Library Usage Fees" in the Agreement shall be deemed deleted and the following shall be substituted therein:

   "10.  LIBRARY USAGE FEES.

   In the event that Sears elects not to renew the Series for additional year(s), but instead elects to air existing programs of the Series for additional year(s) and Bob Vila is still under contract as a spokesperson for Sears, Sears shall pay to Producer a library usage fee each year based upon 42 1/2% of the revenues received from the distribution of the Series less license fees or the advertising barter time value,

-3-

P 0000034

which ever is greater, of each program with a minimum yearly guarantee of $1,000,000. The minimum yearly guaranteed monies of $1,000,000 shall include any monies paid to Bob Vila as a spokesperson for Sears for that given year (the "Minimum Guarantee"). This library usage fee payment criteria shall continue to be in effect for any year(s) in which no new programs are ordered, but old ones are re-aired. Said payment to Producer shall be made by Sears within thirty days at the end of each six month period, (after the first airing) accompanied by appropriate statements setting forth the computations for such payments. Producer shall have standard industry audit rights with regard to said statements.

In the event that Sears elects not to renew the Series for additional year(s) and elects not to air existing programs or is unable to license the Series or Producer's 42 1/2% (combined with monies received by Bob Vila as a spokesperson for Sears) does not total $1,000,000 for that year and Bob Vila is still under contract as a spokesperson for Sears and if Sears so elects, for each successive year Sears shall have the option to pay the difference so that Producer has received a total of $1,000,000 for that year, or said programs shall go into Turnaround."

5. The body of Paragraph "11 - <u>TURNAROUND</u>" in the Agreement shall be deemed deleted and the following shall be substituted therein:

-4-

P 0000035

"11.  <u>TURNAROUND</u>.

In the event that Sears elects not to proceed with the new episodes of Series <u>and</u> elects not to pay the Producer the Minimum Guarantee, Sears agrees by March 1 of said year to therewith turn over to Producer (thereby eliminating any financial or other obligation by Sears to Producer or its representative) all programs in the Series to be used by Producer free and clear to sell or license as a syndicated television series, except Sears shall be entitled to receive 42 1/2% of the revenues, if any, received from the distribution of the Series less distribution fees.  Said payment to Sears shall be made by Producer within thirty days after the end of each six month period (after the first airing) accompanied by appropriate statements setting forth the computations for such payments.  Sears shall have standard industry audit rights. Additionally, Sears agrees to assign to Producer all contracts entered into for the exploitation of the Series and cause to be paid to Producer all revenues due and owing Sears, pursuant to said contracts, from the time of such election forward.  In the event Sears has received any unrecouped advances against the Series, said advances will be equitably pro-rated between Sears and Producer.  During any period of time that Vila is a spokesperson for Sears, Producer agrees that any new or old programs for the Series will not have an "on-air national sponsor" who would be either a national chain retailer or

-5-

P 0000036

manufacturer of a product competitive with Sears Home
Improvement.

In the event that Sears elects not to renew the Series
for additional year(s) and Bob Vila is no longer under contract
as a spokesperson for Sears and Sears has not exploited the
Series during any one year period, the Series shall revert to
Producer and all programs in the Series may be used by Producer
free and clear, to sell or license, as syndicated television
series, except Sears shall be entitled to receive 42-1/2% of
the revenues, if any, received from the distribution of the
Series, less distribution fees."

6.  The parties hereto agree that prior to December 1,
1992, they and/or their representatives will meet to discuss
modifications, if any, in the financial aspects of the
Agreement for Year IV.

In all other respects, the Agreement, except as
modified herein, shall remain in full force and effect.

Very truly yours,

OGILVY & MATHER

By: David Wuffel
~~Account Supervisor~~
ON ACCOUNT MEDIA DIRECTOR
6/16/92

-6-

SEARS, ROEBUCK AND CO.

By: _____
    Bill Patterson
    Vice-President
    Home Improvement Group

B.V.T.V., INC.

By: _____
    Bob Vila

2009F
024280.27

-7-

P 0000038

Exhibit 5

P 0000039

AMENDMENT #5


OGILVY & MATHER
676 North St. Clair
Chicago, IL 60611

February 10, 1993

B.V.T.V., Inc.
P.O. Box 749
Marstons Mills, MA 02648

Attn:  Mr. Bob Vila

        Re:  Amendment No. 5 to Syndication Agreement

Dear Mr. Vila:

        An agreement has heretofore been entered into dated

September 29, 1989 between your production company, B.V.T.V.

Inc. ("Producer"), Ogilvy and Mather ("Ogilvy") as advertising

agency for our client, Sears Roebuck and Co. and Sears, Roebuck

and Co. ("Sears") as amended June 8, 1990 ("Amendment No. 1")

February 8, 1991 ("Amendment No. 2 and No. 3") and January 12,

1992 ("Amendment No. 4") with regard to a syndicated television

series financed by Sears and produced by Producer and starring

Bob Vila. (The agreement and the amendments are herein defined

as the "Agreement".)  We are all desirous at this time of

amending certain terms of the Agreement for Year IV.  The

following therefore constitutes our understanding thereof:


        1.  For Year IV, Producer agrees to produce and deliver to

Ogilvy, 26 one-half hour programs which programs are scheduled

to commence airing weekly in September, 1993.  The 26 programs

("Series IV") shall be delivered in two 13 week cycles and shall conform with the standards set forth in the Agreement. Sears will have prior approval, not to be unreasonably withheld, of the location of two main sites to be used for the Series. In addition to the 26 programs, there shall also be delivered to Ogilvy 26 vignettes of 30 seconds each and 26 ten second "tune-ins". Each of said vignettes and "tune-ins" shall coincide with each respective program.

2. For Year IV of Series IV and for Year IV only, Sears agrees to pay and Producer agrees to accept:

(i) the guaranteed sum of $1,500,000. Said $1,500,000 shall be paid as follows: (a) $750,000 shall be due on or before January 1, 1993 (or within 15 days of execution hereof, which ever is later), $375,000 on or before April 1, 1993 and $375,000 on or before August 1, 1993; plus

(ii) The following sums based upon the sale of 208 units by Group W:

(a) In the event that Group W sells 50% of said units, B.V.T.V. shall receive an additional $200,000;

(b) In the event Group W sells 75% of said units, B.V.T.V. shall receive an additional $300,000 (for a total of $500,000); and

(c) In the event Group W sells 90% or more of said units, B.V.T.V. shall receive an additional of $100,000 (for a total of $600,000).

- 2 -

P 0000041

3.  The parties hereto agree that prior to October 15 1993, they and/or their representatives will meet to discuss modifications, if any, in the financial aspects of the Agreement for Year V.  If no agreement is reached for Year V by said date, there will be no Year V option.

In all other respects, the Agreement, except as modified herein, shall remain in full force and effect.

Very truly yours,

OGILVY & MATHER

By: _Kay Darkin_
    Kay Darkin
    Vice-President
    Director of National Broadcast

SEARS, ROEBUCK AND CO.

By: _Marv Stern_
    Marv Stern
    Vice-President
    Home Improvement Group

B.V.T.V., INC.

By: _Bob Vila_
    Bob Vila

2074F
024280.27

– 3 –

P 0000042

Exhibit 6

P 0000043

<u>AMENDMENT # 6</u>

**OGILVY & MATHER**
**676 North St. Clair**
**Chicago, IL 60611**

November 15, 1993

B.V.T.V., Inc.
P.O. Box 749
Marstons Mills, MA 02648
Attn: Mr. Bob Vila

RE: <u>Amendment No. 6 to Syndication Agreement (Year V)</u>

Dear Mr. Vila:

An agreement has heretofore been entered into dated September 29, 1989 between your production company, B.V.T.V. Inc. ("Producer"), Ogilvy & Mather ("Ogilvy") as advertising agency for our client, Sears Roebuck and Co. ("Sears") as amended June 8, 1990 ("Amendment No. 1") February 8, 1991 ("Amendment No. 2 and No. 3") January 12, 1992 ("Amendment No. 4") and February 10, 1993 ("Amendment No. 5") with regard to a syndicated television series financed by Sears and produced by Producer and starring Bob Vila. (The agreement and amendments are herein defined as the "Agreement".) We are all desirous at this time of amending certain terms of the Agreement for Year V. The following therefore constitutes our understanding thereof:

1. For Year V, Producer agrees to produce and deliver to Ogilvy, 26 one-half hour programs which programs are scheduled to commence airing weekly in September, 1994. The 26 programs ("Series V") shall be delivered in two 13 week cycles and shall

conform with the standards set forth in the Agreement.  Sears will
have prior approval, not to be unreasonably withheld, of the
locations of the Series.  In addition to the 26 programs, there
shall also be delivered to Ogilvy 26 vignettes of 30 seconds each
and 26 ten second "tune-ins".  Each of said vignettes and "tune-
ins" shall coincide with each respective program.

    2.    For Year V of Series V and for Year V only, Sears agrees
to pay and Producer agrees to accept:

    (i)   the guaranteed sum of $1,700,000.  Said $1,700,000
shall be paid as follows:  (a) $750,000 shall be due on or before
January 1, 1994, (b) $375,000 on or before March 1, 1994, (c)
$375,000 on or before August 1, 1994 and (d) $200,000 as a
guarantee for (ii) below but in no event payable later than
December 31, 1994; plus

    (ii)  The following sums based upon the sale of ~~208~~ 312 KD units
by Group W:

    (a)  In the event that Group W sells 50% of said
units, B.V.T.V. shall receive an additional $200,000 (see (i)
above);

    (b)  In the event Group W sells 55% of said units,
B.V.T.V. shall receive an additional $125,000;

    (c)  In the event Group W sells 60% of said units,
B.V.T.V. shall receive an additional $125,000;

    (d)  In the event Group W sells 65% of said units,
B.V.T.V. shall receive an additional $125,000;

2

(e)  In the event Group W sells 70% of said units, B.V.T.V. shall receive an additional $125,000;

(f)  In the event Group W sells 75% of said units, B.V.T.V. shall receive an additional $125,000;

(g)  In the event Group W sells 80% of said units, B.V.T.V. shall receive an additional $125,000; and

(h)  In the event Group W sells 90% of said units, B.V.T.V. shall receive an additional $125,000.

3.  The parties hereto agree that prior to October 15, 1994, they and/or their representatives will meet to discuss modifications, if any, in the financial aspects of the Agreement for Year VI.  If no agreement is reached for Year VI by said date, there will be no Year VI option.

4.  Sears agrees to advance to Producer $100,000 as an advance against Group W selling 50% of the units referred to in Paragraph 2.(i)(a) of Amendment No. 5 dated February 10, 1993. Additional bonus figures based upon the sale of all or part of the ~~208~~ 3,2 K0 units by Group W shall be paid as and when paid to Group W.

5.  The status of Group W's sell-offs shall be provided by Ogilvy to Producer on a quarterly basis.

In all other respects, the Agreement, except as modified herein, shall remain in full force and effect.

3

P 0000046

Very truly yours,

SEARS ROEBUCK & CO.

By: _____

Jerry Post
Vice-President
Home Improvement Group

OGILVY & MATHER

B.V.T.V., INC.

By: _____

Bob Vila

4

P 0000047



Exhibit 7

<u>**AMENDMENT # 7**</u>

**OGILVY & MATHER**
**676 North St. Clair**
**Chicago, IL 60611**

December 5, 1994

B.V.T.V., Inc.
P.O. Box 749
Marstons Mills, MA 02648
Attn: Mr. Bob Vila

RE: <u>Amendment No. 7 to Syndication Agreement (Year VI)</u>

Dear Mr. Vila:

An agreement has heretofore been entered into dated September 29, 1989 between your production company, B.V.T.V. Inc. ("Producer"), Ogilvy & Mather ("Ogilvy") as advertising agency for our client, Sears Roebuck and Co. ("Sears") as amended June 8, 1990 ("Amendment No. 1"), February 8, 1991 ("Amendment No. 2 and No. 3"), January 12, 1992 ("Amendment No. 4"), February 10, 1993 ("Amendment No. 5") and November 15, 1994 ("Amendment No. 6") with regard to a syndicated television series financed by Sears and produced by Producer and starring Bob Vila. (The agreement and amendments are herein defined as the "Agreement".) We are all desirous at this time of amending certain terms of the Agreement for Year VI. The following therefore constitutes our understanding thereof:

1.  For Year VI, Producer agrees to produce and deliver to Ogilvy, 26 one-half hour programs which programs are scheduled to commence airing weekly in September, 1995.  The 26 programs ("Series VI") shall be delivered in two 13 week cycles and shall conform with the standards set forth in the Agreement.  Sears will have prior approval, not to be unreasonably withheld, of the locations of the Series.  In addition to the 26 programs, there shall also be delivered to Ogilvy 26 vignettes of 30 seconds each and 26 ten second "tune-ins".  Each of said vignettes and "tune-ins" shall coincide with each respective program.

2.  For Year VI of Series VI and for Year VI only, Sears agrees to pay and Producer agrees to accept:

(i)     the guaranteed sum of $1,519,500.  Said $1,519,500 shall be paid as follows:  (a) $750,000 shall be due on or before January 1, 1995, (b) $394,500 on or before March 1, 1995, (c) $375,000 on or before August 1, 1995; plus

(ii)     $325,000 as a guarantee for (iii)(a) and (b) below but in no event payable later than December 31, 1995; plus

(iii)     The following sums based upon the sale of 312 units by Group W:

(a)  In the event that Group W sells 50% of said units, B.V.T.V. shall receive an additional $200,000 (see (ii) above);

(b)  In the event Group W sells 55% of said units, B.V.T.V. shall receive an additional $125,000 (see (ii) above);

2

P 0000050

(c)  In the event Group W sells 60% of said units, B.V.T.V. shall receive an additional $125,000;

(d)  In the event Group W sells 65% of said units, B.V.T.V. shall receive an additional $125,000;

(e)  In the event Group W sells 70% of said units, B.V.T.V. shall receive an additional $125,000;

(f)  In the event Group W sells 75% of said units, B.V.T.V. shall receive an additional $125,000;

(g)  In the event Group W sells 80% of said units, B.V.T.V. shall receive an additional $125,000; and

(h)  In the event Group W sells 90% of said units, B.V.T.V. shall receive an additional $125,000.

3.   The above guaranteed sum shall be inclusive of the cost of the Closed Captioning the 26 programs by the National Captioning Institute, Inc.

4.   The parties hereto agree that prior to October 15, 1995, they and/or their representatives will meet to discuss modifications, if any, in the financial aspects of the Agreement for Year VII.  If no agreement is reached for Year VII by said date, there will be no Year VII option.

3

P 0000051

5.   The status of Group W's sell-offs shall be provided by Ogilvy to Producer on a quarterly basis.


In all other respects, the Agreement, except as modified herein, shall remain in full force and effect.

Very truly yours,

OGILVY & MATHER

By: ~~Denny Nooley~~ HENRY J POOSLEY
~~Account Supervisor~~


SEARS, ROEBUCK AND CO.

By: _____
SEARS MARKETING MANAGER


B.V.T.V., INC.

By: _____
Bob Vila


VILA\SYN.AMD.#7

4

P 0000052

Exhibit 8

P 0000053

**AMENDMENT # 8**


**OGILVY & MATHER**
**676 North St. Clair**
**Chicago, IL 60611**


December 19, 1995

B.V.T.V., Inc.
P.O. Box 749
Marstons Mills, MA 02648
Attn: Mr. Bob Vila

RE: Amendment No. 8 to Syndication Agreement (Year VII)

Dear Mr. Vila:

An agreement has heretofore been entered into dated September 29, 1989 between your production company, B.V.T.V. Inc. ("Producer"), Ogilvy & Mather ("Ogilvy") as advertising agency for our client, Sears Roebuck and Co. ("Sears") as amended June 8, 1990 ("Amendment No. 1"), February 8, 1991 ("Amendment No. 2 and No. 3"), January 12, 1992 ("Amendment No. 4"), February 10, 1993 ("Amendment No. 5"), November 15, 1993 ("Amendment No. 6") and December 5, 1994 ("Amendment No. 7") with regard to a syndicated television series financed by Sears and produced by Producer and starring Bob Vila. (The agreement and amendments are herein defined as the "Agreement".) We are all desirous at this time of amending certain terms of the Agreement for Year VII. The following therefore constitutes our understanding thereof:


1. For Year VII, Producer agrees to produce and deliver to Ogilvy, 26 one-half hour programs which programs are scheduled to

commence airing weekly in September, 1996. The 26 programs ("Series VII") shall be delivered in two 13 week cycles and shall conform with the standards set forth in the Agreement. Sears will have prior approval, not to be unreasonably withheld, of the locations of the Series. In addition to the 26 programs, there shall also be delivered to Ogilvy 26 vignettes of 30 seconds each and 26 ten second "tune-ins". Each of said vignettes and "tune-ins" shall coincide with each respective program.

2.  For Year VII of Series VII and for Year VII only, Sears agrees to pay and Producer agrees to accept:

(i)     the guaranteed sum of $1,519,500. Said $1,519,500 shall be paid as follows: (a) $750,000 shall be due on or before January 1, 1996, (b) $394,500 on or before April 1, 1996, (c) $375,000 on or before August 1, 1996; plus

(ii)    $325,000 as a guarantee for a portion of (iii)(a) below, payable on December 1, 1996;

(iii)   The following sums based upon the Revenue (as defined in Exhibit A) generated and received by Group W from the sale of 312 units by them.

(a)  In the event the Revenue received by Group W for said units is $1,400,000, B.V.T.V. shall receive an additional $625,000, ($325,000 of this amount shall be paid as a guarantee on December 1, 1996) see (ii) above;

2

P 0000055

(b)  In the event the revenue received by Group W is $1,600,000, B.V.T.V. shall receive an additional $100,000;

(c)  In the event the revenue received by Group W is $1,800,000, B.V.T.V. shall receive an additional $75,000;

(d)  In the event the revenue received by Group W is $2,000,000, B.V.T.V. shall receive an additional $100,000;

(e)  In the event the revenue received by Group W is $2,200,000, B.V.T.V. shall receive an additional $100,000;

(f)  In the event the revenue received by Group W is $2,400,000, B.V.T.V. shall receive an additional $80,000;

(g)  In the event the revenue received by Group W is $2,600,000, B.V.T.V. shall receive an additional $95,000; and

(h)  In the event the revenue received by Group W is $2,800,000, B.V.T.V. shall receive an additional $25,000.

(iv)    Said total bonus shall be capped at a maximum of $1,200,000.

(v)    A bonus payment schedule will be established on the basis of the contract with Group W, but shall in any event be paid December 1, 1996 (see 2(ii)(a) above), July 15, 1997 and December 1, 1997.


3.  Producer shall be responsible for the cost of Closed Captioning the 26 programs by the National Captioning Institute, Inc.

3

P 0000056

(b)   In the event the revenue received by Group W is $1,600,000, B.V.T.V. shall receive an additional $100,000;

(c)   In the event the revenue received by Group W is $1,800,000, B.V.T.V. shall receive an additional $75,000;

(d)   In the event the revenue received by Group W is $2,000,000, B.V.T.V. shall receive an additional $100,000;

(e)   In the event the revenue received by Group W is $2,200,000, B.V.T.V. shall receive an additional $100,000;

(f)   In the event the revenue received by Group W is $2,400,000, B.V.T.V. shall receive an additional $80,000;

(g)   In the event the revenue received by Group W is $2,600,000, B.V.T.V. shall receive an additional $95,000; and

(h)   In the event the revenue received by Group W is $2,800,000, B.V.T.V. shall receive an additional $25,000.

(iv)     Said total bonus shall be capped at a maximum of $1,200,000.

(v)     A bonus payment schedule will be established on the basis of the contract with Group W, but shall in any event be paid December 1, 1996 (see 2(ii)(a) above), July 15, 1997 and December 1, 1997.


3.   Producer shall be responsible for the cost of Closed Captioning the 26 programs by the National Captioning Institute, Inc.

3

P 0000056

4.    The parties agree that prior to October 15, 1996, they and/or their representatives will meet to discuss renewal of the agreement for Year VIII and any modifications, including modifications of the financial aspects of the Agreement for Year VIII.

5.    The status of Group W's sell-offs shall be provided by Ogilvy to Producer on a quarterly basis.

6.    This agreement may be signed in counterparts.

In all other respects, the Agreement, except as modified herein, shall remain in full force and effect.

                              Very truly yours,

                              OGILVY & MATHER

                              By: _____

                              SEARS, ROEBUCK AND CO.

                              By: _____
                                   ANDY GINGER

B.V.T.V., INC.

By _____
        BOB VILA

ref/vila/syndic.#8

4

P 0000057

## EXHIBIT A

Revenue:    For purposes of this Agreement, the term "Revenue" shall be deemed to mean the aggregate of the sums paid to and actually received by Group W from all sources of the Program for Year VII less the following amounts; (a) taxes (however denominated and irrespective of any tax credits or deductions taken by Group W) paid to any governmental authority in connection with the exploitation of the Program or of any rights relating thereto (except that any corporate income or franchise taxes of Group W shall not be deducted from Revenue) and all sums actually paid as costs of acquiring permits and any similar authority to secure the distribution of the Program or any of said rights; (b) all adjustments, credits, allowances, rebates and refunds actually made by Group W to third parties and if the same has been taken into account as Revenue then an equivalent amount shall be eliminated from subsequent Revenue; (c) unless and until earned, otherwise available to Group W or usable by Group W, all sums received in the nature of security deposits or periodic payments; and (d) all costs and expenses incurred by or on behalf of Group W in order to obtain any damages, settlements or other recoveries in connection with any interference with or infringements of any of Group W's or Sears' rights in the Program.  Group W agrees that such recoveries will be included in Revenue.

P 0000058

Exhibit 9

P 0000059

**DEPOSITION EXHIBIT 4 (3)**

<u>**AMENDMENT # 9**</u>

**OGILVY & MATHER**
**676 North St. Clair**
**Chicago, IL 60611**

December 18, 1996

B.V.T.V., Inc.
P.O. Box 749
Marstons Mills, MA 02648
Attn: Mr. Bob Vila

      Re: **Amendment No. 9 to Syndication Agreement**
          <u>**(Year VIII and Year IX)**</u>

Dear Mr. Vila:

      An agreement has heretofore been entered into dated September 29, 1989 between your production company, B.V.T.V. Inc. ("Producer"), Ogilvy & Mather ("Ogilvy") as advertising agency for our client, Sears Roebuck and Co. ("Sears") as amended June 8, 1990 ("Amendment No. 1"), February 8, 1991 ("Amendment No. 2 and No. 3"), January 12, 1992 ("Amendment No. 4"), February 10, 1993 ("Amendment No. 5"), November 15, 1993 ("Amendment No. 6"), December 5, 1994 ("Amendment No. 7") and December 19, 1995 with regard to a syndicated television series financed by Sears and produced by Producer and starring Bob Vila. (The agreement and amendments are herein defined as the "Agreement".) We are all

P 0000060

desirous at this time of amending certain terms of the Agreement for Year VIII and Year IX. The following therefore constitutes our understanding thereof:

1.    For Year VIII and Year IX respectively, Producer agrees to produce and deliver to Ogilvy, 26 one-half hour programs which programs are scheduled to commence airing weekly in September, 1997 and September, 1998 respectively. The 26 programs ("Series VIII and IX") shall be delivered in two 13 week cycles and shall conform with the standards set forth in the Agreement. Sears will have prior approval, not to be unreasonably withheld, of the locations of the Series. In addition to the 26 programs each year, there shall also be delivered to Ogilvy each year 26 vignettes of 30 seconds each and 26 ten second "tune-ins". Each of said vignettes and "tune-ins" shall coincide with each respective program.

2.    For Year VIII of Series VIII and for Year VIII only, Sears agrees to pay and Producer agrees to accept:

(i)        the guaranteed sum of $1,519,500. Said $1,519,500 shall be paid as follows:  (a) $750,000 shall be due on or before January 1, 1997, (b) $394,500 on or before April 1, 1997, (c) $375,000 on or before August 1, 1997; plus

(ii)       $325,000 as a guarantee for a portion of (iii)(a) below, payable on December 1, 1997;

2

P 0000061

(iii)    The following sums based upon the Revenue (as defined in Exhibit A) generated and received by EyeMark from the sale of 312 units by them.

(a)    In the event the Revenue received by Group W for said units is $1,400,000, B.V.T.V. shall receive an additional $625,000, ($325,000 of this amount shall be paid as the guarantee on December 1, 1997) see (ii) above;

(b)    In the event the revenue received by Group W is $1,600,000, B.V.T.V. shall receive an additional $100,000;

(c)    In the event the revenue received by Group W is $1,800,000, B.V.T.V. shall receive an additional $75,000;

(d)    In the event the revenue received by Group W is $2,000,000, B.V.T.V. shall receive an additional $100,000;

(e)    In the event the revenue received by Group W is $2,200,000, B.V.T.V. shall receive an additional $100,000;

(f)    In the event the revenue received by Group W is $2,400,000, B.V.T.V. shall receive an additional $80,000;

(g)    In the event the revenue received by Group W is $2,600,000, B.V.T.V. shall receive an additional $95,000; and

(h)    In the event the revenue received by Group W is $2,800,000, B.V.T.V. shall receive an additional $25,000.

(iv)    Said total bonus shall be capped at a maximum of $1,200,000.

(v)    A bonus payment schedule will be established on the basis of the contract with EyeMark, but shall in any event be

3

P 0000062

paid December 1, 1997 (see 2(ii)(a) above), July 15, 1997 and December 1, 1998.

3.   For Year IX of Series IX and for Year IX only, Sears agrees to pay and Producer agrees to accept:

(i)      the guaranteed sum of $1,519,500.   Said $1,519,500 shall be paid as follows:  (a) $750,000 shall be due on or before January 1, 1998, (b) $394,500 on or before April 1, 1998, (c) $375,000 on or before August 1, 1998; plus

(ii)      $325,000 as a guarantee for a portion of (iii)(a) below, payable on December 1, 1998;

(iii)      The following sums based upon the Revenue (as defined in Exhibit A) generated and received by EyeMark from the sale of 312 units by them.

(a)   In the event the Revenue received by Group W for said units is $1,400,000, B.V.T.V. shall receive an additional $625,000, ($325,000 of this amount shall be paid as a guarantee on December 1, 1998) see (ii) above;

(b)   In the event the revenue received by Group W is $1,600,000, B.V.T.V. shall receive an additional $100,000;

(c)   In the event the revenue received by Group W is $1,800,000, B.V.T.V. shall receive an additional $75,000;

(d)   In the event the revenue received by Group W is $2,000,000, B.V.T.V. shall receive an additional $100,000;

(e)   In the event the revenue received by Group W is $2,200,000, B.V.T.V. shall receive an additional $100,000;

4

(f)   In the event the revenue received by Group W is $2,400,000, B.V.T.V. shall receive an additional $80,000;

(g)   In the event the revenue received by Group W is $2,600,000, B.V.T.V. shall receive an additional $95,000; and

(h)   In the event the revenue received by Group W is $2,800,000, B.V.T.V. shall receive an additional $25,000.

(i)   In the event the revenue received by Group W is $3,000,000, B.V.T.V. shall receive an additional $50,000.

(iv)     Said total bonus shall be capped at a maximum of $1,250,000.

(v)     A bonus payment schedule will be established on the basis of the contract with EyeMark, but shall in any event be paid December 1, 1998 (see 2(ii)(a) above), July 15, 1999 and December 1, 1999.

4.   Producer shall be responsible for the cost of Closed Captioning the 26 programs each year by the National Captioning Institute, Inc.

5.   The parties agree that prior to October 15, 1998, they and/or their representatives will meet to discuss renewal of the agreement for Year X and any modifications, including modifications of the financial aspects of the Agreement for Year X.

6.   The status of EyeMark's sell-offs shall be provided by Ogilvy to Producer on a quarterly basis.

P 0000064

7.   This agreement may be signed in counterparts.

In all other respects, the Agreement, except as modified herein, shall remain in full force and effect.

Very truly yours,

OGILVY & MATHER

By: _____

SEARS, ROEBUCK AND CO.

By: _____
      ANDY GINGER

B.V.T.V., INC.

By: _____
      BOB VILA

ref/vila/syndic.#9

6

P 0000065

## EXHIBIT A

Revenue:    For purposes of this Agreement, the term "Revenue" shall be deemed to mean the aggregate of the sums paid to and actually received by Group W from all sources of the Program for Year VII less the following amounts; (a) taxes (however denominated and irrespective of any tax credits or deductions taken by Group W) paid to any governmental authority in connection with the exploitation of the Program or of any rights relating thereto (except that any corporate income or franchise taxes of Group W shall not be deducted from Revenue) and all sums actually paid as costs of acquiring permits and any similar authority to secure the distribution of the Program or any of said rights; (b) all adjustments, credits, allowances, rebates and refunds actually made by Group W to third parties and if the same has been taken into account as Revenue then an equivalent amount shall be eliminated from subsequent Revenue; (c) unless and until earned, otherwise available to Group W or usable by Group W, all sums received in the nature of security deposits or periodic payments; and (d) all costs and expenses incurred by or on behalf of Group W in order to obtain any damages, settlements or other recoveries in connection with any interference with or infringements of any of Group W's or Sears' rights in the Program.  Group W agrees that such recoveries will be included in Revenue.

7

Exhibit 10

P 0000067

[date]    1\5\98

B.V.T.V., Inc.
Attn: Mr. Bob Vila
P.O. Box 749
Marstons Mills, MA 02648

Re:    Amendment No. 10 to Bob Vila Syndicated Television Program Agreement
(Year 10 - Year 15)("Amendment No. 10")

Dear Mr. Vila:

The parties hereto, your production company, B.V.T.V., Inc. ("Producer") and us, Ogilvy & Mather ("Ogilvy") as agent for our client, Sears, Roebuck and Co. ("Sears"), are desirous of setting forth the terms for going forward for the next six years ("Year 10-Year 15") with regard to Bob Vila Home Again ("Home Again"), the syndicated television series financed by Sears, produced by B.V.T.V., Inc. ("Producer") and starring you, Bob Vila ("Vila")(the "Series"), subject to the prior arrangements between Sears and Eyemark Entertainment ("Eyemark").

An agreement regarding Home Again, dated September 28, 1989, has heretofore been entered into between Producer and Ogilvy, as advertising agency for Sears, (the "1989 Agreement") and was subsequently amended on June 8, 1990 ("Amendment No. 1"), February 8, 1991 ("Amendment No. 2 and No. 3"), January 12, 1992 ("Amendment No. 4"), February 10, 1993 ("Amendment No. 5"), November 15, 1993 ("Amendment No. 6"), December 5, 1994 ("Amendment No. 7"), December 19, 1995 ("Amendment No. 8") and December 19, 1995 ("Amendment No. 8") (The 1989 Agreement and amendments are herein defined as the "10 Year Agreement.")

1.    THE 10 YEAR AGREEMENT.  The following paragraphs of the 10 Year Agreement shall be deemed to apply to this Amendment No. 10: 3. SEARS CREDIT, 14. INDEMNITIES, 15. FORCE MAJEURE, 16. FULL POWER, 17. NOTICES, 18 SEARS TRADEMARK, TRADE NAMES, SERVICE MARKS, 19. COPYRIGHT NOTICES, 20. PURCHASES, 21. INSURANCE, and 22. GENERAL.

2.    PRODUCER'S OBLIGATIONS.  For Year 10-Year 15, Producer agrees to produce and deliver to Sears 26 one half-hour programs which programs are scheduled to commence airing in September, 1999 (the "26 Programs"). The 26 Programs, Series 10 through Series 15, shall be delivered in two 13-week cycles and shall conform with standards consistent with all prior programs submitted to Ogilvy. Sears will have prior approval over the locations of

the Series. Such approval shall not be unreasonably withheld. In addition to the 26 Programs per year, there shall also be delivered to Sears 26 vignettes of 30-seconds each and 26 "10-second tune-ins." Each of said vignettes and tune-ins shall coincide with each respective program. Producer agrees to produce the Series in a professional manner using a professional staff and in keeping with the standards of previously produced Home Again shows. Producer shall be solely responsible for all aspects of the Series, including but not limited to, project development and/or renovation costs, talent, travel and accommodations, talent and production crew salaries, equipment rentals or purchases, etc. If requested by Sears, Producer agrees to use Sears Home Improvement products and services in the production of the Series wherever applicable, if available and deliverable. Sears shall appoint a Sears liaison from whom Producer may purchase any products or services sold by Sears at Sears cost.

3.    <u>CONSIDERATION</u>. For Year 10-Year 15 (Series 10 through Series 15), Sears agrees to pay and Producer agrees to accept each year the guaranteed sum of $1,519,000 with incentive bonuses up to a maximum of an additional $1,250,000 based upon the following benchmarks:

(a)    The following sums based upon the Revenue (as defined in Exhibit A) generated and received by the first-run syndicator from the sale of 312 units by them.

In the event the Revenue received by the first-run syndicator for said units is:

(i)    $1,400,000, B.V.T.V. shall receive an additional $625,000;

(ii)    $1,600,000, B.V.T.V. shall receive an additional $100,000;

(iii)    $1,800,000, B.V.T.V. shall receive an additional $75,000;

(iv)    $2,000,000, B.V.T.V. shall receive an additional $100,000;

(v)    $2,200,000, B.V.T.V. shall receive an additional $100,000;

(vi)    $2,400,000, B.V.T.V. shall receive an additional $80,000;

(vii)    $2,600,000, B.V.T.V. shall receive an additional $95,000;

(viii)    $2,800,000, B.V.T.V. shall receive an additional $25,000; and

(ix)    $3,000,000, B.V.T.V. shall receive an additional $50,000;

(b)    Said total bonuses shall be capped at a maximum of $1,250,000 per season.

(c)    Said $1,519,000 plus the $1,250,000, if earned, shall be paid as follows:

P 0000069

(i)     $750,000 shall be due on or before each January 1 commencing January 1, 1999 (production fee);

(ii)    $494,500 on or before each March 1 commencing March 1, 1999 (production fee);

(iii)   $475,000 on or before each August 1 commencing August 1, 1999 (of which $275,000 shall be a production fee and $200,000 as the first payment of the incentive bonus);

(iv)    $500,000 on or before each October 1 commencing October 1, 1999 (if incentive bonus is earned); and

(v)     $550,000 on or before each December 1 commencing December 1, 1999 (if incentive bonus is earned).

Producer shall be responsible for the execution and cost each year of the National Captioning Institute, Inc.'s close-captioning of the 26 Programs.

4.      THE LIBRARY.   All shows previously created and subsequently created after the first year of syndication (the "Library"), which shall be delivered to Ogilvy, shall be deemed to be owned by Sears and Producer equally both during the term of this Agreement and upon termination of the Series. The parties agree to submit to each other for prior written approval any and all programs, concepts and ideas relating to the marketing of the Library. Such approval shall not be unreasonably withheld by either party. It shall be the responsibility of Producer and Ogilvy, in connection with Vila's agent, as designated by Vila, to enter into contracts to control and maximize income from the Library from cable sales, second run syndication with the prior written approval of Producer, Ogilvy and Sears. Notwithstanding the above sentence, all such contracts shall be signed by Sears. All gross income from first run syndication and from all subsequent sales and uses of the Library, less the expenses paid to Producer from Year 10-Year 15 and expenses paid to syndicator, less any bonus received by Vila from Year 10-Year 15 shows, shall be divided equally between Sears and Producer. First-run syndication shall be handled by a syndication company such as Eyemark upon which Producer and Ogilvy shall mutually agree. All other uses of the Library shall be mutually agreed upon between Producer and Sears and the income from such uses shall be divided equally between Producer and Sears.

Any disputes relating to this **paragraph 4** shall be arbitrated pursuant to the arbitration provision, attached hereto and incorporated herein as **Exhibit 1**.

P 0000070

Except for the foregoing, all of the terms and conditions of the 1989 Agreement and all amendments relating thereto which are not inconsistent with the foregoing are hereby ratified and affirmed.

Acceptance of and agreement to this Amendment No. 10 is confirmed by signing your name in the place indicated below.

Very truly yours,

OGILVY AND MATHER, as agent for SEARS, ROEBUCK AND CO.

By: _Kay Durkin_

Kay Durkin

ACCEPTED:

B.V.T.V. INC.

By _Bob Vila_

Bob Vila

P 0000071

## ARBITRATION PROVISION FOR PARAGRAPH 4 OF AMENDMENT NO. 10 TO BOB VILA SYNDICATED TELEVISION PROGRAM AGREEMENT (THE "AGREEMENT")

Any and all claims, disputes or controversies (whether in contract, tort, or otherwise, including statutory, common law, intentional tort, property and equitable claims) relating to the uses of the Library pursuant to **Paragraph 4 - The Library** shall be resolved by final and binding arbitration before a single arbitrator (the "Arbitrator") in Cook County, Illinois. This arbitration provision does not prevent either party from seeking interim injunctive relief from a court in order to preserve the status quo or to protect assets until such time as the arbitration has been commenced and the arbitrator has an opportunity to consider the matter of interim relief. Neither party shall institute any proceeding in any court or administrative agency or any arbitration to resolve a dispute between the parties before that party has sought to resolve the dispute through direct negotiation with the other party. If the dispute is not resolved within three (3) business days after receipt of a written demand for direct negotiation, the parties may then attempt to resolve the dispute through arbitration as provided in this arbitration provision.

All arbitrations shall be administered by the American Arbitration Association in according with its then existing Commercial Arbitration Rules by one of the five following qualified media arbitrators, who shall be selected in the following order as each Arbitrator's availability permits:

1)
2)
3)
4)
5)

The prevailing party (as determined by the Arbitrator) shall in addition be awarded by the Arbitrator such party's own attorneys' fees and expenses in connection with such proceeding. The non-prevailing party (as determined by the Arbitrator) shall pay the Arbitrator's fees and expenses. The Arbitrator shall apply relevant law and provide written, reasoned findings of fact and conclusions of law  This arbitration provision is made pursuant to a transaction involving interstate commerce and shall be governed by the Federal Arbitration Act, 9 U.S.C. Section 1, *et seq.* Judgment on the award rendered by the Arbitrator may be entered in any court having jurisdiction. If any portion of this arbitration provision is deemed invalid or unenforceable, it shall not invalidate the remaining portions of this arbitration provision. The substantive law of the State of Illinois without reference to any principles concerning conflicts of law, shall govern the validity of this Agreement, the construction of its terms and the interpretation of the rights, duties and remedies of the parties hereunder; provided, however, that this Arbitration provision and the parties' rights under this provision shall be governed by and construed in accordance with the Federal Arbitration Act.

# DEPOSITION EXHIBIT  7



**kcondon**

| | |
|---|---|
| **From:** | <MRODE@sears.com> |
| **To:** | "kcondon" <kcondon@kaufmannfeiner.com> |
| **Cc:** | <jrusso@ArtistsAgency.com>, "Bob Vila" <rjvila@bobvila.com> |
| **Sent:** | Wednesday, November 24, 2004 12:03 PM |
| **Subject:** | Re: Vila Syndication Agreement |

Ron,

I know Drew was working on it, but I was out all last week and now Drew is out this week. I left a message and should hear something Monday.

As for the K-Mart issue we have been instructed to not talk about the merger. Partly because it won't be done until spring and partly because I don't think they have a clue yet what they're going to do. The only thing they have said with any consistency is some K-Marts will be Sears. That's not a bad thing for the brand (or Bob). I'll let you know when the gag order is lifted and we can schedule a meeting.

Mark P Rode
Craftsman Brand Manager
(847) 286-3447

---

"kcondon" <kcondon@kaufmannfeiner.com>

11/23/2004 11:03 AM

Please respond to "kcondon"

To     <MRODE@sears.com>

cc     "Bob Vila" <rjvila@bobvila.com>, <jrusso@ArtistsAgency.com>
Subject     Vila Syndication Agreement

Dear Mark

A few weeks ago you were kind enough to arrange a conference call so that we could finish off Bob Vila's Syndication Agreement extension. To date, I have not received the redraft from Drew. This is becoming of concern to Bob and myself. Can you please check its status and get back to me?

Also, I would appreciate it if we could arrange a conference call with you, me, Bob and Andy to discuss the recent K-Mart situation and its impact, if any, on Bob.

Thanks, Ron



11/29/04

EXHIBIT
# 71A
1-24-06

P 0000232

# DEPOSITION EXHIBIT  10



# Invoice

| DATE | INVOICE # |
|------|-----------|
| 12/7/2004 | 514 |

| VENDOR # |
|----------|
| 780754065 |

**BILL TO**

Mr. Fred Ciba, Executive Producer
SEARS, ROEBUCK & CO.
Department 727ACS; Location D2-131B
3333 Beverly Road
Hoffman Estates, IL 60179

| DESCRIPTION | AMOUNT |
|-------------|--------|
| SYNDICATION AGREEMENT - Season 16, Payment #1 ($750,000 less 4.75%) | 714,375.00 |
| | |
| Due: January 1, 2005 | |
| | |
| PLEASE MAKE CHECK PAYABLE TO: | |
| | |
| BVTV, INC. | |
| 115 KINGSTON STREET | |
| BOSTON MA  02111 | |
| **Total** | **$714,375.00** |

**The most trusted name in home improvement.**
115 Kingston St • 3rd Floor ▪ Boston, MA 02111 • www.bobvila.com ▪ PHONE 617.848.8452 ▪ FAX 617.848.8401



EXHIBIT
#10 ID
1-24-06

**SEARS 0184**

**DEPOSITION EXHIBIT 13 (1)**

# Ogilvy & Mather
*Advertising*

676 St Clair Chicago, Illinois 60611
Telephone 1 312 988 2500 · Telex 255162 · Cable Ogilvy Chicago

B. V. REV. *BOB VILA*
Colton, Hartnick, Yamin & Sheresky                    *September 29, 1989*
79 Madison Avenue
New York, NY  10016

Dear Bob Vila:

### Re:  Bob Vila Spokesperson Agreement

This will set forth the terms of the agreement between you and
us as agency for our client, Sears, Roebuck and Co., and Sears,
Roebuck and Co., whereby you agree to render personal services
in advertising Sears Home Improvement (Group 700-7) products
and services (hereinafter referred to as "product(s)") upon the
terms and conditions set forth below.

I.   **TERM**

    A.   The term of this agreement shall commence on October
        15, 1989 and continue through December 31, 1990
        ("first-term").

    B.   We shall have the option, if we so elect, to extend
        the term of this agreement for one additional year to
        commence on the first day after termination of the
        then preceding term by giving you notice no later
        than November 1, 1990.

II.  **NATURE OF SERVICES AND USE**

We hereby engage the talent to render the following
professional services to us as spokesperson, performer
and participant in connection with the advertising of the
Client's Products as follows:

    A.   Perform in as many  television commercials as we may
        designate;

    B.   Perform in as many recording sessions/radio
        commercials as we may designate;

    C.   Perform in as many videos or taped announcements for
        industrial use in-store as we may designate;

    D.   Pose for such number of still photographs as we may
        designate;

    E.   Make as many personal appearances as we may designate;

    F.   However, the total days worked shall not exceed 40
        days as defined under "Notice/Availability."



EXHIBIT
#13
1-24-06

P 0000086

- 2 -

G.   You hereby grant to us and our Client the right to
     use and re-use your name, approved likeness, (not be
     be unreasonably withheld) photograph, voice,
     signature, biography, testimonial and/or endorsement
     in all materials produced hereunder, including but
     not limited to the following forms of marketing
     activities:  (a) <u>advertising</u> -- television and radio
     commercials, magazine and newspaper ads (ROP or
     circulars), direct mail, catalogs; (b) <u>industrial use</u>
     -- POP videos and announcements; (c) <u>promotional</u>
     <u>materials</u> -- signs, brochures, posters, displays; (d)
     <u>special merchandising</u> -- premiums, give-aways,
     products; (e) <u>new line items</u> -- "how-to" audio/video
     casssettes, Craftsman/Vila products, etc. (points "a"
     through "e" termed "Advertising").

H.   You warrant and represent that you are familiar with
     the Client and Client's Products, recommend them, and
     will continue to recommend them throughout the Term
     (, and the Option Period(s) if any,) hereof.  Should
     it prove necessary, you shall cooperate with us in
     executing any affidavits, testimonial statements, or
     releases confirming such familiarity and
     recommendation which may be required for network
     clearance or legal reasons.  Such cooperation shall
     include, without limitation, using the product(s)
     which are the subject of such testimonial.

<u>Extent of Ownership and Use</u>

All Advertising produced hereunder, all elements
thereof, shall be and remain the absolute property of
our client forever.  We shall have full and complete
right to copyright said Advertising; and to telecast,
broadcast, use, reproduce, and/or exhibit the Advertising
during the term hereof and for a period of sixty (60)
days thereafter (for make-good purposes only) except for
catalogs or in-store signage issued prior to termination
of this agreement which may be used up until one year
after date of issue.  Sears may telecast broadcast, use,
reproduce, and/or exhibit the Advertising anywhere in the
United States, its possessions and territories, Mexico
and Canada ("Territory(s)") subject only to the
provisions of this agreement and to the restrictions of
any union or guild having jurisdiction hereof.

<u>Notice/Availability</u>

We shall give you two (2) weeks prior notice of the
date(s) and place(s) wherein you will render your
services hereunder which services you shall then render,
subject only to your prior bona fide contractual
commitments which will not include the taping of the
syndicated TV series.  However, we shall do our best to
give more than 2 weeks notice where possible and will
accommodate the taping of the syndicated TV series
whenever possible.

It is understood that during the initial term, we will have your services for a total of 40 working days (8 hour days). Should you be required to perform your services in excess of eight hours on any given day, you will be compensated at the standard applicable union fees as outlined in paragraph III. point one.

Working days shall be defined strictly as scale for those periods when actually performing the requested service, not travel to and from the worksite, weather days, rest, etc.

Manner of Rendering Service

You agree to render your services hereunder in a competent pain-stacking and artistic manner and to the best of your ability. You will attend and participate in all rehearsals, conferences and other such meetings that we may deem necessary or advisable from time to time. All of your services will be subject to our approval, direction and control at all times and you will promptly comply with whatever reasonable instructions, suggestions and recommendations which may be given from time to time in connection with the rendition of your services, on behalf of the Product.

Television commercials or industrial videos to be produced during the Initial Term (and any Option Period(s)) shall be shot at such time(s) and place(s) as we shall designate. The television commercial(s) may be taped or filmed as we may determine. Should weather conditions or any occurrence beyond our reasonable control make it impractical or impossible to shoot, we shall have the right to postpone such shoot(s) without any additional compensation to you until such time(s) as we may determine. We shall have the right to use the footage shot to produce number of commercials or such number of television commercials as we designate.

These commercials shall be of such length and may be used in such a manner as we may determine (during the Initial Term and the Option Period(s)) anywhere within the Territory(s). We shall have the right to edit the commercials for legal reasons, marketing reasons and time requirements.

– 4 –

Recording session shall take place at such time(s) and place(s) as we shall designate. Should any occurrence beyond our reasonable control make it impossible or impractical to record, we shall have the right to postpone such session(s) without additional compensation to you until such time(s) as we may determine. During all recording sessions (whether within the Initial Term or any Option Period(s),) we may require the talent to record radio commercials and/or voiceover tracks to be used in connection with the television commercials, video or taped announcements, produced pursuant to this agreement. We shall have the right to use the recordings made to produce (such number of radio commercials as we determine). These commercials or taped announcements shall be of such length and may be used in such manner as we may determine (during the Initial Term and the Option Period(s) anywhere within the Territory(s). We shall have the right to edit the commercials for legal reasons, marketing reasons, and time requirements.

Still photographs to be shot (during the Initial Term and Options Period(s), if applicable,) shall be shot at such time(s) and place(s) as we shall designate. The photographs taken hereunder may be used, together with such copy as we choose, to produce such number of print advertisements (and promotional materials for store usage -- collateral materials, point of purchase, etc.) as we may determine. The print advertisements may be run by us in newspapers and/or magazines anywhere within the Territory(s). The promotional materials may be used by us in the same territory as the newspaper and magazine advertisements. We shall have the right to use the print materials produced during the Initial Term in the Option Period(s).

You shall make personal appearances at such time(s) and place(s) as we may designate. Personal appearance days may be consecutive or non-consecutive as we may determine, and talent may be required to make such appearances anywhere within the Territory(s).

III.  COMPENSATION

We agree to pay you, and you agree to accept, in consideration of all services rendered by you and the use of the results thereof, all rights granted by you to us, and all covenants and representations made by you, the following compensation:

Initial Term and First Option Period

1.  With respect to all services provided by you pursuant to this agreement, we shall pay you the applicable fees provided for in the respective contracts with the several unions having jurisdiction over the use and re-use of the commercials at scale. Overtime will be compensated at scale and a half (9-10 hours) and double scale (11 hours and beyond).

P 0000089

- 5 -

2. We agree, however, that your guaranteed compensation with respect to all services provided by you pursuant to this agreement shall be the sum of $456,682 ("Guarantee") plus the pension and welfare payment sum of $43,318, based on the standard 11.5% of the amount allocated to broadcast and industrial use ("P & W Guarantee"). The Guarantee shall be paid to you in 3 payments. The first $200,000 payment shall be payable within 15 days upon execution of this agreement. The remaining Guarantee sum of $256,682 will be payable as follows: $128,341 by January 1, 1990 and $128,341 by July 1, 1990. The Guarantee shall also include payment for all other services to be performed by you hereunder, the use of materials produced from such services, and all rights granted and covenants, representations and warranties made by you herein. The Guarantee shall be allocated as follows: a) $250,000 to your service in and the use of television materials; b) $100,000 to your service in and the use of radio materials, c) $26,682 to your services in video or taped announcements for industrial use; and d) $80,000 to your services in posing for still photographs and the use thereof, personal appearances, and all rights granted and covenants, representations and warranties made by you herein. The aforementioned Guarantee shall be credited against all payments that become due under the preceding paragraph.

Should we exercise our option to renew, with respect to your services in the commercials, their use and re-use, we shall likewise pay you the applicable fees provided for in the respective contracts with the several unions having jurisdiction over the use and re-use of the commercials at scale. We will allocate the compensation as we deem it appropriate in our sole discretion.

Any sums that may become due under the appropriate union contract(s) by reason of or on account of additional rehearsal, holding fees and any other additional services covered by said union agreements in connection with the commercials shall be credited against the Guarantee.

We agree to reimburse you for the actual amount of your and one other person's necessary and reasonable travel expenses incurred in connection with the performance of your services hereunder. This shall specifically include: first class a) airfare; b) ground transportation; c) lodging and $100 per diem. You agree to provide us with documentation of such expenses upon request.

- 6 -

All payments to be made to you will be made subject
to such deductions as may be required by law, and you
shall be fully responsible for the payment for all
taxes required by federal, state and local laws. All
payments will be sent to the following address: B.V.
TV., ~~Colton, Hartnick, Yamin & Sheresky, 79 Madison~~
~~Avenue, New York, NY 10016.~~ P.O. BOX 749
MARSTONS MILLS, MA. 02648
You will be responsible for all payments to be made
to any agent, broker, or other third party with
respect to the services rendered by you and the
rights granted by you hereunder.

IV.    **COMPETITIVE PROTECTION**

During the terms of this agreement and for a period of 60
days thereafter, you will not render any services or make
any public statements for on behalf of, nor will you
permit your name, likeness, photograph, voice, biography
to be used in advertising, publicizing or promoting any
product or service other than the Product.  Under mutual
agreement, the one allowable exception is your current
job as a spokesperson for Time/Life home improvement
books.

You hereby commit to a termination schedule of any and
all existing services rendered companies other than the
Product and Time/Life per exhibit A.

IV.    **WARRANTY**

1.    **Testimonial Capacity**

You warrant and represent that the statements made by
you in connection with the commercial and the Product
represents your actual belief and personal experience
and you will provide an affidavit to such effect. You
also warrant that you will comply with all relevant
Federal Trade Commission guidelines on endorsements
and testimonials as directed by Ogilvy & Mather.

2.    **Contractual Capacity**

You and we further warrant and represent that you
have full right to enter into this agreement and that
you are free to perform all of your obligations
hereunder without violating the legal or equitable
rights of anyone.

- 7 -

**VII.**     <u>MISCELLANEOUS PROVISIONS</u>

    1.   <u>Services Unique</u>

It is understood and agreed that the services to be performed by you and the rights and privileges granted to us hereunder are of special, unique, unusual, extraordinary and intellectual character, giving them a peculiar value.

    2.   <u>Pay or Play</u>

We shall not be required to request your services at any time or to utilize your services or the product of your services, it being understood that, subject to articles VII. 6., 7., 9., and 10. hereof, our only obligation shall be to make the payments required pursuant to the provisions of Article III. hereof.

    3.   <u>Union Membership</u>

You warrant, represent and agree that you are a member of the American Federation of Television and Radio Artists and of Screen Actors Guild, and will remain a member in good standing for the duration of this agreement.

    4.   <u>Indemnities</u>

You will at all times indemnify and hold harmless us and our client and our and their respective licensees and assigns from and against any and all claims, damages, liabilities, costs and expenses, including counsel fees, arising out of any material breach by you of any representation, warranty, or agreement made by you herein.

We shall similarly indemnify you and hold you harmless with respect to any claims, damages, liabilities, costs and expenses, including counsel fees, with respect to all material in the Advertising supplied by us, as well as any product liability actions that may be brought against you, us and/or our client.

    5.   <u>Ownership of Materials</u>

You acknowledge that you have no right, title or interest, and agree that you will not claim any, in or to any of the materials produced hereunder.

- 8 -

6. **Breach**

If you or we at any time commit a material breach of any provision of this agreement or at any time fail or refuse to fulfill your material obligations hereunder, then we may terminate this agreement forthwith. Further, in such event, we shall also be entitled to all available legal and equitable remedies which we may have.

In the event that this contract is terminated pursuant to this paragraph, you shall nevertheless be entitled to all payment accrued, including the pro rata portion of the compensation under this contract up to and including the date of such termination.

7. **Morals**

If you have committed or shall commit any act, or have or do become involved in any situation or occurrence bringing you into public disrepute, contempt, scandal or ridicule, or shocking, insulting, or offending the people of this nation or any racial or religious group thereof, or reflecting unfavorably upon our reputation or our Products, then we shall have the right to immediately terminate this agreement. Our decision on all matters arising under this paragraph shall be conclusive and shall be based on our judgment as to whether or not your act or involvement has harmed or may be harmful in a significant respect; provided that our decision to terminate hereunder must be exercised, if at all, not later than sixty 60 days after the facts giving rise to such right under this paragraph are brought to our attention. Should a termination take place, ours and your remedies shall be those set forth in Article VII. 6. above.

8. **Force Majeure**

If for any reason, such as strikes, boycotts, war, Acts of God, labor troubles, riots, delays of commercial carriers, or restraints or public authority, we shall be unable to use and or re-use any of the materials produced hereunder during any period of the Initial Term (or Option Period, if any,) hereof, (as applicable,) then we shall have the right to extend the Initial Term (or Option Period, if any,) hereof for an equivalent period without any additional compensation to you. However, this period shall not exceed 3 months. If the period exceeds 3 months, both parties shall be released from the contract.

— 9 —

9. <u>Death</u>

In the event of your death during the Initial Term (or Option Period, if any) hereof, we shall have the right to elect either: (i) to have this agreement continue in full force and effect with respect to all terms and conditions except those pertaining to your performance of services; or (ii) to terminate all usage permitted hereunder immediately following death. In the event we elect to terminate usage of the materials produced hereunder, the applicable Guarantee set forth in Article III. above shall be equitably prorated to the date of death, and, if necessary, your agent agree to promptly refund any overpayment.

10. <u>Illness</u>

If during the Initial Term or any Option Period hereof, you should fail to fulfill your obligations hereunder due to illness, injury, accident, or significant change in physical appearance or voice, then we shall have the right to terminate this agreement if you are prevented from rendering services for four (4) or more consecutive weeks. In such event, we shall have no obligation to make any payments to you if you have not performed any services. However, if you have already performed some services, we shall have the right to either: (i) use the materials already produced hereunder upon making any payments required under Article II. hereof, or (ii) choose not to continue using the materials produced hereunder, in which case the applicable Guarantee shall be equitably prorated to the date we cease using the materials and, if necessary, you agree to promptly refund any overpayment.

11. <u>Full Power</u>

You and we represent that you have the full right and authority to enter into this agreement.

12. <u>Notices</u>

Service of all notices under this agreement shall be sufficient if given personally, mailed return receipt requested, or telegraphed to the General Counsel of Ogilvy & Mather, New York, NY or to you at the address set forth above. Any notice given personally or mailed shall be deemed to have been given on the date reflected on the receipt evidencing delivery, and any notice telegraphed shall be deemed to have been given on the day it is deposited with the telegraph company for transmission.

13. **Fan Mail**

Any and all mail addressed to the talent and received by us from the public in connection with the results of the services hereunder shall be and shall remain our property.  However, such mail shall be made available upon your request for review and copying.

14. **Waiver**

The failure by either of us to exercise rights granted to us herein upon the occurrence of any of the contingencies set forth in this agreement shall not constitute a waiver of such rights upon the reoccurrence of such contingency.

15. **Entire Understanding**

This agreement constitutes the entire understanding between you and us in respect to the subject matter hereof, and supersedes all prior agreements.  No waiver, modification or addition to this agreement shall be valid unless in writing and signed by the parties hereto.

16. **Law Governing**

This agreement shall be construed in accordance with the law of the State of Illinois.

17. **Interviews, Advertising and Publicity**

You will not authorize or release advertising matter or publicity, or give interviews which make reference to your engagement hereunder without our prior written approval, provided, that the talent may make limited casual references to your performance of services hereunder.

18. **Confidentiality**

You shall hold in strict confidence all information obtained from Sears with respect to Sears operations, plans, and programs, and not divulge or reveal such information to any other persons.

- 11 -

18. **Applicable Union Agreements**

This agreement is subject to all of the terms and conditions of the respective contracts of the union(s) having jurisdiction over services covered by this agreement, as such contracts may be superseded, amended, or supplemented.

Please confirm your acceptance of and agreement to the foregoing by affixing your signature in the place indicated below.

Talent
By _____
Bob Vila
Soc. Sec. # 261 900 699

Sears, Roebuck and Co.
By _____
Bill Patterson
Vice President,
Home Improvements Group

Ogilvy & Mather/Chicago
By _____ (10-3-89)
Ole Riise
Vice President,
Account Supervisor

P 0000096

Exhibit 1

P 0000097

JUN 08 1990 12:06 FROM    COLTON,HARTNICK    TO    15084281954 P.05

OGILVY AND MATHER
676 North St. Clair
Chicago, IL  60611


June 8, 1990


Mr. Bob J. Vila
c/o Ronald E. Feiner, Esq.
79 Madison Avenue
New York, New York  10016

Re:  Amendment to Bob Vila's Spokesperson Agreement

Dear Bob:

An agreement has heretofore been entered into dated September 29th, 1989 between you and us as agency for our client, Sears Roebuck and Co. whereby you agreed to render personal services as a spokesperson for Sears Home Improvement (Group 700-7) Products and Services (the "Agreement"). We are all desirous at this time of extending the term of the Agreement as well as other certain terms and conditions contained therein. The following therefore constitutes the Amendment to the Agreement.


Paragraph "I.  Term" shall be deemed amended by adding thereto a new sub-paragraph C which shall read as follows:


"C. We shall have the option, if we so elect, to extend the term of this agreement for three (3) successive three year extensions (Extension I 1992, 1993, 1994, Extension II 1995, 1996, 1997 and Extension III 1998, 1999, 2000.) On or before

P 0000098

September 1, before the expiration of the option term
or each subsequent extension, we shall have the option
of giving you notice to extend for the next extension
period."

The paragraph on the top of page 3 which refers to "40
working days" unless desired by Sears, shall be deemed not to
include personal appearances made by you on behalf of the
television show entitled "Home Again with Bob Vila" or any
other "non-advertising activities" including NATPE, media
interviews, and industry events.  Notwithstanding the
foregoing, it is understood that you shall have absolute
approval over all such personal appearances which are not
counted toward your forty (40) day commitment.

Also in the same paragraph on top of page 3, it is now
hereby agreed that you shall not be required on any of these
"40 working days" to work more than ten hour days.
Additionally, we agree to use our best efforts to give you a
minimum of 60 days advance notice as to when your services will
be required pursuant to this Agreement.

Paragraph III.  Compensation.  The subheading title
"Initial Term and First Option Period" shall be deemed amended
to read "Initial Term, First Option Period and Extensions I, II
and III ".

- 2 -

P 0000099

06 08/1990 12:07 FROM          COLTON,HARTNICK          TO          15084281954 P.05

The guarantee referred to in subparagraph 2 shall be increased on a 10% cumulative increase each year of the contract (on the base of $500,000) with said 10% increase to begin on January 1, 1992 (e.g., $550,000 for contract year 1992, $605,000 for 1993, $665,500 for 1994, etc.)  Each guarantee commencing with January 1, 1990 shall be payable on a yearly basis in two equal installments due and payable on January 5 and July 1 of each year.

Paragraph IV shall be amended to add the following:

"American Electric Power shall have the right to use you as a spokesperson through December of 1990 (with expenditures not to exceed Two Million ($2,000,000) Dollars for 1990) and the companies listed on the attached schedule shall be permitted to continue to use the generic heat pump advertisements through the periods indicated on the attached schedule.  It is understood that you have no further obligations under these agreements which will in any way affect your performance under this Agreement and that all uses mentioned herein will be of material which has been shot prior to your contract with us."

It is understood by the parties hereto that the Agreement and this Amendment are to be construed and exist separate and apart from the "Bob Vila Syndicated Television Programs" Agreement and Amendment.

Except for the foregoing, all of the terms and conditions of the Agreement are hereby ratified and affirmed.

- 3 -

Please confirm your acceptance of and agreement to the foregoing amendment by affixing your signature in the place indicated below.

Talent:

Sears, Roebuck and Co.

_____
Bob Vila
SS#: 261-900-699

By: _____
Bill Patterson
Vice President,
Home Improvements Group

Ogilvy & Mather/Chicago

By: _____
Ola Riise
Vice President,
Account Supervisor

/76FF:90:05:30

– 4 –

P 0000101

Exhibit 2

P 0000102

OGILVY & MATHER

676 North St. Clair

Chicago, IL  60611


December 3, 1990


Mr. Bob J. Vila
c/o Ronald E. Feiner, Esq.
79 Madison Avenue
New York, New York  10016


RE:  **Amendment II to Bob Vila's Spokesperson Agreement**

Dear Bob:


An agreement has heretofore been entered into dated
September 29, 1989 between you and Ogilvy & Mather, as
advertising agency for Sears, Roebuck and Co., whereby you agreed
to render personal services as a spokesperson for Sears Home
Improvement (Group 700-7) Products and Services (the
"Agreement").  Said Agreement was subsequently amended on June 8,
1990.  We are all desirous at this time of extending the term of
the Agreement as well as modifying other certain terms and
conditions contained therein.  The following therefore
constitutes Amendment II to the Agreement.

P 0000103

Mr. Bob J. Vila

December 3, 1990

Page Two


**Paragraph "I.   TERM"**   Subparagraph A shall be deleted in its entirety and the following language substituted:

    A.   The term of this Agreement shall commence on January 1, 1991, and continue through December 31, 1991.


    Subparagraph B shall be amended by changing the date for notice of renewal of the Agreement from November 1, 1990 to November 1, 1991.


**Paragraph "III.   COMPENSATION"** shall be amended by changing the dates for payment of guaranteed compensation from January 1, 1990, and July 1, 1990 to January 1, 1991 and July 1, 1991, respectively.   The guaranteed compensation for 1991 shall be Five Hundred Thousand ($500,000.00) Dollars in accordance with the terms of paragraph III of the Agreement.


**Paragraph "IV.   COMPETITIVE PROTECTION"** shall be amended by adding the following language:


    You represent that you currently have no contractual obligation to film any more commercials for Time/Life.   In the event you are called upon to enter into such an

P 0000104

Mr. Bob J. Vila

December 3, 1990

Page Three

agreement or are asked to appear in any Time/Life advertisement, you agree to give Sears, during the term of this Agreement and for sixty (60) days thereafter, the right to approve or disapprove of your participation in any future Time/Life advertising.

Please confirm your acceptance of and agreement to the foregoing amendment by affixing your signature in the place indicated below.

**Talent:**

Bob Vila
SS#:  261-900-699

**Sears, Roebuck and Co.**

By: _____
Bill Patterson
Vice President,
Home Improvements Group

**Ogilvy & Mather/Chicago**

By: _____
David Wurfel
Vice President,
Account Media Director

Exhibit 3

P 0000106

AMENDMENT #3

OGILVY AND MATHER
676 North St Clair
Chicago, IL 60611

December 3, 1991

Mr. Bob Vila
c/o Ronald E. Feiner, Esq.
79 Madison Avenue
New York, N.Y. 10016

RE:  Amendment III to Bob Vila Spokesperson Agreement

Dear Bob:

An Agreement has heretofore been entered into dated September 29, 1989, between you and Ogilvy & Mather, as advertising agency for Sears, Roebuck and Co., whereby you agreed to render personal services as a spokesperson for Sears Home Improvement Group (Department 700-7). Said Agreement was subsequently amended on June 8, 1990 (Amendment I) and December 3, 1990 (Amendment II). We are all desirous at this time of extending the term of the Agreement, as well as modifying other terms and conditions contained therein. The following constitutes Amendment III to the Agreement.

Paragraph I.  TERM

Subparagraph A. shall be amended by changing the dates for the term of this Agreement from January 1, 1991 through December 31, 1991, to January 1, 1992 through December 31, 1992, respectively.

Subparagraph B. shall be amended by changing the date for notice of renewal of the Agreement from November 1, 1991 to August 1, 1992.

Subparagraph C., as added by Amendment I dated June 8, 1990, shall be deleted in its entirety and the following language substituted:

"C. We shall have the option, if we so elect, to extend the term of this Agreement for eight (8) successive one-year extensions through the year 2000 by August 1 of each year.

Paragraph III.  COMPENSATION

Paragraph III shall be amended by changing the dates

for payment of guaranteed compensation from January 1, 1991 and July 1, 1991, to January 2, 1992 and July 1, 1992, respectively. The guaranteed compensation for 1992 shall be Five Hundred Fifty Thousand Dollars ($550,000.00) in accordance with the terms of Paragraph III of the Agreement.

It is understood by the parties that the Agreement and its Amendments are to be construed and exist separate and apart from the "Bob Vila Syndicated Television Programs" Agreement and Amendment.

Except for the foregoing, all of the terms and conditions of the Agreement are hereby ratified and affirmed.

Please confirm your acceptance of and agreement to this Amendment by signing your name in the place indicated below.

TALENT:

_____
Bob Vila
SS# 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


SEARS, ROEBUCK AND CO.

By: _____
Bill Patterson
Vice President,
Home Improvement Group


OGILVY & MATHER/CHICAGO

By: _____
Charles Otto
Management Supervisor
Vice President


2007F

—2—

P 0000108

Exhibit 4

P 0000109

AMENDMENT #4

## OGILVY & MATHER
676 North St. Clair
Chicago, Illinois  60611

July 13, 1992

Mr. Bob Vila
c/o Ronald E. Feiner, Esq.
79 Madison Avenue
New York, New York  10016

RE:  Amendment IV to Bob Vila Spokesperson Agreement

Dear Bob:

An Agreement has heretofore been entered into dated September 29, 1989, between you and Ogilvy & Mather, as advertising agency for Sears, Roebuck and Co., whereby you agreed to render personal services as a spokesperson for Sears Home Improvement Group (Department 700-7).  Said Agreement was subsequently amended on June 8, 1990 (Amendment I), December 3, 1990 (Amendment II), and December 3, 1991 (Amendment III).  We are all desirous at this time of extending the term of the Agreement, as well as modifying other terms and conditions contained therein.  The following constitutes Amendment IV to the Agreement.

**Paragraph I.  TERM**

Subparagraph A. shall be amended by changing the dates for the term of this Agreement from January 1, 1992 through December 31, 1992, to January 1, 1993 through December 31, 1993, respectively.

**Paragraph III.  COMPENSATION**

Paragraph III shall be amended by changing the dates for payment of guaranteed compensation from January 1, 1992 and July 1, 1992, to January 2, 1993, and July 1, 1993, respectively.  The guaranteed compensation for 1993 shall be Six Hundred Five Thousand Dollars ($605,000.00) in accordance with the terms of Paragraph III of the Agreement.

It is understood by the parties that the Agreement and its Amendments are to be construed and exist separate and apart from the "Bob Vila Syndicated Television Programs" Agreement and Amendment.

Except for the foregoing, all of the terms and conditions of the Agreement are hereby ratified and affirmed.

Please confirm your acceptance of and agreement to this Amendment by signing your name in the place indicated below.

TALENT:                              SEARS, ROEBUCK AND CO.

Bob Vila                             By: _____
SS# 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                          Marv Stern
                                         Vice President
                                         Home Improvement Group


                                     OGILVY & MATHER/CHICAGO

                                     By: _____
                                         Charles Otto
                                         Management Supervisor
                                         Vice President


2007F

Exhibit 5

P 0000112

<u>AMENDMENT # 5</u>

OGILVY & MATHER
676 North St. Clair
Chicago, Illinois 60611

November 15, 1993

Mr. Bob Vila
c/o Ronald E. Feiner, Esq.
Kaufmann, Feiner, Yamin,
    Gildin & Robbins
777 Third Avenue
New York, New York 10017

RE:    <u>Amendment V to Bob Vila Spokesperson Agreement (Year V)</u>

Dear Bob:

    An Agreement has heretofore been entered into dated September 29, 1989, between you and Ogilvy & Mather, as advertising agency for Sears, Roebuck and Co., whereby you agreed to render personal services as a spokesperson for Sears Home Improvement Group (Department 700-7).    Said Agreement was subsequently amended on June 8, 1990 (Amendment I), December 3, 1990 (Amendment II), December 3, 1991 (Amendment III) and July 13, 1992 (Amendment IV). We are all desirous at this time of extending the term of the Agreement, as well as modifying other terms and conditions contained therein.    The following therefore constitutes Amendment V to the Agreement.

**Paragraph I.    TERM**

    Subparagraph A. shall be amended by changing the dates for the term of this Agreement from January 1, 1993 through December 31, 1993 to January 1, 1994 through December 31, 1994, respectively.

**Paragraph III.    COMPENSATION**

    Paragraph III shall be amended by changing the dates for payment of guaranteed compensation from January 1, 1993 and July 1, 1993 to January 1, 1994 and July 1, 1994, respectively.    The guaranteed compensation for 1994 shall be Six Hundred Sixty Five Thousand Five Hundred Dollars ($665,500.00) in accordance with the terms of Paragraph III of the Agreement.

Page Two

        Except for the foregoing, all of the terms and conditions of
the Agreement are hereby ratified and affirmed.

        Please confirm your acceptance of and agreement to this
Amendment by signing your name in the place indicated below.

TALENT:                              SEARS, ROEBUCK AND CO.

_____              BY: _____
Bob Vila                                 Jerry Post
SS# 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                          Vice President
                                         Home Improvement Group


                        OGILVY & MATHER/CHICAGO


                        By: _____
                            Charles Otto
                            Management Supervisor
                            Vice President

**DEPOSITION EXHIBIT 13 (2)**

Exhibit 6

P 0000115

**AMENDMENT # 6**

**OGILVY & MATHER**
**676 North St. Clair**
**Chicago, Illinois 60611**

October 21, 1994

Mr. Bob Vila
c/o Ronald E. Feiner, Esq.
Kaufmann, Feiner, Yamin,
   Gildin & Robbins
777 Third Avenue
New York, New York 10017

RE:    Amendment VI to Bob Vila Spokesperson Agreement (Year VI)

Dear Bob:

An Agreement has heretofore been entered into dated September 29, 1989, between you and Ogilvy & Mather, as advertising agency for Sears, Roebuck and Co., whereby you agreed to render personal services as a spokesperson for Sears Home Improvement Group (Department 700-7).  Said Agreement was subsequently amended on June 8, 1990 (Amendment I), December 3, 1990 (Amendment II), December 3, 1991 (Amendment III), July 13, 1992 (Amendment IV) and November 15, 1993 (Amendment V).  We are all desirous at this time of extending the term of the Agreement, as well as modifying other terms and conditions contained therein.  The following therefore constitutes Amendment VI to the Agreement.

**Paragraph I.   TERM**

Subparagraph A. shall be amended by changing the dates for the term of this Agreement from January 1, 1994 through December 31, 1994 to January 1, 1995 through December 31, 1995, respectively.

**Paragraph III.   COMPENSATION**

Paragraph III shall be amended by changing the dates for payment of guaranteed compensation from January 1, 1994 and July 1, 1994 to January 1, 1995 and July 1, 1995, respectively.  The guaranteed compensation for 1995 shall be Seven Hundred Thirty Two Thousand and Fifty Dollars ($732,050.00) in accordance with the terms of Paragraph III of the Agreement.

Page Two

     Except for the foregoing, all of the terms and conditions of the Agreement are hereby ratified and affirmed.

     Please confirm your acceptance of and agreement to this Amendment by signing your name in the place indicated below.

TALENT:

_____
Bob Vila
SS# 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

SEARS, ROEBUCK AND CO.

By: _____
    Jerry Post
    Vice President
    Home Improvement Group


OGILVY & MATHER/CHICAGO

By: _____
    Charles Otto
    Management Supervisor
    Vice President

**Exhibit 7**

P 0000118

<u>**AMENDMENT # 7**</u>

**OGILVY & MATHER**
**676 North St. Clair**
**Chicago, Illinois 60611**

November 17, 1995

Mr. Bob Vila
c/o Ronald E. Feiner, Esq.
Kaufmann, Feiner, Yamin,
    Gildin & Robbins
777 Third Avenue
New York, New York 10017

RE: <u>Amendment VII to Bob Vila Spokesperson Agreement (Year VII)</u>

Dear Bob:

An Agreement has heretofore been entered into dated September 29, 1989, between you and Ogilvy & Mather, as advertising agency for Sears, Roebuck and Co., whereby you agreed to render personal services as a spokesperson for Sears Home Improvement Group (Department 700-7). Said Agreement was subsequently amended on June 8, 1990 (Amendment I), December 3, 1990 (Amendment II), December 3, 1991 (Amendment III), July 13, 1992 (Amendment IV), November 15, 1993, (Amendment V) and October 21, 1995 (Amendment VI). We are all desirous at this time of extending the term of the Agreement, as well as modifying other terms and conditions contained therein. The following therefore constitutes Amendment VII to the Agreement.

**Paragraph I. TERM**

Subparagraph A. shall be amended by changing the dates for the term of this Agreement from January 1, 1995 through December 31, 1995 to January 1, 1996 through December 31, 1996, respectively.

**Paragraph III. COMPENSATION**

Paragraph III shall be amended by changing the dates for payment of guaranteed compensation from January 1, 1995 and July 1, 1995 to January 1, 1996 and July 1, 1996, respectively. The guaranteed compensation for 1996 shall be Eight Hundred and Five Thousand Two Hundred and Fifty-Five Dollars ($805,255.00) in accordance with the terms of Paragraph III of the Agreement.

Page Two

    Except for the foregoing, all of the terms and conditions of the Agreement are hereby ratified and affirmed.

    Please confirm your acceptance of and agreement to this Amendment by signing your name in the place indicated below.

TALENT:

_____

Bob Vila
SS# 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


SEARS, ROEBUCK AND CO.

By: _____
    Jerry Post
    Vice President
    Home Improvement Group


OGILVY & MATHER/CHICAGO

By: _____
    Bill Reishtein
    Management Supervisor
    Vice President

P 0000120

Exhibit 8

P 0000121

<u>**AMENDMENT # 8**</u>

**OGILVY & MATHER**
**676 North St. Clair**
**Chicago, Illinois 60611**

December 18, 1996

Mr. Bob Vila
c/o Ronald E. Feiner, Esq.
Kaufmann, Feiner, Yamin,
   Gildin & Robbins
777 Third Avenue
New York, New York 10017

RE:  **Amendment VIII to Bob Vila Spokesperson Agreement**
     **(Year VIII and Years IX)**

Dear Bob:

An Agreement has heretofore been entered into dated September 29, 1989, between you and Ogilvy & Mather, as advertising agency for Sears, Roebuck and Co., whereby you agreed to render personal services as a spokesperson for Sears Home Improvement Group (Department 700-7).  Said Agreement was subsequently amended on June 8, 1990 (Amendment I), December 3, 1990 (Amendment II), December 3, 1991 (Amendment III), July 13, 1992 (Amendment IV), November 15, 1993, (Amendment V), October 21, 1994 (Amendment VI) and November 17, 1995 (Year VII).  We are all desirous at this time of extending the term of the Agreement, as well as modifying other terms and conditions contained therein.  The following therefore constitutes Amendment VII to the Agreement.

**Paragraph I.  TERM**

Subparagraph A. shall be amended by changing the dates for the term of this Agreement from January 1, 1996 through December 31, 1996 to January 1, 1997 through December 31, 1998, respectively.

**Paragraph III.    COMPENSATION**

Paragraph III shall be amended by changing the dates for payment of guaranteed compensation from January 1, 1996 and July 1, 1996 to January 1, 1997 and July 1, 1997 for Year VIII and January 1, 1998 and July 1, 1998 for Year IX respectively.  The guaranteed compensation for 1997 shall be Eight Hundred and Eighty-Five Thousand Seven Hundred and Eighty-Five Dollars ($885,785.00) and for 1998 shall be Nine Hundred and Seventy-Four Thousand Three Hundred and Fifty-Eight Dollars ($974,358.00) in accordance with the terms of Paragraph III of the Agreement.

Except for the foregoing, all of the terms and conditions of the Agreement are hereby ratified and affirmed.

Please confirm your acceptance of and agreement to this Amendment by signing your name in the place indicated below.

**TALENT:**                                **SEARS, ROEBUCK AND CO.**

By: _____

Bob Vila                                    Andy Ginger

SS# 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

**OGILVY & MATHER/CHICAGO**

By: _____

Bill Reishtein

Management Supervisor

Vice President

Exhibit 9

P 0000124

[date]    1|5|99

Mr. Bob Vila
c/o Ronald E. Feiner, Esq.
Kaufmann, Feiner, Yamin, Gildin & Robbins
777 Third Avenue
New York, New York 10017

      **Re:**    **Amendment IX to Bob Vila Spokesperson Agreement
(Years 10 through and including 15)**

Dear Bob:

      An Agreement dated September 29, 1989 has heretofore been entered into between you and Ogilvy & Mather, as advertising agency for Sears, Roebuck and Co. ("Sears")(the "Agreement"), whereby you agreed to render personal services as a spokesperson for Sears Home Improvement Group (Department 700-7). The Agreement was subsequently amended on June 8, 1990 (Amendment I), December 3, 1990 (Amendment II), December 3, 1991 (Amendment III), July 13, 1992 (Amendment IV), November 15, 1993 (Amendment V), October 21, 1994 (Amendment VI), November 17, 1995 (Amendment VII), and December 18, 1996 (Amendment VIII). We are all desirous at this time of extending the term of the Agreement, as well as modifying other terms and conditions contained therein. The following therefore constitutes Amendment IX to the Agreement.

1.    <u>**TERM**</u>

      Paragraph I(A) of the Agreement shall be amended to extend the Term to December 31, 2004.

2.    <u>**COMPENSATION**</u>

      Paragraph III of the Agreement shall be amended such that the guaranteed compensation for the respective years shall be as follows:

1999 - $1,072,000.00 (original contract)
2000 - $1,180,000.00
2001 - $1,300,000.00
2002 - $1,430,000.00
2003 - $1,575,000.00
2004 - $1,725,000.00

Each year, one half of the guaranteed sum for that year shall be paid on January 1 and the other half on July 1.

### 3.    OPTION TO RENEW

Sears shall have to option to renew the Agreement for the Year 2005 at a guaranteed sum of $1,897,500.00.

### 4.    COMMISSION

Vila shall receive a commission on Sears products sold by direct marketing on television commercials in which Vila appears and/or are directly connected to a product endorsement on the Internet. Said commission shall be limited to those sales made by phone and/or mail and/or on the Internet or any other electronic means which may be developed during the Term of this Agreement. Such sales shall not include store sales. Said commission shall be one (1%) percent of gross on each item sold. Said commissions shall be made quarterly to Vila and shall be capped each year at $100,000

### 5.    AVAILABILITY

The first sentence of the second paragraph of the Section of the Agreement entitled Notice/Availability shall be deleted in its entirety and replaced with the following:

"It is understood that during the Term of this Agreement, Sears will have your services for a total of thirty -five (35) working days (eight hour days)."

### 6.    COMPETITIVE PROTECTION

The first sentence of Paragraph IV of the Agreement shall be deleted in its entirety and replaced with the following:

"During the Term of this Agreement and for a period of six (6) months thereafter, you will not render any services or make any public statements for or on behalf of, nor will you permit your name, likeness, photograph, voice or biography to be used in, advertising publicizing or promoting any product or service other than the Product. Vila may submit a written proposal to

2

Sears to promote additional products and services. Sears shall have thirty (30) days to approve or reject Vila's proposal(s). Sears approval shall not be unreasonably withheld. If approved, such additional products and services shall be "approved products and services". Current approved products and services include:

1) Home 1-2-3 Mortgage Company
2) Department of Housing and Urban Development ("HUD")
3) Presley Homes
4) IMT Technology/Surge Plunge 2000
5) Allergy Free

Products and services currently being reviewed for approval include:

1) Bob Vila branded clothing.

Further, although Vila shall have the right to appear in any non-sponsored media without Sears prior approval, Vila shall submit a written proposal to Sears to appear in any sponsored media. Sears shall have thirty (30) days to approve or reject Vila's proposal(s) to appear in sponsored media. Sears approval shall not be unreasonably withheld.

7.   **CANCELLATION OF TELEVISION SHOW**

If the Bob Vila Home Again television show is canceled for any reason, Sears has the right to terminate this Agreement effective the 31st day of December following the notice of cancellation.

8.   **CONTINGENCY**

This Agreement is contingent upon the execution of Amendment No. 10 to the Bob Vila Syndicated Television Program Agreement dated September 28, 1989 ("BVTV Agreement").

Except for the foregoing, all of the terms and conditions of the Agreement and all amendments relating thereto which are not inconsistent with the foregoing are hereby ratified and affirmed.

Acceptance of and agreement to this Amendment is confirmed by signing your name in the place indicated below.

**BOB VILA**                                      **SEARS, ROEBUCK AND CO.**

Date: Dec 21/98                                  Date: Jan 4, 1999
By: _____                               By: _____

3

P 0000127

Exhibit 10

P 0000128

December 1, 2000

Mr. Bob Vila
c/o Ronald E. Feiner, Esq.
Kaufmann, Feiner, Yamin, Gildin & Robbins
777 Third Avenue
New York, NY 10017

Re:   Amendment X to Bob Vila Spokesperson Agreement
      (Years 10 through and including 20)

Dear Bob:

An Agreement dated September 29, 1989 has heretofore been entered into between you and Ogilvy & Mather, as advertising agency for Sears, Roebuck and Co. ("Sears") (the "Agreement"), whereby you agreed to render personal services as a spokesperson for Sears Home Improvement Groups. The Agreement was subsequently amended on June 8, 1990, (Amendment I), December 3, 1990 (Amendment II), December 3, 1991 (Amendment III), July 13, 1992 (Amendment IV), November 15, 1993 (Amendment V), October 21, 1994 (Amendment VI), November 17, 1995 (Amendment VII), December 18, 1996 (Amendment VIII), and January 5, 1999 (Amendment IX). We are all desirous at this time of extending the term of the Agreement, as well as modifying other terms and conditions contained therein. The following therefore constitutes Amendment X to the Agreement.

1.    **TERM**

Paragraph I(A) of the Agreement shall be amended to extend the Term through December 31, 2009.

2.    **COMPENSATION**

Paragraph III of the Agreement shall be amended such that the guaranteed compensation for the respective years shall be as follows:

| | |
|---|---|
| 1999 - $1,072,000.00 (original contract) | 2005 - $1,897,500.00 |
| 2000 - $1,180,000.00 | 2006 - $2,087,250.00 |
| 2001 - $1,300,000.00 | 2007 - $2,295,975.00 |
| 2002 - $1,430,000.00 | 2008 - $2,525,572.00 |
| 2003 - $1,575,000.00 | 2009 - $2,778,129.00 |
| 2004 - $1,725,000.00 | |

Vila Spokesperson Agreement
Amendment X
Page Two

Each year, one half of the guaranteed sum for that year shall be paid on January 1 and the other half on July 1.

3.      Paragraph 4 of Amendment IX is deleted in its entirety subject to final accounting through December 31, 2000.

4.      Paragraph 7 of Amendment IX shall remain in effect during the current term and any extension of that certain Bob Vila Syndicated Television Program Agreement dated September 29, 1989, as amended, between Oglivy & Mather, as agent for Sears, and B.V.T.V., Inc.

5.      This preamble to the Agreement is amended to delete the words "(Group 700-7)."

Except for the foregoing, all of the terms and conditions of the Agreement and all amendments relating thereto which are not inconsistent with the foregoing are hereby ratified and affirmed

Acceptance of and agreement to this Amendment is confirmed by signing your name in the place indicated below.

**BOB VILA**                            **SEARS, ROEBUCK AND CO.**

Date: _____          Date: _12/18/00_____

By: _____          By: _____

# DEPOSITION EXHIBIT  21

**Kin Condon**

From:       <MRODE@sears com>
To:         <rfeiner@kaufmannfeiner com>
Sent:       Friday, January 14, 2005 1 27 PM
Attach:     prod devel-rev1 doc
Subject:    Revision to product agreement

Ron,

Attached is the contract with the revisions you requested (I hope)   I am also collecting Names of people at King World in case you or Jonathan have any good contacts

Mark P  Rode
Craftsman Brand Manager
(847) 286-3447

7/14/2005



P 0000131

DRAFT

_____, 2004January 11, 2005

B.V T.V., Inc.
Attn: Mr. Bob Vila
115 Kingston St.
3rd Floor
Boston, MA 02111

Re   Amendment No. 11 to Bob Vila Syndicated Television Program Agreement
     (Year 16 - Year 17) ("Amendment No. 11").

Dear Mr. Vila:

The parties hereto, your production company, B.V.T.V., Inc. ("Producer") and Sears, Roebuck and Co. ("Sears") are desirous of setting forth the terms for going forward for the next two yearsbroadcast years, i e , September 1, 2005 through August 31, 2006 and September 1, 2006 through August 31, 2007 ("Year 16 - Year 17") with regard to Bob Vila's Home Again ("Home Again"), the syndicated television series financed by Sears, produced by Producer and starring you, Bob Vila ("Vila").

An agreement regarding the Series dated September 28, 1989, has heretofore been entered into between Producer and Ogilvy & Mather, as agent for Sears (the 1989 Agreement") and was subsequently amended on June 8, 1990 ("Amendment No.1"), February 8, 1991 ("Amendment No. 2 and No. 3"), January 12, 1992 ("Amendment No 4"), February 10, 1993 ("Amendment No.5"), November 15, 1993 ("Amendment No.6"), December 5, 1994 ("Amendment No.7"), December 19, 1995 ("Amendment No. 8"), December 18, 1996 ("Amendment No. 9") and January 5, 1999 ("Amendment No. 10) (The 1989 Agreement and amendments are herein defined as "the Agreement."); and the parties desire to amend and extend the Agreement on the terms set forth below.

1.   PRODUCER'S OBLIGATIONS. For each of Year 16 and Year 17, Producer agrees to produce and deliver to Sears a minimum of 26 one half-hour programs which programs are scheduled to commence airing in September, 2005 (the "New Programs"). The New Programs, Series 16 through Series 17, shall be delivered in two 13-week cycles for each year and shall conform with standards consistent with all prior programs submitted pursuant to the Agreement. Sears will have prior approval over the locations of the New Programs. Such approval shall not be unreasonably withheld. In addition to the New Programs, there shall also be delivered to Sears for each of Years 16 and Year 17, a minimum of 26 vignettes of 30-seconds each and a minimum of 26 "10-second tune-ins." Each of said vignettes and tune-ins shall coincide with each respective program. Producer agrees to produce the New Programs, and related vignettes and tune-ins, in a professional manner using a professional staff and in keeping with the standards of previously produced Home Again shows. Producer shall be solely responsible for all aspects of the New Programs, vignettes and tune-ins, including but not limited to, project development and/or renovation costs, talent, travel and accommodations, talent and production crew salaries, equipment rentals or purchases, etc. If requested by Sears, Producer agrees to use Sears Home Improvement products and services in the production of the New Programs wherever applicable, based on availability and delivery Sears shall appoint a Sears liaison from whom Producer may purchase any products or services sold by Sears at Sears cost Each New Program will contain a prominent presentation credit naming Sears in a manner acceptable to it, including, without limitation, placement at the head of each New Program.

DRAFT

2.    CONSIDERATION

(a)    For each of Year 16 and Year 17 (Series 16 through Series 17), Sears agrees to pay and Producer agrees to accept each Year the guaranteed sum of $1,519,500.

(b)    Said $1,519,500 shall be paid each Year as follows

(i)    $750,000 shall be due on or before each January 1 commencing January 1, 2005;

(ii)    $494,500 on or before each March 1 commencing March 1, 2005, and

(iii)    $275,000 on or before each August 1 commencing August 1, 2005

(c)    In addition, any revenue sharing due Producer pursuant to Paragraph 4 of Amendment 10, as amended below, from~~in respect of Years 16 and Year 17 (including amounts for the first-run syndication of~~the New Programs and in respect of any amounts received over such periods relating to the Library) ("Revenue Sharing") shall be paid by Sears as follows:

(i)    On or before August 1 of each Year, commencing August 1, 2005, Sears shall pay Producer a $200,000 advance.

(ii)    On or before October 1 of each Year, commencing October 1, 2005, Sears shall estimate the full amount due Producer for the applicable Year from Revenue Sharing and pay Producer such estimated amount to the extent it is in excess of the above $200,000 advance, and

(iii)    As soon as practicable after Sears' receipt from the syndicator of ~~final~~year-end reconciliation statement(s) with respect to each Year (generally received by _____ following the end of the Year) (the "Year-End Statement"), Sears shall calculate the ~~final~~full amount due Producer from Revenue Sharing for the Year  If the ~~final~~such amount is greater than the amounts previously paid for the Year under (i) and (ii) above, Sears shall pay the difference.  If the ~~final~~such amount is less than the previously paid amounts, Sears may take a credit for the difference against any future amounts payable by Sears to Producer or any of Producer's affiliates, whether pursuant to this or any other agreement.  If ~~the final~~such amount is equal to the previously paid amounts, no further amount will be due and owing.  Sears shall provide Producer a written statement (the "Sears Final Statement") showing the amount being paid, the credit due or that no amount is due, as applicable, together with a copy of the statement(s) from the syndicator upon which such calculation was based.

    The parties acknowledge that Sears may receive after the Sears Final Statement further adjustments in revenue from the syndicator relating to a Year.  As soon as practical after Sears' receipt of such an adjustment, Sears will make any adjustments to the Sears Final Statement, and pay any further amounts due or take such further credits in accordance with the methodology described above, as may be required because of such adjustment.

Producer shall be responsible for the execution and cost each year of the National Captioning Institute, Inc 's close-captioning of all New Programs.

3.    FURTHER AMENDMENTS    Effective with the production of the New Programs, the Agreement shall be further amended as follows:

DRAFT

(a)    The term "Series" as used in the Agreement shall be deemed to include the New Programs together with their related vignettes and tune-in for all purposes as provided therein.

(b)    Paragraph 4 of Amendment 10, THE LIBRARY, is amended as follows: (i) the words "use good faith efforts" shall be inserted before the words "to enter into contracts" in the fourth sentence thereof; (ii) "Ogilvy" shall be substituted with "Mindshare (or other Sears media agency)"; (iii) the sixth sentence thereof is deleted and replaced with the following: "All gross income from first run syndication and from all subsequent sales and uses of the Library, less any fees or other costs paid to Producer for the Series and less fees or other costs paid to a syndicator or other third party relating to the syndication or other sale or use of the Series, shall be divided equally between Sears and Producer;" and (iv) the end of the eighth sentence thereof shall be amended to add the following: "as described above."

(c)    Paragraphs 21(a)(2) and 21(a)(3) of the Agreement are amended to delete "$500,000," each time it appears therein, and replace it with "$1,000,000;" Paragraph 21(a)(5) is amended to delete "$1,000,000" and replace it with "$4,000,000," and a new clause (a)(6) is added as follows: "Professional Liability or Errors & Omissions Insurance with limits of not less that $5,000,000 per claim"

The parties acknowledge that the Distribution and Media Sales Agreement dated September 1, 1999 (as amended, the "Distribution Agreement") between Sears and CBS Broadcasting Inc. for the television distribution of the Series (through Series 15), including the Library, expires August 31, 2005 for broadcast distribution and September 30, 2006 for cable distribution. This Amendment No. 11 and the parties' obligations in connection herewith are therefore expressly conditioned upon the completion of a mutually acceptable written extension of the Distribution Agreement or replacement thereof with respect to the New Programs

All of the terms and conditions of the Agreement which are not inconsistent with the foregoing are hereby ratified and affirmed.

Acceptance of and agreement to this Amendment No. 11 is confirmed by signing your name in the place indicated below.

Very truly yours,

**SEARS, ROEBUCK AND CO.**

By: _____
Its: _____

Agreed and Accepted
B.V.T V., Inc.

_____
Bob Vila

# DEPOSITION EXHIBIT  22

**kcondon**

---

**From:**    "Jonathan Russo" <Jrusso@ArtistsAgency com>
**To:**    "kcondon" <kcondon@kaufmannfeiner com>
**Sent:**    Tuesday, January 18, 2005 10 49 AM
**Subject:**    RE  Vila Agreement

GREAT  WELL DONE, I WILL TELL BIRKHAHN  JR

> -----Original Message-----
> **From:** kcondon [mailto:kcondon@kaufmannfeiner.com]
> **Sent:** Tuesday, January 18, 2005 10:25 AM
> **To:** MRODE@sears.com
> **Cc:** Bob Vila; Jonathan Russo
> **Subject:** Vila Agreement
>
> Dear Mark
>
> The new Vila Syndication Agreement is fine   Can you have Drew arrange for execution copies?  Also,
> please call Jonathan Birkhahn, Senior Vice President of King World Productions, at 212-541-0266
> regarding the syndication agreement
>
> Thanks, Ron Feiner



EXHIBIT
Blumberg No. 5208
#22  I J
1-24-06

1/18/05

**DEPOSITION EXHIBIT  23**

**From:** Redacted
**Sent:**
**To:**
**CC:**
**BCC:**
**Subject:** Re: Vila Extension Agreement

Redacted

"kcondon" <kcondon@kaufmannfeiner.com>
01/21/2005 12:24 PM
Please respond to "kcondon"

To: <dfarka2@sears.com>
cc: "Bob Vila" <rjvila@bobvila.com>, <jrusso@ArtistsAgency.com>,
<MRODE@sears.com>
Subject: Vila Extension Agreement

Dear Drew:
When can I expect to receive execution copies of the Vila extension agreement
whose redline we found to be acceptable? As you can imagine, we are quite
anxious to cause this to be signed and to allow Mark to finish the King World
deal.
Ron

EXHIBIT
Bamberg No. 5208
#23 ѡ
1-24-06

SEARS-2272

# DEPOSITION EXHIBIT  27

more Mel to Mark
Page 84 of 138
Case 1:05-cv-11717-WGY      Document 43-8      Filed 07/21/2006      Page 11 of 12

>> >
>> >
>> > Melissa Marchand <mel.marchand@bobvila.com>
>> >
>> > 03/11/2005 04:26 PM
>> >
>> >
>> > To: MRODE@sears.com
>> > cc:
>> > Subject: Re: Ty.com
>> >
>> >
>> >
>> > Will do!
>> > Mel
>> >
>> > BobVila.com
>> > 115 Kingston St., 3rd floor
>> > Boston, MA 02111
>> > 617-848-8458 (Boston)
>> > 508-737-5328 (mobile)
>> > On Mar 11, 2005, at 5:20 PM, MRODE@sears.com wrote:
>> >
>> > >
>> > > Sure lie to me. Everyone else does.
>> > >
>> > >
>> > > On another note we heard back from Bill Crowley and there >> (as there
>> > > always seems to be these days) are issues. We think we can >> address
>> > some of the issues and are going to regroup with Jeanine on >> Monday
>> > and
>> > > hopefully schedule a meetings with Ron on Tuesday. If you >> would be
>> > > kind enough to percolate that through your group I would >> appreciate
>> > > it.
>> > >
>> > > Mark P. Rode
>> > > Craftsman Brand Manager
>> > > (847) 286-3447
>> > >
>> > >
>> > >
>> > >
>> > >
>> > > Melissa Marchand <mel.marchand@bobvila.com>
>> > >
>> > > 03/11/2005 03:44 PM
>> > >
>> > >
>> > > To: MRODE@sears.com
>> > > cc:
>> > > Subject: Re: Ty.com
>> > >
>> > >
>> > > I got back just as David left. And it's snowing AGAIN!
>> > > Mel
>> > >
>> > > BobVila.com
>> > > 115 Kingston St., 3rd floor
>> > > Boston, MA 02111
>> > > 617-848-8458 (Boston)
>> > > 508-737-5328 (mobile)
>> > > On Mar 11, 2005, at 2:59 PM, MRODE@sears.com wrote:
>> > >
>> > > >
>> > > > No it doesn't and weren't you supposed to be unavailable >> right
>> > now?
>> > > >
>> > > > Mark P. Rode
>> > > > Craftsman Brand Manager
>> > > > (847) 286-3447
>> > > >
>> > > >
>> > > >
>> > > >
>> > > >
>> > > >



EXHIBIT
#27 1D
1-24-06

> Boston, MA 02111
> 617-848-8458 (Boston)
> 508-737-5328 (mobile)
>
Begin forwarded message:

> From: Melissa Marchand <mel.marchand@bobvila.com>
> Date: March 11, 2005 5:58:40 PM EST
> To: MRODE@sears.com
> Subject: Re: Ty.com
>
> Avoid the legumes. Stick with the leafy greens.
> (I'm delighted that Bob was gracious. You deserve it. I think he > understands that you're doing all that you can.)
> Mel
>
> BobVila.com
> 115 Kingston St., 3rd floor
> Boston, MA 02111
> 617-848-8458 (Boston)
> 508-737-5328 (mobile)
> On Mar 11, 2005, at 5:39 PM, MRODE@sears.com wrote:
>
>>
>> I am in bean counter hell. Bob was extraordinarily gracious.
>>
>> Mark P. Rode
>> Craftsman Brand Manager
>> (847) 286-3447
>>
>>
>>
>>
>>
>>
>> Melissa Marchand <mel.marchand@bobvila.com>
>
>>
>>
>> 03/11/2005 04:40 PM
>
>>
>>
>>
>
>>
>> To: MRODE@sears.com
>
>>
>> cc:
>
>>
>> Subject: Re: Ty.com
>
>>
>>
>>
>>
>> feel free to cal me with with any of the color commentary
>> 508-362-2296
>> Mel
>>
>> BobVila.com
>> 115 Kingston St., 3rd floor
>> Boston, MA 02111
>> 617-848-8458 (Boston)
>> 508-737-5328 (mobile)
>> On Mar 11, 2005, at 5:27 PM, MRODE@sears.com wrote:
>>
>> >
>> > Talking to Bob right now.
>> >
>> > Mark P. Rode
>> > Craftsman Brand Manager
>> > (847) 286-3447
>> >
>> >
>> >
>> >

**DEPOSITION EXHIBIT  29**

**Sent:** Fri, 18 Mar 2005 20:39:58 GMT
**From:** kcondon
**To:** dfarka2@sears.com
**CC:** MRODE@sears.com; Bob Vila; jrusso@ArtistsAgency.com
**BCC:**
**Subject:** Bob Vila Shows

Dear Drew: I understand that King World has been trying to reach you. I think that if we don't get a decision regarding Sears' renewal of the shows very soon, we, on behalf of Bob, should negotiate the deal with King World with your blessing - as time is really creating a crunch situation regarding producing the shows in the manner and quality we are all used to. Please let me know your thoughts. Regards, Ron Feiner_



# DEPOSITION EXHIBIT  30

**kcondon**

---

| | |
|---|---|
| **From:** | "kcondon" <kcondon@kaufmannfeiner com> |
| **To:** | "Bob Vila" <rjvila@bobvila com> |
| **Sent:** | Wednesday, March 23, 2005 1 41 PM |
| **Subject:** | Sears Conference Call |

(The following was dictated but not read)

Bob

I had a conversation this day with Andy Ginger, Drew Farkas, Mark Rode and Wendy Pifner, Esq of Holland and Hart

The first 20 minutes of the conversation dealt with their giving me an overview of the chaotic situation presently existing at Sears They said things are unfolding quite quickly By Friday, senior management is expected to be announced as the shareholder vote takes place tomorrow There will probably be some sharing of power at the top which will involve Bill Crowley, Lambert's right-hand man, Alan Lacy, the guy running K-Mart today, and Luis Padilla (who was responsible previously for marketing at Target) Jeannine, Andy's boss, will report directly to Padilla (if she still has her job) In effect, everyone at Sears as well as K-Mart will be applying for a new job at Sears Holding K-Mart and Sears will disappear into the background Padilla runs marketing and merchandising He is working with a budget that calls for a very substantial reduction in marketing

The restructure that they are proposing is strictly from a cost structure, they are not looking for long-term relationships but more like one-offs that Target has been working with The kind of deal that you and Martha have is not Padilla's favorite by any means

Their proposal is as follows

1 They will reduce or eliminate their ownership in the Library for the various considerations herein (they are estimating the Library to have a market value of $12 million based upon prior cable deals, giving Sears a $6 million equity)

2 They will renew "Home Again" for one year with the bonuses refigured on an actual cost basis for them

3 In exchange, Sears wants to reduce the Spokesperson agreement as follows

2006 – $700,000

2007 – $1,000,000

2008 – $1,600,000

2009 – Eliminated

4 They are willing to reduce personal days by five per year, for a total of 20 days (suggesting if we want more, it's possible)

5 They want to eliminate what remains in the incentive bonus for 2004/05 which probably is somewhere in the range of $350,000-450,000

6 We also discussed eliminating the exclusivity on non-competing endorsements

They had not presented this proposal yet to senior management, although it fits within the budget requirements they have They are extremely interested in knowing as soon as possible what our reaction is to the foregoing I

3/23/2005

EXHIBIT
#30 1D
1-24-06
Bumbens No 5206

suggested we would talk again mid-day on Friday

Ron

3/23/2005

# DEPOSITION EXHIBIT  31

**Sent:** Mon, 04 Apr 2005 14:41:15 GMT
**From:** Luis Padilla
**To:** eddie@eslinvest.com; wcc@eslinvest.com
**CC:**
**BCC:**
**Subject:** Vila

Further review of Vila contract and renegotiation. I can review with you tonight. Luis.

----- Forwarded by Luis Padilla/Full-Line/SEARS on 04/04/2005 09:40 AM -----

|  |  |  |
|---|---|---|
| **Andy Ginger** | To: | Luis Pac |
| 04/04/2005 09:13 AM | cc: | |
| | Subject: Vila | |

Per Claudette's request, I'm e-mailing the content of the memo I sent to your office.

Per your request, attached shows where we are. Need input to move forward. Also, need to know if we should prepare for approval through the new contract approval process announced this morning.

**Background:** Current show deal is not bringing Sears a break-even bottom line. Overall investment rising. Spokesperson contract runs through 2009. Sears wants to re-structure to a business arrangement that provides reduced expense. Sears wants to exchange ownership in the TV show library for reduction in future obligations.

**Timing urgent.** CBS/Kingworld has sold-out 2005-06 season to advertisers and has prepared to clear in syndication for this fall.

**Achieved Sears original financial targets going into negotiation:**

- Breakeven potential for 2005 on Home Again
- Breakeven on a final, one-year extension for the TV show
- Significant reductions in spokesperson expense for 2006-2009
- Total agreed reduction in expense of $5.3 to $5.5 MM
- Exceeds Sears est. valuation of 50% ownership in the library by $500 K

**Recommended next steps:**

- Agree on financials
- Negotiate to retain current exclusivity process (1)
- Negotiate to retain 20 days per year (2)
- Prioritize these as stated above, using days to hold exclusivity

**Recap of Vila**
**Negotiation**

|  | C | C | Reduction |
|---|---|---|---|



EXHIBIT
Bunterg No. 5208
#31 10
1-24-06

SEARS-1940



| | Current Contractual Obligation | Current Negotiated Status | |
|---|---|---|---|
| **2004-5 Home Again Incentive** | | | |
| Minimum | 425,000 | 0 | 425,000 |
| Maximum | 625,000 | 0 | 625,000 |
| **Spokesperson Fee** | | | |
| 2006 | 2,08 | 1,04 | 1,043,625 |

SEARS-1941

| Year | | | |
|---|---|---|---|
| (2006, cont.) | …7,250 | …3,625 | |
| 2007 | 2,295,975 | 1,147,988 | 1,147,987 |
| 2008 | 2,525,572 | 1,262,786 | 1,262,786 |
| 2009 | 2,778,129 | 1,389,065 | 1,389,064 |
| Total | 9,686,926 | 4,843,464 | 4,843,462 |

**Spokesperson Days**

| Year | | | |
|---|---|---|---|
| 2006 | 35 | 17.5 | 17.5 |
| 2007 | 35 | 17.5 | 17.5 |
| 2008 | 35 | 17.5 | 17.5 |

SEARS-1942

| | | | |
|---|---|---|---|
| 2009 | 35 | 517.5 | 17.5 |
| Total | 140 | 570 | 70 |
| **Library Ownership** | 50/50 | 100% BVTV | As Proposed By Sears |
| **Show Production Extension** | | 1 Year Extension | As Proposed By Sears |
| **Exclusivity Approval Process** | Sears 100% review | Vila proposes to | Sears does not wish to relax process |

SEARS-1943



and appoval not to be unreasonbly witheld

relax for mortgage, finance, banking. automotive

SEARS-1944

**DEPOSITION EXHIBIT  32**

**Sent:** Wed, 06 Apr 2005 16:20:42 GMT
**From:** Luis Padilla
**To:** WCC
**CC:** gmanto@sears.com
**BCC:**
**Subject:** RE: Vila

    **Redacted**

    **"WCC"**
    **<WCC@eslinvest.com>**      **To:**                                                               <lpadill:
    04/06/2005 10:52 AM          cc:
                                Subject:  RE: Vila

    **Redacted**

    William C. Crowley
    *wcc@eslinvest.com*
    W: 203-861-4603
    M: 917-536-8033

    **From:** lpadilla@sears.com [mailto:lpadilla@sears.com]
    **Sent:** Wednesday, April 06, 2005 10:08 AM
    **To:** WCC
    **Subject:** RE: Vila

    We are negotiating a trade off on dollars and days nothing to report yet. I will have
    finance run an npv you probably won't like it but I will run it by you. Should have it
    done today. Luis.

    **"WCC" <WCC@eslinvest.com>**                                    **To:**  <lpadilla@s
                                           cc:
    04/06/2005 09:15 AM                                  Subject:    RE: Vi

    Is there a trade off of dollars and days?
    In other words, what is greatest reduction that we could get on the economics?  We may
    not decide to do that, but I would like to understand if we could get out of the future
    payments by giving up more upfront, even accelerating some of the payments (he may



SEARS-1948

want it extended, we just want the lowest npv to us).

William C. Crowley
wcc@eslinvest.com
W: 203-861-4603
M: 917-536-8033

**From:** lpadilla@sears.com [mailto:lpadilla@sears.com]
**Sent:** Monday, April 04, 2005 9:41 AM
**To:** Eddie; WCC
**Subject:** Vila

Further review of Vila contract and renegotiation. I can review with you tonight. Luis.

----- Forwarded by Luis Padilla/Full-Line/SEARS on 04/04/2005 09:40 AM -----

**Andy Ginger**

04/04/2005 09:13 AM

To:      Luis Padilla/Full-Line/SEARS@SEARS
cc:
Subject:      Vila

Per Claudette's request, I'm e-mailing the content of the memo I sent to your office.

Per your request, attached shows where we are. Need input to move forward. Also, need to know if we should prepare for approval through the new contract approval process announced this morning.

**Background:** Current show deal is not bringing Sears a break-even bottom line. Overall investment rising. Spokesperson contract runs through 2009. Sears wants to re-structure to a business arrangement that provides reduced expense. Sears wants to exchange ownership in the TV show library for reduction in future obligations.

Timing urgent. CBS/Kingworld has sold–out 2005-06 season to advertisers and has prepared to clear in syndication for this fall.

**Achieved Sears original financial targets going into negotiation:**

- Breakeven potential for 2005 on Home Again

- Breakeven on a final, one-year extension for the TV show

- Significant reductions in spokesperson expense for 2006-2009

- Total agreed reduction in expense of $5.3 to $5.5 MM

- Exceeds Sears est. valuation of 50% ownership in the library by $500 K

**Recommended next steps:**

- Agree on financials
- Negotiate to retain current exclusivity process (1)
- Negotiate to retain 20 days per year (2)
- Prioritize these as stated above, using days to hold exclusivity

| Recap of Vila Negotiation | Current Contractual Obligation | Current Negotiated Stat |
|---|---|---|
| **2004-5 Home Again Incentive** | | |
| Minimum | 425,000 | 0 |
| Maximum | 625,000 | 0 |
| **Spokesperson Fee** | | |
| 2006 | 2,087,250 | 1,043,625 |
| 2007 | 2,295,975 | 1,147,988 |
| 2008 | 2,525,572 | 1,262,786 |
| 2009 | 2,778,129 | 1,389,065 |
| Total | 9,686,926 | 4,843,464 |
| **Spokesperson Days** | | |
| 2006 | 35 | 17.5 |
| 2007 | 35 | 17.5 |
| 2008 | 35 | 17.5 |
| 2009 | 35 | 17.5 |
| Total | 140 | 70 |
| **Library Ownership** | 50/50 | 100% BVTV |
| **Show Production Extension** | | 1 Year Extension |

| Exclusivity Approval Process | Sears 100% review and appoval not to be unreasonbly witheld | Vila proposes to relax for banking. automotive |

# DEPOSITION EXHIBIT  36

**Mark**

| | |
|---|---|
| **From:** | WCC |
| **Sent:** | Saturday, April 16, 2005 1:45 PM |
| 0: | 'MRODE@sears.com' |
| Jc: | 'lpadil4@sears.com' |
| **Subject:** | Re Vila Contract |

Can you send me the excel sheet with the comparison of extending vs. Not extending the production for another year.

What do we think the economics are to him?

Please also send me the contract.

I would like to figure out the cheapest way to get out of this agreement.
-------------------------------
William C. Crowley
ESL Investments
wcc@eslinvest.com
203-861-4603

-----Original Message-----
From: MRODE@sears.com <MRODE@sears.com>
To: WCC <WCC@eslinvest.com>
Sent: Fri Apr 15 12:41:57 2005
Subject: Vila Contract


Bill,

I just wanted to follow up on the short analysis that was sent your way on the Bob Vila situation. Bob has requested a response today on the production portion of the agreement or the 2005-2006 season. I recognize there are a number of moving parts to this and want to make sure you have full disclosure of the facts (as well as a contact name for questions).
Janine had requested that we bundle the show and the spokesperson/library agreement to maximize leverage. However, this has caused Bob to get behind on the show's production. Additionally, Bob's representatives have agreed to take a reduction on monies he is contractually owed from the 2004-2005 season in order to move the 2005-2006 season forward. Which makes the leverage point somewhat moot.

While bundling them makes it neater, if we would like to take more time to evaluate the library v spokesperson agreement portion of the deal, I recommend we move forward on the production agreement. I have already convinced them to take $.25 on the dollar and may be able to cut a little deeper.

Please let me know how you would like me to proceed. Thanks

Mark P. Rode
Craftsman Brand Manager
(847) 286-3447



EXHIBIT
#36-10
1-24-06

**SEARS-1725**

**Sent: Redacted**
**From:**
**To:**
**CC:**
**BCC:**
**Subject:** Re: Vila Proposal

**Redacted**

**Mark Rode**

04/29/2005 11:46 AM

To:
<kcondon@kaufmannfeiner.com>
cc:
Subject:  Re: Vila Proposal

"kcond

Ron,

I understand your position.  Believe me.  However, can you give me a point by point reply so I can walk it back up to the 6th floor.  If you feel summarily insulted and would just prefer to let it litigate, I understand, but would just need to know that to.

Sorry it got to this.  It is a new world here and obviously this is the new management's idea of how the game is played.  However, please let Bob know that I continue to impress upon them his value to the brand and the company and I believe they understand (at some level) that this is true.

Thanks for your help.

Sorry also for the phone situation yesterday.  The trouble was unintentional.

Mark P. Rode
Craftsman Brand Manager
(847) 286-3447



SEARS-1914

**DEPOSITION EXHIBIT  45**

**Sent:** Redacted
**From:**
**To:**
**CC:**
**BCC:**
**Subject:** Re: Vila Proposal

Redacted

Mark Rode

04/29/2005 11:46 AM

To:
<kcondon@kaufmannfeiner.com>
cc:
Subject: Re: Vila Proposal

"kcondc

Ron,

I understand your position. Believe me. However, can you give me a point by point reply so I can walk it back up to the 6th floor. If you feel summarily insulted and would just prefer to let it litigate, I understand, but would just need to know that to.

Sorry it got to this. It is a new world here and obviously this is the new management's idea of how the game is played. However, please let Bob know that I continue to impress upon them his value to the brand and the company and I believe they understand (at some level) that this is true.

Thanks for your help.

Sorry also for the phone situation yesterday. The trouble was unintentional.

Mark P. Rode
Craftsman Brand Manager
(847) 286-3447



SEARS-1914

**DEPOSITION EXHIBIT  46**

**Sent:** Redacted
**From:**
**To:**
**CC:**
**BCC:**
**Subject:** Vila Licensing Proposal

Redacted

"kcondon"
<kcondon@kaufmannfei
ner.com>

04/29/2005 02:14 PM
Please respond to
"kcondon"

To:
cc:
<rjvila@bobvila.com>, <jfob1@aol.com>
Subject:  Vila Licensing Proposal

<MROI
"Bob Vi

Dear Mark:

I shall respond to new management's proposal on a point by point basis as you
requested. New management should understand, if they do not already, that Bob Vila
and BVTV have valid and binding contracts with Sears and have been acting in
accordance with those agreements. New management expressed a desire to renegotiate
those contracts. Given our long and mutually successful relationship with Sears, we
entered into discussions, in good faith, regarding amending both contracts on terms that
would be mutually satisfactory to all. In view of the foregoing, we were very upset with
new management's proposal contained in your e-mail of yesterday.

Nonetheless, in response to your request, I have treated your counter-proposal as if the
bullet points were numbered one through eight; the following constitutes our response
thereto:

1. No - we wish to stick with our original proposal.

2. Only if everything else is agreed and put to bed.

3. No - we wish to stick with our original proposal.

4. I don't understand your need for use of the library for on-line and in-store
promotional purposes. We've done the show for 15 years and Sears has never sought to
use it this manner. If, after the transfer of the library to us, you would like a non-
exclusive license for certain purposes, we will be glad to negotiate it with you.



SEARS-1916

5. No to splitting of revenue on the library. Under the present contract, we are splitting revenue 50-50. The object here is to regain control of the library so that we can exploit it in a better fashion than Sears has to date. That is the consideration for the reduction in spokesperson fees.

6. Yes.

7. Yes.

8. We would like the production agreement to continue for the two years contracted for, but we will settle for one. However, the $1.5 million has to be guaranteed and paid immediately with no possibility of repayment. Secondly, we cannot negotiate on behalf of King World, nor do we want to. It is totally unfair to Bob to attempt to condition his deal on a dispute Sears is having with King World.

Again, I wish to point out that this is as far as we are prepared to go in this. Please understand that the proposal we made initially was in the spirit of trying to help. Based upon this counter-proposal, it has become very difficult for Bob to proceed with the negotiation in this same spirit. Please understand that I am hereby reserving all rights which Bob may have in law or in equity under his present agreements.

Ron Feiner

SEARS-1917

**DEPOSITION EXHIBIT  47**

**Sent:** Thu, 05 May 2005 15:16:28 GMT
**From:** Mark Rode
**To:** WCC
**CC:**
**BCC:** Drew Farkas
**Subject:** RE: Where are we with Vila?
 I will get him what he needs and make sure he has the correct contact.

And, I want to be very clear because I feel like a jerk. I hope it didn't sound like the legal team was holding anything up or was lacking in any way. That is absolutely not the case.

Mark P. Rode
Craftsman Brand Manager
(847) 286-3447


"WCC"                          To:                                    <MROI
<WCC@eslinvest.com>            cc:
05/05/2005 09:33 AM           Subject:  RE: Where are we with Vila?


I want Rob involved.


William C. Crowley
wcc@eslinvest.com
W (203) 861-4603
M (917) 536-8033

**From:** MRODE@sears.com [mailto:MRODE@sears.com]
**Sent:** Thursday, May 05, 2005 10:21 AM
**To:** WCC
**Subject:** RE: Where are we with Vila?


Wanted to answer your question on Rob and I didn't know who he was last night. I don't think we need additional council. Drew, and the legal team, have been great, dedicating all the time we have needed. They have a very good understanding of where we are on the issues and have been a huge asset in keeping me on the straight and narrow. Additionally, trying to get someone else up to speed likely will just slow down the process.

We, as a group, just need to understand exactly what we want to accomplish. We are at the point where we need to fish or cut bait. I would very much like to avoid this becoming a public matter. It would be bad for everyone if this somehow became public knowledge. I would also like to leave our spokesperson with the feeling that we didn't crush him in negotiation. I want the best deal for Sears Holdings, but I also respect what Bob has done



EXHIBIT
#47 ID
1-24-06

for us in the past and what I anticipate he can bring in the future.

That said, I think the deal he offered is better for us than for him. Am I pleased with how much we are paying him? No, but someone negotiated that sucker a while back and short of permanently cutting ties I don't see a good way out. We can get try to get more, but I believe we are on the precipice of causing this to go public.

Let me know if you have time today when we can talk.


Mark P. Rode
Craftsman Brand Manager
(847) 286-3447



**Mark Rode**

05/04/2005 09:23 PM

To:     "WCC" <WCC@eslinvest.com>
cc:
Subject:    RE: Where are we with Vila?**Link**


If you have time tomorrow we can sit with Drew (legal). Let me know what might work.

Mark P. Rode
Craftsman Brand Manager
(847) 286-3447



**"WCC" <WCC@eslinvest.com>**

05/04/2005 07:38 PM

To:     <MRODE@sears.com>
cc:
Subject:    RE: Where are we with Vila?


Keep me involved. Maybe I should call someone. Or should we involve Rob Rathke?

I want to know asap what our options and leverage points are in the production contract and spokesman contract. Is the later exclusive?


SEARS-1932

William C. Crowley
wcc@eslinvest.com
W: 203-861-4603
M: 917-536-8033

**From:** MRODE@sears.com [mailto:MRODE@sears.com]
**Sent:** Wednesday, May 04, 2005 10:40 AM
**To:** WCC
**Subject:** Re: Where are we with Vila?

Legal is reviewing.

Would you like to be involved in strategy or just be briefed on where we end up? As BV is being extraordinarily confrontational, without litigating, I don't see us getting them to move much off their offer.

Mark P. Rode
Craftsman Brand Manager
(847) 286-3447

SEARS-1933

# DEPOSITION EXHIBIT  49

**Sent:** Fri, 06 May 2005 04:11:55 GMT
**From:** Mark Rode
**To:** lpadilla@searshc.com@SEARS
**CC:**
**BCC:**
**Subject:** Bob Vila Agreement

There is a clause in one of the amendments which says if the show is "cancelled" we can terminate the spokesperson agreement. The clause was written to cover us if Bob was no longer marketable and we couldn't sell the show. Since we own the name and pay for syndication, Rob Rathke believes that if we "cancel" the show that would allow us to get out of the remainder of the spokesperson agreement.

I believe Bob has value, but I doubt I can carry they day with blood in the water. See you at 8.


Mark P. Rode
Craftsman Brand Manager
(847) 286-3447


----- Forwarded by Mark Rode/Marketing/SEARS on 05/05/2005 11:05 PM -----


To:

Red

cc:
Subject: Bob Vila Agreement


**Redacted**

EXHIBIT
Bunberg No. 5208
#49 1D
1-24-06

**DEPOSITION EXHIBIT  51**

**Sent:** Redacted
**From:**
**To:**
**CC:**
**BCC:**
**Subject:** Re: ...........Bob Vila, past due............

Redacted

**Mark Rode**

05/18/2005 09:11 AM

To:
Ciba/Marketing/SEARS@Sears
cc:
Anderson/Marketing/SEARS@SEARS
Subject:  Re: ...........Bob Vila, past due............

Fred

Richard

Do not process.  Thanks

Mark P. Rode
Craftsman Brand Manager
(847) 286-3447

**Fred Ciba**

05/18/2005 08:34 AM

To:
Rode/Marketing/SEARS@SEARS
cc:
Anderson/Marketing/SEARS@SEARS
Subject:  ...........Bob Vila, past due............

Mark

Richard

Mark, I have two invoices from Bob Vila, just received, marked **Past Due...**
Invoice #514          Bob Vila                 Syndication Agreement, season
16, payment 1     $714,375.00
Invoice #fer12072004   Michael Ferrone      Syndication Agreement, season 16,
payment 1     $36,625.00
...they, of course, are the Past Due copies of the invoices we originally received for
payment, due 1/1/05. Those invoices I continue to hold per your direction. Advice on



SEARS-1935

# DEPOSITION EXHIBIT 52

**Fred Ciba**

05/18/2005 08:34 AM

To:    Mark Rode/Marketing/SEARS@SEARS
cc:    Richard Anderson/Marketing/SEARS@SEARS
Subject:    ..........Bob Vila, past due............

Mark, I have two invoices from Bob Vila, just received, marked **Past Due...**

| | | |
|---|---|---|
| Invoice #514 | Bob Vila | Syndication Agreement, |
| season 16, payment 1 | $714,375.00 | |

| | | |
|---|---|---|
| Invoice #fer12072004 | Michael Ferrone | Syndication Agreement, |
| season 16, payment 1 | $36,625.00 | |

...they, of course, are the Past Due copies of the invoices we originally received for payment, due 1/1/05. Those invoices I continue to hold per your direction. Advice on these? Thanks, Fred.

**This message and its contents (to include attachments) are the property of Sears Holdings Corporation, Kmart Holding Corporation, Sears Roebuck & Company and/or their affiliates and may contain confidential and proprietary information. You are hereby notified that any disclosure, copying, or distribution of this message, or the taking of any action based on information contained herein is strictly prohibited. Unauthorized use of information contained herein may subject you to civil and criminal prosecution and penalties. If you are not the intended recipient, you should delete this message immediately.**

EXHIBIT
#52 ID
1-24-06
Bamberg No. 5208

# DEPOSITION EXHIBIT  56

**Sent:** Tue, 07 Jun 2005 12:34:44 GMT
**From:** Fred Ciba
**To:** Mark Rode
**CC:** Glori D. Katz; Judy R. Davis
**BCC:**
**Subject:** Re: ...............Bob Vila, spokesperson 2005...........

Judy, may I have a JA# for this? I will handle the SAG/AFTRA payment as well. Might I
go with JA# 503Z02, it was used for the first half of the 2005 payment? Thanks, Fred.

**Mark Rode**

06/06/2005 03:24 PM

To:                                                                          Fred Ci
cc:                                                                          Glori D
Davis/Marketing/SEARS@SEARS
Subject:   Re: ...............Bob Vila, spokesperson {2005}...........

Submit the invoice for payment.

Mark P. Rode
Craftsman Brand Manager
(847) 286-3447

**Fred Ciba**

06/06/2005 02:21 PM

To:                                                                          Mark Ro
cc:                                                                          Judy R.
Katz/Marketing/SEARS@SEARS
Subject:   ...............Bob Vila, spokesperson {2005}...........

Mark, I have in my possesion an invoice for the following (just received)...
**Bob Vila, Personal Spokesperson Contract - Year 2005, Payment #2, Due July 1,
2005, ..... $948,750.00 (Invoice #90)**
.... It is the second half of the invoice for $1,897,500.00. We paid the first half on January 1,
2005 for $948,750.00 (Invoice #83).
Now, this invoice does not have the SAG/AFTRA Union Dues that has been inherent in
years past (last year - $172,612.50) because I could not get the figure from Ogilvy &
Mather. But, we were sent this invoice anyhow, without same. This SAG/AFTRA Union
Dues fee should be in this invoice, as it is required of all our on screen TV commercial
performers.
Advise on how to proceed?   Thanks, Fred.



**DEPOSITION EXHIBIT  57**

**BOB VILA**

# Invoice

| DATE | INVOICE # |
|------|-----------|
| 6/2/2005 | 90 |

| VENDOR # |
|----------|
| 000531772 |

BILL TO:

Mr. Fred Ciba, Executive Producer
SEARS, ROEBUCK & CO.
Department 727ACS; Location D2-131B
3333 Beverly Road
Hoffman Estates, IL  60179

| QTY | DESCRIPTION | RATE | AMOUNT |
|-----|-------------|------|--------|
| 0.5 | PERSONAL SPOKESPERSON CONTRACT - YEAR 2005, PAYMENT #2 | 1,897,500.00 | 948,750.00 |
| 1 | LESS:  Union Dues | -189,939.75 | -189,939.75 |
|  | DUE:  July 1, 2005 |  |  |
|  | PLEASE MAKE CHECK PAYABLE TO: |  |  |
|  | BOB VILA (VENDOR #000531772) 115 KINGSTON STREET BOSTON MA  02111 |  |  |

OK To Pay Approval
**PLEASE PRINT**

Charge Dept. # 727R
Account # 03593101
JA # 512Z025
Approval Name FRED CIBA
Signature *[signature]*
Date 6/20/05
Other: ATM, CR, etc.
Special Terms 3 DAYS!

**SEARS 0464**

EXHIBIT
#57 1D
1-24-06

| | Total | $758,810.25 |

# DEPOSITION EXHIBIT  58



# Invoice

| DATE | INVOICE # |
|------|-----------|
| 7/8/2005 | 536 |

| VENDOR # |
|----------|
| 780754065 |

**BILL TO**

Mr. Fred Ciba, Executive Producer
SEARS, ROEBUCK & CO.
Department 727ACS; Location D2-131B
3333 Beverly Road
Hoffman Estates, IL  60179

| DESCRIPTION | AMOUNT |
|-------------|--------|
| SYNDICATION AGREEMENT - Season 16, Payment #3 ($475,000 less 4.75%) | 452,437.50 |
| | |
| PAYMENT DUE AUGUST 1, 2005 | |
| | |
| PLEASE MAKE CHECK PAYABLE TO: | |
| | |
| √TV, INC. | |
| 115 KINGSTON STREET | |
| BOSTON MA  02111 | |
| | |
| **Total** | **$452,437.50** |

EXHIBIT
#5810
1-24-06

Bornberg No. 0206

**SEARS 0491**

**MICHAEL C. FERRONE**
**PO BOX 2484**
**119 ALPINE AVENUE**
**OAK BLUFFS MA  02557**

| DATE | INVOICE # |
|------|-----------|
| 7/8/2005 | FER07082005-02 |

BILL TO:

Mr. Fred Ciba
SEARS ROEBUCK & CO.
Department 727ACS; Location D2, 131B
3333 Beverly Road
Hoffman Estates IL  60179

| DESCRIPTION | AMOUNT |
|-------------|--------|
| BVTV SYNDICATION AGREEMENT - Season 16, Payment #3 4.75% of $475,000 | $    22,562.50 |
| PAYMENT DUE:  AUGUST 1, 2005 | |
| Please note change of address. | |
| **TOTAL** | $    22,562.50 |

**SEARS 0492**

# DEPOSITION EXHIBIT  62

# SEARS HOLDINGS CORPORATION

Michael W. Kler
Vice President - Deputy General Counsel,
Litigation and Government Affairs
Law Department

Sears Holdings Corporation
3333 Beverly Road, B6-312A
Hoffman Estates, Illinois 60179
Telephone. (847) 286-8272
Fax: (847) 286-0288
mkler@sears.com

August 19, 2005

CERTIFIED MAIL RETURN RECEIPT REQUESTED &
BY FACSIMILE

Mr. Robert Vila
c/o Ronald E. Feiner, Esq
Kaufman, Feiner, Yamin, Gildin & Robbins
777 Third Avenue
New York, NY 10017

Dear Mr. Vila:

Please be advised that, as a result of your conduct, Sears, Roebuck and Co. ("Sears") hereby notifies you of its election to terminate and cancel the Bob Vila Spokesperson Agreement ("Spokesperson Agreement") effective on the date of your receipt of this notice. Sears has learned that you have engaged in substantial misconduct under the agreement, including your violation of Sears' trademark in the Home Again name. As a result of this material breach of the Spokesperson Agreement, Sears was under no obligation to pay for your services beginning on July 1, 2005. In addition, under Article VII(6) of the Spokesperson Agreement, which permits Sears to terminate the agreement in response to any material breach thereunder, Sears hereby terminates the Spokesperson Agreement.

Article VII.7 of the Spokesperson Agreement grants to Sears an independent right to terminate the Spokesperson Agreement if you are "involved in any situation" that "reflect[s] unfavorably upon [Sears'] reputation." The provision states also that Sears' "decision on all matters arising under this paragraph shall be conclusive and shall be based on our judgment as to whether or not your act or involvement has harmed or may be harmful in a significant respect." Sears has determined that your false accusation that Sears knowingly and intentionally deceived you -- which you have insisted on airing notwithstanding Sears' good faith attempt to avoid litigation and adverse publicity -- will "reflect unfavorably upon [Sears'] reputation." Accordingly, by this letter, Sears terminates the Spokesperson Agreement on the independent basis that you have made false accusations that may significantly harm Sears' reputation.

EXHIBIT
#62 D
1-24-06

In addition to Sears' right to terminate the Spokesperson Agreement pursuant to Article VII(6) and (7), Sears also retains and reserves any and all other grounds for termination arising out of your conduct.

Finally, pursuant to Paragraph 7 of Amendment IX to the Spokesperson Agreement, incorporated by Paragraph 4 of Amendment X to the Spokesperson Agreement, if "the Bob Vila Home Again television show is canceled for any reason," Sears has the right to terminate the Spokesperson Agreement effective on December 31 after the notice of cancellation. Paragraph 7 of Amendment IX to the Spokesperson Agreement (emphasis added). As set forth above, Sears has exercised its right to terminate the Spokesperson Agreement immediately pursuant to Article VII(6) and (7). However, should Sears' cancellation pursuant to Articles VII(6) and (7) be deemed ineffective for any reason, Sears hereby exercises its rights under Paragraph 7 of Amendment IX to the Spokesperson Agreement, incorporated by Paragraph 4 of Amendment X to the Spokesperson Agreement, and hereby cancels the Bob Vila Home Again television (confirming prior advice to you). Pursuant to that cancellation, under no circumstances, would the Spokesperson Agreement be effective beyond December 31, 2005.

Sincerely yours,

Michael W. Kier /ope

Michael W. Kier

P 0000289

# DEPOSITION EXHIBIT  69

**Sears, Roebuck & Co.**

# Memo

**To:**     Drew Farkas

**From:** Andy Ginger

**CC:**    Kay Durkin, Henry Ferris

**Date:** 02/26/04

**Re:**    Home Again Licensing Agreement

Attached is a request from Kay indicating that Kingworld wants to get signed copies of the current agreement in place since 2000.

This is timely since Henry will be approaching you shortly to add two years to the agreement. This change needs to be done at the same time we extend the production agreement with BVTV.

Attached is a signature page from the agreement we executed in 2000 that is in my files. While I don't believe we executed and exchanged full signature copies, we have been operating under this contract since that time.

Let Henry know our next steps. Thanks for your assistance.



EXHIBIT

#69        I.D

1-30-06   RMC

**SEARS- 1483**

**DEPOSITION EXHIBIT  71**

◉CBS

CBS BROADCAST INTERNATIONAL
2401 COLORADO AVENUE, SUITE 110
SANTA MONICA, CALIFORNIA 90404-3585

(310) 264-3300
FAX: (310) 264-3301

**VIA AIRBORNE EXPRESS**

April 2, 2004

Attention: Mr. Drew Farkas
Senior Counsel
Department 766X
SEARS, ROEBUCK AND CO.
3333 Beverly Road, B6-263A
Hoffman Estates, Illinois 60179

Re:    <u>Amendment to Distribution and Media Sales Agreement</u>
       **BOB VILA HOME AGAIN**

Dear Mr. Farkas:

Enclosed please find one (1) fully executed original of the Amendment to
the Distribution and Media Sales Agreement referenced above. Thank
you for your cooperation and consideration in this matter. If you have any
questions or comments, please contact me directly.

Best regards,

Elsa Lopez-Megerdichian
Director, Business Affairs
CBS Broadcast International

Enclosures

cc:        Armando Nuñez, Jr. (w/o encl.)
           Barry Chamberlain (w/o encl.)
           Sandy Kryle
           Stephanie Pacheco
           CBI Accounting
           Pamela Genge
           Bob Madden
           Steve LoCascio
           Jon Birkhahn



EXHIBIT
#H ID
1-30-06 RMC

## DISTRIBUTION AND MEDIA SALES AGREEMENT

This Agreement (the "Agreement") is made and entered into as of April 1, 1994, by and between Eyemark Entertainment, a unit of CBS Enterprises, a division of CBS Broadcasting Inc. (the "Distributor") and Sears, Roebuck and Co. ("Producer").

## WITNESSETH:

WHEREAS, Producer, since 1989, has produced a weekly television series starring Bob Vila as the host, entitled "Bob Vila's Home Again," formerly known as "Home Again with Bob Vila" (the "Program"), and Distributor has continuously distributed and/or otherwise exploited the Program for broadcast since the 1990-1991 broadcast year;

WHEREAS, Producer desires Distributor to continue distributing and/or otherwise exploiting the Program for broadcast commencing with the 1994-1995 broadcast year and continuing consecutively through subsequent broadcast years as set forth herein, and Distributor agrees to the same;

WHEREAS, Distributor, formerly doing business as Group W Media Sales, has, since 1992, continuously rendered exclusive U.S. advertiser sales representation services in connection with the Program; and

WHEREAS, Producer desires Distributor to continue rendering exclusive U.S. advertiser sales representation services in connection with the Program for the 1994-1995 broadcast year and four (4) consecutive broadcast years thereafter as set forth herein, and Distributor agrees to the same;

NOW, THEREFORE, the parties hereto agree as follows:

1. **Grant of Rights.**   Subject to the terms and conditions of this Agreement, Producer hereby grants to Distributor for the Term of this Agreement (as defined in Section 3) the sole and exclusive right, license and privilege to distribute, license, exhibit, publicize, advertise, and market the Program for television throughout the Licensed Territory (as defined in Section 4) and in any and all languages.   For purposes of this Agreement, "television" means one-way synchronous broadcast applications, such as free, pay, subscription and cable television, and excludes without limitation asynchronous broadcast, videotape and/or interactive applications. The foregoing rights shall be subject to (a) the rights of Producer to use or refer to the Program, or portions thereof, for internal purposes and to refer to the Program in any advertising or marketing materials prepared at Producer's expense, and  (b) any rights previously granted by Distributor and Producer pursuant to the agreement dated as of June 1, 1991, among Distributor, Producer and Hearst/ABC/NBC d/b/a Arts & Entertainment Networks ("A&E") as the same has heretofore and may hereafter be amended by Distributor, Producer and A&E (the  "A&E Agreement).   Producer acknowledges that the foregoing license includes the right for Distributor to

**SEARS 1147**

distribute in the Domestic Territory (as defined in Section 5) Programs to which A&E has forfeited all rights under the A&E Agreement; provided however, that such Programs shall be distributed for pay, cable and/or subscription television programming only with Sears prior written approval of the schedule and promotional plan for broadcast of such Programs (and any modifications or extensions thereof).

2.  <u>Delivery.</u>  The Program will air weekly for 26 weeks and will consist of 26 original programs and enough repeats to complete each 52-week broadcast year of the Term (as defined below). Producer shall use best efforts to complete the production of the Program in a time and manner consistent with the Program's scheduled air date. Upon notice thereof, Producer shall cause the Program to meet the qualifications and standards required by Distributor for suitability for exhibition and delivery. Distributor acknowledges and agrees that the Program as heretofore produced and delivered meets Distributor's qualifications and standards.

3.  <u>Term of Agreement.</u> The term of this Agreement shall commence on April 1, 1994, and unless sooner terminated as provided in Section 22, shall continue thereafter for five (5) broadcast years, i.e. the 1994-95, 1995-96, 1996-97, 1997-98 and 1998-99 broadcast years (the "Term"). If Producer has the right to continue to produce the Program after the expiration of the Term, Producer will offer Distributor the first option to continue distributing the Program on an exclusive basis in the Licensed Territory, provided that Distributor has fully performed all of its obligations under this Agreement in accordance with the terms of this Agreement.. If Distributor desires to continue such distribution of the Program, Distributor shall so notify Producer within thirty (30) days after the date such offer is first made, and Distributor and Producer shall negotiate in good faith a mutually acceptable written agreement setting forth the terms and conditions of such distribution arrangements. Nothing herein shall be construed to obligate Distributor and Producer to enter into any such agreement if they cannot, in good faith, agree on its terms, nor to require that any of the terms and conditions of this Agreement shall apply to any such subsequent agreement.

4.  <u>Licensed Territory.</u> The licensed territory is the entire world ("Licensed Territory"). The United States and Canada are referred to in this Agreement as "Domestic Territory" and the rest of the world is referred to as "Foreign Territory".

5.  <u>Rebate for 1993-1994 Broadcast Year.</u> Distributor shall pay Producer a rebate of One Hundred Twenty Five Thousand Dollars ($125,000), attributable to the 1993-1994 broadcast year, during the second quarter of 1995. Producer acknowledges receipt of such rebate.

6.  <u>Distribution Fees.</u> In full and complete consideration for Distributor's distribution and/or licensing of the Program, Distributor shall be entitled to compensation in

SEARS 1148

accordance with the following:

A.   Sale of Barter Units:

   (i)   Distributor's Barter Units. The first two :30 units in each episode of the Program, an aggregate of 104 :30 units during the 1994-95 broadcast year, shall be retained by Distributor and shall be used in accordance with the terms of this Section 6 ("Distributor's Barter Inventory"). For each broadcast year during the Term, Producer agrees to guarantee Distributor aggregate advertising revenues net of advertising agency commissions ("Net Sales Proceeds") in the amount of Six Hundred Fifty Thousand Dollars ($650,000) from the sale of Distributor's Barter Inventory. Accordingly, Distributor shall be entitled to retain the first Six Hundred Fifty Thousand Dollars ($650,000) of Net Sales Proceeds from the sale of Distributor's Barter Inventory. Thereafter, Distributor shall pay to Producer the sum of One Hundred Thirty-Eight Thousand Dollars ($138,000), from the Net sales Proceeds of Distributor's Barter Inventory to help defray costs of Nielsen ratings research. Thereafter, all Net Sales Proceeds from the sale of Distributor's Barter Inventory shall be shared equally by Producer and Distributor. Distributor shall pay Producer its share of the Net Sales Proceeds within forty-five (45) days after the end of the calendar quarter in which they were received.

   (ii)   Producer's Barter Units. The remaining four :30 units in each episode of the Program, an aggregate of 208 :30 units during the 1994-1995 broadcast year, shall be retained by Producer ("Producer's Barter Inventory"). Net Sales Proceeds from the sale of Producer's Barter Inventory shall be retained by Producer, subject to Section 8 below.

   (iii)   Additional :30 Unit Commencing With 1995-1996 Broadcast Year. Commencing with the 1995-1996 broadcast year and continuing throughout the Term, an additional :30 unit will be added to the Program, and such unit shall be retained by Distributor ("Distributor's Additional Unit"). Net Sales Proceeds from the sale of Distributor's Additional Unit shall be retained solely by Distributor.

B.   Domestic Pay, Cable and Subscription Television: For any sale or license of the Program for any pay, cable or subscription television application, Distributor shall be entitled to retain twenty-five percent (25%) of the Gross Receipts derived therefrom. The balance of such Gross Receipts shall be paid to Producer within forty-five (45) days after the end of the calendar quarter in which they were received.

**SEARS 1149**

C.  Foreign Distribution:  Distributor shall be entitled to retain thirty-five percent (35%) of the Gross Receipts from the sale, license and/or distribution of the Program anywhere in the Foreign Territory.

D.  Definition of Gross Receipts:  For purposes of this Section 6, "Gross Receipts" means the aggregate of all fees, royalties and other payments, together with the aggregate fair market value of all barter units and other things of value, which are actually received by Distributor from all sources on account of the exhibition, lease, rental, license, and other use or exploitation of the Program and/or the exercise of any other rights granted in this Agreement in connection with the Program; provided, however, that Gross Receipts shall not include any of the following:  (a) taxes (however denominated and irrespective of any tax credits or deductions taken by Distributor) paid to any governmental authority in connection with the exploitation of the Program or of any rights relating thereto (except that any corporate income or franchise taxes of Distributor shall not be excluded from Gross Receipts); (b) duties, excise fees, and other charges for permits and other similar authorization to secure the entry, licensing or exploitation of the Program or any of said rights; (c) all adjustments, credits, allowances, rebates and refunds actually extended by Distributor to third parties and to the extent such item has previously been included in Gross Receipts, then an equivalent amount shall be excluded from subsequent Gross Receipts; (d) unless and until earned or otherwise available to Distributor, all sums received in the nature of security deposits or advances; (e) any sums received for the exercise in the Foreign Territory (as defined in Section 4) of any rights in the Program, to the extent such sums are not received in the United States in United States Dollars, until United States Dollars are received therefor (but Distributor shall use its best efforts to convert and receive such sums in the United States in United States dollars as soon as possible); and (f) all costs incurred by Distributor for the conversion and transmission of any receipts from the Program.

7.  Advertising Restrictions.  Distributor is prohibited from selling any of Distributor's Barter Inventory, Producer's Barter Inventory, and/or Distributor's Additional Unit to other retail stores.  In addition, Distributor shall not sell more than one :30 unit in any episode of the Program to any manufacturer, distributor or seller of products that compete with any of Producer's products, and Distributor shall not allow any advertising to be shown during the Program that makes any comparisons to any goods offered or sold under any of Producer's brands or trademarks, without the prior written approval of Producer.

8.  Producer's Barter Inventory.  Producer hereby appoints Distributor as its exclusive, limited, and special agent throughout the Term in connection with the sale of Producer's Barter Inventory in the Domestic Territory, subject to the terms of this Section 8:

4

SEARS 1150

A. As full and complete consideration for all services rendered by Distributor in connection with the sale of Producer's Barter Inventory, Distributor will be entitled to retain eleven percent (11%) of all Net Sales Proceeds from the sale of Producer's Barter Inventory. For purposes of this Section 8, the total advertising agency commissions deducted in the calculation of Net Sales Proceeds shall not exceed, in any calendar quarter, fifteen percent (15%) of the total advertising revenues received in such calendar quarter.

B. "Producer's Share" means all Net Sales Proceeds remaining after Distributor retains its commission in accordance with subparagraph A. above. Distributor shall remit Producer's Share to Producer within forty-five (45) days after the end of the calendar quarter in which the Net Sales Proceeds were received and, until remitted, all amounts of Producer's Share shall be held by Distributor in trust for Producer.

9. **Costs.** Subject to the rights of recoupment expressly provided for in Section 6 of this Agreement, Distributor and Producer shall, respectively, pay all costs and expenses of their performance of, and compliance with, the terms and conditions of this Agreement on their respective parts to be performed or complied with. Without limiting the foregoing, it is agreed that all promotion, advertising, editing and exploitation expenses and expenses for obtaining research ratings (other than the Nielsen ratings research obtained by Sears) and demographic information (except to the extent specifically authorized in writing in advance by Producer for reimbursement by Producer) incurred by Distributor in connection with its rights and obligations under this Agreement shall be paid solely by Distributor, that any such expenses incurred by Producer without Distributor's written authorization shall be paid by Producer, and that all expenses incurred in connection with the production and delivery of the Program, as well as any and all residuals, re-use fees, royalties, music sync fees, profit participations and any similar fees and expenses, shall be paid solely by Producer.

10. **Accounting and Audits.**

A. **Accounting Requirements.** During the Term and for a period of two (2) years thereafter, Distributor shall keep accurate and true books and records concerning the Program and Distributor's obligations pursuant to this Agreement and shall account to Producer for all amounts received by Distributor in connection with this Agreement, including but not limited to the following:

(i) **Accounting For Producer's Barter Inventory Sales.** Distributor shall furnish to Producer on a monthly basis the National Spots Revenue Spread. Distributor shall account to Producer for the sale of Producer's Barter Inventory by delivering to Producer, within forty-five (45) days after the end of each calendar quarter during which any Net Sales Proceeds are received, a written statement

5

SEARS 1151

setting forth in detail the amount and sources of all cumulative and current period Net Sales Proceeds, the calculation of Producer's Share pursuant to this Agreement and any other information which Producer may reasonably request. Amounts of Producer's Share shall be paid concurrently with the delivery of the statement showing such amounts.

(ii) <u>Accounting for other Receipts.</u> Within forty-five (45) days after the end of each calendar quarter, Distributor shall furnish to Producer a statement showing Gross Receipts, Adjusted Gross Receipts, and Net Receipts applicable to such calendar quarter. Distributor shall not be obligated to render any statements for any calendar quarter during which no Gross Receipts were received. Each statement shall be accompanied by Distributor's remittance of any sums shown by the statement to be due Producer pursuant to this Agreement.

(iii) <u>Media Billing Statements and Sales Information.</u> Notwithstanding anything contained herein, Distributor shall furnish Producer with a written report within forty-five (45) days after the end of the first, second, and third quarters of each broadcast year hereunder setting forth in detail actual media sales billing for each such quarter and projected billing for the remainder of the then current broadcast year. Further, Distributor shall furnish to Producer on a monthly basis copies of all sales contracts and sales revenue summaries.

(iv) <u>Revisions to Statements.</u> Subject to subparagraph (C) below, the rendition of any statement by Distributor pursuant hereto shall not preclude Distributor from revising the same thereafter to adjust for matters erroneously charged or credited therein or omitted therefrom and making any appropriate adjustment in the payment of Producer's Share of Gross Receipts required thereby.

B. <u>Audit Rights.</u> Producer shall have the right to engage a US. Big 6 public accounting firm to examine, audit and copy, at Producer's sole cost and expense and no more than once in any consecutive twelve (12) month period, to examine, audit and copy the books of account and records kept by Distributor with respect to its obligations under this Agreement. Such examination shall take place at Distributor's offices at a mutually convenient date and time during normal business hours. All audits will be completed as expeditiously as possible but in no event may any such audit last longer than thirty (30) days from the actual commencement of the audit. Producer shall pay the auditors for conducting such audit solely on an hourly basis. Distributor shall have the right to audit Producer's and the auditing accountant's books and records regarding costs incurred in connection with such audit.

6

SEARS 1152

Distributor shall pay all actual, out-of-pocket, direct costs of such an audit and all interest on any amounts past due in either of the following events: (1) Distributor and Producer agree to settle a dispute regarding an alleged underpayment of monies to be paid to Producer under this Agreement and such payment exceeds five percent (5%) of the amounts previously paid by Distributor to Producer for the time period(s) in question, or (2) there is a non-appealable legal ruling or finding by a court or other tribunal of competent jurisdiction that Distributor has underpaid Producer by an amount equal to five percent (5%) or more of the amounts due and payable to Producer under this Agreement for the time period(s) in question.

C.     <u>Limitations; Notice of Challenge.</u>  Each statement rendered to Producer by Distributor shall become final and binding two years after it is rendered. Neither party shall have the right to dispute any item contained in any statement subsequent to the expiration of such two-year period or to require examination of Distributor's books, records, or accounts beyond such two-year period. Neither party shall be allowed to increase, change or amend any notice of challenge at a time when an original notice of challenge would be barred with respect to the increased, amended, or changed items. Neither party shall be entitled to bring any action later than one year after the sending of that party's notice of challenge.

11.   <u>A&E Agreement.</u>  In connection with the A&E Agreement and attached hereto as Exhibit "A" is a schedule of payments made by A&E during the 1992-1993, 1993-1994, 1994-1995 and 1995-1996 broadcast years (the "A&E Schedule"). Distributor will periodically update the A&E Schedule as it receives additional payments from A&E in connection with the 1996-1997 broadcast year and subsequent broadcast years hereunder.

12.   <u>Marketing.</u>  Distributor shall have the sole and exclusive right and obligation to market the Program and shall use its best efforts to do so.  Distributor's marketing plan shall be subject to Producer's good faith prior written approval, which shall not be unreasonably withheld except that approvals of the selection of advertisers on the Program shall be subject to Sears sole discretion. Producer acknowledges that it has approved Distributor's marketing plans for the 1994-95, 1995-96 and 1996-97 broadcast years and that such plans fully satisfy the requirements of this Section 12.  Representatives of Distributor and Producer shall meet in April and September of each year during the Term (or at such other times as the parties may mutually agree) to coordinate and review Distributor's marketing efforts, market clearances and other information as requested.  If Producer and Distributor are unable to mutually agree in good faith on any marketing plan within ninety (90) days after commencing negotiations with respect thereto, Producer shall have the right to terminate this Agreement by written notice delivered to Distributor at any time prior to July 1 of the subsequent broadcast year.  In addition, Distributor shall furnish Producer with

7

SEARS 1153

an annual written report, no later than six (6) months following the end of each broadcast year during the Term, summarizing Distributor's results in "clearing" and/or advertising the show to the trade for the preceding broadcast year.

13. **Promotion Rights and Credits.**

   A. **Advertising.** Distributor shall have the nonexclusive right to advertise and promote the Program and, solely to the extent that Producer has obtained the rights necessary for such use, to use and license others to use the names and likenesses of the performers, writers, directors, producers and other parties involved in the production of the Program in such advertising and promotion, but not as a direct endorsement for any product or service; provided, however, that Distributor shall comply with all credit, advertising and other contractual restrictions and requirements as directed by Producer or of which Distributor has been given written notice, and provided further that Distributor's rights hereunder shall be subject to applicable guild and union restrictions. Distributor shall pay for the cost of such advertising and promotions and may recoup as Distribution Expenses the sums expended by Distributor for such advertising and promotions to the extent such amounts have been approved by Producer. Distributor shall include any credits supplied by Producer in all advertising and paid publicity issued by Distributor or under Distributor's control. No casual or inadvertent failure by Distributor or any third party to comply with the provisions of the immediately preceding sentence shall be deemed a breach of this Agreement; provided, however, that promptly following written notice from Producer specifying in reasonable detail any failure to comply with such provisions, Distributor shall use its best efforts to cure prospectively such failure with respect to future prints or tapes.

   B. **Credits.** Throughout the Territory, Distributor shall receive an on-screen credit as the distributor of the Program (which may include, at Distributor's election, its logo) on a separate card in the end titles of all episodes of the Program distributed by Distributor or any of its licensees. Such credit shall be in a form supplied by Distributor to Producer. Distributor shall not delete or alter any credits or copyright notices from any copy of any episode of the Program as delivered by Producer. No casual or inadvertent failure by Distributor or any third party to comply with the provisions of the immediately preceding sentence shall be deemed a breach of this Agreement; provided, however, that promptly following written notice from Producer specifying in reasonable detail any failure to comply with such provisions, Distributor shall use its best efforts to cure prospectively such failure with respect to future prints or tapes.

14. **Copyright.** All rights, services, facilities and materials engaged or obtained in connection with the development and production of the Program shall be contracted for by Producer in its own name or in the name of any wholly owned

8

SEARS 1154

subsidiary of Producer. Producer agrees that it is the sole and exclusive owner of the copyright in the Program. Distributor acknowledges that the Program may include elements the copyrights in which are owned by a party or parties other than Producer. Producer shall place appropriate copyright notices on all prints, tapes and other copies of the Program regardless of the form of media.

15. <u>Producer's Warranties</u>. Producer warrants and represents, subject to the limitations set forth in this Agreement: (a) that Producer is the sole owner of all right, title and interest in and to the Program and has full right and authority to enter into and perform this Agreement and convey the rights granted by this Agreement; (b) that Distributor shall have the right to exercise all of its rights hereunder without payment of any nature to any person, firm or corporation having in any way participated in the production of the Program (other than Producer); (c) that none of the rights, licenses and privileges herein conveyed has in any way been encumbered, conveyed, granted, exploited or otherwise disposed of, and the same are free and clear of any liens, encumbrances or claims of every kind whatsoever in favor of any party whomsoever and said rights, and the full right to exercise the same, have not in any way been prejudiced, limited, diminished or impaired by Producer; (d) that the rights, licenses or privileges conveyed hereunder to Distributor will not in any way infringe upon any intellectual property rights, or constitute a libel or defamation, or invasion of the rights of privacy, of any third party whomsoever; (e) that there are no claims or litigation pending or threatened adversely affecting any of the rights, licenses and privilege herein conveyed; (f) that the performing rights in the music contained in the Program are and will be controlled by BMI, ASCAP, SESAC or any other performing rights society having jurisdiction, are in the public domain, or are and will be controlled by Producer to the extent necessary to permit Distributor's use of the Program under this Agreement; (g) that Producer has obtained or will obtain prior to first broadcast the consent of all persons appearing in the Program to use their names, likenesses and biographies and the results and proceeds of their performances and services in the Program and for advertising and exploiting the Program; and (h) that Producer has not done and will not do any act or thing that will impair, encumber or in any way prevent or interfere in any manner with the full exercise by Distributor of all of the rights, licenses and privileges herein conveyed. Distributor acknowledges that Producer has not made and does not make any representation or warranty as to the amount of Gross Receipts to be derived, or that any Gross Receipts will be derived from the Program or any of Distributor's activities hereunder.

16. <u>Distributor's Warranties.</u>   Distributor warrants and represents:   (a) that Distributor has full power and authority to enter into this Agreement; (b) that by entering into and performing pursuant to this Agreement, Distributor is not and will not be in breach of any agreement, promise, or covenant with any third party; (c) that Distributor has obtained and will maintain all necessary licenses and permits required to perform any of its services hereunder; and (d) that Distributor, including its employees and agents, shall comply with all applicable

9

**SEARS 1155**

laws, statutes, ordinances, rules, and regulations. Subject to Distributor's marketing and other obligations under this Agreement, Producer acknowledges that Distributor has not made and does not make any representation or warranty as to the amount of Gross Receipts to be derived, or that any Gross Receipts will be derived from the Program or any of Distributor's activities hereunder.

17. <u>Indemnity by Producer</u>.  Producer shall protect, defend, indemnify and hold harmless Distributor, its successors, parent, subsidiary or affiliated entities and their respective officers, directors, employees, licensees, agents and contractors against any and all charges, damages, costs, expenses (including reasonable attorneys' fees and costs), judgments, penalties, liabilities, claims, demands, actions, causes of action and losses of any kind which may be sustained or suffered by, secured against or imposed upon each or any of them by reason of any third party claim involving death or injury to any person, damage to or destruction of any property, or other loss or damage actually or allegedly resulting from, arising out of, or in connection with:

(a)  Any acts or omissions of Producer or any of its employees, agents, or contractors undertaken solely in connection with the creation or production of the Program but excluding any promotion, distribution or other activities performed or required to be performed by Distributor under this Agreement; and/or

(b)  Any failure of Producer or any of its employees, agents, or contractors to comply with any applicable statute, ordinance, law, rule or regulation or any inquiries, investigations, or actions brought or conducted by any governmental agency relating solely to the creation or production of the Program but not to any of Distributor's activities or obligations under this Agreement; and/or

(c)  Any material breach of the warranties, representations or other agreements made by Producer herein.

In addition, Producer agrees to defend at its sole expense and to pay any costs and/or damages awarded on the basis of any claim by a third party alleging that the Program (a) infringes on any copyright, trademark, service mark, trade name, or other intellectual property right of any third party and/or (b) defames, or invades the privacy of, or in any way violates the rights of any third party.  The obligations of Producer hereunder are subject to Distributor's compliance with Section 19 below.  Distributor acknowledges that Producer may have the right to seek indemnification under Producer's agreement with B.V.T.V. Inc. for the production of the Program, provided that nothing herein shall be construed to limit Producer's obligations to Distributor under this Section 17.  This Section 17 shall survive termination or expiration of this Agreement.

SEARS 1156

EXECUTION ORIGINAL

18. <u>Indemnity by Distributor.</u>  Distributor shall protect, defend, indemnify, and hold harmless Producer, its successors, parent, subsidiary and affiliated entities and their respective officers, directors, employees, licensees, agents, and contractors against any and all charges, damages, costs, expenses (including reasonable attorneys' fees and costs), judgments, penalties, liabilities, claims, demands, actions, causes of action and losses of any kind which may be sustained or suffered by, secured against or imposed upon each or any of them by reason of any third party claim involving death of or injury to any person, damage to or destruction of any property, or other loss or damage actually or allegedly resulting from, arising out of, or in connection with:

(a)  Any acts or omissions of Distributor or any of its employees, agents, or contractors in connection with this Agreement or the Program; and/or

(b)  Any failure of Distributor or any of its employees, agents, or contractors to comply with any applicable statute, ordinance, law, rule, or regulation or any inquiries, investigations, or actions brought or conducted by any governmental agency relating to any services provided or performed by any of such parties in connection with this Agreement; and/or

(c)  Any material breach of any of the warranties, representations or other agreements made by Distributor herein.

The obligations of Distributor hereunder are subject to Producer's compliance with Section 19 below.  This Section 18 shall survive termination or expiration of this Agreement.

19. <u>Indemnity Procedures.</u>

A.  <u>Notice and Response.</u>  Promptly (and in any event within thirty (30) days) after either party's receipt of notice of a claim or the commencement of any action which may result in a claim for indemnification pursuant to this Agreement, such party (the "indemnified party") shall notify in writing the other party (the "indemnifying party") thereof.  Thereafter the indemnifying party shall advise the indemnified party in writing within ten (10) business days of the indemnifying party's acknowledgment of and instructions with respect to the indemnity obligation.  The indemnified party shall thereafter cooperate fully with the indemnifying party's reasonable requests, at the indemnifying party's sole expense, to effectuate the terms of its indemnities in accordance with this Agreement.  Should the indemnifying party refuse or fail to acknowledge its indemnity obligation hereunder within such 10-day period, the indemnified party shall thereafter have the right to defend such action with counsel chosen by the indemnified party, including the right to settle or otherwise resolve any such dispute without the written

11

consent of the indemnifying party, all without prejudice to the indemnified party's rights against the indemnifying party.

B.   Participation by Indemnified Party.   An indemnified party who has received an acknowledgment of acceptance of indemnity shall have the right (i) to employ separate counsel in any action as to which indemnification may be or has been sought under any provision of this Agreement and to participate in the defense thereof; or (ii) to the extent that it may wish, jointly with any other indemnified party, to assume the defense of any such action with counsel reasonably satisfactory to the indemnifying party, provided that the fees and expenses of such counsel and all other expenses resulting from the participation of the indemnified party shall be at the expense of such indemnified party unless the indemnifying party has agreed in writing to pay such fees and expenses. Except as set forth above, the indemnifying party shall not be liable for any settlement of any action effected without its written consent, which shall not be unreasonably withheld.

20.   Insurance Coverages.   Each party shall maintain at all times during the Term of this Agreement, and provide proof to the other party as requested, the following insurance coverages, in the minimum amounts stated, written by an insurance company or companies reasonably acceptable to Producer:

(a)   Workers' Compensation and Employer's Liability Insurance with limits of liability under the Employer's Liability Insurance portion of not less than $100,000 per accident or disease, and $500,000 aggregate by disease, and with a waiver of subrogation in favor of the other party hereto.

(b)   Automobile Liability Insurance in such party's name including owned, non-owned, leased, and hired motor vehicle coverage. Limits of liability for commercial vehicles used in the business shall be not less than $1,000,000 combined single limit per occurrence for bodily injury and property damage. Limits of liability for any private passenger automobile shall be not less than $500,000 per occurrence combined single limit.

(c)   Commercial General Liability Insurance including, but not limited to, coverage for bodily injury, property damage, personal and advertising injury, and contractual injury, with limits of not less than $5,000,000 combined single limits for bodily injury and property damage per occurrence, naming the other party hereto as an additional insured. The liability limit may be satisfied by a combination of Commercial General Liability and Umbrella Excess Liability insurance.

Each insurance policy required under this Section shall contain clauses stating severability of interest of insureds and enabling cross liability coverage, and each policy shall expressly provide that it shall not be subject

12

SEARS 1158

EXECUTION ORIGINAL

to material change or cancellation without at least thirty (30) days prior written notice to the other party hereto.

Notwithstanding any other provision of this Agreement, each of Sears and Distributor shall have the right to self-insure its insurance obligations under this Agreement, provided that it maintains at all times during the term of this Agreement a net worth of at least $250 million.

21.  Termination.

A.  Producer may terminate this Agreement effective at the end of any broadcast year during the Term, by giving written notice to Distributor by no later than December 15 of each broadcast year during the Term that Producer will not produce new shows for the then upcoming broadcast year. Such termination shall not operate to terminate Distributor's rights and obligations as to any shows which have already been produced by Producer (the "Produced Shows") and this Agreement shall remain in effect as to such Produced Shows for the remainder of the Term hereof, unless otherwise subject to termination pursuant to this Agreement.

B.  This Agreement may be terminated by either party giving written notice to the other party after the occurrence of one or more of the following events:

(i)  The other party becomes the subject of a case under the Federal Bankruptcy Code or similar state or federal insolvency laws; any creditor of such party commences action to enforce or foreclose upon a lien or security interest in property of such party; or any property of such party passes into the hands of a creditor of such party, receiver, or assignee for the benefit of creditors, becomes the subject of a levy for taxes or to satisfy a judgment, or otherwise is attached for the benefit of a creditor of such party (excluding the consensual granting of a lien or security interest by Distributor to secure a debt);

(ii)  The other party breaches any of its material obligations, representations or warranties under this Agreement and fails to cure said breach within fifteen (15) days after notice of such breach is given;

(iii)  The death or disability of Bob Vila or the occurrence of any other event entitling Sears (or its agent) to terminate one or more of its agreements with Bob Vila, thereby preventing the production of the Program.

Any termination under this subsection (B) shall be deemed to occur on the date specified by the terminating party in its written notice of termination.

13

**SEARS 1159**

C.   A termination of this Agreement pursuant to this Section 21 shall not preclude the terminating party from pursuing any other available remedy.

22.  <u>Force Majeure.</u>  Neither party hereto shall be liable for any failure to perform or for delay in performance of its obligations hereunder caused by circumstances beyond its reasonable control, including, but not limited to, fire, flood, earthquake, other natural disasters, war, insurrection, riot, sabotage, epidemic, labor disputes, acts of God, acts of any government or agency thereof, or judicial action. In the event that due to a cause covered by this section a party is unable to perform for a period of ninety (90) days or more, then the other party shall have the right to terminate this Agreement by giving notice thereof to the non-performing party.

23.  <u>Interest Charges.</u>  All amounts that are not paid when due pursuant to this Agreement shall bear interest at the rate of ten percent (10%) per annum.

24.  <u>Confidentiality.</u>  The parties agree to hold the terms of this Agreement strictly confidential and not to disclose any of its terms to any other party except to the extent that disclosure is specifically required to enable the parties to perform their respective obligations hereunder, provided that either party may disclose such terms in response to a subpoena or other official investigation or inquiry so long as such party first notifies the other party and gives such other party a reasonable opportunity to seek an appropriate protective order or other remedy to prevent such disclosure.

25.  <u>Assignment.</u>  All references herein to Distributor shall be deemed to embrace, include and be binding upon the successors and permitted assigns of Distributor, and all references to Producer shall be deemed to include, embrace and be binding upon the successors and permitted assigns of Producer.  Neither this Agreement nor the interest of either party herein shall be assigned by either party hereto without the written consent of the other party, except that this Agreement and/or Distributor's interest herein may be assigned by Distributor to (a) any person, firm or corporation which purchases or acquires substantially all of Distributor's assets, or to any corporation with which Distributor is merging if the proposed assignee assumes all obligations in writing, or (b) CBS Corporation or any of its owned or controlled subsidiaries, or to any partnership, joint venture or otherwise affiliated entity in which CBS Corporation or any of its owned or controlled subsidiaries has a controlling interest; provided that no such assignment shall affect any rights of Producer hereunder.

26.  <u>Notices.</u>  All notices under this Agreement shall be given in writing and delivered in person or deposited, postage pre-paid and addressed as follows by certified mail, return receipt requested, or by overnight delivery service, addressed as follows:

14

**SEARS 1160**

TO DISTRIBUTOR:

EYEMARK ENTERTAINMENT
10877 Wilshire Blvd., 9th Floor
Los Angeles, CA 90024
Attn.: Business Affairs

WITH A COPY TO:

CBS Broadcasting Inc.
West Coast Law Department
7800 Beverly Blvd.
Los Angeles, CA 90036

TO PRODUCER:

Sears, Roebuck and Co.
3333 Beverly Road
Hoffman Estates, IL 60179
Attn.: National Marketing Mgr.

WITH A COPY TO:

Vice President, Law - Mall Stores
D/766, B6-234B
(at same address)

WITH A COPY TO:

Ogilvy & Mather
676 St. Clair
Chicago, Illinois 60611
Attn.: Ms. Kay Durkin

or to such other address as either party may hereafter designate in writing to the other. The date of the mailing of such notice or the personal delivery thereof shall be deemed to be the effective date of such notice. All payments required to be made hereunder by Distributor to Producer shall be sent to the above designated address of Producer.

27. _Notice of Default_. Neither party hereto shall be deemed in default hereunder or liable for damages of any kind arising out of or in connection with any breach of this Agreement until or unless such party shall have been given written notice thereof by the other party hereto and shall have failed to adjust or correct such default or breach within fifteen (15) days from the effective date of the giving of such notice.

15

**SEARS 1161**

28. <u>Miscellaneous</u>.  Nothing herein contained shall constitute a partnership between or joint venture by the parties hereto.  Subject to Section 8 above, Distributor shall neither be obligated to segregate Gross Receipts derived from the Program from its other funds nor be considered a trustee, pledgeholder, fiduciary or agent for Producer by reason of anything done or any money collected by it.  Neither party shall be liable to the other for any special, consequential or incidental damages arising out of any claim of any nature whatsoever, regardless of whether such party was advised of the possibility of such damages.  No waiver by either party hereto of any breach of this Agreement shall be deemed to be a waiver of any prior or subsequent breach of the same or any other provision hereof, nor shall the exercise of, or failure to exercise, any right granted to either party hereunder be deemed to operate as a waiver unless confirmed in writing by the party waiving its rights.  This Agreement is being executed and delivered in, and shall be construed and enforced in accordance with the laws of, the State of Illinois without giving effect to that state's conflict of laws principles.  If any provisions of this Agreement shall be determined by a court or other tribunal of competent jurisdiction to be void or unenforceable, all other provisions of this Agreement shall nevertheless continue in full force and effect.  This Agreement constitutes the complete, final, and exclusive understanding and agreement of the parties hereto with respect to the subject matter hereof, and replaces any and all prior agreements or understandings, whether written or oral, relating in any way to the subject matter hereof.  No modification, amendment or supplement to this Agreement shall be effective unless in writing executed by each of the parties hereto.  Each of the parties hereto acknowledges that it is entering into this Agreement without reliance in any way on any statement, representation, action or other matter not specifically set forth herein.  In the event of any litigation between the parties hereto pertaining to this Agreement or the breach, validity or construction thereof before a court of competent jurisdiction, the prevailing party in such litigation, as determined by the court, shall be entitled to recover, in addition to any other remedies, its reasonable attorneys' fees and out-of-pocket costs incurred in connection with such litigation.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

DISTRIBUTOR:
EYEMARK ENTERTAINMENT,
a Unit of CBS Enterprises,
a Division of CBS Broadcasting Inc.

By: _____

Name: _JON BOOK STRATTON_

Title: _Sr. V.P._

PRODUCER:
SEARS, ROEBUCK AND CO.

By: _____

Name: _John H. Costello_

Title: _SVP_

s:\vengfer\agreemnt\eyemark7.sam

16

**SEARS 1162**

EXHIBIT A

**EYEMARK ENTERTAINMENT**
**SCHEDULE OF PAYMENTS, AS OF OCTOBER 31, 1997**
**HOME AGAIN / TV: HOME AGAIN**

**YEAR I (1992-93 SEASON)**

| PAYMENT DUE DATE | AMOUNT DUE | STATUS |
|---|---|---|
| 05/18/92 | 195,000 | PAID |
| 11/15/92 | 195,000 | PAID |
| 01/15/93 | 195,000 | PAID |
| 03/15/93 | 195,000 | PAID |
| 05/15/93 | 195,000 | PAID |
| TOTAL | 975,000 | |

**YEAR II (1993-94 SEASON)**

| PAYMENT DUE DATE | AMOUNT DUE | STATUS |
|---|---|---|
| EXECUTION | 90,000 | PAID |
| 10/15/93 | 90,000 | PAID |
| 01/15/94 | 90,000 | PAID |
| 04/15/94 | 90,000 | PAID |
| 07/15/94 | 95,000 | PAID |
| TOTAL | 455,000 | |

**YEAR II (2nd EXTENSION (1996-97 SEASON)**

| PAYMENT DUE DATE | AMOUNT DUE | STATUS |
|---|---|---|
| 08/01/96 | 52,000 | PAID 08/96 |
| 11/01/96 | 52,000 | PAID 11/96 |
| 01/01/97 | 52,000 | PAID 01/97 |
| 04/01/97 | 52,000 | PAID 03/97 |
| 07/01/97 | 52,000 | PAID 06/97 |
| TOTAL | 260,000 | |

**YEAR III (1994-95 SEASON)**

| PAYMENT DUE DATE | AMOUNT DUE | STATUS |
|---|---|---|
| EXECUTION | 104,000 | PAID |
| 10/15/94 | 104,000 | PAID |
| 01/15/95 | 104,000 | PAID |
| 04/15/95 | 104,000 | PAID |
| 07/15/95 | 104,000 | PAID |
| TOTAL | 520,000 | |

**YEAR IV (1995-96 SEASON)**

| PAYMENT DUE DATE | AMOUNT DUE | STATUS |
|---|---|---|
| EXECUTION | 110,000 | PAID |
| 10/01/95 | 95,000 | PAID |
| 01/01/96 | 95,000 | PAID |
| 04/01/96 | 95,000 | PAID |
| 10/01/96 | 95,000 | PAID 09/96 |
| TOTAL | 585,000 | |

**YEAR V (1st EXTENSION (1996-97 SEASON)**

| PAYMENT DUE DATE | AMOUNT DUE | STATUS |
|---|---|---|
| 08/01/96 | 52,000 | PAID 08/96 |
| 11/01/96 | 52,000 | PAID 11/96 |
| 01/01/97 | 52,000 | PAID 01/97 |
| 04/01/97 | 52,000 | PAID 03/97 |
| 07/01/97 | 52,000 | PAID 06/97 |
| TOTAL | 260,000 | |

**YEAR III 1st EXTENSION (1995-96 SEASON)**

| PAYMENT DUE DATE | AMOUNT DUE | STATUS |
|---|---|---|
| EXECUTION | 43,335 | PAID |
| 10/01/95 | 43,333 | PAID |
| 01/01/96 | 43,333 | PAID |
| 04/01/96 | 43,333 | PAID |
| 07/01/96 | 43,333 | PAID |
| 10/01/96 | 43,333 | PAID |
| TOTAL | 260,000 | |

**YEAR II 1st EXTENSION (1995-96 SEASON)**

| PAYMENT DUE DATE | AMOUNT DUE | STATUS |
|---|---|---|
| 08/01/95 | 52,000 | PAID |
| 11/01/95 | 52,000 | PAID |
| 01/01/96 | 52,000 | PAID |
| 04/01/96 | 52,000 | PAID |
| 07/01/96 | 52,000 | PAID |
| TOTAL | 260,000 | |

**YEAR V (1996-97 SEASON)**

| PAYMENT DUE DATE | AMOUNT DUE | STATUS |
|---|---|---|
| EXECUTION - 08/96 | 125,000 | PAID 07/96 |
| 10/01/96 | 105,000 | PAID 09/96 |
| 01/01/97 | 105,000 | PAID 01/97 |
| 04/01/97 | 105,000 | PAID 03/97 |
| 07/01/97 | 105,000 | PAID 06/97 |
| 10/01/97 | 105,000 | PAID 10/97 |
| TOTAL | 650,000 | |

SEARS 1163

EYEMARK.WK4

As of August 2, 2000

**AMENDMENT
TO
DISTRIBUTION AND MEDIA SALES AGREEMENT**

**WITNESSETH:**

This Amendment to Distribution and Media Sales Agreement (this "Amendment to Distribution Agreement") is made and entered into as of September 1, 1999, by and between CBS Enterprises, a division of CBS Broadcasting Inc. ("Distributor") and Sears, Roebuck and Co. ("Producer").

**WITNESSETH:**

WHEREAS, Producer and Distributor are parties to that certain Distribution and Media Sales Agreement dated as of April 1, 1994 (the "Distribution Agreement");

WHEREAS, Producer and Distributor desire to amend the Distribution Agreement to extend the term and change certain provisions thereof;

NOW, THEREFORE, the parties hereto agree as follows:

1.      As of the date hereof, the Distribution Agreement is amended as follows:

   A.      Section 1 of the Distribution Agreement is deleted in its entirety and replaced with the following:

      1.      **Grant of Rights.** Subject to the terms and conditions of this Agreement, Producer hereby grants to Distributor for the Term of this Agreement (as defined in Section 3) the sole and exclusive right, license and privilege to distribute, license, exhibit, publicize, advertise, and market episodes of the Program, in the number and for the Term provided below, for television throughout the Licensed Territory (as defined in Section 4) and in any and all languages. For purposes of this Agreement, "television" means one-way synchronous broadcast applications such as free, pay subscription and cable television and excludes without limitation asynchronous broadcast, videotape and/or interactive applications.

   B.      Section 2 of the Distribution Agreement is amended to delete the first sentence and substitute the following: "The Program will air weekly for 26 weeks and will consist of 26 original episodes and 26 repeat programs which may derive from the then current Broadcast Year or prior Broadcast Years".

   C.      Section 3 of the Distribution Agreement is deleted in its entirety and replaced with the following:

"3. Term of Agreement.

         a) Unless sooner terminated as provided herein, the Term of this Agreement, except as provided in b) below, shall commence on September 1, 1999, and continue for six (6) Broadcast Years, i.e., the 1999-2000, 2000-2001, 2001-2002, 2002-2003, 2003-2004 and 2004-2005 Broadcast Years. Each Broadcast Year is deemed to commence on September 1 and end on August 31 of the following year. The Term will expire on August 31, 2005.

         b) Unless this Agreement shall have been terminated prior thereto pursuant to the rights of either party set forth herein, the Term hereof with respect to the distribution of the Program solely by cable television will continue for an additional thirteen (13)

**SEARS 1143**

months, commencing September 1, 2005 and ending September 30, 2006 (herein the "extended term"); provided, however,

    i) The right to so distribute the Program by cable television during the extended term is limited to distribution by The Learning Channel or any other programming service of Discovery Communications Inc. with a subscriber base of ten (10) million or less;

    ii) The territory is the United States, its territories and possessions and Canada; and

    iii) Producer will not furnish original episodes for use during the extended term."

D.    Sections 6.A. (i) and (ii) of the Distribution Agreement are amended by deleting the words "the 1994-95 broadcast year" and replacing them with the following: "each Broadcast Year."

E.    Section 6.A.(i) is further amended by deleting the words "Six Hundred Fifty Thousand Dollars ($650,000)" in the second and third sentences thereof and replacing them with the following: "Six Hundred Seventy-Five Thousand Dollars ($675,000)."

F.    Section 6.B. of the Distribution Agreement is amended by adding the following: "Any such sale or license must be approved by Producer."

G.    Section 8.A. of the Distribution Agreement is amended by deleting the words "eleven percent (11%)" and replacing them with "thirteen percent (13%)."

H.    The provisions of Section 11 of the Distribution Agreement are deleted.

I.    Exhibit A referencing payments made to A&E is deleted.

J.    Section 13.A. of the Distribution Agreement is amended by adding, the following: "Distributor and any subdistributor, e.g., The Learning Channel, shall have the right to advertise or promote the Program or any episode on its web site, provided there is a link to the BobVila.com web site. Distributor and any subdistributor shall have the right to use excerpts from the Program of not more than thirty (30) seconds duration in any such promotion.

Neither Distributor nor any subdistributor shall have the right to license or authorize any advertiser to promote the Program on the internet or use any Program excerpt without Producer's prior written approval.

Distributor recognizes that each episode of the Program will contain a reference to the web site "BobVila.com."

K.    Section 14. of the Distribution Agreement shall be amended by adding the following: "Distributor acknowledges that certain rights, title and interest in the Program series are owned jointly by Producer and B.V.T.V. Inc."

L.    Section 15, clause (a) of the Distribution Agreement is amended to delete the words "Producer is" and replace them with the following: "Producer and B.V.T.V. Inc., are."

M.    Section 26 of the Distribution Agreement is amended to provide that notice to Producer should be sent as follows:

BVTV Amend.
ECL
1/29/04

SEARS 1144

TO PRODUCER:
Sears, Roebuck and Co.
3333 Beverly Road.
Hoffman Estates, IL 60179
Attn: V.P. – Brand Management
WITH COPY TO:
V.P. – Law, Merchandising and Marketing
(at same address)

TO DISTRIBUTOR
CBS Enterprises
A Division Of CBS Broadcasting Inc.
2401 Colorado Avenue, Suite 100
Santa Monica, California 90404-3585
Attn: Business Affairs

WITH COPY TO:
Mindshare
900 North Michigan
Chicago, Illinois 60611
Attn: Ms. Kay Durkin

N.    The fourth WHEREAS clause of the Distribution Agreement is amended to delete the words "four (4)."

2.    Except as amended above, the provisions of the Distribution Agreement shall remain and continue in full force and effect and are hereby ratified and confirmed.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to the Distribution Agreement to be duly executed as of the day and year first above written.

DISTRIBUTOR:                             PRODUCER:

CBS ENTERPRISES                          SEARS, ROEBUCK AND CO.
A Division of CBS Broadcasting Inc.

By: _____             By: _____

Name: _____             Name: _Andrew R Crisp_____

Title: _____            Title: _VP Brand Mgmt_____

BVTV Amend.
ECL
1/29/04

**SEARS 1145**

# DEPOSITION EXHIBIT  75

**Sears, Roebuck & Co**

# Memo

**To:**  Janine Bousquette

**From:** Andy Ginger

**CC:**  Henry Ferris

**Date:** 02/07/05

**Re:**  Bob Vila's Home Again TV Show Contract

---

Currently, this show is a self-liquidating property for Sears. We pay BVTV to produce the show. We sell the shows to CBS/Kingworld. They syndicate and sell advertising on the show and pass revenue to Sears, which offsets our cost.

Earlier, we met with you and secured approval to negotiate a limited extension of 1-2 years vs. the proposed, longer term.

As with other long-term deals, since the merger announcement, as directed, we have been holding back the contract completion on this. We cannot hold back on taking action any longer. Both BVTV and CBS are past the limit on their timing for decisions.

There are two options:

1. Complete the extensions with BVTV and CBS. They are negotiated and ready to sign.

2. Release BVTV to make alternative arrangements.

We have indicated to BVTV that the first option is unlikely in the current situation.

If we choose the second option, we will likely need to release some or all of our ownership within the current contract. A new sponsor will likely want the rights to the 15-year library that we own with BVTV. This will be viewed as a corporate asset being released and will need to be approved in the same fashion as other long-term contracts.

We need to discuss ASAP. I believe we will formally hear from BVTV's attorney on this in the next day or two.



EXHIBIT

#75 ID

1-30-06  RMC

● Page 1

# DEPOSITION EXHIBIT  77

**Mark**

| | |
|---|---|
| **From:** | WCC |
| **Sent:** | Friday, March 04, 2005 4:35 PM |
| **To:** | 'aginger@sears.com' |
| **Subject:** | Re: Contract Follow Up |

Summarize deals in email for me please.
----------------------------------------
William C. Crowley
ESL Investments
wcc@eslinvest.com
203-861-4603

-----Original Message-----
From: aginger@sears.com <aginger@sears.com>
To: WCC <WCC@eslinvest.com>
Sent: Fri Mar 04 14:45:39 2005
Subject: Contract Follow Up

*Redacted*

Need to know what kind of questions you have or information you need.
Talked to Dawn again today. She suggested another e-mail. I'm happy to do this on the phone, in person or however you prefer.

The Home Again deal is also over the timeline.                         Sorry to be a
pest but we need to resolve asap.    Please let me know.

Thanks for your help.

EXHIBIT
#77 ID
1-30-06 RMC

SEARS-1728

# DEPOSITION EXHIBIT  78

**From:** Andy Ginger
**Sent:** Mon, 07 Mar 2005 13:51:40 GMT
**To:** wcc@eslinvest.com
**CC:**
**BCC:**
**Subject:** Contract Amendment Summaries

Per your request, attached are the 3 contract amendment summaries for
, Bob Vila's Home Again and           **Redacted**
. We have reviewed these in detail with Luis Padilla and
Janine Bousquette. **Redacted**

Vila and           are ready for signature. **Redacted**
                We stand ready to
you would like to see. Let me know. We would like to move forward as soon as
possible.

I can send hard copies to Denise in Hoffman if that is helpful.

EXHIBIT
#78  ID
1-30-06 RMC

# DEPOSITION EXHIBIT  80

**Sears, Roebuck & Co**

# Memo

**To:**    Janine Bousquette

**From:** Andy Ginger

**Date:** 03/14/05

**Re:**    Vila Contract Amendment

---

Our original recommendation was to negotiate in 2 steps.   First, negotiate the show...the urgent step...buying time to establish the current value of the library in the market.   Then, negotiate re-structuring the overall relationship, using the library value.

The attached outlines the approach we would use to negotiate **in one step.**  It presumes our historical knowledge of the library value is sufficient to leverage.  In our discussion last week, you favored a one-step approach.  We developed this with in-depth participation from Drew.

If successful, this would achieve many desired outcomes:  2005 almost break-even, 2006 break-even, reduce future spokesperson obligation by over $5 MM.  We do not know how they will react.  The attached reflects an aggressive posture from our end.  *The notes in italics are for our reference only.*

Please let me know if you have any input.  We would like to put this in front of Vila's attorney on Tuesday, March 15.   If the structured negotiation process requires approvals from others before we proceed, please let me know right away.



EXHIBIT

#80  ID

1-30-06

SEARS-2480

# DEPOSITION EXHIBIT  95

**Sent:** Mon, 21 Mar 2005 17:44:13 GMT
**From:** Drew Farkas
**To:** kcondon
**CC:** Mark Rode; Andy Ginger
**BCC:** Mary Tortorice
**Subject:** Re: Bob Vila Shows
  Ron, my apologies for the continued delay.  Unfortunately, the pending merger (slated to close as of the end of this week) is taking up most of the executives' time and is contributing to the delay.

In any event, Andy Ginger is out today and tomorrow.  He returns this Wednesday so I will have the opportunity to discuss this with him then.

Thanks.


**"kcondon"**
**<kcondon@kaufmannfei**
**ner.com>**

03/18/2005 02:39 PM
Please respond to
"kcondon"

To:                                              <dfarka
cc:                                              <MRODE
"Bob Vila" <rjvila@bobvila.com>, <jrusso@ArtistsAgency.com>
Subject:  Bob Vila Shows


Dear Drew: I understand that King World has been trying to reach you. I think that if we don't get a decision regarding Sears' renewal of the shows very soon, we, on behalf of Bob, should negotiate the deal with King World with your blessing -- as time is really creating a crunch situation regarding producing the shows in the manner and quality we are all used to.

Please let me know your thoughts.

Regards, Ron Feiner

EXHIBIT
#95  I.D
1-31-C6 AMC

# DEPOSITION EXHIBIT  100

Can't just walk away from contracts

Take contract and all expenses — cut in half

Including 2009

$5 MM savings                    Ownership To Vita

$9.7                Getting $3.3       Bonus Terms OK
MM                  MM                 One Year On Show

                                       Cut Spokesperson ½

Lose $5 MM

                    Days to ½   17½

                    Rediscussing exclusivity

                    Get $1.5 MM on season now

                    Jan / Mar

                    Jan / June

EXHIBIT
#100    ID
1-31-11
SEARS-2475

# DEPOSITION EXHIBIT  110

**Mark**

| | |
|---|---|
| **From:** | lpadilla@sears.com |
| **Sent:** | Saturday, April 02, 2005 11 09 AM |
| **To:** | WCC |
| **Subject:** | Re: Bob Vila and ▓▓▓▓▓ Contract Details |

Send him back to Cuba? Kidding, we are in process of renegotiating our commitment to minimize our exposure of fees and lenght of time. I will review with you on monday.

---------------------------
Sent from my BlackBerry Wireless Handheld

----- Original Message -----
From: "WCC" [WCC@eslinvest.com]
Sent: 04/02/2005 09:04 AM
To: <lpadilla@sears.com>
Subject: FW: Bob Vila and ▓▓▓▓▓ Contract Details

What is the best way to reduce our exposure to Vila?

William C. Crowley
wcc@eslinvest.com
W: 203-861-4603
M:  917-536-8033

-----Original Message-----
From: Eddie
Sent: Wednesday, March 30, 2005 11:47 AM
To: WCC
Subject: FW: Bob Vila and ▓▓▓▓▓ Contract Details

Make sure you look at the proposed renegotiated deal with Bob Vila to see if it makes sense.

-----Original Message-----
From: ▓▓▓▓▓▓▓▓▓▓
Sent: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
To: ▓▓▓▓
Cc: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
Subject: ▓▓▓▓▓▓▓▓▓▓▓▓▓

Redacted



**EXHIBIT**

#110 ID
1-31-06 RMC

# DEPOSITION EXHIBIT  112

**Sears, Roebuck & Co**

# Memo

**To:**   Luis Padilla

**From:** Andy Ginger

**CC:**   Janine Bousquette

**Date:** 04/04/05

**Re:**   Vila Negotiation

---

Per your request, attached shows where we are.  Need input to move forward.  Also, need to know if we should prepare for approval through the new contract approval process announced this morning.

**Background:**  Current show deal is not bringing Sears a break-even bottom line.  Overall investment rising.  Spokesperson contract runs through 2009.  Sears wants to re-structure to a business arrangement that provides reduced expense.  Sears wants to exchange ownership in the TV show library for reduction in future obligations.


Timing urgent.  CBS/Kingworld has sold–out 2005-06 season to advertisers and has prepared to clear in syndication for this fall.

**Achieved Sears original financial targets going into negotiation:**

- Breakeven potential for 2005 on Home Again
- Breakeven on a final, one-year extension for the TV show
- Significant reductions in spokesperson expense for 2006-2009
- Total agreed reduction in expense of $5.3 to $5.5 MM
  - Exceeds Sears est. valuation of 50% ownership in the library by $500 K

**Recommended next steps:**

- Agree on financials
- Negotiate to retain current exclusivity process (1)
- Negotiate to retain 20 days per year (2)
- Prioritize these as stated above, using days to hold exclusivity



**SEARS-2431**

Recap of Vila Negotiation

|  | Current Contractual Obligation | Current Negotiated Status | Reduction |
|---|---|---|---|

**2004-5 Home Again Incentive**

|  |  |  |  |
|---|---|---|---|
| Minimum | 425,000 | 0 | 425,000 |
| Maximum | 625,000 | 0 | 625,000 |

**Spokesperson Fee**

|  |  |  |  |
|---|---|---|---|
| 2006 | 2,087,250 | 1,043,625 | 1,043,625 |
| 2007 | 2,295,975 | 1,147,988 | 1,147,987 |
| 2008 | 2,525,572 | 1,262,786 | 1,262,786 |
| 2009 | 2,778,129 | 1,389,065 | 1,389,064 |
| Total | 9,686,926 | 4,843,464 | 4,843,462 |

**Spokesperson Days**

|  |  |  |  |
|---|---|---|---|
| 2006 | 35 | 17.5 | 17.5 |
| 2007 | 35 | 17.5 | 17.5 |
| 2008 | 35 | 17.5 | 17.5 |
| 2009 | 35 | 17.5 | 17.5 |
| Total | 140 | 70 | 70 |

| Library Ownership | 50/50 | 100% BVTV | As Proposed By Sears |
|---|---|---|---|

| Show Production Extension |  | 1 Year Extension | As Proposed By Sears |
|---|---|---|---|

| Exclusivity Approval Process | Sears 100% review and appoval not to be unreasonbly witheld | Vila proposes to relax for mortgage, finance, banking. automotive | Sears does not wish to relax process |
|---|---|---|---|

SEARS-2432

egotiation

| Current Contractual Obligation | Sears Proposal | Reduction | Current Negotiated Status | Reduction | Difference |
|---|---|---|---|---|---|
| ain Incentive | | | | | |
| 425,000 | 0 | 425,000 | 0 | 425,000 | 0 |
| 625,000 | 0 | 625,000 | 0 | 625,000 | 0 |
| | | | | | |
| Fee | | | | | |
| 2,087,250 | 1,387,250 | 700,000 | 1,043,625 | 1,043,625 | -343,625 |
| 2,295,975 | 1,295,975 | 1,000,000 | 1,147,988 | 1,147,987 | -147,988 |
| 2,525,572 | 925,572 | 1,600,000 | 1,262,786 | 1,262,786 | 337,214 |
| 2,778,129 | 0 | 2,778,129 | 1,389,065 | 1,389,064 | 1,389,065 |
| 9,686,926 | 3,608,797 | 6,078,129 | 4,843,464 | 4,843,462 | 1,234,666 |
| | | | | | |
| Days | | | | | |
| 35 | 30 | 5 | 17.5 | 17.5 | -13 |
| 35 | 30 | 5 | 17.5 | 17.5 | -13 |
| 35 | 30 | 5 | 17.5 | 17.5 | -13 |
| 35 | 0 | 35 | 17.5 | 17.5 | 18 |
| 140 | 90 | 50 | 70 | 70 | -21 |

| | | | | | |
|---|---|---|---|---|---|
| 50/50 | 100% BVTV | | 100% BVTV | As Proposed By Sears | None |

| | | | | | |
|---|---|---|---|---|---|
| | | | 1 Year Extension | As Proposed By Sears | |

| | | | | | |
|---|---|---|---|---|---|
| Sears 100% review and appoval not to be unreasonbly witheld | No Change | | Vila proposes to relax for mortgage, finance, banking. automotive | Sears does not wish to relax process | |

SEARS-2433

| Expenses | Paid By | Paid To | 2002 Original Est. | 2002 Final 12/02 | 2003 Revised 05/15 | 2003 Final 12/06 | 2004 Original Est. | 2004 Estimate Rev 12/09/04 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| First Run Production | Sears | BVTV | $1,519,000 | $1,519,000 | $1,519,000 | $1,519,000 | $1,519,000 | $1,519,500 | $0 | $0 | $0 | $0 |
| Eyemark Guarantee | Netted | Eyemark | $675,000 | $552,002 | $675,000 | $675,000 | $400,000 | $474,865 | $0 | $0 | $0 | $0 |
| Eyemark Commission | Netted | Eyemark | $135,000 | $143,520 | $128,050 | $102,032 | $102,000 | $123,455 | $0 | $0 | $0 | $0 |
| Eyemark Revenue | Netted | Eyemark | $265,000 | $276,000 | $240,000 | $196,216 | $196,000 | $237,432 | $0 | $0 | $0 | $0 |
| Nielsen Ratings | Netted | Nielsen | $73,000 | $73,000 | $75,000 | $40,400 | $40,000 | $40,000 | $0 | $0 | $0 | $0 |
| Satellite Fees | Netted | Various | $62,000 | $62,802 | $76,000 | $40,400 | $40,000 | $40,000 | $0 | $0 | $0 | $0 |
| Incentive | Sears | BVTV | $1,080,000 | $900,000 | $800,000 | $625,000 | $625,000 | $725,000 | $0 | $0 | $0 | $0 |
| Eyemark Cable Commission | Netted | Eyemark | $479,375 | $479,375 | $333,125 | $333,125 | $349,375 | $349,375 | $178,750 | $200,000 | $375,000 | $200,000 |
| Retilling Expense | | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Store Brochures | | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Mailer Exposures | | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Preprint Ads for Show | | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Total Expenses | | | $4,286,375 | $4,005,699 | $3,846,175 | $3,248,605 | $3,271,375 | $3,509,627 | $178,750 | $200,000 | $375,000 | $200,000 |
| | | | | | | | | | | | | |
| Revenue | | | | | | | | | | | | |
| First Run Ad Revenue Units 1&2 | Eyemark | Sears | $675,000 | $652,002 | $500,000 | $392,432 | $385,000 | $474,865 | $0 | $0 | $0 | $0 |
| First Run Ad Revenue Units 3-6 | Eyemark | Sears | $1,300,000 | $1,104,002 | $995,000 | $784,863 | $785,000 | $949,731 | $0 | $0 | $0 | $0 |
| First Run Ad Revenue Unit 7 | Eyemark | Sears | $350,000 | $276,000 | $240,000 | $196,216 | $200,000 | $237,432 | $0 | $0 | $0 | $0 |
| TLC Cable Revenue | Eyemark | Sears | $1,917,500 | $1,917,500 | $1,332,500 | $1,332,500 | $1,397,500 | $1,397,500 | $715,000 | $800,000 | $1,500,000 | $800,000 |
| Total Revenue | | | $4,242,500 | $3,849,504 | $3,057,500 | $2,706,011 | $2,767,500 | $3,059,528 | $715,000 | $800,000 | $1,500,000 | $800,000 |
| | | | | | | | | | | | | |
| Net Revenue | | | -$45,875 | -$156,195 | -$788,675 | -$542,594 | -$503,875 | -$450,099 | $536,250 | $600,000 | $1,125,000 | $600,000 |
| | | | | | | | | | | | | |
| Who Gets What | | | | | | | | | | | | |
| BVTV Base | | | $2,599,000 | $2,419,000 | $2,319,000 | $2,144,000 | $2,144,000 | $2,244,500 | $0 | $0 | $0 | $0 |
| BVTV Split of Net Revenue | | | -$22,938 | -$78,098 | -$394,338 | -$271,297 | -$251,938 | -$225,050 | $268,125 | $300,000 | $562,500 | $300,000 |
| Sears Split of Net Revenue | | | -$22,938 | -$78,098 | -$394,338 | -$271,297 | -$251,938 | -$225,050 | $268,125 | $300,000 | $562,500 | $300,000 |

SEARS-2435

# Proposal To Vila Currently In Play

**Positioning:**

Sears situation is evolving rapidly. Current investment in the show is not bringing Sears a break-even bottom line. Overall investment keeps rising. Trend line is not acceptable and needs to change. We want to re-structure our relationship to a business arrangement that makes basic fiscal sense. *(Proposal uses show equity to pre-pay/reduce Sears expense by $6.5 MM..)*

**Proposal:**

- Sears wants to exchange ownership in the library for reduction in future obligations.

- Sears believes the library is worth $12 MM or more in the market...Sears equity is $6.0 MM

- Sears will extend Home Again 1 year (06-07), but only on a break-even basis  *(Cable contracts have been in the range of $10 M over 5 years. We have 390 episodes. This values them at $30 K each...an aggressive average. They cannot collect revenue on this until 2007.)*

**What Sears Wants In Exchange:**

- Reductions of spokesperson fee as follows:  2006 - $700 K, 2007 = $1.0 K,  2008 = $1.6 MM *(This reduces them to: $1.4, $1.3, $0.9)*

- End the spokesperson agreement at the end of 2008.  *(Eliminates 2009 obligation of $2.8 MM..)*

- Eliminate any future incentive due in 2005 on Home Again revenue  *(Estimated at $425 K, '05 goes to within $175 K of break-even.)*

**In addition** to releasing it's library rights, Sears offers, and is negotiable on, the following:

- Reduce by 5 personal service days per year, 2005-2008, for a total of 20 days  *(They will negotiate for relaxed exclusivity in non-competitive categories. These have no value without this.)*

**SEARS-2436**

# DEPOSITION EXHIBIT 121

**Sent:** Mon, 20 Jun 2005 17:45:35 GMT
**From:** Fred Ciba
**To:** Judy R. Davis
**CC:** Glori D. Katz; Mark Rode
**BCC:**
**Subject:** Re: ...............Bob Vila, spokesperson 2005...........

            Thanks, Judy, looks like we can pay this on time. Fred.

| **Judy R. Davis** | | |
|---|---|---|
| 06/20/2005 11:05 AM | To: | Fred Ci |
| | cc: | Glori D |
| | Subject: Re: ...............Bob Vila, spokesperson {2005}........... | |

Fred, I don't believe there is a correlation between the spokesperson fee and the legal issue
at hand.  With that in mind, I believe we should go ahead and process the invoice.  The JA#
for the 2nd half fee is 512Z025.
Thanks for your patience.
Judy

| **Fred Ciba** | | |
|---|---|---|
| 06/20/2005 09:01 AM | To: | Mark Ro |
| | cc: | Judy R. |
| | Katz/Marketing/SEARS@SEARS | |
| | Subject: Re: ...............Bob Vila, spokesperson {2005}........... | |

Mark, I'm between a rock and a hard place here. Please help?
Note that you asked that I proceed with paying the Bob Vila, Personal Spokesperson fee
outlined below.
Judy Davis, however, does not have a JA# to cover.
You were going to check on how to proceed. Any progress? I'd like to pay this on time, per
contract.
Advise. Thanks, Fred.
----- Forwarded by Fred Ciba/Marketing/SEARS on 06/20/2005 08:57 AM -----

| **Fred Ciba** | | |
|---|---|---|
| 06/09/2005 09:03 AM | To: | Mark R |
| | cc: | Glori D |
| | Davis/Marketing/SEARS@Sears | |
| | Subject: Re: ...............Bob Vila, spokesperson {2005}........... | |

Mark, will do here. Have held this invoice for two other reasons ...



EXHIBIT
Bloomberg No. 5208
#121 (1
2-1-06

SEARS-2034

1. Need SAG/AFTRA Pension & Welfare figures. (Just received from Ogilvy & Mather).
2. Need JA#. (Standing by on this).
Thanks, Fred.

**Mark Rode**

06/06/2005 03:24 PM

To:                                                     Fred Ci
cc:                                                     Glori D
Davis/Marketing/SEARS@SEARS
Subject:   Re: ..............Bob Vila, spokesperson (2005)..........

Submit the invoice for payment.

Mark P. Rode
Craftsman Brand Manager
(847) 286-3447

**Fred Ciba**

06/06/2005 02:21 PM

To:                                                     Mark Rc
cc:                                                     Judy R.
Katz/Marketing/SEARS@SEARS
Subject:   ..............Bob Vila, spokesperson (2005)..........

Mark, I have in my possesion an invoice for the following (just received)...
**Bob Vila, Personal Spokesperson Contract - Year 2005, Payment #2, Due July 1,**
**2005, ..... $948,750.00 (Invoice #90)**
.... It is the second half of the invoice for $1,897,500.00. We paid the first half on January 1,
2005 for $948,750.00 (Invoice #83).
Now, this invoice does not have the SAG/AFTRA Union Dues that has been inherent in
years past (last year - $172,612.50) because I could not get the figure from Ogilvy &
Mather. But, we were sent this invoice anyhow, without same. This SAG/AFTRA Union
Dues fee should be in this invoice, as it is required of all our on screen TV commercial
performers.
Advise on how to proceed?   Thanks, Fred.

SEARS-2035

**DEPOSITION EXHIBIT  142**


To:
cc:
Subject:

---

If we do not continue paying for the production, can he step in and still produce, or do we control that decision? Not without an agreement from us.
If he produces more shows, do they go into the library? Yes, and would be half owned by us if we pay for production.
What are the plans for syndicating the library? We would like to sell but it is encumbered until '06 What do we think the value of the library is? $4M-$8M How did we come to that value? Past sales, rental, current environment.
What do we think the impact of another year of programming will be on the library? It's the best asset and it keeps our spokesperson on TV
Can we trade a portion of our ownership of the library to eliminate our continuing spokes person obligation? Some, but not all.

Again, I would like to review the contract. Do we have any rights under the contract that might help us in this negotiation? We do not appear to have much leverage.

William C. Crowley
wcc@eslinvest.com <mailto:wcc@eslinvest.com>
W: 203-861-4603
M:  917-536-8033

*Redacted*

---

From:
Sent:
To:
Cc:
Subject:

To:
cc:
Subject:

2-2-06

EXHIBIT NO. 142

D. BRIDGES

SEARS-1758

**DEPOSITION EXHIBIT  148**

🛒 Shopping Ca

# K
### kmart.

See What's New ◈

⚕ PHARMACY         HOMEPAGE        TRACK
❀ MARTHA'S FLOWERS  MY ACCOUNT      STORE
▯ WEEKLY CIRCULAR   CUSTOMER SERVICE  SIGN

| JEWELRY | APPAREL | FOR THE HOME | ELECTRONICS | HEALTH & BEAUTY | SPORTS | TOYS | BABY & KIDS | H |

Search  enter keyword(s)  ⦿ go   Only at Kmart ▸ Martha Stewart Everyday  I Thalia Sodi  I Joe Boxer  I Route 66  I Jaclyn S

Homepage ✦ Company Information

# Kmart Corporation News

## About Kmart Press Releases

January 6, 2005

**Contacts:**

**For Kmart Holding Corporation:**
Kmart Media Relations
248-463-1021

**For Sears, Roebuck and Co.:**
News Media Contact:
Edgar P. McDougal
847-286-9669

**For JPMorgan:**
Adam Castellani
212-270-7441

**For Immediate Release**

### SEARS HOLDINGS CORPORATION LAUNCHES DEBUT $4.0 BILLION REVOLVING CREDIT FACILITY

**TROY, Mich. January 6, 2005** – Sears Holdings Corporation, currently a wholly owned subsidiary of Kmart Holding Corporation created to facilitate the business combination between Kmart Holding Corporation and Sears, Roebuck and Co., announced today the launch of syndication for a $4.0 billion Senior Secured Revolving Credit Facility. Sears Holdings Corporation will be the holding company for the Sears and Kmart businesses after completion of the business combination, which is expected to close by early March 2005. $3.5 billion already has been committed toward the facility by eight financial institutions. The facility is to be available for five years to fund working capital needs, capital expenditures, acquisitions and other general corporate purposes.

"The strong start to the syndication reflects confidence within the bank market in the financial strength of Sears Holdings Corporation, the leadership of the combined management teams and the focus on profitability provided by its Chairman, Edward S. Lampert, whose ESL investment partnerships will be the company's largest shareholder," said James B. Lee, vice chairman of JPMorgan Chase & Co., one of the Joint Lead Arrangers.

The credit facility would become effective upon consummation of the business combination between Kmart Holding Corporation and Sears, Roebuck and Co., which is subject to shareholder and regulatory approvals and is expected to occur by early March 2005. The company has engaged JPMorgan, Citigroup and Bank of America as Joint Lead Arrangers and Joint Bookrunners with JPMorgan serving as Administrative Agent.

**About Sears Holdings Corporation**
Created in connection with the merger of Kmart and Sears announced on Nov. 17, 2004, and subject to the receipt of shareholder and regulatory approvals and the satisfaction or waiver of other conditions, upon close of the merger, Sears Holdings Corporation is expected to be the nation's third largest broadline retailer, with approximately $55 billion in annual revenues, 2,350 full-line and off-mall stores and 1,100 specialty retail stores. Sears Holdings is expected to be the leading home appliance retailer as well as a leader in tools, lawn and garden, home electronics and automotive repair and maintenance. Key proprietary brands are expected to include Kenmore, Craftsman and DieHard, and a broad apparel offering, including such well-known labels as Lands' End, Jaclyn Smith and Joe Boxer, as well as the Apostrophe and Covington brands. It is also expected to have Martha Stewart Everyday products, which are now offered exclusively in the U.S. by Kmart and in Canada by Sears Canada.



EXHIBIT
148
3/1/06 HG

**About Kmart Holding Corporation**
Kmart Holding Corporation and its subsidiaries (together, "Kmart") is a mass merchandising company that offers customers quality products through a portfolio of exclusive brands that include Thalia Sodi, Jaclyn Smith, Joe Boxer, Martha Stewart Everyday and Route 66. For more information visit Kmart's website at www.kmart.com.

**About Sears, Roebuck and Co.**
Sears, Roebuck and Co. ("Sears") is a leading broadline retailer providing merchandise and related services. With revenues in 2003 of $41.1 billion, Sears offers its wide range of home merchandise, apparel and automotive products and services through more than 2,300 Sears-branded and affiliated stores in the U.S. and Canada, which includes approximately 870 full-line and 1,100 specialty stores in the U.S. Sears also offers a variety of merchandise and services through sears.com, landsend.com, and specialty catalogs. Sears is the only retailer where consumers can find each of the Kenmore, Craftsman, DieHard and Lands' End brands together -- among the most trusted and preferred brands in the U.S. The company is the largest provider of product repair services with more than 14 million service calls made annually. For more information, visit Sears' website at www.sears.com.

### # # #

Sears Holdings Corporation has filed a Registration Statement on Form S-4 with the SEC (Registration No. 333-120954) containing a preliminary joint proxy statement-prospectus regarding the proposed transaction involving Kmart Holding Corporation and Sears, Roebuck and Co. **Investors are urged to read the definitive joint proxy statement-prospectus regarding the proposed transaction when it becomes available, because it will contain important information.** Stockholders will be able to obtain a free copy of the definitive joint proxy statement-prospectus, as well as other filings containing information about Sears Holdings Corporation, Kmart Holding Corporation and Sears, Roebuck and Co., without charge, at the SEC's Internet site (http://www.sec.gov). Copies of the definitive joint proxy statement-prospectus and the SEC filings that will be incorporated by reference in the definitive joint proxy statement-prospectus can also be obtained, without charge, by directing a request to Kmart Holding Corporation, 3100 West Big Beaver Road, Troy, Michigan, 48084, Attention: Office of the Secretary, or to Sears, Roebuck and Co., 3333 Beverly Road, Hoffman Estates, Illinois, 60179, Attention: Office of the Secretary. Information regarding Sears Holdings' proposed directors and executive officers, Kmart's and Sears, Roebuck's directors and executive officers and other participants in the proxy solicitation and a description of their direct and indirect interests, by security holdings or otherwise, is available in the preliminary joint proxy statement-prospectus contained in the above-referenced Registration Statement on Form S-4.

### # # #

This document contains forward-looking statements that are subject to risks and uncertainties that may cause actual results to differ materially from expected results. Risks and uncertainties include the business combination involving Sears Holdings, Kmart and Sears, Roebuck not closing; failure to quickly realize cost-savings from the transaction as a result of technical, logistical, competitive and other factors; competitive conditions in retail and related services industries; changes in consumer confidence, tastes, preferences and spending; the availability of consumer debt; anticipated cash flow and the ability of Sears Holdings to maintain sufficient operating cash flow and liquidity; the successful execution of, and customer response to, our strategic initiatives, including the full-line store strategy and the conversion and integration of the Kmart stores and other new store locations; the pace of growth in our store locations, which may be higher or lower than anticipated; the possibility that new business and strategic options for one or more business segments will be identified, potentially including selective acquisitions, dispositions, restructurings, joint ventures and partnerships; trade restrictions, tariffs, and other factors potentially affecting the ability to do business with qualified vendors and access products in an efficient manner; the ability to successfully implement initiatives to improve inventory management capabilities; changes in interest rates; the outcome of pending legal proceedings and bankruptcy claims; social and political conditions such as war, political unrest and terrorism or natural disasters; the possibility of negative investment returns in pension plans; volatility in financial markets; changes in debt ratings, credit spreads and cost of funds; the possibility of interruptions in systematically accessing the public debt markets; the impact of seasonal buying patterns which are difficult to forecast with certainty; and general economic conditions and normal business uncertainty. We intend the forward-looking statements to speak only as of the time first made and we do not undertake to update or revise them as more information becomes available.



| Customer Service | Kmart Stores | My Account | Kmart deals |
|---|---|---|---|
| • Shipping Information | • Store Locator | • Address Book | Sign up for email |
| • Return Policy | • Weekly Ad | • Order History | |
| • Contact Us | • Gift Card | • Wish List | enter email addr |
| • more ▸ | • Pharmacy | • more ▸ | |

Kmart Company Info | Sears Holdings Corporation Info | Careers | Product Recalls
Terms of Use | Privacy & Secure Shopping | Kmart Rewards Card | Vendor Resources | NetZero Internet | Site Map

© 2004 Kmart.com, LLC

**DEPOSITION EXHIBIT  149**

**From:** WCC
**Sent:** Friday, April 01, 2005 8:16 PM
**To:** lpadilla@sears.com
**Subject:** FW: Bob Vila and ▮▮▮▮▮ Contract Details

**Attachments:** DMLIB-#52061-v1-Eddie_Summaries.DOC; vilaflowchart.ppt; HomeAgain.ppt

vilaflowchart.ppt    HomeAgain.ppt (21
(23 KB)                    KB)

*What is the best way to reduce our exposure to Vila?*

William C. Crowley
wcc@eslinvest.com
W: 203-861-4603
M: 917-536-8033

*Redacted*

-----Original Message-----
From: Eddie
Sent: Wednesday, March 30, 2005 11:47 AM
To: WCC
Subject: FW: Bob Vila and ▮▮▮▮▮ Contract Details

Make sure you look at the proposed renegotiated deal with Bob Vila to see if it makes
sense.

-----Original Message-----
From: ▮▮▮▮▮▮▮▮▮▮▮▮
Sent: ▮▮▮▮▮▮▮▮▮▮▮▮
To: ▮▮▮▮▮
Cc: ▮▮▮▮▮▮▮▮▮▮▮▮
Subject: Bob Vila and ▮▮▮▮▮ Contract Details

EXHIBIT
149
3/11/06 HR

SEARS-1763

# DEPOSITION EXHIBIT  150

**Mark**

From:
Sent:
To:
Cc:
Subject:





-----Original Message-----
From: Eddie
Sent: Monday, April 18, 2005 5:07 PM
To: WCC
Subject: Re: Bob Vila

We better understand the value of the library.  What does it consist of?
----------------------------------
Sent from my BlackBerry Wireless Handheld (www.BlackBerry.net)

-----Original Message-----
From: WCC <WCC@eslinvest.com>
To: Eddie <Eddie@eslinvest.com>
Sent: Mon Apr 18 18:05:44 2005
Subject: FW: Bob Vila

I will get Scott's views.

I would like to see if we can get a good value on the library and thereby forego the
obligated cash payments.

I need to review contracts and details, which I got today.


William C. Crowley

wcc@eslinvest.com <mailto:wcc@eslinvest.com>

W: 203-861-4603

M:  917-536-8033

_____

From: MRODE@sears.com [mailto:MRODE@sears.com]
Sent: Monday, April 18, 2005 3:31 PM
To: WCC
Subject: RE: Bob Vila

EXHIBIT
150
3/1/06 HR

I don't have the spreadsheet with me but I think Bob has offered to forego a little more
than $8M to get the library.  The NPV was between $6M-$7M.  I recommend we take that deal
as I don't think we will find better.  I believe I can negotiate somewhat more favorable
terms and pump up the NPV.  The other option is to hit the street with the property, but
we couldn't realize any gains until September '06 when TLC is done with it and we also

SEARS-1751

would have commissions to consider.

Would you like me to move forward exchanging the library for future payments to Bob?

Mark P. Rode
Craftsman Brand Manager
(847) 286-3447

Redacted

To:
cc:
Subject:



From:
Sent:
To:
Cc:
Subject:



SEARS-1752

# DEPOSITION EXHIBIT  151

**Mark**

| | |
|---|---|
| **From:** | WCC |
| **Sent:** | Tuesday, April 19, 2005 1:55 PM |
| **To:** | Eddie |
| **Subject:** | RE  Bob Vila |

50%/50% ownership of library Bob and S.
Right now in 7th year of syndication deal with TLC.

Call me when you get a chance.

William C. Crowley
wcc@eslinvest.com
W: 203-861-4603
M:  917-536-8033

-----Original Message-----
From: Eddie
Sent: Tuesday, April 19, 2005 12:52 PM
To: WCC
Subject: Re: Bob Vila

Ok, but who has the rights to the library now?
------------------------------------
Sent from my BlackBerry Wireless Handheld (www.BlackBerry.net)


-----Original Message-----
From: WCC <WCC@eslinvest.com>
To: Eddie <Eddie@eslinvest.com>
Sent: Tue Apr 19 13:50:03 2005
Subject: Bob Vila

I would like ask Alan Mnuchin to take a look at the library.
See what he thinks of the value.

If there is a big difference in value, then we would retain him to help us negotiate a
deal with Bob or someone else.
I think he knows the King World people well.

OK?

William C. Crowley
wcc@eslinvest.com
W: 203-861-4603
M:  917-536-8033

**EXHIBIT**

151

3/1/06 KR

**DEPOSITION EXHIBIT  154**



**Craftsman.com is temporarily closed for site enhancements**



For Craftsman products visit sears.com

<u>Lawn & Garden</u>  |  <u>Tools</u>



Craftsman is the official tool of NASCAR, NCTS & the NHRA

<u>Sign up</u>  for Craftsman Club e-mail  |  <u>Request</u> a  Craftsman Tool Catalog  |  <u>Order online</u> from o



EXHIBIT
154
3/1/06  HR

# DEPOSITION EXHIBIT  162

# SEARS HOLDINGS CORPORATION

3100 West Big Beaver Road
Troy MI 48084

Legal Department
Robert W. Rathke
Vice President, Legal
248 463 5597 (MI)
Fax 248 458 1036
847 286-7373 (IL)
rrathke@searshc.com

*Protected Settlement Communication*
*Subject to FRE 408*

<u>Via FedEx</u>

July 22, 2005

Ronald Feiner, Esq.
Kaufmann, Feiner, Yamin, Gilding & Robbins LIP
777 Third Avenue
New York, NY 10017



RE:   B.V.T.V. – "Home Again" Television Program

Dear Mr. Feiner:

I write in response to your letter dated June 28, 2005 and as a follow up to our previous conversation.

Initially, suffice it to say that for the reasons previously discussed, Sears disagrees with your position concerning the status of the "Home Again" television program and the Spokesperson Agreement. Sears believes that your position is contrary to the clear terms of the agreements at issue. Sears did not renew the Home Again program and has not authorized anyone to continue to produce or air the program using the Home Again name or any of Sears' trademarks. As between B.V.T.V. and Sears, the Syndicated Television Program Agreement clearly grants Sears all rights to the trademarks for the program. Further, since the program has not been renewed by Sears, the unambiguous terms of the Spokesperson Agreement permits Sears to terminate that agreement. Under Illinois law, which governs the Spokesperson Agreement, unambiguous contractual terms are interpreted using their plain and ordinary meanings. See, <u>Blender v. America Feed and Farm Supply, Inc.</u>, 2005 WL 43258, *4 (N.D. Ill. 2005). Limitations, like those that you are attempting to add to the plain language of the agreement, may not be read into the contract terms that the parties failed to draft into the agreement. <u>Id.</u>

SEARS 0342

Ronald Feiner, Esq.
July 22, 2005
Page 2

Despite what we believe is the strength of our position, we agree that neither party would benefit from protected litigation. To that end, you requested that Sears make a proposal to Bob Vila to amicably resolve the open issues relating to the program and the Spokesperson Agreement. Although a previous verbal offer was made to which you never formally responded, we propose the following to resolve all outstanding disputes.

In return for a complete release from Bob Vila and B.V.T.V of any and all obligations or claims relating to the Home Again program, the Syndication Agreement and the Spokesperson Agreement, Sears offers the following:

- Sears will relinquish and assign to Bob Vila all of Sears' interest in the Home Again television show and the trademarks relating to the program. Bob Vila will be able to fully exploit the show with another sponsor without limitation.

- Sears will transfer and assign to Bob Vila its 50% interest in the Home Again program library.

- Sears will pay Bob Vila the sum of $750,000 upon the execution of a final settlement agreement.

Based on the potential value of the Home Again program library, we believe that this proposal provides significant value to Bob Vila. Sears' proposal also permits Bob Vila to continue to exploit the Home Again name and program.

Again, Sears is hopeful that the parties can arrive at an amicable resolution to the current dispute based on the long history that Bob Vila and Sears enjoy. I look forward to hearing your response. I am available at any time to discuss.

Sincerely,

Robert Rathke

**SEARS 0343**

# DEPOSITION EXHIBIT  170

BurrellesLuceEXPRESS
Page 1 of 3 (8000NX 21838)

Thursday, March 02, 2006
Appears On Page 1,4
Circulation: 573,744
Location: CHICAGO, IL

Chicago Tribune

# Vila shows Sears' harder side

## Company e-mails reveal desire to end deal with spokesman

**By Susan Chandler**
Tribune staff reporter

The contract dispute between Bob Vila and Sears Holdings Corp. is getting nastier.

Vila's attorney has filed exhibits containing internal Sears e-mails and memos that show cost-cutting top executives made it a priority to get out of a multimillion-dollar deal with Vila even though the home remodeling guru already had agreed to more than $5 million in contract concessions.

"What is the best way to reduce our exposure to Vila?" asked William Crowley, Sears' new chief financial officer, in an April 2 e-mail to Luis Padilla, Sears' chief merchant.

"Send him back to Cuba?" Padilla wrote back via his BlackBerry. "Kidding, we are in the process of renegotiating our commitment to minimize our exposure of fees and length of time. I will review with you Monday." Padilla, who also is Cuban, departed Sears last fall. He declined to comment on the e-mail.

The exchange followed a March 30 e-mail from Sears Holdings Chairman Edward Lampert to Crowley, his right-hand man at ESL Investments, directing Crowley to "Make sure you look at the proposed renegotiated deal with Bob Vila to see if it makes sense."

Lampert's e-mail was dispatched six days after Kmart completed its acquisition of Sears.

The e-mails, part of a breach-of-contract lawsuit brought by Vila, provide a peek at the inner workings of the new Sears, a company that is being transformed by Lampert, a hard-nosed hedge fund operator who has taken over many of the day-to-day oper-

*PLEASE SEE SEARS, PAGE 4*

ations at the Hoffman Estates retailer. Cutting expenses and boosting cash flow have become the top goals at Sears' headquarters even as Sears struggles to figure out its strategy in an increasingly competitive retail world.

"Eddie is clearly focused on where the company is spending money and how they're spending money. If there are opportunities to do that more efficiently, that's clearly a priority with him," said Neil Stern, a retail consultant with Chicago's McMillan/Doolittle. "Anything construed as business as usual is no longer that."

Lampert should be sending that message, says Howard Davidowitz, chairman of Davidowitz & Associates, a national retail and consulting firm headquartered in New York City. "What a CEO does is set the tone for the business. Lampert's tone is, 'We're not giving an inch. We're not going to be taken advantage of by a supplier or a landlord.' He is willing to litigate. Most people aren't."

Vila discovered that last summer, his federal lawsuit says, when Sears Holdings repudiated a contract running through 2009 for Vila to act as the spokesman for Sears' Craftsman tool brand.

Sears also canceled its sponsorship of Vila's home repair show, "Bob Vila Home Again," which is syndicated and shown on cable TV stations.

The internal documents show that the Sears executive in charge of the Craftsman brand advised Sears to continue the relationship after Vila agreed to cut his spokesman fees in half and take a reduction on the money he was contractually owed for the 2004-05 TV season.

"I recommend we move forward on the production agreement. I have already convinced them to take $.25 on the dollar and may be able to cut a little deeper," Mark Rode, the Craftsman brand manager, wrote in an e-mail to Crowley. "Please let me know how you would like to proceed. Thanks."

The CFO replied by asking Rode, "What do we think the economics are to [Vila]? I would like to figure out the cheapest way to get out of this agreement."

Sears sent a certified letter to Vila in August notifying him the company was canceling the spokesman contract because language in Vila's lawsuit reflected "unfavorably upon [Sears'] reputation."

A few weeks ago, Vila discovered Sears had been using his image on its Craftsman.com Web site for the past six months even though it had refused to honor the contract. That prompted Vila to ask a Boston federal court judge last week to quickly find that Sears had wrongfully breached its contract with Vila, who is seeking double or triple damages.

Sears has about a month to reply to Vila's latest action. A source close to the case says Crowley gave a deposition in the case Wednesday.

Vila's attorney has not yet requested the right to depose Lampert, although that might still happen, the source said.

*schandler@tribune.com*



© Copyright 2006 The Chicago Tribune
All Rights Reserved.

Thursday, March 02, 2006

Burrelles*Luce*EXPRESS

Chicago Tribune



**As Sears works to terminate its 16-year relationship with spokesman Bob Vila (left), the retailer is beefing up its connection with Ty Pennington, star of ABC's "Extreme Makeover: Home Edition."**

© Copyright 2006 The Chicago Tribune
All Rights Reserved.

BurrellesLuceEXPRESS
Page 3 of 3 (8000NX 21838)

Thursday, March 02, 2006

**Chicago Tribune**



---

**April 15, 2005**

Mark Rode, Craftsman Brand Manager

William Crowley, Chief Financial Officer

Vila Contract

I recommend we move forward on the production agreement. I have already convinced them to take $.25 on the dollar and may be able to cut a little deeper. Please let me know how you would like to proceed. Thanks.

---

**April 16, 2005**

William Crowley, Chief Financial Officer

Mark Rode, Craftsman Brand Manager

RE: Vila Contract

I would like to figure out the cheapest way to get out of this agreement.

Source: Sears e-mails

© Copyright 2006 The Chicago Tribune
All Rights Reserved.

# DEPOSITION EXHIBIT  171

1 of 1 DOCUMENT

Copyright 2006 Chicago Tribune Company
Chicago Tribune

February 12, 2006 Sunday
Chicagoland Final Edition

**SECTION:** BUSINESS ; ZONE C; Pg. 1

**LENGTH:** 1351 words

**HEADLINE:** Sears in demolition mode;
Chairman Edward Lampert continues to remodel his retailing behemoth, scaling back on high-end, star-studded wallpaper like Bob Vila and Martha Stewart, but the moves may cost him

**BYLINE:** By Susan Chandler, Tribune staff reporter

**BODY:**

Edward Lampert certainly isn't dazzled by celebrity.

The Sears chairman has taken on Martha Stewart, asking the diva of home decor to accept less money under her long-term contract with Kmart if she wants to expand her distribution to Sears' stores.

Now he is trying to do a gut-rehab on Bob Vila, the home remodeling whiz.

Sears Holdings Corp. has terminated a long-standing contract with Vila to act as a spokesman for Sears' Craftsman tool line. It also has dumped its sponsorship of his nationally syndicated home remodeling show.

Vila has sued, charging Sears wrongfully breached the contracts, and is seeking more than $14 million in damages. Sears is countersuing Vila and says he has been paid more than he was due. The suit is headed for trial in October.

It's all in a day's work for Lampert, the bottom-line oriented hedge fund operator who engineered Kmart's takeover of Sears in March. Lampert and Sears' chief financial officer, William Crowley, are poring over contracts, looking for places to save money. They are reopening contracts and pushing those who do business with Sears for better terms. In some cases, they are getting them.

In Vila's case, Lampert and Crowley believe that the original host of "This Old House," wasn't doing much for his money, says a source close to Sears. Yet as of late last week, the Craftsman.com Web site still had Vila's photo on its home page with links to "Bob Vila's tips and techniques" and "Bob Vila's project plans."

Sears' willingness to cut ties with a well-known spokesman comes at a time when other companies are eager to sign celebrity endorsers. Catherine Zeta-Jones graces TV spots for T-Mobile. Joan Cusack scampers up staircases and pops out of manhole covers in ads for U.S. Cellular Corp.

Donovan McNabb, the quarterback for the Philadelphia Eagles, represents Campbell's Chunky Soup, and Gap has cycled through a cast of celebrities, including actors Elijah Wood, Gary Sinise and Juliette Lewis; musician Carole King; and comedian Will Ferrell.

But using celebrities to promote a brand is always fraught with peril, says Christie Nordhielm, clinical associate professor of marketing at the University of Michigan's Ross School of Business.

"The problem is you end up raising the awareness of the celebrity and the brand," Nordhielm said. "It increases the celebrity's negotiating power and, therefore, their costs. What starts out as a synergistic partnership can end up as more of a zero-sum game. That's why it's always better to hire cartoons."

At this stage of the game, Vila likely has more to lose than Sears if the two part ways, she adds. "He is getting paid so much right now. His hourly rate is quite high, and from Sears' perspective, Bob Vila's awareness is probably benefiting more than theirs is. It's probably a good strategic shift to refocus on the Sears brand and the Sears product."



Sears in demolition mode; Chairman Edward Lampert continues to remodel h

There's no doubt that Vila had the "street cred" among handymen to be a valuable endorser of Sears' Craftsman lines of drills and power saws when Sears signed him up as a spokesman in 1985. For six years, he had been the folksy host of "This Old House," a nationally syndicated home renovation show on public television.

The relationship deepened four years later when Vila left the PBS show and founded his own production company to produce "Bob Vila's Home Again." Sears agreed to finance the show. In 2000, Sears and Vila formed a joint venture to turn BobVila.com into "America's leading site for home improvement solutions."

Vila says his current spokesman's contract was due to expire at the end of 2009. The contract has a "pay or play" provision that calls for Vila to be paid whether or not Sears calls on him to perform any duties, according to Vila's lawsuit. Most recently, Vila was paid $1.9 million a year for his spokesman's duties.

Drama involves TV show, too

The TV syndication also has been extended and renewed multiple times, but how many times is a matter of dispute. Vila says negotiations over an 11th amendment began in the fall of 2004 and were concluded in January 2005 for Sears to sponsor the 2005-2006 and 2006-2007 seasons. Sears says that no such agreement was reached, and it never agreed to underwrite the next two seasons. Both sides agree that Vila's company began production of a new season of shows.

Much at Sears changed in those months.

Kmart made a friendly $11 billion takeover offer in November 2004 with a plan to form a new company called Sears Holdings. Before the deal closed in March, though, Vila was approached by Kmart's top management about changing the syndication and spokesman agreements, the lawsuit says.

Talks stall, lawsuit follows

Talks went on for several months, but no new agreement was reached. Under pressure from Kmart, the suit alleges, Sears "repudiated" the syndication agreement in late spring. Vila filed a breach of contract suit in Massachusetts state court in mid-July. Sears Holdings then asked for an extension so it could resume negotiations with Vila.

Those talks went on for a month, and the suit was moved to federal court. Then on Aug. 19, Sears Holdings sent Vila a letter, saying it was canceling the spokesman agreement because Vila had engaged in "substantial misconduct," and violated Sears' trademark in the "Home Again" name. Vila's lawsuit "reflected unfavorably" on Sears' reputation, the letter said.

Sears also said it was canceling Vila's show.

A Sears spokesman said the company disagrees "with Mr. Vila's characterization of the circumstances surrounding the fact that he is no longer a Sears spokesman and that the show, "Bob Vila's Home Again," was canceled," but declined to go into detail. He also declined to comment on the use of Vila's image on a Sears' Web site.

Vila is out of the country and could not be reached for comment. His attorney, James O'Brien, declined to comment because the matter is still being litigated, except to say, "We're certainly preparing for trial."

In his suit, Vila argues that only the show's syndicator, King World Productions, can cancel the show, and it hasn't done so. In fact, the show is still airing with new sponsors. He also is disputing that "Home Again" is a trademark of Sears, but he agreed to drop those words from the show's title, which is now simply "Bob Vila."

Vila doesn't blame the old Sears, the one he had a lucrative relationship with for 20 years. He blames the guys at the top of Kmart, who "intentionally and tortiously interfered" with his contracts, according to the suit.

Vila says Sears owes him $948,750 for the second half of 2005 and another $9.7 million for the 2006-2009 period under the spokesman agreement. Under the TV deal, Vila is seeking $3.9 million in damages. He is asking the judge to treble both amounts.

In Sears' answer and counterclaim, the retailer denies that Vila began making the 2005-2006 season of his show "under any purported eleventh amendment of the syndication agreement." By going ahead and making shows under the "Home Again" banner, Vila violated Sears trademark, the retailer says.

'Home Again' rights disputed

As to a nearly million dollar payment due last July, Sears says Vila is entitled to only a pro rata amount because the

Sears in demolition mode; Chairman Edward Lampert continues to remodel h

spokesman agreement was terminated in mid–August. Even that amount should be reduced "by the damages [Sears] has suffered as a result of Vila's misconduct." Sears also alleges that Vila was overpaid by $75,000 in bonuses for the 2003–2004 season TV season.

Sears asks the court to find that it has exclusive rights to the "Home Again" trademark and to order Vila to turn over any materials bearing the logo so they can be destroyed.

The retailer also is seeking unspecified damages as well as attorney fees and costs.

Stephen Presser, a law professor at Northwestern University, says it is tough to get a read on the case unless one examines the actual contracts in dispute.

"My guess is this is a very arcane dispute among lawyers about what some of the clauses mean," he said. "You need some kind of pretext to walk away from a contract. You can always breach a contract but you're going to have to pay damages if you do."

schandler@tribune.com

**GRAPHIC:** PHOTO (color): Sears Holdings Corp. has terminated its contract with Bob Vila, but visitors to the Craftsman Web site can still find his image and plenty of tips and projects. Vila has sued and seeks more than $14 million in damages from Sears, and Sears has countersued.

**PHOTO (color):** OTHER CELEBRITY SPOKESPEOPLE
Actress Joan Cusack scampers up staircases and pops out of manhole covers in ads for U.S. Cellular.

**PHOTO (color):** Donovan McNabb, quarterback for the Philadelphia Eagles, is a spokesman for Campbell's Chunky Soup.

**PHOTO (color):** Actress Catherine Zeta-Jones appears in commercials for T–Mobile cellular phones and service.

**GRAPHIC (color):** Tribune photo illustration by Kiera E. Westphal.
**PHOTOS 4 GRAPHIC**

**LOAD-DATE:** February 12, 2006

**DEPOSITION EXHIBIT  172**

a4a8a7

**Kin Condon**

From:      <MRODE@sears.com>
To:        "Jonathan Russo" <Jrusso@ArtistsAgency.com>
Cc:        "RJVILA@BOBVILA.COM" <RFEINER@KFYGR.COM>
Sent:      Saturday, January 22, 2005 12.20 AM
Subject:   RE: FW Mark Rode/Marketing/SEARS is out of the office

I spoke with Jonathon Wednesday and will handle negotiations going forward. I would appreciate if you would allow me to be the sole contact going forward. As you mentioned there have been some issues and I am trying to expedite the process. Please feel free to contact me if there are any issues. Thank you.

Mark P Rode
Craftsman Brand Manager
(847) 286-3447

"Jonathan Russo" <Jrusso@ArtistsAgency.com>         To     <MRODE@sears com>
                                                     cc     "RJVILA@BOBVILA.COM" <RFEINER@KFYGR COM>, >
01/20/2005 03 51 PM                                  Subject    RE FW Mark Rode/Marketing/SEARS is out of the office

MARK, BOB RON AND I THOUGHT IT WOULD BE USEFUL TO UPDATE YOU ON THE SEARS/HOME AGAIN/ KING WORLD RENEWAL STATUS  BASICALLY I RECEIVED A CALL FROM JONATHAN BIRKHAHN SR VP BUSINESS AFFAIRS WHO JUST RECEIVED A MARKED UP RESPONSE FROM MARK GOLDSTEIN AT MINDSHARE TO KING WORLD'S RENEWAL PROPOSAL  HE HAD NOT HEARD A WORD FROM MARK IN OVER TWO AND A HALF MONTHS, NOR WERE ANY OF HIS CALLS RETURNED  ODDLY, AS HE RELATED IT, THE MARKED UP RESPONSE WAS DATED OCT 25 2004  HE WILL RESPOND ASAP AS HIS TIME PRESSURE INTERNALLY IS INTENSE TO GET THIS DEAL DONE AND ANNOUNCED, BUT VERY PRIVATELY EXPRESSED HIS DISCONTENT AT HOW THIS WAS HANDLED
-----Original Message-----
From: MRODE@sears.com [mailto:MRODE@sears.com]
Sent: Friday, December 10, 2004 3:40 PM
To: Jonathan Russo
Subject: RE: FW: Mark Rode/Marketing/SEARS is out of the office.

The status has not changed since we last communicated  I assure you I will provide updates as activity occurs

Has King World contacted you again? If so, has their position changed? If they do contact you again please refer them to Marc Goldstein as he is the Sears representative on this matter

Mark P Rode
Craftsman Brand Manager
(847) 286-3447



"Jonathan Russo" <Jrusso@ArtistsAgency.com>          To     <MRODE@sears com>

7/14/2005

P 0000248

12/10/2004 11 59 AM

cc
Subject:    RE  FW Mark Rode/Marketing/SEARS is out of the office

**WHAT IS THE STATUS OF SEARS AGREEMENT WITH KING WORLD FOR THE NEW SYNDICATION
AGREEMENT  IT'S ALL IN MY PREVIOUS AGREEMENT TO YOU  PLEASE CALL SO WE CAN TALK  JR**
——Original Message——
From: MRODE@sears.com [mailto:MRODE@sears.com]
Sent: Thursday, December 09, 2004 4:47 PM
To: Jonathan Russo
Cc: rfeiner
Subject: Re: FW: Mark Rode/Marketing/SEARS is out of the office.


What was the follow-up?

Mark P  Rode
Craftsman Brand Manager
(847) 286-3447


Jonathan Russo <jrusso@artistsagency.com>

12/09/2004 03 40 PM

To      <MRODE@sears com>, rfeiner <Rfeiner@kaufmannfeiner com>
cc
Subject    FW Mark Rode/Marketing/SEARS is out of the office


**MARK, ANY PROGRESS ON YOUR INQUIRY INTO BOB SYNDICATION AGREEMENT,
I JUST GOT A FOLLOW UP FROM KING WORLD. JR**

-----Original Message-----
From: MRODE@sears.com [mailto:MRODE@sears.com]
Sent: Thursday, December 02, 2004 6:32 PM
To: Jonathan Russo
Subject: Mark Rode/Marketing/SEARS is out of the office.


I will be out of the office starting  12/02/2004 and will not return until
12/06/2004.

Until I return I will not have access to E-mail.  If you would like to
leave me a voice mail message I will be checking those while I am out of
the office and will return urgent messages.  My phone number is (847)
286-3447.  Please feel free to contact Tom Paluch at (847) 286-7147) if you
need to reach me while I out.


7/14/2005


P 0000249

------ End of Forwarded Message

7/14/2005

P 0000250

# DEPOSITION EXHIBIT  173

**From:** Sarah Monzon <sarah@bobvila.com>
**Subject:** FW: A FL project update
**Date:** February 4, 2005 9:46:38 AM EST
**To:** Mel Marchand <mel.marchand@bobvila.com>, jack <handyman@bobvila.com>

Does anyone know how long he's in Madrid?
I really wish I knew what I was supposed to do here.

S.

——— Forwarded Message
**From:** Bob Vila <rjvila@bobvila.com>
**Date:** Thu, 03 Feb 2005 17:44:12 -0500
**To:** Sarah Monzon <sarah@bobvila.com>
**Subject:** Re: A FL project update

I'm in a difficult position! The extension with Sears remains incomplete due to the K-Mart merger and internecine struggles. I am involved in other negotiations but can't commit to anything just yet. Meanwhile, I'm off to Superbowl tomorrow and then on to Madrid next Tuesday.

On 2/3/05 2:23 PM, "Sarah Monzon" <sarah@bobvila.com> wrote:

Here's some more detail on the expanded Punta Gorda/Port Charlotte FLASH project:

Leslie Henderson (FLASH) reports that it will be no problem for her to track down a low-to-middle income stick-built repair story in Port Charlotte, Arcadia, or another nearby community. FLASH actually does the quality control for the State of Florida low-to-middle income housing program, so she's running it up the flagpole now.

Interestingly, she already had PGT windows lined up on her end, so they should be delighted by this project and she feels she could get them to do the windows for both homes. I'm sure we'll wind up with a lot of supplier overlap, which will work well for both them and us.

Obviously, a stickbuilt home will allow us to involve more show participants, appeal to a wider audience, and include even more "drama" than would be involved in the precast home (even with the 9/11 flight attendant element: one of the Punta Gorda homeowners was working a flight over New York that day and retired to FL to get away from disasters like that...only to be hit by two hurricanes in rapid succession.).

Brian Reading of APA, whom I also spoke with just now, is delighted to get APA's members (including the Florida Wood Council, and active member of the florida rebuild effort) involved in both homes. He thinks they can get the roof for the concrete home and take care of all lumber needs for the stick built repair. He is calling Leslie today to get on the same page.

When I mentioned the Alcoa siding he said that actually would allow them to illustrate even more wall strengthening techniques since the walls would ultimately be covered with vinyl. Given Alcoa's emphasis on their color selection, it might even be fun to consider getting siding for an entire set of neighbors, involving perhaps a "block party" education and repair effort, to spread the good will. Remains to be seen if that will be practical or even desirable, but it's a thought. It is kind of amazing that there

Brian is putting together a list of points/areas they'd be interested in covering, as well as a proposal for a quick storm-resistance retrofit project he's also ready to do with a friend on the SC coast near Charleston. It actually sounds like a great, quick way to get a show that would broaden



the appeal of this series to all homeowners in any high-wind area, not just in Florida. It's an easy stopover from FL and would give us yet more shows to bank for the inevitable time crunch. I'll forward that when it comes.

So it looks like a two-home series with FLASH would be a great way to go. The key next step here would be to get a definite yes so Leslie can firm things up with the homeowners and we can get going on plans etc.

Please advise.

Thanks!
Sarah

——— End of Forwarded Message

P 0000537

**DEPOSITION EXHIBIT  179**

**Kin Condon**

From:        <MRODE@sears.com>
To:          "rfeiner" <Rfeiner@kaufmannfeiner.com>
Sent:        Tuesday, February 01, 2005 4:31 PM
Subject:     Re:

I think you me and Andy (or just you and Andy) will need to talk on this  While I can negotiate contracts I feel comfortable with I don't have access to the individuals here who would ultimately issue a go/no go decision.  Six months ago this would be a no brainer  With the merger Andy is going to need to weigh-in.  I will go nag him right now to make sure he shares any insights he has

Mark P  Rode
Craftsman Brand Manager
(847) 286-3447



"rfeiner" <Rfeiner@kaufmannfeiner.com>

02/01/2005 12 52 PM

                                          To      <MRODE@sears com>
                                          cc
                                          Subject

Because of the contract not being signed, Bob has not received the $750.000 due the first of the year. Another reason for him to complain



7/14/2005

P 0000254

**DEPOSITION EXHIBIT  180**

## SEARS HOLDINGS CORPORATION

3100 West Big Beaver Road
Troy MI 48084

Legal Department
Robert W. Rathke
Vice President, Commercial Transactions
248 463 5597 (MI)
Fax 248 458 1036
847 286-7373 (IL)
rrathke@searshc.com



June 15, 2005

Ronald E. Feiner, Esq.
Kaufmann, Feiner, Yamin, Gildin & Robbins
777 Third Avenue
New York, NY 10017

Re:    B.V.T.V. – "Home Again" Television Program

Dear Mr. Feiner:

Reference is made to Invoices #514 and #FER12072004 submitted by B.V.T.V. to Sears claiming amounts due concerning Season 16 of the "Home Again" television program. As we discussed, it is Sears' position that it never agreed to the production of this or any other future season of the "Home Again" show. Thus, Sears has no obligation to make any payments relating thereto. Your client should not send any further invoices to Sears regarding this matter. As I indicated, Sears does not desire to continue to pay to produce the "Home Again" show and B.V.T.V. is proceeding with the production of the "Home Again" show at its own risk based on our conversation.

As I am sure you recall, we previously had several conversations concerning the "Home Again" TV show and Bob Vila's future with Sears as a Spokesperson. During those conversations, I stated Sears' preference concerning the Bob Vila relationship and discussed with you a proposal to end the relationship. To date I have not heard back from you. Sears would like to come to an amicable resolution of the issues we discussed with Bob Vila. As you know, Paragraph 7 of the Spokesperson Agreement provides that if the Bob Vila Home Again television show is canceled for any reason, Sears has the right to terminate the Spokesperson Agreement. Given the dispute over Season 16 of the "Home Again" show and the terms of the Spokesperson Agreement, I believe that it would be in the best interest of both parties to determine if an amicable resolution is possible

Please call me directly if you would like to discuss.

Sincerely,

Robert Rathke

P 0000281

**DEPOSITION EXHIBIT  195**

EXHIBIT NO. 195
3/27/06
M. D. O'CONNOR

August 23, 2005

Hello BVTV Crew,

After a long ride home, hours of cell phone conversations, three quick, but "friendly roadside visits with Mass State Troopers", I've put together some ideas about today's turn of events. Specifically, the removal of "Home Again" show title. I throw these ideas out there with caution and respect for I am the "new guy".

Facts:
- Florida 01 – 10 and Rowley 14-20 have been shot at both locations: total 16 shows.
- I have edited, duplicated and prepared to ship Fla 01 and 02.
- I have Fla 03 and 04 edited, approved and ready for the audio post and duplicators.
- I have Fla 05,06,07,08,09, 10 and Rowley 1614 edited and ready for previews
- Florida Generic Promos have been edited and ready for audio post and dubs

Challenges:
There are nine (9) elements of already shot and edited shows that will need to be changed if "Home Again" needs to be removed. These elements include both visual and audio components: 1) Slates 2) Countdowns 3) BV Show Opens 4) "Home Again" opening montage 5) Graphics including segment promos/teases/bumpers 6) Closed Caption graphic 7) PROMOS 8) Show closes 9) Credit bed.

Post Production Options:
We talked about a lot of options during the shooting today. Most dealt with quick patches or edits that would just strip "Home Again" off current programming. My opinion would be to screw Sears and their lawyers and create new, fresh elements. I do realize we have 20 DAYS until our first air date. However, my recommendation for post production options include the following:
1) Immediately design and create, either in-house or with a contracted graphics house, new graphic elements for show opens, segment teases, slates, count-downs and credit beds. This would need to be done Wednesday (24th) tomorrow through Friday the 26th. FEDEX Priority Sat Shipping to ME by Saturday the 27th. I'll then have the pieces to create and edit together all new elements for show opens, slates, countdowns.....etc. I'll take 35 – 40hrs Sat/Sun/Mon to create and have preview to ship out for review and approvals by Tuesday the 30th. I have already consulted and put on retainer a qualified Avid Adrenaline Editor who will assist me if time becomes an issue. I have also contacted both the Audio Post House and the Duplication House who will perform their tasks under our critical deadline. The Cotton Hill can produce a preview version of a new music piece if that desired. I have already heard the early version. It's definitely worth considering.

Production Options:
What do we do with all the footage shot already with references to HA. These include all the show open/closes and promos. We have a number of options. I don't want to intrude on the shooting process so take these ideas for what they're worth.

1) Try to edit out video/audio of Home Again references in the already shot footage. This would be very difficult and I wouldn't be happy with quality.

2) Re-shoot opens/closes in "non-Fla" location. I'm afraid this would detract from the quality of the show.

3) Return to Fla early to reshoot all Fla intro's, conclusions and promos.

4) My idea would be to try to find a company to design, create and build a studio set for "The Bob Vila Show". Incorporating "work shop", "tool bench" type set. Include any new graphics designs, tools from current promoters, anything that would add to the "Bob Vila Work Shop" theme. Include in the set, lcd/plasma monitor that we would tease and use a video effect to transition already shot footage in Fla and Rowley. You could see this footage as Bob talk then transition into full screen. It's late, idea might be crazy, but I'm throwing out any ideas at this point.

COSTS:
From my perspective the following costs will need to be incurred:
1) $7,500.00 - Creating/Editing new opens, slates, countdowns, .....etc. If I need to utilize the second editor, that cost will come out of this fee.

2) $16,500 - This will be the cost to re-edit 11 shows at $1,500 per show.

3) Audio Post will cost 15% above quoted cost for immediate emergency services.

4) Duplications will also cost 15% above the quoted price for the emergency service.

These are worst case estimates and will be adjusted if the scope of the work changes.


Anyway, my brain is starting to fade. Ignore typos or misspellingsssss. I'm on my cell phone (518) 470-5328 all day tomorrow and will wait to hear from someone. Keep smiling everyone, I'm looking at this as a challenge to make a good show even better.

Jim

**DEPOSITION EXHIBIT  196**

This message has been scanned for known viruses.

| From | Melissa Marchand |
| --- | --- |
| To | Eddie Ward |
| Subject | Re Tampa Tribune / Vila's Home Again |
| Date | Fri, 26 Aug 2005 12 36 53 -0400 |

Hi, Eddie
I'll see what I can do on the pix. Could you make sure that the article refers to the show as Bob Vila - not Bob Vila's Home Again? It is imperative that this change be made in all future press and that if possible the change should be made in all stories that are currently in process (Obviously without alerting the press to the fact that there is another story - Sears vs BV that they should be investigating)
Thanks!
Mel

BobVila.com
115 Kingston St , 3rd floor
Boston, MA 02111
617-848-8458 (Boston)
508-737-5328 (mobile)

On Aug 25, 2005, at 4 56 PM, Eddie Ward wrote

They're looking are some shots of the couple, of Bob Vila at work and construction shots. They need some overview shots of the house and some detail shots They're trying to put together a nice package on this, so they need lots of art to choose from Is it possible to get a CD to them by Monday? Perhaps can you get a CD to us, as well, of the same shots?

on 8/24/05 6 54 PM, Melissa Marchand at mel marchand@bobvila.com wrote

There are hundreds of photos Can't you give me an idea of what they are looking for? That way I could send along a dozen for them to choose from That is how I normally work with newspapers

BobVila.com

115 Kingston St., 3rd floor

Boston, MA 02111

617-848-8458 (Boston)

508-737-5328 (mobile)

On Aug 24, 2005, at 3 53 PM, Eddie Ward wrote

So who has the art? Do you have a list of jpegs that are available? They need everything by Monday, and we'd like to have those in-house Is there a CD of all art that can be burned and I can get by Friday?

on 8/24/05 1:07 PM, Melissa Marchand at mel marchand@bobvila.com wrote

Hi, Eddie
You can go ahead and set up the interview with Bob He's on the Vineyard till the 31st As for photography, I have lots. She can call me to discuss and I can email whatever is needed Sarah is on vacation this week. John Troy might be able to help you with the list of construction technology/ products (he's at john@bobvila com) or she may find that Leslie can give her everything she needs
Best!
Mel

Marchand
EXHIBIT NO. 196
3/27/06
M. D. O'CONNOR

From: Eddie Ward <eddie@derapr.com>
Subject: **Re: Tampa Tribune / Vila's Home Again**
Date: August 26, 2005 12 53:01 PM EDT
To: Mel Marchand <mel.marchand@bobvila.com>

So it's just "Bob Vila"? If so, we'll send out a blanket release to everyone indicating the show change. We had already sent out a pitch with the earlier name to all home and TV writers.

on 8/26/05 12:36 PM, Melissa Marchand at mel.marchand@bobvila.com wrote:

Hi, Eddie:
I'll see what I can do on the pix. Could you make sure that the article refers to the show as Bob Vila - not Bob Vila's Home Again? It is imperative that this change be made in all future press and that if possible the change should be made in all stories that are currently in process. (Obviously without alerting the press to the fact that there is another story - Sears vs. BV that they should be investigating).
Thanks!
Mel


BobVila com
115 Kingston St., 3rd floor
Boston, MA 02111
617-848-8458 (Boston)
508-737-5328 (mobile)


On Aug 25, 2005, at 4.56 PM, Eddie Ward wrote:

They're looking are some shots of the couple, of Bob Vila at work and construction shots. They need some overview shots of the house and some detail shots They're trying to put together a nice package on this, so they need lots of art to choose from Is it possible to get a CD to them by Monday? Perhaps can you get a CD to us, as well, of the same shots?


on 8/24/05 6.54 PM, Melissa Marchand at mel.marchand@bobvila.com wrote:


There are hundreds of photos. Can't you give me an idea of what they are looking for? That way I could send along a dozen for them to choose from. That is how I normally work with newspapers.


BobVila com


115 Kingston St., 3rd floor

Boston, MA 02111

617-848-8458 (Boston)

508-737-5328 (mobile)

On Aug 24, 2005, at 3:53 PM, Eddie Ward wrote:

So who has the art? Do you have a list of jpegs that are available? They need everything by Monday, and we'd like to have those in-house. Is there a CD of all art that can be burned and I can get by Friday?

on 8/24/05 1:07 PM, Melissa Marchand at mel.marchand@bobvila.com wrote:

HI, Eddie:
  You can go ahead and set up the interview with Bob. He's on the Vineyard till the 31st. As for photography, I have lots. She can call me to discuss and I can email whatever is needed. Sarah is on vacation this week. John Troy might be able to help you with the list of construction technology/ products (he's at john@bobvila.com) or she may find that Leslie can give her everything she needs.
  Best!
  Mel

BobVila.com

115 Kingston St., 3rd floor

Boston, MA 02111

617-848-8458 (Boston)

508-737-5328 (mobile)

On Aug 23, 2005, at 11:15 AM, Eddie Ward wrote:

On behalf of our outreach for the new season of "Bob Vila's Home Again," we've secured a feature

story in the Tampa Tribune (circ. 238,000) to run Sept. 10. The home writer, BC Manion, would like to speak with the homeowners and Bob by Wed., Aug. 31, though she had requested the earlier, the better, for both.

She also requested art of the house being built – Mel, do you have a breakdown of the art that's readily available and we can have the writer choose which ones she wants pics of? She also would like a list of techniques and materials to make the home hurricane-ready, as covered in the show. Can we get those, as well?

The writer is contacting FLASH, as well.

Finally, can we send the first few episodes to her, to send 2-day mail? Her addy is:

Attn: BC Manion
Tampa Tribune
202 S. Parker St.
Tampa, FL 33606-2395
Wk: (813) 259-7150
Fx: (813) 254-4952
C1: bmanion@tampatrib.com

FYI – it runs on two affiliates in her market – WTVT (FOX, Channel 6) and WFTS (ABC, Ch. 28).


Thanks!
Eddie

Eddie Ward | Dera, Roslan & Campion PR | 212-966-4600

********************

# DEPOSITION EXHIBIT  239

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.
05-11717-REK

| | |
|---|---|
| ROBERT J. VILA and B.V.T.V., INC. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| SEARS, ROEBUCK AND CO., | ) |
| SEARS HOLDINGS CORPORATION | ) |
| and KMART HOLDING COPORATION | ) |
| Defendants. | ) |
| | ) |

## <u>NOTICE OF DEPOSITION</u>

TO: Gary Greenberg, Esq.
Anna Sankaran, Esq.
Greenberg Traurig, LLP
One International Place
Boston, MA 02110

Please take notice that, pursuant to Rules 26 and 30 of the Federal Rules of Civil

Procedure, Plaintiffs Robert J. Vila and B.V.T.V., Inc. shall take the deposition upon oral

examination of the individual and/or individuals designated by the Defendant Sears, Roebuck

and Co. pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure who consent to

testify on its behalf as having the most knowledge of the topics listed in Schedule "A" attached

hereto, on Wednesday, April 19, 2006, beginning at 10:00 A.M., and continuing from day to

lay until completed. The deposition will be taken before a Notary Public duly commissioned

for the State of New York, or before some other qualified person, at the offices of James F.

O'Brien, Esq. 410 Park Avenue, Suite 1530, (15th Floor) New York, NY 10022.


You are invited to attend and to cross examine the witness(es).

ROBERT J. VILA and B.V.T.V., INC.

By their attorney,


James F. O'Brien (BBO#375765)
410 Park Avenue, Suite 1530
New York, NY 10022
212 813 9300

Dated: April 7, 2006


## CERTIFICATE OF SERVICE

I, James F. O'Brien, counsel for plaintiffs, hereby certify that on April 7, 2006, I served a true copy of the foregoing Notice of Deposition upon Anna Sankaran, Esq., Greenberg, Traurig LLP, One International Place, Boston, MA 02110 counsel for defendants, by electronic mail and first class mail, postage prepaid.

James F. O'Brien

<u>SCHEDULE A</u>

Pursuant to FED. R. CIV. P. 30(b)(6), Defendant Sears, Roebuck and Co.. is required to designate one or more officers, directors, or managing agents, or other person(s) who consent to testify on its behalf with regard to the matters specifically designated below to appear at the deposition referenced in the accompanying Notice of Deposition and testify, under oath, regarding those areas. Unless designated, the time period covered by this request is January 1, 1990 through the present.

1. The term <u>"Sears"</u> shall mean defendant Sears, Roebuck, Inc., Sears Brands, LLC and any individual, agent, servant, attorney, representative or person acting or purporting to act on its or their behalf.

2. The term <u>"Sears Holdings"</u> shall mean the defendant Sears Holdings Corporation, and any individual, agent, servant, attorney, representative or person acting or purporting to act on its behalf.

3. The term <u>"Kmart"</u> shall mean the defendant Kmart Holding Corporation, and any individual, agent, servant, attorney, representative or person acting or purporting to act on its behalf.

4. The term <u>"Defendants"</u> shall mean Sears, Sears Holdings, and Kmart.

5. The term <u>"Vila"</u> shall mean the plaintiff Robert J. Vila, and any individual, agent, servant, attorney, representative or person acting or purporting to act on his behalf.

6. The term <u>"BVTV"</u> shall mean the plaintiff B.V.T.V., Inc., and any individual, agent, servant, attorney, representative or person acting or purporting to act on its behalf.

7. The term <u>"Plaintiffs"</u> shall mean Vila and BVTV.

8. The terms "concerning" and "relating to" shall mean relating, reflecting, regarding, containing, comprising, concerning, discussing, constituting, evidencing, recording, pertaining or in any way referring or pursuant to.

9. The term "communications" shall mean any oral, written, computerized, telephonic, facsimile, or other exchange or transmission of words, information, thoughts or ideas.

10. The term <u>"Spokesperson Agreement"</u> shall mean the September 29, 1989 Bob Vila Spokesperson Agreement between Sears, Ogilvy & Mather, as agent for Sears, and Robert J Vila and all amendments thereto.

11. The term <u>"Syndication Agreement"</u> shall mean the September 29, 1989 Bob Vila Spokesperson Agreement between Sears, Ogilvy & Mather, as agent for Sears, and Robert J. Vila and all amendments thereto.

12. The term <u>"HOME AGAIN"</u> shall mean the alleged trademark HOME AGAIN as defined in paragraph 9 of Sears' First Amended Counterclaim in this action.

3

## TOPICS FOR EXAMINATION

1. Sears' registration of the alleged trademark HOME AGAIN.

2. Sears' attempted registration(s) of the alleged trademark HOME AGAIN.

3. Sears' ownership of the alleged trademark HOME AGAIN.

4. Sears' exploitation of the alleged trademark HOME AGAIN.

5. The association, if any, by the public of the alleged trademark HOME AGAIN with Sears or any of Sears' products.

6. The promotion of Sears' products by use of the alleged trademark HOME AGAIN.

7. All uses by Sears of the alleged trademark HOME AGAIN from August 19, 2005 to the present.

8. The exhibition of the name and likenesses of Vila on the Craftsman website from August 19, 2005 to the present.

9. All efforts by Sears to enforce its alleged rights in the alleged trademark HOME AGAIN against any third party.

10. Any and all injury Sears has allegedly sustained as alleged in Count I of its Counterclaim.

11. Any and all damages Sears has allegedly sustained as alleged in Count II of its Counterclaim.

12. The alleged overpayment of the bonus for the 2003-2004 season as alleged in Count VII of its Counterclaim.

13. The calculation of the bonus payable to BVTV for the 2004-2005 and 2005-2006 seasons.

14. The nonpayment by Sears to Vila of the amounts due Vila under the Spokesperson Agreement on July 1, 2005 and January 1, 2006.

**DEPOSITION EXHIBIT  242**

# Greenberg
# Traurig

Annapoorni R. Sankaran
Tel 617.310.6058
Fax 617 279 8458
SankaranA@gtlaw.com

August 23, 2005

<u>BY FACSIMILE & OVERNIGHT MAIL</u>
James F. O'Brien, Esq.
410 park Avenue, Suite 1530
New York, NY 10022

Re:  <u>Robert J. Vila et al.  v. Sears, Roebuck and Co., et al.,</u>
     Dukes Superior Court Civil Action No. DUCV 2005-00041

Dear Counsel:

As you are well aware, the defendants in the above-referenced matter, filed their Answer and Counterclaim yesterday, August 22, 2005.  As reflected in the Counterclaim, Sears, Roebuck & Co. ("Sears"), recently learned that plaintiff's Robert J. Vila ("Vila") and B.V.T.V., Inc. ("BVTV") (collectively "Counterclaim Defendants") have been using Sears' "HOME AGAIN" trademark without permission or authorization in contravention of the terms of the September 29, 1989 Bob Vila Syndicated Television Programs Agreement (the "Syndication Agreement"), by producing, promoting and making plans to air new episodes of a home improvement show incorporating Sears' HOME AGAIN trademark.

The Syndication Agreement provides,

(a) . . . Producer [(BVTV)] agrees that it will not use the name "Sears" and any of Sears trademarks, trade names or service marks without the express written permission from Sears.  Producer expressly recognizes and acknowledges that the use of Sears marks shall not confer upon Producer any proprietary rights to any such Sears marks.  Upon expiration or upon termination of Producer's right to use Sears marks for any cause, Producer shall immediately cease all use of all such Sears marks and will not use any such Sears Marks thereafter.  Producer agrees not to question, contest or challenge the ownership by Sears of any such right, title or interest in any such mark, except the right to use the same pursuant to the terms and conditions of this agreement, and will not seek to register the same.

(b) . . . Producer acknowledges that Sears may register any and all of the trademarks, service marks or trade names for the Program(s) under this Agreement in its own name, and that Producer's use thereof shall inure to the benefit of Sears for such purposes, as well as for other purposes.  Producer shall cooperate in any such registration by Sears or application therefore.

ALBANY
AMSTERDAM
ATLANTA
BOCA RATON
BOSTON
CHICAGO
DALLAS
DENVER
FORT LAUDERDALE
LOS ANGELES
MIAMI
NEW JERSEY
NEW YORK
ORANGE COUNTY CA
ORLANDO
PHILADELPHIA
PHOENIX
SILICON VALLEY
TALLAHASSEE
TYSONS CORNER
WASHINGTON D.C.
WEST PALM BEACH
WILMINGTON
ZURICH

Greenberg Traurig, LLP | Attorneys at Law | One International Place | Boston, MA 02110 | Tel 617.310.6000 | Fax 617.310.6001    www.gtlaw.com



DEPOSITION EXHIBIT

AUG-23-2005  16:33        GREENBERG TRAURIG        16173106220    P.06-07

James F. O'Brien, Esq.
Tuesday, August 23, 2005
Page 2

Syndication Agreement Section 18(a) & (b).  The last Amendment to the Syndication Agreement expired in 2004 and covered the 2004-2005 series of HOME AGAIN.  Although Sears entered into negotiations with BVTV and Vila regarding a subsequent extension for another season, no agreement was ever reached and the parties never executed any amendment covering any subsequent season beyond the 2004-2005 season.  It has recently come to Sears' attention that BVTV and Vila began production of a 2005-2006 season of a new television series bearing Sears' HOME AGAIN trademark in or around June 2005, and is scheduled to begin airing on September 12, 2005.  This use of the HOME AGAIN trademark is not authorized and in violation of Sears' intellectual property rights.

Sears has spent substantial effort, resources and capital to develop the HOME AGAIN trademark and pursuant to the Syndication Agreement, this mark is the exclusive property of Sears.  In order to preserve and protect the value of this trademark, Sears is obligated to actively police and address any unauthorized use of its mark, including the actions of BVTV and Vila in producing a 2005-2006 season of a home improvement television program titled HOME AGAIN.

In sum, Vila and BVTV are not authorized to use the HOME AGAIN trademark for any new episodes of a home improvement television program at this time.  If you wish to avoid further escalating this matter, we must receive Counterclaim Defendants' written assurance by 5:00 p.m. E.S.T. on August 24, 2005, that they will cease and desist from any further production of any home improvement television series bearing the HOME AGAIN trademark and will prevent any such episodes from being advertised, marketed or aired.  A duplicate copy of this letter has been enclosed for this purpose.  In addition, Sears demands written confirmation by 5:00 p.m. E.S.T. on August 24, 2005, that CBS Broadcasting, Inc. (including its parents, subsidiaries, and divisions), Discovery Communications, Inc. (including its parents, subsidiaries, and divisions), and King World Productions, Inc. ((including its parents, subsidiaries, and divisions),  will not advertise and/or air any home improvement televisions show bearing the HOME AGAIN trademark from the 2005-2006 season (or any subsequent season).  Please return a signed copy of this letter as well as written conformation from both CBS Broadcasting, Inc., and Discovery Communications, Inc., to me via facsimile at (617) 279-8458.  If we do not receive a timely response, we will take appropriate legal action to protect Sears' rights, including but not limited to adding CBS Broadcasting, Inc., Discovery Communications, Inc., King World Productions, Inc., or any other individual or entity assisting with the infringement of Sears' trademark, as parties to the Counterclaim.

P 0000291

James F. O'Brien, Esq.
Tuesday, August 23, 2005
Page 3

_____

As litigation has commenced in this matter, you are directed to retain all documents and materials of any kind, including e-mails, related to HOME AGAIN and your production, advertising and/or airing of any new episodes for the 2005-2006 season. The foregoing is not a complete or exhaustive statement of the facts or of Sears' position or potential claims or causes of action against Vila and BVT, and all of Sears' rights and remedies are expressly reserved.

Very truly yours,

Anna R. Sankaran

Enclosure
cc:    Gary R. Greenberg, Esq.


Agreed and Accepted this _____

day of _____ 2005.

By:    _____
       James F. O'Brien

P 0000292

**DEPOSITION EXHIBIT  243**

# James F. O'Brien
Counsellor and Attorney at Law

**NEW YORK**
T. 212.813.9300 / F. 212.813.1907
410 Park Avenue, Suite 1530
New York, NY 10022, U.S.A.

**BOSTON**
T. 617.482.8811
10 Liberty Square, Suite 600
Boston, MA 02109, U.S.A.

August 24, 2005

Gary Greenberg, Esq.
Greenberg & Traurig LLP
One International Place
Boston, MA 02110

Re: Robert J. Vila, etal. v. Sears, Roebuck and Co., etal
Civil Action No. 05-11717REK

Dear Gary:

I am in receipt of Anna's fax dated August 23, 2005 regarding B.V.T.V., Inc.'s ("BVTV") use of the phrase "Home Again" in connection with the production of a home improvement television series to be aired for the 2005-2006 season.

Anna's letter claims, in conclusory fashion, that the term "Home Again" is a "trademark" and that that "trademark" is the "exclusive property of Sears [Roebuck and Co.]. BVTV denies that contention.

BVTV, in its production of the television series to be aired for the 2005-2006 season, had intended to use the phrase "Home Again", not only because it is entitled to do so, but because BVTV believed that it was possible that Sears and BVTV would reach a settlement of their issues regarding Sears' obligation to fund the production of the series for the next two seasons. That has not occurred as of yet and, given the tone of Anna's letter, it appears that, in any settlement of the differences between the parties, the use of the phrase "Home Again" by BVTV is going to be contested by Sears.

Although BVTV denies that Sears' position has any merit, it is a non-issue for BVTV and only deflects attention from the real issues between the parties.



You are hereby advised that BVTV's production, advertising and airing of its home improvement television series for the 2005-2006 season and thereafter will not bear the phrase "Home Again".

Very truly yours,

/s/
James F. O'Brien

cc: Anna R. Sankaran, Esq.
    Ronald Feiner, Esq.
    Mr. Robert J. Vila

2

P 0000296

# DEPOSITION EXHIBIT  244

# Greenberg Traurig

Annapoorni R Sankaran
Tel 617 310 6058
Fax 617 279 8458
SankaranA@gtlaw.com

September 14, 2005

BY FACSIMILE & OVERNIGHT MAIL
James F. O'Brien, Esq.
410 park Avenue, Suite 1530
New York, NY 10022

Re:    Robert J. Vila et al.  v. Sears, Roebuck and Co., et al.,
       Dukes Superior Court Civil Action No. DUCV 2005-00041

Dear Counsel:

As you are well aware, on August 23, this office, as counsel to defendant Sears, Roebuck & Co. ("Sears"), sent a letter to you requesting that your clients Robert J. Vila ("Vila") and B.V.T.V., Inc. ("BVTV") (collectively "Counterclaim Defendants"), cease and desist from using Sears' "HOME AGAIN" trademark in connection with the production, marketing, and/or promotion of a home improvement television series for the 2005-2006 season. Although BVTV and Vila refused to execute the letter previously sent as requested, you have both verbally and in writing , per your letter of August 24, 2005 and in paragraph 13 of Counterclaim Defendants' Reply to the Counterclaim, assured that your clients would not continue to use the HOME AGAIN trademark in connection with a 2005-2006 season of a home improvement television show. Despite your verbal assurance, it has come to our attention that Vila and/or BVTV are continuing to unlawfully use the HOME AGAIN trademark. The Bob Vila web site continues to make reference to a current home improvement television series titled HOME AGAIN at the following web pages:

- http://www.bobvila.com/BVTV/HomeAgain/HomeAgain.html,
- http://www.bobvila.com/BVTV/, and
- http://www.bobvila.com/BVTV/HomeAgain/TvSchedule.html.

Furthermore, on Sunday (and again Monday morning), Fox News Channel aired on Fox Magazine an interview with Vila during which Vila described and promoted the sixteenth season of HOME AGAIN. Similarly, on information and belief, CBS is scheduled to air a new season of a home improvement television show titled HOME AGAIN starting this week. Indeed, there does not appear to be a listing of a home improvement television show with Vila which does not bear the trademark HOME AGAIN scheduled to air this week. As previously described, these uses are in breach of the September 29, 1989 Bob Vila Syndicated Television Programs Agreement (the "Syndication Agreement") as Vila and BVTV do not have Sears' permission for these uses of Sears' trademark HOME AGAIN.

Sears has spent substantial effort, resources and capital to develop the HOME AGAIN trademark and pursuant to the Syndication Agreement, this mark is the exclusive

ALBANY
AMSTERDAM
ATLANTA
BOCA RATON
BOSTON
CHICAGO
DALLAS
DENVER
FORT LAUDERDALE
LOS ANGELES
MIAMI
NEW JERSEY
NEW YORK
ORANGE COUNTY, CA
ORLANDO
PHILADELPHIA
PHOENIX
SILICON VALLEY
TALLAHASSEE
TYSONS CORNER
WASHINGTON, D.C
WEST PALM BEACH
WILMINGTON
ZURICH

www gtlaw com



P 0000322

James F. O'Brien, Esq.
Wednesday, September 14, 2005
Page 2

property of Sears. In order to preserve and protect the value of this trademark, Sears is obligated to actively police and address any unauthorized use of its mark, including the actions of BVTV and Vila in producing a 2005-2006 season of a home improvement television program titled HOME AGAIN.

In sum, Vila and BVTV are not authorized to use the HOME AGAIN trademark for any new episodes of a home improvement television program at this time. Sears hereby demands that we receive Counterclaim Defendants' written assurance by 5:00 p.m. E.S.T. on September 15, 2005, that they will cease and desist from any further production of any home improvement television series bearing the HOME AGAIN trademark and will prevent any such episodes from being advertised, marketed or aired. A duplicate copy of this letter has been enclosed for this purpose. In addition, Sears demands written confirmation by 5:00 p.m. E.S.T. on August 24, 2005, that CBS Broadcasting, Inc. (including its parents, subsidiaries, and divisions), will not advertise and/or air any home improvement televisions show bearing the HOME AGAIN trademark from the 2005-2006 season (or any subsequent season). Please return a signed copy of this letter as well as written confirmation from both CBS Broadcasting, Inc., to me via facsimile at (617) 279-8458. If we do not receive a timely response, we will take appropriate legal action to protect Sears' rights, including but not limited to adding CBS Broadcasting, Inc., as parties to the Counterclaim.

Very truly yours,

Anna R. Sankaran

Enclosure
cc:    Gary R. Greenberg, Esq.

Agreed and Accepted this _____

day of _____ 2005.

By:    _____
       James F. O'Brien

P 0000323